UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHNNY M. HUNT, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 3:23-cv-00243 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| SOUTHERN BAPTIST CONVENTION; | ) | MAGISTRATE JUDGE FRENSLEY |
| GUIDEPOST SOLUTIONS LLC; and | ) | |
| EXECUTIVE COMMITTEE OF THE | ) | JURY DEMAND |
| SOUTHERN BAPTIST CONVENTION, | ) | |
| | ) | |
| *Defendants.* | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE EXECUTIVE COMMITTEE OF
THE SOUTHERN BAPTIST CONVENTION'S MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iii

I.      INTRODUCTION ......................................................................................... 1

II.     FACTUAL BACKGROUND .......................................................................... 2

        A.      The Parties. ......................................................................................... 2

        B.      Sexual abuse controversy and the SBC's response............................... 3

        C.      Guidepost's investigation relating to allegations made against Hunt. .................. 4

        D.      Hunt emphatically denies any wrongdoing............................................ 7

        E.      Guidepost provides the Report to the Task Force................................. 8

        F.      Hunt changes his story *again* and accuses the Wife of initiating a
                "consensual" relationship........................................................................ 9

III.    THE COURT LACKS SUBJECT MATTER JURISDICTION..................................... 10

IV.     HUNT DOES NOT PLAUSIBLY ALLEGE ANY ACTIONABLE CONDUCT
        BY THE EC. .............................................................................................. 13

V.      EVEN IF THE COURT EXERCISES SUBJECT MATTER JURISDICTION
        AND ATTRIBUTES CONDUCT TO THE EC, THE COURT SHOULD
        DISMISS COUNTS I–IV BECAUSE HUNT IS A PUBLIC FIGURE.......................... 17

        A.      A public controversy existed concerning sexual assault allegations in the
                SBC giving rise to Hunt's claims........................................................... 18

        B.      Hunt was a public figure within the controversy surrounding sexual abuse
                in the SBC. ........................................................................................... 19

        C.      The Complaint does not plausibly allege actual malice............................ 20

VI.     THE COMPLAINT INDEPENDENTLY FAILS TO STATE CLAIMS. ....................... 22

        A.      Even if Hunt is not public figure, Hunt has failed plausibly plead facts to
                sustain Counts I–III............................................................................... 22

        B.      Even if Hunt is not a public figure, the IIED claim (Count IV) should still
                be dismissed. ....................................................................................... 22

i

C.      The Complaint fails to state a claim for negligent infliction of emotional
distress (Count V). ............................................................................... 23

D.      The Complaint fails to state a claim for disclosure of embarrassing private
facts (Count VI). .................................................................................... 24

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accord v. Anderson Cnty.*, No. 3:21-CV-00077, 2021 WL 6135691, at *2 (M.D. Tenn. Dec. 28, 2021)..................................................................................................10

*Bain v. Wells*,
936 S.W. 2d 618 (Tenn. 1997).................................................................13, 14, 22

*Barret v. Whirlpool Corp.*,
704 F. Supp. 2d 746 (M.D. Tenn. 2010)..........................................................22

*Brown v. Christian Bros. Univ.*,
428 S.W.3d 38 (Tenn. Ct. App. 2013) ...............................................................14

*Brown v. Mapco Exp., Inc.*,
393 S.W.3d 696 (Tenn. Ct. App. 2012)..............................................................22

*Cunningham v. Health Plan Intermediaries Holdings, LLC*,
No. 3:18-cv-00518, 2021 WL 1946645 (M.D. Tenn. May 14, 2021) ...............16, 17

*Delauter v. Nissan Supplemental Exec. Ret. Plan II*,
No. 3:20-cv-00609, 2021 WL 1530926 (M.D. Tenn. Apr. 19, 2021) ......................3

*In re Diocese of Lubbock*,
624 S.W.3d 506 (Tex. 2021)...........................................................................12, 13

*Finley v. Kelly*,
384 F. Supp. 3d 898 (M.D. Tenn. 2019).......................................................13, 24, 25

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)...............................................................................................17

*Harte–Hanks, Comm'cns, Inc. v. Connaughton*,
491 U.S. 657 (1989)..............................................................................................20

*House of God v. Campbell*,
No. 3:06-cv-0066, 2008 WL 701585 (M.D. Tenn. Mar. 13, 2008)..................10, 11

*Hudik v. Fox News Network, LLC*,
512 F. Supp. 3d 816 (M.D. Tenn. 2021)..............................................................17

*Infinite Energy, Inc. v. Pardue*,
713 S.E.2d 456 (Ga. Ct. App. 2011)...................................................................14

iii

*Jackson & Assocs., Ltd. v. Christl*,
    1991 WL 155687 (Tenn. Ct. App. Aug. 16, 1991).........................................................13, 25

*Lane v. Becker*,
    334 S.W.3d 756 (Tenn. Ct. App. 2010) ...............................................................................22

*Lewis v. Northside Hosp., Inc.*,
    599 S.E.2d 267 (Ga. Ct. App. 2004) ....................................................................................14

*Major v. Charter Lakeside Hosp., Inc.*,
    No. 42, 30011 T.D., 1990 WL 125538, at *4–5 (Tenn. Ct. App. 1990)...........................14, 24

*Marla H. v. Knox Cnty.*,
    361 S.W.3d 518 (Tenn. Ct. App. 2011) ........................................................................14, 23, 24

*Mayorga v. Benton*,
    875 S.E.2d 908 (Ga. Ct. App. 2022) ..............................................................................14, 24

*McConnel v. Dep't of Labor*,
    814 S.E.2d 790 (Ga. Ct. App. 2018) ....................................................................................14

*Milligan v. U.S.*,
    644 F. Supp. 2d 1020 (M.D. Tenn. 2009) ......................................................................20, 22

*New Life Center, Inc. v. Fessio*,
    No. 99-1658, 2000 WL 1157800 (4th Cir. 2000) ...........................................................18, 19

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)..............................................................................................................20

*Ogle v. Church of God*,
    153 F. App'x 371 (6th Cir. 2005) ...........................................................................11, 12, 13

*Ogle v. Hocker*,
    279 F. App'x 391 (6th Cir. 2008) .................................................................................11, 12

*Rutherford v. First Tenn. Bank Nat. Ass'n*,
    No. 3:08-CV-19, 2008 WL 3307203 (E.D. Tenn. Aug. 7, 2008) ..........................................24

*S.E. v. Chmerkovskiy*,
    221 F. Supp. 3d 980 (M.D. Tenn. 2016) ..............................................................................13

*Santoni v. Mueller*,
    No. 3:20-CV-00975, 2022 WL 97049 (M.D. Tenn. Jan. 10, 2022) .....................17, 18, 19, 22

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976)......................................................................................................10, 13

iv

*Thomas M. Cooley Law Sch. v. Kurzon Straus, LLP*,
    759 F.3d 522 (6th Cir. 2014) ................................................................................18

*Thomas v. Tenn. Dep't of Human Servs.*,
    No. 3:21-CV-00426, 2022 WL 2286780 (M.D. Tenn. June 23, 2022) .................................10

*Torrance v. Morris Pub. Grp. LLC*,
    636 S.E.2d 740 (Ga. Ct. App. 2006) ..................................................................14

*West v. Media Gen. Convergence, Inc.*,
    53 S.W.3d 640 (Tenn. 2001) ...........................................................................14

*Williams v. CitiMortgage, Inc.*,
    498 F. App'x 532, 536 (6th Cir. 2012) ...............................................................17

## Other Authorities

Fed. R. Civ. P. 12(b)(1) ...........................................................................................10

Restatement (Second) of Torts § 652D, comment a ...........................................................24, 25

U.S. Const. amend. I ..........................................................................................10, 12

# I.   <u>INTRODUCTION</u>

Faced with allegations that the Southern Baptist Convention (the "SBC") and the Executive Committee of the Southern Baptist Convention (the "EC") ignored sexual abuse within its ranks, SBC's leaders, the Messengers, created a Sexual Abuse Task Force (the "Task Force") to engage Guidepost Solutions LLC ("Guidepost") to conduct an independent investigation into the actions and decisions of the EC staff and members.

