IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOHNNY M. HUNT, )<br>　　　Plaintiff, )<br> )<br>v. )<br> )<br>SOUTHERN BAPTIST CONVENTION, )<br>et al., )<br>　　　Defendants. ) | Case No. 3:23-cv-00243<br>Judge Campbell/Frensley |

## ORDER

### I. INTRODUCTION

Johnny Hunt, a pastor and former President of the Southern Baptist Convention ("SBC"), brought this suit against the SBC, the Executive Committee of the SBC ("the Executive Committee"), and Guidepost Solutions LLC ("Guidepost") (collectively, "Defendants") alleging torts including defamation and libel related to an investigative report ("the Report") prepared by Guidepost for the SBC that includes allegations that Mr. Hunt sexually assaulted the wife ("the accuser") of another SBC pastor.[1,2] Docket No. 1. All three Defendants have filed Motions to Dismiss, which have been disposed of. Docket Nos. 25, 29, 31, 150, 151.

This matter is now before the Court upon Guidepost's "Cross-Motion to Compel." Docket No. 125. Guidepost has also filed a Supporting Memorandum and other supporting documents. Docket Nos. 125-1, 126, 128, 128-1.[3] Mr. Hunt has filed a "Response in Opposition to Guidepost Solutions LLC's Cross-Motion to Compel Discovery" and a "Memorandum in Support of

---

[1] Guidepost was engaged by SBC to investigate possible sexual abuse by members of the Executive Committee. Docket No. 1-1, p. 2.
[2] The accuser is also referred to as "the survivor."
[3] Guidepost's Memorandum is filed both under seal and in a redacted form in the public record.

Response in Opposition to Guidepost Solutions LLC's Cross-Motion to Compel Discovery." Docket Nos. 143, 144. Guidepost has filed a Reply. Docket No. 148. The Parties have also filed a Joint Discovery Dispute Statement and other supporting documents. Docket Nos. 119, 119-1 through 119-6, 121, 121-1 through 121-6. For the reasons set forth below, Guidepost's Motion (Docket No. 125) is **GRANTED IN PART**.

## II. LAW AND ANALYSIS

### A. Discovery Requests and Motions to Compel

Discovery in federal court is governed by the Federal Rules of Civil Procedure, which provide that a party may request production of documents or other tangible items as long as the information sought is within the scope of discovery. Fed. R. Civ. P. 34(a); *see also* Fed. R. Civ. P. 26(b)(1). Interrogatories are covered by Rule 33, which provides that "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(3).

In general, the scope of discovery extends to nonprivileged information that is relevant to any party's claim or defense, regardless of whether the information sought is admissible, that is "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The Rules were amended, effective December 1, 2015, in part to address the alleged costs and abuses attendant to discovery. Under Rule 26, "[t]here is now a specific duty for the court and the parties to consider discovery in the light of its 'proportional[ity] to the needs of the case . . . .'" *Turner v. Chrysler Grp. LLC*, No. 3:14-1747, 2016 U.S. Dist. LEXIS 11133, at *2, (M.D. Tenn. Jan. 27, 2016), *quoting* Fed. R. Civ. P. 26(b)(1). The following factors are relevant to a consideration of whether the scope of discovery is proportional:

    (1)    the importance of the issues at stake in the action,
    (2)    the amount in controversy,

2

>    (3) the parties' relative access to relevant information,
>    (4) the parties' resources,
>    (5) the importance of the discovery in resolving the issues, and
>    (6) whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1) (numbering added). "Nevertheless, the scope of discovery is, of course, within the broad discretion of the trial court." *United States v. Carell*, No. 3:09-0445, 2011 U.S. Dist. LEXIS 57435 at *5 (M.D. Tenn. May 26, 2011), *quoting Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998) (internal quotation marks omitted).

