# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| JOHNNY M. HUNT,<br><br>        Plaintiff,<br><br>   v.<br><br>SOUTHERN BAPTIST CONVENTION;<br>GUIDEPOST SOLUTIONS LLC; and<br>EXECUTIVE COMMITTEE OF THE<br>SOUTHERN BAPTIST CONVENTION,<br><br>        Defendants. | Case No. 3:23-cv-00243<br>Chief Judge Campbell<br>Magistrate Judge Frensley<br><br>**DEFENDANT GUIDEPOST<br>SOLUTIONS LLC's STATEMENT<br>OF MATERIAL FACTS NOT IN<br>DISPUTE PURSUANT TO<br>LOCAL RULE 56.01(b)** |

Defendant Guidepost Solutions LLC ("Guidepost") as and for its statement of material facts not in dispute, pursuant to Rule 56.01(b) of the Local Civil Rules of the United States District Court for the Middle District of Tennessee, states as follows:

## I.     Background to the Dispute

1.    This litigation arises out of a crisis within the Southern Baptist Convention ("SBC"), following the publication of a six-part series of articles in the *Houston Chronicle* titled "Abuse of Faith." (See Declaration of Katharine R. Klein, Exhibit 1, Complaint, ¶¶ 5-6.)[1]

**RESPONSE:**

2.    In 2021 Guidepost was engaged to conduct an investigation into the following topics: "(1) allegations of sexual abuse by the Executive Committee; (2) the Executive Committee's mishandling of sexual abuse allegations; (3) allegations of mistreatment of sexual abuse victims; (4) patterns of intimidation of sexual abuse victims or advocates; and (5) resistance

---

[1] Exhibits labeled numerically correspond to the concurrently filed Declaration of Katharine R. Klein.

to sexual abuse reform initiatives." See Exhibit 2, a copy of the Engagement Agreement dated October 5, 2021 ("Engagement Agreement") between and among (i) Guidepost, (ii) the SBC's Sexual Abuse Task Force (the "SBC Task Force"), and (iii) the SBC Executive Committee. (Klein Declaration, Exhibit 2)

**RESPONSE:**

3.        Under Section 2.1 of the Engagement Agreement, Guidepost's client was the SBC Task Force. (Exhibit 2.)

**RESPONSE:**

4.        Under Section 2.1 of the Engagement Agreement, Guidepost was to "act under the leadership and take direction and guidance from the SBC Task Force," while also engaging with the Committee on Cooperation. (Exhibit 2.)

**RESPONSE:**

5.        Following its investigation, Guidepost prepared and submitted to the SBC Task Force its Report of the Independent Investigation (the "Report"). See Klein Declaration at Exhibit 3.

**RESPONSE:**

II.        **Plaintiff Johnny M. Hunt's Public Profile**

6.        Plaintiff Johnny M. Hunt ("Hunt") is a nationally prominent clergyperson who became the pastor of a Georgia megachurch, First Baptist Church Woodstock. (See Deposition of Johnny M. Hunt ("Hunt Dep."), at 26:13-27:23 attached to Klein Declaration at Exhibit 4.)

**RESPONSE:**

2

7.      From 2008-2010, Hunt was the President of the SBC and "led" the "great commission resurgence" and was the "pinnacle," the "voice," and "face of the Convention." (Exhibit 4, Hunt Dep. at 36:10-22; 40:9-21; Compl., ¶ 2; Am. Answer ¶ 2.)

**RESPONSE:**

8.      Hunt did not need the SBC Presidency to acquire public exposure because he already "had such a platform" due to his high profile as pastor of a Georgia megachurch, such that the "average church-going Southern Baptist in Arkansas" knew who he was. (Exhibit 4, Hunt Dep. at 41:4-17; 42:6-16.)

**RESPONSE:**

9.      Hunt testified that he was "president of the largest evangelical body in America" and "pastoring one of the largest churches in America" and that he had been the "Joseph of the Woodstock church," which is one of the largest churches in America. (Exhibit 4, Hunt 52:6-12; 117:6-7; 124:3-5.)

**RESPONSE:**

10.     From 2008-2010, Hunt was an *ex officio* member of the Executive Committee of the SBC during his term as President. (Exhibit 4, Hunt Dep. at 43:21-44:2; Compl., ¶ 58.)

**RESPONSE:**

11.     Hunt claims that Guidepost included him in the Report as the "fall guy" for the denomination "because [Guidepost] not only found one, **they found one that everyone in the convention knew**. And not because I had been the president **but because I had addressed that convention 20 years in a row**, which speaks of the integrity of my life up until this one thing." (Exhibit 4, Hunt Dep. at 148:19-149:6.) (emphasis supplied.)

