# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOHNNY M. HUNT,                          )
                                         )
        Plaintiff,                       )
                                         )C.A. No.
vs.                                      )3:23-cv-00243
                                         )
SOUTHERN BAPTIST CONVENTION;             )
GUIDEPOST SOLUTIONS LLC; and             )
EXECUTIVE COMMITTEE OF THE               )
SOUTHERN BAPTIST CONVENTION,             )
                                         )
                                         )
        Defendants.                      )


HYBRID VIDEOTAPED DEPOSITION OF
JOHNNY HUNT
April 18, 2024
9:01 a.m.


Bradley Arant Boult Cummings LLP

1230 Peachtree Street NE

20th Floor

Atlanta, GA 30309

Robin K. Ferrill, CCR-B-1936, RPR
Magna Legal Services
866.624.6221
www.MagnaLS.com

```
 1              APPEARANCES OF COUNSEL
 2   On behalf of the Plaintiff
     ROBERT D. MacGILL, Esquire
 3   PATRICK J. SANDERS, Esquire
          MACGILL PC
 4        156 E. Market Street
          Suite 1200
 5        Indianapolis, Indiana 46204
          robert.macgill@macgilllaw.com
 6        patrick.sanders@macgilllaw.com
 7
 8   On behalf of the Defendant Southern Baptist Convention
     MATTHEW C. PIETSCH, Esquire (Via Zoom)
 9        TAYLOR, PIQUE, MARCHETTI & BLAIR, PLLC
          2908 Poston Avenue
10        Nashville, Tennessee 37203
          matt@tpmblaw.com
11
12
13   On behalf of Guidepost Solutions, LLC
     SCOTT A. KLEIN, Esquire
14   TERENCE W. McCORMICK, Esquire
     ALEX OTCHY, Esquire (Via Zoom)
15        MINTZ & GOLD LLP
          600 Third Avenue
16        25th Floor
          New York, New York 10016
17        mintz@mintzandgold.com
          mccormick@mintzandgold.com
18
     and
19
20   KATHERINE R. KLEIN, Esquire (Via Zoom)
          RILEY & JACOBSON, PLC
21        1906 West End Avenue
          Nashville, Tennessee 37203
22        kklein@rjfirm.com
23
24
25
```

MAGNA
LEGAL SERVICES

```
 1              APPEARANCES CONTINUED:
 2   On behalf of the Defendant Executive Committee of the
     Southern Baptist Convention
 3   SCARLETT SINGLETON NOKES, Esquire
          BRADLEY ARANT BOULT CUMMINGS LLP
 4        1221 Broadway
          Suite 2400
 5        Nashville, Tennessee 37203
          615.244.3556
 6        snokes@bradley.com
 7
 8   GENE R. BESEN, Esquire (pro hac vice)
          BRADLEY ARANT BOULT CUMMINGS LLP
 9        1445 Ross Avenue
          Suite 3600
10        Dallas, Texas 75202
          214.257.9800
11        gbesen@bradley.com
12
13   GRETCHEN M. CALLAS, Esquire (pro hac vice)
          JACKSON KELLY PLLC
14        500 Lee Street East
          Suite 1600
15        Charleston, West Virginia 25322
          304.340.1000
16        gcallas@jacksonkelly.com
17
18   ALSO PRESENT:
19        Safaa Sammander, Videographer
20        Jon Anderson  (Via Zoom)
21
22
23
24
25
```

MAGNA
LEGAL SERVICES

1                          INDEX

2              HYBRID VIDEOTAPED DEPOSITION OF

3                        JOHNNY HUNT

4                      April 18, 2024

5    EXAMINATION BY                                    PAGE

6    Ms. Nokes                                            8

7    Mr. Klein                                          222

8    Mr. MacGill                                        296

9

                    DESCRIPTION OF EXHIBITS

10

     DEFENDANTS' EXHIBIT   IDENTIFICATION              PAGE

11

12   Exhibit 1    2014 Tax Returns                      71

13   Exhibit 2    2015 Tax Returns                      71

14   Exhibit 3    2016 Tax Returns                      72

15   Exhibit 4    2017 Tax Returns                      73

16   Exhibit 5    2018 Tax Returns                      73

17   Exhibit 6    2019 Tax Returns                      74

18   Exhibit 7    2020 Tax Returns                      75

19   Exhibit 8    2021 Tax Returns                      76

20   Exhibit 9    2022 Tax Returns                      77

21   Exhibit 10   Notes of Guidepost Investigators,    126

22                5/12/22, 12:15 ET

23   Exhibit 11   Letter to Kilpatrick from Lietz      153

24                and Bouchard, 5/20/22

25

**MAGNA**

**LEGAL SERVICES**

1                    INDEX CONTINUED

2                 DESCRIPTION OF EXHIBITS

3    DEFENDANTS' EXHIBIT   IDENTIFICATION              PAGE

4    Exhibit 12   Guidepost Report of the          156

5                 Independent Investigation, 5/15/22

6    Exhibit 13   Article from The Baptist Paper    181

7                 entitled, Hunt Denies Allegations

8                 of Abuse

9    Exhibit 14   NAMB Statement, 5/22/22           183

10   Exhibit 15   Letter to Dear SBC Family from    185

11                Thomas and Ezell, 5/25/22

12   Exhibit 16   Letter to Dear First Baptist      188

13                Woodstock from Johnny Hunt,

14                5/27/22

15   Exhibit 17   Complaint                         207

16   Exhibit 18   Letter to Bundren from MacGill,   238

17                12/14/23

18   Exhibit 19   Letter to Jacobson and Mintz from 240

19                MacGill, 1/15/24

20   Exhibit 20   Plaintiff's Response to Guidepost 245

21                Solutions LLC's First Set of

22                Interrogatories

23   Exhibit 21   Letter to McCormick from Rawlings, 250

24                3/22/24

25

MAGNA
LEGAL SERVICES

1                    INDEX CONTINUED

2                  DESCRIPTION OF EXHIBITS

3     DEFENDANTS' EXHIBIT   IDENTIFICATION            PAGE

4     Exhibit 22  Plaintiff's Amended Statement of      259

5                  Damages

6

7

8

9

10

11

12

13

14          (Original exhibits attached to the Original

15       transcript.)

16

17

18

19

20

21

22

23

24

25

1          HYBRID VIDEOTAPED DEPOSITION OF

2                  JOHNNY M. HUNT

3                  April 18, 2024

4          THE VIDEOGRAPHER:  We are now on the

5     record.  This begins Videotape Number 1 in the

6     deposition of Johnny M. Hunt in the matter of

7     Johnny M. Hunt versus Southern Baptist

8     Convention, et al., filed in the United States

9     District Court for the Middle District of

10    Tennessee, Nashville Division.

11         Today's date is April 18th, 2024.  The time

12    is approximately 9:01 a.m.  This deposition is

13    being taken at Bradley -- the offices of Bradley

14    Arant Boult Cummings, LLP, at Atlanta, Georgia

15    at the request of the same firm.

16         The videographer is Safaa Sammander of

17    Magna Legal Services.  The court reporter is

18    Robin Ferrill, also of Magna Legal Services.

19         Will counsel please introduce yourselves

20    for the record, after which the court reporter

21    will swear in the witness.

22         MR. MacGILL:  Rob MacGill and Patrick

23    Sanders, representing Pastor Johnny Hunt, the

24    plaintiff in this case.

25         MS. NOKES:  Scarlett Nokes with Bradley

1    Arant Boult Cummings representing the defendant,

2    Executive Committee of the Southern Baptist

3    Convention.

4        MR. BESEN:  Gene Besen, Bradley Arant,

5    representing the Executive Committee of the

6    Southern Baptist Convention.

7        MS. CALLAS:  Gretchen Callas with Jackson

8    Kelly, representing the Executive Committee of

9    the Southern Baptist Convention.

10       MR. McCORMICK:  Terrence McCormick of the

11   firm of Mintz & Gold representing Guidepost

12   Solutions.

13       MR. KLEIN:  And Scott Klein, also from

14   Mintz & Gold, representing Guidepost Solutions.

15   JOHNNY M. HUNT,

16       called as a witness, having been duly sworn

17   by a Notary Public, was examined and testified as

18   follows:

19   EXAMINATION

20   BY MS. NOKES:

21       Q.   Good morning.

22       A.   Good morning.

23       Q.   You heard me introduce myself as Scarlett

24   Nokes.  I represent the Executive Committee along

25   with Mr. Besen and Ms. Callas, and other than briefly

MAGNA

**LEGAL SERVICES**

1    meeting you in the hallway just a few minutes ago,

2    you and I have never met before today, correct?

3         A.   Correct.

4         Q.   And the same is true of my co-counsel?

5         A.   I don't think I have met him.

6         Q.   And what is your full name?

7         A.   Johnny Marshall Hunt.

8         Q.   What's your date of birth?

9         A.   7/17/52.

10        Q.   Have you ever gone by a different name?

11        A.   Never.

12        Q.   Have any nicknames?

13        A.   None.

14        Q.   Have you been deposed before today?

15        A.   Never.

16        Q.   Mr. McGill might have told you there are

17   several ground rules.  I'm going to cover some of

18   those in an effort to hopefully help today go

19   smoother.

20             First of all, you took an oath just now

21   that the court reporter administered and you

22   understand that you have an obligation to tell the

23   truth?

24        A.   Absolutely.

25        Q.   And unlike when you talked to the Guidepost

1   investigators back in 2022, in addition to a moral

2   and ethical obligation to tell the truth, there's

3   also a legal obligation in this setting to tell the

4   truth.

5        A.   I understand.

6        Q.   If you don't understand any questions I

7   ask, let me know.  Give truthful and complete

8   answers.  Let me know if during the deposition

9   anything changes about any of your answers.

10       A.   Okay.

11       Q.   Could be as simple as a date.  Could be

12  something more substantive.  But you can always come

13  back and say, You know, what I said earlier, I need

14  to change and give you different information.

15       A.   Okay.

16       Q.   Don't interrupt.  That's usually more of a

17  problem for the lawyers than the witness.  But it

18  will happen.

19       A.   I totally agree.

20       Q.   It will help things go more smoothly if we

21  all don't interrupt each other.  It's tempting in

22  conversation, right, to give nonverbal answers --

23       A.   Right, uh-huh.

24       Q.   -- head nodding?

25            For this proceeding, you have to, in

MAGNA
LEGAL SERVICES

1    addition -- it's fine to nod.  You have to give a

2    verbal answer along with it.

3            We will take lots of breaks, typically

4    about every hour or so.

5        A.   Okay.

6        Q.   If you need a break and we haven't taken

7    one, let us know.  If there's not a question pending

8    waiting for an answer, I'm happy to accommodate that.

9    And if you need something clarified, just ask for

10   clarification --

11       A.   Okay.

12       Q.   -- at any point.

13           Does all of that sound good?

14       A.   Very good.

15           MR. KLEIN:  Before you continue, I just

16       received a text that they're not getting audio

17       on the Zoom.  I don't know if that's anything

18       that may be my colleagues' issue or if it's on

19       your side here.  Is there anything you can

20       check?

21           THE VIDEOGRAPHER:  Do you want to go off

22       the record?

23           The time is 9:05 a.m.  Going off the video

24       record.

25           MR. KLEIN:  Sorry about that.

MAGNA

LEGAL SERVICES

1          (WHEREUPON, a recess was taken.)

2          THE VIDEOGRAPHER:  We are back on the

3    record.  The time is 9:08 a.m.

4    Q.   (By Ms. Nokes) Mr. Hunt, are you taking any

5    medication today that could impair your ability to

6    remember or answer truthfully?

7    A.   No, ma'am.

8    Q.   And is there anything else that might

9    impact your ability to testify truthfully?

10   A.   Nothing.

11   Q.   Truthfully or accurately?

12   A.   Nothing.

13   Q.   What did you do to prepare for your

14   deposition today?

15   A.   I read the -- reread the interrogatories

16   and I read the Complaint.

17   Q.   I don't want to get into the substance of

18   conversations you might have had with your lawyers,

19   but did you meet with your lawyers to prepare?

20   A.   I did.

21   Q.   How many times?

22   A.   Last night for about an hour and this

23   morning for probably 30 minutes.

24   Q.   Okay.  Were those meetings in person?

25   A.   In person, yes, ma'am.

MAGNA
LEGAL SERVICES

1      Q.    Was anyone else present?

2      A.    My wife was present last night.

3      Q.    And it was Mr. McGill, Mr. Sanders?

4      A.    Correct.

5      Q.    Anyone else from their firm?

6      A.    No, ma'am.

7      Q.    Or any other law firm?

8      A.    No, ma'am.

9      Q.    So just to make sure I understand, two

10 in-person meetings totaling about an hour and a half?

11     A.    Yes, ma'am.

12     Q.    Have you spoken to anyone else about this

13 deposition?

14     A.    Just everyone that knows me knows that I'm

15 in a deposition today.  I want to say that's an

16 exaggeration, but anyone I have talked to.

17     Q.    So who are some of those people?

18     A.    That would be my family.  I have been in a

19 conference, so I flew in from a conference for the

20 event.  So my children run the conference.

21     Q.    That was the Jubilee in Branson?

22     A.    Correct.  Yes, ma'am.

23     Q.    And so you got back from that yesterday?

24     A.    Last night.  Flew in and came straight in

25 to meet with my attorneys.

1   Q.   Did you fly in to the Atlanta airport?

2   A.   Yes, ma'am.

3   Q.   It's hectic?

4   A.   Very.

5   Q.   And what have you said to them about your

6   deposition and being here today?

7   A.   I have waited 23 months for it.

8   Q.   You are eager?

9   A.   Yes, ma'am.

10  Q.   Good.

11       You said you reviewed some of the

12  pleadings?

13  A.   Yes, ma'am.

14  Q.   The Complaint.

15       Did you review the Answer?

16  A.   Yes, ma'am.

17  Q.   Did you review all the discovery responses?

18  A.   I did.

19  Q.   Did you review any documents?

20  A.   No, ma'am.

21  Q.   Did you review any of the emails that have

22  been produced in discovery?

23  A.   No, ma'am.

24  Q.   Review any text messages?

25  A.   Just saw one.

MAGNA
LEGAL SERVICES

1      Q.   What text message was that?

2      A.   It was the one that we just received from

3   North American Mission Board.

4      Q.   What about from Roy Blankenship?

5      A.   Nothing from Roy.

6      Q.   Did you bring any documents with you today?

7      A.   No, ma'am.

8      Q.   Did you look through the documents that you

9   produced in this case?

10     A.   No, ma'am.

11     Q.   And this has been going on for a little

12  while now.

13     A.   Right.

14     Q.   Back when discovery requests were issued,

15  walk me through the process you took to see what

16  information you had -- whether email, voicemail,

17  video, text messages -- that were relevant and

18  responsive to the discovery requests.

19     A.   I had changed phones.  I no longer had the

20  computer that was property of North American Mission

21  Board and even prior to that.  So dating back to

22  2010, it would have been First Baptist Church

23  Woodstock.  So I had no computer.  I really am not IT

24  savvy.  So I do 90 percent of my work on the phone.

25  So my phone was turned over to investigations to see

1    if there were any texts or emails and then they have

2    my phone again now.

3         Q.    And what is it, an iPhone or an Android?

4         A.    IPhone, yes, ma'am.

5         Q.    Do you use iCloud?

6         A.    Yes, ma'am.

7         Q.    And when you left your employment at NAMB,

8    they didn't allow you to keep your NAMB computer?

9         A.    I think they gave me the computer, but I

10   don't use a computer.  I used it 99 percent of the

11   time for Zoom calls during 2020.  So I gave it to my

12   granddaughter.

13        Q.    Did you personally look through to see if

14   you had any responsive text messages?

15        A.    I did.  And, again, I just -- with them, it

16   dates back to 2010.  And I think I found maybe one

17   text message.

18        Q.    Did you produce that one text message?

19        A.    I did.

20        Q.    And what about journals?  I watched a

21   sermon you gave somewhat recently.  You talked about

22   keeping a journal on your phone.  Is that still your

23   practice?

24        A.    Yes, it's a prayer journal.

25        Q.    And did you look through your prayer

MAGNA

LEGAL SERVICES

1    journal --

2         A.   Yes.

3         Q.   -- to see if there was anything relevant?

4         A.   It's nothing relevant.  Still have it, the

5    same one.

6         Q.   Did you review it?

7         A.   Yes, ma'am.  I review it every day.

8         Q.   And, specifically, did you review it in

9    connection with this litigation?

10        A.   Oh, no, ma'am.

11        Q.   Where do you currently reside?

12        A.   In Panama City Beach -- or really it's

13   Inlet Beach is the address.

14        Q.   And how long have you lived there?

15        A.   I have lived in that home since 2020.  But

16   I made it my residence in 2022.  But I have lived at

17   Panama City Beach as far as summer and all of our

18   getaways for about 20 years.

19        Q.   Who lives there with you?

20        A.   My wife, Jan.

21        Q.   And so you referenced changing your

22   residence?

23        A.   Uh-huh.

24        Q.   When did that occur?

25        A.   In February of 2022.

MAGNA
LEGAL SERVICES

1      Q.    And what prompted the move?

2      A.    We had -- two things, Number 1, we loved

3    the beach.  And after Covid, we realized we were

4    spending most of our time there.  And then secondly,

5    because of the falsification of the report, it did

6    such damage in the community I have lived in for 33

7    years.

8      Q.    But you said you changed your residence in

9    February of 2022?

10      A.    Uh-huh.

11      Q.    That was prior to the report's publication,

12    correct?

13      A.    Right.

14      Q.    So did that prompt the change of residence?

15      A.    No, that would have been -- made it really

16    nice once the report did hit.

17      Q.    Do you still spend time here in Georgia as

18    well?

19      A.    Well, it serves more as a hotel as I

20    travel.  Most of my time is on the road.

21      Q.    And who lives in Florida with you?

22      A.    My wife.

23      Q.    And her name is?

24      A.    Janet.

25      Q.    How long have you been married?

MAGNA
LEGAL SERVICES

1      A.    Fifty-three years.

2      Q.    And is she involved in your ministry work?

3      A.    Just travels sometime with me.  But, no,

4 she doesn't, she -- for years, but she pretty much

5 retired when I left the church as far as being

6 involved in some of the ministries where I train

7 pastors.

8      Q.    Does she still do bookkeeping work and

9 handling of --

10     A.    Does bookkeeping.  She handles everything

11 for Johnny Hunt Ministry.  Her dad was an accountant.

12     Q.    Does she have training in accounting?

13     A.    Just from school.

14     Q.    And how many children do you have?

15     A.    I have two daughters.

16     Q.    What are their names?

17     A.    Deanna and Hollie.

18     Q.    Last names?

19     A.    Deanna Carswell.  And Hollie Hixson.

20     Q.    How old are they?

21     A.    Deanna is 49.  And Hollie is 46.

22     Q.    And do you provide any financial support to

23 either of your daughters?

24     A.    I could move in with my oldest daughter.

25 And my youngest daughter is married to like a church

MAGNA

LEGAL SERVICES

 1   planner.  So I'm a generous person, so I gift them,

 2   but they don't need financial help.

 3       Q.   Do you employ any of them through your

 4   various business entities?

 5       A.   No, ma'am.  No.

 6       Q.   And have they been involved in your

 7   ministry work over time?

 8       A.   Yes.  In the early days at Woodstock, we

 9   had an extensive tape ministry, which most of it was

10   gifting, and I gave that ministry to my oldest

11   daughter, Deanna.  So now it's just a small part of

12   all of their ministry.

13       Q.   And so tapes, how it started, right,

14   literally cassette tapes?

15       A.   Exactly.  Cassette tapes.

16       Q.   And are these the sermons you now sell on

17   your website.

18       A.   Right, yes.

19       Q.   So the tape has evolved -- are they still

20   CDs or --

21       A.   They are CDs.  Now they have moved to USBs.

22       Q.   Okay.  When I looked earlier this week,

23   your website was down.  Are you aware of that?

24       A.   Somebody told me that just yesterday, but I

25   was not aware.  So I don't know if they are upgrading

MAGNA
LEGAL SERVICES

1   or if there's a difficulty.  I'm not sure.

2       Q.   It's been down the last few days.  But you

3   are still selling your sermons through that website?

4       A.   They are -- hardly anybody buys sermons

5   anymore because you have the Internet.  All you've

6   got to do is go to YouTube or search.

7       Q.   How often do you see your children?

8       A.   A lot.  Now, the oldest daughter, they lead

9   the largest music tour in the world, Christian music.

10  And so they have been in 39 cities, so they have just

11  returned.  So I miss seeing them a lot.  And then

12  Hollie comes to the beach a lot.  So.

13      Q.   And who are their spouses?

14      A.   Pete Hixson is married to Hollie.  And Jake

15  Carswell is married to Deanna.

16      Q.   And it's the Hixsons who run the concert or

17  have I got it backwards?

18      A.   Carswells.

19      Q.   Okay.  And how many grandchildren do you

20  have?

21      A.   I have four grandchildren.

22      Q.   And what are their ages?

23      A.   Katie, which is Deanna's daughter, is 25.

24  And her son, Carson, is 24.  And then Hollie's two

25  children is Hope -- she's special needs, cerebral

MAGNA
LEGAL SERVICES

1  palsy -- she's 22; and her sister, Addie, is 20.

2      Q.   And how old are you, Mr. Hunt?

3      A.   I'm 71.

4      Q.   And are you currently employed full time?

5      A.   I just do sort of itinerant ministries just

6  whenever I'm invited.

7      Q.   So what are your current income sources?

8      A.   I speak a good bit of Sundays.  And I have

9  retirement income from GuideStone.  And I have

10  investments that I draw from.

11      Q.   Conferences?  Do you get money from

12  conferences?

13      A.   Conference, about the only conferences I

14  do, because I was removed after the false

15  allegations.  I was removed from basically everything

16  except for my family and speaking and then a few

17  friends that want me to come on Sunday.

18      Q.   You still do Jubilee, right?

19      A.   That's right.  They own that.

20      Q.   And you do that.  And Branson and Myrtle

21  Beach?

22      A.   Correct.  And Gatlinburg.

23      Q.   How many times a year are those

24  conferences?

25      A.   It's just -- they just do one each of those

MAGNA

LEGAL SERVICES

1    three places.  And there are three conferences a

2    year.

3        Q.   And what about the advanced conferences,

4    are those still happening?

5        A.   The advanced conference is just a gathering

6    of pastors for -- you know, it's not a fee structured

7    thing.  They just come -- it's more or less

8    accommodating pastors for round-table discussions.

9        Q.   And what about your men's conferences, are

10   those still happening?

11       A.   Yes.  They've started again.  So I have

12   been doing a few of those.

13       Q.   Did one in 2023, last year?

14       A.   I did, yes, ma'am.

15       Q.   One or more?

16       A.   Last year?  I can only think of one.  But I

17   have done five this year.

18       Q.   And how many do you have planned for next

19   year?

20       A.   None yet.

21       Q.   How many days would you estimate in 2023

22   that you were booked or on the road for speaking

23   engagements?

24       A.   2023?  Probably 24 Sundays of the year and

25   then the three conferences.

1    Q.   And you have also got a trip planned to

2   Greece; is that correct?

3    A.   I just returned.

4    Q.   And are you going again in October?

5    A.   In October, yes.

6    Q.   And is that something you are earning fees

7   from?

8    A.   No, I led -- just led the group of pastors

9   that had never been.  It's a familiarization trip and

10  bought my own plane ticket.  And so when you go

11  again, since I'm not a pastor of a church, you know,

12  you may make 20 people, and really what it ends up

13  doing is basically paying your way to accommodate

14  them to show them the --

15   Q.   And what's your standard speaking fee?

16   A.   I don't have a fee.  Never have.

17   Q.   And what do churches typically see fit to

18  pay you?

19  ████  ██  █████████████████  ██████████████████████

20  ██  ████████████████

21   Q.   Depending on the size of the church?

22   A.   No, not necessarily.  Just we -- we leave

23  that up to their discretion.  So I've never had a

24  fee.

25   Q.   How long have you been in ministry?

1    A.    About 47 years.

2    Q.    And how long do you intend to work?

3    A.    As long as I'm able.  Retirement is not on

4  the table.  So don't know that I'll make it as long

5  as Charles Stanley.  He went to 88, but.

6    Q.    What educational degrees do you have?

7    A.    I graduated with a Bachelor's Degree from

8  Gardner-Webb College, now University, and I have a

9  Master's Degree from Southeastern Baptist Theological

10  Seminary.

11    Q.    When and where were you ordained?

12    A.    I was ordained at Longleaf Baptist Church

13  in Wilmington, North Carolina in 1979.

14    Q.    Who were your personal mentors in your

15  ministry?

16    A.    Adrian Rogers, Jerry Vines, Jimmy Draper.

17    Q.    Any others come to mind?

18    A.    Charles Stanley.  John Edmund Haggai.

19  Three of those are already in heaven, but anyway.

20    Q.    And are there any -- all of those names are

21  Southern Baptists?

22    A.    Yes.  Most of my affiliation has been

23  within the Southern Baptist family.

24    Q.    Are there any non-SBC preachers you look up

25  to?

MAGNA
LEGAL SERVICES

1      A.   Well, John Edmund Haggai was my Southern

2  Baptist pastor.  He was just a leadership guru.  And

3  John Maxwell.

4      Q.   What about John MacArthur?

5      A.   No.  I know him, but he would not be really

6  a mentor of mine, anyway.

7      Q.   John Pifer?

8      A.   I know him.

9      Q.   There's a lot of biographical information

10  available about you.  So we are not here today to go

11  through your --

12      A.   I understand.

13      Q.   -- life story.  But I would like to skip to

14  the years around 20- -- 2009, 2010 --

15      A.   Okay.

16      Q.   -- and talk about your ministry during that

17  period.

18           You were the lead pastor at First Baptist

19  Church Woodstock at that time, correct?

20      A.   Yes, ma'am.

21      Q.   When did you start in that role?

22      A.   I started the first Sunday in December of

23  1986.

24      Q.   And how many members, estimated, did

25  Woodstock have in 2009?

MAGNA
LEGAL SERVICES

```
 1        A.    In 2009, probably 15,000.
 2        Q.    Was it a single-campus church at that point
 3   in time?
 4        A.    Yes.
 5        Q.    Okay.  Was the church growing during that
 6   period?
 7        A.    Yes.
 8        Q.    When did it experience the most growth?
 9        A.    The most growth would have been when I
10   first went there because it was only averaging 180
11   people.  So, and that was in 2000- -- I'm sorry,
12   1986.  So our explosive growth would have been
13   between '86 and '95.
14        Q.    And it grew from the number you said it
15   was?
16        A.    To over 6,000 in attendance on Sundays.
17        Q.    Was it considered a "mega church" by 2009?
18   Was that word even in use in 2009?
19        A.    I'm not sure when that word came into use.
20   But definitely a large church.
21        Q.    And your pastoring contributed to all that
22   growth, correct?  Fair to say?
23        A.    And a good team around me, so.
24        Q.    We talked a little bit about your tape
25   ministry, but how did you get your messages out in
```

MAGNA
LEGAL SERVICES

1    addition to the tape ministry?

2         A.    That was basically it until the Internet

3    came.   And then people could watch on Sunday.   And I

4    teach in such a way that I have taught pastors

5    preaching, so I put outlines there also.   So it

6    became an extremely popular website for pastors

7    around the world.   They could get all of your stuff.

8         Q.    And are you talking about your website, the

9    Johnny Hunt Ministries website or Woodstock?

10        A.    No.   Woodstock.   Woodstock.

11        Q.    When did Woodstock start streaming its

12   services on the Internet?

13        A.    Probably soon after -- gosh, I would be

14   guessing.   I don't really remember.

15        Q.    You don't recall whether by 2009 it was --

16        A.    Oh, in 2009, definitely, it would have been

17   on by then.

18        Q.    It would have been by then?

19        A.    Yes, ma'am.

20        Q.    Did you keep track or the church keep track

21   of how many people viewed those live stream?

22        A.    We had a media division, so I'm confident

23   they did.

24        Q.    Was it a lucrative time during your

25   ministry; that era of 2009 to 2010?

1    A.   No, it was a busy time.  You served a

2    Southern Baptist Convention that doesn't pay.  And

3    you travel all over the world for the International

4    Mission Board.  And you attend once a year every

5    entity of the SBC to be at their trustee meetings and

6    all.  And plus, I was doing, at that time, three

7    services a day at Woodstock.

8    Q.   But the church was paying you -- I think

9    you're referring to your term as SBC president.

10   A.   Yes, yes, which that was in that period of

11   time.

12   Q.   Right.

13   A.   Nine and '10.

14   Q.   The church was still paying your salary?

15   A.   Yes, of course.

16   Q.   And paid you well?

17   A.   Yes, ma'am.

18   Q.   How was your salary as lead pastor at

19   Woodstock determined year to year?

20   A.   Personnel committee made those decisions.

21   I never made a request.  You could check.  There were

22   probably seven years I refused salary, and you can

23   also check.  I was probably one of the most generous

24   givers of the church.

25   Q.   And it fluctuated pretty dramatically.  Do

1  you have any insight into why from one year to the

2  next it might go up and then the following year go

3  back down?

4       A.   In our giving?

5       Q.   In your salary?

6       A.   In my salary?  I'm not sure.  It would be a

7  good question for my accountant.

8       Q.   Would you agree that you have been a mentor

9  and helped many other pastors to be placed in

10 pastoral roles at other churches?

11      A.   I'm not sure how much I helped them get to

12 the next place.  But I have spent my entire life

13 mentoring pastors.

14      Q.   And some of that was probably formal, some

15 of it informal?

16      A.   Correct.

17      Q.   And, Mr. Hunt, your lawyers might have told

18 you the woman you had the sexual encounter with,

19 we're not going to use her name here today.

20      A.   Okay.

21      Q.   We are going to refer to her as Jane Doe.

22 But if I say that Jane Doe is the woman referenced in

23 the Guidepost report that you had the sexual

24 encounter with, you understand who I'm talking about,

25 correct?

1     A.   Yes, ma'am.

2          MR. MacGILL:  Counsel, we -- we would

3     prefer to use Ms. ██████ name.  And we will

4     honor the -- the Court's made it clear that we

5     are to deal with that in accordance with his

6     wishes.  So we would seal her name, remove her

7     name in any reference.  So you feel welcome to

8     do that.  We are going to file the court order

9     and we are going to cooperate with the ██████

10    but we would encourage you to use her name so

11    there's no confusion.

12         MS. NOKES:  Well, that's why I'm having the

13    discussion with Mr. Hunt.  He's clear on who I

14    reference when I will say Jane Doe.

15         MR. MacGILL:  We don't agree to that.  So

16    Jane Doe is not an appropriate designation for

17    today's purpose.  The Court's made the decision.

18    We have a controlling order.  So we'd ask you to

19    use ██████ ██████ or ██████ ██████ as the case

20    may be, and we will protect that name in all

21    respects, pursuant to the court order, and make

22    sure that's done properly.  But Jane Doe is not

23    appropriate for many reasons, so we would ask

24    you not to use it in this deposition proceeding.

25         We have a controlling order where we are

1    still working with counsel for Ms. ████████    We

2    had hoped to have a document from her today.  We

3    don't have it.  So please use her name.  Jane

4    Doe is not appropriate.

5         MS. NOKES:  I'm going to continue using

6    Jane Doe with the understanding that Mr. Hunt

7    knows who I'm talking about, and if I refer to

8    Jane Doe's husband, you'll also know who that

9    individual is, correct?

10         THE WITNESS:  I do.

11    Q.   (By Ms. Nokes) Okay.  And did you mentor

12  Jane Doe's husband in your ministry?

13         MR. MacGILL:  And she's referring to ████

14    ████████  and I'm going to each time make the

15    mention of the name.  We're not going to do

16    this.

17         MR. BESEN:  Listen up.  You are not going

18    to speak over us the whole time.  You're not.

19    Hear me, you are not.

20         MR. MacGILL:  I am.

21         MR. BESEN:  Your witness has said he knows

22    who Jane Doe's husband is.  The shenanigans and

23    the BS that you do every deposition aren't going

24    to be there.  Your client is already impressed.

25    Let's get back to the questions and answers.

MAGNA
LEGAL SERVICES

1    Your client is eager to testify.  Let him

2    testify.

3         MR. MacGILL:  You have made -- you are

4    making a victim reference by the use of Jane

5    Doe.

6         MR. BESEN:  Jane Doe's anonymity is not --

7         MR. MacGILL:  Let me finish my comment.

8         MR. BESEN:  We're not doing this.

9         MR. MacGILL:  Jane Doe assumes there was

10   some kind of sexual assault.

11        MR. BESEN:  No, it does not.

12        MR. MacGILL:  It creates an inference that

13   is completely inappropriate and you know it.

14   The truth of all this is going to come out

15   today.  The ridiculous behavior that's involved

16   in this case, it's going to be brought into

17   clear focus again today.  But we are not going

18   to agree to a Jane Doe reference.  We are not

19   going to do it.  So you can use the name.  I'm

20   going to object each time.  Go ahead with your

21   questions.

22        MR. KLEIN:  Rob, if I could just add one

23   thing.  I think I would agree with you, Rob, if

24   we were suggesting to use the word "survivor" or

25   "victim."  Whether it's appropriate or not, we

1  understand your position with regard to those
2  words.  I do think the term "Jane Doe" doesn't
3  have the implication that you suggest.  I can't
4  force you to agree with that, Rob, but I would
5  understand if we were asking to use the other
6  words I just said.  We're not.  I think Jane Doe
7  is pretty generic.  Again, Rob, we don't have to
8  belabor this, but I wanted to distinguish for
9  you, Rob, the difference that I would agree with
10  you if Scarlett or I were asking to use those
11  other phrases, those other terms here today.  We
12  are not.
13          MR. MacGILL:  That's fair.  So can we
14  agree, can we all stipulate that the use of the
15  word "Jane Doe" creates no inference of any kind
16  or nature.  Does everyone agree with that?
17          MR. KLEIN:  Yes.
18          MS. NOKES:  And I will add, she's not a
19  party, they are not parties.  They are not
20  seeking monetary damages.  It's clearly for
21  anonymity only.
22          MR. KLEIN:  And I would agree with what you
23  just said, Rob, on the record, as well.
24          MR. MacGILL:  Does everyone agree,
25  Gretchen?  You okay with that?

```
 1              MS. CALLAS:  Yes.
 2              MR. MacGILL:  No inference from the use of
 3       the word "Jane Doe."
 4              MR. KLEIN:  No problem.
 5              MR. MacGILL:  Thank you.  So agreed.
 6              MR. KLEIN:  Thank you.
 7       Q.   (By Ms. Nokes) Jane Doe's husband is
 8  someone you mentored through the course of your
 9  ministry?
10       A.   No.
11       Q.   Not even informally?
12       A.   Informally, but that would be thousands of
13  pastors in a group setting.
14       Q.   But you certainly remember him?
15       A.   Oh, of course.  Absolutely.
16       Q.   Are familiar with him?
17       A.   Yes.
18       Q.   And how did you informally mentor him?
19       A.   I do -- for 28 years, I led a Timothy
20  Barnabus where it averaged 200 pastors in a meeting.
21  And I spend three days teaching leadership, answering
22  questions.
23       Q.   And that's -- that's how you first met him?
24       A.   In that setting, yes.
25       Q.   And what about over time, how did the
```

1    informal mentorship continue?

2          A.   He would call or, for the record, his wife

3    would call on his behalf and ask if I would help him

4    with his difficulties in his church.   So I would meet

5    him for dinner and she would always come with him.

6          Q.   And when did that sort of interaction

7    start?

8          A.   Probably somewhere around maybe 1995.   I'm

9    guessing the date because it's...

10         Q.   You have referenced in earlier answers your

11   SBC presidency.   When were you first elected?

12         A.   2008.

13         Q.   And that's a lofty role within the

14   convention?

15         A.   Uh-huh.

16         Q.   The pinnacle?

17         A.   Right.

18         Q.   Even though it's unpaid --

19         A.   Uh-huh.

20         Q.   -- you are the face of the convention

21   during that time?

22         A.   Exactly.

23         Q.   And you mentioned being mentored by Adrian

24   Rogers?

25         A.   Uh-huh.

1    Q.    I believe he passed away 2005?

2    A.    Correct.  Yes, ma'am.

3    Q.    So before your presidency.  But was it him

4    or someone else who helped teach you how to navigate

5    SBC politics?

6    A.    I'm not sure I ever learned how.  That's

7    where your Barry McCartys come in place to help you.

8    I had been asked for five terms, so that's a 10-year

9    period to be the president.  And I denied it.  Before

10   Dr. Rogers died, his influence would have said:  One

11   day, God may tap you and it may not be what you want

12   to do, but you need to lead.  And so it was after I

13   felt it was gone, a large number of pastors.  It's

14   different than today.  Today it's people are seeking

15   the office.  Adrian Rogers taught me the office seeks

16   the man.

17   Q.    And who were the people over the course of

18   that 10 years, the five terms, who encouraged you to

19   run?

20   A.    It would have been practically all of my

21   peers, large church pastors.  Ted Traylor, the Ken

22   Whittens, the Steve Gaines, that they are all in my

23   age group, so.

24   Q.    And once you agreed to be on the ballot,

25   what did you do to campaign, if anything?

1      A.   Nothing.

2      Q.   And what was your platform or your key

3  issues that you were running --

4      A.   Nothing.

5      Q.   Were you considered part of the

6  conservative resurgence or the carryover of that?

7      A.   Voted.  I was too young.

8      Q.   Voted?

9      A.   I had no voice.

10     Q.   Voted in favor?

11     A.   In favor.

12     Q.   You also -- you led the pastors conference?

13     A.   In '96.

14     Q.   Okay.  How did that come about?

15     A.   Same thing.  Basically, you become known as

16 a leader and people would tap you and lead it.  And,

17 again, you may know, but they honor you by electing

18 you and you honor them by paying for it.

19     Q.   The pastors conference in 1996, do you

20 remember any themes or topics from that particular

21 conference?

22     A.   Yes, I do.  "Love Loud."

23     Q.   And did you speak at that conference?

24     A.   No.

25     Q.   Just to organize it?

1     A.    Just to organize it.

2     Q.    But you did speak, I assume, at the annual

3   meeting after elected and ran the meeting while you

4   were president?

5     A.    Exactly.

6     Q.    What issues related to sexual abuse came up

7   during your two terms as SBC president?

8     A.    None that I remember, to me personally.

9     Q.    So were any sexual abuse topics -- were you

10   aware of any issues related to sexual abuse within

11   the convention during your presidency?

12     A.    I remember none.

13     Q.    There had been discussion of a potential

14   database --

15     A.    Uh-huh.

16     Q.    -- of abusers, correct?  In 2007, 2008?

17     A.    I was not aware of it.

18     Q.    So there was no carryover from those

19   discussions, just in 2008, to your presidency?

20     A.    No, ma'am.

21     Q.    Do you recall any survivors of sexual abuse

22   reaching out to you during your presidency?

23     A.    I don't.

24     Q.    And in those two years, did anyone come to

25   you in confidence with any concerns about any pastors

1 engaging in sexual misconduct?

2     A.    Never.

3     Q.    You have talked about sort of the burden of

4 the role. How would you describe the SBC presidency

5 if you were telling someone who is not a Southern

6 Baptist?

7     A.    It's a great honor the day you are elected.

8 And it's a great joy the day you finish.

9     Q.    And what do you do?

10     A.    What do you do as president?

11     Q.    As president?

12     A.    Represent entities, you know like, so you

13 are kind of championing the cause. I led the

14 convention to give the largest percentage to

15 international missions in the history of our

16 denomination. Our agenda was more of a -- we needed

17 a great commission resurgence. That's what I led.

18 And it's just we needed to be more faithful at what

19 we used to do. So that was -- so you just -- you

20 became the voice, the face, and "bully pulpit," they

21 call it.

22     Q.    And did you tap others to help you with

23 that great commission resurgence?

24     A.    I did.

25     Q.    Who were some of those individuals?

MAGNA
LEGAL SERVICES

1    A.    People like Danny Akin, Al Mohler,

2    J.D. Greear, Ronnie Floyd.    Those are the major ones

3    I remember.

4    Q.    So it's fair to say the SBC presidency gave

5    you more exposure?

6    A.    I'm not sure that would be a true statement

7    for the simple reason I had such a platform.    I had

8    been preaching for other denominations.

9    Q.    You didn't need more exposure?

10    A.    I didn't -- no.    Sometimes -- I heard one

11    preacher that was elected president said:    I'm going

12    to ride this gravy train.    And his definition was all

13    these invitations you get.    I already had

14    invitations.    So I was speaking Sundays in one of the

15    finest in America.    So why did I want to be gone?    So

16    I was sending videos everywhere for congratulation

17    services, but not being there.

18    Q.    Do you think it gave you a larger sphere of

19    influence within the convention?

20    A.    Not really.    I feel like I may have lost

21    influence.

22    Q.    How so?

23    A.    When you are leading a charge for

24    something, you make as many enemies as you do

25    friends.    And I think I was more popular just as a

MAGNA
LEGAL SERVICES

1   pastor and one that just cared for pastors.

2       Q.    And I want to be clear.   Are you talking

3   about other pastors, other leaders within the

4   Southern Baptist Convention?

5       A.    Uh-huh.

6       Q.    What about the average church-going

7   Southern Baptist in Arkansas?   Would they have known

8   that you were the lead pastor at Woodstock Baptist

9   Church without you being the SBC president?

10      A.    Yes, I --

11            MR. MacGILL:   Object to the form of the

12      question.   You may answer.

13      A.    I spoke in their state conventions, their

14  state evangelism conferences, probably 90 percent of

15  our states, of our 42 state conventions, maybe all of

16  them prior.

17      Q.    (By Ms. Nokes) But, again, it's a subset

18  right --

19      A.    It is.

20      Q.    -- of Southern Baptists to go to the

21  meetings of the local association or the state

22  conventions.  So just your average --

23      A.    It would have been --

24      Q.    -- white-haired Southern Baptist lady in

25  the pew, how would she have come to know Johnny Hunt?

1          MR. MacGILL:  Object to the form of the

2      question.  You may answer.

3      A.    I have no idea.  Good question.

4      Q.    (By Ms. Nokes) Did you do any media

5  interviews as SBC president?

6      A.    Probably the only media interview I

7  remember doing is immediately after I was elected.  I

8  stayed out of the paper.  I have friends that loved

9  the press.  I just didn't respond to the press.

10     Q.    Did you do any non-church-service speaking

11  engagements, civic clubs or?

12     A.    If I did, I can't recall a one.

13     Q.    What about political events?

14     A.    No.

15     Q.    Give the prayer or?

16     A.    Oh, yes, I was invited.  I pastored the

17  governor of the state, Sonny Perdue, for eight years.

18  He was -- taught Sunday school, very good friend.  So

19  when they entertained the Republican governors, I was

20  asked to do an opening prayer and attend with him.

21     Q.    And would you agree that during your term

22  as SBC president, you were also a trustee or a member

23  of the Southern Baptist executive committee?

24     A.    Ex officio.

25     Q.    And what's the difference between a regular

MAGNA

LEGAL SERVICES

1   member and an ex officio member?

2        A.   You have no vote.

3        Q.   Are you able to speak in a meeting?

4        A.   If they invite you to.

5        Q.   And are you expected to attend the

6   meetings?

7        A.   At least one out of your two-year term.

8   And sometimes someone only has one-year term, but 90

9   percent of the time, it's you are reelected.  I don't

10  think a -- I don't think anyone has ever been denied

11  the opportunity that ran for the second term.

12       Q.   And do you think your opinions, comments,

13  positions on issues as an executive committee trustee

14  carried more or less weight by virtue of you being

15  the SBC president?

16       A.   I would say the same.  I think I was

17  respected by that group.  They proved that by

18  allowing me to speak at about 20 of 25 conventions.

19       Q.   Do you recall the executive committee

20  dealing with any issues of sexual abuse during your

21  term as an EC trustee?

22       A.   I don't recall any.

23       Q.   And how would you define in your own words

24  "sexual abuse"?  Back during that time, 2008 to 2010.

25       A.   When I think of abuse, I speak -- I think

MAGNA
LEGAL SERVICES

1  of someone actually being physically hurt or -- so

2  abusive, which I guess it could have been verbal too.

3  But that would be all I would have ever probably

4  considered.

5      Q.   And has your own opinion of what sexual

6  abuse is or is not changed since 2010?

7      A.   Yes.  It's changed since I now am able to

8  see the legal definition of it.  Absolutely.

9      Q.   And what's your understanding of the legal

10  definition?

11     A.   To use sexual abuse would be in the context

12  of intercourse, at least, and I know in the State of

13  Florida, and I think in Georgia and Tennessee.  So I

14  see it in that context, but definitely not

15  consensual.

16     Q.   So I want to be clear, you think in order

17  for there to be sexual abuse, there has to be

18  intercourse?  Under a legal definition?

19     A.   That would be part of it.

20     Q.   You focused a lot in your ministry on

21  writing specifically to men and for men.  When did

22  you start your men's conference ministry?

23     A.   I finished in 2021.  Help me with the math.

24  I did my last one at Woodstock in 2021, and that was

25  my 30th year.  Thirty years in a row.  So I would

MAGNA
LEGAL SERVICES

1    have started 30 years prior, so.

2         Q.   And what prompted you to start those

3    conferences?

4         A.   More of men involvement in church.  Women

5    have taken more of the lead role where men have been

6    passive.  And I felt that if we were going to have a

7    ministry that would -- my dream was that the sun

8    would never set on the ministry, men would have to be

9    involved.  So that was -- that was the passion that I

10   started with.

11        Q.   How did you come up with the themes or

12   topics you covered in those conferences?

13        A.   Being a man.

14        Q.   And did you deal a lot with topics about

15   lust?

16        A.   Yes.

17        Q.   Temptation?

18        A.   Yes.

19        Q.   Adultery?

20        A.   It probably came up.  I don't know that I

21   just wrote a message on adultery, but might have.

22        Q.   Did you ever preach at Woodstock on the

23   topic of adultery?

24        A.   I would have to go back and look, 33 years

25   times 52.

MAGNA
LEGAL SERVICES

1    Q.    And at Woodstock, you helped create a

2  ministry specifically for wounded and fallen

3  ministers, correct?

4    A.    Uh-huh.

5    Q.    Tell us about how that came about, the City

6  of Refuge?

7    A.    City of Refuge.  Probably 85 percent of the

8  men had nothing to do with moral failure, et cetera.

9  It really started more out of burnout.  Pastoring is

10  a very difficult job, especially when you realize

11  that 70 percent of Southern Baptist churches run

12  under 65, that you realize that I've addressed four

13  nationally, I have been given the assignment to deal

14  with forced termination and church conflict.  It's

15  massive.  And so dealing, helping in that area, so

16  here would be my premise.  We spend our life helping

17  our people with their issues.  Who helps pastors with

18  theirs?

19          As we see now, if a pastor's issue becomes

20  public, they are out.  But yet we help bring our

21  people in and offer them hope.

22    Q.    And you said 85 percent had nothing to do

23  with a moral failing.  What about the 15 percent that

24  remain?  What were some of their issues?

25    A.    Those are numbers I'm speculating.  But in

1   that number, it could have just been -- many times

2   it's the wife that has been abusive in a relationship

3   and not the husband.  But it brings the couple.  So I

4   think it's very clear that the people understand

5   that.

6       Q.   And how might a wife be abusive -- give me

7   some examples of abusive wives.

8       A.   Of a wife that preyed on someone in the

9   church and that led to an immoral relationship, and

10  then the pastor has resigned because of the decision

11  of his wife.  And then we brought them in to help

12  them.

13      Q.   And was the reverse also true for some of

14  the City of Refuge ministers, that it was the

15  pastor --

16      A.   Yes.

17      Q.   -- who engaged in sexual misconduct?

18      A.   Correct.

19      Q.   And the process was the same, regardless of

20  what the falling --

21      A.   Exactly.

22      Q.   -- or issue was, correct?

23      A.   Correct.

24      Q.   And I think this is from some of the

25  materials.  "The City of Refuge is a long-term

1  residential program that attempts to meet the needs

2  of the minister and his family."

3      A.    Uh-huh.

4      Q.    Is the end goal restoration?

5      A.    Restoration, but in this sense:  Number 1,

6  their relationship with Christ; Number 2, their

7  relationship with each other; Number 3, their

8  relationship with the church, being able to hold

9  their head up again instead of living in shame; and,

10 Number 4, to service.

11          And when I say "service," they may sing in

12 our choir.  They may work in our parking lot.  There

13 was never:  We put you in ministry.  That's sacred.

14 God put them in ministry.  Only he can reissue their

15 ministry.  So we never had a way of pipelining people

16 back into ministry.  So a lot of people misunderstood

17 us.  We just wanted to help them be healthy again,

18 their families be healthy.

19     Q.    So there was no letter from City of Refuge

20 that said, This pastor has successfully --

21     A.    Not that I knew of.

22     Q.    What about informal phone calls to a church

23 that might be looking to call the pastor, would City

24 of Refuge or Woodstock --

25     A.    Oh, absolutely not.

1      Q.   No vouching?

2      A.   They would -- if someone called us and

3 said -- you know, in other words, we were kind of

4 like a legitimizer.  We were a well-known church with

5 a great program and great counselors.  So they may

6 would call us to say:  This person completed your

7 program.  How do you feel?  And we would then turn

8 them over to those who worked with them.

9      Q.   So that would be the process through which

10 City of Refuge would give a thumbs up or were there

11 any cases where, for whatever reason, pastors who

12 came through the program, City of Refuge and

13 Woodstock just weren't convinced that they got all

14 the way through the process?

15     A.   There were times.  And there were also

16 times that they left the process.

17     Q.   And what would be the reasons they didn't

18 successfully complete the process?

19     A.   I couldn't answer that.

20     Q.   Could it be lack of transparency?

21     A.   Not sure.  I never really -- 90 percent of

22 the time, I was not aware why they were there.  I

23 have never needed to know.  If they came in, I put

24 them with those that could help them.

25     Q.   And what was the process for just getting

1  in?

2      A.   You -- you made application and then when

3  you made application, you would meet with James

4  Eubanks, who was the lead at that time.  And then

5  they would do an assessment and make a decision.

6  Because they may feel they could get them help in the

7  city where they lived or --

8      Q.   And were any participants in City of Refuge

9  in pastoral roles while they were going through the

10 program?

11     A.   I'm not aware of any.  Could be.

12          (Discussion off the record.)

13     A.   We are being too still in here.

14     Q.   (By Ms. Nokes) All kinds of --

15     A.   Need some movement in here.

16          MR. KLEIN:  It's blocked.  The motion

17     sensor is blocked.  So that's not helping but

18     that's okay.

19     Q    (By Ms. Nokes) What was your role

20 specifically with the City of Refuge?  What was your

21 involvement?

22     A.   I had no role in the City of Refuge.  I --

23 I introduced it.  I just said there needs to be

24 something like this.

25     Q.   So it was your idea?

MAGNA
LEGAL SERVICES

1    A.   Yes, it was really God's.  It's in the

2  Bible.  City of Refuge is referenced twice.  And it

3  really deals with people that have made bad choices

4  and then how the church comes around to encourage

5  them.

6    Q.   But was anyone on this side of heaven

7  involved in the creation of that ministry alongside

8  you?

9    A.   I just had the dream.  Basically I was the

10  Joseph of the Woodstock church; that is, I dream but

11  had a great team around me that made the dreams

12  become a reality.

13    Q.   How long did the City of Refuge program

14  typically take?

15    A.   Hardly ever did anyone leave in less than a

16  year.  And then many were there for two years.

17    Q.   And were they required to become members of

18  Woodstock to go through the program?

19    A.   Not required to be members, no, they would

20  attend Woodstock.

21    Q.   How many people do you think went through

22  it during its existence?

23    A.   I think I have heard the number of

24  somewhere between, say, 250 and 300 people that --

25  over a 28-year period when I left.

1      Q.   And when did it end?

2      A.   I'm not sure it has.  I'm not in touch with

3 the church, so.

4      Q.   Going back to your men's focus ministry

5 apart from City of Refuge, it was limited to men,

6 correct?  There were no women who -- I know wives

7 would go through with their husbands.

8      A.   Right, uh-huh.

9      Q.   But it was focused more on the men?

10     A.   Well, and in -- they would come in, but

11 then there were women counselors and men counselors.

12 So they had group therapy equally for the women and

13 the men.

14     Q.   Do you recall a conference or a series of

15 sermons you gave on Temptation Island?

16     A.   I do.

17     Q.   Tell me about those messages.  What

18 prompted them and what the heart of the message was?

19     A.   Well, picked up on the theme from

20 television.  And it was really we live on an island

21 of temptation.  Now, whether -- and it's not just in

22 that area.  I mean, whether it's temptation of pride,

23 which is the most insidious sin, in God's word.

24 Power.  There was money.  Sex.  So -- so I dealt with

25 different themes.

MAGNA
LEGAL SERVICES

 1       Q.    And what about the distraction of

 2   attraction, do you remember messages on that topic?

 3       A.    Title, and that's probably 15 or 20 years

 4   old.  So I would have to go back and read it.

 5       Q.    We have talked about adultery.  You don't

 6   recall specifically any sermons or talks at

 7   conferences on that topic?

 8       A.    I have preached some 51.  So I'm sure I

 9   referenced adultery with David.

10       Q.    And what about the conscience, things

11   waking on your conscience?

12       A.    I have dealt with the conscience.

13       Q.    And what are your teachings on that topic?

14       A.    I have no idea.

15       Q.    What are your thoughts on that topic?

16       A.    I hardly remember what I preached last

17   Sunday, much less 16, 20 years ago.  On the

18   conscience, well, I would say my own conscience.  I

19   have to deal with bad choice for the last 14 years.

20   So it bears on my conscience.  Kind of my inner

21   clock, my inner alarm.  And so...

22       Q.    What do you mean by that; can you

23   elaborate?

24       A.    Yes.  I wish I had never crossed to another

25   balcony.  So that bears on my conscious because I

1    have deep conviction against that.  So I went against

2    a core belief of my own heart.

3         Q.   Do you wish you would have handled the

4    aftermath differently?

5         A.   No, I think I handled it perfectly.

6         Q.   And I have your book "Unspoken."

7         A.   Okay.

8         Q.   And I think it was written in 2018.

9         A.   Uh-huh.

10        Q.   I'm going to just read you a quote from

11   it --

12        A.   Okay.

13        Q.   -- and see if it's something you still

14   agree with.  This is on Page 33.

15             MR. MacGILL:  Do you have extra copies of

16        that?

17             MS. NOKES:  No.  I will hand this one after

18        I read from it.

19             MR. MacGILL:  Okay.  That's fine.

20             MS. NOKES:  "God gives us chance after

21        chance to come clean, to admit the truth, to

22        speak up and remain silent no longer.  If we

23        refuse, we allow our fears to keep our mouth

24        shut.  Eventually the time will come when our

25        sin does find us out.  Sometimes even in this

MAGNA

LEGAL SERVICES

1     world, that sin goes proclaimed from the roofs."

2     A.    I believe it with all my heart.

3           MR. MacGILL:  All right.  And this is what

4     you circled?

5           MS. NOKES:  It's the underlined part.

6     A.    And, yes, I still believe that.

7           MR. MacGILL:  Hold on one moment, please.

8     And, Counsel, you were reading from the book

9     "Unspoken" by Pastor Johnny Hunt?

10          MS. NOKES:  Yes, published in 2018.

11          MR. MacGILL:  And Page 33?

12          MS. NOKES:  Correct.

13          MR. MacGILL:  Thank you.

14    Q.    (By Ms. Nokes) Mr. Hunt, do you know

15    personally any Southern Baptist preachers who have

16    committed adultery and continued to be pastors?

17          MR. MacGILL:  Counsel, could you define

18    "adultery" for us?

19          MS. NOKES:  Being unfaithful to one's

20    spouse.

21    A.    That is adultery?

22          MR. MacGILL:  We are going to object to --

23    just so you defined it.

24    Q.    (By Ms. Nokes) Well, let me ask Mr. Hunt.

25          MR. MacGILL:  She has defined it that way.

1          THE WITNESS:  Okay.

2          MR. MacGILL:  So use her definition or if

3     you want to ask your questions.  But we are

4     going to need to have this defined.

5     Q.    (By Ms. Nokes) How do you define

6     "adultery"?

7     A.    Adultery is a man that is married and he

8     has sexual intercourse with someone other than his

9     wife.

10    Q.    So Bill Clinton did not commit adultery?

11    A.    I don't know his story.

12    Q.    If it did not result in sexual intercourse,

13    which we will define as a man's penis being inserted

14    into a women's vagina --

15    A.    Uh-huh, right.

16    Q.    -- to be clear about that definition --

17    anything short of that is not adultery?

18         MR. MacGILL:  Well, Counsel, he's answered

19    your question.  So you're following up here?

20         MS. NOKES:  I'm clarifying.  I want to make

21    sure we are working off the same definitions.

22         MR. MacGILL:  All right.  May I hear his

23    prior answer back and your question, please.

24         THE COURT REPORTER:  Which question?

25         MR. MacGILL:  Where Pastor Hunt described

1    adultery and then Scarlett had a follow-up

2    question.

3         (WHEREUPON, the record was read back by the

4    reporter as follows:)

5         You said, "Mr. Hunt, do you know personally

6    any Southern Baptist preachers who have

7    committed adultery and continued to be pastors?"

8         And you asked her to define adultery for

9    us.

10        And she said, "Being unfaithful to one's

11   spouse."

12        And he said, "That is adultery?"  And then

13   you asked for --

14        MR. MacGILL:  Well, then the next -- then

15   his answer, where he --

16        THE COURT REPORTER:  "Adultery is a man who

17   is married and who has sexual intercourse with

18   someone other than his wife."

19        And she said: "So Bill Clinton did not

20   commit adultery?"

21        And answer:  "I don't know his history."

22        And question:  "If it did not result in

23   sexual intercourse, which we will define as a

24   man's penis being inserted into a women's

25   vagina -- to be clear about the definition --

1          anything short of that is not adultery."

2               MR. MacGILL:  Now, you want him to use your

3          definition now.  That's why I was wanting to

4          hear this.  You want him to use your definition?

5               MS. NOKES:  I want to continue asking

6          questions, and we will get to a working

7          definition.

8               MR. MacGILL:  Well, he did.  He gave a

9          definition.  Now, I just want to make clear, you

10         have made a definition and are you asking him to

11         affirm or not your definition?

12              MR. BESEN:  I think this will all be clear

13         if you just let her ask questions.

14              MR. MacGILL:  All right.  Well, why don't

15         we start with a new question because I couldn't

16         follow what you were doing.  But if you want to

17         ask a new question, maybe that's the most

18         efficient way to do it.

19         Q.   (By Ms. Nokes) What do you consider being

20    unfaithful to one's spouse?

21         A.   To be unfaithful, to me, in my heart, would

22    have been to have gone to another lady's room.  But

23    that is not adultery.

24         Q.   Okay.  When do you cross the line from

25    being unfaithful to committing adultery?

MAGNA
LEGAL SERVICES

1     A.   When you have sex with her.

2     Q.   And by "sex," you mean intercourse?

3     A.   Intercourse.  Exactly.

4     Q.   So you could be unfaithful by going to a

5 woman -- not your wife's -- room and kiss her and

6 that is not adultery?

7     A.   That's not adultery.

8     Q.   Is that what you have counseled people over

9 the years who've come to you seeking marital help?

10    A.   The Bible would counsel that.  And

11 absolutely.

12    Q.   What does the Bible say about adultery?

13    A.   That would -- the Bible speaks of adultery

14 in the sense of David.  And David had a relationship

15 with Bathsheba and she bore a son.  But if she hadn't

16 borne a son, she still had had sex and he had

17 committed adultery.

18    Q.   What's your view on emotional affairs?

19    A.   It would just be that a person had deep

20 feelings for someone other than their spouse.

21    Q.   Is that being unfaithful?

22    A.   It would be unfaithful but not adultery.

23    Q.   So your definition of adultery is limited

24 to sexual intercourse with someone not your spouse?

25    A.   Yes.  Other than that, the Bible used the

MAGNA
LEGAL SERVICES

1    word and history will use the word, "fornication."

2       Q.   Let me go back to an earlier question.  Do

3    you know any Southern Baptist pastors that have been

4    unfaithful to their spouse who have continued on as

5    pastors?

6       A.   Yes.

7       Q.   Who are they?  Well, let me ask this.  How

8    many do you personally know?

9       A.   I have no idea.

10      Q.   More than three?

11           MR. MacGILL:  And when -- I would give you

12           a caution here.  There is a priest penitent

13           privilege, all right?  And she's not asking you

14           to violate -- and I'm sure this is correct, and

15           correct me if I'm wrong -- any priest penitent

16           privilege.  But if you have any knowledge

17           outside of that privilege, you should answer her

18           question.  Do you know what I'm saying?

19           THE WITNESS:  Correct.

20           MR. MacGILL:  Could you --

21      Q.   (By Ms. Nokes) And to be clear, I'm asking

22   about other pastors that you are just aware of -- and

23   I'm limiting it to Southern Baptists, who have been

24   unfaithful to their wife -- because all Southern

25   Baptist pastors are men -- but continue to be

1    Southern Baptist pastors after being unfaithful.

2         A.   All Southern Baptist pastors are not men.

3         Q.   Okay.

4         A.   Just for the record.  That's another issue.

5         Q.   Yes, we won't get into that today.

6         A.   So I understand.  But I would not feel at

7    liberty to give names --

8         Q.   I'm not going to ask you for names.  I

9    asked that question, but I withdraw it.  I just want

10   to know a number.

11        A.   I would be guessing.

12             MR. MacGILL:  Again, I'm going to give you

13        the same counsel.  I think you have an

14        obligation, as a priest, not to give penitent

15        information in any way, shape or form.  And I

16        can be corrected, Scarlett, if you have

17        authority to the contrary.  But I'm just going

18        to caution you that -- that that privilege

19        exists, and you should answer her questions to

20        the extent you can, completely and fully.  But

21        I'm just asking you to be cognizant of any

22        priest penitent privilege.  But please answer

23        all questions that she's putting to you on the

24        topics.

25        A.   I would be guessing.  I have been a pastor

1   for 46 years.  I would have to go back and think.  I

2   know some that committed adultery or it could be,

3   just like with my case, false allegations.  So I

4   would be using false allegations.

5       Q.   (By Ms. Nokes) Well, you keep saying "false

6   allegations," but you did, in fact, kiss another

7   man's wife, correct?

8       A.   I have never kissed her lips in my life.

9   My lips have never touched her lips, so help me God.

10       Q.   Now I'm confused.

11       A.   Okay, good.

12       Q.   Because your complaint very clearly says

13   that the encounter with Jane Doe involved kissing and

14   awkwardly foundling.

15       A.   Because she said I kissed her forehead at a

16   time earlier.  She just didn't get the context, with

17   her husband there, when they were both crying as I

18   was offering counsel because things had fallen apart

19   at their church.  She also said on one occasion,

20   which I do not remember, that I kissed her hand.  And

21   that was a real grooming moment, according to her

22   testimony.  But, no, my lips have never touched her

23   lips.

24       Q.   I want to be crystal clear that in her

25   condo on July 10th, 2010, you did not kiss Jane Doe?

MAGNA
LEGAL SERVICES

1      A.   My hand raised to God, my lips have never

2  touched ████ ████ lips, ever.

3      Q.   And you did not awkwardly fondle her?

4      A.   I did awkwardly fondle her because she was

5  coming on to me.  I have never been questioned before

6  is the reason I'm so excited about being here today.

7  I have never been -- had an opportunity.  And I will

8  speak to all of the Guidepost report and how that

9  came about.  I have never been questioned.

10     Q.   Let's go ahead and just hear from start to

11  finish your take on your interaction with Jane Doe on

12  July 10th, 2010.

13     A.   I had spoke that morning, preached that

14  morning and was resting in my condo.  I had no idea

15  she was coming to my condo.  No idea.  I had received

16  a text from ████ saying that he was going to

17  probably send her down there, and if I saw her, look

18  out for her.  I guess what that meant to me, the only

19  place I had ever seen her in my life was walking by

20  the beach when my wife and I were there and them

21  being together and speaking.  So I thought that's

22  what he meant until I received a text from her.  And

23  it was the pier out from my place.  And my response

24  was simple:  Where are you?

25          She said:  Come to the balcony.  She had

MAGNA
LEGAL SERVICES

1  rented a room next to me, unknowing to me.  She had

2  just been there two weeks prior without her children

3  and with her husband.  Now she's without her husband

4  or her children.  She encourages me to come to her

5  side of the balcony.  She says she wants me to come

6  there so I won't be in the sun.  She's exposed to the

7  exact same sun mine is.  Mine's beside them.  There's

8  no trees.  The sun is there.  It would be the same

9  temperature on her side as mine.  And I continued to

10  refuse.  She continued to seduce.  And so with what I

11  would call temporary forgetfulness of God on my

12  behalf -- I take full responsibility -- I went over

13  and went to her balcony.  She said she wanted to talk

14  to me.  She places her feet up on my knees.  I said:

15  What do you want?  Me to rub your legs?  She said:

16  It would be nice.  And then she said:  I knew if I

17  could get you to come over here, hopefully, you would

18  ask to touch me because you are a perfect gentleman.

19  And that is fine.

20          And then I said, I don't feel comfortable

21  on the porch.  So we went inside.  But as we went

22  inside, I said, I really should leave.  She said,

23  Please don't.  Just be seated on the couch.  Just sit

24  here on the end of the couch.  And so she talked me

25  into sitting on the end of the couch.  She was

MAGNA
LEGAL SERVICES

1    sitting on the opposite end.

2            But then she turned around and spread her

3    legs toward me.  And then said, Please come closer.

4    That's where she would say I pinned her in.  At her

5    request, I came and sat besides her.  And then she

6    lowered her top.  She made herself available, to let

7    me know the reason she could not go jogging with me,

8    which I never invited her to run with me, and when

9    she requested the next day, I denied her.  She said,

10   I can't go running because I don't have a sports bra.

11   And I have to have a sports bra to run.  And so when

12   she did that is when I fondled her.  And then I

13   pulled her pants down with her help.

14            But as I did, I came under deep conviction,

15   stood up and said, I love my wife, and I love your

16   family.  And I shouldn't be here.  And I'm sorry.

17   And I left.  As I was leaving, she said, Please don't

18   be this way.  It's only the first day.

19            I was never given the privilege to tell

20   that story to Guidepost.  And I'd never been alone

21   with her before -- it was not an affair; it was an

22   encounter -- and never after.  And she continued to

23   reach out through her husband over the years.

24        Q.   It was being unfaithful to your wife?

25        A.   Yes, ma'am.  But not adultery.  I thank God

MAGNA
LEGAL SERVICES

1  I stopped when I did and left.  And you can deem that

2  fornication.  You are severely wrong to call it

3  adultery.

4       Q.   Do you know any Southern Baptist pastors

5  that have admitted to being unfaithful to their

6  spouses and stepped away from their pastoral role

7  because of that sin?

8       A.   No one comes to mind.

9       Q.   Not a single one?

10      A.   No.

11      Q.   Did Woodstock --

12           MR. MacGILL:  And, again, you are answering

13      on the same basis as before, not disclosing any

14      priest penitent communications, right?

15           THE WITNESS:  Uh-huh.

16           MR. MacGILL:  You understand?

17           THE WITNESS:  Right.

18           MR. MacGILL:  And that remains your

19      obligation from the beginning of this deposition

20      to the end.  You understand?

21           THE WITNESS:  Yes.

22           MR. MacGILL:  Okay.

23      Q.   (By Ms. Nokes) During your tenure at

24  Woodstock, did the church deal with any ministers,

25  pastors or employees who engaged in sexual

MAGNA
LEGAL SERVICES

1    misconduct?

2        A.    In my 33 years, one.

3        Q.    And was that person allowed to continue

4    working for the church?

5        A.    They stepped away and received counsel and

6    healing.  And then after a long period of time, we

7    invited them back.

8        Q.    And would you be surprised if current

9    Woodstock leadership tells us there are at least four

10   former employees that fall under that category?

11            MR. MacGILL:  Object to the form of the

12        question.  Lack of foundation.

13       A.    I don't -- I mean, I wouldn't be surprised,

14   but then in a church that large, oftentimes they

15   dealt with issues.  I would think they would bring it

16   to me, but I'm -- my mind right now, I'm thinking,

17   Who?  So.

18       Q.    (By Ms. Nokes) How would you describe your

19   ministry from 2011 to 2022, say, April of 2022?

20       A.    Greatly blessed.

21       Q.    And you took your extended sabbatical in

22   the summer of 2010, correct?

23       A.    Uh-huh, correct.

24       Q.    When you went back to the church that

25   August, September?

1       A.    I think somewhere in there.

2       Q.    Any change in your role at that point in

3   time?

4       A.    None.

5       Q.    Just back to business as usual?

6       A.    Correct.

7       Q.    And that included drawing your salary from

8   the church?

9       A.    Correct.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████ █

███████████████████████████████████████████

8     Q.    Why don't we do this, we have been going

9   about an hour.  Let's take a break and I will get the

10  documents out --

11    A.    That would be fine.

12    Q.    -- before we go back on the record.  It

13  will streamline things a little bit.

14          MR. MacGILL:  That's fine.  About 10

15          minutes?

16          THE VIDEOGRAPHER:  The time is 10:14 a.m.

17          Going off the video record.

18          (WHEREUPON, a recess was taken.)

19          THE VIDEOGRAPHER:  We are back on the

20          record.  The time is 10:30 a.m.

21    Q.    (By Ms. Nokes) Mr. Hunt, it's been noted

22  that you and I are sometimes talking over each other.

23  So I just request that you try to wait until I finish

24  my question to answer.

25    A.    Okay.

MAGNA
LEGAL SERVICES

1    Q.   And I will, in turn, try to remember to let

2  you finish your answer before I ask another question.

3    A.   Yes, ma'am.

4    Q.   We were talking about your wages and salary

5  at Woodstock.  So we are going to just go through --

6    A.   Okay.

7    Q.   -- each one.  These exhibits are thick

8  stacks.  I think for purposes of this line of

9  questioning, we are just going to be looking --

10   A.   Okay.

11   Q.   -- at the top page.  So I'm going to hand

12 you what has been marked as Defendants' Exhibit 1.

13        (Defendants' Exhibit 1, 2014 Tax Returns,

14        marked for identification.)

23   A.   Yes, ma'am.

24        (Defendants' Exhibit 2, 2015 Tax Returns,

25        marked for identification.)

MAGNA
LEGAL SERVICES

22      A.      Correct.

23              (Defendants' Exhibit 3, 2016 Tax Returns,

24      marked for identification.)

15    A.    Okay.

16    Q.    Do you see that?

17    A.    Yes, ma'am.

18         (Defendants' Exhibit 5, 2018 Tax Returns,

19    marked for identification.)

20         MS. NOKES:  And is this 5?

21         THE COURT REPORTER:  Yes.

17      A.   Yes, ma'am.

18      Q.   And was this the year that you retired from

19  the church?

20      A.   At the close of that year.

23      A.   Correct.

24      Q.   And so this -- you actually worked at the

25  church --

MAGNA
LEGAL SERVICES

1      A.    I did.

2      Q.    -- in 2019 and were also working for the

3 North American Mission Board that year?

4      A.    Correct.   Uh-huh.

5      Q.    Was that the only year that you actually

6 worked for both?

7      A.    Yes.   I was transitioning out with a new

8 pastor coming in.   So he was -- he was doing most of

9 the leadership at the church, but nonetheless.

10           (Defendants' Exhibit 7, 2020 Tax Returns,

11           marked for identification.)



MAGNA
LEGAL SERVICES

1       A.    Yes, ma'am.

2       Q.    So that was your part of your --

3       A.    Correct.

4       Q.    In recognition of your years of service?

5       A.    Yes, ma'am.

6       Q.    Were you doing any work for the church

7  still in 2020?

8       A.    Just speaking periodically for them.

9       Q.    Did you still attend?

10      A.    Yes.

11      Q.    Had your membership there?

12      A.    I did.

13            (Defendants' Exhibit 8, 2021 Tax Returns,

14            marked for identification.)

█  █  ████████████████████████████

█  ███████  ████████████████  ██████

█  ██████████████████████████████  █

█  ███████

█  █  █████████  ██████████

█  █  █████

█  █  ████████████████████

█  █  ██████████████████

█  █  ██████████

█  █  █████████████████

25      A.    Correct.

1          (Defendants' Exhibit 9, 2022 Tax Returns,

2          marked for identification.)

███  ███  ████████████████████████████

███  ████████████████████████  ████████████

███  ██████████████████████████████

███  ████████████

7          A.   Yes, ma'am.

8          Q.   I'm not sure, going back to 7, that we

9    flipped to the second page.  We looked at Woodstock.

10   If you will go back to Exhibit 7.

11         A.   Oh, this one.

12         Q.   And turn to the second page.

13         A.   Okay.

14         Q.   Is that your W-2 from the North American

15   Mission Board for 2021?

16         A.   Yes, ma'am.

███  ███  ██████████████████████████

███  ██████████████

███  ███  ████████████

███  ███  ██████████████████

███  ████████████████████████████████

███  ████████████████

███  ███  ████████

███  ███  ██████████████████████████

███  ████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

14     Q.    And we have talked some about July 2010.

15     A.    Uh-huh.

16     Q.    July 25th, 2010.  And we will talk about it

17  more today.  But we are still in that time period of

18  20- -- late 2010 to 2022 before the report.  Did you

19  continue to preach and teach on topics like lust,

20  temptation?

21     A.    I not only taught on it, I wrote books on

22  it.  So, yes, ma'am.

23     Q.    And did you ever confess or reveal your own

24  struggles or sin in those areas as part of those

25  writings or teachings?

MAGNA
LEGAL SERVICES

1       A.   With my wife, with my counselor and with

2   the ████████

3       Q.   Did you ever have an accountability partner

4   or accountability team beyond those individuals you

5   listed?

6       A.   Not during those days, no.

7       Q.   And did you ever require counseling, not to

8   get into the substance of the counseling, but did you

9   ever get counseling services after 2010?

10      A.   Not until the false allegations came out.

11      Q.   Okay.  Mr. Hunt, do you believe that women

12  and Southern Baptist women in particular seek out

13  powerful men and pursue them?

14           MR. MacGILL:  Object to the form of the

15      question.

16      A.   I would be guessing.

17      Q.   (By Ms. Nokes) You have never said that to

18  other people before, something along those lines?

19      A.   I would say that anyone that is greatly

20  used in life, it seems like there's a target on them.

21  I think some people would be drawn to a person of

22  influence or feel like they have got their act

23  together.  I have often wondered if that's what --

24  why Lisa stalked me.

25      Q.   You said stalked you?

```
 1        A.    Yes, ma'am.

 2        Q.    How do you define "stalk"?

 3        A.    Moving into a condo next door to me seven

 4   hours from her house.

 5        Q.    Moving in?

 6        A.    And then pursuing -- renting that place

 7   next to me and then pursuing me.

 8        Q.    And did that happen on any occasion other

 9   than the one we have talked about?

10        A.    Never.

11        Q.    Did you get that feeling from her before

12   that date?

13        A.    Never.

14        Q.    That she was attracted to you?

15        A.    No, I was never in her presence other than

16   with her husband, never felt that way.

17        Q.    Have you made comments along the lines of

18   what I mentioned, that women seek out powerful men,

19   have you referenced that in discussing the misconduct

20   of other pastors with women who are in their

21   congregation and under their pastoral authority?

22        A.    I would be speculating to say that because

23   I can't come to mind to say 13 years ago in one of my

24   sermons, so I -- I couldn't.

25        Q.    It's possible?
```

MAGNA
LEGAL SERVICES

1     A.    Exactly.  It is possible.

2     Q.    Have you expressed to others a concern that

3   that kind of seeking out a powerful man could take

4   his ministry down?

5     A.    Absolutely.

6     Q.    And have you said that you feel like

7   women -- and I'm not necessarily talking about Jane

8   Doe, but could be any woman -- have come on to you

9   because of your status as a powerful man within the

10  Southern Baptist Convention?

11    A.    I don't know that I have ever referred to

12  myself as a powerful man.

13    Q.    Have you referred to other women coming on

14  to you for whatever reason?

15    A.    Yes.

16    Q.    Has that happened a lot over the course of

17  your ministry?

18    A.    No, not at all.  No.

19    Q.    How many times, do you think?

20    A.    If I were guessing, I would say maybe

21  three.

22    Q.    And do you hold the belief today that women

23  are attracted to and come on to powerful men?

24    A.    That would be too broad a statement for me

25  to say yes to.

MAGNA
LEGAL SERVICES

1    Q.   How would you --

2    A.   I would say that's possible that could

3   happen, but I would never say a lot of women or -- I

4   don't know.

5    Q.   Okay.  And if we have other witnesses that

6   say you have minimized sexual misconduct by pastors

7   where there's a clear power differential based on the

8   women's propensity to be attracted to and come on to

9   a powerful man, would you dispute that you have made

10  comments along those lines?

11         MR. MacGILL:  Object to the form of the

12         question.  Lack of foundation.

13   A.   I'm not sure I understand your question.

14   Q.   (By Ms. Nokes) If other people have said in

15  your conversations with you that you have excused the

16  misconduct of other pastors, unfaithful sexual

17  misconduct of other pastors by saying that's just a

18  woman coming on to a powerful man trying to trap him

19  and take down his ministry?

20   A.   Yes.  I don't recall ever saying something

21  like that.

22   Q.   But that's also possible?

23   A.   It's possible, yes, ma'am.

24   Q.   We talked in a roundabout way about Johnny

25  Hunt Ministries, but tell in your own words, what is

1  Johnny Hunt Ministries?

2     A.  Johnny Hunt Ministries is coming to a place

3  in my life that I felt I made enough income pastoring

4  my church, and I felt that anything beyond that, we

5  would place in an account and we'd give to missions

6  and to poverty and other areas where we felt we could

7  be of help.  And so we have done that for years.

8     Q.  Do you remember when it was formed?

9     A.  I don't.

10    Q.  And do you know if it's a for profit or a

11  not for profit?

12    A.  It's a not for profit.

13    Q.  And is it incorporated here in Georgia?

14    A.  It is.

15    Q.  Does it have any employees?

16    A.  No, ma'am.

17    Q.  Any contractors that get 1099s that are

18  paid through Johnny Hunt Ministries?

19    A.  No, ma'am.

20    Q.  Has it ever?

21    A.  I don't -- I can't recall.  My wife does

22  the book counting.  So maybe she will remember.  I

23  don't remember ever giving anyone a 1099 from Johnny

24  Hunt Ministries.

25    Q.  As a nonprofit, does it have a board?

MAGNA

LEGAL SERVICES

1    A.    It does.

2    Q.    Who is on that board currently?

3    A.    Let's see, Ginger Anspaugh.

4    Q.    Who is she?

5    A.    She was a business lady in our church.  And

6    so she's in another church now.  She serves on the

7    board.  And John Kissee, and he would be a

8    businessman and has served.  And then I think my wife

9    is the secretary.  And I can't remember if there's

10   one more.  Janet would know that.

11   Q.    And the two individuals who are in the

12   business world that you mentioned, how long have they

13   been on the board?

14   A.    Maybe two years.

15   Q.    And have family members traditionally

16   served on the board?

17   A.    I don't believe any family has been -- I

18   don't remember.  If they did, one of my son-in-laws,

19   but I'm not sure.  Again, Janet keeps that.  And I

20   think we are dealing with that tomorrow, so.

21   Q.    What are the sources of revenue to Johnny

22   Hunt Ministries?

23   A.    The majority has been when I sell books, I

24   place the money in there.  All of the speaking that I

25   do and even now, I have been placing it.  However, my

1    wife said:  You don't have an income.  So I just

2    started telling people to pay me.

3          Q.    When did you do that?

4          A.    Probably in the last five weeks, maybe not

5    even five weeks.  But now I'm taking the income from

6    where I'm speaking.  But it was just I didn't think

7    about it.  You know, just always have been made to

8    assume- -- all of my outside speaking has been money

9    that we received that we underwrote our mission.

10   I'll be in four different countries in May.  And so

11   we pay all of our own expense.  And you even have to

12   compensate, in especially third-world country

13   conferences.  And that money allows us to do that.

14         Q.    Does Johnny Hunt Ministries have any

15   expenditures?

16         A.    Maybe a copy machine every now and then or

17   something like that, but.

18         Q.    So the money flows in from your writings

19   and speaking?

20         A.    Speaking.  That's the majority.

21         Q.    And then flows out to mission work?

22         A.    Missions and different missionaries and

23   people in ministries.

24         Q.    What's your connection to or involvement

25   with It's a New Day, Inc.?

```
 1        A.    Today, nothing.

 2        Q.    And historically, what has your involvement

 3   been?

 4        A.    It was mine.  I owned it.

 5        Q.    And what is It's a New Day?

 6        A.    It's the tape ministry.

 7        Q.    Tape ministry?

 8        A.    That's the tape ministry.

 9        Q.    Do you know the years it was operational?

10        A.    It still is.  So it was probably -- it's

11   probably 25 years old.

12        Q.    And you gifted it to your daughter, I think

13   you said earlier?

14        A.    Daughter, uh-huh.

15        Q.    When was that?

16        A.    Close to 25 years ago.

17        Q.    And was it set up as a for profit or a not

18   for profit?

19        A.    Not for profit.

20        Q.    And does it have any employees currently,

21   if you know?

22        A.    I think it has one.

23        Q.    Do you know who that is?

24        A.    Carrie Day works part-time -- I mean, not

25   Carrie Day, I'm sorry.  Carrie Gwen works part-time
```

1   there.

2       Q.   And, historically, how many employees has

3   it had?

4       A.   I don't think it's ever had more than two.

5       Q.   Is there a board for It's a New Day?

6       A.   I'm sure they have one, but I'm not

7   affiliated with it at all.

8       Q.   When you were affiliated, was there a

9   board?

10      A.   A board, yes.

11      Q.   Do you recall who was on it?

12      A.   Too -- too far.

13      Q.   Did you derive any income from It's a New

14  Day?

15      A.   No.

16      Q.   Where did the money flow out to from it?

17      A.   Probably employees.  Just a bit of

18  information:  Any pastor in the world could request a

19  tape and we gave it to them, and missionaries.  So it

20  was really a giving ministry to people.  So there's

21  pastors in our convention that would say their

22  closets are full of free tapes that they received.

23      Q.   What's your current connection to or

24  involvement with New Song Ministries, Inc. and

25  Extreme Conferences?

MAGNA
LEGAL SERVICES

1      A.   Extreme Conferences, I have spoke until the

2  false allegation removed me.  The New Song, I have

3  served as one of their board members for probably 20

4  years.

5      Q.   Are those two separate entities or is that

6  the same thing?

7      A.   Well, New Song is, first of all, a singing

8  group.  But they have ministries like Winter Jam.

9  That's theirs.  Winter Extreme is two conferences

10  that take place the week after Christmas.  That's all

11  that is.  And so I used to speak on those until the

12  false allegations removed me.

13      Q.   So you have not gone back to those speaking

14  engagements like you have Jubilee?

15      A.   No.  Senior adults are more forgiving.

16      Q.   Is New Song or the Extreme Conferences, is

17  it set up as a for profit or not for profit?

18      A.   They are not for profit, but I have, you

19  know, nothing to do with it other than I just go to a

20  board meeting a couple of times a year.

21      Q.   Who else serves on that board with you?

22      A.   It would be Eddie Carswell, which owns that

23  ministry, and Billy Goodwin, which is the only other

24  owner.  There's just two owners in New Song.  And I'm

25  not sure because -- I'm not even sure I'm still on

1  the board.  I may have lost that also because of the

2  false allegation.  Because I haven't been informed of

3  any meetings.

4      Q.   When was the last time you recall going to

5  a meeting?

6      A.   Two years ago.

7      Q.   Do you recall the month?

8      A.   It would have been probably June.  Normally

9  they would do it in the summer.  Summer meeting.

10      Q.   So June of 2022?

11      A.   Twenty-two.

12      Q.   After the report came out?

13      A.   Right, uh-huh.

14      Q.   Do you derive any income or financial

15  benefit from Extreme Conferences?

16      A.   Only if I speak and I get an honorary.

17      Q.   Do you have any current connection to or

18  involvement with Jubilee conferences?

19      A.   Yes, I speak only.  So I only get an

20  honorary for speaking.

21      Q.   Who owns it?

22      A.   My son-in-law, Jay Carswell.

23      Q.   And you were just there speaking before

24  coming here today, right?

25      A.   Correct.  And that's where I was the first

MAGNA
LEGAL SERVICES

1    time I was interviewed by Guidepost two years ago

2    this week.

3         Q.    And you said in your interrogatory

4    responses that you said you believed you had lost out

5    on Jubilee engagements, but that's no longer true?

6         A.    No, no, I didn't say that in

7    interrogatories.  I said that I lost out on Favored

8    Women and Extreme Conferences, that I'm still doing

9    Jubilee.  I didn't do them -- I didn't do anything

10   the year after the report came out until the end of

11   the year.

12        Q.    And did they -- were you scheduled to do

13   Jubilee and they cancelled?

14        A.    I was, yes, ma'am.

15        Q.    Who works at Jubilee now?

16        A.    Works?

17        Q.    Are there other employees?

18        A.    It would be my son-in-law runs it, and my

19   grandson-in-law works in it and his wife, my

20   granddaughter and my daughter, and then they have

21   some employees.

22        Q.    Is there a board?

23        A.    I don't know.  I have nothing to do with

24   that ministry.

25        Q.    So your role is simply to show up and

1  speak?

2       A.   I speak, yes.

3       Q.   And what is your honorarium for the

4  Jubilee?

███   ███   ████████████████████████████████████

███  ████████

7       Q.   And is that per day or per conference?

8       A.   Per conference.

9       Q.   Tell us about your connection to Timothy

10  and Barnabus?

11      A.   I owned Timothy and Barnabus.  That was my

12  ministry.

13      Q.   What kind of ministry was it?

14      A.   That was training pastors.

15      Q.   When did it start?

16      A.   Okay.  So I did the last one in 2022.  I

17  was doing one when I did the last meeting, and I will

18  just call it a meeting.  It was an ambush with

19  Guidepost.  That was the last meeting that I did with

20  Timothy Barnabus.  I ran it for 25 years.  I did not

21  draw a salary from it.  As a matter of fact, I

22  invested in it.  Because we let -- no pastor was

23  turned away if there was a room for them.  I either

24  gave the money or raised the money for them to come.

25  Twenty-five years.  And then I gave it to North

1  American Mission Board when I went there in 2020 for

2  perseverance and there would be something to continue

3  after I'm gone.

4      Q.   Is it still operational now?

5      A.   No.  Everyone cancelled me, in the sense of

6  that.  So they don't want a name affiliated with me.

7  It's a cancel culture, because of what Guidepost did.

8      Q.   And have you started a similar ministry

9  called Advanced?

10      A.   No.  I did Advanced for the last 15 years.

11      Q.   Okay.  So it's totally different --

12      A.   Totally different.

13      Q.   -- than Timothy Barnabus?

14      A.   That's -- Timothy Barnabus was a lot of

15  pastors from all over the country coming.  This is

16  invitation only.  More of large church pastors

17  that -- large churches only make up about 2 percent

18  of the nation's population.  So they have different

19  issues than you would have just in a room with mostly

20  pastors that have a hundred on Sunday.

1      A.   From Timothy Barnabus.

2      Q.   Yes.

3      A.   It must be a mistake.

4      MR. MacGILL:  Do you have a document we can

5   look at, Counsel?

6      MS. NOKES:  Yes.

7      Q.  (By Ms. Nokes) Let's go back to 2015.  And

8  it's on Page 2.  There's one there for Janet Hunt.

9  I'll let you get -- are you on 2015?

10     A.   Okay.

███   ███   ████████████████████████

███  ███████████████████████   ███████████

███  ███████████████████████████████████████

███  ████████████████████

15      Do you see both of those?

16     A.   Yes.  She maybe can give you insight on

17  that tomorrow.  Because I'm not sure what it is.  I

18  don't know if it's something that it's refunding me

19  for -- I don't understand.  She will have to give me

20  clarity.

21     Q.   So if those payments persisted for four

22  years, from 2015 through 2018, the same answer for

23  each of those years?

24     A.   Yes.

25     Q.   You don't know?

MAGNA
LEGAL SERVICES

1      A.    I don't know.  I really don't.

2      Q.    Do you know why the payments stopped after

3    2018?

4      A.    I don't know why it started.  So, no,

5    ma'am, I don't.

6      Q.    And then we talked about Advanced.  Is it

7    incorporated or is it under Johnny Hunt Ministries?

8      A.    It's just an event I do.  Just -- so, no, I

9    don't know that it's incorporated, no.

10     Q.    And you don't derive any income from it?

11     A.    Income from it, no, ma'am.

12     Q.    Do pastors ever pay -- do they collect a

13   love offering?

14     A.    Not -- no.  It's basically they just pay

15   their own way and they are there.  And there's enough

16   coverage that it would pay my way.  I don't have to

17   pay to be there to host them.  But it's like a

18   four-day event.

19     Q.    And you said it's invitation only.

20     A.    Yes, ma'am.

21     Q.    Do you have any trouble getting people,

22   pastors to accept those invitations?

23     A.    No.  It's basically, if anything, they are

24   saying I hope we keep it at 30, so.

25     Q.    Do you have any connection to 3H Travel,

1    LLC?

2          A.    Nothing.  It's my daughter's business.

3          Q.    What kind of business is it?

4          A.    Travel.

5          Q.    Is there a board?

6          A.    I don't know anything about her business.

7          Q.    Does she handle all of your travel?

8          A.    Most.  Not all.

9          Q.    And what about 3H Publishers, Inc.?

10         A.    That's mine.

11         Q.    And what is it?

12         A.    But it's not -- I don't have it any longer.

13   That -- at one time, I not only wrote books for

14   publishers, but I put books together for pastors of,

15   like, the whole book of Acts, like a commentary.  So

16   I did that.  So I just did self-publish because I

17   already had all the work myself.  So I did that for

18   years.  But I no longer have that company.

19   Everything is Johnny Hunt Ministries now.

20         Q.    Do you know when 3H Publishers stopped

21   operating?

22         A.    Ms. Hunt could tell you.

23         Q.    Do you have any connection to Carswell

24   Motorsports, LLC?

25         A.    No, but they really did a good job running

1  that false narrative on the fact that I owned

2  everything.  So I see the line of reason that we are

3  taking here, that Baptist news ran, that I -- the

4  Hunt Empire.  Have absolutely nothing to do with

5  them.  I have children, family that's been greatly

6  blessed and are hard workers.  And I'm so grateful

7  God has been good to us, and we can be good.  We have

8  been blessed to be a blessing.  So I see the line of

9  reasoning of -- that we have just really been heavily

10  involved in helping people, and you can't help people

11  without it normally helping you.

12      Q.   We talked quite a bit about NAMB and remind

13  me, did you go to work there in 2019 or 2020?

14      A.   2019.  And I will just be real clear.  They

15  wanted my name.  They wanted Johnny Hunt there

16  because they were struggling a lot.  They needed a

17  name of integrity and a name of leadership to help

18  them.  And so because I couldn't go full time until

19  2020, but they just said if we could just have your

20  name and you just do a number of conferences, we want

21  you now.  And that was our understanding.

22      Q.   And so to help them, was that in terms of

23  leadership?

24      A.   Leadership.

25      Q.   And was it to enhance their finances and

1  encourage giving?

2      A.   No, it wasn't about giving.  It was

3  leadership.

4      Q.   And was the role created just for you?

5      A.   They have had people in the past to do a

6  number of things.  But I don't think they had ever

7  had a person to do leadership and evangelism.

8      Q.   And that was your title, right, senior vice

9  president?

10     A.   Senior vice president.  So I answered only

11 to the CEO.

12     Q.   Okay.  And you were working there prior to

13 the release of the Guidepost report, correct?

14     A.   Correct.

15     Q.   Did your role ever change during the

16 three-plus years you were at NAMB?

17     A.   No.

18     Q.   What were your duties and responsibilities

19 in your role?

20     A.   They wanted me to help pastors.  So I did.

21 In 2021, I think I did 13 Timothy Barnabus

22 conferences, and they last like three to four days.

23 So 13 of those.  And then I would teach one day

24 evangelism conferences somewhere around our 42 state

25 conventions.  So very little time in the office.  I

1    was out constantly with pastors.

2        Q.   Did you have to fill out paperwork to get

3    employed or was this more you said they sought you

4    out?

5        A.   Uh-huh.

6        Q.   Did you do the regular employee onboarding?

7        A.   I did.

8        Q.   Did you fill out a paper application?

9        A.   I did.

10        Q.   Did it ask about any past failings?

11        A.   I don't remember.

12        Q.   Did it ask if you'd ever been unfaithful to

13    your spouse?

14        A.   I don't remember that being on there.

15        Q.   Does NAMB have policies in place about

16    interactions with the opposite sex?

17        A.   I bet they do now.

18        Q.   And do you recall anything Dr. Ezell said

19    during your onboarding process about interactions

20    with the opposite sex?

21        A.   I don't remember him saying anything.

22        Q.   Did you receive any training before you

23    started working at NAMB?

24        A.   I don't remember anything formal.  It could

25    have been.  And I just -- I was multitasking so many

1    things.  And maybe Mr. Ezell told you that the reason

2    he's there is because I turned down his job with a

3    unanimous vote.  And I think he was excited about

4    having me since they wanted me to lead the

5    organization.

6         Q.    And you were friends, correct?

7         A.    We have been friends a long time.

8         Q.    And would you say he was your direct

9    supervisor at NAMB?

10        A.    Yes, ma'am.

11        Q.    I know you said you reported to him?

12        A.    He would be.

13        Q.    Did anyone report to you?  Did you have a

14   staff?

15        A.    I did.

16        Q.    Who was on your staff?

17        A.    I had a ministry assistant that I brought

18   from Woodstock, Donna.  I had a young man named Shane

19   that helped in student evangelism.  I had a couple of

20   associates that helped me because if I decided I was

21   going to do a Timothy Barnabus in Lake Tahoe, I

22   didn't do anything.  They lined everything up.  I

23   just showed up to speak.  So they were constantly

24   busy traveling, scheduling our meetings.  I had a

25   young lady named Catherine that worked especially

1   with women, part of our ministry.

2           I think that's -- that's it.

3       Q.   And when did your NAMB employment end?

4       A.   When I got back from being ambushed by

5   Guidepost, I called Kevin and told him I wanted to

6   meet the next day.  And I said, I don't know what

7   they are going to say, but I want you to hear from me

8   what I did twelve years ago.  And they are going to

9   put it in a report of some form, and I'd rather step

10  away instead of causing you grief.  And I offered my

11  resignation that day.

12      Q.   So that was May 13th?

13      A.   Correct.

14      Q.   And the second interview you did with

15  Guidepost was on May 12th?

16      A.   It wasn't an interview.

17      Q.   You talked to Guidepost --

18      A.   It was not an interview.

19      Q.   -- on May 12th?

20      A.   Very little.  They talked over each other

21  to me.  They were very determined.  They had already

22  made their case, and now through the depositions that

23  I have been able to view, the report was written two

24  days before they talked to me.

25      Q.   And so --

MAGNA
LEGAL SERVICES

1       A.    Their minds were made up.

2       Q.    You have written a lot on leadership?

3       A.    Uh-huh.

4       Q.    You are a confident man and leader.  Are

5   you saying they wouldn't let you speak in the meeting

6   you had with them?

7            MR. MacGILL:  Wait.  Just so the

8       question -- you made a statement, so the

9       question is what?

10           MS. NOKES:  Would Guidepost not allow him

11      to speak in the May 12th meeting he had with the

12      investigators?

13           MR. MacGILL:  Thank you.

14      A.    After the way they ambushed me, who wanted

15   to talk to them?

16      Q.    (By Ms. Nokes) And what do you mean when

17   you say "ambushed"?

18      A.    Here's how the meeting came about.  I had

19   met with them in April.  They had absolutely nothing

20   to even hint of about the ███████  Nothing.  They

21   say that they dropped statements that they thought I

22   would jump on board with.  If they will be honest,

23   they will tell you that they asked me if I knew the

24   pastor at Rehoboth Baptist where ██████ had been.

25           I said, I just did his 10th anniversary

MAGNA

LEGAL SERVICES

1   celebration.  His name is Troy Bush.  Had they wanted

2   to know about the ████████ they would have said, No,

3   Mr. Hunt, 12 years ago.  They did not do that.  They

4   stuck with that narrative.  So I left that meeting.

5   There's nothing mentioned.  So there never was an

6   opportunity to say:  You had a chance to come clean.

7   That is not a true statement.

8           So then they reached out to my secretary.

9   I have 200 pastors in a room.  I'm starting at

10  9 o'clock.  They want to know if I can get on a Zoom

11  call at 9:00.  And I'm thinking:  I can't give up

12  time.  I have got 200 pastors I've got to go in.  I

13  can't do it right now.  They assured me that all they

14  wanted to do is just do a follow- -- couple of

15  follow-up questions from my previous meeting.

16          When I went on the Zoom call, immediately,

17  they both dove in, being in different places, and

18  began to say, Tell us about the room that you rented

19  for ████████  ████████ next to you.  Tell us about how you

20  assaulted her.  So as they began to spew that out,

21  and I said, no, I was not saying no to I was never

22  there.  I was saying no to this narrative that was

23  such a lie that they had fabricated and ambushed me.

24          And then they were so kind enough to say,

25  Now, you have two days.  And now that I have listened

MAGNA

LEGAL SERVICES

1  to depositions, they've already met with this couple

2  11 times, 11 times probably over 50 hours.  And if we

3  can get a recording, if -- of the Zoom the day they

4  met, they did not interview me for an hour.  I was

5  back in my meeting.  At the most, that meeting was

6  somewhere between 10 and 15 minutes.

7          And if the courts would order them to show

8  that Zoom call in their computer, it would give the

9  amount of time.  I believe there's a video.  But the

10  video would support me.  And that's why we will never

11  see it.  They literally ambushed me.  I was so

12  unsettled, I had to go in and ask someone to speak

13  for me the next session because of the way they

14  approached me.  It was strictly nothing but

15  accusation, one after another, one over the other.

16  Then in their kindness, if there's anything that you

17  want to say that's different, you have 48 hours to

18  call us.  Well, if they have known this since

19  February, why don't I know it yet?  So I look forward

20  to the public becoming known as to how I was treated

21  and how we will ever justify 50 hours with them,

22  giving them questions they are going to answer.  I

23  was never given a question.  They formulated a story,

24  one-sided story.

25          They didn't believe that it could have been

MAGNA

LEGAL SERVICES

1    a Potiphar's wife, a genesis 39, where maybe the

2    woman was the one that was on the attack and not the

3    man.  And maybe I survived, getting out of there.

4         Q.   But that --

5              MR. MacGILL:  Just for the record, let me

6         reiterate again, if you don't mind, we have been

7         demanding for years this video.  There has to be

8         a video of this.  It has not been produced.  We

9         want -- as Pastor Hunt indicated, we want the

10        video.  There is a video.  We are certain of it.

11        It's been denied by Guidepost repeatedly.  We

12        will ask again that the video be produced.

13             Second, we will ask again that the data

14        showing the amount of time and when this

15        conference took -- when this, quote, ambush as

16        Pastor Hunt has testified to, occurred and the

17        time period.

18             We ask that Guidepost produce both of those

19        pieces of information into evidence to the

20        counsel for the SPC and to counsel for the SPC

21        executive committee as well as our client.

22             Sorry for the interruption.

23             MR. BESEN:  So you are asking us to produce

24        stuff that --

25             MR. MacGILL:  No, I'm asking them to

MAGNA
LEGAL SERVICES

1    produce that and to produce it to you and to us.

2         MR. BESEN:  All right.  Got you.

3    Q.   (By Ms. Nokes) But, Mr. Hunt, what you

4    referred to as the ambush is what prompted you to

5    reach out to Dr. Kevin Ezell and resign without even

6    working out a notice, correct?

7    A.   There would not have been an opportunity

8    for a notice.

9    Q.   To NAMB?

10   A.   Yes, I'm confident of that.  Once --

11   Q.   But this was May 13th.

12   A.   My confession was -- because I did tell him

13   what I did do.  And I said, And to save you heartache

14   of this report, whatever is going to be in it,

15   because I never saw it until -- well, I was going to

16   say you saw it, but I never saw it until the average

17   person saw it.  So when people were finding out what

18   was in the report, I didn't know.  And then to find

19   out that ███ wrote the majority of my report is

20   unbelievable.

21   Q.   So for the sake of clarity in the record,

22   what specifically did you tell Dr. Ezell in

23   connection --

24   A.   I told Dr. Ezell that I broke my own

25   covenant with myself and that I went into a condo

MAGNA
LEGAL SERVICES

1  with a lady that was not my wife and that I did touch

2  her.  And that I will grieve it till the day I died.

3  But I have received counseling after that.  I

4  confessed it to everyone that would have been injured

5  in it.

6          Charles Spurgeon, the most quoted pastor of

7  the 21st century, he said that a confession should be

8  as broad as its offense.  Everyone that was offended

9  in that situation, I went to personally.  And when I

10  went to ███████ his wife had not told him.  The

11  information ██████ got for probably months was

12  whatever I could tell him because his wife would not

13  tell him.

14      Q.   It's your position that based on your

15  account of what happened, that didn't offend the

16  leaders of First Baptist Woodstock?

17      A.   It was a personal matter between God and

18  myself based on Psalms 51:4.  "I have sinned against

19  thee and thee alone."  The church does not have a law

20  that I can sin against.  My sin was against God.  And

21  I had offended ██████ and her husband and my wife.

22      Q.   Do you think there's ever a time when --

23  every sin is a sin against God, you agree?

24      A.   Exactly.

25      Q.   Do you think there ever a time when a

1  pastor sins and it's significant enough that church

2  leaders need to be informed?

3       A.   Let me say, to put it in its perspective,

4  when I was in counseling, I was not -- I was not

5  considering myself pastor at Woodstock.  I was

6  personally removing myself with no intention of ever

7  going back.

8            And so I was making all the preparations

9  for that.  But I found healing through my counseling,

10  through seeking forgiveness of those offended and

11  with God.  And I feel like I was restored by the

12  person who called me.  And so I think it was a

13  private matter in my own heart.  I believe to this

14  day if I had been pastor at Woodstock when this came

15  out, I would still be pastor at Woodstock.  But it

16  being set up the way it was, with an EC member being

17  the pastor, he played along with the Guidepost story.

18       Q.   And to be clear, you said earlier you -- if

19  you could rewind the clock --

20       A.   Yes.

21       Q.   -- which none of us could do, you wouldn't

22  handle any of it differently?

23       A.   Afterwards?

24       Q.   Yes.

25       A.   Absolutely not.  I'm totally content to

MAGNA
LEGAL SERVICES

1  face God one day with the way I dealt with it, that I

2  went to my wife.  I got in my car and drove over to

3  ███████  He could have gotten angry and pulled a gun

4  out and killed me.  I would be willing to die to get

5  it off my heart.  And so I don't want anyone making

6  light of something that was so serious in my heart.

7  And then I gave myself to 16 weeks of intense

8  counseling, sometimes eight hours a day to just, in

9  my own heart, to make sure I reinsure the boundaries

10  in my life.

11          Being a pastor and how I counsel people, I

12  would counsel people to do exactly what I did.  And I

13  have talked to the leading pastors in America, the

14  generation beyond me.  And every one of them would

15  say:  I don't know what you should have done, under

16  God, different than what you did.

17      Q.   What did Kevin Ezell respond to you when

18  you told him?

19      A.   Kevin's greatest grief would be losing me.

20      Q.   That's what he said or that's your

21  perception?

22      A.   That is my perception and he would say

23  that.  No one worked.  The entire work force of NAMB

24  came to an entire new level within my first year of

25  being there.  They've never seen anyone with the work

MAGNA
LEGAL SERVICES

1   ethic that I brought to that place.  Everyone had to

2   start either adding more staff to even accommodate

3   the work that I generated.  And it was a -- it was a

4   fresh new day.

5           NAMB had been under serious scrutiny at

6   every Southern Baptist Convention until I came to

7   place and I stepped up besides Kevin Ezell to do our

8   annual report and there was not one single complaint.

9       Q.  And you were still doing all of your

10  individual Johnny Hunt Ministries things during the

11  time you worked for NAMB?

12      A.  There were very little time.  I mean, if I

13  were free on Sunday, but, normally, I was getting

14  ready to do a conference that night.  So the church I

15  was going to be in just asked me to speak in the

16  morning.

17      Q.  Now, Mr. Hunt, you were aware before

18  Guidepost ever reached out to you that the messengers

19  in Nashville at the 2021 annual meeting had voted to

20  create a task force to specifically look into issues

21  related to sexual abuse, correct?

22      A.  As it pertains to the EC.

23      Q.  And other things, but the EC included.

24      A.  Well, no, no, the --

25          MR. MacGILL:  What's the -- hold on.  What

MAGNA
LEGAL SERVICES

 1      is the question?

 2          MS. NOKES:  He's aware of the messengers'

 3      motion in 2021 to create a task force to

 4      investigate issues of sexual abuse within the

 5      executive committee and other --

 6          THE WITNESS:  I don't know about the other

 7      in there.  A letter of engagement.

 8          MS. NOKES:  The credentials committee --

 9      the credentials committee process was part of it

10      as well.

11          MR. MacGILL:  Are you saying part of the

12      investigation, Scarlett?

13      Q.   (By Ms. Nokes) Were you aware of that?

14          MR. MacGILL:  Do you understand what she's

15      asking?

16      A.   Well. I knew that -- I know that I was not

17  an EC member, and I know they went outside of the

18  letter of engagement.

19      Q.   (By Ms. Nokes) You were not an EC member --

20      A.   No, ma'am.

21      Q.   -- in 2008 to 2010?

22      A.   Oh, then.  But this was after.  This was

23  July of 2010.  I am no longer a member when they

24  chose to include me.  They violated their own letter

25  of engagement.

1    Q.   We will look at the letter of engagement.

2    I will have to print it at lunch, and we will circle

3    back around to that.  But you were aware there was a

4    motion that was approved by the messengers?

5    A.   I was.

6    Q.   So unlike your presidency, this is now a

7    very big topic within the convention --

8    A.   Correct.

9    Q.   -- by 2021?

10    A.   Right.

11    Q.   And you were aware it went back all the way

12    to the year 2000?

13    A.   Correct.

14    Q.   And you were aware that one of the aspects

15    of the engagement was looking into abuse committed by

16    executive committee members?

17    A.   That was the majority of what they were to

18    do.

19    Q.   And it also involved how the executive

20    committee handled allegations of abuse?

21    A.   Exactly, uh-huh.

22        MR. MacGILL:  You are referring to the

23        engagement letter?  It is the engagement letter;

24        is that right?

25        MS. NOKES:  The motion.

1           MR. MacGILL:  I'm sorry.  Okay.

2      Q.   (By Ms. Nokes) How victims or survivors of

3  abuse were treated?

4      A.   Uh-huh.

5      Q.   And patterns of intimidation?

6      A.   Correct.

7      Q.   You were aware of all of that?

8      A.   Yes, ma'am.

9      Q.   And you were aware that their findings

10  would eventually be made public?

11      A.   Correct.

12      Q.   And just as a general matter, would you

13  agree that instructing victims or survivors of sexual

14  abuse to keep silent about their allegations is a

15  form of intimidation?

16      A.   Exactly.

17      Q.   Did you know the members on the committee

18  on cooperation?

19      A.   I'm not sure who is on there.

20      Q.   And based on your understanding of the

21  engagement and the investigation, did you think they

22  had any input into the report's findings?

23      A.   I know that it read that when they --

24  Guidepost finished and they gave it to them, they had

25  so many days, maybe 10 days to ask questions as to

1    its verity and then make any recommendations.

2         Q.   And same question about the sexual abuse

3    task force.  Are you aware there was a task force?

4         A.   I am, uh-huh.

5         Q.   And is it your understanding that they had

6    any input into the investigative findings or the

7    contents of the report?

8         A.   Same.

9         Q.   Same as --

10        A.   Yes, ma'am.

11        Q.   -- the committee on cooperation?

12        A.   Correct.

13        Q.   I want to talk in more detail about your

14   interactions with the Guidepost investigators.

15        A.   Okay.

16        Q.   I call them interviews.  You call them an

17   ambush.  We can agree to disagree on the terminology.

18        A.   The first one was an interview.

19        Q.   And that one was in person, correct?

20        A.   Correct.

21        Q.   On April 26th, 2022?

22        A.   Right.

23        Q.   Now, when did Guidepost first reach out to

24   you wanting to interview you?

25        A.   They never reached out to me.  So they did

1    it through my office, and I'm not sure when they

2    arranged with them.

3         Q.   And is that typical?  You are a busy man.

4         A.   Uh-huh.

5         Q.   You have a full calendar?

6         A.   Yes, that's normal.

7         Q.   Do you normally have staff, administrative

8    staff schedule or handle everything?

9         A.   Correct.  I do.

10        Q.   And did your scheduler bring the request

11   for a Guidepost interview to your attention?

12        A.   I don't remember her doing that, but most

13   likely she looked and thought:  He's here, he's

14   there, and here's the first time he can do it.

15        Q.   And when do you remember first being

16   contacted directly about Guidepost wanting to talk to

17   you?

18        A.   I have no idea.

19        Q.   Do you remember who it was?

20        A.   No, again it would have been through my

21   secretary.

22        Q.   Okay.  And when you finally scheduled for

23   April 26th, in that interview, was it Russell Holske

24   and Samantha Kilpatrick?

25        A.   It was, yes.

MAGNA
LEGAL SERVICES

1    Q.   And did one or both of them tell you that

2  Guidepost was running the investigation?

3    A.   I don't remember.

4    Q.   Do you remember if they told you that

5  Guidepost was in control of the contents of the

6  report?

7    A.   I would -- I don't recall it.

8    Q.   Did they tell you that they were operating

9  independently of the convention and the executive

10  committee?

11    A.   I would have known that just from reading

12  their report.

13    Q.   Did they tell you that their findings would

14  be made public?

15    A.   I don't remember.

16    Q.   Do you remember in your communications with

17  them telling them that you could only give them 90

18  minutes?

19    A.   I know I was speaking that day, so that

20  makes sense.

21    Q.   Did you want to talk to Guidepost?

22    A.   No.

23    Q.   What were your thoughts and feelings about

24  the entire process, the motion and the process that

25  lead to the Guidepost investigation?

1    A.   The reason I did not want to speak with

2    them is they said they wanted to talk to me about

3    particulars of my leadership for the convention.

4    There's a reason that 10 years, what details did I

5    remember when that was just a smidget of all the

6    things I was doing as pastor of one of the largest

7    churches in America.  And I thought:  I can't -- I

8    don't know that I can be any help to you.

9          So then Ed Litton had called me, being a

10   personal friend, being the president at that time,

11   encouraged me to meet with them, but then said this:

12   Whatever you do, don't bring a lawyer.  Ronnie Floyd

13   did, and that was so stupid.  You do not need a

14   lawyer.  I needed a lawyer to meet with Guidepost.

15   Q.   Why?

16   A.   Because they ambushed me.  I think my

17   attorney could have helped me to maneuver that, and I

18   would have a witness there with me.  Because we have

19   already found that Ms. Kilpatrick said when she asked

20   me in the first interview if I knew the couple, I

21   denied it.  And that went out to the whole world.

22   And some of my best friends said:  Johnny as much as

23   we love you, the fact that you denied knowing them,

24   you lied.  And then Ms. Kilpatrick, in deposition,

25   under oath, acknowledged that I didn't lie.  She

MAGNA
LEGAL SERVICES

1    lied.  She did not ask me.  And that did so much

2    damage to me.  Deeply wounded me among friends out

3    there.  That's where it started.  So you can only

4    imagine how now the second goes since they've already

5    got their story and have become such good friends

6    with the ████████

7        Q.   Mr. Hunt, today, your recall of that

8    counter is very specific and detailed.  Is it your

9    testimony that in the first Guidepost interview, your

10   encounter with Jane Doe never crossed your mind

11   during Guidepost questions?

12       A.   Never.  There was no reason for it to cross

13   my mind.  It was 12 years removed.  And the reason my

14   mind is so good on this as opposed to the SBC is

15   because I live with this every day.  I go to bed with

16   it every night, what Guidepost did to me.  And I wake

17   up with it every day, the lies that they told about

18   me.  And so I will deal with that for the rest of my

19   life.  That's why I pay for my own counseling, to go

20   to one of the world-renowned counseling centers to

21   deal with the trauma of this report.

22            And so, yes, I wake -- and my wife does

23   too.  For months my wife cried herself to sleep every

24   night because she knew I had given my confession.

25   She knew I had gone to ████████ office at my risk to

**MAGNA**
**LEGAL SERVICES**

1  tell that man what I had done.  So she knew the truth

2  when it came.  So we thought when it came out, we

3  would just hear the same story.  But the story

4  Guidepost wrote and the story the ███████ have told

5  is not a true story.  And I plan to give my life to

6  the end to prove the lie that they perpetrated on me.

7       Q.    You talked about going to bed and waking up

8  with the weight of the Guidepost report.  How often

9  does being unfaithful to your wife weigh on you?

10      A.    I dealt with that and received God's

11  glorious great forgiveness, the same one that every

12  Southern Baptist church preaches in the gospel every

13  Sunday, that God forgives us, cleanses us, gives us a

14  second chance.  He never even mentioned -- every time

15  he mentioned David in the New Testament, it was in a

16  beautiful light of him doing the will of God, even

17  though he had committed adultery, which I did not

18  commit adultery.  And so there's forgiveness.

19          If Johnny Hunt can't be forgiven, I don't

20  see how anyone that we preach the gospel to can be

21  forgiven.  So I'm not here today just for myself.

22  I'm here to help preachers that will come behind me

23  and the ones that are out there struggling right now

24  that maybe couldn't afford to engage someone like

25  Guidepost when they perpetrate lies on you and to

1   stand your ground and to tell the truth.

2           And it's so easy to speak today because

3   it's so in my heart and it's been there for so long

4   of what they have done to me.

5       Q.   So is it fair to say that the encounter

6   from July 2010 doesn't weigh on you at all at this

7   point?

8       A.   No, that would not be a true statement.

9       Q.   How does it weigh on you?

10      A.   But compared to -- it weighs on me in that

11  I know that I crossed the line, and I have been

12  willing to say:  I own that.  I confess it.  I take

13  full responsibility, but I am so grateful for God's

14  forgiveness.

15      Q.   And you said that it didn't cross your mind

16  at all during the first interview with Guidepost, but

17  the investigators focused a lot of their questions on

18  the summer and fall of 2010; is that correct?

19      A.   Absolutely not.

20           MR. MacGILL:  Scott knows how to get it

21      going again.

22      A.   Now, I don't recall anything about -- I

23  mean, 2008 to 2010 about me being the president, like

24  did you get a letter from Christa Brown or remember

25  things like that.

MAGNA
LEGAL SERVICES

1       Q.   (By Ms. Nokes) Did they ask whether you

2    were under the care of Roy Blankenship?

3       A.   I don't remember that at all.  Absolutely

4    not.

5       Q.   Other than dealing with the aftermath of

6    your encounter with Jane Doe, did you go to

7    Mr. Blankenship for counseling at any other time?

8       A.   No.

9       Q.   And to be clear, he was an employee of

10   Woodstock Baptist Church, correct?

11      A.   He was, and I'm not sure when that divided

12   that he actually -- then he was not.  He was -- he

13   had started Hope Quest, and he was no longer an

14   employee in First Baptist Church Woodstock in 2010.

15      Q.   And they asked about Jane Doe's husband's

16   church.  You mentioned that because you --

17      A.   Uh-huh.

18           MR. MacGILL:  Again, we are referring to an

19   April 26, 2022 interview?

20           MS. NOKES:  The first interview.

21           MR. MacGILL:  I just want to make sure.

22      Q.   (By Ms. Nokes) They asked you about the

23   church where Jane Doe's husband had been the lead

24   pastor?

25      A.   Correct.

1    Q.   And did you ask where the church was

2   located?

3    A.   No, they didn't ask me in that context.

4   You mentioned ███████  ███████ but they didn't mention

5   their names or anything with it.  They asked me if I

6   was aware of a pedophile from like 15 years prior or

7   something.  I said, never heard -- never heard about

8   that.  And they said, Yes, they had a pedophile.  And

9   then they said, Do you know the pastor there?  And

10   then I went into a long explanation:  Yes, Troy Bush.

11   Troy just celebrated his 10th anniversary today.

12   Wanted me to come and speak, but I couldn't, but I

13   did a video for him.  That would have been a perfect

14   time to say no.  Pause:  We are talking about 2010.

15   They did not do that.  There was no hint.  So I had

16   no reason to -- something to come to my mind that was

17   12 years old that I -- that I dealt with.

18    Q.   So it's your testimony they did not ask you

19   about the lead pastor abruptly leaving the church in

20   2010?

21    A.   If they did, I don't recall that in this

22   deposition.

23    Q.   And wouldn't that have prompted you to

24   remember this encounter that weighs on you?

25    A.   Yes.  If they would have brought it up like

**MAGNA**
**LEGAL SERVICES**

1  that, like did you know the pastor that left there in

2  2010?  I would have said, Yes, I -- I guess if it was

3  2010, I would have said, Yes, that would have been

4  ███████  ███████

5       Q.   Did Guidepost, in the April interview, ask

6  you about your sabbatical from the summer of 2010?

7       A.   They may have, but if they did, I don't

8  remember any details as to what they were fishing

9  for.

10      Q.   And why did you extend your sabbatical in

11  2010?

12      A.   Because that's when it happened.  And so

13  when it happened, I was entertaining not returning to

14  Woodstock.  So I was trying to get my spiritual

15  equilibrium.  So in that, that's when I called Roy.

16  And Roy came to where I was and spent a day with me,

17  and that's in the report.  And I spent a day with

18  him, eight hours, and just sharing with him what I

19  had done and that I'm really thinking about stepping

20  away.  And that's just when the counseling process

21  began.

22           And so that continued over the next 15 or

23  16 weeks.  So I just basically said to Woodstock:

24  I'm not in a good place.  But I had already said two

25  weeks prior, that's been on record for a long time,

1  that something inside of me had died, anyway, before

2  all of this happened.  I had just come out of a bout

3  with cancer.  I'm the president of the largest

4  evangelical body in America.  I'm pastoring one of

5  the largest churches in America and I'd hit a wall.

6          And so I was not at my best.  I'd like to

7  believe that if I had been at my best, I would have

8  never gone to that balcony.  So I'm not going to even

9  say that for -- as an excuse.  I'm just telling a

10  fact, a story.  I think people that love me would

11  like to know what all was going on in my life at that

12  time that made it a little different in my life.  Why

13  would I accept her invitation, her consensual

14  invitation to come next door, her consensual offering

15  herself to me?

16      Q.    So to be clear, the sabbatical, the

17  extended sabbatical in 2010 related directly to your

18  encounter with Jane Doe from July of 2010?

19      A.    I can't say that exactly.  Because if I

20  could not have gotten back to the place where I

21  didn't feel dead inside, I wouldn't have been going

22  back then either.  So I already had something going

23  on that my wife is aware of and that I told her two

24  weeks previous and then this certainly added to that.

25      Q.    And you don't recall being asked about your

1    extended sabbatical in your first Guidepost

2    interview?

3           MR. BESEN:  Why don't we go off the record.

4           THE VIDEOGRAPHER:  The time is 11:35 a.m.

5           (WHEREUPON, a recess was taken 11:35 a.m. -

6      12:50 p.m.)

7           THE VIDEOGRAPHER:  We are back on the

8      record.  The time is 12:50 p.m.

9      Q.    (By Ms. Nokes) All right.  Mr. Hunt, we

10    talked a little about the second meeting you had with

11    the Guidepost investigators.  That was May 12th,

12    2022, correct?

13     A.    Yes, ma'am.

14     Q.    And you were at a conference?

15     A.    I was in Lake Tahoe leading a Timothy

16    Barnabus conference.

17     Q.    Did you talk to anyone outside of Guidepost

18    about that follow-up meeting?

19     A.    You mean before the meeting took place?

20     Q.    Yes.

21     A.    No, I just -- I mean, they didn't call

22    until either -- they either called late that night,

23    the night before, or that morning for the meeting.  I

24    mean, it was like I'm just being -- I mean, I was not

25    aware of the meeting when I got to that conference.

 1      Q.   And what's your recollection of what time

 2   the meeting -- and we are calling it a meeting.  It

 3   was a virtual setup, right --

 4      A.   Correct.

 5      Q.   -- on Zoom or Teams?

 6      A.   Yes, ma'am.  Zoom.

 7      Q.   Do you recall what time the meeting was

 8   scheduled for?

 9      A.   I'm fairly confident it was at 9 a.m.

10   because I had to get someone to get my meeting

11   started.  We normally start at 9:00, and then I went

12   and joined the meeting afterwards.

13      Q.   And who was in that meeting?

14      A.   Two hundred pastors.

15      Q.   I'm sorry, the meeting with Guidepost.

16      A.   Oh, that would have been Holske and

17   Kilpatrick.

18      Q.   I'm going to mark as Defendants' Exhibit 10

19   a document you may not have seen before this time.

20   It's been previously marked attorneys eyes only.

21   This will be designated.

22           (Defendants' Exhibit 10, Notes of Guidepost

23           Investigators, 5/12/22, 12:15 ET, marked for

24           identification.)

25      Q.   (By Ms. Nokes) Mr. Hunt, these are notes of

MAGNA
LEGAL SERVICES

1   the Guidepost investigators from that May 12th

2   meeting with you.  Do you see --

3           MR. MacGILL:  Counsel, I just want an

4       administrative question.  We have made our

5       objections known about the conduct of counsel in

6       connection with this, and we will address that

7       by separate motion practice.  But you --

8       Guidepost has produced either 15 or 16 different

9       versions of this document.  Can you tell us, is

10      this the latest -- is Exhibit 10 the latest of

11      the 15th or 16 versions?

12          MS. NOKES:  I can tell you that it's Bates

13      labeled Guidepost 009986.

14          MR. MacGILL:  Is this the first, fifth,

15      tenth, eleventh, 15th version?

16          MS. NOKES:  It's not my document.

17          MR. MacGILL:  Don't know?

18          MS. NOKES:  Don't know.

19          MR. MacGILL:  Okay.  Fair enough.

20          MS. NOKES:  It appeared to be a complete

21      summary from the May 12th meeting with Mr. Hunt.

22      Q.   (By Ms. Nokes) Mr. Hunt, you see at the top

23  that it has you listed as the interviewee?

24      A.   Yes, ma'am.

25      Q.   The second line is the date.  The third

MAGNA

LEGAL SERVICES

1   line, interviewers, correct?

2        A.   Yes, ma'am.

3        Q.   And then it has 12:15 Eastern time?

4        A.   Has what time?

5        Q.   12:15 Eastern time.

6        A.   Right.  And we were West Coast.  That would

7   be 9:00.

8        Q.   Well, would it be 9:15, you were --

9        A.   Yes, ma'am.  It would be three hours

10  earlier.

11       Q.   So not Mountain time --

12       A.   It's West Coast time.

13       Q.   -- but Pacific?

14       A.   Uh-huh.

15       Q.   And then there's a note following those

16  introductory comments that your responses to their

17  questions are in bold.  Do you see that?

18       A.   I do.

19            MR. MacGILL:  Well, hold on a second.  What

20       it says is Dr. Hunt's responses are in bold.

21       Right?  You said to questions.  It doesn't say

22       questions.

23            MS. NOKES:  I don't --

24            MR. MacGILL:  And, further, you lack a

25       foundation in terms of the witness's knowledge

MAGNA

LEGAL SERVICES

1        of this document.

2        Q.   (By Ms. Nokes) Forgive me for misreading

3   line Number 5 that your responses are in bold.

4        A.   Uh-huh.

5        Q.   Do you see that?

6        A.   Yes, ma'am.

7        Q.   And do you see just below that, it says,

8   Dr. Hunt was a very calm interviewee.  He expressed

9   little emotion, did not get upset or raise his voice

10  or express outrage at the serious allegations at

11  hand.  Interviewers presented the allegations of

12  abuse several times and explained that there were

13  several corroborating witnesses.  This did not change

14  Dr. Hunt's demeanor.  So I have two questions related

15  to that:  One, do you agree with how they

16  characterized --

17       A.   Abs- -- sorry.

18       Q.   -- your demeanor?

19       A.   Absolutely not.

20       Q.   So you were not calm?

21       A.   No.

22       Q.   You did express a lot of emotion?

23       A.   I was expressing, as they got into their

24  questions:  That is not true.  That is not true.

25  They continued to talk.

MAGNA◆
LEGAL SERVICES

1     Q.   Did you get upset or raise your voice?

2     A.   I don't know that I raised my voice.  I was

3 upset.

4     Q.   Did you express any outrage?

5     A.   No.  It was -- it was such an attack and it

6 was such a surprise.  And -- and I guess, you know,

7 one thing about this interview being the last of the

8 dates or my wife being the last tomorrow, since I've

9 heard all the depositions and realized what they did

10 before they met with me that day, I'm having a hard

11 time not being outraged right now.

12     Q.   And I hear you.  But I want you to be

13 precise in your answers.

14     A.   Okay.

15     Q.   You have had the benefit of hearing what

16 all the other witnesses have said.

17     A.   Uh-huh.

18     Q.   I'm going to ask you to go back --

19     A.   Okay.

20     Q.   -- to May 12th, 2022, and tell me, based on

21 your own recollection, what happened and what in here

22 is accurate versus inaccurate?

23     MR. MacGILL:  Well, we are not going to do

24    that.  You will not -- I'm going to instruct him

25    not to answer any questions or you are going to

MAGNA

LEGAL SERVICES

1    ask him to go through this document.  It's an

2    outrage.  It's an absolute outrage, what you've

3    done.  We are going to pursue sanctions,

4    certainly against Guidepost and maybe against

5    the SBC and the executive committee.  This

6    document has been withheld from Pastor Johnny

7    Hunt for years, right?  Years.  And what time

8    was it last night, Gene, when you-all sent this

9    to us?  Four o'clock?  You sent us 31 versions

10   of, quote, interview notes at 4 o'clock

11   yesterday that this gentleman, our client, has

12   never seen, okay?  So sanctions are appropriate

13   here, in my judgment.  Whether you-all are going

14   to be the objects of sanctions or just

15   Guidepost, we don't know yet.

16        But for you now to proceed with this

17   witness and ask him to go -- talk to you about

18   this document is an outrage.  And it's wrongful.

19   So we will do -- we will do one step at a time,

20   but let me ask first:  Counsel, will you state

21   on the record why it is you held this document

22   after April 4th?  Can you tell us?

23        MR. KLEIN:  Rob, I'm not going to have that

24   discussion with you now, Rob.  I'm happy to have

25   that discussion with you, Rob, off the record

1      and afterwards.  I'm happy to have a calm

2      discussion about that.

3            MR. MacGILL:  This is -- this is -- this

4      is --

5            MR. KLEIN:  I don't think it's appropriate

6      now to have that discussion.

7            MR. MacGILL:  This is your -- this is your

8      chance.

9            MR. KLEIN:  Let me finish.

10           MR. MacGILL:  All right.

11           MR. KLEIN:  Let me finish, Ron.  And waste

12     this time that your client has been waiting 23

13     months for.  We will have the opportunity -- I'm

14     not talking to you, Rob.  We will have the

15     opportunity -- this is not the appropriate time.

16     I will address anything you have to raise if you

17     are going to make a motion.  I can never stop

18     you from doing that other than meeting and

19     conferring beforehand.  This is not the time to

20     do this.  This is a document that Ms. Nokes is

21     showing the client, showing your client, and

22     they should discuss it.

23           MR. MacGILL:  Counsel of the SBC, could you

24     justify why this document was held after

25     October 4th?

MAGNA

LEGAL SERVICES

1           MR. BESEN:  We are not going to be having

2      conversations on the record.  We're not going to

3      do that.  You can object to form.  We are going

4      to ask our questions, and we are going to start

5      now.  That's where we are going to leave it.

6           MR. MacGILL:  Counsel for the executive

7      committee, and you are speaking for the SBC and

8      the executive committee.

9           MR. BESEN:  I'm telling you we are going to

10     move forward with our deposition.

11          MR. MacGILL:  All right.  So, counsel, I

12     want to give everybody a chance to answer on the

13     record.  So counsel for the SBC executive

14     committee, can you say -- can you give any

15     reason to this Court on this record now why you

16     did not turn this document over previously and

17     certainly after October 4th?

18          MR. BESEN:  You mean the document that's

19     not ours and not in our possession?

20          MR. MacGILL:  It was in your possession.

21          MR. BESEN:  How?

22          MR. MacGILL:  At all times this was in your

23     possession.

24          MR. BESEN:  That document?

25          MR. MacGILL:  Yes.

MAGNA
LEGAL SERVICES

1          MR. BESEN:  Guidepost notes were in SBC's

2     possession?

3          MR. MacGILL:  They were.

4          MR. BESEN:  Really?

5          MR. MacGILL:  In this case, they were.  You

6     have had them -- how long have you had them?

7          MS. NOKES:  They were produced in

8     discovery --

9          MR. MacGILL:  Right.

10          MR. BESEN:  -- to all of us. So we haven't

11     seen them yet.

12          MR. MacGILL:  Right.  I just want you to

13     tell me, Can you justify from the SBC on this

14     record any reason why you withheld Exhibit --

15     these 31 exhibits?

16          MR. BESEN:  Rob, stop.

17          MR. MacGILL:  This is your chance.

18          MR. BESEN:  This is ridiculous.

19          MR. MacGILL:  No, it is not.

20          MR. BESEN:  It is the most asinine thing I

21     have ever seen a lawyer do, Rob.

22          MR. MacGILL:  This is your chance.

23          MR. BESEN:  We are not having a discovery

24     hearing.

25          MR. MacGILL:  We are having a

MAGNA
LEGAL SERVICES

1      meet-and-confer right now.

2           MS. NOKES:  Can we go off the record?

3           MR. MacGILL:  No, we are not going off the

4      record.  We do not consent.  If you tell us

5      now --

6           MR. BESEN:  Okay.  Well, have your client

7      walk out, and why don't you guys go.

8           MR. MacGILL:  No.

9           MR. BESEN:  And we will reschedule him.

10     And we'll interrupt one of his -- unless he

11     agrees for us to take his deposition.

12          MR. MacGILL:  This is your chance.  Would

13     you explain to the Court why you withheld this

14     document and now you are proceeding to question

15     him about it?  Can you offer anything?

16          MR. BESEN:  Just ask him the question.

17          MS. NOKES:  The document was not withheld.

18     You've had it.  We can do the questions without

19     the document.  You know, we have waited a long

20     time to take this deposition as well.  We have

21     been noticing it for many, many months.  So we

22     are all glad to be here today, finally.  I can

23     ask the questions without him having the

24     document as a reference.

25          MR. MacGILL:  I'm not to -- you do what you

MAGNA
LEGAL SERVICES

1    want to do in your deposition.  All I'm asking

2    for my purposes of my motion for sanctions is if

3    you have any reason to justify your withholding

4    this document prior to last night.  You had it.

5    Guidepost had it.  And I just wanted a statement

6    on the record.  I don't want a he said/she said,

7    it's on the record.  Is there any

8    justification --

9         MS. NOKES:  It is not a document the

10    executive committee or the Southern Baptist

11    Convention produced and had no control over the

12    designation.

13         MR. MacGILL:  Okay.  Ask your questions.

14    Q.   (By Ms. Nokes) Mr. Hunt, when -- when asked

15 by the investigators if you knew why they were coming

16 back for a second meeting with you, do you recall

17 being asked that, first of all?

18    A.   I do.

19    Q.   And what was your response?

20    A.   I had no idea.

21    Q.   You were told that there was an allegation

22 of sexual abuse against you; is that correct?

23    A.   I know they are going to bring up an

24 allegation, but I don't know if they asked questions.

25 They weren't much on asking questions.  It was

1   accusations.

2       Q.   Did they tell you you had been accused of

3   sexual abuse?

4       A.   They would have done it more like this.

5   You went into a ladies room and touched her, didn't

6   you?  You abused someone.  You rented the room to

7   bring her here.  And I'm saying, No, no, no.  And it

8   was very brief.  They may have a lot of questions.

9   They did not ask this many questions.  I pray God we

10  can find the video to prove that.

11      Q.   And do you recall saying you were totally

12  in the dark about any allegations of abuse?

13      A.   I don't remember saying that.

14      Q.   Were you told the name of the accuser who

15  we've been --

16      A.   Yes.

17      Q.   -- referring to --

18      A.   Yes.

19      Q.   -- as Jane Doe today?

20      A.   Yes.

21      Q.   And, of course, you knew her?

22      A.   I did.

23      Q.   Did any light bulbs go off in that moment

24  once you heard her name?

25      A.   Yes.  Once I heard her name and then the

1    context they said it, I was scared to say anything

2    else to them.

3        Q.    What were your options at that moment when

4    they identified her and made an accusation?

5        A.    My options were to continue down the road

6    of their false allegations mixed with some truth or

7    for me to simply say in my heart, I don't want to

8    talk to these people.  And that's what I chose to do.

9        Q.    So you didn't answer any questions?

10       A.    So I began to say, No, no, no.  And the nos

11   were still in a narrative form.  And I really believe

12   the reason they are hiding the video is in the video,

13   you will see where they are asking the questions and

14   I'm saying No.  But it's all framed within the

15   context of a false narrative.  I rented a room, I

16   assaulted a lady.  No, it's nothing about the

17   consensual relationship that really happened.  So

18   with that being said, so did I deny some things in

19   the fear of them being there?  So look forward to our

20   Southern Baptist Convention hearing that how many

21   times they met before they confronted me, two days

22   before the report.  Forty-eight hours, I'm 17 hours

23   from home, at 48 hours, and it's a weekend?  And then

24   the report's out on me.  So I'm a sitting duck.  And

25   that's exactly what they planned.  That's exactly

1   what Guidepost did, and that's what I'll testify to a

2   jury.

3        Q.   And if you will turn, Mr. Hunt, to Page 4

4   of the document in front of you.  Four lines down,

5   you see there's a note.  So you never had any

6   physical contact with Jane Doe?  And the response in

7   bold is, Absolutely not.

8             MR. MacGILL:   Where are you, Counsel?

9             THE WITNESS:   On Page 4.  Fourth line.

10            MR. MacGILL:   Okay.  Sorry.  Could you say

11   that again?

12       Q.   (By Ms. Nokes) So the question from

13   Guidepost, So you never had any physical contact with

14   Jane Doe?  And the response in bold, Absolutely not.

15            My question is, do you recall being asked

16   that by the Guidepost investigators?

17       A.   It was brought up in their -- in the

18   context of their barrage of the wrong narrative.

19       Q.   And do you recall answering "Absolutely

20   not" to the question?

21       A.   I would have said "Absolutely not."

22       Q.   To the question about having any physical

23   contact?

24       A.   To the narrative they presented, not to the

25   question.

1    Q.    Well --

2    A.    We are staying in a narrative that they

3    have started, which is a false narrative.

4    Q.    Well, let me ask you a specific question.

5    A.    Okay.

6    Q.    Do you recall them asking if you had any

7    physical contact with Jane Doe?  Using her real name?

8    A.    I remember that in the context of the false

9    narrative.  Of lining up a narrative:  You rented a

10   room next door.  You went in and sexually abused this

11   lady.  No, I did not.  I was invited into her room.

12   She made herself available to me.  In a moment of

13   weakness and temptation, I responded.  I wish to God

14   I never had.  That's the way it happened.  That's

15   what I would have told them.  If they had been kind

16   enough to send me questions like they did them.  And

17   I can hardly wait to let my Southern Baptist family

18   know how many interviews they did, questions sent

19   before, and the ambush they did to me.  And that the

20   report was already finished when these questions were

21   being asked.

22   Q.    Mr. Hunt, I'm going to ask you one more

23   time.

24         MR. MacGILL:  He's answered your question.

25   Q.    (By Ms. Nokes) Were you asked --

MAGNA
LEGAL SERVICES

1          MR. MacGILL:  He's answered your question

2     twice.

3          MS. NOKES:  No, he hadn't.

4          MR. MacGILL:  All right.  Answer it a third

5     time.  Listen to it, the question.

6          THE WITNESS:  Okay.

7          MR. MacGILL:  We'll answer it a third time,

8     and then we are done with this question.

9     Q.   (By Ms. Nokes) Were you asked by

10    Guidepost's investigators on May 12th, 2022, if you

11    had any physical contact with Jane Doe?

12    A.   I was asked that question in the context of

13    a false narrative that added so much more that didn't

14    happen, and that was just part of it.  So I was

15    denying the narrative of the whole thing to do with

16    them.  If they had started with me with honest

17    questions, I would have been delighted to speak then,

18    so.

19    Q.   And what was your response to the question,

20    Did you have any physical contact with Jane Doe?

21    A.   In the context of them lying, to start

22    with, and giving a false narrative, my answer was No.

23    Q.   And were you asked if you ended up being on

24    the same balcony with Jane Doe?

25    A.   I don't remember.

1    Q.    Were you asked if you ended up being in the

2  same condo unit as Jane Doe?

3    A.    I'm sure they asked me.

4    Q.    And what was your response to that?

5    A.    But -- well, my no is they were speaking

6  over me.  My answer was no because it still stayed

7  within the same narrative.

8    Q.    So your answer was no to the question, Were

9  you ever in the same condo unit?

10   A.    As pertains to the narrative as they

11 presented it.

12   Q.    Do you recall saying that you were ready to

13 face the judgment seat of Christ with her allegation?

14   A.    I don't remember saying that.

15   Q.    Do you recall saying that it was not true,

16 absolutely not, you had no contact with Jane Doe

17 whatsoever?

18   A.    Boy, I sure wish they'd produce their

19 video.

20   Q.    That's not a response to my question.

21   A.    So I'm going to make sure I understand your

22 question.  You've got -- is the question here that

23 you are asking me?

24   Q.    The question is, Do you recall saying to

25 Guidepost investigators that it was not true,

1  absolutely not, you had no contact whatsoever?

2  Again, the contact would have been with Jane Doe.

3       A.   I could have said that because I wasn't

4  giving those people the benefit of the doubt to get

5  anything out of me.

6       Q.   The benefit of the truth?

7       A.   No, that wasn't the truth.  Well, the

8  truth, yes, but the truth in a narrative that's

9  proper.  Because if there's a truth, did I abuse

10  somebody?  Absolutely not.  Is there a truth that I

11  had a consensual relationship by a lady that stalked

12  me by coming to where I live and seduced me within

13  the context of my own home.  Yes, to that.  But I

14  want to keep it -- I finally get to tell my side of

15  the story.  And this is -- if I'm not telling them

16  anything, I'm saying no to them.  And if -- you write

17  it down as a lie because I'm not willing to say it in

18  the context of their narrative, that's the facts.

19       Q.   Because you did have physical contact?

20       A.   I did have physical contact.  And I have

21  confessed that, put it in a letter, put it out to the

22  Southern Baptist Convention.  And that's the story,

23  and it never changed.  It's the story my wife heard.

24  It's the story I told her husband because she did not

25  tell her husband.  She continued to stay there.  And

1    if you want to know the story, the next day she was

2    not just there, but she came and sat in front of my

3    wife and I with a bikini and took the -- her top

4    loose and laid counter to where we were laying, in

5    front of us.

6              And then my wife will give the testimony

7    tomorrow, since she was there, as to what she did the

8    next day -- or that same day when they went upstairs.

9    So this is a lady that's abused.  She's now down

10   there wanting to go for a walk with me, laying on a

11   chair in front of us, wanting to know what we are

12   going to do for dinner together that night and has no

13   intentions of leaving and has not told her husband

14   anything.

15        Q.   Did you say anything to the Guidepost

16   investigators about the physical contact being

17   consensual?

18        A.   I don't think I was ever given the

19   opportunity and certainly not asked the question.

20        Q.   Do you recall being asked about whether you

21   said, Praise Jesus, I did not consummate the

22   relationship?

23        A.   In this meeting?

24        Q.   Yes.

25        A.   I denied even having a meeting with those

1    people.  So that doesn't even make sense.

2         Q.   You remember being asked that?

3         A.   No, I don't remember that.  Of being -- it

4    was not a question, it was a statement that I said

5    Praise Jesus.

6         Q.   Did Guidepost ask you if Mrs. Hunt would be

7    willing to talk to them?

8         A.   I don't remember being asked that question.

9         Q.   Did you tell the Guidepost investigators

10   that there had never been any physical intimacy?

11        A.   In the context of their narrative, yes, I

12   would have -- I would have -- I denied everything in

13   the context of the way they framed it.  I have rented

14   her a room.  It looks like an affair that I have

15   scheduled and lined up.  So everything became false

16   within the context of that narrative.  If you took it

17   in the context and I was given the benefit, as a

18   southern Baptist like their southern Baptist, to have

19   been questioned the way they were questioned and my

20   story taken as a friend the way theirs was taken, I

21   would have been able to answer them as much as I've

22   attempted to answer every one of your questions.

23             But looking back on this from 14 years

24   ago -- in three months, it will be 14 years ago, the

25   questions you are asking me -- and I have noticed how

1   a lot of even the attorneys are having trouble

2   answering questions from 15 months ago.  And this is

3   14 years ago.  So to know exactly what they asked me,

4   I just remember how it came as a form of an ambush.

5   The accusation was not -- it was not asking me the

6   question; it was making the accusation of what I did.

7   And that's what I was fearful of responding to and

8   thinking:  I don't want to say any more than I need

9   to.  And that's where I wish Ed Litton had never

10  said, You don't need an attorney.  I needed an

11  attorney dealing with these attorneys.

12      Q.   And, Mr. Hunt, it might have been almost 14

13  years ago, but today you have recalled in great

14  detail the encounter you had with Jane Doe.

15      A.   And I am right now.  I'm continuing to have

16  great recall.  My great recall is:  They framed

17  this -- I'll say it over and over again -- they

18  framed this in a way:  You did this.  You assaulted

19  her.  You rented her that place.  You arranged all of

20  this.  No, I didn't.  No, I didn't.

21          She showed up and shocked me.  And when she

22  showed up, I'll never forget as long as I live:

23  She's texting me and she hasn't even taken her

24  luggage off the luggage rack.  The luggage rack is in

25  her room, which you're not supposed to take them in

MAGNA
LEGAL SERVICES

1  your room.  I have lived there 15 years.  She's not

2  even unpacked yet.  She had one agenda:  To come down

3  there and stalk me and attempt to seduce me.  So,

4  yes, if you want to put it in that framework, I will

5  tell you how I responded in that narrative.  But I'm

6  telling the truth of the narrative.  To remove the

7  narrative would not be telling the truth of how the

8  questions -- and whether they were questions or

9  accusations.

10      Q.   And was it the truth when you denied any

11 physical contact with Jane Doe?

12          MR. MacGILL:  Objection.  Assumes a fact

13      not in evidence.

14      A.   In the context.

15      Q.   (By Ms. Nokes) It was the truth?

16      A.   It was the truth in that I could -- I'm not

17 going to say I touched her with them because they

18 have set it up as a scenario that is a lie.  So they

19 have put an element of truth within a whole

20 contextual lie.  And I wasn't willing to buy into the

21 lie.  So I just said no, and they were continuing to

22 ask the questions.  Two of them against me in their

23 ambush.

24      Q.   How long do you think this meeting with

25 Guidepost lasted?

MAGNA
LEGAL SERVICES

1      A.    It would take one -- it would take one

2  action to find out.  For her to produce her computer

3  and go to that date in her computer and it will show

4  how much time she spent.  I'm going to say 15

5  minutes.  And I look at all of these questions, you

6  can -- you can rattle these off in accusations, but

7  not -- not in this.

8      Q.    And, again, Mr. Hunt, I'm just asking about

9  your recollection.  Do you recall about how long this

10  meeting lasted on May 12th, 2022?

11     A.    I think around 15 minutes.

12     Q.    And you are a very articulate man.  You

13  would have been able to articulate, even in the

14  context of what you are calling a false narrative,

15  that any touching, any sexual activity was

16  consensual, correct?

17     A.    Uh-huh, correct.  And it's all her -- also

18  her testimony that it was consensual.

19     Q.    What did you do in the immediate aftermath

20  of the May 12th interview?

21     A.    Came home, knowing that I had been set up.

22  Knowing that I was the fall guy for Guidepost.  For

23  the millions that the convention was going to spend,

24  they needed somebody, and they had nobody else, and

25  now I realize that.  No one, no one, not one.  And so

1    they had found a guy, and they had not only found

2    one, they found one that everyone in the convention

3    knew.  And not because I had been the president but

4    because I had addressed that convention 20 years in a

5    row, which speaks of the integrity of my life up

6    until this one thing.

7              And I'm grateful that 20 minutes does not

8    define an entire person's life.  And that's what

9    Guidepost would like for me to believe.  It's what

10   the Southern Baptist Convention would like for me to

11   believe, and that's the way I have been treated is I

12   don't have a life beyond Guidepost's report.

13        Q.   And who was the first person after the

14   May 12th meeting that you talked to?

15        A.   My wife.

16        Q.   And what was the context of that

17   conversation?

18        A.   The context was:  What happened --

19             MR. MacGILL:  Hold on.  Hold on.  Hold on.

20        You may not ask about the conversations with his

21        wife.

22             MS. NOKES:  I asked the context, not the

23        substance.

24             MR. MacGILL:  Okay.  He had a conversation

25        with his wife.  Move on.  Nothing further.

MAGNA
LEGAL SERVICES

1    Q.   (By Ms. Nokes) Was she in Lake Tahoe with

2    you?

3    A.   She was.

4    Q.   Who was the second person you talked to

5    about the Guidepost meeting?

6    A.   Jim Law, my senior associate.

7    Q.   And what was that conversation?

8    A.   Basically, I told him what I had done

9    and -- the 12 years previous, and that now Guidepost

10   is going to make that known.  And, see, when -- you

11   need to understand that we used language that I

12   didn't really quite understand, so when the report

13   came out, I thought maybe I would be in a report and

14   it would tell what I did 12 years ago.  I didn't know

15   that it was going to be a report that you didn't just

16   have a consensual relationship.  You assaulted a

17   lady.  So now it's a whole new ball of wax.  So we

18   didn't know that.  And we didn't know what they were

19   going to say in the Guidepost report, since we had

20   never seen it and since nobody had ever really,

21   really questioned me, really interviewed me:  Not

22   attacked, but interviewed; not accusations, but an

23   interview.

24   Q.   And what did Mr. Law say in response to

25   what you shared with him?

MAGNA
LEGAL SERVICES

```
 1        A.   I love you more than I have ever loved you.
 2   And I will stand with you.
 3        Q.   Did he suggest that you talk to anyone
 4   else?
 5        A.   No, he made no suggestions.
 6        Q.   And did you talk to anyone else?
 7        A.   I'm sure I told my children when I got
 8   home.
 9        Q.   And at what point following that May 12th
10   interview did you decide to reach out to Dr. Ezell?
11        A.   When?  On the way home, the flight home.
12        Q.   And how did you reach out to him?
13        A.   I text him.  You-all have the text.
14        Q.   And based on that text, you arranged to
15   meet him --
16        A.   The next day.
17        Q.   -- the following morning?
18        A.   Yes.
19        Q.   Where did that meeting take place?
20        A.   In the parking lot of Burger King.
21        Q.   And you were inside a vehicle?
22        A.   No.  Parking lot, yes, in his vehicle.
23        Q.   Okay.  And I think you have testified
24   previously you told him the truth about the --
25        A.   Yes.  There's nothing about assault because
```

MAGNA
LEGAL SERVICES

1   there never was assault.  But I told him about the

2   consensual relationship.  And then I said I'm

3   tendering my resignation today.

4        Q.   Did you ask or did you just say, I'm

5   resigning?

6        A.   I'm resigning.  I'm a leader.  I kind of

7   know what a man ought to do.

8        Q.   And why did you feel like you ought to do

9   that?

10       A.   I feel like I ought to go because I know

11  that this report was so wicked and so twisted that

12  when it came out, that would have put a lot of

13  pressure on him.

14       Q.   But you had not seen --

15       A.   I had not seen --

16       Q.   -- that version?

17       A.   But to have heard how I was interrogated

18  that day and accused, I could only imagine.

19       Q.   And I asked earlier and I think you told me

20  what you perceived in Dr. Ezell's actions.  What did

21  Dr. Ezell say to you in response to your tendered

22  resignation?

23       A.   Just basically:  I hate this.  I just hate

24  it.

25       Q.   Did he try to talk you out of resigning?

1     A.   No.  No.

2     Q.   Did you also at some point call lawyers

3  about the Guidepost meeting?

4     A.   I had friends just coming and saying, What

5  are you going to do?  And I had never hired a lawyer

6  before in my life, never been in a courtroom for

7  anything before in my life.  So basically I didn't

8  know what to do.  And I didn't know -- I didn't know

9  one lawyer from another lawyer.  I didn't know a

10  difference in a trial lawyer or the ones everybody is

11  advertised on a billboard.  So somebody just said:

12  Hey, I've got some attorneys.  You just need to talk

13  to them.  And so I just reached out to tell them what

14  I was dealing with.

15     Q.   And did one of those attorneys send a

16  letter to Guidepost and Ms. Kilpatrick?

17     A.   Yes.  Because they never gave me my rights

18  before they spoke to me about I could have an

19  attorney present.  So I think -- I don't know law,

20  but is it Upjohn, Upchurch?  What is it.

21        MS. NOKES:  We will mark this as

22       Exhibit 11.

23        (Defendants' Exhibit 11, Letter to

24       Kilpatrick from Lietz and Bouchard, 5/20/22,

25       marked for identification.)

1 Q. (By Ms. Nokes) And ask you if you have seen

2 that document before?

3   MR. KLEIN:  Eleven, you said, Scarlett?

4   MS. NOKES:  Yes.

5 A. Yes.

6 Q. (By Ms. Nokes) And have you had a chance to

7 flip through it?

8 A. Through all of it, I think.  Okay.  I think

9 it's just rules.  Okay.  Yes.

10 Q. Mr. Hunt, is it true that you believed

11 Samantha Kilpatrick was acting as your attorney when

12 she interviewed you as part of the Guidepost

13 investigation?

14 A. Oh, absolutely not.

15 Q. You did not believe that?

16 A. No, I didn't believe that.

17 Q. Do you know why these lawyers would have

18 put that in their letter?

19 A. They may have said that, thinking that I

20 would get the same treatment that the ▮▮▮▮▮ did.  I

21 think a lot of people in the Southern Baptist

22 Convention, when this comes out, is going to think:

23 Wait a minute, independent contractor, to find out if

24 there is abuse, so if you met with them 11 times and

25 probably 50 hours, not counting calls and texts and

MAGNA

LEGAL SERVICES

1  emails, and you have met with this man for probably

2  going to prove 15 minutes, I think it's going to be

3  good public information.

4      Q.   But you were never under the impression

5  that anyone at Guidepost was acting in a capacity as

6  your lawyer?

7      A.   No, they couldn't have.  They were the

8  ████████  attorney.

9      Q.   Do you believe that, that they legally

10  represented --

11      A.   I believe -- I believe --

12      Q.   Let me finish, just --

13      A.   Okay.

14      Q.   -- so we keep the record clean.

15      A.   Okay.  Sorry.

16      Q.   Did you have any reason to think that

17  investigators from Guidepost Solutions were legally

18  representing Jane Doe and her husband?

19      A.   Since I had never had an attorney before in

20  my life, I felt that they were representing them

21  because they brought everything -- there was nothing

22  they talked to me about except for what they had

23  learned from them.  What else could I have believed?

24      Q.   But you had lawyers send a letter saying

25  that you thought Guidepost represented you?

MAGNA
LEGAL SERVICES

 1      A.   Well, I didn't have -- I just -- they asked
 2 me one question.  So I knew nothing about what they
 3 wrote or were representing me.  I don't understand
 4 law.  They simply asked me:  Did they say to you
 5 before they questioned you, We have an accusation we
 6 are bringing against you.  You have a right to
 7 attorney-client privilege.  They did not.  That's all
 8 I knew.  That's all that formed this.  So as far as
 9 how they -- they viewed them, I didn't know.  And I
10 would have not known because I didn't understand law.
11 I didn't know what had just happened, other than I
12 had been accused.
13      Q.   And we talked a lot about the report.
14           MS. NOKES:  Rob, I did not print the entire
15      report.  I printed the cover page and the
16      section that deals with Mr. Hunt.  We have
17      seen -- we have all seen it, multiple iterations
18      of it.  We will mark it --
19           I don't think I put the sticker on it,
20      Mr. Hunt.
21           (Defendants' Exhibit 12, Guidepost Report
22      of the Independent Investigation, 5/15/22,
23      marked for identification.)
24           MR. KLEIN:  You have to make sure you give
25      Rob one.

 1              MS. NOKES:  Yes, Defendants' Exhibit 12.

 2         Q.   (By Ms. Nokes) Mr. Hunt, have you seen this

 3    before?

 4         A.   Is this the regular report?

 5         Q.   It is.

 6         A.   Yes, ma'am, yes.

 7         Q.   It is an excerpt from the full report.

 8         A.   Yes, this --let's see.  And so my

 9    understanding, this is the one who ███ wrote 50

10    percent of, the 13 pages --

11         Q.   This is the final Guidepost report.

12         A.   -- according to depositions?

13         Q.   I'm just asking if you have reviewed the

14    final Guidepost report.

15         A.   I have reviewed ███ and Guidepost's

16    written report.

17         Q.   The document you have in front of you?

18         A.   Yes, ma'am.

19         Q.   And I would ask you to turn to the page

20    that is Number 158 and has page ID 191.  It's a

21    little confusing with multiple page numbers.

22         A.   Okay.  Page 158 and where?

23         Q.   Just at the top, that first line says,

24    During the first interview, Dr. Hunt did acknowledge

25    during his publicly announced extended sabbatical he

MAGNA
LEGAL SERVICES

1  was under the care of Mr. Blankenship.  Is that

2  accurate and correct?

3      A.    That is after the incident.

4      Q.    During your first interview with Guidepost,

5  you acknowledged --

6      A.    Oh, during the first interview?  Oh, yes.

7  That would have been -- correct.

8      Q.    And the next line, when asked if the

9  sabbatical, was it all related to a sexual abuse

10  matter, he, meaning you, replied in the negative.

11      A.    That question was never asked.

12      Q.    Okay.

13      A.    We never talked about me and sex abuse.  Me

14  and sex was never brought up in that first interview.

15      Q.    And, again, this is the first Guidepost

16  interview:  Investigators asked Dr. Hunt several

17  questions about pastor's church without identifying

18  pastor.  Is that accurate?

19      A.    Present tense, they did.  And so we were

20  living in the 2022 world in that question.  It's very

21  important that I say that.  They did not say:  Did

22  you know the pastor in 2010?

23      Q.    Well, the next line is they asked if

24  Dr. Hunt knew the circumstances of the resignation of

25  the senior pastor at that church, who suddenly and

MAGNA

LEGAL SERVICES

1    without explanation, resigned in 2010.  Is that
2    accurate?
3         A.   I don't remember that question being asked.
4         Q.   Do you recall responding that you stated
5    you did not know who the pastor was or why he had
6    resigned?
7         A.   Absolutely not.
8         Q.   So that's inaccurate?
9         A.   Uh-huh.
10         Q.   Is that inaccurate?
11         A.   That is inaccurate.
12         Q.   And then the next paragraph, we have gone
13    to the second interview now.  The first line of the
14    second paragraph says, After interviewing several
15    individuals with relevant information, Guidepost
16    investigators set up a second interview with
17    Dr. Hunt.  Did I read that correctly?
18         A.   Where are you?  I'm sorry.
19         Q.   The second paragraph on that same page we
20    were on.
21         A.   What page is that?
22         Q.   158.
23         A.   Okay.  One second.  So put this in its
24    context again, please.
25         Q.   This is the final Guidepost report.

MAGNA
LEGAL SERVICES

1      A.    Uh-huh.

2      Q.    The second paragraph moves into the second

3  interview you had with Guidepost investigators.   And

4  my question is going to be about the second sentence

5  in that second paragraph --

6      A.    Okay.

7      Q.    -- which says, Guidepost investigators

8  explained to Dr. Hunt that they had received an

9  allegation of abuse involving him and if he knew what

10 they were talking about.   Dr. Hunt responded that he

11 was totally in the dark.   Is that an accurate

12 statement?

13     A.    Let me see -- make sure I'm following you.

14 Are you saying they said this before they met with me

15 the second time or that's what they asked in the

16 second time?

17     Q.    In the second interview.

18     A.    In the second.   No, that would be true in

19 the second interview, they would bring that up.

20     Q.    And now going down to that third paragraph,

21 In the second interview, Dr. Hunt acknowledged this

22 time that he knew pastor, meaning Jane Doe's husband.

23     A.    Being the first time they asked me if I

24 knew him.

25     Q.    And that's accurate?

MAGNA
LEGAL SERVICES

1        A.   So, yes, we need to hold Guidepost

2   responsible for saying that I lied in saying I didn't

3   know him.  Nowhere did I ever say I did not know

4   ████ and ████  ████ never.  But I was -- it's

5   been told.  So the blemish, the lie that they placed

6   out there, placing me in bad light has done some of

7   the worst damage to me.

8        Q.   And in the second interview, this second

9   sentence of the third paragraph, Dr. Hunt stated that

10   he had known the couple for at least 20 years.

11   Pastor had been converted under his ministry and that

12   you had been a strong influence on pastor's life.  Is

13   that all accurate?

14        A.   That's accurate.

15        Q.   You said for a time, you pastored churches

16   in the same state.  Is that accurate?

17        A.   That's accurate.

18        Q.   If you will flip over to the next page,

19   page 159, which is page ID 192 in the record.

20   Paragraph at the top, there's a sentence about

21   halfway down that says, Dr. Hunt remembered Jane Doe

22   texting him a picture of the pier, saying she was

23   there.  And you have testified about that today.  Do

24   you remember sharing that with the Guidepost

25   investigators?

MAGNA
LEGAL SERVICES

1    A.    Yes.  About the picture of the pier.
2  Uh-huh.
3    Q.    Going to the next paragraph, when asked if
4  you had any contact with Jane Doe while she was
5  there, you responded that it was very brief on the
6  balcony.  Is that accurate?
7    A.    May I ask a question?
8    Q.    Only if it relates to --
9    A.    It relates to this.
10    Q.    Go ahead.
11    A.    You skipped the first sentence, and I think
12  it's very important because that's back to my
13  narrative.
14    Q.    First sentence --
15    A.    Investigators at some point, pastor had
16  contacted him about finding a place to rent for
17  survivor.  Absolutely not.  He did not.
18    Q.    And the next --
19    A.    But that's the narrative they drew, that I
20  did find that.  So to skip that is to jump over the
21  main point that I'm making of my case.  So they have
22  actually referred to it.  Absolutely not, I didn't.
23  So that's where it led to, no, that didn't happen,
24  no, it didn't happen because it did not happen in the
25  narrative they presented.

MAGNA
LEGAL SERVICES

1       Q.   Well, the very next sentence after the one

2   you pointed out is that, Dr. Hunt did not remember

3   pastor asking for information, nor did he recall

4   providing a phone number to help find a place.  Is

5   that accurate?

6       A.   It is accurate in the context that when

7   somebody comes to you 12 years later and begins to

8   ask questions that lawyers can't answer in two years,

9   that I'm sitting here thinking, you know, did I?  Or

10  didn't I?  Maybe the statute of limitations -- maybe

11  there's a real reason for that because people can't

12  remember.  But then when you sit back and you begin

13  to question and doubt yourself, like:  Did I?  And

14  then you get a clear mind on it and say, Absolutely

15  not.  He didn't call me about a place.  But he called

16  me about a job.

17      Q.   Do you recall giving him a phone number to

18  help him find a place?

19      A.   Absolutely not.

20      Q.   Okay.  So you told Guidepost you did not

21  recall providing a phone number?

22      A.   Yes.  I did not have a number, and I -- to

23  this day, I don't have a number of who lived next

24  door to me.  And that was his testimony:  I gave him

25  a number and it was the number to the person that

1  lived next door that I have never met in my life, and

2  now, to this day, I don't know who they are -- so

3  fabricated.

4      Q.   So we talked about the picture of the pier.

5  The next sentence is, When asked if he knew where she

6  was, Dr. Hunt said, Unbeknownst to him, Jane Doe had

7  rented the condo next door, but he had no role in

8  that.  Is that accurate?

9      A.   Accurate.

10      Q.   You stated that you had no idea who owned

11  the condo next door because the building is mostly

12  rentals?

13      A.   Correct.

14      Q.   That's accurate?

15      A.   Yes, ma'am.

16      Q.   Going to the next paragraph, when asked if

17  you had any contact with Jane Doe while she was

18  there, you responded that it was very brief on the

19  balcony.  Is that accurate?

20      A.   In the context of being very unsure of what

21  I wanted to say to someone that had made so many

22  accusations, yes.

23      Q.   The next sentence, While on the balcony,

24  you remember Jane Doe telling you about going to see

25  Bobby Bowden speak that morning but do not remember

1   her saying what else she did that day before getting

2   to the beach.  Is that accurate?

3        A.   That's correct.

4        Q.   Then the next sentence is in parentheses

5   but says both you and Jane Doe described the

6   balconies as side by side, but you could not walk

7   through to the other.  Is that accurate?

8        A.   That is.

9        Q.   Next sentence, Dr. Hunt was asked whether

10  he went onto her balcony or entered her condo and he

11  responded he had never entered her condo and was

12  never on her balcony.  Is that accurate?

13       A.   That's what I said in our interview with

14  them.

15       Q.   In the next sentence, you said that, After

16  seeing Jane Doe on the balcony, you did not have any

17  further contact with her during the time she was

18  there.  Is that accurate?

19       A.   In light of the first sentence on the top

20  of the page, that's why I would not say anything to

21  them other than no, no, no.

22       Q.   And the next sentence, However, later in

23  the interview, you stated that you saw her the next

24  day on the beach and then the following day, your

25  wife said something to her.  Is that accurate?

1      A.   And she was unaware of anything happening.

2  But she was aware that there was a person preying on

3  her husband.

4      Q.   Is that sentence in the report accurate?

5      A.   Yes, ma'am.

6      Q.   And the last sentence in that paragraph and

7  you didn't know whether Jane Doe changed her plans or

8  just went home.  Is that accurate?

9      A.   No, that's not accurate.

10     Q.   You said that in that interview?

11     A.   No, I did not say that.

12     Q.   And then on to the next paragraph, you said

13 that you did not have any contact with Jane Doe, in

14 quotes, "no contact whatsoever."  Is that accurate?

15     A.   That's accurate.

16     Q.   You also stated it was not true you were on

17 the balcony or in the condo.  Is that accurate?

18     A.   That's accurate.

19     Q.   When asked specifically about whether you

20 kissed Jane Doe, pulled at her shorts or fondled her,

21 you said no.  Is that accurate?

22     A.   In the context of the -- and these weren't

23 questions that are being asked like you are reading

24 to me now.  We are having a very sensible

25 conversation.  This was not a sensible conversation.

1  This was an attack.   This was blindsided.   This was:

2  We have already got our report.   We are getting ready

3  to bill $2 million.   You are all we got, and they

4  dove in on me.   And that's what happened.   And so I'm

5  denying it in the context of their claim.

6          Q.    So the sentence, as drafted, is accurate?

7          A.    The sentence is correct.

8          Q.    And then the final sentence in that

9  paragraph, you denied sexualized comments about Jane

10 Doe's appearance, panties, tan lines or perfume.   Is

11 that accurate?

12         A.    When she was standing on the balcony, I

13 could smell her perfume, and I said, That perfume

14 smells nice.   The other, I never said any of that.

15         Q.    The next paragraph, bottom of Page 159, you

16 shared that your wife was uncomfortable with Jane Doe

17 next door by herself because it just did not look

18 right she was down there all alone.   Is that

19 accurate?

20         A.    In the context that she seen her on the

21 beach half naked in front of me, and thinking:   What

22 is she doing down here?   She was just here two weeks

23 ago with her husband.   What's she doing back without

24 her husband?   Although I'm told that others maybe

25 were supposed to meet her.   I'm sure you-all have

1    investigated that.  But that statement has to be in

2    the context of my wife didn't feel right about it

3    with her laying there in front of us.  She seemed to

4    be -- women seem to have an awareness if someone is

5    attracted to their husband.  So in that context.  So

6    to not put it in this context is to tell a lie.

7         Q.   The next sentence, which will take us over

8    to page 160, At some point, you think your wife might

9    have said something to Jane Doe and that all you knew

10   was that Jane Doe was not there anymore.  Is that

11   accurate?

12        A.   Until I saw my wife and she told me she had

13   told her to leave.

14        Q.   So at the time, you didn't --

15        A.   At that moment, yes, I didn't know.

16        Q.   And that's what you conveyed to the

17   Guidepost investigators?

18        A.   Yes.

19        Q.   The next sentence, When asked whether your

20   wife was there the whole time with you, you stated

21   there may have been a brief time she was not there

22   because of an event at Southeastern Baptist

23   Theological Seminary where she may have flown in and

24   out in one day or the next day.  Is that accurate?

25        A.   That's accurate.

1    Q.    You said, It was possible that she was not

2  there some of the time that Jane Doe was there.   Is

3  that accurate?

4    A.    That's accurate.

5    Q.    When you asked if you contacted

6  Mr. Blankenship, the counselor, because there was a

7  problem between Jane Doe's husband and Jane Doe, you

8  said that you did not contact him in regard to that

9  but just for general help because Jane Doe's husband

10  was transitioning in ministry and you had always been

11  a sounding board for him.   Is that accurate?

12    A.    That's accurate.

13    Q.    Next paragraph, You remembered only one

14  meeting with the couple, meaning Jane Doe and her

15  husband, on August 2nd, 2010.   Is that accurate?

16    A.    One meeting in what -- what reference?   I

17  don't quite follow you.

18    Q.    I believe that's referencing

19  Mr. Blankenship in a joint meeting.

20    A.    But what do you mean by "only one meeting"?

21    Q.    I'm reading the report and asking if that's

22  accurate based on your recollection of what you said

23  to Guidepost?

24    A.    Well, I feel like to say it was only one

25  meeting means I never met with them again.

MAGNA
LEGAL SERVICES

1    Q.    With Mr. Blankenship?

2    A.    With Mr. Blankenship.    That would -- see,

3    that's not in there.    I'm sorry, but.

4    Q.    Yes.    It's just continuing from the

5    previous paragraph.

6    A.    Okay.

7    Q.    But we can clarify that you only remember

8    meeting one time --

9    A.    Meeting with them -- with --

10    Q.    -- with the couple and Mr. Blankenship?

11    A.    That's correct.

12    Q.    You said that the meeting was brief and

13    that you, your wife, along with Jane Doe and her

14    husband, Mr. Blankenship were present.    Is that

15    accurate?

16    A.    That's correct.

17    Q.    And you claimed you never directed the

18    couple -- meaning Jane Doe and her husband -- towards

19    Mr. Blankenship for counseling?

20    A.    Strictly their decision.

21    Q.    So that's an accurate sentence?

22    A.    That's an accurate sentence.

23    Q.    The next paragraph, You said that you did

24    not apologize to Jane Doe for sexually assaulting her

25    during this meeting because there was no contact

1  between the two of you.  Is that accurate?

2      A.   I had already apologized to her before that

3  meeting in her husband's office with her present.

4      Q.   Without Mr. Blankenship?

5      A.   No, Mr. Blankenship was with me.

6      Q.   Okay.

7      A.   He went with me to their office.  I went to

8  ██████ office at his church, lined the meeting up

9  and met and asked Roy to go with me.  And then -- and

10 told him to bring his wife.

11         MR. MacGILL:  And your question is, Was

12     there an apology?

13         MS. NOKES:  Yes.  Is the sentence in the

14     report accurate based on what you told

15     Guidepost?

16         MR. MacGILL:  Well, read the whole sentence

17     because you -- it's a loaded sentence, Counsel,

18     as you know.  There's a reference to sexual

19     assault here.

20     Q.   (By Ms. Nokes) Dr. Hunt said that he did

21 not apologize to survivor for sexually assaulting her

22 during this meeting.  This is, again, referencing the

23 August 2nd meeting with Roy Blankenship because there

24 was no contact between the two of them.  Is that an

25 accurate sentence?

MAGNA
LEGAL SERVICES

1    A.    There was no contact.   The sentence is very

2  confusing.   I'm not sure I --

3    Q.    Well, let me set the table here.

4    A.    Okay.

5    Q.    This is, again, based on -- it's the final

6  Guidepost report, and here they are reporting your

7  interview, your second meeting, your interview with

8  them and how they summarized it for the report.   So

9  is that summary of what you said about that aspect of

10  the August 2nd meeting with Roy Blankenship --

11    A.    So this is the May 12th meeting?

12    Q.    This is based on the interview on May 12th

13  that you had with Guidepost investigators and what

14  ended up in the report.

15    A.    Yes.   There were -- that would be -- I

16  don't remember saying that, but that's a true

17  statement because I didn't need to apologize for

18  sexually assaulting somebody I never sexually

19  assaulted.

20    Q.    Okay.   You denied saying, in quotes,

21  "Praise Jesus that I didn't consummate the

22  relationship."   Is that accurate?

23    A.    No.   I didn't say that.   That would be so

24  out of character.

25    Q.    So the denial, then, would be accurate.   It

1    gets confusing.

2         A.    The denial of which one, the first one you

3    asked or the one you just asked?

4         Q.    You denied that you said, "Praise Jesus" --

5         A.    Oh, I deny that.  I deny that.

6         Q.    So that's accurate?

7         A.    He denied saying, I praise Jesus that I

8    didn't consummate the relationship.  Are they saying

9    I said this to them?  It's hard to follow for me.

10        Q.    I think they asked did you say that?

11        A.    Oh, did I say that?  Oh, yeah.  Okay.

12        Q.    You said, No, I did not say that.

13        A.    I thought they were saying, I praise Jesus

14   I didn't consummate.

15             MR. MacGILL:  So I don't understand the

16        question.  You are saying the question premise

17        is, Guidepost said, Did you say, quote, "Praise

18        Jesus that I didn't consummate the relationship"

19        unquote.

20             And you are asking him if he denied that

21        statement or question by Guidepost?

22             MS. NOKES:  Yes.  If that's an accurate

23        summary of what he said in the interview.

24             THE WITNESS:  When would I have said that?

25             MS. NOKES:  Well, they -- you want to say

1      something?

2              THE WITNESS:   Yeah, go ahead.

3              MR. BESEN:   Let me just try.   Guidepost

4      accurately reported in the second sentence of

5      the fourth paragraph on page 160 that you denied

6      saying, Praise Jesus that I didn't consummate

7      the relationship.

8              MR. MacGILL:   And you are saying, Gene,

9      that Guidepost said -- made the question --

10             MR. BESEN:   No, I'm saying, Guidepost

11     accurately reported what your client testified

12     to, that he did not say that.

13             MR. MacGILL:   But somebody had to raise it.

14     Who made the quotation?

15             MR. BESEN:   It's irrelevant.   The only

16     question is, Is the report accurate?

17     A.   I don't beyond the context.   When was this?

18     I mean, are they saying I said that --

19     Q.   (By Ms. Nokes) All of this relates to your

20     interviews with Guidepost and how they summarized

21     those interviews in their final report, which is what

22     we all have in our hand.

23     A.   So in the second meeting that I was with

24     them --

25     Q.   Yes.

1      A.    -- they asked me, Did you say, Praise

2   Jesus?

3      Q.    And you said --

4      A.    When would I have said it?  I'm trying to

5   think of like when.  I mean, there must be a

6   contextualized.  Where did it come from?  Like from

7   when?  When would there be an opportunity to say,

8   Praise Jesus?  Like when I was with her that day?  Is

9   that what you're saying?  You're shaking heads.  So I

10  said, Praise Jesus I didn't consummate it, what, as I

11  was leaving the room or when?  I have no context of

12  this statement.

13     Q.    I'm only asking --

14     A.    I can't answer what I don't understand.

15     Q.    That's perfectly reasonable.

16     A.    Okay.

17     Q.    We will move on.

18           The next sentence is, If there was an

19  apology, you believed it was related to Mrs. Hunt

20  offending Jane Doe about being concerned with her

21  being there alone and then apologizing for her having

22  to leave.  Is that accurate?

23     A.    I don't remember that.

24     Q.    And the next sentence, you stated, again,

25  in quotes, "Someone has created a story on me.  I

1  would like to hear her story on this."  Is that

2  accurate?

3      A.  I don't remember saying it, but I would say

4  it today.

5      Q.  So you are not offended by it?

6      A.  Oh, no, I'm not offended.  Somebody did

7  create a story on me and I'd like to hear -- I can

8  hardly wait for her to be deposed and hear her story.

9  And I can hardly wait to face her in court.

10      Q.  And the next sentence is, Dr. Hunt said

11  that Jane Doe had never come on to him and that he

12  never felt threatened by her.  Is that accurate?

13      A.  That would be a true statement.

14      Q.  You said that you and Jane Doe's husband

15  have stayed in contact over the years.  Is that

16  accurate?

17      A.  Yes.  And he initiated 95 percent of it.

18      Q.  Next sentence, Investigators asked you if

19  there were any similar allegations with other women.

20  You answered no.  Are those accurate?

21      A.  That's very accurate.

22      Q.  Going to the next paragraph, Several times

23  during the interview, Guidepost investigators

24  directly asked you about specific allegations of

25  sexual abuse against Jane Doe, controlling the

1  narrative through the use of an unlicensed therapist

2  and trying to protect his ministry, 40,000 churches

3  and the SBC, all of which you denied.  Is that an

4  accurate sentence?

5       A.   Where are you?  I'm sorry.

6       Q.   Bottom of page 160, that last paragraph.

7       A.   That would be accurate in the sense that,

8  again, they are drawing a narrative that's not true,

9  that I'm controlling a narrative -- there it is

10  again, there's the narrative -- that I'm controlling.

11  I have no control.  And even the unlicensed

12  therapist, he owns degrees from our seminary, so when

13  our Southern Baptist Convention understand that, he

14  would be far more trained than a person that goes and

15  gets a license as opposed to one that would spend

16  four years getting a seminary degree.  It makes it

17  sound like he was unqualified.  He was very

18  qualified.

19       Q.   And worked through Woodstock and its

20  ministries, correct?

21       A.   At this particular time, he had his own

22  ministry.  He was not working for me.

23       Q.   Is that sentence accurate, the last one I

24  read at the bottom of 160?

25       A.   No, it's not right.

MAGNA○

LEGAL SERVICES

1    Q.    The next --

2    A.    You mean the trying to protect this

3 ministry?

4    Q.    Yes.

5    A.    No, that's not correct.    That's their --

6 that would be their statement.    Yes, correct, he's

7 saying:    That's their statement, not mine.    So for me

8 to say it's correct, no, it's a lie.

9    Q.    The investigator -- this is the bottom of

10 page 160, going over to page 161.    The investigators

11 asked you if there was anyone else you thought they

12 should speak with about the matter, and you said the

13 only ones who would know would be the couple, meaning

14 Jane Doe and her husband and Mr. Blankenship.    Is

15 that accurate?

16    A.    That's accurate.

17    Q.    The investigators asked if you thought your

18 wife would speak with them.    And you replied no,

19 saying that you doubted she would speak to them

20 because her take was that you and she had handled it

21 and moved on.    Is that accurate?

22    A.    Exactly the truth.

23    Q.    Investigators understood this to mean that

24 Dr. Hunt had apologized for the fact that his wife

25 had upset Jane Doe by telling her to leave.    Is that

1    accurate?

2         A.    I believe that would be their statement of

3    what they thought, not what I thought.

4         Q.    And the final sentence of that paragraph,

5    Throughout the interview, Dr. Hunt remained very

6    calm, expressed little to no emotion, did not get

7    upset, did not raise his voice or express outrage at

8    the allegations?

9         A.    Not true.

10        Q.    The last paragraph is just two sentences.

11   It says, We included the sexual assault allegation in

12   the report because the investigators found pastor and

13   survivor to be credible and the report was

14   corroborated in part by Mr. Blankenship and three

15   other credible witness.  And Dr. Hunt, while denying

16   physical contact, does acknowledge that he had

17   interactions with Jane Doe, including on the condo

18   balcony during the relevant time period.  The

19   investigators did not find Dr. Hunt to be credible in

20   their interviews with him.

21             Two questions about this, first, is it

22   accurate?

23             MR. MacGILL:  Is what accurate?

24             MS. NOKES:  The --

25        A.    Entire paragraph?

MAGNA
LEGAL SERVICES

1          Q.    (By Ms. Nokes) Yes.

2          A.    It's not accurate.

3          Q.    And, again, would you say that's

4    Guidepost's conclusion?

5          A.    That's Guidepost's conclusion.  After

6    meeting 11 times with them and 15 minutes with me,

7    they have made a rational decision.

8          Q.    And the second question is, Do you think it

9    was fair for them to find you to not be credible

10   based on the answers you gave in your interview?

11         A.    Well, since I --

12               MR. MacGILL:  Whoa, whoa, whoa, whoa.

13         Answers you gave when, in the --

14               MS. NOKES:  In the --

15               MR. MacGILL:  There's only been one

16         interview and that was in April, right?  Is that

17         what you are talking about?

18               MS. NOKES:  I think the credibility

19         assessment is a total assessment.

20         Q.    (By Ms. Nokes) So I will rephrase the

21   question.  The final sentence says, The investigators

22   did not find Dr. Hunt to be credible in their

23   interviews with him.

24               And I'm just asking if you think that was a

25   fair assessment from your perspective?

1     A.    It was a very unfair assessment because

2     they really had not assessed me.  They had assessed

3     the couple that they were representing.  They

4     represented the ███████ in this case.  There may be

5     another lawyer out there.  They represented them.

6          Q.    So the report comes out, right, that's what

7     we --

8          A.    Yes, ma'am.

9          Q.    -- we just looked at?

10          Do you recall issuing a public statement by

11    way of a tweet about the report on May 22nd?

12          A.    You mean the letter?

13          Q.    Not the letter.  Did you issue any

14    statements that preceded the letter?

15          A.    I don't remember.

16          (Defendants' Exhibit 13, Article from The

17          Baptist Paper entitled, Hunt Denies Allegations

18          of Abuse, marked for identification.)

19          Q.    (By Ms. Nokes) I'm going to mark as

20    Exhibit 13, this is a -- that's the date it was

21    printed.  It's a article from the Baptist paper.  I'm

22    not really interested in anything other than the last

23    page.  But you are welcome to look at all of it.

24          A.    Okay.  Any particular portion?

25          Q.    Yes.  The -- on the bottom of Page 3,

1  there's a section in bold labeled "Hunt's Response."

2     A.   Okay.

3     Q.   And it says that your May 22nd statement

4  reads, quote, "During my 50 years of ministry, I have

5  always had a singular goal, to share the good news of

6  Jesus Christ with a broken world.  It has been the

7  joy of my life to minister alongside so many selfless

8  men and women at the North American Mission Board to

9  spread the hope, love and grace of the Lord Jesus

10  Christ.  While I have resigned from my position at

11  NAMB, I will continue to dedicate my life to

12  encouraging and instructing pastors.  Of course, I'm

13  aware that Guidepost Solutions issued a report

14  earlier today, May 22nd.  I did not see a copy of the

15  report before today, and I have not had an

16  opportunity to read the entire report," he said.  "I

17  want to be clear, my heart breaks for all victims of

18  abuse.  I support the rights of abuse victims to be

19  heard and respected and made whole.  I also support

20  transparency and accountability for abusers.  But

21  transparency and accountability must be founded on

22  truth and accuracy," Hunt stated.  "To put it

23  bluntly, I vigorously deny the circumstances and

24  characterization set forth in the Guidepost report.

25  I have never abused anybody.  Southern Baptist,

MAGNA
LEGAL SERVICES

1 navigating this challenging season, must remember:

2 Quote, It is the truth that will set us free."

3          Is that an accurate recitation of a

4 statement you made after the report?

5     A.   I made it after the report and believed it

6 and believe it as much or more today.

7     Q.   But is it still available -- how did you

8 put the statement out?

9     A.   I don't know that I put that statement

10 out -- or did I?  It looks like the Baptist paper --

11     Q.   Is it possible it was in a tweet?

12     A.   I don't think so.

13     Q.   Okay.

14     A.   No, I gave up my Twitter account right at

15 this time.

16     Q.   Are those your words?

17     A.   But those would have been my words, yes,

18 ma'am.

19     Q.   And did NAMB also issue a statement on

20 May 22nd?

21     A.   They issued one sometime.  I'm not sure the

22 date.

23          MS. NOKES:  And we will mark this one as

24     Defendants' Exhibit 14.

25          (Defendants' Exhibit 14, NAMB Statement,

1       5/22/22, marked for identification.)

2       Q.   (By Ms. Nokes) And this says, NAMB's

3  statement following the May 22nd, 2022 release of the

4  SBC's Sexual Abuse Task Force Report.  The North

5  American Mission Board, NAMB, issued the following

6  statement from president and CEO, Kevin Ezell:  "The

7  work of the task force is important for our

8  convention and for the healing of survivors.  The

9  details in the report, which we are just now

10  beginning to process, are egregious and deeply

11  disturbing.  We honor the courage of the survivors

12  who came forward.  We are praying for survivors and

13  their families, for our churches, for wisdom, for

14  discernment and for the humility to use this report

15  for God's glory.  On Friday, May 13th, prior to my

16  knowledge of the report's detailed allegations,

17  Johnny Hunt resigned from NAMB as senior vice

18  president of evangelism and leadership.  His

19  resignation was effective immediately.  Out of

20  respect for the investigation of the SBC Executive

21  Committee, we chose not to speak publicly about this

22  resignation until after the task force report was

23  released.  Prior to May 13th, I was not aware of any

24  alleged misconduct on the part of Johnny Hunt.  I

25  learned the details of the report today, along with

MAGNA
LEGAL SERVICES

1   the rest of our Southern Baptist family."

2           First of all, did I accurately read this

3   exhibit?

4       A.   Yes, ma'am.

5       Q.   And had you seen this statement before

6   today?

7       A.   I had seen that.

8       Q.   Anything you disagree with in what

9   Dr. Ezell said on May 22nd?

10      A.   I don't know that he said anything.  Let's

11  see.  Prior to my knowledge of the report...was

12  choosing not to speak.  I'm not aware of any

13  alleged... Basically, he learned the details the same

14  time I did because I was falsely accused of doing

15  something I never did.  Basically one subject:

16  Sexual abuse.

17          (Defendants' Exhibit 15, Letter to Dear SBC

18      Family from Thomas and Ezell, 5/25/22, marked

19      for identification.)

20      Q.   (By Ms. Nokes) What I have marked as

21  Exhibit 16 is a second NAMB statement in more of a

22  letter form, dated May 25th, 2022.  Mr. Hunt, have

23  you seen this before?

24      A.   I'm not sure I have.

25      Q.   The first paragraph states, "We are deeply

1    grieved at the findings of the independent

2    investigation of the SBC Executive Committee

3    commissioned by Guidepost Solutions and especially at

4    the credible allegation of abuse involving one of our

5    former employees.  We must knowledge with grief that

6    we believe the report is well-documented and verified

7    with a high level of professionalism and due process.

8    We are heart broken, especially for the survivor, her

9    husband and the others mentioned in the report.  We

10   are deeply grateful for their courage and sacrifice

11   in speaking up."

12              Did I read that accurately?

13        A.   You did.

14        Q.   And do you agree or disagree with the way

15   NAMB expressed their opinions of the report and its

16   findings?

17        A.   I don't believe I can answer it with agree

18   or disagree.  I would answer it in that they did what

19   every other Southern Baptist did when they saw this

20   falsified report.  And then so much being said about

21   independent investigators, credible allegations, such

22   as three people that could only speak of what they

23   heard her husband say, how under God's heaven, not an

24   attorney in this room believes that those guys could

25   be credible witnesses when they heard from someone

1   else.  So the way it's set up, it looks like there's

2   five people out there proving that Johnny Hunt is a

3   liar and he abused a lady.  That deeply grieves me.

4   And I look forward to being able to say that in front

5   of a jury.

6       Q.   And following up on NAMB, Jeremy Morton

7   succeeded you at First Baptist Woodstock?

8       A.   He did, yes.

9       Q.   And you had a close personal friendship

10  with Jeremy?

11      A.   I did.

12      Q.   And how did your former church respond to

13  the Guidepost report?

14      A.   Mixed.  Mixed.

15      Q.   What about the leadership of First Baptist

16  Woodstock?

17      A.   Mixed.

18      Q.   What about how Pastor Jeremy handled it

19  from the pulpit of the church?

20      A.   Awful.

21      Q.   And why do you say it was awful?

22      A.   Because he believed every word in the

23  report, and the report had not been verified by

24  anyone.

25      Q.   And how did he convey that to the

1  congregation?

2      A.    Basically, took it more along the lines, We

3  are going to do everything we can to make sure that

4  we have preventative measures in place for sexual

5  abuse, when, in the 33 years I was there, I never had

6  to deal with a sexual abuse case.

7      Q.    Not one?

8      A.    That I dealt with I mean, there may have

9  been others.  And it was not to say they were not

10  consensual relationships, but I never dealt with an

11  abuse relationship.

12              (Defendants' Exhibit 16, Letter to Dear

13          First Baptist Woodstock from Johnny Hunt,

14          5/27/22, marked for identification.)

15      Q.    (By Ms. Nokes) I think this is the letter

16  you referenced a minute ago, marked as Defendants'

17  Exhibit 16.  Is this document familiar to you?

18      A.    Yes, ma'am.

19      Q.    And is this a letter that you wrote and

20  released on May 27th, 2022?

21      A.    Yes, ma'am.

22      Q.    And in it, in the second paragraph, you

23  say, I made a brief public comment then, but I would

24  like to say more now.  Is that brief public comment

25  referencing the other document we looked at, other

MAGNA
LEGAL SERVICES

1    statement?

2        A.    Correct.

3        Q.    And then it goes on to say, 12 years ago,

4    right after my service as SBC president and in the

5    aftermath of my battle with cancer, I entered into a

6    season of deep despair and probably clinical

7    depression.  I remember Janet asking me then how I

8    felt, and I said to her, I feel like something inside

9    of me has died.

10            Did I read that correctly?

11       A.    You did.

12       Q.    And does that accurately convey your

13   sentiment?

14       A.    Exactly.

15       Q.    Then it goes on to say, It was during that

16   summer that I allowed myself to get too close to a

17   compromising situation with a woman who was not my

18   wife.  It happened when she invited me into her

19   vacation condo for a conversation.  Against my better

20   judgment, I chose to go.

21       A.    Uh-huh.

22       Q.    And is that -- did I accurately read it?

23       A.    Yes, ma'am.

24       Q.    And is it an accurate statement?

25       A.    It is.

MAGNA

LEGAL SERVICES

1      Q.    Our brief, but improper encounter ended,
2   when, in response to the overwhelming feeling of
3   conviction, I stopped it and I fled the situation.  I
4   remember saying just before leaving the condo, This
5   is not right.  I have no business being here.  I love
6   my wife.  I have never been in a room again privately
7   with the woman involved.
8            Is that accurate?
9      A.    Yes, it is.
10     Q.    I thank God we did not go further than we
11   did.  But that is also no excuse for my grievous sin.
12   I will regret that day for the rest of my life, and I
13   take responsibility for the situation because I chose
14   to enter her condo.
15           Is that accurate?
16     A.    That's correct.
17     Q.    I am sorry.  It was an awful sin, but it
18   was a consensual encounter.  It was not abuse, nor
19   was it assault.
20           Is that all correct?
21     A.    It is positively, absolutely 100 percent
22   the truth.
23     Q.    And you go on to say, Almost immediately
24   after the incident in 2010, I began a process of
25   taking personal responsibility for my personal sin.

1      A.    Correct.

2      Q.    Within the same week, to my shame, I

3 confessed the situation in detail to my wife.

4            Is that correct?

5      A.    Correct.

6      Q.    And putting aside the exhibit, are those

7 details the same details you shared in your

8 deposition today?

9      A.    I think they are.

10     Q.    Is there anything different about what you

11 shared with Janet than the details from today?

12     A.    No, ma'am.

13     Q.    Janet is a truly Godly woman and was far

14 more gracious than I deserved.  I also spoke to the

15 husband of the woman involved about one week later,

16 and I spoke to the husband together with his wife

17 present.  I apologized to both and sought their

18 forgiveness.  I also sought professional help from a

19 counselor in order to better understand how this had

20 happened and to seek advice on an appropriate process

21 of repentance, reconciliation and restoration.  I was

22 willing to resign my ministry then, forever; however,

23 after completing that private process, which involved

24 seeking the forgiveness of God and those involved and

25 recovering from that dark, depressing season, I felt

1    I could return to Woodstock in the fall of 2010.

2           Is that accurate?

3       A.    That's correct.

4       Q.    That is what happened.  I want you to know

5    that this is the truth.  It is also the whole truth.

6           Is that accurate?

7       A.    That's true.

8       Q.    Church, I want to be direct.  I am not

9    seeking your sympathy.  I am not a victim.  I have to

10   bear the responsibility for my sin, which has

11   basically cost me everything except my faith and my

12   family over the last seven days.

13          Is that accurate?

14      A.    That's accurate.

15      Q.    I'm also not asking you to feel sorry for

16   me.  This is my burden to bear.  I am asking you to

17   please pray for us.

18          Is that accurate?

19      A.    That's accurate.

20      Q.    I do want you to know -- and you have known

21   me for over 40 years -- that as awful as my sin was

22   on that terrible day, the account described in the

23   Guidepost report is sensationalized.  I did not groom

24   the woman involved, nor did I intentionally arrange

25   the encounter.  I didn't even know who owned the

1  condo.  And there are other details in the

2  description that are stated as fact which did not

3  happen.

4          Is that accurate?

5      A.  It is.

6      Q.  The most absurd allegation is that this

7  brief consensual encounter constituted assault.  It

8  did not.  This is the reason why I denied the

9  accuracy of the report and why I deny it now.

10         Is that accurate?

11     A.  It is.

12     Q.  As I said in my statement on Sunday, I have

13  never abused anybody.  With God as my witness, while

14  the situation described in the Guidepost report is

15  based in reality, the allegation made in the report

16  is false.  I also am sorry I wasn't more forthcoming

17  with the interviewers because it has made a bad

18  situation worse.  I guess I was just so surprised and

19  so shocked by the allegations of abuse that I shut

20  down.

21     A.  That's exactly what I just told you.

22     Q.  You may be wondering why I did not make my

23  confession to the church at the time of my sin.  I

24  justified not doing so on the basis of a biblical

25  principle that sin is first and foremost against God.

1  King David wrote in Psalm 51:4, Against you and you

2  only have sinned and done this evil in your sight.

3        Is that accurate?

4     A.   It's accurate.

5     Q.   I have also always taught that confession

6  should be as broad as the offense.  Since I had

7  sought forgiveness from those I had offended and put

8  myself under the care of others during the process, I

9  thought I had done my part.

10        Is that accurate?

11    A.   Yes.

12    Q.   So now I ask all of you also to please

13 forgive me.  As I did 12 years ago and again today, I

14 confess that I sinned.  I crossed a line.  I repent

15 in brokenness and shame.  I turn from my sin again.

16 Back then, I confessed and sought forgiveness from

17 all persons I sinned against.  I would ask the same

18 of all that learned of my confession now:  Please

19 forgive me.

20        Is that accurate?

21    A.   Correct.

22    Q.   So I want to pause there.  We will read the

23 rest of it.  But you have said a few times today that

24 you wouldn't change anything about the way you

25 handled it?

MAGNA
LEGAL SERVICES

1       A.      Correct.

2       Q.      So why did you need forgiveness from

3  your -- this was addressed to your church -- why did

4  you need forgiveness at this point from the church?

5       A.      Because the false allegations made it known

6  to people of a private matter, private nature that

7  had been dealt with to those I had sinned against,

8  but when they couldn't find anything else to report

9  and they brought this report to the world, to the

10  world, it's not just hurting me publicly there, but

11  everywhere.  So it makes it look like something is

12  covered up.  But I had uncovered this to the people

13  that had been offended by it.  So certainly if

14  someone would say, I just heard of what happened, I

15  would say, Forgive me.  I'm sorry.  So it weren't --

16  they weren't part of the ones that were abused in

17  this situation.  So.

18       Q.      Do you feel like you needed their

19  forgiveness?

20       A.      I think it's the proper thing to do.

21       Q.      Not necessary, but proper?

22       A.      I think it's absolutely proper thing to do,

23  but not necessarily a must because they have no law.

24  I didn't sin against them.  I sinned against God.

25  All sin is against God.

```
1      Q.    Getting back to the statement, I took then

2  and I take now responsibility for my actions.  I'm

3  also submitting myself to the care of a small group

4  of wise, Godly leaders to enter into a season of

5  intentional restoration, given the public nature of

6  the events of recent days.

7            Is that accurate?

8      A.    Yes.

9      Q.    And, finally, for all of those whose

10 ministries I have influenced over many years, my

11 prayer is that this season, the most difficult of my

12 50-year ministry is a reminder to every one of you

13 that no spiritual leader is beyond temptation.

14           Is that accurate?

15     A.    That's correct.

16     Q.    I thank God for His grace and I'm sorry for

17 any disappointment this news will cause to anyone.  I

18 leave you with a few words from the book of First

19 Timothy, which seem appropriate.  This is a faithful

20 saying and worthy of all acceptance, that Christ

21 Jesus came into the world to save sinners, of whom I

22 am chief.  First Timothy 1:15.  Blessings, Johnny

23 Hunt.

24           Accurate?

25     A.    Yes, ma'am.
```

MAGNA
LEGAL SERVICES

1     Q.   Anything you would change about that letter

2  in light of the time that has passed since you issued

3  it?

4     A.   No, I still believe every word the way I

5  put it in there because the major thing that I would

6  put emphasis on, I never abused anybody.  Never.

7  Never have in my entire life.  Didn't then, didn't

8  now.  And this -- the reason we are around this table

9  today is not how much money I make.  It's not who

10  owns what company in my family.  It's about one

11  thing:  Did Johnny Hunt abuse ████ ████ or did she

12  wait 12 years and for reasons that will be made

13  public, they chose to go the route of making up this

14  story to fit. And that's a reason I guess I'm just

15  finding out with you-all or with my attorney that no

16  wonder it took 16 different drafts of my story

17  because it kept changing in order to accommodate me

18  fitting into the report when I never fit into it to

19  begin with.

20     Q.   Has Jane Doe or her husband filed any

21  lawsuit, to your knowledge?

22     A.   None that I know of.  And I think there

23  was -- I had at least heard, maybe through the

24  grapevine, that they attempted to but it had passed

25  the law of limitation and statute of limitation in

1    the State of Florida, being 12 years.

2         Q.   And is Jane Doe seeking any monetary

3    compensation?

4              MR. MacGILL:  Against the SBC?

5         Q.   (By Ms. Nokes) Against anyone involved?

6         A.   That's probably attorney eyes only, but I

7    haven't --

8              MR. MacGILL:  Yes.  I don't think that he

9         can an- -- he's not been given access to the

10        more than 11,000 pages of documents, therefore,

11        he doesn't have a basis --

12             MS. NOKES:  I'm just asking if he has any

13        knowledge.

14             THE WITNESS:  I don't have.

15             MR. MacGILL:  Just for the record, the

16        Guidepost, perhaps acting in concert with the

17        SBC and the SBC executive committee, have

18        embargoed for you -- from you more than 11,000

19        pages of records in this case.  Are you aware of

20        that?  Do you have that knowledge that they've

21        embargoed 11,000 pages from you?

22             THE WITNESS:  Yes, I'm aware of that.

23             MR. MacGILL:  And you are answering

24        Scarlett's question on the basis of what you

25        know.  You don't know what's in those 11,000

MAGNA
LEGAL SERVICES

1     pages; correct?

2          THE WITNESS:  Right, right.  Correct.

3          MR. MacGILL:  Okay.  Thank you.

4     Q.   (By Ms. Nokes) So you have no knowledge?

5     A.   I have no knowledge, no, ma'am.

6     Q.   You reference in the letter we just read

7     that your sin had cost you everything over the last

8     seven days?

9     A.   Uh-huh.  Uh-huh.

10     Q.   What would it have cost you if it had come

11     to light 12 years before when you committed the sin?

12     A.   Probably some speaking engagements with the

13     Southern Baptist Convention, but I really don't

14     believe it would have cost me my church.  I think I

15     could have led them through that.

16     Q.   How would you have done that?

17     A.   By telling them that I did just what they

18     do when they sin.

19     Q.   Which would be?

20     A.   Repent and ask God to forgive me and get

21     counseling and accountability and move forward.  The

22     very things that I did.  As a matter of fact, I don't

23     even know what anybody else can answer that and show

24     a principle anywhere, in history or in life, of what

25     else to do.  I mean, unless there's more hoops to

1    jump through.  So if somebody wants to get

2    forgiveness on Sunday, come to a class because it

3    will take you the next 14 years to be able to get

4    forgiven.

5         Q.   You would agree though, Mr. Hunt, that

6    pastors are called to a much higher standard than

7    your run-of-the-mill Christian, correct?

8         A.   No, not really.  I don't find that in the

9    Bible.  I know that teachers, any teacher, anyone

10   that's in leadership, certainly they may expect more

11   of us.  But to say there's a verse to say, We want

12   you to know you will be judged with a different

13   judgment because you are a pastor.  We make

14   statements, but that is not a biblical principle to

15   support that statement --

16        Q.   And you --

17        A.   -- that I'm aware of.

18        Q.   You heard Bart Barber's testimony, current

19   SBC president.  And did you listen in on his

20   deposition?

21        A.   Yes, I did.

22        Q.   And did you hear him answer questions about

23   the biblical qualifications for being a pastor?

24        A.   I did, yes, ma'am.

25        Q.   Did you disagree with his testimony?

1     A.   He couldn't remember what they were.  I

2  enjoyed watching that Baptist history Ph.D. that

3  couldn't quote a verse that referred to it, and ya'll

4  had to tell him that he couldn't open his Bible.  So,

5  yes, I did watch that.

6        And here's the question I would ask if I'm

7  permitted.

8     Q.   Go ahead.

9     A.   I would say if a person cannot be pastor if

10  they are not above reproach, does that mean constant,

11  habitually for all of their life if they ever cross a

12  line, they are totally out?  God kicks them out?  He

13  can forgive a Moses that murdered a man and put him

14  into sin.  David can still be the king.  He killed a

15  man and murder.  Peter denied knowing Jesus and

16  cursed him.  And, yet, so in the moment that I did

17  what I did, that really was a moment of:  You're not

18  living above reproach, but you can get back into

19  fellowship with God.  If not, my life is over.  The

20  church has nothing to offer.  The gospel ran out of

21  power for me.  The death of Jesus was not for all of

22  my sins, just part of them.  So.

23     Q.   The biblical qualifications go beyond just

24  being above reproach, though, correct?

25     A.   Correct.

MAGNA

LEGAL SERVICES

1      Q.    It includes being faithful to one wife?

2      A.    Correct.  Right.  And I am.

3      Q.    Were you on July 10th?

4      A.    For 20 minutes of a 53-year marriage.  Have

5  you ever lied?

6      Q.    I have.

7      A.    You have?  Could you get forgiveness?

8      Q.    I'm not a pastor.

9      A.    No, but can you -- Oh, a pastor can't get

10  forgiveness for lying?

11     Q.    I think a pastor can absolutely get

12  forgiveness.  I'm asking about the --

13     A.    I meet --

14     Q.    -- biblical qualifications to you being a

15  pastor.

16     A.    I meet the qualifications.

17     Q.    Despite having been unfaithful?

18     A.    For being unfaithful in a moment of

19  subduction and being stalked, absolutely.  And

20  grateful to God it didn't go any further, thanks to

21  me, and that I got out of there.  And that's my

22  testimony.

23     Q.    I want to look at the complaint.

24           MR. MacGILL:  Counsel, we have been going

25        about an hour.

MAGNA
LEGAL SERVICES

1        MR. BESEN:  Yeah.

2        MR. MacGILL:  Why don't we take a break and

3    then we'll come back to the complaint.

4        THE VIDEOGRAPHER:  The time is about 2:17

5    p.m.  We are off the record.

6        (WHEREUPON, a recess was taken.)

7        THE VIDEOGRAPHER:  We are back on the

8    record.  The time is 2:42 p.m.

9    Q.   (By Ms. Nokes) Mr. Hunt, when did you

10   decide to initiate this lawsuit?

11   A.   I knew that something had happened to be

12   able to get the report together and I wanted to be

13   able to know.  I wanted -- I wanted somebody to be

14   able to verify the report.  And so I knew that the

15   only way I could do that is get a good trial lawyer.

16   Q.   And when did you come to that decision?

17   A.   Gosh.  Times, dates.  Let's see.  My wife

18   had had -- and I had had many discussions about it.

19   I feel like in the context of the attorneys we did

20   have, that helped us to start with it too, that it

21   was more of:  We can defend you.  I weren't looking

22   to be defended.  I was looking to get on the offense

23   and go after Guidepost to find out what happened to

24   me.

25   Q.   And how did you end up choosing Mr. MacGill

MAGNA
LEGAL SERVICES

1   and your legal team?

2       A.   One of my really good friends knew Rob and

3   we vacation a lot together.  And he said, I would

4   like for you to meet one of my friends and have a

5   conversation.  So it just started that way.

6       Q.   And are you personally paying your legal

7   fees?

8           MR. MacGILL:  Objection to the form.

9           Objection.  How does that relate to this, your

10          discovery rights here?

11          MS. NOKES:  It relates to damages and his

12          financial condition.  And he's very much put his

13          finances at issue in the case.  It's not

14          privileged.

15          MR. MacGILL:  So remind me, has the SBC --

16          are we -- yes, you know what, I think because of

17          the punitive damage claim that we are pursuing

18          against the SBC and the punitive damage claim

19          against the EC and the punitive damage claim

20          against Guidepost, I can see some rationale for

21          this.  Why don't we take it question by

22          question.  But because of those punitive damage

23          claims, and especially in light of the testimony

24          today and the testimony in the recent weeks, I

25          think that's fair, to at least go a question or

```
1     two.  So let's repeat -- I'm going to have you

2     go ahead and answer this just as asked.

3          Please read it back.

4          (WHEREUPON, the record was read back by the

5     reporter as follows:

6          "Question:  Are you personally paying your

7     legal fees?"

8          MR. MacGILL:  She's asking you if you were

9     paying me on an hourly basis?
```

6    Q.    Have you talked to anyone besides your

7  lawyers or your wife about your claims in this case?

8    A.    Make sure I understand, about my claims

9  like about the lawsuit?

10    Q.    Yes.

11    A.    Just people that would ask.  People are

12  always asking me, especially if I'm out traveling,

13  pastor may say:  How is your lawsuit going?  Say,

14  we're great force.  We're in the midst.

15    Q.    Do you go into any more detail?

16    A.    With really close friends, I have.

17    Q.    With Jim Law?

18    A.    I have not had a conversation with Jim Law

19  in 23 months.  The report severed that relationship.

20    Q.    With your restoration team?

21    A.    Yes, they would.  Because part of the

22  restoration team was my pastor.  It was Steven Kyle.

23    Q.    And is there anyone else who has knowledge

24  about the claims or your claim damages in this case

25  that we haven't talked about in some way today?

1    A.   When you say "claim damages," you mean like

2    we're --

3    Q.   Where you are asking the executive

4    committee and the Southern Baptist Convention and

5    Guidepost each to pay you money as a result of this

6    lawsuit.

7    A.   I think maybe I -- my lawyer may have to

8    help me here.  But I just know that I was asked to

9    have a forensic accounting done.

10   Q.   Your expert?

11   A.   So, yes.  So he did that.  But I have not

12   ever said I'm looking for a claim.  I noticed there's

13   one suit against the Southern Baptist Convention

14   where they are suing Southwestern.  He says I'm

15   asking for 5 million.  I have never asked for any

16   amount or anything.  I'm just giving information.

17        MS. NOKES:  Okay.  This is the complaint in

18        its entirety with the exhibits.  Marked it as

19        Exhibit 17.

20        (Defendants' Exhibit 17, Complaint, marked

21        for identification.)

22   Q.   (By Ms. Nokes) Have you seen this document

23   before?

24   A.   Yes.

25   Q.   And have you read all of it?  We are not

1   going through this one line by line.

2       A.   All this?  No, I just read my section.

3       Q.   Well, this is the Johnny Hunt versus

4   Southern Baptist Convention, Guidepost Solutions and

5   the executive committee lawsuit.

6       A.   Oh, no, I haven't.  Unless it's -- unless

7   this is made up of what you-all send me in documents,

8   then I read.  So I don't know how this works, so I

9   just --

10      Q.   This is the very first document.  This is

11  the lawsuit itself, the complaint where your

12  allegations against the three defendants are set out.

13  And my question is just:  Did you see it before it

14  was filed?

15      A.   All of this?

16      Q.   Yes.

17      A.   No, ma'am.

18      Q.   Did you see this first page that you have

19  in front of you?

20      A.   Yes.

21      Q.   And I'm going to read paragraph 3 on

22  Page 1.  It says, But Pastor Johnny has also made

23  mistakes in his life.  In particular, in 2010, after

24  his term as SBC president had ended, Pastor Johnny

25  had a brief inappropriate extramarital encounter with

1    a married woman.  Some of the precise details are

2    disputed, but at most, the encounter lasted only a

3    few minutes and it involved only kissing and some

4    awkward fondling.  It is undisputed that Pastor

5    Johnny abruptly ended the encounter.  Both Pastor

6    Johnny and the woman disclosed the encounter to their

7    spouses, and they jointly sought counseling and

8    forgiveness.

9          Is that an accurate statement?

10    A.   It is.

11    Q.   So I think you had said earlier that it was

12    you who told Jane Doe's husband.  Was it you or --

13    A.   Well, I did and I just assumed, when I read

14    that, maybe she was referring to the fact that there

15    was a time that she told him more or told him.  But,

16    no, I am the one that told him.

17    Q.   And it also says that, The encounter

18    involved kissing and awkward fondling.

19          Is that accurate?

20    A.   The kissing is referring back to that kiss

21    on the forehead.

22    Q.   Well, your complaint says the encounter

23    lasted only a few minutes, and it involved only

24    kissing and some awkward fondling.  Do you read that

25    to refer to some instance other than the encounter?

1      A.   I read it as I -- asked if I kissed her, it

2  was only on the forehead that time.  My lips have

3  never touched that woman's lips.

4      Q.   You have heard all the depositions in this

5  case?

6      A.   Uh-huh.  Yes, ma'am.

7      Q.   Looked at a lot of documents.  Tell me in

8  your own words what the executive committee of the

9  Southern Baptist Convention did wrong?

10         MR. MacGILL:  Object to the form of the

11         question.  You may answer.

12     A.   Okay.  Maybe I will be proved wrong.  But

13  I -- I don't see where they would have had time to

14  verify the report.  They took a report while taking

15  all the risks since Guidepost indemnified themselves,

16  we take all the risks.  Did you verify this?  Why

17  would you not call?  Are there two parties involved

18  here?  Is there a person that's accused of doing

19  wrong and one acknowledging doing wrong?  Is it fair?

20  Is this justice that you would spend 11 interviews

21  with a lady getting a story that you need, while

22  never interviewing me until two days before the

23  report and then it be an ambush.  And why would they

24  receive questions and I never received questions?  So

25  my thoughts are:  I have served you as a Southern

1   Baptist 50 years.  This is the way you treat your

2   leaders, your men that have given millions to the

3   cause and -- and leadership of your life?  This is

4   the way you treat us?  You call us and ask us is this

5   accurate?  No one called.

6           We are trying to find now all of the emails

7   between Johnny Hunt and the EC and the SBC.  There

8   are none either way.  I have heard nothing from the

9   Southern Baptist Convention.  I am cancelled.

10      Q.   (By Ms. Nokes) And same question as to the

11  convention, your answer may be the same?

12      A.   It would be the same, yes, ma'am.

13      Q.   And you're still a Southern Baptist?

14      A.   We no longer support the national

15  convention.  We send only on state level and the

16  church that we are in.

17      Q.   And by "we," you mean Highland Park?

18      A.   Highland Park, yes, ma'am.

19      Q.   But it is affiliated with the Florida state

20  convention?

21      A.   Florida convention, yes, ma'am.

22      Q.   How long has it not given to the

23  cooperative program?

24      A.   I think Steven made that decision after the

25  credentials committee told him who could preach in

MAGNA
LEGAL SERVICES

1 his pulpit.

2      Q.   And you are seeking monetary damages as

3 part of your lawsuit, correct?

4      A.   I am letting my attorney lead me in what I

5 need to produce, but I have no figure.  I am seeking

6 first and foremost truth from Guidepost.  I want the

7 truth to be revealed on ███████ and ████████ ████████ If I

8 were going to get one of two things, I want the

9 truth.

10      Q.   And you recognize that any money that is

11 awarded to you from the executive committee or the

12 Southern Baptist Convention would come from

13 cooperative program dollars?

14      A.   Probably come from a lawsuit of their

15 insurance.

16      Q.   You understand, though, that some of it

17 would come directly from cooperative program dollars?

18      A.   They have done a lot of damages.

19      Q.   So you are okay with that?

20      A.   Absolutely.

21      Q.   Do you think that would affect how the

22 average Southern Baptist in the pews giving to the

23 mission work and the cooperative program?

24      A.   Being a former president of the Southern

25 Baptist Convention, when word gets out what Guidepost

MAGNA
LEGAL SERVICES

1 did and how unfair this report is, I predict half of

2 the Southern Baptist Convention churches will freeze

3 their assets until they can get to the bottom of this

4 to see if, indeed, the report was falsified.

5     Q.   So that would be about 20,000 churches?

6     A.   Probably.  Yes, ma'am.  But we have already

7 lost probably around a third of our support from what

8 I'm hearing.

9     Q.   Nationally?

10     A.   Nationally.  Less that's coming in.

11     Q.   Mr. Hunt, I want to go back to July 25th of

12 2010.  You referenced 20 minutes a few times during

13 our back and forth today.  Is that about how long the

14 encounter with Jane Doe --

15     A.   It was a very brief encounter.  And I

16 believe she even testified to the same, that it was a

17 brief encounter.

18     Q.   And would you say 20 minutes?

19     A.   I would say 20 to 30 minutes, you know, it

20 was a brief -- brief amount of time.

21     Q.   And of that time, was the time on the

22 balcony five minutes?

23     A.   Yes.  It was very short.  Because it was

24 extremely hot on the balcony.

25     Q.   So the time inside the condo would have

MAGNA
LEGAL SERVICES

1   been 25 to 30?

2       A.   Probably.  Probably just 15 or 20, 25

3   minutes, somewhere in that timeframe.

4       Q.   Okay.  What was Jane Doe wearing?  What was

5   her attire?

6       A.   She had on short shorts.  And a -- best I

7   remember, a halter top.

8       Q.   Okay.  Were the short shorts, like, running

9   shorts or?

10      A.   Oh, no.  No, they were just short shorts.

11  They were not running shorts.  They were not

12  Lululemon or Nike.

13      Q.   Blue jean, denim?

14      A.   I don't remember that.

15      Q.   And you testified earlier that when you

16  went into the condo, she sat down on the couch?

17      A.   She sat at one end, and I sat at the other

18  end.  She just said -- I was going to leave, she

19  said, No, please don't.  Please be seated and let's

20  just talk.  And I said, Are you having marital

21  trouble?  And best I remember is sort of along the

22  lines, It's been better.  But we didn't go into

23  detail about that.

24      Q.   And what other conversation did you have

25  there on the couch?

1    A.   Well, it took a moment because her husband

2  called her when I was there and she didn't take the

3  call.  I remember that very distinctly.  So if it was

4  an abusive situation, it sure would have been a good

5  way out to answer her husband's phone.  And I think

6  we could -- again, if his phone was ever surrendered,

7  we would see that that call came on that afternoon.

8    Q.   And so after he called, what happened next?

9    A.   She asked me if I would come closer to her.

10  And so I actually came and sat, like, at her

11  waistline right there where she is.  But she had

12  already spread out on the couch.

13    Q.   Let's go back.  When did she -- when you

14  say "spread out," describe what she --

15    A.   All right.  Instead of sitting on the

16  couch, she turned toward -- I'm sorry.  She turned

17  toward me with her legs down toward me.

18    Q.   I think you said earlier her legs were

19  spread?

20    A.   Spread, yes, ma'am.

21    Q.   Could you see inside her shorts?

22    A.   I don't remember that.

23    Q.   And at what point did she -- I think you

24  testified earlier she pulled down her top?

25    A.   When I went and sat besides her.

1    Q.    So that's when she asked you to move

2    closer?

3    A.    Exactly.

4    Q.    Okay.  And what specifically did she do

5    when she pulled down her top?

6    A.    She made reference to the fact, See,

7    there's a reason that I can't run without a -- a

8    halter top or what you ladies call those tops you run

9    in.  Because she knows that I was a runner and going

10   regular.  And that's when she text me the next day.

11   After the alleged assault, she wanted to go on a walk

12   with me.

13   Q.    Was she wearing a bra?

14   A.    I don't remember.  I mean, and I know you

15   can have a bra that doesn't have straps across the

16   top.  So I would be guessing.

17   Q.    Could you see her breasts when she pulled

18   down her shirt?

19   A.    When she pulled down, absolutely.

20   Q.    So they were completely exposed?

21   A.    Yes, exactly.

22   Q.    And what happened after she pulled down her

23   top?

24   A.    Exactly what her report said and that is

25   that I fondled and kissed her breast.

1    Q.   And so that was not through her shirt?

2    A.   That was --

3    Q.   That was your mouth on her skin?

4    A.   -- on hers, yes.

5    Q.   How long did that go on?

6    A.   Just a couple of minutes.

7    Q.   So when you say you've never kissed her

8  mouth, you have kissed other parts of her body?

9    A.   Yes.

10    Q.   And after the breast fondling and the

11  kissing, what was the next thing that happened?

12    A.   Okay.  And let's be real careful to say in

13  this very consensual relationship.  This is not a

14  tense lady.  This is a very welcoming lady.

15    Q.   What was she doing to indicate that she was

16  consenting to this sexual encounter?

17    A.   Enjoying it.

18    Q.   How did she indicate that?

19    A.   By no resistance whatsoever.  No frowns

20  whatsoever.

21    Q.   Was there any talk back and forth?

22    A.   I don't remember a conversation.  She's a

23  very quiet person.

24    Q.   Did you find her attractive?

25    A.   She's an attractive lady, of course.

MAGNA
LEGAL SERVICES

1       Q.   And were you aroused during the encounter?

2       A.   No, I had just had cancer surgery and that

3  was not a possibility.  And while I was touching her

4  breast, she was attempting to get her hands up my

5  swim short leg.  And so -- but never did.  And then

6  when I attempted to pull her shorts down -- with her

7  aid of raising up to make it easy -- and that's when

8  I came to myself and said, No, I'm out of here.  I

9  love my wife.  And I'm sorry.  This should have never

10  happened.  And I left.

11        And then how did I know she was consensual?

12  Because she said, Don't let this be over.  This is --

13  this is just a first day.  She was going to be there

14  evidently that week.  So this was just a start of

15  what she had hoped for.

16       Q.   And going back to her shorts, did you pull

17  them down?

18       A.   I did.  I pulled them down.  And then -- I

19  mean momentarily, and she talks about all this me

20  asking her to roll over.  If she rolled over, she

21  rolled over on her own.

22       Q.   Did she roll over?

23       A.   I don't even remember.  I mean, when I read

24  that in the report, I thought, I don't remember this.

25  But she seems like to me she would sure have to add a

**MAGNA**
**LEGAL SERVICES**

1  good bit of stuff to make it sound like it's an

2  assault, so.

3      Q.   What was the point of pulling down her

4  shorts?  What did you intend to do?

5      A.   You know, when you have momentary

6  forgetfulness of who you are, it don't have to make

7  sense.  It doesn't make sense.  I have asked myself a

8  million times:  What was I even thinking?  So I think

9  I was doing what I believed she wanted me to do, even

10 though I couldn't have gone any further.

11     Q.   Did you pull her shorts down past her

12 knees?

13     A.   Probably to her knees.

14     Q.   And did you touch her anywhere --

15     A.   Absolutely not.

16     Q.   So just to be clear, the sexual encounter

17 was full breast exposure with kissing and fondling

18 her breasts while they were exposed?

19     A.   Correct.  Correct.

20     Q.   Anything else?

21     A.   No, ma'am.

22     Q.   Think she's about your daughter's age,

23 right?

24     A.   Uh-huh, uh-huh.

25          MR. MacGILL:  And what time, in 2010?

MAGNA
LEGAL SERVICES

1          MS. NOKES:  At the time of the encounter.

2          MR. MacGILL:  Okay.  So around 33 or 34, is

3      that what we are talking about?

4      Q.   (By Ms. Nokes) She's still -- they are

5  still about the same -- regardless of what year --

6      A.    Right, yes.

7      Q.    -- they are in the same age range.

8      A.    Yes, ma'am.

9      Q.    And what do you think would cause a woman

10  that much younger than you to have this attraction to

11  you?

12      A.    I wish you could tell me that since you are

13  a lady.

14      Q.    Well, I'm just asking for your --

15          MR. MacGILL:  Let me object to the form.

16      It calls for speculation.  Answer what you can.

17      A.    I have no idea.  Was she in -- was she

18  unhappy with her husband?  Did she see me as a person

19  she was attracted to?  Was she attracted to the early

20  conversation you and I had, that she liked the fact

21  that I'm a leader of the denomination, that I have

22  had a very successful ministry and I'm constantly

23  helping her husband?  I'm not sure.  I'd be

24  speculating.

25          MR. MacGILL:  I'm going to make note of the

```
 1        fact -- and this is important -- that, once
 2        again, Guidepost, I think, acting in concert
 3        with the SBC and acting in concert with the SBC
 4        executive committee have embargoed more than
 5        11,000 pages of information that would provide
 6        details and information that might be responsive
 7        to the question.  So I just want this court and
 8        this jury to be mindful of the embargo that
 9        continued.  He's answered without reference to
10        more than 11,000 pages of records that the
11        defense has embargoed.
12        Q.   (By Ms. Nokes) Mr. Hunt, was Jane Doe
13   wearing underwear?
14        A.   Yes.
15        Q.   Did they come down with her shorts?
16        A.   No, they did not.
17        Q.   And at any point, did you touch her inner
18   thigh?
19        A.   Absolutely not.
20        Q.   Okay.  At any point, did you touch her back
21   side, her buttocks?
22        A.   I did not.
23        Q.   Okay.  Did you touch any part of her body
24   other than her breasts?
25        A.   And her legs when I rubbed her legs with
```

1   her permission on the porch.

2        Q.   No other body parts?

3        A.   No, ma'am.

4             MS. NOKES:  I think I'm ready to take just

5        a short break.

6             THE WITNESS:  Okay.

7             MR. MacGILL:  Why don't we just stay put.

8        Is that all right?  You guys want to talk?

9             THE VIDEOGRAPHER:  The time is 3:04 p.m.

10       Going off the video record.

11            (WHEREUPON, a recess was taken.)

12            THE VIDEOGRAPHER:  We are back on the

13       record.  The time is 3:13 p.m.

14            MS. NOKES:  Mr. Hunt, I do not have any

15       additional questions for you on behalf of the

16       executive committee.

17            THE WITNESS:  Okay.  Thank you.

18  EXAMINATION

19  BY MR. KLEIN:

20       Q.   Good afternoon, Mr. Hunt.

21       A.   Good afternoon.

22       Q.   My name is Scott Klein, and along with my

23  colleague, Terry McCormick, we represent defendant

24  Guidepost Solutions.

25       A.   Okay.

MAGNA◆
LEGAL SERVICES

1     Q.   I'm going to be asking you some additional

2  questions today.

3     A.   Okay.

4     Q.   And just to be clear, like Ms. Nokes said

5  earlier, you and I have never met or spoken before

6  today.  Is that correct?

7     A.   That's correct.

8     Q.   Now, I'm going to do my best to not go over

9  the same items or topics that Ms. Nokes went over

10  because I don't need to keep you or any of us here

11  any longer than we need to.  I may just need to

12  clarify in some documents and some other items that

13  were discussed earlier.

14     A.   Okay.

15     Q.   Fair enough?

16     A.   Fair.

17     Q.   But my goal is not to bring up again, just

18  from a different voice, the same questions.

19     A.   Okay.

20     Q.   Let's start and if I have some delay

21  between questions, I apologize.  It's just trying to

22  make sure I don't do that.

23     A.   Okay.

24     Q.   And I'm going to cut through my outline

25  just to get to the stuff that has not been covered.

1   So I apologize ahead of time.  And I have a

2   tendency -- as you can tell, I'm very loud, which is

3   a good thing.

4       A.   It's a good voice.  You make a great

5   preacher voice.

6       Q.   I've heard I have a voice for radio.  I

7   take that in all sorts of different ways.

8            I am loud.  I sometimes speak quickly.  So,

9   please, if you don't understand my question, let me

10  know and I will rephrase it.

11      A.   All right.

12      Q.   I will ask again that it's against the

13  common way we talk, but please let me finish just for

14  the benefit of the record and the court reporter.

15      A.   Okay.

16      Q.   You probably know what you are going to say

17  often before I finish my question --

18      A.   Uh-huh.

19      Q.   -- because you know where my question is

20  going.

21      A.   Uh-huh.

22      Q.   That's fair.  But do the courtesy, just so

23  the reporter --

24      A.   Yes, sir.

25      Q.   -- let me finish so she can catch up, and

MAGNA

LEGAL SERVICES

1  then you can answer.  Fair enough?

2      A.   Yes, sir.

3      Q.   And I will do the same on my end.

4           So let's start with Ms. Nokes talked to you

5  earlier about your resignation to Kevin Ezell on

6  May 13th.  Do you remember those questions and

7  answers?

8      A.   I do.

9      Q.   Did Kevin Ezell agree with your decision to

10 resign?

11     A.   The only way I know to answer is he didn't

12 disagree.  So I gave it to him.  He left, and then he

13 publishes his letter.

14     Q.   And did he -- and you may have said this

15 earlier, but I just want to make sure I understand

16 it.  Did he ask why or did he not need to because you

17 already explained to him the circumstances as to why?

18     A.   He didn't need to ask why.

19     Q.   Because you had already informed him of the

20 events as you described them here today?

21     A.   Exactly, yes.

22     Q.   Did you get into the level of detail with

23 Kevin Ezell that you did in the last set of questions

24 with Ms. Nokes regarding the specifics of this

25 encounter, the physicalness, the physicality of the

1  encounter?

2        A.    No, sir.

3        Q.    Was it left -- I think you had said earlier

4  that it was just touching or awkward fondling.  Did

5  you use that phrase with Dr. Ezell?

6        A.    No, no.  I just told him that I had crossed

7  a line and had gone into a room with another pastor's

8  wife.

9        Q.    And he didn't ask for anything further

10  about what you meant by that?

11        A.    He didn't go -- ask any details.

12        Q.    You at the time had a good relationship

13  with Dr. Ezell?

14        A.    We had been friends probably 30 years.

15        Q.    You still have a good relationship with

16  him?

17        A.    Haven't heard from him since the report.

18        Q.    By your choice or his choice?

19        A.    I gave him my story.  He wrote his.  And

20  adios.

21        Q.    So I also want to now get to, and you've

22  led me right there, one of the exhibits that

23  Ms. Nokes has shown you was that second statement

24  from NAMB.  It's Exhibit 15.

25              Do you have the exhibits in front of you?

1     A.   Okay.

2          MR. MacGILL:  He does right now.

3          MR. KLEIN:  Thank you, Rob.

4     Q.   (By Mr. Klein) And I believe Ms. Nokes

5     reviewed this with you.  I just have one or two

6     follow-up questions.

7          First, when Ms. Nokes showed you this

8     letter earlier today, was that the first time you'd

9     seen his statement from NAMB or had you seen it

10    prior?

11    A.   I don't remember reading this one after

12    reading his first.  And they were probably maybe on

13    Baptist Press.  I went off of social media, and I was

14    in a survival mode.

15    Q.   So were you aware before reading this

16    letter this morning with Ms. Nokes that NAMB had

17    viewed the allegations in the report as credible?

18    A.   I believe practically everyone that read

19    the report viewed them as credible.

20    Q.   Well, at the moment, I'm only asking if you

21    were aware that NAMB had viewed the allegations in

22    the report as credible?

23    A.   I don't know that I could say that.

24    Q.   Were you aware prior to seeing this letter

25    today that NAMB has asserted that the report is well

1    documented and verified with a high level of

2    professionalism and due process?

3         A.   That's their opinion.

4         Q.   Yes.

5         A.   Yes.

6         Q.   And I just want to know if you were aware

7    of that before seeing this letter today?

8         A.   No, sir.  No, sir.

9         Q.   So reading those or hearing those words

10   from both Ms. Nokes and now myself, that's the first

11   time that you knew?

12        A.   Of how they said it, yes, sir.

13        Q.   Hearing it now, do you agree with that

14   assessment by NAMB and Dr. Ezell?

15        A.   Absolutely not.

16        Q.   And you have not had an opportunity to

17   challenge them about it because you are just seeing

18   these words now for the first time?

19        A.   Yes.  I would probably not challenge them.

20   Because they are not the source of the report.

21        Q.   But they are now publishing in this

22   May 25th letter that's out there published for all

23   the world to see, they are publishing assertions that

24   are stating that the report is credible,

25   well-documented and verified.  You don't have a

1    problem with that?

2        A.    I believe being in the SBC, being the

3    senior VP, turning down Kevin's job, being the

4    president of the convention, I think they are just

5    being poli1tical.  They are saying what they think

6    Southern Baptists want to hear from them.  To say if

7    I believe how they are saying it, how do they know

8    it's varable?  Have they done their discoveries?

9        Q.    I don't know and sounds like you don't know

10   either.  I'm just asking --

11       A.    I'm confident they -- sorry.

12       Q.    Okay.  So I appreciate --

13            MR. MacGILL:  Hold on.  Stop.  Let him

14       finish.  Read his answer back, please.

15            MR. KLEIN:  Wrong, Rob.  He apologized.

16            THE WITNESS:  I was talking.

17            MR. KLEIN:  He interrupted me and he

18       apologized.

19            MR. MacGILL:  Let's start over.  Give the

20       question and the answer.  We don't need to blame

21       Scott or Pastor Johnny.  Let's just make sure we

22       have a good record here.

23       Q.    (By Mr. Klein) There is no one to blame.  I

24   appreciate, Mr. Hunt, you letting me finish.  I'm

25   going to withdraw the question and we will start

MAGNA
LEGAL SERVICES

1   fresh.

2          Because I frankly have forgot the question

3   I was going to ask.  And I don't think Rob is doing

4   that intentionally, but that's okay.

5          You had said that you weren't sure -- well,

6   neither of us knew, sitting here today, whether or

7   not they verified it.  My question to you was:  Are

8   you challenging the assertion, now that you have seen

9   it now, that they view the report as being verified

10  with a high level of professionalism?

11      A.   I would say they spoke uneducatedly.

12  Further, what proof do they have it's a report of

13  verity?

14      Q.   Yes.  I'm just asking you and you have

15  given me an answer, which is fine.

16      A.   Right.

17      Q.   Let's move on to a different subject.

18      A.   Okay.

19      Q.   Let's talk about your retention of emails

20  and text messages, which have been discussed a little

21  bit today.  I'm going into a little more detail.

22      A.   Okay.

23      Q.   Your counsel has represented to us that

24  prior to this litigation in March of 2023, that it

25  was not your practice to keep text messages and

1    emails.  Is that correct?

2         A.   Correct.

3         Q.   Did you routinely -- let's talk about texts

4    first, so there's no confusion.

5         A.   All right.

6         Q.   And then we will talk about emails.  So as

7    to texts, was there a practice for you to routinely

8    delete texts or was it more random?

9         A.   It was routinely.  It was a habit.  It was

10   a:  Let's get this phone cleaned up and make sure I

11   have answered all my texts, emails.  Done with them.

12   Move on.

13        Q.   So was it after you have read them, you

14   would just swipe and delete, or was it a weekly event

15   or something else?

16        A.   It could be a daily event, read them, make

17   sure they are answered if they need an answer, delete

18   and move.

19        Q.   What about with regard to emails, same

20   practice?

21        A.   Same practice.

22        Q.   So if we were to sneak into your office

23   tonight without you knowing and look in your inbox,

24   there would be very little emails in your inbox?

25        A.   Probably 20, maybe.

MAGNA
LEGAL SERVICES

1      Q.    I promise I won't do that, but I will take
2  your word for it.
3            You said you changed phones, meaning the
4  phone you had in 2010, certainly not the same phone
5  you had in 2022?
6      A.    Correct.
7      Q.    Do I have that right?
8      A.    Yes, sir.
9      Q.    The phone you had in 2022, is that the same
10 phone you have today?
11     A.    In '22, yes, sir.
12     Q.    When did you switch to that current phone?
13 We know it was at least in 2022.  How much prior to
14 that did you purchase the phone that you are
15 currently using?
16     A.    Okay.  When I was in counseling, one of the
17 things that we discussed and it's because of my
18 nature of being available to pastors, I was
19 attempting to return every call, answer every email,
20 and someone said -- and my wife along with them, you
21 are too accessible to the world.  You need to get a
22 new number.  And so we just changed phones at that
23 time.
24     Q.    When was that?  I'm sorry.
25     A.    That would have been the -- after -- around

1   end of the summer of 2022.  I'm sorry, 2022, 2010.

2   2010.  So in the time of my counseling and all.

3       Q.   And the counseling you are talking about is

4   with Roy?

5       A.   Roy Blankenship, yes, sir.

6       Q.   So the phone you currently have, you have

7   had that same phone since at least 2011?

8       A.   Correct.

9       Q.   And I believe you said it was an iPhone?

10      A.   Correct.

11      Q.   You haven't upgraded to a new version of

12   the iPhone?

13      A.   Yes.  I have gone up, but I still kept the

14   same number in iCloud.

15      Q.   Same number.  Because of iCloud, did the

16   texts and emails just transfer over to each new

17   upgraded device?

18      A.   They did.

19      Q.   Do you know when you started preserving

20   emails in connection with the claims that you

21   ultimately brought in this lawsuit?

22      A.   I still don't keep them.

23      Q.   You still don't keep them to this day?

24      A.   No, I figure my attorneys are handling any

25   emails that are important for me.

1    Q.   Are you aware that there's a current

2    obligation for you to retain your emails and text

3    messages in connection with this lawsuit?

4    A.   Let me make sure I understand your

5    question.

6    Q.   I'm not looking to confuse you or trick

7    you.  Let's make sure we're talking the same

8    language.

9    A.   You mean from -- like from who?

10   Q.   Anything relevant -- I'm not sure you

11   should be deleting anything, but certainly with

12   regard to any current texts or emails relating to the

13   claims that you have brought in this lawsuit, that

14   you are not permitted to delete any of those.  So

15   let's just start with that.

16   A.   Uh-huh.

17   Q.   Are you testifying that -- and maybe

18   unwittingly and unknowingly -- but are you testifying

19   that you have been still deleting texts and emails --

20   A.   Yes.

21   Q.   -- as they come in once you are done

22   reading them?

23   A.   Yes, the texts, yes, because they haven't

24   related to the case.  The emails, I give them to my

25   wife and she files everything.

1     Q.   So those are still retained?

2     A.   They are still retained, yes.

3     Q.   The texts, you made the determination on

4 your own whether or not a text was germane to the

5 case, and if it was, you have kept it; and if not,

6 you have deleted it?

7     A.   Yes.  But I don't -- I can't even really

8 think.  There may be a couple that we have retained

9 and we have a record of, and I guess that's why my

10 phone is at forensic now.

11    Q.   And as far as you know, have you produced

12 the texts that were on your phone that were germane

13 to this case?

14    A.   The last time we did it, I don't know that

15 we found but maybe two text messages that related to

16 the case.

17    Q.   In May of 2022, Ms. Nokes asked you and you

18 acknowledged that you first retained lawyers in

19 connection with the upcoming release of the report,

20 correct?

21    A.   Right.  Yes, sir.

22    Q.   And that was not Mr. MacGill's firm, that

23 was a different firm.  Is that correct?

24    A.   Correct.  Yes, sir.

25    Q.   At that time, were you made aware of the

MAGNA
LEGAL SERVICES

1   need to preserve any texts or emails that related in

2   any way to the claims that you brought?

3        A.   To the claim.  Yes.  And I believe my wife

4   has all of those.

5        Q.   And she does?

6        A.   Yes.

7        Q.   And when you say your wife has them, how

8   does she get them?

9        A.   I forward them to her.

10       Q.   That's emails.  What about texts?

11       A.   I think I have only had about two texts,

12   and they have been produced.

13       Q.   And so you are saying that since May of

14   2022, you believe there are only two responsive --

15   and when I say "responsive," that's a legal word --

16   germane or relevant texts that relate to this case

17   and you've produced them both?

18       A.   And if there are others, they will be

19   produced soon.

20       Q.   Well, I understand that.  But my question

21   is currently, as far as you know, you have only

22   produced, you say, two.  Whether more get produced,

23   you have only produced approximately two so far?

24       A.   And, again, I want clarity.  I mean, like I

25   found an old text from ██████   So is that what you

1    are referring to?  I want to make sure I follow your

2    questioning.

3        Q.   Yes.  I am just trying to find out what

4    efforts you made to retain responsive or relevant

5    texts and emails in this case, just to make sure, as

6    your lawyer has claimed that we have less than

7    perfect in our document preservation and productive,

8    I'm trying to see if you have been less than perfect

9    in your document retention.  So I'm just trying to

10   find out what efforts you have made.

11       A.   Again, for clarity sake, you are saying if

12   I get a text like, say, from my lawyer or are you

13   saying I get a text from a friend saying, How is your

14   case going?

15       Q.   I'm looking for anything other than lawyer

16   communications.  And I just want to know what you

17   have done with them.  I think I have your answer.

18   You said there are only a couple of texts and you

19   have produced those?

20       A.   Yes, correct.

21       Q.   But you said you still have the policy of

22   deleting texts that you have had throughout?

23       A.   Yes.

24       Q.   So let me now show you a couple of letters

25   and make sure we can get some clarity here.

MAGNA
LEGAL SERVICES

```
 1        A.    Okay.

 2              (Defendants' Exhibit 18, Letter to Bundren

 3        from MacGill, 12/14/23, marked for

 4        identification.)

 5              MR. KLEIN:  I only have one for your team,

 6        sorry.  Actually, I lied.  I have two for your

 7        team.

 8        Q.    (By Mr. Klein) Mr. Hunt, I have just handed

 9  you a letter that's been marked Exhibit 18.  And just

10  for the record, it's a letter on MacGill PC

11  letterhead dated December 14th, 2023 addressed to

12  Brandon Bundren at the Bradley firm.  I'm only going

13  to ask you about one portion of this letter.

14        A.    Okay.

15        Q.    I'm just curious.  Do you remember seeing

16  this letter --

17        A.    I do.

18        Q.    -- before it was sent?

19        A.    Yes, sir.

20        Q.    If you can turn to the last page of the

21  letter where Mr. MacGill's signature is on.  And that

22  last dash that says:  Scope of collection.  Do you

23  see where I'm reading?

24        A.    Yes, sir.

25        Q.    It says, Plaintiff has undertaken a
```

1 reasonable search for responsive documents. As a

2 general practice, prior to the filing of this action,

3 Plaintiff did not retain emails and text messages.

4         Do you see where I have read?

5     A.   Yes, sir.

6     Q.   And I think I have asked you this before,

7 but that is an accurate statement?

8     A.   Yes, sir.

9     Q.   And, again, that's for both personal and

10 business emails and texts, that was your general

11 practice?

12     A.   Unless it's something that we felt we

13 needed to file and I gave it to Janet. To go back,

14 for clarity, I don't even know how to file on a

15 computer. I am not IT savvy, period. So if I

16 receive an email and you were to say, Save that, I

17 would think: How? So I would send it to Janet. She

18 would not only save it, but she would put it in a

19 file.

20     Q.   I understand that. But with texts, you are

21 certainly --

22     A.   Oh, with texts, yeah.

23     Q.   Let's make sure we don't speak over each

24 other. With texts, you are certainly tech savvy

25 enough --

MAGNA◆
LEGAL SERVICES

1     A.    I am.

2     Q.    -- to delete a text?

3     A.    Correct.

4     Q.    Now, if I can show you now another letter,

5  which we will mark as Exhibit 19.

6          (Defendants' Exhibit 19, Letter to Jacobson

7          and Mintz from MacGill, 1/15/24, marked for

8          identification.)

9     Q.    (By Mr. Klein) This is a letter marked as

10  Defendants' Exhibit 19.  It's a letter on MacGill PC

11  letterhead, dated January 15th, 2024, addressed to

12  John Jacobson and Steven Mintz and Terrence

13  McCormick.  Have you seen this letter before,

14  Mr. Hunt?

15    A.    Yes, I have seen this letter.

16    Q.    Again, I'm going to turn right to that last

17  page on the last bullet point.

18    A.    Okay.

19    Q.    On Page 3 that says, "Text Messages."  Do

20  you see where I'm reading?

21    A.    I do, yes, sir.

22    Q.    As general practice prior to the filing of

23  this action, Plaintiff did not retain email -- emails

24  and text messages.  Do you see where I have read?

25    A.    Yes, sir.

MAGNA
LEGAL SERVICES

1    Q.    That sounds similar to the last letter.

2  That's an accurate statement as of January 15, 2024?

3    A.    Yes, sir.

4    Q.    We understand -- well, actually, I'm going

5  to back up for a second.  You say that's an accurate

6  statement, but it sounds like you do retain emails.

7  You just send them to Janet?

8    A.    My wife, yes.

9    Q.    So in your mind, sending them to your wife,

10  is that not retaining them?

11    A.    That would be retaining.

12    Q.    The next sentence says, We understand the

13  plaintiff does not have his same phone that he used

14  in 2010 when the encounter occurred.  You just

15  clarified that you got a new phone soon after that,

16  correct?

17    A.    And new number, yes.

18    Q.    Exactly.

19          Next sentence, Moreover, while Plaintiff

20  had communications with those identified in his

21  response to Interrogatory Number 11 -- I will show

22  you that shortly -- we understand that none of these

23  were substantive conversations.  Do you see where I

24  read?

25    A.    Yes, sir.

1    Q.    Who determined that these communications

2 were not substantive?  Did you?

3    A.    I guess my attorney.

4    Q.    Yes.  I don't want to know about

5 conversations you had with your attorney.

6    A.    Right.

7    Q.    I just wanted to know if you made that

8 decision or if someone other than you made that

9 decision?  And if so, who?

10    A.    I would say my attorneys.

11    Q.    You did not make that decision?

12    A.    It may have been asked about some.  I can't

13 think of any in particular.  But.

14    Q.    So that last sentence that I read, ending

15 with, We understand that none of these were

16 substantive conversations, does that mean that you

17 have certain communications but did not produce them?

18 Or did you delete them?  Which one?

19    A.    I don't remember having any that had

20 anything to do with the case.

21    Q.    But I still just want to understand just

22 procedurally whether that means you retained them and

23 just felt they were not responsive or you deleted

24 them and would not know if they were not responsive?

25    A.    If I deleted them, I would say it's because

1    they are not responsive.

2        Q.    But I don't want to know if you deleted

3    them.   I wanted to know what you actually did.  Did

4    you delete them?

5        A.    I don't know what you are talking about.

6        Q.    Well, neither do I.  That's why I'm asking

7    you the questions.  They're your text message?

8        A.    General- --

9            MR. MacGILL:  Nobody knows what you are

10           talking about.  Let's try again and see if we

11           can get some understanding of what you're

12           talking about.

13           MR. KLEIN:  No, I think he does.  He's just

14           answering as best he can.

15       A.    Yes.

16       Q.    (By Mr. Klein) Which is inconsistent with

17   some of these letters.

18           Do you have access to the emails that you

19   forward to your wife?

20       A.    Yes.

21       Q.    And how do you have that access?

22       A.    She files everything.  She's a good

23   bookkeeping person, so she don't throw anything away.

24       Q.    When you say "file," are you using that

25   term meaning that electronically, she puts them in a

1  folder on a desktop or on your computer?

2      A.   I think both.  I think that, and I think

3  then she makes prints -- copies of them.  But when I

4  say the things I forward to her, it's really stuff

5  that your firms are sending me.  We are not getting

6  rid of any of that.  That's the only communication

7  I'm having about the case that I feel is something

8  substantive to keep.

9          So when something like this comes, I will

10 assure you, she's got that.  And that's where I was

11 asking for clarity:  Is this what you are talking

12 about?  Something like this?  Or -- because I'm not

13 having communication with anyone in detail about my

14 case.

15     Q.   I'm just trying to understand your

16 retention policy of texts and emails.

17     A.   Okay.

18     Q.   And we are almost done.  I would just note

19 that in those emails that you still have access to,

20 if there are any that are responsive to outstanding

21 document requests, there is a continuing obligation

22 to produce.  And I would ask that you look and

23 produce them if they are responsive.

24     A.   And you will have my wife here tomorrow, so

25 she will be able to answer that with greater clarity

1    than me.

2         Q.    And we will ask her, but I wanted to make

3    that record clear with you as well.

4         A.    Got it.  Yes, sir.  Got it.

5         Q.    Thank you.

6               (Defendants' Exhibit 20, Plaintiff's

7               Response to Guidepost Solutions LLC's First Set

8               of Interrogatories, marked for identification.)

9         Q.    (By Mr. Klein) Mr. Hunt, I've handed you

10   what's been marked as Exhibit 20.  And for the

11   record, it's Plaintiff's response to Guidepost

12   Solutions, LLC's first set of interrogatories.  And I

13   would ask you to look through these and when you are

14   done, just let me know if this document is familiar

15   to you?

16        A.    Yes, this is.  I have read this.

17        Q.    Thank you.  If you can turn to Page 14 of

18   this document.  On top, it says, Verification of

19   responses to interrogatories only.  Let me know when

20   you are at that page.

21        A.    I have every page but 14.

22        Q.    Well, I think it's not numbered 14.  It's

23   the one right before 15.

24        A.    Oh, okay.  Right in the back there.

25   Verification --

MAGNA
LEGAL SERVICES

1    Q.   By that, I meant that I -- "Verification of

2  Responses."  Do you see that?

3    A.   Yes, sir.

4    Q.   Is that your signature next to the printed

5  word "signed"?

6    A.   That is.

7    Q.   And you understand that by signing this,

8  you were verifying, as it says here, that, The

9  factual matter stated for me in the above responses

10  to interrogatories are either based on my personal

11  knowledge or information supplied or assembled at the

12  direction of me.  And I believe the factual matter

13  stated in the above responses to the interrogatories

14  is true and correct.  Did I read that accurately?

15    A.   Yes, sir.

16    Q.   Time out.  Technical difficulties.

17         And you understood when you signed it that

18  you were signing it and verifying to the truth of

19  these answers, correct?

20    A.   Yes, sir.

21    Q.   Great.  Let's just look at a few of them.

22  Let's look on Page 7, Question 6, Identify each

23  person with whom you have had an extramarital

24  encounter, setting forth the approximate dates and

25  locations of such encounter.  For purposes of this

MAGNA
LEGAL SERVICES

```
1    interrogatory, such encounters are not confined to
2    acts of sexual intercourse, but shall include without
3    limitation, kissing, awkward fondling or any other
4    form of intimate sexual contact.
5                Do you see where I have read?
6         A.    Yes, sir.
7         Q.    Your answer is none?
8         A.    Correct.
9         Q.    Is that correct?
10        A.    And I'm assuming that we are talking about
11   beyond the ████████.
12        Q.    Well, the question wasn't written that way.
13   So if you are telling me that you want to change your
14   answer or you misunderstood the question, that it's
15   someone other than Jane Doe, I just want to know why
16   you wrote none there.
17        A.    I put none because Ms. ██████ is already
18   mentioned in the sentence above.  So I felt that that
19   was already in the interrogatories.  So to me, to put
20   anything else would say there were others, and there
21   are none.
22        Q.    If you can turn to question 11 on Page 10.
23   Let me know when you are there.
24        A.    I'm there.  Yes.
25        Q.    Question 11 says, Identify each person with
```

1  whom you have had any communications concerning your

2  extramarital encounter with the survivor, the report

3  or the allegations in the complaint.  Your answer is

4  after the encounter but before the report was

5  published, you only had communications regarding the

6  encounter with Janet Hunt, spouse, Jane Doe, Jane

7  Doe's husband and Roy Blankenship.  After the report

8  was published, Plaintiff communicated with the

9  following and you list a series of several bullet

10  points, correct?

11      A.   Yes, sir.

12      Q.   So these are all the people that you

13  communicated with since May 22, 2022 about the report

14  or the allegations in the complaint, correct?

15      A.   Correct.

16      Q.   How did you remember all of these names

17  without having the texts or the emails to identify

18  these people?

19      A.   I don't know that any of these were texts

20  or emails.  My pastor, I talked to him.  Kevin Ezell,

21  I met with him.  Jeremy Morton, I met with him.  Jim

22  Law, I met with him.  Matt Lawson, we had a phone

23  conversation, and I sent him a letter.  And the

24  letter is the one that you-all have produced that I

25  sent to the church.  My pastor and his wife, we met

MAGNA
LEGAL SERVICES

1    and talked.  He was part of the accountability.

2         Q.    So you are saying none of these were

3    written communications?

4         A.    None of these would have been

5    communication.  These would have all been in person.

6         Q.    None of them were written communications?

7         A.    Correct.  The spiritual care team, I met

8    with them.  Counselor, I was with him.  Counselor, I

9    was with him.  Attorneys, we did video calls.

10        Q.    About Jim Law, you said you met with him.

11   How did you meet with Jim Law?

12        A.    I met with Jim law, Oh, gosh, probably a

13   week or 10 days after the report.

14        Q.    And was that the last time you have spoken

15   to Jim?

16        A.    We haven't had a conversation and I haven't

17   seen him since.

18        Q.    And you haven't seen him since?

19        A.    No, sir.

20        Q.    Has he reached out to you?

21        A.    No, sir.

22        Q.    Have you reached out to him?

23        A.    I ran into him -- I said I had not seen

24   him -- I was at the airport about to get on a tram,

25   and I saw him.  So I spoke to him, and he seemed

1    overjoyed to see me.  And just conversations were

2    light.  How are you doing?  Good to see you.  And he

3    was still asking questions.  I had to board the

4    plane -- the train to leave.  That's the only time

5    I've been in his presence since.

6          Q.   When was that?  I'm sorry.

7          A.   That was probably in the last, say, three

8    or four months.

9               (Defendants' Exhibit 21, Letter to

10              McCormick from Rawlings, 3/22/24, marked for

11              identification.)

12         Q.   (By Mr. Klein) I'm marking this as

13    Exhibit 21.  It's two-sided.  One for you and one for

14    your lawyer.

15              Mr. Hunt, just for the record, this is a

16    letter dated March 22, 2024 from Taylor English sent

17    to my colleague Terrence McCormick.  As I said, make

18    sure you look at both sides.  I apologize it's

19    two-sided.  Let me know once you are done looking at

20    it, if you have seen this letter before.

21         A.   I don't remember ever seeing this letter.

22         Q.   I'll represent to you that this is a letter

23    that my colleague received from the lawyers

24    representing FBC Woodstock.

25         A.   Okay.

1     Q.  We received this letter along with a few

2  documents that we provided to all counsel.  I just

3  want to ask you really just one question about this.

4        MR. MacGILL:  Counsel, when did we get --

5        when did you send this to us?  Just so we know.

6        This is not Bates-numbered.

7        MR. KLEIN:  It was a cover -- the cover

8        letter was not Bates-numbered.  It was a couple

9        of weeks ago.  I can get you the exact date,

10       Rob, off line.

11       MR. MacGILL:  But you did send this letter

12       to us?

13       MR. KLEIN:  I believe this letter was sent

14       to you as well with the small production.

15       MR. OTCHY:  March 26th.

16       MR. KLEIN:  We have a voice from afar.

17       Just for the record, that was my colleague Alex

18       Otchy, who I think sent it.  And he's

19       representing, Rob, that it was March 26th.

20     Q.  (By Mr. Klein) Mr. Hunt, just see if you

21  can turn to the second page of that letter.

22     A.  Okay.

23     Q.  The top, the paragraph beginning with the

24  word "finally."  Finally there are a number of

25  documents we believe are responsive, but privileged.

MAGNA
LEGAL SERVICES

1  Do you see where I just read?

2      A.   Yes, sir.

3      Q.   Those are, colon, and the first one says, A

4  series of text messages -- or a series of texts

5  between Jeremy Morton and Johnny Hunt around the time

6  of the SBC report.  Do you see where I just read?

7      A.   Yes, sir.

8      Q.   Do you know why those texts were either not

9  produced or not placed on a privilege log when we

10  asked for these types of documents?

11      A.   I do not.

12      Q.   Do you remember having a series of text

13  exchanges with Jeremy Morton?

14      A.   Mostly around, What are you going to do in

15  trying to move forward?  I don't remember anything in

16  particular that just relates to the case.

17      Q.   Well, his lawyer is at least expressing an

18  opinion that they believe that those text exchanges

19  are responsive, but privileged.  But you don't have a

20  specific recollection either way?

21      A.   No, sir.

22           MR. MacGILL:  Whoa, whoa, whoa.  Hold on.

23           MR. KLEIN:  Rob, do you want to lodge an

24      objection?

25           MR. MacGILL:  Yes, hold on a second.  Okay.

1    Go ahead.

2    Q.   (By Mr. Klein) And I think I got your

3    answer.  You weren't sure either way what they were?

4    A.   Right.

5    Q.   No problem.  You can put that document

6    aside.

7         Mr. Hunt, in your complaint, you have a

8    claim for intentional infliction of emotional

9    distress.  Is that correct?

10   A.   Yes, sir.

11   Q.   Are you still pursuing that claim?

12   A.   Yes, sir.

13   Q.   Now, we received an amended damages

14   report --

15   A.   Uh-huh.

16   Q.   -- from your attorney back in January.  And

17   on that amended damages report, it estimates that the

18   damages that you have incurred in connection with

19   that emotional distress claim are between 30 and $45

20   million.  My question is, do you know how that number

21   was determined?

22        MR. MacGILL:  Could you hand him the

23        document?  You have misstated the document.

24        MR. KLEIN:  Well, he's capable of saying

25        that.  I --

1          MR. MacGILL:  Well, no, I'm saying it.  You

2     have misstated the document.  You need to

3     correct your statement on the record, Counsel.

4     You are an officer of the court.  You have

5     misstated the document.  Give him the document

6     and there won't be a dispute. If you don't give

7     him the document --

8          MR. KLEIN:  Do you want my microphone as

9     well to continue the deposition or can I ask my

10    question?  You absolutely are free to lodge your

11    objection.  If you want to take my microphone,

12    you can ask and answer.  At the moment, you are

13    absolutely free to lodge your objection, which

14    you have.  We don't need the rest of it.  And,

15    of course, he is free to say, I don't remember,

16    that's not what it says.  And then I will share

17    with him the document if I choose to.  At the

18    moment, I'm only asking for his memory, which is

19    part of the reason why we are here.

20         MR. MacGILL:  Okay.  Let's hear the

21    question back, please.

22         (WHEREUPON, the record was read back by the

23    reporter as follows:)

24         "Question: From your attorney back in

25    January and on that amended damages report, it

1          estimates that the damages that you have

2          incurred in connection with that emotional

3          distress claim are between 30 and 45 million.

4          My question is:  Do you know how that number was

5          determined?"

6                MR. MacGILL:  One moment, please.

7                Counsel has misstated the documents,

8          specifically, the document speaks for itself.

9          It is on the court document, Document 110-9,

10         pages 3 of 7 and 4 of 7.

11               You may answer.

12         Q.   (By Mr. Klein) So my question still stands.

13         A.   Okay.

14         Q.   Which is my understanding is your amended

15    damages report claims or estimates that you're

16    seeking between 30 and -- that a jury could award

17    between 30 and $45 million in damages for emotional

18    distress.  And my question is:  Do you know how that

19    number was determined?

20         A.   It was just an estimation.  It was not a

21    request.  It was in a case like this, if Guidepost is

22    found guilty, we believe that the courts, the jury

23    could very well offer that much.  So it was just --

24    it was just mentioned, yes, in that sense, not a

25    request.

1       Q.   And do you know what that was based on,

2  though?

3       A.   My attorney's many, many years of being a

4  trial lawyer.

5       Q.   Fair.

6          Let me ask now some different questions on

7  the same topic.  Have you seen medical doctors to

8  treat you for this alleged emotional distress harm

9  that you have claimed?

10      A.   No.  I don't think it's physical.  I think

11  it's emotional and psychological.  So that's why I

12  went to On Site and the reason my wife and I did an

13  11-hour intensive with two Ph.D. psychologists.

14      Q.   And so were you prescribed any

15  medication --

16      A.   No, sir.

17      Q.   -- from anyone?

18      A.   No, sir.  And the reason is --

19      Q.   No question yet.

20      A.   All right.

21      Q.   Your lawyer will have an opportunity if he

22  wants to clarify anything.

23         MR. MacGILL:  I would like the witness to

24  be allowed to finish his answer.  He's in charge

25  here.  He's not going to let you finish your

MAGNA
LEGAL SERVICES

1    answer.  Nothing I can do about it right now.

2    We will just continue.

3        MR. KLEIN:  I thought he was finished.  I

4    believe he was finished.

5        MR. MacGILL:  Don't worry.  Just keep

6    going.  It's all right.

7    A.    No, I was not finished.

8    Q.    (By Mr. Klein) You can finish your answer.

9    You took a break and I took that to mean you were

10   done.  My apologies, Mr. Hunt.

11   A.    All right.  Yes.

12   Q.    You can finish your answer.

13   A.    The reason, I didn't want medication to

14   make me feel what I am not.  I want to feel this and

15   work through it.  So I'm not big on a drug that would

16   make me feel good when things are not good.

17   Q.    Have you ever taken medication before when

18   you weren't feeling good?

19   A.    No.

20   Q.    You have never been prescribed any

21   medication when you were not feeling well?

22   A.    Oh, for a cold or something or flu, I mean,

23   but not...

24   Q.    At the moment, I'm talking about any

25   medication.

1      A.   Oh, of course.

2      Q.   But you haven't taken any medication or

3  hasn't been prescribed any medication relating to

4  this emotional harm you are discussing?

5      A.   I have not.

6      Q.   Did any doctor offer to prescribe you

7  medication and you turned it down?

8      A.   They did.

9      Q.   And what medication did they offer that you

10  should take?

11     A.   I have no idea.  I'm sorry.

12     Q.   That's okay.  Did any doctor -- not just

13  limited to a medical doctor, which my last question

14  was limited to -- so any doctor, professional, issue

15  any formal diagnosis with regard to your claim of

16  emotional harm?

17     A.   No, sir.

18     Q.   Did they issue any medical reports or

19  findings regarding their treatment of you?

20     A.   On Site came as close of identifying where

21  I was as a result of the trauma of the report.

22     Q.   And how did they identify -- or what did

23  they identify?  I should ask.

24     A.   I think you have the report.

25     Q.   And so it was in that report?

MAGNA
LEGAL SERVICES

1    A.    It's in that report, yes, sir.

2         (Defendants' Exhibit 22, Plaintiff's

3    Amended Statement of Damages, marked for

4    identification.)

5         MR. KLEIN:  Give me one moment, if you can.

6    I may have made -- I have it.

7         You did not mark the amended statement of

8    damages, did you?  I have enough copies.  But

9    you didn't mark it, did you?

10        MS. NOKES:  No, no.

11        MR. KLEIN:  I don't want to mark it twice.

12   I'm handing you what's been marked as

13   Exhibit 22.

14        I need one back.  I'm sorry.  My bad.

15   Sorry.

16   Q.    (By Ms. Klein) Mr. Hunt, I'm going to ask

17 you to take a look at what's been marked as

18 Exhibit 22.  Let me know when you are finished.

19   A.    Yeah, I have seen this document.

20   Q.    You reviewed this document before it was

21 served by your attorneys?

22   A.    Yes, sir.

23   Q.    Did you approve of this final version

24 before it was sent externally?

25   A.    Yes, sir.

MAGNA
LEGAL SERVICES

1      Q.   So I just want to clarify what I thought

2  you said earlier when asked questions by Ms. Nokes

3  regarding this lawsuit and the monies you are

4  seeking.  You are aware in this lawsuit that you have

5  submitted damages claims that, if successful, are

6  seeking, my view from this document, is near a

7  hundred million dollars worth of damages.  The

8  document will speak for itself, but that a jury could

9  return a verdict, you are seeking almost a hundred

10 million dollars.  Is that correct?

11     A.   Not --

12     Q.   Is that your understanding?

13     A.   No, sir.

14          MR. MacGILL:  Object to the form of the

15     question.

16          MR. KLEIN:  I'm sorry, Rob.

17          MR. MacGILL:  Object to the form of the

18     question.  You may answer.

19     Q.   (By Ms. Klein) What's your understanding of

20 what this document claims you are seeking?

21     A.   This document is claiming my losses in

22 damages, which is the same thing the forensic CPA did

23 as far as losses as a result of the report.  The

24 other is just he said, We have no idea.  So he was

25 just listing.  He said, A jury at their discretion,

1    could.  They may not.

2              So my understanding was that was just

3    simply we don't know what happens in a court with a

4    jury.

5         Q.   So you are distinguishing the top category

6    that talks about lost earnings on the top versus the

7    rest of the document?

8         A.   Correct.

9         Q.   And so in your mind, you're seeking -- my

10   word, but correct me if you want to choose a

11   different word -- you are seeking, affirmatively, the

12   damages for lost salary and employment benefits, book

13   sales, speaking engagements, other lost income, and

14   the total there says not less than $15.4 million?

15        A.   Uh-huh.

16        Q.   Is that correct?

17        A.   That's correct.

18        Q.   And you are saying the balance of this

19   chart or this document, you are seeking monetary

20   relief, but in terms of the amounts, you are just

21   saying that a jury could award any amount, this is

22   what you believe you could be entitled to?

23        A.   Possibly.

24        Q.   But you would agree that you are seeking

25   monetary relief for these other categories, correct?

1      A.    We do plan to file in those areas.

2      Q.    You already have filed, right?

3      A.    Right, yes, sir, correct.  Again, you are

4  the attorney.  I'm not.

5      Q.    No.  But I just want to -- it is your

6  lawsuit, though, sir, correct?

7      A.    Yes, sir.

8      Q.    You were aware when you brought this

9  lawsuit you were seeking monetary relief?

10      A.    Yes, sir.  May I respond more to that?

11      Q.    To the question I just asked?

12      A.    Yes.

13      Q.    Sure.

14      A.    Did you understand when you-all filed this

15  report that you-all were going to cause serious

16  damage in every one of these areas?  Making it so

17  explosive and making it so "impactful," the words are

18  in the deposition.

19      Q.    Well, I thought you were going to continue

20  with your answer.  That's a question.  I'm not

21  allowed to answer your questions.

22      A.    No.

23      Q.    You set the record.  That's fine.

24            MR. MacGILL:  We have no objection to you

25            answering the question.

1        MR. KLEIN:  I appreciate that, Rob.  I'm

2    going to decline that, but I thank you for your

3    offer.

4        MR. MacGILL:  Well, and just --

5        MR. KLEIN:  That's fine.  You can put

6    document down.

7        MR. MacGILL:  And just for the record, he's

8    been answering as to compensatory.  The punitive

9    damage component in this has not been addressed,

10   and it is addressed in the way it is, but not

11   specifically.

12       MR. KLEIN:  I understand that.

13       MR. MacGILL:  I just want to make sure we

14   understand each other.

15       MR. KLEIN:  I understand.  I appreciate

16   your testimony there --

17       MR. MacGILL:  I'm going to give it.

18       MR. KLEIN:  -- on that front.

19   Q.   (By Mr. Klein) Mr. Hunt, I apologize.  I'm

20   going to try to skip through my outline and --

21   A.   All right.  No problem.

22   Q.   -- try and skip to some stuff that we

23   haven't yet gone over.  I'm not sure if it was gone

24   over earlier:  Are you claiming that there were book

25   deals that were cancelled as a result of the report?

MAGNA

LEGAL SERVICES

1     A.   Yes, sir.

2     Q.   And do you know which ones?

3     A.   Yes, sir.

4     Q.   Can you identify them to me?

5     A.   Harper Collins.  For 13 years I did one of

6 the most popular devotions in America.  And they

7 cancelled me immediately.

8     Q.   And was that -- I don't mean to stop you.

9     A.   Okay.

10    Q.   I did ask for all of them.  Is it okay if I

11 stop after each one so I can ask some follow-up

12 questions?

13    A.   Yes, sir.  Sure.

14    Q.   Great.  So with that one, help me out.  Is

15 that a -- you said for 13 years you have been working

16 with Harper Collins.

17    A.   Uh-huh.

18    Q.   Is it an annual revenue that you derive

19 from them or is it a particular book that you then

20 produce on an annual or semiannual basis?  Explain

21 that to me.

22    A.   Annually, I would do a new devotion, and

23 then it would hit the market in October of every year

24 for 13 years.

25    Q.   And that stopped when?

MAGNA
LEGAL SERVICES

1     A.    When your report hit.

2     Q.    And that arrangement you have with Harper

3  Collins, is that in a written agreement or document?

4     A.    It is.

5     Q.    And do you know if you produced that in

6  this case?

7     A.    I'm not sure.

8     Q.    We would ask, if it hasn't been produced,

9  that it be produced.

10     A.    I'm confident it has been, yes.

11     Q.    That's fine.

12     A.    Yes.

13     Q.    And I'm not challenging you to remember all

14  the documents that were produced.  I don't remember

15  seeing it.  All I'm saying is we will go back and

16  check.  If it wasn't produced, I'm asking for its

17  production now.

18     A.    Right.

19     Q.    Do you know if that book deal or that

20  agreement with Harper Collins, was that with you

21  individually or with Johnny Hunt Ministries?

22     A.    Johnny Hunt Ministries.

23     Q.    Do you remember for the Harper Collins one

24  how much you were to receive for each of these

25  annual, you said, devotions, is that what you said?

MAGNA⬣
LEGAL SERVICES

1      A.    Correct.

2      Q.    Do you know how much you were to receive?

3      A.    Depends on how many you sell.

4      Q.    Oh, so it's a person- -- it's a per book?

5      A.    It's a per, yes.

6      Q.    I should have known that.  My apologies.

7      A.    That's all right.  No problem.

8      Q.    You said there was other book deals that

9 were cancelled.  What's the next one?

10     A.    I was writing a new book with -- since I

11 haven't dealt with them in two years.  There was

12 somewhere we listed all of those.  We listed the

13 names.

14     Q.    If you don't remember, that's fine.  I'm

15 trying to know your memory for now.

16     A.    I had one that I wrote, the book that I was

17 asked about this morning, we were read from, that

18 company, I was writing another new book for them, and

19 it was cancelled immediately.  Plus, I was charged

20 for the stock in inventory because of the report to

21 the tune of about $39,000.  And then they would no

22 longer publish me.  So they -- my books were

23 continuing to sell, so about three books there, lost

24 the book deal, lost the book deal and --

25     Q.    Is one of the ones you are talking about

1   now Harvest House?

2       A.   There it is.  Yes, sir.  That's it.

3   Harvest House.

4       Q.   The book deal with Harvest House, was that

5   with you individually or with Johnny Hunt Ministries?

6       A.   All were Johnny Hunt Ministries because I

7   gave the funds to that ministry.

8       Q.   I think you had said that earlier, but I

9   appreciate you clarifying that.

10           Now we're going to talk a little bit now,

11  just follow up on a few points with regard to that

12  second Zoom meeting that you had with Guidepost

13  investigators.  I think you had said earlier that at

14  some point in that Zoom, the investigators asked you

15  who else they should interview in addition to

16  yourself.  And I believe your answer to Ms. Nokes was

17  that, yes, you had said Jane Doe and her husband and

18  Roy Blankenship.  Is that correct?

19      A.   Correct.

20      Q.   At that time, when they were questioning

21  you on May 12th, did you know at what point whether

22  the investigators had spoken with Roy Blankenship or

23  not?

24      A.   I did not.

25      Q.   You did not know either way?

1     A.    I didn't know.

2     Q.    Now, I think you have also testified

3     earlier that at some point during that second

4     meeting, which was the Zoom meeting, the

5     investigators mentioned to you that if you remembered

6     any more details that you should contact them in the

7     next 24 to 48 hours?

8     A.    Forty-eight.

9     Q.    Is that correct?

10    A.    Forty-eight.

11    Q.    Forty-eight hours?

12    A.    Yes, sir.

13    Q.    Did you contact them the next 48 hours?

14    A.    I wouldn't have contacted them if they had

15    given me 96 hours.  I felt threatened by them.

16    Q.    In the moment, it sounds like you clearly

17    felt threatened and frustrated.  When you got home

18    later that day and the next day, did you reconsider

19    and say:  Wait a minute, I probably should let them

20    know my side of the story and come back to them and

21    tell them something?

22    A.    Sir, I don't feel they wanted my side of

23    the story.  They had already made their mind up.

24    Q.    But you don't know that because you never

25    told it to them, correct?

MAGNA
LEGAL SERVICES

1      A.   Based on their behavior in that meeting and

2   the way it transpired and now since I'm on this side,

3   I must answer with my full knowledge.  To know what

4   they did with the ███████ all the days and hours and

5   traveling to them and sending the questions ahead of

6   time.

7      Q.   I'm sorry, but --

8      A.   But I have to answer based on my full

9   knowledge now.  But then --

10      Q.   I want to try to put you back in --

11           MR. MacGILL:  Stop.  Stop the

12      interruptions.  Let him finish.

13      Q.   (By Mr. Klein) Go ahead.

14      A.   But then I just -- I didn't trust them.  I

15   feel like they were misrepresenting the truth or they

16   had received this, as they thought was truth from a

17   credible witness, before they interviewed the

18   noncredible witness.

19      Q.   And in your mind, who was the noncredible

20   witness?

21      A.   They referred to me as that in your report.

22      Q.   I'm sorry, Oh, in --

23      A.   They referred to me.

24      Q.   Understood.  And the credible witness would

25   be Jane Doe and her husband?

MAGNA
LEGAL SERVICES

 1      A.   And the three witnesses.  And if they are

 2   witnesses, I'm going to become a lawyer.  And then,

 3   Number 4, Roy Blankenship is played out in the report

 4   that he's against me.  But he's clearly testified for

 5   me in the sense that he saw it the whole time,

 6   talking to both of us, as being consensual.

 7      Q.   But he, in his conversations with the

 8   investigators, as reflected in the report,

 9   acknowledged that there was an encounter that

10   involved physical intimacy, correct?

11          MR. MacGILL:  Objection to form of the

12          question.  You can answer.

13      Q.   (By Mr. Klein) You can answer.

14      A.   In the -- in just what I have testified to

15   just a moment ago, that intimacy, yes.

16      Q.   Yes.  So he acknowledged that in his

17   conversation with the investigators?

18      A.   Correct.  Correct.

19      Q.   You did not?

20      A.   No, he was -- he was ambushed, though.

21      Q.   In his ambush, he had enough time, though,

22   in his ambush to relay the fact that he learned that

23   there was a consensual intimate relationship between

24   you and someone not your wife, correct?

25      A.   Correct.

1       Q.  Is it --

2          MR. MacGILL:  I'm late.  I'm late.  Object

3       to the form of the question.  Lack of

4       foundation.

5          MR. KLEIN:  That's fine.

6       Q.  (By Mr. Klein) You had said just a few

7 minutes ago that you felt it was pointless -- that

8 may not have been your word, but something to that

9 effect -- that it was pointless to reach out to the

10 investigators within 48 hours because they had

11 already made up their mind.  In your mind, is it

12 consistent with someone who has made up their mind to

13 offer you to contact them if you had anything more to

14 add?

15      A.  In light of the fact that they did not tell

16 me what the conversation was about, misled me, and

17 said we just have a few follow-up on what we have

18 already discussed with you.  This was not a

19 follow-up.  What they did, it was an ambush.  And so

20 who under heaven wants to call an attorney that has

21 treated you that way?

22      Q.  But you still had 10 days between that

23 interview and the report being issued to think about

24 that and come back to the investigators with some

25 information and you chose not to do that, correct?

 1    A.    That is not correct.

 2    Q.    You did not have ten days?

 3    A.    Two days.  Two days.  Forty-eight hours.

 4  It's two days.

 5    Q.    No, I understand that.  And I was not clear

 6  with my question.  Yes, I understand you said that

 7  they provided you two days.

 8    A.    Two days.

 9    Q.    You had your lawyers on May 19th and

10  May 20th send letters to Samantha Kilpatrick and

11  Guidepost about the upcoming report, correct?

12    A.    Correct.

13    Q.    Let me show you those letters pretty

14  quickly.

15         MR. KLEIN:  Where's the pile of exhibits?

16         It's right there.  No, right there.  Give me

17         that whole pile.  Thank you.

18    Q.    (By Mr. Klein) It's already an exhibit

19  that's been marked, Mr. Hunt, and I will help you in

20  a moment.  If you can turn to Exhibit 11.

21    A.    I have it, yes.

22    Q.    Thank you.  And you will recall this is one

23  of the letters that Ms. Nokes --

24    A.    Yes.

25    Q.    -- showed you this morning?

MAGNA
LEGAL SERVICES

1   A. Correct.

2   Q. And this firm, Finch McCranie,

3 M-C-C-R-A-N-I-E, these were the lawyers that you had

4 retained at this time?

5   A. Yes, sir.

6   Q. You --

7     MR. KLEIN: Rob, watch for the microphone,

8   yes. Thank you, Rob. You got to fix that.

9     MR. BESEN: It's a motion detector that's

10   blocked by the screen.

11     MR. KLEIN: I understand. I understand.

12     MR. BESEN: I'm not sure what you want me

13   to do.

14     MR. KLEIN: I don't know.

15   Q. (By Mr. Klein) Mr. Hunt, at the time this

16 letter was sent on May 20th, 2022, fair to say that

17 your attorneys knew that you spoke with the Guidepost

18 investigators, correct?

19     MR. MacGILL: Counsel, you should not

20   disclose any communications you had with your

21   lawyers, or I was asleep at the switch when

22   counsel for the SBC executive committee asked

23   you about your communications and got elicited

24   testimony about your private attorney-client

25   communications. I should have stopped that, and

1          I should have instructed you not to answer.  I'm

2          going to instruct you not to answer that

3          question.  You may not answer.  You have a

4          privilege.  So any communications you had with

5          this law firm and these lawyers at the Finch

6          firm, you should not testify to.

7          Q.   (By Mr. Klein) And to be clear -- and Rob

8    has a good point -- I was not looking for your

9    attorney-client communications.  I'm not entitled to

10   them.  I don't want them.  And I guess I was trying

11   to understand just if they were aware -- without a

12   communication, if they knew that you spoke to the

13   lawyers without your communicating with them.  Were

14   they aware that -- withdrawn.

15          Were they aware that you spoke to the

16   investigators?

17          MR. MacGILL:  Same thing.  Same

18          communication.  You are not to answer as to your

19          communications to Mr. -- to the Finch law firm.

20          Next question, please.

21      Q.   (By Mr. Klein) If you can look at the

22   second paragraph in the letter, first page.

23      A.   Yes, sir.

24      Q.   Beginning with "yesterday."

25      A.   Uh-huh.

MAGNA

LEGAL SERVICES

1    Q.    Yesterday, we were advised by Anthony

2   Collura that it is probable that Pastor Hunt will be

3   mentioned in the report.  Do you see that?

4         A.    Yes, sir.

5         Q.    So clearly at the writing of this letter,

6   the law firm was aware that you were probable that

7   you would be mentioned in the report, correct?

8         A.    Correct.

9         Q.    Nowhere in this letter does it say, Hey,

10  wait a minute.  You should know that any encounter

11  that my client had with Jane Doe was consensual,

12  correct?

13        A.    Uh-huh.

14        Q.    Nothing in there about that, is there?

15              MR. MacGILL:   Letter speaks for itself.

16        Q.    (By Mr. Klein) You can answer.

17        A.    Yes.  Yes, if it's not in there.

18        Q.    Okay.  And nothing in this letter about the

19  fact that Jane Doe initiated any encounter between

20  you and her in July of 2010?

21        A.    No, sir.  And remember, at this point, I

22  did not know what was going to be in the report.

23  This abuse that I assaulted or abused her, that's new

24  language other than an accusation in the ambush.

25        Q.    But you will agree, sir, that as of this

1  date, the investigators did not even know your

2  version of what happened, correct?

3      A.    Exactly.   They were --

4      Q.    Okay.  Do you know that there was a letter

5  sent the day before this, also from your lawyers,

6  that was directed to a Mr. Collura, are you aware of

7  that --

8      A.    No, sir.

9      Q.    -- that said the same thing?

10     A.    No.

11     Q.    If you can turn back to a document that's

12  already been recently marked, and it's your response

13  to Guidepost's first set of interrogatories.

14         MR. KLEIN:  I apologize, Rob, I don't

15         remember what number that is.  It's a very

16         recent one.  I just marked it.

17         MR. SANDERS:  Twenty.

18         MR. KLEIN:  Thank you, Patrick.

19     Q.    (By Mr. Klein) I'm going to point you to

20  interrogatory 4 on Page 6.

21     A.    Okay.

22     Q.    Let me know when you are there.

23     A.    I'm there.

24     Q.    Thank you.  The answer to Question 4, I'm

25  not going to read the first paragraph, which is more

MAGNA

LEGAL SERVICES

1    of legalese objections.  I'm going to start with the

2    paragraph beginning "in 2010."  Do you see where I'm

3    about to read?

4         A.   Yes, sir.

5         Q.   Great.  In 2010, after his term as SBC

6    president had ended, Plaintiff had a brief

7    inappropriate extramarital encounter with Jane Doe.

8              Do you see where I have read?

9         A.   Yes, sir.

10        Q.   Plaintiff did not sexually assault Jane

11   Doe, groom her, initiate the encounter, force himself

12   on her or violently kiss her.  Jane Doe initiated the

13   encounter, the encounter lasted only a few minutes

14   and involved only some awkward fondling.

15             Do you see where I just read?

16        A.   Yes, sir.

17        Q.   So here you state that Jane Doe initiated

18   the encounter.  You didn't tell that to Guidepost

19   investigators though, correct?

20        A.   No, sir.

21        Q.   You said it lasted only a few minutes.  You

22   didn't tell that to Guidepost investigators, did you?

23        A.   Not sure I was given the opportunity.

24        Q.   When Ms. Nokes went over the report with

25   you, and there were a lot of things where you were

MAGNA
LEGAL SERVICES

1  asked questions and denied what they said, you were

2  given the opportunity to deny certain statements,

3  though, correct?

4       A.   The denial was in the context of them

5  talking over me while I had said:  This entire

6  narrative is not right.

7            But you did.

8            It is not right.  No, it did not happen

9  like that.  I was staying within a narrative.  If the

10  narrative is wrong, it's not a time to be answering

11  the questions.

12      Q.   Did they say at any point during that

13  meeting that we don't want to hear from you, we only

14  want to accuse you?

15      A.   No, they didn't have to --

16           MR. MacGILL:  Those spoken words?

17           MR. KLEIN:  I'm sorry?

18           MR. MacGILL:  Spoken words.  Did they speak

19      those words, is that your question?

20           MR. KLEIN:  Yes, yes, yes.

21           MR. MacGILL:  He's asking you if they spoke

22      those words to you as he just said.

23      Q.   (By Mr. Klein) Did they tell you at any

24  time that we don't want to hear what you have to say,

25  we just want to make accusations towards you?

1       A.   No, they proved it.

2       Q.   They proved it by giving you --

3       A.   By the way --

4       Q.   Hold on.  You can keep going.  I'm sorry.

5       A.   The way they were overwhelming me,

6  continual.

7       Q.   But they also gave you a chance to answer,

8  at some point, to acknowledge that you did know that

9  Jane Doe was coming down, and you did receive a text

10  of a photo to see that she was in town.  Do I have

11  that right?

12       A.   Correct.

13       Q.   So they did give you an opportunity to

14  acknowledge certain details, correct?

15       A.   Correct.

16       Q.   Do you remember the first time that you

17  mentioned to anybody -- let me withdraw and ask a

18  better question.

19            After your second meeting with the

20  investigators on May 12th, from that moment on, when

21  was the first time that you mentioned that your

22  encounter with Jane Doe was consensual?

23       A.   To my wife, again.

24       Q.   When was that?

25       A.   That same day.  She was there with me.  But

MAGNA
LEGAL SERVICES

1    I told her that 12 years prior.

2        Q.   Let me see here.  Mr. Hunt, it seems fair

3    to say that you have expressed today your frustration

4    with how that second meeting with the investigators

5    was handled; fair statement?

6        A.   Fair.

7        Q.   And it sounds like in particular, some of

8    your gripes certainly that you have raised a few

9    times today were the number of meetings they had with

10   Jane Doe and her husband versus only the two meetings

11   they had with you, only one of which talked in any

12   specifics, correct?

13       A.   Exactly.

14       Q.   And another "gripe" -- my word -- that you

15   have is that, in your words, they shared -- "they"

16   being the investigators -- shared drafts of what

17   ended up in the report with Jane Doe and her husband

18   but not with you?

19       A.   Correct.

20       Q.   And you felt both of those things were key

21   problems for you in how this was handled?

22       A.   I really had no way to know what I was

23   facing.  But yet they were clear, crystal clear of

24   what they were doing and pretty much -- I would love

25   to see -- maybe one day I will be able to see what's

1  attorneys eyes only.  But I would love to know how

2  they promised them that she would never be exposed

3  and there would be no repercussions.

4      Q.   Do you know whether that even was stated to

5  them?

6      A.   Absolutely.

7          MR. MacGILL:  Whoa, whoa, whoa.  Counsel,

8      you can't ask that question.  You've withheld

9      11,000 pages.  We say it properly.  You can't

10     ask him these questions.  You have withheld

11     11,000 pages, and now you are asking him what he

12     knows.  You are responsible for his information

13     deficit here.  So move on to your next question.

14         MR. KLEIN:  Let me know when you are done

15     with your speech, okay?

16         MR. MacGILL:  We are done with you.  We're

17     going to --

18         MR. KLEIN:  Hold on.  Don't make it

19     personal, Rob.

20         MR. MacGILL:  It's personal.

21         MR. KLEIN:  Don't make it personal.

22         MR. MacGILL:  Because it is you that has

23     decided to withhold, unlawfully, 11,000 pages

24     and then you come here.  You give up 31

25     interview drafts yesterday afternoon, right?

1       And you dedesignate.  Now, if there's a court in

2       this country that won't sanction you for that, I

3       want to see it, okay?  Now, you make it worse --

4       and we will make this part of our sanctions

5       motion -- you make it worse by now questioning

6       him about what he knows when you have withheld

7       11,000 pages.  So do so at your peril.  Ask

8       whatever you like.

9           MR. KLEIN:  I've asked you not to

10      personally attack me.  I think we are trying to

11      be respectful with each other.  For the most

12      part, you are.  You certainly haven't been then.

13      You certainly can have whatever complaints you

14      want about how this case has been conducted.

15      Frankly, we have complaints as well.  I would

16      appreciate the mutual respect that you don't

17      have to be personal in your attacks.  That's all

18      I'm saying, one.  Two, I wasn't asking about

19      anything from the attorneys eyes only documents.

20      How can I?  Apparently your client hadn't seen

21      them, if you are honoring the obligation.  All I

22      was asking, in general, in reaction to what he

23      said is how he knew that.

24          MR. MacGILL:  Right.

25          MR. KLEIN:  That's all I asked.

MAGNA
LEGAL SERVICES

1          MR. MacGILL:  He can't --

2          MR. KLEIN:  The only way he can know it is

3     not just based on AOE documents.  It's based on

4     his knowledge of this case.  So I'm not, of

5     course, referring to an AEO document.  He

6     wouldn't have seen that document.  I'm asking of

7     his general knowledge and how he knew that.  He

8     could answer 15 different ways.  I'm looking for

9     an answer.  And that's all I was doing.  I

10    wasn't pointing to any document.

11          And you are jumping in because you need to

12    make the point every hour that you believe we

13    have -- us filing a court order is problematic

14    to you and your clients.  I understand your

15    position legally, totally understand.  I

16    disagree with your sanctions position on it.  We

17    believe we were following the Court order, but I

18    understand your position.  I am not looking for

19    that.  I don't need you every hour to have this

20    speech about the 11,000 documents.  I was just

21    asking your client generally, having nothing to

22    do with the AEO documents.  That was my point,

23    Rob.

24          MR. MacGILL:  It has everything to do with

25    it.  Ask your question.

MAGNA
LEGAL SERVICES

```
1          MR. KLEIN:  I'm going to move on because I

2     have forgotten the question, which again, seems

3     to be your goal often.  And we will move past it

4     because I think I've had the answer sufficiently

5     at the time.

6          MR. MacGILL:  You just complain about

7     personal accusations, don't you, Scott?

8          MR. KLEIN:  Rob, I just find it unhelpful.

9          MR. MacGILL:  Move on.  Move on.

10         MR. BESEN:  Guys, I want dinner.  I'm

11    hungry.

12         MR. MacGILL:  Move on.

13         MS. NOKES:  Amen.

14         MR. MacGILL:  Gene is hungry.

15    Q.   (By Mr. Klein) Mr. Hunt, I have just

16 described to you some of the frustration that you had

17 felt.  We talked about the number of meetings and the

18 shared drafts, correct?

19    A.   Yes, sir.

20    Q.   If there were only two meetings with the --

21 with Jane Doe and her husband, the same two meetings

22 you had, and there were no drafts shared with Jane

23 Doe and the same report was issued, would you still

24 be suing the defendants?

25         MR. MacGILL:  Object to the form of the
```

1     question.

2     A.    Yes.  If they'd said it in one meeting that

3     I assaulted her, she would -- I would be suing.

4     Q.    (By Mr. Klein) So fine.  Thank you.

5          You would agree that it was Jane Doe's

6     allegations that bring us here today, correct?

7          MR. MacGILL:  Object to the form of the

8          question.

9     Q.    (By Mr. Klein) You can answer.

10         MR. MacGILL:  Calls for a legal analysis.

11    You can answer.

12    Q.    (By Mr. Klein) You can answer.

13    A.    Okay.  No, I don't believe that.  I believe

14    it's the fact that you-all didn't give me a fair

15    shake.  I feel ripped off by Guidepost.

16    Q.    You would agree, though, that if Jane Doe

17    did not make the allegations that found its way into

18    the report that you dispute, if she did not make

19    those allegations, you would have no basis to sue us.

20    Is that correct?

21         MR. MacGILL:  Object to the form of the

22         question.  Calls for a legal conclusion.

23    Q.    (By Mr. Klein) You can answer.

24    A.    Say that again.  I'm sorry.

25    Q.    Sure.  Sure.  Your claim is for defamation,

MAGNA
LEGAL SERVICES

1    which are false statements.  Do you understand that?

2        A.   Correct.

3        Q.   And would you agree that the false

4    statements are based on, in part, allegations that

5    were brought by Jane Doe?

6        A.   Correct.

7        Q.   That were given by Jane Doe to the

8    investigators?

9        A.   Exactly, yes.

10       Q.   Why did you not go forward with a

11   defamation lawsuit against Jane Doe and her husband

12   then?  Or Jane Doe, I should say, not her husband.

13            MR. MacGILL:  Object to the form of the

14       question.  You may not answer as to the legal

15       advice that you have been given.  Any

16       communications that you had with your lawyers,

17       you should not repeat.  If you have information

18       separate and apart from the legal advice that

19       you have secured in this matter, go ahead and

20       answer, but --

21       Q.   (By Mr. Klein) I agree.  Yes.  I don't want

22   any of your legal advice.  Just on your own.  Why did

23   you choose, on your own, not to commence a lawsuit

24   against Jane Doe?

25            MR. MacGILL:  Same instruction.  This is

1         not a backdoor way into the legal advice that we

2         have given you over time.  Do not communicate

3         any details of the legal advice that we have

4         given you over time.  But if you have answers

5         separate from the legal advice you have been

6         provided by counsel, please answer.

7         A.   It has not been my desire to do personal

8 suits.  If I were doing personal suits, I would sue

9 Bart Barber, which has been so proven that he lied in

10 his tweet with 66,000 responses.  To call me a felon,

11 and he did not call me credibly accused, he called me

12 an "accused sex abuser."  And I have never been

13 accused.  I have never been convicted.  I have never

14 confessed.  And he wrote the policy.  He violated his

15 own policy.  And so if I were going to go personal,

16 there's a few more.

17         Q.   (By Mr. Klein) I just want to make sure I

18 understand what you mean by "personal."  When you say

19 "personal," what do you mean, suing an individual?

20         A.   Individual.

21         Q.   So you made the choice on your part not to

22 sue any individuals who may have been involved in

23 this and chose, instead, just to sue the entities?

24         A.   Unless before we go to trial, I'm able to

25 see what my attorneys have seen that I haven't been

MAGNA
LEGAL SERVICES

1    privileged to, I may be able to read something else

2    that would change my mind.

3         Q.   Fair enough.  But at this point, that's the

4    reason why you chose to proceed the way you have

5    chosen.

6         A.   Yes, sir.  Yes, sir.  Yes, sir.

7              MR. MacGILL:  And, Counsel, just make the

8         advice -- I know you get unhappy.  Once our

9         client is able to see 11,000 pages, we will make

10        some decisions, okay?  I want you to know that.

11             MR. KLEIN:  I am counting on that, Rob.

12             MR. MacGILL:  You should.  He's not seen

13        any of the documents from the CEO of your

14        company at this point.  He's been embargoed

15        information pertaining to the SBC president,

16        et cetera, et cetera.  So he has not had access

17        to this information.  It's been withheld, we

18        say, inappropriately.

19        Q.   (By Mr. Klein) Did you, Mr. Hunt, have any

20   communications with Jane Doe's attorney at any point?

21        A.   Never.

22        Q.   Did you ever have any -- I don't think you

23   have answered this.  Did you ever -- since the report

24   was issued, have you spoken with Jane Doe at all?

25        A.   None, no conversation.

1     Q.   And with Jane Doe's husband?

2     A.   No conversation.

3     Q.   Not since the report was issued?

4     A.   No.

5     MR. KLEIN:  I think I only may just have a

6     few more questions.

7     The complaint was marked earlier.  It's a

8     very thick document, Rob, if you don't mind

9     sharing it with your client.

10    MS. NOKES:  It's rubber-banded.  Maybe

11    under your binder.

12    MR. MacGILL:  There you go.

13    THE WITNESS:  Okay.

14    Q.   (By Mr. Klein) Let me know when you have it

15  in front of you, Mr. Hunt.

16    A.   I have it.

17    Q.   If you can turn to paragraph 8 on Page 2.

18    A.   I'm there.

19    Q.   First sentence says, On May 22, 2022,

20  Guidepost, the SBC and its leadership publicly

21  released a report that purported to focus on whether

22  the SBC's executive leadership had inappropriately

23  responded to allegations of child and other sexual

24  abuse.  Do you see where I have read?

25    A.   Yes, sir.

MAGNA
LEGAL SERVICES

1     Q.    What evidence do you have that Guidepost,

2  as opposed to the other defendants, that Guidepost

3  publicly released the report?

4          MR. MacGILL:  Again, Counsel, here we go

5          again.  You've withheld 11,000 pages -- I get to

6          say it again, because of your question -- 11,000

7          pages and you want him to answer your question

8          about what evidence?  Well, sir, you have it and

9          you have embargoed the evidence and he hasn't

10         seen any of it.  So are you going to withdraw

11         your question?

12         MR. KLEIN:  I am absolutely not going to

13         withdraw my question, but I appreciate you

14         asking.

15         MR. MacGILL:  I figured you would not.

16         But, again, this is part of the Q&A that we want

17         to submit to the Court so the Court can see the

18         prejudice that's associated with what you have

19         done.

20         All right.  Go ahead and answer the

21         question.

22     Q.    (By Mr. Klein) Do you remember the question

23  before your lawyer's conversation?

24     A.    No, sir.

25     Q.    I will ask it again.

MAGNA
LEGAL SERVICES

 1      A.   Okay.  Thank you.

 2      Q.   I don't want to read the sentence again to

 3  remind you, I read on paragraph 8, Mr. Hunt --

 4      A.   Yes, sir.

 5      Q.   -- that first sentence.  I won't reread

 6  that into the record.

 7      A.   Okay.

 8      Q.   My question, though, is what evidence do

 9  you have that Guidepost publicly released the report

10  as opposed to the other defendants?

11      A.   Right.  I felt in this -- again, I'm no IT

12  person --

13      Q.   I understand.

14      A.   -- but the fact that you-all did post a

15  link to the report on your website and I'm sure it

16  got plenty of activity.

17      Q.   Did you ever click on that link?

18      A.   Never did.

19      Q.   Is that the only basis that you have to

20  assert that Guidepost publicly released the report,

21  that link that you are referring to?

22          MR. MacGILL:  Again, same objection as

23          before.  There's the embargo of 11,000 pages of

24          documents makes the witness certainly at least

25          partially impaired from answering the question.

1       Q.   (By Mr. Klein) Well, I am actually asking

2    about what happened at the time you filed the

3    complaint, not what happened afterwards when there

4    was any discovery.  At the time of filing the

5    complaint -- which is all I'm interested in -- at

6    that time, when you chose to include Guidepost as a

7    defendant, you just stated that from your

8    understanding, the public release by Guidepost was

9    via that link.

10      A.   Right.

11      Q.   And I'm saying, In addition to that link or

12   other than that link at the time of filing the

13   complaint, do you know of any other action that

14   Guidepost did to publicly release the report?

15      A.   Well, I look at it as your report, given to

16   the SBC.  They did not do the work to produce that

17   document.  Guidepost did.

18      Q.   I understand that.

19      A.   And then when I read that Guidepost has

20   identified with three exceptions, I personally

21   believe you violated all three.

22      Q.   I don't think that answers my question.

23   I'm not talking about that.

24      A.   Okay.

25      Q.   That's fine.  I just want to -- I'm going

1    to ask it again.

2        A.    Okay.

3            MR. MacGILL:  Can he finish his answer on

4        this one or no?

5            MR. KLEIN:  He finished his answer on that.

6            MR. MacGILL:  No, he wants to give you the

7        three reasons that you violated -- that you

8        violated your legal obligations here, but you

9        don't want that testimony that he's going to

10       give you?

11           MR. KLEIN:  Rob, I don't think he was going

12       to give them to me.

13       Q.    (By Mr. Klein) Mr. Hunt, if you were going

14   to give them to me and you remember them, have at it.

15   I didn't think you were going to, though.

16       A.    Yeah.  One was -- it was tort.  It was

17   negligent.  And that would be my belief, going back

18   to -- I like the way you put the question.  It was

19   encouraging.  A moment ago when you said what if we

20   had just interviewed them one or two times and you

21   one or two times, wish to God you-all had been that

22   fair and treated her and me alike.  I'm not sure why

23   she deserved special treatment and why she's so

24   believable and I'm not given the opportunity to be

25   believable.  So I see it as very negligent.  And I

MAGNA
LEGAL SERVICES

1  can't remember the third, but I knew I agreed with it

2  when I read it.

3      Q.   I'm going to ask the question again, just

4  to make sure --

5      A.   Okay.

6      Q.   -- you and I are on the same page.  I just

7  said, Other than the link that you referred to that

8  was on our site that you understand ultimately takes

9  you to the report, other than that, is there any

10  other basis that you maintain where Guidepost

11  published the report?  Other than that link?

12      A.   In my reasoning, it's your report.  You've

13  got to own it.

14      Q.   I'm not -- I think maybe we are speaking

15  past each other.  I will try one more time and then I

16  will move past it.

17      A.   Okay.

18      Q.   And it's no problem.  No fault.  I'm not

19  talking about the ownership of the report.  Part of

20  one of the claims is that we published it to a third

21  party.  It's a legal statement, Rob will object, I

22  will try explain to you.  Sorry.

23      A.   All right.

24      Q.   One of the requirements is that we publish

25  to a third party.  I'm only trying to understand.

MAGNA
LEGAL SERVICES

1    You have now stated on the record just now that it's

2    your understanding that we did that by having this

3    link on our site that people could click to.

4        A.    Right.

5        Q.    My question is, other than that -- so

6    forgetting about who owns the report -- is there

7    another basis that you believe that we shared the

8    report with a third party?   Just that specific

9    question.   Do you know of anything else that we did?

10        A.    Not that I know of.   No.

11        Q.    And that's fine.

12        A.    And that's why I would see the lawsuit

13    against the Southern Baptist Convention and EC

14    because they've got to own what they published and

15    what they took from you.

16        Q.    That's fine.

17        MR. KLEIN:  Can we take five minutes and I

18    may be done?

19        MR. MacGILL:  Sure.  Sure.

20        THE VIDEOGRAPHER:  The time is 4:38 p.m. we

21    are off video record.

22        (WHEREUPON, a recess was taken.)

23        THE VIDEOGRAPHER:  We are back on the

24    record.  The time is 4:53 p.m.

25        MR. KLEIN:  Mr. Hunt, on behalf of

1      Guidepost Solutions, thank you for your time.  I

2      have no more questions.

3            THE WITNESS:  Thank you, sir.

4            MR. MacGILL:  Sir, I have got just a few

5      follow-up questions.

6  EXAMINATION

7  BY MR. MacGILL:

8      Q.   One, I would like to just start out on the

9  subject of texts and emails.  First, have you ever

10 discussed the details of the encounter with

11 Ms. ████    in an email with anyone?

12     A.   No.

13     Q.   Have you ever discussed the details of the

14 encounter with Ms. ████    in a text with anyone?

15     A.   No.

16     Q.   Do you have any emails or texts, sir,

17 relating to the encounter that you have not produced

18 to your lawyers in this case?

19     A.   I don't know of any.

20     Q.   When you testified earlier about emails

21 that you forward to your wife, Janet, what emails

22 were you talking about.  Do you remember?

23     A.   Most of them were the ones where -- was it

24 CLO sends us and tells us all that is being discussed

25 among attorneys or what the judge has said or

1  magistrate, that type of information.

2      Q.   Okay.   Fair enough.   Now, I want to cover

3  one last thing.   So you have described to Ms. Nokes

4  and to counsel for Guidepost a number of things about

5  the encounter, the subject of a lot of testimony.   I

6  would like to focus on the day after the encounter in

7  2010.

8      A.   Okay.

9      Q.   Could you tell the Court and jury what --

10  when you next saw Ms. ████ the following day?

11      A.   Yeah.   First, I was out on a run and I

12  leave my phone at home.   And when I came back,

13  really, before I came back, my wife drove to where I

14  was running and confronted me with a text from her.

15  What is this from ████ ████ wanting to go running

16  with you?   And I said, Well, I can answer it right

17  here.   And she can't go running with me.   And there

18  had been no promise or anything of that.   She had

19  just made that request.   Plus, she had made a

20  request -- I think we saw this in a report -- of

21  wanting to borrow salt and pepper.   And so I --

22  because I told her I was not going back, even though

23  she had said this is the first day, I said, I'm

24  leaving.   Come and get it from my wife.

25      Q.   Come and get what from your wife?

1    A.   The salt and pepper.

2    Q.   Okay.  And then what else happened that

3  day?

4    A.   And then later on, my wife and I and my

5  children and their husbands were on the beach.  And

6  that's when she came down in her white bikini.  And

7  we are sitting facing the water.  She turned her

8  chair sideways in front of us.  And it offended my

9  wife and children because they know that I know her,

10 even though she, at that time, didn't know there had

11 been any -- anything to happen.  And so --

12   Q.   So what happened next?

13   A.   -- when she left the beach, my wife

14 followed her and met her on the balcony and just

15 basically said, I want you to get your things in your

16 room and pack up and leave here.  I don't want you to

17 ever text or email my husband again.  Are we clear?

18 She said, Yes, ma'am.  Got her stuff and went home.

19   Q.   All right.  What happened -- was there any

20 follow-up or any other -- in connection with these

21 events, anything else happen?

22   A.   It was not until the next day that ████

23 called me and say, Why would your wife ask her to

24 leave?  And I said, Well --

25   Q.   Ask who to leave?

MAGNA
LEGAL SERVICES

1      A.    Ask his wife to leave, ask █████ to leave.

2    And I said, Well, you can ask.  But he said, yeah,

3    but you know.  And I said, I do.  I said, █████ she

4    felt that your wife was down here flirting and

5    preying on me.  And that's why she asked her to

6    leave.

7      Q.    And what did he say?

8      A.    Well, I don't think that was the case.  He

9    pretty much tried to defend his wife.  And I said,

10   Well, you will have to have that conversation with my

11   wife.  She's the one who made the decision.  And

12   we -- we left it there.  But then we -- we -- after I

13   did share with him that next Monday what had

14   occurred, and then when he came into the room and

15   said -- and he would be one that testified to saying,

16   Not only do I forgive you, I beg you not to quit.  We

17   need you.  You have helped me.  I'm where I am

18   because of you.  And basically when he did leave that

19   church, the following church -- and they would

20   testify to this -- pretty much made a commitment to

21   him predicated on my mentorship, that if I would be

22   available to help him to progress as a leader in the

23   church that he went to in -- outside of Dallas,

24   Georgia.  And he stayed there the next eight years.

25     Q.    Okay.

MAGNA
LEGAL SERVICES

1          MR. MacGILL:  Thank you very much.  No

2     further questions here.

3          MR. BESEN:  No questions.

4          MR. KLEIN:  No questions.

5          MS. NOKES:  None.

6          THE VIDEOGRAPHER:  Anyone on Zoom?

7          MR. KLEIN:  Hearing no response.

8          MR. MacGILL:  Okay.  We are finished.

9          MR. SANDERS:  We would like to reserve

10    signature.

11          THE VIDEOGRAPHER:  The time is 4:58 p.m.

12    Going off the video record.

13          (Whereupon, the proceedings were concluded

14    at 4:58 p.m.)

15

16

17

18

19

20

21

22

23

24

25

MAGNA◆
LEGAL SERVICES

```
1              COURT REPORTER DISCLOSURE
2
       Pursuant to Article 10.B of the Rules and
3  Regulations of the Board of Court Reporting of the
   Judicial Council of Georgia, I make the following
4  disclosure:
5      I am a Georgia Certified Court Reporter.  I am
   here as a representative of Magna Legal Services.
6
       I am not disqualified for a relationship of
7  interest under the provisions of O.C.G.A. §9-11-28 ©.
8  Magna Legal Services was contacted by Bradley Arant Boult
   Cummings LLP to provide court reporting services for this
9  deposition.
10     Magna Legal Services will not be taking this
   deposition under any contract that is prohibited by
11 O.C.G.A. §15-14-37 (a) and (b).
12     Magna Legal Services has no exclusive contract
   to provide reporting services with any party to the
13 case, any counsel in the case, or any reporter or
   reporting agency from whom a referral might have been
14 made to cover this deposition.
15     Magna Legal Services will charge its usual and
   customary rates to all parties in the case, and a
16 financial discount will not be given to any party to
   this litigation.
17
18
19     Robin K. Ferrill
20 _____
   Robin K. Ferrill, RPR, B-1936
21 Certified Court Reporter
22
23
24
25
```

MAGNA
LEGAL SERVICES

```
1                  C E R T I F I C A T E
2    STATE OF GEORGIA   )
3                       ) ss.:
4    FULTON COUNTY      )
5
6        I,  Robin Ferrill, Certified Court Reporter within
7    the State of Georgia, do hereby certify:
8             That Johnny M. Hunt, the witness whose
9    deposition is hereinbefore set forth, was duly sworn by
10   me and that such deposition is a true record of the
11   testimony given by such witness.
12            I further certify that I am not related to any
13   of the parties to this action by blood or marriage; and
14   that I am in no way interested in the outcome of this
15   matter.
16            IN WITNESS WHEREOF, I have hereunto set my
17   hand this _____ day of _____, 2024.
18
19          ___Robin K. Ferrill_____
20             ROBIN K. FERRILL, RPR
21
22
23
24
25
```

MAGNA
LEGAL SERVICES

 1  To: Mr. MacGill
    Re: Signature of Deponent Johnny M. Hunt
 2  Date Errata due back at our offices:
 3  Greetings:
    This deposition has been requested for read and sign by
 4  the deponent.  It is the deponent's responsibility to
    review the transcript, noting any changes or corrections
 5  on the attached PDF Errata.  The deponent may fill out
    the Errata electronically or print and fill out manually.
 6
    Once the Errata is signed by the deponent and notarized,
 7  please mail it to the offices of Magna Legal Services
    (below).
 8
    When the signed Errata is returned to us, we will seal
 9  and forward to the taking attorney to file with the
    original transcript.  We will also send copies of the
10  Errata to all ordering parties.
11  If the signed Errata is not returned within the time
    above, the original transcript may be filed with the
12  court without the signature of the deponent.
13  Please send completed Errata to:
14  Magna Legal Services
15  Certified Court Reporters
16  1635 Market Street
17  9th Floor
18  Philadelphia, PA  19103
19
20
21
22
23
24
25

MAGNA
LEGAL SERVICES

```
 1   ERRATA for ASSIGNMENT # 1130260

 2   I, the undersigned, do hereby certify that I have read

 3   the transcript of my testimony, and that

 4   ___ There are no changes noted.

 5   ___ The following changes are noted:

 6

     Pursuant to Rule 30(7)(e) of the Federal Rules of Civil

 7   Procedure and/or OCGA 9-11-30(e), any changes in form or

     substance which you desire to make to your testimony

 8   shall be entered upon the deposition with a

     statement of the reasons given for making them.  To

 9   assist you in making any such corrections, please use

     the form below.  If additional pages are necessary,

10   please furnish same and attach.

11   Page _____ Line _____ Change _____

12   _____

13   Reason for change _____

14   Page _____ Line _____ Change _____

15   _____

16   Page _____ Line _____ Change _____

17   _____

18   Reason for change _____

19   Page _____ Line _____ Change _____

20   _____

21   Page _____ Line _____ Change _____

22   _____

23   Reason for change _____

24   Page _____ Line _____ Change _____

25   _____
```

MAGNA
LEGAL SERVICES

1  Page _____ Line _____ Change _____

2  _____

3  Reason for change _____

4  Page _____ Line _____ Change _____

5  _____

6  Page _____ Line _____ Change _____

7  _____

8  Reason for change _____

9  Page _____ Line _____ Change _____

10  _____

11  Page _____ Line _____ Change _____

12  _____

13  Page _____ Line _____ Change _____

14  _____

15  Reason for change _____

16  Page _____ Line _____ Change _____

17  _____

18

19

        _____

20            JOHNNY M. HUNT

21  Sworn to and subscribed before me this ___ day of

22  _____, _____.

23  _____

    NOTARY PUBLIC

24

25  My Commission Expires:_____



## Magna
### Key Contacts

Schedule a Deposition:
**Scheduling@MagnaLS.com | 866-624-6221**

Order a Transcript:
**CustomerService@MagnaLS.com | 866-624-6221**

General Billing Inquiries:
**ARTeam@MagnaLS.com | 866-624-6221**

Scheduling Operations Manager:
**Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)**

Customer Care:
**Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)**

Director of Production Services:
**Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)**

National Director of Discovery Support Services:
**Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)**

Billing Manager:
**Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)**

Director of Sales Operations:
**Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)**

**MAGNA**
LEGAL SERVICES

**A**

**ability**
12:5,9
**able**
25:3 44:3 45:7 49:8
101:23 145:21
148:13 187:4 200:3
203:12,13,14
244:25 280:25
287:24 288:1,9
**abruptly**
122:19 209:5
**Abs**
129:17
**absolute**
131:2
**absolutely**
9:24 35:15 45:8
49:25 60:11 82:5
97:4 102:19 108:25
120:19 121:3
129:19 139:7,14,19
139:21 142:16
143:1,10 154:14
159:7 162:17,22
163:14,19 190:21
195:22 202:11,19
212:20 216:19
219:15 221:19
228:15 254:10,13
281:6 290:12
**absurd**
193:6
**abuse**
5:8 39:6,9,10,21
44:20,24,25 45:6,11
45:17 110:21 111:4
112:15,20 113:3,14
114:2 129:12
136:22 137:3,12
143:9 154:24 158:9
158:13 160:9
176:25 181:18
182:18,18 184:4
185:16 186:4 188:5

188:6,11 190:18
193:19 197:11
275:23 289:24
**abused**
137:6 140:10 144:9
182:25 187:3
193:13 195:16
197:6 275:23
**abuser**
287:12
**abusers**
39:16 182:20
**abusive**
45:2 48:2,6,7 215:4
**accept**
95:22 124:13
**acceptance**
196:20
**access**
198:9 243:18,21
244:19 288:16
**accessible**
232:21
**accommodate**
11:8 24:13 110:2
197:17
**accommodating**
23:8
**account**
78:11 84:5 107:15
183:14 192:22
**accountability**
80:3,4 182:20,21
199:21 249:1
**accountant**
19:11 30:7 70:4
72:14
**accounting**
19:12 207:9
**accuracy**
182:22 193:9
**accurate**
130:22 158:2,18
159:2 160:11,25
161:13,14,16,17
162:6 163:5,6 164:8

164:9,14,19 165:2,7
165:12,18,25 166:4
166:8,9,14,15,17,18
166:21 167:6,11,19
168:11,24,25 169:3
169:4,11,12,15,22
170:15,21,22 171:1
171:14,25 172:22
172:25 173:6,22
174:16 175:22
176:2,12,16,20,21
177:4,7,23 178:15
178:16,21 179:1,22
179:23 180:2 183:3
189:24 190:8,15
192:2,6,13,14,18,19
193:4,10 194:3,4,10
194:20 196:7,14,24
209:9,19 211:5
239:7 241:2,5
**accurately**
12:11 174:4,11 185:2
186:12 189:12,22
246:14
**accusation**
104:15 138:4 146:5,6
156:5 275:24
**accusations**
137:1 147:9 148:6
150:22 164:22
278:25 284:7
**accuse**
278:14
**accused**
137:2 152:18 156:12
185:14 210:18
287:11,12,13
**accuser**
137:14
**acknowledge**
157:24 179:16 279:8
279:14
**acknowledged**
117:25 158:5 160:21
235:18 270:9,16
**acknowledging**

210:19
**act**
80:22
**acting**
154:11 155:5 198:16
221:2,3
**action**
148:2 239:2 240:23
292:13 302:13
**actions**
152:20 196:2
**activity**
148:15 291:16
**acts**
96:15 247:2
**add**
33:22 34:18 218:25
271:14
**added**
124:24 141:13
**Addie**
22:1
**adding**
110:2
**addition**
10:1 11:1 28:1
267:15 292:11
**additional**
70:1 222:15 223:1
304:9
**address**
17:13 127:6 132:16
**addressed**
47:12 149:4 195:3
238:11 240:11
263:9,10
**adios**
226:20
**administered**
9:21
**administrative**
115:7 127:4
**admit**
55:21
**admitted**
67:5

MAGNA
LEGAL SERVICES

**Adrian**
25:16 36:23 37:15
**adultery**
46:19,21,23 54:5,9
  56:16,18,21 57:6,7
  57:10,17 58:1,7,8
  58:12,16,20 59:1,23
  59:25 60:6,7,12,13
  60:17,22,23 63:2
  66:25 67:3 119:17
  119:18
**adults**
89:15
**advanced**
23:3,5 93:9,10 95:6
**advertised**
153:11
**advice**
191:20 286:15,18,22
  287:1,3,5 288:8
**advised**
275:1
**AEO**
283:5,22
**afar**
251:16
**affair**
66:21 145:14
**affairs**
60:18
**affect**
212:21
**affiliated**
88:7,8 93:6 211:19
**affiliation**
25:22
**affirm**
59:11
**affirmatively**
261:11
**afford**
119:24
**aftermath**
55:4 121:5 148:19
  189:5
**afternoon**

215:7 222:20,21
  281:25
**age**
37:23 219:22 220:7
**agency**
301:13
**agenda**
40:16 147:2
**ages**
21:22
**ago**
9:1 54:17 81:23
  87:16 90:6 91:1
  101:8 103:3 145:24
  145:24 146:2,3,13
  150:14 167:23
  188:16 189:3
  194:13 251:9
  270:15 271:7
  293:19
**agree**
10:19 30:8 31:15
  33:18,23 34:4,9,14
  34:16,22,24 43:21
  55:14 69:20 107:23
  113:13 114:17
  129:15 186:14,17
  200:5 225:9 228:13
  261:24 275:25
  285:5,16 286:3,21
**agreed**
35:5 37:24 294:1
**agreement**
265:3,20
**agrees**
135:11
**ahead**
33:20 64:10 162:10
  174:2 201:8 205:2
  224:1 253:1 269:5
  269:13 286:19
  290:20
**aid**
218:7
**airport**
14:1 249:24

**Akin**
41:1
**al**
7:8 41:1
**alarm**
54:21
**Alex**
2:14 251:17
**alike**
293:22
██████████
███████████
████████████
█████████
████████
**allegation**
89:2 90:2 136:21,24
  142:13 160:9
  179:11 186:4 193:6
  193:15
**allegations**
5:7 22:15 63:3,4,6
  80:10 89:12 112:20
  113:14 129:10,11
  137:12 138:6
  176:19,24 179:8
  181:17 184:16
  186:21 193:19
  195:5 208:12
  227:17,21 248:3,14
  285:6,17,19 286:4
  289:23
**alleged**
184:24 185:13
  216:11 256:8
**allow**
16:8 55:23 102:10
**allowance**
74:2,21 75:24 76:24
**allowed**
68:3 189:16 256:24
  262:21
**allowing**
44:18
**allows**
86:13

**alongside**
52:7 182:7
**ambush**
92:18 105:15 106:4
  114:17 140:19
  146:4 147:23
  210:23 270:21,22
  271:19 275:24
**ambushed**
101:4 102:14,17
  103:23 104:11
  117:16 270:20
**Amen**
284:13
**amended**
6:4 253:13,17 254:25
  255:14 259:3,7
**America**
41:15 109:13 117:7
  124:4,5 264:6
**American**
15:3,20 74:9 75:3,14
  77:5,14 93:1 182:8
  184:5
**amount**
104:9 105:14 207:16
  213:20 261:21
**amounts**
261:20
**analysis**
285:10
**Anderson**
3:20
**Android**
16:3
**and/or**
304:7
**angry**
109:3
**anniversary**
102:25 122:11
**announced**
157:25
**annual**
39:2 110:8,19 264:18
  264:20 265:25

**Annually**
264:22
**anonymity**
33:6 34:21
**Anspaugh**
85:3
**answer**
11:2,8 12:6 14:15
42:12 43:2 50:19
57:23 58:15,21
61:17 62:19,22
70:24 71:2 94:22
104:22 130:25
133:12 138:9 141:4
141:7,22 142:6,8
145:21,22 163:8
175:14 186:17,18
199:23 200:22
205:2,13,18 210:11
211:11 215:5
220:16 225:1,11
229:14,20 230:15
231:17 232:19
237:17 244:25
247:7,14 248:3
253:3 254:12
255:11 256:24
257:1,8,12 260:18
262:20,21 267:16
269:3,8 270:12,13
274:1,2,3,18 275:16
276:24 279:7 283:8
283:9 284:4 285:9
285:11,12,23
286:14,20 287:6
290:7,20 293:3,5
297:16
**answered**
57:18 98:10 140:24
141:1 176:20 221:9
231:11,17 288:23
**answering**
35:21 67:12 139:19
146:2 198:23
243:14 262:25
263:8 278:10

291:25
**answers**
10:8,9,22 32:25
36:10 130:13
180:10,13 225:7
246:19 287:4
292:22
**Anthony**
275:1
**anybody**
21:4 182:25 193:13
197:6 199:23
279:17
**anymore**
21:5 168:10
**anyway**
25:19 26:6 124:1
**AOE**
283:3
**apart**
53:5 63:18 286:18
**apologies**
257:10 266:6
**apologize**
170:24 171:21
172:17 223:21
224:1 250:18
263:19 276:14
**apologized**
171:2 178:24 191:17
229:15,18
**apologizing**
175:21
**apology**
171:12 175:19
**Apparently**
282:20
**appearance**
167:10
**APPEARANCES**
2:1 3:1
**appeared**
127:20
**application**
51:2,3 99:8
**appreciate**

229:12,24 263:1,15
267:9 282:16
290:13
**approached**
104:14
**appropriate**
31:16,23 32:4 33:25
131:12 132:5,15
191:20 196:19
**appropriately**
71:18
**approve**
259:23
**approved**
112:4
**approximate**
246:24
**approximately**
7:12 236:23
**April**
1:14 4:4 7:3,11 68:19
102:19 114:21
115:23 121:19
123:5 131:22
180:16
**Arant**
1:17 3:3,8 7:14 8:1,4
301:8
**area**
47:15 53:22
**areas**
79:24 84:6 262:1,16
**Arkansas**
42:7
**aroused**
218:1
**arrange**
192:24
**arranged**
115:2 146:19 151:14
**arrangement**
265:2
**article**
5:6 181:16,21 301:2
**articulate**
148:12,13

**aside**
191:6 253:6
**asinine**
134:20
**asked**
37:8 43:20 58:8,13
62:9 102:23 110:15
117:19 121:15,22
122:5 124:25
136:14,17,24
139:15 140:21,25
141:9,12,23 142:1,3
144:19,20 145:2,8
146:3 149:22
152:19 156:1,4
158:8,11,16,23
159:3 160:15,23
162:3 164:5,16
165:9 166:19,23
168:19 169:5 171:9
173:3,3,10 175:1
176:18,24 178:11
178:17 205:2 207:8
207:15 210:1 215:9
216:1 219:7 235:17
239:6 242:12
252:10 260:2
262:11 266:17
267:14 273:22
278:1 282:9,25
299:5
**asking**
34:5,10 59:5,10
61:13,21 62:21
105:23,25 111:15
136:1,25 138:13
140:6 142:23
145:25 146:5 148:8
157:13 163:3
169:21 173:20
175:13 180:24
189:7 192:15,16
198:12 202:12
205:8 206:12 207:3
207:15 218:20
220:14 223:1

MAGNA
LEGAL SERVICES

227:20 229:10
230:14 243:6
244:11 250:3
254:18 265:16
278:21 281:11
282:18,22 283:6,21
290:14 292:1
**asleep**
273:21
**aspect**
172:9
**aspects**
112:14
**assault**
33:10 151:25 152:1
171:19 179:11
190:19 193:7
216:11 219:2
277:10
**assaulted**
103:20 138:16
146:18 150:16
172:19 275:23
285:3
**assaulting**
170:24 171:21
172:18
**assembled**
246:11
**assert**
291:20
**asserted**
227:25
**assertion**
230:8
**assertions**
228:23
**assessed**
181:2,2
**assessment**
51:5 180:19,19,25
181:1 228:14
**assets**
213:3
**assignment**
47:13 304:1

**assist**
304:9
**assistant**
100:17
**associate**
78:8 150:6
**associated**
290:18
**associates**
100:20
**association**
42:21
**assume**
39:2 86:8
**assumed**
209:13
**assumes**
33:9 147:12
**assuming**
247:10
**assure**
244:10
**assured**
103:13
**Atlanta**
1:20 7:14 14:1
**attach**
304:10
**attached**
6:14 303:5
**attack**
105:2 130:5 167:1
282:10
**attacked**
150:22
**attacks**
282:17
**attempt**
147:3
**attempted**
145:22 197:24 218:6
**attempting**
218:4 232:19
**attempts**
49:1
**attend**

29:4 43:20 44:5
52:20 76:9
**attendance**
27:16
**attention**
115:11
**attire**
214:5
**attorney**
117:17 146:10,11
153:19 154:11
155:8,19 186:24
197:15 198:6
205:25 212:4 242:3
242:5 253:16
254:24 262:4
271:20 288:20
303:9
**attorneys**
13:25 71:17 126:20
146:1,11 153:12,15
203:19 233:24
242:10 249:9
259:21 273:17
281:1 282:19
287:25 296:25
**attorney's**
256:3
**attorney-client**
156:7 273:24 274:9
**attracted**
81:14 82:23 83:8
168:5 220:19,19
**attraction**
54:2 220:10
**attractive**
217:24,25
**audio**
11:16
**August**
68:25 169:15 171:23
172:10
**authority**
62:17 81:21
**available**
26:10 66:6 78:4

140:12 183:7
232:18 299:22
**Avenue**
2:9,15,21 3:9
**average**
42:6,22 78:13 106:16
212:22
**averaged**
35:20
**averaging**
27:10
**award**
255:16 261:21
**awarded**
212:11
**aware**
20:23,25 39:10,17
50:22 51:11 61:22
78:16 110:17 111:2
111:13 112:3,11,14
113:7,9 114:3 122:6
124:23 125:25
166:2 182:13
184:23 185:12
198:19,22 200:17
227:15,21,24 228:6
234:1 235:25 260:4
262:8 274:11,14,15
275:6 276:6
**awareness**
168:4
**awful**
187:20,21 190:17
192:21
**awkward**
209:4,18,24 226:4
247:3 277:14
**awkwardly**
63:14 64:3,4
**a.m**
1:15 7:12 11:23 12:3
70:16,20 125:4,5
126:9

---

**B**

**b**

301:11
**Bachelor's**
25:7
**back**
10:1,13 12:2 13:23
15:14,21 16:16 30:3
32:25 44:24 46:24
49:16 53:4 54:4
57:23 58:3 61:2
63:1 68:7,24 69:5
70:12,19 72:16 77:8
77:10,20 89:13 94:7
94:12 101:4 104:5
108:7 112:3,11
124:20,22 125:7
130:18 136:16
145:23 162:12
163:12 167:23
194:16 196:1
201:18 203:3,7
205:3,4 209:20
213:11,13 215:13
217:21 218:16
221:20 222:12
229:14 239:13
241:5 245:24
253:16 254:21,22
254:24 259:14
265:15 268:20
269:10 271:24
276:11 293:17
295:23 297:12,13
297:22 303:2
**backdoor**
287:1
**backwards**
21:17
**bad**
52:3 54:19 161:6
193:17 259:14
**balance**
261:18
**balconies**
165:6
**balcony**
54:25 64:25 65:5,13

124:8 141:24 162:6
164:19,23 165:10
165:12,16 166:17
167:12 179:18
213:22,24 298:14
**ball**
150:17
**ballot**
37:24
**Baptist**
1:6,8 2:8 3:2 5:6,12
25:9,12,23 26:2,18
29:2 40:6 42:4,7,8
42:24 43:23 47:11
56:15 58:6 61:3,25
62:1,2 67:4 71:21
72:3 73:2 74:8,13
77:25 80:12 82:10
97:3 102:24 107:16
110:6 119:12
121:10,14 136:10
138:20 140:17
143:22 145:18,18
149:10 154:21
168:22 177:13
181:17,21 182:25
183:10 185:1
186:19 187:7,15
188:13 199:13
201:2 207:4,13
208:4 210:9 211:1,9
211:13 212:12,22
212:25 213:2
227:13 295:13
**Baptists**
25:21 42:20 61:23
229:6
**Barber**
287:9
**Barber's**
200:18
**Barnabus**
35:20 92:10,11,20
93:13,14,22 94:1,12
94:14 98:21 100:21

125:16
**barrage**
139:18
**Barry**
37:7
**Bart**
200:18 287:9
**base**
75:20
**based**
83:7 107:14,18
113:20 130:20
151:14 169:22
171:14 172:5,12
180:10 193:15
246:10 256:1 269:1
269:8 283:3,3 286:4
**basically**
22:15 24:13 28:2
38:15 52:9 95:14,23
123:23 150:8
152:23 153:7
185:13,15 188:2
192:11 298:15
299:18
**basis**
67:13 193:24 198:11
198:24 205:9,12
264:20 285:19
291:19 294:10
295:7
**Bates**
127:12
**Bates-numbered**
251:6,8
**Bathsheba**
60:15
**battle**
189:5
**beach**
17:12,13,17 18:3
21:12 22:21 64:20
165:2,24 167:21
298:5,13
**bear**
192:10,16

**bears**
54:20,25
**beautiful**
119:16
**becoming**
104:20
**bed**
118:15 119:7
**beg**
299:16
**began**
103:18,20 123:21
138:10 190:24
**beginning**
67:19 184:10 251:23
274:24 277:2
**begins**
7:5 163:7
**behalf**
2:2,8,13 3:2 36:3
65:12 222:15
295:25
**behavior**
33:15 269:1
**belabor**
34:8
**belief**
55:2 82:22 293:17
**believable**
293:24,25
**believe**
37:1 56:2,6 80:11
85:17 104:9,25
108:13 124:7
138:11 149:9,11
154:15,16 155:9,11
155:11 169:18
179:2 183:6 186:6
186:17 197:4
199:14 213:16
227:4,18 229:2,7
233:9 236:3,14
246:12 251:13,25
252:18 255:22
257:4 261:22
267:16 283:12,17

285:13,13 292:21 295:7

**believed**
91:4 154:10 155:23 175:19 183:5 187:22 219:9

**believes**
186:24

**benefit**
90:15 130:15 143:4,6 145:17 224:14

**benefits**
77:24 261:12

**Besen**
3:8 8:4,4,25 32:17,21 33:6,8,11 59:12 105:23 106:2 125:3 133:1,9,18,21,24 134:1,4,10,16,18,20 134:23 135:6,9,16 174:3,10,15 203:1 273:9,12 284:10 300:3

**best**
117:22 124:6,7 214:6 214:21 223:8 243:14

**bet**
99:17

**better**
189:19 191:19 214:22 279:18

**beyond**
80:4 84:4 109:14 149:12 174:17 196:13 201:23 247:11

**Bible**
52:2 60:10,12,13,25 200:9 201:4

**biblical**
193:24 200:14,23 201:23 202:14

**big**
112:7 257:15

**bikini**

144:3 298:6

**bill**
57:10 58:19 167:3

**billboard**
153:11

**Billy**
89:23

**binder**
289:11

**biographical**
26:9

**birth**
9:8

**bit**
22:8 27:24 70:13 88:17 97:12 219:1 230:21 267:10

**BLAIR**
2:9

**blame**
229:20,23

**Blankenship**
15:4 121:2,7 158:1 169:6,19 170:1,2,10 170:14,19 171:4,5 171:23 172:10 178:14 179:14 233:5 248:7 267:18 267:22 270:3

**blemish**
161:5

**blessed**
68:20 97:6,8

**blessing**
97:8

**Blessings**
196:22

**blindsided**
167:1

**blocked**
51:16,17 273:10

**blood**
302:13

**Blue**
214:13

**bluntly**

182:23

**board**
15:3,21 29:4 74:9 75:3,14 77:5,15 84:25 85:2,7,13,16 88:5,9,10 89:3,20 89:21 90:1 91:22 93:1 96:5 102:22 169:11 182:8 184:5 250:3 301:3

**Bobby**
164:25

**body**
124:4 217:8 221:23 222:2

**bold**
128:17,20 129:3 139:7,14 182:1

**bonus**
75:19 76:19,20

**book**
55:6 56:8 84:22 96:15 196:18 261:12 263:24 264:19 265:19 266:4,8,10,16,18,24 266:24 267:4

**booked**
23:22

**bookkeeping**
19:8,10 243:23

**books**
79:21 85:23 96:13,14 266:22,23

**boost**
70:5

**bore**
60:15

**borne**
60:16

**borrow**
297:21

**bottom**
167:15 177:6,24 178:9 181:25 213:3

**Bouchard**

4:24 153:24

**bought**
24:10

**Boult**
1:17 3:3,8 7:14 8:1 301:8

**boundaries**
109:9

**bout**
124:2

**Bowden**
164:25

**Box**
72:21 73:2,11

**Boy**
142:18

**bra**
66:10,11 216:13,15

**Bradley**
1:17 3:3,8 7:13,13,25 8:4 238:12 301:8

**Brandon**
238:12

**Branson**
13:21 22:20

**break**
11:6 70:9 203:2 222:5 257:9

**breaks**
11:3 182:17

**breast**
216:25 217:10 218:4 219:17

**breasts**
216:17 219:18 221:24

**brief**
137:8 162:5 164:18 168:21 170:12 188:23,24 190:1 193:7 208:25 213:15,17,20,20 277:6

**briefly**
8:25

**bring**

MAGNA
LEGAL SERVICES

15:6 47:20 68:15
115:10 117:12
136:23 137:7
160:19 171:10
223:17 285:6
**bringing**
156:6
**brings**
48:3
**broad**
82:24 107:8 194:6
**Broadway**
3:4
**broke**
106:24
**broken**
182:6 186:8
**brokenness**
194:15
**brought**
33:16 48:11 100:17
110:1 122:25
139:17 155:21
158:14 195:9
233:21 234:13
236:2 262:8 286:5
**Brown**
120:24
**BS**
32:23
**budget**
72:19 78:18,19,20
**building**
164:11
**bulbs**
137:23
**bullet**
240:17 248:9
**bully**
40:20
**Bundren**
5:16 238:2,12
**burden**
40:3 192:16
**Burger**
151:20

**burnout**
47:9
**Bush**
103:1 122:10
**business**
20:4 69:5 85:5,12
96:2,3,6 190:5
239:10
**businessman**
85:8
**busy**
29:1 100:24 115:3
**buttocks**
221:21
**buy**
79:2 147:20
**buys**
21:4
**B-1936**
301:20

_____
**C**
_____
**C**
2:8 302:1,1
**calendar**
115:5
**call**
36:2,3 40:21 49:23
50:6 65:11 67:2
92:18 103:11,16
104:8,18 114:16,16
125:21 153:2
163:15 210:17
211:4 215:3,7 216:8
232:19 271:20
287:10,11
**Callas**
3:13 8:7,7,25 35:1
**called**
8:16 50:2 93:9 101:5
108:12 117:9
123:15 125:22
163:15 200:6 211:5
215:2,8 287:11
298:23
**calling**

126:2 148:14
**calls**
16:11 49:22 154:25
220:16 249:9
285:10,22
**calm**
129:8,20 132:1 179:6
**campaign**
37:25
**cancel**
93:7
**cancelled**
91:13 93:5 211:9
263:25 264:7 266:9
266:19
**cancer**
124:3 189:5 218:2
**cap**
78:16
**capable**
253:24
**capacity**
155:5
**car**
109:2
**care**
121:2 158:1 194:8
196:3 249:7
**cared**
42:1
**careful**
217:12
**Carolina**
25:13
**Carrie**
87:24,25,25
**carried**
44:14
**carryover**
38:6 39:18
**Carson**
21:24
**Carswell**
19:19 21:15 89:22
90:22 96:23
**Carswells**

21:18
**case**
7:24 15:9 31:19
33:16 63:3 101:22
134:5 162:21 181:4
188:6 198:19
204:13 206:7,24
210:5 234:24 235:5
235:13,16 236:16
237:5,14 242:20
244:7,14 252:16
255:21 265:6
282:14 283:4
296:18 299:8
301:13,13,15
**cases**
50:11
**cassette**
20:14,15
**catch**
224:5
**categories**
261:25
**category**
68:10 261:5
**Catherine**
100:25
**cause**
40:13 196:17 211:3
220:9 262:15
**caused**
72:15
**causing**
101:10
**caution**
61:12 62:18
**CCR-B-1936**
1:22
**CDs**
20:20,21
**celebrated**
122:11
**celebration**
103:1
**centers**
118:20

century
107:7
CEO
98:11 184:6 288:13
cerebral
21:25
certain
105:10 242:17 278:2
279:14
certainly
35:14 124:24 131:4
133:17 144:19
195:13 200:10
232:4 234:11
239:21,24 280:8
282:12,13 291:24
Certified
301:5,21 302:6
303:15
certify
302:7,12 304:2
cetera
47:8 288:16,16
chair
144:11 298:8
challenge
228:17,19
challenging
183:1 230:8 265:13
championing
40:13
chance
55:20,21 103:6
119:14 132:8
133:12 134:17,22
135:12 154:6 279:7
change
10:14 18:14 69:2
98:15 129:13
194:24 197:1
247:13 288:2
304:11,13,14,16,18
304:19,21,23,24
305:1,3,4,6,8,9,11
305:13,15,16
changed

15:19 18:8 45:6,7
143:23 166:7 232:3
232:22
changes
10:9 303:4 304:4,5,7
changing
17:21 197:17
character
172:24
characterization
182:24
characterized
129:16
charge
41:23 256:24 301:15
charged
266:19
Charles
25:5,18 107:6
Charleston
3:15
chart
261:19
check
11:20 29:21,23
265:16
chief
196:22
child
289:23
children
13:20 19:14 21:7,25
65:2,4 97:5 151:7
298:5,9
choice
54:19 226:18,18
287:21
choices
52:3
choir
49:12
choose
254:17 261:10
286:23
choosing
185:12 203:25

chose
111:24 138:8 184:21
189:20 190:13
197:13 271:25
287:23 288:4 292:6
chosen
288:5
Christ
49:6 142:13 182:6,10
196:20
Christa
120:24
Christian
21:9 200:7
Christmas
89:10
church
15:22 19:5,25 24:11
24:21 25:12 26:19
27:2,5,17,20 28:20
29:8,14,24 36:4
37:21 42:9 46:4
47:14 48:9 49:8,22
50:4 52:4,10 53:3
63:19 67:24 68:4,14
68:24 69:8 71:21
74:13,16,19,22,25
75:9,17 76:6,16
78:9,10 79:10 84:4
85:5,6 93:16 107:19
108:1 110:14
119:12 121:10,14
121:16,23 122:1,19
158:17,25 171:8
187:12,19 192:8
193:23 195:3,4
199:14 201:20
211:16 248:25
299:19,19,23
churches
24:17 30:10 47:11
93:17 117:7 124:5
161:15 177:2
184:13 213:2,5
church-going
42:6

circle
77:20 112:2
circled
56:4
circumstances
158:24 182:23
225:17
cities
21:10
city
17:12,17 47:5,7
48:14,25 49:19,23
50:10,12 51:7,8,20
51:22 52:2,13 53:5
civic
43:11
Civil
304:6
claim
167:5 204:17,18,19
206:1,24 207:1,12
236:3 253:8,11,19
255:3 258:15
285:25
claimed
170:17 237:6 256:9
claiming
260:21 263:24
claims
204:23 206:7,8,24
233:20 234:13
236:2 255:15 260:5
260:20 294:20
clarification
11:10 72:8
clarified
11:9 241:15
clarify
170:7 223:12 256:22
260:1
clarifying
57:20 267:9
clarity
94:20 106:21 236:24
237:11,25 239:14
244:11,25

**class**
200:2
**clean**
55:21 103:6 155:14
**cleaned**
231:10
**cleanses**
119:13
**clear**
31:4,13 33:17 42:2
45:16 48:4 57:16
58:25 59:9,12 61:21
63:24 83:7 97:14
108:18 121:9
124:16 163:14
182:17 206:3
219:16 223:4 245:3
272:5 274:7 280:23
280:23 298:17
**clearly**
34:20 63:12 268:16
270:4 275:5
**click**
291:17 295:3
**client**
32:24 33:1 105:21
131:11 132:12,21
132:21 135:6
174:11 275:11
282:20 283:21
288:9 289:9
**clients**
283:14
**clinical**
189:6
**Clinton**
57:10 58:19
**CLO**
296:24
**clock**
54:21 108:19
**close**
74:20 87:16 187:9
189:16 206:16
258:20
**closer**

**66:3** 70:7 215:9
216:2
**closets**
88:22
**clothing**
79:4
**clubs**
43:11
**Coast**
128:6,12
**cognizant**
62:21
**cold**
257:22
**colleague**
222:23 250:17,23
251:17
**colleagues**
11:18
**collect**
95:12
**collection**
238:22
**College**
25:8
**Collins**
264:5,16 265:3,20,23
**Collura**
275:2 276:6
**colon**
252:3
**come**
10:12 22:17 23:7
25:17 33:14 36:5
37:7 38:14 39:24
42:25 46:11 53:10
55:21,24 60:9 64:25
65:4,5,17 66:3
81:23 82:8,23 83:8
92:24 103:6 119:22
122:12,16 124:2,14
147:2 175:6 176:11
199:10 200:2 203:3
203:16 212:12,14
212:17 215:9
221:15 234:21

268:20 271:24
281:24 297:24,25
**comes**
21:12 52:4 67:8
154:22 163:7 181:6
244:9
**comfortable**
65:20
**coming**
64:5,15 75:8 82:13
83:18 84:2 90:24
93:15 136:15
143:12 153:4
213:10 279:9
**commence**
286:23
**comment**
33:7 188:23,24
**commentary**
96:15
**comments**
44:12 81:17 83:10
128:16 167:9
**commission**
40:17,23 305:25
**commissioned**
186:3
**commit**
57:10 58:20 119:18
**commitment**
299:20
**committed**
56:16 58:7 60:17
63:2 112:15 119:17
199:11
**committee**
1:7 3:2 8:2,5,8,24
29:20 43:23 44:13
44:19 105:21 111:5
111:8,9 112:16,20
113:17 114:11
116:10 131:5 133:7
133:8,14 136:10
184:21 186:2
198:17 207:4 208:5
210:8 211:25

212:11 221:4
222:16 273:22
**committing**
59:25
**common**
224:13
**communicate**
287:2
**communicated**
248:8,13
**communicating**
274:13
**communication**
244:6,13 249:5
274:12,18
**communications**
67:14 116:16 237:16
241:20 242:1,17
248:1,5 249:3,6
273:20,23,25 274:4
274:9,19 286:16
288:20
**community**
18:6
**company**
96:18 197:10 266:18
288:14
**compared**
120:10
**compensate**
86:12
**compensation**
71:22 72:4 73:3,25
74:15 75:15 77:5,17
198:3
**compensatory**
263:8
**complain**
284:6
**complaint**
5:15 12:16 14:14
63:12 110:8 202:23
203:3 207:17,20
208:11 209:22
248:3,14 253:7
289:7 292:3,5,13

MAGNA◆
LEGAL SERVICES

**complaints**
282:13,15
**complete**
10:7 50:18 127:20
**completed**
50:6 303:13
**completely**
33:13 62:20 216:20
**completing**
191:23
**component**
263:9
**compromising**
189:17
**computer**
15:20,23 16:8,9,10
104:8 148:2,3
239:15 244:1
**concern**
82:2
**concerned**
175:20
**concerning**
248:1
**concerns**
39:25
**concert**
21:16 198:16 221:2,3
**concluded**
300:13
**conclusion**
180:4,5 285:22
**condition**
204:12
**condo**
63:25 64:14,15 81:3
106:25 142:2,9
164:7,11 165:10,11
166:17 179:17
189:19 190:4,14
193:1 213:25
214:16
**conduct**
127:5
**conducted**
282:14

**conference**
13:19,19,20 22:13
23:5 38:12,19,21,23
45:22 53:14 92:7,8
105:15 110:14
125:14,16,25
**conferences**
22:11,12,13,24 23:1
23:3,9,25 42:14
46:3,12 54:7 86:13
88:25 89:1,9,16
90:15,18 91:8 97:20
98:22,24
**conferring**
132:19
**confess**
79:23 120:12 194:14
**confessed**
107:4 143:21 191:3
194:16 287:14
**confession**
106:12 107:7 118:24
193:23 194:5,18
**confidence**
39:25
**confident**
28:22 102:4 106:10
126:9 229:11
265:10
**confined**
247:1
**confirm**
71:19
**conflict**
47:14
**confronted**
138:21 297:14
**confuse**
234:6
**confused**
63:10
**confusing**
157:21 172:2 173:1
**confusion**
31:11 231:4
**congratulation**

41:16
**congregation**
81:21 188:1
**connection**
17:9 86:24 88:23
90:17 92:9 95:25
96:23 106:23 127:6
233:20 234:3
235:19 253:18
255:2 298:20
**conscience**
54:10,11,12,18,20
**conscious**
54:25
**consensual**
45:15 124:13,14
138:17 143:11
144:17 148:16,18
150:16 152:2
188:10 190:18
193:7 217:13
218:11 270:6,23
275:11 279:22
**consent**
135:4
**consenting**
217:16
**conservative**
38:6
**consider**
59:19
**considered**
27:17 38:5 45:4
**considering**
108:5
**consistent**
271:12
**constant**
201:10
**constantly**
99:1 100:23 220:22
**constituted**
193:7
**consummate**
144:21 172:21 173:8
173:14,18 174:6

175:10
**contact**
139:6,13,23 140:7
141:11,20 142:16
143:1,2,19,20
144:16 147:11
162:4 164:17
165:17 166:13,14
169:8 170:25
171:24 172:1
176:15 179:16
247:4 268:6,13
271:13
**contacted**
115:16 162:16 169:5
268:14 301:8
**content**
108:25
**contents**
114:7 116:5
**context**
45:11,14 63:16 122:3
138:1,15 139:18
140:8 141:12,21
143:13,18 145:11
145:13,16,17
147:14 148:14
149:16,18,22
159:24 163:6
164:20 166:22
167:5,20 168:2,5,6
174:17 175:11
203:19 278:4
**contextual**
147:20
**contextualized**
175:6
**continual**
279:6
**continue**
11:15 32:5 36:1 59:5
61:25 68:3 79:19
93:2 138:5 182:11
254:9 257:2 262:19
**continued**
3:1 5:1 6:1 56:16

MAGNA
LEGAL SERVICES

58:7 61:4 65:9,10
66:22 75:24 123:22
129:25 143:25
221:9
**continuing**
146:15 147:21 170:4
244:21 266:23
**contract**
301:10,12
**contractor**
154:23
**contractors**
84:17
**contrary**
62:17
**contributed**
27:21
**control**
116:5 136:11 177:11
**controlled**
78:25
**controlling**
31:18,25 176:25
177:9,10
**convention**
1:6,8 2:8 3:2 7:8 8:3
8:6,9 29:2 36:14,20
39:11 40:14 41:19
42:4 82:10 88:21
110:6 112:7 116:9
117:3 136:11
138:20 143:22
148:23 149:2,4,10
154:22 177:13
184:8 199:13 207:4
207:13 208:4 210:9
211:9,11,15,20,21
212:12,25 213:2
229:4 295:13
**conventions**
42:13,15,22 44:18
98:25
**conversation**
10:22 149:17,24
150:7 166:25,25
189:19 204:5

206:18 214:24
217:22 220:20
248:23 249:16
270:17 271:16
288:25 289:2
290:23 299:10
**conversations**
12:18 83:15 133:2
149:20 241:23
242:5,16 250:1
270:7
**converted**
161:11
**convey**
187:25 189:12
**conveyed**
168:16
**convicted**
287:13
**conviction**
55:1 66:14 190:3
**convinced**
50:13
**cooperate**
31:9
**cooperation**
113:18 114:11
**cooperative**
211:23 212:13,17,23
**copies**
55:15 244:3 259:8
303:9
**copy**
73:23 86:16 182:14
**core**
55:2
**correct**
9:2,3 13:4,22 18:12
22:22 24:2 26:19
27:22 30:16,25 32:9
37:2 39:16 47:3
48:18,22,23 53:6
56:12 61:14,15,19
63:7 68:22,23 69:6
69:9 72:7,22 74:14
74:23 75:4 76:3,18

76:25 90:25 98:13
98:14 100:6 101:13
106:6 110:21 112:8
112:13 113:6,11
114:12,19,20 115:9
120:18 121:10,25
125:12 126:4 128:1
136:22 148:16,17
158:2,7 164:13
165:3 167:7 170:11
170:16 177:20
178:5,6,8 189:2
190:16,20 191:1,4,5
192:3 194:21 195:1
196:15 199:1,2
200:7 201:24,25
202:2 206:5 212:3
219:19,19 223:6,7
231:1,2 232:6 233:8
233:10 235:20,23
235:24 237:20
240:3 241:16
246:14,19 247:8,9
248:10,14,15 249:7
253:9 254:3 260:10
261:8,10,16,17,25
262:3,6 266:1
267:18,19 268:9,25
270:10,18,18,24,25
271:25 272:1,11,12
273:1,18 275:7,8,12
276:2 277:19 278:3
279:12,14,15
280:12,19 284:18
285:6,20 286:2,6
**corrected**
62:16
**corrections**
303:4 304:9
**correctly**
159:17 189:10
**corroborated**
179:14
**corroborating**
129:13
**cost**

192:11 199:7,10,14
**couch**
65:23,24,25 214:16
214:25 215:12,16
**Council**
301:3
**counsel**
2:1 7:19 31:2 32:1
56:8,17 57:18 60:10
62:13 63:18 68:5
94:5 105:20,20
109:11,12 127:3,5
131:20 132:23
133:6,11,13 139:8
171:17 202:24
230:23 251:2,4
254:3 255:7 273:19
273:22 281:7 287:6
288:7 290:4 297:4
301:13
**counseled**
60:8
**counseling**
80:7,8,9 107:3 108:4
108:9 109:8 118:19
118:20 121:7
123:20 170:19
199:21 209:7
232:16 233:2,3
**counselor**
80:1 169:6 191:19
249:8,8
**counselors**
50:5 53:11,11
**counter**
118:8 144:4
**counting**
84:22 154:25 288:11
**countries**
86:10
**country**
86:12 93:15 282:2
**COUNTY**
302:4
**couple**
48:3 89:20 100:19

MAGNA
LEGAL SERVICES

103:14 104:1
117:20 161:10
169:14 170:10,18
178:13 181:3 217:6
235:8 237:18,24
251:8
**courage**
184:11 186:10
**course**
29:15 35:8,15 37:17
82:16 137:21
182:12 217:25
254:15 258:1 283:5
**court**
1:1 7:9,17,20 9:21
31:8,21 57:24 58:16
73:21 133:15
135:13 176:9 221:7
224:14 254:4 255:9
261:3 282:1 283:13
283:17 290:17,17
297:9 301:1,3,5,8
301:21 302:6
303:12,15
**courtesy**
224:22
**courtroom**
153:6
**courts**
104:7 255:22
**Court's**
31:4,17
**covenant**
106:25
**cover**
9:17 156:15 251:7,7
297:2 301:14
**coverage**
95:16
**covered**
46:12 195:12 223:25
**Covid**
18:3
**co-counsel**
9:4
**CPA**

260:22
**create**
47:1 110:20 111:3
176:7
**created**
98:4 175:25
**creates**
33:12 34:15
**creation**
52:7
**credentials**
111:8,9 211:25
**credibility**
180:18
**credible**
179:13,15,19 180:9
180:22 186:4,21,25
227:17,19,22
228:24 269:17,24
**credibly**
287:11
**cried**
118:23
**cross**
59:24 118:12 120:15
201:11
**crossed**
54:24 118:10 120:11
194:14 226:6
**crying**
63:17
**crystal**
63:24 280:23
**culture**
93:7
**Cummings**
1:17 3:3,8 7:14 8:1
301:8
**curious**
238:15
**current**
22:7 68:8 88:23
90:17 200:18
232:12 234:1,12
**currently**
17:11 22:4 85:2

87:20 232:15 233:6
236:21
**cursed**
201:16
**customary**
301:15
**cut**
72:17 223:24
**C.A**
1:5

---

**D**

**D**
2:2
**dad**
19:11
**daily**
231:16
**Dallas**
3:10 299:23
**damage**
18:6 118:2 161:7
204:17,18,19,22
262:16 263:9
**damages**
6:5 34:20 204:11
206:24 207:1 212:2
212:18 253:13,17
253:18 254:25
255:1,15,17 259:3,8
260:5,7,22 261:12
**Danny**
41:1
**dark**
137:12 160:11
191:25
**dash**
238:22
**data**
105:13
**database**
39:14
**date**
7:11 9:8 10:11 36:9
81:12 127:25 148:3
181:20 183:22

251:9 276:1 303:2
**dated**
185:22 238:11
240:11 250:16
**dates**
16:16 130:8 203:17
246:24
**dating**
15:21
**daughter**
19:24,25 20:11 21:8
21:23 87:12,14
91:20
**daughters**
19:15,23
**daughter's**
96:2 219:22
**David**
54:9 60:14,14 119:15
194:1 201:14
**day**
17:7 29:7 37:11 40:7
40:8 66:9,18 86:25
87:5,24,25 88:5,14
92:7 98:23 101:6,11
104:3 107:2 108:14
109:1,8 110:4
116:19 118:15,17
123:16,17 130:10
144:1,8,8 151:16
152:18 163:23
164:2 165:1,24,24
168:24,24 175:8
190:12 192:22
216:10 218:13
233:23 268:18,18
276:5 279:25
280:25 297:6,10,23
298:3,22 302:17
305:21
**days**
20:8 21:2 23:21
35:21 80:6 98:22
101:24 103:25
113:25,25 138:21
192:12 196:6 199:8

210:22 249:13
269:4 271:22 272:2
272:3,3,4,7,8
**dead**
124:21
**deal**
31:5 46:14 47:13
54:19 67:24 118:18
118:21 188:6
265:19 266:24,24
267:4
**dealing**
44:20 47:15 85:20
121:5 146:11
153:14
**deals**
52:3 156:16 263:25
266:8
**dealt**
53:24 54:12 68:15
109:1 119:10
122:17 188:8,10
195:7 266:11
**Deanna**
19:17,19,21 20:11
21:15
**Deanna's**
21:23
**Dear**
5:10,12 185:17
188:12
**death**
201:21
**December**
26:22 238:11
**decide**
151:10 203:10
**decided**
100:20 281:23
**decision**
31:17 48:10 51:5
170:20 180:7
203:16 211:24
225:9 242:8,9,11
299:11
**decisions**

29:20 288:10
**decline**
263:2
**dedesignate**
282:1
**dedicate**
182:11
**deem**
67:1
**deep**
55:1 60:19 66:14
189:6
**deeply**
118:2 184:10 185:25
186:10 187:3
**defamation**
285:25 286:11
**defend**
203:21 299:9
**defendant**
2:8 3:2 8:1 222:23
292:7
**defendants**
1:9 4:10 5:3 6:3
71:12,13,24 72:23
73:5,18 74:4 75:10
76:13 77:1 126:18
126:22 153:23
156:21 157:1
181:16 183:24,25
185:17 188:12,16
207:20 208:12
238:2 240:6,10
245:6 250:9 259:2
284:24 290:2
291:10
**defended**
203:22
**defense**
221:11
**deficit**
281:13
**define**
44:23 56:17 57:5,13
58:8,23 81:2 149:8
**defined**

56:23,25 57:4
**definitely**
27:20 28:16 45:14
**definition**
41:12 45:8,10,18
57:2,16 58:25 59:3
59:4,7,9,10,11
60:23
**definitions**
57:21
**degree**
25:7,9 177:16
**degrees**
25:6 177:12
**delay**
223:20
**delete**
231:8,14,17 234:14
240:2 242:18 243:4
**deleted**
235:6 242:23,25
243:2
**deleting**
234:11,19 237:22
**delighted**
141:17
**demanding**
105:7
**demeanor**
129:14,18
**denial**
172:25 173:2 278:4
**denied**
37:9 44:10 66:9
105:11 117:21,23
144:25 145:12
147:10 167:9
172:20 173:4,7,20
174:5 177:3 193:8
201:15 278:1
**Denies**
5:7 181:17
**denim**
214:13
**denomination**
40:16 220:21

**denominations**
41:8
**deny**
138:18 173:5,5
182:23 193:9 278:2
**denying**
141:15 167:5 179:15
**Depending**
24:21
**Depends**
266:3
**deponent**
303:1,4,5,6,12
**deponent's**
303:4
**deposed**
9:14 176:8
**deposition**
1:12 4:2 7:1,6,12
10:8 12:14 13:13,15
14:6 31:24 32:23
67:19 117:24
122:22 133:10
135:11,20 136:1
191:8 200:20 254:9
262:18 301:9,10,14
302:9,10 303:3
304:8
**depositions**
101:22 104:1 130:9
157:12 210:4
**depressing**
191:25
**depression**
189:7
**derive**
88:13 90:14 95:10
264:18
**describe**
40:4 68:18 215:14
**described**
57:25 165:5 192:22
193:14 225:20
284:16 297:3
**description**
4:9 5:2 6:2 193:2

deserved
191:14 293:23
designated
126:21
designation
31:16 136:12
desire
287:7 304:7
desktop
244:1
despair
189:6
Despite
202:17
detail
114:13 146:14 191:3
206:15 214:23
225:22 230:21
244:13
detailed
118:8 184:16
details
117:4 123:8 184:9,25
185:13 191:7,7,11
193:1 209:1 221:6
226:11 268:6
279:14 287:3
296:10,13
detector
273:9
determination
235:3
determined
29:19 101:21 242:1
253:21 255:5,19
device
233:17
devotion
264:22
devotions
264:6 265:25
diagnosis
258:15
die
109:4
died

37:10 107:2 124:1
189:9
difference
34:9 43:25 153:10
different
9:10 10:14 37:14
53:25 86:10,22
93:11,12,18 103:17
104:17 109:16
124:12 127:8
191:10 197:16
200:12 223:18
224:7 230:17
235:23 256:6
261:11 283:8
differential
83:7
differently
55:4 108:22
difficult
47:10 196:11
difficulties
36:4 246:16
difficulty
21:1
dinner
36:5 79:11 144:12
284:10
dinners
79:12,13
direct
100:8 192:8
directed
170:17 276:6
direction
246:12
directly
115:16 124:17
176:24 212:17
disagree
114:17 185:8 186:14
186:18 200:25
225:12 283:16
disappointment
196:17
discernment

184:14
disclose
273:20
disclosed
209:6
disclosing
67:13
disclosure
301:1,4
discount
301:16
discoveries
229:8
discovery
14:17,22 15:14,18
71:16 134:8,23
204:10 292:4
discretion
24:23 260:25
discretionary
78:4,8,14 79:1
discuss
132:22
discussed
223:13 230:20
232:17 271:18
296:10,13,24
discussing
81:19 258:4
discussion
31:13 39:13 51:12
131:24,25 132:2,6
discussions
23:8 39:19 203:18
dispute
83:9 254:6 285:18
disputed
209:2
disqualified
301:6
distinctly
215:3
distinguish
34:8
distinguishing
261:5

distraction
54:1
distress
253:9,19 255:3,18
256:8
District
1:1,2 7:9,9
disturbing
184:11
divided
121:11
division
1:3 7:10 28:22
doctor
258:6,12,13,14
doctors
256:7
document
32:2 72:2 94:4
126:19 127:9,16
129:1 131:1,6,18,21
132:20,24 133:16
133:18,24 135:14
135:17,19,24 136:4
136:9 139:4 154:2
157:17 188:17,25
207:22 208:10
237:7,9 244:21
245:14,18 253:5,23
253:23 254:2,5,5,7
254:17 255:8,9,9
259:19,20 260:6,8
260:20,21 261:7,19
263:6 265:3 276:11
283:5,6,10 289:8
292:17
documentation
74:7
documented
228:1
documents
14:19 15:6,8 70:10
93:23 198:10 208:7
210:7 223:12 239:1
251:2,25 252:10
255:7 265:14

MAGNA
LEGAL SERVICES

282:19 283:3,20,22
288:13 291:24
**Doe**
30:21,22 31:14,16,22
32:4,6 33:5,9,18
34:2,6,15 35:3
63:13,25 64:11 82:8
118:10 121:6
124:18 137:19
139:6,14 140:7
141:11,20,24 142:2
142:16 143:2
146:14 147:11
155:18 161:21
162:4 164:6,17,24
165:5,16 166:7,13
166:20 167:16
168:9,10 169:2,7,14
170:13,18,24
175:20 176:11,25
178:14,25 179:17
197:20 198:2
213:14 214:4
221:12 247:15
248:6 267:17
269:25 275:11,19
277:7,11,12,17
279:9,22 280:10,17
284:21,23 285:16
286:5,7,11,12,24
288:24
**Doe's**
32:8,12,22 33:6 35:7
121:15,23 160:22
167:10 169:7,9
176:14 209:12
248:7 285:5 288:20
289:1
**doing**
23:12 24:13 29:6
33:8 43:7 59:16
75:8 76:6 91:8
92:17 110:9 115:12
117:6 119:16
132:18 167:22,23
185:14 193:24

210:18,19 217:15
219:9 230:3 250:2
280:24 283:9 287:8
**dollars**
212:13,17 260:7,10
**Donna**
100:18
**door**
81:3 124:14 140:10
163:24 164:1,7,11
167:17
**doubt**
143:4 163:13
**doubted**
178:19
**dove**
103:17 167:4
**Dr**
37:10 99:18 106:5,22
106:24 128:20
129:8,14 151:10
152:20,21 157:24
158:16,24 159:17
160:8,10,21 161:9
161:21 163:2 164:6
165:9 171:20
176:10 178:24
179:5,15,19 180:22
185:9 226:5,13
228:14
**drafted**
167:6
**drafts**
197:16 280:16
281:25 284:18,22
**dramatically**
29:25
**Draper**
25:16
**draw**
22:10 92:21
**drawing**
69:7 177:8
**drawn**
80:21
**dream**

46:7 52:9,10
**dreams**
52:11
**drew**
162:19
**dropped**
102:21
**drove**
109:2 297:13
**drug**
257:15
**duck**
138:24
**due**
186:7 228:2 303:2
**duly**
8:16 302:9
**duties**
98:18

---

**E**

**E**
2:4 302:1,1
**eager**
14:8 33:1
**earlier**
10:13 20:22 36:10
61:2 63:16 87:13
108:18 128:10
152:19 182:14
209:11 214:15
215:18,24 223:5,13
225:5,15 226:3
227:8 260:2 263:24
267:8,13 268:3
289:7 296:20
**early**
20:8 220:19
**earning**
24:6
**earnings**
261:6
**East**
3:14
**Eastern**
128:3,5

**easy**
120:2 218:7
**EC**
44:21 108:16 110:22
110:23 111:17,19
204:19 211:7
295:13
**Ed**
117:9 146:9
**Eddie**
89:22
**Edmund**
25:18 26:1
**educational**
25:6
**effect**
271:9
**effective**
184:19
**efficient**
59:18
**effort**
9:18
**efforts**
237:4,10
**egregious**
184:10
**eight**
43:17 109:8 123:18
299:24
**either**
19:23 92:23 110:2
124:22 125:22,22
127:8 211:8 229:10
246:10 252:8,20
253:3 267:25
**elaborate**
54:23
**elected**
36:11 39:3 40:7
41:11 43:7
**electing**
38:17
**electronically**
243:25 303:5
**element**

147:19
**Eleven**
154:3
**eleventh**
127:15
**elicited**
273:23
**email**
15:16 232:19 239:16
240:23 296:11
298:17
**emails**
14:21 16:1 155:1
211:6 230:19 231:1
231:6,11,19,24
233:16,20,25 234:2
234:12,19,24 236:1
236:10 237:5 239:3
239:10 240:23
241:6 243:18
244:16,19 248:17
248:20 296:9,16,20
296:21
**embargo**
221:8 291:23
**embargoed**
198:18,21 221:4,11
288:14 290:9
**emeritus**
75:18,19 76:17,19
**emotion**
129:9,22 179:6
**emotional**
60:18 253:8,19 255:2
255:17 256:8,11
258:4,16
**emphasis**
197:6
**Empire**
97:4
**employ**
20:3
**employed**
22:4 77:25 99:3
**employee**
99:6 121:9,14

**employees**
67:25 68:10 84:15
87:20 88:2,17 91:17
91:21 186:5
**employment**
16:7 101:3 261:12
**encounter**
30:18,24 63:13 66:22
118:10 120:5 121:6
122:24 124:18
146:14 190:1,18
192:25 193:7
208:25 209:2,5,6,17
209:22,25 213:14
213:15,17 217:16
218:1 219:16 220:1
225:25 226:1
241:14 246:24,25
248:2,4,6 270:9
275:10,19 277:7,11
277:13,13,18
279:22 296:10,14
296:17 297:5,6
**encounters**
247:1
**encourage**
31:10 52:4 98:1
**encouraged**
37:18 117:11
**encourages**
65:4
**encouraging**
182:12 293:19
**ended**
141:23 142:1 172:14
190:1 208:24 209:5
277:6 280:17
**ends**
24:12
**enemies**
41:24
**engage**
119:24
**engaged**
48:17 67:25 205:10
**engagement**

111:7,18,25 112:1,15
112:23,23 113:21
**engagements**
23:23 43:11 89:14
91:5 199:12 261:13
**engaging**
40:1
**English**
250:16
**enhance**
97:25
**enjoyed**
201:2
**Enjoying**
217:17
**enter**
190:14 196:4
**entered**
165:10,11 189:5
304:8
**entertained**
43:19
**entertaining**
123:13
**entire**
30:12 72:18 109:23
109:24 116:24
149:8 156:14
179:25 182:16
197:7 278:5
**entirety**
207:18
**entities**
20:4 40:12 89:5
287:23
**entitled**
5:7 181:17 261:22
274:9
**entity**
29:5
**equally**
53:12
**equilibrium**
123:15
**era**
28:25

**Errata**
303:2,5,5,6,8,10,11
303:13 304:1
**especially**
47:10 86:12 100:25
186:3,8 204:23
206:12
**Esquire**
2:2,3,8,13,14,14,20
3:3,8,13
**estimate**
23:21
**estimated**
26:24
**estimates**
253:17 255:1,15
**estimation**
255:20
**et**
4:22 7:8 47:8 126:23
288:16,16
**ethic**
110:1
**ethical**
10:2
**Eubanks**
51:4
**evangelical**
124:4
**evangelism**
42:14 98:7,24 100:19
184:18
**event**
13:20 95:8,18 168:22
231:14,16
**events**
43:13 196:6 225:20
298:21
**eventually**
55:24 113:10
**everybody**
133:12 153:10
**evidence**
105:19 147:13 290:1
290:8,9 291:8
**evidently**

218:14
**evil**
194:2
**evolved**
20:19
**ex**
43:24 44:1
**exact**
65:7 251:9
**exactly**
20:15 36:22 39:5
48:21 60:3 82:1
107:24 109:12
112:21 113:16
124:19 138:25,25
146:3 178:22
189:14 193:21
216:3,21,24 225:21
241:18 276:3
280:13 286:9
**exaggeration**
13:16
**EXAMINATION**
4:5 8:19 222:18
296:6
**examined**
8:17
**examples**
48:7
**exceptions**
292:20
**excerpt**
157:7
**exchanges**
252:13,18
**excited**
64:6 100:3
**exclusive**
301:12
**excuse**
124:9 190:11
**excused**
83:15
**executive**
1:7 3:2 8:2,5,8,24
43:23 44:13,19

105:21 111:5
112:16,19 116:9
131:5 133:6,8,13
136:10 184:20
186:2 198:17 207:3
208:5 210:8 212:11
221:4 222:16
273:22 289:22
**exhibit**
4:10,12,13,14,15,16
4:17,18,19,20,21,23
5:3,4,6,9,10,12,15
5:16,18,20,23 6:3,4
69:11 71:12,13,20
71:24 72:1,20,23,25
73:5,7,18 74:4,6,12
75:10,13 76:13,15
77:1,4,10 126:18,22
127:10 134:14
153:22,23 156:21
157:1 181:16,20
183:24,25 185:3,17
185:21 188:12,17
191:6 207:19,20
226:24 238:2,9
240:5,6,10 245:6,10
250:9,13 259:2,13
259:18 272:18,20
**exhibits**
4:9 5:2 6:2,14 71:7
134:15 207:18
226:22,25 272:15
**existence**
52:22
**exists**
62:19
**expect**
200:10
**expected**
44:5
**expenditures**
86:15
**expense**
86:11
**experience**
27:8

**expert**
69:12 207:10
**Expires**
305:25
**explain**
135:13 264:20
294:22
**explained**
129:12 160:8 225:17
**explanation**
72:10 122:10 159:1
**explosive**
27:12 262:17
**exposed**
65:6 216:20 219:18
281:2
**exposure**
41:5,9 219:17
**express**
129:10,22 130:4
179:7
**expressed**
82:2 129:8 179:6
186:15 280:3
**expressing**
129:23 252:17
**extend**
123:10
**extended**
68:21 124:17 125:1
157:25
**extensive**
20:9
**extent**
62:20
**externally**
259:24
**extra**
55:15
**extramarital**
208:25 246:23 248:2
277:7
**Extreme**
88:25 89:1,9,16
90:15 91:8
**extremely**

28:6 213:24
**eyes**
71:18 126:20 198:6
281:1 282:19
**Ezell**
5:11 99:18 100:1
106:5,22,24 109:17
110:7 151:10
152:21 184:6 185:9
185:18 225:5,9,23
226:5,13 228:14
248:20
**Ezell's**
152:20

_____
F
_____
**F**
302:1
**fabricated**
103:23 164:3
**face**
36:20 40:20 109:1
142:13 176:9
**facing**
280:23 298:7
**fact**
63:6 92:21 97:1
117:23 124:10
147:12 178:24
193:2 199:22
209:14 216:6
220:20 221:1
270:22 271:15
275:19 285:14
291:14
**facts**
143:18
**factual**
246:9,12
**failing**
47:23
**failings**
99:10
**failure**
47:8
**fair**

27:22 34:13 41:4
120:5 127:19 180:9
180:25 204:25
210:19 223:15,16
224:22 225:1 256:5
273:16 280:2,5,6
285:14 288:3
293:22 297:2

**fairly**
126:9

**faith**
192:11

**faithful**
40:18 196:19 202:1

**fall**
68:10 120:18 148:22
192:1

**fallen**
47:2 63:18

**falling**
48:20

**false**
22:14 63:3,4,5 80:10
89:2,12 90:2 97:1
138:6,15 140:3,8
141:13,22 145:15
148:14 193:16
195:5 286:1,3

**falsely**
185:14

**falsification**
18:5

**falsified**
186:20 213:4

**familiar**
35:16 188:17 245:14

**familiarization**
24:9

**families**
49:18 184:13

**family**
5:10 13:18 22:16
25:23 49:2 66:16
79:11 85:15,17 97:5
140:17 185:1,18
192:12 197:10

**far**
17:17 19:5 88:12
156:8 177:14
191:13 235:11
236:21,23 260:23

**fault**
294:18

**favor**
38:10,11

**Favored**
91:7

**FBC**
250:24

**fear**
138:19

**fearful**
146:7

**fears**
55:23

**February**
17:25 18:9 104:19

**Federal**
304:6

**fee**
23:6 24:15,16,24

**feel**
31:7 41:20 50:7 51:6
62:6 65:20 80:22
82:6 108:11 124:21
152:8,10 168:2
169:24 189:8
192:15 195:18
203:19 244:7
257:14,14,16
268:22 269:15
285:15

**feeling**
81:11 190:2 257:18
257:21

**feelings**
60:20 116:23

**fees**
24:6 204:7 205:7,16
206:3

**feet**
65:14

**fellowship**
201:19

**felon**
287:10

**felt**
37:13 46:6 81:16
84:3,4,6 155:20
176:12 189:8
191:25 239:12
242:23 247:18
268:15,17 271:7
280:20 284:17
291:11 299:4

**Ferrill**
1:22 7:18 301:20
302:6,20

**fifth**
127:14

**Fifty-three**
19:1

**figure**
212:5 233:24

**figured**
290:15

**file**
31:8 239:13,14,19
243:24 262:1 303:9

**filed**
7:8 197:20 208:14
262:2,14 292:2
303:11

**files**
234:25 243:22

**filing**
239:2 240:22 283:13
292:4,12

**fill**
99:2,8 303:5,5

**final**
157:11,14 159:25
167:8 172:5 174:21
179:4 180:21
259:23

**finally**
115:22 135:22
143:14 196:9

251:24,24

**finances**
97:25 204:13

**financial**
19:22 20:2 71:16
77:21 90:14 204:12
301:16

**Finch**
273:2 274:5,19

**find**
55:25 106:18 137:10
148:2 154:23
162:20 163:4,18
179:19 180:9,22
195:8 200:8 203:23
211:6 217:24 237:3
237:10 284:8

**finding**
106:17 162:16
197:15

**findings**
113:9,22 114:6
116:13 186:1,16
258:19

**fine**
11:1 55:19 65:19
70:11,14 230:15
262:23 263:5
265:11 266:14
271:5 285:4 292:25
295:11,16

**finest**
41:15

**finish**
33:7 40:8 64:11
70:23 71:2 132:9,11
155:12 224:13,17
224:25 229:14,24
256:24,25 257:8,12
269:12 293:3

**finished**
45:23 113:24 140:20
257:3,4,7 259:18
293:5 300:8

**firm**
7:15 8:11 13:5,7

235:22,23 238:12
273:2 274:5,6,19
275:6
**firms**
244:5
**first**
5:12,21 9:20 15:22
26:18,22 27:10
35:23 36:11 66:18
71:21 72:3 73:2
74:8,13 75:13 76:16
77:25 89:7 90:25
94:13 107:16
109:24 114:18,23
115:14,15 117:20
118:9 120:16
121:14,20 125:1
127:14 131:20
136:17 149:13
157:23,24 158:4,6
158:14,15 159:13
160:23 162:11,14
165:19 173:2
179:21 185:2,25
187:7,15 188:13
193:25 196:18,22
205:10 208:10,18
212:6 218:13 227:7
227:8,12 228:10,18
231:4 235:18 245:7
245:12 252:3
274:22 276:13,25
279:16,21 289:19
291:5 296:9 297:11
297:23
**fishing**
123:8
**fit**
24:17 197:14,18
**fitting**
197:18
**five**
23:17 37:8,18 86:4,5
187:2 213:22
295:17
**fix**

273:8
**fled**
190:3
**flew**
13:19,24
**flight**
151:11
**flip**
154:7 161:18
**flipped**
77:9
**flirting**
299:4
**Floor**
1:19 2:16 303:17
**Florida**
18:21 45:13 198:1
211:19,21
**flow**
88:16
**flown**
168:23
**flows**
86:18,21
**Floyd**
41:2 117:12
**flu**
257:22
**fluctuated**
29:25 78:24
**flush**
78:11
**fly**
14:1
**focus**
33:17 53:4 289:21
297:6
**focused**
45:20 53:9 120:17
**folder**
244:1
**follow**
59:16 103:14 169:17
173:9 237:1 267:11
**followed**
298:14

**following**
30:2 57:19 128:15
151:9,17 160:13
165:24 184:3,5
187:6 248:9 283:17
297:10 299:19
301:3 304:5
**follows**
8:18 58:4 205:5
254:23
**follow-up**
58:1 103:15 125:18
227:6 264:11
271:17,19 296:5
298:20
**fondle**
64:3,4
**fondled**
66:12 166:20 216:25
**fondling**
209:4,18,24 217:10
219:17 226:4 247:3
277:14
**force**
34:4 109:23 110:20
111:3 114:3,3 184:4
184:7,22 206:14
277:11
**forced**
47:14
**forehead**
63:15 209:21 210:2
**foremost**
193:25 212:6
**forensic**
207:9 235:10 260:22
**forever**
191:22
**forget**
146:22
**forgetfulness**
65:11 219:6
**forgetting**
295:6
**forgive**
129:2 194:13,19

195:15 199:20
201:13 299:16
**forgiven**
119:19,21 200:4
**forgiveness**
108:10 119:11,18
120:14 191:18,24
194:7,16 195:2,4,19
200:2 202:7,10,12
209:8
**forgives**
119:13
**forgiving**
89:15
**forgot**
230:2
**forgotten**
284:2
**form**
42:11 43:1 62:15
68:11 80:14 83:11
101:9 113:15 133:3
138:11 146:4
185:22 204:8
210:10 220:15
247:4 260:14,17
270:11 271:3
284:25 285:7,21
286:13 304:7,9
**formal**
30:14 99:24 258:15
**formed**
84:8 156:8
**former**
68:10 186:5 187:12
212:24
**formulated**
104:23
**fornication**
61:1 67:2
**forth**
182:24 213:13
217:21 246:24
302:9
**forthcoming**
193:16

**MAGNA**
LEGAL SERVICES

**Forty-eight**
138:22 268:8,10,11
272:3
**forward**
104:19 133:10
138:19 184:12
187:4 199:21 236:9
243:19 244:4
252:15 286:10
296:21 303:9
**found**
16:16 108:9 117:19
149:1,1,2 179:12
235:15 236:25
255:22 285:17
**foundation**
68:12 83:12 128:25
271:4
**founded**
182:21
**foundling**
63:14
**four**
21:21 47:12 68:9
86:10 94:21 98:22
131:9 139:4 177:16
250:8
**fourth**
139:9 174:5
**four-day**
95:18
**framed**
138:14 145:13
146:16,18
**framework**
147:4
**frankly**
230:2 282:15
**free**
88:22 110:13 183:2
254:10,13,15
**freeze**
213:2
**fresh**
110:4 230:1
**Friday**

184:15
**friend**
43:18 117:10 145:20
237:13
**friends**
22:17 41:25 43:8
100:6,7 117:22
118:2,5 153:4 204:2
204:4 206:16
226:14
**friendship**
187:9
**front**
139:4 144:2,5,11
157:17 167:21
168:3 187:4 208:19
226:25 263:18
289:15 298:8
**frowns**
217:19
**frustrated**
268:17
**frustration**
280:3 284:16
**full**
9:6 22:4 65:12 88:22
97:18 115:5 120:13
157:7 219:17 269:3
269:8
**fully**
62:20
**FULTON**
302:4
**fund**
69:25 78:4,14
**funds**
79:2 205:16,23,24
267:7
**furnish**
304:10
**further**
128:24 149:25
165:17 190:10
202:20 219:10
226:9 230:12 300:2
302:12

**G**

**GA**
1:20
**Gaines**
37:22
**Gardner-Webb**
25:8
**gathering**
23:5
**Gatlinburg**
22:22
**gbesen@bradley.c...**
3:11
**gcallas@jacksonke...**
3:16
**Gene**
3:8 8:4 131:8 174:8
284:14
**general**
113:12 169:9 239:2
239:10 240:22
243:8 282:22 283:7
**generally**
283:21
**generated**
110:3
**generation**
109:14
**generic**
34:7
**generous**
20:1 29:23
**genesis**
105:1
**gentleman**
65:18 131:11
**Georgia**
7:14 18:17 45:13
84:13 299:24 301:3
301:5 302:2,7
**germane**
235:4,12 236:16
**getaways**
17:18
**getting**

11:16 50:25 95:21
105:3 110:13 165:1
167:2 177:16 196:1
210:21 244:5
**gift**
20:1
**gifted**
87:12
**gifting**
20:10
**Ginger**
85:3
**give**
10:7,14,22 11:1
40:14 43:15 48:6
50:10 61:11 62:7,12
62:14 79:7 84:5
94:16,19 103:11
104:8 116:17 119:5
133:12,14 144:6
156:24 229:19
234:24 254:5,6
259:5 263:17
272:16 279:13
281:24 285:14
293:6,10,12,14
**given**
47:13 66:19 72:9
104:23 118:24
144:18 145:17
196:5 198:9 211:2
211:22 230:15
268:15 277:23
278:2 286:7,15
287:2,4 292:15
293:24 301:16
302:11 304:8
**givers**
29:24
**gives**
55:20 119:13
**giving**
30:4 84:23 88:20
98:1,2 104:22
141:22 143:4
163:17 207:16

**MAGNA**
LEGAL SERVICES

212:22 279:2
**glad**
135:22
**glorious**
119:11
**glory**
184:15
**go**
9:18 10:20 11:21
21:6 24:10 26:10
30:2,2 33:20 42:20
46:24 52:18 53:7
54:4 61:2 63:1
64:10 66:7,10 70:12
71:5 72:16 77:10
89:19 94:7 97:13,18
103:12 104:12
118:15,19 121:6
125:3 130:18 131:1
131:17 135:2,7
137:23 144:10
148:3 152:10
162:10 171:9 174:2
189:20 190:10,23
197:13 201:8,23
202:20 203:23
204:25 205:2
206:15 213:11
214:22 215:13
216:11 217:5 223:8
226:11 239:13
253:1 265:15
269:13 286:10,19
287:15,24 289:12
290:4,20 297:15,17
**goal**
49:4 182:5 223:17
284:3
**God**
37:11 49:14 55:20
63:9 64:1 65:11
66:25 97:7 107:17
107:20,23 108:11
109:1,16 119:13,16
137:9 140:13
190:10 191:24

193:13,25 195:24
195:25 196:16
199:20 201:12,19
202:20 293:21
**Godly**
191:13 196:4
**God's**
52:1 53:23 119:10
120:13 184:15
186:23
**goes**
56:1 118:4 177:14
189:3,15
**going**
9:17 11:23 15:11
24:4 30:19,21 31:8
31:9 32:5,14,15,17
32:23 33:14,16,17
33:19,20 41:11 46:6
51:9 53:4 55:10
56:22 57:4 60:4
62:8,12,17 64:16
70:8,17 71:5,9,11
72:17 73:7 77:8
90:4 100:21 101:7,8
104:22 106:14,15
108:7 110:15 119:7
120:21 124:8,11,21
124:22 126:18
130:18,23,24,25
131:3,13,23 132:17
133:1,2,3,4,5,9
135:3 136:23
140:22 142:21
144:12 147:17
148:4,23 150:10,15
150:19 153:5
154:22 155:2,2
160:4,20 162:3
164:16,24 176:22
178:10 181:19
188:3 202:24 205:1
206:13 208:1,21
212:8 214:18 216:9
218:13,16 220:25
222:10 223:1,8,24

224:16,20 229:25
230:3,21 237:14
238:12 240:16
241:4 252:14
256:25 257:6
259:16 262:15,19
263:2,17,20 267:10
270:2 274:2 275:22
276:19,25 277:1
279:4 281:17 284:1
287:15 290:10,12
292:25 293:9,11,13
293:15,17 294:3
297:22 300:12
**Gold**
2:15 8:11,14
**good**
8:21,22 11:13,14
14:10 22:8 27:23
30:7 43:3,18 63:11
96:25 97:7,7 118:5
118:14 123:24
155:3 182:5 203:15
204:2 215:4 219:1
222:20,21 224:3,4
226:12,15 229:22
243:22 250:2
257:16,16,18 274:8
**goods**
79:2
**Goodwin**
89:23
**gosh**
28:13 203:17 249:12
**gospel**
119:12,20 201:20
**gotten**
109:3 124:20
**governor**
43:17
**governors**
43:19
**grace**
182:9 196:16
**gracious**
191:14

**graduated**
25:7
**grandchildren**
21:19,21
**granddaughter**
16:12 91:20
**grandson-in-law**
91:19
**grapevine**
197:24
**grateful**
97:6 120:13 149:7
186:10 202:20
**gravy**
41:12
**great**
40:7,8,17,23 50:5,5
52:11 119:11
146:13,16,16
206:14 224:4
246:21 264:14
277:5
**greater**
244:25
**greatest**
109:19
**greatly**
68:20 80:19 97:5
**Greear**
41:2
**Greece**
24:2
**Greetings**
303:3
**Gretchen**
3:13 8:7 34:25
**grew**
27:14
**grief**
101:10 109:19 186:5
**grieve**
107:2
**grieved**
186:1
**grieves**
187:3

**grievous**
190:11
**gripe**
280:14
**gripes**
280:8
**groom**
192:23 277:11
**grooming**
63:21
**ground**
9:17 120:1
**group**
24:8 35:13 37:23
44:17 53:12 89:8
196:3
**growing**
27:5
**growth**
27:8,9,12,22
**guess**
45:2 64:18 123:2
130:6 193:18
197:14 235:9 242:3
274:10
**guessing**
28:14 36:9 62:11,25
78:15 80:16 82:20
216:16
**Guidepost**
1:7 2:13 4:21 5:4,20
8:11,14 9:25 30:23
64:8 66:20 91:1
92:19 93:7 98:13
101:5,15,17 102:10
105:11,18 108:17
110:18 113:24
114:14,23 115:11
115:16 116:2,5,21
116:25 117:14
118:9,11,16 119:4,8
119:25 120:16
123:5 125:1,11,17
126:15,22 127:1,8
127:13 131:4,15
134:1 136:5 139:1

139:13,16 142:25
144:15 145:6,9
147:25 148:22
149:9 150:5,9,19
153:3,16 154:12
155:5,17,25 156:21
157:11,14 158:4,15
159:15,25 160:3,7
161:1,24 163:20
168:17 169:23
171:15 172:6,13
173:17,21 174:3,9
174:10,20 176:23
182:13,24 186:3
187:13 192:23
193:14 198:16
203:23 204:20
207:5 208:4 210:15
212:6,25 221:2
222:24 245:7,11
255:21 267:12
272:11 273:17
277:18,22 285:15
289:20 290:1,2
291:9,20 292:6,8,14
292:17,19 294:10
296:1 297:4
**Guidepost's**
141:10 149:12
157:15 180:4,5
276:13
**GuideStone**
22:9
**guilty**
255:22
**gun**
109:3
**guru**
26:2
**guy**
148:22 149:1
**guys**
135:7 186:24 222:8
284:10
**Gwen**
87:25

---

**H**

**habit**
231:9
**habitually**
201:11
**hac**
3:8,13
**Haggai**
25:18 26:1
**half**
13:10 167:21 213:1
**halfway**
161:21
**hallway**
9:1
**halter**
214:7 216:8
**hand**
55:17 63:20 64:1
71:11 73:23 129:11
174:22 253:22
302:17
**handed**
238:8 245:9
**handing**
259:12
**handle**
71:18 96:7 108:22
115:8
**handled**
55:3,5 112:20 178:20
187:18 194:25
280:5,21
**handles**
19:10
**handling**
19:9 233:24
**hands**
218:4
**happen**
10:18 81:8 83:3
141:14 162:23,24
162:24 193:3 278:8
298:11,21
**happened**

82:16 107:15 123:12
123:13 124:2
130:21 138:17
140:14 149:18
156:11 167:4
189:18 191:20
192:4 195:14
203:11,23 215:8
216:22 217:11
218:10 276:2 292:2
292:3 298:2,12,19
**happening**
23:4,10 166:1
**happens**
261:3
**happy**
11:8 131:24 132:1
**hard**
97:6 130:10 173:9
**harm**
256:8 258:4,16
**Harper**
264:5,16 265:2,20,23
**Harvest**
267:1,3,4
**hate**
152:23,23
**head**
10:24 49:9
**heads**
175:9
**healing**
68:6 108:9 184:8
**healthy**
49:17,18
**hear**
32:19 57:22 59:4
64:10 101:7 119:3
130:12 176:1,7,8
200:22 229:6
254:20 278:13,24
**heard**
8:23 41:10 52:23
122:7,7 130:9
137:24,25 143:23
152:17 182:19

MAGNA
LEGAL SERVICES

186:23,25 195:14
197:23 200:18
210:4 211:8 224:6
226:17
**hearing**
130:15 134:24
138:20 213:8 228:9
228:13 300:7
**heart**
53:18 55:2 56:2
59:21 108:13 109:5
109:6,9 120:3 138:7
182:17 186:8
**heartache**
106:13
**heaven**
25:19 52:6 186:23
271:20
**heavily**
97:9
**hectic**
14:3
**held**
131:21 132:24
**help**
9:18 10:20 20:2 36:3
37:7 40:22 45:23
47:20 48:11 49:17
50:24 51:6 60:9
63:9 66:13 84:7
97:10,17,22 98:20
117:8 119:22 163:4
163:18 169:9
191:18 207:8
264:14 272:19
299:22
**helped**
30:9,11 37:4 47:1
100:19,20 117:17
203:20 299:17
**helping**
47:15,16 51:17 97:10
97:11 220:23
**helps**
47:17
**hereinbefore**

302:9
**hereunto**
302:16
**Hey**
153:12 275:9
**hiding**
138:12
**high**
69:23 186:7 228:1
230:10
**higher**
200:6
**Highland**
211:17,18
**hint**
102:20 122:15
**hired**
153:5
**historically**
87:2 88:2
**history**
40:15 58:21 61:1
199:24 201:2
**hit**
18:16 124:5 264:23
265:1
**Hixson**
19:19 21:14
**Hixsons**
21:16
**hold**
49:8 56:7 82:22
110:25 128:19
149:19,19,19 161:1
229:13 252:22,25
279:4 281:18
**Hollie**
19:17,19,21 21:12,14
**Hollie's**
21:24
**Holske**
115:23 126:16
**home**
17:15 138:23 143:13
148:21 151:8,11,11
166:8 268:17

297:12 298:18
**honest**
102:22 141:16
**honor**
31:4 38:17,18 40:7
184:11
**honorarium**
92:3,5
**honorary**
90:16,20
**honoring**
79:9 282:21
**hoops**
199:25
**hope**
21:25 47:21 95:24
121:13 182:9
**hoped**
32:2 218:15
**hopefully**
9:18 65:17
**host**
95:17
**hot**
213:24
**hotel**
18:19
**hour**
11:4 12:22 13:10
70:9 104:4 202:25
283:12,19
**hourly**
205:9,12
**hours**
81:4 104:2,17,21
109:8 123:18 128:9
138:22,22,23
154:25 268:7,11,13
268:15 269:4
271:10 272:3
**house**
81:4 267:1,3,4
**housing**
72:21 73:11 74:2,21
75:24 76:24
**humility**

184:14
**hundred**
93:20 126:14 260:7,9
**hungry**
284:11,14
**Hunt**
1:3,13 4:3 5:7,13 7:2
7:6,7,23 8:15 9:7
12:4 19:11 22:2
28:9 30:17 31:13
32:6 42:25 56:9,14
56:24 57:25 58:5
70:21 71:19 80:11
83:25 84:1,2,18,24
85:22 86:14 94:8,11
95:7 96:19,22 97:4
97:15 103:3 105:9
105:16 106:3
110:10,17 118:7
119:19 125:9
126:25 127:21,22
129:8 131:7 136:14
139:3 140:22 145:6
146:12 148:8
154:10 156:16,20
157:2,24 158:16,24
159:17 160:8,10,21
161:9,21 163:2
164:6 165:9 171:20
175:19 176:10
178:24 179:5,15,19
180:22 181:17
182:22 184:17,24
185:22 187:2
188:13 196:23
197:11 200:5 203:9
205:21 206:4 208:3
211:7 213:11
221:12 222:14,20
229:24 238:8
240:14 245:9 248:6
250:15 251:20
252:5 253:7 257:10
259:16 263:19
265:21,22 267:5,6
272:19 273:15

275:2 280:2 284:15
288:19 289:15
291:3 293:13
295:25 302:8 303:1
305:20
**Hunt's**
128:20 129:14 182:1
**hurt**
45:1
**hurting**
195:10
**husband**
32:8,12,22 35:7 48:3
63:17 65:3,3 66:23
81:16 107:21
121:23 143:24,25
144:13 155:18
160:22 166:3
167:23,24 168:5
169:7,9,15 170:14
170:18 176:14
178:14 186:9,23
191:15,16 197:20
209:12 215:1
220:18,23 248:7
267:17 269:25
280:10,17 284:21
286:11,12 289:1
298:17
**husbands**
53:7 298:5
**husband's**
121:15 171:3 215:5
**HYBRID**
1:12 4:2 7:1

**I**

**iCloud**
16:5 233:14,15
**ID**
157:20 161:19
**idea**
43:3 51:25 54:14
61:9 64:14,15
115:18 136:20
164:10 220:17

258:11 260:24
**identification**
4:10 5:3 6:3 71:14,25
72:24 73:6,19 74:5
75:11 76:14 77:2
126:24 153:25
156:23 181:18
184:1 185:19
188:14 207:21
238:4 240:8 245:8
250:11 259:4
**identified**
138:4 241:20 292:20
**identify**
246:22 247:25
248:17 258:22,23
264:4
**identifying**
158:17 258:20
**imagine**
118:4 152:18
**immediate**
148:19
**immediately**
43:7 103:16 184:19
190:23 264:7
266:19
**immoral**
48:9
**impact**
12:9
**impactful**
262:17
**impair**
12:5
**impaired**
291:25
**implication**
34:3
**important**
158:21 162:12 184:7
221:1 233:25
**impressed**
32:24
**impression**
155:4

**improper**
190:1
**inaccurate**
130:22 159:8,10,11
**inappropriate**
33:13 208:25 277:7
**inappropriately**
288:18 289:22
**inbox**
231:23,24
**incident**
158:3 190:24
**include**
111:24 247:2 292:6
**included**
69:7 110:23 179:11
**includes**
78:1 202:1
**including**
179:17
**income**
22:7,9 70:6 74:8 84:3
86:1,5 88:13 90:14
93:21 95:10,11
261:13
**inconsistent**
243:16
**incorporated**
84:13 95:7,9
**increase**
72:15
**incurred**
253:18 255:2
**indemnified**
210:15
**independent**
5:5 154:23 156:22
186:1,21
**independently**
116:9
**INDEX**
4:1 5:1 6:1
**Indiana**
2:5
**Indianapolis**
2:5

**indicate**
217:15,18
**indicated**
105:9
**individual**
32:9 110:10 287:19
287:20
**individually**
265:21 267:5
**individuals**
40:25 80:4 85:11
159:15 287:22
**inference**
33:12 34:15 35:2
**infliction**
253:8
**influence**
37:10 41:19,21 80:22
161:12
**influenced**
196:10
**informal**
30:15 36:1 49:22
**informally**
35:11,12,18
**information**
10:14 15:16 26:9
62:15 71:16 77:21
88:18 105:19
107:11 155:3
159:15 163:3
207:16 221:5,6
246:11 271:25
281:12 286:17
288:15,17 297:1
**informed**
90:2 108:2 225:19
**initiate**
203:10 277:11
**initiated**
176:17 275:19
277:12,17
**injured**
107:4
**Inlet**
17:13

MAGNA
LEGAL SERVICES

inner
  54:20,21 221:17
input
  113:22 114:6
inserted
  57:13 58:24
inside
  65:21,22 124:1,21
   151:21 189:8
   213:25 215:21
insidious
  53:23
insight
  30:1 94:16
instance
  209:25
instruct
  130:24 274:2
instructed
  274:1
instructing
  113:13 182:12
instruction
  286:25
insurance
  78:2 212:15
integrity
  97:17 149:5
intend
  25:2 219:4
intense
  109:7
intensive
  256:13
intention
  108:6
intentional
  196:5 253:8
intentionally
  192:24 230:4
intentions
  144:13
interaction
  36:6 64:11
interactions
  99:16,19 114:14

  179:17
intercourse
  45:12,18 57:8,12
   58:17,23 60:2,3,24
   247:2
interest
  301:7
interested
  181:22 292:5 302:14
interesting
  24:19
international
  29:3 40:15
Internet
  21:5 28:2,12
interrogated
  152:17
interrogatories
  5:22 12:15 91:7
   245:8,12,19 246:10
   246:13 247:19
   276:13
interrogatory
  91:3 241:21 247:1
   276:20
interrupt
  10:16,21 135:10
interrupted
  229:17
interruption
  105:22
interruptions
  269:12
interview
  43:6 101:14,16,18
   104:4 114:18,24
   115:11,23 117:20
   118:9 120:16
   121:19,20 123:5
   125:2 130:7 131:10
   148:20 150:23
   151:10 157:24
   158:4,6,14,16
   159:13,16 160:3,17
   160:19,21 161:8
   165:13,23 166:10

  172:7,7,12 173:23
   176:23 179:5
   180:10,16 267:15
   271:23 281:25
interviewed
  91:1 150:21,22
   154:12 269:17
   293:20
interviewee
  127:23 129:8
interviewers
  128:1 129:11 193:17
interviewing
  159:14 210:22
interviews
  43:5 114:16 140:18
   174:20,21 179:20
   180:23 210:20
intimacy
  145:10 270:10,15
intimate
  247:4 270:23
intimidation
  113:5,15
introduce
  7:19 8:23
introduced
  51:23
introductory
  128:16
inventory
  266:20
invested
  92:22
investigate
  111:4
investigated
  168:1
investigation
  5:5 111:12 113:21
   116:2,25 154:13
   156:22 184:20
   186:2
investigations
  15:25
investigative

  114:6
investigator
  178:9
investigators
  4:21 10:1 102:12
   114:14 120:17
   125:11 126:23
   127:1 136:15
   139:16 141:10
   142:25 144:16
   145:9 155:17
   158:16 159:16
   160:3,7 161:25
   162:15 168:17
   172:13 176:18,23
   178:10,17,23
   179:12,19 180:21
   186:21 267:13,14
   267:22 268:5 270:8
   270:17 271:10,24
   273:18 274:16
   276:1 277:19,22
   279:20 280:4,16
   286:8
investments
  22:10 72:12
invitation
  93:16 95:19 124:13
   124:14
invitations
  41:13,14 95:22
invite
  44:4
invited
  22:6 43:16 66:8 68:7
   140:11 189:18
involved
  19:2,6 20:6 33:15
   46:9 52:7 63:13
   97:10 112:19 190:7
   191:15,23,24
   192:24 198:5 209:3
   209:18,23 210:17
   270:10 277:14
   287:22
involvement

MAGNA
LEGAL SERVICES

46:4 51:21 86:24
87:2 88:24 90:18
**involving**
160:9 186:4
**in-person**
13:10
**iPhone**
16:3,4 233:9,12
**irrelevant**
174:15
**island**
53:15,20
**issue**
11:18 47:19 48:22
62:4 181:13 183:19
204:13 258:14,18
**issued**
15:14 182:13 183:21
184:5 197:2 271:23
284:23 288:24
289:3
**issues**
38:3 39:6,10 44:13
44:20 47:17,24
68:15 93:19 110:20
111:4
**issuing**
181:10
**item**
78:19,20
**items**
223:9,12
**iterations**
156:17
**itinerant**
22:5

————— **J** —————

**J**
2:3
**Jackson**
3:13 8:7
**Jacobson**
2:20 5:18 240:6,12
**Jake**
21:14

**Jam**
89:8
**James**
51:3
**Jan**
17:20
**Jane**
30:21,22 31:14,16,22
32:3,6,8,12,22 33:4
33:6,9,18 34:2,6,15
35:3,7 63:13,25
64:11 82:7 118:10
121:6,15,23 124:18
137:19 139:6,14
140:7 141:11,20,24
142:2,16 143:2
146:14 147:11
155:18 160:22
161:21 162:4 164:6
164:17,24 165:5,16
166:7,13,20 167:9
167:16 168:9,10
169:2,7,7,9,14
170:13,18,24
175:20 176:11,14
176:25 178:14,25
179:17 197:20
198:2 209:12
213:14 214:4
221:12 247:15
248:6,6 267:17
269:25 275:11,19
277:7,10,12,17
279:9,22 280:10,17
284:21,22 285:5,16
286:5,7,11,12,24
288:20,24 289:1
**Janet**
18:24 85:10,19 94:8
94:11 189:7 191:11
191:13 239:13,17
241:7 248:6 296:21
**January**
240:11 241:2 253:16
254:25
**Jay**

90:22
**jean**
214:13
**Jeremy**
187:6,10,18 248:21
252:5,13
**Jerry**
25:16
**Jesus**
144:21 145:5 172:21
173:4,7,13,18 174:6
175:2,8,10 182:6,9
196:21 201:15,21
**Jim**
150:6 206:17,18
248:21 249:10,11
249:12,15
**Jimmy**
25:16
**job**
47:10 96:25 100:2
163:16 229:3
**jogging**
66:7
**John**
25:18 26:1,3,4,7 85:7
240:12
**Johnny**
1:3,13 4:3 5:13 7:2,6
7:7,23 8:15 9:7
19:11 28:9 42:25
56:9 83:24 84:1,2
84:18,23 85:21
86:14 95:7 96:19
97:15 110:10
117:22 119:19
131:6 184:17,24
187:2 188:13
196:22 197:11
205:21 206:4 208:3
208:22,24 209:5,6
211:7 229:21 252:5
265:21,22 267:5,6
302:8 303:1 305:20
**joined**
126:12

**joint**
169:19
**jointly**
209:7
**Jon**
3:20
**Joseph**
52:10
**journal**
16:22,24 17:1
**journals**
16:20
**joy**
40:8 182:7
**Jubilee**
13:21 22:18 89:14
90:18 91:5,9,13,15
92:4,5
**judge**
296:25
**judged**
200:12
**judgment**
131:13 142:13
189:20 200:13
**Judicial**
301:3
**July**
63:25 64:12 79:14,16
111:23 120:6
124:18 202:3
213:11 275:20
**jump**
102:22 162:20 200:1
**jumping**
283:11
**June**
90:8,10
**jury**
139:2 187:5 221:8
255:16,22 260:8,25
261:4,21 297:9
**justice**
210:20
**justification**
136:8

MAGNA
LEGAL SERVICES

**justified**
193:24
**justify**
104:21 132:24
134:13 136:3
**J.D**
41:2

---

**K**

**K**
1:22 301:20 302:20
**KATHERINE**
2:20
**Katie**
21:23
**keep**
16:8 28:20,20 55:23
63:5 95:24 113:14
143:14 155:14
223:10 230:25
233:22,23 244:8
257:5 279:4
**keeping**
16:22
**keeps**
85:19
**Kelly**
3:13 8:8
**Ken**
37:21
**kept**
197:17 233:13 235:5
**Kevin**
101:5 106:5 109:17
110:7 184:6 225:5,9
225:23 248:20
**Kevin's**
109:19 229:3
**key**
38:2 280:20
**kicks**
201:12
**killed**
109:4 201:14
**Kilpatrick**
4:23 115:24 117:19

117:24 126:17
153:16,24 154:11
272:10
**kind**
33:10 34:15 40:13
50:3 54:20 82:3
92:13 96:3 103:24
140:15 152:6
**kindness**
104:16
**kinds**
51:14
**king**
151:20 194:1 201:14
**kiss**
60:5 63:6,25 209:20
277:12
**kissed**
63:8,15,20 166:20
210:1 216:25 217:7
217:8
**Kissee**
85:7
**kissing**
63:13 209:3,18,20,24
217:11 219:17
247:3
**kklein@rjfirm.com**
2:22
**Klein**
2:13,20 4:7 8:13,13
11:15,25 33:22
34:17,22 35:4,6
51:16 131:23 132:5
132:9,11 154:3
156:24 222:19,22
227:3,4 229:15,17
229:23 238:5,8
240:9 243:13,16
245:9 250:12 251:7
251:13,16,20
252:23 253:2,24
254:8 255:12 257:3
257:8 259:5,11,16
260:16,19 263:1,5
263:12,15,18,19

269:13 270:13
271:5,6 272:15,18
273:7,11,14,15
274:7,21 275:16
276:14,18,19
278:17,20,23
281:14,18,21 282:9
282:25 283:2 284:1
284:8,15 285:4,9,12
285:23 286:21
287:17 288:11,19
289:5,14 290:12,22
292:1 293:5,11,13
295:17,25 300:4,7
**knees**
65:14 219:12,13
**knew**
49:21 65:16 102:23
111:16 117:20
118:24,25 119:1
136:15 137:21
149:3 156:2,8
158:24 160:9,22,24
164:5 168:9 203:11
203:14 204:2
228:11 230:6
273:17 274:12
282:23 283:7 294:1
**know**
10:7,8,13 11:7,17
20:25 23:6 24:11
25:4 26:5,8 32:8
33:13 38:17 40:12
42:25 45:12 46:20
50:3,23 53:6 56:14
57:11 58:5,21 61:3
61:8,18 62:10 63:2
66:7 67:4 72:16
78:10 82:11 83:4
84:10 85:10 86:7
87:9,21,23 89:19
91:23 94:18,25 95:1
95:2,4,9 96:6,20
100:11 101:6 103:2
103:10 104:19
106:18 109:15

111:6,16,17 113:17
113:23 116:19
117:8 120:11 122:9
123:1 124:11
127:17,18 130:2,6
131:15 135:19
136:23,24 140:18
144:1,11 146:3
150:14,18,18 152:7
152:10 153:8,8,8,9
153:19 154:17
156:9,11 158:22
159:5 161:3,3 163:9
164:2 166:7 168:15
171:18 178:13
183:9 185:10 192:4
192:20,25 197:22
198:25,25 199:23
200:9,12 203:13
204:16 207:8 208:8
213:19 216:14
218:11 219:5
224:10,16,19
225:11 227:23
228:6 229:7,9,9
232:13 233:19
235:11,14 236:21
237:16 239:14
242:4,7,24 243:2,3
243:5 245:14,19
247:15,23 248:19
250:19 251:5 252:8
253:20 255:4,18
256:1 259:18 261:3
264:2 265:5,19
266:2,15 267:21,25
268:1,20,24 269:3
273:14 275:10,22
276:1,4,22 279:8
280:22 281:1,4,14
283:2 288:8,10
289:14 292:13
295:9,10 296:19
298:9,9,10 299:3
**knowing**
117:23 148:21,22

MAGNA
LEGAL SERVICES

201:15 231:23
**knowledge**
61:16 128:25 184:16
185:11 186:5
197:21 198:13,20
199:4,5 206:23
246:11 269:3,9
283:4,7
**known**
38:15 42:7 104:18,20
116:11 127:5
150:10 156:10
161:10 192:20
195:5 266:6
**knows**
13:14,14 32:7,21
120:20 216:9 243:9
281:12 282:6
**Kyle**
206:22

---

**L**

**labeled**
127:13 182:1
**lack**
50:20 68:12 83:12
128:24 271:3
**ladies**
137:5 216:8
**lady**
42:24 85:5 100:25
107:1 138:16
140:11 143:11
144:9 150:17 187:3
210:21 217:14,14
217:25 220:13
**lady's**
59:22
**laid**
144:4
**Lake**
100:21 125:15 150:1
**language**
150:11 234:8 275:24
**large**
27:20 37:13,21 68:14

93:16,17
**larger**
41:18
**largest**
21:9 40:14 117:6
124:3,5
**lasted**
147:25 148:10 209:2
209:23 277:13,21
**late**
79:18 125:22 271:2,2
**latest**
127:10,10
**law**
13:7 107:19 150:6,24
153:19 156:4,10
195:23 197:25
206:17,18 248:22
249:10,11,12 274:5
274:19 275:6
**Lawson**
248:22
**lawsuit**
197:21 203:10 206:9
206:13 207:6 208:5
208:11 212:3,14
233:21 234:3,13
260:3,4 262:6,9
286:11,23 295:12
**lawyer**
117:12,14,14 134:21
153:5,9,9,10 155:6
181:5 203:15 207:7
237:6,12,15 250:14
252:17 256:4,21
270:2
**lawyers**
10:17 12:18,19 30:17
153:2 154:17
155:24 163:8 206:7
235:18 250:23
272:9 273:3,21
274:5,13 276:5
286:16 296:18
**lawyer's**
290:23

**laying**
144:4,10 168:3
**lead**
21:8 26:18 29:18
37:12 38:16 42:8
46:5 51:4 100:4
116:25 121:23
122:19 212:4
**leader**
38:16 102:4 152:6
196:13 220:21
299:22
**leaders**
42:3 107:16 108:2
196:4 211:2
**leadership**
26:2 35:21 68:9 75:9
97:17,23,24 98:3,7
102:2 117:3 184:18
187:15 200:10
211:3 289:20,22
**leading**
41:23 78:7 109:13
125:15
**learned**
37:6 155:23 184:25
185:13 194:18
270:22
**leave**
24:22 52:15 65:22
133:5 168:13
175:22 178:25
196:18 214:18
250:4 297:12
298:16,24,25 299:1
299:1,6,18
**leaving**
66:17 122:19 144:13
175:11 190:4
297:24
**led**
24:8,8 35:19 38:12
40:13,17 48:9
162:23 199:15
226:22
**Lee**

3:14
**left**
16:7 19:5 50:16
52:25 66:17 67:1
75:20 103:4 123:1
218:10 225:12
226:3 298:13
299:12
**leg**
218:5
**legal**
1:23 7:17,18 10:3
45:8,9,18 204:1,6
205:7,15 206:3
236:15 285:10,22
286:14,18,22 287:1
287:3,5 293:8
294:21 301:5,8,10
301:12,15 303:7,14
**legalese**
277:1
**legally**
155:9,17 283:15
**legitimizer**
50:4
**legs**
65:15 66:3 215:17,18
221:25,25
**letter**
4:23 5:10,12,16,18
5:23 49:19 111:7,18
111:24 112:1,23,23
120:24 143:21
153:16,23 154:18
155:24 181:12,13
181:14 185:17,22
188:12,15,19 197:1
199:6 225:13 227:8
227:16,24 228:7,22
238:2,9,10,13,16,21
240:4,6,9,10,13,15
241:1 248:23,24
250:9,16,20,21,22
251:1,8,11,13,21
273:16 274:22
275:5,9,15,18 276:4

**letterhead**
238:11 240:11
**letters**
237:24 243:17
272:10,13,23
**letting**
212:4 229:24
**let's**
32:25 64:10 70:9
85:3 94:7 157:8
185:10 203:17
205:1 214:19
215:13 217:12
223:20 225:4
229:19,21 230:17
230:19 231:3,10
234:7,15 239:23
243:10 246:21,22
254:20
**level**
109:24 186:7 211:15
225:22 228:1
230:10
**liar**
187:3
**liberty**
62:7
**license**
177:15
**lie**
103:23 117:25 119:6
143:17 147:18,20
147:21 161:5 168:6
178:8
**lied**
117:24 118:1 161:2
202:5 238:6 287:9
**lies**
118:17 119:25
**Lietz**
4:23 153:24
**life**
26:13 30:12 47:16
63:8 64:19 80:20
84:3 109:10 118:19
119:5 124:11,12

149:5,8,12 153:6,7
155:20 161:12
164:1 182:7,11
190:12 197:7
199:24 201:11,19
208:23 211:3
**light**
109:6 119:16 137:23
161:6 165:19 197:2
199:11 204:23
250:2 271:15
**liked**
220:20
**limitation**
197:25,25 247:3
**limitations**
163:10
**limited**
53:5 60:23 258:13,14
**limiting**
61:23
**line**
59:24 71:8 78:20
97:2,8 120:11
127:25 128:1 129:3
139:9 157:23 158:8
158:23 159:13
194:14 201:12
208:1,1 226:7
251:10 304:11,14
304:16,19,21,24
305:1,4,6,9,11,13
305:16
**lined**
100:22 145:15 171:8
**lines**
80:18 81:17 83:10
139:4 167:10 188:2
214:22
**lining**
140:9
**link**
291:15,17,21 292:9
292:11,12 294:7,11
295:3
**lips**

63:8,9,9,22,23 64:1,2
210:2,3
**Lisa**
80:24
**list**
248:9
**listed**
80:5 127:23 266:12
266:12
**listen**
32:17 141:5 200:19
**listened**
103:25
**listing**
260:25
**literally**
20:14 104:11
**litigation**
17:9 230:24 301:16
**little**
15:11 27:24 70:13
98:25 101:20
110:12 124:12
125:10 129:9
157:21 179:6
230:20,21 231:24
267:10
**Litton**
117:9 146:9
**live**
28:21 53:20 118:15
143:12 146:22
**lived**
17:14,15,16 18:6
51:7 147:1 163:23
164:1
**lives**
17:19 18:21
**living**
49:9 158:20 201:18
**LLC**
1:7 2:13 96:1,24
**LLC's**
5:21 245:7,12
**LLP**
1:17 2:15 3:3,8 7:14

301:8
**loaded**
171:17
**local**
42:21
**located**
122:2
**locations**
246:25
**lodge**
252:23 254:10,13
**lofty**
36:13
**log**
252:9
**long**
17:14 18:25 24:25
25:2,3,4 52:13 68:6
85:12 100:7 120:3
122:10 123:25
134:6 135:19
146:22 147:24
148:9 211:22
213:13 217:5
**longer**
15:19 55:22 91:5
96:12,18 111:23
121:13 211:14
223:11 266:22
**Longleaf**
25:12
**long-term**
48:25
**look**
15:8 16:13,25 25:24
46:24 64:17 70:5
93:23 94:5 104:19
110:20 112:1
138:19 148:5
167:17 181:23
187:4 195:11
202:23 231:23
244:22 245:13
246:21,22 250:18
259:17 274:21
292:15

**looked**
20:22 77:9 115:13
181:9 188:25 210:7
**looking**
49:23 71:9 112:15
145:23 203:21,22
207:12 234:6
237:15 250:19
274:8 283:8,18
**looks**
75:25 93:22 145:14
183:10 187:1
**loose**
144:4
**Lord**
182:9
**losing**
109:19
**losses**
260:21,23
**lost**
41:20 90:1 91:4,7
213:7 261:6,12,13
266:23,24
**lot**
21:8,11,12 26:9
45:20 46:14 49:12
49:16 82:16 83:3
93:14 97:16 102:2
120:17 129:22
137:8 146:1 151:20
151:22 152:12
154:21 156:13
204:3 210:7 212:18
277:25 297:5
**lots**
11:3
**loud**
38:22 224:2,8
**love**
38:22 66:15,15 95:13
117:23 124:10
151:1 182:9 190:5
218:9 280:24 281:1
**loved**
18:2 43:8 151:1

**lowered**
66:6
**lucrative**
28:24
**luggage**
146:24,24,24
**Lululemon**
214:12
**lunch**
78:9 79:11 112:2
**lust**
46:15 79:19
**lying**
141:21 202:10

---

**M**

**M**
1:3 3:13 7:2,6,7 8:15
302:8 303:1 305:20
**MacArthur**
26:4
**MacGILL**
2:2,3 4:8 5:16,19
7:22,22 31:2,15
32:13,20 33:3,7,9
33:12 34:13,24 35:2
35:5 42:11 43:1
55:15,19 56:3,7,11
56:13,17,22,25 57:2
57:18,22,25 58:14
59:2,8,14 61:11,20
62:12 67:12,16,18
67:22 68:11 70:14
80:14 83:11 94:4
102:7,13 105:5,25
110:25 111:11,14
112:22 113:1
120:20 121:18,21
127:3,14,17,19
128:19,24 130:23
132:3,7,10,23 133:6
133:11,20,22,25
134:3,5,9,12,17,19
134:22,25 135:3,8
135:12,25 136:13
139:8,10 140:24

141:1,4,7 147:12
149:19,24 171:11
171:16 173:15
174:8,13 179:23
180:12,15 198:4,8
198:15,23 199:3
202:24 203:2,25
204:8,15 205:8,11
205:18 210:10
219:25 220:2,15,25
222:7 227:2 229:13
229:19 238:3,10
240:7,10 243:9
251:4,11 252:22,25
253:22 254:1,20
255:6 256:23 257:5
260:14,17 262:24
263:4,7,13,17
269:11 270:11
271:2 273:19
274:17 275:15
278:16,18,21 281:7
281:16,20,22
282:24 283:1,24
284:6,9,12,14,25
285:7,10,21 286:13
286:25 288:7,12
289:12 290:4,15
291:22 293:3,6
295:19 296:4,7
300:1,8 303:1
**MacGill's**
235:22 238:21
**machine**
86:16
**magistrate**
297:1
**Magna**
1:23 7:17,18 301:5,8
301:10,12,15 303:7
303:14
**mail**
303:7
**main**
162:21
**maintain**

294:10
**major**
41:2 197:5
**majority**
85:23 86:20 106:19
112:17
**making**
33:4 108:8 109:5
146:6 162:21
197:13 262:16,17
304:8,9
**man**
37:16 46:13 57:7
58:16 82:3,9,12
83:9,18 100:18
102:4 105:3 115:3
119:1 148:12 152:7
155:1 201:13,15
**maneuver**
117:17
**manually**
303:5
**man's**
57:13 58:24 63:7
**March**
230:24 250:16
251:15,19
**MARCHETTI**
2:9
**marital**
60:9 214:20
**mark**
72:25 126:18 153:21
156:18 181:19
183:23 240:5 259:7
259:9,11
**marked**
71:12,14,17,25 72:24
73:6,19 74:5 75:11
76:14 77:2 126:20
126:23 153:25
156:23 181:18
184:1 185:18,20
188:14,16 207:18
207:20 238:3,9
240:7,9 245:8,10

250:10 259:3,12,17
272:19 276:12,16
289:7
**market**
2:4 264:23 303:16
**marking**
250:12
**marriage**
202:4 302:13
**married**
18:25 19:25 21:14,15
57:7 58:17 209:1
**Marshall**
9:7
**massive**
47:15
**Master's**
25:9
**materials**
48:25
**math**
45:23
**Matt**
248:22
**matter**
7:6 92:21 107:17
108:13 113:12
158:10 178:12
195:6 199:22 246:9
246:12 286:19
302:15
**MATTHEW**
2:8
**matt@tpmblaw.com**
2:10
**Maxwell**
26:3
**ma'am**
12:7,25 13:6,8,11,22
14:2,9,13,16,20,23
15:7,10 16:4,6 17:7
17:10 20:5 23:14
26:20 28:19 29:17
31:1 37:2 39:20
66:25 71:3,23 73:4
73:10,17 74:1,3,11

74:17 75:16,23 76:1
76:5,23 77:7,16,19
79:5,22 81:1 83:23
84:16,19 91:14 95:5
95:11,20 100:10
111:20 113:8
114:10 125:13
126:6 127:24 128:2
128:9 129:6 157:6
157:18 164:15
166:5 181:8 183:18
185:4 188:18,21
189:23 191:12
196:25 199:5
200:24 208:17
210:6 211:12,18,21
213:6 215:20
219:21 220:8 222:3
298:18
**McCartys**
37:7
**McCORMICK**
2:14 5:23 8:10,10
222:23 240:13
250:10,17
**mccormick@mint...**
2:17
**McCranie**
273:2
**McGill**
9:16 13:3
**meal**
78:10
**mean**
53:22 54:22 60:2
68:13 87:24 102:16
110:12 120:23
125:19,21,24,24
133:18 169:20
174:18 175:5 178:2
178:23 181:12
188:8 199:25
201:10 207:1
211:17 216:14
218:19,23 234:9
236:24 242:16

257:9,22 264:8
287:18,19
**meaning**
158:10 160:22
169:14 170:18
178:13 232:3
243:25
**means**
169:25 242:22
**meant**
64:18,22 226:10
246:1
**measures**
188:4
**media**
28:22 43:4,6 227:13
**medical**
256:7 258:13,18
**medication**
12:5 256:15 257:13
257:17,21,25 258:2
258:3,7,9
**meet**
12:19 13:25 36:4
49:1 51:3 101:6
117:11,14 151:15
167:25 202:13,16
204:4 249:11
**meeting**
9:1 35:20 39:3,3 44:3
89:20 90:5,9 92:17
92:18,19 102:5,11
102:18 103:4,15
104:5,5 110:19
125:10,18,19,23,25
126:2,2,7,10,12,13
126:15 127:2,21
132:18 136:16
144:23,25 147:24
148:10 149:14
150:5 151:19 153:3
169:14,16,19,20,25
170:8,9,12,25 171:3
171:8,22,23 172:7
172:10,11 174:23
180:6 267:12 268:4

268:4 269:1 278:13
279:19 280:4 285:2
**meetings**
12:24 13:10 29:5
42:21 44:6 90:3
100:24 280:9,10
284:17,20,21
**meet-and-confer**
135:1
**mega**
27:17
**member**
43:22 44:1,1 78:9
108:16 111:17,19
111:23
**members**
26:24 52:17,19 79:11
85:15 89:3 112:16
113:17
**membership**
76:11
**memory**
254:18 266:15
**men**
45:21,21 46:4,5,8
47:8 53:5,9,11,13
61:25 62:2 80:13
81:18 82:23 182:8
211:2
**mention**
32:15 122:4
**mentioned**
36:23 69:24 79:10
81:18 85:12 93:21
103:5 119:14,15
121:16 122:4 186:9
247:18 255:24
268:5 275:3,7
279:17,21
**mentor**
26:6 30:8 32:11
35:18
**mentored**
35:8 36:23
**mentoring**
30:13

**mentors**
25:14
**mentorship**
36:1 299:21
**men's**
23:9 45:22 53:4
**message**
15:1 16:17,18 46:21
53:18 243:7
**messages**
14:24 15:17 16:14
27:25 53:17 54:2
230:20,25 234:3
235:15 239:3
240:19,24 252:4
**messengers**
110:18 111:2 112:4
**met**
9:2,5 35:23 102:19
104:1,4 130:10
138:21 154:24
155:1 160:14 164:1
169:25 171:9 223:5
248:21,21,22,25
249:7,10,12 298:14
**microphone**
254:8,11 273:7
**Middle**
7:9
**midst**
206:14
**million**
167:3 207:15 219:8
253:20 255:3,17
260:7,10 261:14
**millions**
148:23 211:2
**mind**
25:17 67:8 68:16
72:9 81:23 105:6
118:10,13,14
120:15 122:16
163:14 241:9 261:9
268:23 269:19
271:11,11,12 288:2
289:8

**mindful**
221:8
**minds**
102:1
**mine**
26:6 65:7,9 87:4
96:10 178:7
**Mine's**
65:7
**minimized**
83:6
**minister**
49:2 182:7
**ministers**
47:3 48:14 67:24
**ministries**
19:6 22:5 28:9 83:25
84:1,2,18,24 85:22
86:14,23 88:24 89:8
95:7 96:19 110:10
177:20 196:10
205:22 206:4
265:21,22 267:5,6
**ministry**
19:2,11 20:7,9,10,12
24:25 25:15 26:16
27:25 28:1,25 32:12
35:9 45:20,22 46:7
46:8 47:2 49:13,14
49:15,16 52:7 53:4
68:19 82:4,17 83:19
87:6,7,8 88:20
89:23 91:24 92:12
92:13 93:8 100:17
101:1 161:11
169:10 177:2,22
178:3 182:4 191:22
196:12 220:22
267:7
**Mintz**
2:15 5:18 8:11,14
240:7,12
**mintz@mintzandg...**
2:17
**minute**
154:23 188:16

268:19 275:10
**minutes**
9:1 12:23 70:15
104:6 116:18 148:5
148:11 149:7 155:2
180:6 202:4 209:3
209:23 213:12,18
213:19,22 214:3
217:6 271:7 277:13
277:21 295:17
**misconduct**
40:1 48:17 68:1
81:19 83:6,16,17
184:24
**misled**
271:16
**misreading**
129:2
**misrepresenting**
269:15
**mission**
15:3,20 29:4 74:9
75:3,14 77:5,15
86:9,21 93:1 182:8
184:5 212:23
**missionaries**
86:22 88:19
**missions**
40:15 84:5 86:22
**misstated**
253:23 254:2,5 255:7
**mistake**
94:3
**mistakes**
208:23
**misunderstood**
49:16 247:14
**mixed**
138:6 187:14,14,17
**mode**
227:14
**Mohler**
41:1
**moment**
56:7 63:21 137:23
138:3 140:12

168:15 201:16,17
202:18 215:1
227:20 254:12,18
255:6 257:24 259:5
268:16 270:15
272:20 279:20
293:19
**momentarily**
218:19
**momentary**
219:5
**Monday**
299:13
**monetary**
34:20 198:2 212:2
261:19,25 262:9
**money**
22:11 53:24 69:25
72:14 78:13 85:24
86:8,13,18 88:16
92:24,24 197:9
205:24,25 207:5
212:10
**monies**
260:3
**month**
90:7
**months**
14:7 107:11 118:23
132:13 135:21
145:24 146:2
206:19 250:8
**moral**
10:1 47:8,23
**morning**
8:21,22 12:23 64:13
64:14 110:16
125:23 151:17
164:25 227:16
266:17 272:25
**Morton**
187:6 248:21 252:5
252:13
**Moses**
201:13
**motion**

51:16 111:3 112:4
112:25 116:24
127:7 132:17 136:2
273:9 282:5
**Motorsports**
96:24
**Mountain**
128:11
**mouth**
55:23 217:3,8
**move**
18:1 19:24 133:10
149:25 175:17
199:21 216:1
230:17 231:12,18
252:15 281:13
284:1,3,9,9,12
294:16
**moved**
20:21 178:21
**movement**
51:15
**moves**
160:2
**moving**
75:12 81:3,5
**multiple**
156:17 157:21
**multitasking**
99:25
**murder**
201:15
**murdered**
201:13
**music**
21:9,9
**mutual**
282:16
**Myrtle**
22:20
**M-C-C-R-A-N-I-E**
273:3

———————————
N
———————————

**naked**
167:21

**NAMB**
5:9 16:7,8 97:12
98:16 99:15,23
100:9 101:3 106:9
109:23 110:5,11
182:11 183:19,25
184:5,17 185:21
186:15 187:6
226:24 227:9,16,21
227:25 228:14
**NAMB's**
184:2
**name**
9:6,10 18:23 30:19
31:3,6,7,10,20 32:3
32:15 33:19 93:6
94:13 97:15,17,17
97:20 103:1 137:14
137:24,25 140:7
222:22
**named**
100:18,25
**names**
19:16,18 25:20 62:7
62:8 122:5 248:16
266:13
**narrative**
97:1 103:4,22 138:11
138:15 139:18,24
140:2,3,9,9 141:13
141:15,22 142:7,10
143:8,18 145:11,16
147:5,6,7 148:14
162:13,19,25 177:1
177:8,9,10 278:6,9
278:10
**Nashville**
1:3 2:10,21 3:5 7:10
110:19
**national**
211:14
**nationally**
47:13 213:9,10
**nation's**
93:18
**nature**

34:16 195:6 196:5
232:18
**navigate**
37:4
**navigating**
183:1
**NE**
1:18
**near**
260:6
**necessarily**
24:22 82:7 195:23
**necessary**
195:21 304:9
**need**
10:13 11:6,9 20:2
37:12 41:9 51:15
57:4 108:2 117:13
146:8,10 150:11
153:12 161:1
172:17 195:2,4
210:21 212:5
223:10,11,11
225:16,18 229:20
231:17 232:21
236:1 254:2,14
259:14 283:11,19
299:17
**needed**
40:16,18 50:23 97:16
117:14 146:10
148:24 195:18
239:13
**needs**
21:25 49:1 51:23
**negative**
158:10
**negligent**
293:17,25
**neither**
230:6 243:6
**never**
9:2,11,15 24:9,16,23
29:21 40:2 46:8
49:13,15 50:21,23
54:24 63:8,9,22

64:1,5,7,9 66:8,19
66:20,22 72:8,17
80:17 81:10,13,15
81:16 83:3 103:5,21
104:10,23 106:15
106:16 109:25
114:25 118:10,12
119:14 122:7,7
124:8 131:12
132:17 139:5,13
140:14 143:23
145:10 146:9,22
150:20 152:1 153:5
153:6,17 155:4,19
158:11,13,14 161:4
164:1 165:11,12
167:14 169:25
170:17 172:18
176:11,12 182:25
185:15 188:5,10
190:6 193:13 197:6
197:6,7,18 207:15
210:3,22,24 217:7
218:5,9 223:5
257:20 268:24
281:2 287:12,13,13
288:21 291:18
**new**
2:16,16 59:15,17
75:7 86:25 87:5
88:5,13,24 89:2,7
89:16,24 109:24
110:4 119:15
150:17 232:22
233:11,16 241:15
241:17 264:22
266:10,18 275:23
**news**
97:3 182:5 196:17
**nice**
18:16 65:16 167:14
**nicknames**
9:12
**night**
12:22 13:2,24 110:14
118:16,24 125:22

125:23 131:8 136:4
144:12
**Nike**
214:12
**Nine**
29:13
**nod**
11:1
**nodding**
10:24
**Nokes**
3:3 4:6 7:25,25 8:20
8:24 12:4 31:12
32:5,11 34:18 35:7
42:17 43:4 51:14,19
55:17,20 56:5,10,12
56:14,19,24 57:5,20
59:5,19 61:21 63:5
67:23 68:18 70:21
71:15 72:1,25 73:7
73:20,22 74:6 75:12
76:15 77:3 80:17
83:14 94:6,7 102:10
102:16 106:3 111:2
111:8,13,19 112:25
113:2 121:1,20,22
125:9 126:25
127:12,16,18,20,22
128:23 129:2
132:20 134:7 135:2
135:17 136:9,14
139:12 140:25
141:3,9 147:15
149:22 150:1
153:21 154:1,4,6
156:14 157:1,2
171:13,20 173:22
173:25 174:19
179:24 180:1,14,18
180:20 181:19
183:23 184:2
185:20 188:15
198:5,12 199:4
203:9 204:11
205:15,21 207:17
207:22 211:10

220:1,4 221:12
222:4,14 223:4,9
225:4,24 226:23
227:4,7,16 228:10
235:17 259:10
260:2 267:16
272:23 277:24
284:13 289:10
297:3 300:5
**noncredible**
269:18,19
**nonprofit**
84:25
**nonverbal**
10:22
**non-church-service**
43:10
**non-ministry-relat...**
79:2
**non-SBC**
25:24
**normal**
115:6
**normally**
78:6 90:8 92:5 97:11
110:13 115:7
126:11
**North**
15:3,20 25:13 74:9
75:3,14 77:5,14
92:25 182:8 184:4
**NORTHERN**
1:2
**nos**
138:10
**notarized**
303:6
**Notary**
8:17 305:23
**note**
71:17 72:21 73:11,13
128:15 139:5
220:25 244:18
**noted**
70:21 304:4,5
**notes**

4:21 126:22,25
131:10 134:1
**notice**
106:6,8
**noticed**
145:25 207:12
**noticing**
135:21
**noting**
303:4
**number**
7:5 18:2 27:14 37:13
48:1 49:5,6,7,10
52:23 62:10 70:7
72:21 73:2 97:20
98:6 129:3 157:20
163:4,17,21,22,23
163:25,25 232:22
233:14,15 241:17
241:21 251:24
253:20 255:4,19
270:3 276:15 280:9
284:17 297:4
**numbered**
245:22
**numbers**
47:25 77:21 157:21

_____

**O**

**oath**
9:20 117:25
**object**
33:20 42:11 43:1
56:22 68:11 80:14
83:11 133:3 210:10
220:15 260:14,17
271:2 284:25 285:7
285:21 286:13
294:21
**objection**
147:12 204:8,9
205:19 252:24
254:11,13 262:24
270:11 291:22
**objections**
127:5 277:1

**objects**
131:14
**obligation**
9:22 10:2,3 62:14
67:19 234:2 244:21
282:21
**obligations**
293:8
**occasion**
63:19 81:8
**occur**
17:24
**occurred**
105:16 241:14
299:14
**OCGA**
304:7
**October**
24:4,5 132:25 133:17
264:23
**offend**
107:15
**offended**
107:8,21 108:10
176:5,6 194:7
195:13 298:8
**offending**
175:20
**offense**
107:8 194:6 203:22
**offer**
47:21 135:15 201:20
255:23 258:6,9
263:3 271:13
**offered**
101:10
**offering**
63:18 95:13 124:14
**office**
37:15,15 98:25 115:1
118:25 171:3,7,8
231:22
**officer**
254:4
**offices**
7:13 303:2,7

**officio**
43:24 44:1
**oftentimes**
68:14
**Oh**
17:10 28:16 35:15
43:16 49:25 77:11
79:5 111:22 126:16
154:14 158:6,6
173:5,11,11 176:6
202:9 208:6 214:10
239:22 245:24
249:12 257:22
258:1 266:4 269:22
**okay**
10:10,15 11:5,11
12:24 20:22 21:19
26:15 27:5 30:20
32:11 34:25 38:14
51:18 55:7,12,19
57:1 59:24 62:3
63:11 67:22 70:25
71:6,10 72:11,20
73:15 74:3,21 77:13
77:23 79:1 80:11
83:5 92:16 93:11
94:10 98:12 113:1
114:15 115:22
127:19 130:14,19
131:12 135:6
136:13 139:10
140:5 141:6 149:24
151:23 154:8,9
155:13,15 157:22
158:12 159:23
160:6 163:20 170:6
171:6 172:4,20
173:11 175:16
181:24 182:2
183:13 199:3
205:18 207:17
210:12 212:19
214:4,8 216:4
217:12 220:2
221:20,23 222:6,17
222:25 223:3,14,19

223:23 224:15
227:1 229:12 230:4
230:18,22 232:16
238:1,14 240:18
244:17 245:24
250:25 251:22
252:25 254:20
255:13 258:12
264:9,10 275:18
276:4,21 281:15
282:3 285:13
288:10 289:13
291:1,7 292:24
293:2 294:5,17
297:2,8 298:2
299:25 300:8
**old**
19:20 22:2 54:4
87:11 122:17
236:25
**oldest**
19:24 20:10 21:8
**onboarding**
99:6,19
**once**
18:16 29:4 37:24
106:10 137:24,25
221:1 234:21
250:19 288:8 303:6
**ones**
41:2 119:23 153:10
178:13 195:16
264:2 266:25
296:23
**one's**
56:19 58:10 59:20
**one-sided**
104:24
**one-year**
44:8
**open**
201:4
**opening**
43:20
**operating**
96:21 116:8

**operational**
87:9 93:4
**opinion**
45:5 228:3 252:18
**opinions**
44:12 186:15
**opportunity**
44:11 64:7 103:6
106:7 132:13,15
144:19 175:7
182:16 228:16
256:21 277:23
278:2 279:13
293:24
**opposed**
118:14 177:15 290:2
291:10
**opposite**
66:1 99:16,20
**options**
138:3,5
**ordained**
25:11,12
**order**
31:8,18,21,25 45:16
104:7 191:19
197:17 283:13,17
**ordering**
303:10
**organization**
100:5
**organize**
38:25 39:1
**original**
6:14,14 303:9,11
**Otchy**
2:14 251:15,18
**ought**
152:7,8,10
**outcome**
302:14
**outline**
223:24 263:20
**outlines**
28:5
**outrage**

129:10 130:4 131:2,2
131:18 179:7
**outraged**
130:11
**outside**
61:17 86:8 111:17
125:17 299:23
**outstanding**
244:20
**overjoyed**
250:1
**overwhelming**
190:2 279:5
**owned**
87:4 92:11 97:1
164:10 192:25
**owner**
89:24
**owners**
89:24
**ownership**
294:19
**owns**
89:22 90:21 177:12
197:10 295:6
**o'clock**
103:10 131:9,10
**O.C.G.A**
301:7,11

**P**

**PA**
303:18
**Pacific**
128:13
**pack**
298:16
**page**
4:5,10 5:3 6:3 55:14
56:11 71:11,20 72:3
74:10,12 75:13,17
76:16 77:9,12 94:8
94:11,13 139:3,9
156:15 157:19,20
157:21,22 159:19
159:21 161:18,19

161:19 165:20
167:15 168:8 174:5
177:6 178:10,10
181:23,25 208:18
208:22 238:20
240:17,19 245:17
245:20,21 246:22
247:22 251:21
274:22 276:20
289:17 294:6
304:11,14,16,19,21
304:24 305:1,4,6,9
305:11,13,16

**pages**
157:10 198:10,19,21
199:1 221:5,10
255:10 281:9,11,23
282:7 288:9 290:5,7
291:23 304:9

**paid**
29:16 75:20 78:10
79:13 84:18 93:24
205:10 206:4

**palsy**
22:1

**Panama**
17:12,17

**panties**
167:10

**pants**
66:13

**paper**
5:6 43:8 99:8 181:17
181:21 183:10

**paperwork**
99:2

**paragraph**
159:12,14,19 160:2,5
160:20 161:9,20
162:3 164:16 166:6
166:12 167:9,15
169:13 170:5,23
174:5 176:22 177:6
179:4,10,25 185:25
188:22 208:21
251:23 274:22

276:25 277:2
289:17 291:3

**parentheses**
165:4

**Park**
211:17,18

**parking**
49:12 151:20,22

**part**
20:11 38:5 45:19
56:5 76:2 79:24
101:1 111:9,11
141:14 154:12
179:14 184:24
194:9 195:16
201:22 206:21
212:3 221:23 249:1
254:19 282:4,12
286:4 287:21
290:16 294:19

**partially**
291:25

**participants**
51:8

**particular**
38:20 80:12 177:21
181:24 208:23
242:13 252:16
264:19 280:7

**particulars**
117:3

**parties**
34:19 210:17 301:15
302:13 303:10

**partner**
80:3

**parts**
217:8 222:2

**party**
34:19 294:21,25
295:8 301:12,16

**part-time**
87:24,25

**passed**
37:1 73:24 197:2,24

**passion**

46:9

**passive**
46:6

**pastor**
7:23 24:11 26:2,18
29:18 42:1,8 48:10
48:15 49:20,23 56:9
57:25 62:25 75:8,18
75:19 78:8 88:18
92:22 102:24 105:9
105:16 107:6 108:1
108:5,14,15,17
109:11 117:6
121:24 122:9,19
123:1 131:6 158:18
158:22,25 159:5
160:22 161:11
162:15 163:3
179:12 187:18
200:13,23 201:9
202:8,9,11,15
206:13,22 208:22
208:24 209:4,5
229:21 248:20,25
275:2

**pastoral**
30:10 51:9 67:6
81:21

**pastored**
43:16 161:15

**pastoring**
27:21 47:9 84:3
124:4

**pastors**
19:7 23:6,8 24:8 28:4
28:6 30:9,13 35:13
35:20 37:13,21
38:12,19 39:25 42:1
42:3 47:17 50:11
56:16 58:7 61:3,5
61:22,25 62:1,2
67:4,25 81:20 83:6
83:16,17 88:21
92:14 93:15,16,20
95:12,22 96:14
98:20 99:1 103:9,12

109:13 126:14
182:12 200:6
232:18

**pastor's**
47:19 158:17 161:12
226:7

**Patrick**
2:3 7:22 276:18

**patrick.sanders@...**
2:6

**patterns**
113:5

**pause**
122:14 194:22

**pay**
24:18 29:2 72:9
76:17,19 86:2,11
95:12,14,16,17
118:19 206:1 207:5

**paying**
24:13 29:8,14 38:18
204:6 205:6,9,11,15

**payments**
94:21 95:2

**PC**
2:3 238:10 240:10

**PDF**
303:5

**Peachtree**
1:18

**pedophile**
122:6,8

**peers**
37:21

**pending**
11:7

**penis**
57:13 58:24

**penitent**
61:12,15 62:14,22
67:14

**people**
13:17 24:12 27:11
28:3,21 37:14,17
38:16 41:1 47:17,21
48:4 49:15,16 52:3

52:21,24 60:8 80:18
80:21 83:14 86:2,23
88:20 95:21 97:10
97:10 98:5 106:17
109:11,12 124:10
138:8 143:4 145:1
154:21 163:11
186:22 187:2 195:6
195:12 206:11,11
248:12,18 295:3
**pepper**
297:21 298:1
**perceived**
152:20
**percent**
15:24 16:10 42:14
44:9 47:7,11,22,23
50:21 93:17 157:10
176:17 190:21
**percentage**
40:14
**perception**
109:21,22
**Perdue**
43:17
**perfect**
65:18 122:13 237:7,8
**perfectly**
55:5 175:15
**perfume**
167:10,13,13
**peril**
282:7
**period**
26:17 27:6 29:10
37:9 52:25 68:6
70:4 79:17 105:17
179:18 239:15
**periodically**
76:8
**permission**
222:1
**permitted**
201:7 234:14
**perpetrate**
119:25

**perpetrated**
119:6
**perseverance**
93:2
**persisted**
94:21
**person**
12:24,25 20:1 50:6
60:19 68:3 80:21
98:7 106:17 108:12
114:19 149:13
150:4 163:25 166:2
177:14 201:9
210:18 217:23
220:18 243:23
246:23 247:25
249:5 266:4 291:12
**personal**
25:14 107:17 117:10
187:9 190:25,25
205:16,23,24 239:9
246:10 281:19,20
281:21 282:17
284:7 287:7,8,15,18
287:19
**personally**
16:13 39:8 56:15
58:5 61:8 107:9
108:6 204:6 205:6
282:10 292:20
**personnel**
29:20 78:22
**persons**
194:17
**person's**
149:8
**perspective**
108:3 180:25
**pertaining**
288:15
**pertains**
110:22 142:10
**Pete**
21:14
**Peter**
201:15

**pew**
42:25
**pews**
212:22
**Philadelphia**
303:18
**phone**
15:24,25 16:2,22
49:22 163:4,17,21
215:5,6 231:10
232:4,4,9,10,12,14
233:6,7 235:10,12
241:13,15 248:22
297:12
**phones**
15:19 232:3,22
**photo**
279:10
**phrase**
226:5
**phrases**
34:11
**physical**
139:6,13,22 140:7
141:11,20 143:19
143:20 144:16
145:10 147:11
179:16 256:10
270:10
**physicality**
225:25
**physically**
45:1
**physicalness**
225:25
**Ph.D**
201:2 256:13
**picked**
53:19
**picture**
161:22 162:1 164:4
**pieces**
105:19
**pier**
64:23 161:22 162:1
164:4

**PIETSCH**
2:8
**Pifer**
26:7
**pile**
272:15,17
**pinnacle**
36:16
**pinned**
66:4
**pipelining**
49:15
**PIQUE**
2:9
**place**
30:12 37:7 64:19,23
72:14 81:6 84:2,5
85:24 89:10 99:15
110:1,7 123:24
124:20 125:19
146:19 151:19
162:16 163:4,15,18
188:4
**placed**
30:9 69:25 161:5
252:9
**places**
23:1 65:14 103:17
**placing**
85:25 161:6
**plaintiff**
1:4 2:2 7:24 238:25
239:3 240:23
241:13,19 248:8
277:6,10
**Plaintiff's**
5:20 6:4 245:6,11
259:2
**plan**
119:5 262:1
**plane**
24:10 250:4
**planned**
23:18 24:1 138:25
**planner**
20:1

**plans**
166:7
**platform**
38:2 41:7
**played**
108:17 270:3
**PLC**
2:20
**pleadings**
14:12
**please**
7:19 32:3 56:7 57:23
62:22 65:23 66:3,17
159:24 192:17
194:12,18 205:3
214:19,19 224:9,13
229:14 254:21
255:6 274:20 287:6
303:7,13 304:9,10
**plenty**
291:16
**PLLC**
2:9 3:13
**plus**
29:6 266:19 297:19
**point**
11:12 27:2 69:2
75:18 120:7 151:9
153:2 162:15,21
168:8 195:4 215:23
219:3 221:17,20
240:17 267:14,21
268:3 274:8 275:21
276:19 278:12
279:8 283:12,22
288:3,14,20
**pointed**
163:2
**pointing**
283:10
**pointless**
271:7,9
**points**
248:10 267:11
**policies**
99:15

**policy**
237:21 244:16
287:14,15
**political**
43:13
**politics**
37:5
**poli1tical**
229:5
**popular**
28:6 41:25 264:6
**population**
93:18
**porch**
65:21 222:1
**portion**
181:24 238:13
**position**
34:1 107:14 182:10
283:15,16,18
**positions**
44:13
**positively**
190:21
**possession**
133:19,20,23 134:2
**possibility**
218:3
**possible**
81:25 82:1 83:2,22
83:23 169:1 183:11
**Possibly**
261:23
**post**
291:14
**Poston**
2:9
**potential**
39:13
**Potiphar's**
105:1
**poverty**
84:6
**power**
53:24 83:7 201:21
**powerful**

80:13 81:18 82:3,9
82:12,23 83:9,18
**practically**
37:20 227:18
**practice**
16:23 127:7 230:25
231:7,20,21 239:2
239:11 240:22
**praise**
144:21 145:5 172:21
173:4,7,13,17 174:6
175:1,8,10
**pray**
137:9 192:17
**prayer**
16:24,25 43:15,20
196:11
**praying**
184:12
**preach**
46:22 79:19 119:20
211:25
**preached**
54:8,16 64:13
**preacher**
41:11 224:5
**preachers**
25:24 56:15 58:6
119:22
**preaches**
119:12
**preaching**
28:5 41:8
**preceded**
181:14
**precise**
130:13 209:1
**predicated**
299:21
**predict**
213:1
**prefer**
31:3
**prejudice**
290:18
**premise**

47:16 173:16
**preparations**
108:8
**prepare**
12:13,19
**prescribe**
258:6
**prescribed**
256:14 257:20 258:3
**presence**
81:15 250:5
**present**
3:18 13:1,2 153:19
158:19 170:14
171:3 191:17
**presented**
129:11 139:24
142:11 162:25
**preservation**
237:7
**preserve**
236:1
**preserving**
233:19
**presidency**
36:11 37:3 39:11,19
39:22 40:4 41:4
112:6
**president**
29:9 37:9 39:4,7
40:10,11 41:11 42:9
43:5,22 44:15 98:9
98:10 117:10
120:23 124:3 149:3
184:6,18 189:4
200:19 208:24
212:24 229:4 277:6
288:15
**press**
43:9,9 227:13
**pressure**
152:13
**pretty**
19:4 29:25 34:7
272:13 280:24
299:9,20

**preventative**
188:4
**previous**
103:15 124:24 150:9
170:5
**previously**
126:20 133:16
151:24
**preyed**
48:8
**preying**
166:2 299:5
**pride**
53:22
**priest**
61:12,15 62:14,22
67:14
**principle**
193:25 199:24
200:14
**print**
112:2 156:14 303:5
**printed**
156:15 181:21 246:4
**prints**
244:3
**prior**
15:21 18:11 42:16
46:1 57:23 65:2
98:12 122:6 123:25
136:4 184:15,23
185:11 227:10,24
230:24 232:13
239:2 240:22 280:1
**private**
108:13 191:23 195:6
195:6 273:24
**privately**
190:6
**privilege**
61:13,16,17 62:18,22
66:19 156:7 252:9
274:4
**privileged**
204:14 251:25
252:19 288:1

**pro**
3:8,13
**probable**
275:2,6
**probably**
12:23 23:24 27:1
28:13 29:22,23
30:14 36:8 42:14
43:6 45:3 46:20
47:7 54:3 64:17
86:4 87:10,11 88:17
89:3 90:8 104:2
107:11 154:25
155:1 189:6 198:6
199:12 212:14
213:6,7 214:2,2
219:13 224:16
226:14 227:12
228:19 231:25
249:12 250:7
268:19
**problem**
10:17 35:4 169:7
229:1 253:5 263:21
266:7 294:18
**problematic**
283:13
**problems**
280:21
**procedurally**
242:22
**Procedure**
304:7
**proceed**
131:16 288:4
**proceeding**
10:25 31:24 135:14
**proceedings**
300:13
**process**
15:15 48:19 50:9,14
50:16,18,25 99:19
111:9 116:24,24
123:20 184:10
186:7 190:24
191:20,23 194:8

228:2
**proclaimed**
56:1
**produce**
16:18 105:18,23
106:1,1 142:18
148:2 212:5 242:17
244:22,23 264:20
292:16
**produced**
14:22 15:9 105:8,12
127:8 134:7 136:11
235:11 236:12,17
236:19,22,22,23
237:19 248:24
252:9 265:5,8,9,14
265:16 296:17
**production**
251:14 265:17
**productive**
237:7
**professional**
191:18 258:14
**professionalism**
186:7 228:2 230:10
**profit**
84:10,11,12 87:17,18
87:19 89:17,17,18
**program**
49:1 50:5,7,12 51:10
52:13,18 211:23
212:13,17,23
**progress**
299:22
**prohibited**
301:10
**promise**
232:1 297:18
**promised**
281:2
**prompt**
18:14
**prompted**
18:1 46:2 53:18
106:4 122:23
**proof**

230:12
**propensity**
83:8
**proper**
143:9 195:20,21,22
**properly**
31:22 281:9
**property**
15:20
**protect**
31:20 177:2 178:2
**prove**
119:6 137:10 155:2
**proved**
44:17 210:12 279:1,2
**proven**
287:9
**provide**
19:22 221:5 301:8,12
**provided**
71:15 251:2 272:7
287:6
**providing**
163:4,21
**proving**
187:2
**provisions**
301:7
**Psalm**
194:1
**Psalms**
107:18
**psychological**
256:11
**psychologists**
256:13
**public**
8:17 47:20 104:20
113:10 116:14
155:3 181:10
188:23,24 196:5
197:13 292:8
305:23
**publication**
18:11
**publicly**

MAGNA
LEGAL SERVICES

157:25 184:21
195:10 289:20
290:3 291:9,20
292:14
**publish**
266:22 294:24
**published**
56:10 228:22 248:5,8
294:11,20 295:14
**publishers**
96:9,14,20
**publishes**
225:13
**publishing**
228:21,23
**pull**
218:6,16 219:11
**pulled**
66:13 109:3 166:20
215:24 216:5,17,19
216:22 218:18
**pulling**
219:3
**pulpit**
40:20 187:19 212:1
**punitive**
204:17,18,19,22
263:8
**purchase**
232:14
**purported**
289:21
**purpose**
31:17
**purposes**
71:8 136:2 246:25
**pursuant**
31:21 301:2 304:6
**pursue**
80:13 131:3
**pursuing**
81:6,7 204:17 253:11
**put**
28:5 49:13,14 50:23
96:14 101:9 108:3
143:21,21 147:4,19

152:12 154:18
156:19 159:23
168:6 182:22 183:8
183:9 194:7 197:5,6
201:13 204:12
222:7 239:18
247:17,19 253:5
263:5 269:10
293:18
**puts**
243:25
**putting**
62:23 191:6
**p.m**
125:6,8 203:5,8
222:9,13 295:20,24
300:11,14

——————————
**Q**
——————————
**qualifications**
200:23 201:23
202:14,16
**qualified**
177:18
**Quest**
121:13
**question**
11:7 30:7 42:12 43:2
43:3 57:19,23,24
58:2,22 59:15,17
61:2,18 62:9 68:12
70:24 71:2,19 80:15
83:12,13 102:8,9
104:23 111:1 114:2
127:4 135:14,16
139:12,15,20,22,25
140:4,24 141:1,5,8
141:12,19 142:8,20
142:22,22,24
144:19 145:4,8
146:6 156:2 158:11
158:20 159:3 160:4
162:7 163:13
171:11 173:16,16
173:21 174:9,16
180:8,21 198:24

201:6 204:21,22,25
205:6,12 208:13
210:11 211:10
221:7 224:9,17,19
229:20,25 230:2,7
234:5 236:20
246:22 247:12,14
247:22,25 251:3
253:20 254:10,21
254:24 255:4,12,18
256:19 258:13
260:15,18 262:11
262:20,25 270:12
271:3 272:6 274:3
274:20 276:24
278:19 279:18
281:8,13 283:25
284:2 285:1,8,22
286:14 290:6,7,11
290:13,21,22 291:8
291:25 292:22
293:18 294:3 295:5
295:9
**questioned**
64:5,9 145:19,19
150:21 156:5
**questioning**
71:9 237:2 267:20
282:5
**questions**
10:6 32:25 33:21
35:22 57:3 59:6,13
62:19,23 103:15
104:22 113:25
118:11 120:17
128:17,21,22
129:14,24 130:25
133:4 135:18,23
136:13,24,25 137:8
137:9 138:9,13
140:16,18,20
141:17 145:22,25
146:2 147:8,8,22
148:5 158:17 163:8
166:23 179:21
200:22 210:24,24

222:15 223:2,18,21
225:6,23 227:6
243:7 250:3 256:6
260:2 262:21
264:12 269:5 278:1
278:11 281:10
289:6 296:2,5 300:2
300:3,4
**quickly**
224:8 272:14
**quiet**
217:23
**quit**
299:16
**quite**
97:12 150:12 169:17
**quotation**
174:14
**quote**
55:10 105:15 131:10
173:17 182:4 183:2
201:3
**quoted**
107:6
**quotes**
166:14 172:20
175:25
**Q&A**
290:16

——————————
**R**
——————————
**R**
2:20 3:8 302:1
**rack**
146:24,24
**radio**
224:6
**raise**
129:9 130:1 132:16
174:13 179:7
**raised**
64:1 92:24 130:2
280:8
**raising**
218:7
**ran**

39:3 44:11 92:20
97:3 201:20 249:23
**random**
231:8
**range**
220:7
**rates**
301:15
**rational**
180:7
**rationale**
204:20
**rattle**
148:6
**Rawlings**
5:23 250:10
**reach**
66:23 106:5 114:23
151:10,12 271:9
**reached**
103:8 110:18 114:25
153:13 249:20,22
**reaching**
39:22
**reaction**
282:22
**read**
12:15,16 54:4 55:10
55:18 58:3 113:23
159:17 171:16
177:24 182:16
185:2 186:12
189:10,22 194:22
199:6 205:3,4
207:25 208:2,8,21
209:13,24 210:1
218:23 227:18
229:14 231:13,16
239:4 240:24
241:24 242:14
245:16 246:14
247:5 252:1,6
254:22 266:17
276:25 277:3,8,15
288:1 289:24 291:2
291:3 292:19 294:2

303:3 304:2
**reading**
56:8 116:11 166:23
169:21 227:11,12
227:15 228:9
234:22 238:23
240:20
**reads**
182:4
**ready**
110:14 142:12 167:2
222:4
**real**
63:21 97:14 140:7
163:11 217:12
**reality**
52:12 193:15
**realize**
47:10,12 148:25
**realized**
18:3 130:9
**really**
15:23 17:12 18:15
24:12 26:5 28:14
41:20 47:9 50:21
52:1,3 53:20 65:22
88:20 95:1 96:25
97:9 123:19 134:4
138:11,17 150:12
150:20,21,21 181:2
181:22 199:13
200:8 201:17 204:2
206:16 235:7 244:4
251:3 280:22
297:13
**reason**
41:7 50:11 64:6 66:7
82:14 97:2 100:1
117:1,4 118:12,13
122:16 133:15
134:14 136:3
138:12 155:16
163:11 193:8 197:8
197:14 216:7
254:19 256:12,18
257:13 288:4

304:13,18,23 305:3
305:8,15
**reasonable**
175:15 239:1
**reasoning**
97:9 294:12
**reasons**
31:23 50:17 197:12
293:7 304:8
**recall**
28:15 39:21 43:12
44:19,22 53:14 54:6
83:20 84:21 88:11
90:4,7 99:18 116:7
118:7 120:22
122:21 124:25
126:7 136:16
137:11 139:15,19
140:6 142:12,15,24
144:20 146:16,16
148:9 159:4 163:3
163:17,21 181:10
272:22
**recalled**
146:13
**receive**
77:24 99:22 210:24
239:16 265:24
266:2 279:9
**received**
11:16 15:2 64:15,22
68:5 86:9 88:22
107:3 119:10 160:8
210:24 250:23
251:1 253:13
269:16
**recess**
12:1 70:18 125:5
203:6 222:11
295:22
**recitation**
183:3
**recognition**
76:4
**recognize**
71:17 212:10

**recollection**
78:12 126:1 130:21
148:9 169:22
252:20
**recommendations**
114:1
**reconciliation**
191:21
**reconsider**
268:18
**record**
7:5,20 11:22,24 12:3
34:23 36:2 51:12
58:3 62:4 70:12,17
70:20 77:22 105:5
106:21 123:25
125:3,8 131:21,25
133:2,13,15 134:14
135:2,4 136:6,7
155:14 161:19
198:15 203:5,8
205:4 222:10,13
224:14 229:22
235:9 238:10 245:3
245:11 250:15
251:17 254:3,22
262:23 263:7 291:6
295:1,21,24 300:12
302:10
**recording**
104:3
**records**
198:19 221:10
**recovering**
191:25
**reduction**
72:9
**reelected**
44:9
**refer**
30:21 32:7 209:25
**reference**
31:7,14 33:4,18
135:24 169:16
171:18 199:6 216:6
221:9

**referenced**
17:21 30:22 36:10
52:2 54:9 81:19
188:16 213:12
**referencing**
169:18 171:22
188:25
**referral**
301:13
**referred**
82:11,13 106:4
162:22 201:3
269:21,23 294:7
**referring**
29:9 32:13 112:22
121:18 137:17
209:14,20 237:1
283:5 291:21
**reflected**
270:8
**Refuge**
47:6,7 48:14,25
49:19,24 50:10,12
51:8,20,22 52:2,13
53:5
**refunding**
94:18
**refuse**
55:23 65:10
**refused**
29:22
**regard**
34:1 169:8 231:19
234:12 258:15
267:11
**regarding**
225:24 248:5 258:19
260:3
**regardless**
48:19 220:5
**regret**
190:12
**regular**
43:25 70:6 99:6
157:4 216:10
**Regulations**

301:3
**Rehoboth**
102:24
**reinsure**
109:9
**reissue**
49:14
**reiterate**
105:6
**relate**
204:9 236:16
**related**
39:6,10 110:21
124:17 129:14
158:9 175:19
234:24 235:15
236:1 302:12
**relates**
162:8,9 174:19
204:11 252:16
**relating**
234:12 258:3 296:17
**relationship**
48:2,9 49:6,7,8 60:14
138:17 143:11
144:22 150:16
152:2 172:22 173:8
173:18 174:7
188:11 206:19
217:13 226:12,15
270:23 301:6
**relationships**
188:10
**relay**
270:22
**release**
98:13 184:3 235:19
292:8,14
**released**
184:23 188:20
289:21 290:3 291:9
291:20
**relevant**
15:17 17:3,4 159:15
179:18 234:10
236:16 237:4

**relief**
261:20,25 262:9
**remain**
47:24 55:22
**remained**
179:5
**remains**
67:18
**remember**
12:6 28:14 35:14
38:20 39:8,12 41:3
43:7 54:2,16 63:20
69:16 71:1 78:20
79:3 84:8,22,23
85:9,18 99:11,14,21
99:24 115:12,15,19
116:3,4,15,16 117:5
120:24 121:3
122:24 123:8
137:13 140:8
141:25 142:14
145:2,3,8 146:4
159:3 161:24 163:2
163:12 164:24,25
170:7 172:16
175:23 176:3
181:15 183:1 189:7
190:4 201:1 214:7
214:14,21 215:3,22
216:14 217:22
218:23,24 225:6
227:11 238:15
242:19 248:16
250:21 252:12,15
254:15 265:13,14
265:23 266:14
275:21 276:15
279:16 290:22
293:14 294:1
296:22
**remembered**
161:21 169:13 268:5
**remind**
97:12 204:15 291:3
**reminder**
196:12

**remove**
31:6 147:6
**removed**
22:14,15 89:2,12
118:13
**removing**
108:6
**rent**
162:16
**rentals**
164:12
**rented**
65:1 103:18 137:6
138:15 140:9
145:13 146:19
164:7
**renting**
81:6
**repeat**
205:1 286:17
**repeatedly**
105:11
**repent**
194:14 199:20
**repentance**
191:21
**repercussions**
281:3
**rephrase**
180:20 224:10
**replied**
158:10 178:18
**report**
5:4 18:5,16 30:23
64:8 69:12,15,18,20
79:18 90:12 91:10
98:13 100:13 101:9
101:23 106:14,18
106:19 110:8 114:7
116:6,12 118:21
119:8 123:17
138:22 140:20
149:12 150:12,13
150:15,19 152:11
156:13,15,21 157:4
157:7,11,14,16

159:25 166:4 167:2
169:21 171:14
172:6,8,14 174:16
174:21 179:12,13
181:6,11 182:13,15
182:16,24 183:4,5
184:4,9,14,22,25
185:11 186:6,9,15
186:20 187:13,23
187:23 192:23
193:9,14,15 195:8,9
197:18 203:12,14
206:19 210:14,14
210:23 213:1,4
216:24 218:24
226:17 227:17,19
227:22,25 228:20
228:24 230:9,12
235:19 248:2,4,7,13
249:13 252:6
253:14,17 254:25
255:15 258:21,24
258:25 259:1
260:23 262:15
263:25 265:1
266:20 269:21
270:3,8 271:23
272:11 275:3,7,22
277:24 280:17
284:23 285:18
288:23 289:3,21
290:3 291:9,15,20
292:14,15 294:9,11
294:12,19 295:6,8
297:20
**reported**
100:11 174:4,11
**reporter**
7:17,20 9:21 57:24
58:4,16 73:21 205:5
224:14,23 254:23
301:1,5,13,21 302:6
**Reporters**
303:15
**reporting**
172:6 301:3,8,12,13

**reports**
258:18
**report's**
18:11 113:22 138:24
184:16
**represent**
8:24 40:12 222:23
250:22
**representative**
301:5
**represented**
155:10,25 181:4,5
230:23
**representing**
7:23 8:1,5,8,11,14
155:18,20 156:3
181:3 250:24
251:19
**reproach**
201:10,18,24
**Republican**
43:19
**request**
7:15 29:21 66:5
70:23 88:18 115:10
255:21,25 297:19
297:20
**requested**
66:9 303:3
**requests**
15:14,18 244:21
**require**
80:7
**required**
52:17,19
**requirements**
294:24
**reread**
12:15 291:5
**reschedule**
135:9
**reserve**
300:9
**reside**
17:11
**residence**

17:16,22 18:8,14
**residential**
49:1
**resign**
106:5 191:22 225:10
**resignation**
101:11 152:3,22
158:24 184:19,22
225:5
**resigned**
48:10 159:1,6 182:10
184:17
**resigning**
152:5,6,25
**resistance**
217:19
**respect**
184:20 282:16
**respected**
44:17 182:19
**respectful**
282:11
**respects**
31:21
**respond**
43:9 109:17 187:12
262:10
**responded**
140:13 147:5 160:10
162:5 164:18
165:11 289:23
**responding**
146:7 159:4
**response**
5:20 64:23 136:19
139:6,14 141:19
142:4,20 150:24
152:21 182:1 190:2
241:21 245:7,11
276:12 300:7
**responses**
14:17 91:4 128:16,20
129:3 245:19 246:2
246:9,13 287:10
**responsibilities**
98:18

**responsibility**
65:12 120:13 190:13
190:25 192:10
196:2 303:4
**responsible**
161:2 281:12
**responsive**
15:18 16:14 221:6
236:14,15 237:4
239:1 242:23,24
243:1 244:20,23
251:25 252:19
**rest**
118:18 185:1 190:12
194:23 254:14
261:7
**resting**
64:14
**restoration**
49:4,5 191:21 196:5
206:20,22
**restored**
108:11
**result**
57:12 58:22 207:5
258:21 260:23
263:25
**resurgence**
38:6 40:17,23
**retain**
234:2 237:4 239:3
240:23 241:6
**retained**
235:1,2,8,18 242:22
273:4
**retaining**
241:10,11
**retention**
230:19 237:9 244:16
**retired**
19:5 74:18
**retirement**
22:9 25:3 70:1 78:3
**return**
74:6 192:1 232:19
260:9

MAGNA

LEGAL SERVICES

**returned**
21:11 24:3 303:8,11
**returning**
123:13
**Returns**
4:12,13,14,15,16,17
4:18,19,20 71:13,24
72:23 73:5,18 74:4
75:10 76:13 77:1
**reveal**
79:23
**revealed**
212:7
**revenue**
85:21 264:18
**reverse**
48:13
**review**
14:15,17,19,21,24
17:6,7,8 303:4
**reviewed**
14:11 157:13,15
227:5 259:20
**rewind**
108:19
**rid**
244:6
**ride**
41:12
**ridiculous**
33:15 134:18
**right**
10:22,23 15:13 18:13
20:13,18 22:18,19
29:12 36:17 42:18
53:8 56:3 57:15,22
59:14 61:13 67:14
67:17 68:16 69:12
74:13 90:13,24 98:8
103:13 106:2
112:10,24 114:22
119:23 125:9 126:3
128:6,21 130:11
131:7 132:10
133:11 134:9,12
135:1 141:4 146:15

156:6 167:18 168:2
177:25 180:16
181:6 183:14 189:4
190:5 199:2,2 202:2
215:11,15 219:23
220:6 222:8 224:11
226:22 227:2
230:16 231:5 232:7
235:21 240:16
242:6 245:23,24
253:4 256:20 257:1
257:6,11 262:2,3
263:21 265:18
266:7 272:16,16
278:6,8 279:11
281:25 282:24
290:20 291:11
292:10 294:23
295:4 297:16
298:19
**rights**
153:17 182:18
204:10
**RILEY**
2:20
**ripped**
285:15
**risk**
118:25
**risks**
210:15,16
**road**
18:20 23:22 138:5
**Rob**
7:22 33:22,23 34:4,7
34:9,23 131:23,24
131:25 132:14
134:16,21 156:14
156:25 204:2 227:3
229:15 230:3
251:10,19 252:23
260:16 263:1 273:7
273:8 274:7 276:14
281:19 283:23
284:8 288:11 289:8
293:11 294:21

**ROBERT**
2:2
**robert.macgill@m...**
2:5
**Robin**
1:22 7:18 301:20
302:6,20
**Rogers**
25:16 36:24 37:10,15
**role**
26:21 36:13 40:4
46:5 51:19,22 67:6
69:2 91:25 98:4,15
98:19 164:7
**roles**
30:10 51:9
**roll**
218:20,22
**rolled**
218:20,21
**Ron**
132:11
**Ronnie**
41:2 117:12
**roofs**
56:1
**room**
59:22 60:5 65:1
92:23 93:19 103:9
103:18 137:5,6
138:15 140:10,11
145:14 146:25
147:1 175:11
186:24 190:6 226:7
298:16 299:14
**Ross**
3:9
**roundabout**
83:24
**round-table**
23:8
**route**
197:13
**routinely**
231:3,7,9
**row**

45:25 149:5
**Roy**
15:4,5 121:2 123:15
123:16 171:9,23
172:10 233:4,5
248:7 267:18,22
270:3
**RPR**
1:22 301:20 302:20
**rub**
65:15
**rubbed**
221:25
**rubber-banded**
289:10
**Rule**
304:6
**rules**
9:17 154:9 301:2
304:6
**run**
13:20 21:16 37:19
47:11 66:8,11 216:7
216:8 297:11
**runner**
216:9
**running**
38:3 66:10 96:25
116:2 214:8,11
297:14,15,17
**runs**
91:18 92:5
**run-of-the-mill**
200:7
**Russell**
115:23

**S**

**sabbatical**
68:21 123:6,10
124:16,17 125:1
157:25 158:9

**sacred**
49:13

**sacrifice**
186:10

**Safaa**
3:19 7:16

**said/she**
136:6

**sake**
106:21 237:11

**salaried**
69:13

**salary**
29:14,18,22 30:5,6
69:7,23 70:6 71:4
72:15,18 75:20
78:23 92:21 261:12

**sales**
261:13

**salt**
297:21 298:1

**Samantha**
115:24 154:11
272:10

**Sammander**
3:19 7:16

**sanction**
282:2

**sanctions**
131:3,12,14 136:2
282:4 283:16

**Sanders**
2:3 7:23 13:3 276:17
300:9

**sat**
66:5 144:2 214:16,17
214:17 215:10,25

**save**
106:13 196:21
239:16,18

**savvy**
15:24 239:15,24

**saw**
14:25 64:17 106:15
106:16,16,17
165:23 168:12
186:19 249:25
270:5 297:10,20

**saying**
61:18 63:5 64:16
83:17,20 95:24
99:21 102:5 103:21
103:22 111:11
137:7,11,13 138:14
142:12,14,15,24
143:16 153:4
155:24 160:14
161:2,2,22 165:1
172:16,20 173:7,8
173:13,16 174:6,8
174:10,18 175:9
176:3 178:7,19
190:4 196:20 229:5
229:7 236:13
237:11,13,13 249:2
253:24 254:1
261:18,21 265:15
282:18 292:11
299:15

**says**
63:12 65:5 128:20
129:7 157:23
159:14 160:7
161:21 165:5
179:11 180:21
182:3 184:2 205:25
207:14 208:22
209:17,22 238:22
238:25 240:19
241:12 245:18
246:8 247:25 252:3
254:16 261:14
289:19

**SBC**
5:10 29:5,9 36:11
37:5 39:7 40:4 41:4

42:9 43:5,22 44:15
118:14 131:5
132:23 133:7,13
134:13 177:3
184:20 185:17
186:2 189:4 198:4
198:17,17 200:19
204:15,18 208:24
211:7 221:3,3 229:2
252:6 273:22 277:5
288:15 289:20
292:16

**SBC's**
134:1 184:4 289:22

**scared**
138:1

**Scarlett**
3:3 7:25 8:23 34:10
58:1 62:16 111:12
154:3

**Scarlett's**
198:24

**scenario**
147:18

**schedule**
115:8

**scheduled**
91:12 115:22 126:8
145:15

**scheduler**
115:10

**scheduling**
100:24

**school**
19:13 43:18

**Scope**
238:22

**Scott**
2:13 8:13 120:20
222:22 229:21
284:7

**screen**
273:10

**scrutiny**
110:5

**seal**

31:6 303:8

**search**
21:6 239:1

**season**
183:1 189:6 191:25
196:4,11

**seat**
142:13

**seated**
65:23 214:19

**second**
44:11 75:17 76:17
77:9,12 94:11
101:14 105:13
118:4 119:14
125:10 127:25
128:19 136:16
150:4 159:13,14,16
159:19,23 160:2,2,4
160:5,15,16,17,18
160:19,21 161:8,8
172:7 174:4,23
180:8 185:21
188:22 226:23
241:5 251:21
252:25 267:12
268:3 274:22
279:19 280:4

**secondly**
18:4

**secretary**
85:9 103:8 115:21

**section**
156:16 182:1 208:2

**secured**
286:19

**seduce**
65:10 147:3

**seduced**
143:12

**see**
15:15,25 16:13 17:3
21:7 24:17 45:8,14
47:19 55:13 72:16
73:16 85:3 94:15
97:2,8 104:11

**MAGNA**
**LEGAL SERVICES**

119:20 127:2,22
128:17 129:5,7
138:13 139:5
150:10 157:8
160:13 164:24
170:2 182:14
185:11 203:17
204:20 208:13,18
210:13 213:4 215:7
215:21 216:6,17
220:18 228:23
237:8 238:23 239:4
240:20,24 241:23
243:10 246:2 247:5
250:1,2 251:20
252:1,6 275:3 277:2
277:8,15 279:10
280:2,25,25 282:3
287:25 288:9
289:24 290:17
293:25 295:12
**seeing**
21:11 165:16 227:24
228:7,17 238:15
250:21 265:15
**seek**
80:12 81:18 191:20
**seeking**
34:20 37:14 60:9
82:3 108:10 191:24
192:9 198:2 212:2,5
255:16 260:4,6,9,20
261:9,11,19,24
262:9
**seeks**
37:15
**seen**
64:19 109:25 126:19
131:12 134:11,21
150:20 152:14,15
154:1 156:17,17
157:2 167:20 185:5
185:7,23 207:22
227:9,9 230:8
240:13,15 249:17
249:18,23 250:20

256:7 259:19
282:20 283:6
287:25 288:12
290:10
**selfless**
182:7
**self-publish**
96:16
**sell**
20:16 85:23 266:3,23
**selling**
21:3
**semiannual**
264:20
**seminary**
25:10 168:23 177:12
177:16
**send**
64:17 140:16 153:15
155:24 208:7
211:15 239:17
241:7 251:5,11
272:10 303:9,13
**sending**
41:16 241:9 244:5
269:5
**sends**
296:24
**senior**
78:7 89:15 98:8,10
150:6 158:25
184:17 229:3
**sensationalized**
192:23
**sense**
49:5 60:14 78:9 93:5
116:20 145:1 177:7
219:7,7 255:24
270:5
**sensible**
166:24,25
**sensor**
51:17
**sent**
131:8,9 140:18
238:18 248:23,25

250:16 251:13,18
259:24 273:16
276:5
**sentence**
160:4 161:9,20
162:11,14 163:1
164:5,23 165:4,9,15
165:19,22 166:4,6
167:6,7,8 168:7,19
170:21,22 171:13
171:16,17,25 172:1
174:4 175:18,24
176:10,18 177:4,23
179:4 180:21
241:12,19 242:14
247:18 289:19
291:2,5
**sentences**
179:10
**sentiment**
189:13
**separate**
89:5 127:7 286:18
287:5
**September**
68:25
**series**
53:14 248:9 252:4,4
252:12
**serious**
109:6 110:5 129:10
262:15
**sermon**
16:21
**sermons**
20:16 21:3,4 53:15
54:6 81:24
**served**
29:1 85:8,16 89:3
210:25 259:21
**serves**
18:19 85:6 89:21
**service**
49:10,11 75:21 76:4
189:4
**services**

1:23 7:17,18 28:12
29:7 41:17 79:2
80:9 301:5,8,8,10
301:12,12,15 303:7
303:14
**session**
104:13
**set**
5:21 46:8 87:17
89:17 108:16
147:18 148:21
159:16 172:3
182:24 183:2 187:1
208:12 225:23
245:7,12 262:23
276:13 302:9,16
**setting**
10:3 35:13,24 246:24
**setup**
126:3
**seven**
29:22 81:3 192:12
199:8
**severed**
206:19
**severely**
67:2
**sex**
53:24 60:1,2,16
99:16,20 158:13,14
287:12
**sexual**
30:18,23 33:10 39:6
39:9,10,21 40:1
44:20,24 45:5,11,17
48:17 57:8,12 58:17
58:23 60:24 67:25
83:6,16 110:21
111:4 113:13 114:2
136:22 137:3
148:15 158:9
171:18 176:25
179:11 184:4
185:16 188:4,6
217:16 219:16
247:2,4 289:23

**sexualized**
167:9
**sexually**
140:10 170:24
171:21 172:18,18
277:10
**shake**
285:15
**shaking**
175:9
**shame**
49:9 191:2 194:15
**Shane**
100:18
**shape**
62:15
**share**
182:5 254:16 299:13
**shared**
150:25 167:16 191:7
191:11 280:15,16
284:18,22 295:7
**sharing**
123:18 161:24 289:9
**shenanigans**
32:22
**shirt**
216:18 217:1
**shocked**
146:21 193:19
**short**
57:17 59:1 213:23
214:6,8,10 218:5
222:5
**shortly**
241:22
**shorts**
166:20 214:6,8,9,10
214:11 215:21
218:6,16 219:4,11
221:15
**show**
24:14 91:25 104:7
148:3 199:23
237:24 240:4
241:21 272:13

**showed**
100:23 146:21,22
227:7 272:25
**showing**
72:4 105:14 132:21
132:21
**shown**
226:23
**shows**
69:15,18
**shut**
55:24 193:19
**side**
11:19 52:6 65:5,9
143:14 165:6,6
221:21 268:20,22
269:2
**sides**
250:18
**sideways**
298:8
**sight**
194:2
**sign**
303:3
**signature**
238:21 246:4 300:10
303:1,12
**signed**
246:5,17 303:6,8,11
**significant**
108:1
**signing**
246:7,18
**silent**
55:22 113:14
**similar**
93:8 176:19 241:1
**simple**
10:11 41:7 64:24
**simply**
91:25 138:7 156:4
261:3
**sin**
53:23 55:25 56:1
67:7 79:24 107:20

107:20,23,23
190:11,17,25
192:10,21 193:23
193:25 194:15
195:24,25 199:7,11
199:18 201:14
**sing**
49:11
**singing**
89:7
**single**
67:9 110:8
**SINGLETON**
3:3
**single-campus**
27:2
**singular**
182:5
**sinned**
107:18 194:2,14,17
195:7,24
**sinners**
196:21
**sins**
108:1 201:22
**sir**
224:24 225:2 226:2
228:8,8,12 232:8,11
233:5 235:21,24
238:19,24 239:5,8
240:21,25 241:3,25
245:4 246:3,15,20
247:6 248:11
249:19,21 252:2,7
252:21 253:10,12
256:16,18 258:17
259:1,22,25 260:13
262:3,6,7,10 264:1
264:3,13 267:2
268:12,22 273:5
274:23 275:4,21,25
276:8 277:4,9,16,20
284:19 288:6,6,6
289:25 290:8,24
291:4 296:3,4,16
**sister**

22:1
**sit**
65:23 163:12
**site**
256:12 258:20 294:8
295:3
**sitting**
65:25 66:1 138:24
163:9 215:15 230:6
298:7
**situation**
107:9 189:17 190:3
190:13 191:3
193:14,18 195:17
215:4
**size**
24:21
**skin**
217:3
**skip**
26:13 162:20 263:20
263:22
**skipped**
162:11
**sleep**
118:23
**small**
20:11 196:3 251:14
**smell**
167:13
**smells**
167:14
**smidget**
117:5
**smoother**
9:19
**smoothly**
10:20
**sneak**
231:22
**snokes@bradley.c...**
3:6
**social**
227:13
**Solutions**
1:7 2:13 5:21 8:12,14

MAGNA
LEGAL SERVICES

155:17 182:13
186:3 208:4 222:24
245:7,12 296:1
**somebody**
20:24 143:10 148:24
153:11 163:7
172:18 174:13
176:6 200:1 203:13
**somewhat**
16:21
**son**
21:24 60:15,16
**Song**
88:24 89:2,7,16,24
**Sonny**
43:17
**son-in-law**
90:22 91:18
**son-in-laws**
85:18
**soon**
28:13 236:19 241:15
**sorry**
11:25 27:11 66:16
74:9 87:25 105:22
113:1 126:15
129:17 139:10
155:15 159:18
170:3 177:5 190:17
192:15 193:16
195:15 196:16
215:16 218:9
229:11 232:24
233:1 238:6 250:6
258:11 259:14,15
260:16 269:7,22
278:17 279:4
285:24 294:22
**sort**
22:5 36:6 40:3 70:1
214:21
**sorts**
224:7
**sought**
99:3 191:17,18 194:7
194:16 209:7

**sound**
11:13 69:12 177:17
219:1
**sounding**
169:11
**sounds**
229:9 241:1,6 268:16
280:7
**source**
228:20
**sources**
22:7 85:21
**Southeastern**
25:9 168:22
**southern**
1:6,8 2:8 3:2 7:7 8:2
8:6,9 25:21,23 26:1
29:2 40:5 42:4,7,20
42:24 43:23 47:11
56:15 58:6 61:3,23
61:24 62:1,2 67:4
80:12 82:10 110:6
119:12 136:10
138:20 140:17
143:22 145:18,18
149:10 154:21
177:13 182:25
185:1 186:19
199:13 207:4,13
208:4 210:9,25
211:9,13 212:12,22
212:24 213:2 229:6
295:13
**Southwestern**
207:14
**spa**
79:6
**SPC**
105:20,20
**speak**
22:8 32:18 38:23
39:2 44:3,18,25
55:22 64:8 89:11
90:16,19 92:1,2
100:23 102:5,11
104:12 110:15

117:1 120:2 122:12
141:17 164:25
178:12,18,19
184:21 185:12
186:22 224:8
239:23 260:8
278:18
**speaking**
22:16 23:22 24:15
41:14 43:10 64:21
76:8 85:24 86:6,8
86:19,20 89:13
90:20,23 116:19
133:7 142:5 186:11
199:12 261:13
294:14
**speaks**
60:13 149:5 255:8
275:15
**special**
21:25 293:23
**specific**
118:8 140:4 176:24
252:20 295:8
**specifically**
17:8 45:21 47:2
51:20 54:6 106:22
110:20 166:19
216:4 255:8 263:11
**specifics**
225:24 280:12
**speculating**
47:25 81:22 220:24
**speculation**
220:16
**speech**
281:15 283:20
**spend**
18:17 35:21 47:16
148:23 177:15
210:20
**spending**
18:4
**spent**
30:12 78:13 123:16
123:17 148:4

205:24
**spew**
103:20
**sphere**
41:18
**spiritual**
123:14 196:13 249:7
**spoke**
42:13 64:13 89:1
153:18 191:14,16
230:11 249:25
273:17 274:12,15
278:21
**spoken**
13:12 223:5 249:14
267:22 278:16,18
288:24
**sports**
66:10,11
**spouse**
56:20 58:11 59:20
60:20,24 61:4 99:13
248:6
**spouses**
21:13 67:6 209:7
**spread**
66:2 182:9 215:12,14
215:19,20
**Spurgeon**
107:6
**ss**
302:3
**stacks**
71:8
**staff**
79:8 100:14,16 110:2
115:7,8
**stalk**
81:2 147:3
**stalked**
80:24,25 143:11
202:19
**stand**
120:1 151:2
**standard**
24:15 200:6

MAGNA
LEGAL SERVICES

**standing**
167:12
**stands**
255:12
**Stanley**
25:5,18
**start**
26:21 28:11 36:7
45:22 46:2 59:15
64:10 92:15 110:2
126:11 133:4
141:21 203:20
218:14 223:20
225:4 229:19,25
234:15 277:1 296:8
**started**
20:13 23:11 26:22
46:1,10 47:9 86:2
93:8 95:4 99:23
118:3 121:13
126:11 140:3
141:16 204:5
233:19
**starting**
103:9
**state**
42:13,14,15,21 43:17
45:12 98:24 131:20
161:16 198:1
211:15,19 277:17
302:2,7
**stated**
159:4 161:9 164:10
165:23 166:16
168:20 175:24
182:22 193:2 246:9
246:13 281:4 292:7
295:1
**statement**
5:9 6:4 41:6 82:24
102:8 103:7 120:8
136:5 145:4 160:12
168:1 172:17
173:21 175:12
176:13 178:6,7
179:2 181:10 182:3

183:4,8,9,19,25
184:3,6 185:5,21
189:1,24 193:12
196:1 200:15 209:9
226:23 227:9 239:7
241:2,6 254:3 259:3
259:7 280:5 294:21
304:8
**statements**
102:21 181:14
200:14 278:2 286:1
286:4
**states**
1:1 7:8 42:15 185:25
**stating**
228:24
**status**
82:9
**statute**
163:10 197:25
**stay**
143:25 222:7
**stayed**
43:8 72:18 142:6
176:15 299:24
**staying**
140:2 278:9
**step**
101:9 131:19
**stepped**
67:6 68:5 110:7
**stepping**
123:19
**Steve**
37:22
**Steven**
206:22 211:24
240:12
**sticker**
156:19
**stipulate**
34:14
**stock**
266:20
**stood**
66:15

**stop**
132:17 134:16
229:13 264:8,11
269:11,11
**stopped**
67:1 95:2 96:20
190:3 264:25
273:25
**story**
26:13 57:11 66:20
104:23,24 108:17
118:5 119:3,3,4,5
124:10 143:15,22
143:23,24 144:1
145:20 175:25
176:1,7,8 197:14,16
210:21 226:19
268:20,23
**straight**
13:24
**straps**
216:15
**stream**
28:21
**streaming**
28:11
**streamline**
70:13
**Street**
1:18 2:4 3:14 303:16
**strictly**
104:14 170:20
**strong**
72:18 161:12
**structured**
23:6
**struggles**
79:24
**struggling**
97:16 119:23
**stuck**
103:4
**student**
100:19
**stuff**
28:7 105:24 219:1

223:25 244:4
263:22 298:18
**stupid**
117:13
**subduction**
202:19
**subject**
185:15 230:17 296:9
297:5
**submit**
290:17
**submitted**
260:5
**submitting**
196:3
**subscribed**
305:21
**subset**
42:17
**substance**
12:17 80:8 149:23
304:7
**substantive**
10:12 241:23 242:2
242:16 244:8
**succeeded**
187:7
**successful**
220:22 260:5
**successfully**
49:20 50:18
**suddenly**
158:25
**sue**
285:19 287:8,22,23
**sufficiently**
284:4
**suggest**
34:3 151:3
**suggesting**
33:24
**suggestions**
151:5
**suing**
207:14 284:24 285:3
287:19

**MAGNA**
LEGAL SERVICES

**suit**
207:13
**Suite**
2:4 3:4,9,14
**suits**
287:8,8
**summarized**
172:8 174:20
**summary**
127:21 172:9 173:23
**summer**
17:17 68:22 90:9,9
120:18 123:6
189:16 233:1
**sun**
46:7 65:6,7,8
**Sunday**
22:17 26:22 28:3
43:18 54:17 93:20
110:13 119:13
193:12 200:2
**Sundays**
22:8 23:24 27:16
41:14
**supervisor**
100:9
**supplied**
246:11
**support**
19:22 104:10 182:18
182:19 200:15
211:14 213:7
**supporting**
74:7
**supposed**
146:25 167:25
**sure**
13:9 21:1 27:19 30:6
30:11 31:22 37:6
41:6 50:21 53:2
54:8 57:21 61:14
77:8 83:13 85:19
88:6 89:25,25 94:17
109:9 113:19 115:1
121:11,21 142:3,18
142:21 151:7

156:24 160:13
167:25 172:2
183:21 185:24
188:3 206:8 215:4
218:25 220:23
223:22 225:15
229:21 230:5
231:10,17 234:4,7
234:10 237:1,5,25
239:23 250:18
253:3 262:13
263:13,23 264:13
265:7 273:12
277:23 285:25,25
287:17 291:15
293:22 294:4
295:19,19
**surgery**
218:2
**surprise**
130:6
**surprised**
68:8,13 193:18
**surrendered**
215:6
**survival**
227:14
**survived**
105:3
**survivor**
33:24 162:17 171:21
179:13 186:8 248:2
**survivors**
39:21 113:2,13 184:8
184:11,12
**swear**
7:21
**swim**
218:5
**swipe**
231:14
**switch**
232:12 273:21
**sworn**
8:16 302:9 305:21
**sympathy**

192:9
**S-125**
73:13

---

**T**

**T**
302:1,1
**table**
25:4 172:3 197:8
**Tahoe**
100:21 125:15 150:1
**take**
11:3 52:14 64:11
65:12 69:10 70:9
82:3 83:19 89:10
93:23 120:12
135:11,20 146:25
148:1,1 151:19
168:7 178:20
190:13 196:2 200:3
203:2 204:21
210:16 215:2 222:4
224:7 232:1 254:11
258:10 259:17
295:17
**taken**
7:13 11:6 12:1 46:5
70:18 125:5 145:20
145:20 146:23
203:6 222:11
257:17 258:2
295:22
**takes**
294:8
**talk**
26:16 65:13 79:16
102:15 114:13
115:16 116:21
117:2 125:17
129:25 131:17
138:8 145:7 151:3,6
152:25 153:12
214:20 217:21
222:8 224:13
230:19 231:3,6
267:10

**talked**
9:25 13:16 16:21
27:24 40:3 54:5
65:24 79:14 81:9
83:24 95:6 97:12
101:17,20,24
109:13 119:7
125:10 149:14
150:4 155:22
156:13 158:13
164:4 206:6,25
225:4 248:20 249:1
280:11 284:17
**talking**
28:8 30:24 32:7 42:2
70:22 71:4 82:7
122:14 132:14
160:10 180:17
220:3 229:16 233:3
234:7 243:5,10,12
244:11 247:10
257:24 266:25
270:6 278:5 292:23
294:19 296:22
**talks**
54:6 218:19 261:6
**tan**
167:10
**tap**
37:11 38:16 40:22
**tape**
20:9,19 27:24 28:1
87:6,7,8 88:19
**tapes**
20:13,14,15 88:22
**target**
80:20
**task**
110:20 111:3 114:3,3
184:4,7,22
**taught**
28:4 37:15 43:18
79:21 194:5
**tax**
4:12,13,14,15,16,17
4:18,19,20 71:13,16

71:24 72:2,23 73:5
73:18 74:4,6 75:10
76:13,15 77:1,4
205:25
**taxes**
206:1
**Taylor**
2:9 250:16
**teach**
28:4 37:4 79:19
98:23
**teacher**
200:9
**teachers**
200:9
**teaching**
35:21
**teachings**
54:13 79:25
**team**
27:23 52:11 80:4
204:1 206:20,22
238:5,7 249:7
**Teams**
126:5
**tech**
239:24
**Technical**
246:16
**Ted**
37:21
**television**
53:20
**tell**
9:22 10:2,3 47:5
53:17 66:19 69:22
70:2 78:23,24 83:25
92:9 96:22 102:23
103:18,19 106:12
106:22 107:12,13
116:1,8,13 119:1
120:1 127:9,12
130:20 131:22
134:13 135:4 137:2
143:14,25 145:9
147:5 150:14

153:13 168:6 201:4
210:7 220:12 224:2
268:21 271:15
277:18,22 278:23
297:9
**telling**
40:5 86:2 116:17
124:9 133:9 143:15
147:6,7 164:24
178:25 199:17
247:13
**tells**
68:9 296:24
**temperature**
65:9
**temporary**
65:11
**temptation**
46:17 53:15,21,22
79:20 140:13
196:13
**tempting**
10:21
**ten**
272:2
**tendency**
224:2
**tendered**
152:21
**tendering**
152:3
**Tennessee**
1:2 2:10,21 3:5 7:10
45:13
**tense**
158:19 217:14
**tenth**
127:15
**tenure**
67:23 72:18
**TERENCE**
2:14
**term**
29:9 34:2 43:21 44:7
44:8,11,21 208:24
243:25 277:5

**termination**
47:14
**terminology**
114:17
**terms**
34:11 37:8,18 39:7
97:22 128:25
261:20
**Terrence**
8:10 240:12 250:17
**terrible**
192:22
**Terry**
222:23
**Testament**
119:15
**testified**
8:17 105:16 151:23
161:23 174:11
213:16 214:15
215:24 268:2 270:4
270:14 296:20
299:15
**testify**
12:9 33:1,2 139:1
274:6 299:20
**testifying**
234:17,18
**testimony**
63:22 118:9 122:18
144:6 148:18
163:24 200:18,25
202:22 204:23,24
263:16 273:24
293:9 297:5 302:11
304:3,7
**Texas**
3:10
**text**
11:16 14:24 15:1,17
16:14,17,18 64:16
64:22 151:13,13,14
216:10 230:20,25
234:2 235:4,15
236:25 237:12,13
239:3 240:2,19,24

243:7 252:4,12,18
279:9 296:14
297:14 298:17
**texting**
146:23 161:22
**texts**
16:1 154:25 231:3,7
231:8,11 233:16
234:12,19,23 235:3
235:12 236:1,10,11
236:16 237:5,18,22
239:10,20,22,24
244:16 248:17,19
252:4,8 296:9,16
**thank**
35:5,6 56:13 66:25
102:13 190:10
196:16 199:3
222:17 227:3 245:5
245:17 263:2
272:17,22 273:8
276:18,24 285:4
291:1 296:1,3 300:1
**thanks**
202:20
**thee**
107:19,19
**theirs**
47:18 89:9 145:20
**theme**
53:19
**themes**
38:20 46:11 53:25
**Theological**
25:9 168:23
**therapist**
177:1,12
**therapy**
53:12
**they'd**
142:18 285:2
**thick**
71:7 289:8
**thigh**
221:18
**thing**

**MAGNA**
LEGAL SERVICES

23:7 33:23 38:15
78:22 89:6 130:7
134:20 141:15
149:6 195:20,22
197:5,11 217:11
224:3 260:22
274:17 276:9 297:3
**things**
10:20 18:2 54:10
63:18 70:13 98:6
100:1 110:10,23
117:6 120:25
138:18 199:22
212:8 232:17 244:4
257:16 277:25
280:20 297:4
298:15
**think**
9:5 16:9,16 23:16
29:8 33:23 34:2,6
41:18,25 44:10,10
44:12,16,25,25
45:13,16 48:4,24
52:21,23 55:5,8
59:12 62:13 63:1
68:15 69:1,22,23
70:7 71:8 72:12
73:22 78:1 80:21
82:19 85:8,20 86:6
87:12,22 88:4 98:6
98:21 100:3 101:2
107:22,25 108:12
113:21 117:16
124:10 132:5
144:18 147:24
148:11 151:23
152:19 153:19
154:8,8,21,22 155:2
155:16 156:19
162:11 168:8
173:10 175:5 180:8
180:18,24 183:12
188:15 191:9
195:20,22 197:22
198:8 199:14
202:11 204:16,25

207:7 209:11
211:24 212:21
215:5,18,23 219:8
219:22 220:9 221:2
222:4 226:3 229:4,5
230:3 235:8 236:11
237:17 239:6,17
242:13 243:13
244:2,2,2 245:22
251:18 253:2
256:10,10 258:24
267:8,13 268:2
271:23 282:10
284:4 288:22 289:5
292:22 293:11,15
294:14 297:20
299:8
**thinking**
68:16 103:11 123:19
146:8 154:19 163:9
167:21 219:8
**third**
2:15 127:25 141:4,7
160:20 161:9 213:7
294:1,20,25 295:8
**third-world**
86:12
**Thirty**
45:25
**Thomas**
5:11 185:18
**thought**
64:21 102:21 115:13
117:7 119:2 150:13
155:25 173:13
178:11,17 179:3,3
194:9 218:24 257:3
260:1 262:19
269:16
**thoughts**
54:15 116:23 210:25
**thousands**
35:12
**threatened**
176:12 268:15,17
**three**

23:1,1,25 25:19 29:6
35:21 61:10 82:21
98:22 128:9 145:24
179:14 186:22
208:12 250:7
266:23 270:1
292:20,21 293:7
**three-plus**
98:16
**throw**
243:23
**thumbs**
50:10
**ticket**
24:10
**till**
107:2
**time**
7:11 11:23 12:3
16:11 18:4,17,20
20:7 22:4 26:19
27:3 28:24 29:1,6
29:11 32:14,18
33:20 35:25 36:21
44:9,24 50:22 51:4
55:24 63:16 68:6
69:3,10 70:4,16,20
79:17 90:4 91:1
96:13 97:18 98:25
100:7 103:12 104:9
105:14,17 107:22
107:25 110:11,12
115:14 117:10
119:14 121:7
122:14 123:25
124:12 125:4,8
126:1,7,19 128:3,4
128:5,11,12 130:11
131:7,19 132:12,15
132:19 135:20
140:23 141:5,7
148:4 160:15,16,22
160:23 161:15
165:17 168:14,20
168:21 169:2 170:8
177:21 179:18

183:15 185:14
193:23 197:2 203:4
203:8 209:15 210:2
210:13 213:20,21
213:21,25 219:25
220:1 222:9,13
224:1 226:12 227:8
228:11,18 232:23
233:2 235:14,25
246:16 249:14
250:4 252:5 267:20
269:6 270:5,21
273:4,15 278:10,24
279:16,21 284:5
287:2,4 292:2,4,6
292:12 294:15
295:20,24 296:1
298:10 300:11
303:11
**timeframe**
214:3
**times**
12:21 22:23 46:25
48:1 50:15,16 82:19
89:20 104:2,2
129:12 133:22
138:21 154:24
176:22 180:6
194:23 203:17
213:12 219:8 280:9
293:20,21
**Timothy**
35:19 92:9,11,20
93:13,14,22 94:1,12
94:13 98:21 100:21
125:15 196:19,22
**tips**
71:22 72:4 73:2,24
75:15
**title**
54:3 98:8
**today**
9:2,14,18 12:5,14
13:15 14:6 15:6
26:10 30:19 32:2
33:15,17 34:11

MAGNA◯
LEGAL SERVICES

37:14,14 62:5 64:6
79:17 82:22 87:1
90:24 118:7 119:21
120:2 122:11
135:22 137:19
146:13 152:3
161:23 176:4
182:14,15 183:6
184:25 185:6 191:8
191:11 194:13,23
197:9 204:24
206:25 213:13
223:2,6 225:20
227:8,25 228:7
230:6,21 232:10
280:3,9 285:6
**today's**
7:11 31:17
**told**
9:16 20:24 30:17
70:4 100:1 101:5
106:24 107:10
109:18 116:4
118:17 119:4
124:23 136:21
137:14 140:15
143:24 144:13
150:8 151:7,24
152:1,19 161:5
163:20 167:24
168:12,13 171:10
171:14 193:21
209:12,15,15,16
211:25 226:6
268:25 280:1
297:22
**tomorrow**
85:20 94:17 130:8
144:7 244:24
**tonight**
231:23
**top**
66:6 71:11,20 72:3
73:1 127:22 144:3
157:23 161:20
165:19 214:7

215:24 216:5,8,16
216:23 245:18
251:23 261:5,6
**topic**
46:23 54:2,7,13,15
112:7 256:7
**topics**
38:20 39:9 46:12,14
62:24 79:19 223:9
**tops**
216:8
**tort**
293:16
**total**
180:19 261:14
**totaling**
13:10
**totally**
10:19 93:11,12
108:25 137:11
160:11 201:12
283:15
**touch**
53:2 65:18 107:1
219:14 221:17,20
221:23
**touched**
63:9,22 64:2 137:5
147:17 210:3
**touching**
148:15 218:3 226:4
**tour**
21:9
**town**
279:10
**track**
28:20,20
**traditionally**
85:15
**train**
19:6 41:12 250:4
**trained**
177:14
**training**
19:12 92:14 99:22
**tram**

249:24
**transcript**
6:15 303:4,9,11
304:3
**transfer**
233:16
**transitioning**
75:7 169:10
**transparency**
50:20 182:20,21
**transpired**
269:2
**trap**
83:18
**trauma**
118:21 258:21
**travel**
18:20 29:3 95:25
96:4,7
**traveling**
100:24 206:12 269:5
**travels**
19:3
**Traylor**
37:21
**treat**
211:1,4 256:8
**treated**
104:20 113:3 149:11
271:21 293:22
**treating**
79:8
**treatment**
154:20 258:19
293:23
**treatments**
79:6
**trees**
65:8
**trial**
153:10 203:15 256:4
287:24
**trick**
234:6
**tried**
299:9

**trip**
24:1,9
**trouble**
95:21 146:1 214:21
**Troy**
103:1 122:10,11
**true**
9:4 41:6 48:13 91:5
103:7 119:5 120:8
129:24,24 142:15
142:25 154:10
160:18 166:16
172:16 176:13
177:8 179:9 192:7
246:14 302:10
**truly**
191:13
**trust**
69:25 269:14
**trustee**
29:5 43:22 44:13,21
**truth**
9:23 10:2,4 33:14
55:21 119:1 120:1
138:6 143:6,7,8,8,9
143:10 147:6,7,10
147:15,16,19
151:24 178:22
182:22 183:2
190:22 192:5,5
212:6,7,9 246:18
269:15,16
**truthful**
10:7
**truthfully**
12:6,9,11
**try**
70:23 71:1 152:25
174:3 243:10
263:20,22 269:10
294:15,22
**trying**
83:18 123:14 175:4
177:2 178:2 211:6
223:21 237:3,8,9
244:15 252:15

MAGNA
LEGAL SERVICES

266:15 274:10
282:10 294:25
**tune**
266:21
**turn**
50:7 71:1 77:12
133:16 139:3
157:19 194:15
238:20 240:16
245:17 247:22
251:21 272:20
276:11 289:17
**turned**
15:25 66:2 92:23
100:2 215:16,16
258:7 298:7
**turning**
229:3
**tweet**
181:11 183:11
287:10
**twelve**
101:8
**Twenty**
276:17
**Twenty-five**
92:25
**Twenty-two**
90:11
**twice**
52:2 141:2 259:11
**twisted**
152:11
**Twitter**
183:14
**two**
13:9 18:2 19:15
21:24 39:7,24 52:16
65:2 75:20 76:21
85:11,14 88:4 89:5
89:9,24 90:6 91:1
101:23 103:25
123:24 124:23
126:14 129:14
138:21 147:22
163:8 167:22 171:1

171:24 179:10,21
205:1 210:17,22
212:8 227:5 235:15
236:11,14,22,23
238:6 256:13
266:11 272:3,3,4,7
272:8 280:10
282:18 284:20,21
293:20,21
**two-sided**
250:13,19
**two-year**
44:7
**type**
72:2 78:10,22 297:1
**types**
252:10
**typical**
115:3
**typically**
11:3 24:17 52:14

---

**U**

**uh-huh**
10:23 17:23 18:10
36:15,19,25 39:15
42:5 47:4 49:3 53:8
55:9 57:15 67:15
68:23 72:6 73:4,12
75:4 79:15 87:14
90:13 99:5 102:3
112:21 113:4 114:4
115:4 121:17
128:14 129:4
130:17 148:17
159:9 160:1 162:2
189:21 199:9,9
210:6 219:24,24
224:18,21 234:16
253:15 261:15
264:17 274:25
275:13
**ultimately**
233:21 294:8
**unanimous**
100:3

**unaware**
166:1
**Unbeknownst**
164:6
**unbelievable**
106:20
**uncomfortable**
167:16
**uncovered**
195:12
**underlined**
56:5
**undersigned**
304:2
**understand**
9:22 10:5,6 13:9
26:12 30:24 34:1,5
48:4 62:6 67:16,20
83:13 94:19 111:14
142:21 150:11,12
156:3,10 173:15
175:14 177:13
191:19 206:8
212:16 224:9
225:15 234:4
236:20 239:20
241:4,12,22 242:15
242:21 244:15
246:7 262:14
263:12,14,15 272:5
272:6 273:11,11
274:11 283:14,15
283:18 286:1
287:18 291:13
292:18 294:8,25
**understanding**
32:6 45:9 97:12
113:20 114:5 157:9
243:11 255:14
260:12,19 261:2
292:8 295:2
**understood**
178:23 246:17
269:24
**undertaken**
238:25

**underwear**
221:13
**underwrote**
86:9
**undisputed**
209:4
**uneducatedly**
230:11
**unfair**
181:1 213:1
**unfaithful**
56:19 58:10 59:20,21
59:25 60:4,21,22
61:4,24 62:1 66:24
67:5 83:16 99:12
119:9 202:17,18
**unhappy**
220:18 288:8
**unhelpful**
284:8
**unit**
142:2,9
**United**
1:1 7:8
**University**
25:8
**unknowing**
65:1
**unknowingly**
234:18
**unlawfully**
281:23
**unlicensed**
177:1,11
**unpacked**
147:2
**unpaid**
36:18
**unqualified**
177:17
**unquote**
173:19
**unsettled**
104:12
**Unspoken**
55:6 56:9

**unsure**
164:20
**unwittingly**
234:18
**Upchurch**
153:20
**upcoming**
235:19 272:11
**upgraded**
233:11,17
**upgrading**
20:25
**Upjohn**
153:20
**upset**
129:9 130:1,3 178:25
179:7
**upstairs**
144:8
**USBs**
20:21
**use**
16:5,10 27:18,19
30:19 31:3,10,19,24
32:3 33:4,19,24
34:5,10,14 35:2
45:11 57:2 59:2,4
61:1 72:14 79:1
177:1 184:14 206:1
226:5 304:9
**usual**
69:5 301:15
**usually**
10:16

**V**

**vacation**
189:19 204:3
**vacillated**
78:23
**vagina**
57:14 58:25
**varable**
229:8
**various**
20:4

**vehicle**
151:21,22
**verbal**
11:2 45:2
**verdict**
260:9
**Verification**
245:18,25 246:1
**verified**
186:6 187:23 228:1
228:25 230:7,9
**verify**
203:14 210:14,16
**verifying**
246:8,18
**verity**
114:1 230:13
**verse**
200:11 201:3
**version**
127:15 152:16
233:11 259:23
276:2
**versions**
127:9,11 131:9
**versus**
7:7 130:22 208:3
261:6 280:10
**vice**
3:8,13 98:8,10
184:17
**victim**
33:4,25 192:9
**victims**
113:2,13 182:17,18
**video**
11:23 15:17 70:17
104:9,10 105:7,8,10
105:10,12 122:13
137:10 138:12,12
142:19 222:10
249:9 295:21
300:12
**videographer**
3:19 7:4,16 11:21
12:2 70:16,19 125:4

125:7 203:4,7 222:9
222:12 295:20,23
300:6,11
**videos**
41:16
**Videotape**
7:5
**VIDEOTAPED**
1:12 4:2 7:1
**view**
60:18 101:23 230:9
260:6
**viewed**
28:21 156:9 227:17
227:19,21
**vigorously**
182:23
**Vines**
25:16
**violate**
61:14
**violated**
111:24 287:14
292:21 293:7,8
**violently**
277:12
**Virginia**
3:15
**virtual**
126:3
**virtue**
44:14
**voice**
38:9 40:20 129:9
130:1,2 179:7
223:18 224:4,5,6
251:16
**voicemail**
15:16
**vote**
44:2 100:3
**voted**
38:7,8,10 110:19
**vouching**
50:1
**VP**

229:3
**vs**
1:5

**W**

**W**
2:14
**wages**
71:4,22 72:4 73:2,24
74:8,15 75:14 77:17
**waistline**
215:11
**wait**
70:23 102:7 140:17
154:23 176:8,9
197:12 268:19
275:10
**waited**
14:7 135:19
**waiting**
11:8 132:12
**wake**
118:16,22
**waking**
54:11 119:7
**walk**
15:15 135:7 144:10
165:6 216:11
**walking**
64:19
**wall**
124:5
**want**
11:21 12:17 13:15
22:17 37:11 41:15
42:2 45:16 57:3,20
59:2,4,5,9,16 62:9
63:24 65:15 93:6
97:20 101:7 103:10
104:17 105:9,9
109:5 114:13
116:21 117:1
121:21 127:3
130:12 133:12
134:12 136:1,6
138:7 143:14 144:1

146:8 147:4 173:25
182:17 192:4,8,20
194:22 200:11
202:23 212:6,8
213:11 221:7 222:8
225:15 226:21
228:6 229:6 236:24
237:1,16 242:4,21
243:2 247:13,15
251:3 252:23 254:8
254:11 257:13,14
259:11 260:1
261:10 262:5
263:13 269:10
273:12 274:10
278:13,14,24,25
282:3,14 284:10
286:21 287:17
288:10 290:7,16
291:2 292:25 293:9
297:2 298:15,16
**wanted**
34:8 49:17 65:13
97:15,15 98:20
100:4 101:5 102:14
103:1,14 117:2
122:12 136:5
164:21 203:12,13
203:13 216:11
219:9 242:7 243:3
245:2 268:22
**wanting**
59:3 114:24 115:16
144:10,11 297:15
297:21
**wants**
65:5 200:1 256:22
271:20 293:6
**wasn't**
98:2 101:16 143:3,7
147:20 193:16
247:12 265:16
282:18 283:10
**waste**
132:11
**watch**

28:3 201:5 273:7
**watched**
16:20
**watching**
201:2
**water**
298:7
**wax**
150:17
**way**
24:13 28:4 49:15
50:14 56:25 59:18
62:15 66:18 81:16
83:24 95:15,16
102:14 104:13
108:16 109:1
112:11 140:14
145:13,19,20
146:18 149:11
151:11 181:11
186:14 187:1
194:24 197:4
203:15 204:5
206:25 211:1,4,8
215:5 224:13
225:11 236:2
247:12 252:20
253:3 263:10
267:25 269:2
271:21 279:3,5
280:22 283:2
285:17 287:1 288:4
293:18 302:14
**ways**
224:7 283:8
**weakness**
140:13
**wearing**
214:4 216:13 221:13
**website**
20:17,23 21:3 28:6,8
28:9 291:15
**week**
20:22 89:10 91:2
191:2,15 218:14
249:13

**weekend**
138:23
**weekly**
231:14
**weeks**
65:2 86:4,5 109:7
123:23,25 124:24
167:22 204:24
251:9
**weigh**
119:9 120:6,9
**weighs**
120:10 122:24
**weight**
44:14 119:8
**welcome**
31:7 181:23
**welcoming**
217:14
**well-documented**
186:6 228:25
**well-known**
50:4
**went**
25:5 27:10 52:21
55:1 65:12,13,21,21
68:24 69:17,19 78:9
93:1 103:16 106:25
107:9,10 109:2
111:17 112:11
117:21 122:10
126:11 137:5
140:10 144:8
165:10 166:8 171:7
171:7 214:16
215:25 223:9
227:13 256:12
277:24 298:18
299:23
**weren't**
50:13 136:25 166:22
195:15,16 203:21
230:5 253:3 257:18
**West**
2:21 3:15 128:6,12
**we'll**

135:10 141:7 203:3
**we're**
30:19 32:15 33:8
34:6 133:2 206:14
206:14 207:2 234:7
267:10 281:16
**we've**
137:15
**whatsoever**
142:17 143:1 166:14
217:19,20
**WHEREOF**
302:16
**white**
298:6
**white-haired**
42:24
**Whittens**
37:22
**whoa**
180:12,12,12,12
252:22,22,22 281:7
281:7,7
**who've**
60:9
**wicked**
152:11
**wife**
13:2 17:20 18:22
36:2 48:2,6,8,11
57:9 58:18 61:24
63:7 64:20 66:15,24
80:1 84:21 85:8
86:1 91:19 105:1
107:1,10,12,21
109:2 118:22,23
119:9 124:23 130:8
143:23 144:3,6
149:15,21,25
165:25 167:16
168:2,8,12,20
170:13 171:10
178:18,24 189:18
190:6 191:3,16
202:1 203:17 206:7
218:9 226:8 232:20

MAGNA
LEGAL SERVICES

234:25 236:3,7
241:8,9 243:19
244:24 248:25
256:12 270:24
279:23 296:21
297:13,24,25 298:4
298:9,13,23 299:1,4
299:9,11
**wife's**
60:5
**willing**
109:4 120:12 143:17
145:7 147:20
191:22
**Wilmington**
25:13
**Winter**
89:8,9
**wisdom**
184:13
**wise**
196:4
**wish**
54:24 55:3 140:13
142:18 146:9
220:12 293:21
**wishes**
31:6
**withdraw**
62:9 229:25 279:17
290:10,13
**withdrawn**
274:14
**withheld**
131:6 134:14 135:13
135:17 281:8,10
282:6 288:17 290:5
**withhold**
281:23
**withholding**
136:3
**witness**
7:21 8:16 10:17
32:10,21 57:1 61:19
67:15,17,21 111:6
117:18 131:17

139:9 141:6 173:24
174:2 179:15
193:13 198:14,22
199:2 222:6,17
229:16 256:23
269:17,18,20,24
289:13 291:24
296:3 302:8,11,16
**witnesses**
83:5 129:13 130:16
186:25 270:1,2
**witness's**
128:25
**wives**
48:7 53:6

**woman**
30:18,22 60:5 82:8
83:18 105:2 189:17
190:7 191:13,15
192:24 209:1,6
220:9
**woman's**
210:3
**women**
46:4 53:6,11,12
80:11,12 81:18,20
82:7,13,22 83:3
91:8 101:1 168:4
176:19 182:8
**women's**
57:14 58:24 83:8
**wonder**
197:16

**wondered**
80:23
**wondering**
193:22
**Woodstock**
5:13 15:23 20:8
26:19,25 28:9,10,10
28:11 29:7,19 42:8
45:24 46:22 47:1
49:24 50:13 52:10
52:18,20 67:11,24
68:9 69:13 71:5,21
72:3 73:2,8 74:13
77:9,25 100:18
107:16 108:5,14,15
121:10,14 123:14
123:23 177:19
187:7,16 188:13
192:1 250:24
**word**
27:18,19 33:24 34:15
35:3 53:23 61:1,1
187:22 197:4
212:25 232:2
236:15 246:5
251:24 261:10,11
271:8 280:14
**words**
34:2,6 44:23 50:3
83:25 183:16,17
196:18 210:8 228:9
228:18 262:17
278:16,18,19,22
280:15
**work**
15:24 19:2,8 20:7
25:2 49:12 76:6
86:21 96:17 97:13
109:23,25 110:3
184:7 212:23
257:15 292:16
**worked**
50:8 74:24 75:6
100:25 109:23
110:11 177:19
**workers**

97:6
**working**
32:1 57:21 59:6 68:4
75:2 98:12 99:23
106:6 177:22
264:15
**works**
87:24,25 91:15,16,19
208:8
**world**
21:9 28:7 29:3 56:1
85:12 88:18 117:21
158:20 182:6 195:9
195:10 196:21
228:23 232:21
**world-renowned**
118:20
**worry**
257:5
**worse**
193:18 282:3,5
**worst**
161:7
**worth**
260:7
**worthy**
196:20
**wouldn't**
68:13 69:16 102:5
108:21 122:23
124:21 194:24
268:14 283:6
**wounded**
47:2 118:2
**write**
143:16
**writing**
45:21 266:10,18
275:5
**writings**
79:25 86:18
**written**
55:8 101:23 102:2
157:16 247:12
249:3,6 265:3
**wrong**

MAGNA LEGAL SERVICES

61:15 67:2 139:18
210:9,12,19,19
229:15 278:10
**wrongful**
131:18
**wrote**
46:21 79:21 96:13
106:19 119:4 156:3
157:9 188:19 194:1
226:19 247:16
266:16 287:14
**www.MagnaLS.com**
1:24
**W-2**
71:20 72:3 73:1,8
74:12 75:14 77:14

---
### Y

**ya'll**
201:3
**yeah**
173:11 174:2 203:1
239:22 259:19
293:16 297:11
299:2
**year**
22:23 23:2,13,16,17
23:19,24 29:4,19,19
30:1,2 45:25 52:16
72:2,18 73:8,9,22
74:16,18,20,22 75:3
75:5,12 76:15,17,22
77:4 78:13 89:20
91:10,11 109:24
112:12 220:5
264:23
**years**
17:18 18:7 19:1,4
25:1 26:14 29:22
35:19 37:18 39:24
43:17 45:25 46:1,24
52:16 54:3,17,19
60:9 63:1 66:23
68:2 70:2,3 75:20
75:21 76:4,21 81:23
84:7 85:14 87:9,11

87:16 89:4 90:6
91:1 92:20,25 93:10
93:25 94:22,23
96:18 98:16 101:8
103:3 105:7 117:4
118:13 122:6,17
131:7,7 145:23,24
146:3,13 147:1
149:4 150:9,14
161:10 163:7,8
176:15 177:16
182:4 188:5 189:3
192:21 194:13
196:10 197:12
198:1 199:11 200:3
211:1 226:14 256:3
264:5,15,24 266:11
280:1 299:24
**yesterday**
13:23 20:24 131:11
274:24 275:1
281:25
**York**
2:16,16
**young**
38:7 100:18,25
**younger**
220:10
**youngest**
19:25
**YouTube**
21:6
**you-all**
131:8,13 151:13
167:25 197:15
208:7 248:24
262:14,15 285:14
291:14 293:21

---
### Z

**Zoom**
2:8,14,20 3:20 11:17
16:11 103:10,16
104:3,8 126:5,6
267:12,14 268:4
300:6

---
### $

**$1,500**
24:20
**$117,726.78**
77:6
**$15.4**
261:14
**$2**
167:3
**$200**
24:19
**$200,550.08**
73:14
**$274,983.54**
75:22
**$3,000**
92:6
**$300,446.53**
77:18
**$305,805.84**
74:10
**$324,280.49**
75:15
**$359,003.60**
76:22
**$372,736.48**
71:22
**$39,000**
266:21
**$401,998.75**
73:9
**$401,999**
69:19
**$407,608.82**
74:16
**$45**
253:19 255:17
**$555,677**
69:21
**$555,677.38**
73:25
**$746,000**
69:13
**$746,368.75**
72:5

**$746,369**
69:14
**$780,755**
69:17
**$780,755.96**
73:3

---
### 0

**009986**
127:13

---
### 1

**1**
4:12 7:5 18:2 49:5
71:12,13 73:2 74:10
208:22
**1/15/24**
5:19 240:7
**1:15**
196:22
**10**
4:21 29:13 37:18
70:14 104:6 113:25
117:4 126:18,22
127:10 247:22
249:13 271:22
**10th**
63:25 64:12 102:25
122:11 202:3
**10,000**
94:12
**10-year**
37:8
**10.B**
301:2
**10:14**
70:16
**10:30**
70:20
**100**
190:21
**100,000**
74:2
**10016**
2:16
**108,000**

72:21
**1099**
84:23 93:24 94:11,13
**1099s**
84:17
**11**
4:23 104:2,2 153:22
153:23 154:24
180:6 210:20
241:21 247:22,25
272:20
**11,000**
198:10,18,21,25
221:5,10 281:9,11
281:23 282:7
283:20 288:9 290:5
290:6 291:23
**11-hour**
256:13
**11:35**
125:4,5
**110-9**
255:9
**1130260**
304:1
**12**
5:4 103:3 118:13
122:17 150:9,14
156:21 157:1 163:7
189:3 194:13
197:12 198:1
199:11 280:1
**12th**
101:15,19 102:11
125:11 127:1,21
130:20 141:10
148:10,20 149:14
151:9 172:11,12
267:21 279:20
**12/14/23**
5:17 238:3
**12:15**
4:22 126:23 128:3,5
**12:50**
125:6,8
**1200**

2:4
**1221**
3:4
**1230**
1:18
**126**
4:21
**13**
5:6 81:23 98:21,23
157:10 181:16,20
264:5,15,24
**13th**
101:12 106:11
184:15,23 225:6
**132,000**
74:22 75:25
**14**
5:9 54:19 72:21
73:11 145:23,24
146:3,12 183:24,25
200:3 245:17,21,22
**14th**
238:11
**1445**
3:9
**15**
5:10 47:23 54:3
93:10 104:6 122:6
123:22 127:8 146:2
147:1 148:4,11
155:2 180:6 185:17
214:2 226:24 241:2
245:23 283:8
**15th**
127:11,15 240:11
**15,000**
27:1
**15-14-37**
301:11
**153**
4:23
**156**
2:4 5:4
**158**
157:20,22 159:22
**159**

161:19 167:15
**16**
5:12 54:17 109:7
123:23 127:8,11
185:21 188:12,17
197:16
**160**
168:8 174:5 177:6,24
178:10
**1600**
3:14
**161**
178:10
**1635**
303:16
**17**
5:15 138:22 207:19
207:20
**18**
1:14 4:4 5:16 7:3
238:2,9
**18th**
7:11
**180**
27:10
**181**
5:6
**183**
5:9
**185**
5:10
**188**
5:12
**19**
5:18 240:5,6,10
**19th**
272:9
**1906**
2:21
**191**
157:20
**19103**
303:18
**192**
161:19
**1979**

25:13
**1986**
26:23 27:12
**1995**
36:8
**1996**
38:19

───────────
**2**
───────────
**2**
4:13 49:6 71:24 72:1
72:20 74:12 93:17
94:8 289:17
**2nd**
169:15 171:23
172:10
**2:17**
203:4
**2:42**
203:8
**20**
5:20 17:18 22:1
24:12 26:14 44:18
54:3,17 79:18 89:3
149:4,7 161:10
202:4 213:12,18,19
214:2 231:25 245:6
245:10
**20th**
1:19 272:10 273:16
**20,000**
213:5
**200**
35:20 103:9,12
**2000**
27:11 112:12
**2005**
37:1
**2007**
39:16
**2008**
36:12 39:16,19 44:24
111:21 120:23
**2009**
26:14,25 27:1,17,18
28:15,16,25

28:15,16,25
**2010**
15:22 16:16 26:14
28:25 44:24 45:6
63:25 64:12 68:22
79:14,16,18 80:9
111:21,23 120:6,18
120:23 121:14
122:14,20 123:2,3,6
123:11 124:17,18
158:22 159:1
169:15 190:24
192:1 208:23
213:12 219:25
232:4 233:1,2
241:14 275:20
277:2,5 297:7
**2011**
68:19 233:7
**2014**
4:12 71:13,20
**2015**
4:13 69:13 71:24
72:2 93:23 94:7,9
94:11,22
**2016**
4:14 69:17 72:23
73:1
**2017**
4:15 69:19 73:5,8
**2018**
4:16 55:8 56:10
69:21 73:18,23,25
93:24 94:22 95:3
**2019**
4:17 74:4,7 75:2
97:13,14
**2020**
4:18 16:11 17:15
75:10,12 76:7 93:1
97:13,19
**2021**
4:19 45:23,24 76:13
76:16 77:15 98:21
110:19 111:3 112:9
**2022**

4:20 10:1 17:16,25
18:9 68:19,19 77:1
77:4 79:18 90:10
92:16 114:21
121:19 125:12
130:20 141:10
148:10 158:20
184:3 185:22
188:20 232:5,9,13
233:1,1 235:17
236:14 248:13
273:16 289:19
**2023**
23:13,21,24 230:24
238:11
**2024**
1:14 4:4 7:3,11
240:11 241:2
250:16 302:17
**207**
5:15
**21**
5:23 250:9,13
**21st**
107:7
**214.257.9800**
3:10
**22**
6:4 22:1 232:11
248:13 250:16
259:2,13,18 289:19
**22nd**
181:11 182:3,14
183:20 184:3 185:9
**222**
4:7
**23**
14:7 132:12 206:19
**238**
5:16
**24**
21:24 23:24 268:7
**240**
5:18
**2400**
3:4

**245**
5:20
**25**
21:23 44:18 87:11,16
92:20 214:1,2
**25th**
2:16 79:16 185:22
213:11 228:22
**250**
5:23 52:24
**25322**
3:15
**259**
6:4
**26**
121:19
**26th**
114:21 115:23
251:15,19
**27th**
188:20
**28**
35:19
**28-year**
52:25
**2908**
2:9
**296**
4:8

――――――  **3**  ――――――

**3**
4:14 49:7 72:23,25
181:25 208:21
240:19 255:10
**3H**
95:25 96:9,20
**3/22/24**
5:24 250:10
**3:04**
222:9
**3:13**
222:13
**3:23-cv-00243**
1:5
**30**

12:23 46:1 95:24
213:19 214:1
226:14 253:19
255:3,16,17
**30th**
45:25
**30(7)(e)**
304:6
**300**
52:24
**30309**
1:20
**304.340.1000**
3:15
**305,800**
74:8
**31**
131:9 134:15 281:24
**33**
18:6 46:24 55:14
56:11 68:2 75:21
188:5 220:2
**34**
220:2
**3600**
3:9
**37203**
2:10,21 3:5
**39**
21:10 105:1

――――――  **4**  ――――――

**4**
4:15 49:10 73:5,7
131:10 139:3,9
255:10 270:3
276:20,24
**4th**
131:22 132:25
133:17
**4:38**
295:20
**4:53**
295:24
**4:58**
300:11,14

**40**
192:21
**40,000**
177:2
**42**
42:15 98:24
**45**
255:3
**46**
19:21 63:1
**46204**
2:5
**47**
25:1
**48**
104:17 138:23 268:7
268:13 271:10
**48,000**
76:24 93:24 94:14
**49**
19:21

---
**5**

**5**
4:16 73:18,20 129:3
207:15
**5/12/22**
4:22 126:23
**5/15/22**
5:5 156:22
**5/20/22**
4:24 153:24
**5/22/22**
5:9 184:1
**5/25/22**
5:11 185:18
**5/27/22**
5:14 188:14
**50**
104:2,21 154:25
157:9 182:4 211:1
**50-year**
196:12
**500**
3:14 70:7
**51**

54:8
**51:4**
107:18 194:1
**52**
46:25
**53-year**
202:4

---
**6**

**6**
4:17 74:4,6,12
246:22 276:20
**6,000**
27:16
**600**
2:15
**615.244.3556**
3:5
**65**
47:12
**66,000**
287:10

---
**7**

**7**
4:18 75:10 77:8,10
246:22 255:10,10
**7/17/52**
9:9
**70**
47:11
**71**
4:12,13 22:3
**72**
4:14
**73**
4:15,16
**74**
4:17
**75**
4:18
**75202**
3:10
**76**
4:19
**77**

4:20
**787**
69:17

---
**8**

**8**
4:6,19 76:13,15
289:17 291:3
**84,000**
73:11
**85**
47:7,22
**86**
27:13
**866.624.6221**
1:23
**88**
25:5

---
**9**

**9**
4:20 77:1,4 103:10
126:9
**9th**
303:17
**9-11-28**
301:7
**9-11-30(e)**
304:7
**9:00**
103:11 126:11 128:7
**9:01**
1:15 7:12
**9:05**
11:23
**9:08**
12:3
**9:15**
128:8
**90**
15:24 42:14 44:8
50:21 116:17
**95**
27:13 176:17
**96**
38:13 268:15

**99**
16:10

MAGNA
LEGAL SERVICES