# EXHIBIT 8

# HUNT

## vs.

# SOUTHERN BAPTIST CONVENTION, ET AL.

## ROY BLANKENSHIP

### April 11, 2024



Lexitas Legal TENNESSEE | 1015 Avery Park Dr | Smyrna, TN 37167 | (615) 595-0073

1         IN THE UNITED STATES DISTRICT COURT FOR THE
           MIDDLE DISTRICT OF TENNESSEE
2               NASHVILLE DIVISION

3

  JOHNNY M. HUNT                     PLAINTIFF
4

5

  v.           Case No. 3:23-cv-00243
6              Judge Campbell
             Magistrate Judge Frensley
7

  SOUTHERN BAPTIST CONVENTION;
8   GUIDEPOST SOLUTIONS LLC; and
  EXECUTIVE COMMITTEE OF THE
9   SOUTHERN BAPTIST CONVENTION         DEFENDANTS

10

11

12 _____

13            ZOOM ORAL DEPOSITION

14                OF

15           ROY BLANKENSHIP

16   (Taken on April 11, 2024 at 8:35 a.m. Central Time)

17 _____

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2
      ON BEHALF OF THE PLAINTIFF:
 3
      Robert D. MacGill
 4    Patrick J. Sanders
      MACGILL PC
 5    156 E. Market St.
      Suite 1200
 6    Indianapolis, IN 46204
      Telephone: (317) 721-1253
 7    patrick.sanders@macgilllaw.com

 8

 9    ON BEHALF OF THE DEFENDANT:

10    Terence W. McCormick (admitted pro hac vice)
      600 Third Avenue
11    25th Floor
      New York, NY 10016
12    Telephone: (212) 696-4848
      mccormick@mintzandgold.com
13

14    Scarlett Nokes
      R. Brandon Bundren
15    BRADLEY ARANT BOULT CUMMINGS
      LLP
16    ONE 22 ONE
      1221 Broadway, Suite 2400
17    Nashville, TN 37203
      Telephone: (615) 244-2582
18    tpresnell@bradley.com
      snokes@bradley.com
19    bbundren@bradley.com

20    Gene R. Besen
      BRADLEY ARANT BOULT CUMMINGS
21    LLP
      Fountain Place
22    1445 Ross Avenue, Suite 3600
      Dallas, TX 75202
23    gbesen@bradley.com

24    Gino Marchetti
      TAYLOR, PIGUE, MARCHETTI & BLAIR,
25    PLLC
```

```
 1    2908 Poston Avenue
      Nashville, TN 37203
 2    Telephone: (615) 320-3225
      gmarchetti@tpmblaw.com
 3
      Gretchen M. Callas
 4    Jackson Kelly PLLC
      500 Lee Street East, Suite 1600
 5    Post Office Box 553
      Charleston, WV 25322
 6    Telephone: 304-340-1000
      gcallas@jacksonkelly.com
 7
      Katharine R. Klein
 8    Riley & Jacobson, PLC
      1906 West End Avenue
 9    Nashville, TN 37203
      Telephone: (615) 320-3700
10    jjacobson@rjfirm.com
      kklein@rjfirm.com
11
      Videographer - Rick Richey
12
      ALSO PRESENT:
13
      David Hayes - witnesses attorney
14    Oliva Beckett
      Robert MacGill
15    Alex Otchy
      Jon Anderson
16    Ella Merritt
      Johnny Hunt - Plaintiff
17

18

19

20

21

22

23

24

25
```

```
                        I N D E X


STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . 1

APPEARANCES  . . . . . . . . . . . . . . . . . . . . . 2

STIPULATION PAGE . . . . . . . . . . . . . . . . . . . 4

WITNESS: ROY BLAKENSHIP

        Direct Examination by Mr. McMormick. . . . . . . . 6

        Cross Examination by Mr. MacGill . . . . . . . . . 70

        Cross Examination by Mr. Besen . . . . . . . . . . 82

        Re-cross Examination by Mr. MacGill. . . . . . . . 97

        Deposition Concluded  . . . . . . . . . . . . . . 98

    COURT REPORTER'S CERTIFICATE . . . . . . . . . . . . . 99


EXHIBITS:     (Exhibits retained by attorney)     IDENTIFIED:

1 -  Email exchange . . . . . . . . . . . . . . . . 47

2 - Report. . . . . . . . . . . . . . . . . . . . . 47



               (MARKED QUESTIONS BY MR. MCCORMICK)

1st marked question . . . . . . . . . . . . . . . . . 8

2nd marked question . . . . . . . . . . . . . . . . . 59

3rd marked question . . . . . . . . . . . . . . . . . 60

4th marked question . . . . . . . . . . . . . . . . . 65
```

1          C A P T I O N

2          ANSWERS AND ORAL DEPOSITION OF ROY BLAKENSHIP, a witness

3     produced at the request of the Defendants, taken in the above-

4     styled and numbered cause on the 11th day of April, 2024, at

5     8:35 a.m.(Central Time), via Zoom, pursuant to the Federal

6     Rules of Civil Procedure.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THEREUPON,

ROY A. BLANKENSHIP,

THE WITNESS HEREINBEFORE NAMED, having been first duly cautioned and sworn by me to testify to the truth, the whole truth, and nothing but the truth, testified on his oath as follows, to-wit:

EXAMINATION

THE VIDEOGRAPHER: Good morning ladies and gentlemen. This is the beginning of media number one in video recorded deposition Roy A. Blankenship. Today's date is April 11th, 2024, it's 9:30 a.m. Eastern Daylight Time. The case is Johnny M. Hunt, plaintiff versus Southern Baptist Convention, Guidepost Solutions, LLC, and Executive Committee of the Southern Baptist Convention defendants, case number 3:23-cv-00243 in the United States District Court for the Middle District of Tennessee, Nashville Division. My name is Rick Richey, I'm the videographer. The court reporter is Leann Massanelli and we represent the Lexis Court Reporting. We've already noted the attorneys on the record. Will the court reporter please swear the witness?

THE COURT REPORTER: Will you raise your right hand? Do you swear or affirm the testimony you're

Case 3:23-cv-00243   Document 219-8   Filed 07/03/24   Page 8 of 118 PageID #: 4448

```
 1              about to give is the truth, the whole truth and

 2              nothing but the truth?

 3                   THE WITNESS:  I do.

 4   BY MR. MCCORMICK:

 5   Q    Good morning, Mr. Blankenship.  Please state your full

 6   name and address for the record.

 7   A    Roy A. Blankenship, 1426 Old, O-L-D Forge, F-O-R-G-E,

 8   Lane, Woodstock, Georgia 30189.

 9   Q    Thank you, sir.  I realized that you've asserted certain

10   boundaries as to (inaudible) talk about and can't talk about --

11                   THE COURT REPORTER:  Excuse me, I hate to do

12              this, I'm having a really hard time hearing from --

13              is there any way to --

14                   MR. MARCHETTI:  Same here, it's hard to hear.

15                   THE COURT REPORTER:  -- yes.

16                   UNIDENTIFIED SPEAKER:  -- it has nothing to do

17              with your mic, that's on my end.

18                   THE COURT REPORTER:  Right, it's just the people

19              on Zoom are having a hard time hearing.  Is there any

20              way to put a mic down at the end for the people on

21              Zoom?

22                   UNIDENTIFIED SPEAKER:  -- is this the

23              microphone?

24                   UNIDENTIFIED SPEAKER:  No, that's the camera.

25                   UNIDENTIFIED SPEAKER:  Well, I knew that but it
```

Case 3:23-cv-00243   Document 219-8   Filed 06/07/24   Page 9 of 118 PageID #: 4449
(615) 595-0073

```
1              -- it's got a --

2                  UNIDENTIFIED SPEAKER:  Is this -- like is this

3          loud?

4                  UNIDENTIFIED SPEAKER:  Okay.  Yeah, I mean, we

5          don't really need this.

6                  THE COURT REPORTER:  And I think we're off the

7          record, correct?

8                  THE VIDEOGRAPHER:  9:33, we're off the record.

9    OFF THE RECORD

10   BACK ON THE RECORD

11                 THE VIDEOGRAPHER:  9:34, we're back on the

12         record.

13   BY MR. MCCORMICK:

14   Q    Okay, so just once again, I understand that you have

15   asserted certain boundaries around counseling sessions as to

16   what you think you can testify to and I understand that the

17   court has spoken and entered an order.  I intend to respect

18   those boundaries as I'm bound to.  I'm trying to stay in my

19   lane, sir, and avoid asking you questions about things that you

20   can't testify to.  If you feel that I'm straying into those

21   areas or counsel feels that I'm straying into those areas, of

22   course, you will have the opportunity to assert an objection

23   and to the extent that it's necessary, I will try to rephrase

24   my question and make it possible for you to answer and if we

25   are at a standoff, I can just mark the question and we can come
```

Case 3:23-cv-00243    Document 219-8 (615) 957-0823    Filed 07/08/24    Page 10 of 118 PageID #: 4450

```
 1    back to it later with the court, if required, okay?  Do we
 2    understand that?
 3    A    (Inaudible response.)
 4    Q    And you understand that you are appearing today pursuant
 5    to a notice of deposition and a subpoena that we served on you;
 6    is that correct?
 7    A    Yes.
 8    Q    Mr. Blankenship, sir, have you ever been deposed before?
 9    A    Yes.
10    Q    How many times?
11    A    Once.
12    Q    Once.  And what kind of a case was that?
13    A    It was a case against Northside Hospital where I fell in
14    their parking, a hole in the parking lot, and shattered my
15    elbow.
16    Q    I see.  And have you ever testified at a trial?
17    A    No.
18    Q    But you -- you've got a basic idea of how this process
19    works, right?
20    A    Yes.
21    Q    Okay.  I need audible responses, which is a point that the
22    court reporter has just brought home to me in a real and
23    personal way, so try to speak up to the extent that you can,
24    shaking your head, yes and no doesn't work, I need to hear the
25    mouth uttering yes and no, got it?
```

Case 3:23-cv-00243   Document 219-8   Filed 07/03/24   Page 11 of 118 PageID #: 4451

```
1    A    (Inaudible response.)

2    Q    Uh-huh doesn't -- doesn't make it, I just need an answer

3    in words and, you know, while this is not a courtroom right

4    here, and I'm addressing my questions to you in a conference

5    room, this is testimony, it's sworn, it's under oath, so you

6    should anticipate that what you're saying you're saying for the

7    benefit of the court and the jury in the event that we have to

8    read or show any of your testimony at trial; do you understand?

9    A    Yes.

10   Q    Okay, terrific.  If any of my questions are not clear to

11   you, please, by all means, say so, and I will try to rephrase

12   the question and help you understand it and answer my question

13   appropriately.  Please wait for me to complete my question,

14   wait until I get to the end, and then if there's a need to

15   clarify, of course, if your counsel sees a need to assert an

16   objection, fine, but let me -- let me get to the end of the

17   sentence before that happens, okay?

18   A    Okay.

19   Q    All right.  If you need a break, let me know, I will do my

20   utmost.  I will try not to have a break while a question is

21   still pending, I want the answer first, but to, you know, as

22   necessary and reasonable, of course, I will do my utmost to

23   accommodate your need for a break.  Mr. Blankenship, have you

24   taken any medication today that might interfere with your

25   ability to understand my questions and answer them in a lucid
```

```
 1   way?

 2   A    No.

 3   Q    No.  Have you consumed any alcohol today?

 4   A    No.

 5   Q    Okay, terrific.  Mr. Blankenship, did you review any

 6   documents in preparation for your deposition this morning?

 7   A    No.

 8   Q    No.  At any point, have you read the Guidepost report, the

 9   report of an independent investigation concerning sexual abuse

10   in the SBC?

11   A    Yes.

12   Q    You have, when?

13   A    When it first came out.

14   Q    Okay, have you read it since?

15   A    No.

16   Q    Are you familiar with its contents though?

17   A    Generally, yes.

18   Q    To the extent that they pertain to you?

19   A    Yes.

20   Q    Very good.  Apart from your counsel, did you speak to

21   anybody else in anticipation of this morning's deposition?

22   A    No.

23   Q    Nobody, okay.  Mr. Blankenship, have you been in

24   communication with Reverend Hunt or his counsel or anybody else

25   acting on Reverend Hunt's behalf in connection with this
```

Case 3:23-cv-00243    Document 219-8 (615) 967-00724    Page 13 of 118 PageID #: 4453

```
 1    lawsuit?

 2    A    No.

 3    Q    You have not.  When's the last time that you did have

 4    contact with Reverend Hunt?

 5    A    I don't recall the exact date, it's probably been close to

 6    a year when he texted me just to see how I was doing.

 7    Q    All right.  He texted you about a year ago?

 8    A    (Inaudible response.)

 9    Q    And was that -- that would have been like around April or

10    so of 2023?

11    A    I don't recall the time period, it's just been a while.

12    Q    Uh-huh.  And can you tell me what -- what the substance of

13    that text message was?

14              THE WITNESS:  David, should I just tell the --

15         what I remember the text message saying?

16              MR. HAYES:  As long as it doesn't contain

17         anything related to counseling.

18              THE WITNESS:  Okay.

19              MR. HAYES:  I don't know what it --

20              THE WITNESS:  It doesn't.

21    BY MR. MCCORMICK:

22    A    Hey, Roy, Pastor Johnny here, something to that effect, I

23    just wanted to see how you're doing.  Thank you for always

24    being there for me, something to -- to that effect.  Just

25    thanking me for being a friend.
```

```
 1    Q    Uh-huh.  And did you respond to him?

 2    A    Very minimal, you're -- you're welcome.

 3    Q    You're welcome?

 4    A    Uh-huh.

 5    Q    Did you have an occasion to have --

 6              MR. MCCORMICK:  -- I just want to say on the

 7         record, I don't believe that that document was

 8         produced to us in response to the subpoena.  I don't

 9         believe it is the document that was identified on the

10         privilege log.  To the extent that that text message

11         exchange still exists, I would ask you to please

12         produce it in due course, Mr. Hayes.

13              MR. HAYES:  I understand.

14              MR. MCCORMICK:  Thank you.

15              MR. HAYES:  I wasn't aware of it before, but, I

16         understand, we'll review it --

17              MR. MCCORMICK:  Yeah, yeah, it's -- it's -- the

18         witness has testified that it's not privileged, and

19         therefore, I would -- I want to have that, okay?

20              MR. HAYES:  Okay.

21              MR. MCCORMICK:  Thank you.

22    BY MR. MCCORMICK:

23    Q    And did you otherwise have occasion to speak to Reverend

24    Hunt on the phone following that text exchange?

25    A    No.
```

```
 1    Q    Did you have any communications with Reverend Hunt
 2  approximate in time to the publication of the report?
 3    A    No.
 4    Q    Do you recall when the report was published?
 5    A    Not exactly, no.
 6    Q    If I said May 2022, would that sound about right to you?
 7    A    Yes, I think, yes.
 8    Q    And you mentioned earlier, I believe, that if you had
 9  reviewed the report at the time or near the time of
10  publication?
11    A    Yes.
12    Q    And did you discuss that with anybody else?
13    A    My husband.
14    Q    Your husband, all right.  Obviously, that's going to go to
15  spousal privilege and I will not invade that, but anybody else?
16    A    No.
17    Q    Okay.  And -- and -- you -- you folks were married at the
18  time that you had that conversation?
19    A    Yes.
20    Q    Okay.  And not to beat a dead horse, but did you have
21  occasion at any point to speak to anybody at First Baptist
22  around the time of the publication of the report?
23    A    No.
24    Q    All right.  Mr. Blankenship, do you or anybody acting on
25  your behalf, including your counsel, have any understanding
```

```
1    regarding the defrayment of your legal fees in connection with
2    your appearing at this deposition?
3    A    Please restate that for me?
4    Q    Let me try to put that in non-legalese --
5    A    Thank you.
6    Q    Who's paying lawyers' fees?
7    A    The insurance company.
8    Q    Insurance company, which insurance company?
9    A    The one that covered me when I was working as an employee
10   at First Baptist Church.
11   Q    So this is under an employee's liability policy?
12            THE WITNESS:  Do you know?
13   BY MR. MCCORMICK:
14   A    That's all I know.
15   Q    Okay.  Reverend Hunt is not participating in the
16   defrayment of your legal fees --
17   A    No.
18   Q    -- or expenses in any way?
19   A    No.
20   Q    Okay.  And do you have -- do you have -- do you have any
21   arrangement of any kind with Reverend Hunt regarding your
22   testimony at this deposition today?
23   A    No.
24   Q    Okay.  Could you tell me, Mr. Blankenship, something about
25   your education, where did you go to school?
```

```
 1   A    The whole history?

 2   Q    Speak up, sir?

 3   A    Do you want the whole -- the whole history?

 4   Q    Yeah, let's start from high school?

 5   A    Shelby County High School, Columbia, Alabama, that's where

 6   I graduated high school.  I went to Auburn University for two

 7   years.

 8   Q    What -- what did you study?

 9   A    Oh, my, what didn't I study, I started out in pre-med

10   until I met calculus.  Then I tried pharmacy and that was

11   organic chemistry that did me in there.

12   Q    I went to the School of Foreign Service at Georgetown,

13   known as SFS, which was also (inaudible) from the science, so I

14   -- I feel you.

15   A    Okay.

16   Q    Pray continue.

17   A    I ended up thinking about a business degree.  I left there

18   and went to the University of Alabama in Birmingham primarily

19   so I could work in my family business while I went to school.

