# EXHIBIT 10

1          UNITED STATES DISTRICT COURT

          MIDDLE DISTRICT OF TENNESSEE

2

———————————————————————————————X

3                          :

JOHNNY M. HUNT              :

4                          :

          Plaintiff          :

5                          :   CASE NUMBER:

vs.                 :

6                          :   3:23-CV-00243

SOUTHERN BAPTIST CONVENTION,  :

7  GUIDEPOST SOLUTIONS, LLC, and  :

EXECUTIVE COMMITTEE OF THE    :

8  SOUTHERN BAPTIST CONVENTION    :

                          :

9          Defendants        :

                          :

10 ———————————————————————————————X

11

12

13         The video-taped Zoom teleconferenced

14 deposition of JULIA MYERS WOOD was held on Thursday,

15 February 15, 2024, commencing at 9:04 A.M., at

16 virtual location before Louisa B. McIntire-Brooks,

17 Notary Public.

18

19 Also present:  Orson Braithwaite, Official

20 Videographer, Johnny M. Hunt, plaintiff

21 REPORTED BY:  Louisa B. McIntire-Brooks

Case 3:23-cv-00243   Document 219-10   Filed 07/03/24   Page 2 of 32 PageID #: 4565

1    after 1994?

2          A.     Yes.

3          Q.     Where?

4          A.     First, I worked for Judge Beam on the

5    United States Court of Appeals for the 8th Circuit as a

6    clerk.

7          Q.     So a one year or two year clerkship?

8          A.     One.

9          Q.     Okay.   And where were you next employed?

10         A.     Mayer, Brown & Platt.

11         Q.     Which office?

12         A.     Chicago.

13         Q.     For how long?

14         A.     Approximately two years.

15         Q.     Where were you employed next?

16         A.     The Office of Independent Counsel.

17         Q.     Where is the Office of Independent Counsel?

18         A.     There were various locations.

19         Q.     Where were you sited?

20         A.     I was sited in Little Rock and Washington,

21    D.C.

1    Q.    And what was your -- what was the work you
2    did with the Office of the Independent Counsel?
3    A.    I was an Associate Independent Counsel.
4    Q.    And what was your role?
5    A.    I worked on the matters that came before
6    the Independent Counsel.
7    Q.    What matters did you work on?
8    A.    I worked on the Lewinsky matter.  I worked
9    on other matters related to the Little Rock
10   investigation.
11   Q.    When you say Little Rock investigation,
12   what do you mean?
13   A.    I mean the investigation relating to the
14   former president, Bill Clinton.
15   Q.    Which particular aspect of the Little Rock
16   investigation did you participate in?
17   A.    Many.
18   Q.    Can you tell us what they were?
19   A.    Yes.
20   Q.    What were they?
21   A.    Susan McDougal.  Appeal of Jim Guy Tucker

Veritext Legal Solutions
www.veritext.com                                 888-391-3376
Case 3:23-cv-00243   Document 219-10   Filed 07/03/24   Page 4 of 32 PageID #: 4567

1    from his bankruptcy fraud trial.  Various other matters

2    that came before the Little Rock office.

3         Q.    Any others comes to mind?

4         A.    Not with specificity.

5         Q.    Okay.  Now, tell us at Mayer Brown, were

6    you in the litigation department?

7         A.    Yes.

8         Q.    And what did you do?  What kind of work did

9    you do at Mayer Brown?

10        A.    It varied.

11        Q.    What kind of work?

12        A.    I had different types of cases in the

13   litigation department.

14        Q.    Okay.  And you say you had different types

15   of cases.  Were they -- they -- were they securities

16   law?  Fraud?  I mean, what was the general nature of

17   the cases?

18             MR. KLEIN:  Objection.  Compound, but you

19   can answer.

20        A.    I worked on a wide variety of matters

21   including antitrust, employment, First Amendment,

1  you sit here this morning?

2        A.    If you would like, I -- we can walk through

3  every single person that I worked with.  It would be

4  helpful to pull out a Mayer Brown directory from that

5  period so I can identify the lawyers from that time.

6        Q.    So you had two years at Mayer Brown and how

7  many years did you work for the Office of the

8  Independent Counsel?

9        A.    About two years.

10        Q.    Okay.  So where did you go after the Office

11  of Independent Counsel?

