# EXHIBIT 11

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOHNNY M. HUNT,                    )
                                   )
                Plaintiff,         )
                                   )
    v.                             )   No. 3:23-cv-00243
                                   )
SOUTHERN BAPTIST CONVENTION; )
GUIDEPOST SOLUTIONS LLC; and )
EXECUTIVE COMMITTEE OF THE   )
SOUTHERN BAPTIST CONVENTION, )
                                   )
                Defendants.        )
_____)

                    600 Third Avenue
                    New York, New York

                    May 29, 2024
                    10:03 a.m.


        DEPOSITION of DOUGLAS LEFF, before Michele
Moskowitz, a Shorthand Reporter and Notary Public
of the State of New York.




                Magna Legal Services
                   866-624-6221
                  www.MagnaLS.com

MAGNA
LEGAL SERVICES

1       A.      Sure.  I was an assistant district

2   attorney for four years right out of law school,

3   then I went to the FBI for a little over 26

4   years, then to the United States Defense

5   Department for another year and a half, and then

6   went to the private sector, to the firm that I'm

7   currently with, which is SI Global Partners.

8       Q.      How long have you been with SI Global

9   Partners?

10      A.      About ten months.

11      Q.      Where were you before that, sir?

12      A.      The Department of Defense.  The

13  specific -- it was -- we were a component of the

14  Department of Defense, Office of Inspector

15  General.

16      Q.      How many years were you with the

17  Department of Defense, generally speaking?

18      A.      A little under two years.

19      Q.      How long were you with the FBI?

20      A.      26.

21      Q.      You indicated you were an assistant

22  district attorney; is that in the federal or

23  state system?

24      A.      The assistant district attorney was

25  state.  During my time with the FBI I was cross-

MAGNA

LEGAL SERVICES

```
 1    designated as a special assistant U.S. attorney
 2    for six years, that was federal.
 3         Q.     Where was that special assistant
 4    designation?
 5         A.     The Eastern District of New York,
 6    which is Brooklyn, covers Staten Island and Long
 7    Island and Queens.
 8         Q.     What did you do in that role as a
 9    special assistant in the U.S. Attorney's Office
10    there?
11         A.     Handled across-the-board matters
12    related to financial crimes mostly; money
13    laundering, some asset forfeiture, and some
14    terrorist financing.
15         Q.     With respect to your career at the
16    U.S. attorney's office, did you litigate cases?
17         A.     Yes, I did.
18         Q.     Were you a trial lawyer?
19         A.     I was, yes.
20         Q.     You said how many years, sir?
21         A.     Six years.
22         Q.     Six years.
23                And that was coterminous with your
24    FBI role for 26 years?
25         A.     Yes, correct.
```

MAGNA
LEGAL SERVICES

1    Q.    When were you engaged in this matter?

2    A.    When was I engaged?

3    Q.    In this matter, yes, sir.

4    A.    I'm just approximating, it was -- if

5 I look at the letter of engagement, I can tell

6 you for sure.  It was approximately four months

7 ago.

8    Q.    Okay.  And who engaged you?

9    A.    I originally talked to the attorneys

10 that are here in the room with us, Alex and Scott

11 and a couple of their colleagues.

12    Q.    What did you understand from your

13 conversation the engagement was going to be, sir?

14         MR. KLEIN:  I would just say you

15    shouldn't talk about communications we had,

16    but you can answer this question not based

17    on those communications, it's based on your

18    general knowledge as to what you were

19    engaged to do.  That's what he wants to know

20    and that's what you can answer.

21         THE WITNESS:  Very good.

22    A.    Okay.  My understanding was that they

23 would seek to qualify me as an expert in the

24 field of reviewing investigations, which is

25 something that I've done a bit of and -- quite a

MAGNA

LEGAL SERVICES

1   bit of, and it was particularly to review an

2   investigation that was already completed into an

3   audit and investigation of the Southern Baptist

4   Commission related entities and a particular

5   allegation having to do with some form of sexual

6   misconduct.

7       Q.    So you were -- one of your roles was

8   to review the -- one, to review the investigation

9   done by Guidepost?

10      A.    Yes.

11      Q.    And the other function that you

12   mentioned, that you were to audit the

13   investigation?

14      A.    It was to review the overall audit

15   and investigation that was completed by Guidepost

16   for the investigative process itself as well as

17   the report writing.

