UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHNNY M. HUNT, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 3:23-cv-00243 |
| v. | ) | |
| | ) | JUDGE CAMPBELL |
| SOUTHERN BAPTIST CONVENTION; | ) | MAGISTRATE JUDGE FRENSLEY |
| GUIDEPOST SOLUTIONS LLC; and | ) | |
| EXECUTIVE COMMITTEE OF THE | ) | JURY DEMAND |
| SOUTHERN BAPTIST CONVENTION, | ) | |
| | ) | |
| *Defendants.* | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE EXECUTIVE COMMITTEE OF
THE SOUTHERN BAPTIST CONVENTION'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ...................................................................................... 1

RELEVANT FACTS ................................................................................... 2

1.    The Parties. ......................................................................................... 2

    A.    The SBC and the EC. ................................................................ 2

    B.    Johnny Hunt. ............................................................................ 3

            i.    Lead Pastor at First Baptist Woodstock. ...................... 4

            ii.    President of the SBC. .................................................. 4

            iii.    Hunt's Overall Popularity. .......................................... 5

            iv.    North American Mission Board. ................................... 6

    C.    Guidepost. ................................................................................ 6

            i.    Guidepost's Investigation. ........................................... 7

                      (1)    A. Numerous Precautions Were Taken to Ensure the Independence and Integrity of Guidepost's Investigation. ............ 7

                      (2)    The EC Had No Involvement in Guidepost's Investigation or Report. ................................................. 9

                      (3)    Guidepost's Investigation Regarding the Allegations Made Against Hunt. ......................................... 10

                      (4)    Guidepost Interviews Hunt Twice, and Hunt Falsely Denies Having Physical Contact with Jane Doe. ................ 11

                      (5)    Guidepost Submits the Report. ................................ 14

             ii.    Hunt Immediately Changes His Story. ........................ 14

ARGUMENT .......................................................................................... 15

1.    No Genuine Issue of Material Fact Exists on Hunt's Defamation Claim Because Hunt Cannot Prove that the EC Acted with Actual Malice or, Alternatively, with Negligence. ...................................................................................... 16

A.      Hunt Is a Public Figure. .................................................................. 17

B.      There is No Genuine Issue of Material Fact That the EC Acted with
        Actual Malice. ................................................................................. 20

C.      Alternatively, There is No Evidence the EC Acted Negligently. ........ 22

2.      No Genuine Issue of Material Fact Exists on Hunt's False Light Claim Because
        Hunt Has No Evidence That the EC Acted with Actual Malice. ...................................... 25

3.      The EC Is Entitled to Summary Judgment on Hunt's Claim for Intentional
        Infliction of Emotional Distress. .................................................................................... 25

4.      The EC Is Entitled to Summary Judgment on Hunt's Claim for Negligent
        Infliction of Emotional Distress. .................................................................................... 26

5.      The EC Is Entitled to Summary Judgment on Hunt's Public Disclosure of
        Embarrassing Private Facts Claim. ................................................................................. 27

6.      The EC Is Entitled to Summary Judgment on All Claims Arising from the Letter. ........ 29

A.      The Ecclesiastical Abstention Doctrine Prohibits the Court from
        Adjudicating Claims Arising from the Letter. .................................... 29

B.      The EC Bears No Responsibility for the Letter. ................................. 31

C.      Hunt Cannot Prove Essential Elements of Each of His Substantive Claims
        With Respect to the Letter. ............................................................... 32

7.      The EC Is Entitled to Summary Judgment on Any Claims Arising from the Tweet. ....... 32

A.      The EC Bears No Responsibility for the Tweet. ................................. 32

B.      Hunt Cannot Prove Essential Elements of Each of His Substantive Claims
        With Respect to the Tweet. ............................................................... 33

8.      Hunt Has No Evidence to Support His Damages Claim. ................................................ 33

CONCLUSION ............................................................................................................ 35

4865-3206-2158.v1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bain v. Wells*,
936 S.W.2d 618 (Tenn. 1997).........................................................................26, 31

*Brown v. Christian Bros. Univ.*,
428 S.W.3d 38 (Tenn. Ct. App. 2013) ...................................................................16

*In re Diocese of Lubbock*,
624 S.W.3d 506 (Tex. 2021)..................................................................................31

*Doe 1 v. Woodland Presbyterian*,
661 S.W.3d 87 (Tenn. Ct. App. 2022) ...................................................................27

*Doe v. Word of Life Fellowship, Inc.*,
No. 11-40077-TSH, 2011 WL 2968912 (D. Mass. July 18, 2011).........................28

*Evans v. Amcash Mortg. Co., Inc.*,
No. 01A01-9608-CV-00386, 1997 WL 431187 (Tenn. Ct. App. Aug. 1, 1997)............ *passim*

*Finley v. Kelly*,
384 F. Supp. 3d 898 (M.D. Tenn. 2019)............................................................31, 32

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)...................................................................................17, 18, 21

*Harte-Hanks Comms., Inc. v. Connaughton*,
491 U.S. 657 (1989)...............................................................................................21

*House of God v. Campbell*,
No. 3:06-cv-0066, 2008 WL 701585 (M.D. Tenn. Mar. 13, 2008).........................29

*Hudik v. Fox News Network, LLC*,
512 F. Supp. 3d 816 (M.D. Tenn. 2021)................................................................17

*Hustler Magazine, Inc. v. Falwell*,
485 U.S. 46 (1988).................................................................................................26

*Jackson & Assocs., Ltd. v. Christl*,
No. 01A019103CV0081, 1991 WL 155687 (Tenn. Ct. App. Aug. 16, 1991).........................31

*Lane v. Becker*,
334 S.W.3d 756 (Tenn. Ct. App. 2010) ..................................................................26

iii

*Lemon v. Williamson Cnty. Sch.*,
618 S.W.3d 1 (Tenn. 2021)................................................................26

*Maethner v. Someplace Safe, Inc.*,
929 N.W.2d 868 (Minn. 2019).............................................................24

*Marla H. v. Knox Cnty.*,
361 S.W.3d 518 (Tenn. Ct. App. 2011)...............................................27

*Memphis Pub. Co. v. Nichols*,
569 S.W.2d 412 (Tenn. 1978)..............................................................23

*Pate v. Serv. Merch. Co., Inc.*,
959 S.W.2d 569 (Tenn. Ct. App. 1996)...........................................23, 24

*Robison v. Watson*,
Case No. 2010-211, 2012 WL 4217050 (E.D. Ky. Sept. 19, 2012) ................................31, 33

*Rutherford v. First Tenn. Bank Nat. Ass'n*,
No. 3:08-CV-19, 2008 WL 3307203 (E.D. Tenn. Aug. 7, 2008)...........................................31

*S.E. v. Chmerkovskiy*,
221 F. Supp. 3d 980 (M.D. Tenn. 2016)...............................................31

*Santoni v. Mueller*,
No. 3:20-cv-00975, 2022 WL 97049 (M.D. Tenn. Jan. 10, 2022) ...................................17, 18

*Scarborough v. Brown Grp., Inc.*,
935 F. Supp. 954 (W.D. Tenn. 1995)....................................................28

*Seaton v. TripAdvisor LLC*,
728 F.3d 592 (6th Cir. 2013) .............................................................25

*Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*,
426 U.S. 696 (1976)......................................................................29, 30

*Snyder v. Phelps*,
562 U.S. 443 (2011)......................................................................25, 28

*Sullivan v. Baptist Mem'l Hosp.*,
995 S.W.2d 569 (Tenn. 1999)..............................................................23

*Thomas M. Cooley L. Sch. v. Kurzon Straus, LLP*,
759 F.3d 522 (6th Cir. 2014) ...........................................................17, 20

*Waldbaum v. Fairchild Pub., Inc.*,
627 F.2d 1287 (D.C. Cir. 1980)...........................................................18

iv

*West v. Media Gen. Convergence, Inc.*,
    53 S.W.3d 640 (Tenn. 2001) ....................................................................................25

*White v. Manchester Enter., Inc.*,
    871 F.Supp. 934 (E.D. Ky. 1994) ...........................................................................26

*Winslow v. Saltsman*,
    No. No. M2014–00574–COA–R3–CV, 2015 WL 6330403 (Tenn. Ct. App.
    Oct. 21, 2015) ..........................................................................................................21

## Other Authorities

https://www.sbc.net/about/what-we-do/sbc-entities/executive-committee ...............................2, 3

Restatement (Second) of Torts § 652D Special Note (Am. L. Inst. 1977) ...................................28

v

# INTRODUCTION

In 2021, in response to allegations suggesting the Southern Baptist Convention (the "SBC") and the Executive Committee of the Southern Baptist Convention (the "EC") had ignored complaints of sexual abuse, the Messengers to the SBC Annual Meeting approved a motion authorizing the creation of a Sexual Abuse Task Force (the "Task Force") to engage a third party to conduct an independent investigation. The Task Force retained Guidepost Solutions LLC ("Guidepost"). Guidepost took numerous precautions to ensure the independence and integrity of its investigation, including ensuring the EC had absolutely no insight or input into the investigative process or responsibility for the contents of Guidepost's investigative report (the "Report").

After receiving a sexual abuse allegation against former SBC President and renowned pastor Johnny Hunt, Guidepost performed a thorough investigation, which included numerous interviews with Hunt's accuser ("Jane Doe"), two interviews with Hunt, interviews with other individuals, and a review of contemporaneous records. When confronted with the sexual abuse allegations against him, Hunt stonewalled, claiming he had "no contact whatsoever" with Jane Doe. Hunt now admits this statement was not true. Indeed, Hunt's story has evolved over time, and he now admits he had a "consensual" sexual encounter with Jane Doe, who "stalked" or pursued him.

