**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JOHNNY M. HUNT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:23-cv-00243** |
| | ) | |
| **SOUTHERN BAPTIST CONVENTION; GUIDEPOST SOLUTIONS LLC; and EXECUTIVE COMMITTEE OF THE SOUTHERN BAPTIST CONVENTION,** | ) | **Judge Campbell**<br>**Magistrate Judge Frensley**<br>**Jury Demand** |
| | ) | |
| **Defendants.** | ) | |

---

**MEMORANDUM OF LAW IN SUPPORT OF RESPONSE IN OPPOSITION TO GUIDEPOST SOLUTIONS LLC'S MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**ARGUMENT** .......... **4**

**I. Pastor Johnny is not a public figure.** .......... **4**

**II. Pastor Johnny has presented admissible evidence upon which a jury could find Guidepost liable under either the negligence standard or actual malice standard.** .......... **4**

**A. There is a genuine dispute of material fact as to Guidepost's actual malice.** .......... 5

**B. Pastor Johnny has cited evidence from which a jury could find that Guidepost acted negligently.** .......... 22

**III. Guidepost agreed to produce a public report and must be held responsible.** .......... **22**

**A. Conditional privilege does not apply by the express terms of Guidepost's engagement letter.** .......... 23

**B. Even if conditional privilege did apply, Guidepost failed to act in good faith and Pastor Johnny has evidence of actual malice.** .......... 25

**IV. False Light** .......... **26**

**A. Pastor Johnny was placed in a false light and viewed as a sex criminal after Defendants' defamatory statements.** .......... 26

**B. Pastor Johnny does not need to show actual malice for his false light claim.** .......... 27

**C. Guidepost's arguments regarding publicity and common interest privilege should be rejected.** .......... 28

**V. Intentional Infliction of Emotional Distress** .......... **28**

**A. There is a genuine issue of material fact as to whether Guidepost's conduct was extreme and outrageous.** .......... 28

**B. Pastor Johnny has presented evidence of serious mental injury.** .......... 30

**C. Common interest privilege does not apply and Guidepost acted with Malice.** .......... 30

**VI. Negligent Infliction of Emotional Distress** .......... **31**

**A. Pastor Johnny has presented evidence of serious mental injury.** .......... 31

**B. There is fact dispute as to whether Guidepost breached its standard of care.** .......... 31

**VII. Public Disclosure of Private Facts** ........................................................................ **32**

**A. Tennessee courts have recognized and applied the tort of public disclosure of private facts.** ........................................................................................................ 32

**B. There is a genuine issue of material fact as to whether publication was highly offensive to a reasonable person and a private matter.** .................................................... 33

**VIII. .. Pastor Johnny is entitled to recover damages from his lost book deals, lost speaking engagements, and other ministry-related income.** ................................................ **33**

**CONCLUSION** ........................................................................................................ **34**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Addiction Ctrs., Inc. v. Nat'l Ass'n of Addiction Treatment Providers*,
515 F. Supp. 3d 820 (M.D. Tenn. 2021)....................................................................30

*Estate of Amos v. Vanderbilt Univ.*,
62 S.W.3d 133 (Tenn. 2001)....................................................................................35

*Atkins v. Parker*,
472 U.S. 115 (1985)................................................................................................12

*Battle v. A&E TV Networks*,
LLC, 837 F. Supp. 2d 767 (M.D. Tenn. 2011) ........................................................30

*Beard v. Akzona, Inc*,
517 F. Supp. 128 (E.D. Tenn. 1981)........................................................................36

*Biltcliffe v. Hailey's Harbor, Inc.*,
No. M2003-02408-COA-R3-CV, 2005 Tenn. App. LEXIS 676
(Tenn. Ct. App. Oct. 27, 2005) ................................................................................26

*Bohler v. City of Fairview*,
No. 3:17-cv-1373, 2018 U.S. Dist. LEXIS 188978
(M.D. Tenn. Nov. 5, 2018) ......................................................................................30

*Chonich v. Wayne Cty. Cmty. Coll.*,
874 F.2d 359 (6th Cir. 1989) ...................................................................................29

*Clark v. Walt Disney Co.*,
642 F. Supp. 2d 775 (S.D. Ohio 2009) ....................................................................12

*Cobb v. Time, Inc.*,
278 F.3d 629 (6th Cir. 2002) .....................................................................................9

*Cottrell v. Smith.*,
788 S.E.2d 772 (Ga. 2016)......................................................................................37

*Davis v. Tennessean*,
83 S.W.3d 125 (Tenn. Ct. App. 2001) .......................................................................8

*g., Albert v. Mitchell*,
42 F. App'x 691 (6th Cir. 2002)...............................................................................31

*Goldwater v. Ginzburg*,
414 F.2d 324 (2d Cir. 1969)....................................................................................21

*Harte-Hanks Commc'ns v. Connaughton*,
491 U.S. 657 (1989) ........ 9

*Hibdon v. Grabowski*,
195 S.W.3d 48 (Tenn. Ct. App. 2005) ........ 26

*International Union v. Garner*,
601 F. Supp 187 (M.D. Tenn. 1985) ........ 36

*Jackson v. Williamson & Sons Funeral Home*,
No. E2010-02489-COA-R3-CV, 2011 Tenn. App. LEXIS 554
(Ct. App. Oct. 12, 2011) ........ 35

*Lindberg v. Dow Jones & Co.*,
No. 20-cv-8231 (LAX), 2021 U.S. Dist. LEXIS 151397
(S.D.N.Y. Aug. 11, 2021) ........ 31

*Masson v. New Yorker Magazine*,
501 U.S. 496 (1991) ........ 24

*McClay v. Airport Mgmt. Servs., LLC*,
596 S.W.3d 686 (Tenn. 2020) ........ 38

*Memphis Pub. Co. v. Nichols*,
569 S.W.2d 412 (Tenn. 1978) ........ 8, 26

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ........ 9

*Parr v. Middle Tennessee State Univ.*,
No. M1999-01442-COA-R3-CV, 1999 Tenn. App. LEXIS 803
(Tenn. Ct. App. Dec. 3, 1999) ........ 36

*Roberts v. Essex Microtel Assocs.*,
46 S.W.3d 205 (Tenn. Ct. App. 2000) ........ 36

*Rogers v. Louisville Land Co.*,
367 S.W.3d 196 (Tenn. 2012) ........ 34

*Secured Fin. Sols., LLC v. Winer*,
No. M2009-00885-COA-R3-CV, 2010 Tenn. App. LEXIS 70
(Ct. App. Jan. 28, 2010) ........ 28

*Simpson Strong-Tie Co. v. Stewart, Estes & Donnell*,
232 S.W.3d 18 (Tenn. 2007) ........ 30

*St. Amant v. Thompson*,
390 U.S. 727 (1968) ........ 9, 10, 14

*West v. Media Gen. Convergence, Inc.*,
53 S.W.3d 640 (Tenn. 2001) ....................................................................................31

**Statutes**

Fla. Stat. Ann. § 794.011 ..........................................................................................12

**Other Authorities**

Restatement (Second) of Torts § 652D ........................................................................28

Restatement (Second) of Torts § 577 ..........................................................................29

Restatement (Second) of Torts § 46 ............................................................................35

## INTRODUCTION

At the motion to dismiss stage, the Court viewed all factual inferences in favor of Pastor Johnny and found that he had alleged plausible claims for (1) defamation, (2) false light, (3) intentional infliction of emotional distress, (4) negligent infliction of emotional distress, and (5) public disclosure of private facts. Discovery confirmed the merits of each allegation.

February 2022, five months into Guidepost's engagement, the company had no allegations of sexual abuse involving an Executive Committee member to include in their multi-million-dollar Report. The company needed something. Then, Jane Doe's[1] Husband came forward with a story from 2010—a brief, consensual extramarital encounter between Jane Doe and Pastor Johnny. Guidepost's lead investigator texted his supervisor and expressed his excitement at the new-found story proclaiming: [redacted] Guidepost found their scapegoat. Guidepost found their "main story" of an "EC member committing abuse" for their Report.

In May 2022, Defendants released the Report to the world. The Report focused on the SBC's executive leadership's response to allegations of child abuse and other sex crimes. The cover page of the Report had a prominent warning to all readers:

> **WARNING**: This report includes information and descriptions related to sexual assault. This may be triggering to readers who have had similar experiences. We encourage you to care for your safety and well-being. The content of this report is not appropriate for children.

