**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| JOHNNY M. HUNT,<br><br>               Plaintiff,<br><br>    v.<br><br>SOUTHERN BAPTIST CONVENTION;<br>GUIDEPOST SOLUTIONS LLC; and<br>EXECUTIVE COMMITTEE OF THE<br>SOUTHERN BAPTIST CONVENTION,<br><br>               Defendants. | Case No. 3:23-cv-00243<br>Chief Judge Campbell<br>Magistrate Judge Frensley<br><br>**PLAINTIFF'S RESPONSES TO DEFENDANT GUIDEPOST SOLUTIONS LLC's STATEMENT OF MATERIAL FACTS** |

The Plaintiff, Johnny M. Hunt ("Pastor Johnny" and/or "Plaintiff") by and through

counsel, pursuant to Fed. R. Civ. P. 56, submits this Response to Guidepost Solutions LLC's

("Guidepost") Statement of Material Facts.

I.      <u>Background to the Dispute</u>

1.      This litigation arises out of a crisis within the Southern Baptist Convention

("<u>SBC</u>"), following the publication of a six-part series of articles in the *Houston Chronicle* titled

"Abuse of Faith." (<u>See</u> Declaration of Katharine R. Klein, <u>Exhibit 1</u>, Complaint, ¶¶ 5-6.)[1]

**RESPONSE:** Disputed. This case arises from the Defendants' mass distribution of private,

embarrassing information about Pastor Johnny Hunt and their decision to misleadingly feature

him in a highly publicized Report alongside child molesters, rapists and sex criminals. Despite

not being accused of child or other abuse and not being accused of some similarly heinous crime,

Pastor Johnny was the first person named in the report because of a brief, consensual,

---

[1]    Exhibits labeled numerically correspond to the concurrently filed Declaration of
Katharine R. Klein.

extramarital counter with an adult woman in 2010. Doc. 35 at Page ID # 497. Hunt Decl. ¶ 2. Complaint, ¶¶ 7-13.

2.      In 2021 Guidepost was engaged to conduct an investigation into the following topics: "(1) allegations of sexual abuse by the Executive Committee; (2) the Executive Committee's mishandling of sexual abuse allegations; (3) allegations of mistreatment of sexual abuse victims; (4) patterns of intimidation of sexual abuse victims or advocates; and (5) resistance to sexual abuse reform initiatives." <u>See</u> <u>Exhibit 2</u>, a copy of the Engagement Agreement dated October 5, 2021 ("<u>Engagement Agreement</u>") between and among (i) Guidepost, (ii) the SBC's Sexual Abuse Task Force (the "<u>SBC Task Force</u>"), and (iii) the SBC Executive Committee. (Klein Declaration, <u>Exhibit 2</u>)

        **RESPONSE:** Undisputed in part and disputed in part.

        Undisputed that Guidepost was engaged to conduct an investigation, but the scope of such investigation was limited to "(1) [a]llegations of abuse by Executive Committee members, (2) [m]ishandling of abuse allegations by Executive Committee members between January 1, 2000, to June 14, 2021, (3) [a]llegations of mistreatment of sexual abuse victims by Executive Committee members from January 1, 2000, to June 14, 2021, (4) [p]atterns of intimidation of sexual abuse victims or advocates from January 1, 2000, to June 14, 2021, (5) [r]esistance to sexual abuse reform initiatives from January 1, 2000, to June 14, 2021." Ex. 23, Section 3.1.

        Undisputed that Guidepost was engaged to prepare a report setting forth its factual findings and recommendations, but Guidepost's engagement also called for the company to produce a "Public Report." *Id*. at Section 3.2. This was clear from the outset of the engagement. Guidepost's submitted proposal described the scope of their engagement including producing a report that

2

would be "███████████████████irety." Ex. 42 at GP_004264. Guidepost's proposal included the following language relating to publication:

- ███████████████████████████████████" *Id.* at GP_004261. (emphasis added).

- ██████████████████████████████████████████████ *Id.* at GP_004264 (emphasis added).

- "████████████████████████████████████████ ███████████████████." *Id.* at GP_004266 (emphasis added).

"██████████████████████████████████████ " *Id.* at GP_004266. (emphasis added).

Undisputed that the Engagement Agreement was between and among Guidepost, the SBC's Sexual Abuse Task Force and the SBC Executive Committee, but disputed that it was only between and among Guidepost, the SBC's Sexual Abuse Task Force and the EC of the SBC. The Engagement was also between the Committee on Cooperation of the Executive Committee. (Ex. 23, Section 2.1) (Under the Engagement Letter, Guidepost would be "engaging with the Committee on Cooperation of the Executive Committee."). The Committee on Cooperation of the EC was acting on behalf of the EC and SBC. The Committee on Cooperation was a Committee of the EC and "was created as a means of assuring the investigation into the EC's handling of sexual abuse is able to proceed as planned and that EC trustees are represented throughout the process," and it "***represents [the EC] in this process.***" Ex. 45 at COC_0000010 (emphasis added). The Committee on Cooperation was a way for the EC to have an official relationship with Guidepost

Solutions while maintaining the independence of Guidepost.[2] The Committee on Cooperation of the EC consisted of two members that had been appointed by the EC, the SBC president (an ex-officio member of the EC), and two were appointed by the Sexual Abuse Task Force of the SBC. Ex. 4, EC 30(b)(6) Dep. 274:15-25. Ex. 23, Section 2.2. All five members of the Committee on Cooperation of the EC were members of the EC. Ex. 4, EC 30(b)(6) Dep. 275:8-11.

3.     Under Section 2.1 of the Engagement Agreement, Guidepost's client was the SBC Task Force. (Exhibit 2.)

**RESPONSE:** Disputed. Guidepost's clients were the SBC, the EC of the SBC, the SBC's Sexual Abuse Task Force and the Committee on Cooperation of the EC. The Engagement Agreement states that the engagement was "was authorized by the SBC" and that it will also be "engaging with the Committee on Cooperation of the Executive Committee." Ex. 23, Section 2.1. The SBC was Guidepost's client. Ex. 3, Wood Dep. 58:2-15 (Q – "Total?" A – "Total for the whole investigation. Our—that's what we billed to the client…" Q – And you billed the SBC approximately $2 million?" A – "That's right.") The EC was Guidepost's client. Ex. 3, Wood Dep. 432:19-433:1) (Q – "Who was the client for your engagement?" A – "The engagement letter was signed by the Executive Committee and the Task Force and we were working for the Task Force."). Furthermore, the Committee on Cooperation of the EC and the Task Force of the SBC were acting on behalf of the EC and SBC. The Committee on Cooperation was a Committee of the EC and "was created as a means of assuring the investigation into the EC's handling of sexual abuse is able to proceed as planned and that EC trustees are represented throughout the process," and it "***represents [the EC] in this process.***" Ex. 45 at COC_0000010 (emphasis added). The Committee

---

[2] https://thebaptistpaper.org/five-member-liaison-group-set-for-executive-committee-investigation/#:~:text=%E2%80%9CThe%20Committee%20on%20Cooperation%20is,interview%20with%20The%20Baptist%20Paper, archived at https://perma.cc/2FXB-YVFB

on Cooperation was a way for the EC to have an official relationship with Guidepost Solutions while maintaining the independence of Guidepost.[3] The Committee on Cooperation of the EC consisted of two members that had been appointed by the EC, the SBC president (an ex-officio member of the EC), and two were appointed by the Sexual Abuse Task Force of the SBC. Ex. 4, EC 30(b)(6) Dep. 274:15-25. Ex. 23, Section 2.2. All five members of the Committee on Cooperation of the EC were members of the EC. Ex. 4, EC 30(b)(6) Dep. 275:8-11. The Task Force was acting on behalf of the SBC. The Task Force was "a specially–appointed committee of the Southern Baptist Convention." *Id.* at 69:6-13. As a specially-appointed committee, the Task Force was acting on behalf of the SBC. Ex. 5, Barber Dep. 14:11-22.

4.    Under Section 2.1 of the Engagement Agreement, Guidepost was to "act under the leadership and take direction and guidance from the SBC Task Force," while also engaging with the Committee on Cooperation. (Exhibit 2.)

**RESPONSE:** Disputed in part and undisputed in part. Undisputed that Section 2.1 of the Engagement Agreement states that Guidepost was to "act under the leadership and take direction and guidance from the SBC Task Force," while also engaging with the Committee on Cooperation of the Executive Committee. Disputed Guidepost was also taking direction from and engaging with the EC and SBC.

Guidepost was also taking direction from and engaging with the EC. The Committee of Cooperation of the Executive Committee was "headed by the President of the SBC, who will also be a member of the Committee." (Ex. 23, Section 2.2). All members of Committee on Cooperation of the Executive committee were members of the Executive Committee. Ex. 4, EC

---

[3] https://thebaptistpaper.org/five-member-liaison-group-set-for-executive-committee-investigation/#:~:text=%E2%80%9CThe%20Committee%20on%20Cooperation%20is,interview%20with%20The%20Baptist%20Paper, archived at https://perma.cc/2FXB-YVFB

30(b)(6) Dep. 234:4-12. The Committee on Cooperation of the Executive Committee was "authorized by the SBC Sexual Abuse Task Force and by the SBC Executive Committee." *Id*. at 150:22-25.

Guidepost was also taking direction from and engaging with the SBC. The Task Force was acting on behalf of the SBC. The Task Force was "a specially–appointed committee of the Southern Baptist Convention." Ex. 4, EC 30(b)(6) Dep. 69:6-13. As a specially-appointed committee, the Task Force was acting on behalf of the SBC.  Ex. 5, Barber Dep. 14:11-22.

5.      Following its investigation, Guidepost prepared and submitted to the SBC Task Force its Report of the Independent Investigation (the "Report"). See Klein Declaration at Exhibit 3.

**RESPONSE**: Objection. This statement of fact requires no response by Plaintiff because it is not supported by any cited evidence. Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1). The Report does not provide information on where the Report was submitted and to whom it was submitted. Disputed. Guidepost prepared a "public report" to be shared with the world, not just the Task Force. Plaintiff incorporates by reference Plaintiff's Response to SOMF 2.  Guidepost published the Report. Ex. 1, Holske Dep. 46:2-3 ("Guidepost ***published*** the report on May 22nd, 2022). (emphasis added) Ex. 1, Holske Dep. 46:17-22 (Q – "[Y]ou know without any doubt, sir, that your company on May 22, 2022, posted a report pertaining to your investigation, including allegations associated with Pastor Johnny Hunt, right?" A – "Correct."). Disputed that this was an independent investigation. The Committee on Cooperation of the EC was a way for the EC to have an official relationship with Guidepost

Solutions while maintaining the independence of Guidepost.[4] All five members of the Committee on Cooperation of the EC were members of the EC. Ex. 4, EC 30(b)(6) Dep. 275:8-11.

## II.    **Plaintiff Johnny M. Hunt's Public Profile**

6.      Plaintiff Johnny M. Hunt ("Hunt") is a nationally prominent clergyperson who became the pastor of a Georgia megachurch, First Baptist Church Woodstock. (See Deposition of Johnny M. Hunt ("Hunt Dep."), at 26:13-27:23 attached to Klein Declaration at Exhibit 4.)

**RESPONSE:** Objection. This statement of fact requires no response by Plaintiff because it is not supported by any cited evidence. Disputed that Pastor Johnny is a "nationally prominent" clergyperson. The cited testimony only refers to an increase in church membership over time at First Baptist Woodstock. Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1).

Disputed that First Baptist Church Woodstock is a "megachurch." Ex. 8, Hunt Dep. 27:17-20 (Q – "Was it considered a 'mega church' by 2009? Was that word even in use in 2009?" A – "I'm not sure when that word came into use. But definitely a large church.").

Undisputed that Pastor Johnny was previously a pastor at First Baptist Woodstock.

7.      From 2008-2010, Hunt was the President of the SBC and "led" the "great commission resurgence" and was the "pinnacle," the "voice," and "face of the Convention." (Exhibit 4, Hunt Dep. at 36:10-22; 40:9-21; Compl., ¶ 2; Am. Answer ¶ 2.)

**RESPONSE:** Disputed in part and undisputed in part. Undisputed that Pastor Johnny was the President of the SBC from June 2008 to June 2010 and that generally the SBC president is "the pinnacle," "voice" "the face of the convention" "***during that time***." Ex. 8, Hunt Dep. 36:10-22;

---

[4] https://thebaptistpaper.org/five-member-liaison-group-set-for-executive-committee-investigation/#:~:text=%E2%80%9CThe%20Committee%20on%20Cooperation%20is,interview%20with%20The%20Baptist%20Paper, archived at https://perma.cc/2FXB-YVFB

40:10-21 (emphasis added). Undisputed that while President of the SBC, fourteen years ago, he led "a great commission resurgence." Ex. 8, Hunt Dep. 40:10-21.

Disputed to the extent it suggests that Pastor Johnny was President of the SBC during the time of the encounter with Jane Doe. Ex. 28 at Hunt_0000279.

8.      Hunt did not need the SBC Presidency to acquire public exposure because he already "had such a platform" due to his high profile as pastor of a Georgia megachurch, such that the "average church-going Southern Baptist in Arkansas" knew who he was. (Exhibit 4, Hunt Dep. at 41:4-17; 42:6-16.)

**RESPONSE:** Disputed. First, the purported "fact" combines answers to separate, unrelated questions at deposition into one fact, creating to a misleading "fact." Ex. 8, Hunt Dep. at 41:4-17; 42:6-16.

