**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| JOHNNY M. HUNT,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHERN BAPTIST CONVENTION; GUIDEPOST SOLUTIONS LLC; and EXECUTIVE COMMITTEE OF THE SOUTHERN BAPTIST CONVENTION,<br><br>Defendants. | Case No. 3:23-cv-00243<br><br>Chief Judge Campbell<br>Magistrate Judge Frensley |

**REPLY IN SUPPORT OF GUIDEPOST SOLUTIONS LLC'S MOTION FOR SUMMARY JUDGMENT**

## I. Hunt is a Public Figure

If Hunt is a public figure (of any sort), his libel claim must be dismissed because there is no evidence to support a finding of actual malice under New York Times v. Sullivan, 376 U.S. 254 (1964). And even if Hunt is somehow found to be a private figure, his claims must *still* be dismissed because he has failed to identify any evidence of negligence on Guidepost's part.

In its Rule 56.01 statement, Guidepost identified admissions by Hunt that are not ***genuinely*** disputed: Hunt was President of the SBC, "led" the "great commission resurgence," and was the "pinnacle," the "voice," and "face of the Convention." (SOF ¶ 7.) While Hunt seeks in his Response to Guidepost's Rule 56.01 Statement ("SOF") to walk back several other admissions as "taken out of context," he cannot run away from his admission that his fame within the SBC was nationwide. (SOF ¶ 8.)

As the Tennessee Supreme Court observed last month, "[t]here are three kinds of public figures: general purpose, limited purpose, and involuntary." Charles v. McQueen, 2024 WL 3286527, at *7 (Tenn. July 3, 2024). Hunt fits all three descriptions. *First,* Hunt became a "general purpose" public figure due to his fame in the SBC. (ECF 217 at 22-23.) While Hunt concedes that "nationwide fame is not required" (Opp. at 4, citing Waldbaum v. Fairchild Prod'ns, Inc., 627 F.2d 1287, 1295 n.22 (D.C. Cir. 1980)), he argues that his status as a general-purpose public figure must be measured "where the defamation was published," and points out that the Report was published nationally. The problem for Hunt is that he admitted his fame within the SBC was not confined to his megachurch in Georgia: the "average church-going Southern Baptist in Arkansas" knew who he was.[1]

Hunt then argues that the undisputed facts fail to establish that he was a "limited purpose" public figure (Opp. at 5-8) because "prior to and separate from the alleged defamatory statements" he purportedly was not part of the public debate on sex abuse. But he was. The sexual abuse scandal within the SBC was as much about the culpability of its leadership (which included Hunt) as it was about the congregation-level abuse that the leadership had covered up. While Hunt asserts that an issue of fact exists because he "stayed out of the paper" as SBC President (Opp. at 6), it is indisputable that by accepting the office of SBC President, he acquired a greater ability than most people to get "in the paper" if he wanted to[2]. See McQueen, 2024 WL

[1] Ogle v. Hocker, 279 F. App'x 391, 399 (6th Cir. 2008) is inapposite. The court in Ogle found that the evidence "whether Ogle is a public figure is sparse," whereas Hunt boasted that he didn't even need the SBC Presidency because his national profile was so high. (SOF ¶ 8.)

[2] Moreover, Hunt's statement that he "stayed out of the paper" does not stand up to scrutiny. See, e.g., https://www.brnow.org/news/investigation-reveals-zacharias-years-long-history-of-sexual-abuse-of-women/, https://thewartburgwatch.com/2020/12/28/pastor-johnny-hunt-drags-the-sbc-into-the-ravi-zacharias-scandal/, and https://virtueonline.org/christian-apologist-ravi-zacharias-owned-two-health-spas-georgia.

3286527, at *10 (finding that, as the "public face" of a residential real estate development, the president of the HOA "presumably had access to the media."). Based on McQueen, because Hunt *had* such access, he falls within the zone of limited purpose public figures.

