# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHNNY M. HUNT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:23-cv-00243 |
| | ) | |
| SOUTHERN BAPTIST CONVENTION, et al., | ) | JUDGE CAMPBELL |
| | ) | MAGISTRATE JUDGE FRENSLEY |
| Defendants. | ) | |

## <u>MEMORANDUM</u>

Pending before the Court are Defendants' motions for summary judgment (Doc. Nos. 216, 222, 229), which are fully briefed (Doc. Nos. 221, 228, 230, 251, 252, 253, 272, 280, 281, 282).[1] Defendants each filed statements of undisputed material facts to which Plaintiff responded. And Plaintiff filed a statement of additional disputed facts to which Defendants filed a joint response.[2] For the reasons discussed below, Guidepost Solutions LLC's motion will be **GRANTED,** and the Southern Baptist Convention's and the Executive Committee of the Southern Baptist Convention's motions will be **GRANTED IN PART**.

---

[1]    Unredacted versions of these memoranda have been filed under seal. (*See* Doc. Nos. 221, 228, 250, 251, 280). The Court has ordered additional briefing regarding the propriety of sealing documents in this case. (*See* Doc. No. 315).

[2]    For ease of references the statements of material facts and responses thereto are cited as follows:

- Guidepost Solutions' Statement of Material Facts (Doc. Nos. 218 (redacted), 221-1 (sealed)), together with Hunt's Response (Doc. No. 245 (redacted), 254 (sealed)) is cited as "Guidepost SOF ¶ ___."
- Southern Baptist Convention's Statement of Undisputed Material Facts (Doc. No. 231), together with Hunt's response (Doc. No. 241) is cited as "SBC SOF ¶ ___."
- The Executive Committee's Statement of Material Facts (Doc. No. 223 (redacted), 227 (sealed)), together with Hunt's Response (Doc. No. 242 (redacted), 252 (sealed)), is cited as "EC SOF ¶ ___."
- Plaintiff's Statement of Additional Disputed Facts (Doc. Nos. 256 (sealed) and 247 (redacted)); together with Defendant's joint response (Doc. Nos. 281 (sealed) and 278 (redacted)) is cited as "Pl. SOF ¶ ___."

# I.    INTRODUCTION

Plaintiff Johnny M. Hunt ("Hunt"), a clergy person and former president of the Southern Baptist Convention ("SBC"), brings this action against the SBC, the Executive Committee of the SBC ("the Executive Committee"), and Guidepost Solutions LLC ("Guidepost") (collectively, "Defendants") for defamation, invasion of privacy, intentional and negligent infliction of emotional distress, and public disclosure of embarrassing private facts.[3]

Defendants move for summary judgment, arguing there is no need for a trial because they have shown there are no genuine disputes as to any material facts and that they are entitled to judgment as a matter of law. Hunt opposes Defendants' motions, arguing he has shown disputes of material fact that require the case to proceed to trial.

The Court has carefully reviewed the entire record in this matter and, for the reasons explained further herein, finds there are no disputes as to any material fact and that Guidepost is entitled to summary judgment on all claims and that the SBC and Executive Committee are entitled to summary judgment on Hunt's claims against them for invasion of privacy, intentional and negligent infliction of emotional distress, public disclosure of embarrassing private facts, defamation under the actual malice standard of fault, and defamation under the negligence standard of fault in connection with statements made in a report and in a letter.

However, the Court finds the SBC and the Executive Committee have failed to demonstrate that Hunt lacks evidence to support his defamation claims against them in connection a tweet posted by Bart Barber.

---

[3]      The Court previously dismissed Hunt's claim for libel *per se* (Count II) because it is not a recognizable claim under Tennessee law. (*See* Doc. No. 150 at PageID # 2030).

2

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id*.

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, "depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials"—that it believes demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Anderson*, 477 U.S. at 249. The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

Rule 56(c) sets forth the procedures to support and object to particular facts:

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> (2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
>
> (4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

If a party fails to properly support a factual assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), Rule 56(e) provides that the Court may consider the fact undisputed for purposes of the motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial."); *see e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 888

4

(1992) ("In ruling upon a Rule 56 motion, a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied.") (internal quotations omitted).

## III.    FACTUAL BACKGROUND

### A.    Executive Summary

Hunt is a former President of the SBC (2008-2010), published author, and sought after speaker.[4] He was Senior Pastor at one of the largest churches in America, First Baptist Church Woodstock, in Georgia, for more than thirty years before accepting an executive position at the North American Mission Board ("NAMB") in 2019.

In October 2021, the Southern Baptist Convention Task Force and the Executive Committee engaged Guidepost to investigate sexual abuse within the SBC. On May 22, 2022, a Report was published regarding findings from Guidepost's investigation (Doc. No. 1-2) ("Report"). The Report mentioned Hunt in the context of the investigation into and conclusions regarding the alleged abuse reported. The Report is 288 pages in length and begins with the following Executive Summary:

> For almost two decades, survivors of abuse and other concerned Southern Baptists have been contacting the Southern Baptist Convention ("SBC") Executive Committee ("EC") to report child molesters and other abusers who were in the pulpit or employed as church staff. They made phone calls, mailed letters, sent emails, appeared at SBC and EC meetings, held rallies, and contacted the press…only to be met, time and time again, with resistance, stonewalling, and even outright hostility from some within the EC.
>
> Our investigation revealed that, for many years, a few senior EC leaders, along with outside counsel, largely controlled the EC's response to these reports of abuse. They closely guarded information about abuse allegations and lawsuits, which were not shared with EC Trustees, and were singularly focused on avoiding liability for the

---

[4]     "For 13 years I did one of the most popular devotions in America." (Hunt Deposition 264:5-6).

5

SBC to the exclusion of other considerations. In service of this goal, survivors and others who reported abuse were ignored, disbelieved, or met with the constant refrain that the SBC could take no action due to its polity regarding church autonomy – even if it meant that convicted molesters continued in ministry with no notice or warning to their current church or congregation.

As survivors became more vocal and the issue of sexual abuse became more prominent in the media, divisions became apparent within EC leadership. In recent years, as some within the SBC have been more open to reforms, they were met with opposition and antagonism from those resistant to change. Finally, at the 2021 Nashville Convention, calls for reform reached a crescendo – the Messengers overwhelmingly voted to approve a Task Force to supervise an independent investigation into the EC's handling of sexual abuse allegations. The Motion called for inquiry into the actions and decisions of EC staff and members from January 1, 2000, to June 14, 2021, with respect to allegations of abuse, mishandling of abuse, mistreatment of victims, patterns of intimidation of victims or advocates, and resistance to sexual abuse reform initiatives. Our findings in these categories are summarized below:

*Allegations of Abuse by EC Staff and Members*

As per the Motion, we were asked to examine allegations of abuse committed by EC members during the relevant time period. During our investigation, an SBC pastor and his wife came forward to report that SBC President Johnny Hunt (2008-2010) had sexually assaulted the wife on July 25, 2010. We include this sexual assault allegation in the report because our investigators found the pastor and his wife to be credible; their report was corroborated in part by a counseling minister and three other credible witnesses; and our investigators did not find Dr. Hunt's statements related to the sexual assault allegation to be credible.

*Mishandling of Abuse Allegations and Mistreatment of Victims*

We considered these categories in tandem because abuse allegations were often mishandled in a manner that involved the mistreatment of survivors. Over the years, the EC's response to sexual abuse allegations was largely driven by senior EC staff members, particularly D. August "Augie" Boto, the EC General Counsel and later Interim EC President, as well as the SBC's long-serving outside counsel – James Guenther, James Jordan, and the firm of Guenther, Jordan & Price ("GJP"). Their status and longevity in the SBC organization – Mr. Guenther had provided legal advice since 1966 and began in 1998 as Vice President for Convention Policy before becoming General Counsel in 2004 – enabled them to control decisions about how the SBC EC would deal with the increasing attention on church sexual abuse.

Their main concern was avoiding any potential liability for the SBC. As this report documents, those who reported abuse were often ignored or told that the SBC had no power to take action. Mr. Guenther advised that EC staff should not undertake

to elicit further information or details about reports of abuse, so that the EC not assume a legal duty to take further action.

Over the years, the existence of these reports of abuse were not shared with EC Trustees. Nor was the fact that, since 2007, an EC staff member working for Mr. Boto was maintaining a list of accused ministers in Baptist churches, including the minister's name, year reported, relevant news articles, state, and denomination. In a May 2019 email to Dr. Ronnie Floyd, the then-EC President, EC Vice President Dr. Roger "Sing" Oldham acknowledged that "[f]or the past decade, I have been regularly sending Augie news reports of Baptist ministers who are arrested for sexual abuse, for his awareness. It hasn't slowed down since the [Houston] Chronicle articles started on February 10." Mr. Boto responded that: "Yes. We are collecting them, and may even post them in some way, but we'd have to really examine the potential liabilities that would stem therefrom."

Despite collecting these reports for more than 10 years, there is no indication that Dr. Oldham, Mr. Boto, or anyone else, took any action to ensure that the accused ministers were no longer in positions of power at SBC churches. The most recent list prepared by the EC staff member contained the names of 703 abusers, with 409 believed to be SBC-affiliated at some point in time.

Our investigative team reviewed the list and conducted significant research to assess whether any of the alleged abusers were still associated with an SBC church. Based on these efforts, it appears that nine (9) people remain in active ministry or connected to ministry. Two (2) of those people appear to be associated with an SBC church. The remaining seven (7) appear to be associated with churches that are not SBC-affiliated. We will provide this information to the Credentials Committee for further review, including whether the seven additional churches mentioned above are in fact non-SBC affiliated. We will also continue to review the latter material to determine whether any referrals or other action needs to be taken.

*Pattern of Intimidation of Victims or Advocates*

Rather than focusing on these accused ministers, some EC leaders turned against the very people trying to shine a light on sexual abuse. The survivors – those persons who actually suffered at the hands of SBC clergy or SBC church staff or volunteers – who spoke out the most, and who criticized the SBC's inaction, were denigrated as "opportunistic," having a "hidden agenda of lawsuits," wanting to "burn things to the ground," and acting as a "professional victim." In an internal email, Mr. Boto even equated the focus on sexual abuse with the work of the devil:

> This whole thing should be seen for what it is. It is a satanic scheme to completely distract us from evangelism. It is not the gospel. It is not even a part of the gospel. It is a misdirection play. Yes, Christa Brown [a survivor] and Rachael Denhollander [a survivor advocate] have succumbed to an availability heuristic because of their victimizations. They have gone to the SBC looking for sexual abuse, and of course, they found it. Their outcries

have certainly caused an availability cascade (just like Lois Gibbs did in the Love Canal example). But they are not to blame. This is the devil being temporarily successful.

Baptist Press ("BP"), the EC's communications arm, was also used to portray survivors in an unflattering light and mischaracterize allegations of abuse. For example, in March 2019, Jennifer Lyell, a senior executive at an SBC entity, was asked by executives at Lifeway and SBC entity heads to disclose her sexual abuse at the hands of her former seminary professor through a first-person account to be published in BP. Rather than publishing Ms. Lyell's corroborated account as BP staff had originally drafted it, the account was changed to read as if Ms. Lyell was consensually involved with her alleged abuser. The article as published reported that Ms. Lyell alleged that she had a "morally inappropriate relationship" with her former seminary professor, making it appear that she engaged in a consensual sexual relationship with him. Ms. Lyell was thereafter subject to vicious attacks, including harsh and hurtful comments on Baptist Press FaceBook – she was called a bitter jealous woman and an adulterer, and some suggested she should be fired. After Ms. Lyell expressed her grave concerns about the article, the story was removed on the advice of outside counsel but not corrected. Finally, after public recognition that the story was inaccurate, and months of pleas by Ms. Lyell, BP retracted the story in October 2019 and issued an apology.

Additionally, an article about the 2019 Caring Well conference, written by an Ethics and Religious Liberty Commission ("ERLC") staffer, was sanitized before publication. The draft article had contained quotes from two survivor advocates who had spoken critically at the conference about the SBC's handling of sexual abuse allegations. When the article was published, some of the story had been deleted, including all references to one of the advocates and all claims that the SBC had failed survivors.

While stories of abuse were minimized, and survivors were ignored or even vilified, revelations came to light in recent years that some senior SBC leaders had protected or even supported abusers:

- Former SBC President Steve Gaines admitted that, as senior pastor at Bellevue Baptist Church, he had delayed reporting a staff minister's prior sexual abuse of a child of "heartfelt concern and compassion for th[e] minister," while acknowledging that he should have "brought it to the attention of our church leadership immediately;"

- Former SBC President Jack Graham, when he was pastor at Prestonwood Baptist Church, allegedly allowed an accused abuser of young boys to be dismissed quietly in 1989 without reporting the abuse to police. The accused abuser, John Langworthy, later was charged with abusing young boys in Mississippi in 2011;

8

- Former SBC President Paige Patterson was terminated from his position at Southwestern Baptist Theological Seminary in 2018 after it was revealed that he told a student not to report a rape in 2003 and, in 2015, emailed his intention to meet with another student who had reported an assault, with no other officials present, so he could "break her down;"

- Former SBC Vice President Judge Paul Pressler is the defendant in a civil sexual abuse lawsuit alleging that he repeatedly sexually abused the plaintiff beginning when the plaintiff was 14 years old. Two other men submitted separate affidavits in the case also accusing Judge Pressler of sexual misconduct; and

- Former EC Interim President and General Counsel Augie Boto testified as a character witness for Mark Schiefelbein, a gymnastics coach convicted of multiple counts of sexual assault against a minor. During his testimony at a post-conviction evidentiary hearing in September 2008, Mr. Boto identified himself as general trial counsel for the Executive Committee of the Southern Baptist Convention.

*Resistance to Sexual Abuse Reform Initiatives*

Over the past twenty years, various reform proposals have been brought to the EC. In evaluating the EC's response to these proposals, we recognize that public awareness about sexual abuse and prevention has changed over time, as people have become more informed about the severe repercussions on survivors and the key steps that can be taken to address the problem. Nevertheless, although some proposals may not have been feasible, it is striking that many reform efforts were met with resistance, typically due to concerns over incurring legal liability:

- A 2007 proposal for an SBC database of accused molesters was rejected in 2008 based on church autonomy, even though SBC outside counsel had submitted a memo to Mr. Boto discussing how it could be accomplished consistent with polity;

- A 2014 proposal for the SBC to hold a sexual abuse education conference was opposed by Mr. Boto, delayed, and ultimately did not occur;

- Some EC leaders and some EC Trustees criticized SBC President J.D. Grear for mentioning the names of churches cited in the Houston Chronicle's series about sexual abuse, and outside counsel warned Dr. Grear that such actions could get the SBC sued for libel. Mr. Boto even called one of the churches to apologize for Dr. Grear's actions – that church's music minister later confessed to committing abuse and the church voluntarily disassociated from the SBC;

- Mr. Boto was resistant to having a Credentials Committee because it might make the Convention vulnerable to liability claims;

- Some EC leaders clashed with the ERLC over sexual abuse initiatives and some opposed funding the Caring Well conference. In addition, when the ERLC was putting together a report about sexual abuse, EC leaders and outside counsel suggested changes to the report to avoid potential liability, including removing the word "crisis" when referring to sexual abuse;

- Dr. Floyd and Mr. Addison were opposed to a Task Force to investigate the EC's response, and Dr. Floyd tried to prevent the Motion.

A full discussion of these and other findings can be found in Part V of this report. The other sections of the report are as follows:

In *Part II.A* of this report, we describe the background of the investigation, including the events that occurred at the June 2021 Nashville Convention, the largest SBC annual meeting since 1995. Amid calls for an investigation into the EC's handling of sexual abuse allegations, Dr. Floyd had announced that an outside firm would conduct a limited review. At the annual meeting, there was opposition to the prospect of the EC overseeing an investigation of itself. Tennessee pastor Grant Gaines, with North Carolina pastor Ronnie Parrot, wrote a Motion for a Task Force to direct any such third-party investigation and proposed a wider purview. The Messengers – over 15,000 representatives from 5,570 churches – overwhelmingly approved the Motion.

The Task Force officially engaged us on September 9, 2021, although the commencement of the investigation was delayed due to disagreements within the SBC EC as to whether attorney client privilege should be waived. No agreement was reached after an initial series of meetings but on October 5, 2021, the SBC EC held a deciding vote in favor of waiving privilege. That decision allowed us to perform a more comprehensive investigation, particularly because, as this report makes clear, outside counsel were deeply involved in managing the EC's response to sexual abuse allegations.

In *Part II.B*, we describe the scope of our engagement. The Motion directed us to investigate, for the time period between January 1, 2000, to June 14, 2021: (1) allegations of abuse by EC members; (2) mishandling of abuse allegations by EC members; (3) allegations of mistreatment of sexual abuse victims by EC members; (4) patterns of intimidation of sexual abuse victims or advocates; and (5) resistance to sexual abuse reform initiatives. We were further directed to perform an audit of the procedures and actions of the Credentials Committee, which was tasked in mid-June 2009 with making determinations about, among other subjects, whether churches accused of

mishandling sexual abuse allegations should be considered "in friendly cooperation" with the SBC.

