**UNITED STATES DISTRICT COURT FOR**
**THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JOHNNY M. HUNT,** | ) | |
| | ) | |
| ***Plaintiff,*** | ) | |
| | ) | **No. 3:23-cv-00243** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **SOUTHERN BAPTIST CONVENTION;** | ) | **MAGISTRATE JUDGE FRENSLEY** |
| **GUIDEPOST SOLUTIONS LLC; and** | ) | |
| **EXECUTIVE COMMITTEE OF THE** | ) | **JURY DEMAND** |
| **SOUTHERN BAPTIST CONVENTION,** | ) | |
| | ) | |
| ***Defendants.*** | ) | |

**[PROPOSED] MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING PLAINTIFF'S PUBLIC FIGURE STATUS AT THE TIME OF THE TWEET**

Defendants Southern Baptist Convention and the Executive Committee of the Southern Baptist Convention (collectively "Defendants"), by counsel, submit this Memorandum of Law in Support of their Motion for Partial Summary Judgment Concerning Plaintiff's Public Figure Status as the Time of the Tweet.

Plaintiff Johnny Hunt is a public figure as a matter of law and the Court can grant summary judgment on Hunt's remaining claim. *See Armstrong v. Shirvell*, 596 F. Appx. 433, 444 (6th Cir. 2015) ("Whether a plaintiff is a private or public figure is a question of law."). There are multiple ways in which Hunt is a public figure. Hunt is a general-purpose public figure based upon his prominence and notoriety as a pastor, particularly within Southern Baptist community. Hunt is also a limited-purpose public figure with respect to the December 5, 2022 Tweet as a result of the robust debate Hunt incited when he publicized, and attempted to benefit from, his so-called

"restoration." With Hunt being a public figure that cannot establish actual malice,[1] summary judgment is appropriate.

## STATEMENT OF FACTS

### A. HUNT UNDISPUTEDLY WAS AND IS A PROMINENT PASTOR, AUTHOR, AND SPEAKER IN THE SOUTHERN BAPTIST / EVANGELICAL COMMUNITY.

Plaintiff Johnny Hunt has been a well-known, prolific Christian pastor, author, and speaker for decades. He says so in his Complaint: "Over the years, Pastor Johnny was a sought-after speaker and author. He was a noted speaker at state and national SBC conferences and conventions." [Doc. 1 at p.5]. Hunt was the pastor at "one of the largest churches in America," First Baptist Church in Woodstock, Georgia, where membership at the church grew "from around 1,000 to more than 19,000." [*Id.*]. In other filings, Hunt, while denying being a household name among the general public, says "it is true that he attained prominence within his local church and community and the SBC." [Doc. 40 at p.11].

Hunt claims he is a popular religious author. For thirteen years he says he published "one of the most popular devotions in America" through well-known publisher, Harper Collins. [Doc. 219-4 at pp.264-265]. He specifically pleads the loss of "current and future book deals" as a source of his damages, [Doc. 1 at p.13], and says he published and sold numerous Christian books over the years. [Doc. 219-4 at pp.80,86,97]. These books include:

- How to Become a More Effective Leader
- Demolishing Strongholds: Finding Victory Over the Struggles That Hold You Back
- Unspoken: What Men Won't Talk About and Why

---

[1] This Court has previously held Hunt is unable to establish actual malice with respect to any of his claims, including defamation with respect to the Tweet. [Doc. 317 at p.69 n.27].

- Anchored in Jesus: Holding on to Truth in a Drifting World

[Doc. 248-5 at p.9]. Hunt maintains a website, https://johnnyhunt.com/store/, where he sells his books and sermons, listing over 1,500 items for sale. [Request for Judicial Notice at pp.8-9]. Many of Hunt's books can be found for sale on other commercial sites, such as Amazon. [*Id*. at pp.9-10]. Indeed, looking at Hunt's Amended Statement of Damages that he filed, Hunt claims to have lost nearly $8 million in income due to lost book sales and speaking engagements alone:

| Category | Statement | Damages |
|---|---|---|
| Lost income; lost earning capacity; loss of existing and future business opportunities, including speaking engagements and books deals.<br><br>For one legal authority permitting such damages, *see*, *e.g.*, Restatement (Second) of Torts § 652H, cmt. d ("The plaintiff may also recover for any special damage that he can prove, of which the invasion of privacy has been the legal cause. In this respect, again, the cause of action resembles that for defamation."). *See also*, *id.* § 622. | Plaintiff has lost his job and primary source of income; he has lost current and future book deals; he has lost the opportunity to generate income through speaking engagements.<br><br>Plaintiff identified currently known lost speaking engagements and book deals in response to Executive Committee Interrogatory Nos. 8-9. | **Lost Salary and Employment Benefits:** Not less than $6,710,000 ($610,000 per year for 11 years)<br><br>**Book Sales:** Not less than $3,960,000 ($360,000 per year for 11 years)<br><br>**Speaking Engagements:** Not less than $3,850,000 ($350,000 per year for 11 years)<br><br>**Other Lost Income:** Not less than $880,000 ($80,000 per year for 11 years)<br><br>**Total:** Not less than $15,400,000 |

[Doc. 248-7 at p.2].

