UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOHNNY M. HUNT,
Plaintiff,
V.
SOUTHERN BAPTIST CONVENTION;
GUIDEPOST SOLUTIONS LLC; and
EXECUTIVE COMMITTEE OF THE
SOUTHERN BAPTIST CONVENTION,
Defendants.

No. 3:23-cv-00243

Sanders Decl.

Ex. A

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

CHRISTOPHER BART BARBER

MARCH 19, 2024

*** HIGHLY CONFIDENTIAL PORTIONS ***

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION OF CHRISTOPHER BART BARBER, produced as a witness at the instance of the Plaintiff, taken in the above-styled and -numbered cause on the 19th day of March, 2024, A.D., beginning at 9:19 a.m. to 3:00 p.m., before Kelly Hassell, RPR, CLR, CSR, in and for the State of Texas, at the offices of Bradley Arant Boult Cummings LLP, located at Fountain Place, 1445 Ross Avenue, Suite 3600, Dallas, Texas, in accordance with the Federal Rules of Civil Procedure and the agreement hereinafter set forth.

APPEARANCES

FOR THE PLAINTIFF:
MR. ROBERT D. MacGILL, ESQ.
MR. PATRICK J. SANDERS, ESQ.
MS. ELIZABETH L. MERRITT, ESQ. (Via Zoom.)
MR. SCOTT E. MURRAY, ESQ. (Via Zoom.)
MacGill PC
156 East Market Street
Suite 1200
Indianapolis, IN 46204
(317) 721-1253
robert.macgill@macgilllaw.com
scott.murray@macgilllaw.com
patrick.sanders@macgilllaw.com
elizabeth.merritt@macgilllaw.com

FOR THE DEFENDANT SOUTHERN BAPTIST CONVENTION AND THE DEPONENT:
MR. MATT C. PIETSCH, ESQ.
Taylor, Pigue, Marchetti & Blair, PLLC
2908 Poston Avenue
Nashville, Tennessee 37203
(615) 320-3225
matt@tpmblaw.com

FOR THE DEFENDANT GUIDEPOST SOLUTIONS LLC:
MS. KATHARINE R. KLEIN, ESQ.
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, Tennessee 37203
(615) 320-3700
kklein@rjfirm.com
-AND-
MR. SCOTT KLEIN, ESQ. (Via Zoom.)
MR. ALEX OTCHY, ESQ. (Via Zoom.)
Mintz & Gold LLP
600 Third Avenue
25th Floor
New York, New York 10016
klein@mintzandgold.com
otchy@mintzandgold.com



APPEARANCES CONTINUED

FOR THE DEFENDANT EXECUTIVE COMMITTEE OF THE SOUTHERN BAPTIST CONVENTION:

MR. GENE R. BESEN, ESQ.
Bradley Arant Boult Cummings LLP
Fountain Place
1445 Ross Avenue
Suite 3600
Dallas, Texas 75202
(214) 257-9800
gbesen@bradley.com
-AND-
MS. SCARLETT SINGLETON NOKES, ESQ. (Via Zoom.)
MR. R. BRANDON BUNDREN, ESQ. (Via Zoom.)
Bradley Arant Boult Cummings LLP
1600 Division Street
Suite 700
Nashville, Tennessee 37203
(615) 244-2582
snokes@bradley.com
bbundren@bradley.com
-AND-
MR. JON ANDERSON, ESQ. (Via Zoom.)
Jackson Kelly PLLC
500 Lee Street East
Suite 1600
Charleston, West Virginia 25322
(304) 340-1000
jlanderson@jacksonkelly.com

ALSO PRESENT:

MS. ERICA TAYLOR - Videographer
MR. JOHNNY HUNT (Via Zoom.)



INDEX


Appearances.................................. Page 2
Stipulations.................................. Page 224
Exhibit List................................. Page 5
Direct Examination by Mr. MacGill............ Page 8
Reporter's Certificate........................ Page 227

HIGHLY CONFIDENTIAL PORTIONS:
Page 93, Line 11
Page 93, Line 21
Page 95, Line 19
Page 97, Line 4
Page 103, Line 16
Page 104, Line 1
Page 104, Line 11
Page 104, Line 16
Page 104, Line 25
Page 107, Line 15
Page 136, Line 8
Page 137, Line 5
Page 138, Line 12
Page 138, Line 14
Page 139, Line 7
Page 139, Line 14
Page 168, Line 7
Page 193, Line 25




EXHIBITS


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 46 | Inquiry letter from SBC Credentials Committee to Hiland Park Baptist Church | 181 |
| Exhibit 63 | FAQ About the SBC | 117 |
| Exhibit 75 | Task Force Challenges and Formal Recommendations | 187 |
| Exhibit 83 | Tweet Mr. Barber sent on December 5, 2022 | 87 |
| Exhibit 85 | Videotape | 30 |
| Exhibit 86 | Mr. Barber's Twitter profile as of March 13, 2024 | 49 |
| Exhibit 87 | Mr. Barber's earlier Twitter profile | 51 |
| Exhibit 88 | Link to Baptist Press article | 56 |
| Exhibit 89 | Tweet Mr. Barber sent on May 25, 2022 | 62 |
| Exhibit 90 | Response by Carissa Bear to May 25, 2022 tweet | 67 |
| Exhibit 91 | Response by Jacob Honeycutt to May 25, 2022 tweet | 68 |
| Exhibit 92 | Response by SAGordon to May 25, 2022 tweet | 68 |
| Exhibit 93 | Tweet from 60 Minutes | 70 |
| Exhibit 94 | "Southern Baptist Convention President Bart Barber on Trump, abortion, sex abuse in the church and more" | 72 |
| Exhibit 95 | Tweet Mr. Smietana sent on November 29, 2022 | 105 |
| Exhibit 96 | Mr. Barber's Praisegod Barebones blog post | 110 |

