UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOHNNY M. HUNT, )
)
Plaintiff, )
vs. ) No. 3:23-CV-00243
)
SOUTHERN BAPTIST CONVENTION; )
GUIDEPOST SOLUTIONS LLC; and )
EXECUTIVE COMMITTEE OF THE )
SOUTHERN BAPTIST CONVENTION, )
)
Defendants. )
)

Sanders Decl.

Ex. B

RULE 30(b)(6) DEPOSITION OF THE EXECUTIVE COMMITTEE OF THE SOUTHERN BAPTIST CONVENTION

(THROUGH JONATHAN HOWE)

TUESDAY, FEBRUARY 27, 2024

8:00 A.M.

Reported by:

Marta G. Harra, LCR #468, CCR #0317

repeat, ensure that the Executive Committee fulfills its fiduciary obligations to the SBC and the messengers; right?

A. Their job was to insure that the Executive Committee and the SBC were fully cooperative.

Q. But it was more than that, sir, wasn't it? The Committee on Cooperation, these members of the Executive Committee that we've just described, they had the responsibility to insure that the Executive Committee fulfills its fiduciary obligations to the Southern Baptist Convention and the messengers; correct?

A. That was the Executive Committee -- The Executive Committee's job -- or the role of fulfilling its fiduciary responsibilities is the Executive Committee's job.

Q. Well, but wasn't it expressly agreed, sir, that the Committee on Cooperation itself would insure that the Executive Committee fulfills its fiduciary obligations to the Southern Baptist Convention and the messengers?

MS. NOKES: Objection; he's been asked and answered.

A. Yeah. The Committee on Cooperation was to insure that the EC and the SBC were fully cooperative in





the matter.

Q. (BY MR. MacGILL) All right. Turn to Exhibit 60 -- Exhibit 2, please. And I'm going to read -- let's read together Section 2.3.

Are you there?

A. Yeah.

Q. Exhibit -- 2.3 of this engagement letter says, "The Committee on Cooperation will insure that the Executive Committee fulfills its fiduciary obligations to the SBC and the Messengers."

Do you see that?

A. I do.

Q. Is that a correct statement of the relationship --

A. It is.

Q. -- as it existed?

Yes?

A. Uh-huh.

Q. And, "Specifically, the Committee is charged with the following things."

Do you see that?

A. I do.

Q. Is that -- Are those from bullet points a correct statement of the agreement of the Committee on Cooperation, that is, this assembled group of the SEC?





A. Can you restate that?

Q. Does this Section 2.3 properly state that the Committee on Cooperation was charged with certain specific obligations?

A. Yes.

Q. "Financial oversight" was one of them?

A. Correct.

Q. "Electing, in cooperation with the Task Force, a liaison between the Executive Committee and Guidepost Solutions"?

A. Correct.

Q. Who was that liaison?

A. The president of the Convention.

Q. Mr. Litton?

A. It was.

Q. "Receipt of periodic monthly updates," was that a part of the responsibility here?

A. It was.

Q. And was the committee also responsible -- was the Committee on Cooperation also responsible that the Executive Committee and the SBC were fully cooperative in this matter?

A. It was.

Q. And looking at Bullet Point 3, let's read that together. You see in Bullet Point 3 that the





Committee on Cooperation was responsible for periodic monthly updates noting document, witness, and information requests made to the committee.

Do you see that?

A. I do.

Q. And that was part of their responsibility?

A. I do.

Q. Now, to be even more specific, sir, the Committee on Cooperation had been charged with the responsibility to, quote, ensure information sought is consistent with and responded to, in cooperation with the motion passed by the Messengers at the SBC Convention in June of 2021.

Do you see that?

A. I do.

Q. And with respect to the motion that was passed, the motion was very specific in terms of the time period that was to be focused on; right?

A. It was.

Q. The time period to be focused on, in terms of the motion itself, was January 1, 2000 through June 14th, 2021; is that right?

A. That's correct.

Q. Is it fair to say that the Southern Baptist Convention Executive Committee had been contacted

in years prior to 2021 about certain claims of child molesters and other abusers who were in the pulpit or employed by the church staff?

A. Yes.

Q. And was it fair to say that prior to the issuance of this report, the following, "For almost two decades survivors of abuse and other concerned Southern Baptists have been contacting the SBC Executive Committee to report child molesters"? Is that fair?

A. Per the report, yes.

Q. Well, that's exactly what it says, isn't it, that they would -- they say that they were survivors, and other concerned Southern Baptists have been contacting the SBC Executive Committee to report, quote, child molesters, unquote; right?

