IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TENNESSEE

NASHVILLE DIVISION

JOHNNY M. HUNT, )
)
Plaintiff, )
) C.A. No.
vs. ) 3:23-cv-00243
)
SOUTHERN BAPTIST CONVENTION; )
GUIDEPOST SOLUTIONS LLC; and )
EXECUTIVE COMMITTEE OF THE )
SOUTHERN BAPTIST CONVENTION, )
)
)
Defendants. )

Sanders Decl.

Ex. C

HYBRID VIDEOTAPED DEPOSITION OF

JOHNNY HUNT

April 18, 2024

9:01 a.m.

Bradley Arant Boult Cummings LLP

1230 Peachtree Street NE

20th Floor

Atlanta, GA 30309

Robin K. Ferrill, CCR-B-1936, RPR

Magna Legal Services
866.624.6221
www.MagnaLS.com

understand your position with regard to those words. I do think the term "Jane Doe" doesn't have the implication that you suggest. I can't force you to agree with that, Rob, but I would understand if we were asking to use the other words I just said. We're not. I think Jane Doe is pretty generic. Again, Rob, we don't have to belabor this, but I wanted to distinguish for you, Rob, the difference that I would agree with you if Scarlett or I were asking to use those other phrases, those other terms here today. We are not.

MR. MacGILL: That's fair. So can we agree, can we all stipulate that the use of the word "Jane Doe" creates no inference of any kind or nature. Does everyone agree with that?

MR. KLEIN: Yes.

MS. NOKES: And I will add, she's not a party, they are not parties. They are not seeking monetary damages. It's clearly for anonymity only.

MR. KLEIN: And I would agree with what you just said, Rob, on the record, as well.

MR. MacGILL: Does everyone agree, Gretchen? You okay with that?



MS. CALLAS: Yes.

MR. MacGILL: No inference from the use of the word "Jane Doe."

MR. KLEIN: No problem.

MR. MacGILL: Thank you. So agreed.

MR. KLEIN: Thank you.

Q. (By Ms. Nokes) Jane Doe's husband is someone you mentored through the course of your ministry?

A. No.

Q. Not even informally?

A. Informally, but that would be thousands of pastors in a group setting.

Q. But you certainly remember him?

A. Oh, of course. Absolutely.

Q. Are familiar with him?

A. Yes.

Q. And how did you informally mentor him?

A. I do -- for 28 years, I led a Timothy Barnabus where it averaged 200 pastors in a meeting. And I spend three days teaching leadership, answering questions.

Q. And that's -- that's how you first met him?

A. In that setting, yes.

Q. And what about over time, how did the informal mentorship continue?



A. He would call or, for the record, his wife would call on his behalf and ask if I would help him with his difficulties in his church. So I would meet him for dinner and she would always come with him.

Q. And when did that sort of interaction start?

A. Probably somewhere around maybe 1995. I'm guessing the date because it's...

Q. You have referenced in earlier answers your SBC presidency. When were you first elected?

A. 2008.

Q. And that's a lofty role within the convention?

A. Uh-huh.

Q. The pinnacle?

A. Right.

Q. Even though it's unpaid --

A. Uh-huh.

Q. -- you are the face of the convention during that time?

A. Exactly.

Q. And you mentioned being mentored by Adrian Rogers?

A. Uh-huh.



Q. I believe he passed away 2005?

A. Correct. Yes, ma'am.

Q. So before your presidency. But was it him or someone else who helped teach you how to navigate SBC politics?

A. I'm not sure I ever learned how. That's where your Barry McCartys come in place to help you. I had been asked for five terms, so that's a 10-year period to be the president. And I denied it. Before Dr. Rogers died, his influence would have said: One day, God may tap you and it may not be what you want to do, but you need to lead. And so it was after I felt it was gone, a large number of pastors. It's different than today. Today it's people are seeking the office. Adrian Rogers taught me the office seeks the man.

Q. And who were the people over the course of that 10 years, the five terms, who encouraged you to run?

A. It would have been practically all of my peers, large church pastors. Ted Traylor, the Ken Whittens, the Steve Gaines, that they are all in my age group, so.

