UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

________________________________________X

JOHNNY M. HUNT :

Plaintiff :

vs. : CASE NUMBER: 3:23-CV-00243

SOUTHERN BAPTIST CONVENTION,
GUIDEPOST SOLUTIONS, LLC, and
EXECUTIVE COMMITTEE OF THE
SOUTHERN BAPTIST CONVENTION :

Defendants :

________________________________________X

Sanders Decl.
Ex. E

The video-taped Zoom teleconferenced deposition of JULIA MYERS WOOD was held on Thursday, February 15, 2024, commencing at 9:04 A.M., at virtual location before Louisa B. McIntire-Brooks, Notary Public.

Also present: Orson Braithwaite, Official Videographer, Johnny M. Hunt, plaintiff

REPORTED BY: Louisa B. McIntire-Brooks

Page 214

the Executive Committee, Mr. -- Pastor -- or Pastor Rolland Slade and Dr. Bruce Frank?
A. Yes.
Q. Was it signed by you?
A. Auto signed, yes.
Q. Is that different?
A. No, but I'm clarifying that I didn't handwrite my signature, I authorized my assistant to put my signature on there.
Q. So you did agree --
A. Yes.
Q. -- to the terms of this letter in each and every respect?
A. Yes.
Q. Now, if we could turn to Bates Number 14. Are you there?
A. Yeah.
Q. You agree, I take it, that you knew that there was going to be transparency associated with your final work product in the sense it was going to be a public report; right?

Page 215

A. Yes.
Q. And specifically, if you go to the prior page, you agree that the key principles of your work will include, but not being limited to, the following best practices and then you listed them on pages five and six; right?
A. Yes.
Q. And then take a look at section 3.6?
A. Yes.
Q. Did you specifically agree on behalf of your company when you executed this agreement that a written report will be made public in its entirety prior to the 2022 SBC annual meeting?
A. I signed the engagement letter. It wasn't within my purview to make public the report, of course, but that was -- I did sign the engagement letter.
Q. So just to be clear, is there any doubt about the fact that you agreed to repeat, you and your company agreed that, "a written report will be made public in its entirety prior to the 2022 SBC annual meeting"?

Page 216

A. If I can explain that --
Q. Just did you agree to that?
A. If I can explain.
Q. Well, I'd like an answer to my question first and then explain. Yes or no, did you agree to that?
A. This was in the report. We were not -- we did not have the ability to release the report so if I could explain, I would like to do that.
Q. Okay. Answer my question first and then you can explain, make a speech, do whatever you like. But did you or did you not agree and acknowledge that "a written report will be made public in its entirety prior to the 2022 SBC annual meeting"?
A. That was my understanding as to what would happen, but Guidepost did not have the ability to do that. That was within the purview of the Task Force.
Q. The report was published by Guidepost website on May 22nd, 2022; was it not?
MR. KLEIN: Objection, calls for a legal conclusion. You can answer.

Page 217

A. No.
Q. I want to make sure, you just said no to that question; did you not?
MR. KLEIN: Objection. Asked and answered.
MR. MACGILL: She said no.
A. Not to my knowledge.
Q. Well --
A. You already asked me this question, it's the same answer.
Q. Is it no or not to your knowledge, ma'am?
MR. KLEIN: Objection, asked and answered. That's why we don't ask a question repeatedly to badger a witness into changing or to giving a different version that you are happy with. Please ask the question once, she will answer it and we can move on.
Q. Did Guidepost publish on its website the report of independent investigation on May 22nd, 2022?
MR. KLEIN: Objection, calls for a legal conclusion. You can answer.
A. No.
(Deposition Exhibit 36 was marked for

Page 218

purposes of identification.)

Q. Okay. Exhibit 36. Is this a screenshot of your website on May 22nd, 2022?

A. I don't know, but I don't have any reason to dispute that. It looks like some things may be taken off. I don't know.

Q. Now, ma'am, now that you see with your own eyes the evidence, there will be testimony on this, ma'am, we know what you did on May 22, 2022. In fact, based on the evidence that has been collected in this case --

MR. KLEIN: Objection. Is that a question or is that a statement?

MR. MACGILL: That's fair.

A. That's a statement.

MR. KLEIN: Don't you speak. Let me speak.

MR. MACGILL: That's fair.

MR. KLEIN: Thank you.

Q. Ma'am, I want you for assume that the jury is going to hear exactly what your company did on May 22, 2022 in terms of its website. I want you to

Page 219

assume that. I want you to further assume that the evidence will be before the jury by the time that your testimony is played that Exhibit 36 is into evidence. Okay? Can you make those two assumptions with me?

