> **WARNING**: This report includes information and descriptions related to sexual assault. This may be triggering to readers who have had similar experiences. We encourage you to care for your safety and well-being. The content of this report is not appropriate for children.

# Report of the Independent Investigation

## The Southern Baptist Convention Executive Committee's Response to Sexual Abuse Allegations and an Audit of the Procedures and Actions of the Credentials Committee

May 15, 2022

Guidepost
www.guidepostsolutions.com
Guidepost Solutions LLC
1130 Connecticut Avenue NW
Suite 520
Washington, DC 20036
T: 202.499.4330
F: 202.331.3989

Sanders Decl.
Ex. I

EXHIBIT
8

**Table of Contents**


I. EXECUTIVE SUMMARY .......... 3
II. BACKGROUND OF THE INVESTIGATION .......... 15
A. Scope of Our Engagement .......... 17
B. Methodology .......... 18
1. Collection and Review of Documents and other Evidentiary Items .......... 19
2. Interviews .......... 22
a. Current and Former EC Staff .......... 23
b. Current and Former EC Trustees and other Key SBC Figures .......... 24
c. Survivor Interviews and Outreach .......... 27
d. Survivor Advocates and other Witness Interviews .......... 28
III. SOUTHERN BAPTIST CONVENTION ("SBC") .......... 29
A. Church Autonomy .......... 29
B. The SBC's Organization .......... 32
C. The Executive Committee .......... 33
D. Committee Structure and Governance .......... 37
IV. FACTUAL FINDINGS/INVESTIGATION .......... 39
A. Timeline .......... 39
B. EC Trustee Interviews .......... 123
C. EC Staff Survey and Interviews .......... 128
D. Survivor Interviews .......... 134
V. OBSERVATIONS AND CONCLUSIONS .......... 148
A. Allegations of Abuse Committed by Executive Committee Members .......... 149
B. Mishandling of Abuse Allegations and Allegations of Mistreatment of Sexual Abuse Victims by Executive Committee Members from January 1, 2000, to June 14, 2021 .......... 161
C. Evidence of Patterns of Intimidation of Sexual Abuse Victims and Advocates by Executive Committee Members from January 1, 2000, to June 14, 2021 .......... 176
D. Resistance to Sexual Abuse Reform Initiatives from January 1, 2000, to June 14, 2021 .......... 185
VI. AUDIT OF THE PROCEDURES AND ACTIONS OF THE CREDENTIALS COMMITTEE .......... 193
A. Introduction .......... 193
B. Scope of Audit .......... 197
C. Methodology of Review .......... 198
D. Background .......... 200
E. CC Process and Procedures .......... 206
F. Analysis of Submissions .......... 221
G. Observations and Conclusions .......... 227
VII. RECOMMENDATIONS .......... 259

## I. EXECUTIVE SUMMARY

For almost two decades, survivors of abuse and other concerned Southern Baptists have been contacting the Southern Baptist Convention ("SBC") Executive Committee ("EC") to report child molesters and other abusers who were in the pulpit or employed as church staff. They made phone calls, mailed letters, sent emails, appeared at SBC and EC meetings, held rallies, and contacted the press…only to be met, time and time again, with resistance, stonewalling, and even outright hostility from some within the EC.

Our investigation revealed that, for many years, a few senior EC leaders, along with outside counsel, largely controlled the EC's response to these reports of abuse. They closely guarded information about abuse allegations and lawsuits, which were not shared with EC Trustees, and were singularly focused on avoiding liability for the SBC to the exclusion of other considerations. In service of this goal, survivors and others who reported abuse were ignored, disbelieved, or met with the constant refrain that the SBC could take no action due to its polity regarding church autonomy – even if it meant that convicted molesters continued in ministry with no notice or warning to their current church or congregation.

As survivors became more vocal and the issue of sexual abuse became more prominent in the media, divisions became apparent within EC leadership. In recent years, as some within the SBC have been more open to reforms, they were met with opposition and antagonism from those resistant to change. Finally, at the 2021 Nashville Convention, calls for reform reached a crescendo – the Messengers overwhelmingly voted to approve a Task Force to supervise an independent investigation into the EC's handling of sexual abuse allegations. The Motion called for inquiry into the actions and decisions of EC staff and members from January 1, 2000, to June 14, 2021, with respect to allegations of abuse, mishandling of abuse, mistreatment of victims, patterns of intimidation of victims or advocates, and resistance to sexual abuse reform initiatives. Our findings in these categories are summarized below:

*Allegations of Abuse by EC Staff and Members*

As per the Motion, we were asked to examine allegations of abuse committed by EC members during the relevant time period. During our investigation, an SBC pastor and his wife came forward to report that SBC President Johnny Hunt (2008-2010) had sexually assaulted the wife on July 25, 2010. We include this sexual assault allegation in the report because our investigators found the pastor and his wife to be credible; their report was corroborated in part by a counseling minister and three other credible witnesses; and our investigators did not find Dr. Hunt's statements related to the sexual assault allegation to be credible.

*Mishandling of Abuse Allegations and Mistreatment of Victims*

We considered these categories in tandem because abuse allegations were often mishandled in a manner that involved the mistreatment of survivors. Over the years, the EC's response to sexual abuse allegations was largely driven by senior EC staff members, particularly D. August "Augie" Boto, the EC General Counsel and later Interim EC President, as well as the SBC's long-serving outside counsel – James Guenther, James Jordan, and the firm of Guenther, Jordan & Price ("GJP"). Their status and longevity in the SBC organization – Mr. Guenther had provided legal advice since 1966 and began in 1998 as Vice President for Convention Policy before becoming General Counsel in 2004 – enabled them to control decisions about how the SBC EC would deal with the increasing attention on church sexual abuse.

Their main concern was avoiding any potential liability for the SBC. As this report documents, those who reported abuse were often ignored or told that the SBC had no power to take action. Mr. Guenther advised that EC staff should not undertake to elicit further information or details about reports of abuse, so that the EC not assume a legal duty to take further action.

Over the years, the existence of these reports of abuse were not shared with EC Trustees. Nor was the fact that, since 2007, an EC staff member working for Mr. Boto was maintaining a list of accused ministers in Baptist churches, including the minister's name,

year reported, relevant news articles, state, and denomination. In a May 2019 email to Dr. Ronnie Floyd, the then-EC President, EC Vice President Dr. Roger "Sing" Oldham acknowledged that "[f]or the past decade, I have been regularly sending Augie news reports of Baptist ministers who are arrested for sexual abuse, for his awareness. It hasn't slowed down since the [Houston] Chronicle articles started on February 10." Mr. Boto responded that: "Yes. We are collecting them, and may even post them in some way, but we'd have to really examine the potential liabilities that would stem therefrom."

Despite collecting these reports for more than 10 years, there is no indication that Dr. Oldham, Mr. Boto, or anyone else, took any action to ensure that the accused ministers were no longer in positions of power at SBC churches. The most recent list prepared by the EC staff member contained the names of 703 abusers, with 409 believed to be SBC-affiliated at some point in time.

Our investigative team reviewed the list and conducted significant research to assess whether any of the alleged abusers were still associated with an SBC church. Based on these efforts, it appears that nine (9) people remain in active ministry or connected to ministry. Two (2) of those people appear to be associated with an SBC church. The remaining seven (7) appear to be associated with churches that are not SBC-affiliated. We will provide this information to the Credentials Committee for further review, including whether the seven additional churches mentioned above are in fact non-SBC affiliated. We will also continue to review the latter material to determine whether any referrals or other action needs to be taken.

*Pattern of Intimidation of Victims or Advocates*

Rather than focusing on these accused ministers, some EC leaders turned against the very people trying to shine a light on sexual abuse. The survivors – those persons who actually suffered at the hands of SBC clergy or SBC church staff or volunteers – who spoke out the most, and who criticized the SBC's inaction, were denigrated as "opportunistic," having a "hidden agenda of lawsuits," wanting to "burn things to the

ground," and acting as a "professional victim." In an internal email, Mr. Boto even equated the focus on sexual abuse with the work of the devil:

> This whole thing should be seen for what it is. It is a satanic scheme to completely distract us from evangelism. It is not the gospel. It is not even a part of the gospel. It is a misdirection play. Yes, Christa Brown [a survivor] and Rachael Denhollander [a survivor advocate] have succumbed to an availability heuristic because of their victimizations. They have gone to the SBC looking for sexual abuse, and of course, they found it. Their outcries have certainly caused an availability cascade (just like Lois Gibbs did in the Love Canal example). But they are not to blame. This is the devil being temporarily successful.

Baptist Press ("BP"), the EC's communications arm, was also used to portray survivors in an unflattering light and mischaracterize allegations of abuse. For example, in March 2019, Jennifer Lyell, a senior executive at an SBC entity, was asked by executives at Lifeway and SBC entity heads to disclose her sexual abuse at the hands of her former seminary professor through a first-person account to be published in BP. Rather than publishing Ms. Lyell's corroborated account as BP staff had originally drafted it, the account was changed to read as if Ms. Lyell was consensually involved with her alleged abuser. The article as published reported that Ms. Lyell alleged that she had a "morally inappropriate relationship" with her former seminary professor, making it appear that she engaged in a consensual sexual relationship with him. Ms. Lyell was thereafter subject to vicious attacks, including harsh and hurtful comments on Baptist Press FaceBook – she was called a bitter jealous woman and an adulterer, and some suggested she should be fired. After Ms. Lyell expressed her grave concerns about the article, the story was removed on the advice of outside counsel but not corrected. Finally, after public recognition that the story was inaccurate, and months of pleas by Ms. Lyell, BP retracted the story in October 2019 and issued an apology.

Additionally, an article about the 2019 Caring Well conference, written by an Ethics and Religious Liberty Commission ("ERLC") staffer, was sanitized before publication. The

draft article had contained quotes from two survivor advocates who had spoken critically at the conference about the SBC's handling of sexual abuse allegations. When the article was published, some of the story had been deleted, including all references to one of the advocates and all claims that the SBC had failed survivors.

While stories of abuse were minimized, and survivors were ignored or even vilified, revelations came to light in recent years that some senior SBC leaders had protected or even supported abusers:

- Former SBC President Steve Gaines admitted that, as senior pastor at Bellevue Baptist Church, he had delayed reporting a staff minister's prior sexual abuse of a child of "heartfelt concern and compassion for th[e] minister," while acknowledging that he should have "brought it to the attention of our church leadership immediately;"

- Former SBC President Jack Graham, when he was pastor at Prestonwood Baptist Church, allegedly allowed an accused abuser of young boys to be dismissed quietly in 1989 without reporting the abuse to police. The accused abuser, John Langworthy, later was charged with abusing young boys in Mississippi in 2011;

- Former SBC President Paige Patterson was terminated from his position at Southwestern Baptist Theological Seminary in 2018 after it was revealed that he told a student not to report a rape in 2003 and, in 2015, emailed his intention to meet with another student who had reported an assault, with no other officials present, so he could "break her down;"

- Former SBC Vice President Judge Paul Pressler is the defendant in a civil sexual abuse lawsuit alleging that he repeatedly sexually abused the plaintiff beginning when the plaintiff was 14 years old. Two other men submitted separate affidavits in the case also accusing Judge Pressler of sexual misconduct; and

- Former EC Interim President and General Counsel Augie Boto testified as a character witness for Mark Schiefelbein, a gymnastics coach convicted of multiple counts of sexual assault against a minor. During his testimony at a post-conviction evidentiary hearing in September 2008, Mr. Boto identified himself as general trial counsel for the Executive Committee of the Southern Baptist Convention.

*Resistance to Sexual Abuse Reform Initiatives*

Over the past twenty years, various reform proposals have been brought to the EC. In evaluating the EC's response to these proposals, we recognize that public awareness about sexual abuse and prevention has changed over time, as people have become more informed about the severe repercussions on survivors and the key steps that can be taken to address the problem. Nevertheless, although some proposals may not have been feasible, it is striking that many reform efforts were met with resistance, typically due to concerns over incurring legal liability:

- A 2007 proposal for an SBC database of accused molesters was rejected in 2008 based on church autonomy, even though SBC outside counsel had submitted a memo to Mr. Boto discussing how it could be accomplished consistent with polity;

- A 2014 proposal for the SBC to hold a sexual abuse education conference was opposed by Mr. Boto, delayed, and ultimately did not occur;

- Some EC leaders and some EC Trustees criticized SBC President J.D. Greear for mentioning the names of churches cited in the Houston Chronicle's series about sexual abuse, and outside counsel warned Dr. Greear that such actions could get the SBC sued for libel. Mr. Boto even called one of the churches to apologize for Dr. Greear's actions – that church's music minister later confessed to committing abuse and the church voluntarily disassociated from the SBC;

- Mr. Boto was resistant to having a Credentials Committee because it might make the Convention vulnerable to liability claims;

- Some EC leaders clashed with the ERLC over sexual abuse initiatives and some opposed funding the Caring Well conference. In addition, when the ERLC was putting together a report about sexual abuse, EC leaders and outside counsel suggested changes to the report to avoid potential liability, including removing the word "crisis" when referring to sexual abuse;

- Dr. Floyd and Mr. Addison were opposed to a Task Force to investigate the EC's response, and Dr. Floyd tried to prevent the Motion.

A full discussion of these and other findings can be found in *Part V* of this report. The other sections of the report are as follows:

In *Part II.A* of this report, we describe the background of the investigation, including the events that occurred at the June 2021 Nashville Convention, the largest SBC annual meeting since 1995. Amid calls for an investigation into the EC's handling of sexual abuse allegations, Dr. Floyd had announced that an outside firm would conduct a limited review. At the annual meeting, there was opposition to the prospect of the EC overseeing an investigation of itself. Tennessee pastor Grant Gaines, with North Carolina pastor Ronnie Parrot, wrote a Motion for a Task Force to direct any such third-party investigation and proposed a wider purview. The Messengers – over 15,000 representatives from 5,570 churches – overwhelmingly approved the Motion.

The Task Force officially engaged us on September 9, 2021, although the commencement of the investigation was delayed due to disagreements within the SBC EC as to whether attorney client privilege should be waived. No agreement was reached after an initial series of meetings but on October 5, 2021, the SBC EC held a deciding vote in favor of waiving privilege. That decision allowed us to perform a more comprehensive investigation, particularly because, as this report makes clear, outside counsel were deeply involved in managing the EC's response to sexual abuse allegations.

In *Part II.B*, we describe the scope of our engagement. The Motion directed us to investigate, for the time period between January 1, 2000, to June 14, 2021: (1) allegations of abuse by EC members; (2) mishandling of abuse allegations by EC members; (3) allegations of mistreatment of sexual abuse victims by EC members; (4) patterns of intimidation of sexual abuse victims or advocates; and (5) resistance to sexual abuse reform initiatives. We were further directed to perform an audit of the procedures and actions of the Credentials Committee, which was tasked in mid-June 2009 with making determinations about, among other subjects, whether churches accused of mishandling sexual abuse allegations should be considered "in friendly cooperation" with the SBC.

An overriding principle of this investigation was our independence. The Engagement Letter stipulates that the Task Force, not the EC, is the client for purposes of the

investigation. A Committee on Cooperation ("CoC") – comprised of the SBC President and four EC members appointed to their first term in June 2021 -- was formed to provide financial oversight of the investigation and to ensure the full cooperation of the SBC EC, among other things. The Engagement Letter further provides there is no attorney-client relationship between Guidepost and any other party, and that neither the EC nor the CoC will conduct, direct, or otherwise manage or influence our investigation in any manner.

In *Part II.C*, we set forth the investigative practices we employed to collect and review all relevant information. This was primarily accomplished through a wide-ranging document review and numerous interviews with current and former EC staff, EC Trustees, other members of the SBC community such as past Presidents and Task Force members, witnesses, and survivors of sexual abuse. As was our protocol, we did not affirmatively contact survivors but rather engaged with them in the manner they chose, with awareness of best practices for trauma-informed communications.

It should be noted that, due to the large amount of information we collected, we cannot discuss every interview or document in this report. We interviewed approximately 330 individuals and had access to over five terabytes of data. We wish to thank everyone who took the time to speak with us, and note that each interview contributed to our understanding of this matter.

In *Part III*, we describe the organization of the SBC, which is based upon the principle of local church autonomy. Unlike hierarchical religious organizations, such as the Catholic Church, the SBC does not dictate church practices or worship, nor does it ordain pastors. Rather, local churches voluntarily select to cooperate with the SBC, and continue to maintain independence to choose their own leaders, bylaws, budget, and policies. An understanding of SBC polity is essential for understanding the reasons invoked by some SBC EC leaders as to why the SBC could not, or should not, take certain actions to address sexual abuse within SBC local churches.

It is also essential to understand how the SBC is run. Each June, local churches send representatives, known as Messengers, to the SBC annual meeting. At the annual meeting, the Messengers elect an SBC President, who typically serves two one-year terms, and other officers, as well as Trustees to oversee various SBC entities and committees. Because the Messengers are so numerous and meet only once per year, the day-to-day functioning of the SBC is managed by an Executive Committee, governed by a board of 86 EC Trustees. The EC Trustees employ a salaried EC President who is also CEO and treasurer. The EC President in turn manages a staff of approximately 30 people who carry out the day-to-day functions of the SBC. Among these functions is running Baptist Press, the SBC news service. Because the EC Trustees only meet three times per year, many of the decisions at the EC level are made by the EC President and senior EC staff members.

In *Part IV*, we lay out the factual findings from our investigation. *Part IV.A* provides a timeline of the EC's response to sexual abuse issues from January 1, 2000, to June 14, 2021. Given the two-decade span, we cannot and do not describe every action or communication related to sexual abuse allegations. Rather, we have focused on providing an overview of some of the most relevant events from that period. Where it would be helpful, we include screenshots of some of the documents discussed.

*Part IV.B* provides an overview of our interviews with current and former EC Trustees. We reached out to all individuals who served during the relevant time period and 175 EC Trustees agreed to speak with us. We want to express our appreciation for their willingness to share their experiences and their thoughts on how the EC could improve in the future. Many EC Trustees told us that they were unaware that survivors and others had been reporting abuse to the EC for years, or that lawsuits had been filed. A common concern was that EC officers and staff members knew more than the EC Trustees, who were not provided with enough time or materials to be thoroughly informed about EC issues. The EC Trustees with whom we spoke were sympathetic to survivors and believed that they should have been met with greater compassion. In addition to our interviews with the EC Trustees, we also conducted a social media review of the public Twitter

accounts of EC Trustees and other key SBC figures. We found that, with one exception, EC Trustee tweets were largely positive toward survivors and open to addressing sexual abuse.

*Part IV.C* contains a discussion of our interviews with approximately 42 current and former EC staff members, as well as the results of two surveys we conducted to gather employees' opinions on how the EC handles issues related to sexual abuse. The surveys were anonymous, and we would like to thank EC staff members for the high rate of participation. In our interviews, EC staff members expressed that the EC would benefit from better openness from its leaders on sexual abuse and other difficult topics. Some staff members noted that the EC would also benefit from clearer policies and training about sexual abuse and harassment. We did conduct a review of the Personnel Policies Manual to examine whether sexual abuse and harassment policies and procedures were in accordance with best practices. We identified several aspects where the policies were lacking – such as the absence of written guidance about reporting procedures, escalation, whistleblower protections, or investigation requirements – and made suggestions for improvements.

*Part IV.D* recounts some of the histories that survivors shared with us about their abuse and their treatment by the SBC EC. During our investigation, we conducted interviews or meetings with 19 survivors, 14 survivor advocates, and six family members of survivors. Six additional survivors provided written information to us. While not all wanted to be named in this report, some survivors expressly wanted their histories to be told. Survivors expressed to us that they not only suffered trauma from their abuse, but also from the response, or nonresponse, of the churches and institutions like the SBC that did not believe them, ignored them, mistreated them, and/or failed to help them.

In *Part V*, as summarized above, we explain and detail our observations and conclusions on the Messenger Motion categories: (1) allegations of abuse; (2) mishandling of abuse allegations and allegations of mistreatment of sexual abuse victims; (3) evidence of

patterns of intimidation of victims and advocates; and (4) resistance to sexual abuse reform initiatives.

In *Part VI*, we include our approximately 65-page report detailing our audit of the procedures and actions of the Credentials Committee. Among other things, we found that the Credentials Committee was under pressure almost immediately after its formation to begin reviewing sexual abuse submissions. Consequently, the Credentials Committee began operating without adopting any written policies and procedures, such as set timelines/deadlines, protocols for correspondence with submitters and churches, and standards for review. At least one outside expert offered help and support in developing criteria and standards, but the offers were rebuffed. Credentials Committee members themselves expressed dissatisfaction because they did not receive adequate information about their role, nor did they have any training. These and other deficiencies led to delays and communications breakdowns that caused submitters and others to lose faith in the process, despite what we believe to be good intentions and effort on the part of the Credentials Committee members. Our findings, as well as an analysis of the submissions made to the Credentials Committee during the audit period, are set out in that section.

Finally, in *Part VII,* we set out a comprehensive list of proposed recommendations intended to provide a pathway for the SBC to improve its response to sexual abuse and misconduct allegations in the future. The recommendations set out voluntary minimum standards that churches, local associations, state conventions, and all SBC entities can implement for the prevention, recognition, and the appropriate handling of sexual abuse and related misconduct allegations. The recommendations address systemic and cultural issues from bottom to top, taking into consideration polity, autonomy, and the reality that this issue needs to be resolved through a willing and voluntary cooperation. Some recommendations will require a significant amount of work, while other elements recognize the need for education and cultural change. A comprehensive implementation of these recommendations should help to create safe spaces for children and all members of the Convention.

Our key recommendations include the following:

- Upon completion of the SATF duties, first form an Independent Commission and later establish a permanent Administrative Entity to oversee comprehensive long-term reforms concerning sexual abuse and related misconduct within the SBC;
- Create and maintain an Offender Information System to alert the community to known offenders. Make the OIS available to churches on a voluntary basis;
- Provide a comprehensive Resource Toolbox including protocols, training, education, and practical information;
- Create a voluntary self-certification program for churches, local associations, state conventions, and entities based on implementation of "best practices" to bring awareness to, and enhance prevention of, sexual abuse;
- Improve governance controls, including the use of enhanced background checks, Letters of Good Standing, and Codes of Conduct to voluntarily strengthen hiring standards and improve governance;
- Restrict the use of nondisclosure agreements and civil settlements which bind survivors to confidentiality in sexual abuse matters, unless requested by the survivor;
- Adopt a "Declaration of Principles" setting out fundamental standards regarding how sexual abuse allegations will be handled at every level of the SBC, and how those who report will be treated going forward. These Principles may provide a model for SBC entities, state conventions, local associations, and local churches to adopt and follow; and
- Acknowledge those who have been affected by SBC clergy sexual abuse, through both a sincere apology and a tangible gesture, and prioritize the provision of compassionate care to survivors through providing dedicated survivor advocacy support and a survivor compensation fund.

With respect to our Credentials Committee Audit, we propose the following key recommendations to ensure that the Credentials Committee effectively and transparently handles submissions relating to sexual abuse:

- Formalize and improve the CC's processes and procedures, adopt standards for CC determinations, and establish standard process timelines in order to provide timely and transparent decisions;

- Empower the CC to better communicate with survivors and churches by providing trauma and sexual abuse training for CC members, and hiring a trauma-informed Survivor Care Support Specialist to provide care and open communication to submitters/survivors;

- Improve the online Reporting Portal to be survivor-care focused and assess the technology applications to improve CC functionality, auditability, and response; and

- If necessary, allow the CC the ability to engage and consult with experts on an extensive inquiry for a submission.

## II. BACKGROUND OF THE INVESTIGATION

As this report lays out, for many years survivors and their supporters within the SBC community have urged the SBC to address the problem of sexual abuse within SBC churches. These efforts came to a head at the 2021 Nashville Convention, which was the largest SBC annual meeting since 1995. Over 15,000 Messengers attended the Convention, representing 5,570 churches.[1]

The issue of sexual abuse was at the forefront. Although Dr. Ronnie Floyd, the Executive Committee ("EC") President and CEO, had earlier announced that an outside firm, Guidepost Solutions, would conduct a limited scope review of the EC's response to sexual abuse allegations under the EC's supervision, some Messengers contended that the EC should not oversee an investigation of itself. Tennessee pastor Grant Gaines, with North Carolina pastor Ronnie Parrot, wrote a Motion for a Task Force to direct any such third-

[1] https://www.baptistpress.com/resource-library/news/largest-sbc-gathering-in-25-years-spurred-by-first-time-messengers-geographical-proximity-to-nashville/.

party investigation and proposed a wider scope. Pastor Gaines described it as "the least we can do for abuse survivors."[2]

The Motion first was referred to the EC, but Todd Benkert appealed to the Messenger body, who voted to consider it on the convention floor where it was overwhelmingly approved. According to the Motion, the Task Force could opt to oversee the independent review already announced by the Executive Committee or begin a separate third-party review, and it must ensure that an investigation includes "any allegations of abuse, mishandling of abuse, mistreatment of victims, a pattern of intimidation of victims or advocates, and resistance to sexual abuse reform initiatives" as well as an audit of the procedures and actions of the Credentials Committee.[3]

The Task Force re-selected Guidepost Solutions to conduct the independent investigation and on September 9, 2021, Dr. Bruce Frank signed an engagement letter with Guidepost.[4] Although the EC voted to fund the investigation on September 21, 2021, there were internal disagreements about whether the SBC should waive attorney client privilege as directed by the Messengers at the June 2021 convention. These disagreements led to a delay in the commencement of the investigation.[5]

The Task Force and EC officers convened September 27-28, 2021, and still could not come to an agreement on the matter of waiving privilege.[6] On October 5, 2021, the SBC EC held another session and ultimately voted in favor of waiving privilege.[7] A second letter of engagement was signed by Pastor Rolland Slade on October 5, 2021.[8] The

---

[2] https://www.baptistpress.com/resource-library/news/motion-spurs-task-force-to-oversee-ec-review/; https://www.baptiststandard.com/news/baptists/sbc-approves-sexual-abuse-task-force/.

[3] *Id.*

[4] SBC EC LOE 20210909.pdf; SBC EC Investigation - SBC EC LOE 20210909.pdf - All Documents (sharepoint.com).

[5] https://www.sataskforce.net/updates/press-release-regarding-ec-meetings.

[6] https://www.sataskforce.net/updates/update-to-the-ec.

[7] https://religionnews.com/2021/10/05/sbc-committee-waives-privilege-abuse-investigation-moves-forward/.

[8] Guidepost Letter of Engagement SBC Task Force final 10.5.21.pdf; SBC EC LOE 20211005 Signature Page.pdf.

Engagement Letter, attached here to as Appendix A, specifies that the Task Force, and not the EC, is the client for purposes of the investigation.

The Committee on Cooperation ("CoC")[9] was created by virtue of the Guidepost contract for the purpose of providing financial oversight, electing a liaison between the EC and Guidepost, receiving periodic monthly updates noting information requests made to the EC, and ensuring that the EC and SBC are fully cooperative. The CoC was also tasked with conducting a factual review of the draft factual portion of Guidepost's report before the report was due to the Task Force.

We wish to express our gratitude to the CoC and the Task Force for facilitating our access to information, answering questions, and providing guidance about SBC organization, polity, and related matters. Their assistance contributed greatly to this investigation.

### A. Scope of Our Engagement

As directed by the Messengers' Motion, Guidepost was charged with investigating:

- Allegations of abuse by EC members
- Mishandling of abuse allegations by EC members between January 1, 2000, to June 14, 2021
- Allegations of mistreatment of sexual abuse victims by EC members from January 1, 2000, to June 14, 2021
- Patterns of intimidation of sexual abuse victims or advocates from January 1, 2000, to June 14, 2021
- Resistance to sexual abuse reform initiatives from January 1, 2000, to June 14, 2021

[9] The CoC was comprised of the SBC President and four EC members who were appointed to their first term in June 2021 (thus outside the scope of the investigation); two members were chosen by the EC and two were chosen by the Task Force.

In addition to the foregoing, the Motion directed us to perform an audit of the procedures and actions of the Credentials Committee ("CC") after its formation in mid-June 2019, using best standards and practices designed to ensure accountability, transparency, and care for the wellbeing of survivors of sexual abuse.

A key component of our investigation was our independence. The investigation was conducted, and this Report was written without any undue influence; the findings herein are solely our own. The Engagement Letter expressly provides that, except as noted above with respect to the CoC's specific functions, neither the EC nor the CoC will conduct, direct, or otherwise manage or influence our independent investigation in any manner. There is no attorney-client relationship between Guidepost and any other party and none of the communications between Guidepost and the SBC or its entities are protected by the attorney-client privilege.

The culmination of our engagement was the issuance of this public Report, setting forth our complete factual findings and a comprehensive recommended framework within which the SBC can operate in order to continue to address the concerns raised by the SBC Motion in a transparent, accountable, and scriptural manner that prioritizes survivor support and care and enhances practices for the prevention of sexual abuse, harassment, and violence.

### B. Methodology

During the course of our investigation, we used standard investigative practices to gather relevant information, including but not limited to preparing and submitting comprehensive document requests to relevant parties and entities; reviewing and analyzing all relevant documents obtained from all sources; contacting or attempting to contact and interview all current and former SBC EC staff and EC Trustees, other high-level SBC official or key figures, and other relevant witnesses identified through our investigation; and conducting in-depth witness interviews of survivors, witnesses, and advocates who affirmatively contacted Guidepost. Of paramount importance was affording survivors and other witnesses an opportunity to share their histories with us, if they so desired, and providing transparency to them about the investigative process.

At the outset of the investigation, we established a dedicated webpage ("Guidepost SBC webpage") on the Guidepost website with information about the investigation, including links to press releases, Task Force updates, and responses to frequently-asked questions. An investigation-specific email address was created so that survivors or other interested parties could directly contact the investigative team; this was also publicized on the Guidepost SBC webpage. The Task Force also provided regular updates on its own website and likewise publicized the Guidepost SBC email address.

We received approximately 60 communications through the Guidepost SBC email address in addition to telephone calls made directly to Guidepost. These communications resulted in the collection of numerous documents and the scheduling of survivor and other witness interviews. To preserve confidentiality, only certain designated members of the Guidepost team had access to the emails sent to this address, and any documents received were uploaded to a secure file serve.

### 1. Collection and Review of Documents and other Evidentiary Items

As part of the investigation, we collected and reviewed an extensive number of documents and other relevant evidentiary items. In total, we collected approximately five (5) terabytes of data from all sources, as described further below. Due to the large volume of materials ultimately gathered, we utilized a secure e-discovery platform for document storage and review. All evidentiary materials were uploaded to that platform, which enabled the investigative team to run keyword and other targeted searches to identify and analyze all potentially relevant documents.

As an initial step, we performed background research to find publicly-available information, including but not limited to, court filings, sex offender records, social media postings, and news reports related to how certain sexual abuse allegations were addressed and handled by the EC.

Second, we submitted a comprehensive document request to the EC seeking materials pertaining to relevant matters, including the EC, the CC, the Bylaws Work Group, and Baptist Press. Among other things, we asked for organizational charts and staff lists, meeting minutes, policies and procedures, and correspondence and other documents related to allegations of sexual misconduct. A copy of our document request is attached as Appendix B.

One of the challenges we faced is that not all SBC EC officers and staff utilized SBC email accounts for their SBC-related communications. EC Trustees were also not issued SBC email accounts, so emails between trustees would not be on SBC servers. In addition, the EC does not have a comprehensive document retention policy so we cannot be sure that all relevant documents were properly classified and retained, and thus available for production to us.

The EC produced the requested documents on a rolling basis from October to December 2021. In addition to hard copy documents, our data experts worked with the SBC EC IT liaison to process and transfer electronic data located on the SBC EC file serves to the platform, as well as electronic data – including text messages – located on Dr. Ronnie Floyd's electronic devices.

We sent a targeted document request to the EC's outside legal counsel, Guenther, Jordan & Price ("GJP"), through the Bradley Group in late November 2021. We note that the EC Trustees' waiver of attorney-client privilege was integral to our ability to conduct a thorough investigation. Because outside counsel was closely involved in managing the EC's response to sexual abuse allegations, having access to those communications gave us a more comprehensive understanding of the EC's actions. We received a limited production in January 2022, which was followed by a larger production on February 1, 2022. These documents were also uploaded to our e-discovery platform for review and analysis by the investigative team.

We visited the Southeastern Baptist Theological Seminary's Archives and Special Collections in Raleigh, North Carolina, to review their collection of Judge Pressler's papers. We likewise visited the Southern Baptist Historical Library and Archives ("SBHLA") to review relevant documents for the following SBC Presidents: James Merritt, Jack Graham, Bobby Welch, Frank Page, Johnny Hunt, Bryant Wright, and Fred Luter. While at SBHLA, we also examined records for the Ethics and Religious Liberty Commission ("ERLC") and Christian Life Commissions related to clergy sex abuse, offender registry, child abuse, pedophiles, and violent predators.

We were not permitted to directly review Dr. Paige Patterson's papers. The SBHLA Director informed us that, if access was needed to Dr. Patterson's papers, then they would need to forward the request to Dr. Patterson, per the procedures. There were no restrictions on the other SBC Presidential Papers.

While Dr. Patterson declined to provide Guidepost direct access to his documents, Dr. Patterson agreed to have his personal counsel, Mr. Shelby Sharpe, go through documents with the Bradley firm to determine which to produce. According to the SBHLA Finding Aid Summary for Dr. Patterson, there are 4 linear feet (3 boxes) of documents stored at the Archives.[10] We received only two pages from Mr. Sharpe and the Bradley firm. We were able to obtain a few other documents related to Dr. Patterson from an outside source, a former employee of Dr. Patterson.[11]

Survivors and other witnesses provided us with various documents and other items, including but not limited to, emails and other correspondence alleging abuse and related misconduct; whistleblower information; emails and written correspondence with the SBC, EC, Baptist Press, and EC Trustees; news articles; audio recordings; notices against abusers; affidavits by current and former SBC personnel; notebooks; legal correspondence with the SBC and the EC; social media threads from, about, and between

---

[10] https://sbhla.org/wp-content/uploads/554.pdf.

[11] https://solutionpointintl.sharepoint.com/:f:/s/SBCECInvestigation/EjDHWLwt0XRAumqs5aEAgl8BjUUluqE40O_E2AT-b88FKg?e=pY9rQ7.

survivors; and screenshots of SMS and IM correspondence. Again, these items, or the transcripts if appropriate, were uploaded to our e-discovery platform for review and analysis by the investigative team.

We also reviewed a large sample of Twitter accounts as part of our investigation and in preparation of recommendations pertaining to staff and EC Trustee conduct online. Twitter was chosen for our review as it was the most widely used platform by EC Trustees. We looked for online activity for 202 EC Trustees who served between 2012 to the present as well as online activity for other prominent SBC leaders.

In order to identify Twitter accounts, Google searches were conducted on the EC Trustee or leader's name with the key word SBC (i.e., John Smith SBC). If an account was not identified after the first step, then the EC Trustee's current or former church of employment websites were searched for social media links. If no accounts were found at this point, third party commercial databases capable of identifying social media accounts were utilized.

For the identified Twitter accounts, key word searches were conducted to identify relevant information over the last five years such as: mention of sexual abuse and/or assault; positive and negative interactions with survivors; advocating for change within the SBC on their sexual abuse policies; and relevant topics discussed in EC meetings concerning and addressing sexual abuse. Relevant posts and comments were screen captured to include the EC Trustee's name, as well as the time stamp and date of the Tweet. Our findings are discussed in Section IV.B, *infra*.

### 2. Interviews

A key component of our investigation was our interviews with EC staff, EC Trustees, other members of the SBC community, witnesses, and survivors. We interviewed or attempted to interview all persons who might have had relevant information regarding the investigation. In total, we conducted approximately 330 interviews. We did not

affirmatively contact survivors; rather we engaged with survivors based on their outreach to our investigative team and in the manner in which they chose to engage with us, whether it be in-person, by telephone or video conference, and/or by email or providing written materials. Below is a summary of the categories of people interviewed by our investigative team.

### a. Current and Former EC Staff

In January 2022, the Guidepost investigative team traveled to the SBC EC offices in Nashville to meet with EC staff. EC staff carry out the day-to-day operations of the SBC, such as supporting the work of EC committees, handling communications, finance, and information technology matters.

An in-person Town Hall meeting with all current SBC EC staff and members of the Guidepost team was held in order to provide information about the investigation. Prior to the trip, we administered a survey to solicit information from the SBC EC staff to obtain their experience and understanding of sexual abuse related to the SBC EC, including their views on training, education, culture, and reporting of allegations, among other things. We had a 96 percent response rate, the results of which were invaluable in preparing for the Town Hall and the SBC EC staff interviews. A more detailed discussion of that survey, as well as our follow-up survey, can be found *infra* at Section IV.C.

During our time in Nashville, we interviewed 19 current and former SBC EC staff. In the following weeks, we interviewed an additional 23 current and former SBC EC staff. We would like to take this opportunity to commend the SBC EC staff not only for their cooperation during the Town Hall and initial interviews, but for helping to coordinate interview rooms and other logistical matters for a number of additional Guidepost trips to the SBC EC offices.

### b. Current and Former EC Trustees and other Key SBC Figures

EC staff provided us with the contact information for all current and former EC Trustees. The EC Trustees are the "members" of the Executive Committee, and there are 86 EC Trustees at any given time. They are responsible for selecting the EC President and electing other EC officers who, along with EC staff, manage the regular affairs of the SBC.

We received information for 332 persons who served as EC Trustees during the relevant time period, and we attempted to contact each person.[12] Initially, we emailed a letter to each current and former EC Trustee who served during the relevant time period, advising them of the investigation and its scope, and letting them know that members of our investigative team would be contacting them in the near future. Each letter explained that, in order to conduct a full, fair, and comprehensive investigation and assessment, it is crucial that we speak with all who have first-hand, relevant information, which necessarily includes current and former EC Trustees. We further explained that the requested interviews are a two-way street – they also provide an opportunity for EC Trustees to express their opinions as to how the SBC can create a safer community going forward.

Based on the initial letter and follow-up scheduling calls and emails, the investigative team interviewed 175 current and former EC Trustees. Twenty-five EC Trustees declined to speak with us. Ninety-eight EC Trustees were either completely unresponsive to our outreach, or initially answered but then did not respond to schedule an interview. We made phone calls to all non-responsive EC Trustees at the end of January. Some EC Trustees were called multiple times, and were left voicemails and messages as permitted. Then, in March, we made a final attempt to contact them by reaching out to current EC Trustees via the CoC, and to former EC Trustees through regular or certified U.S. mail based on the best address we had for each of them.

[12] After our first communication, 81 of the emails "bounced back" as undeliverable. Our analyst team worked to find more updated contact information for those EC Trustees, and were also able to identify 23 EC Trustees who had passed away.

All 14 current and former CC members spoke with us in connection with our audit of the procedures and actions of the CC. We also met with 12 members and staff of the Ethics and Religious Liberty Commission ("ERLC").

We reached out to all SBC Presidents and key leadership who served from 2000 to the present. Three Presidents declined to speak with us: Dr. Bobby Welch, Dr. Jack Graham, and Dr. Paige Patterson. Dr. Welch cited health reasons. Dr. Graham offered access to his Presidential Papers in lieu of an interview; after we confirmed that we already had access to those papers, we received no response to our interview request. A key leader, Judge Paul Pressler, also declined to speak to us. Judge Pressler is a former SBC Vice President, a former EC member, and a long-time SBC influencer.

We sent a certified letter to Dr. Patterson on March 12, 2022, and received a certified signature receipt dated April 1, 2022. However, we did not receive a response to our letter. We called Dr. Patterson's three listed phone numbers provided by the EC on March 11, 2022. Guidepost was able to leave a voicemail on one of the phone numbers, but did not receive a response. The Committee on Cooperation also sent a letter to Dr. Patterson on March 30, 2022, asking that he allow himself to be interviewed by Guidepost Solutions.[13] On April 6, 2022, Dr. Patterson responded with a letter to Dr. Litton, indicating that he had not received communication from Guidepost to seek an interview. He stated in his letter to Dr. Litton that "In an effort to cooperate with the request of Guidepost Solutions to the Executive Committee, I violated my policy and allowed access [by my lawyers] to my presidential files in the Southern Baptist Archives. Any questions Guidepost Solutions would like to ask me can be sent to my attorney Shelby Sharpe for review; and if he deems them appropriate, I will answer them in writing."[14]

In a further effort by Guidepost to pursue an interview with Dr. Patterson, Guidepost asked the Bradley firm to make a request on their behalf. On April 1, 2022, Gene Besen

---

[13] SBC EC Investigation - CoC Letter to Paige Patterson re GPS INT (1).pdf - All Documents (sharepoint.com).

[14] SBC EC Investigation - Ed Litton.pdf - All Documents (sharepoint.com).

facilitated an introduction of Guidepost to Dr. Patterson's counsel, informing him of Guidepost's request for an interview.[15] Mr. Sharpe replied that "Dr. Patterson has not given an interview to anyone since leaving Southwestern. He believes all of his papers there and at all other institutions prior to his time at Southwestern will answer any questions concerning his service. Additionally, his public statements prior to leaving Southwestern are available to anyone wishing to know his position on any subject he addressed. I am pleased to receive any questions from these ladies they would like him to answer and if I deem them appropriate, I will get him to answer them."[16]

On April 6, 2022, Guidepost sent a final letter to Dr. Patterson's attorney asking that, although Dr. Patterson does not have a practice of granting interviews, he consider making an exception due to Dr. Patterson's role in the EC.[17] Mr. Shelby passed on Dr. Patterson's response in lieu of an interview, that "the subject of sexual abuse was not something that came to the Executive Committee or the Credentials Committee to his best recollection during the last six months of his presidency [which was in the scope of the investigation]."[18]

We made multiple attempts to contact Mr. Augie Boto, the former EC General Counsel, by letter, email, text, and phone. Through SBC records and our own research, we identified five possible phone numbers for Mr. Boto, which we ultimately learned were not in service or incorrect. When we called a sixth number, Mr. Boto identified himself on the voice greeting, but the voice mailbox was full. We sent a text message to that number but received no response. Finally, on May 6, 2022, Guidepost investigators went to Mr. Boto's residence to ask in person for an interview. Mr. Boto initially stated that he did not want to make a statement, citing his former position as EC General Counsel as the reason he could not speak to us. However, he did engage in conversation with our investigators for approximately an hour and give his views on various topics related to the investigation.

---

[15] SBC EC Investigation - Dr. Patterson Introduction (1).msg - All Documents (sharepoint.com).
[16] SBC EC Investigation - Re Dr. Patterson Response.msg - All Documents (sharepoint.com).
[17] Dr. Patterson 4.6.22 .docx (sharepoint.com).
[18] SBC EC Investigation - 1591_001.pdf - All Documents (sharepoint.com).

As described above, we made significant efforts to interview as many current and former EC Trustees and other significant SBC figures as possible during our investigation. Though many people agreed to speak with us, some did not for various reasons. Attached as Appendix C, we list those people who were contacted and did not meet with us despite our request, as well as their stated reasons for their decision (if given).

### c. Survivor Interviews and Outreach

Background

We are deeply grateful to the survivors of sexual abuse who contacted us to share their histories and opinions. Because the investigation was widely publicized, many survivors contacted us directly beginning in September 2021. As discussed above, we created a dedicated Guidepost webpage with information regarding the investigation, including an email address to contact Guidepost investigators. Guidepost team members did not affirmatively contact survivors for interviews or information. All contact originated only when the survivor reached out to us, either directly by email or phone or through another witness or Task Force member. In total, we spoke with 22 survivors over the course of the investigation.

Trauma-Informed Communications

As is a best practice, the investigative team was mindful during the investigation of communicating with survivors and their loved ones in a trauma-informed manner. All Guidepost team members received trauma-informed training. Being trauma-informed requires that we communicate in a way that did not assign guilt or responsibility to the survivor and did not re-traumatize them. Survivors were offered anonymity and confidentiality if desired and permitted by law. We prioritized communicating in a prompt and transparent manner with all witnesses, but particularly so with survivors.

Depending on the preference of the survivor, these meetings were conducted via telephone, videoconference, or in person. All survivors were permitted and encouraged to have a support person of their choosing present for the interview. The SBC, Task

Force, EC, and CC were not given access to the names of, or identifying information about, survivors or related witnesses without the consent of the survivors or witnesses.

We have been contacted by and corresponded with several survivors who ultimately chose not to participate in an interview, but contributed to our investigation through email correspondence, documentary evidence, and suggested recommendations for the future state of the SBC. We also held listening sessions with survivors and advocates who provided numerous recommendations.

We realize that participating in the investigation interview process can create added stress related to underlying trauma. Our desire was to provide survivors a safe and confidential space to debrief and process their interviews and participation with this investigation. In order to provide this support to survivors, the Guidepost team engaged Dr. Phil Monroe of Langberg, Monroe & Associates as a Survivor Care Liaison. Dr. Monroe is a licensed psychologist who specializes in treating trauma-related problems. Dr. Monroe was available to survivors to raise questions and talk through their investigation experience with a professional who is trauma-informed and understands the process, as well as to provide suggestions for resources for mental health care. Survivors were provided with contact information for Dr. Monroe, and all interactions with Dr. Monroe remained confidential. A survivor's identity or interaction with Dr. Monroe was not shared with the investigative team without express permission from the survivor. Our connection with Dr. Monroe has been valuable to our work as it has provided a safe space for survivors to debrief following the interview process.

### d. Survivor Advocates and other Witness Interviews

We also met with advocates for survivors, survivors' family members, witnesses who corroborated survivors' histories, whistleblowers who have reported church clergy and staff sexual offenders, experts in issues related to sexual abuse and clergy sexual abuse in particular, and therapists. Survivor advocates, such as Dee Ann Miller and Carol Shelton, provided many suggestions for how the SBC could improve its response to

sexual abuse allegations in the future, which we have considered in forming our own recommendations. We also spoke with Task Force members as well as Messengers and pastors who brought motions over the years pushing for sexual abuse reform. Their experience and guidance were likewise extremely helpful in formulating our recommendations.

In order to assure the accurate application of SBC polity considerations in the proposed recommendations, we formally consulted with four recognized experts on SBC polity, including a seminary president, two academics, and an author of a well-known book on the SBC organization.

## III. SOUTHERN BAPTIST CONVENTION ("SBC")

The SBC is not a church itself; rather, it is a network of independent churches.[19] The purpose of the SBC is "to provide a general organization for Baptists in the United States and its territories for the promotion of Christian missions at home and abroad and any other objects such as Christian education, benevolent enterprises, and social services which it may deem proper and advisable for the furtherance of the Kingdom of God."[20] Currently, over 47,000 Baptist churches in the United States and its territories cooperate with the SBC.[21] In total, the SBC network of churches encompasses over 14 million persons.[22]

### A. Church Autonomy

Unlike hierarchical religious organizations, such as the Catholic Church, where local churches follow the directives of a primary leader, the SBC does not dictate church

---

[19] https://www.sbc.net/about/what-we-do/fast-facts/.
[20] SBC Constitution, Article II. *See* https://www.sbc.net/about/what-we-do/legal-documentation/constitution/.
[21] https://www.sbc.net/about/what-we-do/fast-facts/. *See also* https://research.lifeway.com/2021/05/20/southern-baptist-census-data-reflects-covids-impact-on-churches/.
[22] *Id.*

practices or worship. A fundamental principle of the Southern Baptists is local church autonomy.[23] Article IV of the SBC Constitution provides that: "While independent and sovereign in its own sphere, the Convention does not claim and will never attempt to exercise any authority over any other Baptist body, whether church, auxiliary organizations, associations, or convention."[24]

Each church cooperating with the SBC functions independently and maintains responsibility to select its own leaders, adopt its own bylaws, set its own budget, determine its own policies, and launch its own ministries.[25] Local church participation with the SBC is voluntary and cooperative.[26]

Because the SBC is not a church, it has no role in ordaining pastors.[27] Both initial ordination and recognition of previous ordination are addressed on a local church level.[28] Every cooperating church decides individually whether or not to ordain an individual, or whether to require ordination of its pastor or ministry staff.[29]

The SBC does have the right to determine whether local churches are considered "in friendly cooperation" with the SBC – in other words, whether a specific local church is remaining in good standing with the SBC.[30] To be deemed in friendly cooperation, a church must: (1) have a faith and practice which closely identifies with the SBC's adopted statement of faith, (2) formally approve its intention to cooperate with the SBC, (3) make financial contributions through the Cooperative Program, the SBC's Executive Committee

---

[23] Article VI of the *Baptist Faith and Message* states, in part: "A New Testament church of the Lord Jesus Christ is an *autonomous* local congregation of baptized believers, associated by covenant in the faith and fellowship of the gospel; observing the two ordinances of Christ, governed by His laws, exercising the gifts, rights, and privileges invested in them by His Word, and seeking to extend the gospel to the ends of the earth." *See also* https://www.baptistpress.com/resource-library/sbc-life-articles/the-church-autonomous-and-cooperating/.

[24] https://www.sbc.net/about/what-we-do/legal-documentation/constitution/.

[25] https://www.baptistpress.com/resource-library/news/an-aid-to-understanding-the-sbc/.

[26] *Id.*

[27] https://www.sbc.net/about/what-we-do/faq/.

[28] *Id.*

[29] *Id.*

[30] https://www.sbc.net/about/becoming-a-southern-baptist-church/faq/.

for Convention causes, or any other Convention entity during the fiscal year preceding, (4) *not act in a manner inconsistent with the Convention's beliefs regarding sexual abuse* (emphasis added); and (5) not act to affirm, approve, or endorse discriminatory behavior on the basis of ethnicity.[31]

It should be noted that the "sexual abuse" proviso was only recently added to the SBC Constitution.[32] An amendment to that effect was proposed in February 2019 amid media reports of abuse at SBC churches.[33] The proposed amendment would have added language to Article III of the SBC Constitution that a church be considered in friendly cooperation if it:

> (4) Has not been determined by the Executive Committee to have evidenced indifference in addressing sexual abuse that targets minors and other vulnerable persons and in caring for persons who have suffered because of sexual abuse. Indifference can be evidenced by, among other things, (a) employing a convicted sex offender, (b) allowing a convicted sex offender to work as a volunteer in contact with minors, (c) continuing to employ a person who unlawfully concealed from law enforcement information regarding the sexual abuse of any person by an employee or volunteer of the church, or (d) willfully disregarding compliance with mandatory child abuse reporting laws.[34]

However, in its June 2019 meeting, the EC replaced that language with the following:

> (4) Does not act in a manner inconsistent with the Convention's beliefs regarding sexual abuse.[35]

[31] *See* SBC Constitution Article III.
[32] https://www.baptistpress.com/resource-library/news/wrap-up-sex-abuse-prevention-tops-sbc-exec-comm-agenda/.
[33] https://www.baptistpress.com/resource-library/news/wrap-up-sex-abuse-prevention-tops-sbc-exec-comm-agenda/.
[34] https://plusnxt.relativity.one/Relativity/go?id=8252197-1523262.
[35] https://plusnxt.relativity.one/Relativity/go?id=8252197-1770976.

Ultimately, the new amendment was approved by a two-thirds vote at the SBC conventions in 2019 and 2021.[36]

In connection with the new amendment, an EC committee – the Credentials Committee ("CC") – was tasked with considering issues of whether a church is "in friendly cooperation" under Article III.[37] Prior to June 2019, the CC focused on Messenger registration and operated only during the annual convention. In the wake of the 2019 Convention, the CC was made a standing committee to carry out this new function. The formation and purpose of the CC is discussed extensively in Section VII, below.

According to the SBC Bylaws, the CC is to consider the matter of whether a church is in friendly cooperation with the Convention, review any information available to it, and make inquires of a church.[38] If the CC forms the opinion that a church is not in friendly cooperation, the CC submits a report to the EC stating the CC's reasons for its opinion.[39] The EC, at its next meeting, considers the CC's report and renders a decision.[40] The church may appeal or ask for reconsideration of an adverse judgment.[41] Otherwise, the EC's decision is final, and the church will be "disfellowshipped" from the SBC.[42]

### B. The SBC's Organization

The SBC is under the direction of the Messengers, i.e., the representatives of local churches that cooperate with the SBC.[43] The Messengers convene once a year at a two-

---

[36] https://www.tennessean.com/story/news/religion/2021/06/16/southern-baptist-convention-2021-stronger-stand-against-sexual-abuse/5294209001/.
[37] SBC Bylaw 8(C).
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *See, e.g.,* https://www.baptistpress.com/resource-library/news/sbc-executive-committee-disfellowships-four-churches/.
[43] Churches may choose to financially cooperate with the SBC either through a State Convention, or at the national level. More than 99 percent of churches that cooperate with the SBC also maintain a cooperative relationship with a state or regional Baptist convention. Due to the long-established practice of cooperation

day meeting in June.[44] At the annual meeting, or convention, the Messengers confer and determine the officers, programs, policies, and budget of the Convention.[45]

The Messengers elect the officers of the SBC, including the President, 1st and 2nd Vice Presidents, Recording Secretary, and Registration Secretary.[46] The term of office for the SBC president is limited to two consecutive one-year terms, and a president is not eligible for re-election until as much as one year has elapsed from the time a successor is named.[47] Messengers also elect Trustees to serve on various SBC entities and committees, including the EC, as recommended by the Committee on Nominations. In addition to electing officers, the Messengers approve bylaw changes and the annual operating budget, and may be called upon to address other special business that arises at the annual meeting.

### C. The Executive Committee

Because the Messengers are so numerous and meet only once per year, the day-to-day functioning of the SBC is managed by the EC, the "fiduciary, the fiscal, and executive entity of the Convention."[48] The EC's operations are intended to carry out the business of the Convention between sessions.[49]

The EC is governed by a board of 86 EC Trustees chosen from qualified states and regions.[50] EC Trustees currently serve four-year terms, and no EC Trustee can serve

with state Baptist conventions and local associations, the SBC encourages such multi-level cooperation (local, state, and national) and does not encourage churches to practice national-only cooperation. *See* https://www.sbc.net/about/becoming-a-southern-baptist-church/faq.

44 Each cooperating church can send two messengers to the Convention. Cooperating churches may send additional messengers based on contributions to SBC Cooperative Program, with a maximum of 12 messengers per church. *See* SBC Constitution Article III.

45 https://sbcannualmeeting.net/messengers/becoming-a-church-messenger/.

46 SBC Bylaw 10.

47 SBC Constitution Article V.

48 https://www.sbc.net/about/what-we-do/sbc-entities/executive-committee/.

49 *Id.*

50 https://www.sbc.net/about/what-we-do/sbc-entities/.

more than two consecutive full terms.[51] The EC Trustees meet three times per year, in February, June, and September.

The EC Trustees select and employ an EC President for an indefinite term.[52] The EC President receives a salary and serves as chief executive officer and treasurer, and is an ex officio member of all committees.[53]

The EC Trustees also elect officers such as the Board Chairperson, Vice Chairperson, Secretary, and Chairpersons for the following committees: Committee on Convention Missions & Ministry; Committee on Convention Finances & Stewardship Development; Committee on Convention Events & Strategic Planning; Committee on Southern Baptist Relations.[54] These officers are not paid.

According to the SBC, the EC does not control or direct the activities of Convention entities, although it reviews their financial statements and recommends the Convention annual operating budget.[55] In addition, the EC receives and distributes the monies Southern Baptists give in support of denominational ministries through the Cooperative Program,[56] acts as the recipient and trust agency for all Convention properties, and provides public relations and news services, including Baptist Press.[57] To carry out its function, the EC maintains a professional staff and offices in Nashville, Tennessee.[58]

---

[51] EC Bylaw 3.4.
[52] EC Bylaw 4.8. The president shall serve from the effective date of election until retirement, death, resignation, or by action of the board of trustees.
[53] *Id.*
[54] EC Bylaw 4.1.
[55] https://www.sbc.net/about/what-we-do/sbc-entities/executive-committee/.
[56] The Cooperative Program was formulated in 1925 as a unified giving plan for Southern Baptists. Churches support the Cooperative Program by submitting contributions through a network of state and regional Baptist conventions. Those conventions use a portion of these funds to fuel the ministry and mission goals established by their churches. Each state Baptist convention then forwards a percentage of those funds to the Southern Baptist Convention, providing financial support for Convention entities to send missionaries, train pastors and ministry leaders, plant churches and address ethical and religious liberty concerns related to our faith. Cooperative Program funds forwarded from the states also provide support for the SBC operating budget. *See* https://www.sbc.net/about.
[57] *Id.*
[58] *Id.*

The EC staff carries out the day-to-day functions of the SBC when the convention is not formally in session. The staff exists to serve the EC Trustees in fulfillment of the mission of the EC as set forth in the SBC Organizational Manual.[59] The staff is managed by the President and CEO and assists the various SBC committees in accomplishing their responsibilities.[60]

Throughout the scope of this investigation, the organizational structure of the EC has changed. From 2002-2007, the Executive Committee staff operated with a President/CEO and five executive vice presidents over these offices – Cooperative Program, Convention Policy, Business and Finance, News Services, and Convention Relations.[61] In 2008, the organization chart shows the Convention Policy office was renamed as General Counsel. In 2011, the organizational structure changed from five offices to three offices, with three executive vice presidents for the offices of Convention Finance, General Counsel (Convention Policy and Operations), and Convention Communications and Relations. In 2012 another office was added in the organization chart for Convention Advancement. Again in 2014, another office was added for Cooperative Program and Stewardship. The most recent EC organizational chart, dated December 2021, shows four staff members serving the President and CEO and three offices headed by an Executive Vice President. The three offices are as follows: Great Commission Relations and Mobilization, Communications, and Finance.[62]

Great Commission Relations and Mobilization office is responsible for promoting the Cooperative Program and encouraging Biblical stewardship. This office also promotes cooperative relationships with state conventions, local associations, entities, and churches. In addition, this office develops strategies to strengthen relationships with multiple demographic groups within the SBC and provides assistance to the Executive

---

59 https://www.sbc.net/about/what-we-do/legal-documentation/organization-manual/.
60 https://www.sbc.net/wp-content/uploads/2021/10/EC-Bylaws-June-16-2020-FINAL.pdf.
61 Documents provided indicated no record for 2000-2001; https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EVlqj4L8EJ5EnBcOEq8W3FUBcvY49E0aKNVyJiZBQQRBaA?e=JdWWfF.
62 SBC Staff Organization Chart_1206022.pdf.

Directors of church relations and mobilization for Hispanics, Asian Americans, African Americas and other church affiliations. The Communications office houses Baptist Press, the convention news service, as well as general convention communications. The Finance office is responsible for finance, annual meeting/events planning, information technology, and facilities. The Chief Financial Officer is the head of the Finance office.

There is currently no individual designated for Human Resources, so Finance handles HR matters under their oversight of EC staff payroll and benefits. In addition, there is no designated General Counsel or Chief Compliance/Integrity Officer in the current organizational structure.

The EC is not presently operating with a full staff due to resignations and staff changes since 2021. According to the up-to-date EC Staff Directory on the SBC.net website, the organizational structure is as follows: the President's Office includes the Interim President and CEO with three supporting staff members; Communications includes a Vice President and ten supporting staff members; Finance includes an Interim CFO with five supporting staff members; and Great Commission Relations and Mobilization has a vacancy in the Vice President position, but has five supporting staff members.[63] In total, there are currently 26 EC staff members compared to 31 EC staff positions reflected on the December 2021 organization chart.

The EC also has the responsibility to conduct the general work of promotion and publicity for the Convention in cooperation with the entities.[64] The EC manages and funds Baptist Press, which provides the convention news service to interpret and publicize the stories of Southern Baptists in order to keep the more than 47,000 autonomous churches, 41 state conventions, 1,114 local associations and over 14 million members, connected and informed.

---

[63] https://www.sbc.net/about/what-we-do/sbc-entities/executive-committee/staff/.

[64] SBC Bylaw 18E(8); https://www.baptistpress.com/resource-library/sbc-life-articles/sbc-life-focus-on-your-sbc-entities-the-executive-committee/.

### D. Committee Structure and Governance

In addition to the EC, as described above, the SBC undertakes its work through 11 other ministry entities, as well as an auxiliary called the Woman's Missionary Union.[65] Like the EC, the entities are governed by a board of trustees elected by the Convention.[66] The trustees for the auxiliary are not elected by the Convention.[67]

**GuideStone Financial Resources:** GuideStone assists churches, denominational entities, and other evangelical ministry organizations by making available retirement plan programs, life and health coverage, risk management programs, and personal and institutional investment programs.

**Ethics & Religious Liberty Commission (ERLC):** The Ethics & Religious Liberty Commission exists to assist Southern Baptist churches in applying the moral and ethical teachings of the Bible to the Christian life, through the communication and advocacy of moral and ethical concerns in the public arena. The ERLC assists churches and entities by promoting religious liberty and with their moral witness in local communities.

**International Mission Board (IMB):** The International Mission Board exists to assist the churches of the Southern Baptist Convention by evangelizing persons, planting Baptist churches, and nurturing church planting movements to the unevangelized world outside the United States and Canada. The IMB assists churches in sending and supporting missionaries and volunteers, mobilizing Southern Baptists to be involved in international missions, and developing global strategies for the purpose of making Christ known among all people.

**Lifeway Christian Resources:** Lifeway Christian Resources exists to honor God and serve churches by designing trustworthy experiences that fuel ministry. Lifeway assists

---

[65] https://www.sbc.net/about/what-we-do/sbc-entities/.
[66] The following descriptions of the various entities comes from the SBC ministry reports for each entity's ministry statements. *See* https://www.sbc.net/resource-library/ministry-reports/2021-ministry-report/.
[67] *See* https://erlc.com/resource-library/articles/why-southern-baptists-should-value-the-wmu/.

churches in the development of ministries to men, women, children, and Christian students of all education levels. Lifeway assists churches through the operation of conference centers and camps, architecture and capital fund raising consultations, conducting research, compiling statistics and publication of Christian resources.

**North American Mission Board (NAMB):** The North American Mission Board exists to work with churches, associations and state conventions in mobilizing Southern Baptists as a missional force to impact North America with the Gospel of Jesus Christ through evangelism and church planting. NAMB assists churches by providing leadership development, relief ministries, and providing missions education and volunteer missions opportunities.

**Theological Seminaries:** There are six Southern Baptist theological seminaries: Gateway Seminary of the Southern Baptist Convention, Midwestern Baptist Theological Seminary, New Orleans Baptist Theological Seminary, Southeastern Baptist Theological Seminary, The Southern Baptist Theological Seminary, The Southwestern Baptist Theological Seminary. These seminaries provide theological education in order to prepare students for vocational service in Baptist churches and in other Christian ministries.

**Woman's Missionary Union:** This auxiliary of the SBC assists churches in developing and implementing a mission strategy for churches to fulfill its total mission in the world.

It should be noted that the chief executives of the EC, the 11 entities, and the Women's Missionary Union also comprise the Great Commission Council, whose purpose is to find ways of mutual re-enforcement in assigned responsibilities and distinctive ministries; to avoid overlapping endeavors and competitive ministries; and to consider the means for helping the churches fulfill their mission in Bible teaching and evangelism; world missions, stewardship, Christian training, education and social service.[68]

---

[68] SBC Bylaw 23.

## IV. FACTUAL FINDINGS/INVESTIGATION

### A. Timeline

In this section, we lay out a chronology of the EC's response to sexual abuse issues from January 1, 2000, to June 14, 2021. We cannot and do not describe in detail every EC action or communication; rather, this timeline aims to provide a concise yet comprehensive account of the EC's conduct over those two decades. In Section V *supra*, we refer to these and other facts in making our observations and conclusions regarding the EC's handling of sexual abuse allegations and treatment of survivors.

For the entire relevant period, survivors and their advocates fought to be heard by SBC leadership. The very existence of this report is attributable to their perseverance. As this report makes clear, there were divisions within EC leadership between those who were open to addressing the survivors' allegations publicly and instituting reforms, and others who sought to minimize or ignore allegations in an effort to protect the reputation of the SBC and avoid the risk of legal liability for sexual abuse at SBC churches.

Although the EC is governed by its 86 Trustees, those EC Trustees serve limited terms and meet only three times per year. Consequently, they generally are not privy to the day-to-day decision making by the EC Staff and Officers. During the investigation time period, those decisions were largely left to the discretion of the EC President/CEO and his closest advisors on staff, with high-level issues brought to the SBC President. Unlike the term-limited EC Trustees and even the term-limited SBC Presidents, the EC President/CEO and staff members could, and did, retain their positions for multiple years, even decades in some instances. Throughout the time period, there was no apparent effort to inform the Trustees or involve them in the decision-making process regarding the issue or existence of sexual abuse in the SBC. For example, EC Trustee Rod Martin noted the following on Twitter:




Thus, the EC's response to sexual abuse allegations over the years was largely driven by a small cadre of staff as well as the SBC's long-serving outside lawyers, whose senior positions and institutional knowledge allowed them to control the information about, and management of, issues related to sexual abuse at SBC churches. One key figure was Augie Boto, who was hired in 1998 as Vice President for Convention Policy and became the EC General Counsel in 2004. In his position as General Counsel, Mr. Boto guided the EC's response to sexual abuse allegations, advising the various EC Presidents under whom he served – Dr. Morris Chapman, Dr. Frank Page, and Dr. Ronnie Floyd. Mr. Boto and these leaders also relied on the assistance of the SBC's external counsel: Mr. Guenther, who had represented the SBC since 1966, and GJP. Even as SBC Presidents changed and EC staff retired, GJP remained an institutional source of knowledge in terms of Baptist polity, liability management, and counsel related to sexual abuse.

**2000-2002**

At the outset of the period under investigation until the June 2000 Convention, the SBC President was Paige Patterson. As we explained in Section II.B. *supra*, we were not given access to the entirety of Dr. Patterson's presidential papers, so we cannot conclusively determine what, if any, actions or discussions occurred related to sexual abuse allegations during that term.[69]

We did review correspondence from a pastor seeking guidance about sexual abuse topics from Dr. Patterson. The pastor noted that, several months prior to the date of the letter, Dr. Patterson had made mention of a program on sexual abuse. The pastor wrote: "I

---

[69] We received only two pages from Mr. Sharpe and the Bradley firm in response to our request. We were able to obtain a few other documents related to Dr. Patterson from an outside source, a former employee of Dr. Patterson.

believe it was in regards to having some type of program or course taught at the church informing people on either how to prevent sexual abuse or how to spot a child who is possibly being sexual [sic] abused. It may have been a combination of both of those topics. I would like information on that program and also any other possible details you might have about that subject title."

Dr. Patterson's response is focused not on the prevention of sexual abuse, but rather on the benefits of such a program as a defense in litigation. Dr. Patterson wrote that the matter of sexual abuse to which he referred was "the fact that there are fairly frequent lawsuits now being filed against churches in sexual abuse cases. Interestingly, to my knowledge, even to this date, not one of those charges has been successful in those cases where the churches could document that they had made some effort to educate those who worked among children as to how to watch for and respond to dangers." Patterson noted that this could be achieved by churches holding a lunch and a one-hour awareness seminar.

June 6, 2000

Rev. Doug Pigg
First Baptist Church
124 W. Ashley
Jacksonville, FL 32202

Dear Doug:

Thanks so much for your letter of May 31, 2000. The matter of the sexual abuse to which I referred was the fact that there are fairly frequent lawsuits now being filed against churches in sexual abuse cases. Interestingly, to my knowledge, even to this date, not one of those charges has been successful in those cases where the churches could document that they had made some effort to educate those who worked among children as to how to watch for and respond to dangers. On the other hand, insofar as I know, every lawsuit has been successful in those cases where churches could not show that they had made some effort to prevent it. In other words, the courts are apparently deciding cases based on demonstrable evidence of awareness of the problems potentially involved in sexual abuse on the part of the church.

This has led a number of our churches and has led us here at the seminary to the practice of having an outside firm, even in some cases social services of the government with whom we are, of course, in total disagreement but nonetheless asking them to come in for a Saturday seminar. These churches are simply urging all of their people who are involved in ministry to children to be present for lunch and a one-hour awareness seminar conducted by someone from the outside with knowledge of the matter. This could be also, I assume, an attorney. The church needs to perhaps record the session and in other ways document that they have had it. This, of course, if it should ever come to a court matter, will weigh heavily in the mind of the court. That is what I recommend. Hope this is helpful.

Until He Comes,

After Dr. Patterson's term ended, our investigation revealed limited discussion of sexual abuse or misconduct at the EC-level from mid-2000 to 2003, despite the frequent lawsuits filed against churches as referenced by Dr. Patterson's letter. We interviewed the 2000-2002 SBC President James Merritt, who stated that during his term of service he was not informed of any sexual abuse allegations nor did he have contact with any survivors.[70]

The few times the subject of sexual abuse was addressed during the early 2000s are as follows: (i) a resolution was proposed at the 2000 convention condemning the trafficking of women and children for sexual purposes;[71] (ii) an SBC report in the 2001 convention materials noted that ministering to persons in need, such as the abused, was a priority concern;[72] and (iii) the SBC adopted a resolution at the 2002 convention on the Sexual Integrity of Ministers that, among other things, called on civil authorities to punish to the

[70] Interview Memorandum of James Merritt.

[71] http://media2.sbhla.org.s3.amazonaws.com/annuals/SBC_Annual_2000.pdf.

[72] http://media2.sbhla.org.s3.amazonaws.com/annuals/SBC_Annual_2001.pdf.

fullest extent of the law sexual abuse among clergy and counselors, called on SBC churches to discipline those guilty of any sexual abuse and to cooperate with civil authorities, called on Southern Baptist seminaries to emphasize integrity in their training of ministers and others, and extended prayers and support for those who have been harmed as a result of sexual abuse.[73]

**2004**

At the 2004 Convention in Indianapolis, a motion was made for a child abuse study committee.[74] In pertinent part, the motion called for the new committee to:

> [S]tudy the problem of child abuse, incest, and child molestation perpetrated by members of the laity and/or staff of Southern Baptist churches. In addition, this committee should instruct LifeWay Publishers to produce a curriculum that will educate churches concerning this problem and help churches in developing guidelines and policies for preventing child abuse and sexual molestation and enforce the legal and moral obligation the church has in reporting known incidents to the proper authorities. Furthermore, this committee should seek some means or ways for reproving churches that protect known perpetrators by failing and/or refusing to report such crimes to the authorities and/or by intimidating or terminating the pastor and/or other members of the church staff when they report such crimes to the authorities.[75]

SBC President Jack Graham ruled the motion out of order.[76] According to an EC staff member, it was likely ruled out of order because a motion cannot instruct an SBC entity (Lifeway) to take action.[77] We were unable to question President Graham about the motion as he was unresponsive to our interview request. There is no indication in the documents we reviewed that any attempts were made to revise the motion to overcome this procedural hurdle.

---

[73] http://media2.sbhla.org.s3.amazonaws.com/annuals/SBC_Annual_2002.pdf.
[74] http://media2.sbhla.org.s3.amazonaws.com/annuals/SBC_Annual_2004.pdf.
[75] *Id.*
[76] *Id.*
[77] Interview Memorandum of EC Staff Member 1.

The month after the convention, in July 2004, attorney Deborah Boone Dale, on behalf of Christa Brown,[78] a survivor of clergy sexual abuse, sent a 25-page report by certified mail to multiple Southern Baptist leaders, including the SBC President Bobby Welch.[79] While Ms. Dale's cover letter transmitting the report was produced to us by the EC, we were unable to find the report itself in the document production.

In this correspondence Ms. Brown shared her experience of being sexually abused by the youth and education minister at her church when she was 16 years old, and the fact that the alleged abuser had moved on to another SBC church.[80] Dr. Welch did not respond. Instead, the report was forwarded to the SBC's outside counsel, Mr. Guenther.[81] Mr. Guenther provided advice to Mr. Boto about how they should proceed. Among other things, Mr. Guenther suggested preparing an answer: "It would be sympathetic, would describe how the SBC lacks control over ministers and churches in the hiring of ministers, our appreciation for the national tragedy of clergy sex abuse, but would not respond to demands specifically. Then we would wait to see what transpired. We may or may not get sued. There is no explicit threat in that regard." Mr. Guenther also recommends that he and Mr. Boto inquire about a list of clergy offenders maintained by the Baptist General Convention of Texas ("BGCT"), noting that: "We have often worried about a duty to warn a court might think was owed by the SBC. The BGCT plan may give us some ideas on that subject."

---

[78] SBC EC Investigation - REL0000002406.pdf - All Documents (sharepoint.com).
[79] SBC EC Investigation - Christa Brown Memo to Guidepost.pdf - All Documents (sharepoint.com). The SBC President at that time, from 2004-2006, declined to speak with us due to ill health.
[80] *Id.*
[81] *Id;* https://plusnxt.relativity.one/Relativity/go?id=8252197-2481375.

-----Original Message-----
**From:** James P. Guenther [redacted]
**Sent:** Wednesday, July 14, 2004 1:20 PM
**To:** Augie Boto
**Subject:** Christa Brown

[redacted] has given me a copy of the material sent to [redacted] by Ms. Brown's attorney in Dallas. The same material supposedly went to the two churches involved, the two state conventions in Texas, the local association and to the SBC in care of Dr. Welch at his church address.

The material is in the nature of a "report of sexual abuse and sexual assault by ministerial staff member." It describes an alleged pattern of sexual abuse around 1988 by one Tommy Gilmore. Gilmore is said to have been the youth minister at Farmers Branch (Tex) First Baptist Church. Ms. Brown was 16 and a member of the church. It is alleged that Gilmore was later employed by First Baptist Church of Tyler (Tex) and that Gilmore is now employed by LifeWay at Ridgecrest. [redacted] tells me that to the best of his knowledge, Gilmore is not and never has been an employee of LifeWay. We have not spotted Gilmore's name in the several publications of ministers nor in the current listing on sbc.net). The "report" contains a section in which some fairly modest requests (demands) are made, and she "seeks the following actions from appropriate persons and entities," one of which is the erection of a monument to the victims of clergy sex abuse and a public apology to Ms. Brown. Legally, the letter "puts the recipients on notice" concerning Gilmore's conduct.

1. I think our first need is to get Dr. Welch to confirm to us that he received this letter dated July 6, 2004, allegedly mailed to Dr. Welch certified mail, return receipt requested, from Leticia & Associates, and signed by Deborah Boone Dail. It would be desirable for him to send us a copy. I recommend that he not answer and that he permit you or me to answer. We would need Dr. Welch to tell us if he knows anything about this subject and if he has ever heard of Tommy Gilmore.

2. If he will agree to that, I will answer or prepare an answer over your signature, however you prefer. It would be sympathetic, would describe how the SBC lacks control over ministers and churches in the hiring of ministers, our appreciation for the national tragedy of clergy sex abuse, but would not respond to demands specifically. Then we would wait to see what transpired. We may or may not get sued. There is no explicit threat in that regard.

3. A reference is made in the letter to a list of clergy offenders maintained by the BGCT. I recommend that you or I inquire of the BGCT concerning the existence of such a list and how it works. We have often worried about a duty to warn a court might think was owed by the SBC. The BGCT plan may give us some ideas on that subject.

On July 26, 2004, Mr. Guenther responded by letter to Ms. Brown's attorney. After explaining SBC polity in detail, Mr. Guenther stated that he reviewed an "annual accumulation of church statistics" voluntarily provided to the SBC by SBC churches and did not see the name of the alleged abuser "as being reported to be in a ministerial position in any church."[82]

[82] http://stopbaptistpredators.org/pdf_documents/SBC_letter.pdf.

GUENTHER, JORDAN & PRICE, P.C.
[illegible]
[illegible]
[illegible]
[illegible]

[illegible]
[illegible]
[illegible]

[illegible]

[illegible]
[redacted]
[illegible]
[redacted]

July 26, 2004

Dear [redacted]

Your letter of July 6, 2004 to Dr. Bobby Welch, President of the Southern Baptist Convention, on behalf of Ms. C[redacted] Brown, was sent to me by Dr. Welch. We serve as general counsel to the Convention and so we respond to communications to the Convention's President from attorneys.

We are saddened by Ms. Brown's account of abuse. Abuse of a child by anyone is deplorable. Abuse of a child by one in a ministerial position is especially troubling.

While hierarchical bodies, most noteworthy Roman Catholic orders, bishops and diocese, have a role in the selection, supervision and discipline of ministers, the Southern Baptist Convention does not. Baptist ministers are selected, supervised, and are subject to the discipline of local churches. These churches are autonomous. That is, in the Baptist congregational polity, the church is controlled only by its own individual congregation. The Convention has no control over the church, who the church selects as minister, who supervises him or how he is supervised. The Convention does not ordain or otherwise certify persons as minister. The Convention has no right to and does not discipline ministers. The Convention has no spiritual right to defrock a minister.

This ecclesiology is based on our understanding of the nature of the church. The Convention carefully disavows any control right over a church. The Convention is careful to avoid even the appearance of control. Therefore, the Convention does not have the means or the right to investigate and adjudicate charges of misconduct by ministers of churches and does not purport to have the right to advise churches on who is or is not fit for ministry.

I saw that your letter was also sent to the President of LifeWay Christian Resources of the Southern Baptist Convention. We would know nothing about employment by LifeWay.

July 26, 2004
Page 2

In the most current annual accumulation of church statistics available to me, an accumulation done on a voluntary basis with those churches who wish to report, we do not see that Tommy Gilmore's name appears as being reported to be in a ministerial position in any church.

We deeply regret and grieve over every instance of sexual abuse of children. We appreciate the life-changing effect such abuse can have for the victim. We regret the pain Ms. Brown expresses. We pray that Ms. Brown can find peace.

Sincerely,

James P. Guenther

A few months later, after continued research on her own, Ms. Brown learned that her alleged abuser was serving as a children's minister at an SBC church in Florida.[83] The church was located approximately 51 miles from the church where Dr. Welch was the pastor.

**2005**

On April 22, 2005, an attorney for Ms. Brown wrote to the SBC's Office of Convention Relations and Mr. Guenther to inform them that the alleged abuser appeared to still be in ministry.[84] The letter noted that the Baptist General Convention of Texas (BGCT) had added the alleged abuser's name to their file of ministers who have been involved in sexual abuse.[85] The letter advised that "clergy abusers who prey on the young often have multiple victims…We hope that you will act in a manner that reaches out to other possible victims and that works to safeguard against the possibility of additional victims."[86] According to Ms. Brown, the recipients of the letter took no action with respect to the minister.[87]

83 SBC EC Investigation - Christa Brown Memo to Guidepost.pdf - All Documents (sharepoint.com).
84 http://stopbaptistpredators.org/documents/SBC042205.pdf.
85 *Id.*
86 *Id.*
87 SBC EC Investigation - Christa Brown Memo to Guidepost.pdf - All Documents (sharepoint.com).

MARTIN & CUKJATI, L.L.P.
ATTORNEYS AT LAW
[illegible]
[illegible]
Telephone No. [redacted]
Facsimile No. [redacted]
E-Mail [redacted]

Curtis L. Cukjati

April 22, 2005

Southern Baptist Convention
Office of Convention Relations
901 Commerce Street
Nashville, TN 37203

*Via Certified RRR*

Mr. James P. Guenther
Guenther, Jordan & Price, P.C.
1150 Vanderbilt Plaza
2100 West End Avenue
Nashville, TN 37203

*Via Certified RRR*

Re: Report of sexual abuse by Baptist minister

Gentlemen:

My client has reported that she was sexually abused when she was a 16-year-old girl by the youth and education minister at the First Baptist Church of Farmers Branch in Texas. That minister was named Tommy Gilmore. As my client recalls, this particular Tommy Gilmore was a graduate of Hardin-Simmons University and his wife's name was Sue. In July 2004, a complete report concerning my client's abuse was submitted to you, and at that time, you responded that your records did not show Gilmore's name as being reported in a ministerial position in any church.

This letter is to inform you of our belief that Gilmore has been in ministerial positions in prominent churches during most of the intervening years. We believe it is the same Tommy Gilmore who was recently employed by the First Baptist Church of Oviedo in Florida, and before that by the First Baptist Church of Atlanta. My client has identified his picture, which was on the Oviedo church's website.

We have also received information that the Baptist General Convention of Texas has now added Gilmore's name to its own in-house file of ministers who have been involved in sexual abuse. By published policy, the Baptist General Convention of Texas places a minister in that file based on only three reasons: confession, conviction, or "substantial evidence that the abuse took place" as determined by the BGCT's own attorneys. Thus, my client's report has essentially been substantiated, and we wanted to inform you of that as well.

[illegible fax header]

As you are probably aware, clergy abusers who prey on the young often have multiple victims, and the trauma is such that victims often do not speak of it for many years. My client's primary concern is to prevent the harm that was done to her from being done to others, and her hope is that any other possible victims may be able to receive counseling monies so as to better deal with it psychologically. We hope that you will act in a manner that reaches out to other possible victims and that works to safeguard against the possibility of additional victims.

As with all cases when a minor is sexually abused by a person of trust, the effect on my client's life was devastating. It has been extremely difficult for her in recent times as well as she has struggled to come to terms with it. So far, neither the church nor the denomination has provided her with any assistance, neither with locating Gilmore nor with her counseling costs. I wanted to make sure you were aware of this. The seemingly hostile manner in which her report has been handled by the individual church and the failure of the denomination to assist have grieved her greatly.

Finally, in order to protect the privacy and security of my client as a sexual assault victim, I ask that you black out her name in the report that was previously provided to you so that, if any copies of it are made in the future, my client's name will not be identified.

We know that "Tommy Gilmore" is a relatively common name. To the best of our ability we believe this is the correct Tommy Gilmore that we have tracked to the First Baptist Church of Atlanta and the First Baptist Church of Oviedo. Please confirm this for yourself. If you have any reason to doubt that this is the same Tommy Gilmore who was once at the First Baptist Church of Farmers Branch, we would appreciate it if you would let us know. Obviously, Gilmore has not been found guilty on criminal charges in any court of law. My client's allegations are, however, very serious and significantly substantiated.

Very truly yours,

[signature]

Curtis L. Cukjati

Ms. Brown first filed a lawsuit against her abuser[88] and in July of 2005 filed a lawsuit against the church where the abuse occurred and James Moore, the church music minister.[89]


CAUSE NO.

C. BROWN,
Plaintiff

VS.

TOMMY GILMORE a/k/a
THOMAS E. GILMORE,
Defendant.

IN THE DISTRICT COURT

M-298th JUDICIAL DISTRICT

DALLAS COUNTY, TEXAS

PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, C. Brown ("Plaintiff"), complaining of Tommy Gilmore a/k/a Thomas E.


CAUSE NO.

COPY

C. BROWN,
Plaintiff

VS

FIRST BAPTIST CHURCH OF
FARMERS BRANCH and
JAMES A. MOORE,
Defendants.

IN THE DISTRICT COURT

K-192nd JUDICIAL DISTRICT

DALLAS COUNTY, TEXAS

PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

**2006**

Ms. Brown's lawsuits were eventually consolidated and resolved when Ms. Brown entered into a settlement in January 2006 with the church in which (1) the church agreed that its music minister had "knowledge about Gilmore's sexual contact with Brown as a minor;" (2) the church did not deny the allegations of the lawsuit but disclaimed "legal liability;" and (3) the church agreed to make an apology for the "very serious sexual abuse" with "remorse and contrition." [90] On January 18, 2006, the church issued its written apology to Ms. Brown confirming the conduct of her abuser and authorizing her to publicly share the written apology.[91]

On August 2, 2006, Ms. Brown and leaders at the Survivors Network of those Abused by Priests (SNAP)[92] wrote to then-SBC President Dr. Frank Page and described how her alleged abuser was able to continue in ministry, even though the survivor had notified 18

---

[88] http://stopbaptistpredators.org/pdf_documents/BrownvFirstBaptist.pdf.
[89] http://stopbaptistpredators.org/pdf_documents/BrownvFirstBaptist.pdf.
[90] http://stopbaptistpredators.org/pdf_documents/settlement.pdf.
[91] http://stopbaptistpredators.org/pdf_documents/APOLOGY.PDF.
[92] SNAP, established in 1988, is an independent, peer network of survivors of institutional sexual abuse and their supporters. Although originally focused on abuse by Catholic priests, SNAP now addresses sexual abuse in other organizations as well. SNAP has more than 25,000 members and its support groups meet in over 60 cities worldwide. *See* https://www.snapnetwork.org/about.

Southern Baptist leaders in four different states.[93] The letter requested an immediate investigation of her case, and called for the establishment of a review board to consider reports of clergy abuse.[94] The letter noted that, even if the SBC cannot remove an abusive minister, it is at least capable of informing and warning.[95]

> Specifically, we ask you to launch an immediate investigation into the egregious denominational mishandling of Christa Brown's report of sexual abuse and to institute accountability measures. Please use the mishandling of Brown's report as a launchpad for change. Questions need to be asked. Why was Gilmore able to remain in ministry even after so many leaders knew of Brown's substantiated report? At the national level, no one even bothered to assist Ms. Brown in locating the perpetrator. To the contrary, the SBC responded to her report by writing that it had no record the man was still in ministry – and yet he was at a megachurch in Florida. Surely this denomination can find a way to at least track its own ministers across state lines.
>
> We ask you to institute a centralized location for receiving and recording reports of clergy abuse, to establish an independent denominational review board for investigating and considering reports of clergy abuse, and to implement a nationwide "zero tolerance" policy. We also ask you to establish a procedure for notifying people in the pews when a report of abuse has been made about a minister who worked in their congregation. In this way, the denomination can reach out to other possible victims, allow for the possibility of legitimate denominational investigations, and put parents on notice so that they can talk with their kids. Whether or not the SBC is capable of removing an abusive minister from ministry, it is at least capable of informing and warning.

Rather than looking for solutions to address the problem, once again the response from EC leadership focused on SBC polity and what the organization could not do. Dr. Page's response of August 15, 2006, indicated that "[m]any of the things you have asked for me to do are far beyond my authority and ability." He then forwarded the letter to the EC Chair and the ERLC President, who he said "are in positions to be sensitive to your request."[96] Dr. Page stated that each Baptist entity is autonomous and separate, and that if abuse is covered up, it is the responsibility of that entity.[97] Nonetheless, he stated that he would "meet with the officials of the Southern Baptist Convention to see if there is some way

93 http://stopbaptistpredators.org/documents/SBCletter02.pdf .
94 *Id.*
95 *Id.*
96 *Id.*
97 *Id.*

that we might provide this kind of assistance without infringing upon the autonomy of these state level or local level entities."[98]

> You have asked me to do many things in your letter. Many of the things you have asked for me to do are far beyond my authority and ability. Thus, I am forwarding this letter on to those who are in positions to be sensitive to your request.
>
> However, let me remind you of the structure of the Southern Baptist Convention. Each entity within Southern Baptist life is autonomous and separate. For example, we have absolutely no authority over the Baptist General Convention of Texas. They are a separate entity and in recent days have found themselves quite at odds with the national leaders of the Southern Baptist Convention. If abuse is "routinely covered up", then that is the responsibility of that entity and/or group. However, please remember that even The Baptist General Convention of Texas has no authority over the local church. It is a travesty if a local church covers up abuse by its ministers or its members. Personally, I would never be a part of a congregation that did not act to protect its members. On more than one occasion, the churches I have pastured have had to deal with abusive situations. Fortunately, that has not involved ministers, but has involved elected leaders and others. In each case we have acted decisively and quickly to deal with these situations. However, with all that being said, I do realize the importance of your concern. The possibility of providing some kind of "informing" may be possible. I simply do not know. However, please know that I will not ignore this request. I will meet with the officials of the Southern Baptist Convention to see if there is some way that we might provide this kind of assistance without infringing upon the autonomy of these state level or local level entities.

On September 7, 2006, SBC outside counsel James Jordan emailed Mr. Boto to note that he was working on a response to SNAP.[99] Mr. Jordan described how the BGCT kept a confidential list of individuals who are reported for sexual misconduct, and how churches can inquire as to whether a specific person is on the list.[100] He then went on to state:

> This is something the EC could consider. Having a national "bad list" would eliminate the opportunity for ministers to "hide" in states that did not keep

[98] *Id.*
[99] SBC EC Investigation - SBC_EC_GJPLaw_00024224.pdf - All Documents (sharepoint.com).
[100] *Id.*

lists. It would also keep churches from having to check lists in many different states.[101]

Mr. Jordan goes on to note that, while he is not sure of a perfect answer, "it may be time for policy-makers in the SBC to have the discussion."[102]

On September 26, 2006, after receiving no response to the early-September communication, SNAP sent another letter, again to Dr. Page, and including EC President Morris Chapman, and ERLC President Richard Land, asking for dialogue "to make Southern Baptist churches safer."[103] SNAP asked the SBC to consider, among other things: (i) establishing an independent review board to receive and investigate reports of clergy abuse; (ii) publicizing the existence of the board and contact information for reporting abuse; (iii) adopting a "zero tolerance" policy to expel churches that hire or retain a minister or deacon for whom there has been a credible report of having sexually abused a minor; (iv) withholding financial Mission Board support for such churches; (v) publicizing the SBC's disapproval of confidential settlements, which should not be enforced against victims who might choose to disclose abuse.[104] Ms. Brown made a trip to Nashville to hand-deliver the letters, and did a sidewalk media event outside the EC Offices.[105]

Three days later, on September 29, 2006, Mr. Boto responded to Ms. Brown on EC letterhead on behalf of all three recipients of the original communication. Not only did Mr. Boto refuse to discuss the concerns set forth in the letter or the suggested remedies, he intimated that further communications would not continue.[106] In pertinent part, Mr. Boto wrote that:

---

101 *Id.*
102 *Id.*
103 SBC EC Investigation - 2006 SNAP Letter to SBC.pdf - All Documents (sharepoint.com); https://www.snapnetwork.org/snap_letters/2006_letters/092606_southern_baptist.htm.
104 *Id.*
105 https://goodfaithmedia.org/southern-baptist-leaders-challenged-to-get-tough-on-sex-abuse-by-clergy-cms-7942/ https://goodfaithmedia.org/advocating-for-safety-of-southern-baptist-church-kids/.
106 http://stopbaptistpredators.org/documents/Botoletter.pdf.

The use of hyperbole, argumentative language, strident tones, or pejorative adjectives is not necessary, and disserves the victims you are seeking to help by alienating those with whom you profess to desire to collaborate, and from whom you are requesting assistance. Your staging of a ten-minute, photo-op mock demonstration in front of our building in an attempt to direct press attention to shortcomings you perceive to exist in the Southern Baptist Convention is certainly not a backdrop conducive to the continued dialogue and joint working relationship you expressed as a desire in the letter you hand-delivered at that time. And your use of examples which are inaccurate or which have no relevance is also unhelpful.

Obviously, there may be some ways the Southern Baptist Convention can improve awareness of and protection from the problem of sexual abuse, and we will be both responsive to our constituency and exhortive toward that end, perhaps using portions of your suggestions which find support among rank and file Southern Baptists, and which seem workable and beneficial under our polity. Nevertheless, the adversarial posture which you have assumed is one of several factors leading me to believe that continued discourse between us will not be positive or fruitful.[107]

Dear Mr. Clohessy, et al,

I am in recent receipt of a copy of your letter of September 26 addressed to Drs. Chapman, Land, and Page, in whose joint behalf I make this reply.

I regret that our communications are not accomplishing what either of us intend. That is unfortunate, for I believe our ultimate goals to be similar with regard to the issue of sexual abuse – namely, to eradicate it in a church context (and even more broadly, if possible).

The use of hyperbole, argumentative language, strident tones, or pejorative adjectives is not necessary, and disserves the victims you are seeking to help by alienating those with whom you profess to desire to collaborate, and from whom you are requesting assistance. Your staging of a ten-minute, photo-op mock demonstration in front of our building in an attempt to direct press attention to shortcomings you perceive to exist in the Southern Baptist Convention is certainly not a backdrop conducive to the continued dialogue and joint working relationship you expressed as a desire in the letter you hand-delivered at that time. And your use of examples which are inaccurate or which have no relevance is also unhelpful.

Obviously, there may be some ways the Southern Baptist Convention can improve awareness of and protection from the problem of sexual abuse, and we will be both responsive to our constituency and exhortive toward that end, perhaps using portions of your suggestions which find support among rank and file Southern Baptists, and which seem workable and beneficial under our polity. Nevertheless, the adversarial posture which you have assumed is one of several factors leading me to believe that continued discourse between us will not be positive or fruitful.

Sincerely,

D. August Boto

D. August Boto

---

107 *Id.*

Although Mr. Boto was unwilling to engage with Ms. Brown and SNAP, documentary evidence revealed that Mr. Boto did reach out by letter to the Presbyterian Church USA's national organization on October 9, 2006, and requested information on how they respond to allegations of sexual misconduct.[108] The Presbyterian Church USA General Counsel responded in April 2007, noting that its governing body has authority to handle allegations of sexual misconduct against local church ministers, and that an independent body was created to investigate sexual misconduct by missionaries.[109]

In December 2006, an EC staff member provided Mr. Boto with a memo that the EC staff member had prepared on the SNAP proposals and how they could fit with SBC polity.[110] This memo was prepared on the EC staff member's initiative and not at Mr. Boto's request.[111] According to the EC staff member, Mr. Boto was shocked when the memo was presented to him, and asked if the staff member needed to stop working on this issue because it was too heavy of a task.[112]

Among other things, the memo suggested that the SBC could use the cooperation concept to disallow churches that "hire or retain a minister or deacon for whom there has been a credible criminal report of having sexually abused a minor."[113] The memo also suggested that an independent board could receive information about clergy abuse and maintain a list of those accused.[114] There is no indication from our investigation that Mr. Boto took any action in response to this memo. The EC staff member reported feeling defeated after making the effort to write the memo to no avail.[115]

---

108 SBCEXC0000049921.
109 SBCEC_0000563.
110 Interview Memorandum of EC Staff Member 2.
111 *Id.*
112 *Id.*
113 REL0000010201.
114 *Id.*
115 Interview Memorandum of EC Staff Member 2.

**2007**

On January 21, 2007, the same EC staff member provided Mr. Boto with detailed data and information regarding SBC clergy who may have been involved in sexual abuse from approximately 1960 to the present time.[116] According to the email, the EC staff member had conducted internet searches about pastors, youth ministers, and deacons of Baptist churches who had been arrested or the subject of a civil suit regarding sexual crimes with minors,[117] and identified 66 accused individuals who were believed to be Southern Baptist.[118] There is no documentary evidence that Mr. Boto took any action at that time to ascertain whether these accused abusers were still in ministry. The EC staff member continued to research and maintain this list through approximately 2022.[119]

In anticipation of the February Bylaws Work Group meeting, at which Ms. Brown planned to speak, Mr. Boto provided written materials about SNAP and its requests to the Bylaws Work Group members.[120] In an email exchange with Mr. Boto and Dr. Chapman, the Vice Chairman of the Bylaws Work Group noted that he studied the materials and that "in every way possible we should make it clear we find abuse of minors by our Baptist ministers unacceptable."[121] The Vice Chairman suggested that: "surely we can put some mechanisms in place to make sure that their future ministries do not include easy access to minors;" "our denominational polity does hamper our efforts to stop future abuse by ministers who may return to bad behaviors;" and a "national clearing house for SBC ministers 'who have been convicted of abuse' run by some SBC entity…might actually be helpful."[122] Mr. Boto responded that he will craft a recommendation eventually but not in haste, targeting September.[123]

---

[116] REL0000010204.
[117] *Id.*
[118] *Id.*
[119] Interview Memorandum of EC Staff Member 2.
[120] SBCEC_0000156, SBC EC Investigation - EM Exchange Boto&BWG Chair.pdf - All Documents (sharepoint.com)
[121] SBCEC_0000153, SBC EC Investigation - EM Exchange Boto&BWG Chair.pdf - All Documents (sharepoint.com)
[122] SBCEC_0000152, SBC EC Investigation - EM Exchange Boto&BWG Chair.pdf - All Documents (sharepoint.com)
[123] *Id.*

**From:** [redacted]
**Sent:** Saturday, February 10, 2007 2:45 PM
**To:** Augie Boto
**Cc:** Morris Chapman
**Subject:** SNAP and Ministerial Abuse

Dear Mr.. Boto:

I have already studied the notebook you sent me. I hope we make the right decisions with these issues. In every way possible we should make it clear we find abuse of minors by our Baptist ministers unacceptable. That is the moral stand we should take. In addition, from a political point of view (I am putting on my political advisor's hat), we cannot be seen as coddling abusers. Roman Catholic efforts in confronting these problems in their ranks were a public-relations nightmare, and they lost the battle of public opinion -- Catholic charities and local dioceses are still reeling from the tremendous drop giving.

**From:** [redacted]
**Sent:** Tuesday, February 13, 2007 9:33 AM
**To:** Augie Boto
Morris Chapman
**Subject:** Thanks for your kind and welcomed response.

Dear Mr. Boto:

I am glad it is going to be a "thoughtful review." We cannot afford the rough treatment the media gave the Roman Catholic Church on these issues. And actually, I would favor the EC staff making recommendations on these issues. In a body like the EC, dominated by senior pastors, there is already a certain level of built-in uncomfortable reluctance to confront these issues. They possess a desire to protect other senior pastors, who have erred, but have repented, and want to return to the ministry (none of them, however, would favor unrepentant ministers continuing in the ministry). The thinking of some goes like this, "After all these men were called by God, and something like this could 'destroy their ministries.'" The practice of encouraging errant ministers to relocate to other states to continue in the ministry is more common than many might think. Unfortunately, many of these relocated ministers return to their bad behaviors.

And certainly, I believe in forgiveness for all who seek forgiveness including our own errant ministers. But....surely we can put some mechanisms in place to make sure that their future ministries do not include easy access to minors. Nevertheless, on this point I can not think of clear viable solutions on how to do that-- that is why I favor Dr. Chapman and yourself proposing some solutions. And although SNAP, abuse victims, and the national media think that denominational polity arguments sound like "enabling abuse," the truth of the matter is, that our denominational polity does hamper our efforts to stop future abuse by ministers who may return to bad behaviors. A national clearing house for SBC ministers "who have been convicted of abuse" run by some SBC entity (which one, who knows?) might actually be helpful, and would not necessarily prevent a repentant minister from resuming his calling. For instance, a loving caring church that believes in second chances might still hire him as a Minister of Senior Adults, but not put a convicted child molester back in the youth ministry. Such a clearing house would only provide information, and would not post recommendations (past or future) about these personnel. If such a clearing house begins to post recommendations-- then you can get into major liability issues.

---

**From:** Augie Boto
**Sent:** Tuesday, February 13, 2007 10:26 AM
**To:** [redacted]
**Subject:** RE: Thanks for your kind and welcomed response.

Thanks again. I will be crafting a recommendation eventually for your consideration, I just do not believe I should do so hastily, so it will be in Sept or so when that happens. I appreciate your similar opinion

- Augie

**D. August Boto,** General Counsel and Vice President for Convention Policy
Executive Committee of the Southern Baptist Convention
901 Commerce Street, Nashville, TN 37203-3699
Voice [redacted] Fax [redacted]

*The Cooperative Program*-- Biblical stewardship that changes lives every day, the world over. To get with "*The Program*" go to www.cpmissions.net

At the February Bylaws Work Group meeting, Ms. Brown asked to address EC members. The meeting minutes appear to indicate that Ms. Brown was the only woman present.[124] (There are two versions of the meeting minutes. Both are attached at Appendix D.) Mr. Boto initiated the meeting by referring to Ms. Brown and SNAP making "unusual requests" and noting that, although Ms. Brown claimed that the EC had not responded to her 2006 letter, she had in fact been sent a response.[125] The Chair opened the floor for discussion on whether to allow Ms. Brown and/or members of SNAP to speak.[126] Two members asked that she not be allowed to speak, with one noting that "they did not appreciate the spirit in which the group was attacking Mr. Boto and SBC leadership."[127] Others spoke in favor and Ms. Brown was permitted to address the group.[128] The meeting minutes indicate that Ms. Brown "stated that she was sorry she was unaware of the letter but will not (she emphasized this) apologize for seeking press coverage."[129]

According to Ms. Brown, when she addressed the group and provided details of her sexual abuse as a child among other things, she was mistreated by some of those present, including having an EC member turn his back to her while she was speaking, and another EC member chortling.[130] She expressed her feelings about the meeting as follows:

> I ask you to try to imagine what it's like to speak about something so painful to a room in which men disrespect you in such a way. And I hope that you will also try to imagine the long-lasting impact this had on me – to speak about this horrific trauma of having my pastor repeatedly rape me as a child, only to have religious leaders behave in this way and to have not a single other person who thought it mattered enough to speak up. The sharp edge of such incivility has never worn off.[131]

---

[124] SBC EC Investigation - SBCEXC0000038199.pdf - All Documents (sharepoint.com).
[125] *Id.* at p.2.
[126] *Id.*
[127] *Id.*
[128] *Id.*
[129] *Id.* at p.4.
[130] SBC EC Investigation - Christa Brown Memo to Guidepost.pdf - All Documents (sharepoint.com)
[131] *Id.*

When asked about the treatment of Ms. Brown during the meeting, Dr. Chapman and Dr. Page[132] denied that she was mistreated and stated that she was treated with kindness.[133]

On February 23, 2007, Baptist Press published a story about SNAP, under the byline "Staff," which stated: "A child sexual molestation victims' group apologized to Southern Baptist leaders…for making false accusations that leaders had not responded to the group's letters."[134] The story mentioned Ms. Brown by name.[135] According to Ms. Brown, Baptist Press mischaracterized her apology, claiming she had apologized for making "false accusations" when in fact she had only apologized for being unaware that Mr. Boto had responded to her 2006 letter.[136] The letter had been sent to SNAP's Chicago office where it had been misplaced.[137]

The EC continued to be confronted with warnings about sexual abuse within SBC churches. In March 2007, Father Thomas Doyle, a priest and canon lawyer who first warned of the looming Catholic sex abuse crisis, wrote to the SBC and EC Presidents.[138] He expressed his concerns that SBC leaders could be falling into some of the same patterns as Catholic leaders in not dealing with clergy sex abuse, and he urged that Southern Baptists should learn from Catholic mistakes and take action early-on to implement structural reforms so as to make children safer.[139] Dr. Page responded in a short letter that "Southern Baptist leaders truly have no authority over local churches" but that they would attempt to use their "influence" to provide protections.[140] According to a

---

[132] https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EZPQI09bOwV HoV3BFt6xbn8BOw6LQrP-RJCWMZpdAIG1DQ?e=mGCRKx.
[133] Interview Memoranda of Chapman and Page.
[134] https://www.baptistpress.com/resource-library/news/snap-apologizes-to-sbc-leaders-admits-charges-of-silence-were-erroneous/.
[135] *Id.*
[136] SBC EC Investigation - Christa Brown Memo to Guidepost.pdf - All Documents (sharepoint.com).
[137] *Id.*; http://stopbaptistpredators.org/press/southern_baptists_still_unresponsive.html; https://www.baptistpress.com/resource-library/sbc-life-articles/snap-apologizes-to-sbc-leaders/. The article was reprinted and published a second time on April 1, 2007, in SBC Life, a subsidiary publication of Baptist Press, which is also controlled by the EC. *See* https://www.baptistpress.com/resource-library/sbc-life-articles/snap-apologizes-to-sbc-leaders/.
[138] SBC EC Investigation - 2007 Doyle letter to Chapman and Page.pdf - All Documents (sharepoint.com).
[139] *Id.*
[140] http://stopbaptistpredators.org/documents/documents/Page_ltr_Doyle.pdf.

news source, Father Doyle characterized Dr. Page's response as dismissive, stating that such reactions are standard for people in church leadership positions, who tend to place the needs of the institution before their Christian obligations.[141]

In April 2007, Dr. Page wrote a Point of View article in the Florida Baptist Witness about an upcoming segment on the television program 20/20 entitled "Preacher Predators," for which he had agreed to be interviewed. Dr. Page wrote:

> Let me also share one other word of clarification. There are many people in the news media speaking about this issue. I am thankful that any attention to this issue brings a heightened level of awareness on the part of our churches and people. However, please realize that there are groups who claim to be one thing when in reality they are another. It would be great if the many groups who are claiming to be groups of advocacy and encouragement in ministry were that which they claim. Please be aware that there are groups that are nothing more than opportunistic persons who are seeking to raise opportunities for personal gain.[142]

Meanwhile, also in April and May 2007, another survivor, Debbie Vasquez, emailed Dr. Page and thereafter Mr. Boto detailing her sexual abuse and rape by her pastor when she was a minor.[143] Her sexual abuse resulted in her becoming pregnant with her abuser's child. She explained to the SBC leaders that she was concerned about abusers continuing in ministry with unfettered access to children and proposed some potential reforms, including that the SBC have an investigative body to examine allegations of sexual abuse and maintain a list of offenders.[144] She also requested to speak with SBC leaders at the Convention.[145]

---

[141]https://www.nashvillescene.com/news/what-would-jesus-say/article_74704bcd-f972-52d1-abb9-4f1c25bc88d1.html.
[142] https://christabrown.files.wordpress.com/2014/04/frank-page-florida-baptist-witness.pdf.
[143] SBC EC Investigation - Boto EMs with Debbie Vasquez 2007.pdf - All Documents (sharepoint.com).
[144] *Id.*
[145] *Id.*

After an email exchange, Mr. Boto informed her that the EC was assessing the sexual abuse issue and a report would be forthcoming as a "beginning" and went on to dismiss her reform ideas.[146]

Ms. Vasquez,

I have been traveling and will not return to the office until next week.

I do not recall receiving your original correspondence. Was it an email? If so, would you mind finding it in your sent file and forwarding me the original? I will have some techs look at the header to determine what happened to it.

At any rate, I want to give you a thoughtful response, and will try to do so after I return to the office.

Sincerely,

**D. August Boto,** **General Counsel and Vice President for Convention Policy**
Executive Committee of the Southern Baptist Convention
901 Commerce Street, Nashville, TN 37203-3699
Voice [redacted] Fax [redacted]

**From:** [redacted]
**Sent:** Saturday, May 05, 2007 1:45 PM
**To:** Augie Boto
**Subject:** (no subject)

The following is what I wrote you back in April, but you have not responded -- Why?

Hi

I hope you are doing well.

Dear Ms. Vasquez,

The chief technician here reports to me that he cannot determine why we did not receive your email the first time you sent it. Nevertheless, we have now gotten it, and hope the delay in communication has not caused any harm.

Let me try to address the issues you raised, and in the order you presented them.

---

You need not fear "saying something wrong" or "offending me." I do appreciate your expression of disinterest in assessing blame or hearing defenses. Your stated desire to gain knowledge, however, requires that I address some issues which may come off sounding like I am blaming or defending. My intent is not to do either, but rather to explain.

The process for consideration of issues involves their assessment by the Executive Committee, recommendation or report to the Convention, and action by the Convention in response to the recommendation. Currently, and with regard to the sexual abuse issue, assessment is being made of suggested options. I expect the Executive Committee to make a report and/or a recommendation relevant to the issue once its assessment is complete. This could take some time.

Thank you for sharing your story. The circumstances you describe are tragic. I am wondering about whether you attempted to contact the church yourself. If you did, then the problem is something different than the church not knowing about the earlier incident, which may have some bearing on the efficacy of having a list.

---

146 https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/Efa5Xi2xCqlNjHDUKRmh10wBXVw8mSDArj79_U9BuY-m8A?e=77U1Ub.

In a memo addressed to Mr. Boto dated April 30, 2007, Mr. Guenther proposed a plan where the SBC website would have a link to a database that listed the names of individuals whom the SBC believed had engaged in sexual misconduct.[147] Mr. Guenther advised Boto to place individuals on the list who engaged in sexual misconduct and were convicted of a felony or criminal misdemeanor, and/or had a judgment in a civil action for a common tort.[148] This database plan would be viewed as a means to "assist churches" and, according to Mr. Guenther, "it would fit our polity and present ministries to help churches in this area of child abuse and sexual misconduct." Mr. Guenther further stated that "I recommend immediate action to signal the Convention's desire that the EC and the entities begin a more aggressive effort in this area."[149] The following day, Mr. Guenther provided Mr. Boto with another memo, captioned "Very Very Confidential," assessing the BGCT model for a database of offenders.[150] No action was taken by Mr. Boto on these memos at that time. (Both memos are attached at Appendix E.) On June 11, 2007, just prior to the annual meeting, the Bylaws Work Group met and began consideration of the database issue.

In May 2007, Will Hall, a vice-president for news services of the SBC Executive Committee, downplayed the SBC sexual abuse problem by telling a Tennessee TV station that there had been only 40 "incidents" in the last 15 years in the SBC's 44,000 churches. Hall said this relatively low number over such a long time period showed that the way Baptists dealt with abuse was working. According to Christa Brown, Hall was distorting a prior statement she had made to the Associated Press that in "the past six months SNAP has received reports of about 40 cases of sexual abuse by Southern Baptist ministers." The Baptist Center for Ethics publicly called on Hall to issue a correction, which did not occur.[151]

---

147 SBC_EC_GJPLaw_00008031.
148 *Id.*
149 *Id.*
150 SBC_EC_GJPLaw_00007709.
151 https://goodfaithmedia.org/sbc-official-says-relatively-low-number-of-cases-proves-system-working-against-sexual-predators-cms-8916/.

At the 2007 June Convention in San Antonio, SBC Messenger Wade Burleson presented a motion to create a Database of Clergy or Staff in SBC Churches Involved in Sexual Harassment or Abuse:

> That the Southern Baptist Convention request the Executive Committee to conduct a feasibility study concerning the development of a database of Southern Baptist clergy and staff who have been credibly accused of, personally confessed to, or legally been convicted of sexual harassment or abuse, and that such a database be accessible to Southern Baptist churches in order to assist in preventing any future sexual abuse or harassment, and that the Executive Committee report its findings and/or recommendations no later than the 2008 Southern Baptist Convention in Indianapolis.[152]

The motion was referred to the EC for consideration and for a report back to the 2008 Southern Baptist Convention.[153]

In August 2007, the pastor of a church in Tennessee sent a letter to the SBC President, the EC President, ERLC President, Bylaws Work Group members, and others, which discussed two allegations of sexual abuse in the past year at Memphis churches.[154] Separately, that same month, other persons sent a letter to the above also complaining of sexual abuse in Oklahoma.[155] Guidepost investigators did not find responses to the pastor or the other persons in documents turned over by the EC, or any indication that anyone took any action, including any referrals to law enforcement, passed along this information to any State Conventions or local associations in an effort to have it reviewed, investigated, and/or resolved, or even acknowledged that such potentially egregious allegations involving SBC churches were being levied.

---

[152] https://41jmzr10f8zc229tzr2xml7e-wpengine.netdna-ssl.com/wp-content/uploads/2020/07/2007SBCAnnual.pdf.
[153] *Id.*
[154] SBC EC Investigation - SBCDATA0001113748.pdf - All Documents (sharepoint.com).
[155] SBC EC Investigation - SBCDATA0001113817.pdf - All Documents (sharepoint.com).

**2008**

The database motion from 2007 was to be presented again at the June 2008 Convention in Indianapolis.[156] According to Mr. Burleson, the EC never contacted him about his motion, nor was he invited to the September 2007, February 2008, or June 2008 EC meetings, or any of the conference calls related to his motion in between those meetings.[157] (It was during the September 2007 meeting that survivor Christa Brown, who was an observer, was referred to as a "person of no integrity."[158] This incident is described in Section IV.C in greater detail below.) Although we interviewed several witnesses that would have been present during the meetings in 2007 and 2008, those witnesses were unable to recall details regarding discussions surrounding the database issue, except to say that it was their opinion that such a database would violate local church autonomy.[159]

In the weeks leading up to the Convention, Mr. Guenther, Mr. Jordan, and Mr. Boto exchanged emails about how the EC would respond to the Burleson motion. Mr. Boto was preparing a report, which he shared with the two lawyers, that discussed providing instructional materials to churches but rejected the adoption of an SBC database. Mr. Guenther emailed on April 21, 2008, that: "I re-read the document again this morning. When I finished my thought was that it is likely going to be seen as an explanation of why the EC is not going to do much of anything. 90% turns out to be explanations of why we are not going to do something." Mr. Boto responded: "I also believe my long report can be understood to be subtitled "Reasons Why We Aren't Going to Do Anything…I do not expect naysayers will accept either a long or short report, or, in fact, anything we do short

---

[156] http://media2.sbhla.org.s3.amazonaws.com/annuals/SBC_Annual_2008.pdf.

[157] Interview Memorandum of Burleson.

[158] https://goodfaithmedia.org/clergy-sex-abuse-survivor-questions-fairness-of-sbc-executive-committee-study-cms-9469/.

[159] Interview Memoranda of EC Staff Member 3, Page, Oldham, and EC Officer 1. We interviewed EC Staff Member 3, who told us that Mr. Boto had asked him to research the feasibility of a sexual abuse database, including technical requirements and functionality, and to contact all state conventions to get their current practice and input. EC Staff Member 3 believes he started this discussion with Mr. Boto in 2007 but his work likely occurred around 2011.

of payment of reparations and admission of institutional fault. Of course, we aren't going there."[160]

On June 9, 2008, the Bylaws Work Group issued its recommendation on the issue. While declaring that "utilizing a reliable and authoritative database is an extremely important initial step of background review Southern Baptist churches should take to provide the highest degree of protection against sexual predators," the Bylaws Work Group rejected the implementation of an SBC-managed database. Rather, the Bylaws Work Group recommended churches use the Dru Sjodin national sex offender database, maintained and provided by the United States Department of Justice. The Bylaws Work Group's report laid out some perceived practical problems with maintaining an SBC database, and also stated that SBC polity precluded the Convention from "having any authority to require local churches to report instances of alleged sexual abuse to their local association, their state Baptist convention, or the national Convention. In fact, the Convention does not have the authority to create a centralized investigative body to investigate whether an individual has been "credibly accused" by someone within a local church in regard to any matter." Ultimately, the Bylaws Work Group concluded that: "In summary, prevention of sexual abuse, and proper response when victimization occurs, are best accomplished by churches diligently utilizing procedures, information, and resources already readily available."[161]

In our interview with Mr. Boto in May 2022, he said he was against an SBC database because the EC could not be involved in making judgments about who should be on the list, which could create a risk of false accusations and liability. He stated that he was in favor of a database if it had been managed by an outside entity so it would not be on the SBC to assume the liability.

On June 10, 2008, Dr. Chapman gave a speech reiterating the position of the Bylaws Work Group, reporting that Southern Baptist polity precluded the possibility of an independent review board to assess abuse reports and precluded any centralized record-

---

[160] SBC_EC_GJPLaw_00023696.
[161] June 9, 2008 Bylaws Work Group minutes.

keeping on abuse reports. His speech noted that the "world may never understand our polity" and said that anyone who asserts the SBC is "anemic" in fighting against sexual abuse is making "a false accusation."[162]

A few days later, a church pastor posted on MorrisChapman.com that he was disappointed that the EC didn't approve a database. The poster was critical of Dr. Chapman's leadership and claimed that the SBC was hiding behind local autonomy to avoid addressing sexual abuse.[163]

In November 2008, Ms. Brown and SNAP wrote again to SBC leadership, this time to SBC President Johnny Hunt, reiterating their request for the SBC to create a safe place for victims to report abuse, an independent review panel for assessing abuse reports, and a database.[164] On December 18, 2008, Dr. Oldham sent an email to two staff members at Dr. Hunt's church, copying Mr. Boto, telling them to check out the Stop Baptist Predators web page and noting that Dr. Hunt may need to be informed about Christa Brown. Dr. Oldham offered to be available along with Mr. Boto to speak with him and bring him up to speed, closing with "dealing with SNAP can be tricky. They have a way of twisting your words to suit their purposes." Mr. Boto responded to Dr. Oldham's email - "Good job."[165]

Almost three months later, Dr. Hunt responded by saying "we are looking into that" but there was no further follow-up. In an interview, when asked about receiving a letter from SNAP or Christa Brown, Dr. Hunt responded that he did not recall receiving or responding to the letter. He also did not recall any interaction with Dr. Oldham or Mr. Boto on the matter. He said he had a lot going on with his church and travel, and he thinks the letter

---

[162] https://www.baptistpress.com/resource-library/news/stop-sexual-predators-chapman-urges/; https://plusnxt.relativity.one/Relativity/RelativityInternal.aspx?AppID=8252197&Mode=ReviewInterface&DocumentID=1505516&ArtifactTypeID=10&ViewerType=native.

[163] Clergy Rebuke SBC Head for 'Harsh Rhetoric' Over Sex Abuse Cases | Church & Ministries News (christianpost.com). The pastor had previously signed a rebuke of the SBC over the treatment of survivors in June 2007. SBC EC Investigation - SBCDATA0001116196.pdf - All Documents (sharepoint.com).

[164] https://plusnxt.relativity.one/Relativity/go?id=8252197-1507186.

[165] https://plusnxt.relativity.one/Relativity/go?id=8252197-2002646.

would have gone to someone helping him at his church or the EC. It was possible that someone put a letter in front of him to sign.[166]

**2009**

In February 2009, an individual emailed Mr. Boto and another EC staff member to notify them of a recently-received prayer request. The prayer request was for a church in Virginia where the chairman of deacons had admitted to sexual misconduct. The email states "[o]ur chairman of deacons, who has also taught our church's preschool Sunday School for decades, has surrendered himself to our county police on charges of aggravated sexual assault. He has admitted sexual misconduct...." The email later states, "[a]s a deacon and Sunday school teacher, I fear what the outcome of this potential scandal could become for our church members, especially if the media perceives that our church leadership is trying to keep this story under wraps...I believe we need to improve accountability within local congregations, ours certainly is lacking in the regard."[167]

The email was forwarded to Mr. Boto and Mr. Guenther. Mr. Guenther provided the following guidance to the EC staff member, "I don't have an opinion on whether you should contact [the sender] or not. I don't see any point, I guess in contacting the pastor. Email communications such as [the sender's] could be most anything, from totally legitimate, to something goofy. I might lean toward leaving it alone." Mr. Boto provides his concurrence regarding Mr. Guenther's guidance later in the email chain as "[g]ood counsel, Jim."[168]

**2013**

In August 2013, Mr. Boto instructed an EC staff member, who had been assembling lists of ministers accused of sexual abuse, to send those lists to Mr. Guenther as they may need to be produced in litigation.[169] The EC staff member emailed them to Mr. Guenther

---

[166] Interview Memorandum of Hunt.
[167] https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EVar3S48cQlNvRxGVLOX3T4BRJDwBmeiQRE1B9ITgyMIgg?e=q4Oc61.
[168] SBCFIL0000059060 VirginiaRequestforprayer_Noresponse_February2009.pdf.
[169] SBC_EC_GJPLaw_00021985.

and copied Mr. Boto. The EC staff member noted that the more recent list was a "rough draft" and that the incidents had not yet been confirmed as Southern Baptist. The older list contained incidents from before 2008, although the EC staff member stated that: "I am sure there were incidents that I haven't caught yet."[170] Mr. Boto responded by email to the EC staff member and told the EC staff member "don't worry," explaining that Mr. Guenther "just needs to see what we have because of a question in an interrogatory about any lists we might be keeping relating to sexual abuse. We are going to keep doing this and there is absolutely nothing wrong with our doing it. Basically, we are stuffing newspaper clippings in a drawer. Anybody could do that."[171] Again, there was no indication from our document review or interviews that any action was taken at that time to determine whether any of the accused abusers on those lists were still in ministry.

When we interviewed Mr. Guenther, we specifically asked him whether GJP had ever received a list of sexual abuse cases. He replied that no running log of cases was reported to GJP.[172]

| | |
|---|---|
| From: | Augie Boto <[redacted]> |
| To: | [redacted] |
| CC: | Jim Guenther |
| Sent: | 8/21/2013 3:25:52 PM |
| Subject: | Your "list" |

[redacted]--

Please send to Jim (at the email address above) the "list" of info on claims of sexual abuse against ministers in whatever form you are keeping it. Don't dress it up at all. Just send it the way it is.

Jim will decide whether the interrogatories we've received in a case against us require us to disclose your list.

Thanks,

- Augie

D. August Boto, Executive Vice President and General Counsel
Executive Committee of the Southern Baptist Convention
901 Commerce Street, Nashville, T[redacted]
Voice [redacted] Fax [redacted]

The Cooperative Program – Biblical stewardship that changes lives every day, the world over. To get with "The Program" go to [illegible]

170 SBC_EC_GJPLaw_0002145.
171 REL0000010198.
172 Interview Memorandum of Guenther and Jordan.

From: Jim Guenther </O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=[redacted]
To: [redacted]
Sent: 8/22/2013 1:02:45 PM
Subject: RE: News Articles of Child Sexual Abuse

Just what I needed[redacted] Hope you are well. Jim

James P. Guenther
Guenther, Jordan & Price
1150 Vanderbilt Plaza
2100 West End Avenue
Nashville, Tennessee 37203
[redacted]
Facsimile[redacted]

From: [redacted]
Sent: Thursday, August 22, 2013 9:47 AM
To: Jim Guenther
Cc: Augie Boto
Subject: News Articles of Child Sexual Abuse

Mr. Guenther,

Attached are two documents. One is a confidential draft of news article accounts of child sexual abuse that I prepared for Augie in 2011. The accounts were between 2008-April 11, 2011. I have continued to update that document. It is a rough draft and the incidents have not been confirmed as "Southern" Baptist. The other is a list of accounts prior to 2008. I am sure there were incidents that I haven't caught yet. These documents can be sorted in a number of ways. Please let me know if I can help in any way. I hope you and[redacted]are doing well. Have a great day.

[redacted]

To: [redacted]
From: Augie Boto[/O=SBCEXC/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=AUGIE]
Sent: Thur 8/22/2013 2:43:07 PM (UTC)
Subject: RE: Accounts of child sexual abuse

[redacted]

Incidentally, I may not have explained sufficiently to remove any worries you might have about this. But to cut to the chase – don't worry. He just needs to see what we have because of a question in an interrogatory about any lists we might be keeping relating to sexual abuse. We are going to keep doing this and there is absolutely nothing wrong with our doing it. Basically, we are stuffing newspaper clippings in a drawer. Anybody could do that. (And yes, I know is more orderly than that, but I was merely trying to make a point)

Thanks.

- Augie

From: [redacted]
Sent: Thursday, August 22, 2013 9:31 AM
To: JPGuenther[redacted]
Cc: Augie Boto
Subject: Accounts of child sexual abuse

Mr. Guenther,

Attached are two documents. One is a confidential draft of news article accounts of child sexual abuse that I prepared for Augie in 2011. The accounts were between 2008-April 11, 2011. I have continued to update that document. It is a rough draft and the incidents have not been confirmed as "Southern" Baptist. The other is a list of accounts prior to 2008. I am sure there were incidents that I haven't caught yet. These documents can be sorted in a number of ways. Please let me know if I can help in any way. I hope you and[redacted]are doing well. Have a great day.

[redacted]

At the end of 2013, an anonymous complainant, through the SBC website's "Contact us" link, alleged that a youth pastor who had abused her was now the pastor at a large SBC church. This email was forwarded to Mr. Boto and Dr. Oldham.[173] No response was provided to the complainant; she was ignored by EC leadership, and our investigation did not reveal any action taken by the SBC to determine whether an alleged child sex abuser remained as a pastor at an SBC church. The details of the SBC leaderships' decision are shown below.

**From:** Jim Guenther [redacted]
**To:** 'Augie Boto'
**Sent:** 1/8/2014 11:51:34 AM
**Subject:** RE: Anonymous - Abuse victim

I think saying nothing may be the thing to do.

James P. Guenther
Guenther, Jordan & Price
1150 Vanderbilt Plaza
2100 West End Avenue
Nashville, Tennessee 37203
[redacted]

**From:** Augie Boto [redacted]
**Sent:** Wednesday, January 08, 2014 10:35 AM
**To:** Jim Guenther
**Subject:** FW: Anonymous - Abuse victim

Jim – Don't remember if I ever sent this to you. I have not replied and do not intend to unless you advise otherwise

Thanks

[173] SBC_EC_GJPLaw_00014397.

**2014**

In August 2014, Brad Eubank, a minister for over 30 years who is also a survivor, another survivor, and Greg Love, an advocate for survivors, met with Dr. Page, Mr. Boto, and ERLC Executive Vice President Philip Bethancourt to discuss a proposal that the SBC host a conference to educate SBC members about sexual abuse. Mr. Eubank recounted his own experience of being sexually abused by Music Minister John Mr. Langworthy from the ages of 8-12. Mr. Langworthy had moved from Mr. Eubank's Mississippi church to Prestonwood Baptist Church in Plano, Texas. In 1989 after several years as the Music Minister at Prestonwood, church staff discovered that Mr. Langworthy had molested at least one minor boy. Under Senior Pastor Jack Graham, nobody from Prestonwood notified the police and Mr. Langworthy was quietly fired as Music Minister. He returned to Mississippi where, in 2011, he confessed to his congregation at Morrison Heights Baptist Church in Clinton that he had committed "sexual indiscretions" with teenage boys during his time at Prestonwood and before when he was in Mississippi. Police arrested and charged Langworthy with sex crimes and he received a fifty-year suspended sentence.[174]

According to Mr. Eubank, Mr. Boto controlled the meeting and claimed the EC could not do anything about sexual abuse allegations as per the SBC constitution. Mr. Eubank recounted that Mr. Boto rejected every idea that was brought up.[175] After the meeting, Mr. Eubank and Mr. Love followed up with Mr. Boto, Dr. Bethancourt, and Dr. Page but did not receive any communication until months later, as shown in the below screen shots.

---

[174] Ex-Minister Faces Multiple Sex Charges in Small Mississippi Town | U.S. News (christianpost.com).
[175] Interview Memorandum of Eubank.

**Date:** Wednesday, September 3, 2014 at 7:45 PM
**To:** Philip Bethancourt [redacted], Augie Boto [redacted]
**Cc:** Brad Eubank [redacted]
**Subject:** Re: Confidential - Nashville Meeting

Philip and Augie:
Did this reach you?
gsl

Gregory S. Love
LOVE & NORRIS, Attorneys
621 Hemphill Street
Fort Worth, Texas 76104
[redacted]
MinistrySafe.com
AbusePreventionSystems.com

**From:** Gregory Love [redacted]
**Date:** Tuesday, August 2[illegible], 2014 at 4:53 PM
**To:** Philip Bethancourt [redacted], Augie Boto [redacted]
**Cc:** Brad Eubank [redacted]
**Subject:** Confidential - Nashville Meeting

Gentlemen:
Thanks for making the time. Per your request, we are putting together the materials we believe were requested or would be helpful. Some of the framework has already been created and was sent to Dr. Page; I am not sure whether that was forwarded to each of you (see attached).

When it is convenient, I would be happy to show you how the MinistrySafe system works and the online system that provides the backbone. At one time, we were listed as a resource on SBC.net. By the way, the MinistrySafe Awareness Training is available in five languages (as well as closed caption for hearing impaired). This is a critical piece that should be identified as a resource.

[redacted] and I were discussing a possible panel of speakers for a 2015 Conference: she reminded me that such an event needs to take shape very quickly to get the right speaking faculty and nail down logistics. If this is something that is of interest to the SBC prior to 2016, we would need to move quickly.

We are excited about joining you in this challenge. If there is anything in particular that is of interest that we did not discuss, please let us know.

Peace
gsl

Gregory S. Love

**From:** Gregory Love [redacted]
**Sent:** Friday, September 12, 2014 2:28 PM
**To:** [redacted]; Augie Boto
**Cc:** Brad Eubank; [redacted]
**Subject:** Re: Confidential - Nashville Meeting

Gentlemen:
I have attached a skeletal draft of a proposed conference for 2015; eager for your thoughts.
Again, if/when you contact me ... I can walk you through the latest tools available to churches to address the risk of sexual abuse. Augie, you mentioned that you were interested to learn about tools/trainings that can serve Baptist churches. Let me know when you are ready ...

Finally, I have communicated with both Brad and [redacted] and we are ready to provide dates in Oct, Nov or January for a follow-up meeting.

gsl

Gregory S. Love

**From:** [redacted]
**Sent:** Friday, October 03, 2014 3:26 PM
**To:** Augie Boto
**Cc:** Frank Page
**Subject:** FW: Confidential - Nashville Meeting

Augie,
Dr. Page asked me to forward Pastor Brad Eubanks' email on to you so that you might respond to him.

Thank you for taking care of this.

[redacted]

**From:** [redacted]
**Sent:** Friday, October 03, 2014 12:45 PM
**To:** [redacted]
**Cc:** Gregory Love; [redacted]
**Subject:** Confidential - Nashville Meeting

Dear [redacted]

I know Dr. Page is incredibly busy in September and October as they shared with us back in August, but would love you to forward this information on to him so we can follow up from our August Meeting.

Dr. Page,

I know you are incredibly busy and have seen your name in many places and states where you are speaking – wow you must be tired!! Thanks for taking the time to speak in places big and small in our convention. We are so blessed to have you!

I don't want to take much of your time, but I would like to follow up from our August Meeting we had. Thanks so much for taking the time to meet with us. I really sensed your intense interest in this subject and a deep desire to do something meaningful and impactful on this subject. I was thrilled and excited by that.

We would really like to move to the next step but have had difficulties getting Augie or Phillip to respond back to our emails. I know these men are busy as well, but we would really like to discuss our next steps. Greg has sent the information that we talked about to each of them and also requested some dates that would work for the three of you and us so that we could get back together and possibly even others to attend at your discretion or invitation. If you don't mind, would you please follow up with them and help us know what our next steps need to be and how we can move forward in this process. I look forward to hearing back from you.

In Christ Alone,

Brad Eubank

Ultimately, on October 3, 2014, Mr. Boto drafted an email to them rejecting the idea that the EC or ERLC should take a lead role in addressing sexual abuse in ministry settings, stating: "[c]ertainly, the ministry assignments of the ERLC include addressing the problem of sex abuse, and the coordinating work of the Executive Committee includes the ministries of all the SBC entities, but to make headway, any particular issue has to be

shepherded by those by whom it is seen as primary. Neither the EC nor the ERLC will have that luxury."[176] In addition, with respect to the proposed conference, Mr. Boto delayed further meetings by stating, "[a]s for an acceptable meeting date in the months you mentioned...Our availability this year is not good, and January availability depends on some factors not yet gelled."[177] Dr. Page authorized Mr. Boto to send the email, despite Mr. Boto acknowledging it was a little "dark."[178] The EC did not participate in any such conference.

**To:** Augie Boto [redacted]
**From:** Frank Page [redacted]
**Sent:** Mon 10/6/2014 [redacted]
**Subject:** RE: Confidential - Nashville Meeting

Send it... not too dark

---

**From:** Augie Boto
**Sent:** Friday, October 03, 2014 5:10 PM
**To:** Frank Page
**Subject:** FW: Confidential - Nashville Meeting

As you may have gathered, they have in mind a summit at Bellevue, with you and/or [redacted] hosting. I get the idea that they are the "idea" people and we are the "make it happen" people.

Below, I set out a suggested reply I hope you would find acceptable. It is just a draft and can be reworked to fit your druthers. I admit, it is a little "dark." We can talk about it next week if you have time, but if it is close enough to send now, you can let me know that too, and I will just go ahead and send it out.

- Augie

Greg (and others)

The last 5 weeks since your first email have been extremely busy, and I apologize for not having gotten back to you before now. Dr. Page and I have just today returned from a lengthy trip, and he is heading out again next week, with me doing the same the week and weeks thereafter. I may not have mentioned it when we were together, but this time of year is always a high-travel time for all of the senior management personnel here at the EC, with Dr. Page being in the greatest demand, and therefore the one gone the most.

Let me first address the conference idea. In being direct, as I think you would prefer me to be, my aim is to give you the quickest and best sense of how to accomplish your goals as successfully as possible.

1. We have already discussed the ultimate goal, which is to interest as many of our churches as possible in adequately addressing the problem of sexual abuse in ministry settings. Achieving that long term and overarching goal needs to be fostered by a group for whom it is their primary goal. As I see it, you [redacted] and Brad are core members of that group, however it fleshes out more completely later. Certainly, the ministry assignments of the ERLC include addressing the problem of sex abuse, and the coordinating work of the Executive Committee includes the ministries of all the SBC entities, but to make headway, any particular issue has to be shepherded by those by whom it is seen as primary. Neither the EC nor the ERLC will have that luxury.

---

[176] SBC EC Investigation - SBCDATA0001006590.pdf - All Documents (sharepoint.com).
[177] *Id.*
[178] *Id.* The email that Boto ultimately sent can be found at: SBC EC Investigation - Email Thread with Augie Botos Response_222673832.pdf - All Documents (sharepoint.com).

2. As to the more immediate and short-term goal you apparently have identified, which is to have a conference, I believe I read between the lines a compliment to the drawing power you believe Dr. Page and/or [redacted] have. I concur that they both are widely followed. Neither, however, is followed for their work in the field of sexual abuse. I would argue that it might be better to structure the conference to present an array of notables (or at least recognizables) who have been affected in their ministry by situations that fall into the category.

3. Before picking one or more personalities to be involved in any conference, I suggest your group determine how best to organize and divide up the preparatory work and funding of any conference. The curriculum and materials will best be determined by you experts. Venue and speakers will, in large part, be a factor of the funding, although the dates will factor in, certainly, depending on who you wish to be included.

4. As for dates, I do know that Dr. Page would have a difficult time participating in anything in any October that is not a state convention meeting.

5. Finally, I would suggest that hosting a supper or event during the SBC annual meeting would simplify scheduling, attendance and availability greatly. Your team can confer with [redacted] or [redacted] in our office if that is a direction you all wish to head.

As for an acceptable meeting date in the months you mentioned, I need to keep working on that. Our availability this year is not good, and January availability depends on some factors not yet gelled. Because we are not really essential to your progress, my advice is to make headway in fleshing out your key leader group, and discussing among those persons ideas about how best to structure a conference or build the resource website I suggested you build when we met.

In the meantime, as I have opportunity, I will discuss with Dr. Page the possibility of our getting together again in January and will let you know what looks good at this end.

Blessings

**2016**

On June 3, 2016, David Clohessy, Executive Director of SNAP, emailed Dr. Page and Dr. Moore requesting a "denominationally-funded safe space" office to which Baptist clergy abuse survivors may file a report about their alleged perpetrators and that the "safe place" office be widely publicized. Mr. Boto asked Mr. Guenther and Mr. Jordan for their counsel regarding Mr. Clohessy's email and stated that he thought "no response is needed. SNAP can serve as the 'safe place' if it so desires."[179] That same day Mr. Guenther and Mr. Jordan separately responded to Mr. Boto. Mr. Guenther stated that he agreed with Mr. Boto that "the best thing to do is to make no response. I will not take the time to describe the arguments against what he is proposing."[180] Mr. Jordan's responded, "I don't see how the SBC could start receiving reports of clergy abusers and then do nothing with them . . . No response is required."[181]

[179] https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EaGshfeM5xVNg_7P1DqTKwkBbQjctkEzqbZe6O_L80U4eA?e=5cBvQa.
[180] *Id.*
[181] https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/Efr2fcp4WydDozwoEcBYquwBBSEOWuB3D2ZgdwoG8bnRiQ?e=1CyG7o.

**2018**

In March 2018, Dr. Page announced his retirement as EC president and CEO. EC Chair Stephen Rummage released a statement on behalf of the EC about the circumstances of Dr. Page's retirement:

> Last evening, the officers of the Southern Baptist Convention Executive Committee met via phone conference with Dr. Frank Page during which he announced his plans for retirement. Today, I spoke with Dr. Page and learned that his retirement announcement was precipitated by a morally inappropriate relationship in the recent past.[182]

Dr. Page resigned his position after that disclosure. Dr. Page had maintained an improper relationship with a female from a church where he had been an interim pastor. After gossip at the church, Dr. Page was confronted by another pastor and the conduct was confirmed. Dr. Page stated the relationship was a consensual affair with an adult woman.[183] At the time, the EC conducted no further investigation to verify the accuracy of Dr. Page's disclosure or to determine if his conduct carried over into the workplace.[184] In hindsight, Dr. Rummage noted it would have been helpful for the EC to have verified there was nothing inappropriate done with the staff.[185]

In 2018, another SBC leader's conduct was called into question when former SBC President Paige Patterson was terminated from his position as president of Southwestern Baptist Theological Seminary ("SWBTS"). In what the Washington Post termed a "bombshell announcement," the SWBTS Trustees issued a statement accusing Dr. Patterson of lying about his treatment of an alleged rape survivor in 2003 and, in 2015, of emailing his intention to meet with another sexual assault survivor, with no other officials present, so he could "break her down."[186] The 2003 survivor stated that Patterson and

[182] https://www.baptistpress.com/resource-library/news/ecs-frank-page-resigns-over-personal-failing/.
[183] Interview Memoranda of Rummage and Witness 1.
[184] https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EVRud-Wc0-ROsCbyXMsQOxUB0NAW3e3N0HNhGNMhnfOKmw?e=Z2DFEc.
[185] https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EVRud-Wc0-ROsCbyXMsQOxUB0NAW3e3N0HNhGNMhnfOKmw?e=Z2DFEc.
[186] https://www.washingtonpost.com/news/acts-of-faith/wp/2018/06/01/southern-baptist-seminary-drops-bombshell-why-paige-patterson-was-fired/; https://www.christianitytoday.com/news/2018/may/paige-patterson-fired-southwestern-baptist-seminary-sbc.html.

fellow officials discouraged her from reporting her rape and urged her to forgive the perpetrator.[187]

On the heels of the Patterson revelations, the Messengers at the 2018 Convention passed three resolutions directly targeted at sexual abuse issues. Specifically, the resolutions affirmed the dignity and worth of women, denounced all forms of abuse, and called for sexual purity among Christian leaders.[188] One month after the Convention, on July 26, 2018, Dr. Greear announced the creation of a sexual abuse study group, which was in response to a Motion at the 2018 Annual Meeting.[189] At the September 2018 EC meeting, the EC Trustees budgeted $250,000 from Cooperative Program overage to fund a Sexual Abuse Advisory Study for two years, which was to work jointly with the ERLC.[190]

After J.D. Greear was elected SBC President, Mr. Boto met Dr. Greear and Dr. Greear's assistant to orientate Dr. Greear to the role of SBC President. As part of that process, Dr. Greear and his assistant expressed the desire to run background checks on all trustee and committee appointments. According to the assistant, Mr. Boto told them that conducting background checks would not protect one child because these people are not going to be around children and it would be costly. They were not satisfied with this answer, so they tried to figure out how they could vet those that Dr. Greear would nominate to the committees during his tenure.[191] They decided that they would add a question to their vetting process and ask each potential candidate to answer in writing (electronically) whether he/she had ever been accused, charged, or convicted of any type of abuse.[192] Over the course of Dr. Greear's service as president, two individuals self-selected out of being nominated because of that question.[193]

---

187 *Id.*

188 https://www.baptistpress.com/resource-library/news/sbc-resolutions-affirm-women-denounce-abuse/.

189 Greear announces sexual abuse study group | Baptist Press; https://41jmzr10f8zc229tzr2xml7e-wpengine.netdna-ssl.com/wp-content/uploads/2020/07/2018SBCAnnual.pdf.

190 EC WRAP-UP: Sex abuse prevention, pres. search, DR | Baptist Press.

191 Interview Memorandum of Assistant to Dr. Greear.

192 https://solutionpointintl.sharepoint.com/:u:/s/SBCECInvestigation/EYmo5XvtukJPgilzvJl2gMIB1BdIZGUui-XY80HxUMv9AQ?e=HACO9W.

193 Interview Memorandum of Assistant to Dr. Greear.

**2019**

In 2019, during the period when Mike Stone was EC Chairman, a married pastor of an SBC church in Georgia was accused of having an inappropriate relationship with a single mother by several members of his congregation. The woman was in counseling with the pastor who had been sending her text messages and photographs that were sexually suggestive. These text messages and photographs were viewed by witnesses who were interviewed during our investigation. According to witnesses, the pastor agreed to apologize to the congregation and ask for forgiveness. They stated that the apology was drafted with the assistance of Mr. Stone. The witnesses recounted that the apology made by the pastor was not accurate, and that the survivor was blamed. The witnesses stated that they felt intimidated by Mr. Stone for bringing the pastor's behavior to the attention of the deacons in the church. One witness attempted to call Mr. Stone and was instead contacted by Mr. Stone's assistant who told him that Mr. Stone planned to help the pastor, not the church.[194]

After the apology, the pastor took a leave of absence but eventually came back to preach at the church. The witnesses stated that they were retaliated against by the deacons after they disclosed the pastor's behavior. One witness stated that the deacons told him that an anonymous complaint had been lodged against him for inappropriately touching a parishioner, which the witness perceived to be retaliation against him. All of the witnesses and the survivor left the church after the incident due to the way they were treated.[195]

During his interview with us, Mr. Stone stated that this pastor was a close friend and they had attended college together. Mr. Stone acknowledged knowing about this pastor's inappropriate conduct through text messages but stated that he did not receive information that the conduct "reach[ed] the level of sexual impropriety." He stated that he had not spoken to the pastor in more than a year.[196]

---

194 Interview Memoranda of Witness 2 and Witness 3.

195 *Id.*

196 Interview Memorandum of Stone.

On February 10, 2019, the Houston Chronicle published the first in a series of six articles on sexual abuse in the SBC. The series was released in two clusters, in February and then again in late-May and early-June. The articles identified 10 churches which were involved in the alleged abuse. The Houston Chronicle reported that, in the past 20 years, about 380 Southern Baptist church leaders and volunteers have faced allegations of sexual misconduct, leaving behind more than 700 victims. [197]

Only a few days after the first three articles appeared, on February 18, 2019, Dr. Greear addressed the EC at its regularly scheduled meeting. Dr. Greear specifically named the 10 churches mentioned in the Houston Chronicle, and called for an inquiry into whether those churches were "operating with a faith and practice that upholds the Baptist Faith and Message, specifically Article XV, which says that we should seek to provide for the abused."[198]

Early the next morning, Dr. Greear met with EC leadership and attorneys for the SBC, and was strongly criticized for naming the churches.[199] According to Dr. Greear, they told him that he had set up the Convention because he had accused churches of sexual abuse, and Mr. Guenther said they were going to be sued for libel. When Dr. Greear asked how they could be sued if he had just read from the newspaper article, Mr. Guenther said he was not so sure.[200]

According to an SBC Senior Staff Member, Mr. Boto was very frustrated that Dr. Greear announced the churches publicly as it caused an uproar and could lead to lawsuits.[201] According to a former EC Vice President, the EC leadership was concerned that churches might abstain from sending funds to the Cooperative Program or leave the SBC

---

[197] https://www.houstonchronicle.com/local/investigations/abuse-of-faith/.
[198] https://www.christianitytoday.com/news/2019/february/southern-baptists-sbc-expel-churches-abuse-investigation-jd.html.
[199] Interview Memorandum of Greear.
[200] *Id.*
[201] Interview Memorandum of EC Staff Member 4.

altogether. The witness reported that the named churches pressured Mr. Boto and the Bylaws Work Group Chair to clear the churches' names quickly.[202]

Less than one week after Dr. Greear's report, on February 23, 2019, the Bylaws Work Group released a statement clearing the majority of the churches from inquiry but noting that the EC would recommend an amendment to the SBC Constitution that the Convention does not, and will not, cooperate with a church that clearly evidences indifference to addressing the crime of sexual abuse.[203]

The statement condemned abuse but declared that "in virtually all reported cases, the abuse and cover-up of abuse were criminal acts undertaken by a few individuals" and that the "church body rarely knew about these actions and even more rarely took any action to endorse or affirm the wrongful acts or the actors themselves." Although the Bylaws Work Group noted that victims "should always be encouraged to report the crimes against them," the statement urged EC members and SBC messengers to avoid publicly naming churches absent prior notice to the church and documentation of criminal convictions.[204]

There was an outcry from survivors who believed that the Bylaws Work Group had cleared the churches too quickly, even as one of the cleared churches had an admitted sex offender on staff as the Music Director.[205] In a later letter to Dr. Greear, ERLC President Russell Moore characterized the Bylaws Work Group's decision as a "disastrous move … to 'exonerate' quickly and by fiat churches with credible allegations of negligence and mistreatment of sexual abuse survivors – even leading to a call of apology from an Executive Committee official to a church that had, at the time, a sexual offender on staff."[206] Mr. Boto had called the pastor of one of the named churches to apologize for Dr.

---

[202] Interview Memorandum of EC Staff Member 5.
[203] http://m.bpnews.net/52467/sbc-bylaws-workgroup-releases-sexual-abuse-response.
[204] *Id.*
[205] https://www.baptistpress.com/resource-library/news/churches-named-by-greear-in-abuse-report-respond.
[206] SBC EC Investigation - ERLC Moore to JD BWG.pdf - All Documents (sharepoint.com).

Greear naming the church.[207] That church ended up withdrawing voluntarily from the SBC in February 2020 while it was under inquiry by the Credentials Committee.

After Dr. Greear sent a proposal to the Bylaws Work Group for how SBC churches could take "action steps" to address sexual abuse claims, Mr. Guenther sent Mr. Boto and Mr. Jordan a memorandum taking issue with Dr. Greear's approach. In pertinent part, Mr. Guenther wrote:

> I see Dr. Greear's communication to the workgroup as that of a gratuitously offered document which he thinks "could" be sent to a church by the EC when a church is dealing with an incident of sex abuse.... I see a big difference between providing churches with generic resources on the one hand, and starting to hand churches "instructions" ...[t]he latter is a sure-fire way to cause the victim to see the SBC as a "party" in the matter.
>
> ...
>
> So I don't think we ought to engage in discussions with Dr. Greear about the merits of the document. I think we ought to thank Dr. Greear for sharing this idea with us, as we would any Southern Baptist who offered thoughts, and assure him the EC is working on this. In other words I think we ought to tell him "Thank you – we are on it; we welcome ideas." We ought not assume that he thinks as President of the Southern Baptist Convention he plays a management role in the Executive Committee.
>
> ....
>
> In short, it seems to me we ought not engage with Greear on the wording or possible use of his document.[208]

Jennifer Lyell, a survivor of sexual abuse, agreed in March 2019 to publicly disclose the details of her abuse. Prior to this time, Ms. Lyell had not disclosed her abuse to anyone other than her therapist, closest friends, and her pastor and his wife. At the request of executives at Lifeway as well as SBC entity heads, Ms. Lyell agreed to go public with her sexual abuse after she learned that her abuser had been appointed as a missionary for a non-SBC entity and would be in a position to groom and abuse young women again as

[207] Interview Memorandum of EC Staff Member 1.
[208] SBC_EC_GJPLaw_00008576.pdf.

he did with her.[209] Because Ms. Lyell was a senior executive at Lifeway, an SBC entity, she worked with her Lifeway supervisor and the entity counsel to determine the best way to make the disclosure. This disclosure was also coordinated with Dr. R. Albert Mohler, President of Southern Baptist Theological Seminary ("SBTS"), as her abuser had been employed at SBTS during his abuse of Ms. Lyell. Dr. Mohler agreed to provide corroboration of the abuse to BP.

Previously, in March 2018, Ms. Lyell privately disclosed her abuse to her boss at Lifeway and then to Dr. Mohler, the president of SBTS where her abuser was then employed. She told Dr. Mohler and her boss at Lifeway that any sexual contact she had with Professor Sills had been nonconsensual and involved violence, threats of violence against her and others, and coercion.[210] Dr. Mohler clearly understood not only the nature of Ms. Lyell's disclosure but expressly stated that he believed Ms. Lyell and stated that that it was his opinion that she had been abused by Professor Sills.[211]

---

209 SBC EC Investigation - Roger_Oldham_2-Story Process - March 5-8_2019.pdf - All Documents (sharepoint.com).
210 *Id.*
211 SBC EC Investigation - Mohler 5.23.18 Confirmation Post Confrontation.pdf - All Documents (sharepoint.com).

Jennifer Lyell [redacted]

**concern and assurance**

R. Albert Mohler [redacted] Wed, May 23, 2018 at 3:09 PM
To: [redacted]

Dear Jennifer:

[redacted] and I have been praying for you in recent days, fervently and urgently. Thank you for your courage to call me on Monday. I have proceeded just as we discussed and after a confrontation this morning the employment of the individual involved has been ended.

Your courage is humbling and remarkable. We love you, believe you, and pray God's healing for you. We stand behind you.

I just want to assure you that our concern for you is ongoing and also urgent. I am trying to deal with this according to the very highest standards of personal and institutional responsibility — and beyond that, the spirit of Christ.

I want to affirm again that I encourage you to report any abusive behavior to legal authorities. I must leave that in your hands, but I want you to know of my full support.

Second, I would characterize the behavior involved as described in your call as abuse. I want to make certain that Southern Seminary and I do everything appropriate to reveal any abuse and protect anyone vulnerable. Please advise me if you know of any further investigation that we should undertake. I assure you we will act accordingly.

Know of our love and support. I so greatly admire your courage in this.

Sincerely,
Albert Mohler

As a result of her disclosure, Professor Sills resigned from his position at SBTS after being confronted by SBTS leadership in a meeting. SBTS stated publicly: "Southern Seminary is committed to the highest standards of both principle and policy. Our policies and procedures are clear and are consistently applied. Because this a personnel matter, we cannot comment further."[212] Professor Sills' long-time church was advised of Ms. Lyell's abuse after which he was no longer a member at that church.[213] At Ms. Lyell's request, no public disclosures were made of the abuse by Lifeway or SBTS. At that time, Baptist Press published a story about David Sills' resignation which did not provide a reason for his departure.[214]

Once her boss at Lifeway put Ms. Lyell in touch with BP staff, Ms. Lyell began to communicate with them regarding the potential BP story. She provided a "first person" account of her sexual abuse to BP staff which made it clear that any sexual contact

[212] https://www.brnow.org/news/David-Sills-resigns-leadership-roles/

[213] https://www.courier-journal.com/story/news/religion/2019/03/12/louisville-southern-baptist-seminary-professor-accused-sex-abuse/3130024002/

[214] https://www.baptistpress.com/resource-library/news/sbc-digest-seminary-profs-christian-george-david-sills-resign/.

between her and Professor Sills was not consensual.[215] She recounted that the abuse began during a mission trip, and continued over a period of many years, despite having an otherwise close relationship with his family, and a seemingly close relationship with her abuser.[216] Ms. Lyell was clear that any sexual contact she had with her abuser was nonconsensual and involved violence, threats of violence against her and others, and coercion.[217]

As BP staff were preparing to write the story,[218] Ms. Lyell had numerous interactions with BP staff, as indicated in the evidence we reviewed.[219] For example, BP staff asked her follow-up questions regarding her statement, which she answered, and she provided additional information regarding persons who would corroborate her story and her statements of abuse, including Dr. Mohler, the pastor at Professor Sills' former church, and people at his former missions agency.[220] BP staff indicated they were reaching out for corroboration of Ms. Lyell's written statement to these people, and in fact we saw evidence that BP staff contacted these individuals who corroborated her statement.[221] We did not see any evidence that was presented to BP that indicated that the interactions between Ms. Lyell and Professor Sills was anything but sexual abuse.

Also, I learned that Dr. Sills' former missions agency has a statement prepared that they're willing to give (since he resigned from there as well and that was in the original BP article). [redacted] is the contact for that [redacted]

---

215 SBC EC Investigation - Roger_Oldham_2-Story Process - March 5-8_2019.pdf - All Documents (sharepoint.com).

216 SBC EC Investigation - BP Remarks Attached to Email to Mohler from Lyell.pdf - All Documents (sharepoint.com).

217 *Id.*

218 https://www.courier-journal.com/story/news/religion/2019/03/12/louisville-southern-baptist-seminary-professor-accused-sex-abuse/3130024002/.

219 SBC EC Investigation - Roger_Oldham_2-Story Process - March 5-8_2019.pdf - All Documents (sharepoint.com).

220 *Id.*

221 *Id.*

Nevertheless, we saw evidence that Ms. Lyell was concerned that her abuse would be characterized as consensual by her abuser and requested the opportunity to respond if that occurred.[222]

**From:** Jennifer Lyell [redacted]
**Sent:** Wednesday, March 6, 2019 2:10 PM
**To:** [redacted]
**Cc:** [redacted]
**Subject:** Re: another lead

I just heard from [redacted] that he would be glad to talk to you.

And if [redacted] says it was consensual, I would like to give an additional one sentence quote in response to that lie

Sent from my iPhone

No one from BP ever raised the issue of consent with Ms. Lyell. Further, our investigation revealed evidence that people to whom Ms. Lyell disclosed, including Dr. Mohler, corroborated her abuse,[223] and that Dr. Mohler told BP staff that he believed Ms. Lyell had been abused. Others who were contacted by BP staff and provided corroboration include people at her abuser's former mission agency and her employer at Lifeway.[224]

The evidence we reviewed indicated that one of the first places the potential story was vetted was with EC outside counsel. A member of BP staff wrote a summary of the potential story, as well as Ms. Lyell's "first person" draft, and sent it to Jaime Jordan, Augie Boto, and Sing Oldham for review.[225]

---

222 *Id.*
223 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EU33c-_TJ69Jr6wMiySZZh4BFdV3dIk_AMuNAy7PXWu7fA?e=J3230e
224 SBC EC Investigation - Roger_Oldham_2-Story Process - March 5-8_2019.pdf - All Documents (sharepoint.com).
225 *Id.*

Synopsis of Request to BP to tell a Story of Sexual Misconduct

Jennifer Lyell is an employee at B&H LifeWay. She is a former student at Southern Baptist Theological Seminary. She has contacted Baptist Press alleging that a former SBTS professor groomed her for an affair, leading to his dismissal from the Seminary when she brought it to Dr. Al Mohler's attention in 2018. See related story on SBTS professor http://bpnews.net/[illegible]/alleged-seminary-profs-christian-george-and-david-sills-resign.

Also, please see attached document that she sent to Baptist Press.

[redacted] LifeWay's communication's director, contacted Baptist Press about a possible story. I was put in touch with Jennifer and she shared her story and that she has been in contact with Dr. Mohler about her willingness to go public with her allegations. She noted that Mohler is willing to make a statement. She also mentioned she's been in contact with [redacted] acting LifeWay president, CEO, and he is in full support of her decision. She mentioned ERLC President Russell Moore is also aware of the allegations, noting that [redacted] I also remember her mentioning [redacted] also may be aware of the allegations and her willingness to go public.

Lyell said the main reason she wants to go public with the allegations is that she is aware that the accused is pursuing missionary opportunities outside the SBC, speaking and she wants something on the record that people can find in a Google search when researching the possibility of hiring him or asking him to speak to Christian groups. She's concerned other young women might be in danger of a similar situation she experienced. Right now, there doesn't appear to be any stories that point to why the accused was forced to resign from Southern.

Let me know if you have other questions. Thanks.

Thereafter, Mr. Jordan responded with the following comments:[226]

I have forwarded this to Jim to get his eyes on it. He and I have talked about it, and he may have something to add to what I've said below.

I can understand there are good reasons why BP would want to run this first-person story. I've thought of several of those reasons myself, but I will leave it to BP to determine the value of printing the story.

Several questions and concerns popped into my head as I read this Jennifer's narrative:

226 *Id.*

- What age is Jennifer Lyell?
- Her story uses the term "sexual abuse" but it is not clear to me whether she means child sexual abuse, abusing a relationship of trust, or some type of power differential abuse (such as professor student). I think we need to be careful about those distinctions. Does this article cast Sill in a "false light" as a sex offender? Or is he someone who violated employment policies, Biblical commandments, and ethical standards but not any civil laws?
- She says that the abuse continued for more than a decade, apparently part of which time she was in counseling. When such a relationship continues for a long time and the victim has become a mature adult, I think the case that it was all "abuse" may be harder to make, at least to a jury.
- What has BP done or what can it do to corroborate this story if you decide to run it?
- Will Dr. Mohler say that Sill confessed to "sexual abuse?"
- The author never indicates what the sexual abuse was. While BP would not want to print all the sexual details, it may need to know what they are in order to decide whether or not to run this story. People define abuse in different ways, and if the abuse in her case consisted of hugs and kisses, would BP still want to run the story?
- Will BP ask Sill to comment before it runs the story? In a defamation lawsuit, one of the indicia of malice is whether the publisher of the defamatory statement gave the allegedly defamed person an opportunity to dispute the facts.
- The first paragraph republishes statements allegedly made by [redacted] that Paige Patterson "did not take proper steps reporting the sexual assault or caring for [redacted] in its aftermath." I know that Dr. Patterson vigorously denies that allegation. Will BP include his denial in an editor's footnote?
- BP may get inundated with personal stories such as this one. How will it decide which stories are worthy of publication? If BP establishes standards for publishing such stories, does this story meet those standards?

Based on our review of internal SBC BP documents, the BP initial draft of the BP article described the allegations made by Ms. Lyell against her abuser as sexual abuse in the opening paragraph:[227]

New details of former SBTS
prof's resignation alleged
By [redacted]

Tags: sexual abuse, SBTS, LifeWay

Tweet: .@albertmohler: 'Her statement represents personal courage and a deep concern about telling the truth in order to protect others.'

Facebook: "Her statement represents personal courage and a deep concern about telling the truth in order to protect others."

SSS: Nine months after Southern Baptist Theological Seminary professor David Sills resigned for undisclosed reasons, a woman has alleged Sills "sexually abused" her for more than a decade, including while she was a Southern Seminary student.

LOUISVILLE, Ky. (BP) -- Nine months after Southern Baptist Theological Seminary professor David Sills resigned for undisclosed reasons, a woman has alleged Sills "sexually abused" her for more than a decade, including while she was a Southern Seminary student.

---

[227] *Id.*

Thereafter, BP personnel, including Dr. Oldham and outside legal counsel, reviewed and made suggestions on the language of the article.[228]

From: [redacted]
Sent: Thursday, March 7, 2019 9:27 PM
To: [redacted] Greg Oldham
Subject: Sills story

Let me start by saying I realize I have no authority here and I may be way overstepping my bounds. If so, I apologize.

I have a lot of misgivings about posting the story tomorrow. The facts as they read now seem like gossip about a long-term affair between two adults, though of course I don't fault [redacted] and [redacted] for reporting the facts as they were given.

This is beyond the scope of any story we've run before, at least since I've been here. Of course, we have reported on these types of behaviors before, but not in this way and not as the original source. I think this story crosses us over some kind of Rubicon. It puts us in a totally different category of news outlet, and there's no going back to simply reporting the news and how it affects Southern Baptists. We're now making the news.

As much as I may like the idea of our being the ones to break a story and get an exclusive, it seems to me this story would be better reported by the Courier-Journal with follow up from Baptist Press on the ramifications. Or better yet, reported to the police (if indeed there was criminal behavior), which would certainly warrant a Baptist Press report. (Kentucky has no statute of limitations for sexual assault, by the way. I checked.) Mind you, I feel this way only because the facts in this particular case are so strange and not at all cut and dried.

Perhaps our declining to report it would be worse if it caused us to be seen as complicit or attempting to silence a victim. But I had to get on the record about this.

There was significant back-and-forth discussion on the use of the words sexual abuse or assault.[229]

I'm thinking if we switch the focus to [accusations related to an inappropriate relationship] may be the way to go – without specifically getting into abuse or assault. Because the fact remains that a seminary, church and two mission groups have dismissed him based on or immediately following Jennifer's accusations. Reportable action has been taken. I'll discuss with [redacted] (copied) in the morning about reworking it a bit more and will send a new draft.

It was the opinion of certain BP personnel that details about abuse would come out in other media reports, following the release of the BP story.[230]

---

228 *Id.*
229 *Id.*
230 *Id.*

add that part; I'm still wrestling with not including anything about abuse accusations – although I did leave room for other accusations in the lead. In this latest version, the quotes that were given to us were tightened up and no longer include anything about abuse since we tightened that part in our story. But be assured, those details will come out in other media reports, and I just want to make sure that we're including what we need to so that it doesn't look like – as [redacted] noted – we're being seen as being complicit with abuse. Read the latest below. Thanks!

> My overnight thoughts/suggestions.
>
> [redacted], never hesitate to weigh in with your observations/suggestions. While this does carry BP over a Rubicon of sorts, by reorienting the focus as [redacted] suggested and more explicitly lifting up Lyell's stated purpose of addressing this cultural moment, as I've tried to do in this edit, I think it gives us a precedent that goes far deeper than mere prurient interest and touches on the reality of the scourge of inappropriate sexual conduct that occurs far too often in a church or ministry setting.
>
> [redacted], [redacted] as always – these are suggestions only. It's your story to tell. I know you'll run it by [redacted] once you reach agreement. He can help make sure we're within our legal bounds.
>
> *Roy*

In none of the emails do BP personnel question whether Ms. Lyell had in fact been abused.

About 20 minutes before the final article went live online on March 8, 2019,a BP employee called Ms. Lyell and told her that the lawyers had them pull all uses of the words "abuse" and "nonconsensual."[231] She was told not to worry because they were using other portions of her statement. The BP employee made it clear to Ms. Lyell that the decision was already made and was not a matter for debate.[232]

**New details of former SBTS prof's resignation alleged**

by [redacted], posted Friday, March 08, 2019 (4 months ago)

LOUISVILLE, Ky. (BP) – Nine months after Southern Baptist Theological Seminary professor David Sills resigned for undisclosed reasons, a woman has released a statement of allegations including details of what she says was a morally inappropriate relationship with Sills for more than a decade, beginning while she was a Southern Seminary student.

---

[231] *Id.*

[232] REL0000000045. SBC EC Investigation - Lyell Timeline Overview as Sent to Task Force.pdf - All Documents (sharepoint.com).

She was not given the opportunity to respond to the change in language, despite the fact that it now read that she was alleging a morally inappropriate relationship rather than sexual abuse. Not surprisingly, the afternoon the article was posted, Ms. Lyell contacted BP personnel and expressed her concern with the language used in the article.[233]

Gentlemen,

Thanks for work on the piece. I am concerned it sounds far too consensual and despite what many may think, legally and practically, sexual abuse is not limited to those who are underage and fewer than 20% of crimes are reported.

So, I have posted my full statement at https://www.lyellstatementonabuse.com/. I would be very grateful if BP could update the article with a note somehow or link to the full statement, especially since you reference it.

Thanks again. And in case you have any doubt. I have told the complete truth, so hopefully that will be as sobering to you as it should given what he was able to do and how he was able to manipulate me.

Thanks again,
Jennifer

As indicated in her email, Ms. Lyell published her full statement disclosing her abuse, which made it clear that she had been sexually abused, and never had a consensual sexual relationship with her abuser.[234] She was supported in the effort to change the nature of the story by Lifeway leadership at that time who personally spoke to Dr. Oldham about the inaccuracies in the story.[235]

After the final, edited article was posted Ms. Lyell was subject to numerous online attacks, some of which are reproduced below. The majority of the attacks were based on the incorrect assumption that Ms. Lyell had consented to the sexual relationship with her abuser – an assumption which stemmed from the opening paragraph of the article:[236]

---

233 *Id.*
234 *Id.*
235 https://solutionpointintl.sharepoint.com/:u:/s/SBCECInvestigation/EcVFtvgiE9BAvWgDDxnXoPUB6TmHaiqFQ_CzHrwjUT3Tcw?e=b14pi9.
236 https://solutionpointintl.sharepoint.com/:f:/s/SBCECInvestigation/Eg4UeftlDI1lIO1YJZBM4Q8BcAHG3zxXv-wUutW6LjXXRA?e=vb4qSR.

Most Relevant ▾

Write a comment...

[redacted] Two adults engaged in an illicit affair. Only one is punished. This is not justice. Read the article before commenting.

Like · Reply · 1h 9

↳ 4 Replies · 1 hr

[redacted] She's not a victim, she's a sinner. Join me in emailing Lifeway to call for her resignation. Humanresources@lifeway.com

Like · Reply · 45m · Edited 3

↳ 1 Reply

[redacted] Yeah, totally. Groomed in your mid 20s into an illicit relationship that went on ... for a decade. Seems legit. /Sarcasm

Like · Reply · 1h · Edited 6

[redacted] Why is the woman who had an affair with the professor being lauded as a hero. Both she and the professor were guilty of adultery.

Like · Reply · 1h · Edited 15

Most Relevant is selected, so some comments may have been filtered out.

[redacted]

2:45pm

I hope that Jennifer Lyell who, as an adult, carried on an illicit affair for 12 years is disciplined as harshly as the man in this story. I know neither of them but I do know that this is not justice and she is not a victim. Please consider taking action.

[redacted] We are Christians, the Bible is our standard. The Bible affords moral agency to women more than our culture. If this was assault this woman had a duty to report it in a timely fashion. Unless there is some extenuating circumstance where the professor held her hostage or something similar, I don't see how an affair lasting over ten years can biblically be called anything more than an adulterous affair where both are guilty of a sin worthy of death and both need to repent and look to Christ for the salvation of their souls. God is faithful and just to forgive.

23 "If there is a betrothed virgin, and a man meets her in the city and lies with her, 24 then you shall bring them both out to the gate of that city, and you shall stone them to death with stones, the young woman because she did not cry for help though she was in the city, and the man because he violated his neighbor's wife. So you shall purge the evil from your midst.

Like · Reply · 4d 6

[redacted] She's admits to "being compliant at times." But she's guilty of adultery. Not just "being compliant." That's minimizing and blame-shifting language. "Being compliant" suggests passivity. But consensual adultery is an active sin by both parties involved.

Like · Reply · 4d 1

[redacted] Again scripture is our standard not the culture or our feelings. What does scripture say?

Like · Reply · 4d 1

[redacted] she was how old?? and with how many men?

Like · Reply · 3d

Write a reply...

Many of these attacks were posted on the BP Facebook page, which remained active for a period of time after the article was posted. As seen in the evidence we gathered, the attacks were not only personal to Ms. Lyell, but they were also of a professional nature

and called for her to be fired from her job at Lifeway, an SBC entity.[237] In addition, when Ms. Lyell attended the June 2019 SBC Annual Meeting, she suffered in-person attacks, including being physically threatened and called a "whore."[238]

The month after the Lyell story was published, Dr. Ronnie Floyd was elected President and CEO of the Executive Committee. On April 10, 2019, after his election but before he took office, Dr. Floyd sent an email to Augie Boto, Mike Stone and others setting up a conference call on sexual abuse. The email, which appears to be authored by Dr. Floyd, included "10 Calls to Action on Abuse" from the Sex Abuse Advisory Group created by Dr. Greear, a "Sexual Abuse Inquiry Process Proposal" from Dr. Greear, and a list of "Possible Action Steps on Abuse" which could be taken prior to the upcoming convention in Birmingham.[239] The last list raised the notion of making the Credentials Committee a standing committee for "faith and practice issues" as many state conventions had done. The possible action steps also referred to a database and a reporting procedure. Although there was no mention of the precise nature or content of the database, the document does say implementing one was "extremely difficult (impossible?) to do but we don't want to say that without some other options." The mention of the reporting procedure came with this comment: "We need to establish something that helps us avoid witch hunts on one extreme and ignoring reports while the media skewers us on the other."

In a memo dated April 18, 2019, Mr. Boto provided a legal opinion to Dr. Floyd which advises against creating a Credentials Committee. Mr. Boto's main reason against establishing a Credentials Committee is liability: "[i]n plain English, certifying churches would have the effect of rendering the Convention more vulnerable to a claim of liability." Mr. Boto stressed that, "[t]he importance of maintaining current process, and thereby

---

237 https://solutionpointintl.sharepoint.com/:f:/s/SBCECInvestigation/Eg4UeftlDI1IlO1Y JZBM4Q8BcAHG3zxXv-wUutW6LjXXRA?e=vb4qSR.

238 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/ERPMKivAry9DsbZDKsVMH_oBOYol LFxUhNgH076jj77mLA?e=1VGQMV.

239 SBC0000687289 SBC EC Investigation - SBC0000687289.pdf - All Documents (sharepoint.com), SBC0000687289.0001 SBC EC Investigation - SBC0000687289.0001.pdf - All Documents (sharepoint.com)and SBC687289.0002 SBC EC Investigation - SBC0000687289.0002.pdf - All Documents (sharepoint.com).

continuing the so far impenetrable defenses against ascending liability, cannot be overemphasized." He goes onto to provide other reasons against standing up a Credentials Committee, including the minimal benefits to be derived and ancillary detriments, non-existence of State Convention templates, and Bylaws Work Group's processes (including lessons learned from the past).

In May 2019, it became clear to current EC leadership that at least some of them had been aware of sexual abuse allegations against Baptist ministers for years. In an email from Dr. Oldham to Dr. Floyd, copying Mr. Boto and some EC staff members, Dr. Oldham acknowledged that: "For the past decade, I have been regularly sending Augie news reports of Baptist ministers who are arrested for sexual abuse, for his awareness." Mr. Boto confirmed that, saying: "Yes. We are collecting them, and may even post them in some way, but we'd have to really examine the potential liabilities that would stem therefrom."[240]

In other words, Dr. Oldham and Mr. Boto had been collecting the names of arrested ministers for approximately 10 years, yet never took any action to ensure that the accused ministers were no longer in positions of power at SBC churches. In addition, from our review of the documents in this case, none of the SBC leaders who were included on that email ever requested a copy of that list or made any further inquiry about it. Indeed, in our interview with Dr. Floyd, he acknowledged never receiving the list and admitted he probably never asked to see it.[241] As of August 2018, there were 585 possible abusers on the list.[242]

The mounting outcry about sexual abuse appeared to aggravate some within the SBC and was viewed as a distraction. On May 9, 2019, in an email from Mr. Boto to an EC staff member, Mr. Boto described the focus on sexual abuse as a "satanic scheme" to distract the EC from evangelism. In particular, Mr. Boto singled out Christa Brown and

[240] SBC EC Investigation - SBC0000668499.pdf - All Documents (sharepoint.com).
[241] Interview Memorandum of Floyd.
[242] SBC EC Investigation - SBC0000533532.pdf - All Documents (sharepoint.com).

Rachael Denhollander, a survivor advocate, as architects of this "satanic scheme" and stated that "[t]hey have gone to the SBC looking for sexual abuse, and of course, they found it." In our interview with Mr. Boto in May 2022, he again mentioned that the devil was involved in the magnitude of the sexual abuse issue focus in the SBC, which in his view is taking away from the SBC and EC's role in spreading the gospel. He mentioned a book that explains how focusing on something, e.g., sexual abuse in SBC churches, slants a person to see that very thing elsewhere again and again.

On May 23, 2019, Dr. Floyd told SBC leaders in an email that he had received "some calls" from "key SBC pastors and leaders" expressing "growing concern about all the emphasis on the sexual abuse crisis." He then stated: "Our priority cannot be the latest cultural crisis…" The focus of the SBC must be "seen as the constant voice of and for the Great Commission and the constant call to Acts 1:8 and Matthew 28:19-20." He acknowledged that what the SBC was doing "related to the sexual abuse crisis is needed," but described it as going "down a side street to take care of an immediate need."[243]

In the lead up to the 2019 Birmingham convention, Dr. Floyd emailed the EC to express his desire for SBC leadership to have a unified approach to the sexual abuse issue.[244] Both Dr. Floyd and Dr. Greear attended discussions concerning sexual abuse at the convention[245] and both received communications from survivors.[246]

On June 12, 2019, Dr. Greear addressed the convention for a total of approximately two hours, making approximately 81 references to sexual abuse, the abused, and their abusers.[247] Illustrating his intention to invoke open exploration of the issue, he prayed

---

[243] SBC EC Investigation - SBCDATA0000890918.pdf - All Documents (sharepoint.com).
[244] SBC EC Investigation - SBC0000336266.pdf - All Documents (sharepoint.com).
[245] REL0000000624. 2019, June (EC Minutes - Bylaw 8 Recommendation to amend including EC nominees to CC committee).doc (sharepoint.com)
[246] REL0000000045. SBC EC Investigation - Lyell Timeline Overview as Sent to Task Force.pdf - All Documents (sharepoint.com); REL0000002145 . SBC EC Investigation - REL0000002145.pdf - All Documents (sharepoint.com); REL0000000094 . SBC EC Investigation - 6.11.19 SBC JLL Text Exchange w_RF.pdf - All Documents (sharepoint.com); SBC EC Investigation - FLOYDMB0000202096.pdf - All Documents (sharepoint.com).
[247] SBC EC Investigation - SBC0000020398.0001.pdf - All Documents (sharepoint.com).

that: "The abuse in our churches should have been exposed, not hidden or handled internally."[248] He acknowledged the Houston Chronicle articles "which documented decades of abuse involving more than 200 abusers and 700 victims."[249] He admitted 10 percent of the members of SBC churches under the age of 35 have left because they believed sexual abuse was not being treated seriously. He enumerated failures in training staff and volunteers, caring for survivors, crediting survivors, and reporting to civil authorities, and said they were committed by "misusing church autonomy". He then denied that dealing with sexual abuse was a distraction from the primary mission of the SBC because it is "a Gospel issue."[250]

At the Birmingham convention, the SBC Constitution was amended to deem a church in "friendly cooperation" if the church "does not act in a manner inconsistent with the Convention's beliefs regarding sexual abuse."[251] A standing Credentials Committee was tasked with making determinations about whether churches reported for mishandling sexual abuse allegations should be considered in "friendly cooperation."[252] The Credentials Committee's formation and handling of such determinations is discussed in detail in Section VII, *infra.*

Following the Birmingham convention, the sexual abuse issue continued to demand the attention of the SBC. Despite the convention's steps toward addressing sexual abuse, just two days after Dr. Greear's address, Mr. Guenther emailed Mr. Boto about a civil complaint seeking to hold the SBC liable in a sex abuse case, citing comments made by Dr. Greear.[253] Mr. Guenther wrote that: "Augie, I do not know if you want to alert Greear of this case and send him a copy of the complaint I just sent you. It includes allegations regarding statements by Greear and would help Greear understand both the significance of any statements he makes and of the effort to use resolutions and reports and anything

---

248 *Id.*
249 *Id.*
250 *Id.*
251 SBC Constitution Article III.
252 Bylaw 8.
253 SBC EC Investigation - SBCDATA0000890155.pdf - All Documents (sharepoint.com).

else the plaintiffs' lawyer may think is helpful in holding the Convention liable in this case. The complaint might also be helpful to Dr. Floyd in understanding how the plaintiffs are coming at us in this case."[254]

In early July 2019, Jennifer Lyell wrote to BP in an attempt to have the original BP article taken down.[255] Based upon our review, her correspondence with BP personnel was respectful in tone and focused on the factual mischaracterization of the "morally inappropriate relationship" and its negative impact on her life.[256] This request led to a meeting between Ms. Lyell, Dr. Oldham, and another BP employee.[257] On July 16, 2019, after the meeting, Ms. Lyell emailed Dr. Oldham:

> Thank you so much for your time yesterday as well as for your willingness to hear my concerns and for the care you articulated. I left encouraged and hopeful that we will be able to work together to address the problems created by the BP article and alleviate future negative ramifications, misconceptions, and damage to me and LifeWay.
>
> As we discussed, I am attaching a copy of the remarks I read to you yesterday. I waited to send them until I had a chance to let Dr. Mohler know I had reached out to BP, that you had requested a meeting, how the meeting went, and to allow him to review the statement to ensure that he was aware and could once again review the information to ensure I had not inadvertently or unknowingly misstated anything. He was fully supportive of my request and affirmed my statement, which is attached. I am also attaching the zip file I referenced that our corporate communications office compiled for the screenshots of the harassing comments they captured in just that first weekend. I believe that Dr. Oldham mentioned he hadn't been aware of that, so thought it may be helpful for you to see (I've not actually ever unzipped this file as I've been advised to not do so as it would be too disruptive, but it's my understanding that it is mostly the BP Facebook posts).
>
> Finally, I did pull the BP article announcing Dr. Page's resignation and confirmed, as I suspected, that a "morally inappropriate relationship" was cited by BP as the reason for his resignation, thus clearly setting a precedent (among others I'm sure exist elsewhere in BP archives or on other outlets) that this term is used to refer to consensual affairs, which was never alleged by anyone in my case and was only created as the official narrative when Baptist Press unilaterally decided to use the term despite what was actually reported and established. Honestly, this compels me even further that action absolutely must be taken to rectify the editorial decisions BP made that clearly communicated (with precedent) to the public that I had reported being party to consensual sexual sin, which was never ever the case and never reported to BP or anyone else by anyone. It was created by BP and then broadly reported and spread.
>
> Again, thanks so much for your time and work. I will continue praying and be grateful for updates as frequently as you are able to give them as every day this article is online in its current form is a day that Baptist Press is perpetuating a false, damaging, libelous narrative that places me and LifeWay at risk. I am mindful of the details you'll need to work through and will be happy to help with any information/input/feedback you need to work toward a quiet, mutually agreed upon resolution.
>
> Sincerely,
> Jennifer Lyell

---

[254] *Id.*
[255] SBC EC Investigation - Roger_Oldham_3-Story Removal Request 1.pdf - All Documents (sharepoint.com).
[256] *Id.*
[257] *Id.*

Thereafter, Dr. Oldham wrote to outside counsel for the SBC and asked for a legal opinion regarding two "plans" both of which had been reviewed and approved by Mr. Boto and Dr. Floyd.[258]

Following a preliminary review with Augie yesterday morning, I met with Dr. Floyd and he approved the following course of action. Augie wanted me to run it by you for your review as well. I am ready to send this to Jennifer Lyell ASAP to close this loop.

We plan to offer her this.

<u>Plan A</u>

1. We will remove the story from the BP web site and replace the story with this note on the story's URL:

   Due to ease of global access to Baptist Press articles that are posted online, electronic copies of some previously-published BP articles are removed from the website by the editorial team for a variety of reasons. These articles are permanently archived for historical purposes and scholarly research at the Southern Baptist Historical Library and Archives.

2. We will add this header on the hard-copy of the story that will be stored in SBHLA.

   Editor's Note: As a result of social media comments that referenced the article previously posted here — some of which contained harsh and hurtful characterizations of the individual who alleged she had been sexually abused by a former professor when she was a student and continued to experience a long-term pattern of repeated sexual abuse — the BP editorial team removed this article from its website on July 18, 2019.

[258] SBC EC Investigation - Roger_Oldham_4-Story Removal Request 2.pdf - All Documents (sharepoint.com).

Plan B

If she pushes back and wants the header on the website as well, our fallback position is that we will post the full statement this way on the Website, with the second portion added as an editor's note on the hard copy as noted above:

> Due to ease of global access to Baptist Press articles that are posted online, electronic copies of some previously-published BP articles are removed from the website by the editorial team for a variety of reasons. These articles are permanently archived for historical purposes and scholarly research at the Southern Baptist Historical Library and Archives. As a result of social media comments that referenced the article previously posted here — some of which contained harsh and hurtful characterizations of the individual who alleged she had been sexually abused by a former professor when she was a student and continued to experience a long-term pattern of repeated sexual abuse — the BP editorial team removed this article from its website on July 18, 2019.

Plan A was emailed to Ms. Lyell on July 18, 2019, by Dr. Oldham.[259] Ms. Lyell responded that she had reconsidered the position of just removing the article, and instead requested that a header be added to the original article with the following (or similar) language:

> *Editorial Note: Since issuing the following article on March 8, 2019, Baptist Press has come to realize that some language we used in the article is inaccurate and misleading regarding the allegations made by Jennifer Lyell. Ms. Lyell did not report a "morally inappropriate relationship" as we originally reported and in fact alleged having experienced sexual abuse that was non-consensual. In hindsight, we recognize that the full statement Ms. Lyell originally submitted to Baptist Press prior to the publication of our story made this clear and acknowledge that Baptist Press never received any information from any SBC entity, church, or leader that indicated anything other than an abusive relationship was reported by Ms. Lyell. Ms. Lyell's full statement, submitted to Baptist Press prior to the publication of our story was subsequently published in full by her and can be accessed here. It is this statement by Ms. Lyell that Dr. R. Albert Mohler, Jr. commented in our original article he stood behind and believed was righteously motivated. We greatly regret the misconception that language used in our original article has been duplicated elsewhere, created broad misconceptions about what Ms. Lyell reported, and that in doing so it failed to accurately reflect the circumstances on which we were reporting.*

Again, Ms. Lyell's communication was respectful, but emphasized a need to correct the inaccuracies of the original article. Dr. Oldham forwarded Ms. Lyell's email to a BP staff member with the following comment:

---

[259] *Id.*

> [redacted] this is what I propose I send Augie and Dr. Floyd for their counsel. You may have a different sense of things. I solicit your input.
>
> ---
>
> Jennifer's response came in a few minutes ago. Given the fact that the story we published took its shape as a direct result of recommendations from our legal team, I feel obligated to seek input about how to respond. Here is her request (you can read her full reply to me in the email below this letter). I do not find her request objectionable, as I outline immediately below her recommendation. She asks that we keep the story posted and add this editor's note.

Dr. Oldham went on to explain in detail why he thought Ms. Lyell's specific editorial comment was appropriate and unobjectionable – he supported publishing an editor's note similar to the one requested by Ms. Lyell.[260] Thereafter, internal SBC documents show that there was much written back and forth among Dr. Oldham, SBC personnel, Mr. Boto, Dr. Floyd, and SBC outside counsel between July 19, 2019, and the date the story was removed from the BP website.[261] On some occasions, Dr. Oldham argued that Ms. Lyell should be cared for and her request honored. On other occasions, he stated that her demands had changed and could not be met.[262] Dr. Floyd largely stayed out of the decision-making process but indicated the following:[263]

> Well we know resolve must occur one way or the other. Responsiveness is important. Whatever is right needs to guide us, regardless of what occurred in previous stories and dialogue pertaining to them. Therefore, what is right and what is the right thing to do?

Dr. Oldham did not respond to Ms. Lyell's request for a correction. After approximately 10 days had passed, on July 29, 2019, Ms. Lyell followed up by emailing Dr. Oldham and copying Dr. Floyd. Ms. Lyell also emailed Dr. Floyd separately, summarizing the situation. Ms. Lyell asked him to intervene, noting that she did "not want to hurt the SBC, EC, or BP, but [] cannot continue to silently allow the lies created by BP to go uncorrected." Dr.

---

260 *Id.*
261 *Id.*
262 *Id.*
263 *Id.*

Floyd responded to Ms. Lyell, telling her that Dr. Oldham would contact her and asking that they be given a chance to talk through the matter that day.[264]

On July 29, 2019, the below draft editorial comment was sent to outside legal counsel from Dr. Oldham:[265]

Jim. Augie is aware that I have had a continued check in my spirit with proceeding with the removal of the story. During the day today, [redacted] listened to a podcast that rattled his cage about transparency and openness. It was by a former Christian leader who is now an avowed agnostic. In reflecting on this throughout the afternoon, he has suggested this as an editor's note and leaving the story posted. I have edited [redacted] language to remove a reference to SBTS and to Sills by name. Augie is aware of my goal in this. I value your collective opinion on this proposed language.

EDITORS NOTE: Since this story was originally published, Jennifer Lyell has contacted Baptist Press to express grave concerns that the below article did not adequately express her allegations of sexual abuse and misrepresented the alleged relationship as consensual. In response to her concerns and social media comments that referenced this article when it was posted on the BP website -- some of which contained harsh and hurtful characterizations of Ms. Lyell who alleged she had been sexually abused by a former professor when she was a student and continued to experience a long-term pattern of repeated sexual abuse -- the BP editorial team is linking to her full statement (https://www.lyellstatementonabuse.com/). BP notes that, to its knowledge, no criminal or civil charges have been filed against the accused. BP also was unable to reach the accused for a response to the allegations, nor did other parties referenced in the story disclose to BP why the former professor's employment and involvement at their respective institutions ended. BP remains open to running a follow-up story as new developments unfold.

Outside counsel's response included the below conclusion, and on July 30, 2019, the original story was removed without comment.[266]

All things considered, we believe the best course legally is to take down the story without comment, giving us still further defenses, especially against a claim of malice and punitive damages, if Lyell sues.

---

264 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EWIZZat3ck5OvcOYHxX8UPABe1KuGNeAHNUxcM2skGjiGQ?e=ed4K3t.

265 *Id.*

266 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EWIZZat3ck5OvcOYHxX8UPABe1KuGNeAHNUxcM2skGjiGQ?e=ed4K3t.

Again, despite all of the engagement between Ms. Lyell and the EC, no one contacted Ms. Lyell prior to removing the article from BP website. In fact, Ms. Lyell noticed that the article was removed before Dr. Oldham notified her.[267] Ms. Lyell sent an email to Drs. Oldham and Floyd asking whether the correction would be forthcoming. The next morning, Dr. Oldham emailed the following response to Ms. Lyell:[268]

Jennifer,

In an effort to be responsive and sensitive to your sense of well-being, we reached out to you to hear your concerns when you asked us to remove the story from our website. As I indicated, I was deeply saddened to hear your report of deep hurt as a result of various social media comments and direct contacts from individuals who became aware of your story through Baptist Press, your website, other news sources, and social media posts. In that spirit of concern, we have removed, for now, the story of your allegations against David Sills from our website as you initially requested and we earlier said we were willing to do, only without comment. While this is not what you had requested in your follow-up response, we trust this will assist you in days to come as you continue to recover from the traumatic experiences you courageously shared.

*Sing*

Dr. Floyd emailed Ms. Lyell later that night and affirmed the BP's actions.

| | |
|---|---|
| **From:** | EC President |
| **Sent:** | Wednesday, July 31, 2019 9:01 PM |
| **To:** | Jennifer Lyell |
| **Subject:** | Re: BP Story Removal Plan |
| **Categories:** | Ministry |

Jennifer,

Thank you for bringing this to my attention. As you know, this story was reported before I was in my role, so I am just becoming aware of all of this recently.

I affirm the course of action Baptist Press has taken in responding to your initial request and BP has removed the story from its website for now. You can be assured I will continue to be aware and involved. Also, Dr. Oldham will contact you with additional information.

I will be in prayer for you in the coming days, during which I will be traveling extensively.

Dr. Ronnie Floyd
President/CEO
Southern Baptist Convention Executive Committee

267 *Id.*
268 *Id.*

After the emails from Drs. Oldham and Floyd, and the removal of the story, Ms. Lyell reported that she suffered physically, emotionally, and professionally.[269] These effects were repeatedly brought to the attention of EC and BP personnel, including Dr. Floyd's personal assistant, during the period when Ms. Lyell was requesting that BP correct the article. There was a change in leadership at Lifeway (a new President started in July 2019), and she reported that she did not feel supported by the new leadership; that he treated her in an unprofessional manner in front of her peers.[270] Ms. Lyell further reported that she lost a significant amount of weight and had other health issues, including hair loss and fainting.[271] Ultimately, as described further below, Ms. Lyell lost her career, her health, and many of her colleagues and friends due to the way her "relationship" with her abuser was portrayed in the article written by BP. These facts were confirmed by numerous witnesses interviewed by our investigative team.

While the matter involving Ms. Lyell was ongoing, in a July 18, 2019, letter to Dr. Floyd, Mr. Boto announced his retirement as the EC's executive vice president and general counsel, to be effective as of September 30, 2019. Among other things, Mr. Boto wrote to Dr. Floyd that: "In examining all the ways I might be of help to you and the future of the Executive Committee, I have come to the conclusion that stepping aside in retirement from my work is the best one. This will provide you with the maximum flexibility in reorganizing and re-tasking the EC staff along lines you believe will be most fruitful."[272]

Publicly, going forward into the fall of 2019, the EC took what appeared to be an aggressive stance against sexual abuse. The ERLC sponsored a conference in early October 2019, titled: "Caring Well: Equipping the Church to Confront the Abuse Crisis." At the conference, several SBC leaders and survivor advocates expressed similar

---

[269]https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EXX9oKFV1fpMoB3CiMIlpt8BJm-Bf_rQrxj7T4AwJFEvNg?e=SlpaaW.
[270]https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/ERPMKivAry9DsbZDKsVMH_oBOYolLFxUhNgH076jj77mLA?e=lCDFpZ.
[271] *Id.*
[272]https://www.baptistpress.com/resource-library/news/augie-boto-to-retire-from-sbc-executive-committee/.

concerns about the need for change within the SBC. For example, Drs. Greear and Floyd participated in a panel discussion during which Dr. Greear was quoted in a news report saying the: "common criticism that the convention's steps so far are 'all talk and no action' was 'very fair and understandable.'" According to the same report, Dr. Floyd, when asked why it has taken so long for the SBC to respond to sexual abuse, replied: "Quite honestly, I don't know the answer to that. What I do know is that there's a pretty unhealthy culture at times in the Southern Baptist Convention, which personifies probably the unhealthy culture of many of our churches. And the more unhealthy a church is, the less likely they are going to be able to deal with whatever may come their way, especially this kind of very difficult issue." Dr. Floyd then "urged Southern Baptists to 'establish a healthy culture together.'"[273]

The same day the Caring Well conference ended, Dr. Floyd exchanged a series of emails with key EC staffers concerning the conference. He reported receiving a call from an unnamed "major leader" who complained about Rachael Denhollander's statements accusing some prominent SBC leaders of covering up for an abuser. Dr. Floyd claimed that before the Caring Well conference the SBC was "on a path" that would have brought "real change," which he feared might not be true after the conference.[274]

Some excerpts from the email exchange, set forth below, illustrate the differing perspectives within the EC:

> Dr. Floyd: "Guys, this is really not good at all. We cannot have SBC entities placing people on platforms calling out the matters about how the SBC and some of its leaders and former leaders [*sic*]. All the work on unity is getting challenged."
>
> EC Staff Member 6: "Regarding Matthew 18 – that principle absolutely still applies; the problem is that in nearly every instance in the past when victims

[273] SBC0000269007.0001. When we interviewed Dr. Floyd, he said his comment was describing the divisive way SBC leaders were treating each other, mirroring the divisiveness in America, and was not describing the SBC's response to sexual abuse as unhealthy. *See* Interview Memorandum of Floyd.
[274] SBC EC Investigation - FLOYDMB0000231830.pdf - All Documents (sharepoint.com).

have come to those in power in the SBC, they have been shunned, shamed, and vilified. At the EC, we have inherited a culture of rejecting those who question power or who accuse leaders. [Naming survivors]— they all reported their abuse to those in the SBC and at every turn they were met with resistance, and they were turned away."

Dr. Floyd replied with gratitude and added he was also concerned with "not losing trust with the base of the SBC."[275] In a separate response the same day, Dr. Floyd identified the "base" of the SBC as "thousands upon thousands of leaders and churches that operate at high levels. They are godly and holy, committed to what we do. ... They are not mad. They are not looking the other way at sin. They are giving, going, praying and sending." He cautioned his staffers that they "cannot go into the weeds every time someone wants us to do so."[276]

Dr. Floyd continued to bring the "base" of the SBC into discussions about the response to sexual abuse. On Oct. 8, during a conversation among Dr. Floyd and three EC staffers and two ERLC staffers, which was covertly though legally recorded by one participant, Dr. Floyd again expressed concerns about "the base."[277] After Russell Moore advocated for not having any fear of the truth, Dr. Floyd cautioned that many members of the base will not see it that way.[278] He asked how they could "preserve the base of the people that want to support" and who "believe in the cooperative program." He then asked: "But how do we preserve the base? That's what I'm concerned about is the base." Dr. Moore replied: "Well, I think the base is fine. I think there's a difference between the base and some people on the peripheries of the base who very much would not like these issues being discussed or to have them discussed in a way that's safe and gauzy."[279] Following this meeting, an EC staff member expressed his opinion that churches were going to be

[275] SBC EC Investigation - FLOYDMB0000231838.pdf - All Documents (sharepoint.com).
[276] SBC EC Investigation - FLOYDMB0000231839.pdf - All Documents (sharepoint.com).
[277] "2019 – 1008 – Ronnie Floyd caring well conference" in Teams: General/ SBC Personnel Witness Folders/ Philip Bethancourt/ Bethancourt Recordings. 2019 - 1008 - Russell Moore debrief on Ronnie Floyd caring well conference.docx (sharepoint.com).
[278] *Id.*
[279] *Id.*

upset and leave the SBC. During our interview with him, however, he admitted that he is aware of only two churches that left.[280]

While the EC leadership was engaged in debate, the remaining EC Trustees were kept in the dark. An EC Trustee emailed Dr. Floyd on Oct. 9, saying he was a strong supporter of Dr. Floyd and was concerned about the attacks leveled against him, but stating he is "very uninformed about these sexual abuse accusations." Dr. Floyd responded the same day, saying he had "no knowledge of any cover ups."[282] He made no mention of everything he had learned since becoming President and CEO of the Executive Committee, gave no specifics about the many allegations over the years.

During the remainder of October 2019, Ms. Lyell continued to reach out to Dr. Floyd and key members of his staff regarding her mistreatment by the Baptist Press. Ms. Lyell personally attended the Caring Well conference in October 2019.[283] During the second day of the conference, one of the presenters publicly spoke about Ms. Lyell's story.[284] Soon thereafter a new VP of Communications posted about the commentary:

---

[280] Interview Memorandum of EC Staff Member 5.

[282] SBC EC Investigation - SBC0000684846.pdf - All Documents (sharepoint.com).
[283]https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/ERPMKivAry9DsbZDKsVMH_oBOYolLFxUhNgH076jj77mLA?e=pHDrS9.
[284]https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/ERPMKivAry9DsbZDKsVMH_oBOYolLFxUhNgH076jj77mLA?e=pHDrS9.

**SOUTHERN BAPTIST CONVENTION**
**Executive Committee**
901 Commerce Street | Nashville, Tennessee 37203 | [redacted]

On March 8, 2019, Baptist Press released a news story that was referenced today, October 5, 2019, by Rachael Denhollander in an interview at the Caring Well Conference.

In recent days, I've been made aware of the situation surrounding the article and the decisions made by Baptist Press at the time of publication. I'm also aware that the story omitted all references to abuse and a lack of consent to sexual activity, and was framed as "a morally inappropriate relationship." This led to a general understanding that what happened between Dr. David Sills and Ms. Jennifer Lyell was a consensual affair. As I understand it, that is not accurate.

As the official news service for the Southern Baptist Convention, Baptist Press should be known for integrity, truth, and accuracy. Ensuring that is my top priority.

**Jonathan Howe**
Vice President for Communications
Southern Baptist Convention Executive Committee

Based on the documents reviewed and interviews conducted, our investigation revealed that these events led to a public recognition by the EC that the March 2019 BP story regarding Ms. Lyell was inaccurate, resulting in a retraction on October 15, 2019.[285]

[285] https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/ERPMKivAry9DsbZDKsVMH_oBOYolLFxUhNgH076jj77mLA?e=pHDrS9.

## A Statement from Baptist Press

by BP Staff, posted Tuesday, October 15, 2019 (18 days ago)

NASHVILLE (BP) – At the Caring Well conference in Dallas, Texas, several survivors shared their traumatic experiences of being victims of sexual abuse (Oct. 3-5, 2019). These courageous stories, along with keynote speeches from others, greatly impacted those in attendance and those watching online.

One of the presenters, Rachael Denhollander, shared her personal testimony of suffering through multiple instances of sexual abuse. In her interview with Russell Moore, Denhollander mentioned a situation involving the reporting of Jennifer Lyell's abuse allegations that came to light through Baptist Press in March 2019.

Following Denhollander's comments, our staff worked diligently to reexamine Lyell's statement she provided and all communication surrounding the original publishing of her claims. After a thorough review of what was presented to the writers and editors, and discussions with those involved with its publishing, we confirm and acknowledge that our story that ran on March 8, 2019, did not accurately communicate the allegations made by Lyell.

The story in its original draft form, as submitted by the writer, clearly communicated the emotional and sexual abuse that Lyell alleged took place at the hands of David Sills as she maintained a relationship with his family. However, the story in its finished state omitted references to abuse and was framed as "a morally inappropriate relationship." This change in language seems to have led to a general public understanding that what happened between Sills and Lyell was a consensual affair.

Baptist Press ultimately failed to convey that the heart of Lyell's story was about sexual abuse by a trusted minister in a position of power at a Southern Baptist seminary. The story, as written, made concessions to legal and policy concerns, and Sills never responded to Baptist Press' request for comment. While we acknowledge these issues are always present in journalism, in this case our story apparently made it easy for some to miss what should have been the main focus. For that, we are deeply sorry.

Since the story's publication, Lyell has been the recipient of un-Christlike slurs -- some by fellow Southern Baptists – and her reputation has been besmirched. In fact, the story stayed on the Baptist Press Facebook page for many hours where many of those slurs were posted. The conversation that occurs on our social media profile pages should glorify Christ in the way we treat one another and in the way we support those who report sexual abuse. In this case, it did not. Since this incident, we have enacted a more stringent Facebook commenting policy and monitor the page much more closely in order to prevent situations like this from occurring again.

For these actions, we offer a sincere apology. Lyell came to us with an allegation of abuse and should have been cared for throughout the entire process. Instead, for many this incident may have contributed to a perception that the Southern Baptist Convention is not a safe place for sexual abuse survivors to disclose. Our readers must be able to trust that the news they receive from us is accurate and trustworthy and that the stories we print will ultimately protect and aid those involved.

The apology however came only after certain SBC EC staff undertook a review of what happened in Ms. Lyell's case and uncovered the systemic manner in which she was mistreated, including numerous emails requesting relief that were either ignored or not properly addressed.[286] Finally, Dr. Floyd agreed to meet with Ms. Lyell in October 2019, via videoconference with SBC EC staff present. Based on interviews, during this meeting Dr. Floyd did not provide an apology or offer to take any responsibility for the SBC EC's failure in leadership.

---

[286] 2019 - 1009 (unsure of exact date) - caring well conference debrief.docx and 049_Re What do they want (16).msg

Regardless of the article and apology, Ms. Lyell ultimately had to resign her position at Lifeway due to the fallout from the original article.[287] Her continued employment at Lifeway was being questioned internally by her colleagues and peers as well as externally by current or potential authors. Her resignation letter of October 18, 2019 specifically noted the March 2019 BP article and the fallout thereafter as the cause of her resignation. Essentially the fact that Ms. Lyell had been falsely portrayed as an adulteress by BP rather than a victim of sexual assault caused her to lose her position as a senior executive at an SBC entity, among other things.

Even after BP had printed the retraction of the inaccurate BP article, Dr. Floyd and his staff continued to complain about the survivor community, expressing bewilderment at their online behavior and negative tweets about the SBC's response to sexual abuse concerns. For example, Dr. Floyd asked in an email on Oct. 16, "What do they want?" and bemoaned the fact he had become a target of their ire while going "over the top trying to get us to create a path for the future for the SBC on us addressing this issue."[288]

On Oct 16, 2019, at 5:13 AM, Ronnie Floyd [redacted] wrote:

All, what do they want? What do they want us to speak about? Who do they think Baptist Press is owned by and operates it?

None of this makes sense. I am getting killed online and like I did not want matters corrected? They are correcting presently.

What is missing? Help me understand? All these people who I did not even know that I went over the top in trying to get us to create a path for the future for the SBC on us addressing this issue, now are going after me.

I am very troubled by all of this and just crying out to God to protect me, my family, and all of us in this journey. All of this is really really troubling in every way.

---

[287] https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/Ef_u9cCNfiZHp12GTscvNJoBTNkuvNxZ_MDZViUX7-JjBw?e=8BHQ2h.
[288] SBC EC Investigation - REL0000005207.pdf - All Documents (sharepoint.com).

Dr. Ed Upton, the Assistant to the President replied: “I think the only real, viable option we have here is to just keep moving forward with what we are doing and do our best to ignore what is happening in the social media world . . . I want [Ms. Lyell] to be whole again. I want her to experience healing and happiness, but what she is doing [online] isn’t the way to attain that.”

From: Ed Upton [redacted]
Date: Wednesday, October 16, 2019 at 6:23 AM
To: "Dr. Floyd" [redacted]
Cc: [redacted], [redacted], [redacted], [redacted]
Subject: Re: What do they want

I don't know that I have a great answer for you except that some of these folks are hurting and just want everyone else to hurt too.

I think the only real, viable option we have here is to just keep moving forward with what we are doing and do our best to ignore what is happening in the social media world. I think we may be at a point where we need to stop communicating with Jen, especially if she is thinking seriously about suing us. If she is making threats that way of any sort, we need to notify Jim and Jamie and our insurance company and let them deal with her lawyers directly, which takes us out of the line of communication. Jen is going to wind up digging herself a hole if she's not careful. She wants to be heard, and she is being heard right now, but people will grow weary of this eventually if all she keeps doing is killing people on twitter. I want her to be whole again. I want her to experience healing and happiness, but what she is doing isn't the way to attain that.

We can try to engage her further, but the goal posts are constantly moving. Jonathan said yesterday that we were going to put out the statement and consider it done on our part. I think we need to move that direction. We are moving on to other things.

These folks will see over the next few months that we are serious about changing the culture and that we are serious about doing all we can to make sure sex abuse (to the best of our ability) doesn't happen in SBC churches anymore. Unfortunately, they are going to continue to be loud for now.

We can start to change the narrative though by putting out the notice today that we are looking for a new BP leader.

The only other option, as I see it, is for you to put out a statement detailing what has happened here over the last few months, and the unhealthy culture that has existed at the EC for a long time, but I just think that is something we CAN NOT do.

We have to take the high road... but I realize that's easy for me to say when I'm not the one personally getting attacked either. I will continue to press into folks that I have influence with to help us with the narrative.

Dr. Edward Upton
Assistant to the President
SBC Executive Committee

The VP of Communications, Jonathan Howe, replied with an observation on the survivor community’s responses to Ms. Lyell’s tweets: “The ‘survivor community’ is all up in arms about things they have no clue about,” adding later, “online survivor folks, they just want

to burn things to the ground. They just have to be ignored. They don't reason; they don't listen." The VP added in his response to Dr. Floyd that "Obviously, I don't know what happened with that email and that entire string – who saw it, what Augie or Sing advised, how much they ever shared with you, or even if you actually wrote that. But that section is the critical part to her . . . because of the way [Ms. Lyell] was treated by those before you got here, she was out of grace and understanding." [289]

On Oct 16, 2019, at 8:25 AM, Jonathan Howe [redacted] wrote:
I'm with Ed here. We have to just keep doing our thing.

The "survivor community" is all up in arms about things they have no clue about. But on the flip side, the base (and even the fringe groups of the SBC) were overly positive about the statement and continue to be so.

With these online survivor folks, they just want to burn things to the ground. They just have to be ignored. They don't reason; they don't listen. When Stetzer hosted a survivors thing a few years back at Wheaton, they were even threatening [redacted] It was sick. They are hurt people, and they just want to destroy everyone.

We only have one survivor to focus on, though: Jennifer Lyell.

Yes, she instigated a lot of this through her tweets. And she has an extreme view of how things happened here. I wouldn't exactly say she has the correct narrative. Not even close. But from everything I can tell, this is the sticking point for her as it relates to you, Dr. Floyd.

She sent that email that read:

I truly beg you, Dr. Floyd, if so, to even now intervene and honor my request, which did not even request an apology, simply a correction of what all involve is inaccurate, damaging language (including, but not limited to, Dr. Mohler). I do not understand the unwillingness to do so and am deeply grieved by the response I have received despite my silence, patience, how little I've asked, and how much I could be doing. If this reflects your will as EC President, I need to know that as it is not an acceptable solution (the article remains online elsewhere in multiple places, as does the false baseless libelous language created by BP) and I'll need to pray and seek counsel about next steps to have this truly corrected by BP if you confirm that Dr. Oldham's response reflects your will as well.

And this is what she got back:

---

[289] *Id.*

I affirm the course of action Baptist Press has taken in responding to your initial request and BP has removed the story from its website for now. You can be assured I will continue to be aware and involved. Also, Dr. Oldham will contact you with additional information.

Obviously, I don't know what happened with that email and that entire string—who saw it, what Augie or Sing advised, how much they ever shared with you, or even if you actually wrote that. But that section is the critical part to her. That's what she's basing her ENTIRE narrative on as it relates to you. That's her baseline. It's where she's coming from.

Is it fair to base an entire narrative off of one email? Absolutely not. But because of the way she was treated by those before you got here, she was out of grace and understanding. So she's lashing out, now.

ALL of this is based on that one email exchange. It's the hinge point.

As for a path forward with her, I'm not sure what's best. I do think because of the threat of legal action, we should talk to Jamie and Jim later today and get them up to speed. And from what I gather, it has little to do with libel and the facts of the story, but more to do with defamation and what happened on the Facebook page and the aftermath of the story. In my talks with Jamie earlier this week, he indicated a high level of confidence that we were clear on the libel side. We did not discuss the defamation stuff, though.

I have some other thoughts on how we can move forward with her, but I'd like to hear from [redacted] before I go there.

In December 2019, the new standing Credentials Committee, which Dr. Floyd cited as an accomplishment as recently as his interview with us,[290] was criticized by Christa Brown and an advocate on the churchleaders.com website for not accepting anonymous submissions. Dr. Floyd forwarded a report of that critique to three staffers with the single word comment, "Again. . ."[291] Dr. Upton replied this was an expected criticism, and added that they "are never going to be happy. Some people just want to watch the world burn." In turn, Dr. Floyd said that Christa Brown and the advocate "have become so off-track."[292] On Dec. 19, Dr. Floyd forwarded to key staffers a news report naming the Houston Chronicle stories the number one religion story of 2019. Dr. Floyd added this comment: "and I would be fine if that story was never mentioned again anywhere, but simply wanted to make sure you were aware."[293]

---

290 Interview Memorandum of Floyd.

291 SBC EC Investigation - REL0000004576.pdf - All Documents (sharepoint.com).

292 SBC EC Investigation - SBC0000397323.pdf - All Documents (sharepoint.com).

293 SBC EC Investigation - REL0000004357.pdf - All Documents (sharepoint.com).

**2020**

In January 2020, a survivor emailed Dr. Floyd to complain that Paige Patterson was to speak at a conference.[294] Dr. Floyd asked a key staffer how they should respond. The staff member said he had determined the conference was sponsored by a local church, not a state convention, and so he had to leave it in "the hands of the local pastor and those putting on the event." He then described the situation in this way: "I am not a huge fan of us constantly ducking this on grounds of autonomy, I just don't know what other options we have without jumping in the deep end of the pool on sex abuse. And that's a tough play in this SBC climate from our seat. Because for some in the survivor community…, if you start into this it will never be enough for them." Dr. Floyd replied: "Well autonomy is who we are and how we operate everywhere, therefore we cannot duck it."

The staffer responded by noting that: "There is a general unrest and fear that the SBC will go 'back to normal' as it relates to sec (*sic*) abuse and those involved in covering it up. That 2018-2019 will be forgotten and we'll be holding PP [Paige Patterson] on a pedestal again. And that concern it (*sic*) not without merit because we all know there are people in the convention who would love nothing more than just that. And here we are stuck in the middle with no real authority or standing or involvement. But we keep getting shot at from both sides." Dr. Floyd concluded the exchange by saying, in part: "We are not governing the churches, cannot govern the churches, and it would not be received if we even attempted to do so. … The entire miracle of cooperation around the Great Commission that is based upon our understanding of the Bible is the ONLY thing that keeps us together. Needless to say, this is why we have to do all we can within the influence entrusted to us through our Ministry Assignments and the calling of the Lord, to get ahold of the narrative in every way possible. …."[295]

---

[294] On January 20, 2020, another survivor complained to the CC about the Patterson appearance, noting that she had written to Dr. Floyd and others about it. SBC EC Investigation - 2020.01.11 FL.pdf - All Documents (sharepoint.com).

[295] SBC EC Investigation - SBC0000396253.pdf - All Documents (sharepoint.com).

This still appears to be Dr. Floyd's position. During his interview with us, he expressed the following sentiments when asked how the SBC had such an issue with sexual abuse:[296] Dr. Floyd stated that the SBC has no real authority over churches, due to autonomy and how the SBC is governed, and that local churches have no reason or obligation to report anything. He said that if people understand the governance structure, they could understand how far outside the SBC's role is from the local church. Dr. Floyd explained that the SBC promotes the Cooperative Program that is based on local churches choosing to send money and be a part of this financial set-up; the SBC does not pay attention to issues, it just disperses the money to move the mission forward.

Dr. Greear spoke out about the Dr. Patterson appearance in an interview with the Houston Chronicle reported on January 24, 2020. He noted that Dr. Patterson had been dismissed from Southwestern Baptist Theological Seminary by its trustees for conduct "antithetical to the core values of our faith" and stated: "I advise any Southern Baptist church to consider this severe action before having Dr. Patterson preach or speak and to contact trustee officers if additional information is necessary." Dr. Greear was also quoted in the article as saying: "Southern Baptist churches must take our mutual accountability to each other more seriously than we have in the past. If our system of governance means anything, it means exercising due diligence and heeding what those whom we put in positions of trustee oversight have reported about official misconduct."[297]

At the EC meeting in February 2020, Dr. Greear explained his comments. He declared: "At no point have I said or implied that the SBC President can dictate to churches who they can or can't have in their pulpit. My actual comments . . . were that SBC churches are autonomous, but we have acknowledged that autonomy is no excuse for a lack of mutual accountability…."[298] Under the slogan "Gospel Above All," Dr. Greear set five

---

296 https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EcpQhpc7ACBOiJ0bowDG3CgBYSFpDTZel1RpCs18ccLElQ?e=Ivms2J.
297 SBC EC Investigation - SBC president cautions churches about hosting disgraced leader Paige Patterson.pdf - All Documents (sharepoint.com).
298 SBC 2020 EXEC COMM, March.pdf (provided to us by Dr. Greear as a document linked to the timeline he provided).

objectives for the annual meeting scheduled for June. The foremost was "Handling the sex abuse crisis;" the last two were "Maintaining cooperative efforts and institutions" and "Great missional resurgence." In contrast, Dr. Floyd, under the banner of VISION 2025, focused on increasing the number of missionaries, churches, teenage baptisms and contributions to the Cooperative Program. The sex abuse crisis was not mentioned.[299]

Although he was not outspoken on the sexual abuse issue at the EC meeting, Dr. Floyd did take several actions in February that were responsive to sexual abuse within the SBC. In the wake of the International Mission Board creating a position of prevention and response administrator (to oversee efforts concerning child abuse, sexual harassment and domestic violence among its missionaries and staff), Dr. Floyd praised the effort in a press release.[300] He also approved the release of a statement to Christianity Today saying that Southern Baptists "lament any and all instances of sexual abuse, particularly in a church setting," and citing the Credentials Committee, changes to the SBC Constitution, and the Caring Well initiative as evidence of that posture.[301] On Feb. 17, as part of a presentation to the Cooperative Program Committee, Dr. Floyd again cited the Credentials Committee and the constitutional changes as proof of how the EC "walked through and led through major sexual abuse challenges."[302]

However, friction was growing between Dr. Moore, President of the ERLC, and EC leadership. In February 2020, members of the EC called for an investigative task force to perform a review of the ERLC.[303] Dr. Moore had no prior warning about the announcement.[304] Some ERLC members and staff with whom we spoke viewed the

---

299 REL0000000341.
300 SBC0000284767.
301 REL0000003839.
302 REL0000003615.0001.
303 https://plusnxt.relativity.one/Relativity/go?id=8252197-1505483.
304 https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/ETRV0V58Dt1Lk_BBSggp63MB5GMScV33psgo__hgil-3mA?e=qLq6XO&wdLOR=cCAD2654E-AA22-6740-AFB8-4AC9A9CBFF1D; Interview Memorandum of ERLC Staff Member 1.

investigation as a retaliation against Dr. Moore and the ERLC for their support of the Caring Well conference and other reforms related to sexual abuse.[305]

Following the announcement of the investigation, Dr. Moore wrote a letter dated February 24, 2020, to some ERLC trustees, communicating his frustration with the EC's stonewalling and resistance to change.[306] Dr. Moore explained the problems he saw with the EC's leadership and identified the root of the friction between the EC and himself:

> The presenting issue here is that, first and foremost, of sexual abuse. This Executive Committee, through their bylaws workgroup, "exonerated" churches, in a spur-of-the-moment meeting, from serious charges of sexual abuse cover-up. One of those churches actively had on staff at the time a sex offender. J.D. Greear, our SBC president, and I were critical of this move, believing that it jeopardized not only the gospel witness of the SBC, but, more importantly, the lives of vulnerable children in Southern Baptist churches. Against constant backroom attempts to stop forward momentum, we were able to get across the finish line some modest steps toward addressing the crisis in our convention — the Caring Well Challenge, for instance, and the formation of a credentials committee.
>
> As you know, our last ERLC National Conference was built around the issues of sexual abuse. We said from the beginning that we wanted a place for honest dialogue around these issues, and we would not police anyone from speaking what he or she had experienced or thought. At least one speaker harshly criticized us for not doing enough, or not handling things the way he thought we should. I welcomed that criticism. I learned from it, and was glad that the speaker felt the freedom to do so. At that conference, though, Rachael Denhollender [sic] participated with me in a conversation where, again, I refused to censor or stop anything that she had to say. In that conversation, she spoke about her thoughts about the disparagement and poor treatment of a sexual abuse survivor by Executive Committee staff. The story Rachael told is accurate, and Maria and I know that because we were, even during that very meeting, ministering alongside others to that mistreated young woman.

---

[305] Interview Memoranda of ERLC Staff Members 2 and 3.

[306] https://religionnews.com/2021/06/02/russell-moore-to-erlc-trustees-they-want-me-to-live-in-psychological-terror/.

> This enraged some Executive Committee trustee leadership, who communicated that they were incensed that we would allow such a story to be told. That was communicated with special outrage since the Executive Committee had contributed some money to Caring Well as a reason why we should not have allowed this story to be told. I came away from these conversations with the distinct feeling that I was being told (not from Ronnie Floyd, but from sectors of his trustees, mostly the very sector from which this latest action has come), "You've got a nice little Commission there; would be a shame if something happened to it." I told Maria that at the time. It was, and is, chilling — especially seeing what they had in mind to do under cover of darkness.
>
> I am trying to say this as clearly as I can to you, brothers and sisters: These are the tactics that have been used to create a culture where countless children have been torn to shreds, where women have been raped and then "broken down." [307]

Dr. Moore went on to say that he, his wife, children, and team have endured "psychological and institutional terrorism" for his stance on sexual abuse and racial discrimination issues.[308]

After trying unsuccessfully to obtain a correction to the BP story for approximately 8 months, Ms. Lyell hired legal counsel to pursue a defamation claim. Some SBC and EC leaders had told Ms. Lyell that she was unlikely to succeed in obtaining a correction without resorting to legal action. In May 2020, Ms. Lyell reached a mediated settlement with the EC. Dr. Floyd's presence at mediation was requested, but he declined to participate.

Based upon our review of the evidence, the existence of the May 2020 settlement was not shared with most EC Trustees. The settlement did not become widely known until a second settlement was reached in 2022, which was accompanied by a formal apology from the EC. The apology acknowledged the EC's failure to "adequately listen, protect and care for Jennifer Lyell when she came forward to share her story of abuse by a

[307] *Id.*
[308] *Id.*

seminary professor." The EC further acknowledged that they had failed to accurately report her abuse as nonconsensual and failed to accurately report that her abuse had been reported to multiple SBC entities, as well as investigated and corroborated by those entities.[309]

After the May 2020 settlement with Ms. Lyell, legal concerns over sexual abuse allegations continued to occupy the EC into the fall of 2020. Some within the EC viewed the concept of church autonomy as a legal shield to protect the EC. For example, on September 16th, Mr. Guenther referred to the "steady stream" of cases trying to hold the national or a state convention, or an association, liable "for things happening in churches." He concluded by saying: "We treasure local church autonomy because that fact and consistent practice, rooted in our religious beliefs, is what saves us."[310]

Indeed, to avoid liability, the attorney was of the view that the SBC should not examine churches too closely during the affiliation process. The attorney wrote: "The SBC will create the potential for far greater liability for sex offenses in churches cooperating with the SBC if the SBC undertakes to ascertain that churches are acting in compliance with state law. If an offense occurs in a church we would get suits alleging that the SBC assumed the duty to protect people in that church and was negligent in discharging that duty."[311] Two days later, the same attorney advised: "Legally we are best off the fewer questions we ask beyond securing an affirmation from church representatives that the church claims to exhibit the 5 enumerated evidences of cooperation... And as you consider using folks other then EC staff to 'interview' the churches, ask yourself if they may say things or ask things which your folks would know not to ask. These individuals may be seen as our agents and I worry about what they may say. It can create a legal risk we would not otherwise have if we undertake to query churches."[312]

---

309 https://www.tennessean.com/story/news/religion/2022/02/22/southern-baptist-convention-executive-committee-apologizes-abuse-survivor/6901089001/.
310 SBC0000382421.
311 SBC0000031383.
312 SBC0000031371.

In addition to litigation concerns, the EC was faced with responding to the complaints of survivors. The EC's attitude toward survivors was varied. For example, the newly-installed EC Vice President Greg Addison was sympathetic toward a survivor who complained about receiving lewd photos from a pastor, stating that the survivor should be advised about the Credentials Committee process and advised to contact the police.[313] Yet, just two days later, Mr. Addison described a different survivor as "arrogant," "backhandedly sarcastic" and with an axe to grind, while at the same time admitting he does not know her or her history.[314] In our interview with him, Mr. Addison noted that the survivor had accused the Credentials Committee of favoring a large church that contributed a lot of money, which he found "insulting" and a threat to the credibility of the Credentials Committee. Mr. Addison noted that his email was an internal comment with co-workers, and he would never treat the survivor poorly.[315]

Mr. Addison's adverse reaction to criticism from a survivor was not unique. There are many examples of such comments in the emails shared among EC staff and SBC leadership, for example, saying the survivors do not understand the SBC[316] or just want to burn everything down.[317]

**2021**

The derogatory attitude to survivors by some EC members continued into 2021. A survivor tweeted an accusation that Augie Boto and Dr. Floyd failed to assist the survivors. Mr. Guenther emailed Dr. Floyd and Mr. Addison, hoping they can be comfortable not responding to her, and opining: "She has serious problems."[318]

---

[313] SBC0000378639.
[314] SBC0000482653.
[315] Interview Memorandum of Greg Addison.
[316] FLOYDMB0000234525.
[317] REL0000005207 and SBC0000397323.
[318] FLOYDMB0000370589.

Shortly thereafter, on February 15, 2021, EC Chair Rolland Slade[319] asked Ms. Lyell to speak at the February EC meeting.[320] This request came after many communications between her and Pastor Slade during which she once again disclosed in detail her history of abuse, her disclosure to BP which led to the inaccurate BP article, the serial mistreatment by SBC EC staff and officers, and the resulting re-traumatization. Pastor Slade expressed that he was "deeply saddened" regarding how she was treated. He also told. Ms. Lyell that he did not previously have knowledge of the events surrounding her case.[321] She expressed shock that Pastor Slade had no knowledge of the events that she recounted.[322] Her intent through these communications was to work informally through Pastor Slade to receive some remuneration to compensate her for the lost wages and other injuries suffered as a result of the inaccurate BP article. She also communicated her formal request through EC Executive Vice President Greg Addison, and permitted him to speak with her pastor. Despite all of this, her multiple requests were denied. Internal SBC documents revealed the following commentary regarding at least one of Ms. Lyell's requests:

---

319 https://religionnews.com/2020/06/16/rev-rolland-slade-first-black-chair-of-southern-baptist-executive-committee-elected/.

320 After her resignation, Ms. Lyell sought legal recourse through mediation with the SBC and a settlement with the EC was reached through mediation. Though the EC attorneys attempted to require Ms. Lyell to sign a non-disclosure agreement ("NDA"), Ms. Lyell refused. A witness indicated that the NDA was designed to silence a survivor advocate from discussing Ms. Lyell's case in the future.

321 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EXYGuQYf78FFkCT7IRAZHkQB-ZgSqN_kNHq3c0RQjJeA1w?e=XnQCz4

322 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EVOMibDmigVCikroYmgJ4-gBo7WkvUoQ7UWEgeewVsxm6g?e=JBfxN2.

**From:** Ronnie Floyd
**Sent:** Friday, February 19, 2021 2:54 PM
**To:** Greg Addison
**Cc:** [redacted]
**Subject:** Re: Greetings/urgent request

I am beyond words.

> On Feb 19, 2021, at 1:32 PM, Greg Addison [redacted] wrote:
>
> FYI - the excitement continues to grow.
>
> Greg
>
> Sent from my iPad
>
> **Begin forwarded message:**
>
> **From:** Jennifer Lyell [redacted]
> **Date:** February 19, 2021 at 1:20:21 PM CST
> **To:** Greg Addison [redacted]
> **Subject:** Greetings/urgent request

Mr. Addison,

I hope that you are doing well. I regret that I've not had the opportunity to meet you, but have heard positive things about your ministry and work. I understand you're familiar with my request to address the trustees next week and that a reversal of the decision to deny my request is best processed by you. I also know you're a lawyer, so can imagine that there can be a natural inclination to be hesitant to engage someone who has previously had a legal claim against the EC. However, I'm writing you to ask, to plead, for you to please give me an opportunity to talk with you today about my request. I have absolutely no legal claim against the Executive Committee, the SBC, any of its entities, or agents. Sir, I pledge to you before Christ that I am not seeking this for any purpose other than seeking biblical resolution to a matter that has non-fiduciary elements that fall fully outside the scope of the legal remedies and resolution. Without your help and allowance I am left bearing those (again, non-fiduciary) spiritual, relational, and emotional burdens on my own and there remains a gap in the work of the EC as it relates to me as a Southern Baptist. I think if you speak with me via phone that you will hear that I'm no risk to you all and that if only allowed an opportunity to not be treated as such that so much could be healed that otherwise threatens everything for me. Please, Mr. Addison, could you call me today at [redacted] and at least discuss this with me directly since all that happened was directly and as such the EC is the only one that can restore that biblical breach. I just need to be given the opportunity to demonstrate that I'm not the enemy, not a threat, and that what I desire is what I think you all desire as well. Please, sir.

Respectfully and sincerely,
Jennifer
[redacted]

Ms. Lyell was not permitted to speak at the February 2021 EC meeting.

On May 20, 2021, as the June Convention neared, a survivor publicly called for an investigation of the SBC.[323] On May 31, ERLC President Russell Moore issued a letter to Dr. Greear disclosing conversations internal to the SBC leadership and alleging some EC members had considered an investigation of Dr. Moore and the ERLC, and a censure of Dr. Greear because of their positions on sexual abuse.[324]

Among other things, Dr. Moore wrote that:

> You and I both heard, in closed door meetings, sexual abuse survivors spoken of in terms of "Potiphar's wife" and other spurious biblical analogies. The conversations in these closed door meetings were far worse than anything Southern Baptists knew —or the outside world could report. And, as you know, this comes on the heels of a track-record of the Executive Committee staff and others referring to victims as "crazy" and, at least in one case, as worse than the sexual predators themselves.
>
> .....
>
> Leadership in the Executive Committee, at the trustee level with Mike Stone and his allies, and at the staff level by former Executive Vice-President Augie Boto, have stonewalled many attempts at reform for the sake of the sexually abused. You know that this has happened even after they have given publicly what appeared at the time to be very good and open statements about the matter. And you know that when their stonewalling has failed, you and I have not called them out publicly on what they did privately. We simply focused on the results, of trying to achieve measures to mitigate sexual abuse.

As reported in the Washington Post, factual details of Dr. Moore's letter were corroborated by three employees "who said they needed to remain anonymous to keep their current jobs."[325] On June 2, the Religion News Service published the earlier letter issued by Dr. Moore on Feb. 24, 2020, to the ERLC trustees in which he alleged his opponents within the SBC want him "to live in psychological terror."[326]

---

323 SBC0000368971; https://religionnews.com/2021/05/20/justice-for-sbc-sexual-abuse-victims-a-call-for-an-investigatory-commission.
324 REL0000000241.
325 https://www.washingtonpost.com/religion/2021/06/05/russell-moore-southern-baptist-sex-abuse-allegations/.
326 REL0000000017.

In early June, the refrain that survivors do not understand the SBC reappeared in emails between the Executive Committee and its lawyers. Jennifer Lyell tweeted on June 3, alleging Executive Committee leadership tried to destroy her in retaliation for organizing a petition against Paige Patterson at Southwestern Baptist Theological Seminary. Dr. Floyd forwarded the tweet to Mr. Addison and their attorneys. An attorney responded, saying: "There is a lot of anger and even more failure to understand what the SBC is, and what it is not. And crazy conspiracy theories…It is going to be hard to reason with some of these folks, and there is no forum in which to address their issues." Dr. Floyd agreed.[327]

The next day, a survivor wrote to several EC staffers reporting that she and other students at Southern Baptist Theological Seminary had been sexually assaulted on campus, reported the incidents, but received no response. Mr. Addison responded the same day, saying the Executive Committee has no authority over other SBC institutions, and offered to talk with the survivor. She said she would prefer email communications.[328] Mr. Addison invited further email communications; the survivor sent one on each of the next two days. Then, on June 11th, the survivor wrote again to Mr. Addison stating he ignored her latest emails.[329] Mr. Addison eventually did respond almost three months later, on Sept. 1st, apologizing, saying he had "only recently discovered your emails." He then repeated his initial assertion the Executive Committee had no authority over a seminary and suggested she consider contacting law enforcement or a sexual abuse support group.[330]

On June 5, only ten days before the start of the convention in Nashville, a pastor who worked closely with Dr. Floyd for many years spoke with Dr. Floyd revealing that he and another pastor were considering making a motion for an investigation. This motion was their reaction to the disclosures from the Houston Chronicle and the Russell Moore letter. In the pastor's words: "No matter the repercussions, truth needs to be found."[331] Later

[327] FLOYDMB0000234525.
[328] SBC0000476508
[329] SBC0000476346
[330] SBC0000731734
[331] Interview Memorandum of Witness 4.

that day in a text, the pastor wrote to Dr. Floyd: "The only reasonable way forward is an independent investigation. People are already calling for it."[332] Dr. Floyd appealed to the pastor, saying he and the Executive Committee needed time to deal with the issue, but the pastor and his colleague released the text of the proposed motion.[333] After the release, Dr. Floyd texted his former protégé asking: "Why did you release that after I asked you not to do so."[334] On June 8, Mr. Addison forwarded to Dr. Floyd a news report on the motion.[335]

On June 10, Dr. Bethancourt, who had covertly recorded meetings in 2019, released the tapes.[336] The same day, Dr. Floyd released a statement acknowledging the tapes, encouraging people to listen for themselves rather than accept the recorder's version of what was said. He also stated: "The Convention was – and still is – divided over methods of response to sexual abuse. However, the SBC is not divided on the priority of caring for abuse survivors and protecting the vulnerable in our churches."[337] In response to dr. Moore's allegations, Dr. Floyd also stated in a press article that no survivor allegations had been mishandled during "his time here."[338]

Ultimately, the vote of the messengers at the June convention took the sex abuse issue out of the hands of the EC.

### B. EC Trustee Interviews

As part of our review, we requested to interview all those individuals who served as EC Trustees during the relevant time period. The EC is governed by its board of Trustees – the "members" of the Executive Committee – who are elected by the Convention.[339] The

---

[332] Witness 4-Floyd Texts near Convention 2021 - cleaned.xlsx (sharepoint.com).
[333] Interview Memorandum of Witness 4.
[334] Witness 4-Floyd Texts near Convention 2021 - cleaned.xlsx (sharepoint.com).
[335] SBC EC Investigation - SBC0000476421.pdf - All Documents (sharepoint.com).
[336] SBC EC Investigation - SBC0000367660.pdf - All Documents (sharepoint.com).
[337] SBC EC Investigation - SBC0000450116.pdf - All Documents (sharepoint.com).
[338] https://religionnews.com/2021/06/14/southern-baptist-convention-meeting-2021-sbc-executive-committee-rejects-request-for-system-wide-abuse-inquiry/.
[339] https://www.baptistpress.com/resource-library/sbc-life-articles/your-sbc-executive-committee/.

EC Trustees act on behalf of the Convention between sessions, and select an EC President and other EC officers.[340]

We requested an interview with each EC Trustee in order to conduct a full, fair, and comprehensive investigation. Although 98 EC Trustees were unresponsive to our email and subsequent follow-up attempts, we were able to interview 175 current and former EC Trustees. Twenty-two EC Trustees declined to speak with us.

The interviews were conducted telephonically, by videoconference, or in person, at the EC Trustee's convenience. We were gratified by those Trustees' willingness to engage with us. Many EC Trustees expressed a desire for the EC to improve its response to sexual abuse allegations and made thoughtful suggestions for how it could be done consistent with SBC polity. We took into account all of their advice when we crafted the recommendations in this report.

One of the most striking findings from our interviews is that, for those EC Trustees who served prior to Dr. Greear's naming of the churches from the Houston Chronicle's series, they were largely unaware that survivors had been contacting the EC to report sexual abuse allegations.

Even of those EC Trustees who served after Dr. Greear's announcement, some said that EC leadership still did not sufficiently inform EC Trustees about the scope of the sexual abuse allegations. One EC Trustee said that he did his own internet research after the Houston Chronicles, which he learned about on his own, and not through the EC.[341] He said that the EC Trustees knew nothing about the fact that survivors had been trying to communicate with the EC, and that the EC had not been responsive.[342] Another said that, aside from voting on CC recommendations, sexual abuse allegations were never discussed, and he was "floored" with everything that came out at the conventions.[343]

---

340 https://www.sbc.net/about/what-we-do/sbc-entities/executive-committee/
341 Interview Memorandum of EC Trustee 1.
342 *Id.; see also* Interview Memoranda of EC Trustees 2 and 3.
343 Interview Memorandum of EC Trustee 2; *see also* Interview Memoranda of EC Trustees 4-9.

One EC Trustee said there was a pattern that officers and staff knew more than EC members.[344] There was a perception that the EC Staff was in charge.[345] Some EC Trustees felt that decisions were already made by EC leadership without including the EC Trustees, and that the EC Trustees were expected to be a "rubber stamp" for those decisions.[346] As one person put it: officers expected the EC members to toe the line and not raise issues.[347] One EC Trustee noted that even at the September 2021 meeting, much of the discussions took place in executive sessions.[348] An EC Trustee who early on spoke in favor of a Task Force was accused of not trusting leadership.[349]

The lack of timely and complete information was another common theme in our interviews. At times the EC staff only provided the EC Trustees with information a few days before meetings, which was not enough time for a thorough review, particularly as EC Trustees have their own work and other commitments.[350] One EC Trustee noted that the EC staff only notified him of the Houston Chronicle article the night prior to the release of the series.[351] He said he heard more about sex abuse in social media or the press than from the EC.[352]

Some EC Trustees also told us that the EC did not provide them with sufficient information about lawsuits against the SBC.[353] One EC Trustee said that the EC Trustees only learned about lawsuits against the SBC in the last plenary session, and that while officers may have known, EC Trustees did not.[354]

---

344 Interview Memorandum of EC Trustee 1.
345 Interview Memorandum of EC Trustee 10.
346 Interview Memorandum of EC Trustee 11; see also Interview Memoranda of EC Trustees 5 and 12.
347 Interview Memorandum of EC Trustee 12.
348 Interview Memorandum of EC Trustee 13.
349 Interview Memorandum of EC Trustee 14.
350 Interview Memorandum of EC Trustee 1; see also Interview Memorandum of EC Trustee 15.
351 Interview Memorandum of EC Trustee 16.
352 *Id.*
353 Interview Memoranda of EC Trustees 1, 7, 17-20.
354 Interview Memorandum of EC Trustee 17.

It is our view that the EC Trustees take their responsibilities very seriously and want to participate in leading on this and other issues. If they had been made aware of the problem, the EC Trustees could have been a helpful resource for EC leadership. Many of those who served as EC Trustees were/are pastors, and some had prior experience dealing with sexual abuse issues. For example, some EC Trustee pastors and educators told us they had dealt with reporting requirements in the past,[355] and one pastor himself had reported the sexual abuse of a minor to the police.[356]

The EC Trustees with whom we spoke provided many suggestions for improvements, which we have incorporated into our formulation of the report recommendations. While we cannot recount all EC Trustee comments, the following sentiments show how some EC Trustees believe the EC could better respond to sexual abuse allegations in the future:

- The SBC needs a culture that permits dealing with the issue…They must admit a problem to deal with the problem.[357]

- Lack of transparency was the big issue with the EC and the churches.[358]

- There should be a compassionate response to survivors rather than asking what does this mean to the SBC.[359]

- The EC wants to be transparent and trustworthy, ensure churches are safe places, and provide pastors with resources and the ability to respond well.[360]

- It would be good for survivors to have someone to talk to, and the Credentials Committee Portal is not a substitute for that.[361]

---

[355] Interview Memoranda of EC Trustees 16 and 19.
[356] Interview Memorandum of EC Trustee 11.
[357] Interview Memorandum of EC Trustee 21.
[358] Interview Memorandum of EC Trustee 6.
[359] Interview Memorandum of EC Trustee 22.
[360] Interview Memorandum of EC Trustee 23.
[361] Interview Memorandum of EC Trustee 24.

- This investigation is the most positive thing the SBC is doing…Our job is not to guard the institution but to guard the truth.[362]

In addition to our interviews with EC Trustees, we also conducted a social media review of Twitter accounts for the 202 EC Trustees and other prominent SBC leaders who served from 2012 to the present. For those individuals who had Twitter profiles, we searched for mentions of sexual abuse and/or assault; positive and negative interactions with survivors; calls for change within the SBC regarding sexual abuse policies; and relevant topics discussed in EC meetings concerning and addressing sexual abuse.

Of the 202 EC Trustees and other leaders reviewed: 100 did not have Twitter accounts; 3 had private Twitter accounts; 21 were considered inactive; and 4 were deceased. Of the others, 40 tweeted about sexual abuse and 34 did not mention sexual abuse.

The tweets regarding sexual abuse were largely supportive of the need for change within the SBC and/or were positive toward survivors. We identified one EC Trustee who had interactions with survivors on Twitter that were received negatively by those survivors and others. The negative interactions are discussed in Section V of this report, *infra.* Below we include some examples of more positive interactions.

- EC Trustee 26 had open streams of communication with survivors. He stated that he hopes for the SBC to move towards justice. He also suggested motions that the SBC should consider in order to correct the EC's handling of sexual abuse. He has tweeted, "I stand with any victim of abuse. Leadership should never cover up sinful actions and should be accountable for when they have failed their congregations." (6/5/2021)

- EC Trustee 1 has also had open communication with a survivor, who tweeted requesting him to share the survivors' stories with his church members, association, and SBC leaders, to which he complied. He has tweeted as a Trustee he is trying to move towards justice for the survivors and awareness of the sexual abuse issue.

[362] Interview Memorandum of EC Trustee 25.

- EC Trustee 27 tweeted, "Being on this (executive) committee is miserable, but not even in the same universe compared to what they (survivors) endured and how they were treated." (9/28/2021)

- EC Trustee 28 has tweeted, "I am thankful for brave victims who endure an extra measure of pain to expose the darkness of abuse. Our sympathy is not enough. We must take swift action to make way for justice and healing." (2/19/2019) He also expressed frustration: "After listening to Jennifer Lyell tell her story I am grieved, angry, and disappointed in leadership who recently called out the Executive Committee as cowards when in fact their own cowardice is why we are here." (10/1/2021)

- EC Trustee 18 tweeted thanking GuideStone for providing MinistrySafe webinars for churches, "Thanks GuideStone for providing MinistrySafe webinar for churches today. Wealth of helpful information for churches. Highly recommend to other church leaders who may have missed this event!" (3/21/2019) He also thanked Dr. Greear for his words at the 2021 Annual Meeting: "Thankful for the leadership of JD Greear for the last 3 years at the 2021 Southern Baptist Convention. Powerful words to our convention today. We need hard truth he has brought today." (5/15/2021)

### C. EC Staff Survey and Interviews

As part of our investigation, we also conducted interviews with approximately 42 current and former EC Staff Members. While we discuss specific information provided by those staff members throughout this report, in this section we describe some of the staff's general perceptions about EC workplace culture and attitudes toward sexual abuse allegations.

We also conducted two anonymous surveys of EC employees to gather their impressions of EC workplace culture, with a specific emphasis on sexual harassment and abuse prevention. The first survey was disseminated to the current EC staff on December 22, 2021 and was closed on January 7, 2022. The second survey was disseminated to current EC staff after all staff interviews were completed on April 4, 2022 and was closed on April 8, 2022.

Finally, we reviewed the EC's employee/personnel handbook, which include written policies and procedures relating to harassment, abuse and inappropriate conduct; training materials; and leadership communications.[363] Our observations about those policies are set forth below.

### 1. Staff Interviews

Through our interviews of current and former EC staff and our survey of current employees, we developed an understanding of the EC's historic and current culture and work environment. Unsurprisingly, given the variety of employees with whom we spoke and who completed the survey, we gathered a variety of opinions on the positives and negatives of the EC culture. We did not assess the accuracy of employees' perceptions or opinions. Nonetheless, the comments recounted herein are provided as insight, and several themes emerged from employees' responses to our interview questions and our survey.

EC staff members told us that the EC would benefit from better communications from its leaders with respect to issues relating to sexual harassment and abuse, or other sensitive topics like leadership changes. According to EC staff members, the EC culture is to take care of things quietly with no details shared, to keep it out of the press. For example, a number of EC staff members told us they were confused when Dr. Page suddenly resigned and they were kept in the dark as to why.[364]

Many EC staff members said they do feel valued and appreciated by their leaders and colleagues and enjoy working at the EC. However, some female EC staff members felt women were underrepresented at leadership levels, though this has improved in the last three years, and that some male leaders could be dismissive of female opinions. Some female staff members said they did not speak up when disagreeing with a male leader

[363] https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EW5aAyAHGT9MhgaWbcoOTGUBOXofeYDlmvQTqtsm8zPGgA?e=eWfvvO SBC EC Investigation - Personnel Policies Manual Revised June 2019 (Final).pdf - All Documents (sharepoint.com).
[364] Interview Memoranda of EC Staff Members 4, 7-10.

and would let it go. Others said that they have been subjected to demeaning, objectifying comments or been patronized, dismissed, and disrespected.[365]

Six EC staff members told us that they believed survivor calls came into the EC, and were directly transferred to Mr. Boto's office.[366] The EC staff members did not know how many survivor calls came in. Information about survivor calls was generally kept by Mr. Boto, Dr. Page, and Dr. Oldham. One EC staff member heard Dr. Page make critical comments about Christa Brown, and Dr. Page said he regretted some of the words.[367] They noted that EC staff was not given any insight into the abuse issue or training on how to handle a call if it came into them. One EC staff member said that Mr. Boto did not think sexual abuse was a big deal and had defended some of Dr. Patterson's comments and said he could not do anything about him.[368] Four EC staff members said that EC leadership's concern was protecting the reputation of the SBC,[369] and three staff members opined that Dr. Floyd wanted to resolve sexual abuse issues quickly so he could focus on other matters such as Vision 2025.[370]

Five EC staff members said that EC leadership had a fear of legal ascending liability, which drove their resistance to stepping in to help with sexual abuse issues.[371] For example, one EC staff member was involved with writing and editing a Church Financial Guidebook that contains best practices for church financial and hiring-related issues. The EC staff member, on his own volition, researched and included a section on Safe Church in the guidebook as well as resources on sexual abuse. Mr. Boto instructed the EC staff member not to mention his EC staff position in the book, so that the EC would not be liable for an error made by a local church after giving them that information about sexual

365 Interview Memoranda of EC Staff Members 1, 4, 10-12.
366 Interview Memoranda of EC Staff Members 2, 8, 12-15.
367 Interview Memorandum of EC Staff Member 13.
368 Interview Memorandum of EC Staff Member 11.
369 Interview Memoranda of EC Staff Members 1, 5, 9, and 14.
370 Interview Memoranda of EC Staff Members 1, 4-5.
371 Interview Memoranda of EC Staff Members 1, 6, 13-14.

abuse. The EC staff member said that ascending liability was used as an excuse from the first day he started work at the EC.[372]

Another EC staff member said that, at Executive Leadership Team meetings, when there was reference to sex abuse cases that occurred at the churches or entities, the discussion was "always about keeping arms distance due to ascending liabilities." The EC staff member noted that a pastor had come to the EC seeking advice about an abuse matter involving a youth minister with a young girl. Mr. Boto had said the EC could only point the pastor to an attorney. According to the EC staff member, the pastor was disappointed that the EC could not help him or comment on what he should do.[373]

Many of the veteran EC staff mentioned that there were cultural changes in the EC under different EC Presidents.[374] According to those EC staff members, Dr. Chapman was a good administrator who maintained a good work culture; EC staff members felt respected under Dr. Page but noted he was less engaged than Dr. Chapman as he traveled often so Mr. Boto maintained a stronger presence; there was a difficult transition under Mr. Boto because of the way Dr. Page departed, and the lack of transparency about his departure; and EC staff members felt that Dr. Floyd did not trust them and trusted outside voices/leaders more,[375] although the EC staff members expressed appreciation for Dr. Floyd's efforts to bring more diversity into the EC staff.[376]

### 2. Survey Results

EC Staff Initial Survey

To gather employees' opinions on how the EC handles issues relating to abuse, we developed a 14-question survey that was made available to all of current EC staff that

[372] Interview Memorandum of EC Staff Member 13.
[373] Interview Memorandum of EC Staff Member 14.
[374] Interview Memoranda of EC Staff Members 4, 7, 9, 11, 13-16.
[375] Interview Memoranda of EC Staff Members 1, 4-6, 10-11, 14-15.
[376] Interview Memoranda of EC Staff Members 17-20.

had been hired prior to June 2021.[377] The survey was anonymous, but employees could indicate if they wished to speak to Guidepost and could provide their contact information. We achieved a high rate of participation in the survey: 25 of the 26 current EC employees (96%) responded to our survey questions.

EC Staff Follow-up Survey

Guidepost administered a follow-up survey for the EC Staff in April 2022.[378] The purpose of this survey was to give staff another opportunity to share their thoughts, after having been through the interview process. The survey focused on the issue of sexual abuse and the EC's ability to respond to those concerns as raised from the June 2021 Messengers' motion. The participation rate was 74%, with 17 of 23 current staff responding. A copy of both the initial and follow-up surveys including the survey results, are attached as Appendix F.

### 3. EC Personnel/Harassment Policies

Guidepost reviewed the Personnel Policies Manual to examine if sexual abuse and harassment reporting policies and procedures were clear within the EC organization itself. There is only one known reported incident of sexual harassment in the EC organization documented during the 2000 – 2021 timeframe.

From our review of the file of that incident, it appears that this was a singular situation and does not indicate a pervasive culture of harassment within the EC. In reviewing the EC's personnel policies, and how EC's leaders and HR personnel responded to this

---

377 https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EegSpgdfC2VJlxX8g2f-dM0Bum6DUZiIvcIEhopSaNRW3g?e=4LTouK SBC EC Investigation - FINAL EC Survey Questions 12.2021.pdf - All Documents (sharepoint.com).

378 https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/ETHGzM2RHNxNsxp8lV9KnH0B14mmw5hM3uA3vA740nCLHA?e=o2svgj SBC EC Investigation - EC Survey - Post Interviews 4.2022 FINAL.pdf - All Documents (sharepoint.com).

incident, we identified several aspects of the organization's response that were lacking. Some points for improvement include:

- EC's definition of harassment can be better defined and explained by offering more examples.
- EC written policies do not explain the specific procedures for reporting, investigating, and addressing complaints in areas of harassment, employee conduct, workplace conflict or other inappropriate employee behavior.
- EC policies do not include defined written investigative procedures with specific steps or any requirements about documenting findings.
- EC policies do not have written guidance as to who has decision-making authority with respect to opening or closing an investigation, imposing disciplinary action, or notifying the EC Trustees about an investigation, should the need arise.
- With respect to reporting, the employee handbook tells to whom to report, but does not specify how to report, or provide a method of anonymous reporting. A few employees told us that they were not sure of the exact reporting protocols, and would report to their supervisor or a female Executive Assistant.
- There is also no written guidance for managers as to when they should or must escalate a reported allegation to HR.
- The EC does not have any procedures governing how an accused employee may internally respond to allegations or appeal any adverse finding.
- There are no provisions governing confidentiality, including what can be communicated to the reporting party, the accused party, or other employees during or at the conclusion of an investigation.
- EC Personnel Manual does not contain whistleblower protections.
- There is no guidance on the circumstances that would lead to a warning, what type of warning might be warranted (verbal or written), the memorialization of any warnings, or the escalation of disciplinary action if the misconduct persists.
- Reporting procedures do not provide for an appeal process.

We provide suggestions for correcting these deficiencies in our recommendations section.

### D. Survivor Interviews

We cannot provide a precise number of the survivors of sexual abuse within SBC churches, and certainly many of them never reached out to the EC about their abuse. We note, however, that some within the EC were aware of the existence of Southern Baptist-related sexual abuse allegations for many years. At Mr. Boto's behest, in 2007 an EC staff member started compiling a table of sexual abuse reports using public sources, including the abuser's name, year reported, relevant news articles, state, and denomination. The latest iteration of the table contains the name of 703 abusers, with 409 believed to be SBC-affiliated.[379]

Our investigative team reviewed the list and conducted significant research to assess whether any of the alleged abusers were still associated with an SBC church. Based on these efforts, it appears that nine (9) people remain in active ministry or connected to ministry. Two (2) of those people appear to be associated with an SBC church. The remaining seven (7) appear to be associated with churches that are not SBC-affiliated.

We will provide the information regarding those persons we believe are still associated with an SBC church to the Credentials Committee for further review. We will also provide the information regarding non-SBC affiliated churches to the Credentials Committee to ensure accuracy as to the denomination affiliation. We will also continue to review the latter material to determine whether any referrals or other action needs to be taken.

During our investigation, we conducted interviews or meetings with 22 survivors. Six additional survivors provided written information to us. We also spoke with 14 survivor

379 SBC EC Investigation - REL0000010352.pdf - All Documents (sharepoint.com). As discussed in Section IV of this report, the existence of the list was disclosed to EC leadership in May 2019, when Dr. Oldham noted that, for the past decade, he had been sending Mr. Boto news reports of Baptist Ministers arrested for sexual abuse.

advocates and six family members of survivors. From our document review, we are also aware of other survivors who contacted the EC between January 1, 2000, to June 14, 2021. As was our protocol (*see* Section II.B, *supra*), we did not affirmatively reach out to those survivors. On occasion throughout this report, we have cited to some of those communications without providing identifying information about the survivor.

While some reports did not fall within the scope of our investigation, either because of time period limitations or because the conduct was not reported to the EC, we acknowledge the value and importance of survivors and others sharing their histories with us. These histories underscore how sexual abuse within churches is a wide-ranging and long-standing problem that has a profound effect on survivors and their loved ones. During our investigation, many of the survivors we spoke with were sexually abused as children, both boys and girls, who were of varying ages at the time of their abuse. We also had adult survivors of clergy sexual abuse come forward to share their histories with us.

In our interviews with survivors, they spoke of the trauma from the initial abuse, but also told us of the debilitating effects that come from the response of the churches and institutions like the SBC that did not believe them, ignored them, mistreated them, and failed to help them.

Faith communities and institutions should be a place of safety and refuge, but oftentimes for survivors of sexual abuse the church has been a negative turning point in their recovery and their faith journey – a setback that can create a turning away from the faith and a stunting of spiritual growth and emotional healing. When a survivor of sexual abuse by a faith-based community member comes forward to leaders, the survivor believes that the leaders are in a position to help them and will be a source of help, spiritual guidance, and emotional healing. However, what they often receive are negative social reactions to disclosures which can result in worsening symptoms of shame, depression, post-traumatic stress syndrome, disengagement from the faith community, and even suicide.

The response to a disclosure of abuse can have a profound impact on the healing journey of the survivor.[380] With around fifteen to thirty percent of women experiencing a sexual assault within their lifetime,[381] it is important for church leaders and others in helping positions to understand the effect that they can have on the emotional and spiritual health of those who trust them enough to come and confide in them regarding a sexual assault or rape.

Research shows that most survivors disclose to find emotional support, tangible assistance, or seek justice.[382] Upon disclosing, what they receive in a response may be totally different than what they were seeking. Negative responses to disclosures are often referred to as "secondary victimization" or the "second rape."[383] Roughly one third to two thirds of survivors experience one or more negative responses.[384]

Another problem with negative reactions to disclosures of sexual assault is that the responses have the effect of silencing the survivor. The response tends to silence in one of three ways - creates questioning by the victim of the benefit or effectiveness of future disclosure; self-blaming, and uncertainty in the survivor's mind as to whether the survivor was really raped.[385]

Research has shown that disclosures in general may have a positive effect on mental health.[386] However, the reaction received by the survivor upon disclosure has an effect

---

[380] Sarah, Ullman, *Talking About Sexual Assault*, Washington, DC: American Psychological Association, (2012), Kindle.
[381] *Id.*, Chapter 1.
[382]C. Ahrens., R. Campbell, K. Ternier-Thames, S. Wasco, and T. Sefl,. "Deciding Whom to Tell: Expectations and Outcomes of Sexual Assault Survivors' First Disclosures," *Psychology of Women Quarterly*, 31 (2007): 38–49.
[383] Rebecca Campbell and Sheela Raja, "Secondary Victimization of Rape Victims: Insights From Mental Health Professionals Who Treat Survivors of Violence," *Violence and Victims*, 14, no. 3 (1999): 261-75.
[384] Ullman, *Talking About Sexual Assault*, Introduction.
[385]C. Ahrens, "Being Silenced: The Impact of Negative Social Reactions on the Disclosure of Rape," *American Journal of Community Psychology*, 38 no. 3/4 (2006): 263-274.
[386] C. E. Ahrens, J. Stansell, and A. Jennings, "To Tell or Not to Tell: The Impact of Disclosure on Sexual Assault Survivors'Recovery," *Violence and Victims 25*, (2010): 640.

on symptoms of depression and post-traumatic stress.[387] Survivors who received a positive response upon disclosure were better able to cope and experienced less symptoms of post-traumatic stress; whereas negative responses increased symptoms of post-traumatic stress.[388] Disclosure can bring about or start the process of healing. However, a negative response to disclosure has the potential to "add to the trauma of the initial rape when social systems and informal social network members respond in ways that are blaming or unsupportive."[389]

Finally, if disclosure and response to disclosure affects mental health, it most certainly can have a similar effect on spiritual health. In fact, "spirituality has been shown to interact with negative psychological effects of sexual assault and rape - either to buffer or exacerbate those effects."[390]

The conundrum for survivors then becomes whether to disclose or not - choosing not to disclose can be detrimental to mental health while disclosing to the "wrong" person is harmful as well. A survivor's decision to disclose their history is indeed a decision where they have weighed the cost and the benefit and when they disclose, they have actually decided that the disclosure to a trusted person will be helpful and is the right thing to do.

The survivors with whom we spoke told us that they felt ignored and unheard when they reported their abuse to SBC leadership – some survivors received perfunctory and dismissive responses while others did not receive a response at all.

We have included some of the survivors' experiences with SBC leadership below. This is not a complete list as there were survivors who did not want us to use their histories, and other survivors whom we identified from our document review but who did not speak with

---

387 Ahrens, "To Tell or Not to Tell," 640.

388 Sarah, Ullman and Liana Peter-Hagene, "Social Reactions to Sexual Assault Disclosure, Coping, Perceived Control, and PTSD Symptoms in Sexual Assault Victims," *Journal of Community Psychology,* 42, no. 4 (2014): 495.

389 Ullman, *Talking About Sexual Assault*, Introduction.

390E, Yuvarajan and M.S. Stanford, "Clergy Perceptions of Sexual Assault Victimization," *Violence Against Women*, 22, no. 5 (2016): 589.

us. The narratives below are from survivors who approved our use of their histories in this report:

- From 2006 – 2011, Dave Pittman, a survivor, sent letters, emails, and made phone calls to the SBC in Nashville, the EC, and the Georgia Baptist Convention Board reporting that he had been abused by a church youth minister named Frankie Wiley at Rehoboth Baptist Church when he was 12-15 years old. Mr. Pittman and several others have come forward publicly to report that Mr. Wiley molested and raped them. Mr. Wiley has admitted to having numerous victims at several Georgia Southern Baptist Churches. An official from the Georgia Baptist Convention told Mr. Pittman that the churches were autonomous and there was nothing he could do but pray. Mr. Pittman reported that the SBC and EC never responded to his emails, never answered his calls, and were always unavailable for meetings. Mr. Pittman knew the statute of limitations had run out in his case but he wanted to stop his abuser from being hired and hurting others. He did not know about other survivors until he went public in 2011. At that time he found out two of his best friends from his youth group had also been abused at the same time. [391]

  When JD Greear named ten churches in February 2019, he named Trinity Baptist Church because Frankie Wiley was active as the Music Minister at that church under Pastor Rodney Brown. Augie Boto provided an apology to the church, and the Bylaws Work Group quickly cleared Trinity Baptist. After intervention by Rehoboth Baptist Church Pastor Troy Bush, who obtained a written confession from Mr. Wiley, Pastor Brown allowed Mr. Wiley to resign as Music Minister at Trinity Baptist Church. It should be noted that Trinity Baptist has disaffiliated with the SBC and has re-employed Frankie Wiley as its Music Minister under Pastor Brown.

- A survivor and her husband sent a letter to the EC in July 2018 to report her experience as an adult survivor of clergy grooming and sexual abuse, and to inquire about ways to address clergy sexual misconduct. Survivor was groomed and sexually abused by her music minister over many years. While her abuser was allowed to resign for "lapses in judgment in his personal life," they realized that there was nothing keeping him from re-entering the ministry at an unsuspecting church.[392] Mr. Boto responded in October 2018, apologizing

[391] Interview Memorandum of Pittman.

[392] SBC EC Investigation - Guidestone Docs - 2.pdf - All Documents (sharepoint.com).

for the delay and stating that their letter had been "mis-prioritized."[393] In his response he mentioned the initiative to study sexual abuse and noted that the SBC cannot rescind clergy ordinations. He reached out by phone and then responded by email summing up the polity.[394]

- As a young teen, Christa Brown was sexually abused by the youth and education minister at her Southern Baptist church. According to Ms. Brown, the minister groomed her and groped her, using scripture and her own faith as a weapon to control her. When she was 16 years old, he sexually assaulted her over thirty times. After months of abuse, she disclosed the abuse to the music minister who was also her piano teacher. She was told not to talk about it, and her abuser went on to serve in Southern Baptist churches in multiple states.[395]

  As detailed in Section IV.A of this report, starting in 2004, Christa Brown reported the sexual abuse to multiple SBC leaders, her childhood church, and other leaders in multiple states. After Ms. Brown discovered that her abuser was employed at First Baptist Church of Oviedo, Florida, and before that at First Baptist Church of Atlanta,[396] Ms. Brown's attorney provided this information to the SBC but no action was taken. The perpetrator continued in ministry until the Orlando Sentinel published his name and he officially resigned.[397]

  In August and September 2006, Ms. Brown, with SNAP, again wrote to SBC leaders about the fact that her abuser continued to be in ministry.[398] At this point Ms. Brown had contacted at least 18 Southern Baptist leaders at the local, state, and national level. She also spoke at Bylaws Work Group meetings to urge reforms, even though she felt disrespected.

  Ms. Brown did not give up. In February 2007, she shared her history and sought reforms at an EC meeting. According to the Ms. Brown, during her speech an EC member turned his back to her and another chortled. She described her feelings:

---

393 *Id.*
394 *Id.*
395 SBC EC Investigation - REL0000000229.pdf - All Documents (sharepoint.com).
396 https://www.orlandosentinel.com/news/os-xpm-2005-10-22-baptist22-story.html; *see also* SBC EC Investigation - REL0000000229.pdf - All Documents (sharepoint.com).
397 https://www.orlandosentinel.com/news/os-xpm-2005-10-22-baptist22-story.html.
398 https://plusnxt.relativity.one/Relativity/go?id=8252197-1505375; https://plusnxt.relativity.one/Relativity/go?id=8252197-1505385.

> I ask you to try to imagine what it's like to speak about something so painful to a room in which men disrespect you in such a way. And I hope that you will also try to imagine the long-lasting impact this had on me – to speak about this horrific trauma of having my pastor repeatedly rape me as a child, only to have religious leaders behave in this way and to have not a single other person who thought it mattered enough to speak up.[399]

In September 2007, when Ms. Brown attended a Bylaws Work Group open session, she was hurt by an EC member's comment about "critics that lack integrity and will not be satisfied no matter what Southern Baptists do." Ms. Brown stated: "I wish people could know my motivation. I wish they could get the e-mails I get and the phone calls I get."[400]

During these past 15 years, Ms. Brown told us she has received volumes of hate mail, awful blog comments, vitriolic phone calls, and occasionally worse. She received one anonymous message threatening to cut off her head.[401] On another occasion, she received a large brown envelope with an anonymous 25-page diatribe delivered straight to her home, which contained violent imagery and threats.[402] Ms. Brown said that this backlash had an enormous impact on her life and personhood, and she places responsibility for this harm on the shoulders of SBC leaders, including EC members.[403]

Ms. Brown recounted that almost every SBC survivor she's ever talked with – and there have been many – has said that the effort to report an abusive pastor caused even greater trauma than the sexual abuse itself.[404]

In an effort to obtain assistance and notify the SBC about her abuser, Ms. Brown sent certified letters or emails to SBC president Frank Page, SBC president Ed Litton, SBC president Bobby Welch, EC president Morris Chapman, EC vice president and general counsel Augie Boto, the office of Convention Relations, Mr. Guenther, 18 Southern Baptist church and

---

[399] Christa Brown Memo to Guidepost.pdf.
[400] *Id.*
[401] https://plusnxt.relativity.one/Relativity/go?id=8252197-1505371.
[402] *Id.*
[403] *Id.*
[404] Christa Brown Memo to Guidepost.pdf.

denominational leaders. Of this group, no one ever treated the sexual assault of Ms. Brown "as though it even mattered."

According to Ms. Brown, "In countless encounters with Baptist leaders, their words and deeds have left a legacy of hate. The lesson they taught said, 'You are a creature void of any value – you don't matter.'"[405]

This has had a lasting impact on Ms. Brown. She shares that "for most people of faith, their faith is a source of solace. It gives them comfort and strength for all manner of life's travails. It's a powerful resource for healing. But for me, faith is neurologically networked with a nightmare. Sexual trauma and faith are inextricably seared together in my brain." Ms. Brown shares that "it is not only physically, psychologically, and emotionally devasting, but it is spiritually annihilating. It is soul murder."[406]

- Starting at age 14 years old, Debbie Vasquez's Southern Baptist pastor started sexually abusing her. As a result of one of the many sexual assaults, she became pregnant with her abuser's child. Ms. Vasquez was forced to go in front of her church to ask for forgiveness, but she was told she could not mention who the father of the child was because it would harm the church. Her abuser went on to serve at another Southern Baptist church. Ms. Vasquez contacted SBC leaders at her state convention, and in 2007, Ms. Vasquez emailed the EC to report her abuse by a pastor when she was a teenager.[407] She asked: "Please open up your heart and mind and talk with some of the people who are trying to get things changed. Please put aside differences and compromise – come up with a solution together... please do not ignore and pretend this problem does not exist. Please help stop other people like myself from being hurt in the way I was hurt."[408] Her original email went unanswered and she emailed again. Mr. Boto offered a lengthy response assuring her they are looking into it but asking her not to share her communications with anyone.[409]

Ms. Vasquez contacted EC leadership numerous times over many years and attended annual meetings and EC meetings in hopes of driving reform. In 2009, she asked why churches can be disfellowshipped over homosexuality but not

[405] Christa Brown book, "This Little Light."
[406] *Id.*
[407]https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/Efa5Xi2xCqlNjHDUKRmh10wBXVw8mSDArj79_U9BuY-m8A?e=Q7Vzdi.
[408] Id.
[409]https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/Efa5Xi2xCqlNjHDUKRmh10wBXVw8mSDArj79_U9BuY-m8A?e=Q7Vzdi; https://plusnxt.relativity.one/Relativity/go?id=8252197-1508087.

for having a minister who has sexually abused a child.[410] In 2011, she again requested that the church be removed from the SBC listing of churches. Ultimately, following the Houston Chronicle series, the church was named by Dr. Greear in his address to the EC in February 2019. Later in 2019, the church voluntarily disassociated itself from the SBC.

- As a student, Jennifer Lyell was sexually abused by a professor while she was a student at Southern Baptist Theological Seminary. Ms. Lyell said the abuse began on a mission trip and continued for many years. In 2019, Ms. Lyell disclosed her sexual abuse by her seminary professor. Ms. Lyell decided to make her allegations public when she learned that her abuser had been appointed as a missionary with a non-SBC mission agency. Ms. Lyell stated: "I now realize that despite SBTS handling the situation justly and as I asked – without stating the reason for his resignation – it led to the exact kind of scenario the SBC is now trying to prevent…If I were not to come forward with this [statement], a church or ministry who receives [the abuser's resume] and does an internet search for him would have no way to know the truth behind his resignation. There are plenty of reasons to stay silent in a situation such as this. But we must not be silent."[411]

  At the time she reported the abuse, Ms. Lyell was a valued employee of Lifeway who had received every top recognition and award given to Lifeway employees. Several Southern Baptist and other denominational leaders supported her. She wanted to write a first-person account of her abuse. As discussed in detail in Section IV.A of this report, Baptist Press drastically changed her history and mischaracterized the abuse as a "morally inappropriate relationship." This led to catastrophic consequences for Ms. Lyell, including the loss of her career, her health, and many friends and colleagues. On countless occasions, Ms. Lyell interacted with BP personnel and EC leaders to correct the inaccuracy, but EC leaders would only agree to take the article off the website, without making a correction.

  In June 2019, Ms. Lyell attended the SBC annual meeting in Birmingham where she encountered threats and harassment. She was pulled out of her chair by a woman who threatened her while physically restraining her, was called a "whore," and was the subject of disparaging comments by pastors and sexual abuse survivors who considered her an adulteress.

---

410 https://plusnxt.relativity.one/Relativity/go?id=8252197-1510851.

411 BP ARBaptist.pdf.

Ms. Lyell asked to meet with Dr. Floyd for 10 minutes, but he responded he needed to get through the convention and would consider the request once back in Nashville.[412] He never responded once back in Nashville.

At the Caring Well conference in October 2019, Ms. Lyell again received rude comments calling her an adulteress. As a result of public comments by Rachael Denhollander in her support, Dr. Floyd requested to meet with Lyell. According to witness accounts, Dr. Floyd refused to accept any responsibility for the situation, and Ms. Lyell felt as though Dr. Floyd was simply meeting due to public pressure with no intention of assisting her.

As a result of the BP inaccuracy, Ms. Lyell was forced into resigning her position at Lifeway. A confidential "Transition Agreement" was reached in which Ms. Lyell agreed to waive all legal actions against Lifeway. Ms. Lyell experienced significant physical and emotional harm that required medical treatment. Ultimately, Ms. Lyell entered into a monetary settlement with the EC in lieu of filing a defamation and libel lawsuit in an attempt to compensate her for some of her expenses.

- During her senior year of high school, Jules Woodson was sexually abused by her youth pastor. Though she disclosed her abuse to her local church, she was told not tell anyone and her youth pastor was allowed to leave to go to another church. He was given a going-away party. Almost 20 years later, in 2017, Ms. Woodson shared her story publicly. At that time, her abuser was a pastor in a Southern Baptist megachurch. He issued an "apology" in a live streamed church service calling the abuse a "sexual incident." He received a standing ovation, and he eventually resigned. His current church knew about the abuse when they made the decision to hire him.[413] In 2019, Ms. Woodson shared her experience with EC Trustee Jared Wellman, who submitted the case to the Credentials Committee on her behalf.[414] Ms. Woodson also submitted her allegation to the CC in December 2019 when the portal went live. No action was taken for nearly one year. On November 16, 2020, Ms. Woodson received a status letter from CC that reported her church was removed from inquiry and referenced her blog. Ms. Woodson expressed to us that she was very hurt and offended by the letter as she did not have a blog (another survivor did) and

[412] 2021-12-15 report re Ronnie Floyd.docx, 6.11.19 SBC JLL Text Exchange w_RF.pdf , 6.11.19 SBC JLL Text Exchange Reply .PNG.

[413] https://www.nytimes.com/2018/03/09/opinion/jules-woodson-andy-savage-assault.html.

[414]https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EYYyt7OLdeBKpob6Jly6DTsB_ACUXGFfE7lpp66J626x7g?e=TSTJgd.

because the CC never reached out by phone or email to discuss the decision with her. On Ms. Woodson's behalf, advocate and survivor Dee Ann Miller contacted the Credentials Committee. Ms. Miller felt that Ms. Woodson was not being heard. Ms. Miller emailed and had a Zoom call with CC members. Ms. Miller asked questions about the process and did not receive any answers except that the CC had not received any training and there was not much they could do in this matter. Another advocate in addition to Ms. Miller tried to get the decision reevaluated, to no avail.[415] Witness 7 completed a new submission form on behalf of Ms. Woodson after she had witnessed the CC's lack of communication and transparency with Ms. Woodson, but the CC said that they would not reconsider their original decision. Witness 7 had a phone call with the CC Chair, who explained that they were declining further consideration because there was no new or additional information presented to the CC.

On Thu, Jan 21, 2021 at 8:12 PM [redacted] wrote:

I am so fired at the SBC Credentials Committee right now I could scream!!! A Thread:

Today, a fellow advocate and friend, [redacted] spoke with [redacted] and [redacted] in a Zoom meeting on my behalf. One of the purposes for the meeting was to address their massive failures regarding my submission...Specifically their process and ultimate decision to deem Stonebridge Church [redacted] still in friendly cooperation with the SBC.

[redacted] and [redacted] prefaced the meeting by basically saying that their decision is final, and that it's too late to go back and change anything. I found this to be extremely disturbing considering they really don't seem to know what they are doing. Remember, they never once made an effort to speak with me regarding my submission even though they claimed to have done so!!! What training and/or guidance do they have in evaluating abuse in the church and cover ups as well as communicating/dealing with survivors?

They then proceeded to tell [redacted] that the reason they had such difficulty in making a decision regarding Stonebridge was bc they never received an actual submission from me...it came from someone else so their hands were tied, so to speak. This is completely false as well. I personally sent a submission by mail and received an email a short time later that confirmed they received my submission. *After the call [redacted] sent a short email to [redacted] stating..."I spoke in error. It was in fact [redacted] who submitted to the Credentials committee."

Is this a joke??!! They had just spent all this time explaining to [redacted] about how they were put in an 'awkward position' regarding Stonebridge yet their entire statement was based on erroneous information as it WAS me who presented the request. They further admitted to basing their decision on the information they received after speaking with the church, yet they never once made an effort to speak with me!!! Are you kidding??? They trust the church and pastor that covered up my abuse when I originally reported and who continues to deny wrong doing or respond to my questions to this day??? Even after the Associate Pastor has admitted it was abuse, that it should have been reported to the police, and has since stepped down from any position of authority in his current church?

In summary, the SBC Credentials Committee is a total sham. They are NOT a safe resource for ANY survivor!!! They have lied on multiple occasions. They don't know their head from their ass and certainly can't keep their stories straight. They have ZERO training in how to do their jobs in any capacity and perhaps don't even know what their job is. SBC YOU MUST DO BETTER!!! #ChurchToo #SBCToo

Ms. Woodson expressed to us her frustration, hurt, anger and outrage at the process that she was forced to utilize with the CC. She was particularly upset that, prior to a decision being made, she was not contacted to provide facts or information regarding her submission, and that the CC only spoke to the church that had already treated her so badly when she disclosed her abuse.

415 Interview Memorandum of Woodson.

- Tiffany Thigpen grew up in a Christian home, and her family attended First Baptist Church Jacksonville (FBC-Jax). Ms. Thigpen was committed to her church and committed to going into ministry. During Ms. Thigpen's high school years, Darrell Gilyard, a mentee of Pastor Jerry Vines and Paige Patterson, preached at FBC-Jax. She looked up to Mr. Gilyard as a pastor and friend. During her senior year of high school, Mr. Gilyard even asked her to move to Texas after she graduated to work for him at his church. Mr. Gilyard groomed Ms. Thigpen with late-night phone calls and promises of a summer job in Texas. In the spring of 1991, after a revival meeting at FBC-JAX, Mr. Gilyard attacked Ms. Thigpen and attempted to rape her. Ms. Thigpen fought to get away from him and was able to escape. She was terrified and traumatized. Ms. Thigpen and her mother went to Dr. Vines to tell him about the attack. Dr. Vines was dismissive of her report and told Ms. Thigpen that it would be embarrassing for her if others knew about it.[416]

  A 1991 story in the Dallas Morning News revealed that Dr. Patterson knew of allegations against Mr. Gilyard for at least four years and viewed Mr. Gilyard as a victim when he was fired from a church amid allegations of sexual impropriety in 1987. Dr. Patterson reportedly told the pastor of Hilltop Baptist Church in Norman, OK, that there was nothing to substantiate rumors about Mr. Gilyard. The Oklahoma church hired Mr. Gilyard as assistant pastor. A year later Mr. Gilyard returned to Dallas, as assistant pastor of Shiloh Baptist Church in Garland, where allegations of sexual misconduct resurfaced. Reports continued after Mr. Gilyard became pastor of Victory Baptist Church in Richardson, Texas, before resigning under a cloud in 1991.[417]

  In October of 2019, an EC staff member wrote an email to Dr. Floyd and others expounding on the maltreatment numerous survivors had received at the hands of the EC.[418]

416 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/Eac4AOQMwJpGlQADr4Y370cBglbbu3ihBWZ9a9N0gOqMuA?e=Hhy9EG.

417 https://plusnxt.relativity.one/Relativity/go?id=8252197-1508791.

418 https://plusnxt.relativity.one/Relativity/go?id=8252197-2522948.

On Oct 6, 2019, at 3:22 PM, [redacted] wrote:

Dr. Floyd, Dr. Upton, and [redacted]

A few thoughts:

As for unity around the mission and vision – that is not lost. That is still on course. This weekend did not derail that. It consumed a few of us for a time, but responding well in these instances is a MAIN PART of the unity we are working toward because that requires trust. Us handling instances like this will build trust and move us toward unity. We can't have unity if people don't trust us to do the right thing. So, in part, this weekend HELPED to unify us in some aspects because it bought us trust. Sometimes that's hard to see in the moment, but I hope we can look back at October 3-5 as a turning point in earning trust with Southern Baptists.

Regarding Matthew 18 – that principle absolutely still applies; the problem is that in nearly every instance in the past when victims have come to those in power in the SBC, they have been shunned, shamed, and vilified. At the EC, we have inherited a culture of rejecting those who question power or who accuse leaders. Christa Brown, Debbie Vasquez, Megan Lively, Jules Woodson, Ann Marie Miller, Tiffany Thigpen—they all reported their abuse to those in the SBC and at every turn they were met with resistance, and they were turned away. Christa Brown's book This Little Light is a fascinating look at how poorly abuse victims have been treated. We all heard Megan's story Thursday night for the first time. What happened to her was wrong. End of story. Then there's Jane Roe over in TX who's suing Patterson and SWBTS. PP is on record wanting to "break her down" after she reported what happened to her. So when these are the examples of what happens when victims pursue Matthew 18, I'm not sure folks should be surprised when victims don't want to go that route. Even in Jennifer's case—she pursued it and was received at SBTS and LifeWay…and then BP and the EC did what it did back in the Spring. So while I do think there is now a better climate in the SBC for abuse victims to address these things in a Matthew 18 fashion, we still have much work to do. The good thing is that we can help create that culture that will promote more of a Matthew 18-type response.

Now for who gets platformed at conferences – I'm still of the mind that the ERLC needs to focus solely on Southern Baptists with its materials, messaging, and meetings. However there seems to be a great desire by them to be bigger than the SBC—forget the fact that they are nearly completely funded by SBC funds and its smallest entity. It's my belief that their wider-than-SBC desire is what fuels them to bring in people like Boz and Rachael—and it's also what gets them in trouble most frequently. Can we learn from those outside our denom? Absolutely. Should we? Absolutely. But there also should be a responsibility to bring in people who will advance our mission and who will speak knowledgably about our processes. Neither of those objectives were met by Boz and Rachael. Boz literally called for dismantling our mission, and Rachael literally doesn't understand how the SBC works. Our entities should firmly understand the stewardship they have to build up the SBC for the next generation (this ties back to Vision 2025, and why I like it so much). However, I'm not sure the ERLC leadership sees this the same way as the other entities do. Their "influence the influencers" strategy often lacks the stewardship we so desperately need them to have. Again, I think it's good for us to learn from those like Boz and Rachael, but in smaller settings with a more private audience. Our leaders should be more open to meet with them privately and listen to their critiques instead of giving them carte blanche at a conference.

The EC staff member went on to discuss the fact that 44 women had reported being victims of sexually inappropriate conduct by Mr. Gilyard.[419]

Finally, on Gilyard – Folks need to remember that there were 44 women to come forward about him to PP and JV—FORTY FOUR. …And in almost every instance, they were reportedly shamed for it and left feeling like they were not believed. From all published accounts, it seems Gilyard moved from church to church and left ruined lives in his wake. In his autobiography, Dr. Vines even addressed it briefly, and his only comment about Tiffany Thigpen was "I didn't understand it to go beyond some flirtation. They were both single at the time. Perhaps I misunderstood." It was so much more, and not one SBC leader ever acknowledged Tiffany until Heath Lambert did recently. When that's the track record, it's hard for the survivor community to have anything but a negative reaction to Drs. Patterson and Vines on this subject.

Ok…one more last thing. I know we all hear from a lot of different leaders. We all have our circles we run in. They won't agree with us all the time. If they did, then they'd just be a bunch of sycophants in an echo chamber, which would be worse for us. The four of us have been in our seats for a combined total of 10 months. We're still picking up pieces left by the chaos that preceded us. We're also working to tear down and rebuild a toxic workplace culture. It's going to take time. So I'm having to remind everyone I talk to that it's going to take time to right the ship. I'm also having to remind myself of that daily…sometimes hourly. But there's no one else I'd rather be in the trenches with on this than you three. See you tomorrow…well, except for Amy.

---

[redacted]

SBC Executive Committee
[redacted]
901 Commerce Street
Nashville, TN 37203
[redacted]

In 2002, Dr. James Merritt, shortly after being elected SBC President, sent an email to Dr. Chapman referring to Mr. Gilyard as a "woman squeezer."[420] A Dallas newspaper reported multiple Criswell College students claimed to have reported abuse or suspicion of abuse by Mr. Gilyard to Dr. Patterson, but he

[419] https://plusnxt.relativity.one/Relativity/go?id=8252197-2522948.
[420] https://plusnxt.relativity.one/Relativity/go?id=8252197-2470169.

told them not to speak about it or did not return their calls.[421] However, Dr. Patterson claimed, "I do not and have not endorsed his ministry or work and have made crystal clear to Mr. Gilyard that on the basis of his behavior, as well as his divorce, he has no business serving as pastor of a local church."[422]

In 2006, Ms. Thigpen began to help other survivors and tried to get Mr. Gilyard prosecuted. In 2009, he was convicted of sex crimes against two minors that occurred while he was a pastor at Shiloh Metropolitan Baptist Church. He served a three-year sentence and was required to register as a sex offender in the state of Florida.[423] EC staff followed the media accounts about Mr. Gilyard.[424] In 2012, Mr. Gilyard was back in the news for a probation violation. In February 2012, Mr. Guenther emailed Mr. Boto, alerting him that: "Gilyard, the convicted child molester for whom Paige Patterson once vouched, is getting news attention as a pastor of this church. …Is it by chance one of ours?"[425] EC staff determined the church, Christ Tabernacle, was affiliated with the SBC.[426] Upon learning that the church was an SBC church, Mr. Boto and Mr. Guenther's emails did not discuss the gravity of convicted sex offender Gilyard being back in the pulpit after being released from prison, but instead discussed whether Messengers from the church should be seated.[427]

Through blogging and supporting other survivors, Ms. Thigpen continued to advocate for changes in the SBC to prevent sexual abuse and to protect those in harm's way. Through all these years, Ms. Thigpen had been reluctant to speak with SBC leaders because she did not know whom she could trust given her past experience and the interconnectedness of so many leaders in the SBC.[428] In 2019, after Dr. Greear appointed a study group, Ms. Thigpen was hopeful and decided to try to engage leaders with ideas of change. She wrote to the Bylaws Work Group in February of 2019. In a seven-page letter[429], Ms. Thigpen shared many details about the abuse perpetrated by Mr. Gilyard and about the survivors that were harmed by Mr. Gilyard and how he was allowed

421 https://plusnxt.relativity.one/Relativity/go?id=8252197-1508791.
422 https://plusnxt.relativity.one/Relativity/go?id=8252197-1508791.
423 https://plusnxt.relativity.one/Relativity/go?id=8252197-1507191.
424; .
425 https://plusnxt.relativity.one/Relativity/go?id=8252197-2484396.
426 https://plusnxt.relativity.one/Relativity/go?id=8252197-2484458.
427 https://plusnxt.relativity.one/Relativity/go?id=8252197-2484393.
428 https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EZFKfQom0XFPi6BMphXCeP0BSL-fXdaQpedNVvStEg9c5A?e=8rHrce.
429https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/Eac4AOQMwJpGlQADr4Y370cBglbbu3ihBWZ9a9N0gOqMuA?e=Hhy9EG.

to move from church to church with prominent SBC figures like Dr. Patterson vouching for him along the way.[430] No one on the Bylaws Work Group acknowledged or responded to her letter. Ms. Thigpen also made a submission through the Credentials Committee portal and never heard anything back from the Credentials Committee.[431]

Ms. Thigpen communicated with Dr. Bethancourt who tried to arrange meetings to provide Ms. Thigpen a place to be heard.[432] However, due to mistrust over many years, Ms. Thigpen was wary of meeting with the lawyers on the ERLC staff because of past actions of EC lawyers.[433]

As Ms. Thigpen put it: "When a survivor tells our story it comes at a cost, the energy exhausted takes a toll. Imagine telling for decades to a non-receptive audience, to an audience who abuses you with their shame and their hateful words against you. Imagine simply telling your story in order to keep it from happening to someone else, not to destroy the abuser, but to warn the people what has happened so he cannot do harm to another."[434]

## V. OBSERVATIONS AND CONCLUSIONS

The Messengers' Motion called for inquiry into the actions and decisions of EC staff and members from January 1, 2000, to June 14, 2021, with respect to allegations of abuse, mishandling of abuse, mistreatment of victims, patterns of intimidation of victims or advocates, and resistance to sexual abuse reform initiatives. Our findings in these categories are summarized below.

---

430 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/Eac4AOQMwJpGlQADr4Y370cBglbbu3ihBWZ9a9N0gOqMuA?e=gD3ixd.

431 https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EZFKfQom0XFPi6BMphXCeP0BSL-fXdaQpedNVvStEg9c5A?e=8rHrce.

432 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EUmml1HmPltLITSiFt44DelBhXnTBEk6WgdiVa5HUHmPRg?e=cVUGYt.
https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/Ec-C8AWsvmVlrmKHvQxYBtQBUM-GQy_mqHRLze2xD3lzkg?e=q3GgXa.

433 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EUmml1HmPltLITSiFt44DelBhXnTBEk6WgdiVa5HUHmPRg?e=cVUGYt.
https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/Ec-C8AWsvmVlrmKHvQxYBtQBUM-GQy_mqHRLze2xD3lzkg?e=q3GgXa; Interview Memorandum of ERLC Staff Member 6.

434 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/Ec-C8AWsvmVlrmKHvQxYBtQBUM-GQy_mqHRLze2xD3lzkg?e=C680CO.

### A. Allegations of Abuse Committed by Executive Committee Members

As per the Motion, we were asked to examine allegations of abuse during the relevant time period. During the course of our investigation, an SBC pastor and his wife came forward to report that former SBC President Johnny Hunt (2008-2010), who was the immediate past SBC President at the time, had sexually assaulted the wife on July 25, 2010. The allegations include grooming of the wife during Dr. Hunt's term as SBC President. At the time of the allegations, Dr. Hunt was also Senior Pastor at First Baptist Church, Woodstock, Georgia. Dr. Hunt extended his July sabbatical to mid-September after the alleged incident.[435]

The husband, an SBC pastor for 25 years ("Pastor"), had a professional relationship with Dr. Hunt, whom he considered a mentor. Pastor and his wife ("Survivor") told us that prior to the assault, Dr. Hunt groomed the couple with flattery and promises of help in ministry. They also reported that Dr. Hunt gave an unusual amount of attention to Survivor, including making remarks about her appearance and comments of a sexual nature, and unwelcome touching including kissing her hand.

The couple stated that, after the assault, they were silenced by Dr. Hunt and the staff counselor at First Baptist Church Woodstock, who convinced them they should not talk about what happened. Recently, as Pastor was completing his doctorate while studying clinical counseling, conflict resolution, and peacemaking, and as Survivor entered therapy with a licensed trauma therapist, they began to process what they had experienced, and contacted us with this report.

We conducted multiple interviews with the couple, who relayed the following information:

> At the June 2010 annual meeting, Dr. Hunt invited the couple to come spend some time with him and his family at Panama City Beach while he was on

[435] https://www.baptistpress.com/resource-library/news/johnny-hunt-wife-extend-leave-of-absence/.

sabbatical for the month of July. Pastor and Survivor looked up to Dr. Hunt as a spiritual father figure. Dr. Hunt is 24 years older than the couple, with daughters close in age to Survivor.

The couple did take a short vacation to the beach, staying at a separate location, and spent some time with the Hunts. At one point, Dr. Hunt kissed Survivor on the forehead and made inappropriate comments about Survivor's figure.

After the trip, Pastor told Dr. Hunt that Survivor wanted to return to the beach before school started to hear Bobby Bowden speak at Highland Park Baptist Church in Panama City Beach. Pastor asked Dr. Hunt's advice on securing a condo for her. Dr. Hunt gave him a phone number for a condo owner in his complex. Pastor called, and the owner told him to book directly on VRBO. Unbeknownst to Pastor, it was the unit next door to Dr. Hunt's condo.

On Saturday July 24, 2010, Pastor texted Dr. Hunt and asked him to keep an eye out for Survivor, and Dr. Hunt responded that he would take care of her and that his family will keep an eye out. Pastor and Survivor said they trusted Dr. Hunt and were under the impression that Dr. Hunt and his family would be at the beach, and Survivor could contact them if she needed anything.

On July 25, 2010, Survivor drove to the beach and made several stops – the church to hear Bobby Bowden speak, her childhood home and school, and the first church her husband pastored. Upon arrival at the condo, Survivor texted her husband and Dr. Hunt a picture of the ocean, letting them both know that she had arrived.

Dr. Hunt texted her asking what condo she was in. She responded with the number, and he replied that it was right next door and told her to step out on the balcony. Survivor was surprised that the condo her husband had rented was right next door to the Hunts' condo. Dr. Hunt and Survivor conversed from their respective balconies. He brought her a bottle of water. Survivor recalled Dr. Hunt shifting the conversation from ministry to flattery about her appearance, her clothing, and her perfume. Dr. Hunt remarked that he was hot from being in the sun, and Survivor said he could come sit in the shade on her balcony. Survivor described the balconies as side by

side with no ability to cross from one to the other. Survivor assumed that Dr. Hunt's wife and family were inside his condo unit.

Dr. Hunt came into Survivor's condo and they continued their conversation on Survivor's balcony. Dr. Hunt asked her if she felt safe and she said that she did. She did not know why he would ask such a question. He then told the Survivor to put her feet on his knee; he touched them while commenting on their beauty and size. At one point, he remarked that he was uncomfortable sitting outside because he didn't want to be seen so he suggested that they go inside.

Dr. Hunt pointed to the bedroom and said that he guessed that they didn't need to go in there. She objected by emphatically saying "No!" In the living room, Dr. Hunt asked about ministry and church frustrations. Dr. Hunt slid closer while Survivor was telling a story of the stress that she and her husband were under at the church. He asked her more personal questions about her life – like "have you ever done anything like this before?" and "if she was wild growing up?" She was confused and not sure of what he meant.

Dr. Hunt then moved towards Survivor and proceeded to pull her shorts down, turn her over and stare at her bare backside. He made sexual remarks about her body and things he had imagined about her. During this time, Survivor felt frozen. Survivor said these were some of the longest moments of her life. She mustered the courage to ask him could she turn back over, and Dr. Hunt said yes. When she turned back over, she began to pull up her shorts. Dr. Hunt then pinned her to the couch, got on top of her, and pulled up her shirt. He sexually assaulted her with his hands and mouth. Suddenly, Dr. Hunt stopped and then stood up. Survivor pulled down her shirt. Survivor said she did not want him to ruin his ministry, at which he responded he did not want to ruin hers. But he then forced himself on her again by groping her, trying to pull her shirt down, and violently kissing her. Survivor did not reciprocate, but rather stood eyes open and very stiff, hoping he would just stop and leave. He finally stopped and left.

She locked the door behind him and felt very shocked, confused, and violated. After he left, she tried to unpack her suitcase, and she fought back tears and felt overwhelmed by the shame of Dr. Hunt's sexual assault. Later Dr. Hunt texted her about coming out on the balcony. She wanted to sort out what had just happened, so she went outside. In a brief exchange, Dr.

Hunt stated that he would like to have sex with her three times a day. Survivor could not believe what she was hearing and could not get back inside her own condo quickly enough.

The next morning, Dr. Hunt texted her again to come out on the balcony at 9:30 am. He apologized and said that she did not need what had happened and needed a pastor instead. He asked her to forgive him, and Survivor said that she would. Dr. Hunt inquired if she had girlfriends that she would tell what happened. He told her not to mention what happened to anyone. She said that she would not mention it. He invited her to come down to the beach with him and his family. She said no, but he insisted and would not take no for an answer. She went down to the beach, sat in her own beach chair, and spoke with her husband by phone while on the beach.

On Tuesday, July 27th, Survivor attempted to confront Dr. Hunt about the assault, but never saw him. That morning, Survivor saw Dr. Hunt's wife, who confronted Survivor and told her that she doesn't know what Survivor is doing there, that Survivor needed to leave, that she didn't care where Survivor went, and that Survivor needed to leave that day and to stop talking to her husband. Survivor was very upset and called her husband who told her to just leave and come home. At that time, Pastor did not know that Survivor had been sexually assaulted. She left quickly because she did not want to see the Hunts after all that had happened.

Several days later, Dr. Hunt contacted Pastor and told him that they needed to meet at Pastor's church, FBC Woodstock, on Monday evening, August 2, 2010. Dr. Hunt met the couple there, accompanied by Roy Blankenship, a Counseling Pastor at FBC Woodstock. During the discussion, the Pastor learned for the first time that Dr. Hunt had sexually assaulted Survivor. Dr. Hunt mischaracterized his assault of Survivor, admitting to a light kiss, touching the Survivor's breasts over the clothes, and trying to pull her shorts down. He stated that "thank God I didn't consummate the relationship."

Survivor and Pastor stated that Mr. Blankenship said that in his expert opinion an inappropriate relationship had developed, and that based on his information it was consensual. Survivor states that at the time she believed that, even though she did not consent to what Dr. Hunt did to her, she was made to feel it was consensual because she did not fight back. When Survivor attempted to provide her version of the event, both Dr. Hunt and Mr. Blankenship spoke over her.

> Survivor and Pastor stated that Mr. Blankenship told the couple that he had cleared his calendar and was going to initiate counseling for them. That week, the couple began to meet with Mr. Blankenship, who forbade them from discussing what happened on July 25th. On August 5th, Mr. Blankenship brought Dr. Hunt, his wife, Pastor, and Survivor in for another meeting at HopeQuest, a counseling ministry, to bring closure to the events on the 25th of July. Dr. Hunt and Mr. Blankenship stated that they could never talk about what had happened, and that if they did, it would negatively impact the over 40,000 churches Dr. Hunt represented. Dr. Hunt asked for Pastor's forgiveness, and Pastor said he agreed. After Pastor agreed, Dr. Hunt asked Pastor if Dr. Hunt needed to step down from FBC Woodstock. Pastor said no.

According to the couple, they felt great emotional stress and pain from the directives to forgive, forget, move on, and never tell. They shared that they have suffered financial and ministerial struggles directly related to the trauma they experienced. Dr. Hunt has remained in contact with Pastor even as recently as October 2021, reaching out every so often to partner on Biblical writing and offering to help with employment.

Pastor provided us with a hard drive on which he kept an electronic journal that contains entries related to the counseling sessions with Dr. Blankenship, as well as some audio recordings of the counseling and Pastor's thoughts following the counseling sessions. Guidepost has confirmed forensically that the data on the hard drive was in fact created in 2009-2011, which corroborates the counseling relationship between Mr. Blankenship and the couple.

Guidepost investigators reached out to Mr. Blankenship to discuss the couple's report. Investigators confirmed that, in 2010, Mr. Blankenship served as counseling minister at First Baptist Church Woodstock and CEO of HopeQuest, a counseling ministry. State

licensing records from the time indicate that Mr. Blankenship was not a licensed counselor.[436] Mr. Blankenship is no longer a Southern Baptist.

After multiple attempts to schedule an interview with him via email, Guidepost investigators decided to approach him at his office on May 9, 2022. He initially refused to speak with investigators, but then said he would speak with them for just 20 minutes. He agreed to speak with investigators in his office.

When investigators told him what they wanted to question him about, Mr. Blankenship expressed concern for Survivor and Pastor, but he also said he did not want to betray a confidence. The investigators explained that they had a waiver from the couple to discuss their information. Mr. Blankenship did not offer a narrative of what happened, but he said he was willing to answer yes or no questions.[437] During questioning, at times he provided more than a yes or no answer.

Mr. Blankenship confirmed that Dr. Hunt's extended sabbatical in 2010 was not related to exhaustion.[438] He also confirmed that there was an incident in Panama City Beach involving Dr. Hunt and the Survivor. From the information he recollected, Mr. Blankenship said that Dr. Hunt had kissed Survivor and touched her breast over her clothes. He did not recall anything about pulling down pants. Mr. Blankenship stated that he did not think he received the full story. He confirmed that, at the time, his assessment was based on what Dr. Hunt told him and that the sexual contact was consensual.

---

[436]https://solutionpointintl.sharepoint.com/:i:/s/SBCECInvestigation/EfrVuTuSq6lNkFZYsqFPZcoBnX3DIRHy5tZbqHlOmSPwgQ?e=UvOSYh; https://solutionpointintl.sharepoint.com/:i:/s/SBCECInvestigation/ESb2zWm0HoVGhCa3Uq3uM7sBFFs3MDsKbEjfPoN7x6mWLw?e=zLz6og; https://solutionpointintl.sharepoint.com/:i:/s/SBCECInvestigation/EdsemjgFd4hHlxG7JbUKkSsB_CeKq1QHTytXPaYDJgXdDA?e=F7F4hL.

[437]https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EZkfLXA-CKhCkjmTlihuRjgBmVd8mskWwAHelo_xwslrnw?e=mX4IlY.

[438] http://m.bpnews.net/33492/johnny-hunt-wife-extend-leave-of-absence.

Mr. Blankenship stated that he and Dr. Hunt agreed to meet with the couple the following week, and they did in fact meet at Pastor's church. He stated that Dr. Hunt did not dominate the meeting, but he did apologize to Pastor, and Pastor said that he forgave him. When asked if Survivor gave an account of what happened, he said she could have spoken up, but she stayed silent. He went on to say that Dr. Hunt was the one with the power advantage and he should have been the one to stop it, adding but "it takes two to tango." He said he had been around for a while, and he knew how things worked. He questioned how Dr. Hunt and Survivor ended up in condos next door to each other. He called it a "he said/she said" situation, and he had no proof.

Mr. Blankenship also confirmed that a second meeting took place at HopeQuest and that Dr. Hunt and his wife as well as Survivor and Pastor were present. At that meeting, the couples were present to forgive, forget, and move on. Mr. Blankenship stated that he did remember Dr. Hunt saying that if this (story) got out, it could negatively impact 40,000 churches. He does not think this was said at that first meeting, but he does remember it being said at some point. Mr. Blankenship said that he was focused on helping the couple.

The interview lasted more than 45 minutes. Mr. Blankenship was guarded and hesitant to answer many of the investigators' questions, refusing to answer some while responding with details for others. He did not want to speak about anything related to his work with the couple in counseling.

Our investigators found Mr. Blankenship to be credible. As stated above, he did not seek to participate in the investigation and only reluctantly agreed to speak with investigators. He reported very similar details and events to those reported by Survivor and Pastor, with the only significant difference being on the issue of consent.

In addition to Mr. Blankenship, Guidepost investigators interviewed three additional witnesses with relevant information. Witness 1[439] is a pastor and has been in ministry for over forty years. He has known the Survivor her whole life and her husband Pastor is like a son in ministry to him.

Witness 1 stated that he had a conversation with Pastor in 2010 and said it was like an atomic bomb. He shared that they were riding in a car and Pastor said that Dr. Hunt had made advances toward Survivor and it was not appropriate behavior. He remembered Pastor saying that Dr. Hunt had helped him find a condo to rent for Survivor. Pastor told him that it happened at a beach condo, and that Dr. Hunt had kissed her, touched her breast, undid her shorts, and that it may have stopped there. Pastor also told him that Dr. Hunt wanted to talk and the couple met with Dr. Hunt and a counselor where Dr. Hunt admitted that it was inappropriate but told Pastor that it didn't go all the way. Witness 1 said Pastor told him that Dr. Hunt asked for forgiveness and Pastor forgave him.

Witness 1 stated that both Pastor and Survivor respected Dr. Hunt and valued their relationship with him, and he was not aware of any conflict between Dr. Hunt and the couple prior to this incident. Witness 1 has known Dr. Hunt for over 20 years and traveled with him on international mission trips. He also stated that he could never see Survivor being an instigator in this situation. Witness 1 says that this has affected Pastor and Survivor's ministry and wondered what their ministry trajectory would have been if this had not happened.

Witness 2[440] is currently a senior pastor in a Southern Baptist church, who worked closely in the same church with Pastor for over six years. He stated that Pastor had confided in him sometime around 2012. After a conference where Dr. Hunt was speaking, Pastor told him that Johnny Hunt is not what you might think. Witness 2 said that Pastor told him

---

[439]https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EcdUbPziRfNHgK5sTGHjJWIBOdEA82-Jn5E-L8WFliqZww?e=1XGeGj.

[440]https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EWn8yF4lsGlMk_slpYL8M3oBrvXe_Fp8kVR-Lc2ip3mjKw?e=wG8amh.

about Dr. Hunt abusing Survivor. Pastor did not give specific details but shared that it was sexual in nature. He also said that Pastor felt pressured by Dr. Hunt to forgive him. Witness 2 shared that this has affected Pastor's ministry and he deals with anger because of it. He stated that it was very hard on Pastor when Dr. Hunt was hired by the North American Mission Board ("NAMB"). He also shared that Survivor is an amazing person, and that he observed how hard it is for her to trust people in the church.

Witness 3[441] has served as a bi-vocational pastor in Southern Baptist churches and worked in local and state conventions. He is currently a minister in residence in a Southern Baptist organization. He had a coaching/mentoring relationship with Pastor and has known him for four years and said that during his work with Pastor, Pastor told him about Dr. Hunt making advances on Survivor and groping her and then subsequently covering it up. Pastor also shared that Dr. Hunt had apologized to Pastor for it. Witness 3 stated that he has seen the hurt that this has caused Pastor and it has affected his ministry.

Guidepost investigators found all three witnesses to be very credible with clear recollections of Pastor's statements to them. The witnesses are all still very much involved and committed to Southern Baptist life and the Convention.

As Guidepost investigators were investigating the couple's report, they interviewed Dr. Hunt on two occasions.[442] During the first interview, Dr. Hunt was asked standard questions related to the actions of the EC as detailed in the Messengers' Motion. Guidepost investigators did not directly confront Dr. Hunt at that time, as investigators had not yet spoken to key witnesses for corroboration.

---

441 https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EbOnYO3L1QZLmndFh5IlFlUB9oynCY-5P7HSJ79BVTL13A?e=1z9t1D.

442 https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EYlU6XzqMOVBuVay89itZFABcQjjGHi0qPvelx5ao2E7Kw?e=9fjpio; https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EdBXfBl_33RMtPf3xBZtBzkBRBVo7bhNk1IWdAt1n7zaVg?e=8RXCkK.

During the first interview, Dr. Hunt did acknowledge that, during his publicly-announced extended sabbatical, he was under the care of Mr. Blankenship. When asked if the sabbatical was at all related to a sexual abuse matter, he replied in the negative. Investigators asked Dr. Hunt several questions about Pastor's church, without identifying Pastor. They asked if Dr. Hunt knew the circumstances of the resignation of the senior pastor at that church, who suddenly and without explanation resigned in 2010. Dr. Hunt stated that he did not know who Pastor was, or why he had resigned. Dr. Hunt was also asked about the City of Refuge program affiliated with FBC Woodstock, a program for pastors who have a personal crisis but who wish to reenter ministry, which was started by Dr. Hunt and run by Mr. Blankenship. Dr. Hunt spoke about pastors making bad choices and that they might say to themselves "I can't believe I did this – one night slipped up" and they are now repentant and broken, and that they should be reconciled.

After interviewing several individuals with relevant information, Guidepost investigators set up a second interview with Dr. Hunt. When questioned if he knew why investigators wanted a second interview, Dr. Hunt responded that he did not know. Guidepost investigators explained to Dr. Hunt that they had received an allegation of abuse involving him and if he knew what they were talking about; Dr. Hunt responded that he was "totally in the dark."

In the second interview, Dr. Hunt acknowledged this time that he knew Pastor. Dr. Hunt stated that he had known the couple for at least twenty years, that Pastor had been converted under his ministry, and that Dr. Hunt had been a strong influence on Pastor's life. For a time, they pastored churches in the same state. Dr. Hunt said that while Dr. Hunt attended the 2010 annual convention, he does not remember any personal contact with the couple and does not think he spent any personal time with them. He shared that he takes time off every year in July, but he does not remember having the couple as guests when he was in Panama City Beach, but says they may have had lunch one time during that period of vacation.

Investigators asked if at some point Pastor had contacted him about finding a place to rent for Survivor to come back down to the beach for a week. Dr. Hunt did not remember Pastor asking for information, nor did he recall providing a phone number to help find a place. Dr. Hunt did state that he remembers Pastor calling to say Survivor was coming to the beach and that his family would look out for her. Dr. Hunt remembered Survivor texting him a picture of the pier saying that she was there. When asked if he knew where she was, Dr. Hunt said that unbeknownst to him Survivor had rented the condo next door, but he had no role in that. He stated that he has no idea who owned the condo next door because the building is mostly rentals.

When asked if he had any contact with Survivor while he was there, he responded that it was very brief on the balcony. While on the balcony he remembers Survivor telling him about going to see Bobby Bowden speak that morning but did not remember her saying what else she did that day before getting to the beach. (Both Dr. Hunt and Survivor described the balconies as side by side but you could not walk through to the other.) Dr. Hunt was asked whether he went onto her balcony or entered her condo and he responded he never entered her condo and was never on her balcony.

Dr. Hunt said that after seeing Survivor out on the balcony he did not have any further contact with Survivor during the time she was there. However, later in the interview he stated that he saw her the next day on the beach and then the following day his wife said something to her. And he does not know whether she changed places or just went home.

Dr. Hunt said that he did not have any physical contact with Survivor – "no contact whatsoever." He also restated that it was not true that he was on the balcony or in the condo. When asked specifically about whether he kissed her, pulled at her shorts, or fondled her, he said no. He denied sexualized comments about her appearance, panties, tan lines, or perfume.

Dr. Hunt shared that his wife was uncomfortable with Survivor next door by herself because it just did not look right that she was down there all alone. At some point, he

thinks his wife may have said something to Survivor, and that all he knew was that Survivor was not there anymore. When asked whether his wife was there the whole time with him, he stated that there may have been a brief time that she was not there because of an event at Southeastern Baptist Theological Seminary where she may have flown in and out in one day or the next day. He said it was possible that she was not there some of the time that Survivor was there.

When asked if he contacted Mr. Blankenship, the counselor, because there was a problem between Pastor and Survivor, he said that he did not contact him in regard to that but just for general help because Pastor was transitioning in ministry and Dr. Hunt had always been a sounding board for him.

Dr. Hunt remembers only one meeting with the couple on August 2, 2010. He said the meeting was brief and that he and his wife, along with Pastor and Survivor and Mr. Blankenship were present. Dr. Hunt claims that he never directed the couple towards Mr. Blankenship for counseling.

Dr. Hunt said that he did not apologize to Survivor for sexually assaulting her during this meeting because there was no contact between the two of them. He denied saying "Praise Jesus that I didn't consummate the relationship." If there was an apology, Dr. Hunt believed it was related to Mrs. Hunt offending Survivor about being concerned with her being there alone, and them apologizing for her having to leave. He stated that "Someone has created a story on me. I would like to hear her story on this." Dr. Hunt said that Survivor had never come on to him and he never felt threatened by her. Dr. Hunt stated that he and Pastor have stayed in contact over the years. Investigators asked Dr. Hunt if there were any similar allegations with other women. Dr. Hunt answered no.

Several times during the interview, Guidepost investigators directly asked Dr. Hunt about specific allegations of sexual abuse against the Survivor, controlling the narrative through the use of an unlicensed therapist, and trying to protect his ministry, 40,000 churches, and the SBC, all of which he denied. The investigators asked Dr. Hunt if there was anyone

else he thought we should speak with about the matter, and he said the only ones who would know would be the couple and Mr. Blankenship. The investigators asked if he thought his wife would speak with us and he replied no, saying that he doubts his wife would speak to us because her take was that we handled it and moved on. Investigators understood this to mean that Dr. Hunt had apologized for the fact that his wife had upset Survivor by telling her to leave. Throughout the interview, Dr. Hunt remained very calm, expressed little to no emotion, did not get upset, did not raise his voice, or express outrage at the allegations.

We included this sexual assault allegation in the report because the investigators found Pastor and Survivor to be credible; their report was corroborated in part by Mr. Blankenship and three other credible witnesses; and Dr. Hunt, while denying physical contact, does acknowledge that he had interactions with the Survivor, including on the condo balcony during the relevant time period. The investigators did not find Dr. Hunt to be credible in their interviews with him.

### B. Mishandling of Abuse Allegations and Allegations of Mistreatment of Sexual Abuse Victims by Executive Committee Members from January 1, 2000, to June 14, 2021

As discussed above, the Messengers' Motion called for an investigation of both the mishandling of abuse allegations by EC members between January 1, 2000, to June 14, 2021, and allegations of mistreatment of sexual abuse victims by EC members from January 1, 2000, to June 14, 2021. We discuss these issues in tandem because the mistreatment of victims by some EC leaders – which ranged from decisions not to communicate with survivors and their advocates, to disparagement and outright hostility – were part and parcel of EC leaders' approach to sexual abuse allegations generally.

The prevailing attitude of some EC leaders was that the SBC had no responsibility for addressing the sexual abuse crisis within member churches because, under SBC polity, those churches were autonomous, in charge of their own hiring, and not under the control

of the SBC. When abuse allegations were brought to the EC, including allegations that convicted sex offenders were still in ministry, EC leaders generally did not discuss this information outside of their inner circle, often did not respond to the survivor, and took no action to address these allegations so as to prevent ongoing abuse or such abuse in the future.

In addition, as time went on and survivors and advocates continued to press for change and reform, some within EC leadership expressed frustration with survivors, their advocacy, and their "demands." At times, frustration would give way to public and private criticisms of the survivors themselves. Almost always the internal focus was on protecting the SBC from legal liability and not on caring for survivors or creating any plan to prevent sexual abuse within SBC churches.

### 1. Lack of Transparency

Until SBC President J.D. Greear openly named 10 churches accused of mishandling sexual abuse allegations in 2019, EC leaders typically kept information about these types of allegations quiet, and did not even inform their fellow EC Trustees about them.

Many of the EC Trustees we interviewed who served prior to 2019 told us that EC leaders never provided the EC Trustees with any information about sexual abuse claims.[443] Even after 2019, when the existence of these cases became more public through Dr. Greear's actions and media reports, EC leadership continued to keep EC Trustees out of the loop.[444] For example, one EC Trustee told us that he first learned about the sexual abuse issues in the Houston Chronicle article, which EC staff notified him about the night prior to the release of the series.[445] The EC Trustee believes that the EC should have brought these issues to the entire Board, particularly given the severity of the accusations, and that the survivors should have received help.[446]

---

[443] *See, e.g.*, Interview Memoranda of EC Trustees 11, 22, 24-25, 30-35.
[444] *See, e.g.*, Interview Memoranda of Litton and EC Trustees 1, 5-7, 17, 19, and examples below.
[445] Interview Memorandum of EC Trustee 16.
[446] *Id.*

An EC Trustee emailed Dr. Floyd in October 2019, saying he was a strong supporter of Dr. Floyd but that he is "very uninformed about these sexual abuse accusations." [447] Dr. Floyd responded the same day, saying he had "no knowledge of any cover ups."[448] Dr. Floyd made no mention of everything he had learned since becoming EC President, discussed in more detail below, and gave no specifics about the many allegations over the years.

A recent EC Trustee told us that, because he only heard about sexual abuse issues when the EC reviewed Credentials Committee recommendations, he was "floored" by everything that came out during the 2021 Convention,[449] and had no idea that any survivors had been in contact with the EC.[450] Other EC Trustees were surprised to learn that there had been lawsuits, which had not been disclosed.[451]

Although many EC Trustees were not informed about sexual abuse allegations, there were those within EC leadership who were very aware. Dr. Oldham and Mr. Boto had been collecting information about these types of cases for years. Dr. Oldham acknowledged in an email to Dr. Floyd in May 2019, which was copied to Boto and others, that:

> For the past decade, I have been regularly sending Augie news reports of Baptist ministers who are arrested for sexual abuse, for his awareness. It hasn't slowed down since the Chronicle articles started on February 10. I sent him two more the past two days, one in Texas who was just sentenced and one in North Carolina who was just arrested on federal charges.

Mr. Boto responded that: "Yes. We are collecting them, and may even post them in some way, but we'd have to really examine the potential liabilities that would stem therefrom."[452]

---

[447] SBC0000684846.
[448] *Id.*
[449] Interview Memorandum of EC Trustee 2.
[450] *Id.; see also* Interview Memorandum of EC Trustee 1.
[451] Interview Memoranda of EC Trustees 1 and 18.
[452] SBC0000668499.

The number of alleged abusers on the list is shocking. As of August 2018, an EC staff member, who had been collecting news reports and other information about accused Southern Baptist ministers, had provided Mr. Boto with the following information:

> Since I started keeping the lists, I have at least 585 possible abusers.
>
> We have 3 different lists.
>
> Prior to 2008 – 233 names (143 confirmed SBC)
>
> 2009 - 8/2013 – 290 names (only confirmed 43 SBC, I didn't check others per your instruction because we needed the material for EC mtg. and afterward you told me I didn't need to go back and check them. I would love to check them now. So we could really get an idea of the numbers of SBC offenders. It is difficult for me to verify if a church is SBC affiliated. It is hard on SBC.net and when I just google it. I see that Sing uses Workspace. I don't know how to access that.)
>
> 3rd list 9/2013-8/2018 – 66 names (51 confirmed SBC) – Not necessarily child sexual abuse (sex crimes against adults and pornography included).[453]

In over a decade of collecting this information, which amounted to around 585 possible abusers at the time of the email correspondence, no action was ever taken to share these materials outside a small cadre of people, or to take action to address the possibility that these accused individuals might continue in ministry in SBC churches.

There appeared to be a perception that sexual abuse allegations were not as common in the SBC as in the Catholic Church, so it was not a significant problem, especially if those allegations did not result in successful lawsuits against the SBC. In our interview with Mr. Boto in May 2022, he again invoked the argument that the number of sexual misconduct cases in the SBC is relatively small in comparison to the Catholic Church, resulting in only about two lawsuits per year, and that the SBC was successful in defending these cases. This is only one example of a consistent misperception by EC leadership – that lack of

[453] https://plusnxt.relativity.one/Relativity/go?id=8252197-1785876.

lawsuits equates to lack of abuse cases. Our interviews with numerous people disclosed a lack of knowledge of sexual abuse survivor trauma responses, including not disclosing abuse.

### 2. Treatment of Survivors

EC leaders' failure to openly confront sexual abuse allegations over the years is illustrated by their treatment of those survivors who came forward to report abuse. EC leaders often chose not to interact with sexual abuse victims, either ignoring them entirely or failing make a timely response, even when they alleged that an abuser was still in an SBC pulpit.

Examples include:

- In 2013, Mr. Boto and Dr. Oldham were forwarded an anonymous complaint, made through the SBC website's "Contact us" link, alleging that a youth pastor who had abused the complainant was now the pastor at a fairly large SBC church.[454] The complaint listed a Gmail address as contact information.[455] On January 8, 2014, almost two months later, Mr. Boto wrote Mr. Guenther to inform him that Mr. Boto had decided not to respond.[456] Mr. Guenther responded that: "I think say[]ing nothing may be the thing to do."[457]

- In 2016, a person called to report a pastor's involvement in abuse of her mother. An EC staff member asked Mr. Boto: "Do I call this lady back? I suspect no."[458] No documents indicating a follow-up response from Mr. Boto were found.

- In 2017, a caller contacted the EC about a pastor's possible sexual abuse of an 18-year-old high school girl that he was counseling.[459] The EC staff member discussed autonomy and instructed the caller to contact Child Protective Services. The EC staff member indicated that she would forward the information to legal, but no other follow-up was found in our document review.

- In December 2017, Carol Shelton, a survivor advocate, sent a message through the SBC website to ask how to report a pastor who had allegedly molested at least

---

454 https://plusnxt.relativity.one/Relativity/go?id=8252197-2482502
455 *Id.*
456 *Id.*
457 *Id.*
458 SBC0000566981.
459 https://plusnxt.relativity.one/Relativity/go?id=8252197-1624462

two people. When she did not get a response, Ms. Shelton called the ERLC in Nashville in January 2018. Someone from the ERLC called her back, and Ms. Shelton emailed the ERLC with the details of the abuse.[460] Internally, the ERLC forwarded the email to Dr. Oldham, who in turn forwarded it to Mr. Boto on January 23, 2018.[461] The documents provided to us do not show that Dr. Oldham or Mr. Boto took any further action at that time. A month later, the ERLC representative referred Ms. Shelton to a contact at the EC. Ms. Shelton called and left a message but never heard back.[462]

In April 2018, Ms. Shelton emailed a BP staff member to discuss a possible article about the abuse. The staff member told her the abuser's church was no longer in friendly cooperation with the SBC because they had not given funding to the Cooperative Program, thus a story about the church would be out of scope.[463] Our investigation uncovered that this church is in fact an SBC church, and was listed on the Cooperative Program records in 2019.[464] Ultimately, the accused pastor resigned, admitting he had been involved with two females "in an inappropriate manner," and other media outlets covered the story.[465] On June 29, 2018, over five months after receiving the forwarded email from Ms. Shelton, Mr. Boto forwarded it to Mr. Guenther with high importance, asking Mr. Guenther to call him as soon as possible.[466]

- In May 2018, a mother began contacting the SBC to report that her son had been subjected to inappropriate text messages and predatory grooming by a male youth minister. On May 11 and May 17, 2018, the mother called the SBC and left voice messages asking to be contacted. On May 17, 2018, an EC Staff member contacted the mother and informed her that there was nothing that the SBC could do; that her case was a local church matter; that local church autonomy prevented the SBC from doing anything regarding her case; and that perhaps the incidents never happened. According to the mother, the EC Staff member had no interest in

---

[460] Interview Memorandum of Shelton.

[461] https://plusnxt.relativity.one/Relativity/go?id=8252197-2482457

[462] Interview Memorandum of Shelton.

[463] *Id.*

[464] https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/ET66ZcoTPR9FogS-dvglr98BB377ynNMtyfFlpGJy_AufA?e=LTzMmx.

[465] His accusers claim that the pastor lied in his resignation speech, when he said both ladies were over 18 years old. The survivors stated that they were between the ages of 15 and 17 when they were abused sexually by the pastor. *See* https://www.christianpost.com/news/southern-baptist-pastor-resigns-amid-accusations-he-sexually-molested-teenage-girls.html.

[466] https://plusnxt.relativity.one/Relativity/go?id=8252197-2482457.

notating any information regarding the church leaders, the abuser, or the specifics of the case.[467]

The mother also wrote letters and emails to Dr. Bethancourt, Dr. Greear and Dr. Moore. She never received a response to any of her letters, although she did exchange emails with Dr. Bethancourt and was ultimately referred to the CC portal. She never submitted a report through the portal because she believed a member of the ERLC Leadership Council was involved in covering up abuse at a church, and she did not trust the CC to act on the matter or protect her son's identity.[468]

- In 2019, Ms. Thigpen attempted to engage SBC leaders with ideas of change. She wrote a seven-page letter to the Bylaws Work Group in February 2019, in which she shared many details about her and other survivors' abuse by Gilyard, and how he was allowed to move from church to church with prominent SBC pastors vouching for him along the way.[469] In her letter, she implored the Bylaws Work Group to initiate change. No one on the Bylaws Work Group acknowledged or responded to her letter.

- Dr. Floyd never responded to a June 14, 2021, text from a Survivor giving details of her abuse and referring to the potential EC investigation. Mr. Addison passed along advice to Dr. Floyd in an email that "the abuse community has seized upon this as a tool;" that Dr. Floyd should not reply; and if asked should say "I have sent that to our legal counsel."[470]

- Dr. Floyd did not respond to a text message from Ms. Lyell in June 2019 asking to meet.[471]

- Another survivor of clergy abuse submitted her detailed history to the SBC CC portal the day it went live. She received an automated message of receipt, but never heard back for any other follow up.[472] In addition to the survivor who submitted through the portal, three other women reported being victimized by this pastor. When the survivor's mother hired a private investigator, an additional

[467] Interview Memorandum of Survivor 1.
[468] *Id.*
[469]https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/Eac4AOQMwJpGIQADr4Y370cBglbb u3ihBWZ9a9N0gOqMuA?e=gD3ixd.
[470] https://plusnxt.relativity.one/Relativity/go?id=8252197-1768341.
[471] REL0000000045.
[472] Interview Memorandum of Survivor 2.

potential victim was reportedly identified; that victim committed suicide and her body was found by the pastor.[473]

Even when the survivors did receive a response, it was often couched in language of SBC polity to explain why the EC would not look further into the reports of abuse:

- For example, in January 2012, a survivor wrote to inquire whether there was any litigation against their abuser, who had allegedly committed offenses at three different churches. Mr. Boto responded from the generic SBC "Info" email account, without including his name, that:

> We have no knowledge of any litigation in which a person named [name omitted] is a party. We trust you or someone on your behalf who has actual knowledge reported the facts of the matter to law enforcement authorities and to the churches you mentioned.
>
> Since the Southern Baptist Convention does not ordain or have any disciplinary or supervisory authority over the staff members employed by local congregations, it usually has no knowledge of specific litigation. Also, the Southern Baptist Convention does not move ministers from one church to another, nor does it assign ministers to congregations.
> Please know of our prayers for you.[474]

- On August 11, 2011, Mr. Guenther emailed an EC staff member recounting his phone interactions with a woman who had reported that the pastor of a church in St. Petersburg is a convicted molester of his own children who served prison time. Mr. Guenther stated that: "I explained polity and suggested she call the church and ask the name and telephone number of the chair of deacons. She then wanted to know what to do if they would not give her that. I gave her the Fla Baptist Convention number, told her they, like us, had no control, but they just might have that chairman's name. She was satisfied, I think."[475]

---

[473] *Id.*

[474]https://plusnxt.relativity.one/Relativity/go?id=8252197-1624802; *see also* https://plusnxt.relativity.one/Relativity/go?id=8252197-1785506 (responding to survivor's April 2019 report of sexual abuse as a minor with a discussion of SBC polity); https://plusnxt.relativity.one/Relativity/go?id=8252197-1508094 (BWG file of abuse complaints and response letters).

[475] SBC_EC_GJPLaw_00023246.

Those survivors who did not accept the EC's dismissal or invocation of polity as an end to communication – who instead called out the EC's inaction and fought for reforms – were often met with hostility. Public statements, email exchanges, and discussions illustrate that some EC members and prominent SBC figures did not view such survivors and their advocates favorably:

- In 2007, SBC President Frank Page wrote a Point of View article in the Florida Baptist Witness about an upcoming segment on the television program 20/20 entitled "Preacher Predators," for which he had agreed to be interviewed. Dr. Page wrote:

> Let me also share one other word of clarification. There are many people in the news media speaking about this issue. I am thankful that any attention to this issue brings a heightened level of awareness on the part of our churches and people. However, please realize that there are groups who claim to be one thing when in reality they are another. It would be great if the many groups who are claiming to be groups of advocacy and encouragement in ministry were that which they claim. Please be aware that there are groups that are nothing more than opportunistic persons who are seeking to raise opportunities for personal gain.[476]

- In another article, Dr. Page accused a survivor group of having a hidden agenda of setting up the nation's largest Protestant body for lawsuits.[477] Years later, SNAP called on Mr. Page to apologize for denigrating their motives and to reconsider the feasibility of an offender database. Mr. Page declined to apologize, noting that his statement "was addressed to opportunists rather than to suffering victims — a group for which I have great compassion."[478]

- When Christa Brown spoke at a Bylaws Work Group meeting in February 2007, she was met with hostility. Rather than listening respectfully to her history, EC members focused on chastising her for saying she did not receive Mr. Boto's letter, which had been misplaced and for which she apologized; some opposed her even

---

476 https://christabrown.files.wordpress.com/2014/04/frank-page-florida-baptist-witness.pdf.

477 https://goodfaithmedia.org/sbc-president-questions-motives-of-snap-says-sex-abuse-everywhere-cms-8863/.

478 https://baptistnews.com/article/sbc-official-stands-by-criticism-of-snap/#.YoDbW-jMKUk.

being allowed to speak; an EC member turned his back to her during her speech and another chortled.

- According to Debbie Vasquez, in private emails to her, Dr. Patterson characterized SNAP members as "evil doers" and "just as reprehensible as sex criminals."[479]

.

Patterson's e-mail dated in a message dated 1/13/2008 12:23:2
3 PM Central Standard Time, [redacted] writes

**"Snap is just as reprehensible as sex criminals. To make false accusations against a person in an effort to tarnish his reputation, as they regularly do and have most recently done to me is just as reprehensible and involves just as little integrity. My little granddaughters 10 and 8, were here the other day and heard on TV that their Grandpa harbored sex criminals! I suppose that this is somehow OK since I am a Pastor?"**

**In a message dated 1/13/2008** 8:05:59 PM Central Standard Time,
[redacted] **writes:**

**" Debbie,**
**You continue to suggest that I am not "doing enough," without any facts whatsoever. You also protect evil doers who have slandered others. Is the slander of Snap somehow not a hideous sin also? I am sorry Debbie, but I cannot help anyone whose mind is made up to do wrong even when I regret deeply what has happened to them. I will pray that God meets your every need. Paige Patterson "**

- In a May 2019 email to an EC staff member, Mr. Boto called sexual abuse concerns "a satanic scheme to completely distract us from evangelism."[480]

> This whole thing should be seen for what it is. It is a satanic scheme to completely distract us from evangelism. It is not the gospel. It is not even a part of the gospel. It is a misdirection play. Yes, Christa Brown and Rachael Denhollander have succumbed to an availability heuristic because of their victimizations. They have gone to the SBC looking for sexual abuse, and of course, they found it. Their outcries have certainly caused an availability cascade (just like Lois Gibbs did in the Love Canal example). But they are not to blame. This is the devil being temporarily successful.[481]

---

[479] https://plusnxt.relativity.one/Relativity/go?id=8252197-1505365.
[480] https://baptistnews.com/article/sbc-executive-committee-declines-to-entertain-the-idea-of-broadening-the-scope-of-its-investigation-of-itself/#.YnkPu-jMl2z.
[481] https://plusnxt.relativity.one/Relativity/go?id=8252197-1695621.

When we interviewed Mr. Boto in May 2022, he again expressed his view that the devil was involved in the magnitude of the sexual abuse issue focus in the SBC, which is taking away from the SBC and EC's role in spreading the gospel. He referred to a book that explains how focusing on something, e.g., sexual abuse in SBC churches, slants a person to see that very thing elsewhere again and again. Mr. Boto claimed that if he could have helped the survivors, he would have, but he also stated that the victims would never be satisfied.

- In a December 2019 email message to Dr. Floyd, the Assistant to the President, describes a survivor and advocate, who had criticized the lack of anonymity in the CC process, as "never going to be happy," noting that "[s]ome people just want to watch the world burn." [482]

- In hallway conversations, some EC members and staff reportedly referred to survivors as "Potiphar's wife," i.e., a Biblical character who makes false accusations of rape.[483]

- At an EC Trustee meeting, EC Trustee Rod Martin called Ms. Lyell "a professional victim."[484]

- Mr. Guenther emailed Dr. Floyd and Mr. Addison in response to tweets by Ms. Lyell, stating that "she has serious problems," and hoping they can be comfortable not responding to her.[485]

- In November 20, 2020, Witness 7, an advocate for Jules Woodson, sent an email requesting a second review of the CC's decision not to recommend disfellowship of a church. In an email to an EC Staff Member, Mr. Addison stated that: "I will say that it is completely inappropriate for this person to arrogantly accuse the Committee of favoring that church for its size or CP giving. I have never heard of her and do not know her story, but that kind of baseless and arrogant accusation is far beyond the pale. I am sure you can fill me in, but again I do not care who she is. That is incredibly arrogant, unChristlike (especially in the offensive way she couches this with backhandedly sarcastic fake "grace" "in case you have not" language) and will not be the testimony of the work of this Committee. Clearly, it is

---

482 SBC0000397323.
483 Interview Memorandum of Moore.
484 Interview Memorandum of EC Staff Member 6.
485 FLOYDMB0000370589.

not filled With [sic] mega church people protecting mega churches or whatever axe she obviously seeks to grind."[486]

Survivors also have been subjected to mistreatment on social media. Social media harassment and bullying has become increasingly common. After a Baptist Press article misrepresented the nature of her abuse, Jennifer Lyell became a subject of a firestorm of vicious social media attacks. A sampling of social media comments included:[487]

- *Bitter jealous woman*
- *She's not a victim, she's a sinner. Join me in emailing Lifeway to call for her resignation.*
- *She should also be fired from her job.*
- *But she's guilty of adultery. Not just "being compliant."*

In a Statement published by Baptist Press on October 15, 2019, Baptist Press staff acknowledged that since the inaccurate publication of Ms. Lyell's story:

> Lyell has been the recipient of un-Christlike slurs – some by fellow Southern Baptists – and her reputation has been besmirched. In fact, the story stayed on the Baptist Press Facebook page for many hours where many of those slurs were posted. The conversation that occurs on our social media profile pages should glorify Christ in the way we treat one another and in the way we support those who report sexual abuse. In this case, it did not. Since this incident, we have enacted a more stringent Facebook commenting policy and monitor the page much more closely in order to prevent situations like this from occurring again. For these actions, we offer a sincere apology. Lyell came to us with an allegation of abuse and should have been cared for throughout the entire process. Instead, for many this incident may have contributed to a perception that the Southern Baptist Convention is not a safe place for sexual abuse survivors to disclose.[488]

---

[486]https://solutionpointintl.sharepoint.com/:u:/s/SBCECInvestigation/EVbdhq4T2X1Er7htNVl24lcBOHROYBayYhmikGP7BypYvA?e=jRjgZR.

[487] https://plusnxt.relativity.one/Relativity/go?id=8252197-1505637.

[488] https://www.baptistpress.com/resource-library/news/a-statement-from-baptist-press/

As in many places, Twitter is an active avenue of communication within the Southern Baptist community.[489] As part of our investigation we reviewed a large sample of EC Trustee Twitter accounts. Our interviews of survivors, EC Trustees, and witnesses, and our social media analysis, unveiled that some Southern Baptist leaders and one EC Trustee in particular had negative Twitter interactions with survivors.

EC Trustee Rod Martin has had numerous Twitter interactions with a survivor regarding her lawsuit against the EC.[490] As of March 14, 2022, Mr. Martin had 17,033 Twitter followers, indicating that his tweets were likely seen by many people. When we interviewed Mr. Martin, he said he did not seek the survivor out and admitted he should not have engaged, but noted that the survivor has a huge following and many people tagged him to the survivor's postings and pushed him until he responded.[491]

Even the EC executive staff expressed concerns about Mr. Martin's combative language towards the survivor. Mr. Addison emailed members of the executive staff that "Rod Martin continues to be a flash point on social media. This week he got into a twitter battle

---

[489] The misuse of social media has been an important topic in the Southern Baptist community, as indicated by a Resolution that was passed at the June 2018 Annual Convention. In the Resolution "On Christlike Communication And the Use of Social Media," the Messengers resolved the following:

> *RESOLVED, That the messengers to the Southern Baptist Convention meeting in Dallas, Texas, June 12–13, 2018, commit to maintaining brotherly and sisterly love by resolving our differences in a biblical manner (Matthew 18:15–18); and be it further*
>
> *RESOLVED, That we guard our tongues, using caution and wisdom in our media and social media, and refrain from remarks that tear down others made in the image of God, including refraining from gossip and slander (Psalm 141:3; Proverbs 6:16–19; 17:27–28; 21:23; James 3:10–12); and be it finally*
>
> *RESOLVED, That even in the midst of differences, disagreements, and conflicts, we will engage one another with respect and winsomeness, speaking truth in Christlike love while pursuing unity (Ephesians 4:15).*

*See* https://www.sbc.net/resource-library/resolutions/on-christlike-communication-and-the-use-of-social-media/.

[490] https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EZLzfVVoT-pPhVXKSv-ITJUBUpTWhwGFHhBpV_GBy7bpxg?e=iFV126.

[491] Interview Memorandum of Martin.

with [survivor]– a well-known and outspoken abuse survivor in the SBC world that pays attention to this conversation. Rod is threatening to sue her and similar actions. Because he is a member of the EC Board of Trustees, that gets painted against the entire EC. Dr. Floyd, Rolland Slade, and myself have all spoken with him multiple times."[492]

Another EC executive staff member emailed the leadership team and stated that they did not know what tweets that the survivor "has or has not received from them. But if Rod [Martin] or Mike [Stone] have had **any** (emphasis in original) direct message conversations with her, whether they would perceive them as positive or negative, it would be good for us to know...Regardless, I personally believe it is unwise for either of them (or any EC member for that matter) to engage situations like this on social media in any form, whether publicly in front of the world or privately through direct message. Even when someone is trying to interact in good faith and is being pastoral – to do so in such a forum, without the full knowledge of individual circumstances or how our system can help, will run the risk of giving false hope. And in the worst case scenario, if they engage survivors with the same vigorous debate that they do for all SBC politics, that can be disastrous for these individuals who have already been traumatized at the hands of ministers of the gospel. I sometimes fear that our EC members don't realize the level of their perceived role they come across as a bully and can inflict tremendous harm."[493]

In response to the Twitter conversation and as a way to mitigate the situation, Chairman Slade wrote on October 9, 2021, "I respectful[ly] ask ALL trustees, staff, friends, relatives and those directly or remotely related to the #SBCExecComm to immediately cease in using the names, initials or any identifying letters or marks of sexual abuse survivors in Tweets or Social Media. #EnoughISEnough #LetsStop" In response, Rod Martin wrote, "I respectfully ask for the bogus lawsuit to be withdrawn. Oh, no one's going to do that, are they? So in the meantime, I still want to know why there are two credible accusations of

[492]https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EQxYEYya66hFpfeRw8vjiBYB7XW0eNilgJX4FLqT0ruChg?e=qdvzGA .
[493]https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EVyLYBTudR5OiPcQ9xlJvmoB-zQhfYFsC4S9dgiHCvBA-g?e=f3XSxQ.

sex abuse at Southern Seminary and LifeWay and you're not calling for them to waive privilege."

Mr. Martin has also had interactions with Jennifer Lyell on Twitter. Ms. Lyell tagged Mr. Martin to ask SBC leaders and newsgroups to stop Tweeting, posting, and writing about her. (6/30/2021) Mr. Martin indicated in his interview that he and Ms. Lyell had overall a positive public relationship on social media and that Ms. Lyell stated that she accepted his apology on a misunderstanding concerning a tweet.

Mr. Martin agreed to watch the survivor's video to become more aware of her history, "I'll look at it as soon as I get back to Florida." (9/1/2020) Mr. Martin received responses on Twitter from people who were upset that Mr. Martin could not take 16 minutes out of his day to listen to the survivor's story. Mr. Martin said that after he saw the video, he later reached out to Witness 7 privately to see if there was anything that could be done for the survivor.

The treatment of survivors stands in stark contrast to how SBC churches were treated. For example, after Dr. Greear named 10 churches accused of mishandling abuse allegations, the Bylaws Work Group was pressured to clear the churches' names quickly.[494] Mr. Boto even called the pastor of one of the churches to apologize for the church being named by Dr. Greear.[495] In the words of Dr. Greear, the SBC has a history of erring on the side of the institution, and needs to start erring on the side of the victim.[496] Further, as discussed further below, the manner in which the CC was created gave it no investigatory powers to confirm the accuracy of a church's response to sexual abuse allegations, and also provided little to no provisions for how survivors were to be treated.

494 Interview Memorandum of Moore.
495 Interview Memoranda of EC Staff Member 1 and Assistant to Dr. Greear.
496 Interview Memorandum of Greear.

### C. Evidence of Patterns of Intimidation of Sexual Abuse Victims and Advocates by Executive Committee Members from January 1, 2000, to June 14, 2021

As demonstrated above, over the years survivors were either ignored, put off by invocations of "polity," denigrated as "opportunists," or worse. The survivors with whom we spoke perceived the totality of these actions as a pattern of intimidation. Moreover, this poor treatment likely had a chilling effect on other survivors coming forward to report abuse. For example, Ms. Lyell had excelled as a senior executive at an SBC entity and was well respected in her profession. Her public stature and perception dramatically changed after Baptist Press published an article that mischaracterized her abuse, after which she was subjected to backlash both on social media and in person. Dr. Moore reported that she was distraught after someone called her a "whore" at the 2019 convention, and noted that people were calling Lifeway trying to get her fired.[497] If even an "insider" like Ms. Lyell could be maligned, other survivors may have decided it is not worth the trauma to disclose abuse.

In addition to the mistreatment of survivors by individuals, there was a pattern of Baptist Press articles casting the survivors in a negative light and minimizing the facts of the abuse. For example, as we discussed earlier in the report, Ms. Lyell's sexual abuse was mischaracterized as a morally inappropriate relationship. Christa Brown's "apology" was misconstrued as regret for false accusations rather than only a misplaced letter.

In addition to the minimization of abuse in BP stories, when the ERLC was putting together a report about sexual abuse in 2019, the EC pushed the ERLC to remove the word "crisis" when referring to sexual abuse at SBC churches.[498] In an email from Mr. Boto to Dr. Moore and Dr. Bethancourt, Mr. Boto provided the following additional feedback on the report:

---

[497] Interview Memorandum of Moore.
[498] Interview Memorandum of ERLC Staff Member 4.

> Before getting into the particulars, we can generally say that we strongly suggest and request that the report NOT speak in hyperbolic language, staying away from any sort of sweeping exaggeration bereft of data that characterizes 47,000 plus churches as a lump. Three examples of this in the report are:
>
> · "The abuse epidemic in our churches is overwhelming and daunting."
>
> · "We recognize that we have failed in many ways, including. . . Using church autonomy to excuse proper action."
>
> · "Church autonomy has been one Southern Baptist doctrine that has been confused and misused in the context of sexual abuse within the church."
>
> No instances of these things can be found. No malfeasor has claimed a right to take a bad act under the excuse that his church's autonomy allowed it. These claims are just exaggerated. If they ever became true, of course, we would point them out and condemn them.[499]

In addition, an ERLC staff member wrote an article about the Caring Well conference to be published in Baptist Press on the Monday after the conference ended. The ERLC staff member had quoted Rachael Denhollander and Boz Tchividjian, survivor advocates who had spoken critically about the SBC's handling of sexual abuse allegations at the conference. The ERLC staff member was surprised when his story was not published in Monday's Baptist Press. An EC staff member told the ERLC staff member that they had not had a chance to review the story so it was not included on Monday. Baptist Press told the ERLC staff member on Tuesday that the article's lede could not say that the SBC failed survivors. The ERLC staff member tried to revise the lede without changing the story, but when the article was published on Tuesday, October 8, 2019, some of the story had been deleted, including all references to Boz Tchividjian, and leaving out references to the SBC having failed survivors.[500] The ERLC staff member does not believe that

---

[499] https://solutionpointintl.sharepoint.com/:u:/s/SBCECInvestigation/EfEYxuaDiZ1Kth5zh0AGeMAB_mD1orc3LPMieMfG3ZvR1A?e=JsCJGh.

[500] https://www.baptistpress.com/resource-library/news/caring-well-sbc-must-fight-for-victims/

Baptist Press sent him the final story to review before publication, which is unusual in the journalism industry considering there were many deletions. The ERLC staff member never experienced BP handling any of his previous stories in this way.[501] An EC staff member who was familiar with these events noted that because of the uproar that came about from some of the Caring Well speakers and their critical remarks about the SBC, GJP got closely involved with EC communications in the aftermath of Caring Well. GJP advised that inflammatory language should be removed, such as the SBC having failed survivors, which would show the EC was admitting guilt. Dr. Floyd had also remarked that a well-known pastor was upset about Boz's remarks about the SBC, so Boz should not be mentioned in the article.[502] The article was edited because of the pressures of the Guenther firm.

While survivors' reports of abuse were minimized or disregarded, it is notable that some high-level SBC leaders, by their words and actions, appeared more concerned with protecting abusers than with protecting victims, as discussed further below. These SBC leaders were never held accountable, and they continued to exercise influence within the SBC. This created a culture that intimidated survivors from speaking up about abuse.

To survivors, the 2016 election of Steve Gaines as SBC President conveyed the message that a clergy sex abuse cover-up was considered "no big deal" in the SBC. As senior pastor at Bellevue Baptist Church in Memphis, in 2006 Gaines had kept quiet for months after he learned about a staff minister's prior sexual abuse of a child. Gaines admitted that he had delayed in acting for several months out of "heartfelt concern and compassion for th[e] minister," and acknowledged that he should have "brought it to the attention of

---

[501]https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/ERr0nFh8DSlMnw3CljhYJ6YBGJNYzTae0ndwPuZ5cRmqRQ?e=2i4B6O.
[502]https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EQ5BtkJl5xFPkCw7da0pTJMBfiEtRL_WVzl1X4phwPJ4XQ?e=azlrts.

our church leadership immediately,"[503] and not disclose only after details of the incident appeared in a blog.[504]

During our reporting period of 2000-2021, it came to light that other SBC leaders also had engaged in minimizing or covering up sexual abuse allegations in the past, or had publicly defended abusers. In 2011, a blogger began publicizing sexual abuse allegations against a music minister, John Langworthy. Mr. Langworthy subsequently made a public confession at his current church and was charged by police with sexually abusing several young boys at his former church in Mississippi. It was revealed that when Jack Graham, the 2002-2004 SBC President, was the pastor at Prestonwood Baptist Church, in Plano, Texas, he had allowed Mr. Langworthy to be dismissed quietly in 1989 without reporting sexual abuse allegations to the police. Dr. Graham declined to comment on the matter when the accusations against Mr. Langworthy became public, and he did not agree to an interview with our investigators.[505]

In the mid-2000s, former SBC President Paige Patterson continued to promote the career of pastor Darrell Gilyard even after several women confronted Dr. Patterson with charges of sexual abuse and misconduct against Mr. Gilyard.[506] In 2008 email correspondence with Debbie Vasquez, a survivor, Dr. Patterson wrote that he refused to accuse Mr. Gilyard or anyone else, until Dr. Patterson knew beyond reasonable doubt that they were guilty.[507] Finally, Mr. Gilyard confessed to Dr. Patterson, after he was facing sexual misconduct allegations at a fourth church, and was ultimately convicted of molesting two juveniles in 2009.[508] Notably, after Mr. Gilyard was released from prison and returned to

503 https://www.baptistpress.com/resource-library/news/bellevues-gaines-should-resign-seminary-president-says/.
504 https://baptistnews.com/article/advocates-fault-sbc-presidents-record-on-child-sex-abuse/#.YoQRCOjMKUk
505 https://www.wfaa.com/article/news/local/investigates/disturbing-revelations-about-former-prestonwood-minister/287-410553430; https://baptistnews.com/article/pastors-return-to-ministry-received-as-bad-news-in-abuse-survivor-community/#.YnP-ddrMKUl.
506 In 2000, James Merritt, shortly after being elected SBC President, sent an email to Dr. Chapman referring to Mr. Gilyard as a "woman squeezer." https://plusnxt.relativity.one/Relativity/go?id=8252197-2470169.
507 REL0000006027.0001.
508 https://offender.fdle.state.fl.us/offender/spps/home.jsf; Interview Memorandum of Witness 5.

preach in Christ Tabernacle Baptist Church, which was an SBC church,[509] Mr. Boto determined that Messengers from the church should not be seated at the next convention, not because of the connection to Mr. Gilyard, but rather because the church had not recently contributed to the Cooperative Program.[510]

**From:** Augie Boto [redacted]
**Sent:** Friday, March 09, 2012 11:32 AM
**To:** [redacted]
**Cc:** [redacted]
**Subject:** RE: Church Giving Records

Then that tells me what our position is – which is that the church cannot send messengers this June.
Thanks

**From:** [redacted]
**Sent:** Friday, March 09, 2012 11:22 AM
**To:** Augie Boto
**Cc:** [redacted]
**Subject:** RE: Church Giving Records

Augie,

I checked several places as follows:

1. Our SBCEC records for direct gifts – We do not have any record of this church having ever given directly through the SBCEC offices
2. ACP records – there is no record of any gifts from the church given through the Florida Baptist Convention for 2005-2011. A small gift to the Cooperative Program is noted for 2004
3. I contact [redacted] with the Florida Baptist Convention to have him check their giving records directly and he did not show any gifts for 2009, 2010 or 2011.

[redacted]

**From:** Augie Boto
**Sent:** Friday, March 09, 2012 11:01 AM
**To:** [redacted]
**Cc:** [redacted]
**Subject:**

[redacted]

Would you or someone in your division please attempt to ascertain whether the church in described in the following excerpt of a recent BP story has been a bona fide contributor to the Convention's work during the last completed fiscal year? (for purpose of determining whether it might qualify to send messengers to the upcoming annual meeting in New Orleans?

In 2018, Dr. Patterson was fired by SWBTS after he was accused of telling a student not to report a rape in 2003 and, in 2015, of emailing his intention to meet with another student who had reported an assault, with no other officials present, so he could "break her

509 https://plusnxt.relativity.one/Relativity/go?id=8252197-2484458.
510 https://plusnxt.relativity.one/Relativity/go?id=8252197-2484393.

down."[511] According to the 2003 survivor, Dr. Patterson convinced her not to tell her pastor or family about the incident, and told her she was not raped. She believed Dr. Patterson at the time and did not tell anyone.[512] Witnesses who have spoken to both the 2003 and 2015 survivors allege both women felt violated again by Dr. Patterson as well as shamed and intimidated. These women were asked sexually explicit questions in front of men, about their clothing and behaviors prior to their assaults, and concerning their previous relationships with men.[513]

In 2008 when Christa Brown was interviewed by Florida Baptist Witness, she stated that she believed additional victims had suffered based on Dr. Patterson's secrecy which allowed a serial offender to move to new churches.

**Southwestern President Responds to Victims' Rights Group Criticism**

By Tammi Reed Ledbetter
Southern Baptist Texan in Floridan Baptist Witness
January 10, 2008

http://www.floridabaptistwitness.com/8252.article

[511] https://www.washingtonpost.com/news/acts-of-faith/wp/2018/06/01/southern-baptist-seminary-drops-bombshell-why-paige-patterson-was-fired/; https://www.christianitytoday.com/news/2018/may/paige-patterson-fired-southwestern-baptist-seminary-sbc.html.
[512] Interview Memorandum of Survivor 3.
[513] Interview Memoranda of Witnesses 5-6.

SNAP then blames Patterson for "failing to warn others at risk about a reported serial predator," adding that the accused pastor "was allowed to move on"—a charge Patterson disputes.

SNAP's Christa Brown of Austin wrote, "More innocent and vulnerable Baptist teens and young people suffered because of Patterson's secrecy. Those who make immoral and insensitive responses to clergy sex abuse should not be in positions of leadership for religious institutions."

Brown has made similar guilt-by-association charges in the past, but apologized to Southern Baptist leaders Feb. 22, 2007, for making false accusations that leaders had not responded to the group's letters.

When given a forum at a workgroup meeting of the Executive Committee, Brown told of being raped as a minor by a man who continued working at a Southern Baptist church. Another SNAP representative said their organization depends on the press to solve the problem, alleging that churches do not.

Patterson released a statement Jan. 9 calling the "snap judgments" by Brown and others both misinformed and inaccurate.

"Throughout my 50 years in the ministry, including that time that I served as president of the Criswell College, I have never turned a blind-eye to clergy sex abuse as the SNAP organization purports," he stated. "Clergy sex abuse is one of the greatest tragedies of the modern era, and in the classroom and in the pulpit I have steadfastly fought and will continue to warn and fight against it."

Patterson said he routinely addresses the subject with every incoming class and again with every graduating class.

Recalling his observation of Gilyard's career while a student in the early 1990s, Patterson said he had great hope that God would use the testimony of the young minister, and then later learned a portion of the well-publicized account that Gilyard had been homeless was fabricated.

"I fondly hoped he would walk worthy of his calling in purity of life and heart. He chose not to do that," Patterson stated.

"Nearly two decades ago, I was neither an investigator nor a judge, but the president of a small Bible college. I certainly did not have resources available to me to pursue the case, yet I did all that I could within my means to discover the truth when allegations concerning Mr. Gilyard were brought to my attention," he continued, noting that part of justice includes not making charges against people until one can substantiate them—a lesson he said SNAP could profit from learning.

"Once I had investigated the matter and was able to substantiate that Mr. Gilyard was guilty, I got him to confess that guilt publicly."

Judge Paul Pressler, a former SBC Vice President, is himself the defendant in a sexual abuse civil lawsuit filed in 2017.[514] The plaintiff alleged that Judge Pressler repeatedly sexually abused him beginning at age 14 in the late 1970s. Co-defendants include the SBC, SWBTS, Dr. Paige Patterson, Mr. Pressler's wife Nancy, FBC Houston, Judge Pressler's former law partner Jared Woodfill, and the Woodfill Law Firm, claiming they facilitated the abuse and "concealed the wrongful conduct of Pressler" from law enforcement authorities.[515] The plaintiff claimed that after he enrolled in Judge Pressler's Bible study at First Baptist Church in Houston, Judge Pressler lured him to his (Pressler's) home and a private club for fondling and anal sex. Judge Pressler allegedly convinced the plaintiff to keep "our secret," by telling the boy he was "special" and "no one but God

514 Although the lawsuit was initially dismissed due to statute of limitations, on appeal the plaintiff argued that the statute of limitations should be calculated from when he first realized he was the victim of an alleged sexual assault. The Texas Supreme Court agreed and sent the case back to District Court. https://baptistnews.com/article/abuse-case-against-pressler-may-proceed-texas-supreme-court-rules/#.YnQAyujMI2w.

515 Merritt, Jonathan (May 3, 2018). "The Scandal Tearing Apart America's Largest Protestant Denomination". *The Atlantic*. Retrieved Feb 11, 2019.

would understand" their relationship.[516] The plaintiff, who had become a drug addict and petty criminal, went to prison where Judge Pressler twice intervened with the parole board seeking his release. Later the plaintiff filed a civil claim for assault against Judge Pressler, and received a settlement in which Judge Pressler agreed to pay $1,500 a month as "long as the confidentiality of this agreement is maintained." [517]

As part of the 2017 lawsuit, two other men submitted separate affidavits also accusing Judge Pressler of sexual misconduct. One was a teenager in 1977 when Judge Pressler allegedly grabbed his penis in a sauna at Houston's River Oaks Country Club. Judge Pressler was a youth pastor at Bethel Church in Houston but was ousted in 1978 after church officials received information about "an alleged incident." The other affiant described how he resigned his position at Judge Pressler's former law firm after Judge Pressler invited him to get into a hot tub with him naked.[518]

In a March 2019 email to Mr. Boto, Mr. Guenther commented on the lawsuit against Judge Pressler, noting that there is "concern in some quarters that there may be other shoes to drop on others in SBC churches." Mr. Guenther speculated as to whether other lawsuits might ensue. He remarked: "Hopefully the statute of limitations will prevent any such suits getting to the merits and hopefully the dismissal of the present suit on [statute of limitation] grounds will discourage those suits.[519]

Mr. Boto was a character witness for a convicted child molester. Marc Schiefelbein, a former gymnastics coach, had been convicted of multiple counts of sexual assault against a minor in July 2003. Mr. Boto had attended the criminal trial because his son was subpoenaed to testify. Thereafter, he took a personal interest in Mr. Schiefelbein's criminal trial, legal appeal proceedings, and prison life. Mr. Boto wrote to Mr. Schiefelbein

---

[516]https://baptistnews.com/article/abuse-case-against-pressler-may-proceed-texas-supreme-court-rules/#.YnQAyujMI2w.

[517] Downen, Robert (February 6, 2019). "Lawsuit against ex-judge, Southern Baptist churches drawing to a close". *Houston Chronicle*. Retrieved August 25, 2020.

[518] Downen, Robert (April 13, 2018). "More men accuse former Texas judge, Baptist leader of sexual misconduct". Houston Chronicle. Retrieved May 5, 2018.

[519] SBC_EC_GJPLaw_00013241.

in October 2003, advising him that: "It is probably a good idea NOT to call the gym asking to speak to students. Make sure all your calls are to adults. If they have their kids around, they can decide whether to put them on the phone, but you shouldn't attempt to call any of the kids while your appeal hangs in the balance. The court might not understand."[520] Mr. Boto also noted that it was fine for Mr. Schiefelbein to speak with Mr. Boto's own children, stating that "[i]f you call here, I don't care if you talk to any of my kids" and mentioning their names and ages.[521] In 2004, Mr. Boto wrote to Whiteville Correctional Facility in December 2004 to be approved to be a Chaplain to minister to Mr. Schiefelbein and made a professional reference to himself as "a senior official ... of the Southern Baptist Convention."[522]

Mr. Boto testified at Mr. Schiefelbein's sentencing as well as at a two-day evidentiary hearing in support of his September 2008 post-conviction petition. During the latter testimony, Mr. Boto identified himself as general trial counsel for the Executive Committee of the Southern Baptist Convention. Boto also testified that he had personally known Mr. Schiefelbein for less than five years at the time of trial and that he contributed monetarily to Mr. Schiefelbein's defense after the trial was over.[523] Mr. Boto's participation as a witness in the Schiefelbein matter was known to GJP as Mr. Jordon had discussed the matter with Mr. Boto when they were traveling together. Mr. Jordon stated that Mr. Boto was conflicted regarding what to do as Mr. Schiefelbein had been Mr. Boto's son's coach. According to Mr. Jordon, Mr. Boto knew nothing "shady" about him from that experience. Despite the potential appearance issue for the SBC – a senior executive testifying on behalf of a convicted child molester – GJP did not advise him against testifying. The law firm classified Mr. Boto's experience as a character witness as "very favorable."[524]

These revelations that senior SBC leaders appeared to excuse abuse and/or support accused abusers – and in Judge Pressler's case, be accused himself of abuse -- while at

---

520 SBCEXC0000050194.
521 *Id.*
522 SBCEXC0000038087.
523 https://casetext.com/case/schiefelbein-v-hampton.
524 Interview Memoranda of Guenther and Jordon.

the same time survivors were ignored or treated poorly, created the substantial public and private impression that the SBC EC had no interest in taking real action to address or prevent sexual abuse.

### D. Resistance to Sexual Abuse Reform Initiatives from January 1, 2000, to June 14, 2021

On numerous occasions, the EC has been confronted with proposals for reforms related to clergy and staff sexual abuse. Although there may be valid reasons why certain initiatives were not feasible, it is notable that during most of the twenty-year reporting period very little was done to address sexual abuse within SBC churches. The primary focus was on avoiding the risk of legal liability, sometimes to the exclusion of all other considerations.

#### 1. Response to Reform Proposals

<u>2008 Rejection of the Database Proposal</u>

In 2007, survivor Christa Brown and SNAP were urging the SBC to adopt some reform initiatives, including a review board to receive and investigate reports of sexual abuse. On September 7, 2006, Jaime Jordan emailed Boto about how the BGCT kept a confidential list of individuals who were reported for sexual misconduct, and suggested that:

> This is something the EC could consider. Having a national "bad list" would eliminate the opportunity for ministers to "hide" in states that did not keep lists. It would also keep churches from having to check lists in many different states. [525]

Similarly, in an email exchange with Mr. Boto and Dr. Chapman, Stephen Wilson, the Vice Chairman of the Bylaws Work Group, wrote that "surely we can put some mechanisms in place to make sure that their future ministries do not include easy access

[525] SBC_EC_GJPLaw_00024224.

to minors" and that "national clearing house for SBC ministers 'who have been convicted of abuse' run by some SBC entity...might actually be helpful."[526] Mr. Boto stated that he would craft a recommendation, but not hastily.[527] In April 2007, Mr. Guenther sent Mr. Boto a memorandum explaining how a SBC database could be implemented consistent with SBC polity.[528] According to Mr. Guenther, "it would fit our polity and present ministries to help churches in this area of child abuse and sexual misconduct" and he recommended "immediate action to signal the Convention's desire that the EC and the entities begin a more aggressive effort in this area."[529]

At the 2007 Convention, Wade Burleson presented a motion for a database of clergy or staff in SBC churches involved in sexual harassment or abuse.[530] The motion was referred to the Executive Committee of the Southern Baptist Convention for consideration and for a report to the 2008 Southern Baptist Convention.[531] In the intervening year, the Bylaws Work Group examined the issue. We interviewed several witnesses that would have been present during the meetings in 2007 and 2008 and they provided little to no information about the discussions surrounding the database issue, other than to say that it would violate local church autonomy.[532] Mr. Burleson told us that the EC never invited him to their meetings and never contacted him about the motion. At the 2008 June Convention, the Dr. Chapman rejected the proposal based on SBC polity."[533]

<u>2014 Rejection of a Sexual Abuse Education Conference</u>

In August 2014, EC leadership discussed the issue of holding a conference to educate SBC members about sexual abuse proposed by survivors and a national advocate for sexual abuse awareness training. Mr. Boto was resistant to the idea that the EC or ERLC

---

526 SBCEC_0000152, https://plusnxt.relativity.one/Relativity/go?id=8252197-1507980.

527 *Id.* A few months earlier, an EC staff member had presented him with a memo analyzing how reforms could be made within SBC polity. According to the EC staff member, Boto was dismissive of the memo.

528 SBC_EC_GJPLaw_00008031. SBC EC Investigation - SBC_EC_GJPLaw_00008031.pdf - All Documents (sharepoint.com).

529 *Id.*

530 https://41jmzr10f8zc229tzr2xml7e-wpengine.netdna-ssl.com/wp-content/uploads/2020/07/2007SBCAnnual.pdf.

531 *Id.*

532 Interview Memoranda of EC Staff Member 3, Page, Oldham, and EC Officer 1.

533 https://baptistnews.com/article/sbc-officials-reject-idea-of-sex-offender-database/#.YWbuDyuSk2w.

should take a lead role in addressing sexual abuse in ministry settings.[534] Mr. Boto delayed further meetings about the conference due to his and Dr. Page's lack of availability. [535] The conference did not go forward at the SBC.

Reaction to Dr. Greear's Report on Sexual Abuse

At the 2018 Convention, the Messengers adopted a resolution "On Abuse" which stated they "condemn all forms of abuse"; "urge abuse victims to contact civil authorities, separate from their abusers, and seek protection"; and "encourage leaders in our churches and Southern Baptist Convention entities to be faithful examples, through their words and actions, and to speak against the sin of all forms of abuse." In addition, Dr. Bethancourt made a motion for a task force to assess issues related to sexual abuse, among other things, and Wade Burleson made a motion that the ERLC study resources to help churches protect themselves from sexual predators. Both motions were referred to the ERLC. In response to those motions, Dr. Greear announced that he would form a sexual abuse study group in partnership with the ERLC.

According to an ERLC Staff Member, when the ERLC was putting together the report about sexual abuse in 2019, they were met with some resistance from the Guenther firm, whose "overriding concern" was about ascending liability.[536] The EC made comments on the report, removing the word "crisis" when referring to sexual abuse and expressing concerns that the ERLC was establishing a standard of care or best practices for churches, which could create liability.[537]

This concern about liability was magnified when Dr. Greear named the 10 churches that the Houston Chronicle had implicated in mishandling of sexual abuse cases. According to Russell Moore, people were very angry about the naming of the churches and there was talk of censuring Dr. Greear.[538] Early the next morning, Dr. Greear met with EC leadership and attorneys for the SBC, and was strongly criticized for naming the

---

534 SBCDATA0001006590, https://plusnxt.relativity.one/Relativity/go?id=8252197-2441900.
535 *Id.*
536 Interview Memorandum of ERLC Staff Member 4.
537 *Id.*
538 Interview Memorandum of Moore.

churches.[539] According to Dr. Greear, the threat of liability was raised by SBC attorneys, who said the SBC could be sued for libel. [540] According to an EC staff member, EC leadership was concerned that churches might abstain from sending funds to the Cooperative Program or leave the SBC altogether.[541]

Resistance to the Credentials Committee

In a memo dated April 18, 2019, intended only for Dr. Floyd's audience, Mr. Boto provided a legal opinion which advised against creating a standing Credentials Committee. Mr. Boto's main reason was liability: "[i]n plain English, certifying churches would have the effect of rendering the Convention more vulnerable to a claim of liability." Mr. Boto stressed that, "[t]he importance of maintaining current process, and thereby continuing the so far impenetrable defenses against ascending liability, cannot be overemphasized."

In our interview with Mr. Boto in May 2022, he stated that he was against the formation of the Credentials Committee because the EC is limited by SBC polity; the local church has authority and that is the way it has been for many years.

Resistance to the Caring Well Conference

There was resistance by some in the EC to the Caring Well Initiative, particularly over funding.[542] Initially, the EC voted to provide the ERLC with $200,000 for the initiative, with an additional $50,000 if needed. Ultimately, the EC instead used the $50,000 on legal fees related to sexual abuse instead of the conference. An EC member complained that the conference was not an appropriate use of funds because it was, in his view, centered on "victim advocacy."

Resistance to the Task Force

At the 2021 Convention, Tennessee pastor Grant Gaines proposed setting up a task force to oversee the independent investigation. After the proposal was referred to the EC, Mr.

---

539 Interview Memorandum of Greear.

540 *Id.*

541 Interview Memoranda of EC Staff Member 5.

542 Interview Memorandum of EC Staff Members 1, 6, and ERLC Staff Member 5.

Gaines appealed to the Messengers who overruled that decision by a more than two-thirds majority.

Dr. Floyd and Mr. Addison were resistant to the motion.[543] Dr. Floyd tried to prevent the motion for the investigation from being introduced or approved at the Nashville convention.[544]

Dr. Floyd's resistance to reform as SBC President is disappointing, given that he spoke out against clergy abuse as a pastor, writing in 2014 that: "Furthermore, we can and must hold up the issue. Yes, we are a convention of autonomous churches, but we need to continue to sound the alarm on national, state and the association level, calling churches to protect children in their care."[545]

### 2. Concerns about Liability

As demonstrated in the preceding sections, oftentimes concerns over liability stymied efforts toward reform. According to Dr. Litton, when he had to handle sexual abuse issues, he always received a lecture from the lawyers regarding ascending and descending liability.[546] Dr. Litton's belief is that this focus on liability created a culture where they felt there was nothing they could do to handle the issue.[547]

This focus on liability has been a defining characteristic of the SBC throughout the investigation period. As described in Section IV.A, in June 2000, then-SBC President Paige Patterson was counseling a pastor about sexual abuse programs, not a means to prevent child sexual abuse, but rather as a way to defend against lawsuits. That attitude – that is more important to avoid liability than to tackle the problem of sexual abuse within SBC churches – drove much of the resistance to reform. Indeed, in our interview with Mr.

---

[543] Interview Memorandum of Witness 4.
[544] Witness 4-Floyd Texts near Convention 2021 - cleaned.xlsx.
[545] SBCDATA0000531687.0001.
[546] Interview Memorandum of Litton.
[547] *Id.*

Boto in May 2022, he stated that the SBC cannot take preventative role because calling churches to report allegations could open the door for SBC to be liable.

In many respects, the EC's concern about liability, and its action or inaction regarding sexual abuse, has been guided by legal advice. From 1966 to 2021, the SBC has been advised in its legal affairs by external counsel Mr. Guenther, and later GJP. The key attorneys handling SBC EC matters were Mr. Guenther and Mr. Jordan. They provided counsel on everything from estate grants to the SBC to general litigation support and responding to sexual abuse survivors. Even as SBC Presidents changed and EC staff retired, Mr. Guenther and Mr. Jordan remained an institutional source of knowledge in terms of Baptist polity, risk management and counsel.

After the EC voted to waive attorney-client privilege, GJP resigned from representing the SBC. GJP provided documents in response to our document request, which provide a window into how the firm addressed issues of sexual abuse and reform over the past twenty years. Mr. Guenther and Mr. Jordan also agreed to be interviewed by Guidepost on the condition that they would be interviewed together. Although a joint interview is not normally accepted for factual witnesses, they cited Mr. Guenther's "memory issues" as the reason why a combined interview was necessary in this instance. We note that Mr. Guenther, who is 87 years old, indicated that he is still practicing law.

Although many survivors did not reach out to Nashville or the EC offices, as indicated above, the amount of survivor interaction grew somewhat between 2000-2019. Behind the curtain, the lawyers were advising to say nothing and do nothing, even when the callers were identifying predators still in SBC pulpits. Although Mr. Guenther and Mr. Jordan acknowledged that they were not experts in sexual abuse or clergy abuse,[548] that did not stop them from advising the SBC on how to answer inquiries or whether to respond at all.

[548] Interview Memorandum of Guenther and Jordan.

In a memo to Mr. Boto in or around March 2008, Mr. Guenther discussed two anonymous calls received by Dr. Oldham.[549] The caller identified himself as church staffer who believed the church's pastor was engaged in a relationship with a 14-year-old girl.[550] Among other things, the caller reported that the pastor had directed the staffer to give the girl a cell phone, arrange for a speed dial function so the pastor and girl could communicate, and not to tell the pastor's wife.[551] Mr. Guenther recommended that Dr. Oldham "not undertake to elicit further information or details" and advise the caller to "immediately contact a lawyer and determine his duty to report" and to consider his duty to report to the appropriate church officials.[552] Mr. Guenther went on to note that:

> Neither Sing, you, nor the EC, has a legal duty to take any further action. Specifically, you have no legal duty to report suspected child abuse under GCA Section 19-7-5, in part because you do not know the identity of the child, of the caller, of the church, of the possible abuser(s), the location other than Georgia, etc.
>
> For future reference, once a member of the EC staff is told the identity of a child and where she lives, and is given information which reasonably causes the EC staff member to suspect the child is the victim of abuse, we ought to consider with the staff member his personal duty to report to law enforcement.[553]

Mr. Guenther then suggested that the EC establish a written policy and procedure to give direction to staff who received sexual abuse communications.[554] In our interview with them, Mr. Guenther and Mr. Jordan stated that they did not know whether the EC ever adopted a written policy and procedure.[555]

---

[549] SBCEC_0002308.
[550] *Id.*
[551] *Id.*
[552] *Id.*
[553] *Id.*
[554] *Id.*
[555] Interview Memorandum of Guenther and Jordan.

Mr. Guenther and Mr. Jordan were also primary advisors for the EC leadership with respect to various reform proposals regarding how the SBC could address sexual abuse. While they did advise Mr. Boto in 2007 about how an SBC database could be implemented, in other matters they opposed changes that they perceived as creating a risk for liability.[556] Protecting the polity and the string of favorable decisions meant that they felt that the SBC could not take any proactive steps lest the SBC be seen as demonstrating authority over churches in a way that was prohibited by the SBC Constitution and Bylaws. Over time, they grew more accepting of some actions to address sexual abuse on the part of the SBC, such as considering the issue of deeming churches not in friendly cooperation over sexual abuse issues, in order to "go on record as being willing to equate child abuse at least to the level of homosexuality." [557]

Mr. Guenther and Mr. Jordan indicated that there were some ways that the SBC could address sexual abuse consistent with Baptist polity, and provided several recommendations to our team. However, they told us that it was outside of their role as legal counsel to affirmatively provide creative ideas to the EC about how to reduce abuse during the period that they were counsel to the EC. On the other hand, they had no problem providing creative ideas on ways to reduce legal liability including utilizing sole shareholder for the SBC and advocating for a Tennessee law to limit liability for nonprofits.[558]

Overall, the legal advice focused on liability created a chilling effect on the ability of the EC to be compassionate towards survivors of abuse. Survivors were always viewed through the lens of potential plaintiffs threatening lawsuits, rather than as individuals who had been harmed and were in need of care.

---

[556] SBC_EC_GJPLaw_00008576.pdf.
[557] SBC_EC_GJPLaw_00022337.
[558] Interview Memorandum of Guenther and Jordan.

## VI. AUDIT OF THE PROCEDURES AND ACTIONS OF THE CREDENTIALS COMMITTEE

### A. Introduction

The Credentials Committee ("CC") as it exists today was formed in the wake of a public outcry over sexual abuse within SBC churches. Survivors and their advocates had been pressing the SBC to confront this crisis by instituting reforms, including taking action against churches that mishandle or ignore sexual abuse allegations, or that employ sexual offenders in ministry or staff. For years, SBC EC leadership had taken the position that any action against churches was not possible, due to SBC polity and the principle of local church autonomy.

In early 2019, after a series of news reports exposed sexual abuse connected to 10[559] Southern Baptist churches, then-SBC President J.D. Greear called for an inquiry into whether those churches had a faith and practice consistent with the Baptist Faith and Message. Work began on proposed amendments to the SBC Constitution and Bylaws to address these issues, as discussed above. At the June 2019 convention, the Messengers overwhelmingly adopted changes to those governing documents. In pertinent part, Article III of the SBC Constitution was amended so that a church is considered "in friendly cooperation" with the SBC if, among other things, it "does not act in a manner inconsistent with the Convention's beliefs regarding sexual abuse." Changes to Bylaw 8 also tasked a standing Credentials Committee with making recommendations as to whether a church is in "friendly cooperation" with the Convention as described in Article III.

Since its inception, the CC has been reviewing submissions from survivors and others alleging that specific churches are not "in friendly cooperation" with the SBC.[560] The SBC Constitution and Bylaws do not accord the CC the power to investigate what occurred or to judge the culpability of an accused individual; its only purview is to review how the SBC

[559] One of the ten churches was found to not be associated with the SBC.
[560] Although the scope of this report is limited to sexual abuse allegations, the CC also considers allegations of discrimination concerning a church, or allegations that a church does not have a faith and practice consistent with the Baptist Faith and Message.

church responded to sexual abuse allegations and make recommendations as to whether those actions, or inactions, are consistent with the Convention's beliefs regarding sexual abuse. Ultimately, even if the CC determines that the church did not act in a manner consistent with the Convention's beliefs, it can only recommend that the church be disfellowshipped from the SBC and has no means to sanction an individual. As we discuss in more detail below, this limited scope led to frustration and dissatisfaction on the part of some survivors, who believed that the CC could, and should, do more to address sexual offenses.

At the 2021 Convention, the Messengers voted for a Task Force to oversee a third-party investigation of the SBC EC's response to sexual abuse allegations, which was to include "*an audit of the procedures and actions taken by the Credentials Committee*". As per the Messengers' Motion, we have conducted the audit and our conclusions are laid out in this report.

As a preliminary matter, we want to acknowledge those individuals who served on the CC since its inception in 2019. Even though this audit report contains many suggestions for improvements, it should not be taken as criticism of the CC members themselves. Our document review and interviews demonstrate that as a whole the CC members, who are volunteers, took their responsibilities seriously and tried to do their best in a novel position. All 14 current and former CC members met with us and were instrumental in providing recommendations for how the CC could perform more effectively going forward.

Here, we summarize the key findings from our audit. A detailed description of these and other concerns is contained in Section G *supra.*

*First*, submissions were made to the CC almost immediately after it was established, and the CC also inherited submissions from the Bylaws Work Group. There was pressure on the CC to begin reviewing those submissions quickly. Consequently, the CC did not have time to develop any written policies and procedures governing how the CC would handle and evaluate submissions. The absence of guidelines – such as set timelines/deadlines,

protocols for correspondence with submitters and churches, and standards for review – led to delays and communications breakdowns. Submitters, and the CC members themselves, were frustrated by the lack of clarity in the process. Going forward, formal, written guidance is needed for a more effective and transparent review.

*Second*, the CC's limited authority and lack of investigative power was not adequately explained to submitters, the SBC community, or the public. Some submitters had the expectation that the CC would expose sexual abuse within SBC churches and hold abusers accountable. Under the Bylaws, however, the CC could only inquire of churches about the allegations in the submission and was unable to independently verify whether the church's response was truthful. Moreover, even if a church had mishandled sexual abuse allegations in the past, the CC's focus was on whether the church was currently in "friendly cooperation" in light of present leadership and policies, which may have changed from the time of the allegations. Because this limited purview was not fully understood, the CC's decisions not to recommend a church for disfellowship often were dissatisfactory to submitters.

*Third*, the CC members did not have adequate onboarding or training. Of the 14 current and former CC members we interviewed, nine told us they did not feel equipped or prepared to take on CC membership, and eleven members indicated that the duties, responsibilities, and time commitment were more than they anticipated. In addition, because there was no training, CC members and EC Staff Member Liaisons did not know how to interact in a trauma-informed manner, leading to missteps in correspondence with submitters and survivors. Prior to taking on the CC role, prospective members should have a full understanding of their expected duties and responsibilities, receive training, and be able to commit to attending monthly meetings and completing required work so that the process can operate effectively.

*Fourth,* the CC must have adequate funding and staff support, and should provide counseling and related support to staff and CC members as necessary. CC members and EC Staff Member Liaisons uniformly told us that they were deeply affected by their service

on the Committee, and some noted that the CC was the most difficult role they have served in.

*Fifth*, the submission webpage and the submission process could be made more user-friendly. The submission portal is not prominent on the SBC website, requiring submitters to navigate to the CC webpage. The CC webpage is couched in overly technical language, making it difficult for an average user to have a clear understanding. In addition, the functionality could be improved, as there have been instances when the site "timed out" or when the submissions did not go through to the CC. There also should be an automatically generated receipt email so that a submitter is assured that the submission was received. Currently, an EC Staff Member Liaison manually emails a confirmation of receipt letter to the submitter, which may be sent within a couple days of receipt but has been observed to take a week or longer in some cases.

*Sixth*, the entirety of the CC process – from submission to recommendation or declination – must proceed in a timelier manner. During the review period, the average time the CC took to process sexual abuse inquiries was 9.6 months. We believe that time span could, and should, be shortened. As we discuss in detail below, there are many opportunities to streamline the process and eliminate unnecessary delays, such as a better meeting cadence and enforcement of stricter deadlines.

*Seventh*, the CC should develop better protocols for communications with survivors, submitters, and churches. During our interviews, a majority of current and former CC members reported that communications with SBC churches and survivors were not handled well. Initially the CC did not keep records of its phone calls, so details of communications were often incomplete. CC members also felt uncomfortable or unprepared to handle the communications, particularly with survivors. Communication with submitters was inconsistent, sparse, and lacked transparency; in some cases, submitters went months before receiving any information from the CC. Better training and clear guidelines would assist both CC members and those with whom they are communicating.

*Finally*, CC decision making is unclear due to the lack of comprehensive guidelines. Neither our interviews nor our document review revealed a written set of standards for assessing when a church's conduct merits disfellowship. Moreover, because the CC lacks the power to investigate, it is overly reliant on any information presented by the church or gleaned from state and local associations. The audit revealed that when the submitter's information was contradicted by the information provided by the SBC church, no additional investigation would be permitted due to SBC polity. Except in cases where the church admits to employing a convicted sex offender, it can be difficult for the CC to determine whether the church engaged in conduct inconsistent with the Convention's beliefs regarding sexual abuse. Indeed, even the "Convention's beliefs regarding sexual abuse" is not an explicitly defined term.

Based on all of our findings, we have made a number of recommendations specific to the CC at the end of this report. Among other things, we are recommending enhanced training and onboarding for CC members, improvements to the CC's processes and procedures, better communication of the CC's mission, increased staff support, a more user-friendly and functional Reporting Portal, transparent decision protocols, and adequate funding to support the CC's work.

### B. Scope of Audit

As described above in Section II.A of this Report, the Messengers to the 2021 SBC Convention overwhelmingly approved a motion calling for a task force to oversee a third-party investigation into allegations of the EC's response to sexual abuse allegations. As part of the investigation, the motion specifically called for *"an audit of the procedures and actions taken by the Credentials Committee of the Southern Baptist Convention, which was formed at the Convention meeting in Birmingham, AL, June 11-12, 2019."*[561]

In our engagement letter with the Task Force, we committed to perform the requested audit of the CC from its formation in mid-June 2019 through June 14, 2021, using best

[561] 2021 SBC Annual Report https://www.sbc.net/wp-content/uploads/2021/09/2021-SBC-Annual.pdf.

standards and practices designed to ensure accountability, transparency, and care for the wellbeing of survivors of sexual abuse.[562] Though the CC reviews and provides recommendations on other issues, such as whether practices are consistent with the Baptist Faith and Message and racial discrimination, our review was limited to the CC's actions related to sexual abuse allegations. The findings of our audit are set forth below.

### C. Methodology of Review

The SBC Motion required an audit of both the procedures and the actions taken by the CC. Because the CC did not have formalized procedures during much of our review period, we identified key areas for analysis using our understanding of the Committee's actual practices, goals for the CC, similar practices for other adjudicatory bodies, and input from interviewees. With respect to the actions taken by the CC, we mapped known CC submissions against key metrics, including process, time frame, information considered, and results.

To conduct the audit, we reviewed all documents relevant to the Credential Committee during the relevant time period.[563] These included submissions that were inherited from

562 Guidepost Engagement Letter https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/Ef_k_4q0aztHtw6qWzXhT1MBg0BfLDruX_aT0tqnEH3ahQ?e=5B8gnt.

563 For example, we requested and reviewed documents from the SBC EC relevant to the CC, including but not limited to: the names and credentials of all past and present CC members; all documents, meeting minutes, and communications related to the formation, purpose, scope of work of the CC in 2019; names of all EC staff and volunteers reporting to or serving the CC from June 2019 to June 14, 2021; all documents, meeting minutes or communications related to the selection or appointment process of CC members; all minutes/agenda notes from the CC meetings related to sexual abuse and survivor reports of abuse within SBC churches; all documents, meeting minutes, or communications regarding the process that the CC followed in accepting and processing submissions of mishandling of sexual abuse by cooperating churches; all documents, meeting minutes, or communications regarding the process that the CC followed in determining if a submission should be placed under inquiry and process of inquiring a church; the CC submission webpage; all submissions related to sexual abuse received on the CC submission form published on the SBC website; all communications of CC, EC, and EC staff related to submissions regarding sexual abuse made to the CC, including communications to and from survivors, churches and state and local associations; all research, recommendations, communications, internal inquires, or notes regarding churches reported to the CC for "in cooperation review" if related to the handling of sexual abuse matters; all EC agenda issue advisories from the CC to the EC outlining

the Bylaws Work Group, submissions that were emailed to the CC before the CC submission portal was established in December 2019, submissions to the CC portal,[564] confirmation of receipt letters to the submitters (in some cases),[565] inquiry letters to churches,[566] notes documenting interactions with churches and submitters, minutes of Credential Committee meetings, and final disposition of matters.[567]

In addition to the documents reviewed, we interviewed all 14 current and former members of the CC, as well as eight SBC EC staff who served as liaisons to the Committee. In our interviews, we asked about each individual's participation in the CC, including standardized questions about background, training, process, and recommendations. We spoke with two counseling professionals who volunteered their services to the CC to better understand their role in the process.[568] We also spoke to three ERLC staff members who referred people to the CC submission portal when reports came into the ERLC.[569] In addition, in our interviews with EC Trustees, other SBC leaders, and Sexual Abuse Task Force members as part of the broader investigation, we typically asked about their

---

churches that the CC recommended to be no longer considered in friendly cooperation with the Convention for sexual abuse matters; SBC Constitution and Bylaws, specifically Article III concerning the definition of a church in friendly cooperation; Bylaws 8, 15 and 29 concerning the CC; and the Baptist Faith and Message, specifically Article XV concerning the SBC's beliefs regarding abuse. *See* https://solutionpointintl.sharepoint.com/:f:/s/SBCECInvestigation/Eh2OfrI54mNLnM6FHijK0GoB4DAY9v8pSC7yxWqB-oM1AQ?e=nqmJ1O.

564 CC Submissions Webpage https://www.sbc.net/about/what-we-do/sbc-governance/credentials-committee.

565 Letters of receipt to submitters. https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/Ea_elHWBsORAinB4oQrG2u0B-L9u6c_EQx7lHCPljUdAPA?e=hd05jL.

566 Inquiry letters to churches. https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EW-pbS9KNr5OkhnTuE1279cBpx7pn09drdJ3tchRwtH6HQ?e=VBI71W.

567 Decision letters to churches and submitters. https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EYbRoZRMxmFErbMqSbjKlVwB2VQfEBEIVIr9hz_h8YpWdg?e=D8UkaK.

568 Interview Memoranda of CC Members, EC Staff, and Witnesses. https://solutionpointintl.sharepoint.com/:f:/s/SBCECInvestigation/EtoZny6K649KvvdikKXw0r0BbiuKPyIAFLITuaKK8_EbLQ?e=AaDi7a.

569 Interview Memoranda of ERLC Staff Members 1, 2, and 3. https://solutionpointintl.sharepoint.com/:f:/s/SBCECInvestigation/EmL1DTtju4pPo80r0-MFAh4B0X2kErrcrJyAlWaaXGN4Ng?e=weQzXu.

knowledge of the purpose, creation, and structure of the CC, and solicited their recommendations for enhancing the Committee.

Out of respect for their privacy and consistent with our engagement letter, we did not directly contact survivors or those who submitted abuse allegations through the CC portal. However, as described in Section II.B *supra*, at the outset of this engagement we established a dedicated email address, phone number, and webpage to ensure that survivors or other persons who wished to participate would have the opportunity to do so. We ultimately did interview three survivors and four other witnesses who wanted to share information about their knowledge of, and experience with, the CC process.[570]

### D. Background

#### 1. Creation of the CC

At the February 18, 2019 SBC EC meeting, then-SBC President J.D. Greear reported on sexual abuse, specifically naming 10 churches that were mentioned in news reports concerning sexual misconduct allegations in Southern Baptist congregations. Dr. Greear called for an inquiry into whether those churches were "operating with a faith and practice that upholds the Baptist Faith and Message, specifically Article XV, which says that we should seek to provide for the abused."[571]

According to an SBC EC Staff Member, Mr. Boto was very frustrated that the SBC President announced the churches publicly as it caused an uproar and could lead to lawsuits.[572] According to a former SBC EC Vice President, the SBC EC leadership was concerned that churches might abstain from sending funds to the Cooperative Program

[570] Interview Memoranda of CC Witnesses 1,2,3,4,5,6, and 7. https://solutionpointintl.sharepoint.com/:f:/s/SBCECInvestigation/EtoZny6K649KvvdikKXw0r0BbiuKPyIAF LITuaKK8_EbLQ?e=BeCI0D .
[571] http://m.bpnews.net/52467/sbc-bylaws-workgroup-releases-sexual-abuse-response.
[572] Interview Memorandum of EC Staff Liaison 1.

or leave the SBC altogether. The witness reported that the named churches pressured Boto and the Bylaws Work Group Chair to clear the churches' names quickly.[573]

In the days following Dr. Greear's report, the Bylaws Work Group met via conference calls and ultimately released a statement on February 23, 2019. In pertinent part, the statement sets forth that:

> The Executive Committee is recommending to the Convention's messengers this June an amendment to the Convention's Constitution affirming that the Convention does not, and will not, cooperate with a church that clearly evidences indifference to addressing the crime of sexual abuse, a crime virtually all Southern Baptists and all Christians believe to be monumentally destructive and worthy of the harshest punishment.
>
> It is our collective opinion that in crafting the proposed amendment, the Executive Committee intended to use the test of "evidencing indifference" to the threat or fact of sexual abuse as the standard to determine that a church is not in cooperation with the Convention. Therefore, the receipt of credible information that would demonstrate such indifference should be the trigger for any sort of inquiry into a church's conduct. It is also our opinion that the Executive Committee did not intend for every allegation that a church has demonstrated indifference to establish guilt which would then have to be disproved — in effect, a presumption of guilt which the Executive Committee should view as untenable and unscriptural.
>
> We utterly and completely condemn the abominable horror of child sexual abuse. We must also be careful that our righteous anger does not prevent a deliberate and thoughtful response. Although the overwhelming majority of sexual abuse cases remains tragically unreported, in virtually all reported cases, the abuse and cover-up of abuse were criminal acts undertaken by a few individuals within a church. The church body rarely knew about these actions and even more rarely took any action to endorse or affirm the wrongful acts or the actors themselves. The Convention, through its Executive Committee, should not disrupt the ministries of its churches by launching an inquiry until it has received credible information that the church has knowingly acted wrongfully in one of the four ways described in the proposed amendment:

[573] Interview Memorandum of EC Staff Liaison 3.

> (a) employing a convicted sex offender,
> (b) allowing a convicted sex offender to work as a volunteer in contact with minors,
> (c) continuing to employ a person who unlawfully concealed from law enforcement information regarding the sexual abuse of any person by an employee or volunteer of the church, or
> (d) willfully disregarding compliance with mandatory child abuse reporting laws.
>
> In most cases a judicial body would have already determined these items as matters of fact. Action was taken on this proposed amendment by the Executive Committee officers, the Bylaws Workgroup, the Administrative Committee, and the full Executive Committee. In all discussion, the body was clear that the Executive Committee has neither the authority nor ability to conduct a criminal investigation.[574]

According to the Bylaws Work Group, factors such as the passage of time, changes in the church's administration and membership, and the church's adoption of policies to prevent and properly respond to charges of abuse would be considered when determining whether churches were "evidencing indifference to sexual abuse."[575] In the Bylaws Work Group's judgment, the presence of such factors "would make launching an inquiry of no value" and only "further harm a congregation recovering from the effects of crimes committed in its midst."[576]

Although the Bylaws Work Group noted that victims "should always be encouraged to report the crimes against them," the statement urged EC members and SBC messengers to avoid publicly naming churches absent prior notice to the church and documentation of criminal convictions.[577] Rather, the Bylaws Work Group expressed a preference for the names of suspect churches to be brought to the EC's attention from the local association and the state or regional conventions.[578]

---

[574] http://m.bpnews.net/52467/sbc-bylaws-workgroup-releases-sexual-abuse-response.
[575] *Id.*
[576] *Id.*
[577] *Id.*
[578] *Id.*

The Bylaws Work Group then specifically addressed the churches identified in the SBC President's report as follows:

- Further inquiry was not warranted for six churches based on the information provided.
- Further inquiry was warranted for three churches based on the information provided.
- One church was not a Southern Baptist church.[579]

The Bylaws Work Group made these determinations in less than a week after President Greear's report. As one Trustee expressed to us, the determination that no further inquiry was warranted for the majority of named churches was perceived as shockingly fast and hasty.[580] Survivor and survivor advocates believed that the Bylaws Work Group did not engage in due diligence before clearing the churches,[581] one of which in fact had an admitted sex offender on staff as the Music Director.[582] A later letter from Russell Moore to President Greear references the "disastrous move by the Bylaws Work Group to 'exonerate' quickly and by fiat churches with credible allegations of negligence and mistreatment of sexual abuse survivors – even leading to a call of apology from an Executive Committee official to a church that had, at the time, a sexual offender on staff."[583]

In the wake of this controversy, work began to amend the bylaws to allow a standing committee of the SBC to form an opinion on whether churches were in friendly cooperation with the SBC. At the June 2019 SBC Annual Meeting, an amendment creating the CC as it exists today was approved.[584]

---

579 *Id.*

580 Interview Memorandum of CC Witness 7.

581 https://www.houstonchronicle.com/news/houston-texas/houston/article/Southern-Baptist-leaders-quickly-clear-7-13643282.php.

582 https://www.baptistpress.com/resource-library/news/churches-named-by-greear-in-abuse-report-respond.

583 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EXbMMAPUyhRHjWRP63KdmWQBbZiF6iXGPoqjT_bQo-BPJA?e=jsdNjM.

584 https://41jmzr10f8zc229tzr2xml7e-wpengine.netdna-ssl.com/wp-content/uploads/2020/07/2019SBCAnnual.pdf.

### 2. Authority

At the June 2019 SBC Annual Meeting, Messengers overwhelmingly voted for the amendments to the Constitution related to sexual abuse. Constitutional amendments require a second two-thirds messenger vote at the following SBC Annual Meeting.[585] Because the 2020 meeting was canceled, as of the June 2021 SBC Annual Meeting, the SBC Constitution, Article III read as follows:

> Article III. Composition: The Convention shall consist of messengers who are members of Baptist churches in cooperation with the Convention. The following subparagraphs describe the Convention's current standards and method of determining the maximum number of messengers the Convention will recognize from each cooperating church to attend the Convention's Annual Meeting.
> 1. The Convention will only deem a church to be in friendly cooperation with the Convention, and sympathetic with its purposes and work (i.e., a "cooperating" church as that term is used in the Convention's governing documents) which:
> (1) Has a faith and practice which closely identifies with the Convention's adopted statement of faith. (By way of example, churches which act to affirm, approve, or endorse homosexual behavior would be deemed not to be in cooperation with the Convention.)
> (2) Has formally approved its intention to cooperate with the Southern Baptist Convention. (By way of example, the regular filing of the annual report requested by the Convention would be one indication of such cooperation.)
> (3) Has made undesignated, financial contribution(s) through the Cooperative Program, and/or through the Convention's Executive Committee for Convention causes, and/or to any Convention entity during the fiscal year preceding.
> (4) Does not act in a manner inconsistent with the Convention's beliefs regarding sexual abuse.
> (5) Does not act to affirm, approve, or endorse discriminatory behavior on the basis of ethnicity.[586]

---

585 https://www.baptistpress.com/resource-library/news/southern-baptists-affirm-stances-on-sex-abuse-racism/

586 SBC Constitution, Article III.

Bylaw 8 was also amended to establish the CC. If any issues arose as to whether an SBC Church was in cooperation with the SBC as described in Article III, the CC was charged with considering the matter, reviewing information available to it, and making a recommendation to the Executive Committee:

> If the committee forms the opinion that a church is not in friendly cooperation with the Convention as described in Article III. Composition, of the Constitution, the committee shall submit to the Executive Committee a report stating that opinion and the committee's reasons for its opinion.[587]

If such a report is made, the Executive Committee is to consider the report at its next meeting and make a determination. The SBC Church may appeal the decision by written submission to the CC Chair at least 30 days prior to the SBC Annual Meeting, and the Convention would then consider the appeal during the Annual Meeting. Ultimately, the Convention determines whether to sustain the EC's ruling.[588] There is no appeals process for a submitter who is dissatisfied with the CC's or EC's decisions.

Once an SBC Church is determined not to be in friendly cooperation, it may apply to the CC for reconsideration of its status if it addresses the issues which led to that finding. The CC may recommend to the EC that the church be once again considered a cooperating church "if the circumstances warrant."[589]

Finally, Bylaw 8 expressly notes that the CC may make inquiries of a church, "but shall never attempt to exercise any authority over a church through an investigation or other process that would violate Article IV of the Constitution."[590]

---

[587] Bylaw 8, Section C(3)(a).
[588] Bylaw 8, Sections C(3)(b), (d).
[589] Bylaw 8, Section C(4).
[590] Bylaw 8, Section C(5).

### 3. Membership

The CC is comprised of the Registration Secretary, the Chair of the EC, three members nominated by the EC, and four members nominated by the Committee on Nominations.[591] All members other than the Registration Secretary and the EC Chair serve three (3) year terms and the Committee is permitted to elect its own Chair.[592] There are no written standards or criteria for nominating or selecting CC members.[593]

## E. CC Process and Procedures

Apart from what is described above, Bylaw 8 did not provide any formal processes or procedures for how the CC would function, the time frame within which submissions would be decided, how submissions would be received, or what standard of review would be employed. As described in detail below, our audit revealed that the CC developed an internal, informal process to receive, review, and make recommendations on submissions which developed and transformed between February 2019 and June 2021. Our understanding of this process comes from interviews with current and former CC members, EC Staff Member Liaisons, survivors, witnesses, and advocates who have personal experience with submissions to the CC, and our review of documents gathered during our audit.

During the audit time period, submissions generally came to the CC through electronic mail or through an SBC website portal, which was launched in December 2019.[594]

---

591 Bylaw 8, Section C.

592 *Id.*

593 Bylaw 8, Section C; Bylaw 15.

594 According to a former CC Chair, when the Committee was first formed there was no process to clarify or classify the emailed submissions. The Chair thought there should be an electronic portal to standardize the process. *See* Interview Memorandum of CC Member 1. The launch of the CC submission webpage was publicized in the SBC media outlets, including Baptist Press and the SBC website. *See, e.g.*, https://arkansasbaptist.org/post/sbc-credentials-committee-establishes-portal-to-report-alleged-departure-from-polity-doctrine. The CC also advised an EC Trustee, who previously had emailed multiple submissions on behalf of survivors, to relay to the survivors that they should make individual submissions through the CC submissions website. *See* Interview Memorandum of CC Witness 7.

Anonymous submissions were not considered, however proxies were allowed to submit and advocate on behalf of a survivor or person directly involved with the sexual abuse matter.[595] For example, Dee Ann Miller served as a proxy and emailed a submission on behalf of siblings who were not aware of how to report an abuse concern to the CC. Ms. Miller served as an advocate and resource throughout the CC process.[596] A former CC Chair explained that, because the CC needs to correspond with the submitter in order to gather information, the submitter must be identifiable.[597]

### 1. Submission Portal

Our audit team conducted test submissions using the CC submission webpage, which can be accessed at: https://www.sbc.net/about/what-we-do/sbc-governance/credentials-committee/. As a preliminary matter, we should note that there is no link to the CC submission webpage from the main page of the SBC website.[598] Rather, submitters must perform a site search, or go the menu bar or the bottom of the page to find the link to the CC portion of the SBC site where the submission form is located. There is no information on the main page of the SBC website that clearly highlights that people need to go to the CC submission webpage to make a submission. Baptist Press announced the launch of the submission portal in an article in December 2019,[599] but there have not been efforts to bring continuous awareness to the submission portal.

Once a submitter has navigated to the CC webpage, the top half of the initial page contains a brief description of the CC, noting that it "exists to provide individuals an opportunity to address concerns about whether a church that is currently identified as a cooperating church with the Southern Baptist Convention continues to meet our

---

595 *See* https://41jmzr10f8zc229tzr2xml7e-wpengine.netdna-ssl.com/wp-content/uploads/2020/03/CredentialsCommitteeSubmissionForm.pdf.

596 #6 Church Combined File.pdf

597 Interview Memorandum of CC Member 1; *see also* Draft CC Policies https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EahGEOkaN6NFiMdJQW6hBdABFYXJMKORYAfGNjWtWqY7xA?e=x0TfZq .

598 https://www.sbc.net.

599 https://www.baptistpress.com/resource-library/news/sbc-credentials-committee-establishes-online-submission-portal/

standards of faith and practice."[600] A screen shot of that portion of the webpage is included below.




The bottom half of the initial page contains a "Statement of Assignment," which describes the function of the CC and provides information to the submitter.[601] Among other things, the Statement notes that the CC may make inquiries of a church but not investigate; that any report concerning an abuser should first be made to law enforcement; and that CC will not consider anonymous submissions.[602] The Statement is approximately 20 lines in length and in a smaller font than the top half of the page.[603] At the end of the statement

[600] https://www.sbc.net/about/what-we-do/sbc-governance/credentials-committee.
[601] *Id.*
[602] *Id.*
[603] *Id.*

are "yes" or "no" boxes for submitters to indicate whether they read the statement and want to submit a report.[604] A screen shot of the Statement is set out below.




If submitters select "yes," they are directed to the second step, which asks them to select whether the submission relates to: (i) "discriminatory behavior on the basis of ethnicity," (ii) "sexual or other forms of abuse in a church setting," or (iii) "any other matter of faith or practice."[605] The page also includes a link to download the submission form, if the

[604] A submitter who selects "no" is nonetheless directed to the page containing the submission form, skipping the additional steps described *infra*.
[605] https://www.sbc.net/about/what-we-do/sbc-governance/credentials-committee/#gf_4

submitter would prefer to email or mail it to the CC rather than proceed on the website.[606] A screenshot of the page is set out below.




If submitters make the selection for sexual abuse, they are directed to a third step, titled "Support Phone Call."[607] The webpage notes that the CC is working with a mental health center to provide a support phone call from an individual trained to assist victims of sexual or other forms of abuse. According to the webpage, the support call includes information about the abuse recovery process and the identification of resources in the submitter's area. The webpage further notes that the submitter's selection will have no impact on the CC's inquiry.[608] A screenshot of the page is set below.

---

[606] *Id.*
[607] *Id.*
[608] *Id.*




No matter what selection is pressed,[609] the submitter is directed to the fourth step, which is the submission information form. The information form is prefaced with this statement:

> This form should be used to submit a church to the SBC Credentials Committee for consideration regarding its relationship with the Southern Baptist Convention. The Credentials Committee may submit a recommendation to the Executive Committee that a church be removed from its cooperative standing with the Southern Baptist Convention at the Executive Committee's mid-September, mid-February, or June meeting just prior to the SBC annual meeting. Once a submission has been received by the Credentials Committee, the Committee will communicate in a timely manner with (a) the submitter of any concern and (b) the church about which a concern has been raised. * It will not release comments or updates regarding submissions through the media or by other means unless or until a recommendation is submitted to the Executive Committee for withdrawal of fellowship from a church. *This is why we recommend that law enforcement be contacted first. We do not want the actions of the

[609] We noticed during our audit that, after a submitter makes a selection and presses "next" to move forward in the process, the selection becomes unhighlighted. In other words, just before the screen moves to the next page, it appears to the viewer as if no selection was made. This glitch could make some submitters unsure whether their request for a support call was processed.

> Credentials Committee to confound a needed investigation. Our role is to inquire of the church under question. The church is likely to question the alleged abuser. If the legal investigation has not already begun and reached the point of pressing charges at the time we contact the church, this could make the investigative process more difficult.

Following that language is a series of questions asking for information about the submitter, the church, and whether a law has been violated. There is no auto-verification system to ensure the submitter entered their correct phone number or email address.

The form then provides text boxes for the submitter to: (i) explain why the church is not in friendly cooperation with the SBC, (ii) provide details about the events, (iii) describe when the issue began and how the church acted to address or resolve the issue; and (iv) explain whether a state or local Baptist association has addressed the issue. After those text boxes are completed, there is a short statement at the end as follows:

> Please submit this form to the SBC Credentials Committee by clicking SUBMIT. You will receive an email confirmation that the form was received. If you do not receive this confirmation, please check your spam or junk folder in your email account. If you have additional information or questions, please contact the SBC Credentials Committee at credentials@sbc.net.

Once the "Submit" button is pressed, the submitter is redirected back to the CC's homepage. There is no obvious indication that the submitter's information was received, other than a sentence appended in a small font after three paragraphs of text. The sentence states: "Thanks for contacting us! We will get in touch with you shortly." A screen shot of the homepage with that sentence is included below.




The submission webpage does not provide an email confirmation or other confirmation of receipt, nor does it indicate if there is an error in submission. We interviewed two survivors who indicated that they had made submissions through the webpage, but the CC did not appear to receive those submissions.[610] One of the survivors, who had submitted to the online submission webpage on the day it launched in December 2019, did not become aware that her submission had malfunctioned until she interviewed with Guidepost as part of this investigation.[611]

[610] Interview Memoranda of CC Witnesses 2 and 8.
[611] Interview Memorandum of CC Witness 2.

A third submitter, who was submitting on behalf of a survivor, also encountered difficulty with the submission webpage. The submitter emailed the survivor that she had to contact the CC directly because "the form had a glitch so that it apparently timed out after a while;" the submitter "lost the first 2 drafts, after hours of working on them combined!"[612] Another survivor advocate stated that the CC portal user experience is poor, and the submission form is not easy to find.[613] It is unclear whether this was a CC submission webpage error or user difficulty, but the user interface provided by the portal did not help facilitate survivor access.

### 2. Receipt of Submission

After a submission was received through the CC submission webpage, the EC Staff Member Liaison who was assigned to assist the CC would first verify whether the church being reported was an SBC-affiliated church. The EC Staff Member Liaison made this verification by reviewing the church's Annual Church Profile information.[614] If the church was not an SBC church, the EC Staff Member Liaison emailed the submitter and advised that their submission was outside the CC's authority. The submission was labeled as "Not Affiliated" in the CC's records.[615]

If the church was an SBC-affiliated church, the EC Staff Member Liaison then sent a copy of the submission to the CC Chair and manually emailed a letter of confirmation of receipt to the submitter. The emailed letter was not instantaneous with the submission. One EC

612 CC Witness 3's email to CC Witness 1, when she tried to submit a reconsideration request on the CC submission website. Fwd_ copy of request for appeal.msg.

613 https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EcgEe91EN_FAhcglO6jdGs8Bzi83FxH65z0kx4KqRPZO8Q?e=ekiqAJ

614 The Annual Church Profile is submitted by SBC member churches and includes information about, among other things, the church's membership, leadership, and finances.

615 Interview Memorandum of EC Staff Liaison 1; *see also* Draft CC Policies. https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EahGEOkaN6NFiMdJQW6hBdABFYXJMKORYAfGNjWtWqY7xA?e=x0TfZq.

Staff Member Liaison explained that the letters of receipt were typically sent out within a week after the submission was received, but that in busy times it could take longer.[616]

To write the letter, the EC Staff Member Liaison used an "Initial Acknowledgment Letter" template and tailored it to the submission. The template, among other things, thanks the submitter for having the courage to make a report, expresses the CC's grief and prayers, urges the submitter to contact law enforcement if the submitter suspects criminal behavior, clarifies that the role of the CC is to determine if churches are in friendly cooperation, and notes that the CC will consider the submitter's communication as soon as possible and get back to them about the status of their report.[617] The CC Chairs did not review these letters prior to the EC Staff Member Liaison sending it to the submitter/survivor.[618]

### 3. Information Gathering

It was the responsibility of the EC Staff Member Liaison to manage the information gathering process in the following manner:

- The CC's Access database is used to store a record of the submissions received by the CC. The EC Staff Member Liaison creates a dedicated, numbered file for each submission in the Access database and manually inputs the information from the submission form, along with a brief summary.[619]
- If additional information was needed, the EC Staff Member Liaison emails the submitter. If the submitter does not respond within the next 90 days, the submission is placed in "Inactive" status but not closed. If additional information is received, the EC Staff Member Liaison sends an email confirmation to the

---

616Interview Memorandum of EC Staff Liaison 1; *see also* Credentials Committee Response Templates 11.20.19.
https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EWkhiTD7JoNBrFaNo6Pa6pQB7d3KI7y0jHINiHN6fc8GDw?e=NM1nLU.
617 *Id.*
618 Interview Memorandum of EC Staff Liaison 1.
619 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/ERf-0nySZyRCmuEY3B-uQMQBdxWFNCr875d-KFuGSk-sZA?e=WTEtuN.

submitter, and uploads the additional information into the appropriate file on the server.

- The EC Staff Member Liaison conducts the below open-source searches/inquiries for publicly-available information. As some CC members became familiar with the information gathering process, they occasionally have assisted with the information gathering as well.
    - State/local sex offender registry information
    - Court or police records
    - News articles
    - Facebook/Twitter/social media
    - General internet searches[620]

In addition to the above information, CC members would contact state conventions and/or local associations for information about the status of the church, and to determine whether those entities were aware of any abuse allegations involving the church.[621] An EC Staff Member Liaison stated that these efforts were for background research only and were not an investigation.[622]

Any documents collected during the information gathering stage were scanned by the EC Staff Member Liaison and saved to the numbered file correlating to the submission. An additional step must be taken to manually download the numbered files and the Access database reports to a secure portal for CC members' review. Once files are downloaded

[620]Interview Memorandum of EC Staff Liaison 1; *see also* Draft CC Policies. https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EahGEOkaN6NFiMdJQW6hBdABFYXJMKORYAfGNjWtWqY7xA?e=x0TfZq.

[621] The CC did not contact those entities for information for the early submissions. In fact, the Executive Director of the Missouri Baptist Convention who was an EC Trustee emailed Dr. Floyd in January 2020, expressing concern that the CC Chair had contacted two churches about their inquiry status and did not notify the state convention where the two churches were associated. *See* https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/Eas33krgFnpKmf4I7QJRvw4Ben4CIRfk7REnv9-b2VV0Rw?e=uKMyTk.

[622]Interview Memorandum of EC Staff Liaison 1.

onto the secure portal, CC members are able to review the information for each active submission.

The Access database has room for automated improvement as it is not password protected or encrypted. The database is on the secure Convention policy drive, and only three staff members have access rights with no file share permissions. The database is nonetheless beneficial for the following reasons:

1. Provides the capability for the EC Staff Member Liaison to run reports for active submissions and progress reports in order to formulate the CC meeting agenda;
2. Has a Tasks and Assignments Tab to direct CC members to their specific tasks to be completed before the next CC meeting; and
3. Allows for a diary of details for each submission to be tracked for the CC members' easy reference and review.

#### 4. CC Meetings and Status Determinations

The CC typically met on a monthly basis, but there were a few months the CC did not convene because of various personal/professional/organizational obligations that did not allow for a quorum of CC members to be present to make decisions.[623] Prior to each meeting, the EC Staff Member Liaison created an agenda highlighting the active submissions for discussion. The EC Staff Member Liaison sent the agenda, a summary of active submissions and related information, and a progress report to the CC members. The Tasks and Assignments tab in the Access database directed CC members to the specific tasks that needed to be completed, as well as updates that needed to be presented at the monthly meeting.[624]

---

[623] https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EahGEOkaN6NFiMdJQW6hBdABFYXJMKORYAfGNjWtWqY7xA?e=37YfzT.

[624] Interview Memorandum of EC Staff Liaison 1; *see also* Draft CC Policies https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EahGEOkaN6NFiMdJQW6hBdABFYXJMKORYAfGNjWtWqY7xA?e=x0TfZq.

Any submission received since the CC's last meeting was given the status "Received" to indicate that the submission had not yet been reviewed and/or discussed by the CC. Received submissions were added to the agenda of the next scheduled CC meeting. At the meeting, the CC would determine whether there was sufficient information to proceed with the active submissions and would determine the status to be one of the following: Review, Decline Further Consideration, In Legal Process, or Under Inquiry.[625]

"Review" status meant that the CC had sufficient information enough to warrant concern, but not enough to determine the next status. The CC then would gather more information before the next CC meeting by requesting more information from the submitter, contacting other Baptist bodies for information about the church, compiling publicly available information, or some other action determined to be within the scope of the CC's assignment.[626]

Based on the information gathered, the CC would elect to "Decline Further Consideration" if, in the CC's view, the submission did not pertain to an action or lack of action by a church, was beyond the scope of the CC's duties as outlined by Bylaw 8, or there was not enough information available to the CC for a determination to be made. The CC did not notify the church or the EC of its determinations for both "Review" and "Decline Further Consideration" status.[627]

If there was an ongoing legal matter, the CC could put the submission in "In Legal Process" status. This status was used if the resolution of the legal matter would be beneficial for the CC to know in order to make any determinations regarding the church. If the church was in active legal proceedings, the CC would pause the inquiry until the legal matter was decided.[628]

The submission was considered "Under Inquiry" if the CC agreed that contacting the church was necessary in order for the CC to inquire about any concerns that have been

---

[625] *Id.*
[626] *Id.*
[627] *Id.*
[628] *Id.*

raised during the review of the submission. In that situation, an inquiry letter was prepared and sent to the church. During the first year, this inquiry letter was either mailed or sent via email.[629] In 2020, after receiving criticism for not providing the church with notice prior to sending out the inquiry letter, the CC began calling the church pastor/staff prior to mailing or emailing the inquiry letter.[630]

The inquiry letter typically included five to seven questions for the church to answer. The questions were tailored to the nature of the inquiry. By way of example, in one case, the submitter claimed that the church pastor had committed, and was subsequently indicted for, sexual assault. The inquiry letter posed seven questions, including whether: (1) the church was employing anyone who was accused, arrested, or convicted of sexual assault or similar conduct, and asking for details; (2) the current pastor was currently under investigation; (3) the church believed it mishandled information regarding the allegations; (4) the church's employment of an accused pastor or staff member could be reconciled with Article XV of the Baptist Faith and Message; (5) the church can point to specific facts, circumstances, or actions to show that the church's beliefs on sexual abuse align with the SBC; (6) the church desires to continue in cooperation with the SBC; and (7) a church representative desires a meeting with the CC.[631]

The inquiry letter typically gave each church 30 days to respond. During the Covid pandemic, however, on one occasion the response period was extended to 60 days[632] and on two occasions the inquiry letters did not contain a deadline.[633]

---

[629] According to an EC Staff Liaison, the CC initially sent some letters by certified mail but the churches expressed anger that CP money was used for the mailing expenses, so the practice was discontinued. *See Id.*

[630] Interview Memorandum of EC Staff Liaison 1; *see also* Draft CC Policies. https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EahGEOkaN6NFiMdJQW6hBdABFYXJMKORYAfGNjWtWqY7xA?e=x0TfZq.

[631] *See* Church 9 Inquiry Letter in the Compilation of Credentials Committee Inquiry Letters to Churches. https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EW-pbS9KNr5OkhnTuE1279cBpx7pn09drdJ3tchRwtH6HQ?e=gUmnqd.

[632] *See* Church 15 Inquiry letter.

[633] *See* Church 8 and Church 19 Inquiry letters.

If no response was received during the stated timeframe, a member of the CC would contact the church via telephone. In our review, we identified three churches which decided to voluntarily withdraw from the SBC rather than proceed with the CC's inquiry.[634] Two other churches voluntarily withdrew during the Bylaws Work Group's review of the churches named by Dr. Greear.[635]

If the church provided information, the documents were uploaded to the server and the EC Staff Member Liaison inputted the information and documents into the Access database for review by the CC, although a specific time frame for that review did not exist.

Upon receipt of the church's response, the CC would review the new documents and discuss at the next meeting. The CC could determine that it had additional questions for the church, and a CC member would reach out to the church in a phone call or email. The same process would continue until the CC determined that it could form an opinion.

Once the review was concluded, the CC could recommend to the EC that the church be disfellowshipped, or it could elect to "Close Without Recommendation," which indicated that the CC had considered the information gathered in the inquiry and formed the opinion that they could not conclusively determine that the church was acting "in a manner inconsistent with the Convention's beliefs regarding sexual abuse."[636]

The CC's decision to close a case without recommendation was not made known to the EC but rather was in the sole discretion of the CC. In that instance, a letter of declination was prepared and sent to the church and the submitter.[637] If the case was declined, the information alleged in the submission was not publicized. The CC only released the name

---

[634] Church 5, Church 22, and Church 23. The EC Staff Member Liaison would in these cases coordinate with Lifeway to remove the church affiliation from SBCWorkspace.
[635] Church 1 and Church 2.
[636] Interview Memorandum of EC Staff Liaison 1; *see also* Draft CC Policies. https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EahGEOkaN6NFiMdJQW6hBdABFYXJMKORYAfGNjWtWqY7xA?e=x0TfZq.
[637] *Id.*

of a church if and when it is recommended to the EC as being "not in friendly cooperation."[638]

The EC reviewed recommendations for disfellowship during its sessions in February, June, or September. The CC sent notification of its recommendation to the submitter and the church. During the audit period, the CC recommended three churches to the EC for disfellowship with respect to sexual abuse allegations, and the EC accepted the recommendation in each case. The three disfellowshipped churches did not appeal.[639] Although the EC made public the names of those three churches – Ranchland Heights (Midland, Texas), Westside Baptist (Sharpsville, Pennsylvania), and Antioch (Sevierville, Tennessee) – in this audit report we refer to all churches by number for consistency and confidentiality purposes.

When any submission decision is finalized, the EC Staff Member Liaison changes the status of the submission from Active to Inactive in the Access database to help the CC members stay organized. However, all information is retained for each submission.

### F. Analysis of Submissions

As part of our document request to the EC, we requested all files relating to sexual abuse submissions presented to the CC during the relevant audit period.[640] 32 total submissions related to sexual abuse were received by the CC during that time period, and 30 total submissions were processed.[641] The following statistics are derived from the information we were provided:

---

[638] *Id.*

[639] Executive Committee minutes from February 2020 and February 2021.
https://solutionpointintl.sharepoint.com/:f:/s/SBCECInvestigation/EjM3miQdhlxPp15DWM6DclsBIO27I07wOKXBm5Gn6f3D0A?e=kOaVrW.

[640] When the CC was initially created in June 2019, a number of submissions that were in the process of review by the Bylaws Working Group were transferred to the CC.
https://solutionpointintl.sharepoint.com/:f:/s/SBCECInvestigation/Eh2OfrI54mNLnM6FHijK0GoB4DAY9v8pSC7yxWqB-oM1AQ?e=GyWPhd

[641] Two submissions, Church 1 and Church 2, were inherited from the Bylaws Working Group, and were resolved prior to the CC's formal establishment.

| Status | Number of Submissions |
|---|---|
| Inactive | 4[642] |
| Decline Further Consideration | 5[643] |
| Under Inquiry | 22 |
| Legal Process | 2[644] |
| Voluntary Withdraw | 3[645] |
| Closed Without Recommendation | 12[646] |
| Recommended to the Executive Committee | 3[647] |
| Pending | 2[648] |

We have compiled a summary chart of the submissions setting forth the submission date, general nature of the allegation in each submission, the actions taken by the CC and church response date, if any, and the outcome. The chart is set out below:

| Church | Submission Date | Allegation | Receipt Sent | Inquiry Sent | Church Response | CC Decision Date | Outcome |
|---|---|---|---|---|---|---|---|
| **Church 1** Location: Texas | Inherited from BWG. | Pastor allegedly sexually abused minor and later moved to a new church. New church did not terminate pastor. | N/A | 3/25/19 by BWG | 4/10/19 Church met with BWG | N/A | Church voluntarily dissociated from the SBC. No CC action. |
| **Church 2** Location: Texas | Inherited from BWG. | Pastor, who was previously a middle school principal, pled guilty in 2010 to two second-degree felonies, for sexual relations with a 17-year-old. | N/A | 5/15/19 by BWG | 5/24/19 | N/A | Church voluntarily dissociated from the SBC. No CC action. |
| **Church 3** Location: Texas | Inherited from BWG. | Pastor was a registered sex offender, convicted in 2003 of aggravated sex assault against two girls ages 11 and 12 years. | N/A | 12/11/19 | 1/22/20 | 2/18/20 | 2/18/20 - EC confirms recommendation of **disfellowship.** |

642 Inactive Status – Church 10, Church 18, Church 28, and Church 29.
643 Decline Further Consideration – Church 7, Church 16, Church 17, Church 25, and Church 26.
644 Church 12 (still pending); Church 9.
645 Church 5, Church 22, and Church 23.
646 Church 4, Church 6, Church 9, Church 11, Church 13, Church 15, Church 20, Church 21, Church 24, Church 26, Church 27, and Church 30.
647 Church 3, Church 8, and Church 19.
648 Church 31 and Church 32.

| Church | Submission Date | Allegation | Receipt Sent | Inquiry Sent | Church Response | CC Decision Date | Outcome |
|---|---|---|---|---|---|---|---|
| **Church 4** Location: Kentucky | Inherited from BWG. | Church accused of multiple instances of covering up sexual abuse. | N/A | 9/16/19 [649] | Church response inherited from BWG. | 2/3/20 | Closed without recommendation. *Resubmitted 2/2022. |
| **Church 5** Location: Georgia | Inherited from BWG. | Church Music Director was accused of sexual misconduct but church kept Director. When more allegations came into media, Director confessed and was terminated. | N/A | 12/12/19 | 2/13/20 | N/A | Church voluntarily dissociated from the SBC. No CC action. |
| **Church 6** Location: Illinois | 8/16/2019 Submission emailed to ERLC and EC, which was then forwarded to CC. | Pastor resigned after disclosing his past abuse of a minor relative in the 1960s. | 8/16/19 | 1/15/20 | 2/13/20 | 4/3/20 | Closed without recommendation. |
| **Church 7** Location: Tennessee | 10/9/19 Submitted by email. | Church was in search of a new lead pastor. Submitter alleged that the candidate was accused of manipulating young women into secret relationships, one of them being a sexual relationship, while he was their youth pastor. | Not known | No inquiry | 11/10/19 | 11/10/19 | Decline further consideration.<br><br>Church decided to no longer consider the candidate. |
| **Church 8** Location: Tennessee | 12/3/19 | Pastor may have been convicted in 1998 of statutory rape of a minor congregant. | 12/5/19 | 4/28/20 | 11/2/20 | 11/9/20 | 2/23/21 - EC confirms recommendation of **disfellowship**. |
| **Church 9** Location: Mississippi | 12/4/19 | Pastor was accused of sexually assaulting ex-wife. He was indicted by a grand jury for sexual abuse, but prosecutors did not pursue. | 12/9/19 | 1/15/20 | 2/18/20 | 12/13/21 [650] | Closed without recommendation. |
| **Church 10** Location: North Carolina | 12/5/19 by portal and 12/10/19 by email | Pastor was accused of sexual misconduct. | 12/12/19 | No inquiry | N/A | N/A | Inactive.<br><br>12/15/19 - Submitter emailed that the situation was resolved as the pastor resigned. |

[649] CC documentation shows that the church was placed under inquiry on this date, but the records are unclear if a letter was ever sent. The church had previously sent response documentation to the BWG.
[650] The CC had paused its consideration of this matter from February to December 2020, due to underlying legal proceedings which were delayed due to Covid.

| Church | Submission Date | Allegation | Receipt Sent | Inquiry Sent | Church Response | CC Decision Date | Outcome |
|---|---|---|---|---|---|---|---|
| **Church 11** Location: Indiana | 12/28/19 | Submitter alleged that church leadership ignored her reports of sexual abuse against her father, who was employed by the church. Submitter stated that a church leader had assisted in the forced delivery and death of the child that was the product of abuse. Church allegedly fired the abuser but failed to report it to law enforcement or the seminary. | 1/2/20 | 1/15/20 | 1/20/20 | 5/28/20 | Closed without recommendation.<br><br>Submitter not notified of decision until 7/2020. |
| **Church 12** Location: Indiana | 12/28/19 | Submitter said church leadership ignored her reports of sexual abuse against her father. | 1/3/20 | 1/15/20 | 1/27/20 | N/A | In Legal - Pending |
| **Church 13** Location: Georgia | 1/6/20 | The submitter claims that church has Sex Offender Guidelines that they report to their insurance company, but do not follow regarding a registered sex offender at the church. | 1/16/20 | 1/16/20 | 2/18/20 | 3/2/20 | Closed without recommendation. |
| **Church 14** Location: Florida | 1/10/20 | Submitter complained that church was hosting Dr. Paige Patterson for a Great Commission Weekend to be the main speaker. | 1/16/20 | No inquiry | N/A | 1/13/20 | Decline further consideration.<br><br>Rejected as outside of Bylaw 8 scope. |
| **Church 15** Location: Texas | 1/13/20 (CC had been notified of case on 10/16/19, but asked the submitter to complete submission through the portal when launched.) | Submitter said church youth pastor had sexually assaulted her and the head pastors of the church covered it up and mishandled the abuse report. | No formal receipt sent | 7/24/20 | 9/15/20 | 10/2/20 | Closed without recommendation.<br><br>*11/20/20 - Survivor's advocate asks for a second review and completes a submission; CC denies reconsideration request by reason of no new information provided in the submission. |
| **Church 16** Location: Oklahoma | 2/20/20 | Submitter alleges that church covered up former pastor's sexual harassment and predatory behavior and sent him to the next church with a letter of good standing. | 2/28/20 | No inquiry | N/A | 6/25/20 | Decline further consideration.<br><br>State convention reported that pastor would be arrested soon. |

| Church | Submission Date | Allegation | Receipt Sent | Inquiry Sent | Church Response | CC Decision Date | Outcome |
|---|---|---|---|---|---|---|---|
| **Church 17** Location: Texas | 3/5/20 | Church's former youth pastor had pled guilty to sexual relations with 16-year-old church member. Church senior pastor testified on behalf of youth pastor at sentencing, and the judge reprimanded the senior pastor for not informing congregation that youth pastor was under investigation and allowing him to participate in church even after his removal. | 3/10/20 | No inquiry | N/A | 8/3/20 | Decline further consideration.<br><br>CC relied on determinations of state convention. |
| **Church 18** Location: Indiana | 3/23/20 | Submitter states that 22 years ago a teen boy committed suicide because of sexually abusive minister who is still in SBC pulpit. | 3/25/20 | No inquiry | N/A | N/A | Inactive.<br><br>Submitter did not respond to CC's request for additional information to begin Review process. |
| **Church 19** Location: Pennsylvania | 4/12/20 Notice from LifeWay that state convention and local association had disaffiliated the church. | Pastor was convicted of sexual assault of a child in TX in 1993 and is on FL's sex-offender registry. | N/A | 4/15/20 | 8/3/20 | 9/14/20 | 2/23/21 - EC confirms recommendation of **disfellowship.** |
| **Church 20** Location: North Carolina | 6/13/20 | Submitter alleges that pastor covered up sex crimes committed by his brother-in-law at a church where the pastor had served in the past. | 6/30/20 | No letter sent – oral discuss-ion | 7/13/20 | 9/14/20 | Closed without recommendation. |
| **Church 21** Location: South Carolina | 8/13/20 | Submitter alleges that pastor had inappropriate relationships with church staff, and that the church has allowed pastor to abuse his position of authority. | 8/21/20 | 10/27/20 | 12/11/20 | 10/18/21 | Closed without recommendation.<br><br>CC relied on determinations of state convention. |
| **Church 22** Location: Texas | 9/20/20 | Submitter alleges that church knowingly hired pastor with history of abuse. In 1980s the pastor was sued in civil court for sexual abuse of a parishioner. | 9/25/20 | 11/18/20 Phone call | 12/1/20 | N/A | Church voluntarily dissociated from the SBC 12/1/20 while CC inquiry was pending. |
| **Church 23** Location: Georgia | 9/22/20 . | Submitter alleges that pastor is a registered sex offender who molested a foster child in his care. Pastor is listed on the GA sex offender registry. | 9/25/20 | 10/30/20 | 12/22/20 | N/A | Church voluntarily dissociated from the SBC 12/22/20 while CC inquiry was pending. |

| Church | Submission Date | Allegation | Receipt Sent | Inquiry Sent | Church Response | CC Decision Date | Outcome |
|---|---|---|---|---|---|---|---|
| **Church 24** Location: Vermont | 9/24/20 | Submitter (parent of survivor) alleges that youth pastor began grooming 15-years old minor in December 2017. Submitter alleges that the church pastor blamed minor, made minor repent in front of congregation, and did not want to report conduct of youth pastor. | 9/25/20 | 12/9/20 | 1/6/21 | 1/11/21 | Closed without recommendation.<br><br>CC relied on determinations of state convention. |
| **Church 25** Location: Louisiana | 12/4/20 | Submitter alleges sexual abuse by church's Music Minister. | 12/4/20 | No inquiry | N/A | 3/15/21 | Decline further consideration.<br><br>Pastor encouraged submitter to contact police. Music Minister removed from church and subject to law enforcement proceedings. |
| **Church 26** Location: Texas | 1/16/21 | Submitter alleges that church pastor had an affair with submitter's spouse, who is vulnerable due to mental and physical illness. | 1/19/21 | 10/25/21 Phone call and email attempt. | N/A | 11/15/21 | Closed without recommendation.<br><br>Church had been dissolved. |
| **Church 27** Location: Tennessee | 1/29/21 | Submitter alleges that the church supported a Lifeway employee who was sexually engaged with seven women employed by Lifeway and other ministries. | 1/29/21 | No inquiry | Informal phone calls | 2/14/22 | Closed without recommendation.<br><br>Pastor removed accused employee from teaching roles. |
| **Church 28** Location: Alabama | 2/11/21 | Submitter alleges that church leaders have bullied and intimidated women. | 3/9/21 | No inquiry | N/A | N/A | Inactive.<br><br>Submitter did not respond to request for additional information to begin Review process. |
| **Church 29** Location: Ohio | 3/4/21 | Submitter allegedly was sexually assaulted and stalked by church member, and church leaders did not take actions to ensure submitter's safety. | 3/9/21 | No inquiry | N/A | N/A | Inactive<br><br>Submitter stopped communicating with CC. |

| Church | Submission Date | Allegation | Receipt Sent | Inquiry Sent | Church Response | CC Decision Date | Outcome |
|---|---|---|---|---|---|---|---|
| **Church 30** Location: Texas | 3/4/21 | Submitter alleges that adult youth worker was soliciting underage girls for sex, and that submitter was 14 when the worker started grooming her. When submitter told pastor in 2016, pastor allegedly was not surprised, admitted there were other survivors, and took no action. | 3/9/21 | 11/19/21 | 11/30/21 | | No information on decision which was outside audit scope. |
| **Church 31** Location: Mississippi | 6/8/21 | Submitter alleges that pastor's son, who has an abuse history, is allowed to preach. Pastor's son allegedly left former church after grooming a young woman he was counseling. | 6/28/21 | | | | Pending |
| **Church 32** Location: Texas | 6/23/21 and 8/25/21 | Two submitters allege that the Mission (not itself a church) on occasion allows registered sex offender to teach/preach. The second submitter alleges that pastor was combative when submitter spoke out about the mishandling of the situation. | 6/29/21 – CC sent confirm-ation receipt to submitter #1.<br><br>9/8/21 – CC sent confirm-ation receipt to submitter #2 | | | | Pending |

## G. Observations and Conclusions

Although the concept of the CC is a good one, we have identified several issues in how it was formed and executed, and we have made recommendations for improvements. It is important to note that because the CC did not adopt any written policies and procedures, we were unable to audit its conduct based upon its foundational documents, other than Bylaw 8. Instead, we have conducted our review based on the CC's actual practices measured against best practices that would be expected from an organization with a similar purpose.

### 1. Policies and Procedures

As noted above, the CC was formed in the wake of an uproar about the SBC EC's handling of sexual abuse allegations and was pressured from the outset to respond to submissions. When the establishment of the CC was announced in June 2019, submissions were immediately received for review. At that time, there were no formal, written policies and procedures governing how the CC would handle and evaluate submissions.[651] In particular, there was no written guidance about the following basic items, among others:

- Timeline to complete review and make recommendations to the EC
- Standard of review
- Possible outcomes (disfellowship, denial, "hold status")
- Communications with submitter, church, and others
- What information could be gathered and how

This resulted in procedures being developed without much planning. We recognize that the CC members and EC Staff Member Liaisons were placed in the difficult position of trying to resolve sexual abuse inquiries expeditiously while at the same time starting up a new committee. A former CC Chair and EC Staff Member Liaisons all similarly described the process as "building a plane while flying" and another CC member added that "they were not given the parts to build the plane."[652]

---

[651] The first written draft procedures were dated October 10, 2019, which was almost 4 months after the CC was established at the June 2019 Annual Convention.
https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/Ea5cNwpBMb1MmRQ09n-WocQBEKEBkVOljaGDOghGDDGC0g?e=dWEVJ1
CC Member 3 had asked CC Member 1 for a flow chart or outline of the CC process, and CC Member 1 responded to him in April 2020 (nearly a year after the CC was formed), that there was no such document.
https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EWReZx12AA9DnixzqpmkrJcB3zZDOwpZSVgBByv67eE68g?e=NptNTr

[652] Interview Memoranda for CC Members 1, 2, and 11; Interview Memoranda for EC Staff Liaisons 1, 2, and 3.

According to one of the inaugural CC members, the Chair had met with Mr. Boto and EC staff to put some basic procedures in place before the CC's first meeting. During the CC meeting in August 2019, the CC Chair orally presented a number of procedures for discussion, including how to handle the receipt of submissions, how such submissions would be categorized and reviewed, and how inquiries should proceed, among other things.[653]

In October 2019, an EC Staff Member Liaison began drafting written CC guidelines. Though these have been updated several times, they have never been finalized or formally adopted by the CC. During the orientation for new CC members in 2021, the EC Staff Member Liaison distributed the fifth version, which is the most recent draft.[654]

The lack of set guidelines created a number of avoidable problems, which are discussed in more detail in the report sections below. For example, the failure to set out standard timelines led to a lack of urgency in moving the process forward. In some instances, there were lengthy delays in acknowledging the receipt of submissions,[655] collecting relevant information, and undertaking committee review, among other things. Also, without a standard protocol for communicating with submitters, submitters were sometimes left in the dark about the status of their submissions, leading them to feel ignored.[656] Like other committees, the CC would benefit from formal, written guidance, so that all participants in the CC process, including the CC members themselves, understand their role, timelines, and responsibilities in order to ensure a more effective and transparent review.

[653] Interview Memorandum for CC Member 11; *see also* Email exchange between CC Member 1, Augie Boto and Ronnie Floyd to discuss the CC procedures. https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EYg2X6h0XC9KkJHONGeGXakB5vMdyK6OtJAIBifSNvwUVg?e=oxpymW, Transcript from first CC meeting https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EVg2eFYAXdJLrtcFIL24hfQBGhIOqLA7yy5UGgVFkelbUw?e=vNKtXx

[654] Interview Memorandum of EC Staff Liaison 1; *see also* Draft CC Policies. https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EahGEOkaN6NFiMdJQW6hBdABFYXJMKORYAfGNjWtWqY7xA?e=x0TfZq.

[655] Confirmation of receipt letters were sent to submitters 10 days or longer from the date of receipt in the following submissions: Church 13, Church 20, Church 31, and Church 32.

[656] Submitters reached out to the CC for updates because of the CC's lack of communication in the following submissions: Church 9, Church 15, Church 21, and Church 27.

### 2. Mission and Objectives of the CC

The lack of a written policies and procedures likely contributed to the general sentiment that the mission and objectives of the CC were not adequately explained to prospective committee members,[657] staff, survivors, or the SBC community generally. Our audit revealed that there was confusion within and among these groups, which in many cases left the latter two groups with unrealistic expectations as to the possible outcomes that could be achieved through a CC submission. For example, the ERLC received multiple reports of abuse following the Caring Well conference it had conducted in October 2019. ERLC staff explained to us that when calls came in, they would relay to those reporting abuse that the CC's submission process had not been finalized yet, but when it did that the ERLC would notify them of the process. However, even after the CC submission webpage launched in December 2019, the CC process was still not completely clear to the ERLC staff.[658]

According to an EC Staff Member Liaison, when the CC standing committee was presented at the June 2019 Convention, the gravity of the sexual abuse issue was emphasized in order for the Messengers to understand the need for the CC and to ultimately vote for it. The CC was however presented without full disclosure of the details of its purpose and authority. This created high expectations and false hope for survivors.[659] According to another EC Staff Member Liaison, survivors felt disappointed with the CC because they believed the CC would bring them justice. However, as that EC Staff Member Liaison noted, the CC's purpose did not involve a judgment of the culpability of an accused individual. Rather, the CC was charged with reviewing the actions taken, or not taken, by an SBC Church with regard to allegations of sexual abuse.[660]

---

[657] Of the current and former CC members that we interviewed, 13 told us that they did not understand the purpose of the CC before coming on as a member. Furthermore, 13 believed that the Southern Baptist community, survivors, and the general public likewise did not understand the CC's purpose, and that it was not communicated well to them.

[658] Interview Memoranda of ERLC Staff Members 1, 2, and 3.

[659] Interview Memorandum of EC Staff Liaison 2.

[660] Interview Memorandum of EC Staff Liaison 1.

Further, even if a church was found to have mishandled sexual abuse allegations in the past, Bylaw 8 permits the CC to consider current leadership and policies at the church, which may have changed substantially from the time of the allegations, to determine if a church currently is in friendly cooperation.[661]

This confusion ultimately led to dissatisfaction with not only the CC, but with the SBC EC itself as survivors and advocates felt as if they were once again being re-traumatized and treated poorly.[662] A CC member described it as a "lose-lose situation" where survivors and advocates could not be satisfied because they desired justice and for the abuser to be held responsible, but the CC and EC did not have the authority to hold individuals accountable for their past actions.[663]

Based on our audit as well as best practices in this area, developing a clear written statement of the mission and objectives of the CC is essential. This statement should be posted on the SBC website, the webpage through which submissions are made, and any other SBC-sponsored materials relating to sexual abuse.

### 3. Membership

Our audit revealed some issues related to the composition of CC membership. First, we learned that CC members often did not have a full understanding of their expected duties and responsibilities before they agreed to take on the Committee position. During our interviews, we were told that prospective committee members did not receive a written description of, or relevant information about, a CC member's role. Of the 14 current and former CC members we interviewed, nine told us they did not feel equipped or prepared to take on CC membership. Eleven members indicated that the duties, responsibilities,

---

661 Draft CC Policies state the CC "may only consider churches currently in cooperation with the Convention."
https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EahGEOkaN6NFiMdJQW6hBdABFYXJMKORYAfGNjWtWqY7xA?e=x0TfZq.
662 CC Witness 9 replied to the CC's email notifying her of their decision on Church 11, to close without recommendation. 2021.05.27 Email from CC Witness 9.pdf
663 Interview Memoranda for CC Members 7, 8 and 11.

and time commitment were more than they anticipated.[664] One person told us that he/she may not have agreed to the nomination, had he/she understood the scope of duties at the time of the nomination.[665]

Prospective committee members should be fully informed about the nature of the CC's work, and the time commitment involved. As discussed in more detail below, the CC generally meets once per month, and members also must review submissions and related materials. In addition, CC members are sometimes assigned tasks, such as following up with a church or conducting research.[666] If CC members have other commitments and insufficient time to devote to the CC, it could lead to delays in the review process.[667] An EC Staff Member Liaison noted that every time there is a new EC Chair or Registration Secretary, the membership of the CC changes, resulting in the need for additional onboarding.[668]

There also were no policies in place regarding the composition of the Committee, beyond the number of members specified in the Bylaws. Neither Bylaw 8 or any other document sets forth criteria to be used for selecting potential nominees. An EC Staff Member Liaison and multiple CC members were unaware of any specific reasons why persons were selected to be on the CC.

In analyzing the inaugural CC, the membership was comprised of the following: 2 female pastor's wives, 2 female laypersons, 5 male pastors and 1 African American.[669] Two of the pastors believed they were nominated by the Committee on Nominations because they had decades of SBC ministry and leadership experience, so they understood the

---

[664]Interview Memoranda of CC Members.
https://solutionpointintl.sharepoint.com/:f:/s/SBCECInvestigation/EvZV5cfEcyhNqG7J2lgNMwcBT4HAL1CEcr7xT4I1j-_rrQ?e=JjR7gZ
[665]Interview Memorandum of CC Member 13.
[666] Draft CC Policies.
https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EahGEOkaN6NFiMdJQW6hBdABFYXJMKORYAfGNjWtWqY7xA?e=x0TfZq.
[667] Interview Memorandum of CC Member 10.
[668] Interview Memorandum of EC Staff Liaison 1.
[669] The CC receives submissions concerning racial discrimination in churches.

Baptist polity and theology. One of the EC nominees believed she was nominated because she was a former member of the Bylaws Work Group. One of the Committee on Nominations nominees believed she was nominated because the Chairman knew she had a history of being a strong advocate.

In analyzing the second CC, there were 2 new members. The newly elected EC Chairman and Registration Secretary replaced the previous EC Chairman and Registration Secretary. The racial makeup of the second CC did not change, but the gender balance changed to 3 female and 6 male members.

In analyzing the third and current CC, there were three new members. Two of the members were nominated by the Committee on Nominations, and one new member was a former EC Trustee nominated by the EC. By the second meeting of the CC, two members resigned due to health issues and permanent work obligations that would take away time available for the CC role. There are currently only 7 members on the committee. The racial makeup of the current CC did not change, but the gender balance changed to 2 female and 5 male members.

An email during the discussions surrounding the formation of the CC in May 2019 shows that the EC General Counsel was concerned about the selection of the three CC members that the EC could appoint. There is an indication that they needed to be strategic on whom the EC should choose, not based on the trauma-informed experience or theological experience that a member may have. Outside counsel opined that: "I would hope the Nominations Committee will not be lobbied by ERLC or the President in re that committee's task to nominate persons. Getting the Credentials Committee off on the right foot is critical."[670]

Of the CC members with whom we spoke, 12 thought that pastors should be included on the CC, and 13 thought there should be a gender balance. Six also suggested that a

[670]https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EQ4I9wwMJvVIpy2mvKwY7NMB7uMPbzWPkhW69xnJHxdb9w?e=ZzIWJX

survivor should sit on the CC.[671] We also believe that a diverse membership can contribute to a more effective committee. Selecting members who come from a variety of backgrounds, with differing types of experience and points of view, can lead to a more robust review process.

### 4. Training

We believe that both CC members and EC Staff Member Liaisons would benefit from training. Until recently in September 2021, new CC members did not receive any formal onboarding, orientation, or training regarding their duties and responsibilities.[672] Greg Addison emailed the EC counsels and Dr. Floyd and stated that the new CC members "need to be oriented before that first CC meeting [on September 20, 2021]. Also, it would be a terrible look for us to not have created an orientation process when we respond to the independent review."[673] Further, CC members did not receive any specialized training in sexual abuse matters or how to interact with survivors in a trauma-informed manner.[674]

Based on our interviews, these types of trainings are critical to give the CC members insight into the effects of abuse and understanding on how to extend trauma-informed care through communications with survivors and submitters of sensitive information. Of the 13 CC members we asked, twelve felt that the onboarding process and training were inadequate during the audit period and believed that CC members should receive trauma/sexual abuse training. In addition, multiple EC Staff Member Liaisons expressed that training would have been helpful for Liaisons and CC members in corresponding with survivors. According to an EC Staff Member Liaison, the EC attorneys wanted to deter the members from having direct conversations with submitters, survivors, and leaders at churches under inquiry because they could misspeak and possibly bring liability onto the

[671] Interview Memoranda of CC Members.
[672] In September 2021, a formal orientation for committee members was established.
[673]https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EQ_bcRXcC91Dki4y_cObQWUBu5VLOWP9dFOyuOIT36RZxw?e=jiSn6w
[674] Two CC members reported that they had prior trauma or sexual abuse training or experience outside of their work on the CC.

EC.[675] One Staff Member Liaison wished they had been given the opportunity to attend the Caring Well training, as it would have helped her to formulate correspondence to survivors that conveyed more sensitivity and awareness of trauma. It was hard for the EC Staff Member Liaison to read the submissions, feel grief, but not know how to process and respond properly to submitters.[676]

CC Witness 12, who was a speaker at the Caring Well conference and an expert in this field, noted that the CC did not put a high priority on securing training resources for the CC members and EC staff liaisons. Even with Caring Well conference experts who would be willing to be advisors at their disposable, the CC did not proactively attempt to get assistance, expertise, or training, even when it was repeatedly offered to them pro bono. Instead, the CC relied on the advice of GJP, who were not trauma-informed or experts in sexual abuse issues.[677]

EC Staff Member Liaisons and CC members acknowledged that their lack of training did cause them to take missteps in correspondence with submitters and survivors, and that they made improvements as they learned from mistakes. A CC member suggested that there should be a professional on the EC staff who is trauma-informed, trained, and equipped to speak to survivors.

CC members were deeply affected by their service on the Committee. A former CC Chair noted that nothing has affected them more than being on the CC. Other CC members noted that the CC was the most difficult role they have had. CC members who are respected for their long-standing commitment to ministry indicated that they did not think that one could function on the CC for very long, and in fact, many CC members have not served for more than two years.

---

675 Interview Memorandum of EC Staff Liaison 1.
676 *Id.*
677 https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EUoYOIYA-DJBmACbBx3ojD4BJKNeYhyCvlYj5l6r2e4Tlg?e=DRmWQV.

### 5. Meetings

The cadence of CC meetings must be sufficiently frequent so that reviews of allegations can progress in a timely manner and so that urgent matters can receive appropriate attention. This cadence should be transparent to submitters so that they can be assured that the CC is taking action on their submissions.

Bylaw 8 does not set a meeting cadence and provides only that the CC shall meet on the call of its Chair or of any two of its members after reasonable notice of the time and place for the meeting. The unofficial CC policies and procedures document states that "When practical, the Committee will meet once a month."

In practice, during the audit period the CC typically met once per month over Zoom to discuss CC matters and submissions, although there were a few months the CC did not meet because of various personal/professional/organization obligations that did not allow for a quorum of CC members to be present to make decisions.[678] An EC Staff Member Liaison noted that every time there is a new EC Chair or Registration Chair, the membership of the CC changes, resulting in the need for additional onboarding.[679]

The CC has held a few in-person meetings, COVID permitting, in the months of the EC meetings in Nashville. The CC members indicated that the monthly meetings are generally 2 to 3 hours, and the in-person meetings are generally 4 hours depending on the number of submissions to discuss.

### 6. Staff Support

The CC needs sufficiently trained staff to function effectively. When the CC was formed in June 2019, there were five EC staff members assigned to assist the CC as it was beginning to function as a standing committee. Since then, however, the CC has been

---

[678]https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EahGEOkaN6NFiMdJQW6hBdABFYXJMKORYAfGNjWtWqY7xA?e=37YfzT.
[679] Interview Memorandum of EC Staff Liaison 1.

supported by only one assigned EC Staff Member Liaison, who handles all the administrative functions of the CC.

The current and former CC members uniformly stated that the staff member who has served long-term as EC Staff Member Liaison has done an incredible job in this challenging role and that she has been a critical part of refining the CC process. However, this EC Staff Member Liaison is not dedicated solely to the CC but instead is also responsible for other EC functions and tasks. The EC Staff Member Liaisons have explained to us that on some occasions they had to postpone their work for the CC in order to complete other projects. Current and former CC members also commended another EC Staff Member Liaison, who had trauma-informed training and who gave the CC members guidance on how to communicate with and care for survivors.

Of the CC members we interviewed, seven believed that more staff would be useful to support the CC. Having additional staff who can step in as needed would alleviate the pressure on the one assigned EC Staff Member Liaison and allow for the uninterrupted flow of work. In addition, it would provide for a smoother transition in the event that the EC Staff Member Liaison leaves that role or is absent for any length of time.

Nine CC members also suggested that the CC would benefit from subject matter expertise on sexual abuse matters. Many CC members noted that the EC Staff Member Liaison who assisted the CC from October 2020 to June 2021 was a valuable resource and advisor because that Liaison had completed sexual abuse and trauma training. We recommend that, going forward, the EC Staff Member Liaisons receive such training if they are assigned to the CC.

### 7. Funding

In addition to sufficiently trained staff support, the CC needs adequate funding. While the SBC overwhelmingly approved the formation of the CC, no funding was allocated for it. In 2019, there was no budget line for the CC. Recently, the SBC Interim CFO prepared

an estimate indicating that the current average annual cost for the CC was in the range of $80,000 to $100,000, not including staff salaries, website costs, or conference call fees.[680]

Unlike the other SBC standing committees, the CC requires continuous EC staff support throughout the year. Depending on the number of submissions received, the workflow can be demanding some weeks with heavy information gathering and administrative work. If a third-party advisor is brought in to assist the CC, as we recommend below, funding will need to be allocated for this.[681] Funding will also need to be allocated for training for the CC members and EC Staff Member Liaisons.

### 8. Submission Process/Submission Webpage

While the CC submission webpage may be a useful tool to receive submissions, its functionality could be improved. For example, the submitter currently does not receive any automatically-generated email acknowledgment when a submission is transmitted through the webpage into the portal. Currently, the only instantaneous acknowledgement is a small sentence on the home page, described above, which can be easily overlooked.

Currently, the EC Staff Member Liaison manually creates a letter confirming receipt and emails it to the submitter. If the EC Staff Member Liaison is busy with other work responsibilities, it may take days or weeks before the letter is sent.[682] We reviewed documentation for 25 submissions that were transmitted through the CC webpage. The average CC response time was approximately seven days, with some letters taking much less time or much longer. For example, on two occasions letters of receipt were sent out on the same day the submission was received; on one occasion, a submitter did not

680 https://solutionpointintl.sharepoint.com/:u:/s/SBCECInvestigation/ERD5aTJkGcRDnTna7R7VT0QBr-lOycu12Bl-QH_HZ3EMdw?e=fwkQXa.

681 This was proposed by CC Member 3 to EC leadership in January 2021. At the time, Dr. Floyd considered the proposal "out of bounds over the bylaws establishing the Credentials Committee." https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EfAMh5tW0KZLvcwjGWIe8XMBrIqq9hWhisPn_ahPWm5-oQ?e=8uYPYi.

682 Interview Memorandum of EC Staff Liaison 1.

receive a receipt letter until over a month had passed. On that occasion, the initial submission was received on August 21, 2021. The EC Staff Member Liaison drafted a confirmation email which asked the submitter to provide additional information in writing as the submission was not detailed. The EC Staff Member Liaison sent the draft email to Greg Addison for approval on September 1, 2021. On September 7, 2021, Greg Addison advised that the draft was being reviewed by legal counsel. After not getting any follow up, the EC Staff Member Liaison followed up directly with legal counsel on September 29, 2021, who said that he had never received the draft to review from Greg Addison. Ultimately, legal counsel gave approval on the draft confirmation letter, and the confirmation of receipt letter was sent out to the submitter on October 1, 2021.[683]

Upgrading the CC submissions webpage and portal to generate automatic email receipts would provide a clear audit trail for submissions and would give assurance to submitters that their abuse allegations were received.[684] It could also indicate when a submission did not go through properly. As we detailed above in our description of the portal, on two occasions the CC did not appear to receive survivors' submissions.[685] One of the survivors did not become aware of this malfunction until she interviewed with Guidepost as part of this investigation.[686] A third submitter lost her first two drafts because the website appeared to time out.[687]

Another malfunction caused delays in support call referrals. As described in more detail below, when making a submission related to sexual abuse, submitters could select an option for a counseling center, the Babb Center, to contact them. The center was supposed to be automatically notified of the referral through the website so it could reach

683 Church 33; Emails between EC Staff Liaison 1, Greg Addison and Jaime Jordan; https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/Ed_r8HAOUGJOt9TJk0iylvgBC2FVI6BuVZquGQaZc4DVpw?e=eFExWD.

684 According to an EC Staff Liaison, the Liaison had suggested using automatic receipts, but some CC members viewed them as too impersonal and inconsiderate toward survivors. In our view, the automatic receipt would provide immediate assurance, and the automatic message could indicate that a more comprehensive response from the CC would be forthcoming.

685 Interview Memoranda of CC Witnesses 2 and 8.

686 Interview Memorandum of CC Witness 2.

687 CC Witness 3's email to CC Witness 1, when she tried to submit a reconsideration request on the CC submission website. Fwd_copy of request for appeal.msg.

out to the submitter and provide resources for reporting or counseling in the submitter's local area.

An EC Staff Member Liaison eventually learned through emails and discussions that there was a malfunction that caused a delay in the center contacting submitters.[688] As of the end of 2021, the process has been changed so that the EC Staff Member Liaison now receives the selections for referrals, and the Liaison personally emails those selections to the center rather than relying on the submission webpage and portal. Now when the Babb Center Director receives the email from the EC Staff Member Liaison, the Babb Center sends an email receipt confirmation back and will also send a confirmation email to the submitter or survivor that requested the contact. Then once the contact is made with the submitter or survivor, the Babb Center sends an update email to the CC[689]

This malfunction should be corrected. In addition, the submission webpage should be upgraded to ensure a better user experience. Witnesses have reported to us that the webpage was hard to navigate and was not user friendly. One ERLC staff member went onto the webpage to do a test run in order to be able to explain the process to submitters or survivors, but she thought the form was overwhelming and not survivor focused.[690]

In the Fall of 2019, the CC asked the Babb Center Director and another counseling professional to review and provide recommendations on the CC submission website. The CC incorporated some of their suggestions before launching the final version in December 2019. An overarching theme of the counseling professionals' comments was that that the language on the submission form was very technical and relied heavily on the formal language of the organization (e.g., SBC Constitution, friendly cooperation). The benefit of this writing style is the form uses the exact language from the organization's key documentation. The barrier is that the technical language is not commonly used by the average person and can be misunderstood and/or become a barrier to completion of

[688]https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/ETiZGAIN6GtBmtsAUzr0QiwB8bv0IKP_Zs2ajgkzXqR9hg?e=u2pXRF.
[689]https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EbTurnuAhKtOhh7DVa0J7WABWv9EmfzFNXF5HSXuofa_Yw?e=DnWPkF.
[690]Interview Memorandum of ERLC Staff 1.

the submission form. There is also the risk of the submitter not fully understanding the true purpose of the committee, resulting in unmet/unrealistic expectations."[691]

On December 3, 2019, EC Staff Liaison 3 sent a draft of the CC submissions website to CC Witness 12, an expert in this field, for review and feedback. CC Witness 12 provided feedback to the CC on December 30, 2019, with edits for the language to be more focused on survivor care and not focused on church protections.[692] CC Witness 12 also drafted CC standards and criteria for determining if a church is not in friendly cooperation, and also offered to connect the CC with well-respected trauma-informed care experts who had decades of experience working with survivors of clergy abuse.[693] The CC did not consider any recommendations provided by the CC Witness 12 or accept help from any other experts in this field.

We conducted our own test submission on the CC webpage on April 11, 2022, and observed the following:

- Neither the CC Submission portal, nor any information about it, can be found on the main SBC.net homepage; rather, users must know how to navigate to a separate CC page in order to access it.
- A hyperlink to the SBC's previously adopted resolutions, which was featured on the main CC landing page, was not functioning.
- The CC's Statement of Assignment, which contains valuable information for submitters, is written in a tiny font and is rather lengthy, which may lead readers to skip over it.
- On the second page of the submission website, there is an option for submitters to download a PDF of the submission form if they prefer not to use the portal. The

[691]https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EdgsblwNJ-tDvNi1M-BfbxwBJ6ZgrFha6_Rz9VPJjl-YPA?e=0SUDCS.
[692]https://solutionpointintl.sharepoint.com/:u:/s/SBCECInvestigation/EcQNVGmq8JJltaZXWtrZ7oUBbqTTDjA7fBCPxCCelPzW8Q?e=GZY8G8; https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EXTDDokfopxMtt0UMiUj-4kB_DNV4YhuYTwS_7YPlenyxg?e=MLbKz3.
[693]https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EfaKryFb-lJDiusB97Kpx5YBd44VefAY9z29u8GqWSKy1A?e=yW45bK.

questions on the PDF form match the ones on the website, but there is significantly more explanatory verbiage on the website than the PDF form. The information on both submission options should be identical.

- On the Page 4 of the submission form, for the Question, "To your knowledge, has a law been violated?" when the submitter clicks Yes or No, and then puts the cursor on the next field to complete the rest of the form, the Yes or No fields become unpopulated. We tested this on multiple browsers and encountered the same issue.
- The end of the submission form states that: "You will receive an email confirmation that the form was received. If you do not receive this confirmation, please check you spam or junk folder in your email account." Submitters may expect the email confirmation to be instantaneous and may be confused or anxious when no email is forthcoming. As discussed above, the email confirmation is not automatic, and it often takes multiple days for the manual email to be sent.
- Once the form is submitted, the submitter is redirected to the CC home page. The home page now includes a sentence, appended in a small font after three paragraphs of text, with the following message: "Thanks for contacting us! We will get in touch with you shortly." This acknowledgement sentence, placed in small font in the middle of the page, easily could be overlooked by submitters which may cause unnecessary anxiety and stress, particularly after they may have spent a long time writing their report of abuse, and not knowing if their written responses were recorded successfully.

In addition to fixing the webpage issues, the CC should look to best practices for internal inquiries in order to explore submission options that permit survivors, whistleblowers, and others to report anonymously. The lack of an anonymous reporting option, such as a phone, email, or online tip line, is a discouragement to those who may wish to maintain privacy and impedes the CC's ability to collect all relevant information.

### 9. Timeliness of Reviews

It is clear from our audit that there were many issues surrounding the timeliness of the reviews. This combined with a lack of communication with the submitter was partially the cause of the negative perception of the CC by survivors. During our interviews, eight CC members said that delayed timeframes were an issue when making decisions. The causes of the delays were a combination of things, including:

- Time added for drafting letters of receipt/inquiry/decisions and the back-and-forth time needed for reviews between CC members and legal counsel[694]
- Delayed reviews (put off until the next monthly meeting) due to extended information gathering[695]
- Extensions granted for SBC Churches to provide requested information[696]
- Churches not responding to the inquiries in a timely manner[697]
- Correspondence delays with state and local association representatives[698]
- Reviews that were put on hold if there were legal proceedings[699]
- The fact that the CC recommendations could only be heard/resolved by the SBC EC three times per year[700]
- CC members did not have any abuse or trauma-informed training, so it made sense that they did not feel comfortable to rush these important decisions.[701]

Further compounding the delays in 2019 and 2020 were factors such as a backlog of submissions due to a high volume of initial submissions; a steep learning curve needed to develop the CC template letters to churches and submitters; and the lack of defined standards and policies about how the process should work; and in 2020 the COVID-19

[694] Church 15.
[695] Church 8.
[696] Church 5.
[697] Church 19.
[698] Church 8, Church 21, and Church 24.
[699] Church 9 and Church 12.
[700] Church 8 and Church 19.
[701] Interview Memoranda of CC Members 9 and 10; Interview Memorandum of EC Staff Liaison 1.

pandemic affecting the CC's ability to meet. CC members indicated that much of the time during the 2019 meetings was spent establishing blueprints for the procedures.[702] Some CC members indicated that they sometimes did not have enough time to read the full submission reports, noting that the CC is comprised mainly of volunteers who also have other full-time commitments.[703]

For example, in one instance, the church received the inquiry letter in November 2020 and responded the following month. The CC discussed the church at the January 2021 meeting, and the CC decided additional follow up was necessary. There was no further activity for approximately 8 months, in part because the CC was waiting for information from the submitter but also because the April meeting was cancelled, and the CC did not engage in much work over the summer months due to the Annual Convention and transitions with the Committee.[704]

Submission processing patterns show that if a submission goes under inquiry in the spring, it is likely it will take longer to process because the CC does not meet regularly to make decisions during the summer months due to the Annual Convention and orientation/onboarding of new members.[705]

Delays could be compounded if a church under inquiry did not respond to the CC promptly.[706] For example, one church did not respond to the first inquiry letter and the CC had to follow up.[707] In another instance, a church did not respond for four months.[708] A submission could also be paused if legal proceedings were underway. In one case, legal review was postponed due to COVID-19 and it took the CC approximately 24 months to process for that reason. The submitter continued to reach out to the CC for updates. In

---

[702] Interview Memoranda of CC Members 1, 8, and 12.
[703] Interview Memoranda of CC Members 5, 10, and 13.
[704] Church 21.
[705] Church 19, Church 31, and Church 32.
[706] Church 5.
[707] Church 3.
[708] Church 19.

another case that is still pending in legal review, the submission was received in December 2019, but is still in process.[709]

Even after the CC completed its own process and voted to recommend disfellowship, Bylaw 8 only permits the CC to present that recommendation at the annual Convention, or at the SBC EC meetings in February, June, or September. The gap between the September to February meetings is almost half of a year.

We have reviewed all of the sexual abuse-related submission to the CC during the audit time period. Below are some of our observations of the CC's timeframes:

| **Stages of CC Process** | **Average Time Taken** |
|---|---|
| Submission to sending receipt confirmation to submitter | **6.7 days** |
| Submission to sending inquiry letter to church | **2.5 months** |
| CC to decide to "Decline Further Consideration" | **3 months** |
| CC to decide to "Close Without Recommendation | **8.6 months** |
| CC to decide to "Recommend" a submission to EC | **10.6 months** |

The shortest time that the CC took to process a sexual abuse inquiry was 3 months.[710] The longest time that the CC took to process a sexual abuse inquiry was 29 months, due to pending legal proceedings.[711] The average time the CC took to process sexual abuse inquiries was 9.6 months.

In contrast to how long it took the CC to make final recommendations on sexual abuse submissions and for the EC to disfellowship the church, the EC moved quickly to recommend disfellowship of the DC Baptist Convention ("DCBC"), which was associated

[709] The submission for Church 12 was received by the CC on December 28, 2019, but is still pending because of legal proceedings. The submission for Church 9 was received by the CC on December 4, 2019, but due to the legal proceedings was not decided on for 24 months. https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EXP6oCGWH4xGtvGTDiUePqsBBnvvnmUTHKcZdlutyqPjOg?e=24FLZd.
[710] Church 20.
[711] Church 12.

with a church having homosexual pastors. In January 2017, Calvary Baptist Church hired a married lesbian couple as co-pastors.[712] Calvary had disassociated from the SBC in the early 2000s and was only associated with DCBC. In February 2017, just one month after the EC's discovery of Calvary's leadership, Mr. Boto called CC Witness 10 and expressed that if DCBC did not disfellowship Calvary, then the EC would expel DCBC from the SBC.[713] Witness 10 viewed this as an ultimatum and a violation of DCBC's autonomy as Calvary was not an SBC church. DCBC's Board took time to discuss what they would do, and then the EC asked for the DCBC Executive Director to attend the February 2018 EC meeting. The EC decided on February 20, 2018, to expel DCBC from the SBC. The EC adopted a recommendation granting the DCBC 90 days to secure the removal of any churches from its fellowship that have demonstrated a faith or practice affirming, approving, or endorsing homosexual behavior.[714] DCBC did not disfellowship Calvary, so the EC ended its partnership with DCBC on May 21, 2018. The EC took the issue of DCBC expulsion to the 2018 Annual meeting, and on June 21, 2018, the SBC officially severed ties with DCBC.[715]

### 10. Communications with Survivors and Churches

#### a. In General

Another conclusion reached during our audit was that communications with survivors, submitters, and churches did not follow best practices. This was largely due to the lack of written policies and procedures governing all communications; thus, there was no consistent practice of when, how, and what types of communications would be made with these parties.

---

[712] https://www.christiantoday.com/article/southern-baptists-part-ways-with-d-c-baptist-convention-over-hiring-of-lesbian-pastors/129358.htm
[713] Interview Memorandum of CC Witness 10.
https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/ETkNnXjfAyhDtfCMxewQ_yUBaXQ8JQEELkONb19i6vIe0w?e=SjWT3I
[714] https://www.baptistpress.com/resource-library/news/sbc-ends-relationship-with-dc-convention/
[715] https://www.sbc.net/wp-content/uploads/2020/07/2018SBCAnnual.pdf

We note that, according to an EC Staff Member Liaison, the Guenther firm advised against the CC making any phone calls with churches and survivors because CC members lacked training and might make statements that could draw liability to the EC.[716] The CC members were also hesitant to make calls for fear of encountering backlash from the survivors and churches.[717] Ultimately, CC members did make such calls.[718]

During our interviews, a majority of current and former CC members reported that communications with SBC churches and survivors were not handled well. For example, one former CC Chair reported that when the CC was first created in June 2019, records of phone calls to SBC churches or submitters were not consistently kept. Sometimes CC members gave verbal updates on communications or information gathered at the CC meeting, and the details were not complete.[719] There is now a process governing such record-keeping; CC members are expected to document the contact with an SBC church or submitter and email it to the CC's designated email address for placement in the church's file.[720]

In addition, CC members many times felt uncomfortable or unprepared to handle the communications. The CC Chair requested that the members volunteer to contact the church staff or the submitter. CC members and EC staff liaisons knew that the conversations with the church leadership would be difficult as well because they were giving notice that the church was going to be put under inquiry. The CC members had memories of the backlash from the Bylaws Workgroup inquiries of the 10 churches from February 2019. Pastors at three churches that received inquiry letters from the CC in December 2019 and January 2020 expressed that they did not appreciate receiving the letters.[721] CC members were concerned about this outreach due to lack of training

---

716 Interview Memorandum of EC Staff Liaison 1.
717 Interview Memoranda of CC Witness 11 and EC Staff Liaison 1.
718 Interview Memorandum of EC Staff Liaison 1.
719 Interview Memorandum of CC Member 12.
720 Draft CC Policies. https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EahGEOkaN6NFiMdJQW6hBdABFYXJMKORYAfGNjWtWqY7xA?e=x0TfZq.
721 Church 5, Church 11, and Church 12.

regarding sexual abuse matters and the fear of saying something inadvertently to bring more pain or trauma to the survivor, as well as concerns regarding social media backlash. Even into the second year of the CC's establishment, CC members asked to get training from the Babb Center on how they should handle a phone call with submitters so the EC Staff Member Liaison tried to coordinate a Zoom meeting in March 2021.[722]

We did note, however, that there was a difference in how the CC communicated with the SBC Churches and the submitters and/or survivors, which is discussed further below.

b. SBC Churches

Initially the CC did not call churches before the CC sent them the inquiry letters. Some pastors complained about that practice, with one noting that the language in the letters seemed against the Baptist polity and had a threatening tone.[723] The CC then changed its protocols to first call churches to inform them of the inquiry before sending the letter.

If a church wanted an update on the CC's process, the church would get an email response or a phone call from a CC member. Because the majority of the CC members were pastors, they felt more comfortable having a conversation with a fellow pastor than with a survivor.[724]

---

[722]https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/ETzu0d77UUxJsQIMlRZu89kBm9i1iU MPChsP6PMG0ULLww?e=ktle4l

[723] Church 11 Pastor was angry about the accusatory nature of the inquiry letter and said that they would withhold their CP giving to SBC.
https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EbeXwlOrcE9DuTbMYNy6L6UBMVdum 8LHZfJbXTLhyO9KPw?e=thuhYk
https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EZPujfnC_JBCrrw1FiCNz_wBq8Nl5wO cFbza4gqU7U2Xeg?e=lt0cPe
Church 5 Pastor was also angry.
https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EetRXrm9aGBAurT9EFQiAK4Bpi6-haVk4FjtXuR8gNBkXw?e=bMWv1A

[724] Interview Memorandum of CC Member 8.

c. Submitters/survivors

Information received from submitters and survivors indicates that communication was inconsistent, sparse, and lacked transparency, even if that was not the CC's intention. CC Witness 11, who completed a submission on behalf of a survivor stated that she emailed the CC Chair and sent multiple emails to the CC for updates but received no responses.[725]

One of the early submissions highlights these communication deficiencies. The survivor sent emails to the CC before the submission webpage was open, and the EC Staff Member Liaison replied to the emails. Without direction or training, some of the language of the emails came across as sterile and uncaring to the survivor and seemed overly focused on the Bylaws. There were also some administrative hurdles with misspelled email addresses in responses,[726] which caused a delay in the early correspondence. The survivor made a formal submission in January 2020, but there are no records of any email updates being sent to the survivor for the following 9 months.[727]

In October 2020, the CC assigned a female CC member to call the survivor to share the decision that they would not be recommending the church for disfellowship. Based on information shared in multiple CC member interviews,[728] a CC member tried to make contact, but when the CC did not hear from the survivor, they sent her the decision letter in November 2020. The survivor states that she never received any prior calls or emails.

CC members and EC Staff Member Liaisons acknowledge that the communication with the survivor was flawed and that because they did not have training, they made mistakes.

---

[725]https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EcgEe91EN_FAhcglO6jdGs8Bzi83FxH65z0kx4KqRPZO8Q?e=ekiqAJ

[726] Interview Memorandum of CC Witness 1.

[727] *Id.*

[728] Interview Memoranda of CC Members 1, 7, and 10; Interview Memoranda of EC Staff Liaisons 1 and 2.

They wished that they would have conducted additional follow-up and attempted to reach out to the survivor in other ways to explain the decision before she received the letter.[729]

We provide a few other examples of the lack of timely communication:

- In an inquiry inherited from the Bylaws Work Group, a whistleblower provided information, periodically sent emails asking for an update, and emailed some CC members directly. The CC Chair also had a phone call with the whistleblower. Ultimately, the CC decided to close the inquiry without recommendation in February 2020 but never informed the whistleblower of that fact. When we interviewed the whistleblower in February 2022, he was still not aware of the CC's decision and assumed it was still pending.[730]

- An inquiry was paused due to lengthy legal proceedings that were impacted by Covid delays. The CC's review ultimately lasted 24 months. The submitter sent multiple emails asking for updates, and in May 2020 an EC Staff Member Liaison called the submitter to explain that the submission was on hold pending the legal process. Although the submitter emailed the CC for an update a month later, there are no records of correspondence with the submitter for the next 19 months until January 2022. At that time, a CC member called the submitter to inform them that, after finding the legal case had been dismissed, the CC conducted further inquiry and decided to close the submission without recommendation.[731]

- The CC misunderstood and believed that the survivor was going to send additional documents. The CC did not contact the submitter for 5 months, and the survivor finally asked for a follow-up. The submitter stated that a CC member had indicated that a CC member would call her, but no one did. A CC member then did call the

[729] Interview Memoranda of CC Member 7 and EC Staff Liaison 1.
[730] Interview Memorandum of Brent Detwiler.
[731] Church 9.

submitter, but after that call there was no contact for 4 months until the survivor again reached out.[732]

A EC Staff Member Liaison, who had spoken to multiple survivors, acknowledged that a critical weakness of the CC was that there was no regular communication with survivors/submitters to inform them of updates on their process, and to give the clear understanding of the timelines of decision making.[733] Records from each church under inquiry show that in every situation, the number of correspondences the CC had with the church exceeded the number of correspondences the CC had with the submitter. These survivors had already gone through years of feeling that they were not heard or understood, so the CC's lack of consistent communication added more stress and anxiety.

Early submitters commented that the confirmation of receipt letters and decision letters from the CC seemed sterile, focusing on the Bylaws and not focusing on trauma-informed care for the survivors.[734] The wording in letters has developed over the years, and for recent submissions, a CC member has called the submitter if it is a sensitive decision that will be taken hard so that they do not simply receive the decision letter.[735]

The CC made an effort to connect submitters with an individual trained to assist victims of abuse, including information about abuse recovery and available resources in their local area. When making a submission, a submitter could select an option to receive a support call.

The support calls were provided by the Babb Center, a counseling center that is part of the First Baptist Church in Hendersonville, Tennessee. CC members did hear positive feedback on the Babb Center services and were not aware of any negative experiences from submitters. However, there was no formal contract for services between the Babb

[732] Church 21.
[733] Interview Memorandum of EC Staff Liaison 2.
[734] Interview Memorandum of CC Witness 1.
[735] Church 24.

Center and the EC. Essentially the Babb Center agreed to take on a number of calls for no charge, with a fee for any calls in excess of that number.[736] The Babb Center never received enough requests to have to charge the EC.[737]

This type of "no charge" arrangement can be problematic because there is the potential that a counseling service would not treat these "free" calls with the same time and attention as its regular work. While we are not suggesting that the Babb Center in any way provided a lesser experience to submitters, this is a potential downside of volunteer services of which the CC should be aware. Because there was no formal contract for services between the Babb Center and the EC, the CC did not feel they could exercise authority and accountability over the Babb Center. There was a period where the Babb Center was not responsive to the CC's emails and was not providing confirmation that submitters had been called, but due to the "no charge" arrangement, it was difficult to enforce any actions.

Email correspondences and interviews indicated that there were CC submission webpage and portal errors during the time of the SBC.net website platform change and upgrade, so some submitters who had indicated their desire to be contacted by the Babb Center were not contacted as the Babb Center did not receive the automatic notifications.[738] The EC Staff Member Liaison realized this error, and audited all the submissions that came in since the date of the website upgrade to verify if the submitter had desired a call from the Babb Center. The Liaison emailed the Babb Center directly to ensure that they reached out to the submitters that did not receive a call.

At the end of 2021, the CC decided to change the process to no longer have the website send automatic responses to the Babb Center when a submitter requests a call. In order to keep better track of the Babb Center's correspondence, when the submitter indicates

---

736 Interview Memoranda of EC Staff Liaisons 1 and 3.

737 Babb Director said that they do not get a lot of requests. https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EbTurnuAhKtOhh7DVa0J7WABWv9EmfzFNXF5HSXuofa_Yw?e=G5KaX2

738 https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/ETiZGAlN6GtBmtsAUzr0QiwB8bv0lKP_Zs2ajgkzXqR9hg?e=u2pXRF

they would like a call, the EC Staff Liaison sends an email to the Babb Center with the submitter's information and asks the Babb Center to email a confirmation of receipt and a confirmation email when they have made contact with the submitter.[739]

### 11. Information Gathering

Bylaw 8 and Southern Baptist polity prohibited the CC from conducting an "investigation" into the allegations set forth in any submission because it would violate Article IV of the Constitution. Instead, it was the understanding of the CC members that they were permitted only to request information from the submitter and church, and to research publicly-available information. When asked, the CC members with whom we spoke were split as to whether the CC should have the ability to investigate, or to have a third party investigate sexual abuse allegations in order to make informed decisions regarding whether an SBC Church should remain in friendly cooperation with the SBC.[740]

Some CC members and EC Staff Member Liaisons indicated that they wanted to care for the survivors, and they were frustrated by their limited scope as outlined in Bylaw 8.[741] Because they could only inquire by asking the church to voluntarily answer a few questions about the allegations, some CC members questioned the validity of the conclusions given the limited information available to the Committee to make the decision. Our audit revealed that when the submitter's information was contradicted by the church's inquiry response, no additional investigation would be permitted due to SBC polity. Thus, the church would continue to be considered in friendly cooperation with the Convention and would not be recommended to the EC under these circumstances.

Our audit revealed that the CC did not consider any information outside of the submitter, church, local and state association, and public resources, even when strong evidentiary

---

[739] https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EbTurnuAhKtOhh7DVa0J7WABWv9EmfzFNXF5HSXuofa_Yw?e=G5KaX2

[740] Split – 5 members said yes, 5 said no – 4 not discussed; Vocal about the need for investigation was CC Members 3, 9 and 11.

[741] Interview Memoranda of CC Members 5, 9, and 11.

information was offered to the CC. CC Witness 12 had been closely involved in the investigations into Church 4 before the Bylaws Work Group put it under inquiry, having spent hours meeting with both Church 4 leaders and survivors. In May 2019 while the submission was under review by the Bylaws Work Group, Dr. Bethancourt asked that the Bylaws Work Group not make a quick decision on Church 4, and said that CC Witness 12 had offered to speak to the Bylaws Work Group about the Witness' knowledge of the situation and was willing to facilitate having the survivors speak directly about their experiences.[742] The Bylaws Work Group, and later the CC after inheriting the submission, did not make any attempts to follow up with CC Witness 12 to assess the additional information.[743]

Some CC members and EC Staff Member Liaisons indicated there were instances when they questioned the truthfulness of the information provided by the SBC Church, but they could only consider the information available through the inquiry, which was essentially information provided by the church in defense/response to the inquiry questions.[744] The CC could not ask more questions of the submitter or witnesses from the church, as that would be considered an investigation and violating the autonomy of the church. If the church's response was sufficient for the CC members to form the opinion that the church currently was in friendly cooperation with the Convention according to Article III of the Constitution, then the submission would be closed without recommendation. The CC does not declare a church to be innocent or cleared, nor will the CC make any announcements to the EC or to the public regarding decisions to deem a submission "Closed Without Recommendation."

### 12. Standard of Review

---

742 https://solutionpointintl.sharepoint.com/:u:/s/SBCECInvestigation/Eamo-xx808RDhXSC8whYgU8Bj44qBWdVGQqcGWYa85-XZg?e=CAnVGY
743 https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EUoYOIYA-DJBmACbBx3ojD4BJKNeYhyCvlYj5l6r2e4Tlg?e=trNqd4
744 Churches 15, 9, and 21; Interview Memoranda of EC Staff Liaisons 1 and 2; Interview Memoranda of CC Members 3, 7, and 11.

Neither our interviews nor our document review revealed a written standard for assessing when a church's conduct toward sexual abuse allegations merits disfellowship. In December 2019, CC Witness 12 presented a written framework for CC standards and criteria for determining if a church is not in friendly cooperation, based on the exact language from previous SBC resolutions and bylaws related to sexual abuse. The CC did not make efforts to follow up with the subject matter expert or to establish their own set standards and criteria.[745]

Rather, the CC broadly considered a number of factors in making these determinations, including whether a church employed a convicted sex offender; allowed a convicted sex offender to work as a volunteer in contact with minors; and/or continued to employ a person who unlawfully concealed from law enforcement information regarding the sexual abuse of any person by an employee or volunteer of the church.

Because there was no set standard of review, the CC would gather information until the members could reach a consensus as to whether a church was in friendly cooperation.[746] A former CC Chair indicated that some cases were easier to determine than others. For example, the former CC Chair said that if the current pastor of the church is a registered sex offender, then the church would not be considered in friendly cooperation. On the other hand, if a youth pastor was accused of abuse, but the church had put in safeguards and the youth pastor was no longer there, then the church would be in friendly cooperation, even if the current senior leadership had not handled the original report of abuse properly.[747]

On occasions where the churches under inquiry also had been reported to the state or local association, a CC member or EC Staff Member Liaison typically called the state or

[745] https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EfaKryFb-lJDiusB97Kpx5YBd44VefAY9z29u8GqWSKy1A?e=sGdRNY
[746] Interview Memorandum of CC Member 3; EM from CC Member 1 indicating no process. https://solutionpointintl.sharepoint.com/:b:/s/SBCECInvestigation/EdA3YJ5EhJVKs9G0pE0NS4IBIBR3vTfLKQTWB_ZCACFjcQ?e=K3z7ka
[747] Interview Memorandum of CC Member 1.

local association to discuss its assessment of the church's handling of the situation. There were seven such submissions where a CC member followed up with state and local convention executives to gather information about the church. In all seven submissions, the CC did not depart from the state and local associations' assessments. Some CC members expressed to us that in three such cases they were not confident about the state and local associations' decisions to end further inquiry but the CC nonetheless decided to follow the decision of the state or local association. We were unable to find any detailed records of the conversations that CC members had with the state or local executives, as many of those conversations were phone calls that were not documented in the early months of the CC. From our review and interviews, it appears the state/local associations provided the following information to the CC regarding the three cases:

- Local association director reported that the church had disciplined the accused pastor and changed its personnel policies.[748]
- State and local association representatives supported pastor after abuse case against him was dismissed.[749]
- State convention executive stated that pastor did not try to cover up abuse and took proper steps to address it.[750]

In our view, although the state and local conventions can provide valuable information and assistance to the CC, state and local conventions' determinations should not be adopted unquestioningly. Rather, the CC should weigh those determinations in light of all other relevant information.

In addition to looking at the decisions of the state and local associations, the CC also looked at whether the churches had implemented sexual abuse policies and procedures. CC members acknowledged, however, that the CC did not evaluate the quality of those policies submitted by churches. In any event, there was no requirement that the church

---

[748] Church 21.
[749] Church 9.
[750] Church 24.

have policies or procedures in place in order to be in friendly cooperation with the Convention. For example, a church was under inquiry for employing an alleged sexual offender as a Music Minister.[751] Although the church did not have a sexual abuse policy, the church removed the Minister, the Minister had been reported to law enforcement, and the Senior Pastor had written an apology to the submitter. The CC did not recommend the church for disfellowship in those circumstances.

Our review considered whether donations made by churches affected the decisions of the CC. The majority of CC members said that neither the size of a church nor its Cooperative Program giving amounts had any impact on the CC's determinations. In our audit, we did not find any evidence that the size of a church or its Cooperative Program giving amounts had any impact on the CC's determinations.[752] Ten members also stated that the EC did not influence the CC or dictate its decisions, although one member said that the EC did have some influence on the composition of the CC by virtue of the fact that the CC is made of up 3 members nominated by the EC and the EC Chair.

### 13. Reporting misconduct to authorities and others

The CC did not report the existence of sexual abuse allegations to church parishioners, the public, or law enforcement. A former CC Chair told us that it is the church's decision whether or not to inform its congregation about the sexual abuse inquiry.[753] The CC only released the name of a church if and when it gives its report to and recommendation to the EC for consideration. Churches would know when they were put under inquiry, but they were not notified if they were simply under "Review" status. Sometimes state or local association executives would be aware of a church under review when a CC member

[751] Church 25.

[752] One church [Church 11] sent a letter indicating disapproval of the CC process and stating that they would withhold CP donations until the process was remedied. It is difficult to determine whether the church in fact withheld donations, as the church did not have a history of regular giving. The church did make contributions to the CP in 2020, the year they were under inquiry. Although their 2020 giving amount was lower than in 2019, their giving amount in 2019 was also less than in 2018.

[753] Interview Memorandum of CC Member 1.

contacted them to gather information. Names of churches received for consideration that were not recommended to the EC were not released outside the CC.[754]

The CC's Statement of Assignment, as well as the submission form itself, did include language directing submitters to make reports to law enforcement.[755] In addition, the EC Staff Member Liaison typically included a similar directive in the receipt letters sent manually to submitters, although our review indicated there were some letters in which that language was omitted. Because all details of the abuse circumstance may not be known from the written submission, the reporting directive should be included as a routine matter in all receipt letters to submitters.

### 14. Appeals and Reconsiderations

If the CC determines that an inquiry should be closed without recommendation, the church may be submitted for reconsideration if new or additional information can be presented to the CC.[756] Presently, the ability to resubmit with new information is not explained in the declination letter, although the policy is explained orally to the submitter.

As a matter of best practice, this should be included in the declination letters going forward. If the submitter cannot provide new information that was not included in the original submission, then the CC will not put the church under inquiry again. During the audit period, one reconsideration request was made,[757] which the CC declined because the submitter did not offer new information.

If the CC recommends a church to the EC, and the EC agrees to disfellowship the church, the church can submit a written appeal to the CC Chair, at least 30 days prior to the

[754] Interview Memorandum of EC Staff Liaison 1; *see also* Draft CC Procedures.
[755] https://www.sbc.net/about/what-we-do/sbc-governance/credentials-committee/
[756] Interview Memorandum of EC Staff Liaison 1; *see also* Draft CC Procedures. https://solutionpointintl.sharepoint.com/:w:/s/SBCECInvestigation/EahGEOkaN6NFiMdJQW6hBdABFYXJMKORYAfGNjWtWqY7xA?e=YJi6op
[757] Church 15.

Convention's annual meeting.[758] The Convention will consider the appeal on the first day of the Convention, and the messengers will make the final decision on if the church is in cooperation with the SBC. One representative of the church under consideration and one representative of the CC or EC is permitted to speak to the question. The Bylaws do not state that the submitter is permitted to speak.

If a church which has found not to be in cooperation with the Convention addresses the issues that led to the church's disfellowship, then it can apply to the CC for reconsideration of its status. There were no appeals or requests for reconsideration by churches during the audit period.

## VII. RECOMMENDATIONS

Below we set out proposed recommendations intended to provide a comprehensive framework for the SBC to improve its response to sexual abuse and misconduct allegations. The goal of these recommendations is to achieve meaningful and sustainable reform in a manner that recognizes SBC polity. In crafting these recommendations, we received valuable input from numerous sources – survivors and their advocates, current and former EC Officers and Trustees, current and former EC staff, pastors, and SBC polity experts, among others – who all contributed greatly to our understanding of the many considerations involved.

### Recommendation EC-1: Establish an Independent Commission to Implement and Oversee Reforms

At the 2021 SBC Annual Meeting, the Messengers supported the creation of a Sexual Abuse Task Force to oversee this investigation. However, once this investigation is complete with the final report delivered to the Convention, the Task Force's assignment will be complete. Their dedication and commitment to this work has been valuable and

[758] SBC Bylaw 8, Section C(3).

serves as a model for the recommendation to form a task force/commission to continue the work on addressing sexual abuse.

To ensure the effective implementation and oversight of suggested reforms, we recommend that a new task force/commission be created to continue the work of the next phase - implementing sexual abuse initiatives as ordered by the Messengers. This Independent Commission would have initial responsibility to oversee all reforms concerning sexual abuse, sexual assault, harassment, and related misconduct ("sexual abuse") within the SBC.

| | |
|---|---|
| EC-1. | Consider Establishing an Independent Commission Responsible for Implementing and Overseeing Reforms |
| 1(a). | Define Duties and Oversight: If a Commission is established it is important to strictly define the Commission's duties and oversight. Consider including the following:<br>• Oversight of the SBC EC's implementation of sexual abuse recommendations;<br>• Verification of the SBC EC's compliance with best practices in handling issues related to sexual abuse, including implementation of training and education at the SBC EC level;<br>• Oversight of creation of an Administrative Entity (if created);<br>• Oversight of the online Reporting Portal ("RP"); and<br>• Oversight of CC actions. |
| 1(b). | Evaluate Appropriate Duration: To ensure thoughtful set-up and proper implementation, we recommend that the Commission be in place for a minimum of 10 years and, with bi-annual approval of the Messengers, for up to twenty years. |
| 1(c). | Consider Composition: In identifying members of the Commission, consider a balanced representation of male and female members, including survivors of sexual abuse, and expert advisers who are trauma-informed. |
| 1(d). | Evaluate Outside Experts: Consider whether the Commission needs to engage its own experts in furtherance of its oversight duties and responsibilities. |

**Recommendation EC-2: Consider the Creation of an Administrative Entity to Provide a Permanent Resource for Prevention and Response Efforts related to Sexual Abuse**

Although the Commission could initially oversee reforms on a high level, a permanent Administrative Entity, with sufficient staffing and funding, is necessary to manage the new reform structure, particularly for providing necessary guidance and training.

The Convention may authorize a new entity under Bylaw 25. According to the Bylaw, new entities require the Convention to vote and approve the creation of the entity in two succeeding annual meetings. However, Bylaw 25 provides a potential path for an immediate creation of a new Administrative Entity and states that "this restriction shall not apply to a recommendation of an entity of the Convention concerning its own work." The Executive Committee (and potentially the ERLC) may recommend the formation of a new entity to be tasked with work that would otherwise fall within its ministry assignment to ensure a more expedient path to the creation of the Administrative Entity. We recommend that this more expedient path be explored.

| | |
|---|---|
| EC-2. | Consider the Creation of an Administrative Entity to Provide a Permanent Resource for Prevention and Response Efforts Relating to Sexual Abuse |
| 2(a). | Define Leadership: If an Administrative Entity is created, we recommend that the Committee on Nominations appoint a Board of Trustees who will have the responsibility for hiring an Executive Director, or similar position. |
| 2(b). | Hire Qualified Staff: If created, we recommend that the Administrative Entity include staff members with subject matter expertise on sexual abuse in fields such as legal, medical, psychology, theology, social work, and law enforcement. |
| 2(c). | Establish Clear Duties and Responsibilities: If created, we recommend that the Administrative Entity's work include, but not be limited to, the following responsibilities:<br><br>1. Prevention:<br>• Create and oversee the Sexual Abuse Prevention program to include policies, training, and a Resource Toolbox (see Recommendation EC-3); |

| | |
|---|---|
| | • Create and oversee the creation of a publicly available Offender Information System (OIS) (see Recommendation EC-5(b));<br>• Establish written criteria and make recommendations regarding screening, background checks when requested (see Recommendation EC-5(a));<br>• Engage in continuing education and research on the issue of sexual abuse; and<br>• Establish, define, revise and routinely review new criteria for the CC's mandate for church disfellowship (see Recommendation CC-8(b)).<br><br>2. Response:<br>• Manage a Survivor Support and Assistance Program (SSAP) (see Recommendation EC-7(a));<br>• Establish and facilitate a Survivor Compensation Fund Program (see Recommendation EC-7(b));<br>• Conduct good faith assessments/inquiries, when requested, on sexual abuse cases submitted through the Reporting Portal when requested by the church, state convention, or local association (see Recommendation EC-7(a)); and<br>• Conduct good faith assessments/inquires for disfellowship of churches' regarding sexual abuse (see Recommendation EC-7(a));<br><br>3. Advisory Duties:<br>• Serve as a voluntary advisory resource to state conventions, local associations, entities, and churches on best practices in the area of sexual abuse;<br>• Form an advisory group consisting of the prevention and response administrators/liaisons from entities included under Bylaw 14; and<br>• Make recommendations to the CC based on these requested assessments/inquires.<br><br>4. Data Collection:<br>• Oversee, monitor and collect annual submissions of information from entities, and voluntary submissions from state conventions, local associations and churches to evaluate the effectiveness of these Best Practices. |

**Recommendation EC-3: Create and Maintain a Resource Toolbox for Prevention and Response**

Effective protocols are beneficial to assure the implementation of best practices, serve to reduce the mishandling of sexual abuse, support effective results, and promote prevention. Providing protocols in one place can assist SBC entities and cooperating churches in preventing abuse. For this reason, we recommend the SBC create a Resource Toolbox, which could include a variety of resources associated with prevention and management of sexual abuse.

| EC-3. | Create and Maintain a Resource Toolbox for Prevention and Response |
|---|---|
| 3(a). | Content: We recommend the toolbox include sample protocols and policies including, but not limited to, understanding child and adult sexual abuse, child safety, standards of care for youth and adult volunteers, social media guidelines, overnight and transportation issues, resources and supportive options for survivors, managing the alleged offender, and dispute resolution. |
| 3(b). | Training and programming for Leadership, Staff, and Volunteers: We recommend that the Administrative Entity (if created) create and provide training programs to support the newly created protocols for use by the entities, voluntarily participating state conventions, local associations and churches, including but not limited to clergy/authority figure abuse; grooming and prevention; trauma-informed responses, understanding reporting obligations; investigating sexual abuse allegations; survivor issues, establishing programs including a school and church safe space program, a victim assistance program, and establishing a Sexual Abuse Review Board; sexual abuse and workplace sexual harassment orientation and training and more resources will be available.<br><br>Sexual abuse and workplace sexual harassment orientation training should be mandatory for SBC entities. |
| 3(c). | Create Safe Space Trainings and Curriculums for Community Members: We recommend that age-appropriate trainings and curriculums on sexual abuse be available in the Resource Toolbox to all SBC schools, seminaries, state conventions, local associations, and affiliated churches. |

| | |
|---|---|
| 3(d) | Investigative Guidelines: We recommend that the Resource Toolbox provide a comprehensive foundation for conducting assessments and/or investigations, offer the assurance of consistency throughout the process, and demonstrate a commitment to a fair and credible process. Investigative guidelines may include guidance on conducting a competent, thorough and trauma-informed child or adult sexual abuse investigation; good faith reporting; confidentiality; retaliation; the CC Reporting Portal; updates and links to applicable laws, regulations, policies and comprehensive mandatory reporting obligations under the Federal Child Abuse and Prevention Act (CAPTA). |

**Recommendation EC-4: Provide Support for Establishing Safe Spaces Through a Self-Certification Program**

A self-certification program will allow individual churches, local associations, state associations and entities to strengthen their commitment to working towards reducing sexual abuse.

| EC-4. | Provide Support for Establishing Safe Spaces Through a Self-Certification Program |
|---|---|
| 4(a). | Adopt a Self-Certification Program: We recommend that the SBC support the creation of a voluntary self-certification program for churches, local associations and state conventions based on implementation of "best practices" to bring awareness and enhance prevention of sexual abuse. The entities should also participate.<br>• State conventions or local associations, with the support of their churches, may organize a certification program for all member churches within their association or convention.<br>• The Administrative Entity, if created, could provide written criteria of minimum standards needed to implement to be considered a self-certified "Safe Space Abuse Prevention" location.<br>• All necessary resources needed to self-certify would be available in the Resource Toolbox, but participants may decide to use individually obtained resources.<br>• Voluntary renewal could occur on a periodic basis, such as every three years.<br>The SBC should post an updated list of churches, local associations, state conventions and entities that are certified as "Safe Space Abuse Prevention" locations. |

**Recommendation EC-5: Enhance Prevention Resources.**

The SBC should focus efforts on primary prevention before abuse occurs. A broad collection of prevention resources may enhance the discovery and reporting of criminal acts and aid in holding the offender accountable. We recommend deploying a layered approach in adopting these resources.

| EC-5. | Develop or Enhance Comprehensive Prevention Resources. |
|---|---|
| 5(a). | Background Checks: We recommend that the SBC EC and other entities lead by example in requiring comprehensive background checks, and encourage all state conventions, local associations, and churches to voluntarily create a safe environment by employing reliable, thorough, and comprehensive background checks as part of their hiring practices for all staff and volunteers. (Suggested recommendations for background checks are attached as Appendix G.) |
| 5(b). | Offender Information System: We recommend that as an important step in keeping churches and SBC entities informed, the Administrative Entity set up and maintain (through a third-party vendor) an Offender Information System (OIS) to alert the community to known offenders. This OIS website can fill in gaps left by the National Sex Offender Public Website.[759]<br><br>Here are some potential ways an OIS website could work:<br><br>• The OIS website could be provided free of charge by the SBC EC or another designated entity with voluntary participation by state conventions, local associations and churches.<br>• The SBC entities could maintain webpages within the system and follow the guidelines applicable to churches.<br>• Each participating church will have their own website. Churches may decide to combine with other churches, their local association or a state convention and create a joint webpage on which to jointly enter information.<br>• The Administrative Entity could create written criteria to establish the minimum standards for inclusion on the OIS such as offense details, a photograph of the offender, offender biographical information, the complete Pastoral File and more. |

[759] The National Sex Offender Public Website (NSOPW) is a national database which includes listing of some sex offenders convicted in states, tribes and territories for a registerable sex offense. There are numerous SBC members who have committed acts of sexual abuse, including serial offenders, ministers who abused their position of authority for sexual gain and those whose offenses were never disclosed and the statute of limitations has expired. All of these individuals will never be listed on the NSOPW.

| | |
|---|---|
| | • Sample criteria could include the following:<br>○ Churches are encouraged to voluntarily report the full spectrum of information available.<br>○ Persons legally convicted, personally confessed, or those having been credibly[760] accused or having substantiated allegations of acts including sexual abuse or those established to have aided and abetted[761] in the cover-up of such conduct including allowing an offender to quietly resign or move to another church or institution will be included on the OIS.<br>○ Offenders that are deceased will be included on the OIS in perpetuity.<br>○ The SBC will publish a list of disfellowed churches and those persons whose ordinations or degrees were revoked due to sexual abuse. |
| 5(c). | Letters of Good Standing: We recommend that the SBC offer a standardized "Letter of Good Standing" (LGS) that can be used in all cases where a pastor or staff member is moving to or officially visiting another church or entity. Use of the LGS would allow verification of good standing at the current employment through written verification and personal reference checks. Seminaries could also provide a LGS upon graduation to students in good standing. |
| 5(d). | Code of Conduct: We recommend that the SBC require an ethical Code of Conduct be signed as a condition of current or new employment at an entity, or as a condition of attendance for current or incoming students attending seminary or missionary staff. The Code of Conduct should clearly establish the signee's acknowledgement, responsibility, and obligation to not engage in sexual abuse while employed, volunteering or as a student. The Code of Conduct should further provide notice that a conviction, confession, a credible or substantiated allegation of sexual abuse will result in termination, mandatory reporting to civil authorities, if applicable, notification to the local association/state convention and the SBC EC, as well as posting on the OIS if appropriate.<br><br>The SBC should strongly encourage similar voluntary protocols by state conventions, local associations, churches regarding current and new pastoral and church staff, and volunteers. |

[760] "Credible" is defined as not manifestly false or frivolous.
[761] "Aided and abetted" -- Aid or abet is defined for this purpose as the knowing or intentional assisting of a person who has been convicted, confessed, or a credible or substantiate accusation of sexual abuse to move to another church, seminary or other SBC related entity without fully disclosing to the new entity the allegations faced by the person; failing to terminate a person with a conviction, a confession or credible allegation; in lieu of terminating, allowing a person to retire, resign or quit in the face of conviction, a confession or a credibly allegation without public announcement and written documentation in their employment file the allegations were the cause for their departure; knowingly or willingly hiring a person convicted, confessed or credibly accused of allegations of sexual abuse; having knowledge of a conviction, confession or credible accusation and failing to terminate.

**Recommendation EC-6: Adopt a Declaration of Principles**

| EC-6. | Adopt a Declaration of Principles |
|---|---|
| 6(a). | Declaration of Principles: Consider Adopting an SBC Declaration of Principles regarding sexual abuse. This Declaration should include statements regarding a commitment to repentance and reform, prioritizing survivors, acknowledgement of trauma and commitment to providing prevention resources.<br><br>This Declaration of Principles could serve as a model for SBC entities, state conventions, local associations, and local churches to voluntarily adopt and follow. |

**Recommendation EC-7: Devote Resources to Survivor Support**

| EC-7. | Consider Dedicated Survivor Support Resources. |
|---|---|
| 7(a). | Create a Survivor Support and Assistance Program (SSAP): We recommend the Administrative Entity, if created, facilitate the creation and management of a SSAP to train entity staff members, and staff from voluntarily participating churches, local associations, and state conventions so that they are equipped with knowledge on how to provide survivor care and support.<br><br>The SSAP-sponsored training could include best practices on responding to reports of sexual abuse in a trauma-informed way from the intake of a report through and post the resolution of a matter and can be found in the Resource Toolbox. The individuals trained in this role could be called survivor care and support specialists (SCSSs).<br><br>One model for SCSS could function as follows:<br>• SCSSs will intake and triage reports of sexual abuse. SCSSs employed at the SBC level will receive cases submitted to the online Reporting Portal or Sexual Abuse Hotline. SCSS will communicate with submitters and will assist by determining immediate needs, may connect with law enforcement (including mandatory reports), if appropriate, connect the submitter with local supportive services or other necessary resources, and explain the investigation and resolution process to the submitter.<br>• The SCSS will assist the submitter throughout the case.<br>• On behalf of the submitter, the SCSS may connect with the church, local association, state convention or entity that has not responded to a report of sexual abuse to determine if a local assessment/investigation is feasible. |

| | |
|---|---|
| | • If a local assessment/investigation is not conducted, the SCSS will ensure the case is pursued by the CC, who may request the Administrative Entity to conduct a good faith investigation on behalf of the submitter and report back to the CC.<br>• For information on CC disfellowship see Recommendation CC-12. |
| 7(b). | Establish a Survivor Compensation Fund Program: We recommend a Survivor Compensation Fund Program be created, to be overseen by the Commission and administered by the Administrative Entity (if created) with the assistance of an independent Fund Administrator or Special Master to direct the compensation of funds to SBC clergy sexual abuse and related misconduct survivors for abuse related medical and psychological services.<br><br>Recommended principles for this fund include the following:<br><br>• The intent would be that survivors would not be required to use SBC recommended providers;<br>• In determining the amount of payment, the Administrative Entity with the assistance of the Fund Administrator/Special Master will establish written criteria, including but not limited to factors such as severity of abuse, duration of abuse, age of the victim at time of abuse, prior efforts of the survivor to report the abuse, and prior harm-magnifying institutional responses to the survivor; and<br>• We recommend that the compensation program be supported by a dedicated permanent fund established and replenished with Cooperative Program dollars and/or the selling of SBC assets and be prioritized by the SBC EC. |

**Recommendation EC-8: Consider Prohibiting Confidentiality Agreements in Sexual Abuse Matters**

| EC-8. | Consider Prohibiting Confidentiality Agreements in Sexual Abuse Matters |
|---|---|
| 8(a). | Prohibit Confidentiality Agreements: The Convention and the SBC EC should not condone the use of nondisclosure agreements and civil settlements which bind survivors to confidentiality in sexual abuse matters unless requested by the survivor. The entities are encouraged to follow this position. |

**Recommendation EC-9: Provide Adequate Funding for Reforms**

Prevention and response to sexual abuse requires adequate funding. It is recommended that churches and entities demonstrate their commitment to fostering environments with safeguards for sexual abuse, through their commitment of funding towards reforms.

| | |
|---|---|
| EC-9. | Consider providing Sufficient Funding for Reforms. |
| 9(a). | Encourage Inclusion of Sexual Abuse Prevention and Response in Annual Budgets: We recommend that state conventions, local associations, churches, and all SBC entities be encouraged to include resources for prevention and response to sexual abuse in their annual budgets. |
| 9(b). | Provide Funding for the Administrative Entity: We recommend that upon the creation of an Administrative Entity the allocation of the Cooperative Program funds be adjusted to include adequate funding for the Administrative Entity. |
| 9(c). | Fund Sexual Abuse Reforms: We recommend that in making annual appropriations to entities, the SBC EC allocate additional monies to be recommended to be used towards sexual abuse reforms and prevention. |
| 9(d). | Designated Funds: We recommend that the Administrative Entity (if created) be permitted to accept designated funds directly to the entity. |
| 9(e). | Grant Funding: We recommend that the Administrative Entity (if created) provide awareness of available safety and security grant programs, as well as alternate means for providing safety and security grants to SBC member churches, local associations, state conventions and seminaries to assist with prevention, training, safe hiring practices, and investigative measures. |

**Recommendation EC-10: Consider Further Defining Southern Baptist Beliefs Regarding Sexual Abuse**

In 2019, the messengers took a step in addressing sexual abuse when they approved the Constitutional amendment defining "friendly cooperation" to require that a church "does not act in a manner inconsistent with the Conventions beliefs regarding sexual abuse." *See* Article III. While there are statements in resolutions that arguably set forth the Conventions beliefs regarding abuse, the SBC EC should consider further defining these beliefs regarding sexual abuse to "provide for the ...abused.." *See* Section XV.

| | |
|---|---|
| EC-10. | Consider Further Defining SBC Beliefs Regarding Sexual Abuse. |
| 10(a). | The SBC should consider whether phrases relating to SBC Beliefs regarding sexual abuse are thoroughly defined in SBC governing documents. Consideration may be given to creating a definition of sexual abuse, how churches should work to prevent sexual abuse, and how churches should respond to sexual abuse in a Christ-like manner.<br><br>Past resolutions may be helpful to inform further definitions and the SBC may choose to refer to the following resolutions: On Abuse and Pastoral |

| | |
|---|---|
| | Qualifications (2021); On the Evils of Sexual Abuse (2019); On Abuse (2018); and On Sexual Abuse of Children (2013). |
| 10(b). | The SBC should consider whether the definition of the term "inquiry" with respect to the actions that the CC takes might be expanded. |

**Recommendation EC-11: Improve Governance at the SBC EC by Creating the Position of Chief Ethics and Compliance Officer**

Given the increasing compliance-related responsibilities, including those relating to sexual abuse and harassment, many organizations have a Chief Compliance Officer or Chief Ethics and Compliance Officer ("CECO"). A CECO at the SBC EC could be responsible for designing and implementing the SBC EC's integrity and ethics program such that the SBC EC functions at the highest level of Biblical and ethical standards.

| | |
|---|---|
| EC-11. | Improve Governance at the SBC EC by Creating the Position of Chief Ethics and Compliance Officer. |
| 11(a). | Establish Duties and Responsibilities: We recommend that the roles and responsibilities of the SBC EC CECO could include, but not be limited to, the following:<br>• Develop, revise as necessary and monitor implementation of the SBC EC Code of Conduct, which can be shared with other entities to use as a framework, consistent with faith institution best practices.<br>• Assist as appropriate with the SBC EC's human resources functions, including human relations, recruiting and training and development<br>• Ensure execution and compliance with background and reference checks and training procedures (including trauma, social media, and confidentiality) for SBC EC Trustees and Staff.<br>• Conduct annual re-evaluate of sexual harassment and abuse policies and encourage greater internal reporting.<br>• Develop a document retention policy for the SBC EC and auxiliary entities.<br>• Develop and improve transparency to SBC EC Trustees including enhancing oral and written information flow regarding all sexual abuse issues including comprehensive materials regarding allegations of sexual abuse, sexual abuse litigation at the SBC EC level and notification of survivors' request to address or interact with the SBC EC and SBC and increase lead time for providing meeting information to enhance informed participation by SBC EC Trustees. |

| | |
|---|---|
| | • Develop and improve integrity training programs, including mandatory new hire training and function-specific integrity training, to educate team members on the legal and ethical standards that apply to them, assure use of SBC authorized email and other accounts for conducting SBC business.<br>• Develop and improve orientation and integrity training for newly appointed Trustees to include enhancing active engagement of trustees in SBC EC meetings and business.<br>• Lead and provide oversight of the SBC EC integrity program to ensure compliance with legal, regulatory, and ethical/Biblical standards.<br>• Provide oversight of SBC EC staff ethics, confidentiality, and completion of annual abuse training/education.<br>• Provide oversight of all ethics and integrity related investigations. |

**Recommendation EC-12: Establish a Document Retention Policy**

| EC-12. | Establish a Document Retention Policy for the SBC EC and SBC EC Offices |
|---|---|
| 12(a). | Maintain Centralized Records of Mandated Child Abuse Reports: We recommend that the CC maintain a central, permanent record of all known matters that trigger a mandatory reporting requirement and a permanent record of all reports dealing with sexual abuse. We further recommend that the SBC (CC) endeavor to acquire sufficient information to allow compliance with mandatory reporting requirements. |
| 12(b). | Audit Record Retention Protocols: We recommend that the SBC EC conduct a regular audit of its record retention protocols to ensure it is maintaining a centralized complaint management system that records instances of reports through the RP, the Sexual Abuse Hotline and any instances of complaints or discipline against SBC EC officers or staff. We recommend that the document retention policy should include an exemption for sexual abuse so these records will be retained indefinitely. |
| 12(c). | Periodic Audit Complaints and Mandatory Reports: We recommend that the SBC EC conduct an audit of complaint handling and mandatory reports on a periodic basis to ensure that all mandatory reports have been made to the authorities as required by law. |
| 12(d). | Oversight: We recommend that the new Administrative Entity (if created) be responsible for implementation and oversight of document review policies, in conjunction with the CECO. |
| 12(e). | Use of SBC EC Emails: We recommend that SBC EC Trustees and Officers be assigned an SBC EC email account, and that all SBC EC business be required to be conducted via their SBC EC email account rather than a personal, church or other email account. |

**Recommendation EC-13: Enhance SBC EC Compliance Policies**

| EC-13. | Enhance SBC EC Compliance Policies |
|---|---|
| 13(a). | Employee Written Policies: We recommend enhancing and developing SBC EC employee policies with respect to sexual abuse and harassment, including defining terms including sexual harassment, explaining specific protocols and procedures for reporting including where to report (including a tip line), how to report, and using the CC RP. |
| 13(b). | Managerial Policies: We recommend enhancing and developing SBC EC managerial policies and procedures to address complaints in areas of harassment, employee conduct, workplace conflict or other inappropriate employee behavior, employee discipline including guidance regarding conduct warranting warnings (verbal or written), memorialization of any warnings, the escalation of disciplinary action if the misconduct persists, and whistleblower protections. |
| 13(c). | Investigation Policies: We recommend developing written policies regarding decision-making authority with respect to opening or closing an investigation, imposing disciplinary action, or, if appropriate, notifying the SBC EC Trustees about an investigation, documenting findings. |

**Recommendation EC-14: Create a Media Plan to Bring Awareness to Issues of Sexual Abuse**

Awareness of sexual abuse issues within the church is an important part of preventing future problems and reducing vulnerabilities. The Commission and the SBC EC should consider facilitating a media plan including the conveyance of a genuine apology to survivors of abuse and assault, and create plans and execute a listening tour on the issues of sexual abuse and related misconduct and more.

| EC-14. | Create a Communications Plan to Bring Awareness to Issues of Sexual Abuse. |
|---|---|
| 14(a). | Utilize Baptist Press: Baptist Press should consider increasing their publication of articles to highlight the sexual abuse crisis in the SBC and response by the SBC through a variety of articles and the use of social media. |
| 14(b). | Link to Resources: On a regular basis, Baptist Press publications should include links to the Credentials Committee Reporting Portal, OIS, the |

| | |
|---|---|
| | Resource Toolbox and other relevant sexual abuse resources and publish the Sexual Abuse Hotline telephone number. |
| 14(c). | Promote Reporting Mechanisms: Develop and execute a media campaign advertising the RP and Sexual Abuse Hotline, including how to report sexual abuse, and suggestions regarding posting of information regarding the RP and Sexual Abuse Hotline. |
| 14(d). | Posting of Information: The SBC EC should encourage churches to voluntarily post basic information about the new Administrative Entity (if created), including its contact and website information, in a location that will be easily seen by congregation members. |
| 14(e). | Increase Awareness via Annual Meeting App: Consider increasing awareness of sexual abuse by promoting the Southern Baptist Convention Annual Meeting app to convey and collect information and elevate resources dealing with sexual abuse, which includes livestream features, Book of Reports, various resources, Officer names, nominees for various offices, convention schedule, maps, video archives, and social medial links. The Annual Survey posted after the Annual Convention should include relevant questions such as, "Have you completed the Caring Well challenge?" or "Would you like to be contacted about sexual abuse training?" The Annual Meeting app should include links to the OIS, RP, Toolbox and other relevant resources including the Sexual Abuse Hotline telephone number. |
| 14(f). | Designate a Sunday on SBC Calendar: The SBC EC should consider adding a "Survivor Sunday" to the annual denominational calendar so all Southern Baptists can unite for a Sunday of prayer for Survivors (perhaps in April during Sexual Assault Awareness month). Churches could be encouraged to bring abuse awareness and the importance of Caring Well for survivors on this Sunday, and may collect offerings that can be given directly to the Survivor Compensation Fund overseen by the Administrative Entity. |

**Recommendation EC-15: Acknowledge the Survivors of SBC Clergy Sexual Abuse**

| EC-15. | Acknowledge the Survivors of SBC Clergy Sexual Abuse |
|---|---|
| 15(a). | Written Apology: We recommend that SBC EC leadership and the SBC President issue a sincere written and spoken apology for past failures, identifying specific survivors such as Christa Brown, Jules Woodson, Tiffany Thigpen and others. The apology should include details as to how the SBC EC will work to support survivors and to assist churches to become safer spaces. |
| 15(b). | Memorial: We recommend consideration of a formal and permanent acknowledgement at the front of the SBC offices in Nashville relating to sexual abuse. Specifically, the SBC EC should consider a tangible gesture such as sculpture or garden as a way to publicly acknowledge mistakes in the past and the SBC's commitment to reform. |

**Recommendation EC-16: Enhance Awareness of Sexual Abuse within SBC Entities**

| EC-16. | Enhance Awareness of Sexual Abuse within SBC Entities |
|---|---|
| 16(a). | Each SBC entity, state convention, local association and church should voluntarily play a part to enhance awareness and work towards making the Convention a safe space for children, youth and adults. (See Appendix H.) |

**Recommendation EC-17: Implement Principles for Baptist Press**

| EC17. | Implement Principles for Baptist Press |
|---|---|
| 17(a). | Baptist Press should commit to seek and report truth by: acting independently, ensuring accuracy, verifying information, and using original sources where possible. |
| 17(b). | Baptist Press should minimize harm by balancing the public's need for information against potential harm or discomfort. Baptist Press should use heightened sensitivity when dealing with juveniles, victims of sex crimes, and sources or subjects who are inexperienced or unable to give consent. |

**ALTERNATIVE RECOMMENDATIONS IF NO NEW ADMINISTRATIVE ENTITY IS CREATED**

If the SBC decides that a new Administrative Entity will not be established, we recommend that the SBC commit to implementing the recommendations listed above in the following manner:

| | |
|---|---|
| EC-A. | Create and oversee a Sexual Abuse Prevention Program to include policies, training, and a Resource Toolbox: We recommend that the ERLC, SBC EC and Lifeway should share in this responsibility in overseeing a sexual abuse prevention program in the following manner: the SBC EC's Sexual Abuse Prevention Liaison/Support Care Specialist should perform an audit of the ERLC Caring Well curriculum, suggest improvements and/or modifications and then create the Resource Toolbox and quick reference guides. We recommend that Lifeway take responsibility for publishing and distributing all resources. |

| | |
|---|---|
| EC-B. | Create and oversee the creation of a publicly available Offender Information System (OIS). |

| | |
|---|---|
| B(1). | Creation: We recommend that the SBC EC establish a Sexual Abuse and Prevention Staff with subject matter experts to collaborate with the ERLC to create and establish written criteria to establish the minimum standards required for inclusion on the OIS. |
| B(2). | Maintenance of Data: We recommend that Lifeway oversee the implementation of the criteria established by the SBC EC Sexual Abuse and Prevention Staff and the ERLC as they coordinate with state conventions for ACP data. |
| B(3). | System Maintenance: We recommend that the SBC EC fund the system in perpetuity and coordinate with a third-party vendor for maintenance and system improvements. |

| | |
|---|---|
| EC-C. | Serve as an advisory resource to state conventions, local associations, entities, and churches on best practices in sexual assault and related misconduct. |
| C(1). | Funding and staffing: We recommend that the SBC EC fund and sufficiently resource an SBC EC Sexual Abuse Prevention Staff to serve as an advisory resource to SBC entities and on an as needed basis when requested by state conventions, local associations, and churches. |
| C(2). | Guidance to seminaries: We recommend that the SBC EC's Sexual Abuse Prevention staff establish written criteria and consult and make recommendations to seminaries regarding the conferral and revocation of degrees from identified offenders of sexual abuse. We recommend that information related to revocation of degrees be reported to the SBC EC and entered into the OIS. |
| C(3). | Guidance to state and local conventions/churches: We recommend that the SBC EC's Sexual Abuse and Prevention Staff, assisted by the ERLC and Lifeway, establish model standards for ordination and revocation of ordination for identified offenders and these materials be maintained in the Resource Toolbox. |
| C(4). | Background checks: We recommend that the SBC EC's Sexual Abuse and Prevention Staff establish written model criteria, create resources, and make recommendations for screening, background checks for state conventions, local associations, and churches who voluntarily choose to implement and request assistance. We further recommend that the SBC EC and CC and other entities implement these criteria and employee resources, and that the SBC EC continue to support collaboration with Lifeway to facilitate an economical option for in-depth background checks. |
| C(5). | Hiring guidance: We recommend that the SBC EC support the use of the ERLC's Caring Well Hiring Guide that is currently found on the Caring Well website. |
| C(6). | Survivor support: We recommend that the Sexual Abuse and Prevention Staff manage a Survivor Support and Assistance Program (SSAP) which will |

| | |
|---|---|
| | include Survivor Care Support Specialist (SCSS); that the CC and all SBC entities identify a point of contact to liaison with the SSAP; and that the SBC EC provide adequate funding and staffing for the Survivor Care and Support Specialists. |
| C(7). | Survivor Compensation Fund: We recommend that the SBC EC establish and facilitate a Survivor Compensation Fund Program and the SBC EC will retain an independent Fund Administrator or special master to administer the fund. |
| C(8). | ERLC: We recommend that the SBC EC support the ERLC to continue their ongoing work with continuing education and research on the issue of sexual abuse in SBC affiliated churches. |
| C(9). | Resource Toolbox: The ERLC and the SBC EC's Sexual Abuse and Prevention Staff will assist if requested to create resources found in the Resource Toolbox including sexual abuse trainings, protocols, best practices, curriculums, and templates. Lifeway will collaborate with training through publishing of training materials as needed and the Baptist Press will support the creation of these resources by promoting availability through reoccurring blogs or advertisement. |
| C(10). | Self-certification programs: We recommend that the SBC EC's Sexual Abuse and Prevention Staff facilitate and create written model criteria for the voluntary self-certification programs for churches and seminaries. |
| C(11). | Advisory group: We recommend that the SBC EC's Sexual Abuse and Prevention Staff coordinate the formation of the advisory group consisting of the prevention and response administrators/liaisons from SBC entities. |
| C(12). | Disfellowship criteria: We recommend that an SBC EC Sexual Abuse and Prevention Staff's subject matter expert review, revise, and establish new written criteria for the CC's mandate for church disfellowship; and that the Commission oversee the establishment of this newly defined criteria and approved the standards prior to implementation. |
| C(13). | Reporting Portal process: We recommend that a SCSS housed under the SBC EC's Sexual Abuse and Prevention Staff will serve in the same capacity as the Administrative Entity SCSS outlined in the previous section on RP Process. |
| C(14). | Inquires: We recommend that the Commission ensure that the SBC EC fund the CC's ability to engage and consult with experts as set forth in Recommendation CC-11. |
| C(15). | Media plan: We recommend that the Commission and the ERLC prepare the SBC President's annual convention address. We further recommend that the SBC EC's Sexual Abuse and Prevention Staff collaborate with the Commission to develop and execute the listening tour. We further recommend that the SBC EC's Sexual Abuse and Prevention Staff collaborate with the Committee on Resolutions to develop Resolutions presented by the SBC EC. |

**Credentials Committee Recommendations**

Based on our observations above, we present the following recommendations for changes to the CC's structure and procedures to ensure that the CC effectively handles submissions relating to sexual abuse. These recommendations aim to empower the CC to better communicate with survivors and churches, collect and review relevant information, and render informed decisions in a timely manner, consistent with SBC polity.

**Recommendation CC-1: Consider the Ideal Composition of the CC to Support Sexual Abuse Submissions**

| | |
|---|---|
| CC-1. | Consider the ideal composition of the CC to support sexual abuse submissions. |
| 1(a). | Composition of CC: To ensure the effective handling of CC submissions related to sexual abuse, the CC should be comprised of some members with expertise in sexual abuse/trauma and theology for faith/practice issues related to sexual abuse. A sample membership could include: a survivor/advocate member with personal experience; counselor/social work expert; pastors; theologian; and layperson.<br><br>The Committee on Nominations should consider having a gender balance on the CC, with at least 4 of 9 members (if membership numbers stay the same) be women, in order to have enough representation to speak to female submitters/survivors.<br><br>The CC Chair should be someone who can devote sufficient volunteer time to lead this committee, given the consistent flow of action items to be addressed on a weekly basis. |

**Recommendation CC-2: Improve Onboarding for CC Members**

| | |
|---|---|
| CC-2. | Improve onboarding for CC members. |
| 2(a). | Background Information Provided to CC: We recommend that each prospective CC member should be instructed as to what the role involves (a description that outlines the responsibilities, monthly duties, time commitment, types of submissions reviewed). Candidates should have a clear understanding of the nature of the work, which includes sensitive materials and potentially troubling or triggering information. |

| | |
|---|---|
| 2(b). | Formal Orientation: We recommend that the CC provide an improved formal orientation every July, that includes new and old CC members, so that returning CC members can share their experiences with new CC members and also get a refresher on processes and procedures. |
| 2(c). | Topics for Orientation: The orientation for the full CC should cover topics such as key technology used by the CC; understanding the Access database and the CC review portal; roles and responsibilities of CC members; confidentiality; CC procedures; sexual abuse and trauma training; and theological training as it relates specifically to the CC. The CC should also be presented with written guidance, such as the finalized CC procedures document and flow chart that is currently in draft form. |
| 2(d). | Special Topics for New Members: New CC members should have an additional orientation on governance documents related to the CC's work, including the Bylaws, SBC Constitution, and the Baptist Faith and Message. |

**Recommendation CC-3: Provide Trauma and Sexual Abuse Training for CC Members**

| | |
|---|---|
| CC-3. | Provide trauma and sexual abuse training for CC members. |
| 3(a). | Training Requirements: All CC members should complete trauma and sexual abuse training such as Caring Well, ERLC standards of hiring, trauma care, reporting procedures, and how to interact with/care for survivors/submitters. New CC members should complete sex abuse training/Caring Well before the first CC member orientation meeting. |
| 3(b). | Training Expert: If the Convention establishes a new Administrative Entity, the trauma-informed experts on staff with the new Administrative Entity should provide training to CC members, including training on the definition of abuse in the context of church/resolutions. If the Administrative Entity is not established, the EC should contract with a third-party trauma-informed expert to provide formal training to the CC. |

**Recommendation CC-4: Increase the Number of CC Staff and Provide Greater Support for Them**

Our audit revealed that there were periods of time that the CC needed more EC staff support to make the process more expedient, especially during the spring and summer seasons leading up to the Annual meeting when EC staff have heavy workloads. Having two staff members would give them the ability to consult with each other and troubleshoot problems. In the past, because of the sensitive nature of the issues and the confidentiality requirements, the lone staff member felt isolated in not being able to discuss the work responsibilities with any other staff. Counseling should be provided to CC staff and CC members, who may need support given the nature of their duties. This may also minimize high turnover rate in the CC.

| CC-4. | Increase the number of CC staff and provide greater support for them. |
|---|---|
| 4(a). | Number: Consider having at least 2 staff members assigned to the CC: one EC staff member to manage the CC administrative work and one trained Survivor Care Support Specialist (SCSS). The SCSS would be a new position on staff at the EC, or on staff at the Administrative Entity (in the case the Convention approves the formation of the Administrative Entity). |
| 4(b). | Counseling: We recommend that counseling should be provided to CC staff and CC members, who may need support given the nature of their duties. |
| 4(c). | Automatic Notification to SCSS: We recommend that the SCSS receive automatic notifications of sex abuse related submissions to the CC through the Reporting Portal (RP) and call the submitter/survivor within 72 hours of receipt. |

| | |
|---|---|
| 4(d). | Care Provided by SCSS: Consider having the SCSS provide trauma-informed care and communication to submitters/survivors, informing them of the CC process and timelines from the beginning so they know what to expect, and follow up within 24 hours of the call with a formal email with the same important information discussed, to serve as a record of communication. The email should state information including:<br>• Receipt confirmation for the submission, and acknowledgment that the submission will be reviewed by the CC during its next meeting<br>• Contact information for the SCSS<br>• Resources<br>• Detailed outline of CC processes, procedures and timelines<br>• Link to a secure Dropbox or email, where the submitter/survivor can send documents and additional information related to their submission |
| 4(e). | Local Reporting Assistance: We recommend that the SCSS could assist the submitter/survivor through local reporting processes as needed and point them to resources. |
| 4(f). | Survivor Updates: We recommend that the SCSS would continue to stay in touch with the survivor, providing regular updates until a determination has been made on the submission. |
| 4(g). | Local Resource Assistance: We recommend that the SCSS serve the role that the Babb Center counselor initially did for some submitters and also provide resources to the submitter/survivor of other counseling centers as needed. |
| 4(h). | Information Gathering: Although the CC itself cannot currently investigate under Bylaw 8, consider having the SCSS ask questions of persons involved in the submission in a trauma-informed manner. This would allow a survivor the opportunity to share their history with the CC. The advisor could also contact the church pastor, state convention, and local associations at the direction of the CC. |

**Recommendation CC-5: Give the CC Access to Outside Resources to Support Their Decision-making Processes**

| | |
|---|---|
| CC-5. | Give the CC access to outside resources to support their decision-making processes. |
| 5(a). | Outside Advisory Groups: The CC should have the option to retain outside advisory groups that can help with:<br>• Faith and Practice – Panel of Theologians to consult on a regular basis with respect to issues relating to sexual abuse and SBC governing documents<br>• Sex Abuse – a Survivor Care Support Specialist on the Administrative Entity (if approved) |

| | |
|---|---|
| 5(b). | Legal Counsel: The CC should have the ability to retain legal counsel separate from the EC. Counsel should be present at the CC meetings. |

**Recommendation CC-6: Formalize and Improve the CC's Processes and Procedures**

The informal nature of the CC's processes and procedures negatively impacted the CC's ability to function effectively.

| | |
|---|---|
| CC-6. | Formalize and improve the CC's processes and procedures. |
| 6(a). | Finalize Manual: Finalize the overall CC processes and procedures manual before the July 2022 orientation. |
| 6(b). | Review and Revise Templates and Letters with Expert Advisors: <br>• All template notices, including the confirmation of receipt of submission, inquiry letter, voluntary withdraw notice, decline to review notice and decision letter templates, should be reviewed and revised by trauma-informed and theological experts. <br>• Though a template is used, inquiry letters should be tailored carefully for each submission. In addition, CC members who are pastors should be more involved with writing the inquiry letters to the churches. |
| 6(c). | Documentation of Phone Calls: CC procedures should require written documentation of phone calls including date, time, names, and conversation notes for any calls the CC members or EC staff member liaisons make or receive. |
| 6(d). | Procedures for Survivor Communication for Key Milestones: CC procedures should require that no matter the circumstances, a letter memorializing key milestones (confirmation of receipt of submission, inquiry letter, decision letter, etc.) be sent to the submitter/survivor. In the past, some submissions did not have a formal record of a communication because the CC member or EC staff member liaison may have had a phone call. |
| 6(e). | Standard Timelines: CC should adopt standard guidelines on when/how often the CC will provide updates to the churches/submitters who are waiting for a decision, as well as a standard timeline for information gathering and correspondence with church/submitter/state conventions or local associations. |
| 6(f). | Survivor Care Support Specialist: The CC should connect the survivor with the SCSS, to serve as the survivor's point of contact/liaison with the CC throughout their review process. This staff member would be a trauma-informed care trained professional that can directly communicate with and support the submitter/survivor through the CC process. The SCSS would act as a submitter/survivor liaison and work with assisting with more in-depth fact-finding inquires as needed. |

| | |
|---|---|
| 6(g). | Special EC Meetings: We recommend that the CC should be empowered to recommend churches to EC for disfellowship more often than three times per year at EC meetings. If the CC has many churches that they have determined to recommend to the EC, but the meeting is 3 months in the future, the CC should consider convening a specially-called EC meeting via Zoom. |

**Recommendation CC-7: Formalize CC Meeting Structure and Agendas**

| | |
|---|---|
| CC-7. | Formalize CC meeting structure and agendas. |
| 7(a). | Agenda: We recommend that the EC staff member liaison send the next CC meeting agenda and action items to CC members 10 days before the next meeting, to give CC members sufficient time to review all active submission files to discuss at the meeting. |
| 7(b). | Summary of Submissions: At the start of each CC meeting, we recommend that the EC staff member liaison(s) give a brief summary of each submission to be discussed. |
| 7(c). | Survivor/Submitter Testimonies: The CC should allow survivors/submitters to share personal testimonies with the CC at the meeting in-person or in writing, if they so desire. |

**Recommendation CC-8: Adopt Standards for CC Determinations**

| | |
|---|---|
| CC-8. | Adopt standards for CC determinations. |
| 8(a). | Develop Uniform Standards: The Credentials Committee should work with others, including experts in Baptist theology, trauma, and abuse issues, to develop standards and criteria that they will follow when making determinations on whether a church is not in friendly cooperation with the Convention. |

| | |
|---|---|
| 8(b). | Potential Criteria: When determining appropriate criteria for determining if a church is not in friendly cooperation, it is recommended that the CC criteria includes items such as:<br>• Retention of a pastor, minister, church leader, staff member or professor who is a convicted sex offender or included on the SBC Offender Information System<br>• Allowing a convicted sex offender to work with minors in any church ministry<br>• Continuing to employ a person or recognize as a pastor, deacon or elder of the church, someone who unlawfully concealed from law enforcement information regarding the sexual abuse of any person by an employee or volunteer of the church<br>• Failure to investigate a report of child sexual abuse and related misconduct<br>• Failure to implement any safeguards to create a safe church environment<br>• A knowing failure to notify another church of an employee or volunteer's history of abuse<br>• Willfully disregarding compliance with mandatory child abuse reporting laws as a church<br>• A survivor's decision to not pursue criminal sanctions related to an abuse allegation in a church, shall not prevent the CC from considering a church for disfellowship<br>• Failure of a church or its leaders to cooperate with the work of the Administrative Entity or Credentials Committee<br>• Willfully disregarding a report of sexual abuse or related misconduct and failing to initiate an investigation |

| | |
|---|---|
| 8(c). | Additional areas that the CC should define: The CC should consider more detailed definitions of status and determinations applied to submissions.<br>• Decline further consideration: When the CC declines further consideration on a church, the Survivor Care Support Specialist will call the submitter/survivor within 72 hours to notify them of the decision and next steps in the process. The SCSS will notify the CC once the conversation has occurred, and the CC will email the submitter/survivor a formal notice to decline that includes the reasons for the decision and reconsideration options.<br>• Closed without recommendation: When the CC makes the decision to close the submission without recommending the church to the EC, the Survivor Care Support Specialist will call the submitter/survivor within 72 hours to notify them of the decision and next steps in the process. The SCSS will notify the CC once the conversation has occurred, and the CC will email the submitter/survivor a formal notice to close without recommendation that includes the reasons for the decision and appeals options.<br>• Appeals: The Commission will receive and review appeals of CC decisions of "no recommendation" for disfellowship, as well as, review and appeal EC decisions to decline CC recommendations. |

**Recommendation CC-9: Improve the Online Reporting Portal (RP) and Website to Make It More User-friendly for Submitters**

| | |
|---|---|
| CC-9. | Improve the Online Reporting Portal (RP) and website to make it more user-friendly for submitters. |
| 9(a). | Promote Link: Prominently highlight the RP link on SBC websites including the CC website on the homepage of SBC.net, EC, and other Entity websites. |
| 9(b). | Improve User Experience: Review the user interface/experience for the submission portal. Have a trauma-informed professional and IT professional audit the website and make it user-friendly for submitters/survivors, ensuring that necessary information is displayed prominently. |
| 9(c). | Update Website Formatting: Update the formatting of the Statement of Assignment to make the information more readable, highlighting the important information. |
| 9(d). | Update Website Language:<br>• Separate out the sentence in the Statement of Assignment that states "the Credentials Committee will not be able to consider anonymous submissions about a church," and explain the necessity of having a point of contact for the CC to send formal notices and explain that an advocate can be listed as the contact or that the SCSS can be contacted to serve as the survivor's liaison. |

| | |
|---|---|
| | • Post a clear and thorough explanation of the submission and review process on the CC and Administrative Entity (if approved) websites with criteria for mandatory time frames for responses to submitters of cases to the RP including immediate automated responses to submitters upon submission, live responses by the SCSS within 72 hours of the original submission, assigned points of contact and confidentiality for submitters, and mandatory reporting requirements. |
| 9(e). | Functionality: Conduct regular audits and correct website glitches and repair any broken links. |
| 9(f). | Auto-Referral: When a submission pertaining to sexual abuse or related misconduct is submitted, the submitter should check a box on the form which will then automatically route the submission to the SCSS who will call the submitter within 72 hours. |

**Recommendation CC-10: Improve the Online Reporting Portal (RP), Access Database and Website to Improve CC Functionality, Auditability, and Response**

| | |
|---|---|
| CC-10. | Improve the Online Reporting Portal (RP), Access Database and website to improve CC functionality, auditability, and response. |
| 10(a). | Conduct Audit of Functionality: An analysis should be completed on the submission form on the CC webpage, CC secure portal and Access database, to determine system functionalities and capabilities for automation with regard to submission information input and syncing information between the CC secure portal and the EC server. |
| 10(b). | Access Database Enhancements: Consider password protection and encryption of Access database, for further security of sensitive information. |

**Recommendation CC- 11: If necessary, give the CC the Ability to Engage and Consult with Experts on an Extensive Inquiry for a Submission**

| | |
|---|---|
| CC-11. | If necessary, give the CC the ability to engage and consult with experts on an extensive inquiry for a submission |
| 11(a). | Discretion for Extensive Inquiry: The CC shall have the discretion to engage and consult with the Commission or Administrative Entity (if approved) and rely on their subject matter expertise, to request the Administrative Entity (or third-party advisor) to conduct an extensive inquiry (including composition of the inquiry letter) and advise the CC regarding the determination of whether a church followed the appropriate process in dealing with allegations of sexual abuse-and related misconduct based on best practices. A report submitted by an advisor outside the CC would allow the CC to make more informed decisions, and the CC would feel more confident about the validity of the sex abuse policies and procedures that a church submits. |

**Recommendation CC-12: Provide Timely and Transparent Decisions**

| | |
|---|---|
| CC-12. | Provide timely and transparent decisions. |
| 12(a). | Communication with EC: Prior to each EC meeting, the CC should provide the Commission with a report on behalf of the EC, with the criteria for the report to be defined by the Commission. The CC's report shall include the work, decisions, and rationale of the CC for each submission made to it related to sexual abuse and related misconduct, and the results of each inquiry. If unsatisfied by the content of the report of the CC, the Commission shall have the authority to inquire of the CC or EC and received a detailed explanation as to any churches under inquiry for a sexual abuse and related misconduct submission. |
| 12(b). | Recommendations for Disfellowship: Within 24 hours of notifying the church of their inquiry status, the SCSS will call the submitter/survivor to notify them of the update and next steps in the process. The SCSS will notify the CC once the conversation has occurred, and the CC will email a formal notification of inquiry to the submitter/survivor. |
| 12(c). | Process for Notification: After the inquiry process, when the CC makes the decision to recommend the church to the EC for disfellowship, the following will occur:<br>• A CC member should call the submitter/survivor informing them of the decision to recommend the church to the EC for disfellowship and send a follow up decision letter.<br>• If the EC decides to disfellowship the church, the EC will send a formal decision letter to the submitter/survivor. Baptist Press should create and publish a press release announcing the disfellowship, clearly stating the reason for the disfellowship.<br>• Lifeway will be notified to update the SBC Workspace to remove the church from SBC affiliated church directory. |

**Recommendation CC-13: Audit CC Processes to Ensure all Submissions Have Been Addressed**

| | |
|---|---|
| CC-13. | Audit CC processes to ensure all submissions have been addressed. |
| 13(a). | Audit Trail in Reporting Portal: Create an audit trail on CC forms to ensure that all submissions are included and propèrly tracked. |
| 13(b). | Audit Plan: Create an audit plan for all submissions to provide quality control. |

**Recommendation CC-14: Conduct a Full Audit of Submissions Since the Inception of the CC**

| | |
|---|---|
| CC-14. | Conduct a full audit of submissions since the inception of the CC. |
| 14(a). | Full Audit: Conduct a full audit of all submissions since the inception of the CC to identify any previously reported sexual abuse submission that may have been missed due to system error, and these will be carefully reviewed by the Commission or Administrative Entity (if approved) according to the current policy. |

**Recommendation CC-15: Communicate the Processes and Procedures of the CC to the Messengers and the General Public**

In order to make the purpose of the CC and its processes and procedures more transparent to Southern Baptists, the CC should develop a communication plan. This will also assist submitters to better understand the method to report allegations and have realistic expectations about the CC timeline.

| | |
|---|---|
| CC-15. | Communicate the processes and purpose of the CC to the Messengers and the General Public. |
| 15(a). | Overall Communications Plan: Develop an overall communications plan to raise awareness of the CC. The communications plan should include the use of Baptist Press, the SBC website and the SBC Annual Meeting app to give clarity to the Messengers/submitters/Southern Baptists as to what the CC is meant to accomplish. |
| 15(b). | Media Campaign: The communications plan should include a media campaign for the CC that welcomes/encourage submissions. The campaign should highlight the CC's role in identifying churches in/not-in friendly cooperation by utilizing SBC.net, state convention websites, and a social media manager. |
| 15(c). | Public Awareness: We recommend the creation of a CC 101 layman's guide for understanding the CC process. Candidates for CC nomination should review CC 101 before committing to the assignment. |
| 15(d). | Links to Reporting Portal: Consider placing a link to the Reporting Portal (RP) to each SBC website, including all Entity websites. Place a link to CC 101 on the RP. |

**Recommendation CC-16: Provide the CC with Adequate Funding**

In 2019, there was no budget line for the CC, and the current budget is minimal. Sufficient funding should be provided for the Credentials Committee to complete an increased workload.

| | |
|---|---|
| CC-16. | Provide the CC with adequate funding. |
| 16(a). | Conduct Annual Review of Budget: Review the appropriate budget on an annual basis to support the CC functions. |
| 16(b). | Key Factors for Budget: At a minimum, the budget should include funds for the CC to retain its own legal counsel when necessary, trainings, communication programs, staff resources and third-party investigation consulting when necessary. |