One of the individuals Guidepost uncovered in the investigation was none other than former SBC President, Johnny Hunt ("Hunt"). According to Guidepost, when confronted with sexual abuse allegations against him, Hunt initially claimed he did not know the woman or her husband. However, when the walls started closing in, Hunt remembered that he had known the woman and her husband for "at least twenty years" but did not have any "contact whatsoever" with her even though he separately confessed in counseling "to a light kiss, touching [her] breasts over the clothes, and trying to pull her shorts down." According to Guidepost's report, Guidepost corroborated the allegations against Hunt by talking to three witnesses, a counselor, and examining computer records. Yet Hunt continued to maintain his innocence and demanded silence from his accuser and her husband.

Instead of taking responsibility and asking for forgiveness, Hunt seeks relief in this Court for a "case about defamation and invasion of privacy." This time, however, Hunt tells a new story. After telling Guidepost that he did not have any "contact whatsoever" with his accuser, Hunt *finally* acknowledges he "had a brief, inappropriate, extramarital encounter with a married woman" that involved "kissing and some awkward fondling." Hunt also alleges he did not initiate this "encounter," which flatly contradicts Hunt's prior story to Guidepost that "[the woman] never [came] on to him . . ." Worse yet, Hunt says *he* "ended the encounter" after realizing it "was a sin."

This Court, however, need not decide which version of Hunt's story to believe. Instead, this Court can and should dismiss Hunt's claims against the EC for two reasons. First, the Court lacks subject matter jurisdiction under the ecclesiastical abstention doctrine because the alleged conduct involves questions of theological controversy, church discipline, ecclesiastical government, or the conformity of Southern Baptist Convention's cooperating churches to church doctrine.

Second, the Complaint fails to state claims for relief against the EC because it does not allege any plausible facts attributable to the EC. Even if it did, the claims for defamation, defamation per se, false light, and intentional infliction of emotional distress should be dismissed because Hunt is either a public figure or at least a limited-purpose public figure and there are no plausible allegations that the EC acted with actual malice. Even if Hunt is not a public figure or a limited-purpose public figure, all of his claims independently fail to state claims for relief. Accordingly, this Court should dismiss the Complaint with prejudice.

## II.     FACTUAL BACKGROUND

### A.     The Parties.

A member of the Lumbee Tribe of North Carolina, Hunt is a pastor and former president of the SBC. (Doc. 1, PageID #4–5, ¶¶ 21, 28). A self-described "sought-after speaker and author" and a "noted speaker at state and national SBC conferences and conventions," Hunt previously led "one of the largest churches in the United States" in Woodstock, Georgia. (*See id.*, PageID #5, ¶¶ 27, 29).

Defendant SBC is "a cooperative of almost 50,000 Southern Baptist churches across the country." (*Id.*, PageID #1, ¶ 2). Unlike other hierarchical religious organizations where local churches follow the directives of a primary leader, the SBC does not dictate church practices or

worship. (Doc. 1–2, PageID #62–63).[1] The SBC has no authority over any Baptist body, does not ordain pastors, and does not have any role in the management of any church. (*Id.* at PageID #63). The SBC operates under the direction of Messengers, representatives from churches that cooperate with the SBC, who meet yearly in June to elect officers and to determine the programs, policies, and budgets of the SBC. (*Id.* at PageID #65–66). The SBC's Credentials Committee determines what churches are in friendly cooperation with the SBC, which is based on a specific set of criteria. (*See id.*, PageID #63–64, #226).

Defendant EC manages the SBC's operations between annual meetings but is a discrete legal entity, (*see* Doc. 1, PageID #4, ¶ 17), governed by a separate board of eighty-six EC Trustees chosen from qualified states and regions. (Doc. 1–2, PageID #66). The EC does not control or direct the activities of SBC entities. (*Id.*, PageID #67).

Defendant Guidepost was retained by the Task Force to conduct an independent investigation into the "public relations nightmare" of sexual abuse within the SBC. (*See* Doc. 1, PageID #2, ¶ 5; *see also* Doc. 1–1, PageID #22, § 2.1).

B.    Sexual abuse controversy and the SBC's response.

The SBC faced "allegations that it had improperly ignored reports" of sexual abuse, which led to investigations by local and national news organizations. (*See* Doc. 1, PageID #2, 6, ¶¶ 5–6, 30–33). The SBC responded by voting to create the Task Force at the 2021 SBC Annual Meeting. The Task Force was created to select an entity to conduct a preliminary investigation and to make recommendations to the Messengers at the next SBC meeting. (*See* Doc. 1–1, PageID #24, § 3.6;

---

[1] This Court may consider the Complaint "and any exhibits attached thereto" on a motion to dismiss "so long as they materials are referred to in the Complaint and are central to the claims contained therein." *See e.g., Delauter v. Nissan Supplemental Exec. Ret. Plan II*, No. 3:20-cv-00609, 2021 WL 1530926, at *3 (M.D. Tenn. Apr. 19, 2021) (Richardson, J.). Attached to the Complaint are six exhibits, four of which are central to Hunt's claims. (*See* Docs. 1–1, 1–2, 1–3, and 1–4).

Doc. 1–2, PageID #36). Following a recommendation by the Task Force, and in accordance with the mandate given by the Messengers, the Task Force engaged Guidepost, (*see* Doc. 1–1, PageID #22, § 1.1), "to conduct an independent investigation into the [EC] . . . and an audit of the procedures and actions of the Credentials Committee under the terms and conditions set forth in [the] engagement agreement . . ." (the "Engagement Letter"). (*See* Doc. 1, PageID #6, ¶ 34 (quoting Doc. 1–1)). Significantly, the "Task Force, not the EC, [was] the client for purposes of the investigation." (Doc. 1–1, PageID #42).

Because Guidepost committed to investigate allegations of abuse committed by EC members and allegations that the EC mishandled allegations of abuse, (*see* Doc. 1 at PageID #23, § 3.1), the Task Force and Guidepost established several safeguards to protect the independence and integrity of the investigation. First, the SBC formed the Committee on Cooperation "to provide financial oversight of the investigation and to ensure the full cooperation of the [EC], among other things." (Doc. 1–2, PageID #43). Second, the Engagement Letter provided there was "no attorney-client relationship between Guidepost and any other party." (Doc. 1–1, PageID #24, § 3.3). Third, the EC would not "conduct, direct, or otherwise manage or influence [Guidepost's] independent investigation in any matter." (*Id.*) Fourth, while the Task Force could review Guidepost's eventual findings for accuracy and the Committee on Cooperation could present facts to dispute Guidepost's findings, "[n]o member of the . . . [EC] [was] permitted by Guidepost to edit the report prior to its public release." (*Id.* at PageID #24, § 3.6). Finally, no member of "the [EC] . . . [could] request, receive, or claim ownership of Guidepost's work product" so that "appropriate levels of independence" would remain in place. (*Id.* at PageID #25, § 3.7).