After making a good faith effort to resolve a dispute, a party may move for an order compelling discovery. Fed. R. Civ. P. 37(a)(1). The moving party "must demonstrate that the requests are relevant to the claims or defenses in the pending action." *Carell*, 2011 U.S. Dist. LEXIS 57435 at *5, *quoting Anderson v. Dillard's, Inc.*, 251 F.R.D. 307, 309-10 (W.D. Tenn. 2008) (internal quotation marks omitted). "Relevance for purposes of discovery is broadly construed and the information sought need not be admissible to be discoverable." *T.C. ex rel S.C. v. Metro Gov't of Nashville & Davidson Cty.*, No. 3:17-01098, 2018 WL 3348728, 2018 U.S. Dist. LEXIS 113517, at *17 (M.D. Tenn. July 9, 2018). "If relevancy is shown, the party resisting discovery bears the burden of demonstrating why the request is unduly burdensome or otherwise not discoverable under the Federal Rules." *Carrell*, 2011 U.S. Dist. LEXIS 57435, at *5 (internal quotation marks and citation omitted). Further, for purposes of a motion to compel, "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4).

### B. Guidepost's Motion to Compel

Guidepost contends that Mr. Hunt "is seeking over $100,000,000 in damages but has simultaneously admitted to having destroyed critical evidence and has failed and refused to

produce other evidence in his possession, custody, and control." Docket No. 128-1, p. 1. Specifically, Guidepost asks the Court to order Mr. Hunt to:

> (1) turn his phone and computer over to an IT professional to retrieve any deleted text messages, phone records, and emails with *each* of the witnesses identified in his initial disclosures and responses to Guidepost's interrogatories, retrieve and produce them from the cloud if necessary and practicable, and report back to Guidepost and the Court; (2) produce documents that Hunt has admitted in his initial disclosures are in his possession but has failed and refused to produce; (3) produce or explain the absence of metadata and/or missing email communications relating to that metadata; (4) supplement his privilege log to identify communications preceding the filing of his Complaint and supplement the privilege log based upon improper redactions; (5) supplement his document production to disclose pertinent evidence regarding his claim for emotional harm and monetary damages; (6) produce documents regarding his so-called "restoration" to the ministry by the Hiland Park Baptist Church; and (7) supplement his responses to Guidepost's requests for jurisdictional discovery.

*Id.* at 1-2 (emphasis in original). Guidepost also requests that the Court award its expenses, including attorneys' fees, pursuant to Fed. R. Civ. P. 37(a)(5)(A). *Id.* at 2.

**1. Mr. Hunt's Phone and Computer**

Guidepost maintains that Mr. Hunt "has not produced a single text message or any phone records and has indicated that such messages as well as emails have been deleted." Docket No. 128-1, p. 3. Guidepost argues that there is reason to believe that, at least at one point, Mr. Hunt had such messages: "As revealed in the Report . . . Hunt communicated with the alleged survivor and her husband via text from his phone" and Mr. Hunt "specifically identified two such communications with the alleged survivor in his answer to Guidepost's Interrogatory No. 9." *Id.*, *citing* Docket No. 1-1, p. 150-51, 159; Docket No. 121, p. 10. Guidepost argues that Mr. Hunt "was under a duty to preserve documents ***well before*** he filed the Complaint . . . on March 17, 2023." *Id.* at 4 (emphasis in original). Guidepost asserts that "Hunt evidently contemplated litigation as early as May 19, 2022 (a full year before he filed the Complaint) when his then counsel . . . wrote to both Anthony Collura (Guidepost's Chief Legal Officer) and one of the Guidepost

4

investigators, Samantha Kilpatrick, respectively, asserting that Guidepost purportedly had an ethical duty to deliver an *Upjohn* warning to Hunt during his interview." *Id.* Guidepost maintains that "[a]s of May 19, 2022, at the latest, litigation was reasonably to be anticipated and Hunt should not have deleted any text[] messages, phone records, or emails concerning his potential claims against Guidepost." *Id.* at 4-5 (footnote omitted). Guidepost notes that "in his response to Guidepost Interrogatory No. 11, Hunt identified 42 different people with whom he communicated concerning his extramarital encounter with the alleged survivor, the Report, or the allegations in the Complaint. . . . And yet, his document production was virtually devoid of such communications." *Id.* at 5 (footnote omitted). Guidepost also maintains that "it is not for Hunt in the first instance unilaterally to determine whether a responsive text is 'substantive' or not. If it is responsive, it must be produced." *Id.* at 6.