**RESPONSE:**

3

### III. Hunt's Alleged Sexual Abuse of Jane Doe in July 2010

12.     On July 25, 2010, Hunt had an extramarital sexual encounter with Jane Doe, the wife of another Baptist clergyperson, in a condo in Panama City Beach, Florida. (Exhibit 4, Hunt Dep. at 63:8-67:3; 213:11-20; 216:4-25; 218:16-219:13.)

**RESPONSE:**

13.     Jane Doe was staying in the condo next door to where Hunt and his family were staying. (Exhibit 4, Hunt Dep. at 64:10-65:3.)

**RESPONSE:**

14.     Hunt stated in his deposition that, after speaking to Jane Doe across the balconies of the adjoining units, Hunt entered Jane Doe's condo, where he fondled and kissed Jane Doe's exposed breast "for a couple of minutes" and pulled down her shorts, "probably to her knees" before the encounter abruptly ended. (Exhibit 4, Hunt Dep. at 216:17-217:6; 218:16-18; 219:11-13.)

**RESPONSE:**

### IV. Guidepost's Interview of Jane Doe, Hunt, and Other Witnesses Regarding the Alleged Sexual Assault

15.     In or about February 2022, Jane Doe's husband approached Guidepost with information about the 2010 encounter between Hunt and Jane Doe. This was the first time the investigators heard of an allegation against Hunt. (Exhibit 5, Holske Dep. at 64:12-16; 83:12-16.)

**RESPONSE:**

16.     Starting on March 31, 2022, Guidepost investigators Russell Holske ("Holske")[2] and Samantha Kilpatrick ("Kilpatrick")[3] interviewed and then spoke to Jane Doe and her husband about the encounter on several occasions, separately and together, as well as about subsequent meetings that took place shortly after the encounter that included Jane Doe, her husband, Hunt, his wife, and a marriage counselor who was an ordained minister on the staff of First Baptist Church Woodstock, Roy Blankenship ("Blankenship"). (Exhibit 5, Holske Dep. at 64:8-19; ████████████ ████████████.)

**RESPONSE:**



**RESPONSE:**

---

[2]     Before joining Guidepost, Holske was regional director of investigations, security, and trademark protection for Estee Lauder. Previously, he was an agent for the Drug Enforcement Administration for 32 years. (Exhibit 5, Holske Dep. at 7:17-8:20.)

[3]     Before joining Guidepost, Kilpatrick was an attorney in the Wake County district attorney's office for several years and was then an attorney in private practice. In both government and private practice she has worked extensively with survivors over the years and is trained to deal with trauma situations. (Exhibit 7, Kilpatrick Dep. at 10:20-12:5; 182:7-15.)

5



**RESPONSE:**

19. Jane Doe and her husband identified three witnesses in addition to Hunt and Blankenship who had information relevant to the incident between Hunt and Jane Doe described in the Report. These witnesses were Southern Baptist clergypersons who were friends and acquaintances of Jane Doe's husband. (Exhibit 7, Kilpatrick Dep. at 246:21-247:21; 248:14-20; 250:9-19; 251:2-20; 252:15-253:12; Exhibit 5, Holske Dep. at 48:18-49:11; 50:7-13; 53:17-54:9; 56:9-57:7; 94:19-95:11.)

**RESPONSE:**

20. Guidepost interviewed the three witnesses. The three witnesses confirmed that Jane Doe's husband advised them at various points after the encounter, including in 2010, 2012, and in or around 2018, that Hunt had a sexual encounter with his wife, and the Guidepost investigators included what they heard from the witnesses in the Report. (Exhibit 7, Kilpatrick Dep. at 246:21-

6

247:21; 248:14-20; 250:9-19; 251:2-20; 252:15-254:22; Exhibit 5, Holske Dep. at 48:18-49:11; 50:7-13; 53:17-54:9; 56:9-57:7; 94:19-95:11.).

**RESPONSE:**

21.     Holske and Kilpatrick interviewed Blankenship on or about May 9, 2022. (Exhibit 5, Holske Dep. at 148:7-11; Exhibit 8, Blankenship Dep. at 27:6-28:1; 55:20-56:5.)

**RESPONSE:**

22.     Blankenship admitted that the Guidepost investigators questioned him for about 45 minutes about his involvement in the matter. (Exhibit 8, Blankenship Dep. at 65:12-18.)

**RESPONSE:**

23.     Blankenship confirmed that the Guidepost investigators asked him about the July 25, 2010 incident between Jane Doe and Hunt at the Panama City Beach condo, as well as a subsequent meeting he held with Jane Doe, her husband, and Hunt on August 2, 2010, at the husband's church office. (Exhibit 8, Blankenship Dep. at 41:1-5; 44:6-21; 59:22-60:3; 62:5-64:15.)

**RESPONSE:**

24.     Blankenship confirmed that he answered the investigators' questions regarding the July 25, 2010 sexual encounter and the August 2, 2010 meeting. (Exhibit 8, Blankenship Dep. at 59:22-60:3; 62:5-64:15.)