20   I graduated there, I think it was June of 1980, worked on my

21   post-graduate master's degree in Master of Arts in Marriage and

22   Family Therapy through Liberty University, I graduated in 2010.

23   I worked on a PhD in addiction psychology through Capella

24   University.  I finished the academic work and was starting the

25   dissertation with my wife unexpectedly died from leukemia and I
```

decided at that point that it was not a needed or reasonable thing to continue pursuing.

Q    And I'm terribly sorry to -- to hear about that.  The studies that you underwent at Liberty University in family therapy, could you tell me something about that very briefly, what -- what was the curriculum, what -- what was the coursework and the -- the direction of the study?

A    Counseling theory, abnormal psychology, pharmacology, diagnosing, counseling techniques, group therapy and variants of those things.

Q    Uh-huh.  Let me skip ahead, and then skip back a bit, you're aware that they -- are you generally aware of the nature of the lawsuit that you're now testifying in?

A    In general, I think I know.

Q    Did -- did you ever review the complaint?

A    Very briefly.

Q    You did.  How -- how did you -- how did you get access to the complaint?

A    It was delivered to my door.

Q    It was attached to the subpoena that was served on you?

A    Yes, yes.

Q    Okay.  So you're aware that this is a lawsuit in which Reverend Hunt has asserted that my client, Guidepost Solutions, printed what he asserts are false statements about him in connection with an encounter with a Mrs. ██████ ██████ in 2010,

correct?

A     Correct.

Q     All right.  I will from now on sometimes refer to her as
████  and Mrs.  ████  I may switch to Reverend Hunt's accuser,
but whatever, the event took place -- do you remember when the
-- when the encounter between Reverend Hunt and -- and -- and
the accuser took place?

A     The exact date, no.  General time, yes.

Q     Ballpark, July 2010?

A     Yes.

Q     Does that sound about right?

A     Yes.

Q     Okay.  And when did your studies at Liberty University
conclude?  Was it May of 2010, was that when the degree program
--

A     I think that's correct, yes.

Q     -- right.  So you had just been graduated from Liberty
University with your -- what was it, did you say a master's
degree --

A     Master of Arts in American Family Therapy.

Q     -- all right.  And at the time, did you have a license
from the State to be a marriage counselor?

A     No.

Q     Okay.  Now, I'll do the part about skipping back, so you
finished your degree program, could you please tell me, sir,

```
1    your work history?  And you don't have to tell me about the
2    summer job mowing lawns because I've been there too and it's
3    not that interesting, just tell me, from let's say, after
4    college, okay?
5    A    I had a very short tenure in a finance oriented role with
6    ITT Industrial Credit and Leasing.
7    Q    Uh-huh.
8    A    It was largely being responsible for a loan portfolio and
9    doing credit analysis work.  I hated it.  I went from there to
10   a programmer training role with Central Bank of the South and I
11   spent the next few years in a commercial data processing
12   career, that would have been starting in 1981 or so.  In 1990,
13   I moved to Atlanta.  There was -- there were other firms
14   besides Central Bank of the South that I was working with in
15   the Birmingham area, but I moved to Atlanta in 1990 to pursue a
16   systems engineering support role with a mainframe software
17   company, sale -- sales -- supporting sales people as an
18   engineer.  I did that for approximately five years, at which
19   time I decided to do a career change, which I think happened in
20   the mid 1996 timeframe when I went to work with Johnny Hunt at
21   First Baptist Church.
22   Q    How did that -- how did that come -- come to be?  How did
23   you -- how did you meet Reverend Hunt?
24   A    I had started -- my wife then, my deceased wife, and I
25   went to church there when we moved to Atlanta -- I moved in
```

Case 3:23-cv-00243   Document 219-8   Filed 07/03/24   Page 21 of 118 PageID #: 4461

```
1    1990, she came in 1991 and that's when we started going -- that
2    year we started attending First Baptist Church in Woodstock.
3    Q    Yeah.
4    A    And I got to know Pastor Johnny just like as a church
5    member.  I increasingly perceived myself as feeling a
6    compulsion to be involved in ministry work, some will call it a
7    calling, I'm not sure I totally agree with that language now,
8    but that's what it was.  I made the career change, went to work
9    with Johnny Hunt and my role then was -- I remember him asking
10   me to come and help him use technology to track members'
11   volunteerism involvement in church and ministry work.
12   Q    I'm not too familiar with Baptist polity, in that -- in
13   that capacity, were you an ordained person, a deacon, a
14   minister?
15   A    No, I was just an ordinary person.  It was probably a year
16   later when Johnny asked me to take on the leadership of the
17   senior -- the executive staff leadership of the pastoral care
18   division.
19   Q    So you were on staff?
20   A    Yes.
21   Q    Yes, you were a paid staffer?
22   A    I was from the beginning, yes.
23   Q    Okay.  At some point you became an ordained minister?
24   A    It was soon after that, maybe early 1998 timeframe -- I
25   have a VHS of it at home, no way to watch it, but I have the
```

1   VHS, but.

2   Q    I would think a person who used to be an engineer might

3   have figured out a way to make that happen, but.

4   A    They'd have to have a motivation to.

5   Q    Did you attend any kind of a seminary or formal religious

6   education in anticipation of ordination?

7   A    No, I did that after ordination.

8   Q    Ah.

9   A    So I pursued a Master of Divinity work, I forgot to tell

10  you that part, please forgive me.

11  Q    Well, a good lawyer is supposed to say anything else after

12  an answer, so let's do it a little bit late, anything else?

13  A    I did Southeastern Baptist Theological Seminary and New

14  Orleans -- New Orleans Baptist Theological Seminary offered a

15  real remote campus remote education opportunity for the

16  seminary degree and I pursued that and tried to start in

17  Woodstock with Southeastern, but I did a lot of the academic

18  work from them and I never finished it because, quite honestly,

19  I felt it was impractical and I got tired of hearing about

20  arguments in theology, it wasn't useful so that's when I

21  shifted and went to the marriage and family program.

22  Q    I see.

23  A    To be more relevant in what I was doing with work.

24  Q    Mr. Blankenship, are you familiar with the term City of

25  Refuge?

```
 1    A    Yes.
 2    Q    All right.  Can you please tell me what that was or is?
 3    A    As -- as I was counseling -- pastoral counselors is where
 4    -- where I started, church members, other staff members,
 5    whoever in our community, in that role, Johnny began to
 6    experience pastors who experience -- who were experiencing
 7    difficulties in their ministry life, ministry role for a
 8    numbers of reasons and they would come to Woodstock and
 9    Woodstock First Baptist would then, as part of the City of
10    Refuge program, helped take care of them and their families as
11    they transitioned into a non-ministry employment so they could
12    sustain life and get counseling and therapy for them and their
13    families and their children and go through a restoration
14    program where they could then have a chance to re-enter
15    ministry at a later time.
16    Q    When did that program get started?
17    A    2002, 2003, I think, maybe that was the very beginnings of
18    that.
19    Q    So you had already been a member and a staffer at First
20    Baptist Church Woodstock at the time when -- when the program
21    began?
22    A    Yes, I started the program.
23    Q    You started the program?
24    A    Johnny came to me and said, hey, I want to do this, and I
25    said, great idea, let's do it.
```

```
1    Q    All right.  And what was your involvement, you know, what
2    was the role that undertook, were you the director?
3    A    I -- I had a staff member that I assigned to the directing
4    responsibility for that program and we developed it together,
5    him under my supervision.  I directed the director, how about
6    that.
7    Q    Do you remember that person's name?
8    A    Troy Haas.
9    Q    Troy Haas?
10   A    H-A-A-S, yes.
11   Q    All right.  And so, you said something about
12   rehabilitation, what were the problems that the clergy or the
13   clients of City of Refuge had that you -- that you were trying
14   to deal with?
15              MR. HAYES:  Let me just mention for the record,
16          that question potentially could elicit privileged
17          information, if you can answer in a way that's not
18          revealing any privileged information, which I think
19          will be the more general sense, then you can answer.
20          Certainly, I don't want you to use any specific
21          examples that you may have gained information on
22          through counseling.
23   BY MR. MCCORMICK:
24   Q    I don't want you to identify a person by name at this
25   point, and I don't want you to reveal, to the extent you don't
```

```
 1    feel you're comfortable doing so, the substance of what anybody
 2    told you or what you told them.  I'm just trying to figure out
 3    at this stage, what were the categories --
 4    A    I got you.
 5    Q    -- all right.
 6    A    Often times, it would pastor -- pastors who had difficulty
 7    with their congregation, leadership problems, inability to
 8    manage conflict, confrontation issues.  There were times when
 9    it involved misuse of money, there were times when it involved
10    infidelity, emotional affairs, physical affairs.
11    Q    When you say, emotional affairs, what do you mean by that?
12    A    Communicating and bonding over emotional topics but not
13    necessarily physical involvement.
14    Q    Flirtation?
15    A    Yes, maybe.
16    Q    And also, when you say, physical affairs, you're talking
17    about actual sexual contact between the minister and a person
18    who was not his wife?
19    A    Correct.
20    Q    All right.  Any other categories?
21    A    Not that I recall offhand, that was the major things.
22    Q    Ballpark it for me, Mr. Blankenship, how many of the
23    instances of clients served by the City of Refuge program
24    involved infidelity, emotional affairs, physical affairs,
25    matters of a sexual nature that would be a problem for the
```

```
 1    ministry?

 2    A    Can I guess, I don't --

 3    Q    No.

 4    A    -- I don't have the exact percentages.

 5    Q    Can you give me an approximate number to the best of your

 6    recollection?

 7    A    We would have somewhere in the neighborhood of 10 or 12

 8    families at a time in the program.  Their involvement would

 9    last anywhere from three months to two years, maybe half.

10    Q    Maybe about half of them might have involved some kind of

11    sexual impropriety?

12    A    Yes.

13    Q    All right.  And over a period of how many years are we

14    talking here?

15    A    Can you clarify what you mean by how many years?

16    Q    Well, you say the program began in 2002 or 2003, right?

17    And I'm asking you only as of your personal knowledge because,

18    you know, you can only testify what you know to -- know about,

19    while you were there at -- well, how long were you on staff at

20    First Baptist, after 2000 -- when did you leave First Baptist?

21    A    I transitioned to Hope Quest and -- fully in 2015.

22    Q    So your knowledge about clients being served by the City

23    of Refuge program would be cabined to the years 2002 to 2015;

24    is that correct?

25    A    Maybe some 2016.
```

Case 3:23-cv-00243    Document 219-8 (Filed 05/03/24    Page 27 of 118 PageID #: 4467

```
 1   Q    Maybe -- all right, so we're talking about -- about 14

 2   years, give or take?

 3   A    Yes.

 4   Q    And during those 14 years, on average, it's your testimony

 5   that there were about per year about 10 to 12 clergy being

 6   served by the program, and of those, approximately, 50 percent

 7   would have been there because of some kind of sexual

 8   impropriety?

 9   A    As best I recall, yes.

10   Q    Okay.  And of those instances, Mr. Blankenship, how many

11   involve actual sexual abuse?

12   A    I don't recall.

13   Q    All right.  At some point, were there any -- forgetting

14   how many, just to your recollection, were there any instances

15   of clergy going through the City of Refuge program who had

16   committed sexual abuse?

17   A    Yes.

18   Q    Yes.  Do you have a notion how many?

19   A    I don't recall.  It was -- it was not -- it was the -- it

20   wasn't many.  I -- I don't recall how many.

21   Q    Was it more than one?

22   A    Yes.

23   Q    Yeah, five?

24   A    Over the course of the whole span, 14 years?

25   Q    Yeah.
```

```
 1    A    I will say, maybe, yes.
 2    Q    In the neighborhood of five clergy who would commit, not
 3  just flirtation, not just inappropriate emotional bonds or even
 4  just adultery, but sexual abuse of some kind?
 5    A    Yes.
 6    Q    Okay.  At some point, Mr. Blankenship, did there come a
 7  time when you had a conversation with investigators from
 8  Guidepost Solutions?
 9    A    Yes.
10    Q    And do you remember when that happened?
11    A    I do not remember the exact date.
12    Q    To the best of your recollection?
13    A    Can I look at that paper where I wrote down?
14              MR. HAYES:  He's just asking your recollection.
15  BY MR. MCCORMICK:
16    A    My recollection, okay.
17    Q    Let me help you, Mr. Blankenship.
18    A    All right, please.
19    Q    If I said to you it would have been prior to the date of
20  publication of the Guidepost report, would that sound right?
21    A    Yes.
22    Q    And if -- if I suggested to you that the date might have
23  been right around May 9th, 2022 --
24    A    Yes.
25    Q    -- would that sound pretty much right?
```

A    Yes.

Q    And before I get into the particulars of how that meeting
came about, let me ask you this, is it true that you told the
investigators that there were instances in which you and
Reverend Hunt had a difference of opinion over whether or not a
clergy person should be readmitted back into active ministry?

        MR. HAYES:  Okay, I'm going to object to that as

            that's covered by the court's order, I believe, that

            potentially is listing information that will come

            from counseling sessions Mr. Blankenship had with the

            Hunts and the other couple and I'm going to instruct

            him not to answer.

        MR. MCCORMICK:  Let me rephrase the question

            then.

        MR. MACGILL:  Let me just state for the record,

            I think there needs to be some clarity here.  You've

            spoken generally, in terms of how you interpret the

            court order or your general understandings of the

            court order, we need to now be very specific.  The

            court was very specific in its order and I'm quoting

            in page 14, but the court said specifically,

            "therefore, Mr. Blankenship need not to repeat, need

            not testify to or produce documents regarding the

            marriage counseling sessions with the accuser and her

            husband.  The knowledge that the witness has is

```
 1    exclusively related to the marriage counseling that

 2    he did with the accuser and/or her husband."  That's

 3    the record that's been made.  You've not laid any

 4    foundation that there's an independent basis for

 5    knowledge of this type.  So we ask that you comply

 6    with the court order and the specifics that are

 7    provided on page 14, and also on page 15.

 8        MR. MCCORMICK:  If I could say, Mr. MACGILL, if

 9    I --

10        THE COURT REPORTER:  I don't know who was

11    speaking just then, I can't see him.

12        MR. MACGILL:  Rob MacGill.

13        THE COURT REPORTER:  Okay, if you could just

14    identify yourself.

15        MR. MCCORMICK:  -- Mr. MacGill, I have read the

16    court order, I'm familiar with the court order, I

17    believe I am complying with it.  I would also say

18    that my view, you have just issued a speaking

19    objection, which is improper, and if I have to say so

20    again, I'm going to admonish you not to do that

21    again.  I will work with -- with Mr. Blankenship's

22    counsel and Mr. Blankenship to stay out of prohibited

23    areas.  To the extent that I can find information

24    that came to Mr. Blankenship outside of counseling

25    sessions, I am free to elicit those questions.  I am
```

1    stating that for the record.  Mr. Blankenship, I do -

2    -

3          MR. MACGILL:  Let me -- let me just make

4    something clear so you understand how this is going

5    to go, I'm not speaking to the witness, I'm speaking

6    to you.  You're obligated to follow a court order and

7    it's my responsibility as an officer of this court to

8    make sure that you do so, and I'm going to address

9    you, not the witness, all right?  So --

10          MR. MCCORMICK:  -- I think it's --

11          MR. MACGILL:  -- and I'm speaking to you, not

12    the witness.

13          MR. MCCORMICK:  -- I wish to make it clear to

14    you, sir, as you know very well, you and I, this is

15    not our first rodeo, the whole object of a speaking

16    of objection is to signal an answer to the witness,

17    which I find to be improper.  And if you do it again,

18    I'm going to mention it on the record again.

19   BY MR. MCCORMICK:

20   Q    With that understanding, Mr. Blankenship, I do not wish to

21   invade without permission of Reverend Hunt any communications

22   that took place within the context of your counseling sessions

23   with him and I will not; however, to the extent that you had

24   conversations with Reverend Hunt as pastor of First Baptist

25   Church Woodstock, as a member of his staff concerning the

| | |
|---|---|
| 1 | program, I am asking you, did there come occasions when you |
| 2 | disagreed with him regarding who is proper to be readmitted |
| 3 | into ministry after the program had run its course? |
| 4 | MR. HAYES: Roy, to the extent you can answer |
| 5 | that question without invading counseling sessions |
| 6 | and information you've had exchanged during those |
| 7 | conversations you've had, you can answer. |
| 8 | BY MR. MCCORMICK: |
| 9 | A    I don't recall Johnny and I ever having disagreements on |
| 10 | much of anything, so the answer to your question is no. |
| 11 | Q    Okay. Among those clergy who had gone through the program |
| 12 | who had experienced some form of sexual impropriety, be it |
| 13 | adultery, flirtation, or even sexual abuse, how many were |
| 14 | readmitted to the ministry? |
| 15 | A    I can't recall that exact number. |
| 16 | Q    Were there are some who were not? |
| 17 | A    Yes. |
| 18 | Q    And in your experience, working with program, was there a |
| 19 | dividing line as to who would be appropriate to readmission to |
| 20 | active ministry and who would not be? |
| 21 | A    Well, let -- I'm going to use this term loosely, I'm |
| 22 | objecting to your term admit. We did not have authority in |
| 23 | Baptist polity to say who could or who couldn't? We -- we |
| 24 | simply said who we would endorse and who we wouldn't. |
| 25 | Q    Okay. I appreciate the admonition and the -- the |

Case 3:23-cv-00243    Document 219-8 (615) 367-0031    Page 33 of 118 PageID #: 4473
Filed 07/08/24

```
 1    explanation then, as I have said to you at the beginning of the
 2    deposition, I'm not an expert on Baptist polity.  To the extent
 3    that the church did have authority of any kind --
 4    A    How about clarification instead of admonishment.
 5    Q    -- I have a very thick skin.
 6    A    Okay.
 7    Q    In terms of -- in terms of, you know, to the extent that
 8    the church had the ability to decide whether or not to endorse
 9    a person for the continued act of ministry, of the people who
10    have been involved because of their sexual improprieties, how
11    many would the church not endorse, to use your word, to
12    continue in Baptist ministry?
13                 MR. HAYES:  Counsel, can you define what you
14           mean by church?
15                 MR. MCCORMICK:  Well, let's say First Baptist
16           Church Woodstock?
17                 MR. HAYES:  Thank you.  Could you read the
18           question back please?
19                 MR. MCCORMICK:  I don't know if she heard you.
20                 THE COURT REPORTER:  I did.  Hold on, I've got
21           to stop my real time.  How -- how many people with
22           the church -- hold on.  Okay, how many with the
23           church were not endorsed -- my real time's not real
24           good -- and continue in the Baptist ministry.
25    BY MR. MCCORMICK:
```

Case 3:23-cv-00243    Document 219-8    Filed 07/03/24    Page 34 of 118 PageID #: 4474

```
1    A    I don't recall an exact number.

2    Q    Approximate percentage?

3    A    That were not endorsed?

4    Q    Yeah.

5    A    Twenty.

6    Q    Some were, some weren't?

7    A    Correct.

8    Q    And in your experience, what was the dividing line, the

9    deciding factor, between the two, as to whether they would be

10   or would not be?

11              MR. HAYES:  Again, counsel, are we referring to

12        endorsement or no endorsement?

13              MR. MCCORMICK:  I think the question was pretty

14        clear, yes.

15   BY MR. MCCORMICK:

16   A    So you're asking me the criteria by which the -- we made

17   that decision?

18   Q    You did have some criteria, did you not?

19   A    Maybe that was a bad choice of words.  There -- there was

20   myself, the director of the program, Pastor Johnny, their

21   individual pastoral counselor, sometimes we sent them out to

22   professional counseling, those peoples' opinions mattered and

23   then there was an accountability group in the church, and there

24   had to be a consensus of all of those people.

25   Q    And how would a person -- how did people wind up not being
```

Case 3:23-cv-00243    Document 219-8 (615) 595-0073/24    Page 35 of 118 PageID #: 4475

1    endorsed after going through that process, what was the -- what

2    was the factor that led people to say, no, not him anymore?

3    A    Not making progress in their counseling work, not being

4    open, honest, or not being perceived to be open and honest

5    about what's going on in their life, observation of how they're

6    doing in community within the church body, things of that

7    nature.

8    Q    I think you mentioned a moment ago that there were

9    approximately five people in your experience who had gone

10   through that program who have been accused of sexual abuse, do

11   I recall your answer correctly?

12   A    Yes.

13   Q    Were any of them allowed, endorsed if you will, to go back

14   into active ministry after going through the program?

15   A    I do not remember any of those going back to ministry, no.

16   Q    Do you recall that they, in fact, did not?

17   A    To the best of my memory, no, they did not.

18   Q    And do you recall why?

19   A    No.

20   Q    If they were to be participating in the City of Refuge

21   program for purposes of rehabilitation, that would presuppose

22   that, at least the way things ran at First Baptist Church

23   Woodstock, there was something to rehabilitate; would that be

24   correct?

25   A    I suppose.

```
1    Q    And that would be --

2    A    I don't recall thinking of it as -- in terms of

3    rehabilitation at the time.

4    Q    Would the word restoration be --

5    A    Yes.

6    Q    -- more appropriate?

7    A    Thank you.

8    Q    And since the meaning of words is sometimes a topic of

9    contention at a deposition, can you please define for me what

10   in your mind at the Church of Refuge -- City of Refuge program

11   -- excuse me, restoration meant?

12   A    It's multifaceted, restoration of marriage relationship,

13   restoration of family relationship, restoration of personal

14   relationship with Christ, restoration fellowship within the

15   body of Christ in the local church, and then ultimately,

16   restoration into a role of ministry service, if that were to

17   come about.

18   Q    Would that also include restoration of reputation within

19   the congregation?