12        A.    Went to the U.S. Attorney's Office.

13        Q.    In what office?

14        A.    Eastern District of New York.

15        Q.    And who was the U.S. Attorney at the time?

16        A.    Loretta Lynch.

17        Q.    How many years did you work in the U.S.

18  Attorney's Office in the Eastern District of New York?

19        A.    About two years.

20        Q.    Okay.  What type of cases did you do at the

21  Eastern District of New York U.S. Attorney's Office?

1      A.    I worked on general criminal matters.

2      Q.    Major felonies?

3      A.    Yes.

4      Q.    Okay.  Any other matters?

5      A.    Yes.

6      Q.    What type of matters?

7      A.    Business and securities fraud, narcotics,

8  general fraud, bankruptcy fraud, immigration.  A wide

9  variety.

10     Q.    Okay.  And then where did you go after the

11  U.S. Attorney's Office at the Eastern District of New

12  York?

13     A.    The Treasury Department.

14     Q.    And how long did you work there?

15     A.    About two years.  Maybe a little bit less.

16     Q.    Who was your -- I meant to ask this:  Who

17  was your supervisor at the U.S. Attorney's Office at

18  the Eastern District of New York?

19     A.    Ilene Jaroslaw.

20     Q.    How do you spell her last name?

21     A.    J-A-R-O-S-A -- S-L-A-W.

```
 1        Q.    Okay.  And what did do you at the Treasury
 2   Department?
 3        A.    I was a Deputy Assistant Secretary for
 4   money laundering and financial crimes.
 5        Q.    And for approximately two years?
 6        A.    Yes.
 7        Q.    And where did you go next?
 8        A.    The Justice Department.
 9        Q.    And what did do you at the Justice
10   Department?
11        A.    I was the Chief of Staff for Michael
12   Chertoff.
13        Q.    And for how many years?
14        A.    About a year approximately.
15        Q.    Okay.  And what was the nature of your
16   responsibilities?
17        A.    I assisted him in running the criminal
18   division.
19        Q.    Was he in charge of the criminal division
20   at that time?
21        A.    Yes.
```

1     Q.    And so what year did you work as Chief of

2  Staff to Mr. Chertoff?

3     A.    Two -- parts of 2003 and 2004.  That is my

4  recollection.

5     Q.    Okay.  Where did you go next?

6     A.    The Commerce Department.

7     Q.    Commerce Department?

8     A.    Yes.

9     Q.    And what did you do there?

10     A.    I was the Assistant Secretary for Export

11  Enforcement.

12     Q.    How long did you have that job?

13     A.    Close to two years.  Maybe a little bit

14  lest.

15     Q.    Okay.  Where did you go next?

16     A.    The White House.

17     Q.    What did you do there?

18     A.    Presidential Personnel.

19     Q.    For which president?

20     A.    George W. Bush.

21     Q.    How long did you have that job?

Case 3:23-cv-00243   Document 219-10   Filed 07/03/24   Page 9 of 32 PageID #: 4572

1    A.    A year.

2    Q.    Where did you go next?

3    A.    The Department of Homeland Security.

4    Q.    And who did you work for there?

5    A.    Michael Chertoff.

6    Q.    How long -- and what was your job there?

7    A.    Assistant Secretary for Immigration and

8    Customs Enforcement.

9    Q.    And how long did you have that job?

10    A.    Almost three years.

11    Q.    And where did you go next?

12    A.    I formed my own firm.

13    Q.    What was the name of the firm?

14    A.    Immigration and Custom Solutions and also

15    Immigration -- ICS Consulting was a later firm.

16    Q.    And how long did you have those two firms?

17    A.    About three and a half years give or take.

18    Q.    Did you have any partners in those roles?

19    A.    Yes.

20    Q.    And how many partners did you have?

21    A.    One.

Veritext Legal Solutions
www.veritext.com                                    888-391-3376
Case 3:23-cv-00243   Document 219-10   Filed 07/03/24   Page 10 of 32 PageID #: 4573

1          MR. KLEIN:  Objection.  We covered this now

2     a few times.  We can go over it one last time and we

3     can try to move on.

4          A.    Yes, without looking at the report.

5          Q.    Okay.  Now, you've indicated that there is

6     corroborating evidence associated with the report in

7     Pastor Johnny Hunt's involvements with ██████████.

8     Do you recall that line of testimony?

9          A.    Yes.

10         Q.    Do you have corroborating evidence

11    concerning consent in the interaction between Pastor

12    Johnny Hunt and ████████████?

13         A.    To be clear, I am not the one who developed

14    the corroborating evidence.  I oversaw and reviewed it.