18      Q.    So you indicated that part of role

19   was to review the overall audit and investigation

20   of Guidepost.  What do you mean by review the

21   overall audit by Guidepost?

22      A.    The way -- the manner in which

23   Guidepost conducted their audit of the entities

24   that they were assigned to review, which at one

25   point in that audit process led to the opening of

MAGNA
LEGAL SERVICES

1    after having reviewed them with the partners of
2    our firm, what I believe would be the most
3    appropriate standards, and everybody was in
4    agreement that they were.
5         Q.    What were the most appropriate
6    standards that you determined were appropriate
7    for evaluating the Guidepost investigation here?
8         A.    A combination of training and
9    experience in the field coupled with standards
10   that have been promulgated by the inspector
11   generals.  Federal inspector generals have a
12   Commission on Efficiency and Integrity and they
13   have a set of written standards and guidelines.
14        Q.    What particular standards are you
15   referring to, sir, that you chose based on your
16   work in consultation with the people at your firm
17   that would be applicable in your judgment, sir,
18   to the investigation by Guidepost here?
19        A.    Well, the standards that we cited in
20   there are applicable to all investigations.
21        Q.    What was the standard, sir?
22        A.    The CIGIE, Center -- Committee of
23   Inspector Generals on Integrity and Efficiency, I
24   believe is the acronym, and they have blue books
25   applicable to investigations, to audits and

MAGNA
LEGAL SERVICES

1  inspections, and a couple of other topics that
2  are not germane.
3      Q.    I want to be very literal here and
4  make sure I have a complete understanding of what
5  it is that you did; fair enough?
6      A.    Yes.
7      Q.    So it was you, sir, in consultation
8  with the people at your firm that made a
9  determination that the Guidepost investigation
10 should be measured against the standard that you
11 call the CIGIE standard issued by whom?
12     A.    By the Committee of Inspector
13 Generals.  It's composed of membership from the
14 dozens of inspector generals around the country
15 as well as some agencies that report to those
16 inspector generals.
17     Q.    So that is the standard that you
18 measured the Guidepost investigation against; is
19 that right?
20     A.    Coupled with training, experience.  I
21 mean, the standards as you see them when we cite
22 them, they're generally applicable standards.
23 They have some specific guidelines to the extent
24 that it gets specific, but they don't get as
25 concrete as anything that you see during real-

MAGNA
LEGAL SERVICES

1    world investigations.  So it's a combination of
2    what we know from training, experience, and then
3    how those fit into those guidelines.
4        Q.    So did you conclude, sir, based on
5    your work in this matter that the conduct of the
6    Guidepost company was consistent with what you've
7    described as the CIGIE standards?
8        A.    Yes.  Yes, I did.
9        Q.    I'd like the jury and the court to
10   understand exactly what you did.  Before you
11   decided for your part to use a United States
12   Government Inspector Generals standard to measure
13   Guidepost against, you not only spoke to people
14   in your firm, you also spoke to Mr. Klein, one of
15   the lawyers here, right?
16       A.    That is correct, yes.
17       Q.    And who, tell us, did you speak to --
18   any other lawyers you spoke to here before you
19   determined to utilize that standard that you've
20   now described?
21       A.    Sure.  Terrence, Steve.  And some of
22   the meetings we had were on video, I don't know
23   if they had any other attorneys present, but
24   those were the primary individuals from this firm
25   that I've dealt with.

1    Q.    I'm a little upset because everybody

2    keeps forgetting Alex.  Was Alex --

3        A.    I said Alex right off the bat.  I

4    said Alex and Scott.  I think Alex was the first

5    person I --

6        Q.    He deserves some respect.

7              MR. OTCHY:  Thank you, Rob.

8        A.    He was at the top.

9        Q.    So you determined based on your own

10   experience and background and in consultation

11   with Mr. Klein, Mr. Mintz, Mr. McCormick, and

12   Mr. Otchy that this was an appropriate standard

13   to measure Guidepost investigation against,

14   right?

15       A.    I explained to them that we would,

16   yes, be using that standard.  Primarily it was

17   based on training and experience, and I explained

18   I would articulate that by way of the guidelines

19   because it has a very natural way of breaking

20   down the different components that you would look

21   at in the course of an investigation.