Notwithstanding his ever-shifting narrative, Hunt alleges various claims against the EC, including defamation, false light invasion of privacy, intentional and negligent infliction of emotional distress, and public disclosure of embarrassing facts, all of which arise primarily out of the Report's treatment of Jane Doe's allegations against him. The EC is entitled to summary judgment on each of these claims. First, Hunt cannot raise a genuine issue of material fact that the EC acted with either actual malice or negligence in connection with the Report, which is required for the defamation and false light claims. Second, Hunt has absolutely no evidence that he has

1

suffered serious mental injury, as is required to prove his emotional distress claims. Third, Hunt's public disclosure of embarrassing facts claim fails because the matters discussed in the Report are undeniably matters of legitimate public concern.

Hunt also makes claims based on two additional statements: (1) a letter from the SBC's Credentials Committee to a cooperating Southern Baptist church (the "Letter") and (2) a December 5, 2022 tweet by then-President of the SBC, Bart Barber (the "Tweet"). The EC is entitled to summary judgment on any claims arising out of the Letter and the Tweet because it is undisputed that the EC did not publish those statements, and there is no evidence that the EC bears any responsibility for them. As for claims arising from the Letter, summary judgment is independently necessary because the ecclesiastical abstention doctrine prohibits this Court from adjudicating any issues related to the Letter. For these reasons and the reasons set forth below, the Court should grant summary judgment in favor of the EC and dismiss Hunt's claims against the EC with prejudice.

## RELEVANT FACTS

### 1. The Parties.

#### A. The SBC and the EC.

The SBC is a collection of nearly 50,000 independent Baptist churches in the United States and its territories. (Doc. 1–2, PageID #62.) Unlike other hierarchical religious organizations where local churches follow the directives of a primary leader, the SBC does not dictate church practices or worship. (*Id.*, PageID #62–63.) As a matter of religious faith, the SBC Constitution provides it has no authority over any other Baptist body, does not ordain pastors, and does not have any role in the management of any church. (*Id.* at PageID #63; **Exhibit 1**, Deposition of Jonathan Howe ("Howe Depo.") at 128:5–129:1; <u>Constitution</u>, Southern Baptist Convention, Article IV, https://www.sbc.net/about/what-we-do/legal-documentation/constitution (last visited July 3,

2

2024).) Local church participation with the SBC is voluntary and cooperative. (Doc. 1–2, PageID #63.) The SBC's Credentials Committee determines whether local churches are in friendly cooperation with the SBC based on a specific set of criteria. (*Id.*, PageID #63–64, #226; Constitution, *supra*, Article III.)

The SBC operates under the direction of Messengers, representatives of Baptist churches that are in friendly cooperation with the SBC. (Doc. 1–2., PageID #65; **Exhibit 1**, Howe Depo. at 126:16–20; Constitution, *supra*, Article III.) The Messengers have corporate power and authority over the SBC. (**Exhibit 1**, Howe Depo. at 127:4–7.) They convene once a year where they determine the officers, programs, policies, and budget of the SBC. (Doc. 1–2, PageID #65–66; Constitution, *supra*, Article III.)

The EC manages the SBC's operations between annual meetings of the Messengers, but it is a discrete legal entity from the SBC. (*See* **Exhibit 1**, Howe Depo. at 79:20–25; *see also* Doc. 1, PageID #4, ¶¶ 15, 17.) The EC is comprised of eighty-six EC Trustees chosen by the Messengers from qualified states and regions. (*Id.*, PageID #66; **Exhibit 1**, Howe Depo. at 43:17–19; Executive Committee, Southern Baptist Convention, https://www.sbc.net/about/what-we-do/sbc-entities/executive-committee (last visited July 3, 2024).) The EC does not control or direct the activities of SBC entities. (*Id.*; Doc. 1–2, PageID #67.)

### B. Johnny Hunt.

Hunt, by his own words, is a nationally prominent pastor and former president of the SBC. (Doc. 1, PageID #1, ¶ 2, #5, ¶¶ 26–28.) He served as "the president of the largest evangelical body in America" while simultaneously "pastoring one of the largest churches in America[.]" (**Exhibit 2**, Deposition of Johnny Hunt ("Hunt Depo.") at 124:3–5.) A self-described "sought-after speaker and author" and a "noted speaker at state and national SBC conferences and conventions[,]" Hunt previously led First Baptist Church Woodstock ("First Baptist Woodstock"), "one of the largest

3

churches in the United States[,]" located in Woodstock, Georgia. (Doc. 1, PageID #5, ¶¶ 27, 29.) First Baptist Woodstock has a high profile in the Georgia State Southern Baptist Convention and is well known within the National Southern Baptist Convention. (**Exhibit 3**, Deposition of Roy Blankenship ("Blankenship Depo.") at 82:14–25.) (*See also* **Exhibit 2**, Hunt Depo. at 50:4) ("We were a well-known church[.]").

### i. Lead Pastor at First Baptist Woodstock.

The trajectory of First Baptist Woodstock's growth under Hunt's leadership illustrates Hunt's popularity. When Hunt first became lead pastor, Sunday service attendance averaged around 180 people. (*Id.* at 26:18–23; 27:9–13.) Under Hunt's leadership, the church saw "explosive growth" and transformed from a small congregation into a nationally renowned megachurch. (*See id.* at 27:9–13.) It grew to approximately 15,000 members by 2009, with over 6,000 people in attendance each Sunday. (*Id.* at 26:24–27:16.) Throughout this period of rapid growth, Hunt said he was the "Joseph of the Woodstock church[.]" (*Id.* at 52:9–10.)

Hunt claims his ministry reached far beyond the congregations he preached to on Sundays. During his early years at First Baptist Woodstock, Hunt "had an extensive tape ministry" called "It's a New Day" through which people could purchase cassette tapes (and later CDs and then USB flash drives with audio files) of his recorded sermons. (*Id.* at 20:8–21; 87:5–8.) It's a New Day has been in operation for 25 years. (*Id.* at 87:9–11.) By at least 2009, First Baptist Woodstock was streaming Hunt's sermons online. (*Id.* at 28:11–19.) Hunt also provided outlines of his sermons to other pastors via First Baptist Woodstock's website, which "became an extremely popular website for pastors around the world." (*Id*. at 28:2–7.)

### ii. President of the SBC.

The Messengers elected Hunt president of the SBC in 2008. (*Id.* at 36:10–12.) The presidency is the "pinnacle" of the SBC, and, as president, Hunt was the self-described "face of

4

the [SBC.]. (*Id.* at 36:13–22.) Hunt was such a popular pastor that "practically all of [his] peers" had encouraged him to run for president for five terms—or a period of ten years—before he finally agreed to do so. (*Id.* at 37:8–23.)

As president, Hunt was "the voice" and "the face" of the SBC. (*Id.* at 40:10–21.) Even so, Hunt claims that the SBC presidency did not give him more exposure than he already had because he already had "such a platform." (*Id.* at 41:4–17.) Even before Hunt became president, he "already had [the] invitations" that motivate some other pastors to seek the office of the presidency, and he already "was speaking Sundays in one of the finest [churches] in America." (*Id.* at 41:13–15.)

### iii. Hunt's Overall Popularity.

As Hunt has acknowledged on multiple occasions, he is well-known throughout the Southern Baptist denomination. For example, he believes that even "the average church-going Southern Baptist in Arkansas" would have known that he was the lead pastor at First Baptist Woodstock, separate and apart from his role as president of the SBC. (*Id.* at 42:6–10.) Hunt was so popular that he spoke at "90 percent . . . of our 42 state conventions, [and] maybe all of them prior" to his presidency. (*Id.* at 42:13–16.) The Baptist Press, which publishes "news for and about Southern Baptists[,]" routinely covered Hunt because events involving Hunt were deemed to be "of interest to Southern Baptists." (**Exhibit 1**, Howe Depo. at 56:6–8; 61:19–62:4; 64:2–17.) Roy Blankenship, a counselor at First Baptist Woodstock, observed that, when he was with Hunt, people "[came] up to [Hunt] and [shook] his hand and seem[ed] to know who he was and want[ed] to have conversations with him" wherever they went. (**Exhibit 3**, Blankenship Depo. at 83:4–15.) Hunt was so popular that he even decided he needed to get a new phone number after realizing that he was "too accessible to the world." (**Exhibit 2**, Hunt Depo. at 232:20–23.)

Hunt also received public exposure separate and apart from his high-profile role within the Southern Baptist denomination. For example, he pastored the former Governor of Georgia, Sonny

5

Perdue, for eight years. (*Id.* at 43:16–18.) When Perdue entertained fellow governors, Hunt was asked to attend and give opening prayers. (*Id.* at 43:18–20.) Hunt also is a published author who, ironically, has published books on "topics like lust [and] temptation." (*Id.* at 79:16–22.)

### iv.   North American Mission Board.

Hunt left First Baptist Woodstock in 2019 and began working for the North American Mission Board ("NAMB"). (*Id.* at 74:24–75:8.) Hunt claims NAMB hired him because "[t]hey wanted [his] name. They wanted Johnny Hunt there because they were struggling a lot. They needed a name of integrity and a name of leadership to help them." (*Id.* at 97:12–21.) Hunt held the position of Senior Vice President, and his role was to provide leadership to the organization. (*Id.* at 97:22–98:11.) Hunt led numerous conferences, which included 13 conferences in 2021 that lasted 3-4 days each, plus one-day evangelism conferences "somewhere around our 42 state conventions." (*Id.* at 98:18–99:1.) He "was out constantly with pastors" and spent "very little time in the office." (*Id.* at 98:25–99:1.) Hunt claims it was his leadership that transformed NAMB. As Hunt acknowledges, "[t]he entire work force of NAMB came to an entire new level within my first year of being there. . . . Everyone had to start either adding more staff to even accommodate the work I generated." (*Id.* at 109:23–110:4.)