---

[1] The Parties stipulated that Pastor Johnny's accuser will "be referred to in all filings in this Court . . . [as Jane Doe] for reducing the Court's time related to redactions and sealing" Doc. No. 191 at ECF 2. Further, "Jane Doe, Plaintiff, and Defendants [] stipulate[d] and agree[d] that the use of Jane Doe does not create an inference of any kind or nature concerning the events at issue in this case." *Id.*

Guidepost defined the term "survivor" to mean "those persons who *actually suffered* at the hands of SBC clergy or SBC church staff or volunteers." Yet, the first name mentioned in the Report was not a child molester or convicted sexual abuser—it was Pastor Johnny.

Pastor Johnny is the only name in the section titled "Allegations of Abuse Committee by Executive Committee Members" in a Report professing to focus on child molesters and other abusers. Guidepost intentionally and maliciously created the false impression that Pastor Johnny was a sex criminal. Guidepost's lead investigator testified that Guidepost's intent was to create the impression and convey that Jane Doe survived a sexual assault. Other internal communications revealed that Guidepost's investigators were focused on creating an impact with the Pastor Johnny section of the Report. SBC President and Ex Officio Executive Committee Member Bart Barber read the Report and tweeted that Pastor Johnny had been accused of a "felony." Pastor Johnny received messages from individuals calling him a criminal. Guidepost succeeded.

The details of Jane Doe's encounter with Pastor Johnny, a brief encounter between two consenting adults, was a private matter. It was not abuse. It was not criminal. It should have never been published to the world, especially in a Report detailing instances of child molestation and other sex crimes. As a result of the Defendants' conduct, Pastor Johnny has suffered reputational, pecuniary, and emotional damages.

Now, Guidepost moves for summary judgment and asks the Court to dismiss the case with prejudice. The Court should deny Guidepost's Motion in its entirety. First, Guidepost argues that Pastor Johnny is a public figure, repeating the same arguments that the Court correctly rejected at the motion to dismiss stage. Pastor Johnny is neither the rare "general-purpose public figure" nor a "limited-purpose public figure" under applicable law. Second,

Guidepost contends that Pastor Johnny cannot show Guidepost acted with the necessary degree of fault. Regardless of the standard of care, Pastor Johnny has cited evidence that Guidepost acted negligently and with actual malice. Guidepost knew or was recklessly indifferent to the fact that that the allegations against Pastor Johnny did not amount to a sexual assault or a criminal act, deliberately avoided the truth of the allegations against Pastor Johnny, and ignored all reasons to doubt the veracity of Jane Doe and her Husband. Third, Guidepost attempts to avoid all liability by claiming they did not publish the Report and that any publication was protected by a common interest privilege. It is not. From the outset of Guidepost's engagement, the company understood they would be producing a public report that would be shared with the world in its entirety. And that is exactly what happened. The Guidepost Report stated that the "culmination of our engagement was the issuance of this public Report." Guidepost now claims they had nothing to do with publication and cannot be held liable for their own public Report. Guidepost should be held accountable for the information they decided to publish to the world.

As set forth below, Guidepost's remaining arguments fail to show there is no genuine issue of material fact.

**RESPONSES TO GUIDEPOST'S SEPARATE STATEMENTS OF FACTS**

Each Defendant presents separate statements of facts that they contend are undisputed. Virtually all of these facts, however, are in dispute. Pastor Johnny submits responses that controvert each Defendant's factual statements, along with record citations supporting the same. Local Rule 56.01(c). Pastor Johnny filed each factual response separately, and hereby incorporates each by reference.

## PASTOR JOHNNY'S STATEMENT OF FACTS

Defendants' separate factual statements also leave out evidence that bears on the issues they raise, and that undermines their conclusory assertions. Pastor Johnny therefore submits his own statement of facts relevant to Defendants' motions. Local Rule 56.01(c). Again, to keep his filings orderly and manageable, Pastor Johnny filed that statement separately, and hereby incorporates it by reference.

## ARGUMENT

### I. Pastor Johnny is not a public figure.

Guidepost attempts to invoke the actual malice standard arguing that Pastor Johnny is either (1) a "general-purpose public figure" who has achieved such pervasive fame or notoriety that he is a public figure for all purposes and in all contexts, or (2) a "limited-purpose public figure" who thrust himself to the forefront of a public controversy to influence the resolution of the issues involved. All three Defendants have made this argument. Pastor Johnny responded to this common argument in his Memorandum of Law in Support of his Response in Opposition to the EC and SBC's Motions for Summary Judgment and hereby incorporates his argument by reference.

### II. Pastor Johnny has presented admissible evidence upon which a jury could find Guidepost liable under either the negligence standard or actual malice standard.

In order to prevail on a defamation claim, a plaintiff must prove "that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Davis v. Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001). The applicable standard of fault depends on whether a plaintiff is considered a public or private figure. If a plaintiff is deemed a private figure, a negligence standard applies. *Memphis*

*Pub. Co. v. Nichols*, 569 S.W.2d 412, 418 (Tenn. 1978). If plaintiff is deemed a public figure, the actual malice standard applies. *Id.* at 417.

Regardless of the standard of fault, Pastor Johnny presented admissible evidence upon which a jury could find Guidepost liable under either the negligence standard or actual malice standard.

**A. There is a genuine dispute of material fact as to Guidepost's actual malice.**

A statement is made with actual malice when it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). "A 'reckless disregard for the truth' means that the defendant must have made the false publication with a high degree of awareness of . . . probable falsity." *Cobb v. Time, Inc.*, 278 F.3d 629, 637 (6th Cir. 2002) (internal quotations omitted). Reckless disregard "cannot be fully encompassed in one infallible definition" and "its outer limits will be marked out through case-by-case adjudication." *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968).

In a case involving the reporting of a third party's allegations, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* at 732. While the "failure to investigate will not alone support a finding of actual malice, . . . the purposeful avoidance of the truth is in a different category." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 692 (1989).

Moreover, self-serving assertions by a defendant that they published a statement believing it in good faith to be true does not shield them from liability. Courts have determined that "[p]rofessions of good faith will be unlikely to prove persuasive for example where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified

anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation." *St. Amant*, 390 U.S. at 732.

Here, there is, at a minimum, a genuine dispute of material fact as to Guidepost's actual malice. Pastor Johnny cited admissible evidence, which shows:

- Guidepost knew that the allegations against Pastor Johnny did not amount to a sexual assault or sex crime under applicable law.
- Guidepost disregarded obvious reasons to question the credibility of Jane Doe and her Husband (the "Couple").
- Guidepost deliberately ignored all evidence pointing to a consensual encounter.
- Guidepost intentionally altered the Couple's story to fit their desired narrative.

Pastor Johnny's cited record evidence confirms that Guidepost made a deliberate attempt to avoid the truth of the allegations against Pastor Johnny, all in an effort to create an explosive report with impact. Ex. 32. This is more than sufficient to allow the jury to determine that Guidepost acted with actual malice.

**1. Pastor Johnny's cited record evidence demonstrates that Guidepost knew, or was recklessly indifferent, to the fact that Pastor Johnny had not committed sexual assault or a crime under Florida law.**

Guidepost's Report does, and was intended to, accuse Pastor Johnny of committing sexual assault and being a sex criminal. Guidepost intentionally labeled Jane Doe a "Survivor" in the Report:

[redacted]

[redacted]

Ex. 1, Holske Dep. 238:18-239:1. The cover page of Guidepost's Report has a prominent warning to all readers: "This report includes information and descriptions related to sexual assault." Ex. 28, cover page. The first sentence of the Executive Summary states: "For almost two decades, survivors of abuse and other concerned Southern Baptists have been contacting the [SBC EC] to report child molesters and other abusers who were in the pulpit or employed as church staff." *Id.* at 3. The Report itself focuses on child molesters and sex criminals. *See, e.g., id.* at 7. (referring to a coach who had been "convicted of multiple counts of sexual assault against a minor."); *id.* at 147 (individual convicted of sex crimes against two minors). The Report defines the term "survivor" to mean "those persons who ***actually suffered*** at the hands of SBC clergy or SBC church staff or volunteers . . . ." *Id.* at 5 (emphasis added). A reasonable person reading the Report would understand that given the Report's context and its focus on child molesters and sex criminals, Guidepost was accusing Pastor Johnny of committing a sexual assault and a similar crime when they labeled the allegations against Pastor Johnny a "sexual assault."