Second, Pastor Johnny did not testify as to "public" exposure. *Id*. at 41:4-17. (Q – "So it's fair to say the SBC presidency gave you more exposure?" A – "I'm not sure that would be a true statement for the simple reason I had such a platform. ***I had been preaching for other denominations***.") (emphasis added).

Third, disputed that First Baptist Church Woodstock is a "megachurch." *Id*. at 27:17-20 (Q – "Was it considered a 'mega church' by 2009? Was that word even in use in 2009?" A – "I'm not sure when that word came into use. But definitely a large church.").

Fourth, disputed that "average church-going Southern Baptist in Arkansas" knew who Pastor Johnny was as this fragment was taken out context. *Id*. at 42:6-43:3 (Q – "What about the average church-going Southern Baptist in Arkansas? Would they have known that you were the lead pastor at Woodstock Baptist Church without you being the SBC president?" A – "Yes I spoke in their state conventions, their state evangelism conferences, probably 90 percent of our states, of

8

our 42 state conventions, maybe all of them prior." Q – "But, again, it's a subset right…of Southern Baptists to go to the meetings of the local state association of the state convention. So just your average white-haired Southern Baptist lady in the pew, how would she have come to know Johnny Hunt?" A – "I have no idea. Good question.").

9.     Hunt testified that he was "president of the largest evangelical body in America" and "pastoring one of the largest churches in America" and that he had been the "Joseph of the Woodstock church," which is one of the largest churches in America. (Exhibit 4, Hunt 52:6-12; 117:6-7; 124:3-5.)

**RESPONSE:** Disputed in part and undisputed in part.

First, the purported "fact" combines answers to separate, questions at deposition into one fact, creating to a misleading "fact." Undisputed that Pastor Johnny testified that he was "president of the largest evangelical body in America" and "pastoring one of the largest churches in America."

Undisputed that Pastor Johnny described himself as "the Joseph of Woodstock church" but in the context of "I just had the dream [of City of Refuge]. Basically I was the Joseph of Woodstock church; that is, I dream but had a great team around me that made the dreams become a reality." Ex. 8, Hunt Dep. 52:6-12.

10.     From 2008-2010, Hunt was an *ex officio* member of the Executive Committee of the SBC during his term as President. (Exhibit 4, Hunt Dep. at 43:21-44:2; Compl., ¶ 58.)

**RESPONSE:** Disputed in part and undisputed in part. Undisputed that Pastor Johnny was an ex officio member of the Executive Committee of the SBC during his term as President. Ex. 8, Hunt Dep. 43:21-24. Disputed that Pastor Johnny was an ex officio member for all of 2008 or all of 2010. Pastor Johnny was not an ex officio member of the Executive Committee at the time of the encounter. Ex. 8, Hunt Dep. 111:19-25 ("This was July of 2010. I am no longer a member [of

the Executive Committee]…"). Ex. 6, Guidepost 30(b)(6) Dep. 91:5-8 (Q – "You knew he was not on the Executive Committee at the time of that alleged incident, right?" A – "Yes.")

11.     Hunt claims that Guidepost included him in the Report as the "fall guy" for the denomination "because [Guidepost] not only found one, **they found one that everyone in the convention knew**. And not because I had been the president **but because I had addressed that convention 20 years in a row**, which speaks of the integrity of my life up until this one thing." (Exhibit 4, Hunt Dep. at 148:19-149:6.) (emphasis supplied.)

**RESPONSE:** Disputed. Pastor Johnny testified that he was included in the report as a "fall guy" because Guidepost had spent millions of dollars on their Engagement and had "nobody else" for their Report. Specifically: "[f]or the millions that the convention was going to spend, [Guidepost] needed somebody, and they had nobody else, and now I realize that. No one, no one, not one. And so they had found a guy . . . ." Ex. 8, Hunt Dep. 148:22-149:1. Pastor Johnny then continued "and [Guidepost] had not only found one, they found one that everyone in the convention knew. And not because I had been the president but because I had addressed that convention 20 years in a row, which speaks to the integrity of my life up until this one thing." *Id.* at 148:17-149:6.

### III.     Hunt's Alleged Sexual Abuse of Jane Doe in July 2010

12.     On July 25, 2010, Hunt had an extramarital sexual encounter with Jane Doe, the wife of another Baptist clergyperson, in a condo in Panama City Beach, Florida. (Exhibit 4, Hunt Dep. at 63:8-67:3; 213:11-20; 216:4-25; 218:16-219:13.)

**RESPONSE:** Disputed.

Disputed that the encounter was not consensual. Pastor Johnny had a *consensual* extramarital encounter with Jane Doe. Hunt Decl. ¶ 2. Doc. 1, at Page ID # 10 ¶ 53.

13.     Jane Doe was staying in the condo next door to where Hunt and his family were staying. (Exhibit 4, Hunt Dep. at 64:10-65:3.)

**RESPONSE:** Undisputed in part and disputed in part. Undisputed that Jane Doe was staying in the condo next door to where Pastor Johnny and his family were staying.

Disputed to the extent that it leaves out relevant context. Jane Doe took a ten day beach vacation with her husband to Panama City Beach Florida. Exhibit 27, at GP_008671. Less than a week after returning from the ten day vacation, Jane Doe asked to return to the same beach, alone. *Id*. Husband then booked the condo next to Pastor Johnny for Jane Doe. *Id*.

14.     Hunt stated in his deposition that, after speaking to  (Exhibit 4, Hunt Dep. at 216:17-217:6; 218:16-18; 219:11-13.)

**RESPONSE:** Disputed as this "fact" leaves out critical context to the issue Defendant raises. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions. Disputed that the encounter was not consensual. Pastor Johnny had a *consensual,* extramarital encounter with Jane Doe. Hunt Decl. ¶ 2. Doc. 1, at Page ID # 10 ¶ 53. Disputed that Pastor Johnny entered Jane Doe's condo. Jane Doe invited Pastor Johnny to come to her condominium. Ex. 10, Doe Dep. 186:2-5. (Jane Doe "███████████████████████████.") Disputed that Pastor Johnny fondled and kissed Jane Doe's exposed breast for a couple of minutes. Pastor Johnny "fondled and kissed [Jane Doe's] breast," ***after*** Jane Doe pulled down her shirt, exposing her breasts to him. Ex. 8, Hunt Dep. 216:4-25. Disputed that Pastor Johnny pulled down Jane Doe's shorts. Pastor Johnny "pulled her pants down ***with her help***." *Id.*

at 66:12-13. Disputed that the encounter abruptly ended. Pastor Johnny ended the encounter. *Id*. at 66:14-16.

### IV. Guidepost's Interview of Jane Doe, Hunt, and Other Witnesses Regarding the Alleged Sexual Assault

15.     In or about February 2022, Jane Doe's husband approached Guidepost with information about the 2010 encounter between Hunt and Jane Doe. This was the first time the investigators heard of an allegation against Hunt. (Exhibit 5, Holske Dep. at 64:12-16; 83:12-16.)

**RESPONSE:** Undisputed that Jane Doe's husband approached Guidepost about the 2010 encounter and that this was the first investigators had heard of an allegation against Pastor Johnny.

Disputed that this was *just* the first time investigators had heard of an allegation against Pastor Johnny. Guidepost's investigators had ***nothing*** for the section of the Report titled "Allegations of Abuse Committed by Executive Committee Members." Ex. 6, Guidepost 30(b)(6) Dep. 78:15-20.

Further disputed as Guidepost's statement leaves out additional evidence that bears on the issues they raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions.

16.     Starting on March 31, 2022, Guidepost investigators Russell Holske ("Holske")[5] and Samantha Kilpatrick ("Kilpatrick")[6] interviewed and then spoke to Jane Doe and her husband about the encounter on several occasions, separately and together, as well as about subsequent

---

[5]     Before joining Guidepost, Holske was regional director of investigations, security, and trademark protection for Estee Lauder. Previously, he was an agent for the Drug Enforcement Administration for 32 years. (Exhibit 5, Holske Dep. at 7:17-8:20.)

[6]     Before joining Guidepost, Kilpatrick was an attorney in the Wake County district attorney's office for several years and was then an attorney in private practice. In both government and private practice she has worked extensively with survivors over the years and is trained to deal with trauma situations. (Exhibit 7, Kilpatrick Dep. at 10:20-12:5; 182:7-15.)

meetings that took place shortly after the encounter that included Jane Doe, her husband, Hunt, his wife, and a marriage counselor who was an ordained minister on the staff of First Baptist Church Woodstock, Roy Blankenship ("Blankenship"). (Exhibit 5, Holske Dep. at 64:8-19; Exhibit 6, Jane Doe Dep. at 14:6-23:17.)

**RESPONSE:** Objection. Plaintiff objects that the footnotes are immaterial and therefore should be disregarded under Fed. R. Civ. P. 56(a).

Disputed. Disputed that Guidepost started interviewing Jane Doe and her husband on March 31, 2022. Three interviews took place before March 31, 2022—one on February 11, 2022, a second on February 15, 2022, and a third before March 31, 2022. Ex. 16 at ROG 2. There were a total of 11 interviews. *Id.*

Guidepost's communication with the Couple was not limited to these interviews. Ms. Tongring testified that these 11 interviews did not include all interactions between investigators and the Couple. Ex. 6, Guidepost 30(b)(6) Dep. 75:20-76:8. Russell Holske had "many text messages" with Doe's Husband. Ex. 1, Holske Dep. 68:18-20. Samantha Kilpatrick texted Jane Doe. Ex. 10, Doe Dep. 22:2-12. These text messages included Husband's request for Mr. Holske to destroy investigation-related documents Ex. 34 and Husband's request for Mr. Holske to be a reference on a job Husband was applying for with Guidepost. Ex. 24.

17.    During the March 31, 2022 interview and subsequent conversations, Jane Doe advised the Guidepost investigators that Hunt sexually assaulted her in the Panama City Beach condo on July 25, 2010. (Exhibit 6, Jane Doe Dep. at 23:1-17.)

**RESPONSE:** Objection. This statement of fact requires no response by Plaintiff because it is not supported by any cited evidence. Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1).

Nevertheless, Disputed. First, the cited testimony does not refer to a March 31, 2022 interview. Second, the testimony does not refer to any subsequent conversations. Third, the testimony does not refer to "sexual assault[]." Thus, the testimony provides no details on what Jane Doe told investigators on the March 31, 2022 interview and subsequent conversations.

18.     Jane Doe confirmed that the Guidepost investigators asked her and her husband questions about the following general topics, and that the statements made by Jane Doe and her husband in response to those questions were accurately reflected as written in the final version of the Report:

**RESPONSE:** Objection. Plaintiff objects that this fact is immaterial and therefore, should be disregarded under FED. R. CIV. P. 56(a). The following pages of deposition testimony do not "confirm" any questions or answers by Guidepost's investigators. Instead, Jane Doe merely confirmed the accurate reading of several portions of the report.

a.     ██████████████████████████████████████████
       ████████████████████████████

**RESPONSE:** This statement of fact requires no response by Plaintiffs because it is not supported by any cited evidence. Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1). Disputed in part and undisputed in part. Disputed that the cited evidence supports that the Guidepost investigators asked Jane Doe and her husband questions about this fact. Disputed that the cited evidence supports that Jane Doe confirmed that any responses to such questions were accurately reflected in the Report. Undisputed that Jane Doe confirmed that portions of the report were accurately read aloud to her during the deposition.

Also disputed as this "fact" leaves out important evidence that bears on the issues Defendants raise. Pastor Johnny therefore submitted his own statement of facts relevant to

14

Defendants' Motions. Moreover, Jane Doe's own written version of events contradicts the final report. *See* Ex. 27.

b. ████████████████████████████████████████████████████
████████████████████████████████████████████

**RESPONSE:** This statement of fact requires no response by Plaintiffs because it is not supported by any cited evidence. Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1). Disputed in part and undisputed in part. Disputed that the cited evidence supports that the Guidepost investigators asked Jane Doe and her husband questions about this fact. Disputed that the cited evidence supports that Jane Doe confirmed that any responses to such questions were accurately reflected in the Report. Undisputed that Jane Doe confirmed that portions of the report were accurately read aloud to her during the deposition.

Also disputed as this "fact" leaves out important evidence that bears on the issues Defendants raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions. Moreover, Jane Doe's own written version of events contradicts the final report. *See* Ex. 27.

c. ████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

**RESPONSE:** This statement of fact requires no response by Plaintiffs because it is not supported by any cited evidence. Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1). Disputed in part and undisputed in part. Disputed that the cited evidence supports that the Guidepost investigators asked Jane Doe and her husband questions about this fact. Disputed that the cited evidence supports that Jane Doe confirmed that

15

any responses to such questions were accurately reflected in the Report. Undisputed that Jane Doe confirmed that portions of the report were accurately read aloud to her during the deposition.

Also disputed as this "fact" leaves out important evidence that bears on the issues Defendants raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions. Moreover, Jane Doe's own written version of events contradicts the final report. *See* Ex. 27.

d. 

**RESPONSE:** This statement of fact requires no response by Plaintiffs because it is not supported by any cited evidence. Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1). Disputed in part and undisputed in part. Disputed that the cited evidence supports that the Guidepost investigators asked Jane Doe and her husband questions about this fact. Disputed that the cited evidence supports that Jane Doe confirmed that any responses to such questions were accurately reflected in the Report. Undisputed that Jane Doe confirmed that portions of the report were accurately read aloud to her during the deposition.

Also disputed as this "fact" leaves out important evidence that bears on the issues Defendants raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions. Moreover, Jane Doe's own written version of events contradicts the final report. *See* Ex. 27.

e.  8:1.)