Moreover, as Guidepost argued in its principal submission (ECF 217 at 23-24), even if the Court accepted that Hunt did not "insert" himself voluntarily into the crisis—and he did—he at least could not help being drawn into the vortex. See McQueen, 2024 WL 3286527, at *7 (involuntary public figures drawn into public controversies "'by position, proximity, or chance."). While Hunt argues that he could not be made a public figure by the simple act of a defendant's defaming him (true), he can and did become a public figure by virtue of his position in the SBC and his proximity to the crisis. As one of the former leaders of the SBC who had led the "great commission resurgence," Hunt could not avoid being asked by SBC President Ed Litton to submit to interviews, first about his relationship to the sexual abuse issue during his presidency and then about his participation in the crisis as a sexual abuser himself. (Hunt Dep. at 117:9-11.) Once the SBC Messengers voted in 2021 to authorize an investigation into abuse by members of the EC, there was no way for Hunt, as a former SBC President, to avoid scrutiny. That was the result of two choices ***Hunt*** made: to accept the position of SBC President and to walk into Jane Doe's condo. By position and proximity to the scandal, he became a public figure.

## II. Guidepost Neither Exhibited Actual Malice Nor Was it Negligent

### 1. No Evidence of Actual Knowledge of Falsity

Hunt has no evidence to support a finding that Guidepost ***in fact*** knew the Report "falsely" asserted that Hunt assaulted Jane Doe. (SOF ¶¶ 14, 32, 52-60.) In his opposition, Hunt does not even try to identify evidence in admissible form to show that Guidepost had actual knowledge of falsity. Nor could it have; when confronted with the accusation, ***Hunt lied,*** falsely denying that any encounter had ever taken place and giving up the opportunity that Guidepost

gave him to hear his side of the story. (SOF ¶¶ 14, 32, 52-60.) In fact, Hunt's only attempt to create a fact issue of Guidepost's "actual knowledge" of falsity is a quotation from the dictionary and his argument that the Report accused him of committing "sexual assault or a crime under Florida law." (ECF 244 at 6-10). But the Report does not accuse him of a violation of Florida law. Rather, the Report described Jane Doe as a "survivor," *i.e.,* a young woman who reported that she was one of "those persons who actually suffered at the hands of SBC clergy [here, Johnny Hunt]." (SOF ¶ 47.) Hunt identifies no evidence that Guidepost "knew" she hadn't.

2. Guidepost Acted Without Reckless Disregard of the Truth

Hunt principally confines himself in his opposition to the argument that Guidepost acted with reckless disregard of the truth, *i.e.,* ignored evidence supporting Hunt's own narrative—a narrative that Hunt conceded repeatedly in his deposition that he ***never*** communicated to Guidepost when they interviewed him. (Compare SOF ¶¶ 52-56 with Opp. at 10-21.) A finding of reckless disregard requires evidence that Guidepost acted with a "high degree of awareness" that the Report was in some way false and "in fact entertained serious doubts as to the truth of [its] publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968). And although a motion for summary judgment is read in the light most favorable to the nonmoving party, because Hunt bears the burden of showing actual malice, "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by ***clear and convincing evidence*** or that the plaintiff has not." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56 (1986) (emphasis supplied). None of the "evidence" identified by Hunt creates a jury issue regarding any such "awareness" or "doubts" on the part of Guidepost, much less amounts to "clear and convincing evidence" of malice.

Hunt first suggests that Guidepost "should" have doubted Jane Doe's story due to a reference [redacted]. (Opp. at 10, 13.) But Hunt does not point to evidence that would allow a jury to find that Guidepost had a "high degree of awareness" [redacted]. Quite the contrary: Hunt's own admission that he touched her naked breast and pulled down her pants correlates closely with the details of Jane Doe's own account in the Report. (SOF ¶¶ 14, 18; Jane Doe Dep. 56:1-58-1; Hunt Dep. 216:17-217:6; Report at 152.) Thus, the undisputed evidence proves that Guidepost had no reason to believe her account was inaccurate, particularly given the undisputed fact that, when interviewed by Guidepost, Hunt denied any physical contact whatsoever with Jane Doe. (SOF ¶¶ 32, 55-57; see also Hunt Dep. 166:12-167:14.)