An overriding principle of this investigation was our independence. The Engagement Letter stipulates that the Task Force, not the EC, is the client for purposes of the investigation. A Committee on Cooperation ("CoC") – comprised of the SBC President and four EC members appointed to their first term in June 2021 -- was formed to provide financial oversight of the investigation and to ensure the full cooperation of the SBC EC, among other things. The Engagement Letter further provides there is no attorney-client relationship between Guidepost and any other party, and that neither the EC nor the CoC will conduct, direct, or otherwise manage or influence our investigation in any manner.

In Part *II*.C , we set forth the investigative practices we employed to collect and review all relevant information. This was primarily accomplished through a wide-ranging document review and numerous interviews with current and former EC staff, EC Trustees, other members of the SB C community such as past Presidents and Task Force members, witnesses, and survivors of sexual abuse. As was our protocol, we did not affirmatively contact survivors but rather engaged with them in the manner they chose, with awareness of best practices for trauma-informed communications.

It should be noted that, due to the large amount of information we collected, we cannot discuss every interview or document in this report. We interviewed approximately 330 individuals and had access to over five terabytes of data. We wish to thank everyone who took the time to speak with us, and note that each interview contributed to our understanding of this matter.

In *Part III*, we describe the organization of the SBC, which is based upon the principle of local church autonomy. Unlike hierarchical religious organizations, such as the Catholic Church, the SBC does not dictate church practices or worship, nor does it ordain pastors. Rather, local churches voluntarily select to cooperate with the SBC, and continue to maintain independence to choose their own leaders, bylaws, budget, and policies. An understanding of SBC polity is essential for understanding the reasons invoked by some SBC EC leaders as to why the SBC could not, or should not, take certain actions to address sexual abuse within SBC local churches.

It is also essential to understand how the SBC is run. Each June, local churches send representatives, known as Messengers, to the SBC annual meeting. At the annual meeting, the Messengers elect an SBC President, who typically serves two one-year terms, and other officers, as well as Trustees to oversee various SBC entities and committees. Because the Messengers are so numerous and meet only once per year, the day-to-day functioning of the SBC is managed by an Executive Committee, governed by a board of 86 EC

11

Trustees. The EC Trustees employ a salaried EC President who is also CEO and treasurer. The EC President in turn manages a staff of approximately 30 people who carry out the day-to-day functions of the SBC. Among these functions is running Baptist Press, the SBC news service. Because the EC Trustees only meet three times per year, many of the decisions at the EC level are made by the EC President and senior EC staff members.

In *Part IV*, we lay out the factual findings from our investigation. *Part IV.A* provides a timeline of the EC's response to sexual abuse issues from January 1, 2000, to June 14, 2021. Given the two-decade span, we cannot and do not describe every action or communication related to sexual abuse allegations. Rather, we have focused on providing an overview of some of the most relevant events from that period. Where it would be helpful, we include screenshots of some of the documents discussed.

*Part IV.B* provides an overview of our interviews with current and former EC Trustees. We reached out to all individuals who served during the relevant time period and 175 EC Trustees agreed to speak with us. We want to express our appreciation for their willingness to share their experiences and their thoughts on how the EC could improve in the future. Many EC Trustees told us that they were unaware that survivors and others had been reporting abuse to the EC for years, or that lawsuits had been filed. A common concern was that EC officers and staff members knew more than the EC Trustees, who were not provided with enough time or materials to be thoroughly informed about EC issues. The EC Trustees with whom we spoke were sympathetic to survivors and believed that they should have been met with greater compassion. In addition to our interviews with the EC Trustees, we also conducted a social media review of the public Twitter accounts of EC Trustees and other key SBC figures. We found that, with one exception, EC Trustee tweets were largely positive toward survivors and open to addressing sexual abuse.

*Part IV.C* contains a discussion of our interviews with approximately 42 current and former EC staff members, as well as the results of two surveys we conducted to gather employees' opinions on how the EC handles issues related to sexual abuse. The surveys were anonymous, and we would like to thank EC staff members for the high rate of participation. In our interviews, EC staff members expressed that the EC would benefit from better openness from its leaders on sexual abuse and other difficult topics. Some staff members noted that the EC would also benefit from clearer policies and training about sexual abuse and harassment. We did conduct a review of the Personnel Policies Manual to examine whether sexual abuse and harassment policies and procedures were in accordance with best practices. We identified several aspects where the policies were lacking – such as the absence of written guidance about reporting procedures, escalation, whistleblower

protections, or investigation requirements – and made suggestions for improvements.

*Part IV.D* recounts some of the histories that survivors shared with us about their abuse and their treatment by the SBC EC. During our investigation, we conducted interviews or meetings with 19 survivors, 14 survivor advocates, and six family members of survivors. Six additional survivors provided written information to us. While not all wanted to be named in this report, some survivors expressly wanted their histories to be told. Survivors expressed to us that they not only suffered trauma from their abuse, but also from the response, or nonresponse, of the churches and institutions like the SBC that did not believe them, ignored them, mistreated them, and/or failed to help them.

In *Part V*, as summarized above, we explain and detail our observations and conclusions on the Messenger Motion categories: (1) allegations of abuse; (2) mishandling of abuse allegations and allegations of mistreatment of sexual abuse victims; (3) evidence of patterns of intimidation of victims and advocates; and (4) resistance to sexual abuse reform initiatives.

In *Part VI*, we include our approximately 65-page report detailing our audit of the procedures and actions of the Credentials Committee. Among other things, we found that the Credentials Committee was under pressure almost immediately after its formation to begin reviewing sexual abuse submissions. Consequently, the Credentials Committee began operating without adopting any written policies and procedures, such as set timelines/deadlines, protocols for correspondence with submitters and churches, and standards for review. At least one outside expert offered help and support in developing criteria and standards, but the offers were rebuffed. Credentials Committee members themselves expressed dissatisfaction because they did not receive adequate information about their role, nor did they have any training. These and other deficiencies led to delays and communications breakdowns that caused submitters and others to lose faith in the process, despite what we believe to be good intentions and effort on the part of the Credentials Committee members. Our findings, as well as an analysis of the submissions made to the Credentials Committee during the audit period, are set out in that section.

Finally, in *Part VII*, we set out a comprehensive list of proposed recommendations intended to provide a pathway for the SBC to improve its response to sexual abuse and misconduct allegations in the future. The recommendations set out voluntary minimum standards that churches, local associations, state conventions, and all SBC entities can implement for the prevention, recognition, and the appropriate handling of sexual abuse and related misconduct allegations. The recommendations address systemic and cultural issues from bottom to top, taking into consideration polity, autonomy,

13

and the reality that this issue needs to be resolved through a willing and voluntary cooperation. Some recommendations will require a significant amount of work, while other elements recognize the need for education and cultural change. A comprehensive implementation of these recommendations should help to create safe spaces for children and all members of the Convention.

Our key recommendations include the following:

- Upon completion of the SATF duties, first form an Independent Commission and later establish a permanent Administrative Entity to oversee comprehensive long-term reforms concerning sexual abuse and related misconduct within the SBC;

- Create and maintain an Offender Information System to alert the community to known offenders. Make the OIS available to churches on a voluntary basis;

- Provide a comprehensive Resource Toolbox including protocols, training, education, and practical information;

- Create a voluntary self-certification program for churches, local associations, state conventions, and entities based on implementation of "best practices" to bring awareness to, and enhance prevention of, sexual abuse;

- Improve governance controls, including the use of enhanced background checks, Letters of Good Standing, and Codes of Conduct to voluntarily strengthen hiring standards and improve governance;

- Restrict the use of nondisclosure agreements and civil settlements which bind survivors to confidentiality in sexual abuse matters, unless requested by the survivor;

- Adopt a "Declaration of Principles" setting out fundamental standards regarding how sexual abuse allegations will be handled at every level of the SBC, and how those who report will be treated going forward. These Principles may provide a model for SBC entities, state conventions, local associations, and local churches to adopt and follow; and

- Acknowledge those who have been affected by SBC clergy sexual abuse, through both a sincere apology and a tangible gesture, and prioritize the provision of compassionate care to survivors through providing dedicated survivor advocacy support and a survivor compensation fund.

14

With respect to our Credentials Committee Audit, we propose the following key recommendations to ensure that the Credentials Committee effectively and transparently handles submissions relating to sexual abuse:

- Formalize and improve the CC's processes and procedures, adopt standards for CC determinations, and establish standard process timelines in order to provide timely and transparent decisions;

- Empower the CC to better communicate with survivors and churches by providing trauma and sexual abuse training for CC members, and hiring a trauma-informed Survivor Care Support Specialist to provide care and open communication to submitters/survivors;

- Improve the online Reporting Portal to be survivor-care focused and assess the technology applications to improve CC functionality, auditability, and response; and

- If necessary, allow the CC the ability to engage and consult with experts on an extensive inquiry for a submission.

## B.    Background, Scope, and Methodology

As this report lays out, for many years survivors and their supporters within the SBC community have urged the SBC to address the problem of sexual abuse within SBC churches. These efforts came to a head at the 2021 Nashville Convention, which was the largest SBC annual meeting since 1995. Over 15,000 Messengers attended the Convention, representing 5,570 churches.

 The issue of sexual abuse was at the forefront. Although Dr. Ronnie Floyd, the Executive Committee ("EC") President and CEO, had earlier announced that an outside firm, Guidepost Solutions, would conduct a limited scope review of the EC's response to sexual abuse allegations under the EC's supervision, some Messengers contended that the EC should not oversee an investigation of itself. Tennessee pastor Grant Gaines, with North Carolina pastor Ronnie Parrot, wrote a Motion for a Task Force to direct any such third-party investigation and proposed a wider scope. Pastor Gaines described it as "the least we can do for abuse survivors."

The Motion first was referred to the EC, but Todd Benkert appealed to the Messenger body, who voted to consider it on the convention floor where it was overwhelmingly approved. According to the Motion, the Task Force could opt to oversee the independent review already announced by the Executive Committee or begin a separate third-party review, and it must ensure that an investigation includes "any allegations of abuse, mishandling of abuse, mistreatment of victims, a pattern of intimidation of victims or advocates, and resistance to sexual abuse reform

initiatives" as well as an audit of the procedures and actions of the Credentials Committee.

The Task Force re-selected Guidepost Solutions to conduct the independent investigation and on September 9, 2021. Dr. Bruce Frank signed an engagement letter with Guidepost. Although the EC voted to fund the investigation on September 21, 2021, there were internal disagreements about whether the SBC should waive attorney client privilege as directed by the Messengers at the June 2021 convention. These disagreements led to a delay in the commencement of the investigation.

The Task Force and EC officers convened September 27-28, 2021, and still could not come to an agreement on the matter of waiving privilege. On October 5, 2021, the SBC EC held another session and ultimately voted in favor of waiving privilege. A second letter of engagement was signed by Pastor Rolland Slade on October 5, 2021. The Engagement Letter, attached here to as Appendix A, specifies that the Task Force, and not the EC, is the client for purposes of the investigation.

The Committee on Cooperation ("CoC") was created by virtue of the Guidepost contract for the purpose of providing financial oversight, electing a liaison between the EC and Guidepost, receiving periodic monthly updates noting information requests made to the EC, and ensuring that the EC and SBC are fully cooperative. The CoC was also tasked with conducting a factual review of the draft factual portion of Guidepost's report before the report was due to the Task Force.

We wish to express our gratitude to the CoC and the Task Force for facilitating our access to information, answering questions, and providing guidance about SBC organization, polity, and related matters. Their assistance contributed greatly to this investigation.

A.      Scope of Our Engagement

As directed by the Messengers' Motion, Guidepost was charged with investigating:

- Allegations of abuse by EC members

- Mishandling of abuse allegations by EC members between January 1, 2000, to June 14, 2021

- Allegations of mistreatment of sexual abuse victims by EC members from January 1, 2000, to June 14, 2021

- Patterns of intimidation of sexual abuse victims or advocates from January 1, 2000, to June 14, 2021

16

- Resistance to sexual abuse reform initiatives from January 1, 2000, to June 14, 2021

In addition to the foregoing, the Motion directed us to perform an audit of the procedures and actions of the Credentials Committee ("CC") after its formation in mid-June 2019, using best standards and practices designed to ensure accountability, transparency, and care for the wellbeing of survivors of sexual abuse.

A key component of our investigation was our independence. The investigation was conducted, and this Report was written without any undue influence; the findings herein are solely our own. The Engagement Letter expressly provides that, except as noted above with respect to the CoC's specific functions, neither the EC nor the CoC will conduct, direct, or otherwise manage or influence our independent investigation in any manner. There is no attorney-client relationship between Guidepost and any other party and none of the communications between Guidepost and the SBC or its entities are protected by the attorney-client privilege.

The culmination of our engagement was the issuance of this public Report, setting forth our complete factual findings and a comprehensive recommended framework within which the SBC can operate in order to continue to address the concerns raised by the SBC Motion in a transparent, accountable, and scriptural manner that prioritizes survivor support and care and enhances practices for the prevention of sexual abuse, harassment, and violence.

B.    Methodology

During the course of our investigation, we used standard investigative practices to gather relevant information, including but not limited to preparing and submitting comprehensive document requests to relevant parties and entities; reviewing and analyzing all relevant documents obtained from all sources; contacting or attempting to contact and interview all current and former SBC EC staff and EC Trustees, other high-level SBC official or key figures, and other relevant witnesses identified through our investigation; and conducting in-depth witness interviews of survivors, witnesses, and advocates who affirmatively contacted Guidepost. Of paramount importance was affording survivors and other witnesses an opportunity to share their histories with us, if they so desired, and providing transparency to them about the investigative process.

At the outset of the investigation, we established a dedicated webpage ("Guidepost SBC webpage") on the Guidepost website with information about the investigation, including links to press releases, Task Force updates, and responses to frequently-asked questions. An investigation-specific email address was created so that survivors or other interested parties could directly contact the investigative team; this was also publicized on the Guidepost SBC webpage. The Task Force also

provided regular updates on its own website and likewise publicized the Guidepost SBC email address.

We received approximately 60 communications through the Guidepost SBC email address in addition to telephone calls made directly to Guidepost. These communications resulted in the collection of numerous documents and the scheduling of survivor and other witness interviews. To preserve confidentiality, only certain designated members of the Guidepost team had access to the emails sent to this address, and any documents received were uploaded to a secure file serve.

1. Collection and Review of Documents and other Evidentiary Items

As part of the investigation, we collected and reviewed an extensive number of documents and other relevant evidentiary items. In total, we collected approximately five (5) terabytes of data from all sources, as described further below. Due to the large volume of materials ultimately gathered, we utilized a secure e-discovery platform for document storage and review. All evidentiary materials were uploaded to that platform, which enabled the investigative team to run keyword and other targeted searches to identify and analyze all potentially relevant documents.

As an initial step, we performed background research to find publicly-available information, including but not limited to, court filings, sex offender records, social media postings, and news reports related to how certain sexual abuse allegations were addressed and handled by the EC.

Second, we submitted a comprehensive document request to the EC seeking materials pertaining to relevant matters, including the EC, the CC, the Bylaws Work Group, and Baptist Press. Among other things, we asked for organizational charts and staff lists, meeting minutes, policies and procedures, and correspondence and other documents related to allegations of sexual misconduct. A copy of our document request is attached as Appendix B.

One of the challenges we faced is that not all SBC EC officers and staff utilized SBC email accounts for their SBC-related communications. EC Trustees were also not issued SBC email accounts, so emails between trustees would not be on SBC servers. In addition, the EC does not have a comprehensive document retention policy so we cannot be sure that all relevant documents were properly classified and retained, and thus available for production to us.

The EC produced the requested documents on a rolling basis from October to December 2021. In addition to hard copy documents, our data experts worked with the SBC EC IT liaison to process and transfer electronic data

18

located on the SBC EC file serves to the platform, as well as electronic data – including text messages – located on Dr. Ronnie Floyd's electronic devices.

We sent a targeted document request to the EC's outside legal counsel, Guenther, Jordan & Price ("GJP"), through the Bradley Group in late November 2021. We note that the EC Trustees' waiver of attorney-client privilege was integral to our ability to conduct a thorough investigation. Because outside counsel was closely involved in managing the EC's response to sexual abuse allegations, having access to those communications gave us a more comprehensive understanding of the EC's actions. We received a limited production in January 2022, which was followed by a larger production on February 1, 2022. These documents were also uploaded to our e-discovery platform for review and analysis by the investigative team.