In deposition, Hunt claimed he was so popular in the SBC, which he described as "one of the largest evangelical body [sic] in America," [Doc. 219-4 at p.125], that he had turned down the job of President five times. [*Id*. at p.38]. Then, from 2008-2010, Hunt was the President of the SBC, where he says—he was the "pinnacle" and "face of the Convention." [*Id*. at p.37].[2] Hunt

[2] There are more than 10 million Southern Baptists in the United States, which is an extraordinarily large sphere of influence.

claims he led a "great commission resurgence" and "led the [SBC] to give the largest percentage of international missions in the history of our denomination." [*Id*. at p.41]. Hunt says he has spoken at 90%, if not all, of the 42 state and regional Baptist conventions that cooperate with the SBC. [*Id*. at p.43]. Hunt also regularly spoke at other conferences and churches. [Doc. 248-5 at pp.9-10]. Not surprisingly, Hunt described himself as someone that "everyone in the convention knew." [Doc. 219-4 at p.150].

Hunt's prominence continued when he became Senior Vice President of the North American Mission Board ("NAMB") in 2019. He was "unanimously" asked, but declined, to serve as the Chief Executive Officer of NAMB. [*Id*. at pp.100-101]. When questioned about his employment at NAMB, Hunt testified "[t]hey wanted my name. They wanted Johnny Hunt there because they were struggling a lot. They needed a name of integrity and a name of leadership to help them." [*Id*. at p.98].

## II. HUNT'S PUBLICIZED "RESTORATION" AND THE DECEMBER 5, 2022 TWEET.

In May 2022, the Guidepost Report was released and Jane Doe's allegations of sexual assault against Hunt became public. Hunt first denied that anything happened, and then denied that he had sexually assaulted Jane Doe. Eventually, Hunt admitted that he had, at the very least, an extramarital, sexual encounter with the wife of another Baptist pastor. [Doc. 1 at pp.2-3, 10]. In light of his admitted sin, Hunt says that he entered into a process of pastoral "restoration." Restoration refers to a process by which a "fallen" pastor is "restored" to return to the ministry and continue in his pastoral role.

In November 2022, plans were being made for Hunt to publicize his "restoration" and return to ministry. In a November 4, 2022 text, Hunt shared with a member of his restoration group a "conversation with my publicist contact" that Hunt had about the strategy for "the video

announcing my reentrance into ministry." [Ex. A, 11/4/22 Texts].[3] The plan was for the video to be recorded on November 17, 2022 in Wichita, Kansas. [*Id.*]. Scripts for the video were prepared and circulated, with speaking roles for Hunt's restoration team and Hunt himself. [Ex. B, 11/16/22 Texts]. On November 23, 2022, Hunt stated that the plan was for the video to post at 3 p.m. [Ex. C, 11/23/22 Text].

The fourteen minute video was publicly released. In addition to Hunt's social media pages, [*id.*], the video was posted on internet sites such as Vimeo, titled "Pastors/Hunt Video Combined." [Request for Judicial Notice at p.4]. The public announcement of Hunt's restoration, clearly designed to attract attention, accomplished that goal. The story was picked up by several religious-based news services and blogs. On November 29, 2022, members of Hunt's restoration team were contacted by Bob Smietana, a national reporter for Religion News Service ("RNS"), seeking comment about a story he was working on about Hunt's restoration video. [Ex. D, 11/29/22 Texts]. That article was published by RNS the following day. [Ex. E, 11/30/22 Texts]. In addition to RNS, articles on Hunt's restoration were carried by Baptist News Global, as well as secular news outlets like the Washington Post:

- Baptist News Global: "Panel of four male pastors clears Johnny Hunt to return to ministry" https://baptistnews.com/article/panel-of-four-male-pastors-clears-johnny-hunt-to-return-to-ministry/

- Washington Post: "Pastors say Johnny Hunt, former SBC president accused of abuse, can return to ministry" https://www.washingtonpost.com/religion/2022/11/30/johnny-hunt-southern-baptist-convention/

[3] The text exchanges attached as exhibits were produced by Hunt in discovery. Hunt's production renders them authentic. *See, e.g.*, *Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821705, at *6 (M.D. Tenn. Sept. 26, 2006) (rejecting defendant's authenticity challenge "[g]iven . . . the fact that the defendant itself produced the very document it now challenges); *Lewis v. Horace Mann Ins. Co.*, 410 F. Supp. 2d 640, 648 (N.D. Ohio 2005) (labeling as "utterly spurious and devoid of merit" a defendant's contention that documents it produced during discovery were unauthentic).