EXHIBITS CONTINUED

| EXHIBIT NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 97 | Tweet Mr. Barber sent on November 30, 2022 | 130 |
| Exhibit 98 | Letter to Dr. McLaurin and Mr. Besen, from Mr. MacGill, dated August 31, 2022, re: Pastor Johnny Hunt | 159 |
| Exhibit 99 | Baptist Press publication: "Barber criticizes announcement of Hunt 'restoration' as 'repugnant'" | 171 |
| Exhibit 100 | Tweet Mr. Keahbone sent on January 17 | 177 |
| Exhibit 101 | SBC Sexual Abuse Hotline for Survivors | 208 |
| Exhibit 102 | Email string to All Members of the Executive Committee, from Mr. Jordan, dated September 15, 2022, subject: As a member of the EC, you need to know the truth about the Guidepost report, Bates-stamped EC-000351 through EC-000354 | 210 |
| Exhibit 103 | My Detailed Review of the Guidepost Report, By: Allen Jordan, August 29, 2022 | 216 |
| Exhibit 104 | Email string to All Members of the Executive Committee, from Mr. Jordan, dated September 15, 2022, subject: As a member of the EC, you need to know the truth about the Guidepost report, Bates-stamped EC-000609 through EC-000614 | 219 |



PROCEEDINGS

THE VIDEOGRAPHER: We're now on the record. This begins Videotape Number 1 in the deposition of Bart Barber, in the matter of Johnny M. Hunt versus Southern Baptist Convention in the U.S. District Court for the Middle District of Tennessee.

Today is March 19th, 2024, and the time is 9:19 a.m. This deposition is being taken at Bradley Arant Boult Cummings at the request of counsel for Plaintiff.

The videographer is Erica Taylor of Magna Legal, and the court reporter is Kelly Hassell of Magna Legal.

Will all counsel and all parties present please state their appearances and whom they represent.

MR. MacGILL: Good morning. Rob MacGill and Patrick Sanders representing Pastor Johnny Hunt.

MR. PIETSCH: Matt Pietsch on behalf of the Southern Baptist Convention and the witness.

MR. BESEN: Gene Besen on behalf of the Southern Baptist Convention Executive Committee.

MS. KLEIN: Kathy Klein on behalf of Guidepost Solutions.

THE VIDEOGRAPHER: Okay. Anyone on Zoom?

All right. And the court reporter --



MS. NOKES: Good morning. This is Scarlett Nokes on behalf of the Southern Baptist Convention Executive Committee.

MR. BUNDREN: And Brandon Bundren on behalf of the Executive Committee.

MR. JACKSON: Jon Anderson, Jackson Kelly. I'm not making an appearance. I'm just counsel monitoring for the Executive Committee.

THE VIDEOGRAPHER: Okay. And the court reporter will now swear in our witness.

(The witness was duly sworn.)

THE COURT REPORTER: Thank you. You may proceed.

CHRISTOPHER BART BARBER,

having been first duly cautioned and sworn to testify the truth, the whole truth and nothing but the truth, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. MacGILL:

Q Good morning, sir.
A Good morning.
Q And would you state your name for the record, please.
A Well, everybody calls me Bart Barber. My first name is actually Christopher Bart Barber.



Q All right. And where do you live, sir?
A I live in Farmersville, Texas.
Q All right. And just so we get oriented, we're here in Dallas, Texas this morning.
A Uh-huh.
Q And where is Farmersville in relation to Dallas?
A Oh, it's northeast of here, about an hour's drive.
Q Okay. And, sir, I'd like to get oriented a little bit to your background initially --
A Uh-huh.
Q -- as we get started in the proceedings today. Could you tell us how you're currently employed?
A I'm the pastor -- one of the pastors at First Baptist Church in Farmersville, Texas.
Q All right. And how long have you been the -- the pastor or one of the pastors there?
A 25 years.
Q All right. And --
A Well, it will be 25 years in July.
Q All right. And with respect to that church, you indicated that you're one of the pastors?
A Uh-huh.

Page 10

Q And how many pastors are there in that church presently?
A Four.
Q All right. And do you split the duties at -- at the -- in your church amongst the -- the other three or with the other three?
A So everybody is responsible for preaching from time to time. Everybody is responsible for pastoral care, people are sick in the hospital, people who are grieving someone or whatever. And everyone has specialized assignments. I work in giving staff leadership. I do more of the preaching than the others do, but we have a pastor who works with students more than I do and a pastor who -- who -- who works with music, very talented musically, so --
Q Okay.
A So we have slightly different assignments; but there are some duties, core pastoral duties that we split, share.
Q Thank you. All right.
And so in addition to the pastor- -- pastoral duties you've described at your church, have you also been involved with the Southern Baptist Convention?
A Yes.
Q Could you describe in general terms what your

Page 11

involvements have been with the Southern Baptist Convention, or the SBC?
A Sure.
Well, I have been a messenger. I guess I attended my first annual meeting as a messenger in the late '80s at a meeting in St. Louis. My -- my pastor then from a little town in Arkansas took me there. I've consistently been a messenger to our annual meetings since 2003. I think I missed one year since 2003 serving as a messenger.
I served on the committee -- on committees back in the late 2000s. And then I was elected first vice president on the Southern Baptist Convention in 2013 I think. I served in 2014, was elected in 2013. And I served on the Resolutions Committee in 2021 and 2022. And then I was elected president of the Southern Baptist Convention in 2022 and am still in that role, reelected in 2023, and will wrap up in 90 days or so.
Q Is the -- you'll wrap up your term as the president of the Southern Baptist Convention?
A Yes.
Q You mentioned that you were -- you served in the role on the Committee on Resolutions. Do you --
A Yeah.
Q What is the Committee on Resolutions, sir?

Page 12

A It's a committee that's appointed by the president. Most of the annual meeting is oriented around letting the messengers do something. The Committee on Resolutions is a process through which messengers can say something. It's a -- it's a committee that presents to the messengers various statements, resolutions on topics that the messengers can choose to amend or fail or pass as a statement of the sentiment of the Convention.
Q So the process is the Resolution Committee comes to a resolution on some topic and then presents to the messengers?
A The process is a little bit more than that.
Q Okay.
A I was summarizing anyone whose church is entitled to submit -- to send messengers to the Convention can submit a resolution to the Resolutions Committee.
Q I see.
A The Resolutions Committee has the job of assessing submitted resolutions. It can also determine that it has topics upon which it just wants to take up a resolution itself without it being submitted.
The committee has to report out its disposition of every submitted resolution. And -- and it can combine those resolutions, it can refuse to take up