A. Uh-huh.

Q. And also, specifically, it's recited here by Guidepost, and it's a fact, that the Southern -- the Executive Committee had also been contacted about, quote, other abusers who were in the pulpit or employed as church staff, unquote; right?

A. That's correct.

Q. Now, focusing on you and the actions of the Executive Committee specifically, as far as you





were concerned, when you see, quote, other abusers, unquote, what did you understand that to mean, sir?

A. In relation to?

Q. Well, it's in relation to this report, sir, and this history that's given in the final report, to report child molesters and, quote, other abusers.

What did you understand, quote, other abusers to mean?

A. Those who had engaged in sexual abuse.

Q. Okay. So those engaged in sexual abuse. And sexual abuse would be, quote, sexual abuse as you defined it --

A. Previously.

Q. -- twice in your testimony?

A. Correct.

Q. It says here in the Guidepost final report, Page 3, that -- with respect to, quote, child molesters and other abusers, unquote, that those allegations had been met time and time again with resistence, stonewalling, and even outright hostility from some within the Executive Committee.

Do you see that on Page 3?

A. I see that.

Q. At the time that the SBC hired Guidepost, the Southern Baptist Convention was facing allegations





that it had improperly ignored reports of child molestation; is that right?

A. Define -- Say that again.

Q. At the time that the SBC hired Guidepost, the SBC had been facing allegations that it had improperly ignored reports of child molestation; is that right?

A. It was facing those allegations, correct.

Q. And also, at the time you hired Guidepost, that Guidepost had been reported as -- At the time the SBC hired Guidepost, the SBC was facing the allegation that it ignored reports of rape; is that right?

A. It was facing those allegations.

Q. It also, at the time that the SBC hired Guidepost, it was facing allegations that it ignored reports of other sex crimes occurring in SBC affiliated churches; is that correct?

A. It was facing those allegations.

Q. Okay. So allegations of child molestation; right? That's one?

A. Is that a question?

Q. Yes.

A. Oh.

Q. Okay. Could you answer that?





A. Correct.

Q. SBC was faced with allegations of rape. That's a second form; right?

A. Correct.

Q. The SBC, at the time it hired Guidepost, was also faced with allegations of other sex crimes occurring in SBC affiliated churches; is that right?

A. That's correct.

Q. Okay. Because of these allegations of child molestation, rape, and other sex crimes, there was a public relations problem that the SBC faced; is that fair?

A. That is your understanding, possibly.

Q. Well, did you think it was -- you were vice president of communications. Did you think there were some problems associated with this? Strike that.

Did you think, as the vice president of communications, that the SBC, facing allegations of: 1. Child molestation; 2. Rape; and 3. Other sex crimes, had created public relations issues for the Convention?

A. I think those allegations had posed challenges to the Convention and ones that were needing to be

addressed.

Q Okay. And, for example, there was an article in the Houston Chronicle, it published a six-part series entitled, "Abuse of Faith."

Were you aware of that?

A. I am aware of that.

Q. And that was 2019, as you just said; right?

A. February of 2019.

Q. February of 2019?

A. Uh-huh.

Q. Okay. And the first article -- I mean you'll remember this, sir, the first article of the Houston Chronicle ran under the headline, "20 years; 700 Victims."

Do you remember that?

A. I do.

Q. And there were a collection of mugshots that were included in that first article; correct?

A. Yes.

Q. And there were some 218 people who were said to have been working in or volunteered in Southern Baptist churches and were convicted or pleaded guilty to sex crimes; right?

A. Yes.

Q. Now, let's focus on two words, sir. "Convicted of"



sex crimes. You understood that that first Houston Chronicle reference in that 2019 article included reference, in part, to people who were convicted -- quote, convicted of sex crimes.

Did you understand that?

A. Which two words?

Q. I'm sorry?

A. You listed four words.

Q. "Convicted of" are the two words I'm focused on, sir.

A. Yes.

Q. Do you understand that in my question?

A. I did.

Q. Let's focus on my question now.

Did you understand that that Houston Chronicle article, the first installment, referenced specifically in one part people who were, quote, convicted of, unquote, sex crimes?

A. Yes.

Q. Let's go further, sir, to be specific now.

A. Okay.

Q. In 2019, this first Houston Chronicle article, did you understand that that article also included people who had pleaded guilty, unquote, to sex crimes? Did you understand that, too?



A. Yes.

Q. So the focus, sir, as you understood things in 2019, were some 200 people -- 218 people who worked or volunteered in Baptist churches who were convicted of or pled guilty to sex crimes?