Q. And once you agreed to be on the ballot, what did you do to campaign, if anything?



Case 3:23-cv-00243 Document 384-3 Filed 02/25/26 Page 2 of 11 PageID #: 14209

A. Nothing.
Q. And what was your platform or your key issues that you were running --
A. Nothing.
Q. Were you considered part of the conservative resurgence or the carryover of that?
A. Voted. I was too young.
Q. Voted?
A. I had no voice.
Q. Voted in favor?
A. In favor.
Q. You also -- you led the pastors conference?
A. In '96.
Q. Okay. How did that come about?
A. Same thing. Basically, you become known as a leader and people would tap you and lead it. And, again, you may know, but they honor you by electing you and you honor them by paying for it.
Q. The pastors conference in 1996, do you remember any themes or topics from that particular conference?
A. Yes, I do. "Love Loud."
Q. And did you speak at that conference?
A. No.
Q. Just to organize it?



A. Just to organize it.
Q. But you did speak, I assume, at the annual meeting after elected and ran the meeting while you were president?
A. Exactly.
Q. What issues related to sexual abuse came up during your two terms as SBC president?
A. None that I remember, to me personally.
Q. So were any sexual abuse topics -- were you aware of any issues related to sexual abuse within the convention during your presidency?
A. I remember none.
Q. There had been discussion of a potential database --
A. Uh-huh.
Q. -- of abusers, correct? In 2007, 2008?
A. I was not aware of it.
Q. So there was no carryover from those discussions, just in 2008, to your presidency?
A. No, ma'am.
Q. Do you recall any survivors of sexual abuse reaching out to you during your presidency?
A. I don't.
Q. And in those two years, did anyone come to you in confidence with any concerns about any pastors



engaging in sexual misconduct?
A. Never.
Q. You have talked about sort of the burden of the role. How would you describe the SBC presidency if you were telling someone who is not a Southern Baptist?
A. It's a great honor the day you are elected. And it's a great joy the day you finish.
Q. And what do you do?
A. What do you do as president?
Q. As president?
A. Represent entities, you know like, so you are kind of championing the cause. I led the convention to give the largest percentage to international missions in the history of our denomination. Our agenda was more of a -- we needed a great commission resurgence. That's what I led. And it's just we needed to be more faithful at what we used to do. So that was -- so you just -- you became the voice, the face, and "bully pulpit," they call it.
Q. And did you tap others to help you with that great commission resurgence?
A. I did.
Q. Who were some of those individuals?



A. People like Danny Akin, Al Mohler, J.D. Greear, Ronnie Floyd. Those are the major ones I remember.
Q. So it's fair to say the SBC presidency gave you more exposure?
A. I'm not sure that would be a true statement for the simple reason I had such a platform. I had been preaching for other denominations.
Q. You didn't need more exposure?
A. I didn't -- no. Sometimes -- I heard one preacher that was elected president said: I'm going to ride this gravy train. And his definition was all these invitations you get. I already had invitations. So I was speaking Sundays in one of the finest in America. So why did I want to be gone? So I was sending videos everywhere for congratulation services, but not being there.
Q. Do you think it gave you a larger sphere of influence within the convention?
A. Not really. I feel like I may have lost influence.
Q. How so?
A. When you are leading a charge for something, you make as many enemies as you do friends. And I think I was more popular just as a

pastor and one that just cared for pastors.
Q. And I want to be clear. Are you talking about other pastors, other leaders within the Southern Baptist Convention?
A. Uh-huh.
Q. What about the average church-going Southern Baptist in Arkansas? Would they have known that you were the lead pastor at Woodstock Baptist Church without you being the SBC president?
A. Yes, I --
MR. MacGILL: Object to the form of the question. You may answer.
A. I spoke in their state conventions, their state evangelism conferences, probably 90 percent of our states, of our 42 state conventions, maybe all of them prior.
Q. (By Ms. Nokes) But, again, it's a subset right --
A. It is.
Q. -- of Southern Baptists to go to the meetings of the local association or the state conventions. So just your average --
A. It would have been --
Q. -- white-haired Southern Baptist lady in the pew, how would she have come to know Johnny Hunt?