A. I don't want to make any assumptions.

Q. You're not going to answer any questions based on my assumptions?

A. I don't want to answer hypotheticals. I'm here to answer information about my personal knowledge.

Q. Okay. Now that you see Exhibit 36, ma'am, you were CEO of the company on May 22nd, 2022?

A. Yes.

Q. And you remember that on that date, the date that the report of the independent investigation was issued, that you now made this available on your website through this link?

MR. KLEIN: Objection as to form. You can answer.

A. As I previously stated, the link, as my understanding, is that the link took the reader to the Task Force where they would then have to click a second

Page 220

link in order to get the report. So, no, the report was not published on our website.

Q. All right. So ma'am, there will be testimony, once again, before your testimony is played, but I'd like you to admit one fundamental fact, and that is, you understood on May 22nd, 2022 that any person in the world could click on the link on Guidepost website on that day and download your final report; right?

MR. KLEIN: Objection as to form. You can answer.

A. No, not any person in the world.

Q. Who in the world would not be able to click on the link on your website and download the final report?

A. I think there may be some areas where you can't get in around the world.

Q. That's fair. So anyone with a computer that operates with a connection to the internet could, in fact, click the link on Guidepost website and download your final report; right?

Page 221

A. Anyone with a computer and an internet could click on the link to go to the Task Force, then find the link for the report, I believe, within the Task Force. I don't know whether or not they could download it. I don't -- that's -- defer to the Task Force on that.

Q. We'll have the deposition next month of your head of IT, and that head of IT will be asked for the Google analytic information that shows the number of people that clicked on this website.

MR. KLEIN: Objection. Is that a question or a statement?

MR. MACGILL: That's fair. It's a statement.

Q. So, let me ask it this way. Strike the statement. Tell the court and jury how many people accessed this link on your website after May 22, '22.

A. I don't know.

Q. Ma'am? You don't know? You haven't seen internal e-mails where you were copied or sent information on the number of people that clicked on

Page 222

this link of Exhibit 36?
A. That's not the question that you asked me.
Q. Well, I'm asking you, ma'am. You have been given e-mails, have you not, where people in your company or a person at least in your company provided to you the number of people that clicked on this link; didn't they?
A. I'm not sure.
Q. What do you mean you're not sure, ma'am? Did you get an e-mail or not to that effect?
MR. KLEIN: Objection, asked and answered.
A. I don't know whether I specifically received an e-mail about the number of clicks since May of 2022 on -- and I don't know any, that we would have any analytics on this clicking of this link within our website. So, I don't know. That is the question that you asked me.
Q. Well, with your definitions that you just gave for yourself, let me be specific. Do you have any information of any kind or nature that you can share with this court and this jury about how many people

Page 223

accessed this independent report through access to your website?
A. I'm not aware that we have that information. But you would need to ask someone else.
Q. Who would you ask? Who would be in the best position in your company to give that information?
A. The Task Force would be in the best position.
Q. No, it's your company, ma'am, that's who I asked.
A. I'm not aware that internal links, that there is an analytic on an internal link that takes you to another website.
Q. Who is your IT person?
A. It's Jack Levobic.
Q. Where is he employed?
A. Guidepost Solutions.
Q. Where -- is he a resident here in DC?
A. New York.
Q. Does Guidepost have an office in New York?
A. Yes.

Page 224

Q. Is that your principal office?
A. Yes.
Q. How often do you go to that principal office?
A. Once every couple months.
Q. You indicated earlier that this report was a very small portion of revenue, maybe two or three percent of your revenue; is that right, in the year 2022?
A. Yes.
Q. So your annual revenue is around a hundred million? Is that what you're saying? In 2022?
A. No.
Q. What was the annual revenue?
A. In 2022, it was roughly 81 million or so. And it's 2 million of SBC report spread over two different years.
Q. So when you said two or three percent, you were essentially saying it would be approximately 1 million in 2021 and 1 million in 2022?
A. Yes. I mean, as I said, I need the

Page 225

calculator so unless we can do the math to be precise.
Q. Now, ma'am, you had some texts about the press coverage associated with your report. Do you remember that?
A. Generally, yes.
Q. How many different people texted you about it? Can you estimate for the court and jury?
A. No, I can't.
Q. More than one?
A. Yes.
Q. Do you have a board of directors?
A. Yes.
Q. Who owns your company?
A. SolutionPoint International.
Q. SolutionPoint International?
A. Yes.
Q. Who is on your board?
A. Carriage House is the primary owner.
Q. Carriage House?
A. Yes.
Q. You're saying they have board