C.     <u>Guidepost's investigation relating to allegations made against Hunt.</u>

According to Guidepost, it examined "allegation[s] of abuse committed by EC members during the relevant time period." (*See* Doc. 1–2, PageID #37). During the investigation, an SBC

pastor (the "Husband") and his wife (the "Wife") came forward to report that Hunt, former SBC President from 2008–2010, had sexually assaulted Wife on July 25, 2010. (*Id.* at PageID #182). Guidepost interviewed the couple on multiple occasions, and its review of the Hunt allegations are summarized below.

Husband, a pastor for 25 years, confirmed he had a professional relationship with Hunt, whom Husband considered a "mentor." (*Id.*). According to the couple, Hunt invited them at the June 2010 SBC Annual Meeting to spend time with Hunt and his family at Panama City Beach. (*Id.* at PageID #182–83). Husband and Wife subsequently took a short vacation to the beach spending time with Hunt and his family. (*Id.* at PageID #183). During that trip, Hunt "kissed [Wife] on the forehead and made inappropriate comments about [Wife's] figure." (*Id.*).

After the first trip to Panama City, Husband contacted Hunt to tell him that Wife wanted to return to the area to hear Bobby Bowden[2] speak and asked Hunt for a condo recommendation. (*Id.*). Hunt provided Husband with recommendation, and Husband rented a condo for Wife, which turned out to be the condo immediately next door to Hunt's condo. (*Id.*). On July 25, 2010, Wife arrived at the condo and texted Husband and Hunt a picture of the ocean to let them know that she arrived safely. (*Id.*). After discovering Wife was next door to Hunt's condo, Hunt texted Wife to ask her to step out on her balcony. (*Id.*). On the balcony, Hunt made several flattering remarks about Wife's appearance, clothing, and her perfume, and mentioned he was hot from being in the sun. (*Id.*). Wife invited Hunt to sit in the shade on her balcony. (*Id.*). Hunt accepted and subsequently asked Wife to put her feet on his knee whereby Hunt touched them while commenting on their beauty and size. (*Id.* at PageID# 184). Hunt then suggested they go inside Wife's condo "because [Hunt] didn't want to be seen." (*Id.*). Once inside, Hunt "pointed to the

---

[2] Bowden was a devout Christian and longtime head football coach at Florida State University.

bedroom" and ultimately "slid closer [to Wife on the couch] while [Wife] was telling a story of the stress that she and [Husband] were under at the church." (*Id.*). Hunt, however, re-directed the conversation to personal questions, including asking Wife "if she was wild growing up." (*Id.*). Hunt moved even closer towards Wife and abruptly "pull[ed] her shorts down, turn[ed] her over and stare[d] at her bare backside." (*Id.*). Hunt made sexual remarks about her body and things he had imagined about her. (*Id.*). Wife, describing herself as "frozen," turned back over. (*Id.*). While trying to pull up her shorts, Hunt "pinned her to the couch, got on top of her, and pulled up her shirt . . . sexually assault[ing] her with his hands and mouth." (*Id.*). Hunt then "forced himself on her again by groping her, trying to pull her shirt down, and violently kissing her" before he eventually stopped and left the condo. (*Id.*).

Later that evening, Hunt texted Wife to come back out to the balcony. (*Id.*). Wanting to sort out what had happened, Wife went to the balcony where Hunt stated that he would like to have sex with her three times a day. (*Id.* at PageID #184–85). Wife "could not get back inside her condo quickly enough." (*Id.*). The next morning, Hunt texted her to come out to the balcony again. (*Id.* at PageID #185). Hunt apologized and asked Wife to forgive him. (*Id.*). Hunt also told Wife not to mention what happened to anyone and invited Wife to come to the beach, this time with Hunt's family. (*Id.*). Wife went to the beach, but sat in her own beach chair, and spoke with her husband by phone while on the beach. (*Id.*). Eventually Wife left the condo on July 27, 2010, after Hunt's wife told her to leave and "didn't care where [Wife] went." (*Id.*).

Several days later, Hunt contacted the couple to collectively meet with Roy Blankenship, a counseling pastor at Hunt's church. (*Id.*). Hunt mischaracterized the events during the counseling session, but admitted to Blankenship "to a light kiss, touching [Wife's] breasts over the clothes, and trying to pull her shorts down" claiming that he "thank[ed] God [he] didn't consummate the

relationship." (*Id.*). Blankenship told the couple that he would initiate counseling for the couple. (*Id.* at PageID #186). Blankenship and Hunt then told the couple that they could never discuss what had happened, or "it would negatively impact the over 40,000 churches that [] Hunt represented." (*Id.*).

According to Guidepost, it corroborated the couple's account with Husband's records, which contained contemporaneous electronic journal entries and recordings from the time at issue. (*Id.*). Guidepost also interviewed Blankenship, who was not a licensed counselor, but confirmed both sessions with Hunt and the couple, that Blankenship was told about certain aspects of Hunt's encounter with Wife, admitted he "did not think he received the full story," and that "his assessment was based on what [Hunt] told him." (*Id.* at PageID #187–88). Guidepost also spoke to three other witnesses who spoke with Husband between 2010 and 2012, or had an ongoing relationship with Husband. (*Id.* at PageID #189–90). Guidepost "found all three witnesses to be very credible with clear recollections of [Husband's] statements to them." (*Id.* at PageID #190).

D.    Hunt emphatically denies any wrongdoing.

Guidepost interviewed Hunt on two occasions. (Doc. 1–2, PageID #190). While Guidepost did not question Hunt about the sexual assault allegations in the first interview, Hunt inexplicably claimed not to know Husband. (*See id.* at PageID #190–91). Guidepost interviewed Hunt a second time to specifically discuss the allegations of abuse involving him and Wife. (*Id.* at PageID #191). Hunt feigned ignorance stating he was "totally in the dark." (*See id.*). But, after previously claiming not to know Husband at all in the first interview, Hunt remembered he had known Husband and Wife for "at least twenty years," that Husband "had been converted under [Hunt's] ministry, and that [Hunt] had been a strong influence on [Husband's] life." (*Id.* at PageID #191).

As to the merits of the allegations, Hunt told Guidepost he did not remember any "personal contact with [Husband and Wife]" at the convention, did not remember having the couple as his

guests in Panama City, did not remember Husband asking Hunt for assistance to find a rental condo, only remembered "very brief" contact with Wife on the condo balcony, stated he "never entered [Wife's] condo and was never on [Wife's] balcony, and "did not have any further contact with [Wife] during the time she was [at the Condo]" other than seeing Wife "the next day on the beach." (*Id*. at PageID #191–92). Hunt repeated to Guidepost that he didn't have any "contact whatsoever" with Wife, was not on the balcony or in the condo with Wife, denied kissing Wife, denied pulling at her shorts, denied fondling her, and denied making comments about her appearance, panties, tan lines, or perfume. (*See id*. at PageID# 192). When Guidepost asked whether Hunt contacted Blankenship to discuss a "problem" between Hunt and Husband, Hunt said he did not. (*Id*. at PageID #193). Instead, Hunt said he contacted Blankenship to "help [Husband] because [he] was transitioning in ministry and [Hunt] had always been a sounding board for him." (*Id*.). Hunt ultimately admitted to having one meeting with Blankenship and the couple, but Hunt "did not apologize . . . because there was no contact between [Hunt and Wife]." (*Id*.).