> Guidepost therefore asks the Court to:
>
> [D]irect Hunt to turn his phone over to an IT professional to attempt to retrieve any deleted communications with *each* of the witnesses identified in his initial disclosures and (if necessary) obtain such documents from the cloud and supplement his production accordingly. Hunt should be required to arrange for such IT personnel to report to counsel and the Court regarding the success (or not) of such efforts and, in the event Hunt is unable to do so, schedule a hearing for the purpose of assessing spoliation sanctions against Hunt. For the avoidance of any confusion, this includes **all** of Hunt's email communications that pre-date the filing of the Complaint and a forensic analysis of his email accounts and hard drive as well.

*Id.* at 7 (emphasis in original).

Mr. Hunt responds that he "did not have any substantive written communications with anyone about the 2010 Florida encounter with the accuser," and that "[s]uch written communications never existed; they were not destroyed." Docket No. 144, p. 1-2. Mr. Hunt asserts that while "it is true that [he] sporadically engaged in text messaging with the accuser and her husband **in and around 2010**, when the encounter occurred . . . [he] did not retain these old text

5

messages, and he does not even use the same phone." *Id.* at 2 (emphasis in original). Mr. Hunt maintains that he "has not had any written communications with the accuser or her husband for many years on any topic; and he has never had written communications with them relating to the substantive accusations that are contained in the Report." *Id.*

As for Mr. Hunt's hard drive and emails, Mr. Hunt asserts that he "**does not have access** to any email account that he used prior to issuance of the Report in 2022" and "[a]s for his current email address . . . has already used an e-discovery vendor to collect and search his emails, and any responsive emails have been produced." *Id.* at 2-3 (emphasis in original). Mr. Hunt maintains that he "has not had any substantive communications with anyone by email or text about the encounter or the Report." *Id.* at 3. Regarding the 42 people he identified in his interrogatory responses as individuals with whom he had communications, Mr. Hunt asserts that "those communications were oral and consisted primarily of some acknowledgement of the Report's existence – they were not substantive." *Id.* Mr. Hunt states that he "was advised of his obligation to retain relevant, responsive documents when he began considering filing this case. And he has honored that obligation." *Id.* Mr. Hunt suggests that Guidepost seek more information from Mr. Hunt in his deposition. *Id.*

Guidepost replies that Mr. Hunt "has *conspicuously* failed to acknowledge Guidepost's argument that he was under an obligation to preserve all documents relating to his allegations in the Complaint as early as May 19, 2022 . . . ." Docket No. 148, p. 1 (emphasis in original). Further, Guidepost asserts that Mr. Hunt "has changed his position regarding document preservation," previously stating that he did not retain emails and text messages before filing the Complaint, and now suggesting "that there were no text messages to retain; supposedly, they never *existed* because he 'has not had any *substantive* communications with anyone by email or text about the encounter

6

or the Report.'" *Id.* at 2, *quoting* Docket No. 144, p. 2 (emphasis added by Guidepost). Guidepost maintains that "[t]his is exactly why a forensic examination of his phone and email hard drive is needed . . . only imaging the phone and retrieving lost messages from the cloud will now clear up the uncertainty." *Id.*

To the extent that they exist, there can be no real dispute as to the relevance of text messages between Mr. Hunt and the accuser (or her husband) that are contemporaneous with the events leading to Guidepost's investigation and the Report, and the Court finds that they (and any similar emails) would be relevant to the claims and defenses in this case.[4] The same reasoning extends to responsive communications with those individuals that Mr. Hunt identified in his initial disclosures as potential witnesses. To the extent that Mr. Hunt asserts that he does not have the same phone that he had in 2010, the Court understands him to be arguing that production of those texts (and potentially emails) would be unduly burdensome. The Court finds that this burden can be alleviated by providing the phone to an IT professional who can attempt to recover the relevant and responsive messages. Although Mr. Hunt no longer has the same physical device that he had at the time, it is possible that an IT professional may be able to access and produce the information sought. The Court will therefore order Mr. Hunt, no later than April 22, 2024, to provide his phone to a forensic IT professional with instructions to attempt to retrieve any messages (text or email) that would be responsive to Guidepost's document requests.