**RESPONSE:**

25.     Blankenship also confirmed that the Guidepost investigators asked him about a second meeting that took place on or about August 5, 2010, this time with Jane Doe, her husband, Hunt and his wife at Blankenship's office at his counseling facility, HopeQuest, and that Blankenship answered the investigators' questions about that meeting. (Exhibit 8, Blankenship Dep. at 62:5-20; 63:17-64:15.)

7

**RESPONSE:**

26.     Blankenship invoked priest/penitent privilege and therefore generally declined to confirm or deny the accuracy of the Report's account of his precise responses concerning what Jane Doe, her husband, and the Hunts told him about the encounter itself or what was said during their subsequent meetings. (Exhibit 8, Blankenship Dep. at 39:5-18; 41:10-23; 42:1-7; 58:3-8; 58:20-59:21; 60:4-9; 61:9-62:4; 62:21-63:5; 64:24-65:9.)

**RESPONSE:**

27.     Blankenship was clear that the investigators questioned him extensively about those topics and that he answered their questions when they interviewed him, stating that they were "assertive" and "pushy" and wanted to probe for any information they could get from him regarding the encounter and his meetings with Jane Doe, her husband and the Hunts. (Exhibit 8, Blankenship Dep. at 66:7-67:14.)

**RESPONSE:**

28.     Blankenship testified that there was no moment when he felt relieved that the investigators failed to ask him a question that he did not want to answer and, by the same token, he did not have the impression that they failed to ask him a question that they should have asked. (Exhibit 8, Blankenship Dep. at 67:7-14.)

**RESPONSE:**

29.     Guidepost interviewed Hunt on two occasions, first on April 26, 2022, and again on May 12, 2022. (Exhibit 4, Hunt Dep. at 114:16-22; 125:9-13.)

**RESPONSE:**

30.     Hunt testified that the Report accurately stated that, "during the first interview, Dr. Hunt did acknowledge that, during his publicly-announced extended sabbatical, he was under the

care of Mr. Blankenship," and that the sabbatical followed his sexual encounter with Jane Doe; and that Hunt's 2010 sabbatical was, in conjunction with Hunt's prior cancer recovery, directly related to his sexual encounter with Jane Doe "because that's when it happened." (Exhibit 4, Hunt Dep. at 123:5-124:24, 157:23-158:7; Exhibit 3, Report at 158.)

**RESPONSE:**

31.     During the second of the two interviews on May 12, 2022, Guidepost asked Hunt a series of questions about his sexual encounter with Jane Doe, as well as his prior relationship with Jane Doe and her husband, and his meetings with Blankenship, Jane Doe, and her husband following the encounter. (Exhibit 4, Hunt Dep. at 160:2-179:3; Exhibit 3, Report at 158-161.)

**RESPONSE:**

32.     During his deposition, Hunt confirmed that, with few exceptions, the Report accurately recorded questions that the investigators put to him on the following topics and that the Report accurately recorded his responses to the investigators to those questions. The portions of the Report concerning which Hunt testified at his deposition are set forth below in the order in which he was questioned; italicized portions indicate that Hunt acknowledged being questioned on those topics and that the Report accurately recorded his answer. The portions not italicized signify that Hunt denied being asked those questions by the investigators and/or disputes having given the response:

> ***During the first interview, Dr. Hunt did acknowledge that, during his publicly announced extended sabbatical, he was under the care of Mr. Blankenship.*** When asked if the sabbatical was at all related to a sexual abuse matter, he replied in the negative. Investigators asked Dr. Hunt several questions about [Jane Doe's husband's] church, without identifying [Jane Doe's husband]. They asked if Dr. Hunt knew the circumstances of the resignation of the senior pastor at that church, who suddenly and without explanation resigned in 2010. Dr. Hunt stated that he did not know who [Jane Doe's husband] was, or why he had resigned. (Exhibit 4, Hunt Dep. at 121:15-123:4; 157:23-158:7; 158:15-159:11; 161:8-14; Exhibit 3, Report at 158.)

*[During the second interview] Guidepost investigators explained to Dr. Hunt that they had received an allegation of abuse involving him and [] if he knew what they were talking about; Dr. Hunt responded that he was "totally in the dark."* (Hunt Dep. at 160:7-19; Exhibit 3, Report at 158.)

*In the second interview, Dr. Hunt acknowledged this time that he knew [Jane Doe's husband]. Dr. Hunt stated that he had known the couple for at least twenty years, that [Jane Doe's husband] had been converted under his ministry, and that Dr. Hunt had been a strong influence on [Jane Doe's husband's] life. For a time, they pastored churches in the same state.* (Exhibit 4, Hunt Dep. at 160:20-161:17; Exhibit 3, Report at 158.)