20   A    I don't recall that being a primary goal.

21   Q    Could a person who had gone into the City of Refuge

22   program at First Baptist Church Woodstock, because of some form

23   of sexual impropriety, have been able to continue in ministry

24   without going through the restoration process?

25   A    So rephrase that for me, please, help me with that
```

Case 3:23-cv-00243    Document 219-8 (615) 957-00/23/24    Page 37 of 118 PageID #: 4477

1    question.

2    Q    Well, let me -- let me come at it from a different angle

3    to make it an easier question, of the persons who had gone to

4    the City of Refuge program at First Baptist Church Woodstock,

5    for reasons of some kind of sexual impropriety, whether it was

6    simply flirtation on the one end or sexual abuse on the other,

7    the -- that group of candidates, had -- had the fact that their

8    impropriety become known within the congregation at the time?

9    A    Officially?

10    Q    Or unofficial, was the word out?

11    A    I mean, I don't know.  I know it'd been impossible for

12    some people not to know why they were there because people in

13    church talk.

14    Q    Uh-huh.

15    A    So -- but I don't have personal knowledge of who and when

16    and how many and that kind of thing.

17    Q    I see, okay.  I might come back to that point later but

18    let's -- let's pick this up again with what happened in 2010,

19    let me start just by asking you, can you tell me first in your

20    own words -- well, before 2010, did you know Reverend Hunt's

21    accuser?

22    A    Casually, never had met them or talked to them but I had

23    seen them before.

24    Q    You knew them?

25    A    Yes.

Q    Okay.  And I was actually speaking about the alleged

survivor, but you -- you also knew her husband?

A    I had met them in one of Pastor Johnny's Timothy Barnabas

events --

Q    Uh-huh.

A    -- where there's groups of pastors there.  So I had seen

them, I had been introduced to -- I remember the -- the pastor,

████ and I don't think I remember meeting her there, but I

knew of them and I had been introduced to him --

Q    Okay.

A    -- before.

Q    There came a time, Mr. Blankenship, when you became aware

that there had been an encounter between the accuser and

Reverend Hunt?

        MR. MACGILL:  Objection.  Counsel, you're now

    directly asking him what you may not ask about.

    There's no foundation that he had knowledge outside

    of any counseling session, per the court order on

    page 14, you may not ask this question.

        MR. MCCORMICK:  I -- the objection is on the

    record, but I think you can answer.

        MR. MACGILL:  Well, counsel, you -- we're

    talking about your now, not the witness.  You are now

    violating a court order.  The court order --

        MR. MCCORMICK:  His counsel --

```
 1          MR. MACGILL:  -- let me finish.  The court order

 2     expressly -- you have not laid a foundation that he

 3     has any knowledge about the event of 2010, outside of

 4     counseling, you must make that -- you must lay that

 5     foundation, you have been barred by court order --

 6          MR. MCCORMICK:  -- I think I've heard that.  I

 7     understand.

 8          MR. MACGILL:  -- you haven't heard it because

 9     you nevertheless are violating the order.  The order

10     is very specific, Mr. Blankenship need not testify to

11     or produce documents regarding the marriage

12     counseling sessions with the accused and her husband.

13          MR. MCCORMICK:  That's the third speaking

14     objection.  Mr. Hayes, are you directing the witness

15     not to answer?

16          MR. HAYES:  Now, my turn for objection, Mr.

17     Blankenship, to the extent, in order to answer his

18     question, your basing that information you've gained

19     during your role as a -- in the counseling, you don't

20     need to answer that because that's privileged.

21          THE WITNESS:  I don't remember the question at

22     this point.

23          MR. MCCORMICK:  Court Reporter, could you please

24     read back my question?

25          THE COURT REPORTER:  Yes, Mr. Blankenship, when
```

```
 1            did you become aware that there had an encounter

 2            between the accused and I can't make out what that

 3            other word is.

 4   BY MR. MCCORMICK:

 5   Q     Let me try it again, did there come a time in 2010 when

 6   you became aware of an encounter that had taken place between

 7   Reverend Hunt's accuser and Reverend Hunt?

 8               MR. HAYES:  And so, Roy, to the extent you're

 9               not to discuss anything related to the counseling

10               sessions with the Hunt's or the other couple.

11               THE WITNESS:  Okay.

12               MR. HAYES:  And so, I'm going to instruct you

13               not to answer if answering is going to require to

14               disclose any information you gained during the

15               counseling.

16               THE WITNESS:  Okay.

17   BY MR. MCCORMICK:

18   A     Then I can't answer.

19   Q     All right.

20               MR. MCCORMICK:  And I -- and I -- mark the

21               question, I understand the objection and I respect

22               the order.

23   BY MR. MCCORMICK:

24   Q     I understand there came a time when you were providing

25   marriage counseling services to Reverend Hunt and his wife; is
```

1   that correct?

2   A    Yes.

3   Q    When did that begin?

4           MR. HAYES:  Roy, he's asking you a date kind of

5        question or time period.  He's not asking you

6        substance.  I want to make that clear again to remind

7        you of privilege.

8   BY MR. MCCORMICK:

9   A    I do not remember the exact date, it was sometime in the

10  mid to late July, early August of 2010 time period.

11  Q    Fair enough.  Had your marriage counseling relationship

12  between Reverend Hunt and his wife preceded the time of the

13  encounter that forms the basis of this lawsuit?  Or let me put

14  it another way, did your counseling Reverend Hunt take place

15  before or after the encounter with his accuser?

16  A    After.

17  Q    After.  Did it come before or after the time that you met

18  with the accuser and Reverend Hunt?

19  A    I'm having a hard time with the dates, say it one more

20  time?

21  Q    Again, and I'm -- I'm respectful of the court's order and

22  I certainly do not wish to invade communications that were

23  privileged between you and Reverend Hunt, I want to make that

24  perfectly clear.

25  A    Okay, I'm just needing the question again.

```
 1   Q     All right.  There came a time when you met with Reverend

 2   Hunt and the accuser and her husband; is that correct?

 3   A     That is correct.

 4   Q     Right.  And does August 2nd, 2010, sound about right?

 5   A     Okay, yes.

 6   Q     Okay.  How did that come about?

 7                  MR. HAYES:  Roy, just again, reminding you of

 8              the privilege issue.

 9                  THE WITNESS:  Right.

10                  MR. HAYES:  And to clarify, just the question,

11              are you asking how a meeting with Mr. Hunt or the

12              Hunts and the other couple came about?

13                  MR. MCCORMICK:  Came to be set up, yes.

14                  MR. HAYES:  So joint meeting?

15                  MR. MCCORMICK:  Let's start with that, yes.

16   BY MR. MCCORMICK:

17   A     I asked for it.

18   Q     And why did you ask for it?

19                  MR. HAYES:  Okay, so --

20                  MR. MCCORMICK:  Same -- same instruction.

21                  THE WITNESS:  Yeah.

22   BY MR. MCCORMICK:

23   A     I cannot answer that.

24   Q     Was it your idea to begin with?

25   A     Yes.
```

```
 1   Q    It was your idea, okay.  What was the purpose of the
 2   meeting?
 3   A    I can't -- I can't answer that.
 4                MR. HAYES:  And for the record, I'm assuming
 5                you're not answering it because of the instruction I
 6                would give you?
 7                THE WITNESS:  Yes.
 8                MR. HAYES:  To not testify about counseling
 9                sessions or privileged information, okay.
10                THE WITNESS:  Okay, sit down, be still. [witness
11                talking to his dog.]
12   BY MR. MCCORMICK:
13   Q    Just to return to my earlier question then, had your
14   marriage counseling relationship with Reverend Hunt begun
15   before the August 2nd meeting?
16   A    Yes.
17   Q    It had?
18   A    Yes.
19   Q    So if I were to ask you whether Reverend Hunt suggested to
20   you that this meeting take place, that would only come from
21   within the context of your marriage counseling with Reverend
22   Hunt?  Or is it possible, on the other hand, Mr. Blankenship,
23   that he could have, for example, just called you and said, hey,
24   I've got a problem, I need you to help me.
25                MR. MACGILL:  What is the question, counsel?
```

```
 1            You've two questions, you've talked -- I can't follow

 2        what you're asking.

 3            MR. MCCORMICK:  You can answer.

 4            MR. MACGILL:  Could we hear the questions back,

 5        please?

 6            THE WITNESS:  Yeah, I -- please forgive me, I --

 7        I've lost the question.

 8            MR. MCCORMICK:  I understand.  Could the court

 9        reporter please repeat my question?

10            MR. MACGILL:  Other -- there are two questions,

11        if you'd read both questions?

12            MR. MCCORMICK:  Repeat -- repeat -- repeat the

13        -- the question I just posed to Mr. Blakenship?

14            THE COURT REPORTER:  Yes, so if I were to ask

15        you whether Reverend Hunt suggested to you that this

16        meeting take place that will only come from -- I

17        can't make that out, there -- and then there was --

18        on the other hand, Mr. Blankenship, for example, they

19        just call you and say, hey, I've got a problem, I

20        need you to help me, and then they're started

21        objection.  You got two questions.

22            THE WITNESS:  It's okay, sit down.

23            THE COURT REPORTER:  Let me -- let me go back, I

24        think those are the two --

25    BY MR. MCCORMICK:
```

Q    Mr. Blankenship, the floor is yours.

       MR. HAYES:  Same instruction, Roy.

BY MR. MCCORMICK:

A    I'm not going to comment because I'm confused about the
questions still.

Q    All right.  Let me -- let me try it one more time, did any
communication between yourself and Reverend Hunt connected with
setting up the meeting with the survivor, her husband and
Reverend Hunt take place in a setting outside of your marriage
counseling sessions with Reverend Hunt?

A    No.

Q    No, okay.  Again, without -- without in any way,
penetrating the substance of what was discussed on August 2nd,
how many people were present at that meeting?

       MR. HAYES:  I'm sorry, did you say how many?

BY MR. MCCORMICK:

Q    Who was there?

       MR. HAYES:  So who was there on the August 2nd
       meeting?

BY MR. MCCORMICK:

A    Okay, me, Johnny Hunt, ██████ and ██████ ██████

Q    And where was that?

A    At ██████ pastoral office at Rehoboth Baptist Church.

Q    Okay, terrific.  And from that point forward, did there
come to be times when you met with the ██████ over a period of

months?

A     Yes.

Q     How many -- how many meetings?

A     More than 10, less than 20.

Q     And how long were those meetings?

A     Each meeting?

Q     Yeah.

A     Roughly an hour.

Q     Were you compensated for your work in counseling the
████████?

A     No.

Q     You -- you didn't have an invoice or bill that you gave to
somebody to pay for those sessions?

A     No.

Q     Was that part of your salary --

A     Yes.

Q     -- as an employee?

A     Yes.

Q     I see.  Who had control of the payment of your salary at
First Baptist Church Woodstock?

A     Dan Dohner, the senior staff business administrator and
then Jim Law, the executive pastor.

Q     Jim Law.

A     Those two.

Q     And -- and Jim Law reported to Johnny Hunt?

```
1    A    Yes.

2    Q    Uh-huh.  Did Johnny Hunt have any authority over your

3    employment at First Baptist Church Woodstock?

4    A    Yes.

5    Q    He was your ultimate report?

6    A    No, Jim Law was my ultimate report.

7    Q    I thought you said a moment ago that that Reverend Hunt

8    did have some control over your employment?

9    A    It's a Southern Baptist Church, polity is that the pastor

10   has control of a lot of things or authority over a lot of

11   things.

12   Q    If Reverend Hunt had decided that you were going to be

13   fired, would you be fired?

14   A    Yes.

15   Q    Let me go back to May of 2022, at some point, were you

16   contacted by investigators from Guidepost Solutions?

17   A    Yes.

18   Q    Do you remember when and how?

19   A    The first contact was an email from Cindy Steele, if I

20   recall her name correctly.

21   Q    All right.

22              MR. MCCORMICK:  Please bear with me just one

23        moment.  That was not my idea of how I wanted to have

24        a drop the mic moment.  I am going to show you, sir,

25        what is being marked for identification as
```

```
 1              Blankenship 1, and a copy for your counsel.  And at

 2              some point, I guess we have to make an arrangement

 3              for the court reporter to have this.

 4                   Okay, I'll make that arrangement.  Take a moment

 5              -- if you take a moment, Mr. Blankenship, to look

 6              this document over.

 7                   THE VIDEOGRAPHER:  Mr. McCormick, Court

 8              Reporter, this is the videographer, I just need to go

 9              off the record and then go back on record to break

10              the file so it's --

11                   MR. MCCORMICK:  This is a perfect moment to do

12              that.  Thank you.

13                   THE VIDEOGRAPHER:  10:36 a.m., we're off the

14              record.  This is the end of media number two.

15                   (Exhibit No. 1 is entered into the record.)

16  OFF THE RECORD

17  BACK ON THE RECORD

18                   THE VIDEOGRAPHER:  10:50, we're back on the

19              record, this is the beginning of media number three.

20  BY MR. MCCORMICK:

21  Q    Mr. Blankenship, you understand, of course, you are still

22  under oath?

23  A    Yes.

24  Q    Thank you.  Have you had an opportunity to look at the

25  document that I placed before you as Blankenship 1?
```

```
1   A    Yes.

2   Q    And do you recognize the document?

3   A    Yes.

4   Q    And is this the email exchange you were talking about

5   earlier?

6   A    The content is correct, but it is not the email exchange.

7   Q    I see.  Was there a different one?

8   A    Well, I never got the one from Russell Hulsky to Cindy

9   Steele, but I did get what she copied out of it to me, which

10  was the same.

11  Q    Which is what we have in front of you now?

12  A    Correct.

13  Q    And that -- and that was email originally from Cindy

14  Steele at Guidepost to you on August 18th, 2022?

15  A    Yes.

16  Q    And you responded to her, I guess, pretty much the same

17  day and said -- what was she trying to do?

18  A    She was trying to get me to agree to an interview.

19  Q    Okay.  And your original response was, "Let me think about

20  it until early next week"?

21  A    Uh-huh.

22  Q    All right.  And then, the email exchange goes on, at some

23  point, on the first page of this email, the embedded email

24  thread of April 19, 2022, 7:27, Russell Hulsky enters the

25  picture and says, "This is going to take some thought, let me
```

```
 1    get back to you."  Do you know what that's about?

 2    A    I have no idea.

 3    Q    And that was Mr. Hulsky wrote that, not you?

 4    A    I don't know who wrote it.

 5    Q    Okay.  So the way things stood, the last word to Guidepost

 6    at that point was the email message on the following page of

 7    April 18, let me think about this until early next week; is

 8    that --

 9    A    Yes.

10    Q    -- that's correct?  And at some point, was there any

11    follow up between yourself and Guidepost after that email

12    exchange?

13    A    Please repeat.

14    Q    Was there any follow up between yourself and Guidepost

15    after this email exchange?

16    A    No.

17    Q    No more emails, no more text messages?

18    A    Correct.

19    Q    No phone calls?

20    A    Correct.

21    Q    But there did come a time when you did meet with

22    investigators from Guidepost?

23    A    Yes.

24    Q    Do you remember their names?

25    A    I do not.
```

```
1    Q    Well, one of them, would that have been Russ Hulsky?
2    A    I've got both their names written at home on a notepad, I
3    -- I don't -- I don't recall here.
4    Q    You don't remember their names.  How many people met with
5    you?
6    A    Two.
7    Q    Two.  And do you remember when that happened?
8    A    It was sometime right after this.
9    Q    I think we mentioned earlier, May 9th, sounded like it was
10   in the ballpark?
11   A    I think so, yes.
12   Q    A couple -- a couple of weeks later?
13   A    Yes.
14   Q    Why didn't you -- why didn't you reach back to Guidepost
15   and say I can meet you on such and such a date?
16   A    Because I didn't want to talk to them.
17   Q    Fair enough.  Why not?
18   A    Because anything that I had to say -- I just didn't want
19   to talk to them.
20   Q    Was it because you were offended by they're reaching out
21   to you?
22   A    No.
23   Q    I mean, it's a free country, you don't have to want to
24   speak to them, we understand that, I'm just trying to get an
25   idea as to what -- what your reason was, was it -- did you feel
```

Case 3:23-cv-00243    Document 219-8    Filed 07/08/24    Page 52 of 118 PageID #: 4492

```
1    like your position at First Baptist Church Woodstock would be
2    in peril if you met with them?
3    A    No.
4    Q    Did you believe that by speaking to Guidepost you might be
5    violating clergy-penitent privilege?
6    A    That was a major concern, yes.
7    Q    That was a concern?
8    A    Yes.
9    Q    A concern.  Was there any other concern?
10   A    I didn't want to talk to them.  I just didn't want to.
11   Q    Was it because you didn't feel comfortable getting in the
12   middle of the controversy?
13   A    I don't recall that.
14   Q    Did you mention to anybody that Guidepost had reached out
15   to you?
16   A    No.
17   Q    Kept it to yourself?
18   A    The best I recall, yes.
19   Q    Uh-huh.  So May 9th, 2022, you met with two people, a man
20   and a woman, right?
21   A    May I amend?
22   Q    You certainly may.
23   A    I did talk to my husband about that they had reached out
24   to me.
25   Q    On or about August 18th, the date of the email exchange?
```

Case 3:23-cv-00243   Document 219-8 (Ex. 5) 05-07-08/24   Page 53 of 118 PageID #: 4493

```
1    A    Yes.

2    Q    Okay.  But apart from your husband, nobody else?

3    A    Correct.

4    Q    Okay.  Please describe to me how you came to meet the two

5    Guidepost investigators?

6    A    Well, it was the end of my clinical day in my office,

7    around 7:00 p.m, is when I finished my casework, I am leaving

8    my office, setting the deadbolt, I turn around and there they

9    stand.

10   Q    Can you describe for me who they -- who they were?

11   A    There was a man and woman, again, I can't recall their

12   specific names.

13   Q    Does the name Samantha Kilpatrick mean anything to you?

14   A    No, I -- I don't recall.

15   Q    It doesn't -- doesn't jog your memory?

16   A    I got -- one of them gave me a business card, it was -- I

17   think it was maybe the Russell.

18   Q    Hulsky?

19   A    Maybe, I don't -- I don't really recall though.

20   Q    So they were there, they met you, you were out in front of

21   the building?

22   A    Yes.

23   Q    All right.  On the sidewalk?

24   A    Yes.

25   Q    All right.  What happened, who said what to whom?
```

```
1    A     Hello, Mr. Blankenship, my name is, I can't recall.  I

2    don't recall the specific language they told me who they were,

3    they told me they wanted to talk with me.

4    Q     They told you they were part of Guidepost?

5    A     Yes.

6    Q     Did they mention this email?

7    A     I don't recall.

8    Q     All right.  Did you meet with them?

9    A     I did agree to give them 20 minutes and I think it ended

10   up being longer.

11   Q     You mentioned to me earlier, Mr. Blankenship, that you

12   didn't want to speak Guidepost, at least in -- in April, what

13   made you change your mind?

14   A     Just reflecting back on it, I felt pressure to, almost

15   under duress, I don't know why I felt that, but I did.

16   Q     You didn't -- you didn't feel like you were at liberty to

17   say just get lost?

18   A     Correct.

19   Q     And --

20   A     For the record, I wish I had of.

21   Q     -- so noted, but you didn't.  You invited them into your

22   office?

23   A     Under duress, I did.

24   Q     And what happened next?

25   A     They began to ask me questions.
```

```
 1   Q    And you answered those questions?