15         Q.    With respect to the evidence that you

16    oversaw, with respect to the evidence that you reviewed

17    as the CEO of the company, could you explain to the

18    court each corroborating evidence that Guidepost had at

19    the time it published the report pertaining to the

20    issue of lack of consent by ██████████?

21         A.    Guidepost did not publish the report.  So

1    improper sexual conduct in either interview.

2        Q.    Well, ma'am, have you looked at interview

3    notes from interview one and interview two prior to

4    coming here today?

5        A.    Not recently, no.

6        Q.    Ma'am, you -- you said this was not about

7    consent.  Do you remember that line of testimony or

8    that claim that you just made on the record here?

9        A.    Yes.

10       Q.    You understand that if there's going to be

11   sexual assault, consent is relevant to that?

12            MR. KLEIN:  Objection as to form, calls for

13   a legal conclusion.  You can answer.

14       A.    Sure.

15       Q.    Consent is absolutely critical in terms of

16   determining whether there was sexual misconduct or a

17   sexual assault; isn't it?

18            MR. KLEIN:  Objection, calls for a legal

19   conclusion.  You can answer.

20       A.    The report was not having to determine

21   whether or not a consensual sexual activity occurred

1  because Johnny Hunt denied that any sexual activity

2  occurred.  Therefore, the report was not determining

3  whether or not there was consent.

4       Q.   Okay.  But if there -- you characterized

5  this -- how did you characterize Pastor Johnny Hunt's

6  conduct in the report?  Did you characterize it as a

7  sexual assault?

8            MR. KLEIN:  Objection, compound question.

9  You can answer.

10      Q.   Did you characterize Pastor Johnny Hunt's

11 conduct as a sexual assault in your report?

12      A.   I didn't characterize anything.

13      Q.   Did Guidepost?

14      A.   The report contains the word sexual assault

15 for pulling down the pants and the forcible kissing and

16 moving around, yes.

17      Q.   Okay.  So, yes.  So you, you, and we're

18 talking about you now, you issued a report under your

19 overall responsibility that made a reference to Pastor

20 Johnny Hunt in a sexual assault; right?

21      A.   I sent the report to the Task Force.  The

1  reality of your understanding -- strike that.  You

2  didn't mention what you specifically understood that in

3  the final report that Mr. Blankenship had concluded for

4  his part that there could have been consensual activity

5  that night between ███████ and Pastor Johnny Hunt?

6         MR. KLEIN:  Objection.  The document speaks

7  for itself.  You can answer.

8       A.    The document speaks for itself.  I didn't

9  draft this portion of the report and I'm not in a

10  position without kind of looking at it to talk about

11  specifically what it says there.

12       Q.    Ma'am, you would have had overall

13  responsibility for this.  Didn't you feel you had some

14  responsibility just as a basic human being and the CEO

15  of the company to make sure that the report was

16  accurate on the issue of consent?

17       A.    I -- no, because there was not a dispute on

18  whether there was a consent.  There was a dispute on

19  whether any activity occurred at all.

20       Q.    Now, you edited, you reviewed and edited,

21  the report related to Pastor -- the portion of the

Veritext Legal Solutions
www.veritext.com                                                   888-391-3376
Case 3:23-cv-00243   Document 219-10   Filed 07/03/24   Page 14 of 32 PageID #: 4577

1    report related to Pastor Johnny Hunt; did you not?

2         A.    Yes.

3         Q.    And you confirmed that in interrogatory

4    answers that your company filed; correct?

5         A.    Yes.

6         Q.    Now when you reviewed and edited the report

7    associated with Pastor Johnny Hunt, why did you not

8    author yourself or provide an edit which indicated that

9    there could have been consensual -- there could have

10   been consensual activity that night?  Why didn't you

11   say that, ma'am?

12              MR. KLEIN:  Objection as to form.  You can

13   answer.

14         A.    Well, I edited the report and looked at

15   what the investigators have found with all their

16   experience.  This was not an issue of whether or not

17   there was consent.  Johnny Hunt did not say he engaged

18   in consensual activity.

19         Q.    The whole point, ma'am, you're talking

20   about sexual abuse in a report that you knew was going

21   to be covered by every major network news of the United

1   omitted ████████████ comment entirely from the

2   report; didn't it?