22       Q.    I don't want to hear what any of

23   these gentlemen said to you, but after you spoke

24   to how many lawyers -- let's count them -- one,

25   two, three --

```
 1                    MR. KLEIN:  Don't forget Alex.
 2        Q.      -- four lawyers, after you spoke to
 3   four lawyers with the Mintz & Gold firm, you
 4   determined that you would utilize the CIGIE
 5   standard as a yardstick to measure the Guidepost
 6   investigation against; is that right?
 7        A.      That's an excellent way to put it, as
 8   a yardstick, yes.
 9        Q.      Okay.  Are you saying that if the
10   CIGIE standard were complied with in all
11   respects, then you would bless the investigation
12   as appropriate here in this context?
13        A.      I don't think I would say that, no,
14   because as you see when you look at them,
15   they're -- kind of -- they're very generalized
16   standards.  You have to take them and then use
17   them as -- like you said, as a yardstick in light
18   of your training and experience and basically
19   anything that can happen in the course of an
20   investigation will fit into one or more of those
21   guidelines, but the articulation of what is done
22   right or wrong in an investigation is something
23   you know from training and experience and you use
24   the guidelines to best formulate it.
25        Q.      Was the Guidepost investigation --
```

MAGNA

LEGAL SERVICES

1   did you consider that to be an internal
2   investigation?
3        A.     Yes.   An outside party was brought in
4   to conduct an internal investigation, yes.
5        Q.     Now, the inspector generals -- when
6   the inspector generals -- it's the inspector --
7   let me be more clear.
8              As you understood based on your work
9   in government and otherwise, as you understand it
10  the inspector generals of the United States
11  utilize the CIGIE standards in their work; is
12  that right?
13       A.     Well, you don't see them cited on a
14  daily basis.  It's a -- kind of an overarching
15  umbrella of a source for consultation.  They have
16  meetings, I think, once or -- once every month or
17  two where new topics are brought up.  They also
18  field complaints from federal employees or
19  members of the public who are dissatisfied with
20  an investigation and then it goes to the CIGIE
21  and they determine -- they review and determine
22  whether an investigation was conducted in
23  conformance with how they believe the guidelines
24  should be interpreted and they share that
25  guidance with us, which is another source of

MAGNA
LEGAL SERVICES

1    experience that we get about how they're
2    interpreted.
3        Q.    Well, the CIGIE standard, that's used
4    by the inspector general's office to evaluate its
5    own investigations?
6        A.    Well, yes, it can happen that way,
7    but not each individual inspector general.    For
8    example, if somebody is investigated by the
9    Department of Justice, inspector general feels
10   they were treated unfairly, they would go to the
11   CIGIE, they have a link online where someone can
12   make a complaint, and then the CIGIE would pick
13   representatives of other inspector general's
14   offices to review that investigation and see if
15   any complaint -- if there was any validity or any
16   suggestions should be put out to the field for
17   best practices based on that or pitfalls, things
18   along those lines.
19       Q.    Just a couple things.    With respect
20   to the CIGIE standards, these are standards that
21   are not specific to sexual assault
22   investigations; is that right?
23       A.    That is correct.
24       Q.    And this council of independent
25   inspectors -- let me start over.

1    created in May of 2022, so to answer your

2    question, by February 2022 we hadn't become aware

3    of anything else and I'm unaware of anybody

4    opening up any new investigation, but if they did

5    and it took place after May 15, 2022, I wouldn't

6    probably be privy to that.

7         Q.    Focusing on you now --

8         A.    Yes.

9         Q.    -- just you, did you for your part in

10   connection with your work make an assessment as

11   to whether Guidepost could be impartial in their

12   investigation beginning in February 2022?

13        A.    That was encompassed, yes.

14        Q.    What investigation did you do to

15   determine their impartiality during the month of

16   February 2022?

17        A.    February 2022 is included in the

18   whole time frame that we looked into.