### C.   Guidepost.

Guidepost was engaged by the Task Force to conduct an independent investigation into various issues relating to the EC's handling of sexual abuse allegations within the SBC and to prepare an independent third-party report setting forth its factual findings and recommendations. (*See* Doc. 1–1, Page ID #22, §§ 1.1, 2.1, #24, § 3.4; Doc. 1–2, Page ID #49–51.) Significantly, Guidepost's engagement letter (the "Engagement Letter") confirmed Guidepost's client was the Task Force—and not the EC. (*See* Doc. 1–1, PageID #22, § 2.1.) Additionally, the Engagement Letter provided there was "[n]o attorney-client relationship . . . between Guidepost and any other

6

party" and that the EC would not "conduct, direct, or otherwise manage or influence [Guidepost's] independent investigation in any matter." (*Id.*, PageID #24, § 3.3).

      **i.**      **Guidepost's Investigation.**

      **(1)**      **A. Numerous Precautions Were Taken to Ensure the Independence and Integrity of Guidepost's Investigation.**

Because Guidepost committed to investigate allegations of abuse by EC members and allegations that the EC mishandled allegations of abuse, (*see id.* at PageID #23, § 3.1), the Task Force and Guidepost established safeguards to protect the independence and integrity of the investigation. The SBC formed the Committee on Cooperation "to provide financial oversight of the investigation and to ensure the full cooperation of the [EC], among other things." (Doc. 1–2, PageID #43.) The Committee on Cooperation was <u>not</u> an EC committee; instead, it was established to facilitate cooperation between the EC and the Task Force. (*Id.*; **Exhibit 1**, Howe Depo. at 147:13–22; 148:18–23.) While the Committee on Cooperation was made up of 5 individuals who were also EC members, they were instructed not to disclose any part of the Report to anyone else on the EC. (*Id.* at 275:19–22; 277:10–24.)

The Engagement Letter also made clear that the EC would not "conduct, direct, or otherwise manage or influence [Guidepost's] independent investigation in any manner." (Doc. 1–1, PageID #24, § 3.3.) While the Committee on Cooperation was provided the opportunity to review the factual portion of the Report five days prior to the Report's submission to the Task Force, (*see* **Exhibit 1**, Howe Depo. at 249:5–13; **Exhibit 4**, Guidepost 30(b)(6) Deposition of Krista Tongring ("Tongring Depo.") at 123:7–14), its review was governed by strict protocols to ensure the independence and integrity of the final Report. The review took place in a designated room and was monitored by a Guidepost representative. (*See* **Exhibit 1**, Howe Depo. at 249:14–22; (**Exhibit 4**, Tongring Depo. at 125:17–126:2.) The members of the Committee on Cooperation

agreed not to disclose any portion of the report to anyone in any form, and they were forbidden from photographing or photocopying the report. (*See* **Exhibit 1**, Howe Depo. at 249:23–250:7.) Any notes that they took on the Report were required to be handwritten, were collected by the monitor at the end of each review session and were destroyed at the conclusion of the review. (*See Id.* at 250:8–17; **Exhibit 4**, Tongring Depo. at 126:3–126:14.) While the Committee on Cooperation could check the facts, the polity, and the grammar of the Report, it could not question, edit, or change the report or the conclusions set forth therein. (*See* **Exhibit 1**, Howe Depo. at 227:13–228:10.) Additionally, "[n]o member of the . . . [EC] [was] permitted by Guidepost to edit the report prior to its public release." (Doc. 1–1 at PageID #24, § 3.6.)

The Committee on Cooperation met with Guidepost after their review and could discuss any factual issues where they believed correction was necessary, although Guidepost could not commit to any language changes during that meeting. (*See* **Exhibit 1**, Howe Depo. at 250:18–23; **Exhibit 4**, Tongring Depo. at 126:15–127:15.) Additionally, "Guidepost alone had the ability and the permission to make any language changes to the final report." (**Exhibit 1**, Howe Depo. at 252:16–19.) Once the Committee on Cooperation completed its review and Guidepost made any factual changes it deemed necessary, the Report was finalized and submitted to the Task Force. (*See id.*, Howe Depo. at 250:24–251:4.)

Guidepost provided factual portions of the draft Report to the Committee on Cooperation on two occasions. (*See* **Exhibit 4**, Tongring Depo. at 129:1–2.) First, the Committee on Cooperation reviewed "the majority of the factual portions of the report that were ready for review" at an in-person review session in Nashville. (*Id.* at 129:3–9.) The factual portion of the Report that pertained to Hunt was not provided to the Committee on Cooperation at this time because it was not ready yet. (*See id.* at 129:10–130:8.) Later, on May 13, 2022, the factual portions of the Report

8

pertaining to Hunt were shown to the Committee on Cooperation for the first time during a confidential video call. (*See id.* at 145:5–11; 148:4–12; 150:9–15; 152:3–12.) The Committee on Cooperation did not make any edits to the portion of the Report that discussed Hunt. (*See id.* at 260:8–14.) The Task Force made a single word change to the Hunt section, which Guidepost accepted. (*See id.* at 260:15–261:9.)

### (2) The EC Had No Involvement in Guidepost's Investigation or Report.

Because the EC was the target of Guidepost's investigation, it had no oversight of Guidepost's investigation process or the Report. (*See* **Exhibit 1**, Howe Depo. at 317:12–17, 321:14–21.) Accordingly, it "had no ability to question, edit or adapt the report." (*Id.* at 181:19–22; 182:24–183:2; 225:6–12; 230:5–10.)

The EC never received any portion of the Report prior to its publication. (**Exhibit 4**, Tongring Depo. at 240:7–16; 259:13–18.) (*See also* **Exhibit 1**, Howe Depo. at 262:16–18; 263:15–17; 281:18–21.) It made no changes to the Report. (*See id.* at 225:13–226:9; 226:17–24; 227:8–15; 238:13–23; 252:14–19; 269:3–6.) It was not the EC's responsibility or its place to object to the Report's publication. (*See id.*, Howe Depo. at 314:16–20.) The EC simply published the Report as directed by the Messengers. (*See id.*, Howe Depo. at 314:16–20; 321:18–21.)

Guidepost also confirmed it had no contact with the EC with respect to drafting, editing, or finalizing the Report. (*See* **Exhibit 5**, Deposition of Samantha Kilpatrick ("Kilpatrick Depo.") at 96:19–98:4 ("I did not tell [the EC] anything. . . . I did not have interaction with the Executive Committee or the SBC."); 124:15–16 ("I never had communications with SBC or the EC."); 135:10–13 ("I did not have any communication with the SBC or the EC, and I'm not aware of any other communication that someone else may have had.".) (*See also* **Exhibit 6**, Deposition of Julia Myers Wood ("Myers Wood Depo.") at 432:5–11 (Guidepost "had no contact with the Executive

Committee."); **Exhibit 7**, Deposition of Russell Holske ("Holske Depo.") at 353:4–15.) It did not

offer the EC "an opportunity to edit, comment or offer any feedback on the report prior to its final

issuance." (*See* **Exhibit 4**, Tongring Depo. at 259:19–260:1.)

Guidepost did not provide the portion of the report pertaining to Hunt to the EC at any time

prior to the Report's publication. (*See* **Exhibit 6**, Myers Wood Depo. at 428:15–18.) Additionally,

Guidepost did not inform the EC or the SBC that a draft factual portion of the Report was sent to

████████████████████████████ prior to the Report's publication. (*See* **Exhibit 5**,

Kilpatrick Depo. at 95:19–96:2.)

**(3)**      **Guidepost's Investigation Regarding the Allegations Made Against Hunt.**

Guidepost was specifically tasked with investigating allegations of abuse by EC members.

(*See* Doc. 1–2, Page ID #50; **Exhibit 5**, Kilpatrick Depo. at 205:2–4; 207:8–13; **Exhibit 6**, Myers

Wood Depo. at 329:18–330:2.) During the investigation, Jane Doe and Husband came forward to

report that Hunt had sexually assaulted Jane Doe on July 25, 2010. (Doc. 1–2, PageID #182.)[1]

Guidepost interviewed the couple on multiple occasions. (*Id.*)

Husband, an SBC pastor for 25 years, confirmed that he had a professional relationship

with Hunt, whom he considered a "mentor." (*Id.*) According to the couple, Husband contacted

Hunt to tell him that Jane Doe wanted to travel to Panama City Beach and asked Hunt for a condo

recommendation. (*Id.* at PageID #183.) Hunt provided Husband with a recommendation, and

Husband rented a condo for Jane Doe, which turned out to be located immediately next to Hunt's

condo. (*Id.*) After Jane Doe arrived at the beach, she and Hunt had an encounter that began on their

respective condos' separate balconies and ended in Jane Doe's condo. (*Id.* at PageID #183–184.)

---

[1] The Report refers to Jane Doe and her husband as "Survivor" (or the "wife") and "Pastor" (or the "husband").

10

Once they were inside Jane Doe's condo, Hunt sexually assaulted her, pulled her shorts down, pinned her to the couch, got on top of her, groped her, pulled up her shirt, and violently kissed her before he left the condo. (*Id.* at PageID #184.)

The couple also told Guidepost that, several days later, Hunt asked them to collectively meet with Blankenship, a "counselor" at First Baptist Woodstock. (*Id.* at PageID #185.) During that meeting, Hunt admitted "to a light kiss, touching [Jane Doe's] breasts over the clothes, and trying to pull her shorts down." (*Id.*) Hunt and Blankenship told the couple that they could never discuss what had happened. (*Id*. at PageID #186.)