Record evidence confirms that Guidepost achieved its goal of publicly identifying Pastor Johnny as having engaged in a sexual assault and having been accused of a sex crime. The contemporaneous Tweet of SBC President and Ex Officio Executive Committee Member Bart Barber stated that Pastor Johnny had been accused of a felony. Ex. 51. Other contemporaneous record evidence confirms this intentional impression created by the Report. Pastor Johnny received messages from individuals who read the report and viewed it as accusing him of a sex crime. Hunt Decl. Ex. A ("Really looking forward to Johnny Hunt's next book; how to commit crimes and get away with it."); Hunt Decl. Ex. B ("Having just read the independent investigation report of sexual abuse within the SBC, and specifically, your heinous sexual assault

of a young married woman. . . ."); Hunt Decl. Ex. C ("You will pay for your crimes."). Guidepost's own briefing to the Court admitted that it accused Pastor Johnny committing a sex crime in the Report: "Guidepost authored a report that ***identified Hunt as one of many sexual offenders***." Doc. No. 27 at ECF 2 (emphasis added).[2]

As noted, Guidepost deliberately created the impression Pastor Johnny had been accused of committing a sexual assault and a sex crime. However, the specific factual allegations against Pastor Johnny contained in the Report, *even if true*, would not amount to a sexual assault or a crime under Florida law, the location of the alleged "assault." Sexual abuse crimes in Florida are enumerated broadly as "sexual battery," which is defined as "oral, anal, or female genital penetration by, or union with, the sexual organ of another or the anal or female genital penetration of another by any other object." Fla. Stat. Ann. § 794.011. The Report contains no details of "oral, anal, or female genital penetration," no "union with" the "sexual organ" of another, and no "female genital penetration of another by any other object." *See* Ex. 28 (Report) at 149-161. The intentional impression Guidepost created that Pastor Johnny had been accused of a sexual assault and a sex crime was unequivocally false. Fundamentally, all of the Defendants are "presumptively charged with knowledge of the law." *Atkins v. Parker,* 472 U.S. 115, 130 (1985). Guidepost's recklessness was confirmed when Ms. Kilpatrick (one of Guidepost's lead investigators) confirmed that Guidepost "did not base the definition [of sexual assault] on a

---

[2] A "sex offender" is "a person who has been convicted of a crime involving sex." *Sex offender*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/sex%20offender[https://perma.cc/69EA-8AMF] (last visited July 29, 2024).

Federal Rule of Evidence 201 "permits the Court to take judicial notice, at any stage of proceedings, of a fact . . . 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Clark v. Walt Disney Co.*, 642 F. Supp. 2d 775, 782 (S.D. Ohio 2009) (quoting Fed. R. Evid. 201). A dictionary is one of those sources. *Id.*

particular jurisdiction's law" and that "a sexual assault is a pretty good generally definition" to what Jane Doe described. Ex. 2, Kilpatrick Dep. 185:11-20.

Lack of consent is another required element for a sexual abuse in Florida and otherwise. *See* 1 FL Standard Jury Instructions in Criminal Cases 11.4 (2024). Guidepost's lead investigator understood that for there to be a sexual assault, there has to be a situation where there was not consent:

> Q. [F]or there to be a sexual assault there has to be a situation where there was not consent, right?
>
> A. That's correct.

Ex. 2, Kilpatrick Dep. 188:21-189:2. Despite acknowledging that the conduct must be nonconsensual for a sexual assault, Guidepost's CEO testified that "this [investigation] was not about whether or not the activity was consensual."[3] Consistent with Ms. Wood's testimony, it was apparent from Report itself that consent was not evaluated. The Report itself stated that Mr. Blankenship (the counselor who met with the Couple between 10-19 times for counseling sessions in 2010)[4] "reported very similar details and events to those reported by Survivor and Pastor, ***with the only significant difference being on the issue of consent***." Ex. 28 (Report) at 155 (emphasis added); *see also* Section II.A.4 for full discussion on the failure to evaluate consent.

Based on Ms. Kilpatrick's acknowledgement that consensual conduct does not qualify as sexual assault, Ms. Wood's testimony that consent was not even considered, and the fact that all citizens are "presumptively charged with knowledge of the law," Guidepost had knowledge of

---

[3] Ex. 3, Wood Dep. 99:16-17.

[4] Ex. 7, Blankenship Dep. 44:24-45:4.

or—at a minimum—were recklessly indifferent to the false statement in the Report that Pastor Johnny had been accused of a sexual assault.

**2. The cited contemporaneous record evidence confirms a genuine dispute of material fact as to Guidepost's reckless disregard for the falsity of Jane Doe's story.**

The record evidence also confirms, at a minimum, a genuine dispute of material fact as to whether Guidepost acted with reckless disregard as to the falsity of Jane Doe's story. The record reveals countless reasons to question the veracity of Jane Doe and her Husband, including their motives for suddenly coming forward with an almost 12-year-old allegation against Pastor Johnny. A jury could find that it was reckless to credit any of the Couple's story. *See St. Amant*, 390 U.S. at 732.

**The passage of time.** The passage of time alone presents a reason to question the accuracy of Jane Doe's story. The encounter between Pastor Johnny and Jane Doe occurred in 2010—12 years before the Couple spoke with Guidepost in 2022. Ex. 28 (Report) at 149; Ex. 1, Holske Dep. 83:12-16. Jane Doe confirmed in writing and in interviews that she was "[redacted]" ***before, during, and after the encounter with Pastor Johnny Hunt***. Ex. 27 (Doe Story) at 7 (emphasis added). The significance of this fact cannot be understated—the only witness (besides Pastor Johnny) who was in the room during the encounter was foggy as to the details and [redacted] *Id*. Equally reckless was the decision to publish an allegation ***when for over 10 years, Jane Doe and her Husband did not believe a sexual assault had occurred***. *Id.* at 1 ("[redacted]"). Then, in 2022, they suddenly provide Guidepost with a story on Pastor Johnny.

It was not Jane Doe who reached out to investigators, it was her Husband (who was not present during the encounter). Ex. 25. Husband's initial outreach to Guidepost provided

independent reasons to question the Couple's trustworthiness. Husband expressed concerns with how Guidepost would "[redacted]" of their story before going public. *Id.* at 2. He also wanted to know how Guidepost would protect the Couple from defamation claims and liability. *Id.* This initial outreach should have raised concerns for Guidepost as to the authenticity of the Couple's story.

Discovery revealed the Couple's motivations for coming forward with this new story against Pastor Johnny.

**The Couple's financial motives.** The Couple had a clear financial motivation for speaking with investigators. Jane Doe and her Husband confirmed in writing that part of their motivation for speaking with Guidepost was financial: "[redacted]." Ex. 27 (Doe Story) 7 at 2 (emphasis added). Guidepost's own interview notes stated that the Couple's [redacted] was [redacted] Ex. 33 at 7. Husband provided Guidepost with a letter he had recently drafted, which demanded ***over $2 million dollars from Pastor Johnny.*** Ex. 38. Husband even provided recommendations for Guidepost's Report that would benefit the Couple financially. Ex. 37.

**The Husband's jealousy.** Husband was jealous of Pastor Johnny's success and Jane Doe's feelings for Pastor Johnny. The documents the Couple provided to Guidepost explain that Husband was upset and jealous of Pastor Johnny's success. Ex. 27 (Doe Story) at 36. Husband was also jealous with his wife being around and speaking with other men. *Id.* at 17 ([redacted]; "[redacted]"). Significantly, Husband thought that his wife had "[redacted]." *Id.* at 25.

**Repeated requests for favors and the destruction of documents.** The Couple reached out to Guidepost for favors during and after the investigation. Husband called Guidepost's lead investigator in April 2022—during the course of the investigation—and asked Guidepost to fly the Couple to California as representatives of Guidepost "[redacted]." Ex. 82. Husband later told Mr. Holske that he was applying for a job with Guidepost and asked to use Mr. Holske as a reference. Ex. Y. Mr. Holske agreed. *Id.* Finally, when Pastor Johnny filed his lawsuit, Husband reached out to investigators and asked if they had destroyed documents as he requested. Ex. 34.

* * *

All of these examples provide strong reasons to question the veracity of the Couple's allegations before even turning to the specific details of the encounter. Based on this evidence alone, a jury could find that Guidepost acted recklessly in publishing the allegations against Pastor Johnny.