16

**RESPONSE:** This statement of fact requires no response by Plaintiffs because it is not supported by any cited evidence. Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1). Disputed in part and undisputed in part. Disputed that the cited evidence supports that the Guidepost investigators asked Jane Doe and her husband questions about this fact. Disputed that the cited evidence supports that Jane Doe confirmed that any responses to such questions were accurately reflected in the Report. Undisputed that Jane Doe confirmed that portions of the report were accurately read aloud to her during the deposition. Di██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ p. 59:14-20.

Also disputed as this "fact" leaves out important evidence that bears on the issues Defendants raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions. Moreover, Jane Doe's own written version of events contradicts the final report. *See* Ex. 27.

f.████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████ 61:18.)

**RESPONSE:** This statement of fact requires no response by Plaintiffs because it is not supported by any cited evidence. Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1). Disputed in part and undisputed in part. Disputed that the cited evidence supports that the Guidepost investigators asked Jane Doe and her husband

questions about this fact. Disputed that the cited evidence supports that Jane Doe confirmed that any responses to such questions were accurately reflected in the Report. Undisputed that Jane Doe confirmed that portions of the report were accurately read aloud to her during the deposition.

Also disputed as this "fact" leaves out important evidence that bears on the issues Defendants raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions. Moreover, Jane Doe's own written version of events contradicts the final report. *See* Ex. 27.

19. Jane Doe and her husband identified three witnesses in addition to Hunt and Blankenship who had information relevant to the incident between Hunt and Jane Doe described in the Report. These witnesses were Southern Baptist clergypersons who were friends and acquaintances of Jane Doe's husband. (Exhibit 7, Kilpatrick Dep. at 246:21-247:21; 248:14-20; 250:9-19; 251:2-20; 252:15-253:12; Exhibit 5, Holske Dep. at 48:18-49:11; 50:7-13; 53:17-54:9; 56:9-57:7; 94:19-95:11.)

**RESPONSE:** Disputed. Disputed that Jane Doe and her Husband identified three "witnesses." None of the "witnesses" Guidepost interviewed were present during the encounter. Ex. 3, Wood Dep. 97:21-98:11; 265:14-15 ("I don't believe anyone [other than Pastor Johnny and Jane Doe] was there.") ("Only [Jane Doe] and Johnny Hunt were in that room."). This is also disputed to the extent that Guidepost's statement leaves out evidence that bears on the issues they raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions. Disputed that any of these witnesses had any information pertaining to a sexual assault. Ex. 2, Kilpatrick Dep. 257:6-7 ("So witness one did not use the word sexual abuse."); *Id.* at 258:2-3 ("I don't believe that witness two used the word sexual assault or sexual abuse.") *Id.* at 259:5-6 ("Witness three did not use the words sexual abuse or sexual assault.") These witnesses

18

corroborated what the husband told them, in 2010, 2012 and 2018, that a consensual encounter between Jane Doe and Pastor Johnny occurred. GPS SOMF 20.

20.    Guidepost interviewed the three witnesses. The three witnesses confirmed that Jane Doe's husband advised them at various points after the encounter, including in 2010, 2012, and in or around 2018, that Hunt had a sexual encounter with his wife, and the Guidepost investigators included what they heard from the witnesses in the Report. (<u>Exhibit 7</u>, Kilpatrick Dep. at 246:21-247:21; 248:14-20; 250:9-19; 251:2-20; 252:15-254:22; <u>Exhibit 5</u>, Holske Dep. at 48:18-49:11; 50:7-13; 53:17-54:9; 56:9-57:7; 94:19-95:11.).

**RESPONSE:** Disputed in part and undisputed in part. Undisputed that Guidepost interviewed these three "witnesses." Disputed that these individuals were "witnesses" as none of them were present during the encounter. Ex. 3, Wood Dep. 97:21-98:11; 265:14-15 ("I don't believe anyone [other than Pastor Johnny and Jane Doe] was there.") ("Only [Jane Doe] and Johnny Hunt were in that room.")

Disputed that Husband advised each "witness" that Hunt had a sexual encounter with his wife. At the time of the conversations in 2010, 2012, and 2018 respectively, Husband thought that his wife had a ***consensual*** encounter with Pastor Johnny. Ex. 11, Leff Dep. 230:9-23 (Q – "All [the husband] did was tell people what he understood, right?" A – That's a fair statement."). The Couple did not believe this was a sexual assault until recently and "only became aware of [their] traumatizing abuse through intensive psychological therapy of Diane Langberg and Associates". Ex. 27 at GP_008667. Doc. 75-1 at Page ID # 867. (The Couple told the Houston Chronicle that "[i]t took more than a decade – and extensive expert therapy – for the couple to begin to articulate what occurred. . . ."). Based on this, it is also disputed that Guidepost included what they heard from these "witnesses." In fact, the Report refers to these "witnesses" as "corroborat[ing]"

19

witnesses for a sexual assault allegation, which is false. Ex. 2, Kilpatrick Dep. 257:6-7 ("So witness one did not use the word sexual abuse."); *Id.* at 258:2-3 ("I don't believe that witness two used the word sexual assault or sexual abuse.") *Id.* at 259:5-6 ("Witness three did not use the words sexual abuse or sexual assault."). These witnesses corroborated what the husband told them, in 2010, 2012 and 2018, that a consensual encounter between Jane Doe and Pastor Johnny occurred. GPS SOMF 20.

Also disputed to the extent that Guidepost's statement leaves out evidence that bears on the issues they raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions.

21.     Holske and Kilpatrick interviewed Blankenship on or about May 9, 2022. (Exhibit 5, Holske Dep. at 148:7-11; Exhibit 8, Blankenship Dep. at 27:6-28:1; 55:20-56:5.)

**RESPONSE:** Disputed. Plaintiff disputes the characterization of this meeting as an "interview." Investigators surprised Blankenship outside his office. Ex. 7, Blankenship Dep. 79:22-25. Blankenship felt that he was "under duress" in the meeting and that he was not comfortable the entire time he was being questioned by Guidepost. Ex. 7, Blankenship Dep. 80:1-6.

Disputed that this was a true interview. Guidepost's internal communications confirm that they were ready to publish the Pastor Johnny story regardless of what Mr. Blankenship had to say during the "meeting." Ex. 31 (Mr. Holske emailed Ms. Tongring, ██████████████████ ███████████████████████████████████ .") (emphasis added). Exhibit 30. (Before interviewing Mr. Blankenship or Pastor Johnny, Mr. Holske texted Ms. Wood and Ms. Tongring "████████████████████████████

20

█████████████████████████████████████████████████████████████
█████████████████████████████████████████████).

22.     Blankenship admitted that the Guidepost investigators questioned him for about 45 minutes about his involvement in the matter. (Exhibit 8, Blankenship Dep. at 65:12-18.)

**RESPONSE:** Plaintiff objects that this fact is immaterial and, therefore, should be disregarded under Fed. R. Civ. P. 56(a). Undisputed.

23.     Blankenship confirmed that the Guidepost investigators asked him about the July 25, 2010 incident between Jane Doe and Hunt at the Panama City Beach condo, as well as a subsequent meeting he held with Jane Doe, her husband, and Hunt on August 2, 2010, at the husband's church office. (Exhibit 8, Blankenship Dep. at 41:1-5; 44:6-21; 59:22-60:3; 62:5-64:15.)

**RESPONSE:** Plaintiff objects that this fact is immaterial and, therefore, should be disregarded under Fed. R. Civ. P. 56(a). Disputed in part and undisputed in part.

Plaintiff disputes this statement to the extent it omits relevant information. Blankenship felt that he was "under duress" in the meeting and that he was not comfortable the entire time he was being questioned by Guidepost. Ex. 7, Blankenship Dep. 80:1-6.

Disputed that this was a true interview. Guidepost's internal communications confirm that they were ready to publish the Pastor Johnny story regardless of what Mr. Blankenship had to say during the "meeting." Ex. 31. Exhibit 30.

24.     Blankenship confirmed that he answered the investigators' questions regarding the July 25, 2010 sexual encounter and the August 2, 2010 meeting. (Exhibit 8, Blankenship Dep. at 59:22-60:3; 62:5-64:15.)

**RESPONSE:** Plaintiff objects that this fact is immaterial and, therefore, should be disregarded under Fed. R. Civ. P. 56(a). Disputed in part and undisputed in part.

21

Plaintiff disputes this statement to the extent it omits relevant information. Mr. Blankenship felt that he was "under duress" in the meeting and that he was not comfortable the entire time he was being questioned by Guidepost. Ex. 7, Blankenship Dep. 80:1-6.

Disputed that this was a true interview. Guidepost's internal communications confirm that they were ready to publish the Pastor Johnny story regardless of what Mr. Blankenship had to say during the "meeting." Ex. 31. Exhibit 30.

25.     Blankenship also confirmed that the Guidepost investigators asked him about a second meeting that took place on or about August 5, 2010, this time with Jane Doe, her husband, Hunt and his wife at Blankenship's office at his counseling facility, HopeQuest, and that Blankenship answered the investigators' questions about that meeting. (Exhibit 8, Blankenship Dep. at 62:5-20; 63:17-64:15.)

**RESPONSE:** Plaintiff objects that this fact is immaterial and, therefore, should be disregarded under Fed. R. Civ. P. 56(a). This statement of fact requires no response by Plaintiff because it is not supported by any cited evidence. Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1). The cited testimony does not support that Investigators asked Mr. Blankenship questions on the second meeting.

Disputed. Plaintiff disputes this statement to the extent it omits relevant information. Blankenship felt that he was "under duress" in the meeting and that he was not comfortable the entire time he was being questioned by Guidepost. Ex. 7, Blankenship Dep. 80:1-6.

Disputed that this was a true interview. Guidepost's internal communications confirm that they were ready to publish the Pastor Johnny story regardless of what Mr. Blankenship had to say during the "meeting." Ex. 31. Exhibit 30.

26.     Blankenship invoked priest/penitent privilege and therefore generally declined to confirm or deny the accuracy of the Report's account of his precise responses concerning what Jane Doe, her husband, and the Hunts told him about the encounter itself or what was said during their subsequent meetings. (Exhibit 8, Blankenship Dep. at 39:5-18; 41:10-23; 42:1-7; 58:3-8; 58:20-59:21; 60:4-9; 61:9-62:4; 62:21-63:5; 64:24-65:9.)

**RESPONSE:** Plaintiff objects that this fact is immaterial and, therefore, should be disregarded under Fed. R. Civ. P. 56(a). Undisputed.

27.     Blankenship was clear that the investigators questioned him extensively about those topics and that he answered their questions when they interviewed him, stating that they were "assertive" and "pushy" and wanted to probe for any information they could get from him regarding the encounter and his meetings with Jane Doe, her husband and the Hunts. (Exhibit 8, Blankenship Dep. at 66:7-67:14.)

**RESPONSE:** Plaintiff objects that this fact is immaterial and, therefore, should be disregarded under Fed. R. Civ. P. 56(a). Disputed in part and undisputed in part. Undisputed that Blankenship described investigators as "assertive," "pushy" and that they wanted to probe for any information they could get from him.   Ex. 7, Blankenship Dep. 66:15-25. Disputed that Blankenship "was clear" that the investigators questioned him extensively about these topics. *Id*. at 66:10-14 (Q – "Well, do you feel like they were careful in trying to cover all the topics of what happened between yourself and the Survivor and Reverend Hunt?" A – "*I don't know that I evaluated whether they were careful or not*.") (emphasis added). Disputed that Blankenship answered the investigators' questions about that meeting. *Id*. at 63:11-13 (Blankenship "responded" to their question.) Ex. 28 at Hunt_0000285. Ex. 7, Blankenship Dep. 65:12-18 (Blankenship "was guarded and hesitant to answer many of the investigators' questions, refusing

to answer some while responding with details to others. He did not want to speak about anything related to his work with the couple in counseling.") Further, it is unclear what "these topics" are and the cited evidence does not support the "fact." Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1).

Plaintiff disputes this statement to the extent it omits relevant information. Blankenship felt that he was "under duress" in the meeting and that he was not comfortable the entire time he was being questioned by Guidepost. *Id.* at 80:1-6.

It is also disputed that this was a true interview. Guidepost's internal communications confirm that they were ready to publish the Pastor Johnny story regardless of what Mr. Blankenship had to say during the "meeting." Ex. 31. Exhibit 30.

28.    Blankenship testified that there was no moment when he felt relieved that the investigators failed to ask him a question that he did not want to answer and, by the same token, he did not have the impression that they failed to ask him a question that they should have asked. (Exhibit 8, Blankenship Dep. at 67:7-14.)

RESPONSE: Plaintiff objects that this fact is immaterial and, therefore, should be disregarded under Fed. R. Civ. P. 56(a). Undisputed that Blankenship testified to these statements.

Plaintiff disputes this statement to the extent it omits relevant information. Blankenship felt that he was "under duress" in the meeting and that he was not comfortable the entire time he was being questioned by Guidepost. Ex. 7, Blankenship Dep. 80:1-6.

It is also disputed that this was a true interview. Guidepost's internal communications confirm that they were ready to publish the Pastor Johnny story regardless of what Mr. Blankenship had to say during the "meeting." Ex. 31. Exhibit 30.

24

29.     Guidepost interviewed Hunt on two occasions, first on April 26, 2022, and again on May 12, 2022. (Exhibit 4, Hunt Dep. at 114:16-22; 125:9-13.)