Hunt then attacks Jane Doe's credibility by arguing that Jane Doe's *husband* sought [redacted]. Jane Doe's husband was not the survivor. Moreover, Jane Doe made clear in her deposition that she never suggested to the investigators that her motivation [redacted] or that her husband had written (but never sent) a letter to Hunt; or that her husband had otherwise asked Guidepost for [redacted] (Jane Doe Dep. at 127:1–133:14.) This testimony is unrebutted, and Hunt never bothered to depose Jane Doe's husband. No jury question exists as to whether the *husband's* purported motives would have caused Guidepost to doubt *Jane Doe's* account.

Hunt further argues that Guidepost should have entertained doubts based on the account in the [redacted] that Jane Doe [redacted].

According to Hunt's argument, Jane Doe's [redacted]

[redacted] to place it on an end table. (Opp. at 13.) Notwithstanding Hunt's "tenuous insinuation" from facts in the record, Guidepost's investigator, Samantha Kilpatrick testified that she considered this and other facts when evaluating Jane Doe's credibility and did not find where Jane Doe placed a necklace on a table to be indicative of a consensual sexual encounter. (Kilpatrick Dep. at 190:15-20; 195:11-196:7) See also Rubinovitz v. Rogato, 60 F.3d 906, 911 (1st Cir. 1995) (a party opposing a motion for summary judgment may not defeat the motion through a remote and "tenuous insinuation" from facts in the record, "rather than an acceptable level of probability.") Hunt has not advanced "clear and convincing evidence" to support a jury question of malice on the part of Guidepost as it relates to Guidepost's treatment of Jane Doe's removal of her necklace [redacted]

Hunt further posits that "Guidepost's failure to evaluate consent constitutes actual malice." (Opp. at 14, Point II.A.4.) By Hunt's argument, the testimony of Guidepost's CEO, Julie Myers Wood, that "this was not about whether the activity was consensual" creates a jury question as to whether Guidepost deliberately avoided the truth about Hunt's newly contrived story, *i.e.,* that the encounter in the condo was consensual, not an assault. But in a cynical violation of the "rule of completeness," Hunt quotes only the portions of Ms. Wood's deposition where she states, *e.g.,* "the issue here was not consent." (Opp. at 14, n.6 & n.7). Tellingly, Hunt purposefully omits the reason ***why*** Guidepost was not in a position to evaluate consent: the ***one person*** with first-hand knowledge whom the investigators interviewed other than the alleged survivor was ***Hunt***. ***And "Johnny Hunt denied that anything occurred"—consensual or otherwise.*** (Wood Dep. at 99:17-18; see also SOF ¶ 32; Hunt Dep. at 166:12-167:14.)[3] Although

[3] "[T]he general principle animating the rule of completeness—guarding against deception—is appropriate at the summary judgment phase. A judge, just like a jury, should not be misled, especially on a dispositive motion." Lopez v. Delta Int'l Mach. Corp., 312 F. Supp. 3d

Hunt refers to Blankenship's inadmissible hearsay "understanding" (presumably from Hunt) that the encounter was consensual (Opp. at 15), it bears recalling that Blankenship himself told the investigators that "he did not think he received the full story." (Report at 154.)

Hunt then attempts to raise a jury question with the argument that Guidepost "manufactured a sexual assault claim" by "deliberately altering" the couple's account. (Opp. at 17.) But all that Hunt succeeds in doing is to introduce evidence that Guidepost connected the alleged survivor with a trauma therapist. Hunt identifies no evidence from which a jury could find that "Guidepost influenced the testimony though therapists." And Jane Doe's testimony is entirely to the contrary: [redacted]. (Jane Doe Dep. at 91-94; 152-154.) The remainder of Hunt's narrative of a "manufactured" sexual assault claim is a chart comparing her and her husband's written recollections with the final version of the Report, suggesting editorial decisions by the investigators that do not change the central allegation of abuse and inferring contradictions that are not, in fact, contradictions (for example, compare: [redacted] with "Survivor did not reciprocate, but rather stood open and very stiff, hoping he would just stop and leave.") (Opp. at 19, [redacted] and Report at 151.) While this exercise may succeed in revictimizing the victim, it does not suggest clear and convincing evidence that ***Guidepost*** doubted Jane Doe's veracity when it finalized the Report.