We visited the Southeastern Baptist Theological Seminary's Archives and Special Collections in Raleigh, North Carolina, to review their collection of Judge Pressler's papers. We likewise visited the Southern Baptist Historical Library and Archives ("SBHLA") to review relevant documents for the following SBC Presidents: James Merritt, Jack Graham, Bobby Welch, Frank Page, Johnny Hunt, Bryant Wright, and Fred Luter. While at SBHLA, we also examined records for the Ethics and Religious Liberty Commission ("ERLC") and Christian Life Commissions related to clergy sex abuse, offender registry, child abuse, pedophiles, and violent predators.

We were not permitted to directly review Dr. Paige Patterson's papers. The SBHLA Director informed us that, if access was needed to Dr. Patterson's papers, then they would need to forward the request to Dr. Patterson, per the procedures. There were no restrictions on the other SBC Presidential Papers.

While Dr. Patterson declined to provide Guidepost direct access to his documents, Dr. Patterson agreed to have his personal counsel, Mr. Shelby Sharpe, go through documents with the Bradley firm to determine which to produce. According to the SBHLA Finding Aid Summary for Dr. Patterson, there are 4 linear feet (3 boxes) of documents stored at the Archives.10 We received only two pages from Mr. Sharpe and the Bradley firm. We were able to obtain a few other documents related to Dr. Patterson from an outside source, a former employee of Dr. Patterson.

Survivors and other witnesses provided us with various documents and other items, including but not limited to, emails and other correspondence alleging abuse and related misconduct; whistleblower information; emails and written correspondence with the SBC, EC, Baptist Press, and EC Trustees; news articles; audio recordings; notices against abusers; affidavits by current and former SBC personnel; notebooks; legal correspondence with the SBC and the EC; social media threads from, about, and between survivors; and screenshots of SMS and IM correspondence. Again, these items, or the

19

transcripts if appropriate, were uploaded to our e-discovery platform for review and analysis by the investigative team.

We also reviewed a large sample of Twitter accounts as part of our investigation and in preparation of recommendations pertaining to staff and EC Trustee conduct online. Twitter was chosen for our review as it was the most widely used platform by EC Trustees. We looked for online activity for 202 EC Trustees who served between 2012 to the present as well as online activity for other prominent SBC leaders.

In order to identify Twitter accounts, Google searches were conducted on the EC Trustee or leader's name with the key word SBC (i.e., John Smith SBC). If an account was not identified after the first step, then the EC Trustee's current or former church of employment websites were searched for social media links. If no accounts were found at this point, third party commercial databases capable of identifying social media accounts were utilized.

For the identified Twitter accounts, key word searches were conducted to identify relevant information over the last five years such as: mention of sexual abuse and/or assault; positive and negative interactions with survivors; advocating for change within the SBC on their sexual abuse policies; and relevant topics discussed in EC meetings concerning and addressing sexual abuse. Relevant posts and comments were screen captured to include the EC Trustee's name, as well as the time stamp and date of the Tweet. Our findings are discussed in Section IV.B, *infra*.

2. Interviews

A key component of our investigation was our interviews with EC staff, EC Trustees, other members of the SBC community, witnesses, and survivors. We interviewed or attempted to interview all persons who might have had relevant information regarding the investigation. In total, we conducted approximately 330 interviews. We did not affirmatively contact survivors; rather we engaged with survivors based on their outreach to our investigative team and in the manner in which they chose to engage with us, whether it be in-person, by telephone or video conference, and/or by email or providing written materials. Below is a summary of the categories of people interviewed by our investigative team.

a. Current and Former EC Staff

In January 2022, the Guidepost investigative team traveled to the SBC EC offices in Nashville to meet with EC staff. EC staff carry out the day-to-day operations of the SBC, such as supporting the work of EC committees, handling communications, finance, and information technology matters.

20

An in-person Town Hall meeting with all current SBC EC staff and members of the Guidepost team was held in order to provide information about the investigation. Prior to the trip, we administered a survey to solicit information from the SBC EC staff to obtain their experience and understanding of sexual abuse related to the SBC EC, including their views on training, education, culture, and reporting of allegations, among other things. We had a 96 percent response rate, the results of which were invaluable in preparing for the Town Hall and the SBC EC staff interviews. A more detailed discussion of that survey, as well as our follow-up survey, can be found *infra* at Section IV.C.

During our time in Nashville, we interviewed 19 current and former SBC EC staff. In the following weeks, we interviewed an additional 23 current and former SBC EC staff. We would like to take this opportunity to commend the SBC EC staff not only for their cooperation during the Town Hall and initial interviews, but for helping to coordinate interview rooms and other logistical matters for a number of additional Guidepost trips to the SBC EC offices.

b. Current and Former EC Trustees and other Key SBC Figures

EC staff provided us with the contact information for all current and former EC Trustees. The EC Trustees are the "members" of the Executive Committee, and there are 86 EC Trustees at any given time. They are responsible for selecting the EC President and electing other EC officers who, along with EC staff, manage the regular affairs of the SBC.

We received information for 332 persons who served as EC Trustees during the relevant time period, and we attempted to contact each person. Initially, we emailed a letter to each current and former EC Trustee who served during the relevant time period, advising them of the investigation and its scope, and letting them know that members of our investigative team would be contacting them in the near future. Each letter explained that, in order to conduct a full, fair, and comprehensive investigation and assessment, it is crucial that we speak with all who have first-hand, relevant information, which necessarily includes current and former EC Trustees. We further explained that the requested interviews are a two-way street – they also provide an opportunity for EC Trustees to express their opinions as to how the SBC can create a safer community going forward.

Based on the initial letter and follow-up scheduling calls and emails, the investigative team interviewed 175 current and former EC

Trustees. Twenty-five EC Trustees declined to speak with us. Ninety-eight EC Trustees were either completely unresponsive to our outreach, or initially answered but then did not respond to schedule an interview. We made phone calls to all non-responsive EC Trustees at the end of January. Some EC Trustees were called multiple times, and were left voicemails and messages as permitted. Then, in March, we made a final attempt to contact them by reaching out to current EC Trustees via the CoC, and to former EC Trustees through regular or certified U.S. mail based on the best address we had for each of them.

All 14 current and former CC members spoke with us in connection with our audit of the procedures and actions of the CC. We also met with 12 members and staff of the Ethics and Religious Liberty Commission ("ERLC").

We reached out to all SBC Presidents and key leadership who served from 2000 to the present. Three Presidents declined to speak with us: Dr. Bobby Welch, Dr. Jack Graham, and Dr. Paige Patterson. Dr. Welch cited health reasons. Dr. Graham offered access to his Presidential Papers in lieu of an interview; after we confirmed that we already had access to those papers, we received no response to our interview request. A key leader, Judge Paul Pressler, also declined to speak to us. Judge Pressler is a former SBC Vice President, a former EC member, and a long-time SBC influencer.

We sent a certified letter to Dr. Patterson on March 12, 2022, and received a certified signature receipt dated April 1, 2022. However, we did not receive a response to our letter. We called Dr. Patterson's three listed phone numbers provided by the EC on March 11, 2022. Guidepost was able to leave a voicemail on one of the phone numbers, but did not receive a response. The Committee on Cooperation also sent a letter to Dr. Patterson on March 30, 2022, asking that he allow himself to be interviewed by Guidepost Solutions. On April 6, 2022, Dr. Patterson responded with a letter to Dr. Litton, indicating that he had not received communication from Guidepost to seek an interview. He stated in his letter to Dr. Litton that "In an effort to cooperate with the request of Guidepost Solutions to the Executive Committee, I violated my policy and allowed access [by my lawyers] to my presidential files in the Southern Baptist Archives. Any questions Guidepost Solutions would like to ask me can be sent to my attorney Shelby Sharpe for review; and if he deems them appropriate, I will answer them in writing."

In a further effort by Guidepost to pursue an interview with Dr. Patterson, Guidepost asked the Bradley firm to make a request on their behalf. On April 1, 2022, Gene Besen facilitated an introduction of Guidepost to Dr. Patterson's counsel, informing him of Guidepost's request for an interview. Mr. Sharpe replied that "Dr. Patterson has not given an interview to anyone since leaving Southwestern. He believes all of his papers there and at all other institutions prior to his time at Southwestern will answer any questions concerning his service. Additionally, his public statements prior to leaving Southwestern are available to anyone wishing to know his position on any subject he addressed. I am pleased to receive any questions from these ladies they would like him to answer and if I deem them appropriate, I will get him to answer them."

On April 6, 2022, Guidepost sent a final letter to Dr. Patterson's attorney asking that, although Dr. Patterson does not have a practice of granting interviews, he consider making an exception due to Dr. Patterson's role in the EC. Mr. Shelby passed on Dr. Patterson's response in lieu of an interview, that "the subject of sexual abuse was not something that came to the Executive Committee or the Credentials Committee to his best recollection during the last six months of his presidency [which was in the scope of the investigation]."

We made multiple attempts to contact Mr. Augie Boto, the former EC General Counsel, by letter, email, text, and phone. Through SBC records and our own research, we identified five possible phone numbers for Mr. Boto, which we ultimately learned were not in service or incorrect. When we called a sixth number, Mr. Boto identified himself on the voice greeting, but the voice mailbox was full. We sent a text message to that number but received no response. Finally, on May 6, 2022, Guidepost investigators went to Mr. Boto's residence to ask in person for an interview. Mr. Boto initially stated that he did not want to make a statement, citing his former position as EC General Counsel as the reason he could not speak to us. However, he did engage in conversation with our investigators for approximately an hour and give his views on various topics related to the investigation.

As described above, we made significant efforts to interview as many current and former EC Trustees and other significant SBC figures as possible during our investigation. Though many people agreed to speak with us, some did not for various reasons. Attached as Appendix C, we list those people who were contacted and did not

meet with us despite our request, as well as their stated reasons for their decision (if given).

c.   Survivor Interviews and Outreach

<u>Background</u>

We are deeply grateful to the survivors of sexual abuse who contacted us to share their histories and opinions. Because the investigation was widely publicized, many survivors contacted us directly beginning in September 2021. As discussed above, we created a dedicated Guidepost webpage with information regarding the investigation, including an email address to contact Guidepost investigators. Guidepost team members did not affirmatively contact survivors for interviews or information. All contact originated only when the survivor reached out to us, either directly by email or phone or through another witness or Task Force member. In total, we spoke with 22 survivors over the course of the investigation.

<u>Trauma-Informed Communication</u>

As is a best practice, the investigative team was mindful during the investigation of communicating with survivors and their loved ones in a trauma-informed manner. All Guidepost team members received trauma-informed training. Being trauma-informed requires that we communicate in a way that did not assign guilt or responsibility to the survivor and did not re-traumatize them. Survivors were offered anonymity and confidentiality if desired and permitted by law. We prioritized communicating in a prompt and transparent manner with all witnesses, but particularly so with survivors.

Depending on the preference of the survivor, these meetings were conducted via telephone, videoconference, or in person. All survivors were permitted and encouraged to have a support person of their choosing present for the interview. The SBC, Task Force, EC, and CC were not given access to the names of, or identifying information about, survivors or related witnesses without the consent of the survivors or witnesses.

We have been contacted by and corresponded with several survivors who ultimately chose not to participate in an interview, but contributed to our investigation through email correspondence, documentary evidence, and suggested recommendations for the

24

future state of the SBC. We also held listening sessions with survivors and advocates who provided numerous recommendations.

We realize that participating in the investigation interview process can create added stress related to underlying trauma. Our desire was to provide survivors a safe and confidential space to debrief and process their interviews and participation with this investigation. In order to provide this support to survivors, the Guidepost team engaged Dr. Phil Monroe of Langberg, Monroe & Associates as a Survivor Care Liaison. Dr. Monroe is a licensed psychologist who specializes in treating trauma-related problems. Dr. Monroe was available to survivors to raise questions and talk through their investigation experience with a professional who is trauma-informed and understands the process, as well as to provide suggestions for resources for mental health care. Survivors were provided with contact information for Dr. Monroe, and all interactions with Dr. Monroe remained confidential. A survivor's identity or interaction with Dr. Monroe was not shared with the investigative team without express permission from the survivor. Our connection with Dr. Monroe has been valuable to our work as it has provided a safe space for survivors to debrief following the interview process.

d.      Survivor Advocates and other Witness interviews

We also met with advocates for survivors, survivors' family members, witnesses who corroborated survivors' histories, whistleblowers who have reported church clergy and staff sexual offenders, experts in issues related to sexual abuse and clergy sexual abuse in particular, and therapists. Survivor advocates, such as Dee Ann Miller and Carol Shelton, provided many suggestions for how the SBC could improve its response to sexual abuse allegations in the future, which we have considered in forming our own recommendations. We also spoke with Task Force members as well as Messengers and pastors who brought motions over the years pushing for sexual abuse reform. Their experience and guidance were likewise extremely helpful in formulating our recommendations.

In order to assure the accurate application of SBC polity considerations in the proposed recommendations, we formally consulted with four recognized experts on SBC polity, including a seminary president, two academics, and an author of a well-known book on the SBC organization.

(Report at 15-29) (footnotes omitted).

25

**Allegations Regarding Hunt**

The allegations against Hunt begin on page 149 of the Report, stating as follows:

A.     Allegations of Abuse Committed by Executive Committee Members

As per the Motion, we were asked to examine allegations of abuse during the relevant time period. During the course of our investigation, an SBC pastor and his wife came forward to report that former SBC President Johnny Hunt (2008-2010), who was the immediate past SBC President at the time, had sexually assaulted the wife on July 25, 2010. The allegations include grooming of the wife during Dr. Hunt's term as SBC President. At the time of the allegations, Dr. Hunt was also Senior Pastor at First Baptist Church, Woodstock, Georgia. Dr. Hunt extended his July sabbatical to mid-September after the alleged incident.

The husband, an SBC pastor for 25 years ("Pastor"), had a professional relationship with Dr. Hunt, whom he considered a mentor. Pastor and his wife ("Survivor") told us that prior to the assault, Dr. Hunt groomed the couple with flattery and promises of help in ministry. They also reported that Dr. Hunt gave an unusual amount of attention to Survivor, including making remarks about her appearance and comments of a sexual nature, and unwelcome touching including kissing her hand.

The couple stated that, after the assault, they were silenced by Dr. Hunt and the staff counselor at First Baptist Church Woodstock, who convinced them they should not talk about what happened. Recently, as Pastor was completing his doctorate while studying clinical counseling, conflict resolution, and peacemaking, and as Survivor entered therapy with a licensed trauma therapist, they began to process what they had experienced, and contacted us with this report.

We conducted multiple interviews with the couple, who relayed the following information:

> At the June 2010 annual meeting, Dr. Hunt invited the couple to come spend some time with him and his family at Panama City Beach while he was on sabbatical for the month of July. Pastor and Survivor looked up to Dr. Hunt as a spiritual father figure. Dr. Hunt is 24 years older than the couple, with daughters close in age to Survivor.
>
> The couple did take a short vacation to the beach, staying at a separate location, and spent some time with the Hunts. At one point, Dr. Hunt kissed Survivor on the forehead and made inappropriate comments about Survivor's figure.
>
> After the trip, Pastor told Dr. Hunt that Survivor wanted to return to the beach before school started to hear Bobby Bowden speak at Highland Park Baptist Church in Panama City Beach. Pastor asked Dr. Hunt's advice on securing a

condo for her. Dr. Hunt gave him a phone number for a condo owner in his complex. Pastor called, and the owner told him to book directly on VRBO. Unbeknownst to Pastor, it was the unit next door to Dr. Hunt's condo.

On Saturday July 24, 2010, Pastor texted Dr. Hunt and asked him to keep an eye out for Survivor, and Dr. Hunt responded that he would take care of her and that his family will keep an eye out. Pastor and Survivor said they trusted Dr. Hunt and were under the impression that Dr. Hunt and his family would be at the beach, and Survivor could contact them if she needed anything.

On July 25, 2010, Survivor drove to the beach and made several stops – the church to hear Bobby Bowden speak, her childhood home and school, and the first church her husband pastored. Upon arrival at the condo, Survivor texted her husband and Dr. Hunt a picture of the ocean, letting them both know that she had arrived.

Dr. Hunt texted her asking what condo she was in. She responded with the number, and he replied that it was right next door and told her to step out on the balcony. Survivor was surprised that the condo her husband had rented was right next door to the Hunts' condo. Dr. Hunt and Survivor conversed from their respective balconies. He brought her a bottle of water. Survivor recalled Dr. Hunt shifting the conversation from ministry to flattery about her appearance, her clothing, and her perfume. Dr. Hunt remarked that he was hot from being in the sun, and Survivor said he could come sit in the shade on her balcony. Survivor described the balconies as side by side with no ability to cross from one to the other. Survivor assumed that Dr. Hunt's wife and family were inside his condo unit.

Dr. Hunt came into Survivor's condo and they continued their conversation on Survivor's balcony. Dr. Hunt asked her if she felt safe and she said that she did. She did not know why he would ask such a question. He then told the Survivor to put her feet on his knee; he touched them while commenting on their beauty and size. At one point, he remarked that he was uncomfortable sitting outside because he didn't want to be seen so he suggested that they go inside.