[Request for Judicial Notice at pp.4-5]. Hunt even told members of his restoration team that, according to Hunt's attorney, "our video immensely strengthened our case." [Ex. F, 12/2/22 Text].

Given Hunt's prominence, his "restoration" and its appropriateness (or lack thereof) sparked public debate in the Southern Baptist community. On December 2, 2022, for example, another Southern Baptist pastor wrote an opinion piece in Christianity Today critical of Hunt's restoration:

CHURCH LIFE

**A Southern Baptist Pastor's Plea: Please Listen**

CHRIS DAVIS

*Why Johnny Hunt's "restoration" convinces me we don't have ears to hear.*

[Request for Judicial Notice at pp.4-5].

Among the many who were critical of Hunt's "restoration" was Bart Barber. Dr. Barber is the pastor at First Baptist Church in Farmersville, Texas, a role he has held for 25 years. [Ex. G, Depo. Barber 9:14-22]. Dr. Barber has a long history as a Southern Baptist. He attended his first SBC Annual Meeting as a Messenger in the late 1980s. [*Id*. at 10:21-11:10]. Dr. Barber consistently served as a Messenger at the Annual Meetings since 2003. [*Id*.]. Dr. Barber began serving on SBC committees in the late 2000s. [*Id*. at 11:11-15]. He was elected First Vice President of the SBC in 2013. [*Id*.]. Dr. Barber was elected as President of the Southern Baptist Convention in June 2022. [*Id*. at 11:16-18, 15:24-16:4]. Barber was elected for a one-year term, but was reelected for a second one-year term in June 2023. [*Id*. at 16:5-9].

Dr. Barber has a social media account on "X," formerly known as Twitter, with the handle @bartbarber. [Doc. 1-3]. Dr. Barber's running for and election as SBC President resulted in a substantial increase in the number of his X followers. In October 2021, for example, Dr. Barber had approximately 7,100 followers. [Ex. G, Depo. Barber 52:14-53:1]. Following his election,

Dr. Barber's followers increased to nearly 30,000. [*Id*. at 53:2-24; Doc. 248-18]. This is not surprising given the number of SBC cooperating churches and their congregants.

On December 4, 2022, Dr. Barber was tagged in a Tweet asking him to contrast the restoration of Hunt with that of another minister who had also recently gone through a restoration process. In his December 5, 2022, response, Dr. Barber contrasted the differences between Hunt's restoration and that of the other pastor. It was in this context that Hunt contends Dr. Barber defamed him:




[Ex. H, Aff. Barber ¶7].

For his claim of defamation related to the Tweet, Hunt is a public figure. His complaint, deposition testimony and discovery responses show he represents himself as a longtime, prominent pastor who has published numerous books and thousands of sermons. After initially denying any contact with the victim, he actively publicized his "restoration" to bolster his image. But to advance his claim here, when his public restoration sparked debate and commentary he did not

like, he claims to be merely a private figure. The law of defamation does not allow him to have it both ways and summary judgment is thus appropriate with respect to the Tweet because there is no evidence supporting a claim of actual malice arising from the Tweet.[4]

**ARGUMENT**

"There are two kinds of 'public figure' plaintiffs: a 'limited-purpose' public figure and a 'general-purpose' public figure." *Hunt v. Southern Baptist Convention*, No. 3:23-CV-00243, 2024 WL 1019276, at *3 (M.D. Tenn. Mar. 8, 2024). "A general-purpose public figure is one who attains 'such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.'" *Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 527 (6th Cir. 2014) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)). "A limited-purpose public figure is a public figure with respect to 'a limited range of issues,' and one achieves that status by "voluntarily inject[ing] himself . . . into a particular public controversy.'" *Id*. (quoting *Gertz,* 418 U.S. at 351). "Whether a plaintiff is a private or public figure is a question of law." *Armstrong v. Shirvell*, 596 F. Appx. 433, 444 (6th Cir. 2015). If a plaintiff is a public figure, whether limited or