Page 13

some resolutions, and it can forward others.
So it's really a grass-roots-initiated process on the Committee on Resolutions. It -- it's a grass-roots-terminated process. The Committee on Resolutions provides some structure and guidance to that in the middle of that process.
Q But the committee's in the middle, as you say, but --
A Yeah.
Q -- the messengers make the final determination --
A That's right.
Q -- on actions to be taken by the SBC?
A Right.
Q All right. Now, just to get a little more detail on the work that you've described on the Resolutions Committee, you were appointed to the committee by the then president of the SBC; is that right?
A Uh-huh. Right.
Q And that gentleman's name was Mr. Litton; is that right?
A So I was first appointed by JD Greear --
Q Okay.
A -- who was president of the Southern Baptist

national television -- television audience, your words, quote, 50,000 churches of people I love are represented by me when I speak. That's what you said to a national television audience.
A That's correct.
Q All right. Now, sir, with respect to your role as the president of SBC --
A Uh-huh.
Q -- you not only -- during the time that you were president of the SBC, you not only appeared on national television but you've been using a Twitter account, have you not?
A Yes.
Q And, in fact, you've been -- you've been doing tweets of different kinds pertaining to issues that the SBC has been involved in; is that right?
A Yes.
Q And if some -- you know, as one example, if somebody wanted to reach out to you as the president of the SBC, they could email you your -- at your First Baptist Farmersville email; is that right?
A Yes.
Q They can send -- another way to reach you as president of the SBC is they can fill out a form on the SBC website or web page dedicated to you, the SBC



president; is that right?
A I think so.
Q Let's talk about a third way you could be contacted by Baptists. You could be -- you could call -- they could call the SBC headquarters in Nashville, Tennessee and seek to communicate with you.
MR. BESEN: Object to form.
Q (BY MR. MacGILL) Is that right?
A Well, I suppose.
MR. PIETSCH: Also, just you can lodge an objection to form on my behalf as well, please.
You can answer.
A I suppose so.
Q (BY MR. MacGILL) And there's a fourth way that Baptists could contact you. They could tweet you directly to contact you as the president of the SBC, right?
MR. PIETSCH: Object to the form.
You can answer.
A Well, it's not specifically as president of the SBC people. But yes, people -- people can tweet at me. There are a lot of ways that people can reach me beyond those four things.
Q (BY MR. MacGILL) All right. And you've got a Twitter profile and you've had a Twitter file -- profile



for some period of years; is that right?
A A long time, yes.
Q Okay. And you had a Twitter profile, for example, when you were running to -- to -- for the election or to become elected as the SBC president, right?
A Yes.
Q You used your Twitter account to campaign for the office that you currently hold; is that right?
A Yes.
Q And one of the tenets -- strike that.
One of the bases on which you campaigned was on the -- on the sexual abuse issue; is that fair?
A Yes.
Q And, in fact, if we were to look at your Twitter account, we would see that prior to the time that you were elected as president of the SBC, that you were sending out tweets or there were tweets that you were associated with pertaining to the topic of, quote, sexual abuse, unquote; is that right?
A Yes.
Q Now, to -- to look at this a little bit more specifically, we're going to put up on your screen your Twitter profile as of March 13, 2024.
MR. MacGILL: And this will be what's --



which exhibit, Pat?
MR. SANDERS: 86.
MR. MacGILL: This will be Exhibit 86.
MR. PIETSCH: Just for clarity, does he need to click on it every time to open it?
MR. MacGILL: Yes.
MR. SANDERS: Yes.
THE WITNESS: I think I've got it figured out now. Yes. Okay, I see it.
(Exhibit 86 marked.)
Q (BY MR. MacGILL) Do you have that in front of you, sir?
A I do.
Q And see the -- so the jury can see this as well, this is a picture of you, Bart Barber; is that right?
A Yes.
Q And it's got -- it references you as the SBC -- an SBC pastor?
A Yes.
Q SBC president; is that right?
A Yes.
Q And this particular Exhibit 85 [sic] --
MR. SANDERS: 86.
Q (BY MR. MacGILL) -- fair to say that this is a

profile that you -- you -- you -- you prepared?
A I did, yes.
Q And you wanted anyone that made reference to this profile to have an understanding that you were a pastor as well as the SBC president; is that fair?
A With other things that are there, yes.
Q And is there -- is this a public account, sir?
A Yes.
Q And so as you understand it, anyone in the country can follow you?
A Yes.
Q And is it fair to say that on Twitter you have the understanding and have had it since the time that you have been the president of the SBC that anyone can see your Twitter -- your tweets regardless of whether or not they follow you?
A I'm just -- I'm processing the question.
Q So is it fair to say, sir, that you have -- you've had a general understanding as the president of the SBC, that --
A Okay. But --
Q -- that anyone could follow you -- or I should say anyone could see your tweets regardless of whether they follow you, fair?
A I don't know for sure how that algorithm works.



I -- I don't think it pops up on somebody's feed unless they follow me. But I think it can be shared by other people.
Q Okay.
A So yes, I -- it's not protected in a way where nobody can see it except for people who follow me.
Q Okay. It's not private.
A It's not private.
Q Your tweets are not private.
A They're not private.
Q So when you would tweet about topics of sexual abuse, for example, you understood these tweets were not private in any sense of the word?
A Right.
Q And would you -- when you would tweet, for example, about an individual, my client, Pastor Johnny Hunt, you understood that there was nothing private about those tweets that you made?
A Yes.
Q Okay. Now, looking at the next exhibit, which will be Exhibit 87.
(Exhibit 87 marked.)
Q (BY MR. MacGILL) Could you please click on that?
A Will do, just a moment. Yes. Okay.



Q Now, looking at this, is this a -- what is Exhibit 87, sir?
A Well, I think it's my Twitter profile.
Q And -- and was this your Twitter profile as of October 21st, 2020?
A I don't know it all. I don't know -- it's my Twitter profile.
Q So if you look at the top, you'll see that there -- it says 28 captures and -- let's see if we can look at it.
If you look to the -- if you scroll to the right --
A Well, I can't scroll to the right.
Q Okay. Sir, I'll represent to you that -- that this says on -- in the top banner in October 2021, and it shows the number -- it shows the number of followers -- followers that you had; is that right?
A I cannot see that date.
Q All right.
A I see 26 November 2013 through 19 July 2023 as dates. Under text it says, "28 captures." And then I see the Twitter profile that shows how many people are -- are following me, yeah.
Q All right. And how many followers do you have at that point?