A. That was the focus of that article.

Q. Right.

So from the outset in 2019, you knew -- to repeat, you knew that the focus of what the Houston Chronicle had done was to focus on people convicted of or who had pled guilty to sex crimes; is that right?

MS. NOKES: Objection; mischaracterizes his testimony.

Q. (BY MR. MacGILL) Is that right, sir?

A. Could you restate the question?

Q. You understood from the outset, in 2019, that the focus of the initial installment of the Houston article -- the Houston Chronicle article had been to focus on people who were working in or volunteered in Baptist churches who were, quote, convicted of, unquote, or pled guilty to sex crimes; right?

A. That's -- The focus of the article, you'd have to ask the Houston Chronicle to accurately



characterize their focus.

Q. It does accurately characterize their focus, doesn't it?

A. Right.

Q. And as vice president of communications you were trained, and you were experienced in understanding what the scope and meaning of that public relations circumstance was as a result of the reference to people who had been convicted of or pleaded guilty to sex crimes?

A. I was not at the Executive Committee at the time of the publication of the abuse (inaudible) --

Q. You were the vice president of communications at the time, weren't you?

A. No.

Q. Where were you employed in 2019?

A. I was -- In February of 2019 I was at Lifeway.

Q. You were at Lifeway?

A. Uh-huh.

Q. Okay. One of the ministries of the Baptist church?

A. Yeah.

Q. When did you -- remind me, when did you come into our role as vice president of communications?

A. September of 2019.

Q. Thank you.

178

So to make sure that there's no mistake or confusion about anything that you're going to testify to here this morning, you understood, in September of 2019, that the initial installment from the Houston Chronicle that focused on some 218 people who volunteered or worked in Baptist churches who were, quote, convicted of or pled guilty to sex crimes, unquote?
A. Yeah, to my knowledge.
Q. And, in fact, when it came time for the report that you published to the world, sir, those words were specifically used by Guidepost in this report; right?
A. They may have been.
Q. Okay.
A. I'd have to find it.
Q. Now, one of the purposes of engaging Guidepost, as you understood it for this investigation, was to respond to the allegations that the SBC had not properly responded to sex crimes within Southern Baptist churches appropriately; right?
A. That's correct.
Q. Sir, I want to focus on the scope of the Guidepost investigation.
Is it fair to say that, over the years, the



179

Executive Committee's response to sexual abuse allegations had been largely driven by senior Executive Committee staff members?
A. Can you restate that?
Q. Yes.
Is it fair to say, sir, that, over the years, quote, the Executive Committee's response to sexual abuse allegations was largely driven by senior Executive Committee staff members?
A. How do you define "response"?
Q. Response by the Executive Committee.
A. Yeah.
Q. Yes?
A. How do you define "response"? What do you mean by "response"?
Q. Reaction to.
A. In what way?
Q. Well, that's what I'm asking you. Let me just ask if you will just admit a plain truth here, sir. I'm going to read it to you one more time. You can admit it or deny it.
Will you admit, sir, without any equivocation to the following: Quote, Over the years, the Executive Committee's response to sexual abuse allegations was largely driven by senior Executive



180

Committee staff members?
A. It would depend on what you mean by "response."
Q. Okay.
MS. NOKES: I'm going to object. You appear to be reading directly from something. If you're quoting a document, then I ask that the witness be provided the document.
Q. (BY MR. MacGILL) Why don't we look at a document together. Why don't you just look at the Guidepost report, Page 4.
Now, just to remind the jury here, this exhibit -- What's the exhibit number, sir? Exhibit 8; right?
A. Yes.
Q. Do you have it in front of you?
A. I do.
Q. Exhibit 8 is the exhibit that you published to the world; is it not?
A. This is the exhibit that was provided to us by Guidepost, the report, the final report.
Q. And you -- I'm speaking about you, sir -- you published this to the world; did you not?
A. Per the motion passed by the messengers of the 2021 Convention we published the report in due time.
Q. And it was you that pressed the button, so to



181

speak; right?
A. Yeah.
Q. Okay. Now -- And you -- I think you confirmed to this Court and this jury previously that you read this report in every detail specifically; did you not?
A. That's correct.
Q. I think you told this jury that you spent hours reading this --
A. Correct.
Q. -- report, and its appendices; right?
A. That's correct.
Q. So, as far as you were concerned, every report -- every detail of this report was accurate, after you had read it?
A. That is not what I stated.
Q. You read it; right?
A. I read the report.
Q. And you didn't raise your hand, so to speak, and object to any portion of this report?
A. The Executive Committee had no ability to question, edit or adapt the report.
Q. Okay.
A. We received the report and published the report.
Q. All right. Well, take a look at Page 4, if you