MR. MacGILL: Object to the form of the question. You may answer.
A. I have no idea. Good question.
Q. (By Ms. Nokes) Did you do any media interviews as SBC president?
A. Probably the only media interview I remember doing is immediately after I was elected. I stayed out of the paper. I have friends that loved the press. I just didn't respond to the press.
Q. Did you do any non-church-service speaking engagements, civic clubs or?
A. If I did, I can't recall a one.
Q. What about political events?
A. No.
Q. Give the prayer or?
A. Oh, yes, I was invited. I pastored the governor of the state, Sonny Perdue, for eight years. He was -- taught Sunday school, very good friend. So when they entertained the Republican governors, I was asked to do an opening prayer and attend with him.
Q. And would you agree that during your term as SBC president, you were also a trustee or a member of the Southern Baptist executive committee?
A. Ex officio.
Q. And what's the difference between a regular



member and an ex officio member?
A. You have no vote.
Q. Are you able to speak in a meeting?
A. If they invite you to.
Q. And are you expected to attend the meetings?
A. At least one out of your two-year term. And sometimes someone only has one-year term, but 90 percent of the time, it's you are reelected. I don't think a -- I don't think anyone has ever been denied the opportunity that ran for the second term.
Q. And do you think your opinions, comments, positions on issues as an executive committee trustee carried more or less weight by virtue of you being the SBC president?
A. I would say the same. I think I was respected by that group. They proved that by allowing me to speak at about 20 of 25 conventions.
Q. Do you recall the executive committee dealing with any issues of sexual abuse during your term as an EC trustee?
A. I don't recall any.
Q. And how would you define in your own words "sexual abuse"? Back during that time, 2008 to 2010.
A. When I think of abuse, I speak -- I think



of someone actually being physically hurt or -- so abusive, which I guess it could have been verbal too. But that would be all I would have ever probably considered.
Q. And has your own opinion of what sexual abuse is or is not changed since 2010?
A. Yes. It's changed since I now am able to see the legal definition of it. Absolutely.
Q. And what's your understanding of the legal definition?
A. To use sexual abuse would be in the context of intercourse, at least, and I know in the State of Florida, and I think in Georgia and Tennessee. So I see it in that context, but definitely not consensual.
Q. So I want to be clear, you think in order for there to be sexual abuse, there has to be intercourse? Under a legal definition?
A. That would be part of it.
Q. You focused a lot in your ministry on writing specifically to men and for men. When did you start your men's conference ministry?
A. I finished in 2021. Help me with the math. I did my last one at Woodstock in 2021, and that was my 30th year. Thirty years in a row. So I would

have started 30 years prior, so.
Q. And what prompted you to start those conferences?
A. More of men involvement in church. Women have taken more of the lead role where men have been passive. And I felt that if we were going to have a ministry that would -- my dream was that the sun would never set on the ministry, men would have to be involved. So that was -- that was the passion that I started with.
Q. How did you come up with the themes or topics you covered in those conferences?
A. Being a man.
Q. And did you deal a lot with topics about lust?
A. Yes.
Q. Temptation?
A. Yes.
Q. Adultery?
A. It probably came up. I don't know that I just wrote a message on adultery, but might have.
Q. Did you ever preach at Woodstock on the topic of adultery?
A. I would have to go back and look, 33 years times 52.



Q. And at Woodstock, you helped create a ministry specifically for wounded and fallen ministers, correct?
A. Uh-huh.
Q. Tell us about how that came about, the City of Refuge?
A. City of Refuge. Probably 85 percent of the men had nothing to do with moral failure, et cetera. It really started more out of burnout. Pastoring is a very difficult job, especially when you realize that 70 percent of Southern Baptist churches run under 65, that you realize that I've addressed four nationally, I have been given the assignment to deal with forced termination and church conflict. It's massive. And so dealing, helping in that area, so here would be my premise. We spend our life helping our people with their issues. Who helps pastors with theirs?
As we see now, if a pastor's issue becomes public, they are out. But yet we help bring our people in and offer them hope.
Q. And you said 85 percent had nothing to do with a moral failing. What about the 15 percent that remain? What were some of their issues?
A. Those are numbers I'm speculating. But in



that number, it could have just been -- many times it's the wife that has been abusive in a relationship and not the husband. But it brings the couple. So I think it's very clear that the people understand that.
Q. And how might a wife be abusive -- give me some examples of abusive wives.
A. Of a wife that preyed on someone in the church and that led to an immoral relationship, and then the pastor has resigned because of the decision of his wife. And then we brought them in to help them.
Q. And was the reverse also true for some of the City of Refuge ministers, that it was the pastor --
A. Yes.
Q. -- who engaged in sexual misconduct?
A. Correct.
Q. And the process was the same, regardless of what the falling --
A. Exactly.
Q. -- or issue was, correct?
A. Correct.
Q. And I think this is from some of the materials. "The City of Refuge is a long-term