     E.    <u>Guidepost provides the Report to the Task Force.</u>

On May 15, 2022, Guidepost sent a 288-page report entitled "The Southern Baptist Convention Executive Committee's Response to Sexual Abuse Allegations and an Audit of the Procedures and Action so the Credentials Committee" (the "Report") to the Task Force, which was publicly released on May 22, 2022. (Doc. 1, PageID #8, ¶ 44; Doc. 1–2, PageID #34). The Report outlined not only Guidepost's findings, but detailed the steps Guidepost took to verify the accuracy of its findings, "including but not limited to preparing and submitting comprehensive document requests to relevant parties and entities; reviewing and analyzing all relevant documents obtained from all sources; contacting or attempting to contract and interview all current and former SBC EC staff and EC Trustees, other high-level SBC official or key figures, and other relevant witnesses identified through our investigation; and conducting in-depth witness interviews of survivors,

witnesses, and advocates who affirmatively contacted Guidepost." (*Id.* at PageID #51–62). Hunt even admits "Guidepost conducted hundreds of interviews . . . collected over five terabytes of data . . . and spent thousands of hours on its investigation." (Doc. 1, PageID #9, ¶ 46). Hunt is mentioned in the Report for historical background into the SBC, (*see* Doc. 1–2, PageID #54, 98), and in the context of Guidepost's investigation into and conclusions surrounding Hunt, which are summarized above. (Doc. 1–2, PageID #182–94).

       F.     <u>Hunt changes his story *again* and accuses the Wife of initiating a "consensual"</u>
               <u>relationship.</u>

Hunt filed his Complaint on March 17, 2023, which drastically contradicts his prior stories to Guidepost regarding his involvement with the couple. After telling Guidepost he did not have any "contact whatsoever" with Wife, (Doc. 1–2, PageID #191–92), Hunt *finally* acknowledges on the first page of the Complaint he "had a brief, inappropriate, extramarital encounter with a married woman" that involved "kissing and some awkward fondling." (*See* Doc. 1, PageID #1–2, ¶¶ 3–4). The updated version of his story, however, alleges *Wife* "initiated" this "encounter," which was "consensual" and "limited." (*Id.*, PageID# 10, ¶ 53). This, of course, flatly contradicts Hunt's prior story to Guidepost when he stated that "[Wife] never [came] on to him . . .". (Doc. 1-2, PageID# 192). Shockingly, Hunt says in the Complaint that *he* "ended the encounter" after realizing it "was a sin." (Doc. 1, PageID #10, ¶ 53).

Alleging his reputation has been harmed—even in the face of Hunt's multiple, inconsistent stories—Hunt brings claims against the SBC, Guidepost, and the EC based on three alleged wrongdoings: (1) the Report (Doc. 1, PageID #8–15, ¶¶ 44–68); (2) a December 5, 2022 tweet published by current SBC President Bart Barber (the "Tweet"; Doc. 1, PageID #15, ¶¶ 70–71; Doc. 1–3); and (3) a February 1, 2023, letter from the SBC's Credentials Committee to a

cooperating Southern Baptist church (the "Letter"; Doc. 1, PageID #15, ¶¶ 73–76; Doc. 1–4).[3] The EC recognizes this Court "must take all the factual allegations in the [C]omplaint as true." *See Thomas v. Tenn. Dep't of Human Servs.*, No. 3:21-CV-00426, 2022 WL 2286780, at *4 (M.D. Tenn. June 23, 2022) (Richardson, J.). But, notwithstanding Hunt's ever-shifting narrative, the Court should dismiss the Complaint with prejudice for the reasons set forth below.

## III. THE COURT LACKS SUBJECT MATTER JURISDICTION.

In matters involving questions of church discipline, faith, or ecclesiastical rule, custom, or law, the Free Exercise Clause of the First Amendment requires that "no court interfere with the determinations of the highest of these church judicatories to which the matter has been carried." *See House of God v. Campbell*, No. 3:06-cv-0066, 2008 WL 701585, at *3 (M.D. Tenn. Mar. 13, 2008). Accordingly, courts have no subject matter jurisdiction to consider disputes of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 714 (1976).[4]

This limit on jurisdiction, called the "ecclesiastical abstention" doctrine, stems from "the First Amendment [and] requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." *Campbell*, 2008 WL at *4. This means a court may adjudicate a church dispute only "so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or tenets of faith." *Id.*

---

[3] The Letter is dated February 1, 2022, and the Complaint states that the Letter was sent on that date. However, this is a typo and, to the best of the EC's knowledge, the Letter was sent this year.

[4] Rule 12(b)(1) provides for the dismissal of an action for lack of subject matter jurisdiction, which "is always a threshold determination" and where the burden of proof lies with the party invoking jurisdiction. *See Accord v. Anderson Cnty.*, No. 3:21-CV-00077, 2021 WL 6135691, at *2 (M.D. Tenn. Dec. 28, 2021) (Richardson, J.).

10

Thus, the purpose of the ecclesiastic abstention doctrine is to give religious organizations "an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.* The Sixth Circuit has twice addressed the ecclesiastic abstention doctrine in the defamation context—both times involved the same plaintiff. *Ogle v. Church of God*, 153 F. App'x 371 (6th Cir. 2005) ("*Ogle I*") and *Ogle v. Hocker*, 279 F. App'x 391 (6th Cir. 2008) ("*Ogle II*"). Despite reaching different conclusions as to subject matter jurisdiction, both cases support dismissal here.

In *Ogle I*, a pastor sued the Church of God (and others) asserting claims for breach of contract, tortious interference, invasion of privacy, conspiracy, intentional infliction of emotional distress, defamation, and loss of consortium arising out of the Church suspending him after being accused of making sexual advances to another pastor. *Ogle I*, 153 Fed. App'x at 374. The Sixth Circuit affirmed dismissal for lack of subject matter jurisdiction concluding "all [the alleged conduct] implicate[d] the Church of God's internal disciplinary proceedings." *Id*. at 376.