With respect email accounts from Mr. Hunt's prior employment, the Court accepts Mr. Hunt's assertion that he no longer has access to the accounts. To the extent that it still exists,

---

[4] In his interrogatory responses, Mr. Hunt cites texts between himself and the accuser. *See* Docket No. 121, p. 10. Additionally, the Report (which Mr. Hunt attached as an exhibit to his Complaint) references text messages exchanged between Mr. Hunt and the accuser. Docket No. 1-2, p. 150-51, 159.

information from the email accounts that were provided to him by third parties, such as the First Baptist Church of Woodstock and the North American Mission Board, is presumably available via subpoena to those entities.

### 2. Documents Identified in Mr. Hunt's Initial Disclosures

Guidepost asserts that [i]n reviewing Hunt's document production, Guidepost has been unable to locate documents that Hunt had admitted in his initial disclosures were in his possession, custody, and control." Docket No. 128-1, p. 7. Guidepost identifies these documents as including, but not limited to: "communications from the SBC and/or the Executive Committee to churches where Hunt was scheduled to speak and documents relating to the SBC's and/or the Executive Committee's structure." *Id.* Guidepost maintains that "[s]uch documents bear directly upon Hunt's claim for damages." *Id.* Guidepost asserts that "[t]he conspicuous absence of documents he previously claimed to have had only leads Guidepost to believe that other documents have been withheld (such as the text messages and emails referred to in Part A, above)" and argues that "Hunt should be required to provided a satisfactory explanation for failing to produce them, inasmuch as he had originally said he possessed them." *Id.* at 8.

Mr. Hunt maintains that he is "not withholding any documents identified in his initial disclosures" and explains the absence of some of those documents from his production by stating that he "included in his disclosures certain categories of documents that he anticipated would be produced by other parties in the litigation and that he might then rely upon in proving his claims." Docket No. 144, p. 4. He points to examples from his initial disclosures such as "any document produced during discovery in this case," "expert reports," and "deposition transcripts." *Id.*

Guidepost replies that there are nevertheless several categories of documents that Mr. Hunt claimed to have in his initial disclosures but has not produced, including: "communications from

the SBC and/or the Executive Committee to churches where Hunt was scheduled to speak and documents relating to the SBC's and/or the Executive Committee's structure." Docket No. 148, p. 3.

Mr. Hunt does not dispute that the documents he referred to in his initial disclosures are relevant to the claims or defenses in this matter, and the Court finds that they are relevant. *See* Docket No. 110-1. To the extent that documents referred to in the initial disclosures are not within Mr. Hunt's possession, custody, or control, he obviously need not (and cannot) produce them. But if he has such documents, he must produce them to Guidepost no later than April 22, 2024.

### 3. Metadata and Email Communications Related to Metadata

Guidepost contends that some of the documents produced by Mr. Hunt do not include any metadata. Docket No. 128-1, p. 8, *citing* Docket No. 121-2. Additionally, Guidepost identifies one document that "has an improper redaction." *Id.*, *citing* Docket No. 121-3.

Mr. Hunt responds that the issue is moot, as he has provided the requested metadata and produced an unredacted copy of the document identified by Guidepost. Docket No. 144, p. 5.

Guidepost maintains that while Mr. Hunt produced "an excel metadata document" (after the Motion was filed), the document "fails to address Guidepost's concerns" because the information provided "only showed the forward from Johnny Hunt to his wife Janet, the very top email on the string, and nothing else—still leaving open the questions of how Mr. Hunt received this email; whether he was bcc'd; or if he withheld documents if he was not bcc'd on that correspondence." Docket No. 148, p. 3.

As previously set forth, as the moving party, Guidepost must demonstrate that the information it seeks is relevant to the claims or defenses in this case. *Carell*, 2011 U.S. Dist. LEXIS 57435 at *5. Guidepost does not explain how the absent metadata is relevant, and the

9

Court does not, without guidance, perceive how issues such as *how* Mr. Hunt received an email cancelling a proposed speaking engagement would be relevant to the Parties' claims or defenses. That said, Administrative Order 174-1 contemplates the potential production of metadata, and Mr. Hunt has articulated no burden associated with including it. Admin. Order 174-1, Attach. A, p. 6; *see* Docket No. 144. To the extent any metadata related to electronic discovery produced by Mr. Hunt is within his possession, custody, or control, going forward Mr. Hunt should produce it contemporaneously with the documents to which it pertains. But given the tenuous relevance of at least the example provided to the Court (and considering all of the factors set forth in Rule 26(b)), the Court finds that it would be disproportionate to the needs of the case to require Mr. Hunt to supply the missing metadata associated with documents already produced.