*Dr. Hunt remembered Survivor texting him a picture of the pier saying that she was there. When asked if he knew where she was, Dr. Hunt said that unbeknownst to him Survivor had rented the condo next door, but he had no role in that. He stated that he has no idea who owned the condo next door because the building is mostly rentals.* (Exhibit 4, Hunt Dep. at 161:18-162:2; 162:15-164:13; Exhibit 3, Report at 159.)

*When asked if he had any contact with Survivor while he was there, he responded that it was very brief on the balcony. While on the balcony he remembers Survivor telling him about going to see Bobby Bowden speak that morning but did not remember her saying what else she did that day before getting to the beach. (Both Dr. Hunt and Survivor described the balconies as side by side but you could not walk through to the other.) Dr. Hunt was asked whether he went onto her balcony or entered her condo and he responded he never entered her condo and was never on her balcony.* (Exhibit 4, Hunt Dep. at 164:16-165:21; Exhibit 3, Report at 159.)

*Dr. Hunt said that after seeing Survivor out on the balcony he did not have any further contact with Survivor during the time she was there. However, later in the interview he stated that he saw her the next day on the beach and then the following day his wife said something to her.* And he does not know whether she changed places or just went home. (Exhibit 4, Hunt Dep. at 165:15-166:5; Exhibit 3, Report at 159.)

*Dr. Hunt said that he did not have any physical contact with Survivor – "no contact whatsoever." He also restated that it was not true that he was on the balcony or in the condo. When asked specifically about whether he kissed her, pulled at her shorts, or fondled her, he said no.* He denied sexualized comments about her appearance, panties, tan lines, or perfume. (Exhibit 4, Hunt Dep. at 166:12-167:14; Exhibit 3, Report at 159.)

*Hunt further admitted that he told Jane Doe at the time that her perfume smelled nice.* (Exhibit 4, Hunt Dep. at 167:8-14; Exhibit 3, Report at 159.)

*Dr. Hunt shared that his wife was uncomfortable with Survivor next door by herself because it just did not look right that she was down there all alone. At some point, he thinks his wife may have said something to Survivor, and that all he knew was that Survivor was not there anymore.* (Exhibit 4, Hunt Dep. at 167:15-168:18; Exhibit 3, Report at 159-160.)

*When asked whether his wife was there the whole time with him, he stated that there may have been a brief time that she was not there because of an event at Southeastern Baptist Theological Seminary where she may have flown in and out in one day or the next day. He said it was possible that she was not there some of the time that Survivor was there.* (Exhibit 4, Hunt Dep. at 168:19-169:4; Exhibit 3, Report at 160.)

*When asked if he contacted Mr. Blankenship, the counselor, because there was a problem between [Jane Doe's husband] and Survivor, he said that he did not contact him in regard to that but just for general help because [Jane Doe's husband] was transitioning in ministry and Dr. Hunt had always been a sounding board for him.* (Exhibit 4, Hunt Dep. at 169:5-12; Exhibit 3, Report at 160.)

*Dr. Hunt remembers only one meeting with the couple on August 2, 2010. He said the meeting was brief and that he and his wife, along with [Jane Doe's husband] and Survivor and Mr. Blankenship were present. Dr. Hunt claims that he never directed the couple towards Mr. Blankenship for counseling.* (Exhibit 4, Hunt Dep. at 169:13-170:22; Exhibit 3, Report at 160.)

*Dr. Hunt said that he did not apologize to Survivor for sexually assaulting her during this meeting because there was no contact between the two of them.* He denied saying "Praise Jesus that I didn't consummate the relationship." If there was an apology, Dr. Hunt believed it was related to Mrs. Hunt offending Survivor about being concerned with her being there alone, and them apologizing for her having to leave. He stated that "Someone has created a story on me. I would like to hear her story on this." (Exhibit 4, Hunt Dep. at 170:23-171:5; 171:20-172:24; 175:1-176:4; Exhibit 3, Report at 160.)

*Dr. Hunt said that Survivor had never come on to him and he never felt threatened by her. Dr. Hunt stated that he and [Jane Doe's husband] have stayed in contact over the years. Investigators asked Dr. Hunt if there were any similar allegations with other women. Dr. Hunt answered no.* (Exhibit 4, Hunt Dep. at 176:10-21; Exhibit 3, Report at 160.)

*Several times during the interview, Guidepost investigators directly asked Dr. Hunt about specific allegations of sexual abuse against the Survivor, controlling the narrative through the use of an unlicensed therapist, and trying to protect his ministry, 40,000 churches, and the SBC, all of which he denied.* (Exhibit 4, Hunt Dep. at 176:22-178:4; Exhibit 3, Report at 160.)