 2   A    Some.

 3   Q    Some, some you didn't?

 4   A    Correct.

 5   Q    What form did your answers take?

 6   A    I'm not sure how to answer that.

 7   Q    Were some of the answers yes or no?

 8   A    Correct, yes.

 9   Q    And were some of them a little bit more fulsome than that?

10   A    Yes.

11   Q    To the best of your recollection?

12   A    Yes.

13   Q    And to the extent that you said no, was the reason because

14   you felt that that strayed into areas you just didn't feel

15   comfortable talking about?

16   A    Correct.

17                MR. HAYES:  Object to the form of the question.

18                MR. MCCORMICK:  Okay, just one second.  Oh, I'm

19          sorry, yes, thank you.

20   BY MR. MCCORMICK:

21   Q    Mr.  Blankenship, I've placed before you what I have

22   marked as Blankenship deposition Exhibit number 2, do you

23   recognize the document?

24   A    I do.

25                (Exhibit No. 2 is entered into the record.)
```

Case 3:23-cv-00243    Document 219-8    Filed 07/03/24    Page 56 of 118 PageID #: 4496

```
1    BY MR. MCCORMICK:

2    Q      All right.  It's the report of the independent

3    investigation that you mentioned earlier?

4    A      Yes.

5    Q      If I could direct your attention to page 155 of the

6    report?

7    A      Yes.

8    Q      Actually, no, strike that, page 154 of the report.  I'd

9    like to ask you some questions about the portion of the report

10   that discusses your meeting with the Guidepost investigators.

11   And again, just to reassure you and your counsel and Mr.

12   MacGill, I understand there might be instances where you don't

13   feel you can answer a question because of the parameters the

14   court set.  Your attorney will, of course, indicate if it's not

15   appropriate for you to answer, I will respect that.  To the

16   extent that you can answer my questions, I would appreciate an

17   answer.  And we'll go through this one at a time and hopefully

18   it won't take too long, okay?

19   A      Okay.

20   Q      All right.  On page 154, the first full paragraph on the

21   page, because I like to hear myself speak I'll read to you the

22   following, "After multiple attempts to schedule an interview

23   with him via email, Guidepost investigators decided to approach

24   him at his office on May 9th, 2022.  He initially refused to

25   speak with investigators, but then he would speak with them for
```

```
 1    just 20 minutes.  He agreed to speak with investigators in his
 2    office."  Do you see that?
 3    A    Yes.
 4    Q    Is that accurate?
 5    A    Yes.
 6    Q    That's what we just discussed?
 7    A    Yes.
 8    Q    Okay, terrific.  Going further, "When investigators told
 9    him what they wanted to question him about, Mr. Blankenship
10    expressed concern for survivor and pastor, but he also said he
11    did not want to betray a confidence.  The investigators
12    explained that they had a waiver from the couple to discuss
13    their information."  Do you read that so far?
14    A    Yes.
15    Q    Is that an accurate reflection of your conversation with
16    the investigators?
17    A    Yes.
18    Q    And Mr. Blankenship, when the investigators told you that
19    they had a waiver, did they show you a document?
20    A    No.
21    Q    Do you -- do recall that they did not?
22    A    Correct, I did not see a document.
23    Q    It was just verbal?
24    A    Yes.
25    Q    One of the investigators said, "We had a waiver"?
```

```
 1    A     Yes.

 2    Q     Did you ask to see it?

 3    A     No.

 4    Q     Why not?

 5    A     Did not think to.

 6    Q     Did you take them at their word?  Let me rephrase the

 7  question, did that give you enough comfort that you felt you

 8  could speak to them?

 9    A     I don't like the word comfort.  There was no comfort in

10  the meeting for me.

11    Q     Did that help you feel that you could speak to them?

12    A     No, actually it made it more confusing.

13    Q     But you spoke to them all the same?

14    A     Yes, I did.

15    Q     Okay.  [As read:]  "Mr. Blankenship did not offer a

16  narrative of what happened but he said he was willing to answer

17  yes or no questions.  During questioning, he at times provided

18  more than a yes or no answer."  Is that accurate?

19    A     That is accurate.

20    Q     And we just spoke about that a second ago?

21    A     Yes.

22    Q     Yes.  Mr. Blankenship confirmed that Dr. Hunt's extended

23  sabbatical in 2010 was not related to exhaustion; was that

24  accurate?

25    A     Yes.
```

Case 3:23-cv-00243    Document 219-8    Filed 07/03/24    Page 59 of 118 PageID #: 4499

1    Q    You told them that?

2    A    Yes.

3    Q    In fact, Dr. Blankenship, what was the reason for this the

4    extended sabbatical?

5    A    I won't comment on that.

6    Q    Is that because you feel that, that would intrude upon

7    marriage counseling --

8    A    -- yes.

9    Q    -- privilege, okay.  All right, if you can't answer that

10   question, did Dr. Hunt -- Reverend Hunt take a sabbatical every

11   year?

12   A    Yes.

13   Q    Okay.  And typically how long was it?

14   A    One month.

15   Q    One month.  My clergyman only got two weeks.  How much

16   longer was this one?

17   A    I don't recall the exact time.

18   Q    It was longer than a month?

19   A    Yes.

20   Q    Reading on, "He also confirmed that this -- that there was

21   an incident in Panama City Beach involving Dr. Hunt and the

22   survivor.  From the information he recollected, Mr. Blankenship

23   said that Dr. Hunt had kissed the survivor and touched her

24   breast overlook clothes.  He did not recall anything about

25   pulling down pants.  Mr. Blankenship stated that he did not

```
 1    think he received the full story.  He confirmed that at the
 2    time his assessment was based on what Dr. Hunt told him and
 3    that the sexual contact was consensual."  You got that?
 4    A    I got that.
 5    Q    Is that an accurate reflection of what you told the
 6    investigators?
 7              MR. HAYES:  Roy, I'm going to instruct you not
 8          to answer under the basis that this information would
 9          be information received during the counseling and
10          based on the court's order and Georgia statute, you
11          can't be compelled to testify.
12              THE WITNESS:  Okay.
13              MR. MCCORMICK:  We'll mark that question, that's
14          fine.
15    BY MR. MCCORMICK:
16    Q    Is it true that the topic came up and that you spoke to
17    the investigators about it?
18              MR. MACGILL:  Same objection.
19              MR. HAYES:  Same instruction, Roy.
20    BY MR. MCCORMICK:
21    A    Yeah, okay, no comment.
22    Q    Did the investigators asked you about the incident in
23    Panama Beach?
24              MR. HAYES:  You can answer that.
25    MR. MCCORMICK:
```

1     A     Yes.

2     Q     And you responded to their question?

3     A     Yes.  [speaking to his dog] Sit, sit down girl, sit.

4     Q     Do you recall telling the interviewers that you did not

5     believe Reverend Hunt's version of the story?

6     A     No comment.

7     Q     I take it that by no comment you're saying you're invoking

8     the privilege based on the court's order?

9     A     Yes.

10    Q     Okay.  Well, let me ask you this then, did you believe Dr.

11    Hunt's version of it?

12                    MR. MACGILL:  Same objection.

13                    MR. HAYES:  Same --

14                    MR. MCCORMICK:  Okay --

15                    MR. HAYES:  -- same objection.

16                    MR. MCCORMICK:  -- I understand, question

17             marked.

18    BY MR. MCCORMICK:

19    Q     Before you began marriage counseling sessions with

20    Reverend Hunt, had you heard prior reports about Reverend

21    Hunt's sexual conduct with women, other than his own wife?

22    A     No.

23    Q     Nothing at all?

24    A     None.

25    Q     Do you recall telling the investigators that you've heard

1  rumors?

2  A    No.

3  Q    You don't recall that at all?

4  A    No.

5  Q    As you sit here today, you're testifying that you had

6  never heard a rumor of Reverend Hunt being involved with a

7  woman in any way other than his wife?

8  A    Correct.

9  Q    Moving on, "Mr. Blankenship stated that he and Dr. Hunt

10 agreed to meet with the couple the following week, and they did

11 in fact meet at pastor's church.  He stated that Dr. Hunt did

12 not dominate the meeting but he did apologize to pastor and

13 pastor said that he forgave him.  When he asked, did pastor

14 gave an account of what happened, he said she could have spoken

15 up, but she stayed silent.  He went on to say that Dr. Hunt was

16 the one with the power advantage, and that he should have been

17 the one to stop it, adding but, it takes two to tango.  He said

18 he'd been around for a while and he knew how these things

19 worked.  He --" meaning you, Mr. Blankenship, "questioned how

20 Dr. Hunt and survivor ended up in condos next door to each

21 other, he called it a he said, she said situation and he had no

22 proof."  Is this an accurate reflection of what you told the

23 investigators?

24            MR. HAYES:  Same objection, Roy.

25            THE WITNESS:  Objection.

MR. HAYES:  Same instruction.


BY MR. MCCORMICK:

A       No -- no comment.

Q       Understood.  Did the topic of Dr. Hunt's encounter with

██████  ██████  come up, were you asked about it, (inaudible)

without telling me anything that Dr. Hunt told you, or Janet,

or even the  ██████  in the counseling sessions, I'm talking

about your conversation with the investigators, did they ask

you?

A       You're asking me did they ask me about this stuff?

Q       Yes, exactly correct.

A       Yes.

Q       It came up?

A       Yes.

Q       And you answered their question?

A       Yes.

Q       Okay.  And in this instance with more than just a yes or

no answer?

A       Yes.

Q       [As read:] "Mr. Blankenship also confirms that a second

meeting took place at Hope Quest and that Dr. Hunt and his wife

as well as pastor --" I'm sorry, "as well as survivor and

pastor were present.  At that meeting the couples were present

to forgive, forget and move on."  Is that an accurate

reflection of what you told the Guidepost investigators?

                MR. HAYES:  Same objection and instruction, Roy.

                THE WITNESS:  Okay.

BY MR. MCCORMICK:

A    No comment.

Q    Did the investigators ask you about the second meeting?

A    I don't recall them -- I don't recall how that came up.

Q    But do you recall that there was at least some discussion between you and them about there having been a second meeting?

A    Yes.

Q    Okay.  And without getting into what you actually said, you responded to their question?

A    Yes.

Q    Okay.  Just take a step away from the document for a moment.

A    Okay.

Q    There was a second meeting after the August 2nd meeting?

A    Yes.

Q    So the original August 2nd meeting, I think we talked about a second ago, was Reverend ███████ office at his church (inaudible) and that involved Reverend Hunt, the alleged survivor, her husband, and yourself, right?

A    (Inaudible response.)

Q    And then there's the second meeting, can you recall when that happened?

A    Exact date, no, shortly thereafter.

Q    Shortly thereafter, would I be close if I said somewhere around August 9th?

A    That seems --

Q    About a week later?

A    -- yes.

Q    That sounds right?

A    Yes.

Q    And where did that meeting take place?

A    At my office at the Hope Quest campus.

Q    So not -- not -- not the husband's church, but at your office?

A    At my office, that's correct.

Q    And who was -- who was present for that meeting?

A    Johnny Hunt, Janet Hunt, ████ and ████ ██████ myself.

Q    And again, without getting into particulars, what was the purpose of the meeting?

A    I can't comment.

            MR. HAYES:  Same objection and instruction.

BY MR. MCCORMICK:

Q    You cannot comment because you feel that would violate the clergy-penitent privilege?

A    Yes.

Q    All right, okay.  Getting back to the document, "Mr. Blankenship stated that he did remember Dr. Hunt saying that if

1   this story got out it could negatively impact 40,000 churches.

2   He does not think that this was said at that first meeting, but

3   he does remember it being said at some point.  Mr. Blankenship

4   said that he was focused on helping the couple."  Is that an

5   accurate reflection of what you told the investigators?

6                    MR. HAYES:  Same objection and instruction.

7                    THE WITNESS:  Okay.

8   BY MR. MCCORMICK:

9   A    No comment.

10                   MR. MCCORMICK:  Understood, mark the question.

11  BY MR. MCCORMICK:

12  Q    Reading on, "The interview lasted more than 45 minutes.

13  Mr. Blankenship was guarded and hesitant to answer many of the

14  investigators' questions, refusing to answer some while

15  responding with details for others.  He did not want to speak

16  about anything related to his work with the couple in

17  counseling."  Is that accurate?

18  A    Yes.

19  Q    You would agree with that.  After the 45 minute long

20  meeting with the -- well, how did -- how did the meeting end?

21  A    I don't recall.

22  Q    Did you shake their hands?

23  A    I don't recall.

24  Q    Did they leave on a cordial basis?

25  A    Yes.

```
 1    Q    Was the conversation friendly?

 2    A    Yes.

 3    Q    Were they professional?

 4    A    Yes.

 5    Q    Did they treat you with respect?

 6    A    Okay, yes.

 7    Q    Did you have a sense that they were diligent in exploring

 8    with you what you felt they could tell -- you could tell them?

 9    A    Please rephrase for me?

10    Q    Well, do you feel like they were careful in trying to

11    cover all the topics of what had happened between yourself and

12    the survivor and Reverend Hunt?

13    A    I don't know that I evaluated whether they were careful or

14    not.

15    Q    Did you feel they were too intrusive or aggressive?

16    A    Yes.

17    Q    They were aggressive.  Why do you say that?

18    A    Very -- very assertive.

19    Q    Very assertive?

20    A    I wouldn't go aggressive.

21    Q    Uh-huh.  But they wanted to probe everything they could

22    get out of you?

23    A    Yes.

24    Q    That was your clear impression?

25    A    Yes.
```

```
 1    Q    All right.  Did you tell them to back off ever?

 2    A    I said no quite a bit.

 3    Q    Did you feel they were giving you the third degree?

 4    A    They were pushy.

 5    Q    They were pushy?

 6    A    Yes.

 7    Q    Was there ever a point when you sighed and said, thank God

 8    they didn't ask you that question?

 9    A    No.

10    Q    No?  I -- it has to be audible for the court reporter.

11    A    No.

12    Q    Was there any time when you thought that they should have

13    asked a question that they didn't?

14    A    No.

15    Q    Did the investigators contact you after that interview?

16    A    No.

17    Q    Did you have any contact with them at all, you calling

18    them directly or indirectly?

19    A    No.

20    Q    That was the last time that you spoke with them?

21    A    Yes.

22    Q    Okay.  And was that the last time you spoke to anybody

23    with Guidepost at all?

24    A    Yes.

25    Q    Did anybody -- anybody at all, other than Reverend Hunt
```

```
 1   and Janet, okay?  Attempt to question you or interview you
 2   about your meeting between Reverend Hunt and the accuser at
 3   anytime?
 4   A    No.
 5              MR. MACGILL:  Object to the form of the
 6         question.
 7   BY MR. MCCORMICK:
 8   Q    Did you understand my question?
 9   A    I think so.
10   Q    All right.  And by that, I mean, at any time in 2010, the
11   years after, 2022?
12   A    Ask me again, so I'll make sure.
13   Q    Sure thing.  Did anybody -- actually I want to exclude
14   Reverend Hunt, did anybody at all attempt to question or
15   interview you other than the two Guidepost investigators,
16   right?  About the encounter between Reverend Hunt and his
17   accuser?
18   A    No.
19   Q    No.  The only people you spoke to about the encounter
20   between Reverend Hunt and his accuser were Reverend Hunt, his
21   wife, the accuser, her husband, and yourself?
22   A    Correct.
23   Q    Close hold, right?
24   A    Correct.
25   Q    And of course the investigators?
```

```
 1   A    Of course.

 2   Q    Nobody else?

 3   A    Correct.

 4   Q    Okay.  I want to go back to something I asked you about in

 5   connection with the City of Refuge program, in your view, could

 6   a minister who had fondled another man's wife effectively serve

 7   within a Southern Baptist congregation after it became known?

 8   A    I guess I'm wondering why you're asking me that question?

 9   Q    Well, I'm the one who gets to ask the questions in this

10   room.

11   A    I know, I know that.

12   Q    You were in the City of Refuge program, we've established

13   that, right?  And some of the clergy there had engaged in one

14   form of sexual impropriety or another; is that correct?

15   A    I object to the general nature of the criteria you -- the

16   criteria you set.

17   Q    Forget about the criteria.

18   A    Okay.

19   Q    I'm just asking you.

20   A    I know you're asking me.

21   Q    In your experience, you know, would it be possible for a

22   minister, a Southern Baptist minister, to be able to

23   effectively to serve their congregation after it became

24   disclosed that they had fondled, kissed, what have you, a woman

25   who is not their wife?
```

```
 1    A    Would it be possible, yes.

 2    Q    Would it be easy?

 3              MR. MACGILL:  What was your question, I didn't

 4         hear the last part?

 5    BY MR. MCCORMICK:

 6    Q    Would it be easy?

 7              MR. MACGILL:  Would it be easy?

 8    BY MR. MCCORMICK:

 9    A    That depends on the person and the situation.

10    Q    Do you know any instances where that has happened?

11    A    In general, in the City of Refuge program, I know that

12    that was the case but I do not remember specific names.

13    Q    Do you remember instances where that was not the case?

14    A    Where they were not allowed to go back?  I don't recall

15    the specificity of that, no.

16              MR. MCCORMICK:  Can we take a five minute break?

17              MR. HAYES:  Yes.

18              THE VIDEOGRAPHER:  11:24 a.m., we're off the

19         record.  This is the end of media number three.

20    OFF THE RECORD

21    BACK ON THE RECORD

22              THE VIDEOGRAPHER:  At 11:29 a.m., we're back on

23         the record, beginning of media number four.

24              MR. MCCORMICK:  I don't have any further

25         questions at this point.  Thank you, Mr. Blankenship.
```

CROSS EXAMINATION

BY MR. MACGILL:

Q    Sir, good morning.  I introduced myself to you earlier today, I am Rob MacGill, I'm a lawyer representing Pastor Johnny Hunt.  I've got just a few questions for you.  I wanted to hear a little bit more about your education, as I understand it, you graduate -- graduated from the University of Alabama in 1980; is that correct?

A    Correct.

Q    And the degree that was awarded, you got -- you've received a BS in business administration and finance; is that right?

A    Correct.

Q    Okay.  And your master's degree in family and marriage therapy, that was awarded in what year, sir?

A    2010.

Q    Okay.  And I see a date here, April 13, 2010; does that sound right in terms of the degree?

A    It's close.

Q    Okay, fair enough.  I want to talk a little bit about your job in your consulting career, or your jobs in your consulting career.  As I understand it, you've explained to the jury that you were ordained a minister by the First Baptist Church of Woodstock in the year 1996; is that right?

A    I think it was more early 1998 when the ordination

1    happened.

2    Q    Okay.  But in that year, you were ordained in that

3    particular First Baptist Church of Woodstock; is that correct?

4    A    Ordained minister and also licensed -- as a licensed

5    ministry.

6    Q    Okay.

7    A    I forget the exact title of it.

8    Q    Let me ask a couple follow ups on that.  So on your

9    counseling role, were you -- did you serve as in a -- as the

10   senior counseling pastor at the Woodstock church?

11   A    Yes, sir.

12   Q    And could you describe for the court here and the jury the

13   role that you had as a senior counseling pastor at the

14   Woodstock church, what did that involve?

15   A    Administrative leadership, personnel issues, hiring,

16   firing, performance reviews, involvement in the development of

17   church programs, counseling processes, the adoption of

18   counseling theory, methods that we would use, and things of

19   that nature, and I carried a personal caseload.

20   Q    Focusing, if we could, for just a minute on the methods

21   that you employed while you were the senior counseling pastor,

22   is it fair to say that in that role you had -- you lead

23   different counseling ministries in that -- in that work?

24   A    Yes.

25   Q    And did you serve in connection with your role as the

1  senior counseling pastor, provide yourself counseling service

2  that were grounded in biblical doctrine?

3  A    Please repeat for me?

4  Q    Yes, and was your counseling that you did as the senior

5  counseling pastor of Woodstock, was that counseling -- were

6  those services grounded in biblical doctrine?

7  A    Yes, it was my first certification that I ever had was in

8  a board certified pastoral counselor.

9  Q    Okay.  Now with respect to the your -- your work as the

10  senior counseling pastor, did you provide those counseling

11  services to members of the church?

12  A    Yes.

13  Q    To fellow ministers as well?

14  A    Yes.

15  Q    And to members of the community, generally speaking?

16  A    At times.

17  Q    All right.  Now, you testified earlier about some of your

18  leadership and connection with the Hope Quest Ministry Group,

19  do you recall that line of testimony?

20  A    No, sir.

21  Q    All right.  Do you remember that -- were you in fact, the

22  founder of the Hope Quest Ministry Group?

23  A    Yes.

24  Q    And did you serve as its leader beginning in the year

25  2004?