3              MR. KLEIN:  Objection as to form.  You can

4   answer.

5        A.   The comment that --

6        Q.   Her comment that she said, ████████████

█   ████ You omitted that from your report; didn't you?

8        A.   I do not believe that is in the report.  We

9   did not omit it, it was not included in the report.

10       Q.   Tell the jury why you did not include that

11  fact in the report.

12       A.   Well, after working on the Monica Lewinsky

13  report and other things, I really wanted to make sure

14  that we kept out things that were salacious, things

15  that could potentially harm others without good cause.

16  Here, Johnny Hunt was saying nothing happened and the

17  ████ and others were saying something did happen.

18  So, you didn't need to have all the salacious facts

19  like sex three times a day, what his wife smells like

20  and other kinds of things that are corroborating

21  details about the conversation provide input but don't

1　go to the core.　Here she's saying, I was assaulted and

2　this happened and he's saying nothing happened at all.

3　He didn't say something happened, it was consensual.

4　If he had said that, we would have put it in the

5　report.　This whole section would not have been in the

6　report.　But he didn't say that, even though we

7　interviewed him, not once, not twice, he got lawyers,

8　he came to us, he still didn't say it.　This would not

9　have been in there at all.　And it's really

10　unbelievable that we're going through this.

11　　　　　　　　MR. MACGILL:　Let's go ahead and take a

12　break.

13　　　　　　　　THE WITNESS:　Sure.　Absolutely.

14　　　　　　　　MR. BRAITHWAITE:　The time is 1:12 p.m.

15　Off the record.

16　　　　　　　　(A discussion was held off the record.)

17　　　　　　　　MR. BRAITHWAITE:　The time is 1:18 p.m.

18　We're on the record.

19　　　　Q.　　Ma'am, we have been reviewing in this line

20　of questioning this idea of reciprocation.　What is

21　your understanding of reciprocate in connection with

1  how it was used in this report?

2      A.    Can you be more specific?

3      Q.    You see the word reciprocate was used in

4  this report?

5            MR. KLEIN:  Do you want to point her to a

6  particular page or paragraph, Rob, to help her or do

7  you want her to look through multiple pages?

8      Q.    Do you have it still open on 151?

9      A.    No.

10     Q.    Why don't you do that.

11     A.    Okay.

12     Q.    Do you now?

13     A.    Yes.

14     Q.    Okay.  You remember that I asked you about

15  this phrase survivor did not reciprocate?

16     A.    Yes.

17     Q.    So that's what you and your company

18  wrote -- published and issued; right, survivor did not

19  reciprocate?

20     A.    No.

21     Q.    So you didn't publish this report?

1      A.      No, we did not publish this report.

2      Q.      All right.  So you understand that the

3  report was put on your website?

4      A.      No.

5      Q.      You don't know that the report was

6  published on your website in May of 2022?

7      A.      My understanding is that we put a link to

8  another website, the Task Force website, but feel free

9  to correct me.  I don't --

10      Q.      Ma'am, by going on your website, any

11  citizen of the United States or the world could click

12  on your link and see your report; right?  In May of

13  2022?

14      A.      The link directs you to the Task Force and

15  they publish the report on their website.

16      Q.      So let me just make sure we understand.

17  You're parsing words in a way that I'm not really

18  following.  It's an easy question.  Did somebody in May

19  of 2022 go to your website and click on a link that

20  appears on your website that would then show them the

21  Guidepost report?

Veritext Legal Solutions
www.veritext.com                                        888-391-3376
Case 3:23-cv-00243   Document 219-10   Filed 07/03/24   Page 19 of 32 PageID #: 4582

1    A.    The link would direct him to the Task Force

2    website, and then from the Task Force website, I

3    believe, but we would have to validate based on that

4    time, they would then have to click on a separate link

5    to get to the report.  But I am not the expert on that

6    piece.  So you would need to ask someone else on that.

7         Q.    Well, your senior investigator testified

8    not ten days ago that you published the report through

9    your website.  That's what your senior investigator,

10   Mr. Holske, said at the outset of his deposition.  Was

11   he testifying falsely in his testimony in this

12   courtroom?

13             MR. KLEIN:  Objection, compound question.

14   You can answer.

15        A.    It's not a courtroom, but Mr. Holske is not

16   involved in the website's design nor does he have all

17   the information.

18        Q.    So did he testify falsely when he said that

19   the Guidepost report was published through your website

20   in May of 2022?