19        Q.    What specific analysis did you make?

20        A.    That they conducted the investigation

21   in a manner that was appropriate in all respects

22   in accordance with standards in the industry,

23   both public and private sector, and that there

24   was nothing done that was out of the ordinary

25   with respect to any manner in which the

MAGNA
LEGAL SERVICES

1    investigators were selected, the investigation
2    was conducted, or the report was prepared.
3         Q.    Let's be more specific about you now.
4         A.    Okay.
5         Q.    What did you do, or perhaps fail to
6    do here, sir, with respect to the ▮▮▮▮ ▮▮▮▮
7    allegation? When did that first -- when was that
8    first made to Guidepost?
9         A.    I'd have to look at the document to
10   know the exact date when it was made. I don't
11   know off the top of my head.
12        Q.    What month, sir?
13        A.    I don't know the month off the top of
14   my head.
15        Q.    Well, you don't know whether it's
16   February of 2022, March 2022, April 2022?
17              MS. KLEIN:  Objection, asked and
18        answered, but you can answer.
19        A.    Yeah, I would be guessing. I don't
20   want to guess.
21        Q.    As you assessed impartiality, sir,
22   for your part as an investigator here, did you
23   come to understand when it was that ▮▮▮▮ ▮▮▮▮
24   first came forward with his claim or his
25   allegation?

1          A.       -- is credible allegation, which is a

2     fairly slight standard.  Now, how you measure it,

3     the ways investigators determine whether or not

4     there was a credible allegation, if that's the

5     question, that's a feasible question to answer.

6          Q.       What is the answer, please?  Answer

7     that question.  That's all I'm asking you.

8     Answer that question for the jury.

9                   MR. KLEIN:  Which question?  The

10         question he's now framed?

11                  MR. MacGILL:  The one he just posed,

12         yes.

13                  MR. KLEIN:  You can answer how it's

14         measured.

15         Q.       Do you want me to read back what you

16    just said?

17                  MR. KLEIN:  No, we got it.  How it's

18         measured.

19                  MR. MacGILL:  You have it?

20         Q.       Tell the court and jury what you have

21    to establish in order to establish a credible

22    accusation.

23         A.       Well, it can consist of various

24    things, but simply put, it's whether the

25    allegation is believable, whether there's been a

MAGNA
LEGAL SERVICES

1  believable allegation met that investigators --
2  there are subsets of that that investigators use
3  to look into whether or not something is
4  believable, such as -- I mean, if you want me to
5  go on this is --
6       Q.      Please.
7       A.      -- such as whether it's coming from
8  an identified citizen or from an anonymous
9  source, whether there's corroboration to it.
10 Although it's important to point out at this --
11 probably at this juncture that even probable
12 cause, which is a significantly higher standard
13 than credible allegation, courts have held, I
14 believe universally, that an identified citizen
15 making a complaint is sufficient to establish
16 probable cause.  I know that to be the case
17 because I've done it myself many times.
18           So a credible allegation, frankly,
19 would have been the survivor coming forward,
20 determining upon interviewing her demeanor and
21 all that she's believable, that would have been
22 enough to say we've got a credible allegation
23 here, folks, and sign off.  They went way beyond
24 that, which is why many of these things that
25 you're asking me about steps were not steps at

MAGNA LEGAL SERVICES

 1  all because it was unnecessary.  They had
 2  themselves a credible allegation.  They did way
 3  more.  They did a tremendous service to the
 4  accused here, frankly, in how much additional
 5  work they did beyond having determined there was
 6  a credible allegation.
 7       Q.    So credible allegation is a
 8  believable allegation according to you?
 9       A.    That's a -- it's a simply put way to
10  state it.
11       Q.    But you're the expert here, and as an
12  expert you're telling this court and jury that
13  credible allegation is a believable allegation,
14  right?
15       A.    In sum and substance, yes.
16       Q.    In sum and substance, yes?
17       A.    Yes.
18       Q.    Yeah, all right.
19             So if something is -- what does it
20  take to be believable, sir, in this context of
21  the Guidepost investigation?  What would be
22  necessary to be believable?
23       A.    To examine the allegation, scrutinize
24  it, where it comes from, what, if any, motives
25  are there to fabricate any preexisting history

```
 1    between the complainant and the subject, the
 2    accused, any other witnesses, any documentation
 3    corroborating things like time frames or
 4    locations relevant to it, those, frankly, go way
 5    beyond it.
 6              Like I say, the standard for credible
 7    allegation is a very, very light standard, and an
 8    identified citizen saying that something
 9    happened, like I say, is enough to go out and we
10    can put handcuffs on somebody for that, we can
11    search someone's home based on that even though
12    later on they may very well be exonerated because
13    it still rose to the probable cause standard.
14    And like I say, significant -- a credible
15    allegation is a lower standard even than probable
16    cause.
17              So all the things I'm telling you on
18    the checklist, probably the instructors at
19    Quantico would disagree that all or most of those
20    even need to be there.  They're gravy basically.
21    And Guidepost, to their credit, did a lot of
22    extra digging on this that they didn't need to in
23    applying that standard of a credible allegation.
24        Q.     They did a lot of extra digging here,
25    sir, to justify their own conduct, did they not?
```