Guidepost corroborated the couple's account by examining Husband's contemporaneous journals and recordings, interviewing Blankenship, and interviewing three other individuals who had relevant information. (*Id.* at PageID #186–190; **Exhibit 7**, Holske Depo. at 94:4–96:14.)

### (4) Guidepost Interviews Hunt Twice, and Hunt Falsely Denies Having Physical Contact with Jane Doe.

Guidepost interviewed Hunt twice during its investigation. (Doc. 1–2, PageID #190.) During the first interview, Hunt "was asked standard questions related to the actions of the EC" and was not questioned about the sexual abuse allegations since Guidepost "had not yet spoken to key witnesses for corroboration." (*Id.*)

During his deposition, Hunt claimed that the encounter with Jane Doe "never" crossed his mind during the first interview even though the entire purpose of the interview concerned uncovering allegations of sexual abuse. (**Exhibit 2**, Hunt Depo. at 118:7–12.) However, he acknowledged in his deposition that he was asked questions that certainly should have brought Jane Doe to mind. For example, during the first interview, Hunt told Guidepost that he was under the care of a counselor, Blankenship, during the extended sabbatical that he took in 2010. (*See id.* at 157:23–158:7; Doc. 1–2, PageID #191.) (During his deposition, Hunt explained that he decided

11

to extend his sabbatical in order to "get his spiritual equilibrium" following his encounter with Jane Doe, so discussing the extended sabbatical presumably would have caused him to think about Jane Doe.) (**Exhibit 2**, Hunt Depo. at 123:10–124:5.) Hunt also confirmed that he was asked several questions by Guidepost about Husband's church (although Husband was not identified in those questions). (*See id.* at 158:15–19; Doc. 1–2, PageID #191.) Guidepost gave Hunt every opportunity during the first interview to volunteer information concerning his "encounter" with Jane Doe. Hunt did not do so.

Guidepost interviewed Hunt a second time on May 12, 2022 to confront Hunt with the abuse allegations. (*See* **Exhibit 2**, Hunt Depo. at 125:9–13; Doc. 1–2, PageID #191.) Hunt has confirmed that, during the second interview, he made numerous statements that are attributed to him in the Report, many of which he now admits were unequivocally false. During his deposition, Hunt admitted that he told Guidepost:

- He had "very brief" contact with Jane Doe while she was at the beach, which occurred when they were each on the balconies of their respective condos next door to each other. (*See* **Exhibit 2**, Hunt Depo. at 164:16–22; Doc. 1–2, PageID #192.) Hunt admitted in his deposition this was not true. (*See* **Exhibit 2**, Hunt Depo. at 143:20.)

- He was never inside the same condo unit with Jane Doe, he did not go to her condo, and he was never on her balcony. (*See id.* at 142:8–11; 165:9–21; 166:16–18; Doc. 1–2, PageID #192.) Hunt admitted in his deposition this was not true. (*See* **Exhibit 2**, Hunt Depo. at 189:15–189:25.)

- He did not kiss Jane Doe, pull at her shorts, or fondle her. (*See id.* at 166:19–167:7; Doc. 1–2, PageID #192.) Hunt admitted in his deposition this also was not true. (*See* **Exhibit 2**, Hunt Depo. at 216:22–217:4; 218:16–18.)

Hunt confirmed that he answered "absolutely not" to Guidepost when asked whether he had any physical contact with Jane Doe, (*see id.* at 139:19–25; 141:19–22; 142:24–143:5), and he admitted that he told Guidepost that he had "no contact whatsoever" with her. (*See id.* at 166:12–

12

15; Doc. 1–2, PageID #192.) Hunt now acknowledges that these statements were false because he "did have physical contact" with Jane Doe. (*See* **Exhibit 2**, Hunt Depo. at 143:19–20.)

Under oath, Hunt also admitted in his deposition that the Report accurately reflects statements he made to Guidepost regarding events that occurred after the alleged encounter with Jane Doe. For example, he confirmed in his deposition that he told Guidepost that he contacted Blankenship not because there was a problem between Husband and Jane Doe but for general help with Husband's ministry. (*See id.* at 169:5–12; Doc. 1–2, PageID #193.) Hunt admitted in his deposition this statement to Guidepost was false. (*See* **Exhibit 2**, Hunt Depo. at 171:2–10.) He acknowledged that the Report's description of his statements regarding his meeting with Jane Doe, Husband, and Blankenship on August 2, 2010 were accurate. (*See id.* at 169:13–170:22; Doc. 1–2, PageID #193.) Hunt also admitted in his deposition these statements to Guidepost were not true. (*See* **Exhibit 2**, Hunt Depo. at 171:2–10.)

During his deposition, Hunt confirmed that the Report's statement that "Dr. Hunt said that [Jane Doe] had never come on to him and he never felt threatened by her" was "a true statement." (*See id.* at 176:10–13; Doc. 1–2, PageID #193.) Notably, this statement is unequivocally inconsistent with Hunt's account of the events as re-told in the Complaint, where he incredibly alleges *Jane Doe* "initiated" the "encounter[,]" which was "consensual[.]" (*See* Doc. 1, PageID #10, ¶ 53.) (*See also* **Exhibit 2**, Hunt Depo. at 277:10–20 (acknowledging that his recent characterization of the encounter is inconsistent with his statements to Guidepost).)

Finally, Hunt confirmed the accuracy of the Report's statements regarding his response to questions posed by the investigators at the end of the second interview, including about whether they should speak with anyone else about the matter and whether they should speak with Hunt's wife. (*See id.* at 178:9–22; Doc. 1–2, PageID #193–194.) At the end of the interview, the

investigators asked Hunt to contact them within the next 48 hours if he remembered any more details. (*See id.* at 268:2–12.) Hunt confirmed that he did not contact Guidepost following the interview and "wouldn't have contacted them if they had given [him] 96 hours." (*See id.* at 268:13–15.) Instead, Hunt confirmed in his deposition that he acted "perfectly" and would not have done anything different. (*See id.* at 55:3–5; 108:18–25.)

**(5)**      **Guidepost Submits the Report.**

Guidepost sent the final Report to the Task Force on May 15, 2022. (*See* **Exhibit 7**, Holske Depo. at 46:2–3. *See also* **Exhibit 5**, Kilpatrick Depo. at 84:19–85:2; 85:14–17.) The 288-page Report mentioned Hunt in the context of providing historical background on the SBC, (*see* Doc. 1–2, PageID #54, 98–99), and in a discussion of Guidepost's investigation into and conclusions regarding the alleged abuse reported by Jane Doe. (*See* Doc. 1–2, PageID #182–94.)

**ii.**      **Hunt Immediately Changes His Story.**

Immediately after his second interview with Guidepost, Hunt changed his story. On May 13, 2022—one day after the second interview—Hunt abruptly resigned from his position at NAMB and admitted to a colleague that he "went into a condo with a lady that was not [his] wife and that [he] did touch her." (*See* **Exhibit 2**, Hunt Depo. at 106:3–107:5.) (*See also id.* at 226:3–8 (admitting that he told his NAMB colleague that he "had crossed a line and had gone into a room with another pastor's wife").) Of course, these admissions directly contradicted Hunt's statements to Guidepost that he had "no contact whatsoever" with Jane Doe (*see id.* at 166:12–15; Doc. 1–2, PageID #192), and that he was never in the same condo unit with her. (*See* **Exhibit 2**, Hunt Depo. at 165:9–14; Doc. 1–2, PageID #192.) Furthermore, Hunt made these statements to his NAMB colleague within 48 hours of his second interview, the period in which Guidepost had asked Hunt to contact them if he remembered additional details. (*See* **Exhibit 2**, Hunt Depo. at 268:2–12.)

14

However, Hunt did not contact Guidepost or provide the information that he shared with his NAMB colleague to the investigators. (*See id.* at 268:13–15.)

On May 27, 2022, after the Report's release, Hunt wrote a letter in which he admitted that he "wasn't . . . forthcoming with the [Guidepost] interviewers[,] (*See* **Exhibit 8**, "Dear First Baptist Woodstock Letter" from Hunt, p. 2. *See also* **Exhibit 2**, Hunt Depo. at 193:16–21.) In that letter, he confessed that he "chose to enter [Jane Doe's] condo" and had a "brief, but improper encounter" with "a woman who was not [his] wife." (*See* **Exhibit 8**, p. 1; **Exhibit 2**, Hunt Depo. at 188:19–190:16.)

While Hunt emphasizes that "never kissed [Jane Doe's] lips in [his] life," (*Id.* at 63:5–9), he now admits that he kissed her breasts, fondled her breasts, and pulled her pants down. (*See id.* at 66:2–13; 216:17–217:9; 218:5–18; 219:11–13; 219:16–19.) Notwithstanding these admissions, Hunt continues to deny that he committed "adultery" because he didn't have sexual intercourse with Jane Doe. (*See id.* at 57:5–9; 59:24–60:3; 119:17–18.) During his deposition, Hunt also simultaneously described the encounter with Jane Doe as a "consensual relationship" and claimed that he was "seduced" by her. (*See id.* at 143:10–13.) When he was asked by counsel for the EC during his deposition what he thought "would cause a woman that much younger than [him] to have this attraction to [him,]" Hunt shockingly responded to Ms. Nokes, "**I wish you could tell me that since you are a lady**." (*See id.* at 220:9–13 (emphasis added).)