**3. The cited retrospective record evidence confirms a genuine dispute of material fact as to Guidepost's reckless disregard of the falsity of Jane Doe's story.**

Jane Doe was deposed in the case. The testimony was alarming. Jane Doe repeatedly contradicted key elements of her own story she provided to Guidepost's investigators.

During her deposition, Jane Doe explained how she provided investigators a 53-page documented entitled "[redacted]" (hereinafter "Doe Story"), which she confirmed during her deposition was true and correct. Ex. 10, Doe Dep. 78:24-79:16; 80:8-15. Guidepost's investigators relied on this document when writing the Report. Ex. 1, Holske Dep. 174:11-13 ("We relied on [the Doe Story document]"). But the Doe Story document tells a different story than the one that was published.

For example, Jane Doe wrote that she had "[redacted]" during the encounter, which is quite different than the no reciprocation version published by Guidepost. *Compare* Ex. 27 (Doe Story) at 11 [redacted]), *with* Ex. 28 at 151 (Report) ("Survivor did not reciprocate"). Jane Doe was questioned on her written statement provided to investigators at her deposition, but Jane Doe ***denied kissing Pastor Johnny back despite her written narrative to the contrary***. Ex. 10, Doe Dep. 188:20-22. The contradictions did not stop there:

- Jane Doe denied that part of her motivation for coming forward was financial, despite the fact that her financial interest was (1) confirmed in her own writing, and (2) was captured in Guidepost's investigators' interview notes. Ex. 10, Doe Dep. 122:1–3; Ex. 27 (Doe Story) at 2; Ex. 33 at 7.

- Jane Doe wrote that she was foggy before, during, and after the encounter. Jane Doe also described taking medication, Darvocet, before the encounter. This was written *twice* in the Doe Story document. Yet, at her deposition, Jane Doe denied taking Darvocet *at all* that day. Ex. 27 (Doe Story) at 6-7, 11; Ex. 10, Doe Dep. 180:15-17, 182:21-23, 184:8–12.

- In the Doe Story document, Jane Doe described the layout of the condo where the encounter occurred. According to Jane Doe's own written description, Pastor Johnny was sitting on right side of the couch. Jane Doe on the left. Before the alleged encounter, Jane Doe wrote that she removed her necklace and placed it on the end table on Pastor Johnny's side of the couch and not the end table on her side. Jane Doe's written narrative implies she leaned over Pastor Johnny's lap before the encounter began. At her deposition, Jane Doe changed her story again. Ex. 27 (Doe Story) at 8-9; Ex. 10, Doe Dep. 188:5-15.

This is not a failure to investigate. Guidepost deliberately avoided the truth. Guidepost attempts to highlight the experience of their investigators throughout their Motion. GPS Mot. at 7 nn.2-3. But any investigator, even an inexperienced one, would verify basic facts before publishing a story to the world accusing someone of sexual assault, such as: did the accuser French kiss the accused back; why did she do so; what medications did the accuser take; did this medication impact her memory; did the accuser take off her necklace, put it on the end table on

the accused's side and lean over the accused's lap—initiating contact before the encounter started; why did the accuser do so if there was an end table on their side of the couch.[5] Guidepost interviewed Jane Doe and her Husband individually and collectively 10 times before publication of the Report. Ex. 16 at Interrogatory No. 2. Guidepost was not truly interested in finding the truth. Instead, they wanted an explosive report with "impact" and were purposefully ignoring the truth. Ex. 32.

Guidepost's purposeful avoidance of the truth is further established by their admitted failure to corroborate a consensual encounter.

#### 4. There is a genuine dispute of material fact as whether Guidepost's failure to evaluate consent constitutes actual malice.

"To be clear, this was not about whether or not the activity was consensual."[6]
Julie Myers Wood (Guidepost CEO)

Guidepost's CEO repeatedly,[7] and adamantly, stressed at her deposition that consent did not matter in their investigation, despite intentionally including Pastor Johnny in a Report focused on child molesters and sex criminals and accusing him of a "sexual assault," and referring to his accuser as a "survivor." Yet, Ms. Wood acknowledged that before accusing someone of sexual assault, Guidepost had an obligation to make its own assessment whether the encounter was consensual or non-consensual. Ex. 3, Wood Dep. 245:16–246:5. Guidepost failed to do so by its own admission; indeed, it did not even try. Thus, there is a genuine issue of

[5] Mr. Holske did no investigation Jane Doe's description of removing the necklace. Ex. 1, Holske Dep. 284:17-285:5.

[6] Ex. 3, Wood Dep. 99:16-17.

[7] "[T]his wasn't about consent"; "the report was not having to determine whether or not a consensual sexual activity occurred"; "[t]his was not an issue of whether or not there was consent"; "we weren't looking to see whether there was consent"; "the issue here was not consent." Ex. 3, Wood Dep. 156:4; 161:15-162:3; 170:16-17; 176:7-8; 189:7-8.

material fact as to whether Guidepost's admitted failure to look for consent before publicly reporting Pastor Johnny had been accused of "sexual assault" Jane Doe was reckless.

Moreover, the Report does not contain a single account by any alleged witness that would support a claim for sexual assault. Mr. Blankenship is the only alleged "corroborator" who spoke with Jane Doe directly. Mr. Blankenship had between ten (10) and nineteen (19) counseling sessions with Jane Doe and her Husband, individually and collectively in 2010—*the year of the encounter*. Ex. 7, Blankenship Dep. 44:24-45:4. Each meeting lasted roughly an hour. *Id.* 45:5-8. Mr. Blankenship told Guidepost that he ***understood that the encounter was consensual.*** Ex. 28 (Report) at 155 ("[Mr. Blankenship] reported very similar details and events to those reported by Survivor and Pastor, with the only significant difference being on the issue of consent."). Far from "corroborating" a sexual assault, Mr. Blankenship directly disputed any allegation of sexual assault against Pastor Johnny.

Similarly, none of the three "corroborating" witnesses told Guidepost that the encounter was nonconsensual. They could not have. Each of these witnesses relied exclusively on Jane Doe's Husband for their version of encounter. Jane Doe's Husband was not present during the alleged sexual assault and had no firsthand knowledge of the encounter. Ex. 3, Wood Dep. 266:4–6. Thus, each witness was relying on hearsay for their own hearsay account. Jane Doe's Husband ***thought that his wife had a consensual encounter*** with Pastor Johnny, until relatively recently. Ex. 27 (Doe Story) at 1; *see also* Ex. 40. Therefore, when Jane Doe's Husband spoke with each alleged "corroborating" witness in 2010, 2012, and around 2018 respectively he could not, and did not, tell them his wife had been sexually assaulted. GPS SOMF ¶ 19. Ms. Kilpatrick confessed at her deposition that not a single one of the alleged "corroborating" witnesses used the words "sexual assault" or "sexual abuse" to describe what they had been told by Husband.

Ex. 2, Kilpatrick Dep. 257:2-7; 257:18-258:6; 259:2-9. Yet, the Guidepost Report cites each witness in the final Report as "corroborating" a sexual assault. Ex. 28 (Report) at 161.

Jane Doe's Husband provided investigators with his journal entries and five recordings of counseling sessions the Couple had with Mr. Blankenship in 2010. The journal provided no evidence of a sexual assault. The journal entries established that Husband thought that his wife had had feelings for Pastor Johnny. The journal included entries from Mr. Blankenship that revealed ***Jane Doe had directed her emotional needs to Pastor Johnny and Pastor Johnny was not reciprocating.*** Ex. 27 (Doe Story) at 26 [redacted].").

There is also a dispute of fact as to whether Guidepost's investigators listened to the counseling session recordings that were provided to them. Mr. Holske told Jane Doe's Husband that he [redacted] . . . ." Ex. 67. (emphasis added). If Guidepost had listened to the recordings, they would have confirmed Jane Doe was having marital problems unrelated to any sexual assault. Ex. 83 (counseling excerpt where Husband explains Jane Doe associates Husband with [redacted]).

Guidepost failed to determine whether the encounter between Jane Doe and Pastor Johnny was consensual before reporting to the world that Pastor Johnny had been accused of sexually assaulting Jane Doe. Guidepost ignored the fact that not a single piece of evidence corroborated a non-consensual encounter. This evidence, individually and collectively, would allow a jury to determine that Guidepost purposefully avoided the truth.