**RESPONSE: Disputed.**

Plaintiff disputes any suggestion that Guidepost met with him on two occasions regarding the allegations against him. During the first meeting, on April 26, 2022 despite having conducted at least six interviews with Jane Doe and her Husband, Guidepost investigators did not mention Jane Doe, her Husband, or their allegations against Pastor Johnny. Exhibit 35. Ex. 6, Guidepost 30(b)(6) Dep. 191:19-192:10;192:11-19. Ex. 1, Holske Dep. 218:5-13. Exhibit 16 at ROG 2.

Disputed that the May 12, 2022, Zoom call was an interview. Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview.") During the Zoom call, Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her.") During this "interview," investigators were talking over Pastor Johnny. Ex. 8, Hunt Dep. 278:4-6. Also disputed to the extent that Guidepost's statement leaves out evidence that bears on the issues they raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' motions.

Further, the evidence shows that the "interview" did not matter and Guidepost was ready to publish the allegations against Pastor Johnny regardless of what he said. Exhibit 30. (Before interviewing Mr. Blankenship or Pastor Johnny about these allegations, Mr. Holske texted Ms. Wood and Ms. Tongring " ██████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████ (emphasis added).

30.     Hunt testified that the Report accurately stated that, "during the first interview, Dr. Hunt did acknowledge that, during his publicly-announced extended sabbatical, he was under the care of Mr. Blankenship," and that the sabbatical followed his sexual encounter with Jane Doe; and that Hunt's 2010 sabbatical was, in conjunction with Hunt's prior cancer recovery, directly related to his sexual encounter with Jane Doe "because that's when it happened." (Exhibit 4, Hunt Dep. at 123:5-124:24, 157:23-158:7; Exhibit 3, Report at 158.)

**RESPONSE:** Plaintiff objects that this fact is irrelevant and, therefore, should be disregarded under Fed. R. Evid. 402. Disputed that Pastor Johnny testified that the Report accurately stated that, "during the first interview, Dr. Hunt did acknowledge that, during his publicly-announced extended sabbatical, he was under the care of Mr. Blankenship," and that the sabbatical followed his sexual encounter with Jane Doe. Disputed that Pastor Johnny testified that this sabbatical directly related to his sexual encounter with Jane Doe. Ex. 8, Hunt Dep. 124:16-24 (Q – "So to be clear, the sabbatical, the extended sabbatical in 2010 related directly to your encounter with Jane Doe from July 2010?" A – "*I can't say that* exactly. Because if I could not have gotten back to the place where I didn't feel dead inside, I wouldn't have been going back then either. So I already had something going on that my wife is aware of and that I told her two weeks previous and then this certainly added to that.") (emphasis added). Further disputed by Defendant's own statement of fact in the proceeding chart. (***During the first interview, Dr. Hunt did acknowledge that, during his publicly announced extended sabbatical, he was under the care of Mr. Blankenship.** When asked if the sabbatical was at all related to a sexual abuse matter, he replied in the negative.* Investigators asked Dr. Hunt several questions about [Jane Doe's husband's] church, without identifying [Jane Doe's husband]. They asked if Dr. Hunt knew the circumstances of the resignation of the senior pastor at that church, who suddenly and without

26

explanation resigned in 2010. Dr. Hunt stated that he did not know who [Jane Doe's husband] was, or why he had resigned. (Exhibit 4, Hunt Dep. at 121:15-123:4; 157:23-158:7; 158:15-159:11; 161:8-14; Exhibit 3, Report at 158.)) SOMF 18a.

31.    During the second of the two interviews on May 12, 2022, Guidepost asked Hunt a series of questions about his sexual encounter with Jane Doe, as well as his prior relationship with Jane Doe and her husband, and his meetings with Blankenship, Jane Doe, and her husband following the encounter. (Exhibit 4, Hunt Dep. at 160:2-179:3; Exhibit 3, Report at 158-161.)

**RESPONSE:** Disputed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny.  Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id.* at 278:4-6. Exhibit 30. (Before interviewing Pastor Johnny about these allegations, ███████████ ████████████████ngr███████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████   ███████████  mphasis added).

32.    During his deposition, Hunt confirmed that, the Report accurately recorded questions that the investigators put to him with few exceptions, on the following topics and that the Report accurately recorded his responses to the investigators to those questions. The portions of the Report concerning which Hunt testified at his deposition are set forth below in the order in which he was questioned; italicized portions indicate that Hunt acknowledged being questioned

27

on those topics and that the Report accurately recorded his answer. The portions not italicized signify that Hunt denied being asked those questions by the investigators and/or disputes having given the response:

**RESPONSE:** Objection, Local Rule 56.019b) requires that "each fact must be set forth in a separate numbered paragraph." Plaintiff objects that these facts are highly confusing, therefore, should be disregarded under Fed. R. Evid. 402. Objection, it is impossible to decipher whether the questioning attorney sought to elicit (1) whether the attorney read a portion of the report accurately, (2) whether investigators asked about a topic, or (3) whether a statement to investigators was accurately recorded in the Report. Disputed as these facts omits important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

Further disputed to the extent that Guidepost's statement leaves out evidence that bears on the issues they raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions.

Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him.

---

*During the first interview, Dr. Hunt did acknowledge that, during his publicly announced extended sabbatical, he was under the care of Mr. Blankenship.* When asked if the sabbatical was at all related to a sexual abuse matter, he replied in the negative. Investigators asked Dr. Hunt several questions about [Jane Doe's husband's] church, without identifying [Jane Doe's husband]. They asked if Dr. Hunt knew the circumstances of the resignation of the senior pastor at that church, who suddenly and without explanation resigned in 2010. Dr. Hunt stated that he did not know who [Jane Doe's husband] was, or why he had resigned. (Exhibit 4, Hunt Dep. at 121:15-123:4; 157:23-158:7; 158:15-159:11; 161:8-14; Exhibit 3, Report at 158.)

    **RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

---

*[During the second interview] Guidepost investigators explained to Dr. Hunt that they had received an allegation of abuse involving him and [] if he knew what they were talking about;*

29

*Dr. Hunt responded that he was "totally in the dark."* (Hunt Dep. at 160:7-19; <u>Exhibit 3</u>, Report at 158.)

      **RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

*In the second interview, Dr. Hunt acknowledged this time that he knew [Jane Doe's husband]. Dr. Hunt stated that he had known the couple for at least twenty years, that [Jane Doe's husband] had been converted under his ministry, and that Dr. Hunt had been a strong influence on [Jane Doe's husband's] life. For a time, they pastored churches in the same state.* (<u>Exhibit 4,</u> Hunt Dep. at 160:20-161:17; <u>Exhibit 3</u>, Report at 158.)

      **RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context. Disputed that investigators had asked about Jane Doe's husband. Ex. 8, Hunt Dep. 160:23-24 ("A – "Being the first time they asked me if I knew him.") Disputed as these

facts omit important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id.* at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. *Id.* at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

***Dr. Hunt remembered Survivor texting him a picture of the pier saying that she was there. When asked if he knew where she was, Dr. Hunt said that unbeknownst to him Survivor had rented the condo next door, but he had no role in that. He stated that he has no idea who owned the condo next door because the building is mostly rentals.*** (Exhibit 4, Hunt Dep. at 161:18-162:2; 162:15-164:13; Exhibit 3, Report at 159.)

**RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom

call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

***When asked if he had any contact with Survivor while he was there, he responded that it was very brief on the balcony. While on the balcony he remembers Survivor telling him about going to see Bobby Bowden speak that morning but did not remember her saying what else she did that day before getting to the beach. (Both Dr. Hunt and Survivor described the balconies as side by side but you could not walk through to the other.) Dr. Hunt was asked whether he went onto her balcony or entered her condo and he responded he never entered her condo and was never on her balcony.*** (Exhibit 4, Hunt Dep. at 164:16-165:21; Exhibit 3, Report at 159.)

**RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context. Pastor Johnny explained that "in the context of being vey unsure of what [he] wanted to say to someone that had made so many accusations," he denied investigators false narrative. Ex. 8, Hunt Dep. 165:20-22. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7

("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

---

*Dr. Hunt said that after seeing Survivor out on the balcony he did not have any further contact with Survivor during the time she was there. However, later in the interview he stated that he saw her the next day on the beach and then the following day his wife said something to her.* And he does not know whether she changed places or just went home. (Exhibit 4, Hunt Dep. at 165:15-166:5; Exhibit 3, Report at 159.)

**RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

---

*Dr. Hunt said that he did not have any physical contact with Survivor – "no contact whatsoever." He also restated that it was not true that he was on the balcony or in the condo. When asked specifically about whether he kissed her, pulled at her shorts, or fondled her, he said no.* He denied sexualized comments about her appearance, panties, tan lines, or perfume. (Exhibit 4, Hunt Dep. at 166:12-167:14; Exhibit 3, Report at 159.)

33

**RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context within the cited testimony. Pastor Johnny was not interviewed. Ex. 8, Hunt Dep. 166:22-167:5 ("In the context of the – and these weren't questions that are being asked like you are reding to me now. We are having a very sensible conversation. This was not a sensible conversation. This was an attack. This was blindsided. This was: We have already got our report. We are getting ready to bill $2 million. You are all we got, and they dove in on me. And that's what happened. And so I'm denying it in the context of their claim." The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

*Hunt further admitted that he told Jane Doe at the time that her perfume smelled nice.* (Exhibit 4, Hunt Dep. at 167:8-14; Exhibit 3, Report at 159.)

**RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits

34

important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

---

***Dr. Hunt shared that his wife was uncomfortable with Survivor next door by herself because it just did not look right that she was down there all alone. At some point, he thinks his wife may have said something to Survivor, and that all he knew was that Survivor was not there anymore***. (Exhibit 4, Hunt Dep. at 167:15-168:18; Exhibit 3, Report at 159-160.)

**RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as this omits the context Pastor Johnny provided in the cited testimony. Pastor Johnny's wife was uncomfortable with Doe's actions. Ex. 8, Hunt Dep. 167:20-168:6 "In the context that she seen [Doe] on the beach half naked in front of me, and thinking: What is she doing down here? She was just here two weeks ago with her husband. What's she doing back without her husband… So in that context. So to not put it in that context is to tell a lie." Disputed as these facts omits important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8,

Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

***When asked whether his wife was there the whole time with him, he stated that there may have been a brief time that she was not there because of an event at Southeastern Baptist Theological Seminary where she may have flown in and out in one day or the next day. He said it was possible that she was not there some of the time that Survivor was there.*** (Exhibit 4, Hunt Dep. at 168:19-169:4; Exhibit 3, Report at 160.)

      **RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. Id. at 278:4-6. Also disputed as it omits that

Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

*When asked if he contacted Mr. Blankenship, the counselor, because there was a problem between [Jane Doe's husband] and Survivor, he said that he did not contact him in regard to that but just for general help because [Jane Doe's husband] was transitioning in ministry and Dr. Hunt had always been a sounding board for him.* (Exhibit 4, Hunt Dep. at 169:5-12; Exhibit 3, Report at 160.)

**RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. Id. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

*Dr. Hunt remembers only one meeting with the couple on August 2, 2010. He said the meeting was brief and that he and his wife, along with [Jane Doe's husband] and Survivor and Mr.*

***Blankenship were present. Dr. Hunt claims that he never directed the couple towards Mr. Blankenship for counseling.*** (Exhibit 4, Hunt Dep. at 169:13-170:22; Exhibit 3, Report at 160.)

 **RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. Id. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

***Dr. Hunt said that he did not apologize to Survivor for sexually assaulting her during this meeting because there was no contact between the two of them.*** He denied saying "Praise Jesus that I didn't consummate the relationship." If there was an apology, Dr. Hunt believed it was related to Mrs. Hunt offending Survivor about being concerned with her being there alone, and them apologizing for her having to leave. He stated that "Someone has created a story on me. I would like to hear her story on this." (Exhibit 4, Hunt Dep. at 170:23-171:5; 171:20-172:24; 175:1-176:4; Exhibit 3, Report at 160.)

 **RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview."

Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

***Dr. Hunt said that Survivor had never come on to him and he never felt threatened by her. Dr. Hunt stated that he and [Jane Doe's husband] have stayed in contact over the years. Investigators asked Dr. Hunt if there were any similar allegations with other women. Dr. Hunt answered no.*** (Exhibit 4, Hunt Dep. at 176:10-21; Exhibit 3, Report at 160.)

**RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that

Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

---

***Several times during the interview, Guidepost investigators directly asked Dr. Hunt about specific allegations of sexual abuse against the Survivor, controlling the narrative through the use of an unlicensed therapist, and trying to protect his ministry, 40,000 churches, and the SBC, all of which he denied.*** (Exhibit 4, Hunt Dep. at 176:22-178:4; Exhibit 3, Report at 160.)