---

1115, 1155 (D.N.M. 2018). Because the entire Wood Deposition is in the record, the Court can consider ***all*** of Ms. Wood's testimony regarding why the issue of consent never arose and not just the phrases cited by Hunt in his brief. See Wood Dep. at 170:17-18 ("Johnny Hunt did not say he engaged in consensual activity"); Wood Dep. at 176:8-9 ("He did not say I engaged in consensual activity"); and Wood Dep. at 189:8 ("Johnny Hunt denied that anything happened.").

Hunt's final gambit is to attack the integrity of his interviews. (Opp. at 20-21.) Hunt does not dispute that on May 12, 2022, Guidepost spoke to him on a Zoom, asked him forthrightly what happened in the condo, and gave him 48 hours to supplement his story. (SOF ¶ 32; *see also* Hunt's 56.01(c) Response to Guidepost's SOF ¶¶ 29-31 (ECF 245).) Nor does Hunt dispute that he omitted any suggestion of a "consensual encounter" and that he falsely denied that there had been any encounter at all. (Id.) While Hunt claims that, from his perspective, the interview was no interview at all but an "ambush," he points to no evidence—other than his conjecture and his spin—that would enable a jury to find that Guidepost had reason to doubt Jane Doe's account. Allegations grounded entirely in speculation "are insufficient to create a genuine dispute of material fact for trial." Bell v. Ohio State Univ., 351 F.3d 240, 253 (6th Cir. 2003). Hunt's desperate attempt to make something stick falls far short of the "clear and convincing evidence" of actual malice that the Supreme Court has required to defeat a motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255-56.

3. Hunt Has Failed to Establish a Genuine Issue of Material Fact Regarding Guidepost's Discharge of its Duty of Care

When unrebutted evidence shows that that the defendant discharged its duty of care as a matter of law, summary judgment is required. See Nye v. CSX Transp., Inc., 437 F.3d 556, 567 (6th Cir. 2006). See also Wiley v. Ohio/Oklahoma Hearst Argyle Television, Inc., 33 F. App'x 434, 437 (10th Cir. 2002) (summary judgment proper where plaintiff in libel case "failed to present *any* evidence to the district court regarding the standard of care") (emphasis in original). Here, Guidepost demonstrated that Hunt cannot establish evidence of negligence—an essential element of his claim (*i.e.,* even if Hunt were found to be a private figure). See Celotex v. Catrett, 477 U.S. 317, 323 (1986). The unrebutted evidence shows that Guidepost discharged its duty of care by interviewing every witness it could find, including Hunt himself (twice) and each of the

witnesses Hunt himself told the investigators to interview. (SOF ¶¶ 18, 20, 22-28, 32-35, 52-56, 65.) Guidepost's expert testified that it followed industry standards at every step. (SOF ¶ 37.)[4]

In his response to Guidepost's Rule 56.01(b) statement, Hunt disingenuously "disputes" Jane Doe's testimony confirming that the investigators questioned her about the topics covered in the Report, that the statements made by Jane Doe (and her husband) in response to those questions were accurately reflected as written in the final version of the Report. (SOF ¶ 18.) Jane Doe's testimony on these points is unequivocal and unrebutted. (Id.; see also Jane Doe Dep. at 66:21-25, 67:1-23.) The only "counter" evidence Hunt cites is to repeat his reference to the [redacted] which, as set forth above, would not alert Guidepost that Jane Doe's account was in any way false. (SOF ¶ 18; Kilpatrick Dep. at 154.) Hunt does not dispute that Guidepost interviewed the three pastors with whom Jane Doe's husband spoke after the encounter but confines himself to disputing whether the witnesses corroborated "abuse" as opposed to corroborating that Jane Doe's husband spoke of the incident. (SOF ¶ 20.) Regardless, the unrebutted evidence shows that Guidepost sought out the relevant witnesses and asked the relevant questions before submitting the Report to the SBC Task Force.