Dr. Hunt pointed to the bedroom and said that he guessed that they didn't need to go in there. She objected by emphatically saying "No!" In the living room, Dr. Hunt asked about ministry and church frustrations. Dr. Hunt slid closer while Survivor was telling a story of the stress that she and her husband were under at the church. He asked her more personal questions about her life – like "have you ever done anything like this before?" and "if she was wild growing up?" She was confused and not sure of what he meant.

Dr. Hunt then moved towards Survivor and proceeded to pull her shorts down, turn her over and stare at her bare backside. He made sexual remarks

about her body and things he had imagined about her. During this time, Survivor felt frozen. Survivor said these were some of the longest moments of her life. She mustered the courage to ask him could she turn back over, and Dr. Hunt said yes. When she turned back over, she began to pull up her shorts. Dr. Hunt then pinned her to the couch, got on top of her, and pulled up her shirt. He sexually assaulted her with his hands and mouth. Suddenly, Dr. Hunt stopped and then stood up. Survivor pulled down her shirt. Survivor said she did not want him to ruin his ministry, at which he responded he did not want to ruin hers. But he then forced himself on her again by groping her, trying to pull her shirt down, and violently kissing her. Survivor did not reciprocate, but rather stood eyes open and very stiff, hoping he would just stop and leave. He finally stopped and left.

She locked the door behind him and felt very shocked, confused, and violated. After he left, she tried to unpack her suitcase, and she fought back tears and felt overwhelmed by the shame of Dr. Hunt's sexual assault. Later Dr. Hunt texted her about coming out on the balcony. She wanted to sort out what had just happened, so she went outside. In a brief exchange, Dr. Hunt stated that he would like to have sex with her three times a day. Survivor could not believe what she was hearing and could not get back inside her own condo quickly enough.

The next morning, Dr. Hunt texted her again to come out on the balcony at 9:30 am. He apologized and said that she did not need what had happened and needed a pastor instead. He asked her to forgive him, and Survivor said that she would. Dr. Hunt inquired if she had girlfriends that she would tell what happened. He told her not to mention what happened to anyone. She said that she would not mention it. He invited her to come down to the beach with him and his family. She said no, but he insisted and would not take no for an answer. She went down to the beach, sat in her own beach chair, and spoke with her husband by phone while on the beach.

On Tuesday, July 27th, Survivor attempted to confront Dr. Hunt about the assault, but never saw him. That morning, Survivor saw Dr. Hunt's wife, who confronted Survivor and told her that she doesn't know what Survivor is doing there, that Survivor needed to leave, that she didn't care where Survivor went, and that Survivor needed to leave that day and to stop talking to her husband. Survivor was very upset and called her husband who told her to just leave and come home. At that time, Pastor did not know that Survivor had been sexually assaulted. She left quickly because she did not want to see the Hunts after all that had happened.

Several days later, Dr. Hunt contacted Pastor and told him that they needed to meet at Pastor's church, FBC Woodstock, on Monday evening, August 2, 2010. Dr. Hunt met the couple there, accompanied by Roy Blankenship, a Counseling Pastor at FBC Woodstock. During the discussion, the Pastor

28

learned for the first time that Dr. Hunt had sexually assaulted Survivor. Dr. Hunt mischaracterized his assault of Survivor, admitting to a light kiss, touching the Survivor's breasts over the clothes, and trying to pull her shorts down. He stated that "thank God I didn't consummate the relationship."

Survivor and Pastor stated that Mr. Blankenship said that in his expert opinion an inappropriate relationship had developed, and that based on his information it was consensual. Survivor states that at the time she believed that, even though she did not consent to what Dr. Hunt did to her, she was made to feel it was consensual because she did not fight back. When Survivor attempted to provide her version of the event, both Dr. Hunt and Mr. Blankenship spoke over her.

Survivor and Pastor stated that Mr. Blankenship told the couple that he had cleared his calendar and was going to initiate counseling for them. That week, the couple began to meet with Mr. Blankenship, who forbade them from discussing what happened on July 25th. On August 5th, Mr. Blankenship brought Dr. Hunt, his wife, Pastor, and Survivor in for another meeting at HopeQuest, a counseling ministry, to bring closure to the events on the 25th of July. Dr. Hunt and Mr. Blankenship stated that they could never talk about what had happened, and that if they did, it would negatively impact the over 40,000 churches Dr. Hunt represented. Dr. Hunt asked for Pastor's forgiveness, and Pastor said he agreed. After Pastor agreed, Dr. Hunt asked Pastor if Dr. Hunt needed to step down from FBC Woodstock. Pastor said no.

According to the couple, they felt great emotional stress and pain from the directives to forgive, forget, move on, and never tell. They shared that they have suffered financial and ministerial struggles directly related to the trauma they experienced. Dr. Hunt has remained in contact with Pastor even as recently as October 2021, reaching out every so often to partner on Biblical writing and offering to help with employment.

Pastor provided us with a hard drive on which he kept an electronic journal that contains entries related to the counseling sessions with Dr. Blankenship, as well as some audio recordings of the counseling and Pastor's thoughts following the counseling sessions. Guidepost has confirmed forensically that the data on the hard drive was in fact created in 2009-2011, which corroborates the counseling relationship between Mr. Blankenship and the couple.

Guidepost investigators reached out to Mr. Blankenship to discuss the couple's report. Investigators confirmed that, in 2010, Mr. Blankenship served as counseling minister at First Baptist Church Woodstock and CEO of HopeQuest, a counseling ministry. State licensing records from the time indicate that Mr. Blankenship was not a licensed counselor. Mr. Blankenship is no longer a Southern Baptist.

After multiple attempts to schedule an interview with him via email, Guidepost investigators decided to approach him at his office on May 9, 2022. He initially refused to speak with investigators, but then said he would speak with them for just 20 minutes. He agreed to speak with investigators in his office.

When investigators told him what they wanted to question him about, Mr. Blankenship expressed concern for Survivor and Pastor, but he also said he did not want to betray a confidence. The investigators explained that they had a waiver from the couple to discuss their information. Mr. Blankenship did not offer a narrative of what happened, but he said he was willing to answer yes or no questions. During questioning, at times he provided more than a yes or no answer.

Mr. Blankenship confirmed that Dr. Hunt's extended sabbatical in 2010 was not related to exhaustion. He also confirmed that there was an incident in Panama City Beach involving Dr. Hunt and the Survivor. From the information he recollected, Mr. Blankenship said that Dr. Hunt had kissed Survivor and touched her breast over her clothes. He did not recall anything about pulling down pants. Mr. Blankenship stated that he did not think he received the full story. He confirmed that, at the time, his assessment was based on what Dr. Hunt told him and that the sexual contact was consensual.

Mr. Blankenship stated that he and Dr. Hunt agreed to meet with the couple the following week, and they did in fact meet at Pastor's church. He stated that Dr. Hunt did not dominate the meeting, but he did apologize to Pastor, and Pastor said that he forgave him. When asked if Survivor gave an account of what happened, he said she could have spoken up, but she stayed silent. He went on to say that Dr. Hunt was the one with the power advantage and he should have been the one to stop it, adding but "it takes two to tango." He said he had been around for a while, and he knew how things worked. He questioned how Dr. Hunt and Survivor ended up in condos next door to each other. He called it a "he said/she said" situation, and he had no proof.

Mr. Blankenship also confirmed that a second meeting took place at HopeQuest and that Dr. Hunt and his wife as well as Survivor and Pastor were present. At that meeting, the couples were present to forgive, forget, and move on. Mr. Blankenship stated that he did remember Dr. Hunt saying that if this (story) got out, it could negatively impact 40,000 churches. He does not think this was said at that first meeting, but he does remember it being said at some point. Mr. Blankenship said that he was focused on helping the couple.

The interview lasted more than 45 minutes. Mr. Blankenship was guarded and hesitant to answer many of the investigators' questions, refusing to answer some while responding with details for others. He did not want to speak about anything related to his work with the couple in counseling.

Our investigators found Mr. Blankenship to be credible. As stated above, he did not seek to participate in the investigation and only reluctantly agreed to speak with investigators. He reported very similar details and events to those reported by Survivor and Pastor, with the only significant difference being on the issue of consent.

In addition to Mr. Blankenship, Guidepost investigators interviewed three additional witnesses with relevant information. Witness 1 is a pastor and has been in ministry for over forty years. He has known the Survivor her whole life and her husband Pastor is like a son in ministry to him.

Witness 1 stated that he had a conversation with Pastor in 2010 and said it was like an atomic bomb. He shared that they were riding in a car and Pastor said that Dr. Hunt had made advances toward Survivor and it was not appropriate behavior. He remembered Pastor saying that Dr. Hunt had helped him find a condo to rent for Survivor. Pastor told him that it happened at a beach condo, and that Dr. Hunt had kissed her, touched her breast, undid her shorts, and that it may have stopped there. Pastor also told him that Dr. Hunt wanted to talk and the couple met with Dr. Hunt and a counselor where Dr. Hunt admitted that it was inappropriate but told Pastor that it didn't go all the way. Witness 1 said Pastor told him that Dr. Hunt asked for forgiveness and Pastor forgave him.

Witness 1 stated that both Pastor and Survivor respected Dr. Hunt and valued their relationship with him, and he was not aware of any conflict between Dr. Hunt and the couple prior to this incident. Witness 1 has known Dr. Hunt for over 20 years and traveled with him on international mission trips. He also stated that he could never see Survivor being an instigator in this situation. Witness 1 says that this has affected Pastor and Survivor's ministry and wondered what their ministry trajectory would have been if this had not happened.

Witness 2 is currently a senior pastor in a Southern Baptist church, who worked closely in the same church with Pastor for over six years. He stated that Pastor had confided in him sometime around 2012. After a conference where Dr. Hunt was speaking, Pastor told him that Johnny Hunt is not what you might think. Witness 2 said that Pastor told him about Dr. Hunt abusing Survivor. Pastor did not give specific details but shared that it was sexual in nature. He also said that Pastor felt pressured by Dr. Hunt to forgive him. Witness 2 shared that this has affected Pastor's ministry and he deals with anger because of it. He stated that it was very hard on Pastor when Dr. Hunt was hired by the North American Mission Board ("NAMB"). He also shared that Survivor is an amazing person, and that he observed how hard it is for her to trust people in the church.

Witness 3 has served as a bi-vocational pastor in Southern Baptist churches and worked in local and state conventions. He is currently a minister in residence in a Southern Baptist organization. He had a coaching/mentoring relationship with Pastor and has known him for four years and said that during his work with Pastor,

Pastor told him about Dr. Hunt making advances on Survivor and groping her and then subsequently covering it up. Pastor also shared that Dr. Hunt had apologized to Pastor for it. Witness 3 stated that he has seen the hurt that this has caused Pastor and it has affected his ministry.

Guidepost investigators found all three witnesses to be very credible with clear recollections of Pastor's statements to them. The witnesses are all still very much involved and committed to Southern Baptist life and the Convention.

As Guidepost investigators were investigating the couple's report, they interviewed Dr. Hunt on two occasions. During the first interview, Dr. Hunt was asked standard questions related to the actions of the EC as detailed in the Messengers' Motion. Guidepost investigators did not directly confront Dr. Hunt at that time, as investigators had not yet spoken to key witnesses for corroboration.

During the first interview, Dr. Hunt did acknowledge that, during his publicly-announced extended sabbatical, he was under the care of Mr. Blankenship. When asked if the sabbatical was at all related to a sexual abuse matter, he replied in the negative. Investigators asked Dr. Hunt several questions about Pastor's church, without identifying Pastor. They asked if Dr. Hunt knew the circumstances of the resignation of the senior pastor at that church, who suddenly and without explanation resigned in 2010. Dr. Hunt stated that he did not know who Pastor was, or why he had resigned. Dr. Hunt was also asked about the City of Refuge program affiliated with FBC Woodstock, a program for pastors who have a personal crisis but who wish to reenter ministry, which was started by Dr. Hunt and run by Mr. Blankenship. Dr. Hunt spoke about pastors making bad choices and that they might say to themselves "I can't believe I did this – one night slipped up" and they are now repentant and broken, and that they should be reconciled.

After interviewing several individuals with relevant information, Guidepost investigators set up a second interview with Dr. Hunt. When questioned if he knew why investigators wanted a second interview, Dr. Hunt responded that he did not know. Guidepost investigators explained to Dr. Hunt that they had received an allegation of abuse involving him and if he knew what they were talking about; Dr. Hunt responded that he was "totally in the dark."

In the second interview, Dr. Hunt acknowledged this time that he knew Pastor. Dr. Hunt stated that he had known the couple for at least twenty years, that Pastor had been converted under his ministry, and that Dr. Hunt had been a strong influence on Pastor's life. For a time, they pastored churches in the same state. Dr. Hunt said that while Dr. Hunt attended the 2010 annual convention, he does not remember any personal contact with the couple and does not think he spent any personal time with them. He shared that he takes time off every year in July, but he does not remember having the couple as guests when he was in Panama City Beach, but says they may have had lunch one time during that period of vacation.

Investigators asked if at some point Pastor had contacted him about finding a place to rent for Survivor to come back down to the beach for a week. Dr. Hunt did not remember Pastor asking for information, nor did he recall providing a phone number to help find a place. Dr. Hunt did state that he remembers Pastor calling to say Survivor was coming to the beach and that his family would look out for her. Dr. Hunt remembered Survivor texting him a picture of the pier saying that she was there. When asked if he knew where she was, Dr. Hunt said that unbeknownst to him Survivor had rented the condo next door, but he had no role in that. He stated that he has no idea who owned the condo next door because the building is mostly rentals.

When asked if he had any contact with Survivor while he was there, he responded that it was very brief on the balcony. While on the balcony he remembers Survivor telling him about going to see Bobby Bowden speak that morning but did not remember her saying what else she did that day before getting to the beach. (Both Dr. Hunt and Survivor described the balconies as side by side but you could not walk through to the other.) Dr. Hunt was asked whether he went onto her balcony or entered her condo and he responded he never entered her condo and was never on her balcony.

Dr. Hunt said that after seeing Survivor out on the balcony he did not have any further contact with Survivor during the time she was there. However, later in the interview he stated that he saw her the next day on the beach and then the following day his wife said something to her. And he does not know whether she changed places or just went home.

Dr. Hunt said that he did not have any physical contact with Survivor – "no contact whatsoever." He also restated that it was not true that he was on the balcony or in the condo. When asked specifically about whether he kissed her, pulled at her shorts, or fondled her, he said no. He denied sexualized comments about her appearance, panties, tan lines, or perfume.

Dr. Hunt shared that his wife was uncomfortable with Survivor next door by herself because it just did not look right that she was down there all alone. At some point, he thinks his wife may have said something to Survivor, and that all he knew was that Survivor was not there anymore. When asked whether his wife was there the whole time with him, he stated that there may have been a brief time that she was not there because of an event at Southeastern Baptist Theological Seminary where she may have flown in and out in one day or the next day. He said it was possible that she was not there some of the time that Survivor was there.

When asked if he contacted Mr. Blankenship, the counselor, because there was a problem between Pastor and Survivor, he said that he did not contact him in regard to that but just for general help because Pastor was transitioning in ministry and Dr. Hunt had always been a sounding board for him.

Dr. Hunt remembers only one meeting with the couple on August 2, 2010. He said the meeting was brief and that he and his wife, along with Pastor and Survivor and Mr. Blankenship were present. Dr. Hunt claims that he never directed the couple towards Mr. Blankenship for counseling.

Dr. Hunt said that he did not apologize to Survivor for sexually assaulting her during this meeting because there was no contact between the two of them. He denied saying "Praise Jesus that I didn't consummate the relationship." If there was an apology, Dr. Hunt believed it was related to Mrs. Hunt offending Survivor about being concerned with her being there alone, and them apologizing for her having to leave. He stated that "Someone has created a story on me. I would like to hear her story on this." Dr. Hunt said that Survivor had never come on to him and he never felt threatened by her. Dr. Hunt stated that he and Pastor have stayed in contact over the years. Investigators asked Dr. Hunt if there were any similar allegations with other women. Dr. Hunt answered no.

Several times during the interview, Guidepost investigators directly asked Dr. Hunt about specific allegations of sexual abuse against the Survivor, controlling the narrative through the use of an unlicensed therapist, and trying to protect his ministry, 40,000 churches, and the SBC, all of which he denied. The investigators asked Dr. Hunt if there was anyone else he thought we should speak with about the matter, and he said the only ones who would know would be the couple and Mr. Blankenship. The investigators asked if he thought his wife would speak with us and he replied no, saying that he doubts his wife would speak to us because her take was that we handled it and moved on. Investigators understood this to mean that Dr. Hunt had apologized for the fact that his wife had upset Survivor by telling her to leave. Throughout the interview, Dr. Hunt remained very calm, expressed little to no emotion, did not get upset, did not raise his voice, or express outrage at the allegations.