4 Under Tennessee law, all defamation plaintiffs "must prove actual reputation damages from the defamation; damages cannot be presumed." *Doe v. Andrews*, 275 F. Supp. 3d 880, 890 (M.D. Tenn. 2017). "'[T]he plaintiff must show that her standing in the community and her public reputation for character has been injured by the alleged defamatory statement and that as a result she has suffered real or actual damages due to that loss of standing or reputation.'" *Service Jewelry Repair, Inc. v. Cumulus Broadcasting, LLC*, 145 F. Supp. 3d 737, 749 (M.D. Tenn. 2019) (quoting *McLeay v. Huddleston*, No. M2005–02118–COA–R3–CV, 2006 WL 2855164, at *9 (Tenn. Ct. App. Oct. 6, 2006)). Even assuming Hunt was a private figure, he still has no evidence of any reputational harm and resulting damages as a result of the Tweet, particularly in light of Jane Doe's allegations of sexual assault against him having been published months prior. Indeed, it is difficult to imagine how the alleged falsity in the Tweet caused Hunt any harm. The alleged falsity in the Tweet is that the allegations of sexual assault against Hunt would "constitute a *felony* in any jurisdiction in the US." [Doc. 1 at p.12, 15; Doc. 240 at p.35]. According to Hunt, the statement is false and defamatory because his alleged conduct would not constitute a felony in Florida where the encounter occurred or in Texas where Dr. Barber resides. [Doc. 1 at p.15]. However, the alleged conduct would, at a minimum, constitute the crime of misdemeanor battery. *See, e.g.*, Fla. Stat. § 784.03. Thus, if the Tweet had said the allegations would "constitute a crime in any jurisdiction in the US" or "constitute a misdemeanor in any jurisdiction in the US," it would not be actionable. Still, Hunt has no evidence that this distinct word caused harm.

general purpose, he must prove that the statement was made with actual malice. *Bohler v. City of Fairview, Tennessee*, 429 F. Supp. 3d 477, 490 (M.D. Tenn. 2019).

As discussed below, there are multiple ways that Hunt's public figure status can be analyzed. However, they all point to the same conclusion. Regardless of how labeled or analyzed, the result is the same. Hunt was a public figure at the time of the Tweet, meaning that to prevail on his defamation claim, he must prove actual malice, which the Court has already determined was not established. [Doc. 317 at p.69 n.27].

## I. HUNT WAS A GENERAL-PURPOSE PUBLIC FIGURE WITH RESPECT TO COMMENTARY ON HIS PASTORAL ACTIVITIES, INCLUDING HIS FITNESS FOR MINISTRY.

To be a general-purpose public figure does not require general fame or notoriety, but rather merely prominence in a particular field or profession. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974), in examining whether the plaintiff was a general-purpose public figure, the Court noted that he had "no general fame and notoriety in the community" and that he was not generally known to "the local population." *Id*. at 351-52 (emphasis added). To be a general-purpose public figure does not require nationwide fame among all audiences. *See Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1295 n.22 (D.C. Cir. 1980) ("We therefore conclude that nationwide fame is not required."). Along those lines, courts have recognized that individuals may have prominence and fame in a particular field or profession which results in them being public figures with respect to that field. *See Barry v. Time, Inc.*, 584 F. Supp. 1110, 1120 n.13 (N.D. Cal. 1984) ("*Chuy* suggests that the *Gertz* test should not be applied woodenly, and that there may be persons whose fame is pervasive in a particular field or profession and who are public figures with respect to that field, without regard to whether there is a particular existing controversy."). This is consistent with Sixth Circuit precedent.

In *Falls v. Sporting News Pub. Co.*, 714 F. Supp. 843 (E.D. Mich. 1989), Joseph Falls was fifty-seven years old and had been a sportswriter for over thirty-five years, including working as a sports editor of The Detroit News and contributing to The Sporting News, a weekly column, from 1963 to 1985. *Id*. at 844. Following his termination from The Sporting News in 1985, Mr. Falls claimed he was defamed by both the editor and president of The Sporting News with respect to his work as a sportswriter. The district court found "it was clear" that Mr. Falls was a public figure with respect to his sports writing activities:

> Based upon a review of the record it is clear that Plaintiff is a public figure with regard to his sports writing activities. By virtue of the fact that Plaintiff has been a sports writer for national publications, given radio shows and made television appearances, written books and made many speaking and personal appearances, Plaintiff has voluntarily thrust himself into the public eye within the meaning of *Gertz.*

*Id*. at 846-47 (citation omitted).

On appeal, the Sixth Circuit affirmed and held that Mr. Falls was a public figure for purposes of commentary on him as a sportswriter:

> The plaintiff argues that he is not a public figure because he did not thrust himself into a controversy over his firing. This is not the test. The real question is whether Mr. Falls' career as a sportswriter made him a public figure for purposes of commentary on him as a sportswriter.