A 7,129.
Q All right. Looking at the prior exhibit, can you look at Exhibit 85 and tell us how many -- or 86, how many followers did -- do you have there?
A 28,000.
Q And this was -- so during the time that you're -- so prior to the time you were SBC president, you had approximately 7,100 followers. And then once you were SBC president, you had 28,000 followers; is that right?
A Gosh. I -- again, I don't know what they -- this other one is. I gained followers on Twitter when I became president of the Southern Baptist Convention.
Q Okay. And you've seen now that you -- with your own eyes these two exhibits that you have 7,129 followers --
A At some point.
Q -- at some point, and then you have 28,000 followers presently, as of March 13, 2024; is that fair?
A Yes.
Q So over the period of time referenced by these two exhibits, some 21,000 more people are following your Twitter account?
A I'm sure that's probably true.
Q And you provide -- now, is it fair to say, sir,

Page 54

also that you provide updates to the SBC community through your Twitter account?

MR. PIETSCH: Object to the form.

You can answer.

A So I talk about SBC things on my Twitter account.

Q (BY MR. MacGILL) So your Twitter account is used as a mechanism to, quote, talk about things, unquote?

A Yes.

Q Talk about things pertaining to the SBC?

A Yes.

Q All right. In addition to talk -- talking about things on your Twitter account to the SBC community, do you do anything specific that's more defined than, quote, talking about things?

MR. PIETSCH: Object to the form.

You can answer.

A Could you rephrase that question? I don't know if I understand.

Q (BY MR. MacGILL) So I asked you about whether you provided updates to the SBC community by virtue of Twitter. Do you recall that question?

A Yeah. That was two questions ago.

Q Yeah.

Page 55

And then your -- your answer was, well, in your -- on your Twitter account you, quote, talk about things, unquote, right?

A Yes.

Q Why are you -- why did you not agree that you provide updates and instead said that you want to say that you only talk about things?

A Because when I need to give -- when I need to get -- need to give an update to the SBC community, which I guess we're talking about people who are a part of churches who are -- who are in friendly cooperation with the SBC, generally I submit something through Baptist Press to do that. I may sometimes add something onto Twitter as well.

But, for example, I'm required constitutionally to update the SBC on the appointment of the Resolutions Committee. I just did that a few weeks ago. I don't think I ever announced that on Twitter --

Q But, sir --

A -- but I put it through Baptist Press.

So -- so if you're asking how do I provide an update to Southern Baptists about things, generally I do that through Baptist Press. I may or may not say something on Twitter on it.

Q Okay. But, in fact, we can review this, sir,

Page 56

but you provide updates on SBC matters through Twitter, do you not?

A Sometimes I'll talk about SBC-related items on Twitter.

Q Okay.

A Yes.

Q Let's look at an exhibit or two.

A Okay.

Q Or more.

A That's fine.

Q Let's look at one. Now, look at what's next on your screen. And this will be Exhibit 88.

A Uh-huh.

(Exhibit 88 marked.)

Q (BY MR. MacGILL) Do you have Exhibit 88 in front of you?

A Yeah.

Q And do you see, is this a -- an update that you provided on December 18, 2023?

A It's a link to a Baptist Press article, yes.

Q Could you tell us --

A Yes, it's -- that's what this is.

Q -- how many -- how many people viewed as of the time of -- strike that.

How many people viewed this update?

Page 57

A It says there were 18,800 views.

Q All right. And then you -- it's -- could you read to the Court what you wrote on this tweet?

A I wrote "An update at the halfway mark of this SBC year," and then a link to a Baptist Press article.

Q Now, would you use the Twitter account to provide updates like this in addition to what we see here?

A Well, the Baptist Press article was the update, and I linked to it on Twitter. So I use Twitter to share material related to the SBC. I talk -- talk about things related to the SBC on Twitter.

Q Now, let's turn to the time that you ran for SBC president and some of the details there.

Would you, sir, agree that there was a, quote, sexual abuse crisis within the SBC when you were running for your first term as president of the SBC?

A Yes.

Q At the time you were -- and that was during the -- the 2022 year, the first half of the year?

A Yes.

Q All right. And the -- at that time, sir, was the SBC facing the allegations that it had ignored reports of child molestation?

MR. PIETSCH: Object to the form.

You can answer.
A Would you -- would you ask that one more time, please?
Q (BY MR. MacGILL) During the -- the first half of the year 2022, was the SBC facing allegations that it had improperly ignored reports of child molestation?
MR. BESEN: Object to form.
MR. PIETSCH: Same objection.
A I don't doubt that there were people who were accusing the SBC of that.
Q (BY MR. MacGILL) Of child molestation?
A Of ignoring reports of child molestation, yeah.
Q My question is very specific: At the time that you were running for president of the SBC, was the SBC at that time facing allegations that it had improperly ignored reports of child molestation?
MR. PIETSCH: Object to the form.
MR. BESEN: Object to form.
MR. PIETSCH: You can answer.
A If I were pressed to identify a specific person who had alleged that the Southern Baptist Convention ignored reports of child molestation, I don't think I could identify one of those accusations or who made it. But I don't -- I don't deny it. I know that there are people who have made all manner of accusations about



things that the SBC has done and had at that time.
Q (BY MR. MacGILL) Okay. And, sir, during the time you were running for president of the SBC, was the SBC facing allegations that it had improperly ignored reports of rape?
MR. PIETSCH: Object to form.
MR. BESEN: Object to form.
MR. PIETSCH: You can answer.
A I don't recall any specific allegations along those lines directed at the Southern Baptist Convention. So, I mean, I -- I have to say I don't -- I don't know.
Q (BY MR. MacGILL) At the time you were running for president of the SBC, was the SBC facing allegations that it had improperly ignored reports of other sexual crimes --
MR. PIETSCH: Object. I'm sorry.
Q (BY MR. MacGILL) -- occurring in SBC-affiliated churches?
MR. PIETSCH: Object to the form.
You can answer.
MR. BESEN: Object to form.
A That -- that may very well be the case. Like I said, I don't remember any specific accusations along those lines, but I -- I don't doubt it.
Q (BY MR. MacGILL) All right. Now, sir, at the