residential program that attempts to meet the needs of the minister and his family."
A. Uh-huh.
Q. Is the end goal restoration?
A. Restoration, but in this sense: Number 1, their relationship with Christ; Number 2, their relationship with each other; Number 3, their relationship with the church, being able to hold their head up again instead of living in shame; and, Number 4, to service.
And when I say "service," they may sing in our choir. They may work in our parking lot. There was never: We put you in ministry. That's sacred. God put them in ministry. Only he can reissue their ministry. So we never had a way of pipelining people back into ministry. So a lot of people misunderstood us. We just wanted to help them be healthy again, their families be healthy.
Q. So there was no letter from City of Refuge that said, This pastor has successfully --
A. Not that I knew of.
Q. What about informal phone calls to a church that might be looking to call the pastor, would City of Refuge or Woodstock --
A. Oh, absolutely not.

Q. Were you asked if you ended up being in the same condo unit as Jane Doe?
A. I'm sure they asked me.
Q. And what was your response to that?
A. But -- well, my no is they were speaking over me. My answer was no because it still stayed within the same narrative.
Q. So your answer was no to the question, Were you ever in the same condo unit?
A. As pertains to the narrative as they presented it.
Q. Do you recall saying that you were ready to face the judgment seat of Christ with her allegation?
A. I don't remember saying that.
Q. Do you recall saying that it was not true, absolutely not, you had no contact with Jane Doe whatsoever?
A. Boy, I sure wish they'd produce their video.
Q. That's not a response to my question.
A. So I'm going to make sure I understand your question. You've got -- is the question here that you are asking me?
Q. The question is, Do you recall saying to Guidepost investigators that it was not true,



absolutely not, you had no contact whatsoever? Again, the contact would have been with Jane Doe.
A. I could have said that because I wasn't giving those people the benefit of the doubt to get anything out of me.
Q. The benefit of the truth?
A. No, that wasn't the truth. Well, the truth, yes, but the truth in a narrative that's proper. Because if there's a truth, did I abuse somebody? Absolutely not. Is there a truth that I had a consensual relationship by a lady that stalked me by coming to where I live and seduced me within the context of my own home. Yes, to that. But I want to keep it -- I finally get to tell my side of the story. And this is -- if I'm not telling them anything, I'm saying no to them. And if -- you write it down as a lie because I'm not willing to say it in the context of their narrative, that's the facts.
Q. Because you did have physical contact?
A. I did have physical contact. And I have confessed that, put it in a letter, put it out to the Southern Baptist Convention. And that's the story, and it never changed. It's the story my wife heard. It's the story I told her husband because she did not tell her husband. She continued to stay there. And



if you want to know the story, the next day she was not just there, but she came and sat in front of my wife and I with a bikini and took the -- her top loose and laid counter to where we were laying, in front of us.
And then my wife will give the testimony tomorrow, since she was there, as to what she did the next day -- or that same day when they went upstairs. So this is a lady that's abused. She's now down there wanting to go for a walk with me, laying on a chair in front of us, wanting to know what we are going to do for dinner together that night and has no intentions of leaving and has not told her husband anything.
Q. Did you say anything to the Guidepost investigators about the physical contact being consensual?
A. I don't think I was ever given the opportunity and certainly not asked the question.
Q. Do you recall being asked about whether you said, Praise Jesus, I did not consummate the relationship?
A. In this meeting?
Q. Yes.
A. I denied even having a meeting with those



people. So that doesn't even make sense.
Q. You remember being asked that?
A. No, I don't remember that. Of being -- it was not a question, it was a statement that I said Praise Jesus.
Q. Did Guidepost ask you if Mrs. Hunt would be willing to talk to them?
A. I don't remember being asked that question.
Q. Did you tell the Guidepost investigators that there had never been any physical intimacy?
A. In the context of their narrative, yes, I would have -- I would have -- I denied everything in the context of the way they framed it. I have rented her a room. It looks like an affair that I have scheduled and lined up. So everything became false within the context of that narrative. If you took it in the context and I was given the benefit, as a southern Baptist like their southern Baptist, to have been questioned the way they were questioned and my story taken as a friend the way theirs was taken, I would have been able to answer them as much as I've attempted to answer every one of your questions.
But looking back on this from 14 years ago -- in three months, it will be 14 years ago, the questions you are asking me -- and I have noticed how

a lot of even the attorneys are having trouble answering questions from 15 months ago. And this is 14 years ago. So to know exactly what they asked me, I just remember how it came as a form of an ambush. The accusation was not -- it was not asking me the question; it was making the accusation of what I did. And that's what I was fearful of responding to and thinking: I don't want to say any more than I need to. And that's where I wish Ed Litton had never said, You don't need an attorney. I needed an attorney dealing with these attorneys.