In *Ogle II*, the same aggrieved pastor brought defamation and intentional infliction of emotional distress claims against the pastor who had originally reported the alleged abuse to the Church and who incorporated those allegations into three sermons on the same day. *Ogle II*, 279 Fed. App'x at 393. The trial court exercised subject matter jurisdiction but dismissed on the merits. *Id*. at 394. The Sixth Circuit affirmed the exercise of subject matter jurisdiction but reversed on merits holding, in part, the Court would not be forced to inquire into "doctrinal issues" because although the alleged statements were part of a sermon, the pastor had repeated those allegations on numerous occasions taking the "bulk of his comments outside the religious practice context." *Id*. at 396. The Court also concluded that the sermons were not related to employment or polity issues, and thus, the Court was not asked to determine whether the pastor's statements "complied

with church law, whether [the] religious condemnation . . . comports with the religious tenents . . . or whether [the] statements be construed to involve pastor-parishioner discipline . . .". *Id.*

Hunt's claims in this case are much more akin to *Ogle I* than *Ogle II*. Here, the alleged statements were published by the Task Force, which had a specific mandate from the SBC Messengers to investigate whether the EC covered up alleged sexual abuse. The Messengers also tasked the SBC to determine whether specific churches were in friendly cooperation with the SBC in the creation of the Credentials Committee. If courts forbade these types of decisions, religious organizations would no longer have the freedom afforded to it under the First Amendment. And, this case is distinguishable from *Ogle II* in that the SBC's actions were the result of a specific process put in motion by the SBC's Messengers to investigate and eradicate sexual abuse, not to smear Hunt in a sermon from a pulpit or by making comments "outside the religious practice context." *See Ogle II,* 279 F. App'x at 396.

*In re Diocese of Lubbock*, 624 S.W.3d 506 (Tex. 2021), is directly on point with the facts here. There, a deacon argued that a church defamed him by publicly disseminating a report that listed his name along with other clergy who had been credibly accused of sexual abuse. The church moved to dismiss for lack of subject matter jurisdiction. The trial court denied the motion and the church sought mandamus relief at the intermediate court, which concurred with the trial court. The Texas Supreme Court, however, reversed and directed the trial court to dismiss the deacon's claims for subject matter jurisdiction. *Id.* at 516 ("The court of appeals' focus on the publication ignores the real critical nuance in this case: that [plaintiff's] suit is "inextricably intertwined" with the Diocese's decision to investigate its own clergy, judicial review of which would impermissibly interfere with a church's ability to regular the character and conduct of its leaders.").

Similar to *Lubbock*, because the alleged defamatory statements concern matters of church governance and an investigation into the conduct of the EC, this Court lacks subject matter jurisdiction to adjudicate Hunt's claims under the ecclesiastical abstention doctrine. The Messengers charged the SBC to investigate allegations of abuse and mishandling of abuse by the EC. (*See* Doc. 1–2, PageID #36). As a result, the Report focused on, in part, allegations of abuse by EC members, including Hunt. (*See* Doc. 1–2, PageID# 50). The Tweet by current SBC President Barber (Doc. 1–3) does not specifically mention the Report, however, it is "inextricably intertwined" in "theological controversy" and relates to "the conformity of the members of the church to the standard of morals required of them" requiring abstention. *See Milivojevich*, 426 U.S. at 714. *See also Lubbock*, 624 S.W.3d at 516. Finally, the Letter is the product of the SBC charging the Credentials Committee with the responsibility of reviewing and determining, when asked by way of a submission, whether a particular church is in cooperation with the SBC. (*See* Doc. 1–4, PageID #323). Like the facts in *Ogle I* and in *Lubbock*, judicial review of the these actions of investigating the EC and cooperating churches impermissibly interferes with the ability for these religious organizations to regulate the character and conduct of its leaders. As a result, the Complaint should be dismissed.

## IV.     HUNT DOES NOT PLAUSIBLY ALLEGE ANY ACTIONABLE CONDUCT BY THE EC.

Each count of the Complaint requires Hunt to allege specific conduct by the EC. *See Finley v. Kelly*, 384 F. Supp. 3d 898, 906 (M.D. Tenn. 2019) (defamation requires a party to have "published a statement"); *S.E. v. Chmerkovskiy*, 221 F. Supp. 3d 980, 985 (M.D. Tenn. 2016) (false light invasion of privacy requires that the EC "gave publicity to [Hunt] that places [him] in a false light"); *Bain v. Wells*, 936 S.W. 2d 618, 622 (Tenn. 1997) (emotional distress requires that the EC engaged in certain conduct); *Jackson & Assocs., Ltd. v. Christl*, 1991 WL 155687, at *3 (Tenn. Ct.

App. Aug. 16, 1991) (public disclosure of private facts requires the EC gave "publicity to a matter concerning [Hunt's] private life."). Because the Complaint does not plausibly allege any conduct by the EC, the Court should dismiss the claims against it.[5]

As referenced above, Hunt's claims center around three items: (1) the Report (Doc. 1, PageID #8–15, ¶¶ 44–68); (2) the Tweet (Doc. 1, PageID #15, ¶¶ 70–71; Doc. 1–3); and (3) the Letter (Doc. 1, PageID #15, ¶¶ 73–76; Doc. 1–4). Taking these in order, there are no plausible allegations that the EC published the Report or is otherwise responsible for it. The Task Force was Guidepost's client, which was charged with investigating wrongdoing by the EC. (*See* Doc. 1–1, PageID #22, § 2.1). In fact, because the Report centered around allegations that the EC mishandled historical reports of sexual abuse, the SBC established a separate Committee on Cooperation to ensure that the EC cooperated fully with the investigation. (*Id.* at PageID #22–23, §§ 2.2, 2.3; Doc. 1–2, PageID #43). Furthermore, the EC could not conduct, direct, or otherwise manage

---

[5] Tennessee and Georgia appear to have the most significant relationship to Hunt's claims. But, there are no meaningful distinctions between Georgia and Tennessee substantive law for the purposes of this Motion. *Compare Infinite Energy, Inc. v. Pardue*, 713 S.E.2d 456, 460 (Ga. Ct. App. 2011) *with Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) (defamation); *Torrance v. Morris Pub. Grp. LLC*, 636 S.E.2d 740, 747 (Ga. Ct. App. 2006) *with West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 644 (Tenn. 2001) (false light invasion of privacy); *Lewis v. Northside Hosp., Inc.*, 599 S.E.2d 267, 270 (Ga. Ct. App. 2004) *with Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997) (intentional infliction of emotional distress). With respect to negligent infliction of emotional distress, Georgia law requires a physical injury, *see Mayorga v. Benton*, 875 S.E.2d 908, 917–18 (Ga. Ct. App. 2022), while Tennessee only requires a "serious" or "severe" mental injury supported by expert medical or scientific proof. *See Marla H. v. Knox Cnty.*, 361 S.W.3d 518, 529 (Tenn. Ct. App. 2011). Likewise, while the underlying elements for a claim for public disclosure of embarrassing private facts are the same, Georgia has explicitly adopted this tort while the Tennessee Supreme Court has not. *Compare McConnel v. Dep't of Labor*, 814 S.E.2d 790, 801 (Ga. Ct. App. 2018) *with Major v. Charter Lakeside Hosp., Inc.*, No. 42, 30011 T.D., 1990 WL 125538, at *4–5 (Tenn. Ct. App. 1990). Ultimately, because the Complaint fails to plausibly plead that the EC took any affirmative conduct to cause his injury or that the other defendants were acting as agents of the EC, and because the Complaint also fails to allege necessary facts to support his claims under either Georgia or Tennessee law, these distinctions between Georgia and Tennessee law are without a difference for the purpose of this Motion.

Guidepost's investigation. (Doc. 1–1, Page ID #24, § 3.3). Guidepost only shared the Report with the Task Force and the Committee on Cooperation in advance of publishing for the sole purpose of reviewing the factual accuracy of Guidepost's reporting. (*Id.* § 3.5). Guidepost also prohibited the EC from editing the Report prior to its public release, (*id.* § 3.6), and expressly agreed that the EC could not adopt or claim ownership of Guidepost's work product. (*Id.* at Page ID #25, § 3.7). Finally, the Task Force, established by the SBC, was responsible for making the Report available to the public. (Doc. 1–1, PageID #24, § 3.6; Doc. 1–2, PageID #36). As a result, the EC did not publish the Report and cannot be held liable for the statements contained in it.