### 4. Documents Preceding the Complaint and Mr. Hunt's Privilege Log

Guidepost requests that the Court order Mr. Hunt to log all communications between himself and his counsel that occurred prior to filing this lawsuit. Docket No. 128-1, p. 9. Further, Guidepost contends that third parties have produced documents showing "Hunt's counsel communicating and leaving voicemails with the [accuser's] husband that were never produced by Hunt." *Id.* at 10, *citing* Docket No. 121-4. Guidepost notes that it "defined Hunt to include all parties acting on his behalf, including his counsel." *Id.* Guidepost argues that "Hunt should be required to produce *all* documents responsive to Guidepost's requests, including his counsel's correspondence with the alleged survivor and her husband, as well as supplement their privilege log." *Id.* (emphasis in original).

Mr. Hunt asserts that he has logged his pre-filing communications with his counsel, but has identified them by category rather than by logging individual documents. Docket No. 144, p. 5-6. Mr. Hunt maintains that "there is no reason to waste time or resources in putting them individually

10

Case 3:23-cv-00243 Document 159 Filed 04/05/24 Page 10 of 16 PageID #: 2118

on a log." *Id.* at 6. As for the voicemail from Mr. Hunt's counsel identified by Guidepost as having been produced by a third party and not by Mr. Hunt, Mr. Hunt states that "[Mr. Hunt's counsel] does not have a copy of that voicemail – only the accuser's husband does. That's how voicemails work." *Id.*

Guidepost argues that it "is not asking Hunt to identify the substance of his communications with counsel—only to identify on a privilege log pre-filing communications and to properly log them" so that Guidepost will have the means to test the privilege. Docket No. 148, p. 3.

Guidepost is correct: there is no means available to test the privilege when documents are logged as categories instead of individually. Mr. Hunt's caselaw to the contrary is out of Circuit, and neither it nor Administrative Order No. 174-1, which addresses communications with counsel that take place after the filing of a complaint, changes his obligation to log each separate communication. *See* Admin. Order 174-1, p. 3. This Court is unlikely to order the disclosure of communications between attorneys and their clients, but that does not obviate the need to log them properly in the first instance. Therefore, no later than April 22, 2024, Mr. Hunt must update his privilege log to reflect each pre-filing communication that he is withholding on the basis of any privilege.

**5. Documents Related to Claims for Emotional Harm and Monetary Damages**

Guidepost contends that Mr. Hunt has failed to produce documents related to "the professional services [he] received in connection with the emotional injury for which he seeks damages in this action." Docket No. 128-1, p. 10. Guidepost argues that "[b]ecause Hunt placed his medical condition at issue in this case, Guidepost is entitled to his medical records, documents concerning his care, diagnosis, and prescriptions." *Id.* Guidepost also argues that Mr. Hunt has failed to update his discovery responses to requests for documentation of his monetary damages,

11

Case 3:23-cv-00243   Document 159   Filed 04/05/24   Page 11 of 16 PageID #: 2119

noting that the calendar for his speaking engagements that was produced did not go past January 4, 2023.[5] *Id.* at 11-12.

Mr. Hunt responds that Guidepost could have served a subpoena to Mr. Hunt's providers to obtain his treatment records directly from them, but that he "will reach out to these providers to obtain any documents they have and then produce any that are responsive." Docket No. 144, p. 6-7. Mr. Hunt maintains that "it is impractical to expect [him] to supplement his discovery responses on a daily basis to reflect any such efforts [to earn income], but that he "will work with Guidepost to agree to a reasonable supplementation schedule to cover such documents through trial." *Id.* at 7.