*The investigators asked Dr. Hunt if there was anyone else he thought we should speak with about the matter, and he said the only ones who would know would be the couple and Mr. Blankenship. The investigators asked if he thought his wife would speak with us and he replied no, saying that he doubts his wife would speak to us because her take was that we handled it and moved on.* Investigators understood this to mean that Dr. Hunt had apologized for the fact that his wife had upset Survivor by telling her to leave. Throughout the interview, Dr. Hunt remained very calm, expressed little to no emotion, did not get upset, did not raise his voice, or express outrage at the allegations. (Exhibit 4, Hunt Dep. at 178:9-179:9; Exhibit 3, Report at 160-161.)

**RESPONSE:**

33.     The Guidepost investigators gave Hunt the opportunity to supplement what he told them within 48 hours, but he did not do so. (Exhibit 4, Hunt Dep. at 104:16-18; 268:2-15.)

**RESPONSE:**

34.     Instead, shortly after his interview with the Guidepost investigators, Hunt engaged lawyers to raise the possibility of litigation with Guidepost if they delivered the Report to the SBC with Jane Doe's account of sexual abuse Doe in her condo. (Exhibit 4, Hunt Dep. at 272:9-12; 275:1-13 & Exhibit 9 [Defendants' Exhibit 11].)

**RESPONSE:**

35.     Hunt's counsel did not advise Guidepost that Jane Doe had initiated the encounter, that it was consensual, or otherwise point to any anticipated falsehoods in the Report but confined their complaint to the suggestion that the Guidepost investigators had failed to convey an *Upjohn* warning to Hunt. (Exhibit 4, Hunt Dep. at 272:9-12; 274:21-276:3 & Exhibit 9 [Defendants' Exhibit 11].)

**RESPONSE:**

36.     Guidepost was not called upon to determine whether the sexual encounter was consensual, since Hunt denied that any sexual encounter ever occurred with Jane Doe. (Exhibit 10, Wood Dep. at 161:20-162:23; 169:17-19; 170:16-18.)

**RESPONSE:**

37.     Guidepost followed industry standards in planning and conducting interviews of each of the relevant witnesses and did so under circumstances of complete independence. (Exhibit

12

<u>11</u>, Deposition of Douglas Leff, SI Global Partners, at 14:5-20:18; 27:14-28:2; 75:23-81:9; 165:5-167:6; 180:3-182:1; 201:23-204:4-230:15-232:13.)[4]

**RESPONSE:**

## V. Guidepost's Submission of the Factual Portions of the Report Regarding Hunt to the Committee on Cooperation and the SBC Task Force

38.     Pursuant to <u>Section 3.5</u> of the Engagement Agreement, for the sole purpose of ensuring the factual accuracy of the Report, Guidepost was to show factual portions of the Report to the Committee on Cooperation and the SBC Task Force. (<u>Exhibit 2</u>.)

**RESPONSE:**

39.     At first, Guidepost provided drafts of factual portions of the majority of the Report to both the Committee on Cooperation and the SBC Task Force but at that time Guidepost had not yet completed Hunt's second interview. (<u>Exhibit 12</u>, Guidepost 30(b)(6) Dep. at 128:16-129:20.)

**RESPONSE:**

40.     At that time, Hunt's section of the Report was still being reviewed and edited by Guidepost personnel. (<u>Exhibit 12</u>, Guidepost 30(b)(6) Dep. at 130:6-131:2.)

**RESPONSE:**

41.     Then, on May 12, 2022, in accordance with the Engagement Agreement, Guidepost provided the factual portions of the Report to the SBC Task Force with the Hunt allegations via a password-protected file.  (<u>Exhibit 13</u>, GP_23,422-GP_23,424; <u>Exhibit 10</u>, Wood Dep. 428:15-430:4.)

---

[4]     Mr. Leff is a Managing Director of SI Global Partners. Previously, he was served as a Special Agent with the Federal Bureau of Investigation (FBI) from 1996-2022, starting at the New York Organized Crime Branch and ultimately serving as Assistant Director in Charge of the Inspection Division, the top internal compliance investigative position in the agency. His work in the Inspection Division involved reviewing the adequacy of prior investigations. (<u>Exhibit 11</u>, Deposition of Douglas Leff, SI Global Partners, at 8:1-9:25; 10:22-11:6.)

**RESPONSE:**

42. Then, on May 13, 2022, Guidepost showed factual portions of the Report that contained references to Hunt's encounter with Jane Doe in a confidential Zoom meeting with members of the Committee on Cooperation present. (Exhibit 12, Guidepost 30(b)(6) Dep. at 152:3-12.)

**RESPONSE:**

43. Neither the Committee on Cooperation nor the SBC Task Force disputed any factual information presented in the Hunt portion of the Report. (Exhibit 10, Wood Dep. at 431:13-432:18.

**RESPONSE:**

**VI.  Guidepost Submits the Report to the SBC Task Force, Which Publishes the Report on its Own Website**

44. On or about May 15, 2022, Guidepost delivered its Report of the Independent Investigation (the "Report") to the SBC Task Force. (Exhibit 3.)