```
1    A    Correct.

2    Q    Okay.  Now, I've read some information on your LinkedIn

3    and you described in your LinkedIn posts the Hope Quest

4    ministry as follows, "Hope Quest provides professional clinical

5    treatment services for people with addiction problems.  Hope

6    Quest specializes in addictive behavior, in co-occurring

7    disorders related to alcohol use, substance use and sexual

8    behavior.  Hope Quest is a Christian organization."  Does that

9    remain a good description of the Hope Quest Ministry Group?

10   A    Yes.

11   Q    Now, I want to focus on a couple of details about 2010 for

12   a minute.  So in 2010, you were not at that time a licensed

13   counselor; is that right?

14   A    In --

15   Q    2010.

16   A    2010, I did receive my associate professional counselor

17   license from the State of Georgia --

18   Q    Okay.

19   A    -- in 2010.

20   Q    Now, let me ask about prior to that licensure that you

21   just mentioned, did you understand that prior to the time of

22   license -- licensure in Georgia that you were able to provide

23   counseling services in your role at the First Baptist Church at

24   Woodstock under a statutory exemption that existed at the time?

25   A    Correct.
```

Q    And you -- to be even more specific, if I could, about
your role at that time prior to being licensed, did you
understand for your part that under Georgia law where you
practiced that you were allowed to act as a counselor without a
license?

A    Correct.

Q    Now, I'm going to ask some general questions, but I'm not
going to be asking any questions about what occurred in
counseling sessions, okay?

A    Okay.

Q    So please don't offer any information about what occurred
in sessions, okay?

A    Okay.

Q    At the time that you were acting in this -- in the role as
a counselor and specifically as the senior counseling pastor at
Woodstock church, did you serve as a counsel for the ███████
Let me ask a better question, did you provide counseling
services to ████ ████████

A    Yes.

Q    Did you provide counseling services to ████ ████████

A    Yes.

Q    And sir, again, without getting into what occurred in the
sessions, at the time you acted as a counselor for the ███████
you understood that you were providing counseling services
under that Georgia law exemption that you described earlier; is

that fair?

A     Yes.

Q     And at the time you clarified this a couple of minutes ago, but at the time that you were providing the counseling to each of the ████████ you had your master's degree in family and marriage therapy, right?

A     Correct.

Q     In terms of your counseling, your focus, at least in part -- strike that.  Your focus when you were counseling the ████████ was to provide counseling assistance to them; is that right?

          MR. BESEN:  Object to form -- because we're getting dangerously close here.

          MR. MACGILL:  Okay, fair -- fair -- fair enough, Mr. Besen objected to the question.

          THE COURT REPORTER:  I'm sorry, I didn't get --

          MR. MACGILL:  I'll restate, I'll restate.

BY MR. MACGILL:

Q     So sir, just generally speaking -- let me come at it this way, in terms of your counseling sessions with the ████████ you conducted those in a manner that you conducted your counseling sessions generally using your training, your experience, your experience, and specifically the biblical doctrines that you described earlier; is that fair?

A     Yes, yes.

Q ' Now, one more detail on your work with Mr. ████ and Ms.

████ is it fair to say, in general terms, that those

counseling sessions with the ████ sir, were at all times

based on biblical doctrine and they were conducted for the

purpose of rehabilitating and fostering the disclosing party's

marriages?

            MR. HAYES:  Object to form, the same objection

        and instruction --

BY MR. MACGILL:

Q    Let me withdraw the question, I understand the problem.

Sir, I want to move from the background that you just described

to the court and jury to some specifics about today, in terms

of your licenses and the certifications that you currently

have, are you currently certified in advanced alcohol and drug

counselor?

A    Yes.

Q    And are you a certified EMDR therapist?

A    Yes.

Q    To tell the court, if you would, sir, what EMDR stands

for?

A    Eye movement desensitization reprocessing.

Q    Okay.  Are you also, as you sit here today, a certified

professional counselor supervisor?

A    Yes.

Q    Are you a certified sex addiction therapist, sir?

```
 1   A    Yes.
 2   Q    Are you licensed -- are you a licensed a -- strike that.
 3   Are you a licensed marriage and family therapist in the State
 4   of Georgia?
 5   A    Yes.
 6   Q    And are you a licensed professional counselor here in the
 7   State of Georgia?
 8   A    Yes.
 9   Q    In addition to the certifications that you described, and
10   in addition to the educational background that you've
11   described, are you also a member of certain professional
12   associations?
13   A    LPC -- Licensed Professional Counseling Association of
14   Georgia, International Association of EMDR Therapists, those
15   are the major two.
16   Q    Could I ask a couple more?  Are you -- are you also
17   certified here in Georgia as an alcohol and drug abuse --
18   A    Oh, yeah, Alcohol and Drug Abuse Certification Board of
19   Georgia, ADACABGA, that thing.
20   Q    Okay.  That's a long acronym, but it's the alcohol --
21   You're certified as an alcohol and drug abuse expert by the
22   Board of Georgia here?
23   A    Yes.
24   Q    Okay.  Are you -- are you associated -- do you have a
25   professional association with the American Association of
```

```
1    Marriage and Family Therapist, sir?

2    A    No, I did not maintain that association.

3    Q    Okay.

4    A    ITAP, that's where the certifications from sex (inaudible)

5    come from?

6    Q    Yeah.  Yeah, let me -- I understand your testimony.  Let

7    me -- let me move on to a couple of details that you testified

8    about the way in which you were approached by the people from

9    Guidepost, okay?  You were asked on direct examination about

10   two people that showed up at your place of business in -- here

11   in Georgia; is that -- do you recall that testimony?

12   A    Yes.

13   Q    And you indicated to the court and jury that you felt --

14   well, let me back up, had these two people from the Guidepost

15   company, had they told you in advance that they were going to

16   come see you?

17   A    No.

18   Q    So as far as you were concerned, this was a surprise

19   visit?

20                 MR. MCCORMICK:  Form.

21   BY MR. MACGILL:

22   Q    Based on the form objection, let me restate, you didn't

23   expect anybody to be outside your door when you were locking up

24   for the day, did you?

25   A    That is correct.
```

```
 1    Q    All right.  And you testified earlier to the jury that

 2    with respect to the way in which these two folks from Guidepost

 3    conducted themselves, you felt, for your part, that you were

 4    under duress in connection with their questioning; is that

 5    fair?

 6    A    Yes.

 7    Q    And you also indicated to the jury about whether you were

 8    comfortable in connection with the meeting, is it fair to say

 9    that during the entire time of the investigators questioning

10    you, that you that you were not comfortable in that meeting

11    with them?

12    A    Correct.

13    Q    Do you still have that booklet in front of you?

14    A    (Inaudible response.)

15    Q    Would you mind turning to Exhibit 2 and page 154 and 155?

16    I have a couple of follow up questions for you.  Are you there,

17    sir?

18    A    Yes.

19    Q    All right.  Now, you recall being asked a number of

20    questions by counsel for Guidepost here pertaining to what we

21    see on page 154 and 155?

22    A    Yes.

23    Q    And you describe the meeting on August 2nd, that is

24    referenced on page 154; do you remember that?

25    A    Yes.
```

Q    And you described in your testimony earlier about a
meeting that took -- is referenced on page 155 in the second
paragraph; is that correct?

A    Correct.

Q    And do you recall the date of this second meeting which
included the Pastor Johnny Hunt and his wife?  Do you remember
when that was?

A    Not exactly, no.

Q    Okay.  You testified earlier about the meeting that you
had -- the sequence of meetings that you had with the ▮▮▮▮▮
you described -- do you remember describing 10 to 20 meetings
that you had with the ▮▮▮▮ after the incident that's the
subject of this case?

A    Ask me that --

Q    Yeah.  So do you remember describing earlier in your
testimony that you had some 10 -- somewhere between 10 and 20
meetings with the ▮▮▮▮ that were approximately one hour
each?

A    Yes.

Q    And did those meetings, were those after the incident
that's the subject of this case?

A    Yes.

Q    Once these counseling sessions that you had with ▮▮▮
▮▮▮ and his wife, ▮▮ ▮▮▮ were completed, did ▮▮
▮▮ at anytime reach out to you and ask that you pay

```
1    compensation to him?

2    A     No.

3                 MR. MACGILL:  That's all the questions I have,

4          thank you.

5                      CROSS EXAMINATION

6    BY MR. BESEN:

7    Q     Mr. Blankenship, my name's Gene Besen.  I represent the

8    Executive Committee of the Southern Baptist Convention.  I want

9    to start by thanking you for your time, I know sitting in a

10   room with a bunch of lawyers is not how anyone wants to spend

11   their Thursday.

12   A     Agreed.

13   Q     So I'm happy to have you here and I'm going to try to be

14   as quick and as efficient as I can be.  I want -- I want to

15   start by asking you about First Baptist Church Woodstock, is

16   that a large Southern Baptist Church?

17   A     Yes.

18   Q     Is it one of the largest in the State of Georgia?

19   A     Yes.

20   Q     Did it have a pretty high profile within the Georgia State

21   Southern Baptist Convention?

22   A     Yes.

23   Q     And what about within the National Southern Baptist

24   Convention, it was a well known church, wasn't it, sir?

25   A     As far as I know.
```

```
 1   Q    And what about Pastor Johnny, Pastor Johnny was kind of a

 2   big deal in Southern Baptist circles, wasn't he?

 3   A    I'm not sure I'm a good judge of that.

 4   Q    Did you ever go to the Southern Baptist Convention annual

 5   meetings with Pastor Johnny?

 6   A    Once, maybe twice.

 7   Q    When he walked around at the annual meeting, did people

 8   come up to him and shake his hand and seem to know who he was

 9   and want to have conversations with him?

10   A    I don't remember, I mean, in general, that was pretty

11   common wherever we went.

12   Q    Right.  When you were around Southern Baptist pastors and

13   members of FPC Woodstock, people wanted to talk to Pastor

14   Johnny and be around Pastor Johnny and interact with him?

15   A    Yes.

16   Q    Okay.  You -- do you think he had a pretty high profile

17   within the Southern Baptist Convention?

18   A    I don't know how to measure that, I know he was the

19   president of the convention, that seems to be high profile.

20   Q    High enough to win the vote at the annual meeting in 2011,

21   right?

22   A    Okay, I'll go with that.

23   Q    Sure.  Was Pastor Johnny well known for his work at

24   Woodstock with the City of Refuge ministry?

25   A    Please say that one more time?
```

```
1    Q    Was he very well known in Southern Baptist circles for the
2    City of Refuge ministry he worked on with you?
3    A    I think so, yes.
4    Q    And speaking of City of Refuge, can you give us an idea of
5    -- I know you talked about a little bit generally, I want to go
6    a little deeper, were you selective about which pastors were
7    taken into the City of Refuge?
8    A    Yes.
9    Q    And -- and when you did that, those were typically pastors
10   who had had a public fall; would that be fair to say?
11   A    Yes.
12   Q    They had stepped away from ministry in their own churches
13   for a scandal or summaries that caused them to need to seek
14   refuge at the City of Refuge, correct?
15   A    I don't like the word scandal.
16   Q    Okay.  What word do you like?  I'm happy to change it.
17   A    You said for some reason, I'll go with that.
18   Q    Okay, all right.  Those reasons, I know Mr. McCormick
19   asked you a bunch of questions, sometimes those reasons were
20   sexual impropriety?
21   A    Correct.
22   Q    Adultery?
23   A    Yes.
24   Q    Were there issues with addiction as well?
25   A    Yes.
```

```
 1   Q    And the thing that each one of those pastors that came to
 2   the City of Refuge had in common is they had left their own
 3   churches where they were serving as pastors in that church; is
 4   that correct?
 5   A    I think that's fair, yes.
 6   Q    And when they did that, when they left their original
 7   churches, did they tell those congregations why they were
 8   stepping down from ministry?
 9   A    I don't know.  That would have been a case by case thing.
10   Q    Okay.  And I'm not asking you to tell me every time yes or
11   every time no, and I don't want to know Tim, Alex or Perry,
12   right?  We're not going to get into any of the specifics, but
13   -- but as a general rule, when folks came to the City of
14   Refuge, they were coming in crisis?
15   A    That is correct.
16   Q    And often times it was a public crisis because they
17   stepped away from their church ministry; is that true?
18   A    They stepped away from their church ministry, yes.  I
19   suppose that's public.  I don't know how public it was.  The
20   people in their church surely would have known.
21   Q    Sure, sure, that's fair, that's great.  So once these
22   pastors came to City of Refuge, they didn't pay FPC Woodstock
23   to get access to City of Refuge, did they?
24   A    No.
25   Q    Did they -- were they required to become members at FPC
```

1   Woodstock?

2   A    I don't recall that they had to become members, many of

3   them did.  They had to attend, but I don't recall the

4   requirement if they had to join the membership.

5   Q    Sure.  And we talked a little -- you talked a little bit

6   with Mr. McCormick about the sort of -- well, forget that, I'm

7   making it more complicated than it needs to be.  How did -- how

8   did you and the City of Refuge staff determine when a pastor

9   was restored, ready to return to ministry?

10  A    It was a consensus of opinion by the leadership involved

11  in their case, which included me, the director of the program,

12  obviously Pastor Johnny, the therapist that they were under --

13  the primary therapists there, the input from the accountability

14  group, a group of men that they met with consistently

15  throughout their tenure.

16  Q    Was that accountability group primarily made up of deacons

17  at Woodstock, or was it just members at large within the

18  Woodstock community?

19  A    I think deacons often but wasn't a requirement.

20  Q    And before somebody got the endorsement from the City of

21  Refuge to return to ministry, were they required to be sort of

22  fully transparent in what their issues were and be able to

23  share that and own their journey, their fall and then their

24  restoration?

25  A    I don't know that we ever wrote that in policy, but to

1    answer your question, yes.

2    Q    And in part, because the biblical standards for a pastor

3    in a Southern Baptist Church required the pastor to be beyond

4    reproach, correct?

5    A    Is that a -- asking me for a theological opinion?

6    Q    I think you provided over a decade of biblical counseling

7    at Woodstock, I think you've got a sense of what it means to be

8    a Southern Baptist pastor, yes, sir, just your thoughts.

9    A    The Bible does say beyond reproach, so I'll go with that.

10   I'll avoid getting into my thoughts about what I think about

11   it.

12   Q    Sure.  And beyond reproach is clearly a term that would be

13   subject to interpretation, but it says beyond reproach, it also

14   says faithful to their wives, right?  The Bible?

15   A    Yes.

16   Q    Okay.  Do you think that kissing and awkwardly fondling

17   another pastor's wife is being faithful to your own wife?

18   A    I won't comment on that.

19   Q    You don't have a -- you can't tell me whether or not if a

20   -- if an individual who was a pastor kissed and fondled another

21   pastor's wife, if that would not -- that would be -- being

22   faithful to his own wife?

23   A    It's a matter of opinion.

24   Q    So there's a scenario, and just making sure we're clear,

25   there's a scenario in your mind where a pastor could kiss and

```
 1    fondle another pastor's wife and that would not -- that would

 2    be faith -- being faithful to his own wife?

 3    A    I guess it would depend on how we define faithful and over

 4    what period of time.  The factors we're going to consider for

 5    faithfulness are considered.

 6    Q    Okay.  It's your answer, Mr. Blankenship, I'm totally fine

 7    with whatever you say, we're good.

 8    A    Okay.

 9    Q    Mr. Blankenship, I know -- you certainly seem to me to be

10    an honest man, would you consider yourself to be an honest man,

11    sir?

12    A    I try to be.

13    Q    I think you do.  When you met with the investigators from

14    Guidepost, were you being honest with them?

15    A    Well, I wasn't being dishonest with them.

16    Q    Yeah.  And I'm not --

17    A    I'm not sure I understand what you're after, but.

18    Q    -- I'm -- you told them the truth, correct?

19    A    Yes.

20    Q    There wasn't anything you told them that you were trying

21    to obfuscate or mislead them about?

22    A    Of course, no.

23    Q    And you said you felt very uncomfortable in that

24    conversation and that makes all the sense in the world to me,

25    Mr. Blankenship, that is an uncomfortable setting.  One
```

```
1    question I had about that, were you aware of the broader sexual
2    abuse investigation that the SPC was involved in before those
3    Guidepost investigators showed up at your office?
4    A    You know, that was a time ago, I'm trying to -- maybe
5    marginally in the background.
6    Q    Yeah, and when -- I know -- I know -- maybe not running
7    around in Southern Baptist circles these days, and I guess when
8    did you sort of leave the Southern -- leave Woodstock and leave
9    sort of the Southern Baptist?
10   A    I'm trying to think of the exact time period, it would
11   have been early 2019.
12   Q    Okay, that makes sense.  Do you remember seeing, in 2019,
13   maybe around the same time, there was a article -- a series of
14   articles written in the Houston Chronicle.  The series was
15   entitled abuse of faith and highlighted sexual abuse concerns
16   within the Southern Baptist Convention, do you recall seeing
17   that, sir?
18   A    Say the thing again?
19   Q    Abuse of faith, it was a series of articles that were run
20   in the Houston Chronicle on 2019 about sexual abuse within the
21   Southern Baptist Convention?
22   A    I remember seeing the Houston Chronicle and some things
23   that -- but I don't remember that specific article.
24   Q    Okay.  Do you have any recollection, and I'm just trying
25   to go down the timeline, there's no tricks or curveballs here
```

```
 1    at all, do you recall in May of 2020 -- well, June of 2021, at
 2    the SBC annual meeting in Nashville, I don't know that you
 3    would have been paying attention, so let me just ask, the
 4    messengers at that 2021 meeting voted to authorize an
 5    investigation into sexual abuse.  That's what led to the
 6    Guidepost investigation.  I'm just wondering if you knew about
 7    that in the summer of 2021?
 8    A    I know nothing about it.
 9    Q    Okay, that's perfect.  That helps.  So truly, when the
10    Guidepost investigators show up in your lobby, waiting for you
11    at the end of your clinical day at 7:00 p.m., that was a
12    surprise.  And other than the email from Cindy Steele, you had
13    no idea that was coming?
14    A    That's correct.
15    Q    And they were asking you details about counseling sessions
16    that were confidential, right?
17    A    Yes.
18    Q    And that made you really uncomfortable?
19    A    Yes.
20    Q    And you also wanted to be cooperative because the people
21    interviewing you were trying to appeal to your need to help and
22    the importance of the work they were doing, does that seem like
23    what was happening?
24    A    Yes.
25    Q    Okay.  And -- and just one more time, you were -- you were
```

```
 1    honest and cooperative with them to the best of your ability

 2    and within the bounds of your professional obligations?