21        A.    Yes, I believe he was incorrect.

1    A.    If I can explain that --

2    Q.    Just did you agree to that?

3    A.    If I can explain.

4    Q.    Well, I'd like an answer to my question

5    first and then explain.  Yes or no, did you agree to

6    that?

7    A.    This was in the report.  We were not -- we

8    did not have the ability to release the report so if I

9    could explain, I would like to do that.

10    Q.    Okay.  Answer my question first and then

11    you can explain, make a speech, do whatever you like.

12    But did you or did you not agree and acknowledge that

13    "a written report will be made public in its entirety

14    prior to the 2022 SBC annual meeting"?

15    A.    That was my understanding as to what would

16    happen, but Guidepost did not have the ability to do

17    that.  That was within the purview of the Task Force.

18    Q.    The report was published by Guidepost

19    website on May 22nd, 2022; was it not?

20    MR. KLEIN:  Objection, calls for a legal

21    conclusion.  You can answer.

1    A.    No.

2    Q.    I want to make sure, you just said no to

3    that question; did you not?

4         MR. KLEIN:  Objection.  Asked and answered.

5         MR. MACGILL:  She said no.

6    A.    Not to my knowledge.

7    Q.    Well --

8    A.    You already asked me this question, it's

9    the same answer.

10   Q.    Is it no or not to your knowledge, ma'am?

11        MR. KLEIN:  Objection, asked and answered.

12   That's why we don't ask a question repeatedly to badger

13   a witness into changing or to giving a different

14   version that you are happy with.  Please ask the

15   question once, she will answer it and we can move on.

16   Q.    Did Guidepost publish on its website the

17   report of independent investigation on May 22nd, 2022?

18        MR. KLEIN:  Objection, calls for a legal

19   conclusion.  You can answer.

20   A.    No.

21        (Deposition Exhibit 36 was marked for

1    You can answer again.

2          A.    I personally did not have any facts.  I

3    understand what you're saying about this document.  I

4    will say there are many damning facts in this document,

5    Exhibit 7, which were not included in the report.  The

6    investigators believed that these additional damning

7    facts were not necessary to be included in the report,

8    especially given that Johnny Hunt denied that anything

9    happened at all.

10          Q.    Right.  But you don't impeach your own

11    company here, ma'am, they were damning facts associated

12    with what you failed to do and that's what I am asking

13    you about.  You failed to identify material facts of

14    the alleged incident and did so intentionally; did you

15    not?

16                MR. KLEIN:  Objection, compound, calls for

17    legal conclusion.  You can answer.

18          Q.    You intentionally disregarded facts that

19    would weigh against any suggestion of a nonconsensual

20    event; right?

21                MR. KLEIN:  Objection, argumentative, you

1    can answer.

2         A.      That's absolutely not true.  We talked to

3    Johnny Hunt several times, we gave him every

4    opportunity to tell us the truth and he failed to do

5    so.

6         Q.      You failed to include any facts, ma'am,

7    that would have rebutted the conclusion that you made

8    about Johnny Hunt being involved in some form of sexual

9    abuse; did you not?

10                MR. KLEIN:  Objection, asked and answered

11   you can answer.

12        A.      We asked Johnny Hunt if there were other

13   witnesses who we could talk to, could we talk to other

14   people who could corroborate his story, his lie, you

15   know, but he couldn't point us anywhere.  So we wanted

16   to talk to other witnesses to get other information.

17   But obviously, the Hunt portion was a very small

18   portion of a 280 plus page report and we didn't include

19   everything in there.

20        Q.     In terms of your objectives here, you

21   wanted a report that had impact; right?  That's what

1    Q.    Before accusing someone of sexual assault,

2    you agree that Guidepost had an obligation to make its

3    own assessment of whether the encounter was consensual

4    or nonconsensual?

5    A.    Yes.

6    Q.    You said earlier that a consensual

7    encounter would not have been included in the report at

8    all.  Do you remember that line of testimony?

9    A.    Yes.

10    Q.    Do you agree that there are details in the

11    ▆▆▆▆▆▆▆ account that would be consistent with a

12    consensual encounter?

13         MR. KLEIN:  Objection as to form.  You can

14    answer if you know.

15    A.    I would defer to the investigative team.

16    Q.    What details are you aware of, as you sit

17    here today, from the Guidepost's perspective that would

18    be consistent with a consensual encounter?