MAGNA
LEGAL SERVICES

1      A.      I would disagree based on what I
2  observed.  No, sir.  I believe they did that
3  extra digging to see if, in fact, there might be
4  something out there that would cause them not to
5  include it in the report.
6      Q.      They did a lot of digging to dig
7  themselves out of a $2 million financial hole,
8  did they not?
9      A.      No, I'm sorry, I disagree with that.
10     Q.      You're laughing, but you know that
11 that's a reality, that as of February 1 they were
12 in a $2 million hole, weren't they, sir?
13     A.      No, sir.  From my understanding, I
14 would not use the word hole.
15     Q.      Sir, they were --
16     A.      Hole sounds like they gambled at the
17 track and lost $2 million.  I disagree.
18     Q.      Didn't you take the time, sir, to
19 read the texts and the e-mails at the time
20 concerning the desperation that existed in those
21 texts pertaining to the fact that the company had
22 spent millions of dollars and had not found one
23 new sexual abuse allegation?  Didn't you see
24 texts and e-mails to that effect?
25              MR. KLEIN:  Objection, compound and

MAGNA
LEGAL SERVICES

```
 1        mischaracterizes his testimony.  You can
 2        answer.
 3        Q.      Restated: didn't you see with your
 4   own eyes e-mails, sir, confirming the concerns
 5   that Guidepost in the February 2022 period that
 6   they had no new allegations of sexual abuse?
 7             MR. KLEIN:  Objection, asked and
 8        answered.  You can answer.
 9        A.      That, I saw.  I can't state off the
10   top of my head what time frame I saw that in, but
11   yes, I saw that.  If nothing else, what jumps out
12   the most is your precise question from you at the
13   depositions where everyone confirmed that that is
14   correct.
15        Q.      That there was some level of
16   desperation at Guidepost because according to
17   what you saw with your own eyes, they had no new
18   allegations of sexual abuse, right?
19        A.      No, sir.  I disagree with that.  They
20   never -- didn't pick up any desperation.  In
21   fact, when you look at what they did with their
22   report, everything was done outside the scope of
23   anything to do with Mr. Hunt.  They made various
24   recommendations.
25             It's not a failure to find that even
```

1    though proper steps weren't in place in an

2    organization that fortunately nothing bad came

3    out of it.  That's not a failure on the part of

4    the investigators.  They did their job whether

5    they found a hundred people that had allegations

6    or they found zero.  The fact is they identified

7    procedures that should be there and hopefully in

8    the future will be.  That was their job and

9    that's very typical in this type of review.

10        Q.    Did Guidepost at the time of this

11   investigation have a code of conduct or ethics?

12        A.    Is this beyond what we talked about

13   earlier or --

14        Q.    Yes, sir.  It's very much different.

15              Do you understand that there's a

16   distinction between a code of conduct in a

17   company and an investigatory series of

18   guidelines?

19        A.    Okay.

20        Q.    Do you understand that?

21        A.    That, I do understand.

22        Q.    Okay.  With that understanding, did

23   Guidepost have a code of conduct in place at the

24   time of this investigation?

25        A.    A code of conduct for Guidepost's own

MAGNA

LEGAL SERVICES

Page 165

```
 1      A.      Yes.  Consistent with what was --
 2      Q.      Right.
 3      A.      -- dictated to them before they
 4   started.
 5      Q.      As a matter of common decency or
 6   logic or just general humane behavior, no
 7   reasonable investigator would do that before
 8   interviewing Johnny Hunt, would they?
 9      A.      I would disagree with that.  I mean,
10   they picked out a title.  Could be victim, could
11   be complainant, could be survivor.  These are all
12   interchangeable things.  It doesn't indicate a
13   conclusion.  And the way the investigation
14   developed and was documented shows that they were
15   objective and independent and fair-minded
16   throughout.
17      Q.      Since we're talking about you --
18      A.      Okay.
19      Q.      -- and a you did and what you failed
20   to do in connection with your work in this case,
21   it's okay by you if the investigators here write
22   the story before they interview Pastor Johnny
23   Hunt?
24              MR. KLEIN:  Objection as to form.
25      You can answer.
```