## ARGUMENT

Three statements form the basis of Hunt's Complaint: (1) the Report; (2) the Letter; and (3) the Tweet. The EC will first demonstrate why it is entitled to summary judgment on all claims

concerning the Report. It will then explain why it is entitled to summary judgment on all claims arising from the Letter and the Tweet.[2]

1. <u>**No Genuine Issue of Material Fact Exists on Hunt's Defamation Claim Because Hunt Cannot Prove That the EC Acted with Actual Malice or, Alternatively, with Negligence.**</u>

Defamation requires a plaintiff to prove that: "(1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013). "[A] plaintiff must demonstrate some level of fault on the part of the defendant." *Evans v. Amcash Mortg. Co., Inc.*, No. 01A01-9608-CV-00386, 1997 WL 431187, at *3 (Tenn. Ct. App. Aug. 1, 1997). A public figure plaintiff must prove the statement was made "with 'actual malice'–that is, with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Hudik v. Fox News Network, LLC*, 512 F. Supp. 3d 816, 825 (M.D. Tenn. 2021) (citation omitted). A private figure plaintiff must prove that the defendant acted negligently. *Evans*, 1997 WL 431187, at *3 (citing *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 418 (Tenn. 1978)).

Hunt (by his own words) is a public figure. Accordingly, Hunt must prove that the EC acted with actual malice and made statements with the knowledge that they were false or with reckless disregard as to whether they were false or not. *See Hudik*, 512 F. Supp. 3d at 825. Because there is no genuine issue of material fact that the EC acted with actual malice, the EC is entitled to summary judgment. Alternatively, the EC is entitled to summary judgment even if the Court

---

[2] In its Memorandum granting in part and denying in part the Defendants' motions to dismiss, the Court applied Tennessee law to Hunt's claims. (*See* Doc. 150, PageID #2024–25.) Accordingly, the EC applies Tennessee law here.

16

determines that Hunt is not a public figure because the record contains no evidence that the EC acted negligently.

A. **Hunt Is a Public Figure.**

A public figure plaintiff may be either a general-purpose public figure or a limited public figure. *Thomas M. Cooley L. Sch. v. Kurzon Straus, LLP*, 759 F.3d 522, 527 (6th Cir. 2014). A general-purpose public figure is an individual who has "achieve[d] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). A limited purpose public figure is a public figure with respect to a limited range of issues, who achieves that status by voluntarily injecting himself into a particular public controversy. *See Cooley*, 759 F.3d at 527.

A two-step approach is used to determine whether an individual is a limited-purpose public figure. *Santoni v. Mueller*, No. 3:20-cv-00975, 2022 WL 97049 at *11, (M.D. Tenn. Jan. 10, 2022). First, the court must "determine whether there is a public controversy," which is defined as "a real dispute, the outcome of which affects the general public or some identifiable segment of the public in an appreciable way." *Id.* Second, the court must determine whether the plaintiff "has become so involved in the public controversy as to constitute a public figure via his involvement." *Id.* (citation omitted). Three factors are considered when determining the level of a plaintiff's involvement in a public controversy: (1) the voluntariness of his involvement; (2) the extent to which he had access to channels of communication to counteract false statements; and (3) the prominence of his role. *Id.*

The record demonstrates that Hunt is a general-purpose public figure in the relevant community—here, the Southern Baptist/evangelical community. *See Gertz*, 418 U.S. at 352 (noting that "clear evidence of general fame or notoriety *in the community*" is required for an individual to be deemed a general-purpose public figure) (emphasis added). *See also Waldbaum*

17

*v. Fairchild Pub., Inc.*, 627 F.2d 1287, 1295, n.22 (D.C. Cir. 1980) ("[N]ationwide fame is not required."). Hunt is a prominent pastor and former president of the SBC. His deposition testimony is replete with admissions underscoring his fame within the Southern Baptist community. (*See, e.g,* **Exhibit 2**, Hunt Depo. at 42:6–10 (acknowledging that "the average church-going Southern Baptist in Arkansas" would have known who he was).) *See generally* Section 1.B. of the Relevant Facts, *supra.* Deposition testimony from other witnesses further evidences Hunt's prominence within the denomination. (*See, e.g.,* **Exhibit 1**, Howe Depo. at 61:19–62:1; 64:2–17 (explaining that The Baptist Press routinely covered Hunt because events involving Hunt were deemed to be "of interest to Southern Baptists").) Accordingly, Hunt is a general-purpose public figure.

Even if he is not a general-purpose public figure, Hunt is at least a limited public figure with respect to the public controversy[3] concerning allegations of sexual abuse in the Southern Baptist denomination. Hunt was so involved in the public controversy as to constitute a public figure via his involvement.

The evidence conclusively demonstrates that the three factors used to evaluate whether Hunt was sufficiently involved in the controversy to become a limited purpose public figure are satisfied. Hunt has not even contested the second and third factors—and for good reason. Regarding the second factor, the facts clearly demonstrate that Hunt had access to channels of communication to counteract any allegedly false statements. Hunt was interviewed twice by Guidepost. (*See* Doc. 1–2, PageID #190.) During those interviews, Hunt had ample opportunity to provide his version of the events and counter any false statements. Guidepost even gave Hunt an additional 48 hours to provide the investigators with further details after the second interview

---

[3] This Court has already recognized that a public controversy exists here. (Doc. 150, PageID #2028.) ("The allegations in the complaint describe a public controversy.")

18

concluded. (*See* **Exhibit 2**, Hunt Depo. at 268:2–15.) Hunt did not take advantage of that opportunity (despite the fact that he shared a version of the events that directly contradicted the story he told Guidepost within that 48-hour period to his then-current employer). (*Id.* at 106:3–107:5.) In fact, Hunt admitted he had the opportunity to talk to Guidepost again but testified he "wouldn't have contacted them if they had given [him] 96 hours." (*See id.* at 268:13–15.) As for the third factor, Hunt emphasizes the prominence of his role in the controversy throughout his Complaint. (*See, e.g.,* Doc. 1 at PageID #2, ¶¶ 7–8) (alleging that Defendants used Hunt as their "scapegoat" in the sexual abuse controversy and noting that Hunt was "the first name mentioned in the report"). He therefore cannot dispute that he played a prominent role in the controversy.

While Hunt has contended that his involvement in the controversy was not voluntary, the evidence belies that assertion. Hunt admits he lied to Guidepost multiple times and that he denied having physical contact with Jane Doe. (*See, e.g.,* **Exhibit 2**, Hunt Depo. at 139:12–21; 141:19–22; 142:24–143:5; 143:19–20; 166:12–15.) His choices to lie and obfuscate prompted the need for, and undoubtedly led to, a more thorough treatment of the incident in the Report, particularly because Hunt was a former President of the SBC and former EC member. Had Hunt disclosed the facts regarding his encounter with Jane Doe—even his version of the facts—then the Report would have been different and may not have included Hunt at all. (*See* **Exhibit 5**, Kilpatrick Depo. at 303:1–304:10) (acknowledging that, if Guidepost had determined the encounter was consensual or even more likely than not to have been consensual, then it would have left the encounter out of the Report). However, by appearing before Guidepost as a prominent former President of the SBC and (unsuccessfully) attempting to cover up Jane Doe's allegations by telling Guidepost a multitude of lies, Hunt "injected himself" into the "vortex" of the sexual abuse controversy. *See*

19

*Cooley*, 759 F.3d at 527. (*See also* **Exhibit 5**, Kilpatrick Depo. at 303:1–304:10.) Hunt therefore is at least a limited purpose public figure in the instant public controversy.

        **B.**      **There is No Genuine Issue of Material Fact That the EC Acted with Actual Malice.**

As a public figure, Hunt must prove that the EC acted with actual malice in publishing the allegedly defamatory statements at issue. No genuine issue of material fact exists regarding whether Hunt can prove actual malice. It is abundantly clear that he cannot do so.

As an initial matter, the evidence amply demonstrates that the EC had absolutely no input regarding Guidepost's investigative process or responsibility for the contents of the Report. *See generally* Section 1.C.i. of the Relevant Facts, *supra.* It did not receive any portion of the Report prior to its publication, and it made no changes to the Report. (*See* **Exhibit 4**, Tongring Depo. at 240:7–16; 259:13–18; **Exhibit 1**, Howe Depo. at 225:13–226:9; 226:17–21; 227:8–15; 238:13–23; 252:14–19; 269:3–6.) In fact, Guidepost explicitly prohibited the EC from editing the Report prior to its public release (*see* Doc. 1–1 at PageID #24, § 3.6.), and it expressly agreed that the EC could not adopt or claim ownership of Guidepost's work product. (*See id.* at PageID #25, § 3.7.) Accordingly, no issue of material fact exists as to whether the contents of the Report, including the statements at issue, can be attributed to the EC.

Additionally, Guidepost took numerous steps to ensure the thoroughness of its investigation and the accuracy of the allegations published in the Report. (*See, e.g.,* Doc. 1–2, PageID #51) (describing Guidepost's document requests, document review, outreach to relevant witnesses, and in-depth interviews with relevant witnesses). With respect to the allegations concerning Hunt specifically, Guidepost interviewed Jane Doe and Husband on multiple occasions, interviewed Hunt on two occasions, spoke to numerous witnesses, and examined Husband's contemporaneous electronic journals and recordings. (*See* Doc. 1–2, PageID #182–94.)

20

The EC indisputably did not act with actual malice in relying on Guidepost's investigation when publishing the Report. The Supreme Court has held that, when the applicable standard of fault is actual malice, a "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 688 (1989). *See also Winslow v. Saltsman*, No. M2014–00574–COA–R3–CV, 2015 WL 6330403 (Tenn. Ct. App. Oct. 21, 2015) ("Failing to investigate information provided by others before publishing it, even when a reasonably prudent person would have done so, is not sufficient by itself to establish reckless disregard.") (citation omitted). Instead, the publisher must have a "high degree of awareness of . . . probable falsity" to be deemed to have acted with actual malice. *Gertz*, 418 U.S. at 332 (citation omitted). Hunt cannot demonstrate that the EC had *any* awareness that the allegations at issue were highly likely to be false. Accordingly, the EC's publication of the Report without independently investigating the allegations set forth therein cannot constitute actual malice as a matter of law.