### 5. Guidepost manufactured a sexual assault claim against Pastor Johnny.

Guidepost attempts to hide behind Jane Doe's "confirmation" of the story published in the final Report. GPS SOF ¶ 19. This is no defense. First, even if Guidepost had simply reported what the Couple had said, it would not change the relevant legal standard. Guidepost may not act with reckless disregard of the falsity of a story, no matter who is telling them the story. Indeed, "[r]epetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted or the accuracy of his reports." *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969). Guidepost had a myriad of reasons to question the veracity of the Couple's story and their credibility. *See* Section II.A.2.

Guidepost's conduct went beyond simply reporting the story they were told by the Couple. Guidepost deliberately altered the Couple's story to fit their desired narrative—a sexual assault.

Jane Doe and her Husband did not believe that a sexual assault had occurred on July 25, 2010, until they met with Phillip Monroe and other counselors from Langberg, Monroe & Associates in 2022. Doc. No. 75-1 at ECF 10 (Houston Chronicle Article quoting the Couple) ("Through counseling with experts, including with the firm of renowned religious trauma scholar Diane Langberg, the couple said they came to understand what they could not quite articulate for a decade."). ***Guidepost engaged and recommended the therapists who helped the Couple change their view about what had occurred almost 12 years ago***. Ex. 27 (Doe Story) at 28; Ex. 65; Plaintiff's SOMF ¶¶ 32-44. Guidepost went well-beyond reporting what they were told—Guidepost influenced the testimony through therapists. Consider the grooming allegations before and after the therapy.

| Doe Story on Grooming (Ex. 27 (Doe Story)) | Post-Counseling on Grooming |
| --- | --- |
| [redacted]<br><br>[redacted]<br><br>Ex. 27 at 3. | [redacted]<br><br>Ex. 10, Doe Dep. 138:9-18 |

Guidepost further manipulated the Couple's written words to remove every reference to a consensual encounter to fit their desired narrative. The alterations and omissions are staggering:

| Doe Story (Ex. 27) | Final Report (Ex. 28) |
| --- | --- |
| [redacted] (p.7) | Entirely omitted from final Report. |
| [redacted] (pg. 8) | Guidepost omitted Jane Doe's consent to Pastor Johnny sitting closer:<br><br>"Dr. Hunt slid closer while Survivor was telling a story of the stress that she and her husband were under at the church." (pg. 151) |
| Jane Doe's description the layout of the condo where the encounter occurred. According to Jane Doe's own written description, Pastor Johnny was sitting on right side of the couch. Jane Doe on the left. Before the alleged encounter, Jane Doe wrote that she removed her necklace and placed it on the end table on Pastor Johnny's side of the couch. (pgs. 8-9) | Jane Doe removing her necklace: Omitted entirely. |

| | |
|---|---|
| [redacted] | Guidepost altered Jane Doe's story to remove any reciprocation:<br><br>"Survivor did not reciprocate, but rather stood eyes open and very stiff, hoping he would just stop and leave." (pg. 151) |
| [redacted]<br>(pg. 12) | Guidepost altered Jane Doe's story to remove the reciprocation. Guidepost removed Jane Doe's response to Pastor Johnny's alleged statement:<br><br>"Hunt stated that he would like to have sex with her three times a day. Survivor could not believe what she was hearing and could not get back inside her own condo quickly enough." (pg. 152) |
| **[The day after the alleged assault]**<br>[redacted]<br>(pg. 13) | Guidepost omitted Jane Doe's repeated attempts to interact with Pastor Johnny after the alleged sexual assault, including the fact that Jane Doe asked to go for a jog with Pastor Johnny the day after the alleged sexual assault. |
| **[The day after the alleged assault]**<br>[redacted]<br>(pg. 13) | Guidepost omitted Jane Doe's repeated attempts to interact with Pastor Johnny after the alleged sexual assault, including the fact that Jane Doe asked to borrow salt and pepper from Pastor Johnny the day after the alleged sexual assault. |
| [redacted]<br>(pg. 16) | Guidepost altered who asked for forgiveness:<br><br>"Dr. Hunt asked for Pastor's forgiveness, and Pastor said he agreed." (pg. 153) |

Ms. Kilpatrick conceded at her deposition that the "totality of the things [Jane Doe] talked to us about" were "details that some could argue may be represented or showed or could be used as evidence of consent." Ex. 2, Kilpatrick Dep. 190:1-4. Ms. Kilpatrick then agreed that the following pieces of evidence that could be used as evidence of consent of Jane Doe: (1) Inviting Pastor Johnny over onto her balcony; (2) continuing the conversation with him; (3) consenting to Pastor Johnny sliding closer on the couch; (4) having Pastor Johnny come into the condo; (5) French kissing him back; (6) asking to join Pastor Johnny on a run the day after the alleged sexual assault. Ex. 2, Kilpatrick Dep. 190:6–7; 190:12–14; 200:15–19; 200:1–10. Only one of these details was included in the Report. *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991) (finding that "deliberate alteration" of the words uttered by another that "results in a material change in the meaning conveyed" may equate to knowledge of falsity for meeting the actual malice standard.). Guidepost altered the story so much that Jane Doe's Husband thought Guidepost had changed the meaning of events after reading the Report. *See* Ex. 40.

Thus, there is record evidence that Guidepost did not just report what they were told; they knew that there was no sexual assault and Guidepost altered the story through therapists and omission of any detail relating to consent.

### 6. There is a genuine issue of material fact as to whether Guidepost interviewed Pastor Johnny on the allegations against him.

Pastor Johnny was interviewed on April 26, 2022, but the interview had nothing to do with the allegations against him. At the time of this interview, Guidepost had met with Jane Doe and her Husband individually and collectively six (6) times. Ex. 16 at Interrogatory 2. Yet, Guidepost ***did not ask Pastor Johnny a single question about Jane Doe's allegations***. Ex. 1, Holske Dep. 187:3-6, 192:15-21. Guidepost did not share any of the details from their six interviews with the Couple with Pastor Johnny. *Id.* at 191:10-15; 191:16-192:3.

Instead, Guidepost waited until May 12, 2022 to "interview" Pastor Johnny. Ex. 16 at Interrogatory No. 2. Just a few days before Guidepost needed to finalize their Report. Pastor Johnny described the meeting as an "ambush" that lasted approximately 15 minutes with Guidepost's investigators speaking over him and asking few questions. Ex. 8, Hunt Dep. 92:16-93:3, 102:16-105:3, 136:21-137:1, 148:8-11. Few questions; framed in a false narrative. *Id.* 138:9-139:2. Guidepost gave Pastor Johnny only 48 hours to come forward with any additional information. *Id*. 268:2-8.

Guidepost states that Pastor Johnny would never have been in the Report had he taken Guidepost's investigators up on their 48-hour deadline to come forward with evidence. GPS Mot. at 32. But the evidence confirms that Guidepost had already committed to publishing the story on Pastor Johnny regardless of what he said at the May 12, 2022 "interview." On same day as the "interview," Guidepost provided the SBC with a draft Report, which included the allegations against Pastor Johnny. GPS SOMF ¶ 41. On May 13, within 24 hours of Pastor Johnny's second "interview," Ms. Tongring texted Ms. Wood that [redacted] in the Report. Ex. 69. *See also*, Exs. 30, 31. Guidepost was committed to running its story on Pastor Johnny and avoided any evidence that would raise doubts as to its truth.

* * *

In sum, the evidence shows that Guidepost created the unequivocally false impression Pastor Johnny had been accused of committing a sex crime. Guidepost had knowledge of or was recklessly indifferent to the false impression they created satisfying the actual malice standard. Additionally, Guidepost purposefully ignored all evidence that would undermine their desired narrative and even altered the story to fit their need.

### B. Pastor Johnny has cited evidence from which a jury could find that Guidepost acted negligently.

Because Pastor Johnny is a private figure, he must simply show "negligence in failing to ascertain the truth of the statement." *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005). "In determining the issue of liability the conduct of the defendant is to be measured against what a reasonably prudent person would, or would not, have done under the same or similar circumstances." *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 418 (Tenn. 1978). Ultimately, resolving whether Guidepost was negligent in making the defamatory statements lies with a jury. *Biltcliffe v. Hailey's Harbor, Inc.*, No. M2003-02408-COA-R3-CV, 2005 Tenn. App. LEXIS 676, at *9 (Tenn. Ct. App. Oct. 27, 2005). The same evidence that supports actual malice in Section II presents a genuine issue of material fact for the jury on negligence.[8]

## III. Guidepost agreed to produce a public report and must be held responsible.

Guidepost produced a Report that was published publicly in its entirety and shared with the world, not just Guidepost's client. Conditional privilege does not apply and the Report was published by Guidepost. In any event, it is a fact issue for the jury.