      **RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context. Pastor Johnny testified that investigators questions were "drawing a narrative" and his denials were in that context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

40

> *The investigators asked Dr. Hunt if there was anyone else he thought we should speak with about the matter, and he said the only ones who would know would be the couple and Mr. Blankenship. The investigators asked if he thought his wife would speak with us and he replied no, saying that he doubts his wife would speak to us because her take was that we handled it and moved on.* Investigators understood this to mean that Dr. Hunt had apologized for the fact that his wife had upset Survivor by telling her to leave. Throughout the interview, Dr. Hunt remained very calm, expressed little to no emotion, did not get upset, did not raise his voice, or express outrage at the allegations. (<u>Exhibit 4,</u> Hunt Dep. at 178:9-179:9; <u>Exhibit 3,</u> Report at 160-161.)
>
> **RESPONSE:** Undisputed that Pastor Johnny was read relevant portions of the report and testified that the attorney accurately read that portion to him. Disputed as these facts omits important context. Pastor Johnny was never interviewed. The Zoom call was not an "interview." Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview."). During the Zoom call Guidepost investigators, Mr. Holske and Ms. Kilpatrick, accused Pastor Johnny of sexually assaulting Jane Doe. Ex. 8, Hunt Dep. 136:21-137:10 ("They weren't much on asking questions. It was accusations.") Investigators ambushed Pastor Johnny. Ex. 8, Hunt Dep. 103:16-20 ("[I]mmediately, they both dove in…Tell us about how you assaulted her."). During this Zoom call investigators were talking over Pastor Johnny. *Id*. at 278:4-6. Also disputed as it omits that Pastor Johnny's denials were in the context of the investigator's false narrative. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no.").

33.     The Guidepost investigators gave Hunt the opportunity to supplement what he told them within 48 hours, but he did not do so. (<u>Exhibit 4,</u> Hunt Dep. at 104:16-18; 268:2-15.)

**RESPONSE:** Disputed in part and undisputed in part. Undisputed that Pastor Johnny did not contact Guidepost in the forty-eight hours following the May 12th meeting. Disputed that

41

Guidepost actually gave Pastor Johnny forty-eight hours to contact them. Pastor Johnny met with Guidepost at 12:15pm Eastern Time on May 12, 2022. Ex. 71 at GP_023504. Guidepost decided that Pastor Johnny would be included in the report at 10:08am Eastern Time on May 13, 2022, less than twenty-four hours after the second meeting occurred. Ex. 71 at GP_023505. (Ms. Tongring texted Ms. Wood ███████████████████████ .                    )

34.     Instead, shortly after his interview with the Guidepost investigators, Hunt engaged lawyers to raise the possibility of litigation with Guidepost if they delivered the Report to the SBC with Jane Doe's account of sexual abuse Doe in her condo. (Exhibit 4, Hunt Dep. at 272:9-12; 275:1-13 & Exhibit 9 [Defendants' Exhibit 11].)

**RESPONSE:** Plaintiff objects that this fact is immaterial and, therefore should be disregarded under Fed. R. Civ. P. 56(a). Undisputed that Pastor Johnny engaged legal counsel. Disputed that Guidepost interviewed Pastor Johnny about this encounter. Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview.") Plaintiff incorporates by reference Plaintiff's Response to SOMF ¶ 31. Disputed that the Guidepost Report simply included Jane Doe's account of sexual abuse. Guidepost included their "conclusions regarding the alleged abuse reported by Jane Doe." (EC Statement of Undisputed Fact #17 citing (Doc. 1–2, Page ID #54, 98–99, 182–194.))

35.     Hunt's counsel did not advise Guidepost that Jane Doe had initiated the encounter, that it was consensual, or otherwise point to any anticipated falsehoods in the Report but confined their complaint to the suggestion that the Guidepost investigators had failed to convey an *Upjohn* warning to Hunt. (Exhibit 4, Hunt Dep. at 272:9-12; 274:21-276:3 & Exhibit 9 [Defendants' Exhibit 11].)

**RESPONSE:** Plaintiff objects that this fact is immaterial and, therefore should be disregarded under Fed. R. Civ. P. 56(a). Disputed in part and undisputed in part. Undisputed that

Pastor Johnny's counsel did not advise Guidepost that Jane Doe had initiated this encounter. Plaintiff disputes the suggestion that Pastor Johnny's counsel could have pointed to "anticipated falsehoods." Neither Pastor Johnny nor his counsel knew what was going to be in the report. Ex. 8, Hunt Dep. 275:18-24. Guidepost did not give Pastor Johnny an opportunity to review the portion of the Report pertaining to him. Ex. 6, Guidepost 30(b)(6) Dep.179:21-180:7.

36.     Guidepost was not called upon to determine whether the sexual encounter was consensual, since Hunt denied that any sexual encounter ever occurred with Jane Doe. (Exhibit 10, Wood Dep. at 161:20-162:23; 169:17-19; 170:16-18.)

**RESPONSE:** Disputed. Guidepost's CEO, Julie Meyers Wood testified that Guidepost had an obligation to make "its own assessment of whether the encounter was consensual or nonconsensual." Ex. 3, Wood Dep. 246:1-5 (Q – "Before accusing someone of sexual assault, you agree that *Guidepost had an obligation to make its own assessment of whether the encounter was consensual or nonconsensual*?" A – "Yes.") (emphasis added). Guidepost was engaged to investigate "allegations of *abuse* by Executive Committee members." Ex. 23, Section 3.1 (emphasis added). Guidepost's lead investigator understood that for there to be a sexual assault, there has to be a situation where there was not consent. Ex. 2, Kilpatrick Dep. 188:21-189:2. Guidepost reported and published that Johnny Hunt sexually assaulted Jane Doe despite not "looking to see whether there was consent." Ex. 28 at Hunt_0000279-291. (Guidepost refers to Jane Doe as "survivor" throughout the report.) Ex. 1, Holske Dep. 238:15-239:1 (Q – "And the impression that you for your part in drafting this report and your contributions, you were attempting to convey that [Jane Doe] survived a sexual assault; is that right?" A – "That's correct.") Ex. 3, Wood Dep. 176:7-9 (Ms. Wood testified "we weren't looking to see whether there was consent…").

37.    Guidepost followed industry standards in planning and conducting interviews of each of the relevant witnesses and did so under circumstances of complete independence. (Exhibit 11, Deposition of Douglas Leff, SI Global Partners, at 14:5-20:18; 27:14-28:2; 75:23-81:9; 165:5-167:6; 180:3-182:1; 201:23-204:4-230:15-232:13.)[7]

**RESPONSE:** Disputed. Guidepost did not follow industry standards in planning and conducting interviews of the relevant witnesses and did not do so under circumstances of complete independence. Guidepost's own expert, opined in his report that providing a portion of the draft Report to Jane Doe and her husband for review and suggested editing was a "*variation* from typical investigative techniques." Ex. 20 p. 11 (emphasis added). Jane Doe and her husband had many edits. (Ex. 77) (Jane Doe texted Ms. Kilpatrick ██████████████ d.") Disputed that Guidepost conducted interviews under circumstances of "complete independence." Investigators were "█████" for Jane Doe and her husband during the investigation. Ex. 84 (Lead investigator texted Jane Doe's husband "████████████████" on May 29, 2022, before ever interviewing Pastor Hunt about the allegations.) Investigators wanted to publish a report with "█████." Ex. 32. Guidepost's CEO, Julie Meyers Wood, testified that Guidepost *had an obligation* to make "its own assessment of whether the encounter was consensual or nonconsensual." Ex. 3, Wood Dep. 246:1-5 (Q – "Before accusing someone of sexual assault, you agree that *Guidepost had an obligation to make its own assessment of whether the encounter was consensual or nonconsensual?*" A – "Yes.") (emphasis added). Wood also testified that Guidepost did nothing

---

[7]    Mr. Leff is a Managing Director of SI Global Partners. Previously, he was served as a Special Agent with the Federal Bureau of Investigation (FBI) from 1996-2022, starting at the New York Organized Crime Branch and ultimately serving as Assistant Director in Charge of the Inspection Division, the top internal compliance investigative position in the agency. His work in the Inspection Division involved reviewing the adequacy of prior investigations. (Exhibit 11, Deposition of Douglas Leff, SI Global Partners, at 8:1-9:25; 10:22-11:6.)

to determine whether the sexual encounter between Pastor Johnny and Jane Doe was consensual. Ex. 3, Wood Dep. 156:4;161:15-162:3;170:16-17;176:7-8;189:7-8 ("[T]his wasn't about consent," "the report was not determining whether or not there was consent," "[t]his was not an issue of whether or not there was consent," "we weren't looking to see whether there was consent," and "the issue here was not consent.").

## V. Guidepost's Submission of the Factual Portions of the Report Regarding Hunt to the Committee on Cooperation and the SBC Task Force

38.      Pursuant to Section 3.5 of the Engagement Agreement, for the sole purpose of ensuring the factual accuracy of the Report, Guidepost was to show factual portions of the Report to the Committee on Cooperation and the SBC Task Force. (Exhibit 2.)

**RESPONSE:** Disputed in part and undisputed in part. Undisputed that this language appears in Section 3.5 of the Engagement Letter, disputed to the extend this is an incomplete description of the Committee on Cooperation of the Executive Committee's role. The Committee on Cooperation could "check the facts, the polity, and the grammar of the report." Ex. 4, EC 30(b)(6) Dep. 227:17-23). The Committee on Cooperation of the Executive Committee could also "discuss suggested languages or changes." Ex. 61. According to the Engagement Letter, after reviewing the draft Report, the Committee on Cooperation of the Executive Committee would have "five (5) calendar days to review and *dispute* the factual information present in, or relied upon, and/or *related conclusions* reached in the draft Report, and to provide supplemental documents and/or information to Guidepost." Section 23, Section 3.5 (emphasis added). The Committee on Cooperation of the Executive Committee could also "discuss suggested languages or changes." Ex. 61.

Disputed the Committee on Cooperation of the EC only reviewed factual portions of the Report. According to the Engagement Letter, the Committee on Cooperation of the Executive

45

Committee would have "five (5) calendar days to review and ***dispute*** the factual information present in, or relied upon, and/or ***related conclusions*** reached in the draft Report. . . ." Section 23, Section 3.5.

Disputed that the EC did not review the drafts of the report. The Committee on Cooperation of the EC was acting on behalf of the EC. The Committee on Cooperation was a Committee of the EC and "was created as a means of assuring the investigation into the EC's handling of sexual abuse is able to proceed as planned and that EC trustees are represented throughout the process," and it "***represents [the EC] in this process.***" Ex. 45 at COC_0000010 (emphasis added). The Committee on Cooperation was a way for the EC to have an official relationship with Guidepost Solutions while maintaining the independence of Guidepost.[8] The Committee on Cooperation of the Executive Committee consisted of two members that had been appointed by the EC, the SBC president (an ex-officio member of the EC), and two were appointed by the Sexual Abuse Task force of the SBC. Ex. 4, EC 30(b)(6) Dep. 274:15-25; Ex. 23, Section 2.2. All five members of the Committee on Cooperation of the Executive Committee were members of the SBC Executive Committee. Ex. 4, EC 30(b)(6) Dep. 275:8-11.

39.    At first, Guidepost provided drafts of factual portions of the majority of the Report to both the Committee on Cooperation and the SBC Task Force but at that time Guidepost had not yet completed Hunt's second interview. (<u>Exhibit 12</u>, Guidepost 30(b)(6) Dep. at 128:16-129:20.)

**<u>RESPONSE:</u>** Disputed in part and undisputed in part. Undisputed that Guidepost provided drafts of the report to both the Committee on Cooperation of the Executive Committee and the SBC Task Force. Disputed that such drafts were only factual portions. Ex. 3, Wood Dep.

---

[8]https://thebaptistpaper.org/five-member-liaison-group-set-for-executive-committee-investigation/#:~:text=%E2%80%9CThe%20Committee%20on%20Cooperation%20is,interview%20with%20The%20Baptist%20Paper, archived at https://perma.cc/2FXB-YVFB

427:10-21 ("could review the report" and "provided a hard copy of the report.") According to the Engagement Letter, The Committee on Cooperation could review and dispute conclusions in the draft Report. Ex. 23, Section 3.5 ("Guidepost shall allow the Committee on Cooperation five (5) calendar days to *review and dispute* the factual information presented in, or relied upon, and/or *related conclusions* reached in the draft Report, and to provide supplemental documents and/or information to Guidepost.") (emphasis added). Plaintiff disputes any suggestion that Guidepost only provided drafts to these the Committee on Cooperation of the Executive Committee and the SBC Task Force. Guidepost provided Jane Doe and her husband the Johnny Hunt section of the Report to review and edit. Ex. 1, Holske Dep. 207:22-208:16. Ex. 2, Kilpatrick Dep. 114:22-115:12 ("We received…a red line document back from [Jane Doe and her husband]") Guidepost also provided the Report to two individuals who were not appointed to the Committee on Cooperation of the Executive Committee or the SBC Task Force. Ex. 3, Wood Dep. 427:10-21 ("As I recall, they asked to have an extra person or two attend to provide commends and we allowed that.") Disputed that Guidepost interviewed Pastor Johnny about this encounter. Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview.").

40.     At that time, Hunt's section of the Report was still being reviewed and edited by Guidepost personnel. (<u>Exhibit 12</u>, Guidepost 30(b)(6) Dep. at 130:6-131:2.)

**RESPONSE:** Undisputed. Undisputed that Guidepost was still reviewing and editing the Hunt's section of the Report despite not even *mentioning* to Pastor Johnny the allegations against him. Ex. 2, Kilpatrick Dep. 68:2-7. (Guidepost did not approach Hunt "specifically with the allegations" until May 12, 2022).

41.     Then, on May 12, 2022, in accordance with the Engagement Agreement, Guidepost provided the factual portions of the Report to the SBC Task Force with the Hunt

47

allegations via a password-protected file.  (Exhibit 13, GP_23,422-GP_23,424; Exhibit 10, Wood Dep. 428:15-430:4.)