Similarly, while Hunt admits that Guidepost interviewed Blankenship for 45 minutes, he waives that fact away as "immaterial" and points to Blankenship's statement that he responded to Guidepost's questions under "duress." (Resp. to SOF ¶ 21.) But Hunt offers no proof tending to

---

[4] Hunt points to a statement in the expert report of Douglas Leff that permitting Jane Doe and her husband to suggest edits to the Report constituted a "departure from ordinary procedures." Once again, Hunt violates the rule of completeness and omits to mention that the report goes on to opine that this variation from "ordinary procedures did not infect the Report," because, *inter alia,* "the only portion of the Report shown to the Survivor and her husband was the synopsis of *her statement*" and investigators typically have discretion to provide witnesses with a written statement of their own. (Exhibit 11) (emphasis added). This expert's report is unrebutted.

show that the investigators did anything other than persistently question Blankenship about the encounter and the topics set forth in the Report. Indeed, on each count Blankenship admitted in his deposition that they had. (SOF ¶¶ 22-28.) Hunt provides no credible evidence to the contrary.

Although Hunt disingenuously "disputes" that the investigators questioned him on the topics set forth in SOF ¶ 32, and that he confirmed having given the answers contained in the Report (the admitted portions are set forth in bold and italic in the chart in SOF ¶ 32), he does not adduce contrary evidence as required by Rule 56. Indeed, there can be none, since Hunt admitted—repeatedly—having given the relevant responses during his deposition. (SOF ¶ 32.) Significantly, the unrebutted evidence also shows that Hunt told the investigators to interview only Jane Doe, her husband, and Blankenship—and they did just that. (SOF ¶ 32; Hunt Dep. at 178:9-22.) Hunt cannot overcome his admissions during his deposition that (1) he gave the answers recorded in the Report—including the answers in which he persistently lied to the investigators' faces and denied that he had had any physical contact with Jane Doe, and (2) he failed to come forward in the 48 hours after his second interview to correct his lies. (SOF ¶ 33.)

While Hunt argues that Guidepost had already determined to include the Hunt allegations in the Report as of May 13, 2022 (Resp. to SOF ¶ 33), the Report was not delivered to the SBC Task Force until May 15, 2022 (and not published by the Task Force until May 22). The 48 hours provided to Hunt to clarify his responses or offer additional information to Guidepost's questions was enough time to reconsider his responses and correct his lies. When Hunt chose to remain silent, Guidepost was entitled to consider its duty of care amply discharged. Rule 56 requires more than rank speculation about an unsupportable "agenda" to establish negligence.

Hunt similarly fails to discharge his burden under Rule 56 of refuting Guidepost's evidence that, as of the date of publication of the Report, ***"the investigators did not even know***

***[Hunt's] version of what happened***" (SOF ¶ 52; Exhibit 4, Hunt Dep. at 275:18-276:3); that he never told the investigators that Jane Doe purportedly "initiated" the encounter (SOF ¶ 53); and that when he confessed his sin to his former congregation, he wrote ***"I also am sorry I wasn't more forthcoming with the interviewers."*** (SOF ¶¶ 52-56.) Hunt simply dismisses all this as "immaterial." But Hunt cannot lie to Guidepost about what happened and then complain that Guidepost did not properly describe what did happen. Accordingly, even reading the motion in the light most favorable to Hunt, there is no genuine question of material fact regarding Guidepost's discharge of its duty of care, and his libel claim must therefore be dismissed.