We included this sexual assault allegation in the report because the investigators found Pastor and Survivor to be credible; their report was corroborated in part by Mr. Blankenship and three other credible witnesses; and Dr. Hunt, while denying physical contact, does acknowledge that he had interactions with the Survivor, including on the condo balcony during the relevant time period. The investigators did not find Dr. Hunt to be credible in their interviews with him.

(Report at 149-161) (footnotes omitted).

## D.     Post-Report Communications

On May 27, 2022, less than a week after the Report was made public, Hunt wrote a letter to his FBCW congregation in which he stated that he allowed himself to have a "brief, consensual encounter" with a woman who was not his wife. (Doc. No. 219-16). Hunt also wrote, "I'm so sorry

34

I wasn't more forthcoming with the interviewers because it made a bad situation worse. I guess I

was just so surprised and so shocked by the allegations of abuse that I shut down." (*Id*.).

On December 5, 2022, the President of SBC, Bart Barber, tweeted:

Hunt was the subject of a third-party investigation in response to allegations that he sexually assaulted a woman half his age in ways that would, to my knowledge, constitute a felony in any jurisdiction in the U.S.

(Doc. No. 1-3) (the "Tweet").

In February 2023, SBC's Credentials Committee sent a letter to Hiland Park Baptist

Church, stating as follows:

Dear Hiland Park Baptist Church,

We write to notify you that our committee has received a request to consider the relationship between Hiland Park Baptist Church, Panama City, Florida, and the Southern Baptist Convention. Specifically, the request is to consider whether the church in a manner that is consistent with the Convention's beliefs regarding sexual abuse. SBC Constitution Article III provides that a church will only be deemed to be in friendly cooperation with the Convention which "does not act in a manner inconsistent with the Convention's beliefs regarding sexual abuse."

We recognize that neither the Southern Baptist Convention nor our committee has any investigative authority or power over Hiland Park Baptist Church or any other Baptist body. This is clearly stated in Article IV of the SBC Constitution. However, the Convention has a responsibility to determine for itself the churches with which it will cooperate. For that reason, the Southern Baptist Convention has tasked this committee to assist in resolving questions about whether a church is in cooperation with the Convention.

The information we received raises a concern that Hiland Park Baptist Church may be acting in a way that is inconsistent with the Convention's beliefs regarding sexual abuse due to the church platforming Johnny Hunt, an individual who has been credibly accused of sexual abuse, according to the standards adopted by the Convention. In light of the information received, we ask that your church provide any information which it would like for our committee to consider. In addition, our committee would particularly like the church's response to the following:

SBC Constitution Article III reads as follows:
…
1.      The convention will only deem a church to be in friendly cooperation with the Convention, and sympathetic with its purposes and work (i.e. a "cooperation "church as that term is used in the Convention's governing documents) which:

…

(4) Does not act in a manner inconsistent with the Convention's beliefs regarding sexual abuse.

….

The messengers to the 2021 Southern Baptist Convention adopted a resolution regarding the Convention's beliefs regarding sexual abuse as follows:

…

"That the messengers of the Southern Baptist Convention, meeting in Nashville, Tennessee, June 15-16, 2021, believe that any person who has committed sexual abuse is permanently disqualified from holding the office of pastor" and "That we recommend that all of our affiliated churches apply this standard to all positions of church leadership."

…

The messengers to the 2022 Southern Baptist Convention adopted recommendations made by the Sexual Abuse Task Force which state:

…

"an independent third party who has been hired by any church or other Baptist body, may determine, by preponderance of the evidence following an inquiry, that a pastor, denominational worker, or ministry employee or voluntary is credibly accused."

…

Following a third-party investigation, it was concluded that a sexual assault allegations made against Johnny Hunt was found to be credible while "investigators did not find Dr. Hunt's statements related to the sexual assault allegation to be credible."

Given the information provided above, please help our committee understand how your church's recent decision to platform a credibly accused individual can be considered to be consistent with the Convention's beliefs regarding sexual abuse?

Whether your church chooses to respond to these questions or to provide any information in response to this letter is entirely up to the church. However, if your church declines to respond to this letter within thirty (30) days of receipt, it may be viewed as an indication that Hiland Park Baptist Church does not wish to be a cooperating church with the Convention. This is not our desire.

We are grateful for the partnership with your church in supporting the missions and ministries of the Convention and thank you for your attention to this matter. We look forward to hearing back from your church at your earliest possible convenience. You may send your response to credentials@sbc.net or send by mail to SBC Credentials Committee, 901 Commerce Street, Nashville 37203.

Sincerely,
The SBC Credentials Committee

(Doc. No. 1-4) (the "Letter").

36

## E.    This Lawsuit

On March 17, 2023, Hunt filed the present action against the SBC, the Executive Committee of the SBC, and Guidepost for defamation, invasion of privacy (false light), intentional and negligent infliction of emotional distress, and public disclosure of embarrassing private facts. Hunt claims the Report falsely labeled the 2010 encounter as a "sexual assault" and wrongfully disclosed his private information. He maintains that the 2010 encounter was wholly unrelated to sexual abuse crisis that led to the investigation and should not have been included in the Report. Hunt claims the Report created the false impression that he had been accused of committing a sex crime because the Report largely focused on convicted child molesters and other sex criminals.

## F.    Guidepost's Investigation Regarding Allegations Against Hunt

As noted in the Report, during the course its investigation, in or about February 2022, a husband and wife ("Doe") approached Guidepost with information about an incident involving Hunt sexually touching Doe in 2010.[5] (Guidepost SOF ¶ 15). Guidepost connected Doe with a licensed psychologist who specialized in treating trauma-related problems. (Pl. SOF ¶¶ 32-36). Doe met with that psychologist two or three times in February and March 2022. (Pl. SOF ¶¶ 37-38).[6]

Starting on March 31, 2022, Guidepost investigators interviewed and then spoke to Doe and her husband about the encounter on several occasions, separately and together, as well as about subsequent meetings that took place shortly after the encounter that included Doe, her husband, Hunt, his wife, and Roy Blankenship ("Blankenship"), a marriage counselor and ordained minister

---

[5]    The Parties have stipulated that Hunt's accuser will be referred to in all filings as Jane Doe and that the use of Jane Doe does not create an inference of any kind or nature concerning the events at issue in this case. (Doc. No. 244 at PageID # 8964 (citing Doc. No. 191 at 2)).

[6]    Doe continues to receive counseling from this provider and continues to pay for it herself. (Doe Deposition 94:10-21; 154:6-20).

on the staff of First Baptist Woodstock. (Guidepost SOF ¶ 16). Doe advised Guidepost during the investigation that Hunt groomed her during his term as SBC President. (Doe Deposition 140:4-141:19). Doe confirmed under oath that the statements she and her husband made to Guidepost investigators were accurately reflected as written in the final version of the Report:

a. On July 25, 2010, Doe was staying in a condo next door to a unit where Hunt and his family were staying Panama City Beach, Florida.

b. During a conversation across adjoining balconies, Hunt came over to Doe's balcony, conversed with her, and then entered her condo unit, where he sexually assaulted her.

c. The next day, Doe went down to the beach and sunned herself near the Hunt family until Mrs. Hunt demanded that she leave.

d. Several days later, Doe and her husband met with Hunt and Blankenship.

e. Hunt and Blankenship made Doe believe that the encounter was consensual because she did not fight back.

f. Blankenship then arranged to conduct purported marriage counseling sessions with Doe and her husband and commanded the couple never to talk again about what transpired between Doe and Hunt.

(Guidepost SOF ¶ 18; Doe Deposition 26, 38-61).

Doe and her husband identified three witnesses in addition to Hunt and Blankenship who had information relevant to the encounter between Hunt and Doe described in the Report; all of them were SBC clergypersons and friends and acquaintances of Doe's husband. (Guidepost SOF ¶ 19).[7] Guidepost located and interviewed the three individuals (separately) during the first week of May 2022, and they each confirmed that Doe's husband had advised them (separately) after July

---

[7] The Report referenced the three individuals as "witnesses," but it is undisputed that Doe and Hunt were the only individuals present during the sexual encounter. Hunt disputes that any of the three individuals "had any information pertaining to sexual assault." (*See* Guidepost SOF ¶ 19). As the statement at issue does not state otherwise, Hunt has failed to create a genuine dispute of fact as to whether Doe and her husband identified three individuals in addition to Hunt and Blankenship who had information relevant to the incident between Doe and Hunt described in the Report.

2010 that Hunt had a sexual encounter with Doe. (Guidepost SOF ¶¶ 19-20).[8] The Guidepost

investigators included what they heard from the witnesses in the Report. (*Id*.).

On May 9, 2022, Guidepost investigators interviewed Blankenship in person and

questioned him about his involvement in the matter. (Guidepost SOF ¶¶ 21-22).[9] Blankenship

confirmed that the Guidepost investigators asked him about the July 25, 2010 incident between

Doe and Hunt at the Panama City Beach condo, as well as a subsequent meeting he held with Doe

---

[8]     Hunt disputes whether Doe's husband advised each "witness" that Hunt had a sexual encounter
with Doe based on his argument that Doe's husband thought the sexual encounter was consensual. (*See*
Guidepost SOF ¶ 20). As the statement at issue does not speak to the issue of consent, but rather the
occurrence of the sexual encounter at all, Hunt has failed to create a genuine dispute of fact as to whether
Doe's husband advised each "witness" that Hunt had a sexual encounter with Doe. Hunt filed his own
statements of fact regarding the same (*see* Pl. SOF ¶¶ 71-77), which are not genuinely disputed.

[9]     Hunt objects to the characterization of this meeting as an "interview" on the grounds that
Blankenship testified in his deposition that the Guidepost investigators surprised him outside of his office
and that he felt under duress and uncomfortable while he was being questioned. (*See* Guidepost SOF ¶ 21;
*see also* Hunt's own statement of fact regarding Blankenship's surprise (Pl. SOF ¶ 81). Blankenship's
testimony on April 11, 2024, about how he felt on May 9, 2022, while speaking with Guidepost
investigators, does not create a genuine dispute as to whether Blankenship met with and was questioned by
Guidepost investigators for about 45 minutes on May 9, 2022.

Hunt also objects to the characterization of this meeting as an "interview" on the grounds that "Guidepost's
internal communications confirm that they were ready to publish the Pastor Johnny Story regardless of what
Mr. Blankenship had to say during the 'meeting.'" (*See* Guidepost SOF ¶ 21). The internal communications
Hunt cites to in support of the foregoing proposition consist of one email and one text message sent by a
Guidepost investigator on May 9, 2022, that include the following statements:

- "I've drafted some language solely by memory and will clean it up tomorrow, however this is
basically the story to date before we add in whatever we get or don't get from Blankenship." (Doc.
No. 258-10); and

- "Also, it is possible to get someone to draft what the Hunt narrative might look like today so we
can send it to the [Doe and her husband] for feedback based on what we currently know. It may
save time so we can just add Roy and Hunt 2. As discussed what I wrote will need to be paired
down and conform with rest of doc." (Doc. No. 258-9).

Hunt filed his own statements of fact as to the contents of the same two internal Guidepost communications.
(Pl. SOF ¶¶ 78, 80). Even viewing these facts in the light most favorable to Hunt and drawing all reasonable
inferences in his favor, none the foregoing statements from the Guidepost investigator appear to contradict
the fact specifically averred by Guidepost in this statement of fact – that Guidepost investigators
interviewed Blankenship on May 9, 2022 about his involvement in the matter. Accordingly, the Court
considers this fact as undisputed for purposes of summary judgment. Fed. R. Civ. P. 56(e)(2).

and her husband and Hunt on August 2, 2010, at Doe's husband's church office. (Guidepost SOF ¶ 23).[10] Blankenship confirmed that he answered the investigators' questions regarding the July 25, 2010 sexual encounter and the August 2, 2010 meeting. (Guidepost SOF ¶ 24).[11] Blankenship also confirmed that the Guidepost investigators asked him about a second meeting that took place on or about August 5, 2010, this time with Doe and her husband and Hunt and his wife at Blankenship's office at his counseling facility, HopeQuest, and that Blankenship answered the

---

[10]     The Court has already addressed Hunt's objection that Blankenship's interview with the Guidepost investigators was not a "true interview." *See supra*. Hunt also asserts that he "disputes this statement of fact to the extent it omits relevant information." (Guidepost SOF ¶ 23). As this statement does not direct the Court to any evidence in the record as contradicting the facts specifically averred by Guidepost in this statement of fact, the Court considers this fact as undisputed for purposes of summary judgment. Fed. R. Civ. P. 56(e)(2).

[11]     The Court has already addressed the objections Hunt raises in response to this statement of fact.

> A.     ...Roy Blankenship is played out in the report that he's against me. But he's clearly testified for me in the sense that he saw it the whole time, talking to both of us, as being consensual.
>
> Q.     But he, in his conversations with the investigators, as reflected in the report, acknowledged that there was an encounter that involved physical intimacy, correct?
>
> A.     In the – in just what I have testified to just a moment ago, that intimacy, yes.
>
> Q.     Yes. So he acknowledged that in his conversation with the investigators?
>
> A.     Correct. Correct.
>
> Q.     You did not?
>
> A.     No, he was – he was ambushed, though.
>
> Q.     In his ambush, he had enough time, though, in his ambush to relay the fact that he learned that there was a consensual intimate relationship between you and someone not your wife, correct?
>
> A.     Correct.

(Hunt Deposition 270:3-25).

40

investigator's questions about that meeting. (Guidepost SOF ¶ 25).[12] Blankenship repeatedly invoked priest/penitent privilege during his deposition and therefore generally declined to confirm or deny the accuracy of the Report's account of his precise responses concerning what Doe and her husband and the Hunts told him about the encounter itself or what was said during their subsequent meetings. (Guidepost SOF ¶ 26). While Blankenship felt the Guidepost investigators were aggressive and wanted to probe everything they could get out of him in response to their questions during their May 2022 interview, at no time did he think that the Guidepost investigators should have asked a question that they did not ask. (Guidepost SOF ¶¶ 27-28).[13]

---

[12]     The Court has already addressed the objections Hunt raises in response to this statement of fact.

[13]     The Court has already addressed Hunt's objection that Blankenship's interview with the Guidepost investigators was not a "true interview." *See supra*. Hunt also disputes the statement of fact that Blankenship "answered [Guidepost's] when they interviewed him" about a second meeting based on Blankenship's following deposition testimony:

> Q.     Did the investigators ask you about the second meeting?
>
> A.     I don't recall them – I don't recall how that came up.
>
> Q.     But you do recall that there was at least some discussion between you and them about there having been a second meeting?
>
> A.     Yes.
>
> Q.     Okay. And without getting into what you actually said, you responded to their question?
>
> A.     Yes.

(Blankenship Deposition 63:6-13). Even viewing these facts in the light most favorable to Hunt and drawing all reasonable inferences in his favor, Blankenship's foregoing testimony does not appear to contradict the fact specifically averred by Guidepost in this statement of fact. Accordingly, the Court considers this fact as undisputed for purposes of summary judgment. Fed. R. Civ. P. 56(e)(2).

41

Guidepost interviewed Hunt on two separate occasions, first on April 26, 2022, and again on May 12, 2022. (Pl. SOF ¶¶ 65, 95; Guidepost SOF ¶¶ 29-30).[14] During the second interview on May 12, 2022, the Guidepost investigators asked Hunt a series of questions about his sexual encounter with Doe, as well as his prior relationship with Doe and her husband, and his meetings with Blankenship, Doe, and her husband following the encounter. (Guidepost SOF ¶ 31).[15] The investigators asked Hunt if he had any contact with Doe and Hunt; he responded that it was very brief on the balcony. (Hunt Deposition at 164:16-22).[16] The investigators also asked Hunt whether he went onto Doe's balcony or entered her condo; Hunt responded he never entered Doe's condo and was never on her balcony. (Hunt Deposition 165:9-14, 166:16-18).[17] Hunt told the Guidepost

---

[14]    The Court has already addressed the objections Hunt raises in response to this statement of fact. *See supra*. Guidepost investigators scheduled both interviews through Hunt's administrative staff at NAMB. (Hunt Deposition 103:8; 114:16-115:21).

[15]    The Court has already addressed the objections Hunt raised in response to this statement of fact.

[16]

> Q.    Going to the next paragraph, when asked if you had any contact with [Doe] while she was there, you responded that it was very brief on the balcony. Is that accurate?
>
> A.    In the context of being very unsure of what I wanted to say to someone that had made so many accusations, yes.