*Falls v. Sporting News Pub. Co.*, 899 F.2d 1221 (Table), 1990 WL 41001, at *4 (6th Cir. Apr. 10, 1990) (unpublished) (emphasis added).

In its opinion, the district court stated, "By virtue of the fact that Plaintiff has been a sports writer for national publications, given radio shows and made television appearances, written books and made many speaking and personal appearances, Plaintiff has *voluntarily thrust* himself into the public eye within the meaning of *Gertz*." *Id*. While the "voluntarily thrust" language from

*Gertz* is associated with a limited-purpose public figure, on appeal, the Sixth Circuit stated, "[T]hat is not the test." 1990 WL 41001, at *4. Instead, The Sixth Circuit analyzed the issue as one of a general-purpose public figure in the sportswriting context. The Sixth Circuit's opinion in *Falls* supports the conclusion that an individual, like Hunt, can be a public figure with respect to a profession or field and for purposes of commentary in that regard.

*Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979) reached a similar result. There, the plaintiff was a former professional football player for the Philadelphia Eagles. The Third Circuit found he was a public figure as to his playing career and ability to play football:

> Professional athletes, at least as to their playing careers, generally assume a position of public prominence. Their contractual disputes, as well as their athletic accomplishments, command the attention of sports fans . . . The article, which discussed Chuy's physical condition, his contractual dispute, and his retirement, clearly concerned a man who was a public figure, at least with respect to his ability to play football.

*Id*. at 1280; Bruce W. Sanford, *Libel and Privacy* § 7.4 (2d ed.) ("The courts generally conclude that sports figures, entertainers and the like are 'public figures'—at least for the purpose of publications relating to the cause of their fame or notoriety, basis for achievement or fitness for position.").

Hunt has been a well-known, prolific Christian pastor, author, and speaker for decades. He served as pastor of one of the largest churches in America. He has promoted himself by publishing numerous books and sermons. He was elected President of the SBC. By his own admission he was previously asked to run for SBC President five prior times because he was so popular. Hunt describes himself as a "sought-after speaker and author" who was "a noted speaker at state and national SBC conferences and conventions." [Doc. 1 at p.5]. Hunt himself admits (and promotes) his prominence as a pastor and leader of the SBC. [Doc. 40 at p.11].

Hunt's prominence is also shown by the attention given to his pastoral "restoration" and return to ministry which he sought by his public announcement in November 2022. Articles on Hunt's restoration were carried by religious media outlets like Religion News Service, Baptist News Global, and Christianity Today. It was even covered by secular outlets such as the Washington Post. And, not surprisingly, the purported restoration of a prominent pastor who, at the very least, admitted to an extramarital sexual encounter, sparked debate, particularly within the Southern Baptist / evangelical community. And this debate on Hunt's restoration and fitness for his return to the ministry is exactly the context in which the controversial Tweet was made.

Like the sportswriter in *Falls* who was a public figure for commentary on his sportswriting activities, and the former football player in *Chuy,* Hunt was a public figure related to commentary on his pastoral activities, including his fitness and qualifications for ministry. Whether Hunt could be appropriately "restored" to the ministry was exactly the context of the Tweet and falls squarely within commentary on his fitness for the ministry. Hunt cannot realistically claim he was a mere private figure as it pertains to Dr. Barber's Tweet. As the Court has already found actual malice cannot be established with respect to the Tweet, [Doc. 317 at p.69 n.27], summary judgment should be granted.

## II. HUNT WAS AN ALL PURPOSE PUBLIC FIGURE IN THE SOUTHERN BAPTIST / EVANGELICAL COMMUNITY AT THE TIME OF THE TWEET.

Household recognition on a nationwide basis is not required. Under *Gertz's* flexible test, individuals can be public figures in their particular community of interest. 418 U.S. at 351-52 Echoing *Gertz*, the court in *Denison Powerlifting Inc. v. Dorsey*, No. 8:23-CV-00744-JVS-KES, 2025 WL 1011784 (C.D. Cal. Mar. 3, 2025) stated:

> This Court agrees with the several courts that have read *Gertz* to allow for a more flexible test that aligns with the policy justifications underpinning public figure status . . . These policy rationales are

> obvious in the context of household celebrities like Taylor Swift or Tiger Woods. But these rationales also prove true for those who hold notoriety and general fame in the context of their particular community. An iconic surfer may not be a household name for most, but within the surfing community, the media would provide him an effective opportunity for rebuttal.

*Id*. at *8. Here, the relevant community of interest is the Southern Baptist / evangelical community. This is the community to whom the Tweet was primarily published and from which Hunt's alleged reputational harm and damages arose, as demonstrated by his claim to loss of fame and income from book sales, speeches and other economic ventures in that community.