time you were running for president of the SBC, had questions been raised as to the whether the SBC and its cooperating churches had appropriately handled historical allegations --
A Yes.
Q -- of sexual abuse?
A I'm so sorry. Yes.
Q And at the time you ran for the president of the SBC, did you understand at least some members of the SBC were concerned with the SBC's historical failure to take -- take steps to respond to reports of sexual abuse or sex crimes in the past?
MR. PIETSCH: Object to the form.
MR. BESEN: Object to form.
MR. PIETSCH you can answer.
A Yes.
THE COURT REPORTER: I'm sorry. Mr. Besen, did you just object then? Okay. Because it's not picking it up. You can barely hear it.
MR. BESEN: Okay. I'll -- I'll pick it up. I can be loud.
Q (BY MR. MacGILL) Sir, with respect to these allegations pertaining to child molestation, rape, and other sex crimes, did you believe, sir, for your part it was important for you to address these concerns when you



ran for the presidency of the SBC?
MR. PIETSCH: Object to form.
You can answer.
A Yes.
Q (BY MR. MacGILL) Is it fair, sir, to say that addressing sexual abuse within the SBC was your main priority when you were running for SBC president?
A A major priority, yes.
Q And, sir, when you made your stance on sexual abuse known to the messengers, did you do so with the aim of boosting or enhancing your status as a potential candidate for presidency of the SBC?
MR. PIETSCH: Object to the form.
You can answer.
A Yes.
Q (BY MR. MacGILL) Sir, in May of 2022 did you -- had you as of that time seen the Sexual Abuse Task Force report that had been prepared by Guidepost?
A Is that at any point in May of 2022?
Q As of May 25, 2022, if you want me to be more specific.
A Well, I -- I don't have a recollection of exactly that date. But I can tell you that I was aware of the report the day that the report was released.
Q All right. Let's go to the next exhibit, sir.

A I do not know.
Q But in essence, you made it clear that you did not want women to be ordained in the Baptist faith.
A I did.
Q Did you tweet on spiritual health issues while you were a candidate for the SBC president?
A I did.
Q Now, was the -- was the predominant number of your tweeting pertaining to sexual abuse issues?
A I -- I don't know.
Q You don't have an impression one way or another?
A I do not.
Q Now, as a part of your candidacy for the SBC presidency, did you want to have a timeline developed for actions that could be taken to combat the, quote, sexual abuse crises in the SBC, unquote?
A So apart from the word "timeline," I think I would say yes to answer the question. I don't know that I ever developed a timeline. But I wanted us to take actions to address sexual abuse, yes.
Q Okay. And did you want to demonstrate to messengers as you were pursuing your SBC presidency to understand that you would do something to address sexual abuse?



A Yes.
Q And you were elected after the publication of the Guidepost report; is that correct?
A Yes.
Q Now, there was some -- there was some tweets that were exchanged during the candidacy pertaining to sexual abuse that you were involved with; is that right?
A Oh, I'm sure.
Q Do you remember a tweet from a woman by the name of Carissa Beard?
A I do not.
Q Okay. Let's pull up the next exhibit.
(Exhibit 90 marked.)
Q (BY MR. MacGILL) This is Exhibit 90, sir.
A Okay.
Q You see this is a response to the tweet we just reviewed, Exhibit 89?
A I do, yes.
Q And Carissa Bear writes the next day, "And this is just part of the reason I will be voting for @bartbarber in Anaheim. He needs your vote too." Do you see that?
A I do.
Q Did you communicate with Ms. Beard prior to the time of this tweet?



A I don't know.
Q Sir, let's go to the next exhibit, Exhibit 91.
(Exhibit 91 marked.)
A Okay.
Q (BY MR. MacGILL) Exhibit 91, do you see that? This is a response by a person by the name of Jacob Honeycutt to your May 25 tweet. Do you see that?
A I do.
Q Do you see that he writes, "Bart has a track record of consistently going out of his way to address sexual abuse in the SBC. He's the right man for the job of president." Do you see that tweet?
A I do.
Q Did you speak to Mr. Honeycutt prior to the time that he sent this?
A Not to my knowledge. I don't know who that is.
Q Let's go to the next exhibit, Exhibit 92.
(Exhibit 92 marked.)
A Okay.
Q (BY MR. MacGILL) Is this a response to -- by a gentleman by the name of SAGordon on May 25, saying, "This is the correct response, consistently over time, to the issue of sexual abuse in our midst at Southern Baptist. This is the leadership we need in our next president for our Convention." Do you see that?



A I do, yes.
Q Had you seen this before?
A I -- I assume I've seen all of these before.
Q Did you communicate with him pre- -- prior to this?
A So --
Q Prior to this tweet.
A Scott Gordon is a long-time friend. I -- I -- I did not speak to him about this tweet, nor for any of these people did I speak to them about their tweets beforehand. But I had spoken with Scott many times.
Q Now, sir, I want to be a little more specific about some of your general statements and now talk about some of the specifics in terms of what you said on national television and how you were brought forward to a national audience.
Is it fair to say, sir, that with respect to your 60 Minutes interview that you understood that you were going to be addressing the sex abuse scandal that's rocked the Southern Baptist Conven- -- Convention and that was your number one priority?
A You're asking if that was my number one priority for the interview or -- can -- can you clarify that?
Q I would be happy to.

A Okay.
Q Is it fair to say that when you gave an audience nationally on 60 Minutes as the SBC president, that you wanted to make clear that your number one priority was addressing the sex abuse scandal that's rocked the Southern Baptist Convention?
A Yes.
Q Okay. Let's look at this next exhibit. This is will be Exhibit 100.
A I'm only up to 93.
Q My -- my mistake. 93 it is.
(Exhibit 93 marked.)
Q (BY MR. MacGILL) Now, do you see this -- it says, "60 Minutes @60Minutes - October 7, 2022"? Do you recognize this?
A I do.
Q And what is this, sir?
A It's a tweet from 60 Minutes.
Q All right. And this was to promote -- as you understood it, this was 60 Minutes promoting its broadcast; is that right?
A Yes.
Q And promoting its broadcast where you were interviewed as -- as the president of the SBC; is that correct?