Q. And, Mr. Hunt, it might have been almost 14 years ago, but today you have recalled in great detail the encounter you had with Jane Doe.

A. And I am right now. I'm continuing to have great recall. My great recall is: They framed this -- I'll say it over and over again -- they framed this in a way: You did this. You assaulted her. You rented her that place. You arranged all of this. No, I didn't. No, I didn't.

She showed up and shocked me. And when she showed up, I'll never forget as long as I live: She's texting me and she hasn't even taken her luggage off the luggage rack. The luggage rack is in her room, which you're not supposed to take them in



your room. I have lived there 15 years. She's not even unpacked yet. She had one agenda: To come down there and stalk me and attempt to seduce me. So, yes, if you want to put it in that framework, I will tell you how I responded in that narrative. But I'm telling the truth of the narrative. To remove the narrative would not be telling the truth of how the questions -- and whether they were questions or accusations.

Q. And was it the truth when you denied any physical contact with Jane Doe?

MR. MacGILL: Objection. Assumes a fact not in evidence.

A. In the context.

Q. (By Ms. Nokes) It was the truth?

A. It was the truth in that I could -- I'm not going to say I touched her with them because they have set it up as a scenario that is a lie. So they have put an element of truth within a whole contextual lie. And I wasn't willing to buy into the lie. So I just said no, and they were continuing to ask the questions. Two of them against me in their ambush.

Q. How long do you think this meeting with Guidepost lasted?



A. It would take one -- it would take one action to find out. For her to produce her computer and go to that date in her computer and it will show how much time she spent. I'm going to say 15 minutes. And I look at all of these questions, you can -- you can rattle these off in accusations, but not -- not in this.

Q. And, again, Mr. Hunt, I'm just asking about your recollection. Do you recall about how long this meeting lasted on May 12th, 2022?

A. I think around 15 minutes.

Q. And you are a very articulate man. You would have been able to articulate, even in the context of what you are calling a false narrative, that any touching, any sexual activity was consensual, correct?

A. Uh-huh, correct. And it's all her -- also her testimony that it was consensual.

Q. What did you do in the immediate aftermath of the May 12th interview?

A. Came home, knowing that I had been set up. Knowing that I was the fall guy for Guidepost. For the millions that the convention was going to spend, they needed somebody, and they had nobody else, and now I realize that. No one, no one, not one. And so



they had found a guy, and they had not only found one, they found one that everyone in the convention knew. And not because I had been the president but because I had addressed that convention 20 years in a row, which speaks of the integrity of my life up until this one thing.

And I'm grateful that 20 minutes does not define an entire person's life. And that's what Guidepost would like for me to believe. It's what the Southern Baptist Convention would like for me to believe, and that's the way I have been treated is I don't have a life beyond Guidepost's report.

Q. And who was the first person after the May 12th meeting that you talked to?

A. My wife.

Q. And what was the context of that conversation?

A. The context was: What happened --

MR. MacGILL: Hold on. Hold on. Hold on. You may not ask about the conversations with his wife.

MS. NOKES: I asked the context, not the substance.

MR. MacGILL: Okay. He had a conversation with his wife. Move on. Nothing further.

Q. (By Ms. Nokes) Was she in Lake Tahoe with you?
A. She was.
Q. Who was the second person you talked to about the Guidepost meeting?
A. Jim Law, my senior associate.
Q. And what was that conversation?
A. Basically, I told him what I had done and -- the 12 years previous, and that now Guidepost is going to make that known. And, see, when -- you need to understand that we used language that I didn't really quite understand, so when the report came out, I thought maybe I would be in a report and it would tell what I did 12 years ago. I didn't know that it was going to be a report that you didn't just have a consensual relationship. You assaulted a lady. So now it's a whole new ball of wax. So we didn't know that. And we didn't know what they were going to say in the Guidepost report, since we had never seen it and since nobody had ever really, really questioned me, really interviewed me: Not attacked, but interviewed; not accusations, but an interview.
Q. And what did Mr. Law say in response to what you shared with him?