The same is true for the Tweet. Bart Barber published the Tweet from his personal Twitter account while he was president of the SBC. (Doc. 1–3). Because Barber tweeted from his personal account, those statements are only attributable to Barber himself, who is not a defendant here. However, even assuming the Tweet could be attributable to the SBC, the Tweet cannot be attributable to the EC because, again, the SBC is a separate entity from the EC, a fact which Hunt acknowledges. (*See* Doc. 1, PageID #4, ¶ 17).

The separation between the SBC and the EC is by design. The SBC was chartered in Georgia in 1845. (Doc. 1, PageID #4, ¶ 15). Messengers, selected by cooperating Southern Baptist churches, convene annually to elect the SBC President and other officers. (*See* Doc. 1–2, PageID #65–66). Conversely, the EC is a separate Tennessee corporation doing business in Tennessee (Doc. 1, PageID #4, ¶ 17), which is made up of a board of eighty-six EC Trustees from qualified states and regions. (*See* Doc. 1–2, PageID #66). The EC Trustees select and employ their own president and do not control or direct the activities of the SBC entities. (*See id.* at PageID #67). This is especially true of elected SBC officers, like the SBC President. Just as the EC had no

control over the Messenger's decision to elect Barber, the EC had no control over Barber at the time he published the Tweet, and those statements are not attributable to the EC.

As to the Letter, it was published by the SBC's Credentials Committee—not the EC. (*See* Doc. 1–2, PageID #236; Doc. 1–4). Again, the separation between the Credentials Committee and the EC is by design. The SBC created the Credentials Committee as a separate standing committee of the SBC (Doc. 1–2, PageID #236), which when asked via submission, could inquire regarding churches' cooperation with the SBC, including compliance with the SBC's new policy against sexual abuse. (*Id.* at PageID #238). Under this bylaw, the Credentials Committee has a separate duty to inquire whether churches are in "friendly cooperation" with the SBC.

Here, the Credentials Committee sent the Letter in response to information submitted to it that Hiland Park Baptist Church had "platformed" Hunt after he was credibly accused of sexual assault. (Doc. 1–4, PageID #323). The Credentials Committee requested that Hiland Park provide more information to "help [the] committee understand how [the] church's recent decision to platform a credibly accused individual can be considered consistent with the [SBC's] beliefs regarding sexual abuse." (*Id*. at PageID #324). The Letter states that the Credentials Committee has not reached a decision on Hiland Park's cooperation. (*Id*.). Accordingly, the EC has played absolutely no part in the publication of the Letter or any other action by the Credentials Committee.

Finally, while Hunt alleges the SBC Task Force acted as an "agent for the SBC," (Doc. 1, PageID #7, ¶ 36), and that the Committee on Cooperation acted as an "agent for both the SBC and the [EC]," (*id*. at ¶ 37), the Complaint and its exhibits directly refute these allegations. A plaintiff has the burden "to allege at least some facts to support an inference of an agency relationship." *See Cunningham v. Health Plan Intermediaries Holdings, LLC*, No. 3:18-cv-00518, 2021 WL 1946645, at *3 (M.D. Tenn. May 14, 2021). Allegations of universal agency among defendants

will not do. *Id.*; *see also Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) ("When a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."). Accordingly, Hunt's conclusory allegations of "agency" should be rejected.

Hunt has failed to state any conduct attributable to the EC to sustain any of his claims against the EC. As a result, even if the Court exercises subject matter jurisdiction, the Court should dismiss all claims against the EC.

**V.     EVEN IF THE COURT EXERCISES SUBJECT MATTER JURISDICTION AND ATTRIBUTES CONDUCT TO THE EC, THE COURT SHOULD DISMISS COUNTS I–IV BECAUSE HUNT IS A PUBLIC FIGURE.**

Assuming Hunt can allege factual matter plausibly suggesting conduct attributable to the EC, Hunt's claims for defamation/libel (Count I), defamation/libel per se (Count II), invasion of privacy/false light (Count III), and intentional infliction of emotional distress ("IIED") (Count IV) should still be dismissed because Hunt is either a public figure or at least a limited-purpose public figure and has failed to allege any facts that the EC acted with actual malice.

A public official or public figure in a defamation case must prove that the defamatory statement was made "with actual malice—that is, with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *See Hudik v. Fox News Network, LLC*, 512 F. Supp. 3d 816, 825 (M.D. Tenn. 2021) (Richardson, J.). The same standard applies for false light claims and claims for IIED when that claim is based upon a publication. *See Santoni v. Mueller*, No. 3:20-CV-00975, 2022 WL 97049, at *10–11, n. 11 (M.D. Tenn. Jan. 10, 2022) (Richardson, J.). Hunt tries to avoid the application of the actual malice standard by claiming he "is not a public figure." (Doc. 1, PageID #17, ¶ 87). Hunt, however, is a general-purpose public figure because he has acquired "such pervasive fame or notoriety that he [has become] a public figure for all purposes and in all contexts." *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351

(1974). But even if he is not a general-purpose public figure, Hunt is at least a limited-purpose public figure. As a result, the actual malice standard applies, and Hunt comes nowhere close to satisfying it.

A.   A public controversy existed concerning sexual assault allegations in the SBC giving rise to Hunt's claims.

A limited-purpose public figure is a public figure with respect to a limited range of issues, and one achieves that status by voluntarily injecting himself into a particular public controversy. *See Thomas M. Cooley Law Sch. v. Kurzon Straus, LLP*, 759 F.3d 522, 527 (6th Cir. 2014). Tennessee courts utilize a two-step approach to determine whether an individual is a limited-purpose public figure. *Santoni*, 2022 WL 97049, at *11. The Court must first determine whether there is a public controversy, which is defined as "a real dispute, the outcome of which affects the general public or some identifiable segment of the public in an appreciable way." *Id*. Stated differently, a public controversy is "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *See Cooley*, 759 F.3d at 529.

Here, there is no doubt that a public controversy exists concerning allegations of sexual abuse in the Southern Baptist Church. The SBC is a cooperative of almost 50,000 churches across the country, (Doc. 1, PageID #1, ¶ 2), and the SBC's cooperating church congregations make up "over 14 million persons." (Doc. 1–2, PageID #62). As Hunt readily admits, multiple local and national news organizations performed and published a number of in-depth reports concerning sexual abuse in the SBC and the SBC's handling of those allegations. (*See* Doc. 1, PageID #6, ¶¶ 30–33). The ramifications of this controversy were, and continue to be, extremely widespread. And, the allegations concerning SBC's handling of sexual abuse victims are akin to the allegations of sexual abuse in the Catholic Church, where the Fourth Circuit held there was "no real dispute" that a public controversy existed. *See New Life Center, Inc. v. Fessio*, No. 99-1658, 2000 WL

1157800, at *5 (4th Cir. 2000). Like *Fessio*, a public controversy existed concerning the sexual abuse and alleged mishandling of those allegations within the EC, which unquestionably gave rise to Hunt's claims. *See Santoni*, 2022 WL 97049, at *11.