It appears to the Court that the Parties are more or less in agreement on these issues. Mr. Hunt must produce any documents within his possession, custody, or control that are relevant to his claim for emotional damages, including those related to his treatment providers, because he has placed his medical condition at issue in this litigation. *See Maday v. Pub. Librs. of Saginaw*, 480 F.3d 815, 821 (6th Cir. 2007) (holding that a patient waives the privilege when he puts his "emotional state at issue in the case"). Related to his claim for damages due to lost work opportunities, Mr. Hunt must also provide Defendants with any updated information related to his speaking engagements or other sources of income on a monthly basis.

### 6. Documents Related to Ministry Restoration by Hiland Park Baptist Church

Guidepost contends that Mr. Hunt has produced "limited, if any, documents and

---

[5] Guidepost also asserts that "given that the only emails produced by Hunt almost predominantly include his assistant, Kerry, it begs the question whether Kerry likewise had her email account searched for all responsive documents." Docket No. 128-1, p. 12. Mr. Hunt responds that he "took reasonable steps to collect any responsive documents from her, including engaging an e-discovery vendor to collect and search her emails." Docket No. 144, p. 7. The Court concludes that nothing further is needed from Mr. Hunt in this regard.

12

communications concerning his 'restoration' to public ministry at Hiland Park Baptist Church in Panama City, Florida. Docket No. 128-1, p. 12. Mr. Hunt responds that "he is not withholding any documents related to his restoration." Docket No. 144, p. 7. Guidepost maintains that "it is implausible that Hunt has only two communications regarding his restoration to the ministry" and argues that "[t]his is yet further evidence that a forensic analysis of Hunt's phone and email hard drives should be ordered to ascertain how many more documents relating to Mr. Hunt's alleged restoration exist." Docket No. 148, p. 4.

Rule 34, which governs discovery, provides for the request for and production of documents that "are in the possession, custody or control of the party upon whom the request is served." As another court has explained:

> Therefore, Rule 34 only requires a party to produce documents that are already in existence. *See Rockwell Int'l Corp. v. H. Wolfe Iron and Metal Co.,* 576 F. Supp. 511, 511 (W.D.Pa. 1983); *see also* 8A Charles Alan Wright et al., Federal Practice and Procedure § 2210 (2d ed. 1994) ("[A] party cannot be required to permit inspection of documents or things that it does not have and does not control.") A party is not required "to prepare, or cause to be prepared," new documents solely for their production. *See Rockwell,* 576 F. Supp. at 511.

*Alexander v. FBI*, 194 F.R.D. 305, 310 (D.D.C. 2000). *See also Harris v. Advance Am. Cash Advance Centers, Inc.*, 288 F.R.D. 170, 173 (S.D. Ohio 2012); *Chambers v. N.C. Dep't of Juvenile Justice & Delinquency Prevention*, 1:10CV315, 2013 U.S. Dist. LEXIS 99672 at *6 (M.D.N.C. July 17, 2013).

Mr. Hunt has asserted that he does not have any further documents related to his "restoration to ministry." Docket No. 144, p. 7. Absent evidence to the contrary, the Court will accept this representation. Guidepost can, of course, solicit relevant documents from Hiland Park Baptist Church via subpoena pursuant to Rule 34(c) and Rule 45.

**7. Responses to Requests for Jurisdictional Discovery**

Guidepost contends that there is reason to believe that Mr. Hunt's domicile is still Georgia, not Florida as he asserts, and that consequently, diversity jurisdiction does not exist. Docket No. 128-1, p. 13. Guidepost therefore asks the Court to order Mr. Hunt to respond to Document Request Nos. 4 and 9, which seek "[d]ocuments sufficient to show [Mr. Hunt's] travel during the Relevant Time Period" and "[a]ll credit card statements of credit cards issued to [Mr. Hunt], including merchant location information, showing [Mr. Hunt's] expenditures during the Relevant Time Period." *Id.* at 14, *quoting* Docket No. 119-2.