**RESPONSE:**

45. Guidepost did not transmit the Report to any other person. (Exhibit 12, Guidepost 30(b)(6) Dep. at 145:12-146:1; 148:4-12; 152:3-19; 159:21-160:18; Exhibit 10, Wood Dep. 95:15-21; 429:2-430:11.)

**RESPONSE:**

46. Hunt admitted in his deposition that he has no evidence that Guidepost ever published the Report other than to submit it to the SBC Task Force pursuant to the Engagement Agreement. (Exhibit 4, Hunt Dep. at 292:11-17; 294:6-295:10.)

**RESPONSE:**

14

47.    The Report contained not only the allegations by Jane Doe, her husband, and the other witnesses, but also related Hunt's categorical denial of a sexual encounter. (Exhibit 3, Report at 159-160.)

**RESPONSE:**

48.    The Report was never hosted on the Guidepost website at any time. Rather, Guidepost placed at the top of its own website an "SBC EC" tab. When a person clicked on that hyperlink, the visitor immediately left the Guidepost website and was taken to website of the *SBC Task Force*, which, in turn, hosted the Report. Once there, the viewer would have to scroll down the SBC Task Force website past certain updates to the SBC community until coming to yet *another* hyperlink, which only would then display the Report. Again, by this point the visitor was no longer on the Guidepost website. In other words, the Report was "published," not by Guidepost, but by the SBC Task Force in accordance with the Engagement Agreement. (Exhibit 12, Guidepost 30(b)(6) Dep. at 146:8-147:8, 204:11-206:7; 235:12-236:13; Exhibit 10, Wood Dep. at 201:17-203:6, 216:4-217:20.)[5]

**RESPONSE:**

49.    On or about May 22, 2022, the SBC Task Force—not Guidepost—published the Report on the SBC Task Force's website. (Exhibit 12, Guidepost 30(b)(6) Dep. at 146:8-147:8; 235:12-236:13; Exhibit 10, Wood Dep. at 201:17-203:6.)

**RESPONSE:**

---

[5]    Guidepost's designated witness pursuant to Fed. R. Civ. P. 30(b)(6) was its Executive Vice President, Krista Tongring. Among her other qualifications, Ms. Tongring had over six years of experience at the DEA and over five years experience as a trial attorney at the Department of Justice. She previously clerked in the United States District Court for the District of New Jersey. (Exhibit 12, Guidepost 30(b)(6) Dep. at 11:5-14; 15:12-21; Exhibit 15 [Deposition Exhibit 105.])

15

50.     Moreover, Jonathan Howe, who testified on behalf of the Executive Committee of the Southern Baptist Convention, stated that he personally uploaded and published the Report through an online server after receiving an "embargoed" copy from Bruce Frank, Chairman of the SBC Task Force. (Exhibit 14, Deposition of Jonathan Howe, at 69:3-18; 69:22-70:24; 71:3-19; 71:23-72:24; 77:8-17, 223:9-224:8.)

**RESPONSE:**

51.     The only parties to whom Guidepost delivered the Report, or any part of it, were the Committee on Cooperation and the SBC Task Force. (Exhibit 12, Guidepost 30(b)(6) Dep. at 145:12-146:1; 148:4-12; 152:3-19; 159:21-160:18; Exhibit 10, Wood Dep. 429:2-430:11.)

**RESPONSE:**

**VII.     Hunt Discloses His Sexual Encounter With Jane Doe After the SBC Task Force Publishes the Report and Admits He Never told the Guidepost Investigators the Truth About his Encounter With Jane Doe**

52.     As of May 20, 2022—after the Report had already been submitted to the SBC Task Force and a mere two days before it was released to the public on the SBC Task Force's website— Hunt conceded that *"the investigators did not even know [his] version of what happened."* (Exhibit 4, Hunt Dep. at 275:18-276:3.)

**RESPONSE:**

53.     Hunt never told the Guidepost investigators that Jane Doe initiated the encounter. (Exhibit 4, Hunt Dep. at 277:17-20.)

**RESPONSE:**

54.     After the publication of the Report by the SBC Task Force, Hunt wrote to his congregation on May 27, 2022 releasing his statement regarding the "Task Force Report." (Exhibit 4, Hunt Dep. at 188:12-191:5; and Exhibit 16 [Defendants' Deposition Exhibit 16].)

**RESPONSE:**

55.     While Hunt had told the Guidepost investigators that he had no physical contact with Jane Doe, he told his congregation that "I allowed myself to get too close to a compromising situation with a woman who was not my wife" in what he referred to as a "brief, consensual encounter." (<u>Exhibit 4</u>, Hunt Dep. at 189:15-23; 193:1-11; <u>Exhibit 16</u> [Defendants' Exhibit 16].)