 3    A     Yes.

 4    Q     Okay.  Do you think it's important for a lead pastor and

 5    the former president of a Southern Baptist -- of the Southern

 6    Baptist Convention to be honest with his congregation and his

 7    church?

 8    A     Yes.

 9    Q     Do you think it's important for him to be vulnerable and

10    truthful about the fact that like everybody else, he is just

11    human and has sin and falls from grace and makes mistakes?

12    A     Say that one more time?

13    Q     Do you think it's important for a lead pastor and the

14    former president of Southern Baptist Convention, to be

15    vulnerable and honest and disclose his own shortcomings and his

16    own falls because we all sin and make mistakes?

17    A     Do I -- are you asking me, do I believe we should do that,

18    yes.

19    Q     And do you think it's a problem when the lead pastor and

20    the former president of Southern Baptist Convention isn't

21    honest with his congregation about his falls and his sins?

22    A     Please say it one more time?

23    Q     Sure, I'm going to do my best.  Do you think it's

24    important when the lead pastor of a Southern Baptist Church

25    isn't honest and forthright about his own sins and his own
```

```
 1   falls with his congregation?

 2                MR. HAYES:  Object to the form.

 3   BY MR. BESEN:

 4   Q    You can answer, sir.

 5   A    I can't answer that.

 6   Q    Okay.  Because you don't want Pastor Johnny or because you

 7   just think there's too many variables and what -- what that

 8   means --

 9   A    There's too many variables.

10   Q    -- okay, that's fine.  I'm just making sure I knew which

11   one, that's totally okay.  Do you think that Pastor Johnny was

12   honest and truthful to First Baptist Church Woodstock about why

13   he took a sabbatical in 2010?

14   A    Yes.

15   Q    You do?

16   A    Yes.

17   Q    It was because he was exhausted?

18   A    He elaborated on that exhaustion many times from the

19   pulpit.

20   Q    Do you think he was honest with the congregation about why

21   he was exhausted?

22   A    I -- I do.

23   Q    You do?  Did he -- did he not lie by omission?

24                MR. HAYES:  Object to the form.

25   BY MR. BESEN:
```

```
1    A    I'm not going to answer that.

2    Q    Okay.  You're not going to answer that because you know

3    the answer but it would require you to divulge what you learned

4    in the counseling session, correct?

5    A    Yeah, I feel it's a doorway into what I'm not going to

6    talk about regarding protecting the -- the counseling people.

7    Q    I'm not arguing with you, sir.  I understand.

8    A    Okay.

9    Q    I'm just making sure it's clear on the record why you're

10   not answering.

11   A    Okay.

12   Q    Is there anything in the Guidepost report that pertains to

13   you that you think is wrong?

14                  MR. MACGILL:  Asked and answered.

15                  MR. HAYES:  You can answer.

16                  THE WITNESS:  I can?

17                  MR. HAYES:  Well --

18   BY MR. BESEN:

19   Q    I'm not asking you to elaborate what it is, just is there

20   anything in there that you think is wrong?

21                  MR. MACGILL:  I'm going to object to this

22          because it's directly contrary to the terms of this

23          order.

24                  MR. HAYES:  I do think it depends on what is

25          wrong or right and if it's anything to do with
```

```
1              counseling, then it's the same instruction and
2              objection.
3    BY MR. BESEN:
4    Q    Well, let me ask a different question and see if I can get
5    around it, and if not, y'all will shut me down.  You testified
6    earlier that when the Guidepost report was published you
7    reviewed it and maybe talked to your husband about it.  At
8    first reading the Guidepost report, that review back in May of
9    '22 or whenever you decided to read it, when you read the
10   sections that relate it to you and use your name, was there
11   anything in there where you said I didn't say that?
12             MR. MACGILL:  Same objection.
13             MR. HAYES:  Same instruction.  I'll tell you if
14        there's something about the logistics of when -- how
15        Guidepost --
16             THE WITNESS:  So I can or can't answer it?
17             MR. HAYES:  It depends on the answer.  If it's
18        about stuff that you've gained --
19             THE WITNESS:  I'm glad I'm not a lawyer.
20             MR. HAYES:  -- if it's about stuff you've --
21   BY MR. BESEN:
22   Q    We're all operating in a pretty fuzzy world and I'm really
23   -- I'm not trying -- if the answer to that question is
24   dependent on what you know or learned through your counseling
25   sessions, that's fine.  I'm really -- what I'm trying to get to
```

```
1    is, despite the court's order, the Guidepost report says what

2    it says and it has your name attributed to statements and the

3    only thing I want you to discern and counsel can weigh in

4    however they want is, is there something in the report that

5    you, you know, Roy Blankenship, thinks is inaccurate in terms

6    of its attribution to you?

7                    MR. MACGILL:  -- Counsel, you can't answer that

8            without making reference to the protected

9            information.

10                    MR. BESEN:  Well, he can say yes or no.

11                    MR. MACGILL:  No, he can't.

12                    MR. BESEN:  Okay.

13                    MR. MACGILL:  Okay.

14                    MR. BESEN:  I'm not going to argue about it.

15                    MR. MACGILL:  That's fair.  I'm going to object

16            to this, the question directly intrudes on the

17            privilege that's been upheld by the court in the

18            ruling of the court on page 14.

19    BY MR. BESEN:

20    A    That's the way it feels to me, so I'm going to say no

21    comment.

22    Q    Okay.

23                    MR. HAYES:  And that'd be based on my

24            instruction you not to answer?

25                    THE WITNESS:  Yes.
```

```
 1              MR. HAYES:  So there we go.
 2    BY MR. BESEN:
 3    Q    Mr. Blankenship, did you -- did you find in your time at
 4    City of Refuge that having the endorsement of Johnny Hunt was
 5    important to the restoration process of the pastors that passed
 6    through City of Refuge?
 7    A    Was it important?
 8    Q    Um-huh.
 9    A    Yes.
10    Q    It was a stamp of approval, wasn't it?
11    A    Okay, can I elaborate?
12    Q    Please.
13    A    Southern Baptist polity, how could a church put forth a
14    recommendation that the church senior pastor didn't approve of?
15    Q    Sure, I didn't -- I guess, I -- I don't think I'm the one
16    being deposed, I agree with you.
17    A    Sorry about that.
18    Q    No, no, no, no, no apology necessary.  I think where I was
19    going is, you know, Johnny Hunt is a high profile, influential
20    leader in the Southern Baptist Convention and when somebody has
21    come to City of Refuge and it gets the endorsement from the
22    City of Refuge that they have been restored, that mattered in
23    the Southern Baptist community and to the churches that pastor
24    would ultimately seek to rejoin ministry with?
25              MR. MACGILL:  Object to the form, lack of
```

```
 1              foundation.
 2    BY MR. BESEN:
 3    A    My opinion?
 4    Q    Yes, sir.
 5    A    Yes.
 6    Q    All right.
 7              MR. BESEN:  Let's take a five minute break.
 8              THE VIDEOGRAPHER:  12:09, we're off the record.
 9         This is the end of media number four.
10    OFF THE RECORD
11    BACK ON THE RECORD
12              THE VIDEOGRAPHER:  12:12 p.m. and we're back on
13         the record.  This is beginning of media number five.
14              MR. BESEN:  Mr. Blankenship, no further
15         questions from the Executive Committee of the
16         Southern Baptist Convention.
17              MR. HAYES:  Anybody else?
18              MR. MCCORMICK:  I have no further questions.
19                   RE-CROSS EXAMINATION
20    BY MR. MACGILL:
21    Q    Just one quick follow up on one of Mr. Besen's lines of
22    questions, so you'll recall that Mr. Besen was asking you about
23    whether you were truthful when you were interviewed by the two
24    Guidepost representative -- representatives, do you remember
25    those questions?
```

```
1   A    (Inaudible response.)

2   Q    And you've been truthful here in giving the testimony that

3   you have provided in detail today, fair statement?

4   A    Yes.

5                MR. MACGILL:  That's all we have.  Thank you

6           very much.

7                THE VIDEOGRAPHER:  12:13 p.m., we're off the

8           record.  This concludes the deposition.

9                (WHEREUPON, the proceedings were concluded in

10          the matter at 12:13 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        CERTIFICATE

 2    STATE OF TENNESSEE

 3         I, Lori Massanelli, #950, license expiration June 30,

 4    2024, do hereby certify that the facts stated by me in the

 5    caption on the foregoing proceedings are true; and that the

 6    foregoing proceedings were reported verbatim through the use of

 7    the voice-writing method and thereafter transcribed by me or

 8    under my direct supervision to the best of my ability, taken at

 9    the time and place set out on the caption hereto.

10         I FURTHER CERTIFY, that I am not a relative or employee of

11    any attorney or employed by the parties hereto, nor financially

12    interested or otherwise, in the outcome of this action, and

13    that I have no contract with the parties, attorneys, or persons

14    with an interest in the action that affects or has a

15    substantial tendency to affect impartiality, that requires me

16    to relinquish control of an original deposition transcript or

17    copies of the transcript before it is certified and delivered

18    to the custodial attorney, or that requires me to provide any

19    service not made available to all parties to the action.