19         MR. KLEIN:  Objection as to form.  You can

20    answer if you know.

21    A.    From my understanding, after meeting with

1    Q.    What did you do with the comments?

2    A.    I think we kept them.

3    Q.    Do you still have them?

4    A.    I believe -- I don't know if we have all of

5    them.  I believe that the comments that I had were

6    provided to counsel.  But let me say this hard copy

7    review did not include the Johnny Hunt section.  It was

8    not in the portion of the report that there was a hard

9    copy review.

10    Q.    Why not?

11    A.    We had not timely decided whether or not we

12    were going to include that in the report and we didn't

13    want to have that in the report until we were sure that

14    we were going to include it in the report.

15    Q.    When did you give the report including the

16    Johnny Hunt portion at any time to the Executive

17    Committee?

18    A.    Not to the Executive Committee, no.

19    Q.    To whom did you give the report?

20    A.    To the committee on cooperation, we

21    provided then just the Johnny Hunt portion.  But I

1  don't recall how that was done.

2       Q.    List the people that got the Johnny Hunt,

3  the people and the entities that got the Johnny Hunt

4  portion of the report.

5            MR. KLEIN:   At any time, Rob?

6            MR. MACGILL:   At any time.

7            MR. KLEIN:   Prior to its publication of

8  issuance?

9            MR. MACGILL:   Yeah.

10      A.    I believe that we sent it to the committee

11  on cooperation but I'm not sure of who -- whether all

12  the members saw it or we had a Zoom call where we

13  shared via screen for them to read it on screen.  That

14  is our typical practice.  Versus like a hard copy

15  thing.  We definitely didn't sit down with them and do

16  a hard copy again.

17      Q.    Who else other than the members of the

18  committee on cooperation?

19      A.    The members of the Task Force.

20      Q.    Same format?  Either by video?  By video?

21      A.    I think for the task -- I'm not sure.  We

1    either provided it to them via video or -- and screen

2    share or we could have sent a watermarked kind of

3    confidential draft, or something, copy password

4    protected.

5         Q.    Did the SBC itself get a copy?

6         A.    The -- the definition of SBC is highly

7    argued over.  So the -- the only people that got a copy

8    before the report are these two groups that I just

9    identified, that the COC with those individuals of the

10   COC added and the Task Force and then we sent the final

11   copy solely to the Task Force.

12        Q.    Did any member of the -- is the committee

13   on cooperation part of the Executive Committee?

14        A.    No.

15        Q.    Part of the SBC?

16        A.    No.  The committee on cooperation was a

17   creation of this engagement.  It was appointed by the

18   Executive Committee or President Litton and there were

19   some Executive Committee members and maybe some others

20   but I defer to the Executive Committee on who was on

21   that.

1    Q.    Was the Task Force a part of the Executive

2  Committee?

3    A.    No.

4    Q.    It was part of the SBC?

5    A.    It -- the -- I'm struggling with the SBC

6  question given the way the SBC is -- is -- is

7  organized.  The Task Force was appointed by President

8  Litton and those members were named.  It was not an

9  official branch or arm of the Executive Committee or

10  any Southern Baptist formal organization.  But with

11  respect to the organization of the Task Force, I defer

12  to the Executive Committee.

13    Q.    Did any members of the committee, the

14  cooperation committee, did any of them say to remove

15  the allegations against Pastor Hunt because they did

16  not fit within the assignment?

17    A.    Not that I recall.

18    Q.    Did anyone from the Task Force say to

19  remove the allegations against Hunt because they didn't

20  fit within the assignment?

21    A.    I mean it did fit within the assignment but

1  not that I recall anyone saying that.

2        Q.    Did anyone express concerns that the

3  allegations fell outside the engagement?

4        A.    Not that I recall.

5        Q.    Did anyone at the SBC or the Executive

6  Committee express any concern over the accuracy of the

7  allegations?

8        A.    I cannot answer any questions about what

9  the SBC did.  So, I -- I -- with respect to the

10 Executive Committee, we had no contact with the

11 Executive Committee.

12       Q.    Did anyone from the cooperation committee

13 express any concerns over the accuracy of the

14 allegations?

15       A.    Over the accuracy, no.

16       Q.    Did anyone express concern for liability

17 for defamation to you or your company?

18       A.    Not that I recall.

19       Q.    Who was the client for your engagement?

20       A.    The engagement letter was signed by the

21 Executive Committee and the Task Force and we were

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.