1           THE WITNESS:  Right.
2      A.    I don't know that I would say okay by
3  me because I'm not the one -- I was -- I was
4  taught the same, trained and observed the same
5  things happen, best practices as anywhere else
6  and it's definitely all right because that's the
7  way we're taught to do it.  There's various
8  reasons why it's best to do it.
9      Q.    It's definitely all right in your
10  words, sir, as an expert, according to yourself
11  that you are an expert.  You're claiming it's
12  okay to write the story before you interview the
13  person accused of a sexual abuse incident, right?
14           MR. KLEIN:  Objection,
15      mischaracterizes his testimony.  But you can
16      answer.
17      A.    Again, it's writing a potential
18  version of the story, what may seem like a likely
19  outcome at that point but with the flexibility to
20  adapt and amend it as necessary even if it turns
21  to the opposite conclusion.
22      Q.    Wouldn't a reasonable person in the
23  seat that you sit in realize, had you actually
24  relied on this, that this was a red flag in terms
25  of the investigation conducted by Guidepost?

1    A.    The fact that it existed was -- it
2  was an observation, it was a potential red flag,
3  but combining it as cited in the Exhibit 1 with
4  the other documents that are related to it, then
5  the concern evaporates, any potential concern
6  evaporates.
7    Q.    Sir, survivor was a trigger word
8  here, wasn't it?
9    A.    No.  It's a word of the trade.  It's
10 become --
11   Q.    No, sir.  You know better than that.
12         Did you actually read the Guidepost
13 report and how they described survivor?
14   A.    Yes.
15   Q.    Did you read those -- tell the jury
16 what Guidepost defined a survivor of --
17 notwithstanding all the claims in statements and
18 paragraphs that you've given us here today, tell
19 this court and jury how they define survivor.
20   A.    I'd have to read their exact words.
21   Q.    Just tell us what you remember, sir,
22 because you've adopted that here today.
23   A.    I can't without --
24   Q.    What do you remember?
25   A.    I can't without looking at it.  I

MAGNA
LEGAL SERVICES

1  cooperate with us.  That's the closest I come to

2  an ambush interview.

3       Q.     And an ambush interview would also be

4  an interview where you don't tell the person

5  you're going to be interviewing the topic of your

6  interview?

7       A.     No, sir.  That would not -- to me

8  that's not an ambush at all.

9       Q.     An ambush -- how would you describe

10  that if you, you know -- for example,

11  Mr. Blankenship, they never told

12  Mr. Blankenship -- these Guidepost people, they

13  never told Mr. Blankenship what they were going

14  to ask him about, right?

15       A.     That's consistent with what I recall

16  learning, yes.

17       Q.     And they camped outside his office,

18  didn't they?

19       A.     I know after -- I believe there was a

20  period of time of him being unresponsive to their

21  attempts to schedule something formal that they

22  waited for him outside his office.

23       Q.     They waited for him outside his

24  office?

25       A.     Yes.

MAGNA
LEGAL SERVICES

1      Q.      Right.  And he was not a willing

2    participant in an interview, as you understood

3    it?

4              MR. KLEIN:  Objection as to form.

5        You can answer.

6        A.      There may be some degree of

7    willingness.  I don't know.  And they did

8    successfully interview him, so obviously on some

9    level he became willing to do it, but he was

10   unresponsive, uncooperative despite knowing the

11   importance of --

12       Q.      So would you call that an ambush

13   interview?