Tennessee law confirms that no genuine issue of material fact exists regarding whether the EC acted with actual malice in publishing the allegedly defamatory statements. For example, the Court of Appeals in *Evans* applied the negligence standard and found that the defendant employer did not act negligently by relying solely on its attorney's investigation when evaluating the truthfulness of sexual harassment allegations against the plaintiff employee. In stark contrast to the comprehensive investigation undertaken by Guidepost, the attorney's investigation consisted solely of an interview with the victim. 1997 WL 431187 at *2. Neither the attorney nor the defendant interviewed the plaintiff or even informed the plaintiff of the allegations against him prior to his termination. *Id.* Nevertheless, the court concluded that the defendant "acted reasonably in relying upon its attorneys' judgment that [the victim's] allegations were sincere and true" and

concluded that the trial court erred in denying defendant's motion for summary judgment on plaintiff's defamation claim. *Id.* at *4. Because the *Evans* defendant's reasonable reliance on its attorney's observations and conclusions was sufficient for the court to determine that the defendant had not acted *negligently* at the summary judgment stage, it is abundantly clear that the EC cannot be found to have acted with actual malice in relying on Guidepost's comprehensive independent investigation here, particularly since the EC was *required* to publish the Report per the Messengers' mandate. (*See* **Exhibit 1**, Howe Depo. at 314:16–20; 321:18–21.)

The Report accurately reflects *exactly* what Hunt told Guidepost (which Hunt now admits was not truthful), and it also sets forth Jane Doe's account of her encounter with Hunt. If Hunt had been forthcoming with Guidepost and admitted to the version of events that he now claims is the truth—a "consensual" encounter with Jane Doe—then Guidepost undoubtedly would have interviewed Jane Doe again and ultimately would have published a different Report. (*See* **Exhibit 5**, Kilpatrick Depo. at 303:1–304:10.) Hunt cannot create any genuine issue of material fact that the EC acted with actual malice—that is, with knowledge of the challenged statements' falsity or with reckless disregard for the truth—when he intentionally impeded Guidepost's investigative procedures by lying repeatedly and thereby prevented Guidepost from discovering Hunt's version(s) of the truth.

### C.     Alternatively, There is No Evidence the EC Acted Negligently.

Alternatively, even if the Court determines that Hunt is not a public figure, the EC still is entitled to summary judgment because Hunt cannot prove that the EC acted negligently. *See Pate v. Serv. Merch. Co., Inc.*, 959 S.W.2d 569, 574 (Tenn. Ct. App. 1996) ("[D]efamation is not a strict liability tort. To prevail in a defamation cause of action, the plaintiff must also show some level of fault on the part of the defendant."). For defamation suits involving private, non-public figures,

that standard is negligence. *See Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). As the Tennessee Supreme Court has stated:

> In determining the issue of liability, the conduct of the defendant is measured against what a reasonably prudent person would, or would not, have done under the same or similar circumstances. . . . In our opinion, the appropriate question to be determined from a preponderance of the evidence is whether the defendant exercised reasonable case and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it.

*Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 418 (Tenn. 1978).

It is not uncommon for the absence of negligence to be determined as a matter of law at the summary judgment stage in a defamation action. As noted, in *Evans*, the Court of Appeals determined that the defendant employer "exercised reasonable care and caution in investigating the veracity of [the victim's] allegations of sexual harassment against Plaintiff" employee where the defendant relied solely on an investigation conducted by its attorney when evaluating the truthfulness of the allegations. 1997 WL 431187 at *4. It therefore found that "an essential element of Plaintiff's defamation claim fails" and reversed the trial court's order denying defendant's motion for summary judgment. *Id.* Similarly, in *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868 (Minn. 2019), the Minnesota Supreme Court affirmed a decision granting summary judgment to defendant non-profit victim-advocacy organization on a defamation claim after determining that defendant was not negligent in failing to investigate claims made by plaintiff's ex-wife before publishing allegedly defamatory statements identifying the ex-wife as a victim of domestic violence. The court noted:

> [b]eyond mere assertions that [defendant] had a duty to investigate, [plaintiff] has not offered any evidence to create an issue for trial. Specifically, he has not offered proof that a reasonable person in the circumstances here would have investigated [the ex-wife's] statements or that the relevant customs and practices of non-profit, victim-

23

>
> advocacy organizations are to investigate the accuracy of statements
> made by a person who sought services from that organization.

*Id.* at 883–84. *See also Pate*, 959 S.W.2d at 575 (affirming summary judgment in favor of defendants on defamation claim because "defendants exercised reasonable care and caution").

These cases demonstrate that Hunt has no evidence that the EC acted negligently in relying on Guidepost's investigation and conclusions. The numerous steps that Guidepost took to ensure that it conducted a thorough independent investigation are detailed in Section 1.C.i. of the Relevant Facts, *supra*. Given the exhaustive nature of Guidepost's investigation and Hunt's admitted lies to Guidepost during that process, the evidence regarding the absence of negligence here is even stronger than in *Evans*. The defendant's attorney in *Evans* only interviewed the victim regarding her sexual harassment allegations and did not even speak with the plaintiff, who was the alleged perpetrator of the harassment. 1997 WL 431187, at *2. In contrast, Guidepost interviewed Jane Doe and Husband on multiple occasions, interviewed Hunt on two occasions, spoke to numerous witnesses, and examined Husband's contemporaneous electronic journals and recordings. (*See* Doc. 1–2, PageID #182–94.) Since the *Evans* defendant was found to have "exercised reasonable care and caution in investigating the veracity of [the victim's] allegations of sexual harassment against Plaintiff[,]" 1997 WL 431187, at *4, it is indisputable that the EC acted as a reasonably prudent person would in relying on Guidepost's findings and conclusions prior to publishing the Report.

Regardless of whether the actual malice or negligence standard applies, Hunt cannot create a genuine issue of material fact on an essential element of his defamation claim. Accordingly, the EC is entitled to summary judgment.

24

**2.** **No Genuine Issue of Material Fact Exists on Hunt's False Light Claim Because Hunt Has No Evidence That the EC Acted with Actual Malice.**

The elements of false light invasion of privacy are: "(1) publicity, (2) that places the plaintiff in a false light, (3) that is 'highly offensive to a reasonable person,' and (4) that the defendant knew of or acted with reckless disregard to the 'falsity of the publicized matter and the false light in which the other would be placed.'" *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 601 (6th Cir. 2013) (quoting *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 643-44 (Tenn. 2001)). "[A]ctual malice is the appropriate standard for false light claims when the plaintiff is a . . . . public figure, or when the claim is asserted by a private individual about a matter of public concern." *West*, 53 S.W.3d at 647.

For the reasons set forth in Section 1.A. of the Argument *supra*, Hunt is a public figure. Even if he is deemed to be a private figure, the public controversy concerning allegations of sexual abuse in the Southern Baptist denomination is undeniably "a matter of public concern." *Id. See also Snyder v. Phelps*, 562 U.S. 443, 454 (2011) (identifying "scandals involving the Catholic clergy" as an example of a "matter[] of public import"). Hunt therefore must prove that the EC acted with actual malice in publishing the allegedly defamatory statements. He cannot do that for the reasons set forth in Section 1.B. of the Argument *supra*. Accordingly, the EC is entitled to summary judgment on Hunt's false light claim.

**3.** **The EC Is Entitled to Summary Judgment on Hunt's Claim for Intentional Infliction of Emotional Distress.**

To recover for intentional infliction of emotional distress ("IIED"), Hunt must prove that the EC's "conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury" to him. *Lemon v. Williamson Cnty. Sch.*, 618 S.W.3d 1, 21 (Tenn. 2021) (quoting *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012)). Additionally, because Hunt is a public figure, he must prove that the EC acted with

25

actual malice in publishing the Report. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988).

The EC is entitled to summary judgment on Hunt's IIED claim for several reasons. First, Hunt cannot establish that the EC acted with actual malice for the reasons set forth in Part 1.B. of the Argument *supra*. Second, there is no evidence that the EC's publication of the report was "so outrageous that it is not tolerated by civilized society[.]" *Lemon*, 618 S.W.3d at 21. For conduct to be outrageous, it must be "so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Bain v. Wells*, 936 S.W.2d 618, 623 (Tenn. 1997). This is an "exacting standard" and "not an easy burden to meet." *Lane v. Becker*, 334 S.W.3d 756, 762-63 (Tenn. Ct. App. 2010). It is indisputably clear that Hunt cannot meet that exacting standard and that the EC's publication of the Report was not outrageous conduct. *See, e.g., White v. Manchester Enter., Inc.*, 871 F.Supp. 934, 939 (E.D. Ky. 1994) (concluding that defendants' publication of false statements that were embarrassing to plaintiff and damaging to her reputation did "not constitute extreme and outrageous behavior"). Finally, there is absolutely no evidence that Hunt has suffered serious mental injury. Hunt has not sought treatment from any medical doctors for his alleged emotional distress, has received no diagnosis, and takes no medication to alleviate his emotional distress. (*See* **Exhibit 2**, Hunt Depo. at 256:6–10; 258:2–5; 258:12–17; *See also* **Exhibit 9**, Hunt's Responses to Guidepost's First Set of Interrogatories, #14.) For these reasons, the EC is entitled to summary judgment on the IIED claim.