---

[8] Tennessee has rejected the "journalistic malpractice" standard. *Memphis Pub. Co.*, 569 S.W.2d at 418. Thus, Mr. Leff's testimony is not controlling on any negligence or actual malice analysis. Moreover, a jury is free to accept or reject expert testimony at trial.

Guidepost's assertion that "Guidepost followed established industry standards in planning and conducting interviews of each witness and did so under circumstances of complete independence" is false. GPS Mot. at 27.

Mr. Leff did not even know if Guidepost had internal standards (Ex. 11, Leff Dep. 53:21–23); measured Guidepost's conduct against a standard he had never seen applied to private investigations (*Id.* 23:6–24); did not review the Guidepost's entire investigation file (*Id.* 99:3–9); and opined that Guidepost "depart[ed] from ordinary procedures" when they shared a version of the Pastor Johnny section of the Report with Jane Doe and her Husband (Ex. 20 at 11).

### A. Conditional privilege does not apply by the express terms of Guidepost's engagement letter.

From the outset of Guidepost's engagement, the company knew and agreed to produce a public report to be shared with the world. The record evidence confirms that Guidepost repeatedly agreed to provide a public report.

Prior to Guidepost's official engagement, it submitted a response to the SBC's request for qualifications. Ex. 42. Guidepost's submitted proposal described the scope of their engagement including producing a report that would be "[redacted]." *Id.* at 5, 7. Guidepost's proposal included the following language relating to publication:

- [redacted] *Id.* at 2 (emphasis added).
- [redacted]
- [redacted] *Id.* at 7 (emphasis added).
- [redacted] *Id.* (emphasis added).

Guidepost's signed engagement letter is consistent with their original proposal. Paragraph 3.2 of the signed engagement letter defines the "key principles of Guidepost's work," which was agreed to include "Transparency: Public Report." Ex. 23 (Engagement Letter). Paragraph 3.6 states that the "written report will be made public in its entirety prior to the 2022 SBC Annual Meeting." *Id.* Finally, Guidepost's Report itself stated that the "culmination of our engagement was the ***issuance of this public Report***." Ex. 28 (Report) at 18 (emphasis added).

Guidepost explicitly agreed to waive privileges for the Report, including attorney-client privilege. Paragraph 3.3 of the engagement letter states that "communications between Guidepost

(including its employees and agents) on the one hand, and the Committee on Cooperation, the Task Force, the SBC, the Executive Committee, and/or the Credentials Committee will not be protected by the attorney-client privilege." Ex. 23 (Engagement Letter) at 3; *See also*, *id.* at 5-6 ("No Attorney-Client Privilege"). Any and all communications regarding the Report were discoverable. The decision to waive attorney-client privilege was so reckless that it caused fifteen (15) to twenty (20) Executive Committee Board of Directors to resign from their positions. Ex. 4, EC 30(b)(6) Dep. 36:3-8.

A recent case decided by the Tennessee Court of Appeals is instructive. In *Loftis v. Rayburn*, the defendant communicated the statements at issue to only one person. No. M2017-01502-COA-R3-CV, 2018 Tenn. App. LEXIS 201, at *22 (Tenn. Ct. App. Apr. 20, 2018). The court found that the necessary publicity[9] element was met because the person who defendant told was a reporter and it was "fair to assume [defendant] ***knew*** [the other individual] was a reporter for *The Tennessean* and that [the reporter] would report [defendant's] statements in the newspaper." *Id.* at *22-23.

In Pastor Johnny's case, the facts are even stronger. Guidepost contracted to produce a public report. Guidepost's witnesses testified that they understood during the drafting process that the Report would be made public. Ex. 2, Kilpatrick Dep. 85:14-17 (**"**Q Okay. And you knew that there was going to be a detailed report which would be made public, right? A. Correct."); Ex. 3, Wood Dep. (163:8-15) (Ms. Wood "understood that the report would be public" even from the "beginning of [her] work"). The Executive Committee wrote in its briefing that it was

---

[9] A communication that meets the "publicity" standard in a false light claim also meets the "publication" standard for defamation. "Publication" means a communication to a third party. Restatement (Second) of Torts, § 652D, cmt a. "Publicity" means the communication is to the public at large. *Id. See also Secured Fin. Sols., LLC v. Winer*, No. M2009-00885-COA-R3-CV, 2010 Tenn. App. LEXIS 70, at *10-11 (Ct. App. Jan. 28, 2010)

"required" to publish the Report. EC Mot. at 22. There was no doubt the Report would be published to the world.

Finally, the Restatement (Second) of Torts provides that "[o]ne is liable for the publication of defamation by a third person whom as his servant, agent or ***otherwise he directs or procures to publish defamatory matter***.") Restatement (Second) of Torts, § 577, cmt. f (emphasis added). That is exactly what Guidepost did here—entered into a contract to produce a "public report."

Guidepost agreed to produce a public report and must be held accountable for the information they chose to publish to the world.

**B. Even if conditional privilege did apply, Guidepost failed to act in good faith and Pastor Johnny has evidence of actual malice.**

If the Court were to determine that Guidepost's communications were conditionally privileged (they are not), there is a genuine issue of material fact as to whether Guidepost abused the privilege. *Chonich v. Wayne Cty. Cmty. Coll.*, 874 F.2d 359, 363 (6th Cir. 1989) ("Abuse of the claimed privilege is generally a jury question.").

First, Guidepost argues it "transmitted the Report solely to the SBC Task Force and the Committee on Cooperation." GPS Mot. at 4. There is a genuine dispute of material fact on this topic. Ex. 3, Wood Dep. 427:18-19, 430:7-11 (admitting to transmitting the Report to individuals not part appointed members of the CoC of the EC and Task Force); Ex. 36 (Guidepost transmitting portion of Report on Pastor Johnny to Jane Doe and her Husband for edits). Both of Guidepost's lead investigators testified at deposition that Guidepost published the Report. Ms. Kilpatrick testified she "understood [the Report] was going to be published by Guidepost." Ex. 2, Kilpatrick Dep. 84:19-85:2. Mr. Hoslke testified unequivocally: "Guidepost published the report on May 22nd, 2022." Ex. 1, Holske Dep. 46:2-3. Mr. Holske also testified:

> Q. But in any event, as you sit here today, you know without any doubt, sir, that your company on May 22, 2022, posted a report pertaining to your investigation, including allegations associated with the Pastor Johnny Hunt, right?
>
> A. Correct.

Ex. 1, Holske Dep. 46:17-22.

Second, common interest privilege does not provide a complete defense to liability. In Tennessee, "a qualified or conditional privilege is one that may be defeated if the defamatory publication was made with malice, ill-will, or for an improper purpose." *Simpson Strong-Tie Co. v. Stewart, Estes & Donnell*, 232 S.W.3d 18, 22 (Tenn. 2007); *Bohler v. City of Fairview*, No. 3:17-cv-1373, 2018 U.S. Dist. LEXIS 188978, at *46 (M.D. Tenn. Nov. 5, 2018) (finding that common interest privilege "is premised on good faith"); *Am. Addiction Ctrs., Inc. v. Nat'l Ass'n of Addiction Treatment Providers*, 515 F. Supp. 3d 820, 833 (M.D. Tenn. 2021) (finding that the "requirement of good faith is still existing law.").

The evidence cited in Section II shows that Guidepost made the statements in bad faith, ill-will, and for an improper purpose.

At the very least, there is a genuine issue of material fact as to publication and common interest privilege that should be determined by the jury.

## IV. False Light

### A. Pastor Johnny was placed in a false light and viewed as a sex criminal after Defendants' defamatory statements.

Guidepost argues that no reader would be confused why Pastor Johnny was included in the Report and he was not placed a false light. (GPS Mot. at 30). This issue is for the jury to decide. *Battle v. A&E TV Networks*, LLC, 837 F. Supp. 2d 767, 776 (M.D. Tenn. 2011). In any event, the evidence shows that readers did view Pastor Johnny in a false light after reading the Report. *See* Section II.A.1.