**RESPONSE:** Disputed in part and undisputed in part. Undisputed that Julie Meyers Wood testified that the Report was shared with the SBC Task Force on May 12, 2022. The cited evidence does not support that the shared drafted was limited to "factual portions." Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1). Disputed. Julie Meyers Wood testified that this was "the Johnny Hunt portion." Ex. 3, Wood Dep. 428:15:429:1. The draft reviewed by the Committee on Cooperation contained Guidepost's conclusions. Ex. 72. at GP_007422 (███████████████████████████████

███████████████) Guidepost also provided the Report to two individuals who were not appointed to the Committee on Cooperation of the Executive Committee or the SBC Task Force in violation of the Engagement Letter. Ex. 3, Wood Dep. 427:10-21 ("As I recall, they asked to have an extra person or two attend to provide commends and we allowed that."). Guidepost also provided a copy of the Johnny Hunt portion of the Report to Jane Doe and her husband. Ex. 36. Disputed that such review was in accordance with the Engagement Letter. This process was in violation of the engagement letter. Ex. 23, Section 3.5. ("For the sole purpose of ensuring the factual accuracy of its report, Guidepost will provide a draft of any factual information contained in the report to the ***Task Force and the Committee on Cooperation 35 days prior*** to submitting it to the Task Force. The Committee on Cooperation may review the draft with Guidepost together with any supporting documents and/or information, in order to confirm the accuracy of the factual information presented in, relied upon, or related to matters and/or issues contained in the draft Report. Guidepost ***shall allow the Committee on Cooperation five (5) calendar days to review and dispute*** the factual information presented in, or relied upon, and/or related

48

conclusions reached in the draft Report, and to provide supplemental documents and/or information to Guidepost.) (emphasis added).

42.    Then, on May 13, 2022, Guidepost showed factual portions of the Report that contained references to Hunt's encounter with Jane Doe in a confidential Zoom meeting with members of the Committee on Cooperation present.  (Exhibit 12, Guidepost 30(b)(6) Dep. at 152:3-12.)

**RESPONSE:** Disputed in part and undisputed in part. Undisputed that on May 13, 2022 Guidepost showed portions of the Report that contained the Hunt allegations to members of the Committee on Cooperation of the Executive Committee.

Disputed that this was factual portions of the Report, with the Hunt allegations. Julie Meyers Wood testified that this was "the Johnny Hunt portion." Ex. 3, Wood Dep. 428:15-429:1. Plaintiff disputes any suggestion that this Zoom was confidential or that only members of the Committee on Cooperation were present. Ex. 3, Wood Dep. 429:2-430:1 ("So the – the only people that got a copy before the report are these two groups that I just identified, that *the COC with those individuals of the COC added* and the Task Force.") (emphasis added) Disputed that such review was in accordance with the Engagement Letter. This process was in violation of the engagement letter. Ex. 23, Section 3.5 ("For the sole purpose of ensuring the factual accuracy of its report, Guidepost will provide a draft of any factual information contained in the report to the *Task Force and the Committee on Cooperation 35 days prior* to submitting it to the Task Force. The Committee on Cooperation may review the draft with Guidepost together with any supporting documents and/or information, in order to confirm the accuracy of the factual information presented in, relied upon, or related to matters and/or issues contained in the draft Report. Guidepost *shall allow the Committee on Cooperation five (5) calendar days to review and dispute*

49

the factual information presented in, or relied upon, and/or related conclusions reached in the draft Report, and to provide supplemental documents and/or information to Guidepost.) (emphasis added).

43.     Neither the Committee on Cooperation nor the SBC Task Force disputed any factual information presented in the Hunt portion of the Report. (Exhibit 10, Wood Dep. at 431:13-432:18.

**RESPONSE:** Disputed. Both the Committee on Cooperation of the Executive Committee and the SBC Task Force disputed information presented in the Hunt portion of the Report. The Committee on Cooperation of the EC provided comments on the Johnny Hunt Section which Ms. Tongring recorded as comments in the margins of a draft Report. Ex. 71 at GP_023508. (Ms. Tongring asked Ms. Wood if she should take notes and "is it okay if I do it by comment in…")) Ex. 72. (Krista Tongring added comments to the Johnny Hunt section of the report.) The Task Force also disputed information presented in the Johnny Hunt portion. Exhibit 47 ("███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████                █████████████████████████

## VI.     Guidepost Submits the Report to the SBC Task Force, Which Publishes the Report on its Own Website

44.     On or about May 15, 2022, Guidepost delivered its Report of the Independent Investigation (the "Report") to the SBC Task Force. (Exhibit 3.)

**RESPONSE:** Objection, The cited evidence does not support that Guidepost delivered this Report to the SBC Task Force. Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1). Disputed that Guidepost did not also published the report to the world. Guidepost admitted to publishing the report. Ex. 1, Holske Dep. 46:2-3

("Guidepost *published* the report on May 22nd, 2022). (emphasis added) *Id*. at 46:17-22 (Q – "[Y]ou know without any doubt, sir, that your company on May 22, 2022, posted a report pertaining to your investigation, including allegations associated with Pastor Johnny Hunt, right?" A – "Correct."). Guidepost's website featured a banner, directing users to the Report, "CLICK HERE" for the "SBC EC Report." Ex. 64. Plaintiff incorporates by reference Plaintiff's Response to SOMF 42.

45.     Guidepost did not transmit the Report to any other person. (Exhibit 12, Guidepost 30(b)(6) Dep. at 145:12-146:1; 148:4-12; 152:3-19; 159:21-160:18; Exhibit 10, Wood Dep. 95:15-21; 429:2-430:11.)

**RESPONSE:** Disputed. Guidepost admitted to publishing the report. Ex. 1, Holske Dep. 46:2-3 ("Guidepost *published* the report on May 22nd, 2022). (emphasis added) *Id*. at 46:17-22 (Q – "[Y]ou know without any doubt, sir, that your company on May 22, 2022, posted a report pertaining to your investigation, including allegations associated with Pastor Johnny Hunt, right?" A – "Correct."). Guidepost's website featured a banner, directing users to the Report, "CLICK HERE" for the "SBC EC Report." Ex. 64. Plaintiff incorporates by reference Plaintiff's Response to SOMF 42.

46.     Hunt admitted in his deposition that he has no evidence that Guidepost ever published the Report other than to submit it to the SBC Task Force pursuant to the Engagement Agreement. (Exhibit 4, Hunt Dep. at 292:11-17; 294:6-295:10.)

**RESPONSE:** Disputed. Objection, this asks for a legal conclusion. Pastor Johnny did testify that he has no evidence that Guidepost published the Report. Pastor Johnny testified to the contrary. Pastor Johnny testified that Guidepost posted "a link to the report on [its] website," and that its Guidepost's Report. Ex. 8, Hunt 291:8-16;292:1-17;294:6-295:10.

51

47.     The Report contained not only the allegations by Jane Doe, her husband, and the other witnesses, but also related Hunt's categorical denial of a sexual encounter. (Exhibit 3, Report at 159-160.)

**RESPONSE:** Disputed. The Report is directly contradicted by record evidence provided by Jane Doe and her Husband. Ex. 27. Pastor Johnny was never interviewed about the allegations against him. Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview.") Plaintiff incorporates by reference Plaintiff's Response to SOMF 31. Disputed that the Report only contained allegations by Jane Doe. Guidepost referred to Jane Doe as a survivor, to convey that she had actually been sexually assaulted. Ex. 28, at H_0000135. (The Report defines the term "survivor" to mean "those persons who ***actually suffered*** at the hands of SBC clergy or SBC church staff or volunteers . . . ." (emphasis added)). Ex. 1, Holske 238:18-239:1 (Guidepost referred to Jane Doe as "Survivor" to convey that she has survived a sexual assault.) Disputed that the report contained allegations of other witnesses. The "corroborating witnesses' did not corroborate a sexual assault. Ex. 2, Kilpatrick Dep. 257:6-7 ("So witness one did not use the word sexual abuse."). *Id*. at 258:2-3 ("I don't believe that witness two used the word sexual assault or sexual abuse."). *Id*. at 259:5-6 ("Witness three did not use the words sexual abuse or sexual assault.") Ex. 28, at Hunt_0000285. ("[Blankenship reported very similar details and events to those reported by Survivor and Pastor, with ***the only significant difference being on the issue of consent***.") (emphasis added).  Disputed that the Report contained Pastor Johnny's denial. Pastor Johnny denied having physical contact with Jane Doe, in the context of investigators presenting a false narrative. Ex. 8, Hunt Dep. 141:19-22 (Q – "And what was your response to the question, Did you have any physical contact with Jane Doe?" A – "In the context of them lying, to start with, and giving a false narrative, my answer was no.").

Additionally, this is disputed to the extent that Guidepost's statement leaves out evidence that bears on the issues they raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' motions.

48.     The Report was never hosted on the Guidepost website at any time. Rather, Guidepost placed at the top of its own website an "SBC EC" tab. When a person clicked on that hyperlink, the visitor immediately left the Guidepost website and was taken to website of the *SBC Task Force*, which, in turn, hosted the Report. Once there, the viewer would have to scroll down the SBC Task Force website past certain updates to the SBC community until coming to yet *another* hyperlink, which only would then display the Report. Again, by this point the visitor was no longer on the Guidepost website. In other words, the Report was "published," not by Guidepost, but by the SBC Task Force in accordance with the Engagement Agreement. (Exhibit 12, Guidepost 30(b)(6) Dep. at 146:8-147:8, 204:11-206:7; 235:12-236:13; Exhibit 10, Wood Dep. at 201:17-203:6, 216:4-217:20.)[9]

**RESPONSE:** Objection, this asks for a legal conclusion. Disputed that the Report was never hosted on the Guidepost website. Guidepost's website featured a banner, directing users to the Report, "CLICK HERE" for the "SBC EC Report." Ex. 64.

---

[9]     Guidepost's designated witness pursuant to Fed. R. Civ. P. 30(b)(6) was its Executive Vice President, Krista Tongring. Among her other qualifications, Ms. Tongring had over six years of experience at the DEA and over five years experience as a trial attorney at the Department of Justice. She previously clerked in the United States District Court for the District of New Jersey. (Exhibit 12, Guidepost 30(b)(6) Dep. at 11:5-14; 15:12-21; Exhibit 15 [Deposition Exhibit 105.])



This banner included a hyperlink that took readers to the report.

Further, Guidepost's corporate representative testified was shown exhibit 85 and testified "I have no idea" what would happen if the link of exhibit 85 was clicked. Ex. 6, Guidepost 30(b)(6) Dep. 235:1-6.

Disputed that the Report was not published by Guidepost. Guidepost admitted to publishing the report. Ex. 1, Holske Dep. 46:2-3 ("Guidepost *published* the report on May 22nd, 2022). (emphasis added) Ex. 1, Holske Dep. 46:17-22 (Q – "[Y]ou know without any doubt, sir, that your company on May 22, 2022, posted a report pertaining to your investigation, including allegations associated with Pastor Johnny Hunt, right?" A – "Correct.").

49.     On or about May 22, 2022, the SBC Task Force—not Guidepost—published the Report on the SBC Task Force's website. (Exhibit 12, Guidepost 30(b)(6) Dep. at 146:8-147:8; 235:12-236:13; Exhibit 10, Wood Dep. at 201:17-203:6.)

**RESPONSE:** Objection, this asks for a legal conclusion. Disputed. Guidepost did publish the report. Plaintiff incorporates by reference Plaintiff's Response to SOMF 48.

50.     Moreover, Jonathan Howe, who testified on behalf of the Executive Committee of the Southern Baptist Convention, stated that he personally uploaded and published the Report through an online server after receiving an "embargoed" copy from Bruce Frank, Chairman of the

SBC Task Force. (Exhibit 14, Deposition of Jonathan Howe, at 69:3-18; 69:22-70:24; 71:3-19; 71:23-72:24; 77:8-17, 223:9-224:8.)

**RESPONSE:** Objection, this asks for a legal conclusion. Disputed in part and undisputed in part. Undisputed that Howe testified to this. Disputed. Guidepost did publish the report. Plaintiff incorporates by reference Plaintiff's Response to SOMF 48. However, this is disputed to the extent that Guidepost's statement leaves out evidence that bears on the issues they raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions.

51.     The only parties to whom Guidepost delivered the Report, or any part of it, were the Committee on Cooperation and the SBC Task Force. (Exhibit 12, Guidepost 30(b)(6) Dep. at 145:12-146:1; 148:4-12; 152:3-19; 159:21-160:18; Exhibit 10, Wood Dep. 429:2-430:11.)

**RESPONSE:** Disputed. The Committee on Cooperation of the Executive Committee and the SBC Task Force were not the only parties to whom Guidepost delivered the Report, or any part of it. Disputed. Guidepost did publish the report. Plaintiff incorporates by reference Plaintiff's Response to SOMF 48. Guidepost also provided Jane Doe and her husband the Johnny Hunt section of the Report to review and edit. Ex. 1, Holske Dep. 207:22-208:16. Ex. 2, Kilpatrick Dep. 114:22-115:12 ("We received…a red line document back from [Jane Doe and her husband]") Guidepost also provided the Report to two individuals who were not members of the Committee on Cooperation of the Executive Committee or the SBC Task Force. Ex. 3, Wood Dep. 427:10-21 ("██████████████████████████████████████████████████████████e ████████████████

**VII.    Hunt Discloses His Sexual Encounter With Jane Doe After the SBC Task Force Publishes the Report and Admits He Never told the Guidepost Investigators the Truth About his Encounter With Jane Doe**

52.     As of May 20, 2022—after the Report had already been submitted to the SBC Task Force and a mere two days before it was released to the public on the SBC Task Force's website—

55

Hunt conceded that *"the investigators did not even know [his] version of what happened."* (Exhibit 4, Hunt Dep. at 275:18-276:3.)