## III. GUIDEPOST'S SUBMISSION OF THE REPORT TO THE SBC TASK FORCE WAS PROTECTED BY THE COMMON INTEREST PRIVILEGE

Hunt argues that because the Engagement Agreement contemplated a public-facing Report, Guidepost's submission of the Report to the SBC Task Force and the CoC amounts to publication and does not otherwise qualify for protection under the common interest privilege. (Opp. at 23-25.) Hunt's authority for this proposition, Loftis v. Rayburn, 2018 WL 1895842, *8 (Tenn. Ct. App. Apr. 20, 2018), is distinguishable. While the Loftis court found that it was "fair to assume Mr. Rayburn knew Mr. Myers was a reporter for *The Tennessean* and that Mr. Myers would report his statements in the newspaper," there was no claim of a common interest.[5] Because the unrebutted evidence shows that Guidepost was communicating with its client in the discharge of a legal duty, that communication did not constitute "publication" and, in the

---

[5] Without the common interest privilege, investigations such as the one commissioned by the SBC Task Force and undertaken by Guidepost will cease to exist; no investigative firm will accept such an engagement if it is not able to share its findings with its client, without risking a libel suit.

alternative, the conditional privilege applies absent evidence of actual malice. Woods v. Helmi, 758 S.W.2d 219 (Tenn. Ct. App. 1988).[6]

While Hunt disputes that Guidepost delivered the Report to the SBC Task Force and not to the world at large (Hunt Resp. to SOF ¶ 5), Guidepost's Rule 30(b)(6) witness unambiguously testified that Guidepost emailed the Report to the SBC on or about May 15, 2022, and the SBC Task Force—not Guidepost—made it available to the public after posting it. (Exhibit 12, Guidepost 30(b)(6) Dep. at 145:12-146:1.) [7] Hunt's only remaining support for the argument that Guidepost, as opposed to the SBC Task Force, "published" the Report is his statement that the Guidepost website contained a hyperlink to the Report. (SOF ¶ 48; Hunt's SOMF ¶ 170.) The Report was never hosted on the Guidepost website. (SOF ¶ 48.) While a hyperlink to the Report was included on the website, the unrebutted evidence is that the hyperlink took the reader to the ***SBC Task Force*** website—and it was there that the Report had been uploaded and hosted. (Guidepost 30(b)(6) Dep. at 146:3-22; 236:6-8.) The courts are clear that a website's use of a hyperlink, by itself, constitutes no more than a reference directing the reader to a document published ***elsewhere*** and does not amount to publication. See Sack on Defamation, 7.3.1[B] Hyperlinks or Other References to Internet-Borne Material (citing, inter alia, In re Philadelphia

---

[6] Publication, which "is a term of art meaning the communication of a defamatory matter to a third person," Brown v. Christian Bros. Univ., 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013), is not satisfied when a statement is simply shared between persons in a "need to know channel," even if those persons are associated with different organizations. Woods v. Helmi, 758 S.W.2d at 224 (citing Freeman v. Dayton Scale Co., 19 S.W.2d 255, 257 (Tenn. 1923).)

[7] Hunt asserts that Holske and Kilpatrick testified that "Guidepost published the Report on May 22nd, 2022." (Opp. at 25-26.) However, as explained by Guidepost's CEO, the investigators do not have direct personal knowledge regarding the ultimate publication of the Report, and they did not participate in Guidepost's submission of the Report to the SBC Task Force or the management of Guidepost's website. (Wood Dep. at 203:7-206:14; Guidepost 30(b)(6) Dep. at 204:6-10; 237: 15-17.) In context, the testimony is clear that the Report went live on May 22nd (because the Task Force uploaded it), not that Guidepost "published" it.

Newspapers, LLC, 690 F.3d 161, 175 (3d Cir. 2012)). Hunt admits he is unaware of any other "publication" by Guidepost. (SOF ¶ 46.)