[17]

> Q.    Next sentence, Dr. Hunt was asked whether he went onto her balcony or entered her condo and he responded he had never entered her condo and was never on her balcony. Is that accurate?
>
> A.    That's what I said in our interview with them.
> ….
>
> Q.    You also stated it was not true you were on the balcony or in the condo. Is that accurate?
>
> A.    That's accurate.

investigators that he did not have any physical contact with Doe – "no contact whatsoever." (Hunt Deposition 166:12-15).[18]

When Guidepost investigators asked Hunt specifically about whether he kissed Doe or fondled her, Hunt said no. (Hunt Deposition 166:19-167:7).[19] Hunt told the Guidepost investigators that Doe had never come on to him and he never felt threatened by her. (Hunt Deposition 176:10-13).[20] Hunt also told Guidepost investigators that he remembered attending a brief meeting in August 2010 with his wife, Doe, Doe's husband, and Blankenship. (Hunt Deposition 169:13-170:16). Guidepost investigators told Hunt to contact them in the next 48 hours if he remembered any more details. (Hunt Deposition 268:2-12). Hunt did not notify Guidepost of any more details. (Hunt Deposition 268:13-15 ("I wouldn't have contacted them if they had given me 96 hours. I felt threatened by them.")).

---

[18]

Q.   And then on to the next paragraph, you said that you did not have any contact with [Doe], in quotes, "no contact whatsoever." Is that accurate?

A.   That's accurate.

[19]

Q.   When asked specifically about whether you kissed [Doe], pulled at her shorts or fondled her, you said no. Is that accurate?

A.   In the context of the – and these weren't questions that are being asked like you are reading to me now. We are having a very sensible conversation. This was not a sensible conversation. This was an attack….

Q.   So the sentence, as drafted, is accurate?

A.   The sentence is correct.

[20]

Q.   And the next sentence is, Dr. Hunt said that [Doe] had never come on to him and that he never felt threatened by her. Is that accurate?

A.   That would be a true statement.

43

Shortly after his second interview with Guidepost on May 12, 2022, Hunt engaged legal counsel. (Guidepost SOF ¶ 34). Although Hunt's counsel sent a letter to Guidepost dated May 22, 2022, the letter did not advise Guidepost that Doe had initiated the encounter or that the encounter was consensual. (Guidepost SOF ¶ 35).[21] Hunt never told Guidepost investigators that Doe tempted him, seduced him, or initiated the sexual encounter. (Guidepost SOF ¶¶ 52-53, 58).[22] In his deposition in this matter, Hunt admitted that when the Report was published on May 22, 2022, "the investigators did not even know [Hunt's] version of what happened." (Guidepost SOF ¶ 52).

In May 2022, Guidepost submitted drafts of the Report to the SBC for prepublication review to check the facts, polity, grammar, and to let Guidepost know if there were any disputes about the factual information and/or related conclusions. (Guidepost SOF ¶¶ 38-42; Pl. SOF ¶¶ 84, 89, 109-111, 124). The Report was made public on May 22, 2022, and less than a week later Hunt wrote to his congregation that he allowed himself to have a "brief, consensual encounter" with a woman who was not his wife. (Doc. No. 219-16). Hunt also wrote, "I'm so sorry I wasn't

---

[21]

| Q. | Okay. And nothing in this letter about the fact that [Doe] initiated any encounter between you and her in July of 2010? |
|---|---|
| A. | No, sir. And remember, at this point, I did not know what was going to be in the report. … |
| Q. | But you will agree, sir, that as of this date, the investigators did not even know your version of what happened, correct? |
| A. | Exactly. … |

(Hunt Deposition 275:18-276:3).

[22]

| Q. | So here you state that [Doe] initiated the encounter. You didn't tell that to Guidepost investigators though, correct? |
|---|---|
| A. | No, sir. |

(Hunt Deposition 277:17-20).

44

more forthcoming with the interviewers because it made a bad situation worse. I guess I was just so surprised and shocked by the allegations of abuse that I shut down." (*Id.*).

## G. Undisputed Material Facts

Before turning to the parties' legal arguments, the Court provides the following condensed recap of the undisputed material facts:

During Guidepost's investigation, Doe communicated allegations to the investigators that Hunt sexually assaulted her on July 25, 2010 and that Hunt groomed her during his term as SBC President. Guidepost investigators interviewed every single person identified as having information relevant to Doe's allegations against Hunt: (1) Doe; (2) Doe's husband; (3) SBC clergyperson 1; (4) SBC clergyperson 2; (5) SBC clergyperson 3; (6) Blankenship; and (7) Hunt.

In their separate interviews with the Guidepost investigators during the first week of May 2022, the three SBC clergypersons each independently corroborated knowledge of the occurrence of a sexual encounter between Hunt and Doe in 2010.

In his interview with the Guidepost investigators on May 9, 2022, Blankenship corroborated that: there was an incident in Panama City Beach involving Hunt and Doe; the incident involved Hunt kissing Doe and touching her breasts; there was a counseling meeting in August 2010 between Blankenship, Hunt, and the couple at the husband's church about the incident between Hunt and Doe; and that there was a second counseling meeting in August 2010 between Blankenship, Hunt, his wife, Doe, and her husband at HopeQuest.

In his interview with Guidepost investigators on May 12, 2022, Hunt denied: the occurrence of the sexual encounter; that he had kissed or fondled Doe; that he had any physical contact with Doe; that he had entered Doe's condo; that he had entered Doe's patio. During the same interview, Hunt told the Guidepost investigators that Doe had never come on to him and he

45

never felt threatened by her; he also corroborated the occurrence of a meeting in August 2010 with his wife, Doe, Doe's husband, and Blankenship. At the conclusion of Hunt's interview on May 12, 2022, the Guidepost investigators told Hunt to let them know within 48 hours if he remembered any additional information. Hunt did not provide the Guidepost investigators with any additional information after his interview on May 12, 2022.

The investigators further corroborated the counseling relationship between Blankenship and the couple via forensic analysis of the audio recordings and electronic journal entries produced by Doe's husband.

In drafting the section of the Report concerning Doe's allegations against Hunt, the Guidepost investigators relied on all of the information gathered over the course of its investigation rather than a single source. Guidepost put the Report through a prepublication review. Neither Guidepost, SBC, nor the Executive Committee knew that Hunt viewed his 2010 sexual encounter with Doe as consensual before the Report was drafted or published.

## IV.    STATEMENTS AT ISSUE

To provide appropriate context for the parties' arguments, Hunt identifies the following three statements as defamatory and portraying him in a false light:

(1) During our investigation, an SBC pastor and his wife came forward to report that SBC President Johnny Hunt (2008-2010) had sexually assaulted the wife on July 25, 2010. (Report, Doc. No. 1-2 at 4)

(2) Hunt was the subject of a third-party investigation in response to allegations that he sexually assaulted a woman half his age in ways that would, to my knowledge, constitute a felony in any jurisdiction in the U.S. (Tweet, Doc. No. 1-3).

(3) The information we received raises a concern that Hiland Park Baptist Church may be acting in a way that is inconsistent with the Convention's beliefs regarding sexual abuse due to the church platforming Johnny Hunt, an individual who has been credibly accused of sexual abuse, according to the standards adopted by the Convention. (Letter, Doc. No. 1-4).

46

## V.    LAW AND ANALYSIS

Hunt brings claims against Guidepost, the SBC, and the Executive Committee for false light invasion of privacy, public disclosure of embarrassing private facts, and defamation based on the Report, and for false light and defamation against the SBC and the Executive Committee based on the Tweet and the Letter. Hunt also brings claims against each of the Defendants for negligent and intentional infliction of emotion distress. The Court addresses the claims in turn, beginning with the claims based on the Report.

### A.    The Report

#### 1.   False light invasion of privacy and public disclosure of private facts

To establish a claim for false light invasion of privacy under Tennessee law, a plaintiff must prove: "(1) publicity, (2) that places the plaintiff in a false light, (3) that is 'highly offensive to a reasonable person,' and (4) that the defendant knew of or acted with reckless disregard to the 'falsity of the publicized matter and the false light in which the other would be placed.'" *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 601 (6th Cir. 2013) (quoting *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 643-44 (Tenn. 2001)). False light plaintiffs must satisfy the actual malice standard when the speech at issue is related to a matter of public concern. *Charles v. McQueen*, 693 S.W.3d 262, 269 (Tenn. 2024). "When the false light plaintiff is a private individual and the speech at issue relates only to a matter of private concern, the negligence standard applies." *Id.*

A claim for public disclosure of private facts requires that the information revealed not be a matter of legitimate public concern. *See Brown v. CVS Pharmacy, L.L.C.*, 982 F. Supp. 2d 793, 806 (M.D. Tenn. 2013) (citing Restatement (Second) of Torts § 652D)).

Hunt claims the Report portrayed him in the false light of being a sex criminal and disclosed private information concerning the sexual encounter with Doe. Defendants argue the Report is

47

related to matters of public concern – allegations of sexual abuse involving clergy members and how allegations of such abuse were handled – and that Hunt cannot show actual malice. The Court agrees.

a.    <u>Public Concern</u>

"Speech by citizens on matters of public concern lies at the heart of the First Amendment, which was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Lane v. Franks*, 573 U.S. 228, 235–36 (2014) (citation and internal quotations omitted). As such, "commentators may invoke the First Amendment as a 'defense in state tort suits' aimed at punishing them for their speech." *Higgins v. Kentucky Sports Radio, LLC*, 951 F.3d 728, 734 (6th Cir. 2020) (citing *Snyder v. Phelps*, 562 U.S. 443, 451 (2011)). "Whether the First Amendment prohibits holding [Defendants] liable for [their] speech in this case turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case." *Snyder*, 562 U.S. at 451. As Chief Justice Roberts explained in 2011:

> "[S]peech on 'matters of public concern' ... is 'at the heart of the First Amendment's protection.'" The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."

*Id*. at 451–52.

Although "the boundaries of the public concern test are not well defined," the United States Supreme Court has articulated "some guiding principles … that accord broad protection to speech to ensure that courts themselves do not become inadvertent censors." *Id*. at 452 (citing *San Diego v. Roe*, 543 U.S. 77, 83 (2004) (*per curiam*)). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the

48

community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id*. at 453 (internal citations and quotations omitted). To determine whether speech involves a matter of public concern, courts look to the "content, form, and context of a given statement, as revealed by the whole record." *Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373, 381 (6th Cir. 2024) (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)); *State v. Mitchell*, 343 S.W.3d 381, 394 n.6 (Tenn. 2011) (same). "The inquiry into the protected status of speech is one of law, not fact." *Connick*, 461 U.S. at 148 n.7.

Here, the "content" of the Report relates to broad issues of interest to society at large, rather than matters of purely private concern. Specifically, the issues the Report highlights – allegations of sexual abuse involving clergy members and how allegations of such abuse were handled – are matters of public import. *See Snyder*, 562 U.S. at 454 (identifying "scandals involving the Catholic clergy" as an example of a "matter[] of public import"). That 12 out of the 288 pages of the Report contain statements relating to Hunt specifically does not require a different conclusion because "the relevant question is whether the communication touches upon matters only of personal interest." *Marquardt v. Carlton*, 971 F.3d 546, 551 (6th Cir. 2020) (citations and internal quotations omitted); *see, e.g.*, *Mosholder v. Barnhardt*, 679 F.3d 443, 450-51 (6th Cir. 2012) ("A public concern/private interest analysis does not require that a communication be utterly bereft of private observations or even expressions of private interest."); *Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011) (holding that it is not "necessary for the entire expression to address matters of public concern, as long as some portion of the speech does") (citation omitted)). For these reasons, the Court finds that the Report as a whole and the portions of the Report concerning Hunt specifically address matters of public concern; namely, alleged sexual misconduct involving clergy members and how such allegations are handled.

Because the Report addresses matters of public concern, the actual malice standard applies to Hunt's false light claims and his claim for public disclosure of embarrassing private facts fails.

      b.    <u>Actual Malice</u>

"The 'actual malice' fault standard is a subjective one in which the ultimate question is whether the defendant made the statement with 'knowledge that the statement was false' or with 'reckless disregard for the truth.'" *Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 531 (6th Cir. 2014) (quoting *Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989)). "To make a statement with reckless disregard for the truth, a defendant must have made the statement 'with a high degree of awareness of probable falsity,' or must have entertained serious doubts as to the truth of his publication[.]'" *Id*. (quoting *Harte–Hanks*, 491 U.S. at 667). "This is a subjective standard that focuses on the state of the publisher's mind at the time of publication." *Holbrook v. Harman Auto., Inc.*, 58 F.3d 222, 226 (6th Cir. 1995) (citing *Harte-Hanks*, 491 U.S. at 688). Reckless disregard may be found where "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports," *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968), or where evidence indicates "the purposeful avoidance of the truth[.]" *Harte-Hanks*, 491 U.S. at 692.

Whether a statement was made with reckless disregard for the truth "is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the defendant in fact entertained serious doubts as to the truth of its publication." *Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 526 (6th Cir. 2007) (quoting *St. Amant*, 390 U.S. at 731) (internal alterations and quotation marks omitted). "The relevant legal inquiry focuses on the extent of the defendant's efforts to avoid the truth, not the extent of the defendant's investigation to discover the truth." *See Compuware*, 499 F.3d at 528. As

50

such, "[f]ailing to investigate information provided by others before publishing it, even when a reasonably prudent person would have done so, is not sufficient by itself to establish reckless disregard." *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 301 (Tenn. Ct. App. 2007), *abrogated on other grounds*, *Burke v. Sparta Newspapers, Inc.*, 592 S.W.3d 116, 123 (Tenn. 2019) (citing *Harte–Hanks*, 491 U.S. at 688; *McCluen v. Roane County Times, Inc.*, 936 S.W.2d 936, 941 (Tenn. Ct. App. 1996)); *New York Times Co. v. Sullivan*, 376 U.S. 254 , 287-88 (1964) (found the evidence insufficient to establish actual malice even though checking news stories in the Time's own files would have revealed the falsity of a part of the challenged publication). "Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice." *Harte-Hanks*, 491 U.S. at 667.

A plaintiff must establish actual malice with clear and convincing evidence. "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Charles v. McQueen*, 693 S.W.3d 262, 281-82 (Tenn. 2024) (citations and internal quotations omitted). "This is a demanding burden." *Id.* at 282. "The evidence 'must produce a firm belief or conviction in the fact finder's mind about the truth of the facts to be established.'" *Id.* (quoting *In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023)).

The question of whether the evidence in the record is sufficient to support a finding of actual malice is a question of law. *See Harte-Hanks*, 491 U.S. at 685. "Most fundamentally, the rule is premised on the recognition that judges, as expositors of the Constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice." *Thomas M. Cooley*, 759 F.3d at 532 (quoting *Harte–Hanks*, 491 U.S. at 686) (internal brackets, citation, and quotation marks omitted).

51

i.  Guidepost

Guidepost argues Hunt cannot show that it acted with actual malice with regard to statements in the Report because it interviewed all the identified witnesses about all the relevant topics, who corroborated multiple key elements of Doe's allegations, had a prepublication review by multiple people for accuracy, and acted in good faith, including giving Hunt 48 hours to contact them if he remembered any additional information.

Hunt responds that a reasonable jury could find that Guidepost acted with actual malice because it knew the allegations against him did not amount to sexual assault or a sex crime under Florida law; disregarded obvious reasons to question the credibility of Doe and her husband, failed to look for evidence of consent, ambushed him with accusations of sexual assault, needed the Report to make a "big impact" to justify its fee, ignored that Blankenship told investigators he understood the encounter to be consensual, ignored that none of the corroborating witnesses used the words "sexual assault" or "sexual abuse" when speaking with investigators; intentionally omitted references to a consensual encounter to fit its desired nonconsensual narrative; manipulated Doe's testimony through a therapist; and was committed to running the Hunt story in the Report regardless of what Hunt or Blankenship told them about the encounter.

The Court first considers Hunt's argument that Guidepost had knowledge of falsity because the allegations against him would not amount to a sex crime in Florida and "all citizens are presumptively charged with knowledge of the law." *Atkins v. Parker*, 472 U.S. 115, 130 (1985) (holding notice mailed by Massachusetts Depart. of Public Welfare did not violate the due process clause). Of course, caselaw is not evidence, let alone clear and convincing evidence that any of the defendants knew the statement was false. Further, the Report does not accuse Hunt of a violation of Florida law but rather describes Doe as a "survivor" – an individual who reported that she was

52

one of "those persons who actually suffered at the hands of the SBC clergy." And Hunt identifies

no evidence that Guidepost "knew" she wasn't. [23] Moreover, it is undisputed that the Guidepost

investigators used the term "sexual assault" in the Report in the colloquial/vernacular sense: [24]

> Q.      There's reference in the Guidepost report to this incident involving Pastor Johnny Hunt and [Doe] as a sexual assault. Do you understand that's the language that was used in the Guidepost report?
>
> A.      Yes.
>
> Q.      Now, did you agree to that language sexual assault?
>
> A.      Agree to the language of sexual assault?
>
> Q.      Right. The word – these are words that were used in the report. Are these words that you agreed should be used.
>
> A.      I do agree they should be used.
>
> Q.      Did you at that time?