In *Chapman v. Journal Concepts, Inc.*, 528 F. Supp. 2d 1081 (D. Haw. 2007), the court applied *Gertz* and found a prominent surfer was a public figure within the surfing community. While recognizing Chapman was not a nationwide household name like Michael Jordan or Tiger Woods, the Court looked more specifically at the surfing community. "Clearly, he is not a household name like legendary sports stars Michael Jordan or Tiger Woods . . . However, the question remains whether his iconic status in the surfing community makes him a public figure *within the particular context of the surfing community.*" *Id*. at 1090 (emphasis in original). Given Chapman's prominence as a surfer, the court found he was a general-purpose public figure in the surfing community and the alleged defamatory statements in The Surfer's Journal were primarily limited and targeted to that community. Therefore, the actual malice standard applied. *Id*. at 1091-92.

The court in *Dorsey* reached a similar result, finding the United States Powerlifting Association was a general-purpose public figure in the powerlifting community:

> USPA is correct that it is not an all-purpose public figure for all purposes and in all contexts. For most people in California or the broader United States, USPA is not a household name. Indeed, the powerlifting community is smaller than many popular sporting communities. However, within this smaller community, USPA has

> reached general fame and pervasive involvement such that it may be called a public figure in the powerlifting community.

2025 WL 1011784, at *8.

Hunt's claims here show he was a public figure in the Southern Baptist / evangelical community, which is the primary, if not exclusive, community to which the Tweet was published. Dr. Barber has been a Baptist pastor for 25 years. [Ex. G, Depo. Barber 9:14-22]. The fact that his followers increased significantly after being elected SBC President shows his X audience were primarily Southern Baptist and/or those interested in Southern Baptist issues.

Hunt's claims arise squarely in the community. The context of the challenged Tweet was a back and forth between Barber and another Southern Baptist pastor. In fact, by arguing that the Tweet was on behalf of all Defendants, and not by Barber personally, [Doc. 240 at p.36], Hunt admits the community to which the Tweet was published would be primarily Southern Baptists.

Viewing Hunt as a public figure as to the Tweet makes sense in light of the source of his alleged reputational harm and damages; all arise from the Southern Baptist / evangelical community. Hunt was a Senior Vice President at NAMB, which is a Southern Baptist ministry entity. Hunt alleges that he lost that job and income due to the defamation. [Doc. 1 at p.13]. Hunt alleges that he lost current and future book deals with respect to his authorship of Christian / ministry-related books. [*Id.*]. Hunt alleges he lost income through his preaching and speaking engagements. [*Id.*].[5] The harm and damages Hunt is alleging do not arise from the general public. They arise from the Southern Baptist / evangelical community in which Hunt is a general-purpose public figure and where he claims he made substantial income.

---

[5] Of course, all of this occurred months prior to the Tweet. Hunt has identified no distinct damages due to the alleged falsity in the Tweet, which is another ground judgment upon Hunt's defamation claim on the Tweet would be proper.

That the source of the alleged reputational harm and damages is from that community is important. It is nonsensical that Hunt would allege he has been harmed as a private person when the entirety of his damages arise from his loss of status within the community in which he himself claims to be a prominent public figure. Because his damage claims are rooted in the Southern Baptist / evangelical community, it does not matter that someone outside those communities may have viewed the defamatory material.[6]

Accordingly, a finding that Hunt is a general-purpose public figure in the Southern Baptist / evangelical community results in summary judgment on his remaining defamation claim for the Tweet.

## III. Hunt Was a Limited-Purpose Public Figure With Respect His Pastoral "Restoration."

A limited-purpose public figure is one who has "voluntarily thrust themselves to the forefront of a particular public controversy so that they may influence the issues involved." *Clark v. E! Ent. Television, LLC*, No. 3:13-CV-00058, 2018 WL 1470372, at *3 (M.D. Tenn. Mar. 26, 2018). "Both federal courts and Tennessee state courts utilize a two-step approach to determine whether an individual is a limited-purpose public figure." *Santoni v. Mueller*, No. 3:20-CV-00975, 2022 WL 97049, at *11 (M.D. Tenn. Jan. 10, 2022). "The first step is for the Court to determine whether there is a public controversy." *Id*. "A public controversy is defined as a real dispute, the outcome of which affects the general public or some identifiable segment of the public in an appreciable way." *Id*. (quoting *Hibdon v. Grabowski*, 195 S.W.3d 48, 59 (Tenn. Ct. App. 2005)).