A This is from that interview, yes.
Q Yes.
And, sir, what 60 Minutes had to say, sir, in terms of this tweet that you reviewed, "Sunday, on 60 Minutes, Bart Barber tells @andersoncooper that addressing the sex abuse scandal that's rocked the Southern Baptist Convention is his number one priority." Is that right, sir?
A Yes. I -- I agreed when you asked it the first time, yes.
Q Did you as the SBC president, sir, at the time of this interview want to show that the SBC had learned from its mistakes regarding sexual abuse?
MR. PIETSCH: Object to the form.
You can answer.
A Had -- had learned from its mistakes regarding sexual abuse, that's --
Q (BY MR. MacGILL) Yeah. Was it important to -- for you as the SBC president to show during this interview that the SBC had learned from its mistakes regarding sexual abuse?
A I certainly wanted to communicate that we were planning to take decisive action with regard to sexual abuse in the Convention, and I certainly think the report found some mistakes that the Executive Committee made in



the treatment of survivors. And I would hope that we would learn from those, yes.
Q And when you refer to the mistakes that the Executive Committee made, what are you referring to?
A I'm referring to the dismissive way that survivors of sexual abuse were treated by the Executive Committee when they came forward with their own testimony about what had happened to them. And I'm talking about ways that people within the Executive Committee appeared to work to -- to prevent steps to try to help churches know how to prevent abuse and -- and respond well to abuse when it happens in their midst.
Q Okay. I'm going to refer to some portions of the transcript, sir. And you are free to refer to it if that would be helpful.
And we'll mark this as the next exhibit, which will be Exhibit 94.
(Exhibit 94 marked.)
Q (BY MR. MacGILL) And sir, you're welcome to rely on this transcript or your own memory, whichever you prefer.
Do you have it in front of you?
A A short pencil is better than a long memory. I'll probably look at the -- at the transcript.
Q You're welcome to, sir.



A Yeah. That's --
Q Whatever you prefer.
A Thank you.
Q All right. So if you look at Page 3 of 9 --
A 3. Hold on just a second.
Q And let me just ask for foundation.
Do you recognize this document as the transcript of your 60 Minutes interview?
A Yes.
Q Okay. And we're looking at Page 3 of 9 now.
A Okay.
Q And on Page 3 do you see there's an entry here, and I'll read it to you, "Anderson Cooper: When you read that report and to read accounts of people who were brave enough to call in to the Executive Committee" -- "Executive Committee, to report abuse, for them to be ignored," and then did you interrupt him at that point and you began --
A I did.
Q -- to answer?
A I did.
Q Okay. And at the time you interrupted him, you said, "That's not a strong enough word. We didn't just ignore them. Sometimes we impugned their motives. Sometimes we attacked them. The reason why I'm president

of the SB- -- of the Southern Baptist Convention is because our churches do not agree with that and have taken action to correct those things."
Is that a correct transcription of what you said?
A Yes.
Q Now, when you said, "sometimes we attacked them," were you referring to the SBC?
A I was referring to the Executive Committee --
Q Okay.
A -- when I said that statement.
Q So when you told the national audience sometime -- quote, sometimes we attack them, unquote, the "we" is referring to the SBC Executive Committee; is that right?
A Yes.
Q And was that also referring to the SBC?
A No.
Q Now, you as the SBC president are also a member of the Executive Committee; is that correct?
A Yes.
Q So at the time that you gave this statement, you were speaking about yourself as a member of the Executive Committee and as the Executive Committee as well; is that right?
MR. BESEN: Object to form.



MR. PIETSCH: Object to the form.
You can answer.
A Right. Well, I was speaking about -- right, I was a member of the Executive Committee, so I was using "we" to refer to the Executive Committee.
Q (BY MR. MacGILL) Which includes yourself?
A Uh-huh.
Q And you had two roles at the time of this interview. You were the SBC president, correct?
A Right.
Q And also during this interview you were a member of the SBC Executive Committee.
MR. BESEN: Object to form.
Q (BY MR. MacGILL) Right?
A Yes.
Q Now, sir, I -- stepping apart from the interview for a minute, could you describe in your own words what the Guidepost report found?
A I'll -- I'll do my best. I didn't reread the whole report or anything in preparation for this, but --
Q Are you able to describe the -- are you able to summarize at least, sir, in your own words the Guidepost report as you sit here today?
A I think so.
Q Thank you.



A Let's give it a shot.
Q Please, let's do.
A Yeah.
The report found that there were occasions where survivors had come to the SBC Executive Committee asking for the Executive Committee to help churches to identify people who were engaging in sexual abuse and that -- that they were rebuffed and ignored by individual members of the Executive Committee, by individual employees of the Executive Committee who were described in the report.
The report also found that -- that -- that one employee of the Executive Committee had kept an internal list of people who had been reported in the news to have committed sexual abuse but had -- but had not made that public, had -- had resisted efforts to create a public-facing database that would help churches. But he had kept this sort of press clippings list -- list internally for himself.
And so, you know, I think those are -- those are some of the things that I'm referring to out of the report when I made these statement.
Q Anything else, sir, for the Guidepost report?
A There were a lot of things in the Guidepost report. I don't -- I don't know that I could summarize



all of it. But those are the things that I had in my mind when I made this statement.
Are we still talking about the Anderson Cooper interview?
Q No.
A We're not. I'm sorry.
Q We're talking -- we're talking about your summary of the Guidepost report, separate -- I said separate and apart from the --
A Okay. Okay.
Q Separate and apart and away --
A I'm so sorry.
Q -- from the interview, where I'm now asking you to summarize for this jury and this Court the Guidepost report.
You've talked about two findings. Anything else?
A Gosh, that's a big question. There was an occasion -- it -- it described JD Greear's efforts to lead the Convention toward sex abuse reform. It described the creation of the Credentials Committee. And it described some -- some things that looked like acts of resistance against that process, an occasion where an employee of the Executive Committee called the church in Georgia and seemed to offer an apology for the fact that

Southern Baptist Convention asserted themselves to request the investigation of an entity related to the Southern Baptist Convention. So it -- it -- it marked a key moment in our very complicated polity for that reason.

It also represented a moment when, obviously, Southern Baptists took action to try to understand and respond to a problem, sexual abuse in churches, that -- that historically we had never been at in a moment when we faced a question like that or -- or -- or tried to respond to this problem -- problem in that way.

So certainly, it's a -- it's both a key moment just in our polity, in our development as a -- as a religious body, and in our addressing of this particular subject matter.

Q Okay. Give me one second.

Now, sir, you said earlier in your testimony -- I want to -- strike that.

I want to review some details of the Guidepost report.

You indicated earlier that you had read the Guidepost report?

A I have.

Q At some time after its publication in May of



2022?

A Yes.

Q And did you read it promptly after it was issued?

A Yes, as promptly as I could.

Q Did you read it in its entirety?