A. I love you more than I have ever loved you. And I will stand with you.
Q. Did he suggest that you talk to anyone else?
A. No, he made no suggestions.
Q. And did you talk to anyone else?
A. I'm sure I told my children when I got home.
Q. And at what point following that May 12th interview did you decide to reach out to Dr. Ezell?
A. When? On the way home, the flight home.
Q. And how did you reach out to him?
A. I text him. You-all have the text.
Q. And based on that text, you arranged to meet him --
A. The next day.
Q. -- the following morning?
A. Yes.
Q. Where did that meeting take place?
A. In the parking lot of Burger King.
Q. And you were inside a vehicle?
A. No. Parking lot, yes, in his vehicle.
Q. Okay. And I think you have testified previously you told him the truth about the --
A. Yes. There's nothing about assault because



there never was assault. But I told him about the consensual relationship. And then I said I'm tendering my resignation today.
Q. Did you ask or did you just say, I'm resigning?
A. I'm resigning. I'm a leader. I kind of know what a man ought to do.
Q. And why did you feel like you ought to do that?
A. I feel like I ought to go because I know that this report was so wicked and so twisted that when it came out, that would have put a lot of pressure on him.
Q. But you had not seen --
A. I had not seen --
Q. -- that version?
A. But to have heard how I was interrogated that day and accused, I could only imagine.
Q. And I asked earlier and I think you told me what you perceived in Dr. Ezell's actions. What did Dr. Ezell say to you in response to your tendered resignation?
A. Just basically: I hate this. I just hate it.
Q. Did he try to talk you out of resigning?



A. No. No.
Q. Did you also at some point call lawyers about the Guidepost meeting?
A. I had friends just coming and saying, What are you going to do? And I had never hired a lawyer before in my life, never been in a courtroom for anything before in my life. So basically I didn't know what to do. And I didn't know -- I didn't know one lawyer from another lawyer. I didn't know a difference in a trial lawyer or the ones everybody is advertised on a billboard. So somebody just said: Hey, I've got some attorneys. You just need to talk to them. And so I just reached out to tell them what I was dealing with.
Q. And did one of those attorneys send a letter to Guidepost and Ms. Kilpatrick?
A. Yes. Because they never gave me my rights before they spoke to me about I could have an attorney present. So I think -- I don't know law, but is it Upjohn, Upchurch? What is it.
MS. NOKES: We will mark this as Exhibit 11.
(Defendants' Exhibit 11, Letter to Kilpatrick from Lietz and Bouchard, 5/20/22, marked for identification.)

there's a section in bold labeled "Hunt's Response."
A. Okay.
Q. And it says that your May 22nd statement reads, quote, "During my 50 years of ministry, I have always had a singular goal, to share the good news of Jesus Christ with a broken world. It has been the joy of my life to minister alongside so many selfless men and women at the North American Mission Board to spread the hope, love and grace of the Lord Jesus Christ. While I have resigned from my position at NAMB, I will continue to dedicate my life to encouraging and instructing pastors. Of course, I'm aware that Guidepost Solutions issued a report earlier today, May 22nd. I did not see a copy of the report before today, and I have not had an opportunity to read the entire report," he said. "I want to be clear, my heart breaks for all victims of abuse. I support the rights of abuse victims to be heard and respected and made whole. I also support transparency and accountability for abusers. But transparency and accountability must be founded on truth and accuracy," Hunt stated. "To put it bluntly, I vigorously deny the circumstances and characterization set forth in the Guidepost report. I have never abused anybody. Southern Baptist,



navigating this challenging season, must remember: Quote, It is the truth that will set us free."
Is that an accurate recitation of a statement you made after the report?
A. I made it after the report and believed it and believe it as much or more today.
Q. But is it still available -- how did you put the statement out?
A. I don't know that I put that statement out -- or did I? It looks like the Baptist paper --
Q. Is it possible it was in a tweet?
A. I don't think so.
Q. Okay.
A. No, I gave up my Twitter account right at this time.
Q. Are those your words?
A. But those would have been my words, yes, ma'am.
Q. And did NAMB also issue a statement on May 22nd?
A. They issued one sometime. I'm not sure the date.
MS. NOKES: And we will mark this one as Defendants' Exhibit 14.
(Defendants' Exhibit 14, NAMB Statement,