B.    Hunt was a public figure within the controversy surrounding sexual abuse in the SBC.

The Court must next determine whether Hunt "has become so involved in the public controversy as to constitute a public figure via his involvement." *See Santoni*, 2022 WL 97049, at *11. Three factors are relevant to this analysis: (1) the voluntariness of Hunt's involvement; (2) the extent to which Hunt had access to channels of communication in order to counteract false statements; and (3) the prominence of Hunt's role. *Id.*

Here, each of these factors conclusively demonstrate Hunt was a limited-purpose public figure. First, Hunt voluntarily participated in the public controversy at issue. Hunt was a "sought-after speaker and author," a "noted speaker at state and national SBC conferences and conventions," previously led "one of the largest churches in the United States" in Woodstock, Georgia, and the former President of the SBC leading "a cooperative of almost 50,000 Southern Baptist churches." (Doc. 1, PageID #5, ¶¶ 27–29). Hunt became even further intertwined the public controversy following his "brief, inappropriate, extramarital encounter with a married woman" as a member of the EC, (*id.*, PageID #1, ¶ 3), an "encounter" which he initially and emphatically denied. (*See* Doc. 1–2, PageID #192). As a result, Hunt voluntarily placed himself within the SBC public controversy and this factor favors categorizing him as a limited-purpose public figure.

Second, Hunt had ample access to channels of communication in order to counteract any false statements. Guidepost provided Hunt two opportunities to provide his version of the events. (*See* Doc. 1–2, PageID #190). While he now admits that at least parts of the couple's allegations are true, Hunt had direct access to "counteract any false statements." *See Santoni*, 2022 WL 97049,

19

at \*11. Simply put, Hunt had effective means to rebut any false statements in the Report, and he chose then not to do so.

Finally, the prominence of Hunt's role cannot be overstated. Indeed, Hunt claims he is the most prominent name in the Report since he was the "first name mentioned." (*See* Doc. 1, PageID #2, ¶ 8). According to Hunt, Guidepost made a "strategic decision" to "focus[] on the allegation against [Hunt]" for a "bombshell" effect and to use Hunt "as their scapegoat." (Doc. 1, PageID #2–3, 9, ¶¶ 7, 11, 49). As a result, Hunt was squarely implicated in the public controversy when Hunt himself had been accused of sexual assault and subsequently denied it. As the President of the SBC who was also credibly accused of sexual assault, Hunt cannot deny these three factors demonstrate Hunt was at least a limited-purpose public figure. Accordingly, the actual malice standard applies to his claims for defamation, false light invasion of privacy, and IIED.

C.     The Complaint does not plausibly allege actual malice.

Because the actual malice standard applies to Counts I–IV, Hunt must plead that the EC made statements with the knowledge that they were false or with reckless disregard of whether it was false or not. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). This requires "a total disregard for the truth, rather than merely ill-will, hatred, spite, or a desire to injure the plaintiff." *See Milligan v. U.S.*, 644 F. Supp. 2d 1020, 1036 (M.D. Tenn. 2009). Whether actual malice exists is a question of law. *See Harte–Hanks, Comm'cns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989).

As noted above, the EC did not make any of the alleged defamatory statements referenced in the Complaint. But, assuming it did, the Complaint fails to establish that the EC made any statements with actual malice. The Report notes the extensive steps Guidepost took to verify the accuracy of the allegations contained therein. These steps included but were not limited to "preparing and submitting comprehensive document request to relevant parties and entities;

20

reviewing and analyzing all relevant documents obtained from all sources; contacting or attempting to contract and interview all current and form SBC EC staff and EC Trustees, other high-level SBC official or key figures, and other relevant witnesses identified through our investigation; and conducting in-depth witness interviews of survivors, witnesses, and advocates who affirmatively contacted Guidepost." (Doc. 1–2, PageID #51). In fact, Hunt admits "Guidepost conducted hundreds of interviews . . . collected over five terabytes of data . . . and spent thousands of hours on its investigation." (Doc. 1, PageID #9, ¶ 46).

As it relates to the specific allegations concerning Hunt, Guidepost interviewed the couple on multiple occasions, Hunt on two occasions, spoke to numerous witnesses, and examined the Husband's electronic journals and recordings. (*See* Doc. 1–2, Page ID #182–94). This effort alone shows that Guidepost took appropriate steps to verify the accuracy of the statements in the Report and certainly does not indicate that it recklessly disregarded the truth of the statements. The same is true of the Tweet and the Letter which either quote the Report verbatim or synthesize the allegations stated in the Report.[6]

Hunt's threadbare allegations that "Defendants acted with malice in that they acted either with knowledge that the statements were false or with reckless disregard of whether the statements were false or not" are not enough to plausibly allege actual malice. (*See* Doc. 1, PageID #17–18, ¶¶ 86, 97). Moreover, those allegations are directly refuted by the Report and other allegations in the Complaint. As a result, Counts I–IV should be dismissed.

---

[6] And, with respect to the EC, even if it could have taken action, the Engagement Letter forbade it as EC could not conduct, direct, or otherwise manage Guidepost's investigation (Doc. 1–1, Page ID #24, § 3.3) and could not edit the Report prior to its public release (*id.* § 3.6).

## VI.     THE COMPLAINT INDEPENDENTLY FAILS TO STATE CLAIMS.

### A.     Even if Hunt is not public figure, Hunt has failed plausibly plead facts to sustain Counts I–III.

If the Court concludes Hunt is not a public figure, the law requires Hunt to plausibly plead negligence to sustain his defamation claims. *See Milligan*, 644 F. Supp. 2d at 1033. For his false light claim, Hunt must plead the EC negligently placed him in a false light. *See Santoni*, 2022 WL 97049, at *13. While "[n]egligence is not a particularly high pleading standard . . . it must be met—and met with factual matter." *Id*. With respect to the defamation claims, and for the reasons set forth above, (*see infra* § III(C)), Hunt cannot plausibly allege the EC was negligent in making any statement. And, with respect to his claim for false light, Hunt has not recited any aspect of the EC's "requisite state of mind." *See Santoni*, 2022 WL 97049 at *13. Accordingly, the Court should dismiss these claims.

### B.     Even if Hunt is not a public figure, the IIED claim (Count IV) should still be dismissed.

For IIED, a plaintiff must show "(1) the conduct complained of must be intentional or reckless; (2) the conduct complained of must be so outrageous that it is not tolerated in civil society; and (3) the conduct complained of must result in serious mental injury." *Barret v. Whirlpool Corp.*, 704 F. Supp. 2d 746, 757 (M.D. Tenn. 2010). For conduct to be outrageous, it must be "so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Bain v. Wells*, 936 S.W.2d 618, 623 (Tenn. 1997). This is an "exacting standard" and "not an easy burden to meet." *Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010); *Brown v. Mapco Exp., Inc.*, 393 S.W.3d 696, 703 (Tenn. Ct. App. 2012).