Mr. Hunt responds that "there can be no reasonable dispute that [Mr. Hunt] is a citizen of Florida for purposes of this Court's diversity jurisdiction." Docket No. 144, p. 7. Mr. Hunt asserts that:

> [Mr. Hunt] and his wife decided to make their Florida house their permanent residence in late 2022 and early 2023, prior to the filing of the lawsuit. Consistent with that decision, they obtained Florida drivers' licenses; they registered to vote in Florida; they joined a church in Florida; and they filed a sworn Declaration of Domicile in the State of Florida. These objective facts, combined with the allegations of domicile in the Complaint and [Mr. Hunt's] sworn interrogatory response declaring Florida as his domicile, put an end to this question.
>
> . . .
>
> It is undisputed that [Mr. Hunt] continues to have family connections and to own property in Georgia. Therefore, documents will indeed show travel to and from Georgia. But such travel is not inconsistent with having changed their domicile to Florida, and it does not change the fact that [Mr. Hunt] and his wife spend the majority of their time in Florida, have registered to vote in Florida, have joined a Florida church, have obtained Florida drivers' licenses, and have filed a sworn Declaration of Domicile in the State of Florida.

*Id.* at 8.

Guidepost does not dispute that Mr. Hunt has taken the actions described above, but argues that he "doggedly resists producing the real time evidence of where he was eating his meals and from and to where he was traveling." Docket No. 148, p. 4.

Guidepost correctly points to the factors that courts in this Circuit consider when determining a person's domicile, including:

> Current residence; voting registration and voting practices; location of personal and real property; location of brokerage and bank accounts; memberships in unions, fraternal organizations, churches, clubs and other associations; place of employment or business; driver licenses and other automobile registration; [and] payment of taxes.

Docket No. 128-1, p. 13, *quoting Caffey v. Home Depot*, No. 3:14-0476, 2014 WL 1681705, at *2 (M.D. Tenn. Apr. 28, 2014) (internal quotation marks omitted; alteration added by Guidepost).

Guidepost does not dispute that Mr. Hunt has provided evidence supporting several of these factors, including voting registration, church membership, and driver licenses. *See* Docket Nos. 128-1, 148. Notably absent from the list above are factors such as "where meals are eaten" or "where traveling to and from." And for good reason—these are clearly not reliable indicators of domicile. The Court finds that Guidepost has failed to establish the relevance of the information sought by its Document Request Nos. 4 and 9. Therefore, Mr. Hunt need not make any further response to these Requests.

### 8. Expenses and Fees

Pursuant to Rule 37(a)(5)(A), Guidepost requests that the Court award its expenses, including attorneys' fees, in the event the Motion is granted (or if Mr. Hunt provides the requested documents after the Motion was filed). Docket No. 128-1, p. 16. Because the Motion is only granted in part, the Court finds that an award of fees is not justified in this instance.

### III. CONCLUSION

For the foregoing reasons, Guidepost's Motion (Docket No. 125) is **GRANTED IN PART**. No later than April 22, 2024, Mr. Hunt must take the following actions. First, he must provide his phone to a forensic IT professional for the purpose of attempting to retrieve any messages (text or

15

Case 3:23-cv-00243   Document 159   Filed 04/05/24   Page 15 of 16 PageID #: 2123

email) that are responsive to Guidepost's document requests. No later than one week following receipt of the IT professional's report being issued to Mr. Hunt, Mr. Hunt must file the report with the Court via the CM/ECF system. Second, Mr. Hunt must produce to Guidepost any additional documents he has within his possession, custody, or control that are identified in his initial disclosures. Third, Mr. Hunt must produce a revised privilege log that individually identifies all communications that took place before the filing of the Complaint that he is withholding on the basis of any privilege. Fourth, Mr. Hunt must produce any documents within his possession, custody, or control that are relevant to his claim for emotional damages, including those related to his treatment providers. Including these productions, going forward, Mr. Hunt must include complete metadata (to the extent it is available) with every piece of electronic discovery produced. Finally, beginning on May 1, 2024, and on a monthly basis thereafter until the disposition of this matter, Mr. Hunt must provide to Guidepost updated information regarding his efforts to generate income and any income earned.

     **IT IS SO ORDERED.**

                                            **JEFFERY S. FRENSLEY**
                                            **United States Magistrate Judge**

16

Case 3:23-cv-00243   Document 159   Filed 04/05/24   Page 16 of 16 PageID #: 2124