**<u>RESPONSE:</u>**

56.     Hunt also wrote, "***I also am sorry I wasn't more forthcoming with the interviewers*** because it made a bad situation worse. I guess I was just so surprised and so shocked by the allegations of abuse that I shut down." (emphasis supplied) (<u>Exhibit 4</u>, Hunt Dep. at 193:12-21; <u>Exhibit 16</u>, [Defendants' Exhibit 16].)

**<u>RESPONSE:</u>**

57.     Although he told the Guidepost investigators that he had no physical contact with Jane Doe, Hunt admits in his Complaint that he had an "inappropriate, extramarital encounter" with his accuser involving what he termed "kissing and some awkward fondling" and alleges was initiated by his accuser. (<u>Exhibit 1</u>, Compl., ¶¶ 3, 53.)

**<u>RESPONSE:</u>**

58.     Hunt did not tell the Guidepost investigators that Jane Doe had tempted and seduced him and instead denied any physical contact whatsoever. (<u>Exhibit 4</u>, Hunt Dep. at 275:9-276:3; 277:10-20.)

**<u>RESPONSE:</u>**

59.     Hunt denied that he had left his balcony to be with Jane Doe. (<u>Exhibit 4</u>, Hunt Dep. at 141:19-142:11.)

**<u>RESPONSE:</u>**

17

60.     Hunt's explanation as to why he denied to the Guidepost investigators that he had engaged in physical sexual contact and did not explain that Jane Doe had initiated the sexual encounter is that he felt "ambushed" and that he was saying "no" to what he deemed to be an overall "false narrative." (Exhibit 4, Hunt Dep. at 102:4-103.23; 138:3-141:22.)

**RESPONSE:**

## VIII.     Guidepost Published the Challenged Statements In Good Faith and Without Malice

61.     Guidepost investigator Russell Holske confirmed that, in or around May 4, 2022, 18 days before Guidepost delivered the Report to the SBC Task Force in, Guidepost was not going to include Johnny Hunt in the Report because Guidepost had only spoken with Jane Doe and her husband and had not yet spoken with corroborating witnesses. (Exhibit 5, Holske Dep. at 198:5-204:17.)

**RESPONSE:**

62.     Mr. Holske testified that because Guidepost needed to be fair to Hunt, he gave Hunt "the same opportunity to provide hours and hours of detail on his version of the events, but [Hunt] denied any physical contact whatsoever." (Exhibit 5, Holske Dep. at 307:5-13.)

**RESPONSE:**

63.     Mr. Holske also testified, when asked whether the Report was in favor of Jane Doe's and her husband's version of events over Hunt's denial, that "Guidepost Solutions had no agenda in investigating the allegations against Dr. Hunt. If Roy Blankenship had not talked to us, if Dr. Hunt had not talked to us the second time, we were comfortable with the report not going in as it relates to Dr. Hunt." (Exhibit 5, Holske Dep. at 253:20-254:10.)

**RESPONSE:**

18

64.     Guidepost's CEO, Julie Myers Wood, and investigator Kilpatrick both testified that had Hunt claimed his encounter with Jane Doe was consensual encounter rather than falsely denying the encounter happened at all, Hunt would not have been included in the Report. (<u>Exhibit 10</u>, Wood Dep. at 199:10-200:10, 246:1-9; <u>Exhibit 7</u>, Kilpatrick Dep. at 303:11-304:10.)[6]

**RESPONSE:**

65.     Guidepost asked Hunt if there were other witnesses who they could talk to who could corroborate his denial, and Hunt had no other individuals except Jane Doe, her husband, and himself – individuals Guidepost interviewed. (<u>Exhibit 10</u>, Wood Dep. at 241:6-19; <u>Exhibit 4,</u> Hunt Dep. at 267:10-19.)

**RESPONSE:**

### IX.     <u>Hunt Has Not Experienced Severe Emotional Distress</u>

66.     Hunt went to an "intensive workshop" shortly after the SBC Task Force published the Report, but he rejected medication because he "didn't want medication to make me feel what I am not. I want to feel this and work through it." (<u>Exhibit 4</u>, Hunt Dep. at 256:6-257:16; 258:2-5.)

**RESPONSE:**

---

[6]     Ms. Wood's qualifications include having clerked in the United States Court of Appeals for the Eighth Circuit for Hon. C. Arlen Beam, following which she worked at Mayer, Brown, & Platt. Subsequently, Ms. Wood was employed by the Office of Independent Counsel and worked on the Monica Lewinsky matter. Ms. Wood later worked at the U.S. Attorney's Office for the Eastern District of New York, and the United States Treasury Department. Ms. Wood was later Chief of Staff for Michael Chertoff, and then the United States Commerce Department as Assistant Secretary for Export Enforcement. Ms. Wood was later worked in the White House for President George W. Bush, and was subsequently the Assistant Secretary for Immigration and Customs Enforcement with the United States Department of Homeland Security. (<u>Exhibit 10</u>, Wood Dep. at 10:3-12:2; 14:6-19; 15:10-15; 16:7-14; 17:5-18:15.)