20         WITNESS MY HAND AND SEAL this 1st day of May, 2024.

21

22    LORI MASSANELLI

23

24

25
```

**1**

**1** 47:1,15,25

**10** 25:7 26:5 45:4 81:11,16

**10:36** 47:13

**10:50** 47:18

**11:24** 70:18

**11:29** 70:22

**11th** 6:12

**12** 25:7 26:5

**12:09** 97:8

**12:12** 97:12

**12:13** 98:7,10

**13** 71:17

**14** 26:1,4,24 28:21 29:7 37:19 95:18

**1426** 7:7

**15** 29:7

**154** 55:8,20 80:15, 21,24

**155** 55:5 80:15,21 81:2

**18** 49:7

**18th** 48:14 51:25

**19** 48:24

**1980** 16:20 71:8

**1981** 19:12

**1990** 19:12,15 20:1

**1991** 20:1

**1996** 19:20 71:24

**1998** 20:24 71:25

**2**

**2** 54:22,25 80:15

**20** 45:4 53:9 56:1 81:11,16

**2000** 25:20

**2002** 22:17 25:16, 23

**2003** 22:17 25:16

**2004** 73:25

**2010** 16:22 17:25 18:9,14 36:18,20 38:3 39:5 40:10 41:4 57:23 68:10 71:16,17 74:11, 12,15,16,19 92:13

**2011** 83:20

**2015** 25:21,23

**2016** 25:25

**2019** 89:11,12,20

**2020** 90:1

**2021** 90:1,4,7

**2022** 14:6 27:23 46:15 48:14,24 51:19 55:24 68:11

**2023** 12:10

**2024** 6:12

**22** 94:9

**2nd** 41:4 42:15 44:13,18 63:17,19 80:23

**3**

**30189** 7:8

**3:23-cv-00243** 6:17

**4**

**40,000** 65:1

**45** 65:12,19

**5**

**50** 26:6

**7**

**7:00** 52:7 90:11

**7:27** 48:24

**9**

**9:30** 6:12

**9:33** 8:8

**9:34** 8:11

**9th** 27:23 50:9 51:19 55:24 64:3

**A**

**a.m.** 6:12 47:13 70:18,22

**ability** 10:25 32:8 91:1

**abnormal** 17:8

**abuse** 11:9 26:11, 16 27:4 31:13 34:10 36:6 78:17, 18,21 89:2,15,19, 20 90:5

**academic** 16:24 21:17

**access** 17:17 85:23

**accommodate** 10:23

**account** 61:14

**accountability** 33:23 86:13,16

**accurate** 56:4,15 57:18,19,24 59:5 61:22 62:25 65:5, 17

**accused** 34:10 38:12 39:2

**accuser** 18:4,7 28:24 29:2 36:21 37:13 39:7 40:15, 18 41:2 68:2,17, 20,21

**acronym** 78:20

**act** 32:9 75:4

**acted** 75:23

**acting** 11:25 14:24 75:14

**active** 28:6 31:20 34:14

**actual** 24:17 26:11

**ADACABGA** 78:19

**addiction** 16:23 74:5 77:25 84:24

**addictive** 74:6

**adding** 61:17

**addition** 78:9,10

**address** 7:6 30:8

**addressing** 10:4

**administration** 71:11

**Administrative** 72:15

**administrator** 45:21

**admit** 31:22

**admonish** 29:20

**admonishment** 32:4

**admonition** 31:25

**adoption** 72:17

**adultery** 27:4 31:13 84:22

**advance** 79:15

**advanced** 77:14

**advantage** 61:16

**affairs** 24:10,11, 16,24

**affirm** 6:25

**aggressive** 66:15,17,20

**agree** 20:7 48:18 53:9 65:19 96:16

**agreed** 56:1 61:10 82:12



betray 56:11

Bible 87:9,14

biblical 73:2,6
76:23 77:4 87:2,6

big 83:2

bill 45:12

Birmingham
16:18 19:15

bit 17:11 21:12
54:9 67:2 71:6,20
84:5 86:5

Blakenship
43:13

Blankenship 6:3,
11 7:5,7 9:8 10:23
11:5,23 14:24
15:24 21:24 24:22
26:10 27:6,17
28:10,22 29:22,24
30:1,20 37:12
38:10,17,25 42:22
43:18 44:1 47:1,5,
21,25 53:1,11
54:21,22 56:9,18
57:15,22 58:3,22,
25 61:9,19 62:21
64:25 65:3,13
70:25 82:7 88:6,9,
25 95:5 96:3
97:14

Blankenship's
29:21

board 73:8 78:18,
22

body 34:6 35:15

bonding 24:12

bonds 27:3

booklet 80:13

bound 8:18

boundaries 7:10
8:15,18

bounds 91:2

break 10:19,20,23
47:9 70:16 97:7

breast 58:24

briefly 17:5,16

broader 89:1

brought 9:22

BS 71:11

building 52:21

bunch 82:10
84:19

business 16:17,
19 45:21 52:16
71:11 79:10

---

## C

cabined 25:23

calculus 16:10

call 20:6 43:19

called 42:23
61:21

calling 20:7 67:17

calls 49:19

camera 7:24

campus 21:15
64:10

candidates 36:7

capacity 20:13

Capella 16:23

card 52:16

care 20:17 22:10

career 19:12,19
20:8 71:21,22

careful 66:10,13

carried 72:19

case 6:13,16 9:12,
13 70:12,13
81:13,21 85:9
86:11

caseload 72:19

casework 52:7

Casually 36:22

categories 24:3,
20

caused 84:13

cautioned 6:5

Central 19:10,14

certification 73:7
78:18

certifications
77:13 78:9 79:4

certified 73:8
77:14,17,22,25
78:17,21

chance 22:14

change 19:19
20:8 53:13 84:16

chemistry 16:11

children 22:13

choice 33:19

Christ 35:14,15

Christian 74:8

Chronicle 89:14,
20,22

church 15:10
19:21,25 20:2,4,
11 22:4,20 30:25
32:3,8,11,14,16,
22,23 33:23 34:6,
22 35:10,15,22
36:4,13 44:23
45:20 46:3,9 51:1
61:11 63:20 64:11
71:23 72:3,10,14,
17 73:11 74:23
75:16 82:15,16,24
85:3,17,18,20
87:3 91:7,24
92:12 96:13,14

churches 65:1
84:12 85:3,7
96:23

Cindy 46:19 48:8,
13 90:12

circles 83:2 84:1
89:7

City 21:24 22:9
23:13 24:23 25:22
26:15 34:20
35:10,21 36:4
58:21 69:5,12

70:11 83:24 84:2,
4,7,14 85:2,13,22,
23 86:8,20 96:4,6,
21,22

clarification 32:4

clarified 76:3

clarify 10:15
25:15 41:10

clarity 28:16

clear 10:10 30:4,
13 33:14 40:6,24
66:24 87:24 93:9

clergy 23:12 26:5,
15 27:2 28:6
31:11 69:13

clergy-penitent
51:5 64:22

clergyman 58:15

client 17:23

clients 23:13
24:23 25:22

clinical 52:6 74:4
90:11

close 12:5 64:2
68:23 71:19 76:13

clothes 58:24

co-occurring
74:6

college 19:4

Columbia 16:5

comfort 57:7,9

comfortable 24:1
51:11 54:15 80:8,
10

comment 44:4
58:5 59:21 60:6,7
62:4 63:5 64:18,
21 65:9 87:18
95:21

commercial
19:11

commit 27:2

committed 26:16

Committee 6:15

82:8 97:15

**common** 83:11 85:2

**Communicating** 24:12

**communication** 11:24 44:7

**communications** 14:1 30:21 40:22

**community** 22:5 34:6 73:15 86:18 96:23

**company** 15:7,8 19:17 79:15

**compelled** 59:11

**compensated** 45:9

**compensation** 82:1

**complaint** 17:15, 18

**complete** 10:13

**completed** 81:24

**complicated** 86:7

**comply** 29:5

**complying** 29:17

**compulsion** 20:6

**concern** 51:6,7,9 56:10

**concerned** 79:18

**concerns** 89:15

**conclude** 18:14

**concluded** 98:9

**concludes** 98:8

**condos** 61:20

**conduct** 60:21

**conducted** 76:21 77:4 80:3

**conference** 10:4

**confidence** 56:11

**confidential** 90:16

**confirmed** 57:22 58:20 59:1

**confirms** 62:21

**conflict** 24:8

**confrontation** 24:8

**confused** 44:4

**confusing** 57:12

**congregation** 24:7 35:19 36:8 69:7,23 91:6,21 92:1,20

**congregations** 85:7

**connected** 44:7

**connection** 11:25 15:1 17:25 69:5 72:25 73:18 80:4,8

**consensual** 59:3

**consensus** 33:24 86:10

**considered** 88:5

**consistently** 86:14

**consulting** 71:21

**consumed** 11:3

**contact** 12:4 24:17 46:19 59:3 67:15,17

**contacted** 46:16

**content** 48:6

**contention** 35:9

**contents** 11:16

**context** 30:22 42:21

**continue** 16:16 17:2 32:12,24 35:23

**continued** 32:9

**contrary** 93:22

**control** 45:19 46:8,10

**controversy** 51:12

**convention** 6:14, 16 82:8,21,24 83:4,17,19 89:16, 21 91:6,14,20 96:20 97:16

**conversation** 14:18 27:7 56:15 62:9 66:1 88:24

**conversations** 30:24 31:7 83:9

**cooperative** 90:20 91:1

**copied** 48:9

**copy** 47:1

**cordial** 65:24

**correct** 8:7 9:6 18:1,2,16 24:19 25:24 33:7 34:24 40:1 41:2,3 48:6, 12 49:10,18,20 52:3 53:18 54:4,8, 16 56:22 61:8 62:12 64:13 68:22,24 69:3,14 71:8,9,13 72:3 74:1,25 75:6 76:7 79:25 80:12 81:3, 4 84:14,21 85:4, 15 87:4 88:18 90:14 93:4

**correctly** 34:11 46:20

**counsel** 8:21 10:15 11:20,24 14:25 29:22 32:13 33:11 37:15,22,25 42:25 47:1 55:11 75:16 80:20 95:3, 7

**counseling** 8:15 12:17 17:8,9 22:3, 12 23:22 28:10,24 29:1,24 30:22 31:5 33:22 34:3 37:18 38:4,12,19 39:9,15,25 40:11,

14 42:8,14,21 44:10 45:9 58:7 59:9 60:19 62:8 65:17 72:9,10,13, 17,18,21,23 73:1, 4,5,10 74:23 75:9, 15,17,20,24 76:4, 8,9,10,20,21 77:3 78:13 81:23 87:6 90:15 93:4,6 94:1, 24

**counselor** 18:22 33:21 73:8 74:13, 16 75:4,15,23 77:15,23 78:6

**counselors** 22:3

**country** 50:23

**County** 16:5

**couple** 28:11 39:10 41:12 50:12 56:12 61:10 65:4, 16 72:8 74:11 76:3 78:16 79:7 80:16

**couples** 62:24

**coursework** 17:7

**court** 6:18,20,21, 23,24 7:11,15,18 8:6,17 9:1,22 10:7 28:18,19,20,21 29:6,10,13,16 30:6,7 32:20 37:18,24 38:1,5, 23,25 43:8,14,23 47:3,7 55:14 67:10 72:12 76:16 77:12,19 79:13 95:17,18

**court's** 28:8 40:21 59:10 60:8 95:1

**courtroom** 10:3

**cover** 66:11

**covered** 15:9 28:8

**credit** 19:6,9

**crisis** 85:14,16

**criteria** 33:16,18

69:15,16,17

CROSS 71:1 82:5

curriculum 17:6

curveballs 89:25

---

**D**

Dan 45:21

dangerously
76:13

data 19:11

date 6:12 12:5
18:8 27:11,19,22
40:4,9 50:15
51:25 64:1 71:17
81:5

dates 40:19

David 12:14

day 48:17 52:6
79:24 90:11

Daylight 6:13

days 89:7

deacon 20:13

deacons 86:16,19

dead 14:20

deadbolt 52:8

deal 23:14 83:2

decade 87:6

deceased 19:24

decide 32:8

decided 17:1
19:19 46:12 55:23
94:9

deciding 33:9

decision 33:17

deeper 84:6

defendants 6:16

define 32:13 35:9
88:3

defrayment 15:1,
16

degree 16:17,21
18:14,19,25 21:16
67:3 71:10,14,18
76:5

delivered 17:19

depend 88:3

dependent 94:24

depends 70:9
93:24 94:17

deposed 9:8
96:16

deposition 6:11
9:5 11:6,21 15:2,
22 32:2 35:9
54:22 98:8

describe 52:4,10
72:12 80:23

describing 81:11,
15

description 74:9

desensitization
77:21

detail 77:1 98:3

details 65:15
74:11 79:7 90:15

determine 86:8

developed 23:4

development
72:16

diagnosing 17:9

died 16:25

difference 28:5

difficulties 22:7

difficulty 24:6

diligent 66:7

direct 55:5 79:9

directed 23:5

directing 23:3
38:14

direction 17:7

directly 37:16
67:18 93:22 95:16

director 23:2,5
33:20 86:11

disagreed 31:2

disagreements
31:9

discern 95:3

disclose 39:14
91:15

disclosed 69:24

disclosing 77:5

discuss 14:12
39:9 56:12

discussed 44:13
56:6

discusses 55:10

discussion 63:8

dishonest 88:15

disorders 74:7

dissertation
16:25

District 6:17,18

dividing 31:19
33:8

Divinity 21:9

division 6:19
20:18

divulge 93:3

doctrine 73:2,6
77:4

doctrines 76:23

document 13:7,9
47:6,25 48:2
54:23 56:19,22
63:14 64:24

documents 11:6
28:23 38:11

dog 42:11 60:3

Dohner 45:21

dominate 61:12

door 17:19 61:20
79:23

doorway 93:5

drop 46:24

drug 77:14 78:17,
18,21

due 13:12

duly 6:4

duress 53:15,23
80:4

---

**E**

earlier 14:8 42:13
48:5 50:9 53:11
55:3 71:3 73:17
75:25 76:24 80:1
81:1,9,15 94:6

early 20:24 40:10
48:20 49:7 71:25
89:11

easier 36:3

Eastern 6:13

easy 70:2,6,7

education 15:25
21:6,15 71:6

educational
78:10

effect 12:22,24

effectively 69:6,
23

efficient 82:14

elaborate 93:19
96:11

elaborated 92:18

elbow 9:15

elicit 23:16 29:25

email 46:19 48:4,
6,13,22,23 49:6,
11,15 51:25 53:6
55:23 90:12

emails 49:17

embedded 48:23

EMDR 77:17,19
78:14

emotional 24:10,
11,12,24 27:3

employed 72:21

employee 15:9
45:17

employee's
15:11

employment
22:11 46:3,8

encounter 17:25
18:6 37:13 39:1,6
40:13,15 62:5
68:16,19

end 7:17,20 10:14,
16 36:6 47:14
52:6 65:20 70:19
90:11 97:9

ended 16:17 53:9
61:20

endorse 31:24
32:8,11

endorsed 32:23
33:3 34:1,13

endorsement
33:12 86:20 96:4,
21

engaged 69:13

engineer 19:18
21:2

engineering
19:16

entered 8:17
47:15 54:25

enters 48:24

entire 80:9

entitled 89:15

established
69:12

evaluated 66:13

event 10:7 18:5
38:3

events 37:4

exact 12:5 18:8
25:4 27:11 31:15
33:1 40:9 58:17
64:1 72:7 89:10

examination 6:8
71:1 79:9 82:5
97:19

examples 23:21

exchange 13:11,
24 48:4,6,22
49:12,15 51:25

exchanged 31:6

exclude 68:13

exclusively 29:1

excuse 7:11
35:11

executive 6:15
20:17 45:22 82:8
97:15

exemption 74:24
75:25

exhausted 92:17,
21

exhaustion 57:23
92:18

exhibit 47:15
54:22,25 80:15

existed 74:24

exists 13:11

expect 79:23

expenses 15:18

experience 22:6
31:18 33:8 34:9
69:21 76:22,23

experienced
31:12

experiencing
22:6

expert 32:2 78:21

explained 56:12
71:22

explanation 32:1

exploring 66:7

expressed 56:10

expressly 38:2

extended 57:22
58:4

extent 8:23 9:23
11:18 13:10 23:25
29:23 30:23 31:4
32:2,7 38:17 39:8
54:13 55:16

Eye 77:21

F

F-O-R-G-E 7:7

fact 34:16 36:7
58:3 61:11 73:21
91:10

factor 33:9 34:2

factors 88:4

fair 40:11 50:17
71:20 72:22 76:1,
14,24 77:2 80:5,8
84:10 85:5,21
95:15 98:3

faith 88:2 89:15,
19

faithful 87:14,17,
22 88:2,3

faithfulness 88:5

fall 84:10 86:23

falls 91:11,16,21
92:1

false 17:24

familiar 11:16
20:12 21:24 29:16

families 22:10,13
25:8

family 16:19,22
17:4 18:20 21:21
35:13 71:14 76:5
78:3 79:1

feel 8:20 16:14
24:1 50:25 51:11
53:16 54:14 55:13
57:11 58:6 64:21
66:10,15 67:3
93:5

feeling 20:5

feels 8:21 95:20

fees 15:1,6,16

fell 9:13

fellow 73:13

fellowship 35:14

felt 21:19 53:14,15
54:14 57:7 66:8
79:13 80:3 88:23

figure 24:2

figured 21:3

file 47:10

finance 19:5
71:11

find 29:23 30:17
96:3

fine 10:16 59:14
88:6 92:10 94:25

finish 38:1

finished 16:24
18:25 21:18 52:7

fired 46:13

firing 72:16

firms 19:13

flirtation 24:14
27:3 31:13 36:6

floor 44:1

focus 74:11 76:8,
9

focused 65:4

Focusing 72:20

folks 14:17 80:2
85:13

follow 30:6 43:1
49:11,14 72:8
80:16 97:21

fondle 88:1

fondled 69:6,24
87:20

fondling 87:16

Foreign 16:12

forgave 61:13

Forge 7:7

forget 62:25
69:17 72:7 86:6

Case 3:23-cv-00243    Document 219-6    Filed 07/03/24    Page 107 of 118 PageID #:
4547

forgetting 26:13

forgive 21:10 43:6 62:25

forgot 21:9

form 31:12 35:22 54:5,17 68:5 69:14 76:12 77:7 79:20,22 92:2,24 96:25

formal 21:5

forms 40:13

forthright 91:25

forward 44:24

fostering 77:5

foundation 29:4 37:17 38:2,5 97:1

founder 73:22

FPC 83:13 85:22, 25

free 29:25 50:23

friend 12:25

friendly 66:1

front 48:11 52:20 80:13

full 7:5 55:20 59:1

fully 25:21 86:22

fulsome 54:9

fuzzy 94:22

---

**G**

gained 23:21 38:18 39:14 94:18

gave 45:12 52:16 61:14

Gene 82:7

general 17:14 18:8 23:19 28:18 69:15 70:11 75:7 77:2 83:10 85:13

generally 11:17 17:12 28:17 73:15 76:19,22 84:5

---

gentlemen 6:10

Georgetown 16:12

Georgia 7:8 59:10 74:17,22 75:3,25 78:4,7,14,17,19, 22 79:11 82:18,20

girl 60:3

give 7:1 25:5 26:2 42:6 53:9 57:7 84:4

giving 67:3 98:2

glad 94:19

goal 35:20

God 67:7

good 6:9 7:5 11:20 21:11 32:24 71:3 74:9 83:3 88:7

grace 91:11

graduate 71:7

graduated 16:6, 20,22 18:17 71:7

great 22:25 85:21

grounded 73:2,6

group 17:9 33:23 36:7 73:18,22 74:9 86:14,16

groups 37:6

guarded 65:13

guess 25:2 47:2 48:16 69:8 88:3 89:7 96:15

Guidepost 6:15 11:8 17:23 27:8, 20 46:16 48:14 49:5,11,14,22 50:14 51:4,14 52:5 53:4,12 55:10,23 63:1 67:23 68:15 79:9, 14 80:2,20 88:14 89:3 90:6,10 93:12 94:6,8,15 95:1 97:24

---

**H**

H-A-A-S 23:10

Haas 23:8,9

half 25:9,10

hand 6:25 42:22 43:18 83:8

hands 65:22

happen 21:3

happened 19:19 27:10 36:18 50:7 52:25 53:24 57:16 61:14 63:25 66:11 70:10 72:1

happening 90:23

happy 82:13 84:16

hard 7:12,14,19 40:19

hate 7:11

hated 19:9

Hayes 12:16,19 13:12,13,15,20 23:15 27:14 28:7 31:4 32:13,17 33:11 38:14,16 39:8,12 40:4 41:7, 10,14,19 42:4,8 44:2,15,18 54:17 59:7,19,24 60:13, 15 61:24 62:1 63:2 64:19 65:6 70:17 77:7 92:2, 24 93:15,17,24 94:13,17,20 95:23 96:1 97:17

head 9:24

hear 7:14 9:24 17:3 43:4 55:21 70:4 71:6

heard 32:19 38:6, 8 60:20,25 61:6

hearing 7:12,19 21:19

helped 22:10

---

helping 65:4

helps 90:9

HEREINBEFORE 6:4

hesitant 65:13

hey 12:22 22:24 42:23 43:19

high 16:4,5,6 82:20 83:16,19,20 96:19

highlighted 89:15

hiring 72:15

history 16:1,3 19:1

hold 32:20,22 68:23

hole 9:14

home 9:22 20:25 50:2

honest 34:4 88:10,14 91:1,6, 15,21,25 92:12,20

honestly 21:18

Hope 25:21 62:22 64:10 73:18,22 74:3,4,5,8,9

horse 14:20

Hospital 9:13

hour 45:8 81:17

Houston 89:14, 20,22

Hulsky 48:8,24 49:3 50:1 52:18

human 91:11

Hunt 6:13 11:24 12:4 13:24 14:1 15:15,21 17:23 18:6 19:20,23 20:9 28:5 30:21, 24 37:14 39:7,25 40:12,14,18,23 41:2,11 42:14,19, 22 43:15 44:7,9, 10,21 45:25 46:2,

---

7,12 58:10,21,23
59:2 60:20 61:6,9,
11,15,20 62:7,22
63:21 64:15,25
66:12 67:25 68:2,
14,16,20 71:5
81:6 96:4,19

**Hunt's** 11:25 18:4
36:20 39:7,10
57:22 60:5,11,21
62:5

**Hunts** 28:11
41:12

**husband** 14:13,
14 28:25 29:2
37:2 38:12 41:2
44:8 51:23 52:2
63:22 68:21 94:7

**husband's** 64:11

————————

**I**

————————

**idea** 9:18 22:25
41:24 42:1 46:23
49:2 50:25 84:4
90:13

**identification**
46:25

**identified** 13:9

**identify** 23:24
29:14

**impact** 65:1

**importance**
90:22

**important** 91:4,9,
13,24 96:5,7

**impossible** 36:11

**impractical** 21:19

**impression**
66:24

**improper** 29:19
30:17

**improprieties**
32:10

**impropriety**
25:11 26:8 31:12
35:23 36:5,8

69:14 84:20

**inability** 24:7

**inaccurate** 95:5

**inappropriate**
27:3

**inaudible** 7:10
9:3 10:1 12:8
16:13 62:6 63:21,
23 79:4 80:14
98:1

**incident** 58:21
59:22 81:12,20

**include** 35:18

**included** 81:6
86:11

**including** 14:25

**increasingly**
20:5

**independent**
11:9 29:4 55:2

**indirectly** 67:16

**individual** 33:21
87:20

**Industrial** 19:6

**infidelity** 24:10,
24

**influential** 96:19

**information**
23:17,18,21 28:9
29:23 31:6 38:18
39:14 42:9 56:13
58:22 59:8,9 74:2
75:11 95:9

**initially** 55:24

**input** 86:13

**instance** 62:18

**instances** 24:23
26:10,14 28:4
55:12 70:10,13

**instruct** 28:11
39:12 59:7

**instruction** 41:20
42:5 44:2 59:19
62:1 63:2 64:19
65:6 77:8 94:1,13

95:24

**insurance** 15:7,8

**intend** 8:17

**interact** 83:14

**interesting** 19:3

**interfere** 10:24

**International**
78:14

**interpret** 28:17

**interpretation**
87:13

**interview** 48:18
55:22 65:12 67:15
68:1,15

**interviewed**
97:23

**interviewers**
60:4