14       A.      No.

15       Q.      How would you describe that?

16       A.      Relatively standard practice.  The

17   more effective way to interview someone when it's

18   a factual type of interview that -- where they're

19   likely to remember specific things that are not

20   relying on -- no need to rely on outside

21   documents or complex records in a business record

22   case is to be asking them the questions first

23   time when we're in front of them so that they

24   don't have -- so they're not reflecting on it

25   ahead of time and possibly considering what's

MAGNA
LEGAL SERVICES

 1    better for them in their responses.
 2        Q.    How about Johnny Hunt?  Did they tell
 3    Johnny Hunt ahead of time that they were going to
 4    interview him about this event with ████████████
 5        A.    Did they tell him ahead of time?
 6        Q.    Yeah.
 7        A.    I don't recall how the approach went
 8    to --
 9        Q.    You didn't take any steps to
10    understand what the context of that interview
11    was?
12              MR. KLEIN:  Objection as to form.
13        Q.    All right.  So let me ask a better
14    question.
15              So you can admit right now without
16    any equivocation you did no analysis or
17    investigation for your part to determine the
18    context and circumstances of the second Johnny
19    Hunt interview?
20        A.    No.  That's absolutely not correct.
21    I'm saying as I sit here right now I don't recall
22    exactly how the interview was arranged or whether
23    it was impromptu.
24        Q.    Tell us what you do remember,
25    everything you remember about how Guidepost

1  incident that is going to cause some level of

2  discomfort to the person you're inquiring of, but

3  it doesn't mean it's confrontational in the tone,

4  that you're going all out into interrogation

5  mode.

6      Q.    Well, direct and confronting suggests

7  that it's not going to be open-ended answers by

8  the person confronted, right?

9      A.    No, sir.  Not in this context.

10 Because of what we all know.  The background of

11 this was just from the date the letter of

12 engagement was drawn up the potential victims,

13 the survivors, had the right to state whether or

14 not they wanted their identities revealed, they

15 wanted the incident -- the details revealed, so

16 saying being direct to me is what we would do

17 even without a letter of engagement like that,

18 which is saying, listen, your identity is going

19 to come to light when we ask certain questions,

20 we want to make you aware of that, make sure

21 you're comfortable with that.  That's what that

22 sentence says to me.

23     Q.    Okay.  Let's take one step further on

24 this second interview.

25            Did you understand in this second

MAGNA○
LEGAL SERVICES

1 interview that Pastor Johnny Hunt was given no
2 advance notice that he was going to be questioned
3 about this event involving ███████ ████████
4      A.     Yes, sir, that's my understanding.
5      Q.     Okay.  So you have two circumstances
6 of the interviews that you know about and can
7 testify to; that is, there's no advance notice to
8 Pastor Johnny Hunt, number one, and, number two,
9 that the investigators were going to be direct
10 and confronting to Johnny Hunt, right?
11      A.     The word confronting, again, is
12 subject to interpretation, but that they were
13 going to approach him, that they were going to --
14 use the word confront as long as we're not
15 putting a hostile spin on it, yes.  Confronting
16 covers a lot, but yes.
17      Q.     Now, as an interviewee, if somebody
18 like Kilpatrick or somebody like Holske is going
19 to be direct and confronting to the interviewee,
20 isn't it a fact that that interviewee may be not
21 giving narrative and long answers?
22      A.     It's a possibility.
23      Q.     Right.  You know that your
24 interviewee can shut down if somebody's being
25 direct with that person, right?

1      A.      There's always the potential for
2   that.
3      Q.      There also is a potential of that
4   interviewee, if he is being confronted, to lock
5   down and not be responsive?  Potential, right?
6      A.      Well, I'm guessing by your question
7   you're referring to them saying, Hey, I got
8   nothing to say to you, I want to speak to my
9   attorney, something like that.  I want you out,
10  words to that effect, certainly that's a
11  possibility.
12     Q.      What about words to the effect of
13  accusation made by Kilpatrick, accusation made by
14  Holske: No, no, no, is that the kind of thing you
15  get if somebody's being -- sometimes when
16  somebody's being direct and confronting?
17     A.      No.  I can't -- I didn't -- a lot of
18  interviews having done, experienced, and reviewed
19  of others being done, the word no is pretty --
20  it's pretty unambiguous.  It usually -- in the
21  context you're saying, I can't imagine it not
22  being followed by, No, I'm not having this
23  conversation.  When somebody's asked the
24  question, Hey, did this happen?  Did you pull her
25  shorts down?  And you just say, No, nothing

 1   further. I can't imagine any other way to

 2   interpret that reasonably as being a no, a denial

 3   of what you're asking.

 4        Q.    Okay.  Now --

 5              MR. KLEIN:  At an appropriate time,

 6        you tell me.

 7              MR. MacGILL:  Okay.  Couple more

 8        minutes.

 9              MR. KLEIN:  Sure.

10        Q.    You understood that the Guidepost had

11   conducted eleven interviews with the

12        A.    That number sounds right to me, yes.

13        Q.    Nine of these interviews were prior

14   to publication, right?