**4.** **The EC Is Entitled to Summary Judgment on Hunt's Claim for Negligent Infliction of Emotional Distress.**

The elements of a claim for negligent infliction of emotional distress ("NIED") are: (i) duty; (ii) breach; (iii) injury or loss; (iv) causation in fact; (v) proximate cause; and (iv) serious or

severe emotional injury caused by defendant's negligence. *Doe 1 v. Woodland Presbyterian*, 661 S.W.3d 87, 109-10 (Tenn. Ct. App. 2022). A plaintiff must "support his or her serious or severe injury with expert medical or scientific proof." *Marla H. v. Knox Cnty.*, 361 S.W.3d 518, 529 (Tenn. Ct. App. 2011).

The EC is entitled to summary judgment on Hunt's NIED claim for multiple reasons. First, Hunt cannot show that the EC owed him any duty or that it breached any duty in publishing the Report. Additionally, there is absolutely no evidence that Hunt suffered a serious or severe emotional injury, let alone one caused by the EC's negligence. Hunt has not sought treatment from any medical doctors for his alleged emotional distress, has received no diagnosis, and takes no medication to alleviate his emotional distress. (*See* **Exhibit 2**, Hunt Depo. at 256:6–10; 258:2–5; 258:12–17; **Exhibit 9**, Hunt's Responses to Guidepost's First Set of Interrogatories, #14.) Furthermore, given that Hunt has not even sought treatment from a medical doctor or received a diagnosis, it is abundantly clear that he cannot offer "expert medical or scientific proof" of his alleged injury. *Marla H.*, 361 S.W.3d at 529. Nor has Hunt identified any such expert, only designating experts to support his economic damage claims. Accordingly, the Court should grant summary judgment on Hunt's NIED claim.

5. **The EC Is Entitled to Summary Judgment on Hunt's Public Disclosure of Embarrassing Private Facts Claim.**

To establish a claim for the tort of public disclosure of embarrassing private facts, Hunt must show that the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public. *See Scarborough v. Brown Grp., Inc.*, 935 F. Supp. 954, 964 (W.D. Tenn. 1995). In contrast to defamation, this tort gives a cause of action "for publicity given to *true* statements of fact." Restatement (Second) of Torts § 652D Special Note (Am. L. Inst. 1977) (emphasis added). The Tennessee Supreme Court has never

27

officially recognized this tort, nor should this Court. *See Rutherford v. First Tenn. Bank Nat. Ass'n*, No. 3:08-CV-19, 2008 WL 3307203, at *6 (E.D. Tenn. Aug. 7, 2008).

Assuming, however, this Court is willing to recognize this claim, the EC is entitled to summary judgment because the matters discussed in the Report, including all of the allegations against Hunt, are undeniably matters of legitimate public concern. As Hunt readily admitted in his Complaint, the revelations of sexual abuse within the SBC created a "public relations nightmare" and a high-profile public scandal. (*See* Doc. 1, PageID #6, ¶¶30–33.) Guidepost's investigation and reporting on sexual abuse within the SBC, including its reporting on Jane Doe's allegations against Hunt, therefore must be categorized as reporting on a matter of public concern. *See Snyder*, 562 U.S. at 454 (identifying "scandals involving the Catholic clergy" as an example of a "matter[] of public import").

Even under Hunt's admitted version of the events, there is nothing actionable about a public report of an extramarital sexual encounter by a prominent pastor and a former leader of the SBC whose sermons and publications happen to focus on topics of religion and morality and reached large audiences across the nation. Given his position, even his version of a sexual encounter with Jane Doe is of legitimate concern to the public. *See, e.g., Doe v. Word of Life Fellowship, Inc.*, No. 11-40077-TSH, 2011 WL 2968912, at *2 (D. Mass. July 18, 2011) (concluding that defendant's "former employment and leadership role in a religious organization" made him "of public interest" in case involving alleged sexual abuse in the religious organization).

While the contents of the Report may be embarrassing to Hunt, there is no genuine issue of material fact as to whether they are of public interest. Accordingly, the EC is entitled to summary judgment on Hunt's claim for public disclosure of embarrassing private facts.

28

**6.**     <u>The EC Is Entitled to Summary Judgment on All Claims Arising from the Letter.</u>

    **A.**     **The Ecclesiastical Abstention Doctrine Prohibits the Court from Adjudicating Claims Arising from the Letter.**

As an initial matter, the EC is entitled to summary judgment on any claims arising from the Letter because the ecclesiastical abstention doctrine prohibits the Court from adjudicating those claims. The ecclesiastical abstention doctrine "preclude[s] a civil court from exercising jurisdiction over ecclesiastical matters[.]" *House of God v. Campbell*, No. 3:06-cv-0066, 2008 WL 701585, at *3 (M.D. Tenn. Mar. 13, 2008). It applies where a court would be required to consider disputes involving "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to standard of morals required of them." *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 714 (1976). The purpose of the doctrine is to give religious organizations "an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Campbell*, 2008 WL 701585, at *4.

The Letter—a communication from the SBC Credentials Committee to Hiland Park Baptist Church ("Hiland Park") in Panama City, Florida, where Hunt preached after the publication of the Report—concerns matters of church governance and therefore squarely implicates the ecclesiastical abstention doctrine. (Doc. 1–4.) (*See also* **Exhibit 10**, Deposition of Bart Barber ("Barber Depo.") at 180:18–24.) In the Letter, the Credentials Committee informed Hiland Park that it had been asked to determine whether Hiland Park was in "friendly cooperation" with the SBC and specifically whether Hiland Park had acted "in a manner that is consistent with the Convention's beliefs regarding sexual abuse." (Doc. 1–4, PageID #323.) (*See also* **Exhibit 10**, Barber Depo. at 180:18–182:12; 183:3–185:12; 189:20–191:23.) The Letter stated that the Credentials Committee had received information that "raises a concern that Hiland Park Baptist

29

Church may be acting in a way that is inconsistent with the Convention's beliefs regarding sexual abuse due to the church platforming Johnny Hunt, an individual who has been credibly accused of sexual abuse, according to the standards adopted by the Convention." (Doc. 1–4, PageID #323.) It requested information from Hiland Park to assist it in determining whether Hiland Park continues to be in "friendly cooperation."[4] (Doc. 1–4, PageID #323–24.)

Hunt claims that the Letter's characterization of him as "an individual who has been credibly accused of sexual assault, according to the standards adopted by the Convention" is defamatory. (Doc. 1, PageID #15–16, ¶ 73–76 (quoting Doc. 1–4)). Setting aside the fact that the quoted language merely summarizes information received by the Credentials Committee (*see* **Exhibit 10**, Barber Depo. at 184:5–185:12), it also indisputably relates to a matter of church governance—namely, whether Hiland Park's behavior was consistent with SBC beliefs and whether Hiland Park was in friendly cooperation with the SBC. It also clearly concerns "the conformity of the members of the church to the standard of morals required of them." *Milivojevich*, 426 U.S. at 714. The latter point is underscored by the Letter's framing of the inquiry as concerning whether Hiland Park "may be acting in a way that is inconsistent with the Convention's beliefs regarding sexual abuse" and its reference to "the standards adopted by the Convention." (Doc. 1–4, PageID #323.)

Hunt's admissions in his Complaint alone disqualify him from serving as a pastor according to Baptist theology. (*See* **Exhibit 10**, Barber Depo. at 104:15–105:9; 106:13–108:5;

---

[4] To be in "friendly cooperation" with the SBC, a church must: (1) have a faith and practice which closely identifies with the SBC's adopted statement of faith; (2) formally approve its intention to cooperate with the SBC; (3) make financial contributions through the Cooperative Program [to] the SBC's Executive Committee for Convention causes or any other Convention entity during the fiscal year proceeding; (4) not act in a manner inconsistent with the Convention's beliefs regarding sexual abuse; and (5) not act to affirm, approve, or endorse discriminatory behavior on the basis of ethnicity. (Doc. 1–2, PageID #63–64.)

114:24–115:5; 122:22–128:24; 142:15–148:10; 194:5–198:23.) Judicial review of the SBC's and Credentials Committee's efforts to investigate a cooperating church's continued "platforming" of a Biblically disqualified pastor impermissibly interferes with these religious organizations' ability to regulate the character and conduct of their leaders. *See In re Diocese of Lubbock*, 624 S.W.3d 506, 516 (Tex. 2021). Accordingly, this Court should grant summary judgment on all claims related to the Letter.

**B.    The EC Bears No Responsibility for the Letter.**

Even if the ecclesiastical abstention doctrine did not apply, the EC still would be entitled to summary judgment on claims arising from the Letter. Hunt does not allege—nor can he prove—that the EC published the Letter or otherwise bears any responsibility for the Letter. It is undisputed that the Letter was written and sent by the Credentials Committee, which is a committee of the SBC (*see* **Exhibit 10**, Barber Depo. at 182:4–12)—and not by the EC.

Each count of the Complaint requires Hunt to allege specific conduct by the EC. *See Finley v. Kelly*, 384 F. Supp. 3d 898, 906 (M.D. Tenn. 2019) (defamation requires a party to have "published a statement"); *S.E. v. Chmerkovskiy*, 221 F. Supp. 3d 980, 985 (M.D. Tenn. 2016) (false light invasion of privacy requires that the EC "gave publicity to [Hunt] that places [him] in a false light"); *Bain v. Wells*, 936 S.W. 2d 618, 622 (Tenn. 1997) (emotional distress requires that the EC engaged in certain conduct); *Jackson & Assocs., Ltd. v. Christl*, No. 01A019103CV0081, 1991 WL 155687, at *3 (Tenn. Ct. App. Aug. 16, 1991) (public disclosure of private facts requires the EC "gave publicity to a matter concerning [Hunt's] private life."). Because the EC indisputably did not engage in any of the requisite conduct—or any conduct at all—in connection with the Letter, it is entitled to summary judgment on any claims arising from the Letter. *See, e.g., Robison v. Watson*, Case No. 2010-211, 2012 WL 4217050, at *8 (E.D. Ky. Sept. 19, 2012) (granting summary judgment in favor of defendant on defamation and false light invasion of privacy claims

31

where there was "no evidence" that defendant published allegedly defamatory press release and it was "undisputed" that her colleague published it).