### B. Pastor Johnny does not need to show actual malice for his false light claim.

Under Tennessee law, "actual malice is the appropriate standard for false light claims when the plaintiff is a public official or public figure, or when the claim is asserted by a private individual about a matter of public concern." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 647 (Tenn. 2001). Actual malice is not required when the claim is brought by a "private plaintiff[] about matters of private concern." *Id.* Pastor Johnny is not a public figure for the reasons stated in his Opposition to the EC and SBC's Motion for Summary Judgment. Moreover, Pastor Johnny's encounter with Jane Doe was a matter of private concern.

Whether two adults engaging in an extramarital encounter is not a matter of public concern. *See, e,g., Albert v. Mitchell*, 42 F. App'x 691, 693 (6th Cir. 2002) ("That two corrections officers engaged in an affair in violation of department rules, though perhaps appealing to the prurient interest of some members of the public and Albert, does not implicate a matter of public concern."); *Lindberg v. Dow Jones & Co.*, No. 20-cv-8231 (LAX), 2021 U.S. Dist. LEXIS 151397, at *21 (S.D.N.Y. Aug. 11, 2021) (noting that an "extramarital affair would typically not be a matter of 'public concern'"). Pastor Johnny was not the president of the SBC or a member of the Executive Committee at the time of the incident. Ex. 6, Guidepost 30(b)(6) Dep. 91:5-8. He was merely a private citizen whose marital fidelity was nobody else's business. The fact that the SBC was enveloped in a scandal regarding sexual abuse within its ranks does not convert a private, consensual extramarital encounter into a matter of public concern.

Therefore, because Pastor Johnny is a private figure and his brief, consensual encounter is a matter of private concern, the negligence standard applies to Pastor Johnny's false light claim. Pastor Johnny has cited record evidence showing Guidepost acted negligently or with

actual malice. *See* Section II. At minimum, there is a genuine issue of material fact as to whether the encounter was a matter of public concern, which should go to the jury.

### C. Guidepost's arguments regarding publicity and common interest privilege should be rejected.

Guidepost argues it cannot be liable under false light because it did not give "publicity" to the Report and the claims are barred by the common interest privilege. As set forth in Section III, these arguments fail. *See Loftis*, 2018 Tenn. App. LEXIS 201, at *22-23 (finding publicity element was met even when defendant only told one person because defendant told a reporter and it was "fair to assume [defendant] knew [the other individual] was a reporter for *The Tennessean* and that [the reporter] would report [the defendant's] statements in the newspaper"). Guidepost entered into a contract to produce a public report, waived attorney client privilege, and published a public report to the world. Finally, even if the common interest privilege did apply, Guidepost lost the privilege when they acted with actual malice. *See* Section II.

## V. Intentional Infliction of Emotional Distress

### A. There is a genuine issue of material fact as to whether Guidepost's conduct was extreme and outrageous.

Until Jane Doe's Husband came forward with allegations against Pastor Johnny, Guidepost had spent five months working on their multi-million-dollar report and found no evidence of any new allegation of sexual abuse involving an Executive Committee member. Ex. 6, Guidepost 30(b)(6) Dep. 77:14-78:4. When Jane Doe's Husband came forward, Guidepost was relieved. Upon learning of the allegations, Mr. Holske exclaimed [redacted] Ex. 26. Guidepost's investigator later wrote: [redacted] Ex. 29 (emphasis added); Doc. No. 155 at ¶ 47; Doc. No. 161 at ¶ 47.

Guidepost's investigators knew Pastor Johnny was outside the scope of their engagement—he was not on the Executive Committee at the time of the encounter—and proceeded anyway. Ex. 8, Hunt Dep. 111:19-25. It is undisputed that Guidepost billed over $2 million dollars for the Report—a fact Guidepost attempted to withhold from Pastor Johnny until the Court ruled on a motion to compel. Ex. 15 at Interrogatory No. 5. Discovery revealed that Guidepost actually had done $4 million dollars of work and may have also been motivated to promote and promote their new faith-based solutions division by creating an explosive report. Ex. 3, Wood Dep. 58:8-12; Ex. 6, Guidepost 30(b)(6) Dep. 224:19-225:16; Ex. 68 (Guidepost website linking to the Report and promoting new Faith-Based Solutions division); Ex. 66 at 2 (Guidepost Faith-Based Solutions website with the SBC/EC Report listed under first under "select experience"). Thus, in order to justify its fee, Guidepost intentionally and maliciously published a false statement that Pastor Johnny was accused of a sexual assault. *See* Section II.A.1.

Guidepost ignores this evidence and argues that that there was no motive to justify its fees because Pastor Johnny would never have been in the Report had he taken Guidepost's investigators up on their 48-hour deadline to come forward with evidence. GPS Mot. at 32. This is disputed. Internal Guidepost emails confirm that Guidepost had already started drafting the section of the Report on Pastor Johnny before he or Mr. Blankenship were even interviewed and that they were going to add [redacted] Ex. 31. A text message from Ms. Tongring to Ms. Wood ***less than 24 hours after Pastor Johnny's May "interview"*** states: [redacted] Ex. 69. Guidepost's witnesses' self-serving statements cannot be credited when compared with these contemporaneous

communications. At the very least, there is a genuine issue of material fact that should go to the jury.

**B. Pastor Johnny has presented evidence of serious mental injury.**

Pastor Johnny has proffered sufficient evidence showing his emotional distress as a result of the publication of the Report. Pastor Johnny detailed the professional help he sought for the emotional distress resulting from Defendants' defamatory statements. Ex. 13 at Interrogatory No. 13; Hunt Decl. Ex. D. He identified in detail the emotional damages caused by Defendants' conduct. Ex. 14 at Interrogatory No. 14; Hunt Decl. ¶¶ 8-10. Additionally, Pastor Johnny testified at his deposition regarding emotional damages caused by Defendants' conduct. Ex. 8, Hunt Dep. 118:2-3, 118:15-21, 149:11-12; 206:18-19, 226:12-17, 227:13-14, 256:10-13. At trial, a "plaintiff may present this evidence by his or her own testimony, the testimony of lay witnesses acquainted with the plaintiff such as family, friends, and colleagues, or by the testimony of medical experts." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 210 (Tenn. 2012). No expert testimony is required. *Id.* This evidence creates a genuine issue of material fact as to whether Pastor Johnny suffered severe emotional distress, and Pastor Johnny is entitled to present that evidence to the jury.

**C. Common interest privilege does not apply and Guidepost acted with Malice.**

Because Pastor Johnny is not a public figure, the actual malice standard does not apply. Even if it did (it does not), a jury could find actual malice. *See* Section II.

Guidepost argues that it cannot be liable under intentional infliction of emotional distress because the claims are barred by the common interest privilege. Guidepost cites no authority applying the common interest privilege to intentional infliction of emotional distress claims in Tennessee. Guidepost relies solely on the Restatement (Second) of Torts, which states that a

party may not be liable when "he has done no more than to insist upon his legal rights in a permissible way." Restatement (Second) of Torts, § 46, cmt. g. Guidepost has no "legal right" to intentionally injure anyone.

If the privilege is applicable to intentional infliction of emotional distress claims, it should not apply. As set forth in Section III, Guidepost entered into a contract to produce a public report, waived attorney client privilege, and issued a public report. Furthermore, if conditional privilege does apply, it was waived when Guidepost acted with actual malice. *See* Section II.

## VI. Negligent Infliction of Emotional Distress

### A. Pastor Johnny has presented evidence of serious mental injury.

Guidepost claims that "[t]o go to a jury on this claim requires proof of 'serious' or 'severe' emotional injury supported by expert medical or scientific proof." GPS Mot. at 32. However, this standard is a "special evidentiary requirement[]" that applies to cases where plaintiffs allege damages from mental anguish alone. *Estate of Amos v. Vanderbilt Univ.*, 62 S.W.3d 133, 137 (Tenn. 2001). This standard does not apply in cases like this one where "emotional damages are a 'parasitic' consequence of negligent conduct that results in multiple types of damages. . . ." *Id.* Thus, Pastor Johnny can seek emotional damages under his negligent infliction of emotional distress claim in tandem with any of his other claims.