   **RESPONSE:** Plaintiff objects that this fact is immaterial and, and therefore, should be disregarded un Fed. R. Civ. P. 56(a). Disputed that Hunt had a real opportunity to share his version. Pastor Johnny was never interviewed about the allegations against him. Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview.") Plaintiff incorporates by reference Plaintiff's Response to SOMF 31.

   53.     Hunt never told the Guidepost investigators that Jane Doe initiated the encounter. (Exhibit 4, Hunt Dep. at 277:17-20.)

   **RESPONSE:** Plaintiff objects that this fact is immaterial and, and therefore, should be disregarded un Fed. R. Civ. P. 56(a). Disputed that Pastor Johnny had an opportunity to tell investigators Jane Doe initiated the encounter. Pastor Johnny was never interviewed about the allegations against him. Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview.") Plaintiff incorporates by reference Plaintiff's Response to SOMF 31. Disputed that Guidepost actually gave Pastor Johnny forty-eight hours to contact them. Pastor Johnny met with Guidepost at 12:15pm Eastern Time on May 12, 2022. Ex. 71 at GP_023504. Guidepost decided that Pastor Johnny would be included in the report at 10:08am Eastern Time on May 13, 2022, less than twenty-four hours after the second meeting occurred. Ex. 71 at GP_023505. (Ms. Tongring texted Ms. Wood "[the JH allegations] will be included.").

   54.     After the publication of the Report by the SBC Task Force, Hunt wrote to his congregation on May 27, 2022 releasing his statement regarding the "Task Force Report." (Exhibit 4, Hunt Dep. at 188:12-191:5; and Exhibit 16 [Defendants' Deposition Exhibit 16].)

   **RESPONSE:** Objection, this asks for a legal conclusion. Plaintiff objects that this fact is immaterial and therefore, should be disregarded in Fed. R. Civ. P. 56(a). Disputed in part and

undisputed in part. Undisputed that Pastor Johnny wrote a letter to his congregation. Any suggestion that Guidepost did not also publish the report is disputed. Plaintiff incorporates by reference Plaintiff's Response to SOMF 48.

55.     While Hunt had told the Guidepost investigators that he had no physical contact with Jane Doe, he told his congregation that "I allowed myself to get too close to a compromising situation with a woman who was not my wife" in what he referred to as a "brief, consensual encounter." (Exhibit 4, Hunt Dep. at 189:15-23; 193:1-11; Exhibit 16 [Defendants' Exhibit 16].)

**RESPONSE:** Plaintiff objects that this fact is immaterial and, and therefore, should be disregarded un Fed. R. Civ. P. 56(a). Disputed that Pastor Johnny was ever interviewed about the allegations. The Zoom call was not an interview. Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview.") Plaintiff incorporates by reference Plaintiff's Response to SOMF 31. Disputed that Pastor Johnny told investigators that he had no physical contact with Jane Doe. Pastor Hunt denied having physical contact with Jane Doe, in the context of Investigators presenting a false narrative. *Id*. at 141:19-22 (Q – "And what was your response to the question, Did you have any physical contact with Jane Doe?" A – "In the context of them lying, to start with, and giving a false narrative, my answer was no.").

56.     Hunt also wrote, "***I also am sorry I wasn't more forthcoming with the interviewers*** because it made a bad situation worse. I guess I was just so surprised and so shocked by the allegations of abuse that I shut down." (emphasis supplied) (Exhibit 4, Hunt Dep. at 193:12-21; Exhibit 16, [Defendants' Exhibit 16].)

**RESPONSE:** Plaintiff objects that this fact is immaterial and, and therefore, should be disregarded un Fed. R. Civ. P. 56(a). Undisputed in part, but Plaintiff disputes this fact to the extent

57

that Guidepost's statement leaves out evidence that bears on the issues they raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions.

57.     Although he told the Guidepost investigators that he had no physical contact with Jane Doe, Hunt admits in his Complaint that he had an "inappropriate, extramarital encounter" with his accuser involving what he termed "kissing and some awkward fondling" and alleges was initiated by his accuser. (<u>Exhibit 1</u>, Compl., ¶¶ 3, 53.)

**RESPONSE:** Plaintiff objects that this fact is immaterial and, and therefore, should be disregarded un Fed. R. Civ. P. 56(a). Disputed in part and undisputed in part. Undisputed that Pastor Johnny acknowledges this ***consensual***, extramarital encounter in his complaint. Hunt Decl. ¶ 2. Doc. 1, at Page ID # 10 ¶ 53. Disputed that Pastor Johnny was ever interviewed about the allegations. The Zoom call was not an interview. Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview.") Plaintiff incorporates by reference Plaintiff's Response to SOMF 31. Disputed that Pastor Johnny told investigators that he had no physical contact with Jane Doe. Pastor Hunt denied having physical contact with Jane Doe, in the context of Investigators presenting a false narrative. *Id*. at 141:19-22 (Q – "And what was your response to the question, Did you have any physical contact with Jane Doe?" A – "In the context of them lying, to start with, and giving a false narrative, my answer was no.").

This is also disputed to the extent that Guidepost's statement leaves out evidence that bears on the issues they raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions.

58.     Hunt did not tell the Guidepost investigators that Jane Doe had tempted and seduced him and instead denied any physical contact whatsoever. (<u>Exhibit 4</u>, Hunt Dep. at 275:9-276:3; 277:10-20.)

58

**RESPONSE:** Plaintiff objects that this fact is immaterial and, and therefore, should be disregarded un Fed. R. Civ. P. 56(a). Disputed in part and undisputed in part. Undisputed that Pastor Johnny did not tell Guidepost investigators that Jane Doe has tempted and seduced him. Disputed that Pastor Johnny was ever interviewed about the allegations. The Zoom call was not an interview. Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview.") Plaintiff incorporates by reference Plaintiff's Response to SOMF 31. Disputed that Pastor Johnny told investigators that he had no physical contact with Jane Doe. Pastor Hunt denied having physical contact with Jane Doe, in the context of Investigators presenting a false narrative. *Id.* at 141:19-22 (Q – "And what was your response to the question, Did you have any physical contact with Jane Doe?" A – "In the context of them lying, to start with, and giving a false narrative, my answer was no.").

This is also disputed to the extent that Guidepost's statement leaves out evidence that bears on the issues they raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions.

59.     Hunt denied that he had left his balcony to be with Jane Doe. (Exhibit 4, Hunt Dep. at 141:19-142:11.)

**RESPONSE:** Disputed. Pastor Johnny testified that he did not remember if investigators asked if he ended up on the same balcony as Jane Doe. Ex. 8, Hunt Dep. 141:23-25. Pastor Johnny testified that he denied ending up in the same condo as Jane Doe, because "it still stayed within the same narrative," of a sexual assault. Ex. 8, Hunt Dep. 142:1-11.

60.     Hunt's explanation as to why he denied to the Guidepost investigators that he had engaged in physical sexual contact and did not explain that Jane Doe had initiated the sexual encounter is that he felt "ambushed" and that he was saying "no" to what he deemed to be an overall "false narrative." (Exhibit 4, Hunt Dep. at 102:4-103.23; 138:3-141:22.)

59

**RESPONSE:** Disputed in part and undisputed in part. Undisputed that Pastor Johnny was ambushed and that he said no to the Guidepost investigator's false narrative. Pastor Johnny was not interviewed. Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview.") Investigators ambushed Pastor Johnny. *Id*. at 137:4-7 ("A – "[Guidepost's investigators] would have done it more like this. You went into a ladies room and touched her, didn't you? You abused someone. You rented the room to bring her here. And I'm saying, No, no no."). Plaintiff incorporates by reference Plaintiff's Response to SOMF 31. Further disputed as it leaves out evidence that bears on the issue raised. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions.

**VIII.    Guidepost Published the Challenged Statements In Good Faith and Without Malice**

61.    Guidepost investigator Russell Holske confirmed that, in or around May 4, 2022, 18 days before Guidepost delivered the Report to the SBC Task Force in, Guidepost was not going to include Johnny Hunt in the Report because Guidepost had only spoken with Jane Doe and her husband and had not yet spoken with corroborating witnesses. (Exhibit 5, Holske Dep. at 198:5-204:17.)

**RESPONSE:** Undisputed in part and disputed in part. Undisputed that Holske testified to this at deposition. Plaintiff disputes any suggestion that Guidepost spoke with "corroborating witnesses." None of the "witnesses" Guidepost interview were present during the encounter. Ex. 3, Wood Dep. 97:21-98:11; 265:14-15 ("I don't believe anyone [other than Pastor Johnny and Jane Doe] was there.") ("Only [Jane Doe] and Johnny Hunt were in that room.") Disputed that any of these "witnesses" corroborated a sexual assault. Ex. 2, Kilpatrick Dep. 257:6-7 ("So witness one did not use the word sexual abuse."). *Id*. at 258:2-3 ("I don't believe that witness two used the word sexual assault or sexual abuse."). *Id*. at 259:5-6 ("Witness three did not use the words sexual abuse or sexual assault.") Ex. 28 at Hunt_0000285 ("[Blankenship reported very similar details

60

and events to those reported by Survivor and Pastor, with ***the only significant difference being on***

***the issue of consent***.") (emphasis added).

Pastor Johnny was never interviewed. Ex. 8, Hunt Dep. 101:16 ("It wasn't an interview.")

Investigators ambushed Pastor Johnny. Hunt 137:4-7 ("A – "[Guidepost's investigators] would

have done it more like this. You went into a ladies room and touched her, didn't you? You abused

someone. You rented the room to bring her here. And I'm saying, No, no no."). Plaintiff

incorporates by reference Plaintiff's Response to SOMF 31. Guidepost was going to include Pastor

Johnny in the Report regardless of these interviews. Ex. 30 ███████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████                              Despite offering

Pastor Johnny forty-eight hours to provide additional details to investigators after this ambush,

Guidepost decided that Pastor Johnny would be included in the report less than twenty-four hours

after meeting with him about the allegations. Ex. 71 at GP_023505. (Ms. Tongring text to Ms.

Wood "████████████████████████████                        ").

Further disputed to the extent that Guidepost's statement leaves out evidence that bears on

the issues they raise. Pastor Johnny therefore submitted his own statement of facts relevant to

Defendants' Motions.

62.     Mr. Holske testified that because Guidepost needed to be fair to Hunt, he gave Hunt

"the same opportunity to provide hours and hours of detail on his version of the events, but [Hunt]

denied any physical contact whatsoever." (Exhibit 5, Holske Dep. at 307:5-13.)

**RESPONSE:** Disputed in part and undisputed in part. Undisputed that Holske testified to

this statement.

Disputed that this is true. Guidepost investigators did not give Hunt "the same opportunity" to provide his version of events. Guidepost investigators conducted at least nine interviews before publication with Jane Doe and her husband. Ex. 10, Doe Dep. 21:8-22:1. Ex. 16 at ROG 2. Guidepost investigators met with Pastor Johnny once, a day before the Report was due to the Committee on Cooperation of the EC, about the allegations. Ex. 2, Kilpatrick Dep. 68:2-7 (Guidepost did not approach Pastor Johnny "specifically with the allegations" until May 12, 2022). Jane Doe and her husband had months to provide additional details to Guidepost investigators. Ex. 16 at ROG 2 (Investigators held interviews over 14 weeks before the Report was published).

Guidepost decided that Pastor Johnny would be included in the report less than twenty-four hours after meeting with him about the allegations. Ex. 71 at GP_023505. (Ms. Tongring text to Ms. Wood ███████████████████████) Jane Doe and her husband reviewed a draft and provided edits and comments on the same. Ex. 1, Holske Dep. 207:22-208:16 Ex. 2, Kilpatrick Dep. 114:22-115:12 ("We received…a red line document back from [Jane Doe and her husband]") Guidepost did not provide a report to Pastor Johnny for his review. Ex. 1, Holske Dep. 208:18-209:1.

63.    Mr. Holske also testified, when asked whether the Report was in favor of Jane Doe's and her husband's version of events over Hunt's denial, that "Guidepost Solutions had no agenda in investigating the allegations against Dr. Hunt. If Roy Blankenship had not talked to us, if Dr. Hunt had not talked to us the second time, we were comfortable with the report not going in as it relates to Dr. Hunt." (Exhibit 5, Holske Dep. at 253:20-254:10.)

**RESPONSE:** Undisputed in part and disputed in part. Undisputed that Holske testified to this statement. Disputed that this statement is true.

Guidepost had an agenda in investigating the allegations against Pastor Johnny. Guidepost had no other new allegations. Ex. 3, Wood Dep. 333:18-21 (Q – ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ "████████████████") Guidepost had no ████████████ ██s." Ex. 29. Guidepost wanted the Johnny Hunt section of the Report to create an "█████". Ex. 32. Guidepost had billed the client "approximately $2 million." Ex. 3, Wood Dep. 57:11-19. Guidepost was rooting for Jane Doe and her husband. Ex. 84 (Lead investigator texted Jane Doe's husband ██████████████████ on May 29, 2022.) Disputed that if Roy Blankenship had not talked to Guidepost and if Pastor Johnny had not talked to Guidepost a second time, Guidepost would not have included the allegations against Pastor Johnny in the report. Guidepost was going to include the allegations against Pastor Johnny in the report, and add whatever they got from Blankenship and Pastor Johnny Hunt. Ex. 31 (Mr. Holske emailed Ms. Tongring, ████████████ ████████████████████████████████████████████████████ (emphasis added). Ex. 30 (Mr. Holske texted Ms. Wood and Ms. Tongring, "████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████." ) (emphasis added). Despite offering Pastor Johnny forty-eight hours to provide additional details to investigators after this ambush, Guidepost decided that Pastor Johnny would be included in the report less than twenty-four hours after meeting with him about the allegations. Ex. 71 at GP_023505. (Ms. Tongring text to Ms. Wood "████████████████████████ ████████████).