Hunt goes on to argue that even if a conditional privilege applied, it was (1) abused or (2) overcome by malice (Opp. at 25-26). Hunt is wrong on both counts. Hunt's abuse allegation is based on the fact that two individuals other than the SBC Task Force and the CoC learned of the allegations against Hunt prior to the SBC Task Force's publication on its website. (Opp. at 25-26.) The two individuals in question were invited by the ***CoC*** to participate in the review process. (Wood Dep. at 427:10-21.) No jury could infer that invitees of the CoC were outside the zone of shared interest. See, e.g., McGuffey v. Belmont Weekday School, 2020 WL 2754896 (Tenn. Ct. App. May 7, 2020) (school communications with parents regarding staffing issues falls under the common interest privilege). As to malice, Hunt's argument fails for the same reasons that his actual malice argument fails in support of his libel claim, and he points to no evidence of spite or ill will. See Point II.1, II.2, above. Hunt's libel claim must be dismissed.

## IV. HUNT HAS FAILED TO DEMONSTRATE A JURY ISSUE ON HIS CLAIM OF FALSE LIGHT INVASION OF PRIVACY

Hunt asserts in his opposition that the Report was intended to "focus" on "child molesters and other abusers." But the Engagement Agreement expresses no such "focus." (See Engagement Agreement at ¶ 3.1.) The language of the Engagement Agreement, not Hunt's spin, defines the scope of the Report.

Hunt's remaining argument that a former SBC President's abuse of a young married woman is not of public concern is not serious, and it demeans and further insults the SBC, its members, and most of all the victims of sexual abuse. See Snyder v. Phelps, 562 U.S. 443, 454 (2011) (instances of clergy abuse described as "matters of public import"). As set forth above, the unrebutted evidence shows that Hunt's false light claim fails on the other elements, *i.e.,*

because he is a public figure, Guidepost submitted the Report without actual malice or negligence, and the element of publicity is absent. The Court should grant Guidepost summary judgment on this count.

## V. HUNT'S EVIDENCE STILL FALLS FAR SHORT OF A VIABLE CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Hunt's principal basis for resisting summary judgment is a pair of statements by the Guidepost investigator, Russell Holske, that [redacted] (Opp. at 28.) But even read in the light most favorable to Hunt, Holske's observation that Jane Doe's account was unique does not support a finding of intentional or reckless conduct "so outrageous that it is not tolerated by civilized society." Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 51 (Tenn. 2004).

Nor has Hunt come forward with evidence in admissible form to support a claim for emotional damages of the severity required for the tort of IIED. While Hunt stated in his deposition and interrogatory responses that he went to counseling sessions and felt anguish and shame, proof of "serious" or "severe" distress requires evidence that "a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." Camper v. Minor, 915 S.W.2d 437, 446 (Tenn. 1996). As stated in Guidepost's principal submission, by Hunt's own admission, he has been more than able to cope, maintaining a regular preaching and travel schedule (see also Hunt Decl., ¶ 11), and he has refused medication. (SOF ¶¶ 66-67.)

The remainder of Hunt's purported evidence is similarly insufficient to create an issue of fact for the jury. While Hunt offers a report from [redacted], the document is inadmissible hearsay. See, e.g., United States

v. Mason, 294 Fed. App'x 193, 199-201 (6th Cir. 2008) (psychiatric report, with nothing more, offered as evidence of emotional condition of the patient did not qualify for exception under FRE 803(3), 803(4), or or 803(6).) Nor does the report otherwise establish an inability to cope with his distress under Camper.[8] Therefore, because the tort of IIED is barred in the absence of actual malice, and for the other reasons set forth in Guidepost's principal submission (ECF 217 at 30-32), the IIED claim must be dismissed.

## VI. HUNT HAS NOT DEMONSTRATED A JURY QUESTION FOR HIS CLAIM OF NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Hunt still has not adduced evidence of "serious" or "severe" harm. (See Point V, supra; SOF ¶¶ 67-68.) Furthermore, because Guidepost did not breach its duty of care, the element of negligence is wanting. This cause of action should be dismissed.