---

[23]    To the contrary, Hunt testified that the Guidepost investigators:

> …didn't believe that it could have been a Potiphar's wife, a genesis 39, where maybe Doe was the one that was on the attack and not the man. And maybe I survived, getting out of there.

(Hunt Deposition 104:25-105:3).

[24]    The Fifth Circuit rejected a similar argument regarding the term "sexual harassment":

> Duffy also claims that actual malice is shown from the fact that neither of these two incidents, either alone or together, would constitute sexual harassment under current Supreme Court interpretations of Title VII. Duffy's interpretation of Title VII may well be correct; we are nevertheless not persuaded by his argument. Although "sexual harassment" has a particular meaning in Title VII litigation, it also has a vernacular meaning that encompasses a far broader range of misconduct than would be actionable under Title VII.

*Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315–16 (5th Cir. 1995) ("We doubt whether sexual harassment in this vernacular sense could even be the subject of a defamation. Such a characterization may well be no more than an opinion, which is not actionable.").

A.    Yes.

Q.    Now, what did sexual – at the time you made that agreement for your part, what did you understand sexual assault to mean?

A.    Sexual assault was what was described to me by [Doe] when I met her personally on March 31.

Q.    What does it mean? Is it defined in the law somewhere?

A.    So she – she described … Hunt touching her in sexual ways … and that she did not consent to that. So that is why I would describe that as a sexual assault.

Q.    Now, is that defined in the law somewhere or is this just a definition that you use for your own purposes in reports like this?

A.    We did not base the definition on a particular jurisdiction's law, but that a sexual assault is a pretty general definition and those things that she described to us would fit that.

Q.    So you used no legal standard yourself in approving the language sexual assault. There was no legal reference to that for your part.

A.    We did not reference anything legal in the report, no.

Q.    And you didn't – I mean I'm just saying you agreed to the terms of this report – when you agreed to use the phrase sexual assault, you didn't make any reference to any particular law?

A.    No, we did not.

Q.    You just used your common understanding of the term?

A.    Yes. The common understanding, the things that [Doe] described to us, would fit a general definition of sexual assault.

(Kilpatrick Deposition 183:22-186:22).

Next, the Court turns to Hunt's argument that Guidepost acted with reckless disregard by crediting any part of the couple's account. Here, Doe was the source for the allegation that Hunt touched her sexually without her consent in 2010. Hunt relies on *St. Amant v. Thompson*, 390 U.S. 727 (1968) for the contention that Doe was an obviously unreliable source because of the passage of time, her reported fogginess during the encounter, her husband's motives (money, jealousy, general ill will towards Hunt), and inconsistencies from her 2024 deposition testimony. The Court's examination of the record, however, leads the undersigned to conclude that reliance on Doe as a primary source does not come close to approaching the level of recklessness required by the Supreme Court. Because of *St. Amant*'s importance in the actual malice analysis, a brief summary of that case is useful:

> Deputy Sheriff Thompson sued St. Amant, a candidate for public office, for repeating in the course of a televised speech the false allegation that Sheriff Thompson had taken bribes from a local Teamsters Union president. The record showed that St. Amant had based his allegation exclusively on information provided by an active member of a dissident faction within the Teamsters. At the time, the dissident faction was locked in a struggle for control against the faction led by the Teamsters' official alleged to have paid bribes to the Sheriff. Although he had no knowledge of the source's reputation for veracity, St. Amant failed to investigate independently the obviously serious charge of bribery and failed to seek confirmation of the information from others who might have known the facts. Notwithstanding this evidence, the Supreme Court found the record insufficient to support a finding of actual malice.

> Before evaluating the specific record before it, the St. Amant Court provided examples of the kind of proof that would likely support a finding of actual malice. The examples fell into three general categories: evidence establishing that the story was (1) "fabricated"; (2) "so inherently improbable that only a reckless man would have put [it] in circulation"; or (3) "based wholly on an unverified anonymous telephone call" or some other source that the defendant had "obvious reasons to doubt." 390 U.S. at 732, 88 S.Ct. at 1326. After setting forth these illustrative examples, the Court held that the evidence before it, by comparison, was clearly inadequate. St. Amant's failure to investigate was deemed not indicative of actual malice, inasmuch as the plaintiff had not proven "a low community

55

assessment of [the source's] trustworthiness or unsatisfactory experience with him by St. Amant." *Id*. at 733, 88 S.Ct. at 1326. The Court also found support for its decision in evidence tending to show that St. Amant published the charge in good faith, including St. Amant's testimony that he had verified other aspects of his source's information and evidence that the source had sworn to his answers in the presence of newsmen.

*Tavoulareas v. Piro*, 817 F.2d 762, 789–90 (D.C. Cir. 1987) (*en banc*), *cert. denied*, 484 U.S. 870 (1988).

Here, Hunt cites to no evidence that would allow a jury to find that Guidepost was aware Doe's memory was tainted (by the passage of time, fogginess on the day of the encounter, or anything else) such that it obviously should have doubted the veracity of her or her recollections. Doe's testimony taken in 2024 is not probative of what Guidepost knew at the time of drafting the Report in 2022. And Hunt's assertion that the husband's purported motives were obvious reasons to question the veracity of Doe or the accuracy of her reports is not supported by any citations to case law or other legal authority.

Moreover, Hunt ignores that much of Doe's information was independently verified by other sources whose credibility he does not challenge. For instance, Doe told the Guidepost investigators that she, her husband, Hunt, and his wife had attended a meeting in August 2010 with counselor Blankenship regarding the sexual encounter with Hunt. Hunt denied having any physical contact with Woman or that he had been in Doe's condo at all. Guidepost published the statements about Hunt in the Report only after receiving independent confirmation of the occurrence, nature (sexual encounter between Hunt and Doe), and timeframe of the counseling sessions from Blankenship and a forensic analysis of the couple's hard drive containing recordings and notes from those counseling sessions. *St. Amant*, 390 U.S. at 733 (reliance on a source locked in a fierce struggle with union officials closely allied to Sheriff Thompson did not permit an inference of actual malice when St. Amant had "verified other aspects" of the source's information and had

56

other indicia of the source's credibility). The only evidence before the Court demonstrates that Guidepost was justified in considering Blankenship's and the forensic analysis's confirmation of the occurrence of the counseling sessions about the alleged sexual encounter between Hunt and Doe as important evidence of Doe's credibility.

And this was not all the information in Guidepost's possession that corroborated elements of Doe's allegations against Hunt. Three members of the SBC clergy independently confirmed to the investigators that they had separately communicated with Doe's husband about the occurrence of a sexual encounter between Doe and Hunt. *St. Amant v. Thompson*, 390 U.S. 727, 733 (1968) (St. Amant's knowledge that source repeated information to others in manner bespeaking earnestness indicative of good-faith belief in source's credibility). Doe was not an anonymous or unverified informant, but someone with whom the Guidepost investigators met with multiple times and corroborated key elements of her account (who, when, where) with multiple other sources. *St. Id.* at 731. And there is no evidence in this record that Doe was known to be untrustworthy in 2022 or any other time. In short, Hunt fails to demonstrate that he can prove by clear and convincing evidence that Guidepost had obvious reasons to doubt Doe's word or the veracity of her account before the Report was published in May 2022.

Next, the Court considers Hunt's contention that Guidepost purposefully avoided the truth by failing to look for evidence of consent and ignoring the absence of evidence corroborating a nonconsensual encounter. In the seminal case on purposeful avoidance of the truth, *Harte–Hanks*, the Supreme Court found "the purposeful avoidance of the truth" in a publisher's failure to consult a key witness and listen to readily available tape recording of a contested conversation where such efforts would have verified or contradicted the informant's "highly improbable" charges, which five other witnesses had cast into serious doubt. *Commc'ns, Inc. v. Connaughton*, 491 U.S. 657,

691-92 (1989). As noted by the Sixth Circuit, *Harte–Hanks* "presented a unique situation in which the newspaper's own sources indicated that there was a question as to the truth of what they were reporting, and that a readily available additional source would provide proof of whether their story was accurate." *Perk v. Reader's Dig. Ass'n, Inc.*, 931 F.2d 408, 412 (6th Cir. 1991).

In the present case, Hunt does not identify a single piece of evidence that Guidepost deliberately ignored that would have undermined the statement that Hunt sexually assaulted another pastor's wife. *See McQueen*, 693 S.W.3d at 282-83 ("Although 'purposeful avoidance of the truth' can support a charge of actual malice, Charles offers no evidence that McQueen deliberately ignored information that would have undermined her claims.").[25] Instead, Hunt claims Guidepost ignored the *absence of evidence* corroborating a non-consensual encounter.[26] Unlike the defendants in *Harte-Hanks*, Guidepost did not deliberately ignore sources or other evidence that might have disputed Doe's account. 491 U.S. at 690. Rather, Guidepost interviewed every known witness, including Hunt, independently of one another; and the witnesses corroborated each other. Accordingly, no reasonable jury could find by clear and convincing evidence that Guidepost purposefully avoided the truth of the statement that Hunt has been accused of sexually assaulting another pastor's wife.

Additionally, Hunt argues a reasonable jury could find that Guidepost acted with actual malice by intentionally omitting important facts from the published Report to fit its desired narrative of a nonconsensual encounter. According to Hunt, these keys facts include: (1) that Doe

---

[25]    Although Hunt asserts that Guidepost ignored that Blankenship told the investigators he understood that the encounter was consensual, this assertion is belied by the Report itself which indicates that Blankenship understood the encounter to be consensual. *See* Report at 155 (Blankenship "reported very similar details and events to those reported by Survivor and Pastor, with the only significant difference being on the issue of consent.").

[26]    Specifically, Hunt appears to argue that Guidepost purposefully avoided the truth by ignoring the absence of the term "sexual assault" in the husband's journals and corroborating witnesses' statements.

took off her necklace and put it on a side table by Hunt before the sexual encounter; (2) that Doe consented to Hunt sitting closer to her on the couch before the sexual encounter; (3) that Doe began to feel foggy while in the condo with Hunt; (4) Doe's response to Hunt allegedly kissing her after the sexual encounter; (5) that Doe and Hunt communicated with each other the day after the sexual encounter; and (6) that Hunt asked for forgiveness from Doe's husband. However, even assuming Guidepost did intentionally omit the information from the Report, Hunt has not shown that the omitted information would have caused Guidepost to harbor serious doubts about Doe's depiction of the encounter as nonconsensual. Further, Hunt ignores the testimony from one of the Guidepost investigators that she considered these and other facts when evaluating Doe's credibility and that she did not find where Doe placed a necklace on a table to be indicative of a consensual encounter. *See Thomas M. Cooley*, 759 F.3d at 534.

Moreover, Hunt has not introduced any evidence suggesting that Guidepost intentionally omitted these facts for the purpose of fitting its desired nonconsensual narrative or otherwise defaming Hunt. Instead, the undisputed evidence demonstrates that Guidepost actively sought to compile a factually accurate and complete report. Prior to publication, the Report was reviewed by multiple individuals for its accuracy. Guidepost's efforts to ensure the accuracy of the facts in its report as of the date it turned Report over to the SBC "belie any contention that [it] intentionally omitted essential facts." *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 527 (6th Cir. 2007). "Even without this prepublication review, … a defendant's failure to include every relevant and potentially positive detail in its publication is insufficient to establish actual malice." *Id*. (citing *Perk v. Reader's Dig. Ass'n, Inc.*, 931 F.2d 408, 412 (6th Cir. 1991) (noting that a publisher has "no legal obligation to present a balanced view" in its article)); *see also Tavoularas*,

817 F.2d at 795–96 (finding that an "adversarial stance" is not indicative of actual malice where the reporter conducted a detailed investigation and wrote a story that was substantially true.").

In sum, Hunt's actual malice arguments ignore objective facts that provide a reasonable basis for Guidepost's subjective belief that Doe's allegations against Hunt were true: Blankenship corroborated the occurrence of the sexual encounter in the condo in Panama City and the subsequent counseling sessions; the three SBC clergy verified they had been told that Hunt had a sexual encounter with Doe in Florida in 2010; and the couple's counseling recordings verified that they were at the place at the time with the people that they said they were with. Although these reports did not use the phrase "sexual assault," they support Guidepost's belief that the sexual encounter occurred. These facts provide at least some factual basis for the statement. "[Guidepost] need not have unassailable proof … for [its] statement; it was enough that [Guidepost] could reasonably infer the basis for [its] statement from the surrounding circumstances." *Charles v. McQueen*, 693 S.W.3d 262, 282 (Tenn. 2024). This factual basis is sufficient to rebut any charge that the statement was fabricated, made up, or inherently improbable. *Id*.

For all of these reasons, a reasonable jury could not conclude that Guidepost acted with actual malice in connection with the Report. Therefore, Guidepost is entitled to judgment on Hunt's claims of false light.

ii.     <u>SBC and Executive Committee</u>

The SBC argues Hunt cannot show it acted with actual malice with regard to the statements about Hunt in the Report because there is no evidence that it knew any of the allegations about Hunt were untrue before publication and because "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989). Similarly, the

Executive Committee argues Hunt cannot show it acted with actual malice in publishing the Report because he "cannot demonstrate that the [Executive Committee] has any awareness that the allegations at issue were highly likely to be false," particularly when Hunt "intentionally impeded Guideposts investigative procedures by lying repeatedly and thereby preventing Guidepost from discovering Hunt's version(s) of the truth." (Doc. No. 228 at 27-28). The Executive Committee observes that if Hunt had been forthcoming during the investigation, the Report would likely have been different. (*Id*. at 28).

In response, Hunt contends that the SBC and the Executive Committee acted with actual malice when they published the Report with knowledge that Hunt had not been accused of committing a sexual assault or sex crime under Florida law. He also contends that the SBC and Executive Committee acted with reckless disregard by avoiding any evidence in its prepublication review of the Report "that would raise doubts as to the truth of the allegations." (Doc. No. 240 at II.A.3.a). The evidence that Hunt accuses the SBC and Executive Committee of avoiding during its prepublication review includes multiple 2024 deposition transcripts, the Report, the couple's 53-page long narrative provided to Guidepost investigators, an article published in June 2022, the Guidepost engagement letter, and text messages and emails between Guidepost investigators and the couple regarding Doe's desire to pursue therapy through a trauma informed psychologist. (*See Id*.). According to Hunt, if the SBC and the Executive Committee had reviewed that evidence before the Report was made public on May 22, 2022, they would have learned that: Blankenship understood the encounter was consensual; Doe worked with a therapist recommended by Guidepost and that therapist helped Doe articulate what had occurred with Hunt; and things that Doe's husband subjectively believed about the sexual encounter for several years.

Half of the documents Hunt faults the SBC and Executive Committee for not reviewing in May 2022 did not exist in May 2022. The Court has already addressed why the remaining information does not undermine Doe's allegations against Hunt. Again, the facts of this case in no way resemble the "unique situation" in *Harte-Hanks*, where a publisher failed to consult a key witness or listen to a recording of the contested conversation that would have either verified or contradicted an informant's "highly improbable" charges, which five other witnesses had cast into serious doubt. *Harte-Hanks*, 491 U.S. at 691-92. Here, there is no recording of the 2010 sexual encounter or the 2010 Blankenship counseling sessions attended by Hunt; the charges were not highly improbable; and multiple witnesses had not cast doubt on Doe's allegations.

Further, the Court has already rejected Hunt's first argument premised on imputed knowledge of the Florida criminal code.

For these reasons, Hunt's false light invasion of privacy claims against the SBC and the Executive Committee based on the Report fail.

2. <u>Defamation</u>

For a defendant to be liable for defamation, "there must be publication of matter that is both defamatory and false." *Brown v. Mapco Exp., Inc.*, 393 S.W.3d 696, 708 (Tenn. Ct. App. 2012) (citation omitted). "Thus, it is not enough for the statement in question to be false; the plaintiff must show that the defendant made a false statement that defamed him." *Id*. "[T]he basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation." *Id*. (quoting *Davis v. The Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001)); *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) ("It is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation.") (citations omitted).

62

To establish a prima facie case of defamation under Tennessee law, a plaintiff must prove that: (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Christian Bros. Univ.*, 428 S.W.3d at 50. The standard for establishing liability for defamation depends on whether the plaintiff is a public figure or a private figure. *See Charles v. McQueen*, 693 S.W.3d 262 (Tenn. 2024). Private individuals need only show that the statements were made negligently. *Id*. at 269. Public individuals, on the other hand, must show the statements were made with actual malice. *Id*.

Guidepost argues summary judgment is appropriate on Hunt's defamation claims against it because he cannot prove it published the Report, the element of fault (negligence or actual malice), damages, or that the common interest privilege does not apply. The SBC and the Executive Committee argue they too should receive summary judgment because Hunt doesn't have proof of fault. Hunt opposes summary judgment on his defamation claims on the grounds that there are genuine disputes of material fact as to Defendants' actual malice and that he has cited evidence from which a jury could find Defendants acted negligently.