---

[6] In *Waldbaum*, the court discussed the possibility that where dissemination was to a wide audience, an individual may need to be treated as a public figure for the segment of the audience in which he is a public figure, and a private individual for the remainder. *See* 627 F.2d at 1295 n.22. Here, such an analysis is unnecessary because, again, all of the reputational harm and damages Hunt has identified arise from the community in which he is a general-purpose public figure.

"The public controversy in question must be what 'g[ave] rise to the defamation.'" *Id*. (quoting *Gertz*, 418 U.S. at 352).

"The second step is for the Court to determine whether Plaintiff has become so involved in the public controversy as to constitute a public figure via his involvement." *Id*. "There are three factors to consider in reviewing Plaintiff's involvement in a public controversy: the voluntariness of the involvement, the extent to which Plaintiff had access to channels of communication in order to counteract false statements, and the prominence of his role." *Id*.

The question of Hunt's purported "restoration" and his fitness to continue as an acclaimed Southern Baptist pastor constituted a public controversy. *See Waldbaum*, 627 F.2d at 1297; *Hibdon v. Grabowski*, 195 S.W.3d 48, 60 (Tenn. Ct. App. 2005) ("No arm of the government, including the judiciary, should be able to set society's agenda for public debate, consequently, the courts look to see what matters were already in dispute prior to the time when the alleged defamatory statements were made."). The debate about Hunt's "restoration" was receiving national media attention and was the subject of numerous articles, Op Eds, and Twitter exchanges, among other things. As the court stated in *Walbaum*:

> The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment. It should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.

627 F.2d at 1297. There is no doubt that Southern Baptists and the religious media were impacted by and wrestling with the meaning and propriety of Hunt's "restoration."

In *Hudik v. Fox News Network*, LLC, 512 F. Supp. 3d 816, 827 (M.D. Tenn. 2021), the court cited *Hibdon* as a good example of what constitutes a public controversy and reasoned that

Hibdon knowingly and consciously sought publicity for his jet ski business with postings about the speed obtained from his jet ski modifications, noting: "The dispute as to the accuracy of Hibdon's claimed successes with modifying jet skis to achieve record-breaking speeds received public attention because its ramifications would be felt by persons who are not direct participants, those persons being individuals in the jet ski modification business, as well as recreational jet ski enthusiasts and purchasers of jet skis." *Id*.

Like *Hibdon*, Hunt's "restoration" —the subject of the Tweet—was a public controversy.[7] As a prominent pastor, Hunt publicized his restoration to jumpstart his ministry by being "restored" after his publicly admitted extramarital encounter. Thus, before the Tweet, Hunt's restoration received significant media attention and sparked debate. *Carter v. Jones*, No. 40285-1-III, 2025 WL 3761337, at *26 (Wash. Ct. App. Dec. 30, 2025) ("Evangelists such as Micahn Carter, who reach hundreds through media, embrace similar characteristics to office holders and Catholic clergy. The public possesses an interest in the pastor's fitness to serve the Lord and a congregation. Thus, sexual scandals of an evangelist should be a subject of public concern."); *Waldbaum*, 627 F.2d at 1297 ("If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy."). A public controversy clearly existed and Dr. Barber's Tweet was made in the context of the controversy.

Hunt is a limited-purpose public figure because he voluntarily created the public controversy. Hunt sought to publicize the video confirming is restoration. [Ex. A, 11/4/22 Texts; Ex. B, 11/16/22 Texts; Ex. C, 11/23/22 Text]. Hunt thought the publicized restoration would

---

[7] Pastoral "restoration" is a controversial topic and even more so when the restoration is of a prominent individual such as Hunt. The Bible states that pastors be "above reproach." 1 *Timothy* 3:2. And while pastors can be forgiven for their sins the same as any other, there is disagreement as to whether an individual who has had an extramarital sexual encounter can thereafter ever be considered "above reproach."

"immensely strengthen[] our case." [Ex. F, 12/2/22 Text]. The public controversy about whether or not Hunt was (or could be) "restored" never occurs but for his own efforts to publicize and benefit from his "restoration." Voluntariness has been recognized as the most important of the factors. *See Mitre Sports Intern. Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 251 (S.D.N.Y. 2014) ("Voluntary attention-seeking, or voluntary participation in a particular controversy is a key factor in determining limited public figure status."); *National Life Ins. Co. v. Phillips Pub., Inc.*, 793 F. Supp. 627, 638 (D. Md. 1992) ("Evaluating Plaintiff's voluntary efforts is the most important factor in considering public figure status.").

Hunt voluntarily publicized his restoration in order to promote his return to ministry, undoubtedly aware of the extensive publicity and debate it would receive. Hunt also had access to adequate channels of communications. As evidenced by the release of his restoration video, he utilized the internet, as well as having extensive access to social media accounts and his own website. *See Cooley*, 759 F.3d at 531 ("[P]laintiff has access to channels of effective communication to express its position, including its website, advertisements, recruiting materials, written publications, and career services presentations, and plaintiff has utilized those channels to disseminate its message that the critics do not have their facts straight."). Last, Hunt played a prominent role in the controversy over whether he could be restored despite his admission of extramarital sexual contact with another pastor's wife. Hunt himself sought to incite a public discussion of his "restoration." He cannot now claim his restoration was purely a private matter.

Accordingly, Hunt was a limited-purpose public figure with respect to the public controversy surrounding his pastoral "restoration." The Tweet was made in the context of that public debate and Hunt must prove actual malice, which he cannot do as a matter of law.

## CONCLUSION

Hunt was a public figure in a number of respects. He can be considered a general-purpose public figure with respect to commentary on his pastoral activities and fitness and in the Southern Baptist / evangelical community. Hunt can be also considered a limited-purpose public figure with respect to his pastoral "restoration" which he voluntarily and publicly announced in November 2022. Regardless of the route taken, the result is the same. Hunt was a public figure at the time of the Tweet and summary judgment should be granted because there is no evidence of actual malice.

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

*/s/Scarlett Singleton Nokes*
Scarlett Singleton Nokes, TN Bar No. 028994
Gene R. Besen (pro hac vice)
220 Ross Avenue, 20th Floor
Dallas, TX 75201
Phone: 469-391-7411
Fax: 469-391-7401
snokes@sheppardmullin.com
gbesen@sheppardmullin.com

JACKSON KELLY PLLC

*/s/Thomas J. Hurney, Jr.*
Thomas J. Hurney, Jr. (pro hac vice)
Gretchen M. Callas (pro hac vice)
500 Lee Street East
Suite 1600
Charleston, WV 25301
Phone: 304-340-1000
thurney@jacksonkelly.com
gcallas@jacksonkelly.com
*Counsel for Defendant Executive Committee of the Southern Baptist Convention*

GORDON REES SCULLY MANSUKHANI, LLP

By: *s/ Matthew C. Pietsch*
Matthew C. Pietsch, TN Bar No. 024659
4031 Aspen Grove Drive, Suite 290
Franklin, TN 37067
Phone: 615-722-9000
Fax: 615-970-7490
mpietsch@grsm.com
*Counsel for Defendant Southern Baptist Convention*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and complete copy of the foregoing has been served through the Court's electronic filing system to the following on **February 3, 2026**:

| | |
|---|---|
| Robert D. MacGill<br>Patrick J. Sanders<br>MacGill PC<br>156 E. Market Street, Suite 1200<br>Indianapolis, IN 46204<br>robert.macgill@macgilllaw.com<br>patrick.sanders@macgilllaw.com<br><br>Todd G. Cole<br>Andrew Goldstein<br>Cole Law Group, P.C.<br>1648 Westgate Circle, Suite 301<br>Brentwood, TN 37027<br>tcole@colelawgrouppc.com<br>agoldstein@colelawgrouppc.com<br>*Counsel for Plaintiff* | John R. Jacobson<br>Katherine R. Klein<br>Riley & Jacobson, PLC<br>1906 West End Avenue<br>Nashville, TN 37203<br>jjacobson@rjfirm.com<br>kklein@rjfirm.com<br><br>Steven G. Mintz<br>Terence W. McCormick<br>Scott Klein<br>Adam Kahan Brody<br>Alex Otchy<br>Mintz & Gold LLP<br>600 Third Avenue, 25th Floor<br>New York, NY 10016<br>mintz@mintzandgold.com<br>mccormick@mintzandgold.com<br>klein@mintzandgold.com<br>brody@mintzandgold.com<br>otchy@mintzandgold.com<br>*Counsel for Defendant Guidepost Solutions, LLC* |
| Matthew C. Pietsch<br>Gordon Rees Scully Mansukhani, LLP<br>4031 Aspen Grove Drive, Suite 290<br>Franklin, TN 37067<br>mpietsch@grsm.com<br><br>Louis Gino Marchetti, Jr.<br>Taylor, Pigue, Marchetti & Blair, PLLC<br>2908 Poston Avenue<br>Nashville, TN 37203<br>gmarchetti@tpmblaw.com<br>*Counsel for Defendant*<br>*Southern Baptist Convention* | Melissa J. Hogan<br>Qavah Law<br>8757 Horton Highway<br>College Grove, TN 37046<br>melissajhogan@qavahlaw.com<br>*Counsel for Jane Doe* |

*/s/ Thomas J. Hurney, Jr.*