A Yes.

Q Did you read the section of the report pertaining to Pastor Johnny Hunt?

A I did.

Q And I am going to hand you -- I'm going to go to the next exhibit, sir.

MR. MacGILL: Well, going back to 83. Okay.

Q (BY MR. MacGILL) Sir, we're going to go back to your December 5th, 2022 e-mail -- strike that. We've not shown this yet.

A My start -- I started '85, so I don't have anything earlier than that.

Q Yeah. I -- I need to be more clear.

(Exhibit 83 marked.)

Q (BY MR. MacGILL) I'm going to show you what has been marked as Exhibit 83 in this case.

A Okay.

Q Okay. So do you have Exhibit 83 in front of



you?

A I do not. I have something that's popped up that says "Document 11," but it does not have a box next to it.

MR. SANDERS: Mr. Barber, if you click that, once you click that, it will say "83." So just a little bit different than the others.

THE WITNESS: Thank you.

Q (BY MR. MacGILL) Tell us when you have it in front of you.

A I do have it in front of me.

Q All right. Now, sir, with respect to this particular document, is this a tweet that you sent?

A It is.

Q Tell the Court and jury what the date is that you tweeted this.

A December 5th, 2022.

Q All right. Now, sir, specifically, that is how many months into your terms -- term as the SBC president?

A Six.

Q And would you please read to the jury what you tweeted six months into your term as president of the SBC.

A "1. Hunt was the subject of a third-party investigation in response to allegations that he sexually



assaulted a woman half his age in ways that would, to my knowledge, constitute a felony in any jurisdiction in the U.S."

Q Now, you tweeted that to -- this tweet, Exhibit 83, that you just read into the record and provided to this jury and this Court, this was available to anyone who -- this was available to anyone and everyone who cared to look, right?

A Yes.

Q And you understood that at the time you tweeted this?

A Yes.

Q And I think you testified to this jury earlier that as the president of the SBC you understood that it was important for you -- for your part to be thoughtful in your communications publicly, right?

MR. PIETSCH: Object to the form.

You can answer.

A For anyone, yes, it's important to be thoughtful in communication.

Q (BY MR. MacGILL) Okay. And it's important to be accurate in a public communication like this, isn't it?

A I think so, yes.

Q And it's important that you have a basis for

A I think Matt is the only lawyer that's representing --
Q (BY MR. MacGILL) All right.
A -- me here today.
Q Well, I understood from your prior testimony that you've got the lawyers from the Bradley Arant firm representing you. Is that mistaken? Was I mistaken?
A I met with them, but I think they represent the Executive Committee of the Southern Baptist Convention.
Q Okay. And -- so your understanding is that only Mr. Matt Pietsch represents you?
A I think so.
Q All right. And rep- -- only he represents the SBC -- SBC; is that right?
A I think so.
MR. PIETSCH: Counsel, can we clarify, are we talking about for purposes of this case?
MR. MacGILL: Yes.
MR. PIETSCH: Okay.
MR. MacGILL: Yeah.
MR. PIETSCH: Questions related to this case.
Q (BY MR. MacGILL) But you -- with respect to the SBC Executive Committee, we could count the lawyers, and I think we probably should count them all here today



since we're together here this morning.
MR. BESEN: Object to form.
Q (BY MR. MacGILL) There are five lawyers representing the SBC and the SBC Executive Committee as we sit here today, right?
MR. PIETSCH: Object to the form.
You can answer.
A You know better about that than I do. But I would say, sure, there are -- there are multiple lawyers who are here. Matt's representing me. There are other people who are here --
Q Let's count them --
A -- from associated --
Q Let's -- let's count them.
A Okay.
Q Mr. Matt Pietsch represents the SBC, right?
A Yes.
Q You didn't call Mr. Pietsch prior to the time you wrote Exhibit 83, did you?
A I never even met him at that time. No --
Q You didn't?
A -- I did not call him.
Q Now, Mr. Besen's laughing about this. We're going to get to Mr. Besen here in a minute.
But did you have other counsel that were



available as well -- did the SBC have other counsel that have been long-time counsel for the SBC at the time you wrote this tweet?
A Yes.
Q And who were they?
A So at that time -- well, Guenther Jordan & Price were not there anymore. Bradley I think was it. I don't think --
Q Okay.
A -- we had --
Q Did you call the Bradley firm -- did you call anyone at the Bradley firm prior to the time that you wrote this tweet, Exhibit 83, to determine what might constitute a felony in any jurisdiction in the United States?
A No.
Q Did you constitute -- did you call anyone at the Gunther firm be- -- prior to writing this tweet to determine what might constitute a felony in any jurisdiction in the United States prior to sending that?
A No.
Q Let's go to another law firm. You've got also -- well, you've got the -- the Bradley firm. There are multiple lawyers in the Bradley firm representing the Executive Committee; is that right?



A Right.
Q Mr. Besen is here, right?
A Right.
Q You didn't call him prior to sending this tweet, 83, did you? Exhibit 83.
A I did not.
Q Did you call his partner, any of his partners?
A I did not.
Q Okay. Ms. Scarlett Nokes, you did not call her prior to sending Exhibit 83?
A I did not.
Q All right. How about Mr. Bundren? Did you call Mr. Bundren, also with the Bradley Arant firm, prior to sending Exhibit 83?
A I don't know him.
Q Okay. You -- don't you think he was a gentleman that was on the phone with you when you got prepared for the deposition?
MR. PIETSCH: Object to the form. Misstates his testimony.
A I -- I --
Q (BY MR. MacGILL) He was not -- he was not part of your preparation?
A What was his first name?
Q Brandon Bundren?

A No.
Q Okay.
A No.
Q He was not part of the phone conversation?
A I don't think I know him at all.
Q Fair enough.
A Okay.
Q Mr. Anderson, what firm is he with?
A That's Jon?
Q Yes, sir.
A I don't know what firm he's with. I think he may be in the same firm as Tom Hur- -- Hurney. Is that --
Q Okay. Did you call Mr. Hurney prior to the time that you sent Exhibit 83 to learn what might constitute a felony in any jurisdiction in the United States?
A I didn't know Tom at that time. But no, I did not.
Q Now, sir, I want to talk with you a little bit about -- let me back up. Two questions on this tweet.
So as I understand your testimony, you can't cite any specific law that Pastor Johnny Hunt violated accor- -- under the allegations?
A No.



Q Okay. And Pastor Johnny Hunt has never been convicted in any court of law of any crime, right?
A Right.
Q And Pastor Johnny Hunt, sir, has never had a civil judgment at any point rendered against him or returned against him for any of the allegations associated with what you reference in Exhibit 83; is that correct?
A That's what I referred to it, just as allegations.
Q Right.
A Right. He's not been convicted of anything, to my knowledge.
Q So it's never been established by a preponderance of evidence or otherwise that Pastor Johnny Hunt was involved in any sexual abuse of [redacted]; is that right?
A Nor did I say so. But, yes, that's right.
Q Okay. I'm going to read the question back and your answer to make sure you're comfortable with that answer.
MR. MacGILL: Please read the question back and his answer.
A Okay.
(Requested portion read.)



THE WITNESS: Yeah, [redacted]. Could we start again, please?
MR. PIETSCH: I think he wanted the question and answer.
MR. MacGILL: Yeah.
(Requested portion read.)
Q (BY MR. MacGILL) So, sir, with that background that you have admitted that Pastor Hunt -- that it has never been established, to repeat, never been established, that Pastor Johnny Hunt was involved with sexual abuse of [redacted] under a preponderance of the evidence standard or otherwise, did you nevertheless object to his return to the pulpit?
A Yes.
Q Okay. Now, without anything other than allegations from the [redacted], you objected to Pastor Johnny Hunt preaching again after his name appeared in the Guidepost report, did you not?
A I objected, yes, to his --
Q Okay.
A -- restoration to ministry by a church in Florida.
Q And you objected despite the fact, sir, there was no proof by a preponderance of the evidence that he been guilty under the allegations of [redacted] of



Q some form of sexual abuse, right?
MR. PIETSCH: Object to the form.
MS. KLEIN: Objection; form.
MR. PIETSCH: You can answer.
A What he admitted to doing in his fourth statement in response to this I think disqualifies him from pulpit ministry. So, yes, I objected, but not on the basis of the allegations, on the basis of his own admitted behavior.
Q (BY MR. MacGILL) Now, you made that opinion known to members of the SBC; is that right?
A I made it publicly known to anyone, yes.
Q Let's turn to the next exhibit.
A That's 95? That was a question. Are we talking about 95?
MR. SANDERS: Yes.
THE WITNESS: Okay.
(Exhibit 95 marked.)
Q (BY MR. MacGILL) Now, sir, looking at Exhibit 95, you -- this is a tweet that you sent on November 29, 2022?
A So the first tweet is not one that I sent. It's by a reporter with Religion News Service. And then I replied on November 29th, 2022, yes.
Q All right. And you -- read to the Court and

Page 106

jury how you replied on November 29, 2022 to this article pertaining to former SBC president returning to the ministry.
A I wrote, "Shocked by this repugnant act. I am driving right now but will say more later."
Q "This repugnant act," sir, that's what you wrote?
A Yes.
Q What is the repugnant act that you were referring to?
A The idea that you can impanel four friends of yours to claim that they've restored you to ministry.
Q Why is it -- why is it repugnant to restore Pastor Johnny Hunt to the ministry?
A Well, I think it's contrary to what the Bible teaches in First Timothy and in Titus concerning pastoral qualifications. And I also think that this form of doing it is contrary to Baptist practice for 400 years with regard to how people wind up being ordained in the ministry. It's a departure from Baptist history and Baptist belief.
Q What are the -- what pastoral qualifications are at issue here, sir?
A Well, the -- I can -- is it okay for me to -- to take my iPad and just --

Page 107

Q No. I just want you to tell us your memory. You -- you said that it -- that this is repugnant because it -- it flies in the face of pastoral qualifications.
What qualifications makes this repugnant?
A So I could do better if I could read the Bible that talks about those qualifications. But I -- it calls upon people who are pastors to be people who are above reproach, who have been tested and -- and without sin, have been -- have been found -- people that are qualified to be holding that office. It -- it -- it makes a number of statements.
Q Well, sir, you -- you testi- -- you tweet to the world that this is a repugnant act. Well, you're saying that -- you had nothing other than allegations from [redacted], right?
MR. PIETSCH: Object to the form.
MR. BESEN: Object to form.
MS. KLEIN: Objection; form.
A Actually, I testified contrary to that. I said that what he had admitted to in his fourth statement in response to these allegations, his own statement, his own confession about what he had done --
Q (BY MR. MacGILL) What were --
A -- I believe is in violation of the idea that he's above reproach and -- and is fit to be restored to

Page 108

A ministry.
Q So what about his -- what about his statement that -- what in his statement is repugnant?
A I didn't say his statement was repugnant. I said this means of restoration is a repugnant act.
Q No. No. You talked about a repugnant act. Are you referring -- was it the ministers who restored him that were repugnant, or is it Pastor Johnny Hunt that is repugnant?
A It's the process of restoring someone in this way.
Q All right. But in your tweet you didn't make that -- you didn't -- you didn't make that clear, sir. You just said with respect to a repugnant act. You didn't say a repugnant act of the restoration by these four ministers, did you, sir?
A I think the tweet is clear the way it is. It's in response to an article about the restoration.
Q Okay. Let's go back to -- to this exhibit. You say, "shocked by this repugnant act." And you -- the repugnant act you're referring to is the restoration by whom?
A "Pastors say Johnny Hunt, former SBC president accused of abuse, can return to ministry," so it's -- it's the pastors involved in that.

Page 109

What's repugnant is the act. It's the restoration itself.
Q Okay. And the -- the act is the restoration, so the repugnant act was by which ministers?
A So I -- there were four of them. I don't remember their names.
Q Okay. And with respect to this repugnant act, what steps did you take, sir, to follow up on this, quote, repugnant act by these four ministers?
A I -- steps to follow up?
Q Yeah. What did you do as a -- other than saying that their -- the actions of these four ministers were repugnant, what did you do, if anything, to follow up on this?
A I -- I wrote and published an explanation of -- of how this is contrary to Baptist belief.
Q But let's just make sure we're 100 percent clear.
The repugnant act that you referred to in this tweet was the actions of four ministers -- four Baptist ministers and not Johnny Hunt; is that right?
A Right. That's the subject of this tweet is the act of restoring.
Q Let's go to the next exhibit if we could.
(Exhibit 96 marked.)