5/22/22, marked for identification.)
Q. (By Ms. Nokes) And this says, NAMB's statement following the May 22nd, 2022 release of the SBC's Sexual Abuse Task Force Report. The North American Mission Board, NAMB, issued the following statement from president and CEO, Kevin Ezell: "The work of the task force is important for our convention and for the healing of survivors. The details in the report, which we are just now beginning to process, are egregious and deeply disturbing. We honor the courage of the survivors who came forward. We are praying for survivors and their families, for our churches, for wisdom, for discernment and for the humility to use this report for God's glory. On Friday, May 13th, prior to my knowledge of the report's detailed allegations, Johnny Hunt resigned from NAMB as senior vice president of evangelism and leadership. His resignation was effective immediately. Out of respect for the investigation of the SBC Executive Committee, we chose not to speak publicly about this resignation until after the task force report was released. Prior to May 13th, I was not aware of any alleged misconduct on the part of Johnny Hunt. I learned the details of the report today, along with



the rest of our Southern Baptist family."
First of all, did I accurately read this exhibit?
A. Yes, ma'am.
Q. And had you seen this statement before today?
A. I had seen that.
Q. Anything you disagree with in what Dr. Ezell said on May 22nd?
A. I don't know that he said anything. Let's see. Prior to my knowledge of the report...was choosing not to speak. I'm not aware of any alleged... Basically, he learned the details the same time I did because I was falsely accused of doing something I never did. Basically one subject: Sexual abuse.
(Defendants' Exhibit 15, Letter to Dear SBC Family from Thomas and Ezell, 5/25/22, marked for identification.)
Q. (By Ms. Nokes) What I have marked as Exhibit 16 is a second NAMB statement in more of a letter form, dated May 25th, 2022. Mr. Hunt, have you seen this before?
A. I'm not sure I have.
Q. The first paragraph states, "We are deeply

grieved at the findings of the independent investigation of the SBC Executive Committee commissioned by Guidepost Solutions and especially at the credible allegation of abuse involving one of our former employees. We must knowledge with grief that we believe the report is well-documented and verified with a high level of professionalism and due process. We are heart broken, especially for the survivor, her husband and the others mentioned in the report. We are deeply grateful for their courage and sacrifice in speaking up."

Did I read that accurately?

A. You did.

Q. And do you agree or disagree with the way NAMB expressed their opinions of the report and its findings?

A. I don't believe I can answer it with agree or disagree. I would answer it in that they did what every other Southern Baptist did when they saw this falsified report. And then so much being said about independent investigators, credible allegations, such as three people that could only speak of what they heard her husband say, how under God's heaven, not an attorney in this room believes that those guys could be credible witnesses when they heard from someone



else. So the way it's set up, it looks like there's five people out there proving that Johnny Hunt is a liar and he abused a lady. That deeply grieves me. And I look forward to being able to say that in front of a jury.

Q. And following up on NAMB, Jeremy Morton succeeded you at First Baptist Woodstock?

A. He did, yes.

Q. And you had a close personal friendship with Jeremy?

A. I did.

Q. And how did your former church respond to the Guidepost report?

A. Mixed. Mixed.

Q. What about the leadership of First Baptist Woodstock?

A. Mixed.

Q. What about how Pastor Jeremy handled it from the pulpit of the church?

A. Awful.

Q. And why do you say it was awful?

A. Because he believed every word in the report, and the report had not been verified by anyone.

Q. And how did he convey that to the



congregation?

A. Basically, took it more along the lines, We are going to do everything we can to make sure that we have preventative measures in place for sexual abuse, when, in the 33 years I was there, I never had to deal with a sexual abuse case.

Q. Not one?

A. That I dealt with I mean, there may have been others. And it was not to say they were not consensual relationships, but I never dealt with an abuse relationship.

(Defendants' Exhibit 16, Letter to Dear First Baptist Woodstock from Johnny Hunt, 5/27/22, marked for identification.)

Q. (By Ms. Nokes) I think this is the letter you referenced a minute ago, marked as Defendants' Exhibit 16. Is this document familiar to you?

A. Yes, ma'am.

Q. And is this a letter that you wrote and released on May 27th, 2022?

A. Yes, ma'am.

Q. And in it, in the second paragraph, you say, I made a brief public comment then, but I would like to say more now. Is that brief public comment referencing the other document we looked at, other



statement?

A. Correct.

Q. And then it goes on to say, 12 years ago, right after my service as SBC president and in the aftermath of my battle with cancer, I entered into a season of deep despair and probably clinical depression. I remember Janet asking me then how I felt, and I said to her, I feel like something inside of me has died.

Did I read that correctly?

A. You did.

Q. And does that accurately convey your sentiment?

A. Exactly.

Q. Then it goes on to say, It was during that summer that I allowed myself to get too close to a compromising situation with a woman who was not my wife. It happened when she invited me into her vacation condo for a conversation. Against my better judgment, I chose to go.

A. Uh-huh.

Q. And is that -- did I accurately read it?

A. Yes, ma'am.

Q. And is it an accurate statement?

A. It is.

Page 190

Q. Our brief, but improper encounter ended, when, in response to the overwhelming feeling of conviction, I stopped it and I fled the situation. I remember saying just before leaving the condo, This is not right. I have no business being here. I love my wife. I have never been in a room again privately with the woman involved.
Is that accurate?
A. Yes, it is.
Q. I thank God we did not go further than we did. But that is also no excuse for my grievous sin. I will regret that day for the rest of my life, and I take responsibility for the situation because I chose to enter her condo.
Is that accurate?
A. That's correct.
Q. I am sorry. It was an awful sin, but it was a consensual encounter. It was not abuse, nor was it assault.
Is that all correct?
A. It is positively, absolutely 100 percent the truth.
Q. And you go on to say, Almost immediately after the incident in 2010, I began a process of taking personal responsibility for my personal sin.

Page 191

A. Correct.
Q. Within the same week, to my shame, I confessed the situation in detail to my wife.
Is that correct?
A. Correct.
Q. And putting aside the exhibit, are those details the same details you shared in your deposition today?
A. I think they are.
Q. Is there anything different about what you shared with Janet than the details from today?
A. No, ma'am.
Q. Janet is a truly Godly woman and was far more gracious than I deserved. I also spoke to the husband of the woman involved about one week later, and I spoke to the husband together with his wife present. I apologized to both and sought their forgiveness. I also sought professional help from a counselor in order to better understand how this had happened and to seek advice on an appropriate process of repentance, reconciliation and restoration. I was willing to resign my ministry then, forever; however, after completing that private process, which involved seeking the forgiveness of God and those involved and recovering from that dark, depressing season, I felt

Page 192

I could return to Woodstock in the fall of 2010.
Is that accurate?
A. That's correct.
Q. That is what happened. I want you to know that this is the truth. It is also the whole truth.
Is that accurate?
A. That's true.
Q. Church, I want to be direct. I am not seeking your sympathy. I am not a victim. I have to bear the responsibility for my sin, which has basically cost me everything except my faith and my family over the last seven days.
Is that accurate?
A. That's accurate.
Q. I'm also not asking you to feel sorry for me. This is my burden to bear. I am asking you to please pray for us.
Is that accurate?
A. That's accurate.
Q. I do want you to know -- and you have known me for over 40 years -- that as awful as my sin was on that terrible day, the account described in the Guidepost report is sensationalized. I did not groom the woman involved, nor did I intentionally arrange the encounter. I didn't even know who owned the

Page 193

condo. And there are other details in the description that are stated as fact which did not happen.
Is that accurate?
A. It is.
Q. The most absurd allegation is that this brief consensual encounter constituted assault. It did not. This is the reason why I denied the accuracy of the report and why I deny it now.
Is that accurate?
A. It is.
Q. As I said in my statement on Sunday, I have never abused anybody. With God as my witness, while the situation described in the Guidepost report is based in reality, the allegation made in the report is false. I also am sorry I wasn't more forthcoming with the interviewers because it has made a bad situation worse. I guess I was just so surprised and so shocked by the allegations of abuse that I shut down.
A. That's exactly what I just told you.
Q. You may be wondering why I did not make my confession to the church at the time of my sin. I justified not doing so on the basis of a biblical principle that sin is first and foremost against God.