Here, the Complaint fails to state an IIED claim for at least two reasons other than his failure plausibly plead actual malice. First, the Complaint fails to allege that alleged defamatory

statements were extreme or outrageous. Hunt apparently did not himself consider the allegations lodged against him as either extreme or outrageous. In fact, according to Guidepost, when confronted with the allegations, Hunt "remained very calm, expressed little to no emotion, did not get upset, did not raise his voice, or express outrage at the allegations." (Doc. 1–2, PageID #194). If Hunt failed to react when he was directly confronted with the allegations, he cannot now claim that the statements in the Report (or the Tweet or Letter which just quote or synthesize the Report) are extreme or outrageous. Second, even assuming the alleged defamatory statements were extreme or outrageous, Hunt has failed to allege he suffered serious mental injury. For these three reasons, Hunt has failed to plausibly state an IIED claim and the Court should dismiss it.

C.    The Complaint fails to state a claim for negligent infliction of emotional distress (Count V).

To establish a claim of negligent emotional distress, Hunt must (1) satisfy the elements of ordinary negligence; (2) establish a "serious" or "severe" emotional injury; and (3) support his serious or severe injury with expert medical or scientific proof. *See Marla H. v. Knox Cnty.*, 361 S.W.3d 518, 529 (Tenn. Ct. App. 2011). A serious injury is one that a reasonable person would be unable to adequately cope with the mental stress engendered by the circumstances of the case. *Id.*

This claim should be dismissed for two reasons. First, Hunt argues that the Defendants breached a duty to use reasonable care in reporting when they "included the allegations against [Hunt] in a report focused on child molesters and other sex abusers." (Doc. 1, PageID #19, ¶ 111). However, as the Engagement Letter and the Report make clear, Guidepost's inquiry was not limited to "child molesters and other sex abusers," but also focused on allegations that EC members themselves had committed sexual abuse. (*See* Doc. 1–1, PageID #23, § 3.1). As a result, even assuming a duty existed, Hunt has failed allege facts that the EC, or any Defendant, breached that duty because the Report fairly and accurately describes subject matter within the scope of

Guidepost's investigative mandate. Second, Hunt does not cite to a serious or severe mental injury under Tennessee law or a physical injury if the Court applies Georgia law.[7] (Doc. 1, PageID #19, ¶¶ 109–113). Threadbare allegations do not state a claim here, and the Court should dismiss it.

      D.    <u>The Complaint fails to state a claim for disclosure of embarrassing private facts (Count VI).</u>

To establish a claim for the tort of public disclosure of embarrassing private facts, Hunt must show that the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public. *See Major v. Charter Lakeside Hosp., Inc.*, No. 42, 30011 T.D., 1990 WL 125538, at *4–5 (Tenn. Ct. App. 1990). "Publicity," as used in this tort, "means that the matter is made public by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D, comment a. In other words, to "publicize" a statement such that it becomes actionable as a tort of public disclosure of private acts, the statement must "reach[], or [be] sure to reach, the public." *Id.* Numerous courts have held that disclosure of an individual's information to a small number of persons was insufficient to sustain this action. *See Finley v. Kelly*, 384 F. Supp. 3d 898, 909 (M.D. Tenn. 2019) (collecting cases).

The Tennessee Supreme Court has never officially recognized this tort. *See Rutherford v. First Tenn. Bank Nat. Ass'n*, No. 3:08-CV-19, 2008 WL 3307203, at *6 (E.D. Tenn. Aug. 7, 2008). While lower courts have acknowledged it, most courts assume the cause of action exists and alternatively dismiss it for lack of a *public* disclosure of private facts. *See Finley*, 384 F. Supp. 3d at 909. As a result, "communication to a single individual or to a small group of people, absent a breach of contract, trust or other confidential relationship will not give rise to liability." *See*

---

[7] As referenced above, Georgia law requires a physical injury, *see Mayorga*, 875 S.E.2d at 917–18, while Tennessee only requires a "serious" or "severe" mental injury supported by expert medical or scientific proof. *See Marla H.*, 361 S.W.3d at 529.

*Jackson & Assocs., Ltd. v. Christl*, No. 01A019103CV00081, 1991 WL 155687, at *3 (Tenn. Ct. App. Aug. 16, 1991). Assuming this cause of action exists, it should be dismissed for two reasons.

First, the Letter states that Hunt was credibly accused of sexual abuse with no further detail. Without actual facts that would be considered private, the Complaint fails to state a claim as it relates to the Letter. Moreover, the Letter was only sent to single church and therefore was not publicized in a manner that was sure to reach the public. *See* Restatement (Second) of Torts § 652D, comment a. *See also See Finley*, 384 F. Supp. 3d at 909. Second, while the Report, Tweet, and the Letter publicly disclosed private facts, all of these statements were made in response to a matter of public concern. Therefore, Hunt has failed to state a claim because the embarrassing private facts relate to a matter of public concern.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint for lack of subject matter jurisdiction. Alternatively, the Court should dismiss the Complaint for failure to state a claim.

Respectfully submitted,

*s/ R. Brandon Bundren*

E. Todd Presnell (BPR #17521)
Scarlett Singleton Nokes (BPR #28994)
R. Brandon Bundren (BPR #30985)
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, Tennessee 37203
P: 615.252.2355
F: 615.252.6355
tpresnell@bradley.com
snokes@bradley.com
bbundren@bradley.com

Gene R. Besen (*pro hac vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
Fountain Place
1445 Ross Ave., Suite 3600
Dallas, Texas 75202
P: 214.257.9800
F: 214.939.8787
gbesen@bradley.com

*Attorneys for the Executive Committee of the Southern
Baptist Convention*

## CERTIFICATE OF SERVICE

I certify that on May 4, 2023, I electronically filed a true and correct copy of the Memorandum of Law in Support of the Executive Committee of the Southern Baptist Convention's Motion to Dismiss with the Clerk of Court for the U.S. District Court Middle District of Tennessee through the Court's Electronic Case Filing System, which will automatically serve all counsel of record listed below:

| | |
|---|---|
| Robert D. MacGill<br>Scott E. Murray<br>Patrick J. Sanders<br>MacGill PC<br>156 E. Market Street, Suite 1200<br>Indianapolis, Indiana 46204<br>robert.macgill@macgilllaw.com<br>scott.murray@macgilllaw.com<br>Patrick.sanders@macgilllaw.com<br><br>Todd G. Cole<br>Andrew Goldstein<br>Cole Law Group, P.C.<br>1648 Westgate Circle, Suite 301<br>Brentwood, Tennessee 37027<br>tcole@colelawgrouppc.com<br>agoldstein@colelawgrouppc.com<br><br>*Counsel for Plaintiff* | John R. Jacobson<br>Katherine R. Klein<br>Riley & Jacobson, PLC<br>1906 West End Avenue<br>Nashville, Tennessee 37203<br>jjacobson@rjfirm.com<br>kklein@rjfirm.com<br><br>Steven G. Mintz<br>Terence W. McCormick<br>Mintz & Gold LLP<br>600 Third Avenue, 25th Floor<br>New York, New York 10016<br>mintz@mintzandgold.com<br>mccormick@mintzandgold.com<br><br>*Counsel for Guidepost Solutions, LLC*<br><br>L. Gino Marchetti, Jr.<br>Matthew C. Pietsch<br>Taylor, Pique, Marchetti & Blair, PLLC<br>2908 Poston Avenue<br>Nashville, Tennessee 37203<br>gmarchetti@tpmblaw.com<br>matt@tpmblaw.com<br><br>*Counsel for Southern Baptist Convention* |

*s/ R. Brandon Bundren*
R. Brandon Bundren