67.    Hunt has continued a steady schedule of preaching, traveling, and attending conferences. (Exhibit 18, Johnny Hunt Ministries 30(b)(6) Dep., 59:2-64:23.)

**RESPONSE:**

X.    **Hunt Can Not Claim Damages Related To Non-Profit Johnny Hunt Ministries, Inc.**

68.    Hunt's Expert, Lamar Barden, issued an expert report stating that all revenues derived from speaking engagements, publications and other ministry related activities belonged to non-profit Johnny Hunt Ministries, Inc. ("JHM"). Exhibit 19, Barden Expert Report.

**RESPONSE:**

69.    All of Hunt's book deals proceeds went to JHM, as well as all proceeds from speaking engagements. (Exhibit 4, Hunt Dep. at 85:23-86:2; 267:4-7)

**RESPONSE:**

70.    As of April 18, 2024, the date of Hunt's deposition, Hunt only began "[p]robably in the last five weeks, maybe not even five weeks," to direct individuals to pay him, as opposed to JHM, for speaking engagements and other revenue generating activities. (Exhibit 4, Hunt Dep. 85:21-86:13.)

**RESPONSE:**

71.    Janet Hunt, testifying as JHM's 30(b)(6) witness, admitted that the purpose of JHM was for mission work, the propagation of the gospel of Jesus Christ, getting the message out and supporting the church. It was not to enrich any particular individual. (Exhibit 18, Johnny Hunt Ministries 30(b)(6) Dep. at 14:23-15:15.)

**RESPONSE:**

72.    JHM has never paid any income to Hunt. (Exhibit 18, Johnny Hunt Ministries 30(b)(6) Dep. at 28:2-13.)

20

**RESPONSE:**

Respectfully submitted,

**RILEY & JACOBSON, PLC**

*s/John R. Jacobson*

John R. Jacobson, Esq. (BPR # 014365)
Katharine R. Klein, Esq. (BPR # 019336)
1906 West End Avenue
Nashville, TN 37203
Telephone: (615) 320-3700
jjacobson@rjfirm.com
kklein@rjfirm.com

-and-

**MINTZ & GOLD LLP**
Steven G. Mintz (admitted pro hac vice)
Terence W. McCormick (admitted pro hac vice)
Scott Klein (admitted pro hac vice)
Alex Otchy (admitted pro hac vice)
600 Third Avenue
25th Floor
New York, NY 10016
Telephone: (212) 696-4848
mintz@mintzandgold.com
mccormick@mintzandgold.com
klein@mintzandgold.com
otchy@mintzandgold.com

*Counsel for Guidepost Solutions LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served through the Court's electronic filing system on the following:

Todd G. Cole, Esq. (BPR # 031078)
Andrew Goldstein, Esq. (BPR # 037042)
COLE LAW GROUP, P.C.
1648 Westgate Circle, Suite 301
Brentwood, TN 37027
Telephone: (615) 326-9059
tcole@colelawgrouppc.com
agoldstein@colelawgrouppc.com

Robert D. MacGill, Esq. (Ind. Bar. 9989-49)
Patrick J. Sanders, Esq. (Ind. Bar. 36950-29)
MACGILL PC
156 E. Market St. Suite 1200
Indianapolis, IN 46204
Telephone: (317) 721-1253
robert.macgill@macgilllaw.com
patrick.sanders@macgilllaw.com

*Counsel for Plaintiff*

Scarlett Singleton Nokes, Esq.
R. Brandon Bundren, Esq.
E. Todd Presnell
BRADLEY ARANT BOULT CUMMINGS LLP
ONE 22 ONE
1221 Broadway, Suite 2400
Nashville, Tennessee 37203
Telephone: (615) 244-2582
snokes@bradley.com
bbundren@bradley.com
tpresnell@bradley.com

Gene R. Besen, Esq.
BRADLEY ARANT BOULT CUMMINGS LLP
Fountain Place
1445 Ross Avenue, Suite 3600
Dallas, Texas 75202
Telephone: (214) 257-9758
gbesen@bradley.com

Thomas J. Hurney, Jr., Esq.
Gretchen M. Callas, Esq.
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
Post Office Box 553
Charleston, West Virginia 25322
Telephone: 304-340-1000
thurney@jacksonkelly.com
gcallas@jacksonkelly.com

*Counsel for the Executive Committee of the Southern Baptist Convention*

L. Gino Marchetti, Jr., Esq.
Matt C. Pietsch, Esq.
TAYLOR, PIGUE, MARCHETTI & BLAIR, PLLC
2908 Poston Avenue
Nashville, TN 37203
Telephone: (615) 320-3225
gmarchetti@tpmblaw.com
matt@tpmblaw.com
*Counsel for the Southern Baptist Convention*

on this 3rd day of July, 2024.

*s/John R. Jacobson*

22