**interviewing**
90:21

**introduced** 37:7,
9 71:3

**intrude** 58:6

**intrudes** 95:16

**intrusive** 66:15

**invade** 14:15
30:21 40:22

**invading** 31:5

**investigation**
11:9 55:3 89:2
90:5,6

**investigators**
27:7 28:4 46:16
49:22 52:5 55:10,
23,25 56:1,8,11,
16,18,25 59:6,17,
22 60:25 61:23
62:9 63:1,6 65:5
67:15 68:15,25
80:9 88:13 89:3
90:10

**investigators'**
65:14

**invited** 53:21

**invoice** 45:12

**invoking** 60:7

**involve** 26:11
72:14

**involved** 20:6
24:9,24 25:10
32:10 61:6 63:21
86:10 89:2

**involvement**
20:11 23:1 24:13
25:8 72:16

**involving** 58:21

**issue** 41:8

**issued** 29:18

**issues** 24:8 72:15
84:24 86:22

**ITAP** 79:4

**ITT** 19:6

————————

**J**

————————

**Janet** 62:7 64:15
68:1

**Jim** 45:22,23,25
46:6

**job** 19:2 71:21

**jobs** 71:21

**jog** 52:15

**Johnny** 6:13
12:22 19:20 20:4,
9,16 22:5,24 31:9
33:20 44:21 45:25
46:2 64:15 71:5
81:6 83:1,5,14,23
86:12 92:6,11
96:4,19

**Johnny's** 37:3

**join** 86:4

**joint** 41:14

**journey** 86:23

**judge** 83:3

**July** 18:9 40:10

**June** 16:20 90:1

jury 10:7 71:22
72:12 77:12 79:13
80:1,7

**K**

Kilpatrick 52:13

kind 9:12 15:21
21:5 25:10 26:7
27:4 32:3 36:5,16
40:4 83:1

kiss 87:25

kissed 58:23
69:24 87:20

kissing 87:16

knew 7:25 36:24
37:2,9 61:18 90:6
92:10

knowledge
25:17,22 28:25
29:5 36:15 37:17
38:3

**L**

lack 96:25

ladies 6:9

laid 29:3 38:2

lane 7:8 8:19

language 20:7
53:2

large 82:16 86:17

largely 19:8

largest 82:18

lasted 65:12

late 21:12 40:10

law 45:22,23,25
46:6 75:3,25

lawns 19:2

lawsuit 12:1
17:13,22 40:13

lawyer 21:11 71:4
94:19

lawyers 82:10

lawyers' 15:6

lay 38:4

lead 72:22 91:4,
13,19,24

leader 73:24
96:20

leadership 20:16,
17 24:7 72:15
73:18 86:10

Leann 6:20

learned 93:3
94:24

Leasing 19:6

leave 25:20 65:24
89:8

leaving 52:7

led 34:2 90:5

left 16:17 85:2,6

legal 15:1,16

leukemia 16:25

Lexis 6:21

liability 15:11

liberty 16:22 17:4
18:13,17 53:16

license 18:21
74:17,22 75:5

licensed 72:4
74:12 75:2 78:2,3,
6,13

licenses 77:13

licensure 74:20,
22

lie 92:23

life 22:7,12 34:5

lines 97:21

Linkedin 74:2,3

listing 28:9

LLC 6:15

loan 19:8

lobby 90:10

local 35:15

locking 79:23

log 13:10

logistics 94:14

long 12:16 25:19
45:5 55:18 58:13
65:19 78:20

longer 53:10
58:16,18

loosely 31:21

lost 43:7 53:17

lot 9:14 21:17
46:10

loud 8:3

LPC 78:13

lucid 10:25

**M**

Macgill 28:15
29:8,12,15 30:3,
11 37:15,22 38:1,
8 42:25 43:4,10
55:12 59:18 60:12
68:5 70:3,7 71:2,4
76:14,17,18 77:9
79:21 82:3 93:14,
21 94:12 95:7,11,
13,15 96:25 97:20
98:5

made 20:8 29:3
33:16 53:13 57:12
86:16 90:18

mainframe 19:16

maintain 79:2

major 24:21 51:6
78:15

make 8:24 10:2
21:3 30:3,8,13
36:3 38:4 39:2
40:6,23 43:17
47:2,4 68:12
91:16

makes 88:24
89:12 91:11

making 34:3 86:7
87:24 92:10 93:9
95:8

man 51:19 52:11
88:10

man's 69:6

manage 24:8

manner 76:21

MARCHETTI
7:14

marginally 89:5

mark 8:25 39:20
59:13 65:10

marked 46:25
54:22 60:17

marriage 16:21
18:22 21:21 28:24
29:1 35:12 38:11
39:25 40:11
42:14,21 44:9
58:7 60:19 71:14
76:6 78:3 79:1

marriages 77:6

married 14:17

Massanelli 6:20

Master 16:21
18:20 21:9

master's 16:21
18:18 71:14 76:5

matter 87:23
98:10

mattered 33:22
96:22

matters 24:25

Mccormick 7:4
8:13 12:21 13:6,
14,17,21,22 15:13
23:23 27:15 28:13
29:8,15 30:10,13,
19 31:8 32:15,19,
25 33:13,15
37:20,25 38:6,13,
23 39:4,17,20,23
40:8 41:13,15,16,
20,22 42:12 43:3,
8,12,25 44:3,16,
20 46:22 47:7,11,
20 54:18,20 55:1
59:13,15,20,25
60:14,16,18 62:3

63:4 64:20 65:8,
10,11 68:7 70:5,8,
16,24 79:20 84:18
86:6 97:18

**meaning** 35:8
61:19

**means** 10:11 87:7
92:8

**meant** 35:11

**measure** 83:18

**media** 6:10 47:14,
19 70:19,23 97:9,
13

**medication** 10:24

**meet** 19:23 49:21
50:15 52:4 53:8
61:10,11

**meeting** 28:2
37:8 41:11,14
42:2,15,20 43:16
44:8,14,19 45:6
55:10 57:10 61:12
62:22,24 63:6,9,
17,19,24 64:9,14,
17 65:2,20 68:2
80:8,10,23 81:2,5,
9 83:7,20 90:2,4

**meetings** 45:3,5
81:10,11,17,20
83:5

**member** 20:5
22:19 23:3 30:25
78:11

**members** 22:4
73:11,15 83:13
85:25 86:2,17

**members'** 20:10

**membership**
86:4

**memory** 34:17
52:15

**men** 86:14

**mention** 23:15
30:18 51:14 53:6

**mentioned** 14:8
34:8 50:9 53:11
55:3 74:21

**message** 12:13,
15 13:10 49:6

**messages** 49:17

**messengers**
90:4

**met** 16:10 36:22
37:3 40:17 41:1
44:25 50:4 51:2,
19 52:20 86:14
88:13

**methods** 72:18,
20

**mic** 7:17,20 46:24

**microphone** 7:23

**mid** 19:20 40:10

**middle** 6:18 51:12

**mind** 35:10 53:13
80:15 87:25

**minimal** 13:2

**minister** 20:14,23
24:17 69:6,22
71:23 72:4

**ministers** 73:13

**ministries** 72:23

**ministry** 20:6,11
22:7,15 25:1 28:6
31:3,14,20 32:9,
12,24 34:14,15
35:16,23 72:5
73:18,22 74:4,9
83:24 84:2,12
85:8,17,18 86:9,
21 96:24

**minute** 65:19
70:16 72:20 74:12
97:7

**minutes** 53:9
56:1 65:12 76:3

**mislead** 88:21

**mistakes** 91:11,
16

**misuse** 24:9

**moment** 34:8
46:7,23,24 47:4,5,
11 63:15

**money** 24:9

**month** 58:14,15,
18

**months** 25:9 45:1

**morning** 6:9 7:5
11:6 71:3

**morning's** 11:21

**motivation** 21:4

**mouth** 9:25

**move** 62:25 77:11
79:7

**moved** 19:13,15,
25

**movement** 77:21

**Moving** 61:9

**mowing** 19:2

**multifaceted**
35:12

**multiple** 55:22

---

**N**

**name's** 82:7

**NAMED** 6:4

**names** 49:24
50:2,4 52:12
70:12

**narrative** 57:16

**Nashville** 6:18
90:2

**National** 82:23

**nature** 17:12
24:25 34:7 69:15
72:19

**necessarily**
24:13

**needed** 17:1

**needing** 40:25

**negatively** 65:1

**neighborhood**
25:7 27:2

**non-legalese**

15:4

**non-ministry**
22:11

**Northside** 9:13

**noted** 6:22 53:21

**notepad** 50:2

**notice** 9:5

**notion** 26:18

**number** 6:10,17
25:5 31:15 33:1
47:14,19 54:22
70:19,23 80:19
97:9,13

**numbers** 22:8

---

**O**

**O-L-D** 7:7

**oath** 6:6 10:5
47:22

**obfuscate** 88:21

**object** 28:7 30:15
54:17 68:5 69:15
76:12 77:7 92:2,
24 93:21 95:15
96:25

**objected** 76:15

**objecting** 31:22

**objection** 8:22
10:16 29:19 30:16
37:15,20 38:14,16
39:21 43:21 59:18
60:12,15 61:24,25
63:2 64:19 65:6
77:7 79:22 94:2,
12

**obligated** 30:6

**obligations** 91:2

**observation** 34:5

**occasion** 13:5,23
14:21

**occasions** 31:1

**occurred** 75:8,11,
22

offended 50:20

offer 57:15 75:11

offered 21:14

offhand 24:21

office 44:23 52:6,
8 53:22 55:24
56:2 63:20 64:10,
12,13 89:3

officer 30:7

Officially 36:9

omission 92:23

open 34:4

operating 94:22

opinion 28:5
86:10 87:5,23
97:3

opinions 33:22

opportunity 8:22
21:15 47:24

ordained 20:13,
23 71:23 72:2,4

order 8:17 28:8,
18,19,20 29:6,16
30:6 37:18,24
38:1,5,9,17 39:22
40:21 59:10 60:8
93:23 95:1

ordinary 20:15

ordination 21:6,7
71:25

organic 16:11

organization
74:8

oriented 19:5

original 48:19
63:19 85:6

originally 48:13

Orleans 21:14

overlook 58:24

---

**P**

---

p.m 52:7

p.m. 90:11 97:12
98:7,10

paid 20:21

Panama 58:21
59:23

pants 58:25

paper 27:13

paragraph 55:20
81:3

parameters
55:13

parking 9:14

part 18:24 21:10
22:9 45:15 53:4
70:4 75:3 76:8
80:3 87:2

participating
15:15 34:20

particulars 28:2
64:16

party's 77:5

passed 96:5

pastor 12:22 20:4
24:6 30:24 33:20
37:3,7 45:22 46:9
56:10 61:12,13
62:23,24 71:4
72:10,13,21 73:1,
5,10 75:15 81:6
83:1,5,13,14,23
86:8,12 87:2,3,8,
20,25 91:4,13,19,
24 92:6,11 96:14,
23

pastor's 61:11
87:17,21 88:1

pastoral 20:17
22:3 33:21 44:23
73:8

pastors 22:6 24:6
37:6 83:12 84:6,9
85:1,3,22 96:5

pay 45:13 81:25
85:22

paying 15:6 90:3

payment 45:19

pending 10:21

penetrating
44:13

people 7:18,20
19:17 32:9,21
33:24,25 34:2,9
36:12 44:14 50:4
51:19 68:19 74:5
79:8,10,14 83:7,
13 85:20 90:20
93:6

peoples' 33:22

perceived 20:5
34:4

percent 26:6

percentage 33:2

percentages
25:4

perfect 47:11
90:9

perfectly 40:24

performance
72:16

peril 51:2

period 12:11
25:13 40:5,10
44:25 88:4 89:10

permission
30:21

Perry 85:11

person 20:13,15
21:2 23:24 24:17
28:6 32:9 33:25
35:21 70:9

person's 23:7

personal 9:23
25:17 35:13 36:15
72:19

personnel 72:15

persons 36:3

pertain 11:18

pertaining 80:20

pertains 93:12

pharmacology

17:8

pharmacy 16:10

Phd 16:23

phone 13:24
49:19

physical 24:10,
13,16,24

pick 36:18

picture 48:25

place 18:5,7 30:22
39:6 40:14 42:20
43:16 44:9 62:22
64:9 79:10

plaintiff 6:14

point 9:21 11:8
14:21 17:1 20:23
23:25 26:13 27:6
36:17 38:22 44:24
46:15 47:2 48:23
49:6,10 65:3 67:7
70:25

policy 15:11
86:25

polity 20:12 31:23
32:2 46:9 96:13

portfolio 19:8

portion 55:9

posed 43:13

position 51:1

post-graduate
16:21

posts 74:3

potentially 23:16
28:9

power 61:16

practiced 75:4

Pray 16:16

pre-med 16:9

preceded 40:12

preparation 11:6

present 44:14
62:24 64:14

**president** 83:19
91:5,14,20

**pressure** 53:14

**presuppose**
34:21

**pretty** 27:25 33:13
48:16 82:20
83:10,16 94:22

**primarily** 16:18
86:16

**primary** 35:20
86:13

**printed** 17:24

**prior** 27:19 60:20
74:20,21 75:2

**privilege** 13:10
14:15 40:7 41:8
51:5 58:9 60:8
64:22 95:17

**privileged** 13:18
23:16,18 38:20
40:23 42:9

**probe** 66:21

**problem** 24:25
42:24 43:19 77:10
91:19

**problems** 23:12
24:7 74:5

**proceedings**
98:9

**process** 9:18
34:1 35:24 96:5

**processes** 72:17

**processing**
19:11

**produce** 13:12
28:23 38:11

**produced** 13:8

**professional**
33:22 66:3 74:4,
16 77:23 78:6,11,
13,25 91:2

**profile** 82:20
83:16,19 96:19

**program** 18:14,25

21:21 22:10,14,
16,20,22,23 23:4
24:23 25:8,16,23
26:6,15 31:1,3,11,
18 33:20 34:10,
14,21 35:10,22
36:4 69:5,12
70:11 86:11

**programmer**
19:10

**programs** 72:17

**progress** 34:3

**prohibited** 29:22

**proof** 61:22

**proper** 31:2

**protected** 95:8

**protecting** 93:6

**provide** 73:1,10
74:22 75:17,20
76:10

**provided** 29:7
57:17 87:6 98:3

**providing** 39:24
75:24 76:4

**psychology**
16:23 17:8

**public** 84:10
85:16,19

**publication** 14:2,
10,22 27:20

**published** 14:4
94:6

**pulling** 58:25

**pulpit** 92:19

**purpose** 42:1
64:17 77:5

**purposes** 34:21

**pursuant** 9:4

**pursue** 19:15

**pursued** 21:9,16

**pursuing** 17:2

**pushy** 67:4,5

**put** 7:20 15:4

40:13 96:13

---

## Q

**Quest** 25:21
62:22 64:10
73:18,22 74:3,4,6,
8,9

**question** 8:24,25
10:12,13,20 23:16
28:13 31:5,10
32:18 33:13 36:1,
3 37:19 38:18,21,
24 39:21 40:5,25
41:10 42:13,25
43:7,9,13 54:17
55:13 56:9 57:7
58:10 59:13 60:2,
16 62:16 63:12
65:10 67:8,13
68:1,6,8,14 69:8
70:3 75:17 76:15
77:10 87:1 89:1
94:4,23 95:16

**questioned**
61:19

**questioning**
57:17 80:4,9

**questions** 8:19
10:4,10,25 29:25
43:1,4,10,11,21
44:5 53:25 54:1
55:9,16 57:17
65:14 69:9 70:25
71:5 75:7,8 80:16,
20 82:3 84:19
97:15,18,22,25

**quick** 82:14 97:21

**quoting** 28:20

---

## R

**raise** 6:24

**ran** 34:22

**RE-CROSS** 97:19

**re-enter** 22:14

**reach** 50:14 81:25

**reached** 51:14,23

**reaching** 50:20

**read** 10:8 11:8,14
29:15 32:17 38:24
43:11 55:21 56:13
57:15 62:21 74:2
94:9

**reading** 58:20
65:12 94:8

**readmission**
31:19

**readmitted** 28:6
31:2,14

**ready** 86:9

**real** 9:22 21:15
32:21,23

**realized** 7:9

**reason** 50:25
54:13 58:3 84:17

**reasonable** 10:22
17:1

**reasons** 22:8
36:5 84:18,19

**reassure** 55:11

**recall** 12:5,11
14:4 24:21 26:9,
12,19,20 31:9,15
33:1 34:11,16,18
35:2,20 46:20
50:3 51:13,18
52:11,14,19 53:1,
2,7 56:21 58:17,
24 60:4,25 61:3
63:7,8,24 65:21,
23 70:14 73:19
79:11 80:19 81:5
86:2,3 89:16 90:1
97:22

**receive** 74:16

**received** 59:1,9
71:11

**recognize** 48:2
54:23

**recollected** 58:22

**recollection** 25:6
26:14 27:12,14,16
54:11 89:24



58:4,10 92:13

salary 45:15,19

sale 19:17

sales 19:17

Samantha 52:13

SBC 11:10 90:2

scandal 84:13,15

scenario 87:24,
25

schedule 55:22

school 15:25
16:4,5,6,12,19

science 16:13

sections 94:10

seek 84:13 96:24

sees 10:15

selective 84:6

seminary 21:5,
13,14,16

senior 20:17
45:21 72:10,13,21
73:1,4,10 75:15
96:14

sense 23:19 66:7
87:7 88:24 89:12

sentence 10:17

sequence 81:10

series 89:13,14,
19

serve 69:6,23
72:9,25 73:24
75:16

served 9:5 17:20
24:23 25:22 26:6

service 16:12
35:16 73:1

services 39:25
73:6,11 74:5,23
75:18,20,24

serving 85:3

session 37:18
93:4

sessions 8:15
28:10,24 29:25
30:22 31:5 38:12
39:10 42:9 44:10
45:13 60:19 62:8
75:9,12,23 76:20,
22 77:3 81:23
90:15 94:25

set 41:13 55:14
69:16

setting 44:8,9
52:8 88:25

sex 77:25 79:4

sexual 11:9
24:17,25 25:11
26:7,11,16 27:4
31:12,13 32:10
34:10 35:23 36:5,
6 59:3 60:21
69:14 74:7 84:20
89:1,15,20 90:5

SFS 16:13

shake 65:22 83:8

shaking 9:24

share 86:23

shattered 9:14

Shelby 16:5

shifted 21:21

short 19:5

shortcomings
91:15

shortly 64:1,2

show 10:8 46:24
56:19 90:10

showed 79:10
89:3

shut 94:5

sidewalk 52:23

sighed 67:7

signal 30:16

silent 61:15

simply 31:24 36:6

sin 91:11,16

sins 91:21,25

sir 7:9 8:19 9:8
16:2 18:25 30:14
46:24 71:3,15
72:11 73:20 75:22
76:19 77:3,11,19,
25 79:1 80:17
82:24 87:8 88:11
89:17 92:4 93:7
97:4

sit 42:10 43:22
60:3 61:5 77:22

sitting 82:9

situation 61:21
70:9

skin 32:5

skip 17:11

skipping 18:24

software 19:16

Solutions 6:15
17:23 27:8 46:16

sort 86:6,21 89:8,
9

sound 14:6 18:11
27:20,25 41:4
71:18

sounded 50:9

sounds 64:7

South 19:10,14

Southeastern
21:13,17

Southern 6:14,16
46:9 69:7,22 82:8,
16,21,23 83:2,4,
12,17 84:1 87:3,8
89:7,8,9,16,21
91:5,14,20,24
96:13,20,23 97:16

span 26:24

SPC 89:2

speak 9:23 11:20
13:23 14:21 16:2
50:24 53:12
55:21,25 56:1
57:8,11 65:15

SPEAKER 7:16,
22,24,25 8:2,4

speaking 29:11,
18 30:5,11,15
37:1 38:13 51:4
60:3 73:15 76:19
84:4

specializes 74:6

specific 23:20
28:19,20 38:10
52:12 53:2 70:12
75:1 89:23

specifically
28:21 75:15 76:23

specificity 70:15

specifics 29:6
77:12 85:12

spend 82:10

spent 19:11

spoke 57:13,20
59:16 67:20,22
68:19

spoken 8:17
28:17 61:14

spousal 14:15

staff 20:17,19
22:4 23:3 25:19
30:25 45:21 86:8

staffer 20:21
22:19

stage 24:3

stamp 96:10

stand 52:9

standards 87:2

standoff 8:25

stands 77:19

start 16:4 21:16
36:19 41:15 82:9,
15

started 16:9
19:24 20:1,2 22:4,
16,22,23 43:20

starting 16:24
19:12

**state** 7:5 18:22 28:15 74:17 78:3, 7 82:18,20

**stated** 58:25 61:9, 11 64:25

**statement** 98:3

**statements** 17:24 95:2

**States** 6:17

**stating** 30:1

**statute** 59:10

**statutory** 74:24

**stay** 8:18 29:22

**stayed** 61:15

**Steele** 46:19 48:9, 14 90:12

**step** 63:14

**stepped** 84:12 85:17,18

**stepping** 85:8

**stood** 49:5

**stop** 32:21 61:17

**story** 59:1 60:5 65:1

**strayed** 54:14

**straying** 8:20,21

**strike** 55:8 76:9 78:2

**studies** 17:4 18:13

**study** 16:8,9 17:7

**stuff** 62:11 94:18, 20

**subject** 81:13,21 87:13

**subpoena** 9:5 13:8 17:20

**substance** 12:12 24:1 40:6 44:13 74:7

**suggested** 27:22 42:19 43:15

**summaries** 84:13

**summer** 19:2 90:7

**supervision** 23:5

**supervisor** 77:23

**support** 19:16

**supporting** 19:17

**suppose** 34:25 85:19

**supposed** 21:11

**surely** 85:20

**surprise** 79:18 90:12

**survivor** 37:2 44:8 56:10 58:22, 23 61:20 62:23 63:22 66:12

**sustain** 22:12

**swear** 6:23,25

**switch** 18:4

**sworn** 6:5 10:5

**systems** 19:16

---

**T**

**takes** 61:17

**talk** 7:10 36:13 50:16,19 51:10,23 53:3 71:20 83:13 93:6

**talked** 36:22 43:1 63:19 84:5 86:5 94:7

**talking** 24:16 25:14 26:1 37:23 42:11 48:4 54:15 62:8

**tango** 61:17

**techniques** 17:9

**technology** 20:10

**telling** 60:4,25 62:7

**Tennessee** 6:18

**tenure** 19:5 86:15

**term** 21:24 31:21, 22 87:12

**terms** 28:17 32:7 35:2 71:18 76:8, 20 77:2,12 93:22 95:5

**terribly** 17:3

**terrific** 10:10 11:5 44:24 56:8

**testified** 6:6 9:16 13:18 73:17 79:7 80:1 81:9 94:5

**testify** 6:5 8:16,20 25:18 28:23 38:10 42:8 59:11

**testifying** 17:13 61:5

**testimony** 6:25 10:5,8 15:22 26:4 73:19 79:6,11 81:1,16 98:2

**text** 12:13,15 13:10,24 49:17

**texted** 12:6,7

**thanking** 12:25 82:9

**that'd** 95:23

**theological** 21:13,14 87:5

**theology** 21:20

**theory** 17:8 72:18

**therapist** 77:17, 25 78:3 79:1 86:12

**therapists** 78:14 86:13

**therapy** 16:22 17:5,9 18:20 22:12 71:15 76:6

**thick** 32:5

**thing** 17:2 36:16 68:13 78:19 85:1, 9 89:18 95:3

**things** 8:19 17:10 24:21 34:6,22 46:10,11 49:5 61:18 72:18 89:22

**thinking** 16:17 35:2

**thinks** 95:5

**thought** 46:7 48:25 67:12

**thoughts** 87:8,10

**thread** 48:24

**Thursday** 82:11

**Tim** 85:11

**time** 6:13 7:12,19 12:3,11 14:2,9,18, 22 18:8,21 19:19 22:15,20 25:8 27:7 32:21 35:3 36:8 37:12 39:5, 24 40:5,10,12,17, 19,20 41:1 44:6 49:21 55:17 58:17 59:2 67:12,20,22 68:10 74:12,21,24 75:2,14,23 76:3,4 80:9 82:9 83:25 85:10,11 88:4 89:4,10,13 90:25 91:12,22 96:3

**time's** 32:23

**timeframe** 19:20 20:24

**timeline** 89:25

**times** 9:10 24:6,8, 9 44:25 57:17 73:16 77:3 85:16 92:18

**Timothy** 37:3

**tired** 21:19

**title** 72:7

**to-wit** 6:7

**today** 9:4 10:24 11:3 15:22 61:5 71:4 77:12,22 98:3

**Today's** 6:12



## Y

**y'all** 94:5

**year** 12:6,7 20:2,
15 26:5 58:11
71:15,24 72:2
73:24

**years** 16:7 19:11,
18 25:9,13,15,23
26:2,4,24 68:11

## Z

**Zoom** 7:19,21