15        A.    I didn't know that breakdown, but

16   okay.

17        Q.    They only had one interview with

18   Pastor Johnny Hunt on the matter at hand; is that

19   right?

20        A.    Well, ultimately they had two, right.

21        Q.    Well, one -- you already admitted,

22   haven't you, that the first interview had nothing

23   to do with

24        A.    Yeah, I wouldn't phrase that -- no,

25   sir.  I wouldn't say that.  Because doing that

MAGNA
LEGAL SERVICES

 1   there's reason to believe that it was followed
 2   the other times, but I have no idea whether it
 3   was or not.
 4        Q.    Well, if it wasn't, wouldn't that
 5   indicate that this undermined the credibility of
 6   ▓▓▓▓ and Guidepost?
 7        A.    I don't see how it would.  There
 8   could be many reasons for that.
 9        Q.    All right.  Now, looking at whether
10   something is credible in offering reasonable
11   grounds for being believed, is there anyone who
12   corroborated ▓▓▓▓ ▓▓▓▓'s story?
13        A.    To some extent, yes.
14        Q.    Who?
15        A.    As far as the story goes -- when we
16   say story, the time frame as opposed to potential
17   of a recent fabrication -- there were reports
18   made at various times through her husband,
19   through the survivor's husband, to two or three
20   different people.
21        Q.    Right.  All he did was tell people
22   what he understood, right?
23        A.    That's a fair statement.
24        Q.    So you know, you've been in this
25   business a long time, there were -- those three

1   other people only repeated what ████ ████ told

2   them, right?

3           A.      That sounds right to me.

4           Q.      And to be honest, sir, that's not a

5   corroboration of any kind, is it?

6           A.      I disagree with, respectfully.

7           Q.      Oh, you would? So you would say that

8   if a person describes an event that he thinks

9   occurred to somebody else and he says, Yes,

10  that's what the husband told me, then that's

11  corroborating?

12          A.      Well, as we know, in many areas of

13  the law corroboration doesn't mean that it has to

14  substantiate every single element or every single

15  fact. It just has to -- the way a lot of cases

16  word it is slightly, to whatever extent

17  demonstrates some portion of the statement of

18  events here.

19              The value in that was the fact that

20  it was the date, that it shows that it wasn't a

21  recent fabrication, that it wasn't something that

22  was concocted because suddenly there's all this

23  attention and a chance for a potential payday.

24  It shows that this was discussed at a prior date.

25  So is it tremendous homerun corroboration? No.

MAGNA
LEGAL SERVICES

1  But is it significant?  Yes.
2      Q.    Okay.  So the only thing those three,
3  quote, corroborating witnesses provided was that
4  ███████████ story was not a recent
5  fabrication?
6      A.    At least one.  One or two.  I can't
7  remember the dates.  It was at least one that was
8  significantly predating the investigation.
9      Q.    Okay.  And so that's the only value
10  of those three, quote, corroborating witnesses,
11  that they showed that this was not a recent
12  fabrication?
13      A.    That's the main value of it.
14      Q.    Is there any other value, sir?
15      A.    It would be slight.
16      Q.    What other -- I want to see if
17  there's any other substantive value according to
18  you.
19            What other substantive value is of
20  these other three, quote, corroborating witnesses
21  other than that they suggest this was not a,
22  quote, recent fabrication, unquote?
23      A.    There's a -- in these areas of law
24  there's what's known as a prompt outcry, which
25  I'm not suggesting that any of these would meet

MAGNA
LEGAL SERVICES



```
1          ------
             E R R A T A
2          ------

3

4 PAGE  LINE      CHANGE  FROM      CHANGE  TO       REASON

5  88   17    " attempted "    " didn't attempt"  recollection of testimony

6                    Nothing Follows

7

8

9

10                           07/02/2024

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



1     ACKNOWLEDGMENT OF DEPONENT

2       I, _Douglas A Leff_, do
3   hereby certify that I have read the
    foregoing pages,  1 - PGS, and that the
4   same is a correct transcription of the
    answers given by me to the questions
5   therein propounded, except for the
    corrections or changes in form or
6   substance, if any, noted in the attached
    Errata Sheet.

7

8   _MAGNA_,        _7/2/24_
    WITNESS NAME            DATE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

applicant, 7/2/24