### C. Hunt Cannot Prove Essential Elements of Each of His Substantive Claims With Respect to the Letter.

Even if the Letter could somehow be attributed to the EC, summary judgment on each of Hunt's substantive claims arising from the Letter still would be warranted because Hunt cannot prove essential elements of each of those claims. First, Hunt cannot prove that anything about the letter is false, as is required for defamation and false light claims. The Letter simply stated that the Credentials Committee received certain information, summarized that information, and requested that Hiland Park respond to its inquiry. (*See* **Exhibit 10**, Barber Depo. at 184:5–185:12) (explaining that the Letter stated "the nature of the concern that was raised in the complaint or in the submission that came to" the Credentials Committee). Second, Hunt also cannot prove that the EC acted with actual malice or negligence in connection with the Letter, so a second essential element of his defamation and false light claims fails. Third, there is absolutely no evidence that the Letter caused Hunt to suffer serious mental injury, as is required to prove his emotional distress claims. Fourth, Hunt's public disclosure claim fails because the Letter, which was sent to a single church, did not constitute a public disclosure. *See Finley v. Kelly*, 384 F. Supp. 3d 898, 909 (M.D. Tenn. 2019) ("[C]ommunication to a single individual or to a small group of people . . . will not give rise to liability[.]") (citations and quotation marks omitted). Fifth, the public disclosure claim also fails because the matter discussed in the Letter is a matter of legitimate public concern.

### 7. The EC Is Entitled to Summary Judgment on Any Claims Arising from the Tweet.

### A. The EC Bears No Responsibility for the Tweet.

The EC also is entitled to summary judgment on any claims arising from the Tweet. Hunt does not claim—nor can he prove—that the EC published or had any responsibility for the Tweet.

32

Instead, Hunt acknowledges that Bart Barber published the Tweet from his personal Twitter account while he was president of the SBC. (Doc. 1, PageID #15, ¶ 70; Doc. 1–3, PageID #322). The statements in the Tweet are only attributable to Barber himself. Even assuming that the Tweet could be attributed to the SBC, it still could not be attributed to the EC, which is a separate entity.

As noted in Section 6 of the Argument *supra*, each count of the Complaint requires Hunt to allege specific conduct by the EC. Because the EC indisputably did not engage in any of the requisite conduct—or any conduct at all—in connection with the Tweet, it is entitled to summary judgment on any claims arising from the Tweet. *See, e.g., Robison*, 2012 WL 4217050, at *8.

**B.    Hunt Cannot Prove Essential Elements of Each of His Substantive Claims With Respect to the Tweet.**

Summary judgment on each of Hunt's substantive claims arising from the Tweet still would be warranted even if the Tweet somehow could be attributed to the EC. First, there is no issue of material fact that the EC acted with either actual malice or negligence in connection with the Tweet, as is required for defamation or false light claims. Second, there is absolutely no evidence that the Tweet caused Hunt to suffer serious mental injury, as is required to prove his emotional distress claims. Third, Hunt's public disclosure claim fails because the Tweet discussed a matter of legitimate public concern.

**8.    <u>Hunt Has No Evidence to Support His Damages Claim.</u>**

Finally, because it is clear from the record that Hunt cannot present evidence to support various components of his $100 million damages claim (*see* Doc. 110–9, PageID #1487–88), the EC is entitled to summary judgment declaring those damages to be unrecoverable.

First, Hunt cannot include lost income that would have been paid to Johnny Hunt Ministries ("JHM") in his damages claim, including—but not limited to—lost income from book sales (alleged to be not less than $3,960,000) and lost income from speaking engagements (alleged to

33

be not less than $3,850,000). (*See* Doc. 110–9, PageID #1487.) JHM is a public charity that was founded in 2010 for the purpose of propagating the gospel. (*See* **Exhibit 11**, 30(b)(6) Deposition of Janet Hunt ("JHM Depo.") at 12:22–24; 14:3–13; 15:6–7.) It is undisputed that, until recently, all income from Hunt's speaking engagements, book deals, and conferences was income to JHM, not Hunt individually. (*See id.* at 22:6–11; 31:11–23; 44:16–25.) (*See also* **Exhibit 2**, Hunt Depo. at 265:19–22; 266:21–267:7) (confirming that Hunt's canceled book deals were deals with JHM). It also is undisputed that Hunt has never received income from JHM, ██████████████ ████████ (*See* **Exhibit 11**, JHM Depo. at 28:2–15; 33:12–16.) Even if Hunt had requested income from JHM, it is unlikely that it would have paid to him because any such request would have had to be authorized by JHM's board, and such authorization was "not very likely" to occur. (*See id.* at 35:22–36:6; 37:11–38:7.) Instead, all income from JHM was deposited into an account to be used to fund mission work. (*See* **Exhibit 2**, Hunt Depo. at 84:2–7; **Exhibit 11**, JHM Depo. at 28:16–24.) Revenue from Hunt's book sales and speaking engagements continued to be deposited into JHM's account until as recently as five weeks before Hunt's April 18, 2024 deposition. (*See id.* at 85:21–86:13.) Because these categories of income would have been income to JHM and not to Hunt individually, they are not recoverable as damages in this action.

Second, Hunt's $30-45 million emotional distress damages claim is totally unsupported. (*See* Doc. 110–9, PageID #1487–88.) As noted in Sections 3 and 4 of the Argument *supra*, Hunt has not shown that he suffered compensable emotional distress at all. He has not sought treatment from any medical doctors for his alleged emotional distress, he has received no diagnosis, and he takes no medication to alleviate his emotional distress. (*See* **Exhibit 2**, Hunt Depo. at 256:6–10; 258:2–5; 258:12–17; **Exhibit 9**, Hunt's Responses to Guidepost's First Set of Interrogatories, #14). During his deposition, Hunt even admitted that his emotional distress damages claim is "just an

estimation" that was based only on his "attorney's many, many years of being a trial lawyer" and that he has "no idea" what his losses are. (*See* **Exhibit 2**, Hunt Depo. at 255:14–256:4; 260:19–261:23.) Hunt should not be permitted to recover such speculative damages for emotional distress when he admits that he has no evidence to support them.

<u>**CONCLUSION**</u>

For the foregoing reasons, the EC respectfully requests that the Court enter summary judgment against Hunt on each of the claims alleged against the EC.

Respectfully submitted,

/s/ R. Brandon Bundren
E. Todd Presnell (BPR #17521)
Scarlett Singleton Nokes (BPR #28994)
R. Brandon Bundren (BPR #30985)
BRADLEY ARANT BOULT CUMMINGS LLP
1221 Broadway, Suite 2400
Nashville, Tennessee 37203
P: 615.252.2355
F: 615.252.6355
tpresnell@bradley.com
snokes@bradley.com
bbundren@bradley.com

Gene R. Besen (*pro hac vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
Fountain Place
1445 Ross Ave., Suite 3600
Dallas, Texas 75202
P: 214.257.9800
F: 214.939.8787
gbesen@bradley.com

Thomas J. Hurney, Jr. (*pro hac vice*)
Gretchen M. Callas (*pro hac vice*)
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
P.O. Box 553
Charleston, West Virginia 25301
P. 304.340.1000
thurney@jacksonkelly.com
gcallas@jacksonkelly.com

*Attorneys for the Executive Committee of the Southern Baptist Convention*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 3, 2024, I electronically filed a true and correct copy of the Memorandum of Law in Support of the Executive Committee of the Southern Baptist Convention's Motion for Summary Judgment with the Clerk of Court for the U.S. District Court Middle District of Tennessee through the Court's Electronic Case Filing System, which will automatically serve all counsel of record listed below:

| | |
|---|---|
| Robert D. MacGill<br>Patrick J. Sanders<br>MacGill PC<br>156 E. Market Street, Suite 1200<br>Indianapolis, Indiana 46204<br>robert.macgill@macgilllaw.com<br>Patrick.sanders@macgilllaw.com<br><br>Todd G. Cole<br>Andrew Goldstein<br>Cole Law Group, P.C.<br>1648 Westgate Circle, Suite 301<br>Brentwood, Tennessee 37027<br>tcole@colelawgrouppc.com<br>agoldstein@colelawgrouppc.com<br><br>*Counsel for Plaintiff* | John R. Jacobson<br>Katherine R. Klein<br>Riley & Jacobson, PLC<br>1906 West End Avenue<br>Nashville, Tennessee 37203<br>jjacobson@rjfirm.com<br>kklein@rjfirm.com<br><br>Steven G. Mintz<br>Terence W. McCormick<br>Mintz & Gold LLP<br>600 Third Avenue, 25th Floor<br>New York, New York 10016<br>mintz@mintzandgold.com<br>mccormick@mintzandgold.com<br><br>*Counsel for Guidepost Solutions, LLC*<br><br>L. Gino Marchetti, Jr.<br>Matthew C. Pietsch<br>Taylor, Pique, Marchetti & Blair, PLLC<br>2908 Poston Avenue<br>Nashville, Tennessee 37203<br>gmarchetti@tpmblaw.com<br>matt@tpmblaw.com<br><br>*Counsel for Southern Baptist Convention* |

*/s/* R. Brandon Bundren
R. Brandon Bundren