### B. There is fact dispute as to whether Guidepost breached its standard of care.

Guidepost argues that Pastor Johnny's claim should fail because there is no showing that Guidepost breached a duty of care. Specifically, because "Guidepost carefully observed industry standards and interviewed every witness they could before publishing the Report." GPS Mot. at 33. Breaching the duty of care is measured under the "reasonable person" standard. *Jackson v.*

*Williamson & Sons Funeral Home*, No. E2010-02489-COA-R3-CV, 2011 Tenn. App. LEXIS 554, at *6-9 (Ct. App. Oct. 12, 2011). There is a genuine issue of material fact as to whether Guidepost breached its duty care when it published the Report on Pastor Johnny and accused him of committing a crime. *See* Section II. Additionally, Ms. Wood acknowledged that before accusing someone of sexual assault, Guidepost had an obligation to make its own assessment whether the encounter was consensual or non-consensual. Ex. 3, Wood Dep. 246:1-5. Guidepost's admitted failure to do so could be evidence of a breach of their duty of care. There is also a factual dispute as to whether Guidepost "interviewed" each witness; and interviews alone are insufficient, especially if exculpatory evidence is ignored. Finally, Guidepost's own expert admitted the company "depart[ed] from ordinary procedures" when they shared a version of the Hunt section of the Report with Jane Doe and her Husband. Ex. 20 (Leff Expert Report) at 11.

## VII. Public Disclosure of Private Facts

### A. Tennessee courts have recognized and applied the tort of public disclosure of private facts.

The Tennessee Court of Appeals has held: "Tennessee has adopted the common law tort of invasion of privacy." *Roberts v. Essex Microtel Assocs.,* 46 S.W.3d 205, 210-11 (Tenn. Ct. App. 2000); *see also Parr v. Middle Tennessee State Univ.,* No. M1999-01442-COA-R3-CV, 1999 Tenn. App. LEXIS 803, *9 (Tenn. Ct. App. Dec. 3, 1999) (recognizing a claim for invasion of privacy for public disclosure of private facts).

Two federal opinions construing Tennessee law have also followed the Restatement (Second) of Torts § 652D approach for the tort. *See International Union v. Garner,* 601 F. Supp 187, 190 (M.D. Tenn. 1985); *Beard v. Akzona, Inc,* 517 F. Supp. 128, 132 (E.D. Tenn. 1981).

### B. There is a genuine issue of material fact as to whether publication was highly offensive to a reasonable person and a private matter.

Guidepost argues that "publication of sexual misconduct on the part of a Christian minister is not highly offensive to a reasonable person; nor is it a matter outside the public's concern." GPS Mot. at 34. In support, Guidepost cites *Cottrell v. Smith*., 788 S.E.2d 772, 280 (Ga. 2016). However, *Cottrell* did not rule that an extramarital affair was a matter of public concern. *See id.* at 787. The court simply found that the extramarital affairs involved in the specific case were not private due to the disclosure by plaintiff, including his verbal disclosure and "open[] acknowledge[ment]" of his close relationship a woman who was not his wife. *Id.* By contrast, the evidence shows that the public was not aware of Pastor Johnny's encounter with Jane Doe until it was published by Defendants. Hunt Decl. ¶ 3. Guidepost's citation to Pastor Johnny disclosing the encounter in a letter to his congregation at First Baptist Church Woodstock is puzzling. This was five days after publication of the Report. Thus, it was after Defendants had already revealed the private facts.

Finally, Guidepost repeats its argument that this claim is barred by the common interest privilege and publicity. It is not. As set forth in Section III, Guidepost entered into a contract to produce a public report, waived attorney client privilege, and issued a public report. *See also Loftis*, 2018 Tenn. App. LEXIS, at *22. If the conditional privilege does apply, Guidepost waived it when they acted with actual malice. *See* Section II.

## VIII. Pastor Johnny is entitled to recover damages from his lost book deals, lost speaking engagements, and other ministry-related income.

Guidepost attempts to preclude Pastor Johnny from receiving lost income from book deals, speaking engagements, and other ministry-related activities. Guidepost fails to acknowledge that Pastor Johnny is engaged directly to speak at events, write and publish books,

and engage in other ministry-related activities. Hunt Decl. ¶ 11-12. As a result, Pastor Johnny determines the distribution of the money he receives from his ministry involvement. *Id.* at 13-14. Pastor Johnny can keep the money for himself and treat it as taxable income, or distribute the money to Johnny Hunt Ministries, Inc. Ex. 8, Hunt Dep. 85:21-86:6. Defendants' expert recognized this distinction at his deposition. Ex. 12, Alexander Dep. 104:11-18; 104:25-105:4; 108:21-109:3. Whether Pastor Johnny is able to recover these damages is a jury issue. *McClay v. Airport Mgmt. Servs., LLC*, 596 S.W.3d 686, 690 (Tenn. 2020) ("We also have long-recognized that the ascertainment of damages is a question of fact for the jury.") (collecting cases).

**CONCLUSION**

For all these reasons, the Court should deny Guidepost's motion for summary judgment, and this case should proceed to trial.

Dated: July 31, 2024

Respectfully submitted,

s/ Andrew Goldstein

**Todd G. Cole, Esq., BPR # 031078**
**Andrew Goldstein, Esq., BPR # 037042**
COLE LAW GROUP, P.C.
1648 Westgate Circle, Suite 301
Brentwood, TN 37027
Telephone: (615) 490-6020
Fax: (615) 942-5914
tcole@colelawgrouppc.com
agoldstein@colelawgrouppc.com

*-and-*

**Robert D. MacGill, Esq. (*pro hac vice*)**
**Patrick J. Sanders, Esq. (*pro hac vice*)**
MACGILL PC
156 E. Market St.
Suite 1200
Indianapolis, IN 46204
Telephone: (317) 721-1253
robert.macgill@macgilllaw.com
patrick.sanders@macgilllaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing Memorandum of Law in Support of Response in Opposition to Guidepost Solutions LCC's Motion for Summary Judgment to be electronically filed with the Clerk of the Court on July 31, 2024, using the CM/ECF system, which will automatically serve all counsel of record listed below:

Todd G. Cole, Esq.
Andrew Goldstein, Esq.
COLE LAW GROUP, P.C.
1648 Westgate Circle, Suite 301
Brentwood, TN 37027
Telephone: (615) 326-9059
tcole@colelawgrouppc.com
agoldstein@colelawgrouppc.com

Robert D. MacGill, Esq.
Patrick J. Sanders, Esq.
MACGILL PC
156 E. Market St.
Suite 1200
Indianapolis, IN 46204
Telephone: (317) 721-1253
robert.macgill@macgilllaw.com
patrick.sanders@macgilllaw.com

*Counsel for Plaintiff*

John R. Jacobson, Esq.
Katharine R. Klein, Esq.
RILEY & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
(615) 320-3700
(615) 320-3737 *Facsimile*
jjacobson@rjfirm.com
kklein@rjfirm.com

Scarlett Singleton Nokes, Esq.
R. Brandon Bundren, Esq.
E. Todd Presnell, Esq.
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, Tennessee 37203
Telephone: (615) 244-2582
snokes@bradley.com
bbundren@bradley.com
tpresnell@bradley.com

Gene R. Besen, Esq.
BRADLEY ARANT BOULT CUMMINGS LLP
Fountain Place
1445 Ross Avenue, Suite 3600
Dallas, Texas 75202
Telephone: (214) 257-9758
gbesen@bradley.com

Thomas J. Hurney, Jr., Esq.
Gretchen M. Callas, Esq.
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
Post Office Box 553
Charleston, West Virginia 25322
Telephone: 304-340-1000
thurney@jacksonkelly.com
gcallas@jacksonkelly.com

*Counsel for the Executive Committee of the Southern Baptist Convention*

Steven G. Mintz, Esq.
Terence W. McCormick, Esq.
Scott Klein, Esq.
Adam Brody, Esq.
Alex Otchy, Esq.
MINTZ & GOLD LLP
600 Third Avenue
25th Floor
New York, NY 10016
Telephone: (212) 696-4848
mintz@mintzandgold.com
mccormick@mintzandgold.com
klein@mintzandgold.com
brody@mintzandgold.com
otchy@mintzandgold.com

*Counsel for Defendant Guidepost Solutions LLC*

L. Gino Marchetti, Jr., Esq.
Matt C. Pietsch, Esq.
TAYLOR, PIGUE, MARCHETTI & BLAIR, PLLC
2908 Poston Avenue
Nashville, TN 37203
Telephone: (615) 320-3225
gmarchetti@tpmblaw.com
matt@tpmblaw.com

*Counsel for the Southern Baptist Convention*

Melissa J. Hogan, Esq.
QAVAH LAW
8757 Horton Hwy
College Grove, TN 37046
Telephone: (615) 293-6623
melissajhogan@qavahlaw.com

*Counsel for Jane Doe*

s/ Andrew Goldstein
ANDREW GOLDSTEIN