64.    Guidepost's CEO, Julie Myers Wood, and investigator Kilpatrick both testified that had Hunt claimed his encounter with Jane Doe was consensual encounter rather than falsely

denying the encounter happened at all, Hunt would not have been included in the Report. (<u>Exhibit 10</u>, Wood Dep. at 199:10-200:10, 246:1-9; <u>Exhibit 7</u>, Kilpatrick Dep. at 303:11-304:10.)[10]

**RESPONSE:** Plaintiff objects that the footnotes are immaterial and therefore should be disregarded under Fed. R. Civ. P. 56(a). Disputed in part and undisputed in part. Undisputed that Wood and Kilpatrick testified at deposition that had Hunt claimed the encounter with Jane Doe was consensual, Hunt would not have been included in the Report. Ex. 3, Wood Dep at 119:10-200:10; 246:6-9. Ex. 2, Kilpatrick Dep. 303:1-304:10. Disputed that this is true. Guidepost's lead counsel, Steven Mintz, affirmed the opposite in his letter of March 13, 2023. Ex. 74 ("If Dr. Hunt had asserted during his interviews that his encounter with the accuser was 'consensual' his claim would have been in the report.") Guidepost's Chief Executive Officer, Julie Meyers Wood, testified "this wasn't about consent," "the report was not determining whether or not there was consent," "[t]his was not an issue of whether or not there was consent," "we weren't looking to see whether there was consent," and "the issue here was not consent." Ex. 3, Wood Dep. 156:4;161:15-162:3;170:16-17;176:7-8;189:7-8. Investigators were going to include Pastor Johnny in the report, regardless of whether or not witnesses told them it was consensual. Exhibit 31. (Mr. Holske emailed Ms. Tongring, ████████████████████████████

████████████████████████████                                Ex. 30 (Mr. Holske

---

[10]     Ms. Wood's qualifications include having clerked in the United States Court of Appeals for the Eighth Circuit for Hon. C. Arlen Beam, following which she worked at Mayer, Brown, & Platt. Subsequently, Ms. Wood was employed by the Office of Independent Counsel and worked on the Monica Lewinsky matter. Ms. Wood later worked at the U.S. Attorney's Office for the Eastern District of New York, and the United States Treasury Department. Ms. Wood was later Chief of Staff for Michael Chertoff, and then the United States Commerce Department as Assistant Secretary for Export Enforcement. Ms. Wood worked in the White House for President George W. Bush, and was subsequently the Assistant Secretary for Immigration and Customs Enforcement with the United States Department of Homeland Security. (<u>Exhibit 10</u>, Wood Dep. at 10:3-12:2; 14:6-19; 15:10-15; 16:7-14; 17:5-18:15.)

64

texted Ms. Wood and Ms. Tongring, "███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

65.     Guidepost asked Hunt if there were other witnesses who they could talk to who could corroborate his denial, and Hunt had no other individuals except Jane Doe, her husband, and himself – individuals Guidepost interviewed. (Exhibit 10, Wood Dep. at 241:6-19; Exhibit 4, Hunt Dep. at 267:10-19.)

**RESPONSE:** Disputed that the testimony at Ex. 3, Wood Dep. 241:6-19 supports this statement. Disputed that Hunt had no other individuals except Jane Doe, her husband and himself. Pastor Johnny testified "Jane Doe and her husband **and Roy Blankenship**" should be interviewed in addition to himself. Ex. 8, Hunt Dep. 267:10-19 (emphasis added).

## IX.     Hunt Has Not Experienced Severe Emotional Distress

66.     Hunt went to an "intensive workshop" shortly after the SBC Task Force published the Report, but he rejected medication because he "didn't want medication to make me feel what I am not. I want to feel this and work through it." (Exhibit 4, Hunt Dep. at 256:6-257:16; 258:2-5.)

**RESPONSE:** Undisputed that Pastor Johnny met with Ph.D. psychologists, David and Teresa Ferguson of Relational Care, Inc. for three days of intensive counseling. Ex. 8, Hunt Dep. 256:10-13. Ex. 13 at ROG 13. Hunt Decl. Ex. D. Also undisputed that Pastor Johnny did not want to take medication that "make [him] feel good when things are not." Ex. 8, Hunt Dep. 257:15-16. However, this is disputed to the extent that Guidepost's statement leaves out evidence that bears on the issues they raise. Pastor Johnny therefore submitted his own statement of facts relevant to Defendants' Motions.

65

Plaintiff disputes any suggestion that Guidepost did not also publish the Report. Guidepost's website featured a banner, directing users to the Report, "CLICK HERE." Ex. 64. This banner included a hyperlink that took readers to the report. Disputed that the Report was not published by Guidepost. Guidepost admitted to publishing the report. Ex. 1, Holske Dep. 46:2-3 ("Guidepost *published* the report on May 22nd, 2022). (emphasis added) *Id*. at 46:17-22 (Q – "[Y]ou know without any doubt, sir, that your company on May 22, 2022, posted a report pertaining to your investigation, including allegations associated with Pastor Johnny Hunt, right?" A – "Correct.").

67.     Hunt has continued a steady schedule of preaching, traveling, and attending conferences. (Exhibit 18, Johnny Hunt Ministries 30(b)(6) Dep., 59:2-64:23.)

**RESPONSE:** Disputed. Pastor Johnny has not continued a steady schedule of preaching, traveling, and attending conferences. Pastor Johnny's speaking engagements "dried up in the year 2022." Ex. 9, Johnny Hunt Ministries 30(b)(6) Dep. 54:19-22. Pastor Johnny "didn't do anything the year after the report came out until the end of the year." Ex. 8, Hunt Dep. 91:3-11. Today, Pastor Johnny is speaking "some." Ex. 9, Johnny Hunt Ministries 30(b)(6) Dep. 64:11-12. Pastor Johnny "is no longer invited to" significant events. Ex. 9, Johnny Hunt Ministries 30(b)(6) Dep. 62:13-25. Pastor Johnny has "lost out on Favored Women and Extreme Conferences…" Ex. 8, Hunt Dep. 91:3-11.

## X.     Hunt Can Not Claim Damages Related To Non-Profit Johnny Hunt Ministries, Inc.

68.     Hunt's Expert, Lamar Barden, issued an expert report stating that all revenues derived from speaking engagements, publications and other ministry related activities belonged to non-profit Johnny Hunt Ministries, Inc. ("JHM"). Exhibit 19, Barden Expert Report.

66

**RESPONSE:** This statement of fact requires no response by Plaintiff because it is not supported by any cited evidence. Therefore, Plaintiff objects to this statement of fact and it should be stricken under Fed. R. Civ. P. 56(c)(1). Disputed. Lamar Barden's report stated that "…Pastor Johnny has consistently generated revenue for Johnny Hunt Ministries, Inc. ("JHM") through his speaking engagements, publications, and other ministry related activities. Pastor Johnny has always been the principal person that represented JHM in all of its mission and evangelical endeavors. Historically, Pastor Johnny voluntarily ***chose to direct the revenue from these activities into affiliated nonprofit entities*** in order for the proceeds to be used for charitable purposes. However, I understand that, on a going forward basis, Pastor Johnny could have chosen at any time to receive directly any future revenue through JHM and the to treat such proceeds as taxable income." Doc. No. 221-13 (Barden Report) ¶ 17. (emphasis added).

69.    All of Hunt's book deals proceeds went to JHM, as well as all proceeds from speaking engagements. (Exhibit 4, Hunt Dep. at 85:23-86:2; 267:4-7)

**RESPONSE:** Disputed in part and undisputed in part. Undisputed that Pastor Johnny historically directed the proceeds from his book deals to Johnny Hunt Ministries. Disputed that all proceeds from his speaking engagements went to Johnny Hunt Ministries. Pastor Johnny personally received payments for some of his speaking engagement. Ex. 9, Johnny Hunt Ministries 30(b)(6) Dep. 24:19-25:6 (Q – "Just curious, how come there would be like a half dozen of Mr. Hunt's speaking engagements paid to him personally on the personal return as opposed to Johnny Hunt Ministries?" A – "Well, sometimes they did not get the message that we wanted – they didn't get the W whatever it is, W9, W – whatever it is to make the checks out to Johnny Hunt Ministries." Q – "Okay." A – "And they would make it to him personally. So then he would get a 1099.").

67

70.     As of April 18, 2024, the date of Hunt's deposition, Hunt only began "[p]robably in the last five weeks, maybe not even five weeks," to direct individuals to pay him, as opposed to JHM, for speaking engagements and other revenue generating activities. (<u>Exhibit 4</u>, Hunt Dep. 85:21-86:13.)

**RESPONSE:** Undisputed that Pastor Johnny has begun directing individuals to pay him, not Johnny Hunt Ministries, for speaking engagements and other revenue generating activities.

71.     Janet Hunt, testifying as JHM's 30(b)(6) witness, admitted that the purpose of JHM was for mission work, the propagation of the gospel of Jesus Christ, getting the message out and supporting the church. It was not to enrich any particular individual. (<u>Exhibit 18</u>, Johnny Hunt Ministries 30(b)(6) Dep. at 14:23-15:15.)

**RESPONSE:** Undisputed.

72.     JHM has never paid any income to Hunt. (<u>Exhibit 18</u>, Johnny Hunt Ministries 30(b)(6) Dep. at 28:2-13.)

**RESPONSE:** Disputed. Pastor Johnny receives a "$3,000 per month Housing Allowance from Johnny Hunt Ministries, Inc." Doc. No. 221-13 (Barden Report) ¶ 24.


<u>Dated:</u> July 31, 2024                          Respectfully submitted,

                                                     s/ Andrew Goldstein
                                                     **Todd G. Cole, Esq., BPR # 031078**
                                                     **Andrew Goldstein, Esq., BPR # 037042**
                                                     COLE LAW GROUP, P.C.
                                                     1648 Westgate Circle, Suite 301
                                                     Brentwood, TN 37027
                                                     Telephone: (615) 490-6020
                                                     Fax: (615) 942-5914
                                                     tcole@colelawgrouppc.com
                                                     agoldstein@colelawgrouppc.com

*-and-*

**Robert D. MacGill, Esq. (*pro hac vice*)**
**Patrick J. Sanders, Esq. (*pro hac vice*)**
MACGILL PC
156 E. Market St.
Suite 1200
Indianapolis, IN 46204
Telephone: (317) 721-1253
robert.macgill@macgilllaw.com
patrick.sanders@macgilllaw.com

*Attorneys for Plaintiff*

69

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing Responses to Defendant Guidepost Solutions LLC Local Rule 56.01 Statement of Material Facts to be electronically filed with the Clerk of the Court on July 31, 2024, using the CM/ECF system, which will automatically serve all counsel of record listed below:

Todd G. Cole, Esq.
Andrew Goldstein, Esq.
COLE LAW GROUP, P.C.
1648 Westgate Circle, Suite 301
Brentwood, TN 37027
Telephone: (615) 326-9059
tcole@colelawgrouppc.com
agoldstein@colelawgrouppc.com

Robert D. MacGill, Esq.
Patrick J. Sanders, Esq.
MACGILL PC
156 E. Market St.
Suite 1200
Indianapolis, IN 46204
Telephone: (317) 721-1253
robert.macgill@macgilllaw.com
patrick.sanders@macgilllaw.com

*Counsel for Plaintiff*

John R. Jacobson, BPR #14365
Katharine R. Klein, BPR #19336
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
(615) 320-3700
(615) 320-3737 *Facsimile*
jjacobson@rjfirm.com
kklein@rjfirm.com

Steven G. Mintz (admitted pro hac vice)
Terence W. McCormick (admitted pro hac vice)
Scott Klein (admitted pro hac vice)
Mintz & Gold LLP
600 Third Avenue
25th Floor
New York, NY 10016
Telephone: (212) 696-4848

Scarlett Singleton Nokes, Esq.
R. Brandon Bundren, Esq.
E. Todd Presnell
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, Tennessee 37203
Telephone: (615) 244-2582
snokes@bradley.com
bbundren@bradley.com
tpresnell@bradley.com

Gene R. Besen, Esq.
BRADLEY ARANT BOULT CUMMINGS LLP
Fountain Place
1445 Ross Avenue, Suite 3600
Dallas, Texas 75202
Telephone: (214) 257-9758
gbesen@bradley.com

Thomas J. Hurney, Jr., Esq.
Gretchen M. Callas, Esq.
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
Post Office Box 553
Charleston, West Virginia 25322
Telephone: 304-340-1000
thurney@jacksonkelly.com
gcallas@jacksonkelly.com

*Counsel for the Executive Committee of the Southern Baptist Convention*

L. Gino Marchetti, Jr., Esq.
Matt C. Pietsch, Esq.
TAYLOR, PIGUE, MARCHETTI & BLAIR, PLLC
2908 Poston Avenue
Nashville, TN 37203
Telephone: (615) 320-3225

mintz@mintzandgold.com
mccormick@mintzandgold.com
klein@mintzandgold.com

*Counsel for Defendant*
*Guidepost Solutions LLC*

gmarchetti@tpmblaw.com
matt@tpmblaw.com

*Counsel for the Southern Baptist Convention*



s/ Andrew Goldstein
ANDREW GOLDSTEIN