## VII. HUNT'S CLAIM OF PUBLIC DISCLOSURE OF PRIVATE FACTS FAILS

Infidelity and sexual abuse on the part of a prominent clergyperson like Hunt is by definition a matter of public concern (see Synder, supra), which is one of the elements required for this tort. Garmley v. Opryland Hotel Nashville, LLC, 2007 WL 4376078, *2-3 (M.D. Tenn. Dec. 13, 2007). It beggars the imagination that the self-proclaimed leader of the "great commission resurgence" within the SBC should consider his encounter with Jane Doe to be anything but a matter of public concern. And it obviously ***was*** a matter of public concern, as Hunt himself wrote an apology letter to his megachurch and posted it on the Internet. (SOF ¶ 54; Exhibit 16.) For these reasons and the others identified in Guidepost's principal submission (ECF 217 at 33-35), summary judgment should be entered on this cause of action.[9]

---

[8] [redacted]

[9] Guidepost respectfully refers the Court to its previously filed argument that Hunt cannot recover [redacted]. (ECF 217 at 35.)

Dated: August 14, 2024

Respectfully submitted,


s/John R. Jacobson
John R. Jacobson, Esq. (BPR # 014365)
Katharine R. Klein, Esq. (BPR # 019336)
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
Telephone: (615) 320-3700
jjacobson@rjfirm.com
kklein@rjfirm.com

-and-

**MINTZ & GOLD LLP**
Steven G. Mintz (admitted pro hac vice)
Terence W. McCormick (admitted pro hac vice)
Scott Klein (admitted pro hac vice)
Alex Otchy (admitted pro hac vice)
Adam Brody (admitted pro hac vice)
600 Third Avenue
25th Floor
New York, NY 10016
Telephone: (212) 696-4848
mintz@mintzandgold.com
mccormick@mintzandgold.com
klein@mintzandgold.com
otchy@mintzandgold.com
brody@mintzandgold.com


*Counsel for Defendant Guidepost Solutions LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served through the Court's electronic filing system on the following:

Todd G. Cole, Esq. (BPR # 031078)
Andrew Goldstein, Esq. (BPR # 037042)
COLE LAW GROUP, P.C.
1648 Westgate Circle, Suite 301
Brentwood, TN 37027
Telephone: (615) 326-9059
tcole@colelawgrouppc.com
agoldstein@colelawgrouppc.com

Robert D. MacGill, Esq. (Ind. Bar. 9989-49)
Patrick J. Sanders, Esq. (Ind. Bar. 36950-29)
MACGILL PC
156 E. Market St. Suite 1200
Indianapolis, IN 46204
Telephone: (317) 721-1253
robert.macgill@macgilllaw.com
patrick.sanders@macgilllaw.com

*Counsel for Plaintiff*

Scarlett Singleton Nokes, Esq.
R. Brandon Bundren, Esq.
E. Todd Presnell
BRADLEY ARANT BOULT CUMMINGS LLP
ONE 22 ONE
1221 Broadway, Suite 2400
Nashville, Tennessee 37203
Telephone: (615) 244-2582
snokes@bradley.com
bbundren@bradley.com
tpresnell@bradley.com

Gene R. Besen, Esq.
BRADLEY ARANT BOULT CUMMINGS LLP
Fountain Place
1445 Ross Avenue, Suite 3600
Dallas, Texas 75202
Telephone: (214) 257-9758
gbesen@bradley.com

Thomas J. Hurney, Jr., Esq.
Gretchen M. Callas, Esq.
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
Post Office Box 553
Charleston, West Virginia 25322
Telephone: 304-340-1000
thurney@jacksonkelly.com
gcallas@jacksonkelly.com

*Counsel for the Executive Committee of the Southern Baptist Convention*

L. Gino Marchetti, Jr., Esq.
Matt C. Pietsch, Esq.
TAYLOR, PIGUE, MARCHETTI & BLAIR, PLLC
2908 Poston Avenue
Nashville, TN 37203
Telephone: (615) 320-3225
gmarchetti@tpmblaw.com
matt@tpmblaw.com

*Counsel for the Southern Baptist Convention*

this the 14th day of August, 2024.

*s/ John R. Jacobson*