This claim turns on proof of fault. Accordingly, the Court begins and ends there. The Court has already determined the record does not contain clear and convincing evidence that any defendant acted with actual malice in connection with the Report. *See supra*. And for the reasons discussed below, the record is similarly devoid of evidence from which a reasonable jury could conclude Defendants acted with negligence in connection with the Report.

a.    <u>Negligence</u>

To prevail on a negligence claim, a plaintiff must prove (1) a duty of care owed by Defendant to the Plaintiff; (2) conduct below the applicable standard of care that amounts to breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) legal cause. *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993). A duty is the legal obligation a defendant owes to a plaintiff to conform to a reasonable person standard of care in order to protect against unreasonable risks of harm. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). Whether a duty exists is a question of law for the court. *Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998). The Court must decide "whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant." *Id*. In defamation cases, "a failure to thoroughly investigate a claim amounts to negligence." *McQueen*, 693 S.W.3d at 282 (citations omitted).

Guidepost argues the undisputed facts show that it was not negligent in connection with the Report because it interviewed every single person that Hunt and the couple told them to interview. (Doc. No. 221 at 25 (citing Guidepost SOF ¶¶ 19-20, 32, 65)). Guidepost also points to undisputed evidence in the record that they interviewed the seven individuals identified as having relevant information and that those individuals confirmed under oath in their depositions in this matter that the statements they gave to Guidepost investigators were accurately reflected as written in the final version of the Report. (*Id*. at 26 (citing Guidepost SOF ¶¶ 18, 20, 22-23, 27-28, 32, 52-56, 65)). Guidepost notes that in addition to Doe, Blankenship, and Hunt each confirming that Guidepost interviewed the relevant witnesses and that the Report reflected the pertinent facts, Hunt admitted that following his last interview, the investigators gave him 48 hours to provide additional information, and he failed to do so before the publication of the Report.

64

Guidepost emphasizes that neither Hunt nor his retained legal counsel ever told the investigators that he viewed the encounter as consensual and, as a result, the investigators did not know Hunt's version of what happened. (Doc. No. 221 at 27 citing (Guidepost SOF ¶ 52)). Further, Guidepost submits that the investigators could not have known Hunt's version of the encounter as consensual because Hunt lied and withheld that information. In response to Hunt's unsupported assertion that it had already determined to include the Hunt allegations in the Report as of May 13, 2022, Guidepost notes that the Report was not delivered to the SBC until May 15, 2022 and not made public until May 22, 2022. It submits that the 48 hours provided to Hunt to clarify his responses or offer additional information as to Guidepost's questions was enough time to reconsider his responses and correct his lies. (Doc. No. 280 at 8-11).

In sum, Guidepost argues its investigators left no stone unturned and interviewed every logical witness. It argues the unrebutted evidence shows that the only reason it was unaware that Hunt viewed the 2010 encounter as consensual was because Hunt waited until after the Report to say so, not because it failed to uncover Hunt's "consensual encounter" story through any other source of information. As such, Guidepost submits that it follows that there is no genuine issue of material fact that Guidepost discharged its duty of care.

The SBC and the Executive Committee point to Guidepost's thorough investigation and argue that there is no evidence that they acted negligently in relying on Guidepost's investigation and conclusions. (*See* Doc. No. 228 at 29-30; Doc. No. 230 at 14-15).

In response, Hunt argues negligence is a jury question but does not put forth developed argument concerning Defendants' purported negligence. (Doc. No. 250 at II.B.). Hunt also submits – without citation to supporting legal authority – that a jury could find the SBC and Executive Committee acted negligently in publishing the Report because the allegations against him

concerned conduct from almost 12 years before and because they had a contractual right to review the final draft of the Report and dispute factual findings and conclusions. (*Id*.). While both of Hunt's asserted facts may be true, neither have any bearing on the issue of fault; that is whether Defendants' conduct in connection with the Report was unreasonable in light of the circumstances.

Although Hunt is correct in that the question of whether a party breached their duty to act with reasonable care is often a question for the jury, summary judgment is appropriate where a plaintiff fails to respond to a properly supported motion with any evidence from which a reasonable juror could find that a defendant failed to act with reasonable care in ascertaining the truth of the challenged statement. And here, Hunt does not direct the Court to any evidence of investigative deficiencies. Indeed, Guidepost investigated the encounter "using one of the most effective means possible—by going directly to [Hunt and Doe] and requesting further information." *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 527 (6th Cir. 2007). Furthermore, "[Guidepost] provided [Hunt] with a unique opportunity unavailable to most alleged victims of defamation: a chance to assist in the defendant's prepublication investigation to ensure it was adequate and complete. But [Hunt] squandered this opportunity, providing only a short, virtually fact-free … response to [Guidepost]'s inquiry." *Id*. at 527–28. Hunt now attempts to use his own conduct against Guidepost, arguing it should have looked for evidence of consent. But this argument is without merit here where Hunt does not direct the Court to any evidence of investigatory deficiencies from which a reasonable jury could find that Guidepost failed to act with reasonable care in ascertaining the truth of the challenged statement or that the SBC and the Executive Committee failed to act with reasonable care in relying on Guidepost's investigation and conclusions.

66

## B. The Tweet

Hunt also brings claims for false light invasion of privacy and defamation against the SBC and the Executive Committee based on a December 5, 2022 Tweet by then-current President of the SBC, Bart Barber, that stated:

> Hunt was the subject of a third-party investigation in response to allegations that he sexually assaulted a woman half his age in ways that would, to my knowledge, constitute a felony in any jurisdiction in the U.S.

(Doc. No. 1-3).

For the reasons stated above with regard to the Report, the Tweet addresses a matter of legitimate public concern. Accordingly, the actual malice standard applies to Hunt's claim for false light invasion of privacy as to the Tweet. Proof of fault for the defamation claim is either actual malice or negligence depending on whether Hunt is a public figure.

The SBC and the Executive Committee contend they bear no responsibility for the Barber Tweet, which was published from Barber's personal Twitter account. They argue that even if the Tweet was attributable to the SBC or Executive Committee, the Tweet discussed a matter of legitimate public concern and there is no evidence that they acted with actual malice or negligence in connection with the Tweet.

In response, Hunt argues there is a factual dispute concerning whether Barber published the Tweet in his personal capacity or in his role as President of the SBC. Hunt points to evidence that Barber's Twitter biography stated that he was the "SBC President," and that Barber testified that he used Twitter to "share material related to the SBC." (*See* Barber Deposition at 45:24-46:5). Hunt also argues a jury could find that the statement was made with actual malice or negligence because Hunt's attorney sent a letter to the SBC in August 2022 explaining that the allegations against Hunt did not amount to a crime under Florida law and because Barber admitted he did not research sexual assault laws in Florida prior to posting the Tweet. According to Hunt, "this

67

provides an independent reason for finding that Mr. Barber tweeted that Pastor Johnny was accused of a felony with reckless disregard for its truth." (Doc. No. 250 at VIII.B.). Hunt concludes by stating "[t]he same evidence would also be sufficient for a jury finding of negligence." (*Id.*).

The Court is unable to determine the applicable standard of fault because the parties have not adequately addressed Hunt's status as a public or private figure at the time of the Tweet. Accordingly, in resolving this motion the Court assumes Hunt is a private figure for purposes of the defamation claim arising out of the Tweet. This determination is subject to reconsideration upon further development of evidence and argument concerning Hunt's status at the time of the Tweet.

Hunt has presented evidence from which a jury could conclude that Barber's Tweet was in his capacity as SBC president. Therefore, judgment cannot be granted in favor of the SBC or the Executive Committee on this basis.

As for proof of actual malice, the letter from Hunt's counsel may be evidence of what Hunt thought about the allegations against him in August 2022, but it is not evidence that Barber entertained serious doubts as to the truth of the statement in the Tweet. *See Thomas M. Cooley*, 759 F.3d at 532–33 ("that plaintiff informed defendants of its belief that the employment and salary data statement in the JD Underground post was false does not show that defendants subjectively believed their statement to be false or made with reckless disregard for the truth; it shows only that plaintiff believed defendants' statements were false."). Nor does Barber's failure to investigate before posting the Tweet constitute evidence of reckless disregard. *See id.* at 533. Given this lack of evidence, a jury would be unable to find by clear and convincing evidence that the SBC or the Executive Committee acted with actual malice in connection with the Tweet. Therefore, summary

68

judgment will be granted in favor of the SBC and Executive Committee on Hunt's claim for false light invasion of privacy as to the Tweet.[27]

The same evidence, however, could support a finding in Hunt's favor under a negligence standard of fault. A jury could conclude that Barber breached a reasonable duty of care when he accused Hunt of assaulting a woman in ways that would "constitute a felony in any jurisdiction in the U.S" after having been advised that the allegations against Hunt do not constitute a crime in Florida. Accordingly, summary judgment will be denied as to the defamation claim based on the Tweet.

## C.    The Letter

Hunt brings claims for false light invasion of privacy and defamation against the SBC and the Executive Committee based on the Letter sent from the Credentials Committee to Hiland Park Baptist Church. In the Letter, the Credentials Committee states that it has "received a request to consider whether the church [is acting] in a manner that is consistent with the Convention's beliefs regarding sexual abuse." (Doc. No. 1-4). The Letter states that "following a third-party investigation, it was concluded that a sexual assault allegation made against Johnny Hunt was found to be credible" and asked the church to help the SBC Credentials Committee understand "how [the] church's recent decision to platform a credibly accused individual can be considered to be consistent with the Convention's beliefs regarding sexual abuse[.]" (*Id.*).

The SBC and the Executive Committee argue Hunt's claims concerning the propriety of the Credentials Committee Letter to Hiland Park Baptist Church necessarily involve the "impermissible secular determination" as to whether the SBC's ecclesiastical inquiry was proper, and that the ecclesiastical abstention doctrine prohibits judicial scrutiny of the Letter. (Doc. No.

---

[27]    If it is later determined that Hunt was a public figure at the time of the Tweet, judgment in favor of the SBC and the Executive Committee would also be warranted.

230 at 18-19; *see also* Doc. No. 228 at 35). Alternatively, SBC submits that the Letter was not a public disclosure because it was sent to a single church and argues there is no evidence that it acted with actual malice or negligence in connection with the Letter. The Executive Committee echoes the SBC's argument with regard to actual malice and negligence and adds that Hunt cannot prove anything about the letter is false.

Assuming the Court's consideration of the Letter is not barred by the ecclesiastical abstention doctrine and that sending the Letter to a single recipient constitutes "publication," for the reasons already explained with regard to the Report and the Tweet, the subject matter of the Letter is a matter of public concern. *See Snyder*, 562 U.S. at 454 (identifying "scandals involving the Catholic clergy" as an example of a "matter[] of public import"); *see, e.g.*, *Garner v. S. Baptist Convention*, No. E2024-00100-COA-R3-CV, 2025 WL 48205, at *11 (Tenn. Ct. App. Jan. 8, 2025) (subject matter of letter was a matter of public concern under Tennessee law where subject matter of the purportedly defamatory statements therein was an alleged sexual assault); *Ashford v. Univ. of Michigan*, 635 F. Supp. 3d 593, 602 (E.D. Mich. 2022), aff'd, 89 F.4th 960 (6th Cir. 2024) (noting that it was undisputed "that the university's handling of student sexual assault complaints is a matter of public concern."); *Doe v. Roe*, 638 S.W.3d 614, 622 (Tenn. Ct. App. 2021) ("we conclude that sexual assault is clearly an issue related to 'health or safety,' as those terms are commonly understood"). Therefore, the actual malice standard applies to Hunt's claim for public disclosure of private facts. As previously explained, the defamation claim is subject to proof based on actual malice or negligence depending on whether Hunt was a public figure. The parties have not provided sufficient briefing on Hunt's status as a public figure at the time the Letter was sent. But here, it does not matter because Hunt cannot satisfy either standard of fault.

As an initial matter, the Court notes that the statement in the Letter – that "[f]ollowing a third-party investigation, it was concluded that a sexual assault allegation made against Johnny Hunt was found to be credible," is undeniably a true statement. Hunt argues that by referencing the "standards adopted by the Convention," the Letter effectively accuses him of "a sexual act that could result in 'criminal charges or civil liability,'" which he contends is an "unequivocally false" statement, and that the SBC and Executive Committee knew it was false because Hunt's lawyer had informed them that that "allegations against Pastor Johnny did not amount to a crime under Florida law." (Doc. No. 250 at IX.C.). This ignores that the SBC definition of "sexual assault" includes sexual acts that could result in "criminal charges *or* civil liability." (*See* Doc. No. 248-16) (emphasis added). Hunt makes no argument concerning the reasonableness of the SBC's belief that Hunt could be subject to civil liability for the tort of battery for the conduct described in the Report. *See Paul v. Holbrook*, 696 So. 2d 1311 (Fla. Ct. App. 1997) ("Battery consists of the infliction of harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent."). Moreover, as previously stated, the August 2022 letter from Hunt's attorney is not evidence that the SBC entertained serious doubts as to the truth of the statements in the Letter. *See supra*.

Hunt has not presented evidence from which a jury would be able to find that the SBC or the Executive Committee acted with actual malice or negligence in connection with the Letter.

71

**D.      Intentional Infliction of Emotional Distress**

To establish a claim for intentional infliction of emotional distress under Tennessee law, a plaintiff must allege that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff. *Lemon v. Williamson Cnty. Sch.*, 618 S.W.3d 1, 21 (Tenn. 2021).

Defendants argue that they are entitled to summary judgment on the intentional infliction of emotional distress claim because there is no evidence that Hunt suffered a "serious" or "severe" injury. Additionally, Defendants argue that they are entitled to summary judgment on the intentional infliction of emotional distress claim because Hunt failed to establish actual malice and there is no evidence that Defendants' conduct was extreme or outrageous. In response, Hunt argues that a genuine issue of material fact exists as to whether Defendants' conduct was extreme and outrageous and that emotional damages are an issue for the jury. The standard for demonstrating "outrageous" conduct is high. *Finley v. Kelly*, 384 F. Supp. 3d 898, 911–12 (M.D. Tenn. 2019) (internal citations omitted). "To say that Tennessee courts narrowly define 'outrageous conduct' would be something of an understatement. The conduct must be 'atrocious,' 'utterly intolerable,' and 'beyond all bounds of decency.'" *Id*. "A plaintiff must in addition show that the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*.

The Court finds that Defendants' conduct fails to rise to the level of "outrageous" conduct for the same reasons described above. Accordingly, Hunt's claim for intentional infliction of emotional distress fails.

### E. Negligent Infliction of Emotional Distress

The elements of a claim for negligent infliction of emotional distress include the elements of a general negligence claim, which are duty, breach of duty, injury or loss, causation in fact, and proximate causation; the plaintiff must also prove that the defendant's negligence caused the plaintiff serious or severe emotional injury. *See Doe 1 v. Woodland Presbyterian*, 661 S.W.3d 87, 109 (Tenn. Ct. App. 2022) (citing *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 206 (Tenn. 2012)). In order to demonstrate a "serious or severe emotional injury," Hunt must demonstrate that a "reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Slowik v. Lambert*, 529 F. Supp. 3d 756, 767 (E.D. Tenn. 2021) (internal citation omitted). Moreover, "when 'all of the material allegations involve the intentional, deliberate acts of the defendants,' a claim for negligent infliction of emotional distress does not exist." *Id.* (internal citation omitted).

Defendants argue that the record is void of evidence that Hunt suffered a "serious" or "severe" injury such that he is "unable to adequately cope with the mental stress engendered by the circumstances of the case." Defendants also argue that this claim fails because Hunt cannot show that Defendants breached a duty of care. Hunt argues that he has presented evidence of serious mental injury and that a factual dispute exists as to whether Defendants breached the standard of care regarding the negligent infliction of emotional distress.

The Court has already determined that the record does not contain evidence that any defendant acted with negligence in connection with the Report. Moreover, Hunt has failed to point to evidence of mental and emotional injuries as a result of any of the statements which would disable a reasonable, normally constituted person from adequately coping with the alleged mental stress. Accordingly, Hunt's negligent infliction of emotional distress claim fails.

## VI.    CONCLUSION

For the reasons stated, Defendants' motions for summary judgment (Doc. Nos. 216, 222, 229), will be **GRANTED** as follows: Guidepost's motion (Doc. No. 216) will be **GRANTED** as to all claims. The motions by the SBC and the Executive Committee (Doc. No. 222, 229) will be **GRANTED** as to the claims for false light invasion of privacy, public disclosure of private facts, negligent and intentional infliction of emotional distress, and the defamation claims arising out of the Report and the Letter. The SBC and the Executive Committee's motion will be **DENIED** as to the defamation claim based on the Tweet.

An appropriate Order shall enter.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE